# Mika Meyers Beckett & Jones PLC

900 Monroe Avenue NW   Grand Rapids, Michigan 49503   Tel 616-632-8000   Fax 616-632-8002   Web mmbjlaw.com

Attorneys at Law

| | | | | | |
|---|---|---|---|---|---|
| James R. Brown | Fredric N. Goldberg | Neil L. Kimball | Benjamin A. Zainea | *Of Counsel* | *Also Admitted In* |
| Larry J. Gardner | James K. White | Ross A. Leisman | Ronald M. Redick | James B. Beckett | ¹Colorado |
| Claude L. Vander Ploeg | Stephen J. Mulder | Neil P. Jansen | Marjorie B. Gell | John C. Jones | ²Illinois |
| Ronald J. Clark | Douglas A. Donnell⁴ | James M. Eardley² | Brian M. Andrew | Steven L. Dykema | ³New York |
| John M. DeVries⁴ | Scott E. Dwyer | Eric S. Richards | Heidi A. Lyon | Leonard M. Hoffius¹ | ⁴Ohio |
| Michael C. Haines | William A. Horn⁵ | Daniel J. Parmeter, Jr. | Matthew E. Fink | | ⁵Wisconsin |
| Scott S. Brinkmeyer | Jeffrey A. DeVree | Mark E. Nettleton² | Nikole L. Canute³ | *Retired* | |
| John T. Sperla | Daniel R. Kubiak | Andrea D. Crumback | Steffany J. Dunker | Ernest A. Mika | |
| David R. Fernstrum | Mark A. Van Allsburg | Jennifer A. Puplava | | Veryl N. Meyers | |
| Mark A. Kehoe | Elizabeth K. Bransdorfer | Nathaniel R. Wolf | | | |

November 15, 2006

Ms. Pat Meyer
Box 112
West Olive, MI 49460

Dear Pat:

Pursuant to your telephone conversation with my secretary, enclosed please find:

(1)    Consolidated Class Action Complaint for Violations of the Employee Retirement Income Security Act filed in the United States District Court for the Eastern District of Michigan *In Re: Delphi Corporation Securities, Derivative & "ERISA" Litigation*, Master File No. 05-CV-70882-DT; and

(2)    Consolidated Class Action Complaint filed in the United States District Court for the Southern District of New York *In Re: Delphi Corp. Securities Litigation*, Master File No. 1:05-CV-2637 (NRB).

Should you need anything further, please do not hesitate to contact the undersigned.

Yours very truly,

Ronald J. Clark

RJC:rsb
Enclosures
h:\rjc\cln\general\meyer.let.doc

I. PREFATORY NOTES ...................................................................................... vi

II. INTRODUCTION ............................................................................................1

III. JURISDICTION AND VENUE ......................................................................3

IV. PARTIES.........................................................................................................3

    A.    Plaintiffs ..............................................................................................3

    B.    Defendants ...........................................................................................4

V. THE PLANS .....................................................................................................8

    A.    Nature of the Plans.............................................................................8

    B.    The Plan Documents...........................................................................9

    C.    Delphi Savings-Stock Purchase Program for Salaried
        Employees (the "Salaried Plan") ....................................................12

    D.    Delphi Personal Savings Plan for Hourly-Rate Employees (the
        "Hourly Plan") .................................................................................15

    E.    Delphi Mechatronic Systems Savings-Stock Purchase Program.....17

    F.    ASEC Manufacturing Savings Plan .................................................19

    G.    The Delphi Common Stock Fund .....................................................20

    H.    The Plans' Alleged ESOP Status .....................................................22

    I.    GM Stock Funds ...............................................................................22

VI. DEFENDANTS' FIDUCIARY STATUS .......................................................23

    A.    The Nature of Fiduciary Status ........................................................23

    B.    Delphi ................................................................................................24

    C.    Directors Defendants ........................................................................26

    D.    Executive Committee Defendants......................................................27

    E.    IPC Defendants ................................................................................28

    F.    Defendant GMIMCo..........................................................................30

    G.    Defendant State Street Bank and Trust Company ...........................33

H.      ASEC and Mechatronic............................................................34

VII. FACTS BEARING ON FIDUCIARY BREACH................................................35

A.      Background ............................................................................35

B.      Delphi's Accounting Scheme...................................................38

C.      The Truth Begins To Emerge ................................................50

VIII. FALSE AND MISLEADING STATEMENTS TO PLAN
FIDUCIARIES ............................................................................................66

A.      Year-End 1999........................................................................67

B.      First Quarter 2000 .................................................................68

C.      Second Quarter 2000 .............................................................70

D.      Third Quarter 2000.................................................................72

E.      Fourth Quarter and Year-End 2000 ......................................74

F.      Mid-Quarter Guidance – March 29, 2001 .............................77

G.      First Quarter 2001 .................................................................78

H.      Second Quarter 2001 .............................................................81

I.      Third Quarter 2001.................................................................84

J.      Fourth Quarter / Year End 2001 ............................................86

K.      First Quarter 2002 .................................................................90

L.      Second Quarter 2002 .............................................................92

M.      Third Quarter 2002.................................................................94

N.      Fourth Quarter/ Year-End 2002.............................................97

O.      First Quarter 2003 .................................................................99

P.      Delphi Revises Its Earnings Estimates Downward for the 2003
        Second Quarter ....................................................................100

Q.      Second Quarter 2003 ...........................................................101

R.      Third Quarter 2003...............................................................103

S.      Fourth Quarter/Full Year 2003 ...........................................104

iii

T.      First Quarter 2004 ..........................................................................106

U.      Second Quarter 2004 .......................................................................107

V.      Third Quarter and Fourth Quarter 2004 .......................................108

IX. DELPHI'S HIGHLY RISKY AND ILLEGAL ACCOUNTING AND
BUSINESS PRACTICES ...........................................................................................112

A.      Delphi's Financial Statements Failed to Comply with GAAP
        and SEC Regulations Prohibiting False and Misleading Public
        Filings.............................................................................................112

X. THE DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES................................131

A.      The Director Defendants had actual knowledge of the
        misconduct. ....................................................................................131

B.      Executive Committee Defendants either had actual knowledge,
        or had sufficient information so as to be charged with actual
        knowledge, of the misconduct. .....................................................135

C.      The Director Defendants Failed to Disclose the Imprudence of
        the Investment in Delphi Stock to other Fiduciaries of the
        Plans. ..............................................................................................137

XI. THE RELEVANT LAW .......................................................................................138

XII. ERISA § 404(C) DEFENSE INAPPLICABLE ......................................................140

XIII. CAUSES OF ACTION.......................................................................................141

A.      Count I:  Breach of Fiduciary Duty of Prudence............................141

B.      Count II:   Breach of Duty to Act in Accordance with the
        Terms of the Investment Management Agreement and ERISA....................148

C.      Count III:  Failure to Monitor Fiduciaries....................................149

D.      Count IV:  Breach of Duty To Disclose and Inform Other
        Fiduciaries of the Plans Incidental to the Defendants'
        Fiduciary Obligations as Fiduciaries of the Plans .........................152

E.      Count V:  Co-Fiduciary Liability ...................................................153

XIV. CAUSATION ...................................................................................................155

XV. REMEDY FOR BREACHES OF FIDUCIARY DUTY...............................................156

XVI. CLASS ACTION ALLEGATIONS .......................................................................158

iv

**XVII. PRAYER FOR RELIEF**.................................................................................................160

# I. PREFATORY NOTES

- On or about October 8, 2005, Delphi Corporation ("Delphi" or the "Company"), ASEC Manufacturing ("ASEC"), and Delphi Mechatronic Systems ("Mechatronic") filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code. As such, this action is stayed as to Delphi, ASEC, and Mechatronic unless and until such time as the stay is lifted or relief from the stay is granted by the bankruptcy court. Currently, Plaintiffs (as defined below) are not asserting claims against, or seeking relief from Delphi, ASEC, or Mechatronic through this action.

- Plaintiffs filed a "Class Proof of Claim" in the ongoing bankruptcy proceedings before Judge Drain in the Southern District of New York, and plan to proceed with claims against Delphi through that mechanism.

- If the bankruptcy stay is modified or lifted to permit further prosecution of this action against Delphi, ASEC, and/or Mechatronic, Plaintiffs will notify the Court and will seek to name Delphi, ASEC, and/or Mechatronic as a defendant(s) in this action.

- All allegations contained herein are based on the investigation of counsel, except for allegations pertaining to the named Plaintiffs, which are partially based on personal knowledge. As of the date of this Consolidated Complaint, Plaintiffs have received only limited materials from Defendants in response to formal and informal discovery requests. As a result, it is likely that, once the discovery process begins in earnest, the roles of additional parties in the wrongdoing outlined below will be revealed and the wrongdoing itself will be further defined. In that event, Plaintiffs will seek leave to amend this Complaint to add new parties and/or new claims against those parties and/or existing parties.

For their Consolidated Class Action Complaint for Violations of the Employee Retirement Income Security Act (the "Complaint"), Plaintiffs allege as follows:

## II. INTRODUCTION

1.     This is a class action brought by participants in the Delphi Savings-Stock Purchase Program for Salaried Employees (the "Salaried Plan"), the Delphi Personal Savings Plan for Hourly-Rate Employees (the "Hourly Plan"), the ASEC Manufacturing Savings Plan (the "ASEC Plan"), and the Delphi Mechatronic Systems Savings-Stock Purchase Program (the "Mechatronic Plan") (collectively, the "Plans") pursuant to §§ 502(a)(2) and (a)(3) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1132(a)(2) and (a)(3), against the fiduciaries of the Plans for violations of ERISA.

2.     Delphi Corp (formerly Delphi Automotive Systems) is the world's largest global supplier of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology to vehicle manufacturers. Headquartered in Troy, Michigan, Delphi was originally incorporated in Delaware in 1998 as a subsidiary of General Motors Corp. ("GM"). GM began its divestiture of Delphi in February 1999, by selling approximately 20% of Delphi in an initial public offering ("IPO"). Delphi's opening price was $17. In May, 1999, GM completed the separation of Delphi through the approval of a spin-off to holders of GM common stock of the remaining 80% of the Delphi still held by GM (the "Spin-Off"). Delphi established the Salaried and Hourly Plans in connection with the Spin-Off effective May 28, 1999.

3.     The Plans are retirement plans sponsored by Delphi, ASEC, and Mechatronic. Both ASEC and Mechatronic are wholly-owned subsidiaries of Delphi.

4.     Plaintiffs' claims arise from the failure of Defendants, who are fiduciaries of the Plans, to act solely in the interest of the participants and beneficiaries of the Plans, and to exercise the required skill, care, prudence, and diligence in administering the Plans and the Plans' assets during the period May 28, 1999 to November 1, 2005 (the "Class Period").

1

5.      Specifically, Plaintiffs allege in Count I that the Defendants who were responsible for the investment of the assets of the Plans breached their fiduciary duties to the Plans' participants in violation of ERISA by failing to prudently manage the Plans' investment in Delphi stock. In Count II, Plaintiffs allege that Defendant State Street Bank and Trust ("State Street") failed to act in accordance with the terms of its Investment Management Agreement. In Count III, Plaintiffs allege that the Defendants who were responsible for the selection, monitoring, and removal of the Plans' other fiduciaries failed to properly monitor the performance of their fiduciary appointees and remove and replace those whose performance was inadequate, as well as provide them with the necessary information to fulfill their fiduciary duties. In Count IV, Plaintiffs allege that the Defendants failed to provide other fiduciaries with information the other fiduciaries reasonably needed to know to fulfill their fiduciary duties to the participants and beneficiaries. And in Count V, Plaintiffs allege that Defendants are subject to co-fiduciary liability under ERISA.

6.      As more fully explained below, during the Class Period, Defendants imprudently permitted the Plans to hold and acquire hundreds of millions of dollars in Delphi stock and in GM stock. As a result of the Defendants' breaches, the Plans suffered enormous losses.

7.      This action is brought on behalf of the Plans and seeks losses to the Plans for which Defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109, and 1132(a)(2). In addition, under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), Plaintiffs seek other equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, equitable tracing, and other monetary relief.

8.      ERISA §§ 409(a) and 502(a)(2) authorize participants such as Plaintiffs to sue in a representative capacity for losses suffered by the Plans as a result of breaches of fiduciary duty. Pursuant to that authority, Plaintiffs bring this action as a class action under Fed. R. Civ. P. 23 on

2

behalf of all participants and beneficiaries of the Plans whose Plan accounts were invested in Delphi stock and/or GM stock during the Class Period.

9.      In addition, because the information and documents on which Plaintiffs' claims are based are, for the most part, solely in Defendants' possession, certain of Plaintiffs' allegations are by necessity upon information and belief. At such time as Plaintiffs have had the opportunity to conduct discovery, Plaintiffs will, to the extent necessary and appropriate, amend this Complaint, or, if required, seek leave to amend, to add such other additional facts as are discovered that further support their claims.

### III. JURISDICTION AND VENUE

10.      **Subject Matter Jurisdiction**. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

11.      **Personal Jurisdiction**. ERISA provides for nation-wide service of process. ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2). All of the Defendants are either residents of the United States or subject to service in the United States and this Court therefore has personal jurisdiction over them. This Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(1)(A).

12.      **Venue**. Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and/or some Defendants reside and/or transact business in this district.

### IV. PARTIES

**A.      Plaintiffs**

13.      **Plaintiff Gregory Bartell ("Bartell")** is a resident of Texas. He worked for Delphi from June 1998, prior to the spin-off from GM, until July 2003, after the spin-off, and is a

3

current participant in the Salaried Plan. During the Class Period, as a result of his and the Company's contributions, Bartell acquired and held shares of Delphi stock in his Plan account.

14.    **Plaintiff Thomas Kessler ("Kessler")** is a resident of Ohio. He worked for GM from 1977 until Delphi was spun-off from GM in May 1999. He worked for Delphi from May 1999 through August 2005 and was a participant of the Delphi Hourly Plan during the Class Period. During the Class Period, as a result of his and the Company's contributions, Kessler held shares of Delphi stock in his Plan account.

15.    **Plaintiff Neal Folck ("Folck")** is a resident of Ohio. He is an employee of Delphi and a participant in the Salaried Plan. During the Class Period, as a result of his and the Company's contributions, Folck acquired and held shares of Delphi stock in his Plan account.

16.    **Plaintiff Donald McEvoy ("McEvoy")** is a resident of New York. He is a former employee of Delphi and a participant in the Salaried Plan. During the Class Period, as a result of his and the Company's contributions, McEvoy held shares of Delphi stock in his Plan account.

17.    **Plaintiff Irene Polito ("Polito")** is a resident of New York. She is currently an employee of Delphi and a participant in the Hourly Plan. During the Class Period, as a result of her and the Company's contributions, Polito acquired and held shares of Delphi stock in her Plan account.

18.    **Plaintiff Kimberly Chase-Orr ("Chase-Orr")** is a resident of Michigan. She is a former employee of Delphi and a participant in the Salaried Plan. During the Class Period, as a result of her and the Company's contributions, Chase-Orr held shares of Delphi stock in her Plan account.

**B.    Defendants**

19.    All of the Defendants are fiduciaries of the Plans within the meaning of ERISA, as is explained in Section VI ("Defendants' Fiduciary Status"), and all of them breached their fiduciary duties in various ways as is explained in Section XIII ("Causes of Action").

4

### *Director Defendants*

20.     **Defendant J.T. Battenburg III** ("Battenberg") was at all relevant times, the Chairman of the Board of Directors of Delphi, the Chief Executive Officer, and President. Battenberg held numerous positions at GM and Delphi during the course of his career in the auto industry.   He was appointed Vice President and Group Executive of GM's Automotive Component Group Worldwide, the GM department eventually spun-off as Delphi in 1992, and elected as President of Delphi Automotive Systems in 1995. In 1999, he was named to lead the IPO and eventual spin-off of Delphi.  At the time of the IPO, Battenberg was also named Delphi's President, CEO and Chairman.  He served as Delphi's President from 1999 until January 7, 2005, when Rodney O'Neal was named President and COO. Battenberg continued to serve as Delphi's CEO and Chairman until succeeded by Robert S. Miller on July 1, 2005. Battenberg's retirement was announced on February 23, 2005, ten days before Delphi admitted to pervasive accounting manipulations dating back to the Company IPO. Battenberg was one of three Inside Directors responsible for the day-to-day operations of the Corporation.  In that capacity he was privy to confidential information concerning the Company and its operations and, upon information and belief, knew that members of upper level management, including the Chief Financial Officer of the Company, had engaged in accounting irregularities which artificially inflated the share price of Delphi stock and made it an unsuitable investment for the Plan.

21.     **Defendant Allen S. Dawes** ("Dawes") served as Vice Chairman, Chief Financial Officer and Director during the Class Period.  Dawes was named CFO and Vice President in 1998 and became Director and Executive Vice President in charge of Finance, Mergers & Acquisitions and Information Technology in January 2000.  As of January 2003, Defendant Dawes served as Vice Chairman and Chief Financial Officer of Delphi. He joined the Board of Directors in June 2003.  He served in these capacities until March 4, 2005 when Dawes was forced to resign in the midst of Delphi's accounting scandal when the Audit Committee

5

expressed a loss of confidence in him. While Vice Chairman and CFO, Dawes reported to Battenberg. Defendant Dawes served as one of three Inside Directors responsible for the day-to-day operations of the Company. In these capacities, he was responsible for maintaining the accuracy of the Company's financial books and records and certifying to the SEC and investors in Delphi stock that the financial statements of Delphi did not contain untrue statements and fairly presented in all material respects the financial condition of Delphi. As the Chief Financial Officer of the Company, Defendant Dawes was privy to confidential information concerning the Company and its operations and, upon information and belief, knew that members of upper level management, including himself as Chief Financial Officer, had engaged, or were engaging, in accounting irregularities which artificially inflated the price of Delphi stock and made it an unsuitable investment for the Plans.

22.     Defendants Battenberg and Dawes are hereafter collectively referred to as the "Director Defendants."

### *Executive Committee Defendants*

23.     As explained in more detail in Section VI below, the Delphi Corporation Board of Directors Executive Committee (the "Executive Committee") was the "Named Fiduciary" of the Salaried and Hourly Plans.

24.     Upon information and belief, the members of the Executive Committee during the Class Period included:

(a)     **Defendant John D. Opie** ("Opie") served as an Independent Director of Delphi and Executive Committee Member during the entire Class Period. Defendant Opie joined the Board in 1999 and served on the Audit Committee at all relevant times, and as its Chairman from 1999 through 2001. He was appointed Lead Independent Director in 2002 and in that capacity served as Chairperson of the Executive Committee from 2002 to the present. According to the Delphi Corporation Corporate Governance

6

Guidelines (the "Delphi Guidelines"),[1] the Lead Independent Director is an outside director who "provides a bridge between the outside directors and the management of the company." *Id.* Moreover, the Guidelines require that the Lead Independent Director have a "solid knowledge of the company, its business, the competitive environment in which it operates, and the element of effective corporate governance."[2] The Guidelines also dictate that the Lead Independent Director shall in addition to other duties, maintain close contact with the chairperson of each Standing Committee.[3]

      **(b)**    **Defendant Thomas H. Wyman** ("Wyman") served as Lead Independent Director of Delphi from 1998 until Mary 1, 2002, and served in that capacity as Chairperson of the Executive Committee as well. Wyman served on the Audit Committee from 1999 through 2001.

      **(c)**    **Defendant Susan McLaughlin** ("McLaughlin") was Chairperson of the Delphi Compensation and Executive Committee and thus a Member of the Executive Committee from 1999 to 2001. McLaughlin was also a member of the Audit Committee.

      **(d)**    **Defendant Robert H. Brust** ("Brust") joined the Delphi Board in 2001 and served on the Audit Committee of the Delphi Board ("the Audit Committee") from 2001 through 2003, and as Chairperson of Audit Committee and thus a Member of the Executive Committee in 2002 and 2003.

    25.    Defendants Opie, Wyman, McLaughlin, and Brust are referred to the as "Executive Committee Defendants."

        ***Defendant Investment Policy Committee***

    26.    **Defendant Investment Policy Committee ("IPC") and its Members.** As explained in more detail below in Section VI, the IPC was an investment fiduciary for the Plans.

---

[1] The Delphi Guidelines are publicly available at www.delphi.com.
[2] *Id.* at Section 7.
[3] *Id.*

7

27.    To date, Defendants have not yet provided Plaintiffs with the names of the individuals who served on the IPC. Thus, Plaintiffs do not currently know the identity of the IPC members during the Class Period. The yet to be identified IPC members are named fictitiously, as Defendants John and Jane Does 1-10. Once their true identities are ascertained, Plaintiffs will seek leave to join them under their true names.

28.    The IPC and its members (John and Jane Does 1-10) are referred to as the "IPC Defendants."

### *Defendant General Motors Investment Management Corporation*

29.    **Defendant General Motors Investment Management Corporation** ("GMIMCo"). GMIMCo, a Delaware Corporation, is a subsidiary of GM and a registered investment advisor with the Securities and Exchange Commission. As described below in Section VI, pursuant to the Plans' documents, GMIMCo was the Named Fiduciary for investment of the Plans' assets and was appointed Investment Manager for all of the Plans' assets.

### *Defendant State Street Bank and Trust Company*

30.    **Defendant State Street Bank and Trust Company** ("State Street"). State Street is a subsidiary of State Street Corporation. As described below in Section VI, GMIMCo appointed State Street as Investment Manager of certain Plan funds, including the Delphi and GM stock funds. State Street also served as the Trustee of the Trust Fund established for the benefit of the Plans.

## V. THE PLANS

### A.    Nature of the Plans

31.    The Plans are "employee pension benefit plan[s]" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A). Further, they are "eligible individual account plan[s]" within the meaning of ERISA § 407(d)(3), 29 U.S.C. § 1107(d)(3), and also "qualified cash or deferred

8

arrangement[s]" within the meaning of I.R.C. § 401(k), 26 U.S.C. § 401(k). While the Plans are not a party to this action, pursuant to ERISA, the relief requested in this action is for the benefit of the Plans pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2).

32.    At all relevant times, the Plans had two separate components: (1) a contributory portion, which consisted of participant contributions, and (2) a matching component, which consisted entirely of employer contributions.

**B.    The Plan Documents**

33.    ERISA requires that every employee benefit plan be "established and maintained pursuant to a written instrument." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1). During the Class Period, the Salaried Plan was established and maintained under the Delphi Savings-Stock Purchase Program for Salaried Employees, effective January, 2002 and amendments dated November 14, 2002, December 12, 2002, December 19, 2002, September 5, 2003, November 20, 2003, December 9, 2003, March 19, 2004, August 6, 2004, October 18, 2004, December 8, 2004, January 14, 2005, March 11, 2005, and November 4, 2005 respectively (collectively the "Salaried Plan Document").[4]

34.    During the Class Period, the Hourly Plan was established and maintained under the following Plans:

- Supplemental Agreement Covering Personal Savings Plan, Exhibit G-1 to Agreement between Delphi Corporation and UAW, Delphi Personal Savings Plan for Hourly-Rate Employees in the United States, effective January 1, 2004, and amendments thereto dated August 6, 2004 and March 11, 2005 (collectively the "2004 Hourly Plan Document");[5]

---

[4] The Salaried Plan Document is attached hereto as Exhibit A, 104(b)-000001-000107; Delphi Memorandum to the Employee Benefit Plans Committee dated November 4, 2005, attached hereto as Exhibit AA, 104(b)-000419-000421.

[5] The 2004 Hourly Plan Document is attached hereto as Exhibit B, 104(b)UAW-200000-200049, 104(b)-000093-000097, 000106-000107.

9

- Delphi Personal Savings Plan for Hourly-Rate Employees in the United States effective January 1, 2000, and amendments dated September 5, 2003 and November 20, 2003 (collectively the "2000 Hourly Plan Document").[6]

35.    During the Class Period, the Mechatronic Plan was established and maintained under the Delphi Mechatronic Systems Savings-Stock Purchase Program, effective June 1, 2001 and amendments 1-5, dated and/or effective February 12, 2002, April 15, 2002, December 17, 2002, April 1, 2003, and March 29, 2004, respectively (hereinafter collectively the "Mechatronic Plan Document").[7]

36.    During the Class Period, the ASEC Plan was established and maintained under the ASEC Manufacturing Savings Plan, Amended and Restated, effective May 28, 1999 and amendments 1-6, effective December 31, 2000,  (the second amendment is undated, "effective May 28, 1999"), January 1, 2002, June 1, 2003, November 17, 2003, and April 1, 2004 respectively (hereinafter collectively the "ASEC Plan Document").[8]

37.    ERISA requires that every participant in an employee benefit plan be given a Summary Plan Description ("SPD").  The SPD currently in force for the Salaried Plan is the Prospectus and Summary Plan Description, Delphi Corporation Savings-Stock Purchase Program for Salaried Employees in the United States, effective January 1, 2005 (the "2005 Salaried Plan SPD");[9] its predecessors are the Prospectus and Summary Plan Description, Delphi Corporation Savings-Stock Purchase Program for Salaried Employees in the United States, effective January 1, 2004 (the "2004 Salaried Plan SPD"),[10] Prospectus, Delphi Automotive Systems Corporation Savings Stock Purchase Program for Salaried Employees in the United States, effective January

---

[6] The 2000 Hourly Plan Document is attached hereto as Exhibit C, PSP00001-00042, 104(b)-000069-000070, 104(b)-000073-000088.

[7] The Mechatronic Plan Document is attached hereto as Exhibit D, 104(b)-000797-000879.

[8] The ASEC Plan Document is attached hereto as Exhibit E, 104(b)-000450-000544.

[9] The 2005 Salaried Plan SPD is attached hereto as Exhibit F, 104(b)-000108-000164.

[10] The 2004 Salaried Plan SPD is attached hereto as Exhibit G, CZY00409-00459.

10

1, 2002 (the "2002 Salaried Plan SPD"),[11] Prospectus, Delphi Automotive Systems Corporation Savings Stock Purchase Program for Salaried Employees in the United States, effective March 15, 2001 (the "2001 Salaried Plan SPD"),[12] Prospectus, Delphi Automotive Systems Corporation Savings Stock Purchase Program for Salaried Employees in the United States, effective May 28, 1999 (the "1999 Salaried Plan SPD").[13]

38.    The SPD currently in force for the Hourly Plan is the Prospectus and Summary Plan Description Delphi Corporation Personal Savings Plan for Hourly-Rate Employees in the United States (the "2005 Hourly Plan SPD").[14]

39.    The SPD currently in force for the Mechatronic Plan is the Prospectus and Summary Plan Description, Delphi Mechatronic Systems Savings-Stock Purchase Program effective June 1, 2003 (the "2003 Mechatronic Plan SPD").[15]

40.    The SPD currently in force for the ASEC Plan is the ASEC Manufacturing Prospectus and Summary Plan Description, ASEC Manufacturing Savings Plan, effective January 1, 2004 (the "2004 ASEC SPD").[16]

41.    The assets of an employee benefit plan, such as the Plans here, must be "held in trust by one or more trustees." ERISA § 403(a), 29 U.S.C. § 1103(a). During the Class Period, the assets of the Salaried and Hourly Plans and, upon information and belief, the ASEC and Mechatronic Plans, were held in a trust (the "Master Trust") by State Street Bank and Trust Company ("State Street"), pursuant to the Delphi Automotive Systems Savings Trust, effective May 28, 1999 (the "Trust Agreement").[17]

---

[11] The 2002 Salaried Plan SPD is attached hereto as Exhibit H, BAR00155-00202.

[12] The 2001 Salaried Plan SPD is attached hereto as Exhibit I, BAR00102-00154.

[13] The 1999 Salaried Plan SPD is attached hereto as Exhibit J, BAR00059-00101.

[14] The 2005 Hourly Plan SPD is attached hereto as Exhibit K, 104(b)UAW-200054-200103.

[15] The 2003 Mechatronic Plan SPD is attached hereto as Exhibit L, 104(b)-000886-929.

[16] The 2004 ASEC Plan SPD is attached hereto as Exhibit M, 104(b)-000545-000598.

[17] The Trust Agreement is attached hereto as Exhibit N, 104(b)-000169-000207.

11

42.     Effective January 1, 1999, Delphi and GMIMCo entered into an Investment Management Agreement (the "Delphi and GMIMCo Investment Management Agreement"), wherein Delphi appointed GMIMCo investment manager for the assets in the Salaried and Hourly Plans.[18]

43.     Effective May 28, 1999, GMIMCo and State Street entered into an Investment Management Agreement (the "GMIMCo and State Street Investment Management Agreement"), wherein GMIMCo appointed State Street investment manager for specific funds in the Salaried and Hourly Plans, including the Delphi and GM stock funds.[19]

44.     Effective September 17, 2002, Delphi and GMIMCo entered into a Management Services Agreement (the "Management Services Agreement"), wherein GMIMCo was designated investment manager for all Plans, and the IPC was given the authority to remove assets from the investment control and authority of GMIMCo, as described below.[20]

## C.    Delphi Savings-Stock Purchase Program for Salaried Employees (the "Salaried Plan")

45.     Delphi established the Salaried Plan in connection with the Spin-Off from GM on May 28, 1999. For Delphi employees that transferred from GM with investments in the GM Salaried Plan, the assets which represented their holdings were transferred to the Delphi Salaried Plan on May 28, 1999. All assets that were transferred to the Salaried Plan were reinvested in investment options similar to those under the GM Plan.[21]

---

[18] The Delphi and GMIMCo Investment Management Agreement (January 1, 1999) is attached hereto as Exhibit O, GMIMCo, MDL-1725 000012-000025.

[19] The GMIMCo and State Street Investment Management Agreement (May 28, 1999) is attached hereto as Exhibit P, GMIMCo, MDL-1725 000001-000011.

[20] The Management Services Agreement (September 17, 2002) is attached hereto as Exhibit Q, GMIMCo, MDL-1725 000080-000112.

[21] The Delphi Savings-Stock Purchase Program for Salaried Employees Form 11-K Annual Report (the "Salaried Plan Form 11-K") for 1999, available at www.sec.gov/edgar.shtml.

46.     The Salaried Plan is a defined contribution plan.  Employees are eligible to
participate in the Plan on the first day of the month following completion of six months of
service with Delphi.[22]

### 1.     Participant Contributions

47.     Participants directed the investment of their contributions into various investment
options offered by the Salaried Plan.  One of the available investment options was the Delphi
Common Stock Fund.

48.     Under the Salaried Plan, 50% of an employee's contributions to the Plan *were
required* to be invested in the Delphi Common Stock Fund and the remaining 50% of an
employee's contributions were invested at the election of the employee into any of the other
investment options offered by the Plan in 10% increments.[23]  The 50% contribution required to
be invested in the Delphi Common Stock Fund was subject to a "Required Retention Period"
whereby employees could not transfer these funds to another investment option until the end of
the retention period, December 31st of the Plan year.  Employees who did elect to transfer these
contributions were charged a 1% redemption fee.[24]

49.     According to the Salaried Plan SPDs for 1999, 2001, and 2002[25] and the year end
2002 11-K SEC filing,[26] from 1999 to March 31, 2002, subject to Internal Revenue Service
limitations, eligible participants of the Salaried Plan were permitted to make contributions up to
20% of their eligible salary, including both pre-tax and after-tax contributions, for investment in
the investment options offered by the Salaried Plan including the Delphi Common Stock Fund.

---

[22] *See* Salaried Plan Document, Exhibit A, Article I, Section 1, at 104(b)-000015.

[23] *See* Salaried Plan Document, Exhibit A, Article 1, Section 5(a), at 104(b)-000019.

[24] *Id.* at 104(b)-000014.

[25] *See* 1999 Salaried Plan SPD, Exhibit J, at BAR00066; 2001 Salaried Plan SPD, Exhibit I, at
BAR00109; 2002 Salaried Plan SPD. Exhibit H, at BAR00162.

[26] *See* 2002 Salaried Plan Form 11-K Annual Report, available at www.sec.gov/edgar.shtml.

13

On April 1, 2002, and then again on January 1, 2004, this percentage was increase to 40% and 60% respectively.[27]

50. Beginning January 1, 2001, employees hired after this date, upon becoming eligible to participate in the Salaried Plan, were automatically enrolled at a 3% deferred savings contribution rate.[28]

### 2.    Employer Contributions

51.    In addition to the participant contributions, during various relevant times during the Class Period, the Company made two types of contributions to the Salaried Plan: (1) the "Company Match" and (2) the 1% Delphi Benefit Contribution.[29]  Both of these contributions were invested *entirely* in the Delphi Common Stock Fund, and *were required* to remain invested in the Delphi Common Stock Fund during the Required Retention Period.[30]

52.    For Plan Year 1999, under the Salaried Plan, Delphi provided a Company Match of 70% of an employee's "Basic Savings" (defined in 1999 as employee contributions up to 6% of an employee's eligible salary).[31]  For Plan Year 2000 through February 28, 2001, Delphi provided a Company Match of 70% of an employee's "Basic Savings" (defined in 2000 and 2001 as employee contributions up to 7%, or up to 8% if an employee was hired on or after January 1, 2001).[32]

---

[27] *See* Salaried Plan Document, Exhibit A, Article I, Section 2(a), at 104(b)-000016; *see also* Salaried Plan Form 11-K for 2002 and 2003, available at www.sec.gov/edgar.shtml.
[28] *See* 2001 Salaried Plan SPD, Exhibit I, at BAR00110.
[29] *See* Salaried Plan Document, Exhibit A, Article I, Section 4, at 104(b)-000011, 104(b)-000018.  Additionally, Delphi established the 1999 U.S. Classified Incentive Compensation Program, an off-shoot of the GM Profit Sharing Program, in which employees received a pay-out corresponding to a percentage of their level of annual base salary, depending upon Delphi's performance.  *See* Delphi Participant Correspondence Regarding the 1999 U.S. Classified Incentive Compensation Program is attached hereto as Exhibit R, at BAI00008-00009.
[30] *See* 2002 Salaried Plan SPD, Exhibit H, at BAR00164.
[31] *See* 1999 Salaried Plan SPD, Exhibit J, at BAR00066.
[32] *See* Salaried Plan Form 11-K for 2000, available at www.sec.gov/edgar.shtml.

14

53.     On March 1, 2001, the Company Match was suspended for a one-month period. Effective April 1, 2001, the Company Match was reinstated and provided to participants at 50% of an employee's "Basic Savings" (defined in 2001 as employee contributions up to 7% or up to 8% if an employee was hired on or after January 1, 2001).[33]

54.     On May 1, 2001, the Salaried Plan again suspended the Company Match.[34] Effective February 1, 2003, the Company Match was reinstated to a level of $.30 per dollar of an employee's basic savings up to 7% of annual base salary. On October 16, 2004, the Company Match was again suspended. [35]

55.     In April, 2002, the Required Retention Period for the Company Match was suspended; though, it was reinstated again effective February 1, 2003.[36]

**D.     Delphi Personal Savings Plan for Hourly-Rate Employees (the "Hourly Plan")**

56.     Like the Salaried Plan, the Hourly Plan was established in connection with the spin-off from GM on May 28, 1999. For Delphi Hourly-rate employees that transferred from GM with investments in the GM Hourly Plan, the assets which represented their holdings were transferred to the Delphi Hourly Plan. All assets transferred were reinvested in investment options similar to those under the GM Plan.[37]

57.     The Hourly Plan is a defined contribution plan. Employees are eligible to participate and accumulate savings under the Plan on the first day of the first pay period following the attainment of seniority. An employee attains seniority upon completion of ninety days of employment with Delphi. A previously eligible employee who resumes active employment following a termination of employment will be eligible to participate immediately.[38]

---

[33] *See* 2001 Salaried Plan SPD, Exhibit I, at BAR00109.

[34] *See* 2002 Salaried Plan SPD, Exhibit H, at BAR00164.

[35] *See* Salaried Plan Form 11-K for 2004, available at www.sec.gov/edgar.shtml.

[36] *See* Salaried Plan Form 11-K for 2002, available at www.sec.gov/edgar.shtml

[37] The Delphi Personal Savings Plan for Hourly-Rate Employees Form 11-K (the "Hourly Plan Form 11-K") for 1999, available at www.sec.gov/edgar.shtml.

[38] *See* 2004 Hourly Plan Document, Exhibit B, Article II, Section 2.38 and Section 3.01, at 104(b)UAW-200019.

15

### 1.    Participant Contributions

58.    Participants directed the investment of their contributions into various investment options offered by the Hourly Plan.  One of the available investment options was the Delphi Common Stock Fund.

59.    From May 28, 1999 through December 2001, subject to Internal Revenue Service limitations, eligible participants of the Hourly Plan were permitted to contribute up to 25% of their eligible weekly earnings, including both pre-tax and after-tax contributions, for investment in the investment options offered by the Hourly Plan including the Delphi Common Stock Fund. From the beginning of 2002 through December 31, 2003, and then again on January 1, 2004, this percentage increased to 40% and 60% respectively. [39]

60.    Employees who met the following criteria were automatically enrolled in the Hourly Plan at a 3% deferred savings contribution rate: (1) the employee had attained six months of seniority;  (2) the employee was eligible to participate in the Hourly Plan; and (3) the employee was hired on or after May 3, 2004 under the UAW Supplemental Authority Agreement.[40]

### 2.    Employer Contributions

61.    For certain employees hired between January 1, 1994 and May 2, 2004, Delphi's contributions were made *entirely* in the Delphi Common Stock Fund, in an amount based on local units' competitive hiring agreements.  During that time period the Company Match contributions *were required* to remain in the Delphi Common Stock Fund for three years, at which point participants could transfer the funds to an investment option of their choice. [41]

62.    For certain employees hired on or after May 3, 2004, Delphi provided a 30% Company Match on the first 7% of employee contributions *entirely* into the Delphi Common Stock Fund.  The Company Match contribution started after six months of seniority and was to

---

[39] *See* Hourly Plan Form 11-K for 2001, 2002, and 2004, available at www.sec.gov/edgar.shtml.
[40] *See* 2005 Hourly Plan SPD, Exhibit K, at 104(b)UAW-200063.
[41] *See* Hourly Plan Form 11-K for 2004, available at www.sec.gov/edgar.shtml.

remain in the Delphi Common Stock Fund during the Required Retention Period, as defined in ¶ 48.[42]

63.     Additionally, participants were allowed to elect to contribute, in 1% increments, up to 100% of their profit sharing payment from the Delphi Profit Sharing Plan for Hourly-Rate Employees into the Hourly Plan. Profit Sharing amounts contributed to the Plan were invested in the same investment options as selected by the employees for weekly contribution, which included the Delphi Common Stock Fund. [43]

## E.     Delphi Mechatronic Systems Savings-Stock Purchase Program

64.     Mechatronic established the Mechatronic Plan on June 1, 2001, in connection with the formation of the company, Delphi Mechatronic Systems, Inc. and the acquisition of the Vehicle Switch/Electronics Division of Eaton Corporation by Delphi Corporation on March 30, 2001.

65.     The Mechatronic Plan is a defined contribution plan. Eligible employees may participate in the Plan upon completion of six months of service with Mechatronic.[44]

### 1.     Participant Contributions

66.     Participants direct the investment of their contributions into various investment options offered by the Mechatronic Plan. One of the available investment options was the Delphi Common Stock Fund.

67.     From June 1, 2001 to March 31, 2002, subject to Internal Revenue Service limitations, eligible participants of the Mechatronic Plan were permitted to defer up to 20% of their eligible salary to the Mechatronic Plan, including both pre-tax and after-tax contributions,

---

[42] *See* 2005 Hourly Plan SPD, Exhibit K, at 104(b)UAW-200063..

[43] *Id.* at 104(b)UAW-200062.

[44] *See* Mechatronic Plan Document, Exhibit D, Article III, Section 1, at 104(b)-000811.

17

for investment in the investment options offered by the Mechatronic Plan including the Delphi Common Stock Fund. Effective April 1, 2002, this percentage increased to 40%.[45]

68.     From June 1, 2001 to March 31, 2003, 50% of the first 6% of compensation contributions by the participants *were required* to be invested in the Delphi Common Stock Fund and had to remain in the fund during the Required Retention Period, as defined above at ¶ 48.[46] Effective April 1, 2003, the percentage was increased to 7%.[47]    In addition, if a participant moved assets out of the Delphi Common Stock Fund that had been held less than 30 days, the fund imposed a 1% redemption fee.[48]

## 2.    Employer Contributions

69.     In addition to the participant contributions, Mechatronic also made contributions to the Mechatronic Plan.  The employer match was invested *entirely* in the Delphi Common Stock Fund, and was subject to the Required Retention Period.[49]

70.     From June 1, 2001 to March 31, 2003, Mechatronic provided an employer match of 25% of a participant's contributions, up to the first 6% contributed.  Subsequently, effective April 1, 2003, the employer match was increased to 30% of a participant's contributions, up to the first 7% of Plan contributions made by the participant.[50]

71.     Effective October 16, 2004, the employer match was suspended.[51]

---

[45] *See* The Delphi Mechatronic Savings-Stock Purchase Program Form 11-K (the "Mechatronic Plan Form 11-K") for 2002, available at www.sec.gov/edgar.shtml.

[46] *See* Mechatronic Plan Document, Exhibit D, First Amendment, at 104(b)-000864.

[47] *See* Mechatronic Plan Document, Exhibit D, Fourth Amendment, at 104(b)-000877.

[48] *See* Mechatronic Plan Document, Exhibit D, Article XI, Section 3, at 104(b)-000829.

[49] *See* Mechatronic Plan Document, Exhibit D, Article XI, Section 1 at 104(b)-000829; 2003 Mechatronic Plan SPD, Exhibit L, at 104(b)-000893.

[50] *See* Mechatronic Plan Form 11-K for 2004, available at www.sec.gov/edgar.shtml.

[51] *Id.*

05-44481-rdd   Doc 21841   Filed 03/07/12   Entered 03/07/12 15:34:28   Main Document
Pg 25 of 199

**F.    ASEC Manufacturing Savings Plan**

72.    The ASEC Plan is a defined contribution plan covering all full-time employees and eligible part-time employees who have one year of service with ASEC, a subsidiary of Delphi Corporation, currently doing business as Delphi Catalyst.[52]

73.    The stated purpose of the ASEC Plan is to promote "the future economic welfare of the Employees, to develop in those Employees an increased interest in the Employer's successful operation, and to encourage Employee savings for retirement."[53]

**1.    Participant Contributions**

74.    Participants direct the investment of their contributions into various investment options offered by the ASEC Plan.  One of the available investment options is the Delphi Common Stock Fund.

75.    From May 28, 1999 to December 31, 2001, subject to Internal Revenue Service limitations, eligible participants of the ASEC Plan were permitted to contribute up to 17% of their eligible earnings, including both pre-tax and after-tax contributions, for investment in the investment options offered by the ASEC Plan including the Delphi Common Stock Fund.[54] Effective January 1, 2002, this percentage increased to 25%.[55]

**2.    Employer Contributions**

76.    In addition to the participant contributions, ASEC also made contributions to the ASEC Plan. The Delphi Common Stock Fund was at all times an investment option available to the employees for employer contributions.[56]

---

[52] *See* the ASEC Manufacturing Savings Plan Form 11-K Annual Report (the "ASEC Plan Form 11-K") for 2000, 2001, 2002, 2003 and 2004, available at www.sec.gov/edgar.shtml.

[53] *See* ASEC Plan Document, Exhibit E, Article I, Section 1.3, at 104(b)-000455.

[54] *See* ASEC Plan Document, Exhibit E, Article 6, Section 6.1, at 104(b)-000473.

[55] *See* ASEC Plan Document, Exhibit E, Third Amendment, at 104(b)-000533.

[56] *See* ASEC Plan Document, Exhibit E, Article 9, at 104(b)-000478-000479; 2004 ASEC Plan SPD, Exhibit M, at 104(b)- 000553; ASEC Plan Form 11-K for 1999, 2000, 2001, 2002, 2003, and 2004, available at www.sec.gov/edgar.shtml.

19

77.    After one year of service in the ASEC Plan, ASEC provided a 50% employer match on the first 8% of an employee's contributions during the next 60 months of participation in the Plan. In the subsequent years of participation, the employer match was equal to 100% of the first 8%.[57]

78.    Effective June 1, 2003 the Plan was amended to suspend the employer match.[58]

79.    On April 1, 2004, the Plan was amended to reinstate the employer match to a level of 25% of the first 8% of a participant's contributions.[59]

### G.    The Delphi Common Stock Fund

80.    The Delphi Common Stock Fund holds the Plans' shares of Delphi stock. The Delphi Common Stock Fund was to invest "primarily" in Delphi stock.[60] Neither the Salary nor the Hourly Plan otherwise specify parameters for the extent of the Delphi Common Stock Fund's investment in Delphi common stock.

81.    Throughout the Class Period, and before, the Plans' assets were heavily invested in the Delphi Common Stock Fund.

82.    Effective March 11, 2005, both employee and employer contributions to the Delphi Common Stock Fund were suspended, as a result of Delphi's announcement of its intention to restate its audited financial statements and related independent auditors' reports for 2001 and subsequent periods.[61] Any contributions that were directed into Company Stock were

---

[57] *See* ASEC Plan Form 11-K for 2004, available at www.sec.gov/edgar.shtml.

[58] *See* ASEC Plan Document, Exhibit E, Fourth Amendment, at 104(b)-000539; 2004 ASEC Plan SPD, Exhibit M, at 104(b)-000553.

[59] *See* ASEC Plan Document, Exhibit E, Sixth Amendment, at 104(b)-000543.

[60] *See* Salaried Plan Document, Exhibit A, at 104(b)-000036; 2004 Hourly Plan Document, Exhibit B, at 104(b)UAW-200035; Mechatronic Plan Document, Exhibit D, Article XVI, Section 2(B), at 104(b)-000843; ASEC Plan Document, Exhibit E, Article 9, Section 9.1(b)(1), at 104(b)-000479.

[61] As of March 14, 2005, the Required Retention Period for employee contributions and 1% redemption fee on trading of Delphi stock was suspended. *See* Salaried Plan Form 11-K for 2004; Hourly Plan Form 11-K for 2004; Mechatronic Plan Form 11-K for 2004; ASEC Plan Form 11-K for 2004 (All are available at www.sec.gov/edgar.shtml).

automatically directed into the Promark Income Fund.[62]   On March 11, the closing price for shares of Delphi Common Stock was $5.12 per share.

83.    On October 5, 2005, State Street initiated a program to sell the Delphi common stock held in the Delphi Common Stock Fund.[63]   On October 5, the closing price for shares of Delphi Common Stock was $2.50 per share.

84.    On October 8, 2005, Delphi filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code.

85.    On October 12, 2005, State Street ceased selling the Delphi common stock held in the Fund based on an order entered by the Bankruptcy Court prohibiting large shareholders of Delphi common stock, including State Street on behalf of the Fund, from selling their Delphi shares.  Participant requests for withdrawals and exchanges out of the Fund received after 4:00 p.m. on October 12, 2005 were not processed.[64]

86.    After receiving a waiver from the Bankruptcy Court, State Street recommenced the selling program on October 17, 2005, and the suspension on participant transactions in the Fund was lifted.[65]

87.    On November 1, 2005, the remaining Delphi common stock held in the Delphi Common Stock Fund was distributed.[66]   On November 1, the closing price for shares of Delphi Common Stock was $0.41 per share.

---

[62]   *See* Salaried Plan Document, Exhibit A, at 104(b)-000106; Delphi Salaried Participant Communication dated March 11, 2005, attached hereto as Exhibit S, 104(b)-000208; Delphi Hourly Participant Communication dated March 11, 2005, attached hereto as Exhibit T, 104(b)UAW-200143-44; Delphi Mechatronic Participant Communication dated March 11, 2005, attached hereto as Exhibit U, 104(b)-001090; ASEC Participant Communication dated March 11, 2005, attached here to as Exhibit V, 104(b)-000783.

[63]   Delphi Salaried Participant Communication dated October 2005, attached hereto as Exhibit W, 104(b)-000417-000418; Delphi Hourly Participant Communication dated October 2005, attached hereto as Exhibit X, 104(b)UAW-200153-200154; Delphi Mechatronic Participant Communication dated October 2005, attached hereto as Exhibit Y, 104(b)-001098-001099; ASEC Participant Communication dated October 2005, attached hereto as Exhibit Z, 104(b)-000789-000790.

[64]   *Id.*

[65]   *Id.*

21

88.   On November 4, 2005, GMIMCo and State Street recommended that Delphi discontinue the Delphi Common Stock Fund.[67]

### H.   The Plans' Alleged ESOP Status

89.   In addition to being an "employee pension benefit plan," as defined by ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A), both the Salaried and Hourly Plans assert that the Delphi Common Stock Fund is an Employee Stock Ownership Plan ("ESOP").[68]  On information and belief, the Delphi Common Stock Fund does not qualify as an ESOP under the numerous requirements set forth in both ERISA and the Internal Revenue Code.   Even if the Delphi Common Stock Fund did qualify as an ESOP, Plan fiduciaries may not invest in employer securities regardless of the circumstances.   On the contrary, while the duty to diversify does not apply to company stock investments *per se* in an ESOP, or to eligible individual account plans, the fiduciaries remain bound by their other core ERISA fiduciaries duties, including the duties to act loyally, prudently, and honestly.

### I.   GM Stock Funds

90.   In addition to the Delphi Common Stock Fund, the Plans' assets were invested in additional single equity stock funds, including the GM Class H Common Stock Fund and the GM $1-2/3 Par Value Common Stock Fund, the "GM Stock Funds."[69]

91.   As previously discussed, when Delphi spun-off from GM on May 28, 1999, Delphi employees that transferred from GM to Delphi with investments in a GM Plan had their assets transferred to their respective Delphi Plan. All assets that were transferred to the Delphi Plans were reinvested in investment options which corresponded to investment options

---

[66] Delphi Memorandum to the Employee Benefit Plans Committee dated November 4, 2005, attached hereto as Exhibit AA, 104(b)-000419-000421, 104(b)-000420.

[67] *Id.*

[68] *See* Salaried Plan Document, Exhibit A, at 104(b)-000036; 2004 Hourly Plan Document, Exhibit B, at 104(b)UAW-200035.

[69] *See* Salaried Plan, Hourly Plan and ASEC Plan Form 11-K for years 1999-2004, available at www.sec.gov/edgar.shtml.

previously held in the GM Plan, including the GM Stock Funds. Transferred employees could hold investments in the GM Stock Funds in their accounts, but were unable to exchange or make new contributions to the GM Stock Funds.[70]

92.      During the Class Period, the Plans held millions of dollars worth of investments in the GM Stock Funds.

## VI. DEFENDANTS' FIDUCIARY STATUS

### A.      The Nature of Fiduciary Status

93.      **Named Fiduciaries**. ERISA requires every plan to have one or more "named fiduciaries." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).   The person named as the "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the sponsor is the administrator.   ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

94.      **De Facto Fiduciaries**. ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions.  Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

95.      Each of the Defendants was a fiduciary with respect to one or more of the Plans and owed fiduciary duties to one or more of the Plans and the participants under ERISA in the

---

[70] *Id.; see* 1999 Salaried Plan SPD, at BAR00081.

23

manner and to the extent set forth in the Plans' documents, through their conduct, and under ERISA.

96.    As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plans, and the Plans' investments solely in the interest of the Plans' participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

97.    Plaintiffs do not allege that each Defendant was a fiduciary with respect to all aspects of the Plans' management and administration. Rather, as set forth below, Defendants were fiduciaries to the extent of the fiduciary discretion and authority assigned to or exercised by each of them, and, as further set forth below, the claims against each Defendant are based on such specific discretion and authority.

98.    ERISA permits fiduciary functions to be delegated to insiders without an automatic violation of the rules against prohibited transactions, ERISA § 408(c)(3), 29 U.S.C. § 1108(c)(3), but insider fiduciaries must still act solely in the interest of participants and beneficiaries, not in the interest of the sponsor. Moreover, all fiduciaries of the Plans were obliged, when wearing their fiduciary hat to act independently of Delphi which had no authority under the governing Plans' documents to direct the conduct of any of them with respect to the Plans, investments therein, or the disclosure of information between and among fiduciaries or from fiduciaries to the participants.

**B.    Delphi**

99.    Pursuant to the Plan documents for the Salaried and Hourly Plans, Delphi is the Plan Administrator for the Salaried and Hourly Plans.[71] As Plan Administrator of the Salaried

---

[71] *See* Salaried Plan Document, Exhibit A, at 104(b)-000005; 2004 Hourly Plan Document, Exhibit B, Article II, Section 2.02 at 104(b)UAW-200014.

24

and Hourly Plans, Delphi had the discretionary authority to "construe, interpret, apply, and administer" the Plans, and could delegate aspects of the Plan Administration as it deemed appropriate.[72]

100.    Pursuant to the Delphi and GMIMCo Investment Management Agreement,[73] Delphi appointed, and thus had a duty to monitor, the following fiduciaries for the Salaried and Hourly Plans:

> a.    GMIMCo as a named fiduciary (as that term is defined in ERISA) for purposes of investment of the assets of the Salaried and Hourly Plans;

> b.    The Executive Committee to serve as the named fiduciary (as that term is defined in ERISA) with respect to the Salaried and Hourly Plans; and

> c.    The IPC, to serve as an investment fiduciary.[74]

101.    Moreover, Delphi, at all applicable times, exercised control over the activities of its officers and employees that performed fiduciary functions with respect to the Salaried and Hourly Plans, including the IPC Defendants, and could hire, terminate, and replace such employees at will.

102.    Finally, as a matter of corporate law, Delphi is imputed with the knowledge that the Defendants, including the Director Defendants and the Executive Committee Defendants, had of the misconduct alleged herein, even if not communicated to Delphi.

103.    Consequently, in light of the foregoing duties, responsibilities, and actions, Delphi was both a named fiduciary of the Salaried and Hourly Plans pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and a *de facto* fiduciary of the Salaried and Hourly Plans within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that it exercised

---

[72] *See* Salaried Plan Document, Exhibit A, Article IV, Section 1(C), at 104(b)-000042; 2004 Hourly Plan Document, Exhibit B, Article X, Section 10.01, at 104(b)UAW-200037.
[73] *See* Delphi and GMIMCo Investment Management Agreement, Exhibit O, MDL-1725 000012-000025.
[74] *Id.* at MDL-1725 000015-16.

25

discretionary authority or discretionary control respecting management of the Plans, exercised authority or control respecting management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans.

104.    Delphi, as a corporate entity, cannot act on its own without any human counterpart. In this regard, during the Class Period, Delphi relied and continues to rely directly on its Board of Directors, in particular Defendants Battenberg and Dawes to carry out its fiduciary responsibilities under the Plans and ERISA.

## C.    Directors Defendants

105.    Under Delaware law and Delphi's charter and bylaws, the Board had the authority to manage the business and affairs of Delphi. Because Delphi was, as alleged above, a fiduciary of the Salaried and Hourly Plans during the Class Period, so, necessarily, was the Board and its members, which had the ultimate authority for the affairs of Delphi.

106.    Pursuant to the Management Services Agreement,[75] Delphi's Board of Directors, on behalf of Delphi, appointed, and thus had a duty to monitor, the following fiduciaries for the Plans:

      a.    GMIMCo as named fiduciary (as defined in ERISA) for purposes of investment of the Plans' assets;

      b.    The Executive Committee as named fiduciary (as defined in ERISA) with respect to the Plans;[76] and

      c.    The IPC, as an investment fiduciary.[77]

107.    Consequently, in light of the foregoing duties, responsibilities, and actions, the Director Defendants were *de facto* fiduciaries of the Salaried and Hourly Plans within the

---

[75] *See* Management Services Agreement, Exhibit Q, MDL-1725 000080-000099.
[76] Additionally, according to Delphi's bylaws, the Board of Directors appointed, and thus had a duty to monitor, the Executive Committee. *See* Amended and Restated Bylaws of Delphi Corporation, Article III, Section 3.11 at p. 11, available at www.delphi.com.
[77] *Id.* at MDL-1725 000080.

meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that they exercised discretionary authority or discretionary control respecting management of the Plans, exercised authority or control respecting management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans.

### D.    Executive Committee Defendants

108.    As set forth in the plan documents for the Salaried and Hourly Plans, the Executive Committee is the "Named Fiduciary" of the Salaried and Hourly Plans.[78]    The Executive Committee could delegate its authority to carry out its responsibilities as it deemed proper to the extent permitted by ERISA.[79]

109.    Pursuant to the Trust Agreement, the Executive Committee is "a named fiduciary with respect to the control and management of each of the individual account retirement plans sponsored by Delphi and its subsidiaries."[80]

110.    Additionally, according to the Trust Agreement as well as the Form 11-K Annual Reports for the Salaried and Hour Plans for years 1999, 2000, 2001, 2002, 2003, and 2004, the Executive Committee appointed, and thus had a duty to monitor, GMIMCo.[81]

111.    Additionally, pursuant to the Management Services Agreement, the IPC made annual recommendations to the Executive Committee regarding investment policy guidelines for the assets of the Plans.[82]

112.    Consequently, in light of the foregoing duties, responsibilities, and actions, the Executive Committee Defendants were both named fiduciaries of the Plans pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and *de facto* fiduciaries of the Plans within the meaning of

---

[78] *See* Salaried Plan Document, Exhibit A, Article IV, Section 1(A), at 104(b)-000041; 2004 Hourly Plan Document, Exhibit B, Article X, Section 10.01, at 104(b)UAW-200037.
[79] *Id.*
[80] *See* Trust Agreement, Exhibit N, at 104(b)-000173.
[81] *Id.; see also* Salaried Plan Form 11-K and Hourly Plan Form 11-K for the years 1999-2004, available at www.sec.gov/edgar.shtml.
[82] *See* Management Services Agreement, Exhibit Q, at GMIMCo, MDL-1725 000080.

27

ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that they exercised discretionary authority or discretionary control respecting management of the Plans, exercised authority or control respecting management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans.

### E.    IPC Defendants

113.    According to the Delphi and GMIMCo Investment Management Agreement, the IPC was charged with "develop[ing] an Investment Policy Statement for the Salaried and Hourly Plan[s], approv[ing] investment options for election by participants and hav[ing] such other responsibilities as the board of directors of Delphi or the Executive Committee shall determine."[83]

114.    GMIMCo was to prepare and deliver to the IPC an annual report "indicating the investment performance" for each Investment Fund, and was to meet with the IPC "at least annually to discuss investment performance of the Investment Funds and such other matters as the [IPC] may request." [84]

115.    The IPC had final approval, based on recommendations by GMIMCo, of "additions to and deletions from the approved list of Investment Funds based on the Investment Policy Statement as in effect from time to time, general financial market conditions, and other factors." [85]

116.    Additionally, according to the Management Services Agreement, the IPC was authorized to:

> (a) make annual recommendations to the Executive Committee regarding investment policy guidelines for the assets of the U.S. Plans sponsored by Delphi; (b) interact with and oversee the performance of the named fiduciary for investment purposes of the U.S. Plan sponsored by Delphi [GMIMCo]; (c) acting as employer on behalf of Delphi and in accordance

---

[83] *See* Delphi and GMIMCO Investment Management Agreement, Exhibit O, at MDL-1725 000016.

[84] *Id.* at MDL-1725 000017-000018.

[85] *Id.* at MDL-1725 000017.

> with a procedure described in ERISA § 402(a)(2), remove and replace the
> named fiduciary for investment purposed of the U.S. Plans sponsored by
> Delphi [GMIMCo] with itself or another appointee; and (d) perform such
> fiduciary and other responsibilities as may be delegated to it or as have
> been authorized by the Executive Committee.[86]

117.    Also, the "IPC removed and immediately re-appointed GMIMCo as named

fiduciary for investment purposes and re-appointed GMIMCo as investment manager of the

[Plans]...to undertake the duties, responsibilities and authority set forth in the [2002

Management Services Agreement]," and thus had a duty to monitor GMIMCo for these fiduciary

responsibilities.[87]

118.    Pursuant to the Management Services Agreement, the IPC reserved for itself the

authority to:

> (a) remove a portion of the assets of any of the [Plans] from the
> investment control and authority of GMIMCo (any assets so removed by
> the IPC or by any other person or entity duly appointed and empowered by
> Delphi or a Delphi Subsidiary are referred to as the "Removed Assets");
> (b) direct how the Removed Assets are to be invested; and (c) appoint
> "investment manager(s)" (as defined in ERISA § 3(38)(A)) to manage the
> Removed Assets (investment managers other than GMIMCo that are
> appointed by the IPC or by any other entity duly appointed and
> empowered by Delphi or a Delphi Subsidiary are referred to in this
> Agreement as "Delphi Investment Managers") as it deems appropriate in
> its sole discretion.[88]

119.    Consequently, in light of the foregoing duties, responsibilities, and actions, the

IPC Defendants were *de facto* fiduciaries of the Plans within the meaning of ERISA § 3(21), 29

U.S.C. § 1002(21), during the Class Period in that they exercised discretionary authority or

discretionary control respecting management of the Plans, exercised authority or control

respecting management or disposition of the Plans' assets, and/or had discretionary authority or

discretionary responsibility in the administration of the Plans.

---

[86] *See* Management Services Agreement, Exhibit Q, at GMIMCo, MDL-1725 000080.
[87] *Id.*
[88] *Id.* at GMIMCo, MDL-1725 000080-81; *see also id.* at MDL-1725 000088-90.

29

### F.    Defendant GMIMCo

120.    As set forth in the Plan Documents for the Salaried, Hourly, ASEC and Mechatronic Plans, GMIMCo is the "Named Fiduciary" for purposes of investments of the Plans' assets.[89] Pursuant to the Plan Documents, GMIMCo could delegate authority to carry out its plan-related fiduciary responsibilities, to the extent permitted by ERISA.[90]

121.    Additionally, as set forth in the Delphi and GMIMCo Investment Management Agreement, Delphi appointed GMIMCo "investment manager" (as defined in ERISA § 3(38)(A)) with respect to the Plans.

122.    Pursuant to this Agreement, GMIMCo assisted the IPC in developing an Investment Policy Statement for the Plans and, upon request, revising such Investment Policy Statement from time to time.[91]

123.    Additionally, subject to the Investment Policy Statement, GMIMCo selected the investment options for election by participants.[92]

124.    As explained above, GMIMCo periodically recommended to the IPC, for its approval, additions to and deletions from the approved list of Investment Funds based on the Investment Policy Statement, general financial market conditions, and other factors; met with the IPC or any of its members or designated representatives at least annually to discuss investment performance of the Investments Funds; and prepared and delivered to the IPC an annual report for each Investment Fund.[93]

---

[89] *See* Salaried Plan Document, Exhibit A, Article IV, Section 1(A) at 104(b)-000041; 2004 Hourly Plan Document, Exhibit B, Article X, Section 10.01 at 104(b)UAW-200037; Mechatronic Plan, Exhibit D, Article XVII, Section 1(B), at 104(b)-000844; 2004 ASEC SPD, Exhibit M, at 104(b)-000593.

[90] *Id.*

[91] *See* Delphi and GMIMCO Investment Management Agreement, Exhibit O, at MDL-1725 000016.

[92] *Id.*

[93] *See* Delphi and GMIMCO Investment Management Agreement, Exhibit O, at MDL-1725 000017-000018.

125.    Pursuant to the Management Services Agreement between Delphi and GMIMCo, GMIMCo had the following investment management authority:

    a.    selecting, hiring, monitoring, evaluating, and terminating investment managers, as well as establishing investment guidelines for the investment managers it appoints;

    b.    allocating assets among investment managers and strategies;

    c.    managing of portfolio transitions;

    d.    selecting, hiring, monitoring, evaluating, and terminating the Trustee;

    e.    projecting of cash flows of the investment accounts within the Plans;

    f.    evaluating performance of asset mix management;

    g.    managing short-term cash;

    h.    establishing and managing equitization, currency overlay and similar derivative-based strategies with respect to the Plans' assets.

126.    Pursuant to the Management Services Agreement, GMIMCo had additional duties with respect to the Plans, including:

    a.    conducting comprehensive studies of the Plans' investment objective and risk tolerance;

    b.    periodically reviewing and providing recommendations concerning the investment policy guidelines for the Hourly and Salaried Plans;

    c.    providing recommendations regarding the addition or deletion of investment options;

    d.    with respect to the assets in the Plans, monitoring the investment risk exposures, monitoring investment manager investment guideline compliance and assessing risks of investment manager internal investment controls; and

e.      participating in: quarterly meetings with the IPC to report on fund returns and analysis of fund performance and to discuss significant activities affecting the Plans' investments; annual benefits meetings with the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America ("UAW") and the International Union of Electronic, Electrical, Salaried, Machines and Furniture Workers and Communication Workers of America ("IUE-CAW"); and such other meetings as requested by Delphi.

127.    Pursuant to the Delphi and GMIMCo Investment Management Agreement and the GMIMCo and State Street Investment Management Agreement, GMIMCo appointed State Street as the Investment Manager (as defined in § 3(38) of ERISA) for the Delphi Common Stock Fund and the GM Stock Funds, as well as the Raytheon Company Common Stock Fund (the "Raytheon Stock Fund") and the EDS Common Stock Fund (the "EDS Stock Fund") in the Plans.[94]  Accordingly, GMIMCo had the duty to "periodically review and evaluate the services and performance of State Street."[95]

128.    GMIMCo and State Street were to meet to discuss the investment of the assets in the aforementioned funds, or State Street was to submit its analysis in writing to GMIMCo.[96]

129.    According to the Trust Agreement, GMIMCo had the authority and power to select one or more trustees and to enter into trust agreements with respect to the Plans, and, accordingly, appointed State Street as Trustee for the Plans.[97]

---

[94] *See* Delphi and GMIMCO Investment Management Agreement, Exhibit O, at MDL-1725 000017; GMIMCo and State Street Investment Management Agreement, Exhibit P, at GMIMCo, MDL-1725 000002.

[95] *See* Delphi and GMIMCO Investment Management Agreement, Exhibit O, at MDL-1725 000017.

[96] *See* GMIMCo and State Street Investment Management Agreement, Exhibit P, at GMIMCo, MDL-1725 000005.

[97] *See* Trust Agreement, Exhibit N, at 104(b)-000169.

130.    Consequently, in light of the foregoing duties, responsibilities, and actions, GMIMCo was both a named fiduciary of the Plans pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and a *de facto* fiduciary of the Plans within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that it exercised discretionary authority or discretionary control respecting management of the Plans, exercised authority or control respecting management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans.

## G.    Defendant State Street Bank and Trust Company

131.    As noted above, pursuant to the Delphi and GMIMCo Investment Management Agreement and the GMIMCo and State Street Investment Management Agreement, GMIMCo appointed State Street as the Investment Manager (as defined in § 3(38) of ERISA) for the Delphi Common Stock Fund, the GM Stock Funds, as well as the Raytheon Stock Fund and the EDS Stock Fund in the Plans.[98]

132.    According to the Investment Management Agreement between GMIMCo and State Street, State Street had discretionary authority of the assets in the Delphi and GM Stock Funds. Indeed, States Street acknowledged that it "shall be responsible in its sole judgment and discretion for the management and investment of the Investment Accounts," for the aforementioned funds.[99]

133.    Pursuant to the Investment Management Agreement between GMIMCo and State Street, State Street "acknowledges that it is a fiduciary, within the meaning of ERISA with respect to the [Plans] and represents that it is familiar with and will comply with the fiduciary

---

[98] *See* Delphi and GMIMCO Investment Management Agreement, Exhibit O, at MDL-1725 000017; GMIMCo and State Street Investment Management Agreement, Exhibit P, at GMIMCo, MDL-1725 000002.

[99] *See* GMIMCo and State Street Investment Management Agreement, Exhibit P, at GMIMCo, MDL-1725 000002.

33

responsibility provisions of Title I, Part 4, of ERISA in the performance of its obligations under this Agreement."[100]

134.    Pursuant to the Investment Management Agreement, State Street agreed to:

> [D]ischarge its duties under this Agreement solely in the interest of the participants of the [Plans] and their beneficiaries and (i) for the exclusive purpose of providing benefits to such participants and their beneficiaries and defraying reasonable expenses of administering the [Plans]; (ii) with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, (iii) by diversifying the investments in the Investment Accounts so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so, and (iv) in accordance with the documents and instruments governing the [Plans] and the provisions of the Agreement insofar as they are consistent with the provisions of ERISA, as the same may from time to time be amended....[101]

135.    Consequently, in light of the foregoing duties, responsibilities, and actions, State Street was both a named fiduciary of the Plans pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and a *de facto* fiduciary of the Plans within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that it exercised discretionary authority or discretionary control respecting management of the Plans, exercised authority or control respecting management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans.

## H.    ASEC and Mechatronic

136.    Pursuant to the Plan documents for the ASEC and Mechatronic Plans, ASEC and Mechatronic are the "Plan Administrators" for those Plans (respectively) as that term is defined in ERISA.[102]

---

[100] *See* GMIMCo and State Street Investment Management Agreement, Exhibit P, at GMIMCo, MDL-1725 000006.

[101] *Id.* at GMIMCo, MDL-1725 000007.

[102] *See* ASEC Plan Document, Exhibit E, Article 4, Section 4.1, at 104(b)-000470; Mechatronic Plan Document, Exhibit D, Article XVII, Section 1(C), at 104(b)-000846.

137.    Additionally, pursuant to Addendum 1 and 2 to the Management Services Agreement between Delphi and GMIMCo, ASEC and Mechatronic both appointed GMIMCo to serve as "named fiduciary for purposes of investment of the assets" of the ASEC and Mechatronic Plans, and "investment manager" for the ASEC and Mechatronic Plans.[103]

138.    Consequently, in light of the foregoing duties, responsibilities, and actions, ASEC and Mechatronic were named fiduciaries of the ASEC and Mechatronic Plans (respectively) pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), and *de facto* fiduciaries of the ASEC and Mechatronic Plans (respectively) within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period in that they exercised discretionary authority or discretionary control respecting management of the Plans, exercised authority or control respecting management or disposition of the Plans' assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plans.

### VII. FACTS BEARING ON FIDUCIARY BREACH

**A.    Background**

#### 1.    The Divestiture and Spin-Off of Delphi

139.    Delphi was incorporated in late 1998 as a wholly-owned subsidiary of GM. Known originally within GM as the Automotive Components Group, Delphi had transitioned from a completely integrated GM division to a semi-autonomous wholly-owned subsidiary of GM that also supplied components and parts to other auto-makers.

140.    During 1998, GM announced its intention to create and divest itself of a separate company consisting of the GM businesses and operations that now comprise Delphi and the associated assets and liabilities of such businesses and operations. As part of that divestiture GM made an initial offering to the public in February 1999 of approximately 20% of the common stock of the newly created company. Delphi's opening price was $17. In about May, 1999, GM

---

[103] *See* Management Services Agreement, Exhibit Q, Addendum 1, at GMIMCo, MDL-1725 000100-000102; *id.*, Addendum 3, at GMIMCo, MDL-1725 000106-000108.

completed the separation of Delphi through the approval of a spin-off to holders of GM common stock of the remaining 80% of the Delphi common stock still held by GM. At the time of the spin-off, Delphi, with revenues of $28 billion, was the largest supplier of automotive parts in the world on both a gross sales and market capitalization basis. The Company immediately became a Fortune 25 company.

141.    In spinning-off Delphi, GM sought to transform itself from a "complacent and non-competitive company into a more stream-lined, more agile organization," according to *The New York Times*, May 25, 1999.[104] Rather than getting 80% of its components from Delphi, GM projected enormous savings in seeking more competitive pricing from other suppliers. Like GM, Delphi was saddled with expensive union contracts: in late 1999, Delphi employed approximately 203,000, of whom, about 95% were unionized. Where non-union workers earned approximately $10 an hour, Delphi's workers were paid twice that under GM union contracts. Thus, Delphi's manufacturing costs were substantially greater than its competitors. GM rationalized that once spun-off, Delphi could renegotiate more favorable union contracts, minimize its union work force, and offer GM and other auto-makers competitive pricing.

## 2.    Delphi Reports Positive Showing Post Spin-Off Despite Economic Downturn in Automobile Industry

142.    Immediately following the spin-off, Delphi was faced with tremendous pressure to grow its non-GM business in order to reduce its dependence on GM which over the last several years had generated 80% of Delphi's revenue. As of 2001, Delphi would lose its most-favored nation status when its contractual provisions with GM expired. After 2001, GM no longer had to offer Delphi the "right of last refusal" for new initiatives -- the opportunity to provide a more competitive price on the lowest bid that GM obtained from competing suppliers.

---

[104] Robyn Meredith, *GM Is Set to Spin Off Parts* Division, The New York Times, May 25, 1999, attached hereto as Exhibit BB.

143.    As Delphi's sales to GM were expected to decline significantly over the coming years, Delphi's ability to grow non-GM business became one of the major variables that both investors and analysts tracked to predict Delphi's revenue and earnings, and to gauge its financial condition.

144.    However, at the time of the IPO, Delphi presented an optimistic long-term business plan of gradual reduction of reliance on GM as its primary customer, so that, by 2002, other vehicle manufactures would account for at least 50% of its net sales. Indeed, Defendant Battenberg proclaimed at the time of the spin-off that by 2002, he wanted Delphi's earnings per share to grow more than 10 percent a year.

145.    In 2000, Delphi's business faced additional challenges when the downturn in the economy precipitated decreased production by GM. In 2000, GM cut production capacity by 400,000 vehicles, or 5% of its North American and European production capacity. Production declines by GM, and automakers generally, forced Delphi to contend with the inability to move inventory. The downturn in the automobile industry continued into 2001.

146.    However, despite the downturn in the economy generally, Delphi reported profitable quarters every quarter after the IPO until the second quarter of 2002. Delphi attributed its profitability to its ability to realize greater efficiencies and cost cutting methods that allegedly were resulting in greater margins and reduced costs.

147.    As is described in Section C below, Delphi's financial realities were actually quite different. In fact, Delphi's reported financial disclosures from the spin-off in May 1999 until the accounting improprieties were acknowledged in March 2005, were based on an elaborate fraud designed to conceal Delphi's financial woes and dupe analysts and the investing public. On June 30, 2005, Delphi restated its reported financial results for Fiscal Years 2002 and 2003, and selected financial data for Fiscal Years 2000 and 2001 (including retained earnings at December 31, 2001), in its Form 10-K for the year ended December 31, 2004 (the "Restatement").

37

**B.    Delphi's Accounting Scheme**

148.    Throughout much of the Class Period, Delphi concealed its true financial condition from the investing public and the participants in the Plans by engaging in questionable and unlawful accounting practices which made Delphi stock a highly risky and imprudent retirement investment.    Moreover, the Director Defendants played a direct role in this concealment by failing to provide the Plans' Fiduciaries and the Plans' participants with an accurate accounting of Delphi's financial position.

      **1.    Financing and Loans from Third Parties Disguised as Income**

149.    In 1999, 2000 and 2001, Delphi entered into a series of transactions in which the Company knowingly gave the investing public a misleadingly positive impression of its financial performance by disguising loans as income and cash flow-generating sales. Delphi professed to transfer assets classified as inventory or "indirect materials"[105] to third parties in exchange for hundreds of millions of dollars, when, in reality, Delphi was obligated to buy back these very same assets.  Rather than giving these transactions proper accounting treatment as off-balance sheet financings, Delphi falsely presented the proceeds of these loans as though they were the product of asset sales in the ordinary course of business.

150.    In accounting for these loans as sales of inventory and indirect materials, rather than as the financing transactions that they actually were, Delphi violated GAAP Statement of Financial Standard No. 49 ("SFAS 49"), which states that when a company concludes "a transaction in which [it] sells and agrees to repurchase inventory with the repurchase price equal to the original sale price plus carrying and financial costs," that transaction is a product financing transaction, not a sale or any other sort of income or cash flow-generating asset transfer. SFAS 49 further provides that a company that agrees to repurchase the inventory "shall record a

---

[105] "Indirect materials" refers to materials used in production, but that do not end up as part of the finished product.

liability at the time the proceeds are received from the other entity" and "shall not record the transaction as a sale and not remove the covered product from its balance sheet."

151.   Despite the fact that it had committed to reacquire the inventory and indirect materials it had transferred to other parties, Delphi failed to record the transactions as financings, improperly removed the assets it was obligated to repurchase from its balance sheet, and improperly recorded income and cash flow from the transactions as though the underlying assets had been sold for profit.  In so doing, Delphi materially misrepresented its financial condition in several critical ways:

a.   First, Delphi recorded the proceeds of these financing transactions as income and cash flow from operating activities, which had the effect of inflating the Company's cash from operations, net income and earnings. Such income and cash flow-generating events are typically understood by the market to be the result of a company's core operations and imply – falsely in this case – that such income and cash flow will be available in the future.

b.   Second, by failing to treat the arrangements as financing transactions, Delphi gave the investing public the false impression that it was less leveraged than it actually was—i.e., the Company understated its debt obligations by failing to record the proceeds of the financings as liabilities on its balance sheet. Increases in a company's debt burden of the sort that Delphi should have reported in connection with these off-balance sheet financings are understood negatively by the market, adversely impacting a company's credit rating and raising questions about its ability to generate future income.

      c.      Finally, beyond the income, cash flow and balance sheet distortions just discussed, the transactions gave the misleading impression that Delphi was efficiently and effectively managing its excess assets and inventories because they removed indirect materials and inventory from its balance sheet.

152.    As a result of these accounting maneuvers Delphi inflated its earnings and caused Delphi common stock to be artificially inflated in value and an imprudent Plan investment during the Class Period.

### a. Delphi's Sham Sales of Inventory

153.    As admitted in the Restatement, in 2000 and 2001, Delphi improperly accounted for almost $300 million in loans from third parties as dispositions of inventory:

> In 2000 and 2001, Delphi entered into several transactions, in each case improperly recording the transaction as a disposal of inventory to [an unidentified] third party and repurchasing the same inventories in subsequent periods. Each of these transactions should have been accounted for as a financing transaction, not a disposal. Specifically, in the fourth quarter of 2000, Delphi entered into transactions, one for approximately $70 million, a second to a different third party for approximately $200 million, and a third, also with a different third party, for approximately $7 million.... In the first and fourth quarters of 2001, Delphi disposed of $10 million and $9 million, respectively of inventory at book value.

154.    Upon information and belief, Delphi carried the improper inventory transactions referred to in the Restatement by selling inventory to third parties and recording an account receivable for the purchase price of the inventory, and then allowing the third party to settle the account receivable by using cash received through financing arranged by Delphi. Upon information and belief, Delphi conducted these types of transactions at strategic times when it was important that Delphi boost its cash flow. Delphi would move inventory off its books for a short period of time, and then return the inventory to the books when cash flow had improved.

40

155.    Upon information and belief, Defendant Dawes, as well as other individuals at Delphi, directly arranged and handled these transactions for Delphi.

156.    Upon information and belief, Delphi disguised one of the transactions referred to in its Restatement -- a loan for $200 million -- as a sale of precious metals from its inventory. Delphi improperly recorded the transaction as a sale because Delphi had agreed to buy back the assets at a later time.  Upon information and belief, Delphi did buy back the assets within weeks of the close of the quarter in which it had reaped the ability to record $100 million in extra pre-tax income

157.    By improperly recording these transactions as sales in 2000, Delphi was able to report record cash flow from operations of $268 million for 2000.  Given the substantial production cuts and lay-offs that the auto industry was suffering generally, Delphi's cash flow was viewed as a significant accomplishment.  However, Delphi, as subsequently admitted, was only able to achieve these gains through sham transactions and fraudulent accounting.  In actuality, Delphi's cash flow from operations was only $68 million, $200 million or 75% less than originally reported.

158.    As a result of these accounting maneuvers Delphi inflated its earnings and caused Delphi common stock to be artificially inflated in value and an imprudent Plan investment during the Class Period.

### b.    *Delphi's Sham Sales of Indirect Materials*

159.    Upon information and belief, Delphi improperly recorded $145 million dollars in financing transactions with a third party as income from sales of indirect materials in 1999 and 2000. In the Restatement, Delphi admitted:

> In 1999 and 2000, Delphi improperly recorded asset dispositions, in a series of transactions, amounting to approximately $145 million of indirect materials to an [unidentified] indirect material management company. . . The transactions should not have been accounted for as asset dispositions

41

but rather as financing transactions, principally because Delphi had an
obligation to repurchase such materials.

160.    Upon information and belief, Delphi entered into these financing transactions
disguised as sales in order to secure capital from third parties, and used the inventory as
collateral. Upon information and belief, the financing nature of the transaction was known by all
parties and it was clearly understood that Delphi would repurchase the inventory.

161.    Upon information and belief, Delphi's Electronics & Safety Division's treatment
of indirect materials was considered such a success within the Company that Delphi instituted a
corporate wide program where individuals from other divisions in the Company were sent to the
Electronics & Safety Division to see how they disposed of their indirect materials and to learn
from their methods.

162.    As acknowledged in its Restatement, Delphi artificially inflated its pre-tax income
by approximately $60 million in 1999 and $16 million in 2000 by improperly accounting for
these financing transactions with third parties.

163.    As a result of these accounting maneuvers Delphi inflated its earnings and caused
Delphi common stock to be artificially inflated in value and an imprudent Plan investment during
the Class Period.

    **2.    Improper Accounting of Warranties with GM Creates Illusion of Income**

164.    In addition to falsely reporting financing transactions as sales, Delphi also
fraudulently accounted for over $260 million in transactions with GM by alternatively (i)
deferring expenses that should have been recognized immediately, and (ii) immediately
recognizing credits that should have been deferred. In so doing, Delphi manipulated the timing
of its expense recognition, thereby materially understating its expenses and overstating its
income. Accordingly, at a critical point early in its life as a stand-alone company, Delphi's
improper accounting for its transactions with GM made the Company appear significantly more
profitable than it actually was.

42

165.    According to its Restatement, Delphi's improper accounting for its transactions with GM included the following:

     a.    Delphi improperly classified and recorded a $202 million cash payment to GM to settle a warranty claim as an adjustment to post-retirement obligations in the fourth quarter of 2000;

     b.    Delphi prematurely recognized warranty credits received from GM as a reduction to expenses amounting to $30 million in 2001, and $20 million in 2002; and

     c.    Delphi improperly failed to record a $10 million warranty obligation in the first quarter of 2003.

166.    The net effect of this fraudulent reporting was that Delphi significantly overstated its pre-tax income by $202 million in 2000, $30 million in 2001 and $20 million in 2002.

167.    As a result of these accounting maneuvers Delphi inflated its earnings and caused Delphi common stock to be artificially inflated in value and an imprudent Plan investment during the Class Period.

### a.    Delphi's Improper Classification of Warranty Expenses

168.    In connection with the spin-off, Delphi made a payment of $237 million to GM in the third quarter of 2000 in order to cover contested warranty issues regarding the recall costs associated with Delphi-produced parts.

169.    Upon information and belief, the resolution of these issues was handled at the highest financial levels of both companies and involved then Delphi CFO Defendant Dawes.

170.    Under GAAP, Delphi was required to account for these payments as a settlement of warranty claims which should have been expensed or charged against the warranty accrual. As Delphi admitted in its Restatement:

Delphi improperly accounted for $202 million cash payments made to its former parent in calendar year 2000 as a pension settlement agreement.

43

> The payment should have been accounted for as a settlement of warranty claims and should have been expensed or charged against the warranty accrual in 2000 rather than reflected as an adjustment to post-retirement obligations and amortized over future periods.

171.    Whereas GAAP clearly requires that Delphi immediately record the full amount of this payment as an expense, Delphi improperly classified $202 million - or 85% - of this cash payment as an adjustment to post-retirement obligations in order to defer the expense by amortizing this amount over several future periods and reduce the unwanted adverse effect on the 2000 financial results.

172.    Through this improper classification, Delphi was also able to reduce its post-retirement liabilities by $202 million on its balance sheet.

173.    As a result of these accounting maneuvers Delphi inflated its earnings and caused Delphi common stock to be artificially inflated in value and an imprudent Plan investment during the Class Period.

### b.    Delphi's Premature Recognition of Warranty Credits

174.    In late 2001, Delphi again seized the opportunity to artificially inflate its income presented by the warranty dispute with GM. In connection with the warranty dispute set forth in ¶ 165 above, it was ultimately determined that Delphi had overpaid GM by $85 million to settle the warranty claims. As a result, GM provided Delphi with $85 million in credits. In order to record additional income, as Delphi has now admitted, it immediately recorded $30 million of the $85 million in warranty credits, reducing expenses based on claims that had not yet occurred. Under GAAP, Delphi was only permitted to use these credits as a reduction to expenses against actual warranty claims when such claims occurred. The result was that Delphi overstated income in 2001 by $30 million and, using the same maneuver, by $20 million in 2002.

175.    As a result of these accounting maneuvers Delphi inflated its earnings and caused Delphi common stock to be artificially inflated in value and an imprudent Plan investment during the Class Period.

44

### c. *Delphi's Failure to Recognize Warranty Obligation to GM*

176.    Delphi also failed to recognize a $10 million warranty obligation to GM in the first quarter of 2003 in violation of GAAP which provides that warranty obligations shall be accrued, and therefore, treated as an expense recognized, when they are probable and estimable. As Delphi has since admitted in the Restatement, "Delphi should have recognized a $10 million warranty obligation to its former parent in the first quarter of 2003." Delphi's failure to recognize this warranty obligation resulted in it overstating pre-tax income in 2003 by $10 million.

177.    By deferring warranty expenses that should have been recognized immediately and immediately recognizing credits that should have been deferred, by 2003, Delphi was left with substantial expenses without any credits to offset them and faced the prospect of understating income in 2003. Rather than reveal its fraud, Delphi chose to continue its concealment.

178.    As a result of these accounting maneuvers Delphi inflated its earnings and caused Delphi common stock to be artificially inflated in value and an imprudent Plan investment during the Class Period.

### 3.    Delphi's Improper Accounting of Transactions with the Company's Suppliers

179.    Delphi fraudulently accounted for nearly $110 million in transactions with various service suppliers during the Class Period in order to further artificially inflate its income. In short, Delphi unlawfully manipulated when it would and would not recognize income and expenses and thereby inflated its income when deemed necessary. In its Restatement, Delphi admitted that it violated GAAP in its accounting for these transactions when it: (i) prematurely recognized credits; (ii) improperly deferred recognition of expenses; and (iii) improperly failed to recognize obligations in transactions with its suppliers.

45

180.    As of December 31, 2001, Delphi fraudulently accumulated more than $86 million in retained earnings by prematurely recognizing the cost savings provided by rebates, credits and other lump sum payments received from third party suppliers.

181.    Delphi disregarded the GAAP guidelines which state that the benefit of rebates, credits and similar payment arrangements can only be recorded when realized, realizable and earned. In particular, GAAP provides that rebates can be recognized only when the products are actually purchased and/or the related services are actually performed. Quite the opposite, Delphi recognized the benefits offered by rebates and credits immediately, rather than at the time of contractual performance as required by GAAP. The Company admitted as much in its Restatement:

> Delphi did not recognize certain liabilities or appropriately defer recognition of payments and credits that were received in conjunction with agreements for future information technology services. In addition, the investigation identified other rebate transactions occurring between 1999 and 2004 in which the payments and credits received by Delphi from suppliers were tied to agreements for the provision of future services or products, and for which Delphi recognized the payment or credit when received rather than as the services were performed or products were purchased.

182.    As admitted in its December 8, 2004, Form 8-K, Delphi improperly recognized rebates and credits received from at least three separate suppliers, including the following:

a.    $20 million rebate credits as a reduction of expenses when received from EDS, one of the Company's primary information technology service providers in the fourth quarter of 2001;

b.    $26 million rebate from EDS in the third quarters of 2000 and 2001; and

c.    $19.5 million in rebate credits received from one of the Company's technology service providers as a reduction of expense when received.

46

183.    As a result of these accounting maneuvers Delphi inflated its earnings and caused Delphi common stock to be artificially inflated in value and an imprudent Plan investment during the Class Period.

### a.    *Delphi's Improper Accounting for Transactions with EDS*

184.    In the fourth quarter of 2001, Delphi improperly recorded a $20 million rebate at the time it was received from EDS as income. Delphi conceded in its December 8, 2004, Form 8-K that, "the $20 million pre-tax payment should have been recorded as a liability when received in the fourth quarter of 2001 and that this liability should have been reduced as payments were made to EDS pursuant to a services agreement entered into at the time the payment was received."

185.    Upon information and belief, Delphi's improper recognition of rebates and credits from EDS was well known to and directed by the Defendant Dawes, as all of Delphi's accounting for its EDS rebate transactions was handled in the finance department by Defendant Dawes and his staff.

186.    Delphi also admitted in its December 8, 2004, Form 8-K that it improperly recognized $20 million in rebate credits that it received from EDS in 2000 and an additional $26 million in 2001.

187.    Upon information and belief, EDS had to offer Delphi substantial cost savings and price concessions in order to effectively compete for its business. These cost savings were typically offered in the form of rebates, credits and similar payment discounts.

188.    Upon information and belief, Defendant Dawes was also actively involved in the master service agreement negotiations between Delphi and EDS. When Delphi determined that the cost savings offered by EDS were insufficient, because it could not recognize the benefits immediately, upon information and belief, Delphi's finance department, including Defendant

47

Dawes, insisted that the rebates be recognized up-front as opposed to when actually earned in subsequent periods.

189.    As set forth in its Restatement, Delphi recognized approximately $26 million in rebate credits ($8 million of which was recognized in the third quarter of 2000, and $18 million of which was recognized in the third quarter of 2001) received from EDS as a reduction of expenses when received. Thus, Delphi artificially reduced its expenses and inflated its income.

190.    As a result of these accounting maneuvers Delphi inflated its earnings and caused Delphi common stock to be artificially inflated in value and an imprudent Plan investment during the Class Period.

### b.    *Delphi's Improper Accounting for IT Services*

191.    Delphi admitted additional violations of GAAP regarding its business transactions with EDS in its Restatement. Specifically, Delphi improperly deferred approximately $22 million in payments made for system implementation services rendered in 2002. GAAP (FASB Concept No. 6) dictates that these costs be recognized as an expense at the time the services are rendered as Delphi conceded in the Restatement: "[t]hese payments should have been recorded as expense when services were rendered, rather than deferred and recorded as an expense in later periods."

192.    The net effect of these improper deferrals was to artificially inflate net income by approximately $22 million in 2002.

193.    As above, upon information and belief, Defendant Dawes was aware of this misconduct because, the finance department handled all aspects of the accounting for Delphi's transactions with EDS.

194.    As a result of these accounting maneuvers Delphi inflated its earnings and caused Delphi common stock to be artificially inflated in value and an imprudent Plan investment during the Class Period.

48

### c.    *Delphi's Improper Accounting for Rebate Credits from a Technology Service Provider*

195.    Delphi also overstated its pre-tax income for Fiscal Years 2000 and 2001 by fraudulently recording $19.5 million in rebate credits when received from a technology service provider, instead of recognizing the credits when earned over the seven years provided for under the Company's contract with the provider.

196.    From January 2000 through August 2001, Delphi improperly recorded $16 million in rebate credits received from its technology service provider, in addition to the millions in rebates and credits it improperly recorded from EDS. Delphi recognized the balance of the credits, an additional $3.5 million, as a reduction to expenses in the second quarter of 2001.

197.    In its December 8, 2004 Form 8-K, Delphi admitted that its accounting for these rebate credits was improper, and that the "credits should have been recognized over the related contract periods, which are from 2000 through 2007."

198.    As a result of these accounting maneuvers Delphi inflated its earnings and caused Delphi common stock to be artificially inflated in value and an imprudent Plan investment during the Class Period.

### 4.    Delphi's Improper Accounting for Obligations and Adjustments

199.    In its Restatement, Delphi also admitted that it had failed to accrue for obligations and recorded adjustments in the wrong period, thereby artificially inflating its pre-tax income. GAAP (FASB Concept No. 6) requires that a company record the financial effects of transactions or events in the periods in which those transactions or events occur rather than only in the periods in which cash is received or paid. In addition, SFAS 5 also requires that a company accrue for a loss contingency when it is probable and estimable.

200.    By failing to accrue obligations and recording adjustments in the wrong period, Delphi overstated its retained earnings by $29 million in 2001, overstating its pre-tax income by $14 million in 2002 and by $34 million in 2003.

49

201.   In addition, Delphi stated in its December 8, 2004 Form 8-K that it failed to recognize an obligation of approximately $1.8 million pre-tax to a technology service provider, conceding that "the obligation and the related expense should have been recognized as incurred in the second, third and fourth quarters of 2001, which would have reduced pre-tax income in those quarters."

202.   As a result of these accounting maneuvers Delphi inflated its earnings and caused Delphi common stock to be artificially inflated in value and an imprudent Plan investment during the Class Period.

### 5.   Delphi Misleads Investors Regarding its Use of Credit Facilities

203.   Since its inception and separation from GM, Delphi had maintained certain credit facilities in Europe that it used as a source of short-term liquidity, however the Company misled the investing public regarding the extent to which it had drawn upon these credit facilities.  The Company admitted in its June 8, 2005 Form 8-K that: "the Company did not accurately disclose the extent of its use of these sources of financing. This inaccuracy was known to Company personnel."

204.   As a result of these accounting maneuvers Delphi inflated its earnings and caused Delphi common stock to be artificially inflated in value and an imprudent Plan investment during the Class Period.

### C.   The Truth Begins To Emerge

205.   Delphi's fraudulent activities first came to light when Delphi announced in a September 29, 2004 press release, filed with the SEC on a Form 8-K, that the SEC had served a subpoena on Delphi in July 2004 requesting information regarding certain transactions between Delphi and its suppliers of information technology services, including EDS.

50

206. On October 18, 2004, the Company explained that it was not filing a Form 10-Q to report its quarterly financial information due to an internal investigation by the Company's Audit Committee, initiated by the SEC's investigation.

207. On December 8, 2004, Delphi announced in its Form 8-K filing that the Audit Committee was directing an independent review of certain accounting practices engaged in by Delphi during 2000 through 2003 relating to the transactions identified by the SEC's ongoing investigation. The Audit Committee also announced that it had engaged outside counsel to advise it regarding the review and a related investigation by the SEC into possible accounting irregularities at Delphi.

208. While on December 8, 2004, the Audit Committee stated that its review was not complete and its conclusions might change, the Committee had preliminarily concluded, among other things, that improper accounting for certain rebate transactions between Delphi and information technology service providers had resulted in an understatement of Delphi's expenses during 2000 through 2003.

209. On December 10, 2004, Delphi's press release, filed with its Form 8-K, announced the Company's 2005 outlook. Delphi stated it was implementing plans to further reduce 8,500 positions at the Company.

210. In fact, in addition to the 8,500 positions Delphi planned to cut in 2005, the Company had already eliminated several thousand positions in 2004 as part of its restructuring efforts. In the Company's January 20, 2005, press release, filed with its 8-K/A, Defendant Dawes stated:

> With approximately 6,175 U.S. hourly reductions over a 15-month period, Delphi exceeded its targeted reduction of 5,000 U.S. hourly workers in connection with the restructuring program announced in October 2003. Additionally during this period, Delphi completed 500 U.S. salaried and 3,000 non-U.S. workforce reductions related to the same restructuring program...

51

211.    The outlook for the automotive parts supply industry in 2005 was dismal.  Several

analysts expressed concerns regarding the industry.  In a February 2, 2005, *Reuters News* article

Standard & Poor's ("S&P") analyst Martin King stated:

> "Several suppliers built heavy debt loads over the years to increase
> business with automakers...Those that cannot cut costs when production
> declines, use a high percentage of metal or resins, or rely heavily on Ford
> or GM and will be particularly exposed...There is going to be a continued
> crisis among those companies over the next couple of quarters..."[106]

212.    In a February 23, 2005 press release, filed with the Company's Form 8-K,

Defendant Battenberg, Delphi's Chairman and CEO, announced his intention to retire later in the

year.  Defendant Battenberg had served as Delphi's founding Chairman, CEO and President until

Rodney O'Neal was named President and Chief Operating Officer.

213.    Less than one week later, on March 3, 2005, the Audit Committee released the

preliminary findings of its internal investigation pointing to widespread accounting irregularities

in Delphi's transactions dating back to 1999 and requiring the Company to restate its financial

statements.

214.    On the following day, March 4, 2005, Delphi filed a Form 8-K with the SEC, in

which it confirmed the need to restate its financial statements:

> [T]he findings..., as a result of its ongoing internal investigation, indicate
> that certain prior transactions involving the receipt of rebates, credits or
> other lump-sum payments from suppliers ("Rebate Transactions") and off-
> balance sheet financing of certain indirect materials and inventory were
> accounted for improperly. Based upon information to date, ***the Company
> believes that the improper accounting for off-balance sheet financing
> transactions in 2000 resulted in the Company overstating cash flow from
> operations, determined in accordance with generally accepted
> accounting principles (GAAP), for that year by approximately $200
> million and that the improper accounting for Rebate Transactions in
> 2001 resulted in the Company overstating pre-tax income under GAAP
> for that year by approximately $61 million.*** In addition the Company is

---

[106] David Bailey, *More Auto Parts Makers May Fall into Bankruptcy*, Reuters News, February 2,
2005, attached hereto as Exhibit CC.

still evaluating the impact of adjustments to the Company's financial statements for other periods that will be required to be reflected as the Company unwinds the improper accounting of the transactions identified below.

Although the Company is still evaluating additional transactions, the magnitude of the errors and the preliminary conclusions reached to date with respect to the transactions under review led the Audit Committee to conclude that *the audited financial statements and related independent auditors' reports for 2001 and subsequent periods as a result of the unwinding of the improperly recorded transactions, should no longer be relied upon and a restatement will be required.* As emphasized below, the internal investigation is not complete and although the findings described below have been preliminary discussed with the Company's auditors, Deloitte & Touche LLP, the findings have not been the subject of a review or audit by Deloitte & Touche LLP. Moreover, additional transactions are under examination, and it is possible that the review will determine that they were not properly recorded and that previously issued financial statements for other periods may require additional corrections.

(Emphasis added).

215.    In addition, the March 4, 2005 Form 8-K revealed numerous accounting irregularities that Delphi had engaged in since 1999:

a.    Delphi had inflated its cash flow from operations and earnings in 1999 by $446.5 million and in 2001 by $166 million;

b.    In the fourth quarter of 2000, Delphi prematurely recognized income from technology contracts and rebates, inflating its cash flow from operations by over 80%, when it should have spread them over the lifetime of the contract. In addition, Delphi improperly capitalized expenses over time, rather than recognizing them immediately, and boosted cash flow from operations and pre-tax earnings by claiming it sold assets and inventory that it had actually agreed to buy back later;

c.    Delphi admitted that between 1999 and 2001, it had engaged in a series of transactions, in which it sold inventory, precious metals and other assets to

53

unnamed companies and recorded operating cash flow and in some cases, earnings. In one instance, $200 million of precious metals that Delphi said it sold in 2000 were repurchased the following year; under GAAP, those transactions should have been recorded as financing. In 1999 and for parts of 2000 and 2001, Delphi improperly recorded the sale of unwanted materials to a third party, which boosted Delphi's pretax income by $60 million in 1999 and $116 million in 2000. According to the Audit Committee's investigation, these sales were questionable because Delphi was obligated to buy the materials back;

d.    In 2001, the Company improperly accounted for rebates given to customers, inflating pretax income in 2001 by approximately $61 million rather than amortizing it over several quarters. As a consequence of this overstatement, the Company later under-reported pretax income totaling $44 million for 2002, 2003 and the first three quarters of 2004. In 2002, the Company deferred software expenses until 2003, overstating its pre-tax income of $529 million by $23 million by.

216.    The Form 8-K also reported that the Audit Committee had met with members of management who were involved with or knew about the transactions at issue "to evaluate the conduct and knowledge of these individuals, and to consider after carefully evaluating all of the findings of the investigation and the level of cooperation, what personnel changes or other steps, if any, should be taken to strengthen the Company's internal controls and procedures over financial reporting and disclosure controls and procedures to prevent the future occurrences of similar errors."

54

217. The March 4, 2005, SEC filing further stated that the Audit Committee had accepted the resignation of the Company's Vice Chairman and Chief Financial Officer, Alan S. Dawes, effective March 4, 2005, expressing "a loss of confidence in him."

218. On March 5, 2005, Fitch downgraded Delphi's debt-rating to junk status based on the Company's revelation that it had inflated its earnings and operating cash flow since 1999.

219. On March 11, 2005, Delphi revealed in its Form 8-K that it had suspended purchases of shares of Delphi common stock by participants in the Plans until it filed restatements with the SEC.

220. In a Company press release filed with its Form 8-K on March 22, 2005, Delphi stated that the Audit Committee had identified additional transactions, including one in which Delphi may have improperly accounted for a $237 million warranty claim payment to GM in 2000 as an adjustment to post retirement obligations amortized over future payments. The payment should have been booked as a warranty expense.

221. On March 30, 2005, the Detroit office of the Federal Bureau of Investigation confirmed that, together with the U.S. Postal Inspection Service, it had initiated a criminal investigation into Delphi's accounting.

222. On April 5, 2005, it was revealed that Delphi, in addition to its other financial uncertainties, also faced substantial pension obligations to its employees. *The Wall Street Journal* reported that the Pension Benefit Guaranty Corp. was more concerned about Delphi than any other company: "Delphi's plans have pension promises valued at $11.4 billion but assets of only $7.4 billion...Delphi relies on GM for about half of its $28 billion in annual revenue and is saddled with high labor and raw-materials costs at the same time that GM's production is

55

falling." The article suggested that Delphi should consider a Chapter 11 filing, in part to shed its

pension obligations and to pressure the United Auto Workers ("UAW") to help cut costs.[107]

223.    On April 8, 2005, GM disclosed that it had received a subpoena for records

related to Delphi transactions and that it had turned over unspecified documents to the SEC.

224.    On May 11, 2005, *Reuters* reported that Delphi had retained restructuring adviser

Rothschild Inc.[108]

225.    On May 13, 2005, Delphi filed a Form 8-K, in which it reported unaudited first

quarter 2005 financial results with revenues of $6.9 billion, and a GAAP net loss of $409 million

or $0.74 per share.

> "Versus our expectations for the first quarter, we were significantly
> challenged by weaker-than-expected production volumes with some of our
> larger North American customers," said J.T. Battenberg III, Delphi's
> chairman, and chief executive officer. "We expect these pressures to
> continue for the remainder of the year. Delphi's management team is
> focused on addressing these issues while remaining committed to serving
> our customers' needs. At the same time as we work to address our short-
> term challenges, we continue to grow our business through our ongoing
> technology leadership, global expansion and adjacent market growth.
> During the quarter, Delphi was able to reach a new milestone with non-
> GM revenues reaching 51 percent of total sales."

***

> "Like many other companies in the automotive sector, Delphi's first
> quarter performance was impacted by high commodity costs year-over-
> year and low production volumes, particularly with GM North America,"
> said John D. Sheehan, Delphi's acting chief financial officer. "We are
> engaging our entire global workforce to identify additional opportunities
> to reduce SG&A and discretionary spending so that we can focus on our
> restructuring activities and overall transformation. Concurrently, we are
> successfully growing our non-GM revenues domestically, overseas and in
> adjacent markets, evidenced by strong first quarter bookings. Additionally,

---

[107] Michael Schroeder, *"Pension Agency Braces for Car Trouble --- As Auto-Industry Funds for Retired Workers Run Short Government Could Inherit Plan*, The Wall Street Journal, April 5, 2005, attached hereto as Exhibit DD.

[108] *Delphi Taps Rothschild as Adviser*, Reuters News, May 11, 2005, attached hereto as Exhibit EE.

> 64 percent of Delphi's first quarter bookings were from non-GM customers – further proof that our diversification efforts are working."

226.    On May 17, 2005, Collins & Aikman, another Michigan-based automotive supplier, filed for Chapter 11 bankruptcy protection.[109]

227.    That same day S&P downgraded Delphi's debt rating into lower junk status, and in the days that followed, Moody's Investor Services ("Moody's") and Fitch downgraded Delphi's debt rating to "worse junk."

228.    On June 8, 2005, Delphi confirmed, in its Form 8-K, that it intended to issue restated financial statements and become current in its periodic reporting obligations on or before June 30, 2005. The Company noted that there were inaccuracies in previously disclosed non-GAAP measures of Delphi's net liquidity. Following its review, the Audit Committee accepted the resignations of the Company's Treasurer, Pam Geller and of John Blahnik, its former Vice President of Treasury, Mergers & Acquisitions.

229.    On June 14, 2005, Delphi reached an agreement with its lenders to amend certain terms of its existing $1.5 billion five-year revolving credit facility. As a result of the refinancing, Delphi replaced its previous $3.0 billion revolving credit facility with $2.8 billion of available credit. Also, on June 14, 2005, Delphi contributed $475 million to its U.S. pension plans, bringing the total contributions for the quarter to $625 million and fulfilling Delphi's 2005 minimum pension funding requirements. Current Report (Form 8-K) (June 14, 2005).

230.    On June 22, 2005, Delphi issued a press release in which it declared a quarterly dividend of $0.015 per share. The dividend was lower than the previous quarterly dividend of $0.03 per share, which was declared in January, 2005. The Company stated:

> The Board determined that the reduction of the dividend is the prudent course of action at this time given the significant challenges facing the industry, including the reduction and continued uncertainty of U.S. production volumes from Delphi's largest customer.

---

[109] Shawn Langlois, *Collins & Aikman Files for Bankruptcy*, MarketWatch, May 17, 2005, attached hereto as Exhibit FF.

Defendant Battenberg stated:

> This decision provides further evidence of Delphi's commitment to
> maintaining and conserving liquidity. Last week, Delphi announced the
> completion of a $2.8 billion refinancing plan designed to provide the
> company continued access to long-term liquidity.[110]

231.    The Company also reported on May 13, 2005, in its Form 8-K, that the Board of

Directors of Delphi had named Robert S. "Steve" Miller as the Company's new Chairman and

CEO, effective July 1, 2005.

232.    On June 30, 2005, Delphi filed the Restatement (as defined in ¶ 147 above), as

well as Form 10-Q/A amended Quarterly Reports for the three month periods ending March 31,

2004 and June 30, 2004, in which it restated its financial statements for those periods. In its

Restatement, Delphi again admitted that its past years' financial statements were unreliable,

stating:

> Delphi is the subject of an ongoing investigation by the Staff of the
> Securities Exchange Commission ("SEC") and other federal authorities
> involving Delphi's accounting for and disclosure of a number of
> transactions. The transactions include rebates or other lump-sum payments
> received from suppliers, certain off-balance sheet financings of indirect
> materials and inventory, and the payment in 2000 of $237 million in cash,
> and the subsequent receipt in 2001 of $85 million in credits, as a result of
> certain settlements between Delphi and its former parent company,
> General Motors. Delphi's Audit Committee has completed its internal
> investigation of these transactions and concluded that many were
> accounted for improperly.

233.    Elaborating on its fraud, the Company admitted that it:

> ... inaccurately disclosed to credit ratings agencies, analysts and the Board
> of Directors the amount of sales of accounts receivable from 1999 until
> year-end 2004.... [W]e also determined that our disclosure of operating
> cash flow measured on a non-GAAP basis as set forth in our earnings
> releases for the first and second quarters of 2003 were inaccurate.
> Specifically, we overstated this measure of operating cash flow by $30

---

[110] Claudia Baucus, *Delphi Board Declares Quarterly Dividend*, Delphi Media Room, June 22,
2005, attached hereto as Exhibit GG.

> million in the first quarter of 2003 and understated the measure by the
> same amount in the second quarter of 2003.

234.    In the MD&A section of its 2004 10-K, Delphi further admitted that its fraudulent

transactions not only affected its financial statements for the years in which they happened, but

also for subsequent years as those transactions were wound-up:

> Subsequent to the issuance of Delphi's consolidated financial statements
> for the years ended December 31, 2003 and 2002, and following an
> internal investigation conducted by the Audit Committee of its Board of
> Directors, *Delphi management determined that its originally issued
> financial statements for those periods required restatement to correct the
> accounting for a number of transactions recorded in prior years.* Such
> transactions included (i) rebates, credits and other lump sum payments
> from suppliers; (ii) disposition of indirect material and other inventories;
> (iii) warranty settlements with Delphi's former parent company; and (iv)
> certain other transactions.

(Emphasis added.)

235.    The Company also admitted that its internal controls were fatally inadequate,

stating:

> Delphi is subject to stringent disclosure standards, and accounting,
> corporate governance and other securities regulations, including
> compliance with Section 404 of the Sarbanes-Oxley Act of 2002 ("Section
> 404"), as well as the listing standards of the New York Stock Exchange.
> Delphi management's assessment pursuant to Section 404 determined that
> Delphi had not maintained effective internal controls over financial
> reporting at December 31, 2004. In addition, management concluded that
> during such periods, Delphi's disclosure controls and procedures were also
> ineffective. Delphi has undertaken and is continuing to take actions to
> address material weaknesses in its internal controls over financial
> reporting and the deficiencies in its disclosure controls and procedures.

236.    The Restatement purports to correct dozens of false and misleading figures from

the Company's past filings. Among the categories Delphi restated in its Consolidated Statements

of Operations for the years ending December 31, 2002 and December 31, 2003 were: Net Sales,

Sales to GM and affiliates, sales to other customers, operating expenses, cost of sales, SG&A,

depreciation and amortization, operating income, interest expense, other income, income (loss)

59

before income tax, minority interest, and equity income, income tax benefit (expense), net income (loss), basic and diluted earnings (loss) per share.

237.    Among the categories in its Consolidated Balance Sheets for the year ending December 31, 2003, Delphi restated: cash and cash equivalents, accounts receivable (from GM and other customers), inventories (productive material, work-in-process and supplies, and finished goods), total assets, long-term assets (property, deferred income taxes, goodwill), intangible assets, and other long-term assets. Correspondingly, it restated its current liabilities (notes payable and long-term debt, accounts payable, accrued liabilities), total liabilities, long-term liabilities (long-term debt, post-retirement benefits other than pensions), minority interest, additional paid-in capital, retained earnings, minimum pension liability, accumulated comprehensive loss, and total stockholders' equity.

238.    The Restatement also restated the following metrics in its Consolidated Statements of Cash Flows for Fiscal Years 2002 and 2003: cash and cash equivalents at beginning of period, cash flows provided by (used in) operating activities, cash flows used in investing activities, cash flows provided by (used in) financing activities, net (decrease) increase in cash and cash equivalents and cash and cash equivalents at end of period.

239.    One June 30, 2005, in a press release filed with its Form 8-K, Delphi announced the completion of its financial restatement. The effects of the restatement reduced retained earnings as of Dec. 31, 2001 by $265 million, reduced 2002 net income by $24 million, and improved 2003 net loss by $46 million.

240.    On July 1, 2005, the law firm of Skadden, Arps, Slate, Meagher, & Flom, L.L.P. and Associates was retained by Delphi to assist in its restructuring efforts.

241.    On July 27, 2005, *The Detroit News* published a news article in which Miller reportedly stated:

> This town is in deep trouble...and I believe that General Motors Corp.'s troubles are more serious than Delphi's.

60

\*\*\*

> There is still a theoretical possibility of a [bankruptcy] filing...Delphi's situation is somewhat precarious. We have some time to do this, but we cannot go on indefinitely...

Miller reiterated that it was crucial that GM, the United Auto Workers ("UAW") union, and Delphi work together to reach concessions. "I don't expect our conversations will be easy because what we will be asking [the UAW] to do will go against grain of all they have achieved over the years..."[111]

242.    On August 5, 2005, Delphi filed a Form 8-K confirming that it initiated a draw down of $1.5 billion under its $1.8 billion revolving credit facility.

243.    On the same day, S&P lowered Delphi's credit rating to CCC-plus from B-plus, its senior unsecured rating to CCC-minus from B-minus, and its short-term rating to C from B-3. Fitch also downgraded Delphi's senior unsecured debt rating to CCC from B and the rating on its trust preferred securities to CCC-minus from CCC-plus.

244.    On August 8, 2005, Delphi's press release in its Form 8-K announced second quarter revenues of $7.0 billion and a GAAP net loss of $338 million or a loss of $0.60 per share, compared to second quarter 2004 GAAP net income of $143 million or earnings of $0.25 per share. Non-GM revenues were $3.6 billion, representing 51 percent of total revenues.

245.    In that same announcement Miller stated:

> While we are pleased with our regional performance, it is apparent that we must immediately address the U.S. legacy issues. We are engaging our major unions in discussions to seek modifications required to implement our restructuring plan, as well as with GM to seek related financial support. As we announced on Aug. 5, we drew $1.5 billion under our revolving credit facility to make additional cash readily available to finance our operations to the extent required during our restructuring discussions with our unions and GM. If these discussions do not lead to the implementation of a plan that addresses our existing legacy liabilities

---

[111] Daniel Howes, *Delphi's Mr. Fix-It Embraces Challenge; Scaremonger Or Realist, Supplier's New Chief Knows Well The Lost Wars Of Business*, The Detroit News, July 27, 2005, attached hereto as Exhibit HH.

> and the resulting high cost of U.S. operations, we will consider other
> strategic alternatives, ***including chapter 11 reorganization for our U.S.
> businesses***, to preserve the value of the company and complete our
> transformation plan.

(Emphasis added).

246.     On August 9, 2005, *Reuters News* reported Miller had stated in a phone interview

that: "[i]f all we got was some help from GM, but no help from the UAW, that would not be

sufficient.... We need both of them to participate in this restructuring." Miller also commented

that October 17, 2005, the effective date of The Bankruptcy Abuse Prevention and Consumer

Protection Act of 2005, was a compelling date for airlines that "are teetering on the edge."

Miller summarized the situation by saying: "The question, of course, is whether they [GM and

the UAW] are better off coming to an accommodation with us on a timely basis, an out-of-court

basis, or suffer the consequences of a bankruptcy filing by Delphi and deal with it that

way...."[112]

247.     On August 16, 2005, it was reported that at a previous day media reception Miller

stated: "Plant closures are a theoretic prospect.... Some plants, we may not be able to sustain."

He also reiterated that if an agreement could not be reached between GM and the UAW the

Company could file for bankruptcy protection.[113]

248.     Miller presented Delphi's demands to UAW President Ron Gettelfinger on

August 3, 2005, which included wage cuts of at least $5 an hour, benefit reductions and work

rule changes that totaled approximately $2.5 billion in givebacks. The demands were not well

received by union leaders. "The UAW leadership says it will not be strong-armed into

concessions. The union says it will consider only solutions that do not require it to reopen its

national contract and that blue-collar workers should not be the only ones asked to make

---

[112] David Bailey, *Interview – Delphi needs GM, UAW Help To Avoid Chapter 11 – CEO*, Reuters
News, August 9, 2005, attached hereto as Exhibit JJ.
[113] Ed Garsten, *Delphi CEO Warns Of Plant Closings; Auto Supply Company Says Short Of A
Deal With Unions, It May Be Forced To File Bankruptcy*, The Detroit News, August 16,
2005, attached hereto as Exhibit KK.

sacrifices." The UAW President also revealed that few substantive talks had taken place with Delphi regarding a cost-cutting agreement: "I'm not sure there's been that much discussion going on at this point.... We will analyze it.... But I am not sure if he [Miller] has overplayed his hand here."[114]

249.    On August 30, 2005, it was reported in the *Detroit Free Press* that the UAW had informed Delphi that "the union cannot and will not meet their demands." Reportedly, in a newsletter to union members the UAW stated that "Shoemaker [UAW Vice President] doesn't believe that the union and Delphi will be able to reach agreement in the timetable that Delphi has given.... There is no way that the UAW can agree to all of Delphi's demands and it may be better to let Delphi file for bankruptcy."[115]

250.    When asked by reporters whether the UAW union was trying to conclude a deal by October 17, Shoemaker said "not really.... I don't think that has anything to do with our negotiations."[116]

251.    In an interview at Delphi headquarters, Miller stated: "Not going into Chapter 11 is much preferred." However, other reports suggested that Delphi had been trying to find participants for debtor-in-possession financing. Miller declined to discuss the lender issue:

> I won't discuss our financing activities...But I have been pretty blunt in saying, however, that if we choose the Chapter 11 process we would be very well organized, very well financed and to that end we are doing all necessary contingency planning. But we are also spending enormous time trying to find an out-of-court solution with GM and the unions.[117]

---

[114] *Id.*

[115] Michael Ellis, *UAW Will Not Bend For GM And Delphi; Union Says It Can't Agree To Companies' Concessions*, Detroit Free Press, August 30, 2005, attached hereto as Exhibit LL.

[116] Christine Tierney, *Union In No Hurry To Strike Delphi Deal; Auto Parts Firm Strives For Cost-Savings Contract Before New Bankruptcy Law Takes Effect Oct. 17*, The Detroit News, September 9, 2005, attached hereto as Exhibit MM.

[117] Jeffrey McCracken, *Delphi CEO Would Rather Fix Company's Woes Out of Court*, The Wall Street Journal, September 21, 2005, attached hereto as Exhibit NN.

252.    On September 28, 2005, *Bloomberg News* reported that Delphi requested an aid package from GM worth $6 billion to help Delphi avoid bankruptcy.[118]

253.    On that same day, *The Detroit News* reported that Delphi had hired bankruptcy lawyer Jack Butler, who was best known as lead counsel for Kmart Corporation when it filed for Chapter 11 in 2002. "Butler, a corporate restructuring expert with the law firm Skadden, Arps, Slate, Meagher & Flom, was retained by Delphi to analyze legal options available to the struggling auto parts maker." Miller added: "Butler has been advising me on my strategic alternatives.... There are two paths we can take. One is not to file, and one is to file. When you are in the red zone, you need to know all the ins and outs of Chapter 11."[119]

254.    Delphi then hired David Sherbin, a former executive with Federal-Mogul Corp. as its chief attorney. Miller was quoted as saying that Delphi needed more legal help as it tried to win support from GM and the UAW union.[120]

255.    On October 5, 2005, three days before Delphi filed for bankruptcy, State Street initiated a program to sell the Delphi Common Stock held in the Plans.[121]

256.    On October 7, 2005, reports began to emerge that negotiation talks had stalled between Delphi, GM and the UAW union. Delphi stock plunged on speculation that it would file for bankruptcy. Shares fell to a record low, closing at $1.12 per share.

257.    On October 8, 2005, Delphi filed for Chapter 11 bankruptcy protection. In a press release, filed with its Form 8-K, Miller stated:

---

[118] John Lippert and Jeff Bennett, *Delphi Seeks $6 Billion to Avoid Bankruptcy, People Say*, Bloomberg News, September 28, 2005, attached hereto as Exhibit OO.

[119] Bill Vlasic, *Auto supplier hires bankruptcy attorney in case it can't negotiate cuts in wages, benefits*, The Detroit News, September 28, 2005, attached hereto as Exhibit PP.

[120] Michael Ellis, *Sherbin will head Delphi's legal effort*, Detroit Free Press, October 4, 2005, attached hereto as Exhibit QQ.

[121] *See* Delphi Memorandum to Employee Benefit Committee, Exhibit AA, at 104(b)-000419; Delphi Mechatronic Systems Savings-Stock Purchase Program for Salaried Employees in the United States Prospectus Update, dated October 12, 2005 (the "Mechatronic Prospectus Update"), attached hereto as Exhibit RR, at 104(b)-001096-001097; ASEC Manufacturing Savings Plan Prospectus Update, dated October 12, 2005 (the "ASEC Prospectus Update"), attached hereto as Exhibit SS, at 104(b)-000794-96.

> We simply cannot afford to continue to be encumbered by high legacy
> issues and burdensome restrictions under current labor agreements that
> impair our ability to compete. We must also realign our global product
> portfolio and manufacturing footprint to preserve our core businesses. This
> will require a substantial segment of our U.S. manufacturing operations to
> be divested, consolidated or wound-down through the chapter 11 process.
> We believe the chapter 11 process will provide the flexibility to address
> our legacy issues and allow us to take advantage of the fundamental
> strength of our businesses.

258.    Participants in the ASEC and Mechatronic Plans were notified on October 12,

2005 that State Street "may be required by the federal pension law to sell the company stock held

in any Company Stock Fund in which you invest if State Street determines that it is *inconsistent*

*with the federal pension law for the Delphi Common Stock Fund to continue to be invested in*

*company stock.*"[122]

259.    During the week of October 24, 2005, the Hourly and Salaried Plans' participants

were notified that State Street had commenced a program to sell Delphi Common stock in the

Plans as described above at ¶¶ 83, 255.  Participants in the Plans were also advised that, upon

completion of the sales it was expected that the Delphi Common Stock Fund would be

discontinued and that participants would be asked to exchange any remaining balances in the

Fund for other investment options.[123]

260.    On October 27, 2005, State Street advised Delphi that it had completed the "sell

program" with the exception of a few shares it had held to honor participant requests for share

equivalent distributions.   State Street and GMIMCo subsequently recommended that Delphi

discontinue the Delphi Common Stock Fund.[124]

261.    On January 31, 2006, Delphi released its Form 8-K for the period ending January

26, 2006, in which it reported impairment charges of approximately $952 million (pre-tax).

---

[122] *See* Mechatronic Prospectus Update, Exhibit QQ, at 104(b)-9001096; ASEC Prospectus
Update, Exhibit RR, at 104(b)-00094 (emphasis added).

[123] *See* Delphi Memorandum to Employee Benefits Committee, Exhibit AA, at 104(b)-000419.

[124] *Id.* at 104(b)-000420.

Delphi further explained that the substantial impairment charges could be attributed to its
substantial decline in profitability during 2005. Delphi stated that its deteriorated financial
performance resulting in net losses in 2005 was due in large part to:

        a.      GM's reduced production;

        b.      rising commodity prices;

        c.      high-cost of labor; and

        d.      restrictive agreements with labor unions.

## VIII.  FALSE AND MISLEADING STATEMENTS TO PLAN FIDUCIARIES

262.    In regular press releases and in periodic filings with the SEC, Delphi, the Director
Defendants and Executive Committee Defendants collectively made hundreds of materially false
and misleading statements to the investing public, including the other plan fiduciaries, and did
not fairly present in all material respects the financial condition, results of operation and cash
flows of Delphi during the Class Period.

263.    Periodically during the Class Period Delphi, as the Plan Administrator,
disseminated information to the participants of the Plans including Summary Plan Descriptions
("SPD") for the Plans. The SPDs and, on information and belief, other information disseminated
by Delphi to the participants of the Plan incorporated by reference the SEC filings, which
contained misleading information regarding the financial condition of the Delphi and its results
of operations.

264.    As set forth chronologically below, these statements were false and misleading
not only because they misstated Delphi's financial results, but also because they provided wholly
false explanations to support the Company's improperly reported results, and failed to disclose
that Delphi was engaging in a set of fraudulent accounting practices that rendered its financial
reporting wholly unreliable.

A.    **Year-End 1999**

265.    Delphi filed its Form 10-K for the year ended December 31, 1999 ( "1999 10-K"),
signed by Defendant Battenberg, on February 9, 2000. The 1999 10-K reported operating
income of $1.7 billion and net income of $1 billion based on total net sales of $29 billion. In
addition, the 1999 10-K reported:

a.    Non-GM net sales of $6.9 billion;

b.    Net cash used in operating activities of $1.2 billion;

c.    Net inventories of $1.7 billion excluding inventories acquired through
acquisition;

d.    Notes payable and current portion of long-term debt of $117 million;

e.    Total current liabilities of $6.8 billion;

f.    Cash flow provided by financing activities of $2.9 billion; and

g.    Total operating expenses of $27.5 billion.

266.    The statements set forth in ¶ 265 above, were each false and misleading when
made because, as described above, Delphi's reported financial results violated GAAP and
materially overstated net income, operating income, earnings per share, cash flow from operating
activities, total net sales and non-GM net sales, and materially understated inventory, notes
payable and current portion of long-term debt, total current liabilities, total expenses, and cash
flow from financing activities.

267.    Specifically, net income, operating income and earnings per share were materially
overstated by, among other things, (i) improper accounting for rebates, credits and other lump
sum payments from third-party vendors (*see* Section VII.B.3, *supra*); (ii) disguising financing
transactions as sales of indirect materials (*see* Section VII.B.1, *supra*), and (iii) failure to record
obligations and failure to recognize adjustments and accruals in the proper period (*see* Section
VII.B.4, *supra*).

67

268.    Further, by disguising financing transactions as sales of indirect materials (*see* VII.B.1, *supra*), Delphi distorted its financial results as follows:

  a. Materially overstated total net sales and non-GM net sales;

  b. Materially overstated cash flow from operations;

  c. Materially understated cash flow from financing;

  d. Materially understated inventory;

  e. Materially understated current liabilities; and

  f. Materially understated notes payable and current portion of long-term debt.

**B.    First Quarter 2000**

269.    On April 12, 2000, Delphi announced its financial results for the quarter ended March 31, 2000 ("1Q 2000 Press Release"), "Delphi Automotive Systems Earnings Increase 13 Percent To $322 Million in First Quarter 2000, Sales to Customers Other than GM Soar a Record 30 Percent – Highlighting Success of Customer Diversification Efforts." The 1Q 2000 Press Release reported that "[o]n a pro forma basis, earnings per share for the period were $0.57, compared to $0.50 per share in the first quarter last year." Delphi boasted that "operating cash flow in the first quarter was $495 million, building upon Delphi's strong 1999 performance in this key financial measure" – a tune Delphi continued to sing in every press release during the Class Period.

270.    Delphi also filed its Form 10-Q for the quarter ended March 31, 2000 ("1Q 2000 10-Q") on April 12, 2000, reiterating the financial results reported in the 1Q 2000 Press Release. The 1Q 2000 10-Q reported operating income of $466 million and net income of $290 million based on total net sales of $7.8 billion. In addition, the 1Q 2000 10-Q reported:

  a. Non-GM net sales of $2.2 billion;

  b. Net cash used in operating activities of $520 million;

68

    c.      Inventories, net of $1.8 billion, which represented a $71 million decline in net inventories during the quarter excluding inventories acquired through acquisition;

    d.      Notes payable and current portion of long-term debt of $1.3 billion;

    e.      Total current liabilities of $6.9 billion;

    f.      Cash flow from financing activities of $1.1 billion; and

    g.      Total operating expenses of $7.3 billion.

271.   During an earnings conference call Delphi hosted on April 12, 2000, to discuss its financial results for the first quarter ("1Q 2000 Conference Call"), Defendant Dawes reiterated the Company's financial results as disclosed in the 1Q 2000 Press Release and 1Q 2000 10-Q. Defendant Dawes also praised the Company's first quarter performance, stating:

> [W]e feel very good about Delphi's future from a number of standpoints. We've now reported five quarters in a row of solid earnings results, solid cash flow, you know we're establishing a record of consistency as we highlighted at the top. So the basic fundamentals of the business, we think we've proven, are running very well.

272.   The statements set forth in ¶¶ 269-271 above were each materially false and misleading when made because, as described above, Delphi's reported financial results violated GAAP and materially overstated net income, operating income, earnings per share, cash flow from operating activities, total net sales and non-GM net sales, and materially understated inventory, notes payable and current portion of long-term debt, total current liabilities, total expenses, and cash flow from financing activities.

273.   Specifically, net income, operating income and earnings per share were materially overstated by, among other things, (i) improper accounting for rebates, credits and other lump sum payments from third-party vendors (*see* Section VII.B.3.a-b, *supra*); (ii) disguising financing transactions as sales of inventory and indirect materials (*see* Section VII.B.1, *supra*),

69

and (iii) failure to record obligations and to recognize adjustments and accruals in the proper period (*see* Section VII.B.4, *supra*).

274.    Further, by disguising financing transactions as sales of inventory and indirect materials (*see* Section VII.B.21, *supra*), Delphi distorted its financial results as follows:

  a.    Materially overstated total net sales and non-GM net sales;

  b.    Materially overstated cash flow from operations;

  c.    Materially understated cash flow from financing;

  d.    Materially understated inventory;

  e.    Materially understated current liabilities; and

  f.    Materially understated notes payable and current portion of long-term debt.

## C.    Second Quarter 2000

275.    On July 17, 2000, Delphi released its earnings for the quarter ending June 30, 2000 ("2Q 2000 Press Release"), which amounted to "$424 million, or $0.75 per share, in line with analyst consensus estimates." The release stated that "strong cash flow from operations generated $455 million in the second quarter" and that:

> For the first half of the year Delphi is on track to meet 2000 financial targets. Earnings for the first six months of 2000 rose 10 percent, excluding a one-time charge of $32 million in the first quarter, versus 1999 levels. Operating cash flow totaled $950 million, well on track for meeting the $1.5-$2.0 billion 2000 target.

276.    Defendant Dawes boasted in the 2Q 2000 Press Release that "[s]tructural cost reductions helped us achieve year-over-year net income improvements in every quarter since our independence. In addition, new business bookings in excess of $5 billion indicate top-line growth and margin improvements in future years."

277.    That same day, Delphi also filed its quarterly report with the SEC for the quarter ended June 30, 2000 ("2Q 2000 10-Q"). In its 2Q 2000 10-Q, Delphi reported operating income

70

of $683 million and net income of $424 million, and boasted in the MD&A section that these earnings represented a 7.6% increase compared to the same reporting period in the previous year. The 2Q 2000 10-Q also reported operating income of $1.15 billion and net income of $714 million for the six months ended June 30, 2000.

    278.    Delphi further reported in its 2Q 2000 10-Q:

        a.    Total net sales of $7.8 billion;

        b.    Non-GM net sales of $2.2 billion;

        c.    Net cash used in operating activities of $266 million;

        d.    Inventories, net of $1.8 billion, which represented a $66 million decline in net inventories during the quarter, excluding inventories acquired through acquisition;

        e.    Notes payable and current portion of long-term debt of $1.4 billion;

        f.    Total current liabilities of $7.3 billion;

        g.    Net cash provided by financing activities of $996 million; and

        h.    Total operating expenses of $7.1 billion.

    279.    Delphi hosted an earnings conference call on July 17, 2000 to discuss the Company's financial results for the second quarter ("2Q 2000 Conference Call"). During the 2Q 2000 Conference Call, Defendant Dawes reiterated the financial results reported in the 2Q 2000 Press Release and the 2Q 2000 10-Q, and commented that "cash flow remain[ed] quite strong" and that earnings per share were "up exactly 10 percent over the first sixth months of the year."

    280.    The statements set forth in ¶¶ 275-279 above, were each false and misleading when made because, as described above, Delphi's reported financial results violated GAAP and materially overstated net income, operating income, earnings per share, cash flow from operating activities, total net sales and non-GM net sales, and materially understated inventory, notes

71

payable and current portion of long-term debt, total current liabilities, total expenses, and cash flow from financing activities.

281.    Specifically, net income, operating income and earnings per share were materially overstated by, among other things, (i) improper accounting for rebates, credits and other lump sum payments from third-party vendors (*see* Section VII.B.3.a-b, *supra*); (ii) disguising financing transactions as sales of inventory and indirect materials (*see* Section VII.B.1, *supra*), and (iii) failure to record obligations and failure to recognize adjustments and accruals in the proper period (*see* Section VII.B.4, *supra*).

282.    Further, by disguising financing transactions as sales of inventory and indirect materials (*see* Section VII.B.3, *supra*), Delphi distorted its financial results as follows:

        a.    Materially overstated total net sales and non-GM net sales;

        b.    Materially overstated cash flow from operating activities;

        c.    Materially understated cash flow from financing;

        d.    Materially understated inventory;

        e.    Materially understated current liabilities; and

        f.    Materially understated notes payable and current portion of long-term debt.

**D.    Third Quarter 2000**

283.    On October 11, 2000, Delphi issued an earnings release headlined "Delphi Earnings Increase 9 Percent to $148 Million in Third Quarter – Year-over-Year Margin Improvement Every Quarter Since IPO – Mobile MultiMedia Product Line Sales up 777% Over Prior Year" and announced its financial results for the quarter ended September 30, 2000 ("3Q 2000 Press Release"). Delphi reported third quarter earnings of "$148 million, or $0.26 earnings per share, in line with analyst consensus estimates. This represents a 9 percent increase in earnings over the same period last year."

72

284.    Included in the 3Q 2000 Press Release were Defendant Battenberg's comments on the Company's positive performance:

> Today's results mark the seventh consecutive quarter since our IPO that we have achieved solid financial performance. We continue to deliver on the targets established at our independence to produce long-term value for our shareholders. We remain focused on targets of 5 percent net income margin by the end of 2002, year-over-year non-GM sales growth of more than 10 percent and return on net assets of 12.5 percent, while generating operating cash flow of $1.5-2.0 billion per year.

285.    Additionally on October 11, 2000, Delphi filed its Form 10-Q for the quarter ended September 30, 2000 ("3Q 2000 10-Q"). The financial results reported in the 3Q 2000 Press Release were reiterated in the 3Q 2000 10-Q and it reported operating income of $230 million and net income of $148 million. The MD&A section of the 3Q 2000 10-Q, stated that "[n]et income totaled $148 million for the third quarter of 2000 compared to $136 million for the third quarter of 1999. This represents a 9% increase over 1999." For the nine months ended September 30, 2000, Delphi reported in its 3Q 2000 10-Q operating income of $1.38 billion and net income of $862 million. In addition, in its 3Q 2000 10-Q, Delphi reported:

a.    Total net sales of $6.6 billion and non-GM net sales of $2.0 billion;

b.    Net cash provided by operating activities of $226 million;

c.    Inventories, net of $2.0 billion;

d.    Notes payable and current portion of long-term debt of $1.2 billion;

e.    Total current liabilities of $7.0 billion;

f.    Net cash provided by financing activities of $789 million;

g.    Total operating expenses of $6.4 billion; and

h.    Post-retirement benefits other than pensions of $4.4 billion.

286.    The statements set forth in ¶¶ 283-285 above, were each false and misleading when made because, as described above, Delphi's reported financial results violated GAAP and materially overstated net income, operating income, earnings per share, cash flow from operating

activities, total net sales and non-GM net sales, and materially understated inventory, notes payable and current portion of long-term debt, total current liabilities, total expenses, cash flow from financing activities and post-retirement benefits other than pensions.

287.    Specifically, net income, operating income and earnings per share were materially overstated by, among other things, (i) improper accounting for rebates, credits and other lump sum payments from third-party vendors (*see* Section VII.B.3.a-b, *supra*); (ii) disguising financing transactions as sales of inventory and indirect materials (*see* Section VII.B.1, *supra*), (iii) failure to record obligations and failure to recognize adjustments and accruals in the proper period (*see* Section VII.B.4, *supra*) and (iv) improper classification and deferral of $202 million of expenses related to warranty obligations to GM (*see* Section VII.B.2.a, *supra*).

288.    Further, by disguising financing transactions as sales of inventory and indirect materials (*see* Section VII.B.1, *supra*), Delphi distorted its financial results as follows:

        a.      Materially overstated total net sales and non-GM net sales;

        b.      Materially overstated cash flow from operating activities;

        c.      Materially understated cash flow from financing;

        d.      Materially understated inventory;

        e.      Materially understated notes payable and current portion of long-term debt; and

        f.      Materially understated total current liabilities.

289.    In addition, by improperly classifying a $202 million warranty settlement payment to GM as an adjustment to post-retirement obligations, Delphi materially understated its post-retirement benefit obligation and warranty expenses.

**E.    Fourth Quarter and Year-End 2000**

290.    Delphi issued an earnings release, announcing its financial results for the quarter and year ended December 31, 2000 ("Year-End 2000 Press Release") on January 17, 2000. The

74

Year-End 2000 Press Release announced: "Delphi Earns $200 Million on Revenues of $6.9 Billion in Fourth Quarter of 2000 – Sales to Non-GM Customers Hits Record $8.5 Billion in 2000 – Full Year Operating Cash Flow Exceeds $1.6 Billion." In its Year-End 2000 Press Release, Delphi announced fourth quarter earnings of "$200 million, or $0.36 EPS, on sales of $6.9 billion, exceeding industry analysts' consensus estimates of $0.32." For the year, Delphi reported $1.1 billion in net income, $1.6 billion in operating cash flow, and $1.94 earnings per share.

291.    In the Year-End 2000 Press Release, Defendant Battenberg touted management's agile response to adverse market conditions stating: "[w]e were successful in moderating the impact of the rapid fourth quarter order decline through aggressive inventory management, workforce adjustments and other cost reduction initiatives."

292.    On February 8, 2001, Delphi filed on Form 10-K405, its annual report for Fiscal Year 2000 ("2000 10-K"), signed by, among others, Defendants Battenberg and Dawes. The 2000 10-K reiterated the Company's financial results reported in the Year-End 2000 Press Release, including that, for the year ended December 31, 2000, operating income was $1.7 billion and net income was $1.1 billion on total net sales of $29.1 billion.

293.    In addition, in its 2000 10-K, Delphi reported:

      a.      Non-GM net sales of $8.5 billion;

      b.      Net cash provided by operating activities of $268 million;

      c.      Inventories, net of $1.7 billion;

      d.      Notes payable and current portion of long-term debt of $1.6 billion;

      e.      Total current liabilities of $6.2 billion;

      f.      Net cash provided by financing activities of $1.1 billion;

      g.      Total operating expenses of $27.4 billion;

      h.      Post-retirement benefits other than pensions of $4.6 billion; and

        i.      Non-GM accounts receivable of $2.1 billion.

294.    In addition, the MD&A section of the 2000 10-K stated with respect to Delphi's 2000 net income:

> Net income for 2000 totaled $1,062 million compared to $1,083 million for 1999. Excluding [one-time charges] our net income margin of 3.8% expanded from our 1999 margin of 3.7% as a result of ***aggressive inventory management***, implementation of lean manufacturing initiatives and other cost reduction initiatives. (Emphasis added.)

295.    The statements set forth in ¶¶ 290-294 above, were each false and misleading when made because, as described above, Delphi's reported financial results violated GAAP and materially overstated net income, operating income, earnings per share, cash flow from operating activities, total net sales, non-GM net sales and non-GM accounts receivable, and materially understated inventory, notes payable and current portion of long-term debt, total current liabilities, total expenses, net cash provided by financing activities and post-retirement benefits other than pensions.

296.    Specifically, net income, operating income and earnings per share were materially overstated by, among other things, Delphi's (i) disguising financing transactions as sales of inventory and indirect materials (*see* Section VII.B.1, *supra*); (ii) improper accounting for rebates, credits and other lump sum payments from third-party vendors, including without limitation improper recognition of $16 million in credits received from an unnamed technology services provider (*see* Section VII.B.3.a-b, *supra*); (iii) failure to record obligations and failure to recognize adjustments and accruals in the proper period (*see* Section VII.B.4, *supra*); and (iv) improper classification and deferral of $202 million of expenses related to warranty obligations to GM (*see* Section VII.B.2.a, supra).

297.    Further, by disguising financing transactions as sales of inventory and indirect materials (*see* Section VII.B.1, *supra*), Delphi distorted its financial results by:

        a.      Materially overstating total net sales and non-GM net sales;

b.      Materially overstating cash flow from operating activities;

c.      Materially overstating accounts receivable;

d.      Materially understating cash flow from financing;

e.      Materially understating inventories, net;

f.      Materially understating notes payable and current portion of long-term debt; and

g.      Materially understated total current liabilities.

298.    In addition, by improperly classifying a $202 million warranty settlement payment to GM as an adjustment to post-retirement obligations, Delphi materially understated its post-retirement benefit obligation.

299.    Specifically, based on the Restatement, the Company's originally reported net income for Fiscal Year 2000 was overstated by *$245 million, or 30%*, and its GAAP earnings per share on a fully diluted basis were overstated by *$0.43 or 30%.*

300.    Despite widespread difficulties within the automotive sector, Delphi's reported year-end financial results resulted in the Company's stock price remaining firmly within the (artificially inflated) range of $14.00 to $15.00.

**F.    Mid-Quarter Guidance – March 29, 2001**

301.    On March 29, 2001, Delphi announced a major restructuring plan, giving downward guidance for the first quarter of 2001 that included a $400 million charge against earnings. However, in the same announcement, the Company touted other "separate" initiatives it claimed would increase productivity. Specifically, it highlighted the following efforts:

> - Utilizing web-based systems for procurement, logistics and inventory management to obtain greater savings in inventory and production support; and
>
> -Eliminating warehouses and other inventory storage and distribution points for greater value chain efficiency.

77

302.    Defendant Dawes added that "[t]he actions outlined today should improve our ability to rebound decisively in more favorable automotive market conditions."

303.    Delphi's announcement was false and misleading when made because it failed to state that the Company's restructuring charge would be applied against earnings that were materially overstated in violation of GAAP by, among other things, Delphi's (i) improper accounting for rebates, credits and other lump sum payments from third-party vendors (*see* Section VII.B.3.a-b, *supra*); (ii) disguising financing transactions as sales of inventory and indirect materials (see Section VII.B.1, *supra*); (iii) failure to record obligations and failure to recognize adjustments and accruals in the proper period (see Section VII.B.4, *supra*); (iv) improper classification and deferral of $202 million of expenses related to warranty obligations to GM (see Section VII.B.2.a, *supra*); and (v) improperly recognizing warranty credits received from GM as a reduction to expenses (see Section VII.B.2.b *supra*).

304.    In addition, Delphi's announcement was false and misleading because it failed to disclose that the Company's reduced inventories and costs associated with inventories were the result of the Company's improper accounting for financing transactions as sales of inventory and indirect materials, in violation of GAAP (*see* Section VII.B.1 *supra*).

G.    **First Quarter 2001**

305.    On April 19, 2001, Delphi issued an earnings release, announcing its financial results for the quarter ended March 31, 2001 ("1Q 2001 Press Release"), reporting "$2 million of operating income and a consolidated net loss of $25 million, or $0.04 loss per share, excluding the impact of global restructuring and impairment charges announced on March 29, 2001.... Analyst consensus for the quarter as reported on First Call was $0.05 loss per share."

306.    In the 1Q 2001 Press Release, Defendant Dawes stated that "[i]n spite of breakeven operating results, Delphi generated $102 million of operating cash flow during the period."

78

307.    On April 19, 2001, Delphi also filed its Form 10-Q for the quarter ended March 31, 2001 ("1Q 2001 10-Q"). In its 1Q 2001 10-Q, Delphi reiterated the financial results reported in the 1Q 2001 Press Release, and stated that "[i]n the opinion of management, all adjustments, consisting of only normal recurring items, which are necessary for a fair presentation have been included."

308.    In addition, the 1Q 2001 10-Q reported:

    a.    Net sales of $6.5 billion and non-GM sales of $2.2 billion;

    b.    Operating loss of $597 million;

    c.    Total operating expenses of $7.1 billion;

    d.    Non-GM accounts receivable of $2.0 billion;

    e.    Inventories, net of $1.7 billion;

    f.    Notes payable and current portion of long-term debt of $1.5 billion;

    g.    Post-retirement benefits other than pensions of $4.7 billion;

    h.    Total current liabilities of $6.5 billion; and

    i.    Net cash provided by financing activities of $146 million.

309.    In the Commitments and Contingencies Section of the 1Q 2001 10-Q, Delphi discussed possible future warranty claims against the Company and noted that "[w]e settled certain pre-Separation warranty claims with General Motors . . . in September 2000."

310.    The statements set forth in ¶¶ 305-309 above, were each false and misleading when made because, as described above, Delphi's reported financial results violated GAAP and materially overstated net income, earnings per share, operating income, total net sales, non-GM net sales and non-GM accounts receivable, and materially understated inventory, notes payable and current portion of long-term debt, total current liabilities, total expenses, cash flow from financing activities and post-retirement benefits other than pensions.

311.    Specifically, net income, earnings per share and operating income were materially overstated by, among other things, Delphi's (i) improper accounting for rebates, credits and other lump sum payments from third-party vendors (*see* Section VII.B.3.a-b, *supra*); (ii) disguising financing transactions as sales of inventory and indirect materials (*see* Section VII.B.1, *supra*); (iii) failure to record obligations and failure to recognize adjustments and accruals in the proper period (*see* Section VII.B.4, *supra*); (iv) improper classification and deferral of $202 million of expenses related to warranty obligations to GM (*see* Section VII.B.2.a, *supra*); and (v) improperly recognizing warranty credits received from GM as a reduction to expenses (*see* Section VII.B.2.b, *supra*).

312.    By disguising financing transactions as sales of inventory and indirect materials (*see* Section VII.B.1, *supra*), Delphi distorted its financial results as follows:

        a.     Materially overstated total net sales and non-GM net sales;

        b.     Materially overstated accounts receivable;

        c.     Materially understated cash flow from financing;

        d.     Materially understated inventory;

        e.     Materially understated current liabilities; and

        f.     Materially understated notes payable and current portion of long-term debt.

313.    Delphi's statement that it settled pre-separation warranty claims with GM in September 2000 was false and misleading because it failed to disclose that Delphi had improperly classified and accounted for the $202 million payment to settle these warranty claims as an adjustment to post-retirement obligations in violation of GAAP. Moreover, Delphi failed to disclose that by improperly classifying the warranty settlement payment to GM as an adjustment to post-retirement obligations, Delphi materially understated its post-retirement benefit obligation.

80

314.   In its 1Q 2001 Press Release, the Company reported net liquidity at March 31, 2001 of $(2.7) billion. This was false and misleading because, as Delphi has since admitted, it did not disclose certain factoring facilities as sources of short-term liquidity in its non-GAAP measures of net liquidity. Specifically, in the 1Q 2001 Press Release, it understated its negative liquidity by $334 million or 11.1%.

**H.   Second Quarter 2001**

315.   On July 18, 2001, Delphi issued an earnings release, announcing its financial results for the quarter ended June 30, 2001 (the "2Q 2001 Press Release"). The 2Q 2001 Press Release reported "second quarter net income of $164 million, or $0.29 per share, in line with First Call consensus estimates."

316.   On July 18, 2001, Delphi filed its Form 10-Q for the quarter ended June 30, 2001 ("2Q 2001 10-Q"). The 2Q 2001 10-Q reiterated the financial results reported in the 2Q 2001 Press Release. The 2Q 2001 10-Q also reported a net loss of $265 million for the six months ended June 30, 2001.

317.   In addition, the 2Q 2001 10-Q reported:

    a.    Total net sales of $6.9 billion;

    b.    Non-GM net sales of $2.2 billion;

    c.    Operating income of $303 million;

    d.    Total operating expenses of $6.6 billion;

    e.    Inventories, net of $1.8 billion;

    f.    Notes payable and current portion of long-term debt of $1.3 billion;

    g.    Total current liabilities of $6.5 billion;

    h.    Post-retirement benefits other than pensions of $4.8 billion; and

    i.    Net cash provided by financing activities of $121 million.

318.   In the MD&A section of the 2Q 2001 10-Q, Delphi noted that:

81

> [N]et cash provided by financing activities was $0.1 billion and $1.0
> billion for the six months ended June 30, 2001 and 2000, respectively.
> Cash provided by financing activities during the first six months of 2001
> represented the net proceeds from the $500 million public debt offering
> partially offset by repayments of uncommitted lines of credit and
> commercial paper. The cash provided by financing activities for the first
> six months of 2000 included borrowings under our commercial paper
> program used to fund pension contributions and to make advances to GM
> for pension and other post-retirement obligations.

319.    On July 18, 2001, the Company hosted an earnings conference to discuss its

financial results for the second quarter (the "2Q 2001 Conference Call"). On the 2Q 2001

Conference Call, Defendant Dawes reiterated the Company's financial results as reported in the

2Q 2001 Press Release and the 2Q 2001 10-Q. During the call, Defendant Dawes praised the

Company's results for the quarter, stating that it was "some real solid improvement" as

compared to the first quarter and "clearly demonstrates we got good traction on our cost

reduction efforts."

320.    The statements set forth in ¶¶ 315-319 above, were each false and misleading

when made because, as described above, Delphi's reported financial results violated GAAP and

materially overstated net income, earnings per share, operating income, total net sales and non-

GM net sales, and materially understated inventory, notes payable and current portion of long-

term debt, total current liabilities, total expenses, cash flow from financing activities and post-

retirement benefits other than pensions.

321.    Specifically, net income, earnings per share and operating income were materially

overstated by, among other things, Delphi's (i) improper accounting for rebates, credits and other

lump sum payments from third-party vendors (*see* Section VII.B.3.a-b, *supra*); (ii) disguising

financing transactions as sales of inventory and indirect materials (*see* Section VII.B.1, *supra*);

(iii) failure to record obligations and failure to recognize adjustments and accruals in the proper

period (*see* Section VII.B.4, *supra*); (iv) improper classification and deferral of $202 million of

expenses related to warranty obligations to GM (*see* Section VII.B.2.a, *supra*); (v) improperly

recognizing warranty credits received from GM as a reduction to expenses (*see* Section VII.B.2.b, *supra*); and (vi) failure to recognize an obligation to an unidentified information technology provider (*see* Section VII.B.3.c, *supra*).

322.    By disguising financing transactions as sales of inventory and indirect materials (*see* Section VII.B.1, *supra*), Delphi distorted its financial results as follows:

        a.    Materially overstated total net sales and non-GM net sales;

        b.    Materially overstated cash flow from financing;

        c.    Materially understated inventory;

        d.    Materially understated current liabilities; and

        e.    Materially understated notes payable and current portion of long-term debt.

323.    Further, Delphi's statements regarding its net cash provided by financing activities was false and misleading because it failed to disclose that its net cash from financing activities was materially understated for the quarter and six months ended June 30, 2001 and for the six months ended June 30, 2000 (as discussed in ¶ 278 above), due to the Company's improper accounting for financing transactions as sales.

324.    In its 2Q 2001 Press Release, the Company reported net liquidity at June 30, 2001 of $(2.7) billion. This was false and misleading because, as Delphi has since admitted, it did not disclose certain factoring facilities as sources of short-term liquidity in its non-GAAP measures of net liquidity.  Specifically, in the 2Q 2001 Press Release, it understated its negative liquidity by $374 million or 12.2%.

325.    In addition, by improperly classifying a $202 million warranty settlement payment to GM as an adjustment to post-retirement obligations, Delphi materially understated its post-retirement benefit obligation.

83

**I.     Third Quarter 2001**

326.    On October 16, 2001, Delphi issued an earnings release, announcing its financial
results for the quarter ended September 30, 2001 ("3Q 2001 Press Release"). The headline for
the 3Q 2001 Press Release announced: "Delphi Earns $0.05 Per Share and Generates $111
Million of Operating Cash Flow in Third Quarter -Positive Progress Reducing Breakeven --
Despite Weaker Revenue -Lean Manufacturing Helps Delphi Uphold Customer Commitments."
The 3Q 2001 Press Release reported "net income of $26 million, or $0.05 per share, in line with
First Call consensus estimates."

327.    In commenting on the Company's financial results for the third quarter,
Defendant Dawes explained: "The flexibility inherent in the Delphi Manufacturing System,
combined with key business initiatives, helped Delphi meet our customer commitments while
also protecting our results for the quarter." Dawes added that "[g]iven the uncertain market,
Delphi is increasingly focused on improving cash flow. Actions include: trimming structural
costs in line with demand; efficiently managing working capital; limiting capital expenditures;
and accelerating global restructuring plans. These steps allowed us to materially improve our
cash flow, reduce our breakeven level and stabilize third quarter earnings."

328.    On October 16, 2001, Delphi filed its Form 10-Q for the quarter ended September
30, 2001 ("3Q 2001 10-Q"). In its 3Q 2001 10-Q, Delphi reiterated the financial results reported
in the 3Q 2001 Press Release. Delphi also reported operating income of $81 million and, for the
nine months ended September 30, 2001, an operating loss of $213 million and net loss of $239
million based on total net sales of $19.7 billion for the nine-month period.

329.    In addition, the 3Q 2001 10-Q reported:

      a.    Net sales of $6.2 billion and non-GM net sales of $2.0 billion;

      b.    Net inventories of $1.8 billion;

      c.    Notes payable and current portion of long-term debt of $1.4 billion;

      d.    Total current liabilities of $6.5 billion;

      e.     Cash flow provided by financing activities of $213 million;

      f.     Total operating expenses of $6.1 billion; and

      g.     Post-retirement benefits other than pensions of $4.9 billion.

330.    In the MD&A section of the 3Q 2001 10-Q, Delphi stated: "Consolidated net sales for the third quarter of 2001 were $6.2 billion compared to $6.6 billion for the same period of 2000." The Company explained this decline as follows:

> Consolidated net sales were moderately impacted by the September terrorist attacks. In addition, sales were affected by ongoing softening of U.S. and European aftermarket demand and year over year weaknesses in the euro. Net sales to GM declined by $0.4 billion, principally due to reduced vehicle production volumes in North America and our ongoing elimination of marginally profitable and unprofitable product lines.

331.    The statements set forth above, were each false and misleading when made because, as described above, Delphi's reported financial results violated GAAP and materially *overstated* net income, earnings per share, operating income, net sales and non-GM net sales, and materially *understated* inventory, notes payable and current portion of long-term debt total current liabilities, total expenses, cash flow from financing activities and post-retirement benefits other than pensions.

332.    Specifically, net income, earnings per share and operating income were materially overstated by, among other things, Delphi's (i) improper accounting for rebates, credits and other lump sum payments from third-party vendors (*see* Section VII.B.3, *supra*); (ii) disguising financing transactions as sales of inventory and indirect materials (*see* Section VII.B.1, *supra*); (iii) failure to record obligations and failure to recognize adjustments and accruals in the proper period (*see* Section VII.B.4, *supra*); (iv) improper classification and deferral of $202 million of expenses related to warranty obligations to GM (*see* Section VII.B.2.a, *supra*); (v) improperly recognizing warranty credits received from GM as a reduction to expenses (*see* Section

85

VII.B.2.b, *supra*); and (vi) failure to recognize an obligation to an unidentified information technology provider (*see* Section VII.B.3.c, *supra*).

333.    By disguising financing transactions as sales of inventory and indirect materials (*see* Section VII.B.1, *supra*), Delphi distorted its financial results as follows:

      a.    Materially overstated net sales and non-GM net sales;

      b.    Materially understated cash flow from financing;

      c.    Materially understated inventory;

      d.    Materially understated current liabilities; and

      e.    Materially understated notes payable and current portion of long-term debt.

334.    In its 3Q 2001 Press Release, the Company reported net liquidity at September 30, 2001 of $(2.8) billion. This was false and misleading because, as Delphi has since admitted, it did not disclose certain factoring facilities as sources of short-term liquidity in its non-GAAP measures of net liquidity. Specifically, in the 3Q 2001 Press Release, it understated its negative liquidity by $301 million or 9.8%.

335.    In addition, by improperly classifying a $202 million warranty settlement payment to GM as an adjustment to post-retirement obligations, Delphi materially understated its post-retirement benefit obligation.

**J.    Fourth Quarter / Year End 2001**

336.    On January 17, 2002, Delphi issued an earnings release, announcing its financial results for the quarter and year ended December 31, 2001 ("Year-End 2001 Press Release"). The Year-End 2001 Press Release was headlined "Delphi Reports Ongoing Earnings of $55 Million on Revenues of $6.4 Billion in Q4." The Year-End 2001 Press Release reported that "net income for the quarter totaled $55 million, or $0.10 per share....matching industry analysts' estimates as reported on Thomson First Call. On a GAAP basis, which does not exclude the impact of special

86

charges, Delphi reported a net loss of $131 million during the quarter." The Company also touted

its "strong operating cash flow" in the fourth quarter.

337.    In commenting on the Company's performance, Defendant Battenberg stated:

> In the fourth quarter of 2001, we continued to take action to differentiate
> our performance from the remainder of the automotive supplier segment.
> While faced with declining customer production levels, recessionary
> economics and the impact of extraordinary national events, we've steadily
> implemented our strategies to transform our company by streamlining our
> portfolio, rationalizing excess capacity and reducing operating costs.

338.    On February 12, 2002, Delphi filed a Form 10-K405 for Fiscal Year 2001 ("2001

10-K"), which was signed by, among others, Defendants Battenberg and Dawes. The 2001 10-K

reiterated the financial results as reported in the Year-End 2001 Press Release. For the year, the

10-K reported an operating loss of $284 million and yearly net loss of $370 million, based on

total net sales of $26.1 billion. In addition, the 2001 10-K reported:

a.    Net sales of $26.1 billion and non-GM net sales of $8.5 billion;

b.    Net inventories of $1.6 billion;

c.    Notes payable and current portion of long-term debt of $1.3 billion;

d.    Total current liabilities of $5.9 billion;

e.    Net cash provided by financing activities of $13 million;

f.    Total operating expenses of $26.4 billion;

g.    Non-GM accounts receivable of $1.8 billion; and

h.    Post-retirement benefits other than pensions of $4.7 billion.

339.    The MD&A section of the 2001 10-K stated with respect to Delphi's 2000 net

income:

> Net income for 2000 totaled $1,062 million compared to $1,083 million
> for 1999. Excluding [one-time charges] our net income margin of 3.8%
> expanded from our 1999 margin of 3.7% as a result of *aggressive
> inventory management*, implementation of lean manufacturing initiatives
> and other cost reduction initiatives. (Emphasis added.)

87

340.    The statements set forth in ¶¶ 336-339 above, were each false and misleading when made because, as described above, Delphi's reported financial results violated GAAP and materially overstated net income, earnings per share, operating income, net sales and non-GM net sales, and materially understated inventory, notes payable and current portion of long-term debt total current liabilities, total expenses, cash flow from financing activities, accounts receivable and post-retirement benefits other than pensions.

341.    Specifically, net income, earnings per share and operating income were materially overstated by, among other things, (i) improper accounting for rebates, credits and other lump sum payments from third-party vendors, including, without limitation, improperly accounting for a $20 million rebate received from EDS, $18 million in credits received from EDS and $16 million in credits received from an unidentified IT provider (*see* Section VII.B.3, *supra*); (ii) disguising financing transactions as sales of inventory and indirect materials; (*see* Section VII.B.1, *supra*); (iii) failure to record obligations and failure to recognize adjustments and accruals in the proper period (*see* Section VII.B.4, *supra*); (iv) improper classification and deferral of $202 million of expenses related to warranty obligations to GM (*see* Section VII.B.2.a, *supra*); (v) improperly recognizing warranty credits received from GM as a reduction to expenses (*see* Section VII.B.2.b, *supra*); and (vi) failure to recognize an obligation to an unidentified information technology provider (*see* Section VII.B.3.c, *supra*).

342.    By disguising financing transactions as sales of inventory and indirect materials (*see* Section VII.B.1, *supra*), Delphi distorted its financial results as follows:

        a.     Materially overstated net sales and non-GM net sales;

        b.     Materially understated cash flow from financing;

        c.     Materially understated inventory;

        d.     Materially understated current liabilities;

        e.     Materially understated accounts receivable; and

88

       f.       Materially understated notes payable and current portion of long-term debt.

343.    In addition, by improperly classifying a $202 million warranty settlement payment to GM as an adjustment to post-retirement obligations, Delphi materially understated its post-retirement benefit obligation.

344.    Defendant Battenberg's statement claiming that Delphi had "steadily implemented our strategies to transform our company by streamlining our portfolio, rationalizing excess capacity and reducing operating costs" was false and misleading because Battenberg failed to disclose that operating costs were materially understated due to (i) Delphi's improper accounting for credits received in connection with warranty obligations; and (ii) the improper deferral of expenses relating to Delphi's purchase of "system implementation services."

345.    Specifically, based on the Restatement, the Company's originally reported net loss for the year ended December 31, 2001 was understated by $58 million, or 13.6%, and its loss per share on a diluted basis was understated by $(0.10), or 13.2%.

346.    Further, Delphi has provided specific information regarding its retained earnings at December 31, 2001. Indeed, the Company has since admitted that, based on the following pre-tax components of its fraudulent scheme, its 2001 pre-tax retained earnings were overstated by $431 million ($265 million net of tax):

       a.       $86 million for improper recognition of payments and credits and failure to recognize liabilities associated with contracts for future information technology services;

       b.       $50 million for fictitious sales of indirect materials and inventories that should have been accounted for as financing activities;

       c.       $225 million for prematurely reducing expenses as a result of credits received from GM relating to warranty obligations;

89

d.      $29 million for improperly recognizing obligations before they accrued and recording adjustments in the improper period; and

e.      $41 million in other miscellaneous adjustments.

347.    In its 4Q 2001 Press Release, the Company reported net liquidity at December 31, 2001 of $(2.6) billion. This was false and misleading because, as Delphi has since admitted, it did not disclose certain factoring facilities as sources of short-term liquidity in its non-GAAP measures of net liquidity. Specifically, in the 4Q 2001 Press Release, it understated its negative liquidity by $193 million or 6.9%.

348.    In response to the false and misleading statements in Delphi's Year-End 2001 Press Release and 2001 10-K, Delphi's stock steadily increased by 11%, from $14.11 on February 11, 2002 to $14.75 on February 13, 2002 to $15.49 on February 21, 2002, and, even higher, to $16.39 on February 26, 2002.

K.      **First Quarter 2002**

349.    On April 17, 2002, Delphi published an earnings release announcing its financial results for the quarter ended March 31, 2002 ("1Q 2002 Press Release"). The headline for the earnings release stated: "Delphi Announces Improved First Quarter 2002 Financial Results - Reports the First Quarter-Over-Quarter Sales Increase in Seven Quarters – Initiates New Restructuring Plan and Charge to Earnings -Operating Cash Flow Remains Strong." According to the 1Q 2002 Press Release, Delphi reported:

> [P]ro forma first quarter earnings of $123 million, up from a pro forma loss of $20 million in Q1 2001.... Earnings per share for the quarter were $0.22 compared to analyst consensus as reported on First Call of $0.21 per share. On a GAAP basis, including the impact of special charges taken in the quarter, Delphi reported a loss of $51 million or $(0.09) per share versus a loss of $429 million or $(0.77) per share in Q1 2001.

350.    On April 17, 2002, Delphi also filed its Form 10-Q for the quarter ended March 31, 2002 ("1Q 2002 10-Q"), which reiterated the GAAP financial results reported in the 1Q 2002

Press Release. In addition, the 1Q 2002 10-Q reported operating loss of $32 million and operating expenses of $6.7 billion.

351.    The statements referenced in ¶¶ 349-350 above were each materially false and misleading when made because, as described above, Delphi's reported financials violated GAAP and materially understated net loss, operating loss, loss per share, and operating expenses.

352.    Specifically, net loss, operating loss, loss per share, and operating expenses were all understated by, among other things, (i) improperly deferring recognition of payments made for system implementation services; (*see* Section VII.B.3.b *supra*); and (ii) improperly recording warranty credits as a reduction of expenses in 2002 rather than in later periods, when they were to be utilized (*see* Section VII.B.2.b *supra*);

353.    Net loss, operating loss, and loss per share, were all also understated by Delphi's improper failure to accrue for obligations at the end of the accounting period in which they were incurred (*see* Section VII.B.2.c *supra*).

354.    On April 17, 2002, Delphi hosted a conference call to discuss its first quarter 2002 earnings ("1Q 2002 Conference Call"). Commenting on Delphi's first quarter earnings, Defendant Dawes stated that Delphi was able "to report results of about $123 million profit which was up $143 million from pro forma results last year versus revenue increase of about $153 million. So the bottom line is that we are able to bring the revenue increases to the bottom line."

355.    These statements were false and misleading when CFO Dawes made them because: Delphi's 1Q 2002 reported net loss was understated by (i) the improper deferral of expenses relating to Delphi's purchase of "system implementation services" (*see* Section VII.B.3.b, *supra*), and (ii) Delphi's failure to record certain obligations incurred and to make certain accounting adjustments in the proper accounting period (*see* Section VII.B.4, *supra*).

91

356.    In its 1Q 2002 Press Release, the Company also reported net liquidity at March
31, 2002 of $(2.6) billion.  This was false and misleading because, as Delphi has since admitted,
it did not disclose certain factoring facilities as sources of short-term liquidity in its non-GAAP
measures of net liquidity.  Specifically, in the 1Q 2002 Press Release, Delphi understated its
negative liquidity by $187 million, or 6.7 %.

**L.    Second Quarter 2002**

357.    Beginning in or about mid-2002, the Company began to condition the market to
expect leaner quarters going forward – "guidance" that was, ironically, driven in large part by the
fact that Delphi had improperly pulled forward earnings from the latter part of the Class Period
in order to boost its reported results in its early years as a stand-alone company.  It revealed
small bits of negative news to the market, through reports of declining earnings, reduced
guidance, and massive restructuring costs, with concomitant adverse effects on its stock price.
That said, the Company sought to put a facially positive spin on its struggling business model,
continued to disseminate its fraudulent results from past reporting periods, and failed to disclose
that its "success" to date as a stand-alone public company was attained primarily through
elaborate fraudulent accounting.  And while the degree of financial statement manipulations
decreased going forward, the Company's reported financial results for much of the balance of the
Class Period were nonetheless infected with vestiges of the fraud.

358.    On July 17, 2002, Delphi published an earnings release, announcing its financial
results for the quarter ended June 30, 2002 ("2Q 2002 Press Release"), as well as its Form 10-Q
for the quarter ended June 30, 2002 ("2Q 2002 10-Q").  Among other false statements, the 2Q
2002 Press Release and 2Q 2002 10-Q reiterated the false financial results for prior periods.  The
Company also reported on its ongoing $262 million (pre-tax) restructuring effort, and cautioned
investors that the outlook for future reporting periods should be tempered due to, among other

92

things, the Company's anticipation that the "Delphi content per vehicle" was trending downward.

359.    For the six months ended June 30, 2002, the 2Q 2002 10-Q reported operating income of $350 million, net income of $169 million, earnings per share of $0.30, and operating expenses of $13.7 billion.

360.    The statements referenced in ¶¶ 357-359 were each materially false and misleading when made because, as described above, Delphi's reported financials violated GAAP and materially overstated net income, operating income and earnings per share, and materially understated operating expenses.

361.    Specifically, net income, operating income and earnings per share were all overstated, and operating expenses were understated by, among other things, (i) improperly deferring recognition of payments made for system implementation services; (see Section VII.B.3 supra); and (ii) improperly recording warranty credits as a reduction of expenses in 2002 rather than in later periods, when they were to be utilized (see Section VII.B.2.b supra).

362.    Net income, operating income, and earnings per share were all also overstated by Delphi's improper failure to accrue for obligations at the end of the accounting period in which they were incurred (see Section VII.B.4 supra).

363.    In its 2Q 2002 Press Release, the Company reported net liquidity at June 30, 2002 of $(2.9) billion. This was false and misleading because, as Delphi has since admitted, it did not disclose certain factoring facilities as sources of short-term liquidity in its non-GAAP measures of net liquidity. Specifically, in the 2Q 2002 Press Release, Delphi understated its negative liquidity by $313 million, or 9.7 %.

## M.    Third Quarter 2002

364.    Delphi faced more stringent reporting obligations in the third quarter of 2002 as it was the first quarter in which SEC filings were governed by the Sarbanes Oxley Act.[125]  Under Sarbanes Oxley, Delphi, like all publicly traded companies, had to provide certifications from its CEO and CFO attesting to the accuracy of its reporting of financial information and the soundness of its internal controls.    While Delphi attempted to present an appearance of conservatism and regulatory compliance, the Company's quarterly and annual filings in the post-Sarbanes Oxley era continued to contain substantial materially false and misleading statements as Delphi and other Defendants failed to revise the Company's fraudulent financial reporting.

365.    On October 16, 2002, Delphi issued a press release announcing its financial results for the quarter ended September 30, 2002 ("3Q 2002 Press Release"), and its Form 10-Q for the quarter ended September 30, 2002 ("3Q 2002 10-Q").  The 3Q 2002 Press Release reported that the Company's quarterly operating income was $125 million and its operating expenses were $6.3 billion.  For the nine months ending September 30, 2002, the Company reported operating income of $475 million, net income of $223 million, earnings per share of $0.40 and operating expenses of $20 billion.

366.    Among other false statements, the 3Q 2002 Press Release and 3Q 2002 10-Q reiterated false financial results for prior periods.  The Company also reported on its ongoing restructuring effort and, further, cautioned investors that due to, among other things, "industry headwinds", the Company expected "the difficult market conditions experienced in the first three quarters of 2002 to persist in the fourth quarter ...."

367.    The statements referenced in ¶¶ 364-366 above were each materially false and misleading when made because, as described above, Delphi's reported financials violated GAAP and materially *overstated* net income, operating income and earnings per share, and materially *understated* operating expenses.

---

[125] Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745 (2002).

368.     Specifically, net income, operating income, and earnings per share were all *overstated*, and operating expenses were *understated* by, among other things, (i) improperly deferring recognition of payments made for system implementation services; (*see* Section VII.B.3.b *supra*); and (ii) improperly recording warranty credits as a reduction of expenses in 2002 rather than in later periods, when they were to be utilized (*see* Section VII.B.2.b *supra*); Net income, operating income and earnings per share, were all also overstated by Delphi's improper failure to accrue for obligations at the end of the accounting period in which they were incurred (*see* Section VII.B.4 *supra*).

369.     In its 3Q 2002 Press Release, the Company reported net liquidity at September 30, 2002 of $(2.7) billion. This was false and misleading because, as Delphi has since admitted, it did not disclose certain factoring facilities as sources of short-term liquidity in its non-GAAP measures of net liquidity. Specifically, in the 3Q 2002 Press Release, Delphi understated its negative liquidity by $290 million, or 9.5 %.

370.     The 3Q 2002 10-Q was signed by Defendants Battenberg and Dawes, who also submitted a Certification of Principal Executive Officer and a Certification of Principal Financial Officer, respectively (collectively referred to as the "Officer Certifications"). In their Officer Certifications, Battenberg and Dawes, respectively, certified that:

> I, [Battenberg/Dawes], certify that:
>
> 1.     I have reviewed this quarterly report on Form 10-Q of Delphi Corporation;
>
> 2.     Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report;
>
> 3.     Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash

95

flows of the registrant as of, and for, the periods presented in this quarterly report;

4.     The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and we have:

a).     designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this quarterly report is being prepared;

b).     evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this quarterly report (the "Evaluation Date"); and

c).     presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date.

5.     The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

a).     all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

b).     any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

The registrant's other certifying officers and I have indicated in this quarterly report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

96

371.    The 3Q 2002 10-Q also contained as exhibits sworn certifications by Battenberg and Dawes, as required by the Sarbanes-Oxley Act.    In these sworn certifications, both Defendants Dawes and Battenberg again certified that "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

N.    **Fourth Quarter/ Year-End 2002**

372.    On January 17, 2003, Delphi issued a press release announcing its financial results for the fourth quarter 2002 and Fiscal Year 2002 ("Year-End 2002 Press Release"), and on February 18, 2003, Delphi filed its Form 10-K for Fiscal Year 2002 ("2002 10-K"), which reiterated the reported information in the Year-End 2002 Press Release.    In addition, the 2002 10-K reported the following results for 2002:

a.    Operating income of $690 million;

b.    Net income of $343 million;

c.    Earnings per share of $0.61; and

d.    Total operating expenses of $26.7 billion.

373.    The statements referenced above were each materially false and misleading when made because, as described above, Delphi's reported financials violated GAAP and materially overstated net income, operating income, earnings per share, and materially understated operating expenses.

374.    Specifically, net income, operating income, and earnings per share were all overstated, and operating expenses were understated by, among other things, (i) improperly deferring recognition of payments made for system implementation services; (*see* Section VII.B.3.b *supra*); and (ii) improperly recording warranty credits as a reduction of expenses in 2002 rather than in later periods, when they were to be utilized (see Section VII.B.2.b *supra*);

97

375.    Net income, operating income, and earnings per share, were all also overstated by Delphi's improper failure to accrue for obligations at the end of the accounting period in which they were incurred (*see* Section VII.B.4 *supra*).

376.    Indeed, Delphi later admitted that, for the year-ended December 31, 2002, based on the following components of its fraudulent scheme, its income was overstated by $59 million:

a.    $22 million for improperly capitalizing system implementation services;

b.    $20 million for prematurely reducing expenses as a result of credits received from GM relating to warranty obligations;

c.    $14 million for improperly recognizing obligations before they accrued and recording adjustments in the improper period; and

d.    $19 million in other improper adjustments.

377.    In its Year-End 2002 Press Release, the Company reported net liquidity at December 31, 2002 of $(2.4) billion. This was false and misleading because, as Delphi has admitted, it did not disclose certain factoring facilities as sources of short-term liquidity in its non-GAAP measures of net liquidity.    Specifically, in the Year-End 2002 Press Release, it understated its negative liquidity by $ 300 million or 11.1 %.

378.    As set forth in the table below, the Company has since admitted that the impact, including all adjustments (i.e., related tax effects of $35 million), of Delphi's improper accounting of expenses for system implementation services, warranty obligation credits, and accruals and other adjustments: (i) overstated the Company's operating income, net income and earnings per share; and (ii) understated the Company's operating expenses by the following amounts:

|  | Originally Reported | Restated | Overstated/(Understated) |
|---|---|---|---|
| Operating Expenses | $26.7 billion | $27 billion | $(266) million |
| Operating Income | $690 million | $638 million | $52 million |
| Net Income | $343 million | $318 million | $25 million |

379.    The 2002 10-K was signed by, among others, Defendants Battenberg and Dawes. In addition, both Battenberg and Dawes submitted Officer Certifications, which certified, *inter alia*, that the 2002 10-K accurately portrayed the Company's financial condition and that each had inspected the Company's internal controls and found them to be effective. As required by the Sarbanes-Oxley Act of 2002, Battenberg and Dawes also signed certifications (the "Sarbanes-Oxley Certifications") attached to the 2002 10-K, which asserted that the 10-K accurately presented, "in all material respects, the financial condition and results of operations of the Company."

**O.    First Quarter 2003**

380.    On April 16, 2003, Delphi issued a press release announcing its financial results for the quarter ended March 31, 2003 ("1Q 2003 Press Release"), and its Form 10-Q for the quarter ended March 31, 2003 ("1Q 2003 10-Q"). Among other false statements, the 1Q 2003 Press Release and 1Q 2003 10-Q re-reported Delphi's previously issued financial results for the quarter ended March 31, 2002 and the year ended December 31, 2002. In fact, the 1Q 2003 10-Q specifically instructed that "this report should be read in conjunction with our 2002 Annual Report on Form 10-K."

381.    The 1Q 2003 10-Q was signed by Defendants Battenberg, and Dawes. In addition, Battenberg and Dawes submitted both Officer Certifications and the Sarbanes-Oxley Certifications, which certified, *inter alia*, that the 1Q 2003 10-Q accurately portrayed the Company's financial condition and that each had inspected the Company's internal controls and found them to be effective.

99

382.   The statements referenced above were each false and misleading because, as described above, Delphi's financial results reported materially overstated net income and earnings per share in violation of GAAP.   Specifically, the results were inflated by the Company's admitted (i) failure to recognize a $10 million warranty obligation to GM; and (ii) improper accounting for accruals and other adjustments.   These components of Delphi's fraudulent scheme served to overstate the Company's income by $19 million, or 17.6 % for the quarter.

383.   In its 1Q 2003 Press Release, the Company reported net liquidity at March 31, 2003 of $(2.0) billion excluding off-balance sheet sales of accounts receivable. This was false and misleading because, as Delphi has admitted, it did not disclose certain factoring facilities as sources of short-term liquidity in its non-GAAP measures of net liquidity.   Specifically, in the 1Q 2003 Press Release, it understated its negative liquidity by $974 million or 33%.

384.   In addition, the statements referenced in ¶¶ 380-383 regarding its previously reported financial results for first quarter of 2002 were false and misleading.   Indeed, as explained above, the statements regarding Delphi's first quarter 2002 financial results were false and misleading when initially made. Delphi re-reported those results without disclosing their false and misleading nature.   Accordingly, these statements were false and misleading for the same reasons set forth above.

385.   Significantly, Delphi also touted "its track record of solid cash flow generation" – a record that had of course been built largely through the fraudulent manipulations described herein.

**P.      Delphi Revises Its Earnings Estimates Downward for the 2003 Second Quarter**

386.   On June 12, 2003, Delphi issued a press release revising its earnings outlook downward for the quarter ended June 30, 2003 ("2Q 2003 Earnings Revision Press Release"). The 2Q 2003 Earnings Revision Press Release reported that,

100

> [T]he company has revised its earnings outlook for Q2 2003, attributing
> the reduced forecast to a combination of events that include weakness in
> market demand and production volumes – notably suspended operations at
> General Motors' Oklahoma City facility – as well as an adverse legal
> judgment and timing of portfolio-related actions such as facility closures
> and employee separations.

387.    Defendant Dawes further explained, "[t]he collective effect of these events during
the current quarter will drive earnings below previous guidance."

388.    The statements in the 2Q 2003 Earnings Revision Press Release were false and
misleading because, as set forth above, Delphi failed to disclose the negative impact that the
unwinding of the Company's prior fraudulent accounting was having on its second quarter 2003
financial results.

**Q.    Second Quarter 2003**

389.    On July 17, 2003, Delphi issued a press release announcing its financial results
for the quarter ended June 30, 2003 ("2Q 2003 Press Release"), which stated that the Company
had met the reduced expectations announced a month earlier.

390.    On July 17, 2003, Delphi filed its Form 10-Q for the quarter ended June 30, 2003
(the "2Q 2003 10-Q"). The 2Q 2003 10-Q reiterated Delphi's financial results as reported in the
2Q 2003 Press Release and represented that "in the opinion of management, all adjustments,
consisting of only normal recurring items, which are necessary for a fair presentation have been
included."

391.    The 2Q 2003 10-Q also re-reported Delphi's previously issued financial results
for the three and six months ended June 30, 2002 and the year ended December 31, 2002.  In
fact, the 2Q 2003 10-Q specifically instructed that "this report should be read in conjunction with
our 2002 Annual Report on Form 10-K."

392.    The 2Q 2003 10-Q was signed by Defendants Battenberg and Dawes.  In addition,
Battenberg and Dawes submitted both Officer Certifications and the Sarbanes-Oxley
Certifications, which certified, *inter alia*, that the 2Q 2003 10-Q accurately portrayed the

101

Company's financial condition and that each had inspected the Company's internal controls and found them to be effective.

393.    The statements referenced above were each false and misleading because, as described above, the fraudulent transactions in earlier periods materially misstated the Company's financial results. Specifically, the results were misstated by the Company's admitted (i) premature recognition of rebate income; (ii) improper accounting of payments made to and credits received from GM for warranty and pension obligations; (iii) improper accounting for accruals and other adjustments; and (iv) off-balance sheet financing transactions involving indirect materials.    Indeed, Delphi's second quarter 2003 financial results reflected the Company's earlier fraudulent accounting practices.

394.    In its 2Q 2003 Press Release, the Company reported net liquidity at June 30, 2003 of $(1.9) billion excluding off-balance sheet sales of accounts receivable.  This was false and misleading because, as Delphi has admitted, it did not disclose certain factoring facilities as sources of short-term liquidity in its non-GAAP measures of net liquidity.  Specifically, in the 2Q 2003 Press Release, it understated its negative liquidity by $980 million or 34%.

395.    Delphi's statements regarding it previously reported financial results for the three and six months ended June 30, 2002 and Fiscal Year 2002 were false and misleading.  Indeed, as explained above, the statements regarding Delphi's financial results for these periods were false and misleading when initially made.  Delphi re-reported those results without disclosing their false and misleading nature.  Accordingly, these statements were false and misleading for the same reasons set forth above.

396.    In the 2Q 2003 Press Release, Battenberg commented:

> Although we experienced a number of unusual items concurrently in the quarter – most notably an adverse legal judgment, timing of portfolio actions and general weakness in market demand and production volumes – we met the targets we set for ourselves within the context of these events while keeping our operating performance on track.

> While the pattern of production levels is impacting the second half of the year, we remain confident that Delphi will meet our CY2003 guidance and is on the right path for future growth and profitability.

397.    The reasons given by Battenburg for the Company's struggles were false and misleading because they failed to disclose that the Company's results for the second quarter had been adversely affected by Delphi's fraudulent accounting earlier in the Class Period, namely, through the scheme whereby the Company had improperly pulled forward to earlier periods within the Class Period earnings that should not have been recognized in this quarter.

**R.    Third Quarter 2003**

398.    On October 16, 2003, Delphi issued a press release announcing its financial results for the quarter ended September 30, 2003 ("3Q 2003 Press Release"), which reported another massive restructuring charge (this one quantified at over a half-billion dollars (pre-tax)). Delphi attributed the charge to employee and production line costs and said that "[e]xcluding the charge, the company reported net income of $3 million during the quarter, in line with guidance and First Call consensus."

399.    In the 3Q 2003 Press Release, the Company reported net liquidity at September 30, 2003 of $(2.5) billion excluding off-balance sheet sales of accounts receivable. This was false and misleading because, as Delphi has admitted, it did not disclose certain factoring facilities as sources of short-term liquidity in its non-GAAP measures of net liquidity. Specifically, in the 3Q 2003 Press Release, it understated its negative liquidity by $770 million or 27.8%.

400.    Also on October 16, 2003, the Company filed its 10-Q Quarterly Report (the "3Q 2003 10-Q"). The 3Q 2003 10-Q reiterated Delphi's financial results as reported in the 3Q 2003 Press Release.

401.    The 3Q 2003 10-Q also reiterated the Company's financial performance for the three month and nine month periods ending September 30, 2002, as presented in the 3Q 2002 10-

103

Q, and relied on these prior reported figures for comparison with the third quarter of 2003. The 3Q 2003 10-Q states: "[T]his report should be read in conjunction with our consolidated financial statements and notes thereto included in our Annual Report on Form 10-K filed with the Securities and Exchange Commission."

402.    The 3Q 2003 10-Q was signed by Defendants Battenberg and Dawes. In addition, Battenberg and Dawes submitted both Officer Certifications and Sarbanes-Oxley Certifications, which certified, *inter alia,* that the 3Q 2003 10-Q accurately portrayed the Company's financial condition and that each had inspected the Company's internal controls and found them to be effective.

403.    The statements referenced above were each false and misleading because, as described above, they materially misstated the Company's financial results by continuing to conceal and failing to account for the improper accounting for Delphi's fraudulent transactions in earlier periods. Specifically, the results were misstated by the Company's admitted (i) premature recognition of rebate income; (ii) improper accounting of payments made to and credits received from GM for warranty and pension obligations (iii) improper accounting for accruals and other adjustments; and (iv) off-balance sheet financing transactions involving indirect materials.

404.    As Delphi has admitted, the third quarter financial results were materially false and misleading because they reflected the Company's surreptitious attempt to unwind its earlier fraud, rather than disclose it.

## S.    Fourth Quarter/Full Year 2003

405.    On January 20, 2004, Delphi issued a press release, announcing the Company's financial results for the fourth quarter of and Fiscal Year 2003 ("Year-End 2003 Press Release"), and on January 28, 2004, the Company filed its 10-K Annual Report for Fiscal Year 2003 ("2003 10-K"). The 2003 10-K was signed by, among others, Defendants Battenberg and Dawes.

104

406. Rather than disclose Delphi's earlier fraudulent accounting practices, the Year-End 2003 Press Release and 2003 10-K instead touted the Company's consistent growth since its inception and its ability to execute long-term strategy and, further, disseminated anew false financial results for prior reporting periods. The filings also failed to disclose that the Company's reported performance for the fourth quarter and Fiscal Year 2003 had been adversely affected because the Company had improperly pulled earnings forward to earlier periods in the Class Period.

407. These filings were each false and misleading because, as described above, they materially misstated the Company's financial results by continuing to conceal and failing to account for the improper accounting for Delphi's fraudulent transactions in earlier periods. Specifically, the results were misstated by the Company's admitted (i) premature recognition of rebate income; (ii) improper accounting of payments made to and credits received from GM for warranty and pension obligations (iii) improper accounting for accruals and other adjustments; and (iv) improperly omitted financing transactions involving indirect materials.

408. Moreover, as Delphi has admitted, the 2003 10-K financial results were materially false and misleading because they reflected the Company's surreptitious attempt to unwind its earlier fraud, rather than disclose it.

409. In addition, in the 2003 10-K Company reported a change in its inventory accounting from LIFO to FIFO method, stating in pertinent part:

> The FIFO value of inventories valued at LIFO amounted to approximately $633 million and $725 million at December 31, 2001 and 2000, respectively. The effect of the LIFO method of accounting was to increase operating income by $41 million in 2001, including the $7 million effect of deflation. The effect of the LIFO method of accounting was to increase Delphi's 2000 operating income by $96 million, net of the effect of inflation of $34 million.....

410. This statement was materially false and misleading because it failed to disclose facts necessary to make it not false and misleading, namely, that the Company's fraudulent

105

inventory disposal transactions in 2000, described above, created the Company's LIFO liquidation gains for that year, and artificially inflated its 2000 operating income for that year.

411.    Finally, the Company reported net liquidity at December 31, 2003 of $(2.4) billion excluding off-balance sheet sales of accounts receivable. This was false and misleading because, as Delphi has admitted, it did not disclose certain factoring facilities as sources of short-term liquidity in its non-GAAP measures of net liquidity. Specifically, it understated its negative liquidity by $215 million or 8.4 %.

412.    Battenberg and Dawes submitted both Officer Certifications and Sarbanes-Oxley Certifications, which certified, *inter alia*, that the 2003 10-K accurately portrayed the Company's financial condition and that each had inspected the Company's internal controls and found them to be effective.

T.    **First Quarter 2004**

413.    On April 16, 2004, Delphi issued a press release announcing its financial results for the quarter ended March 31, 2004 ("1Q 2004 Press Release"), as well as its 10-Q Quarterly Report ("1Q 2004 10-Q"). In the release, Defendant Dawes touted the Company's past history of performance, saying, "Once again, Delphi extended its track record for strong cash generation...."

414.    The filings also re-reported Delphi's previously issued financial results for the quarter ended March 31, 2003, and the year ended December 31, 2003. In fact, the MD&A section states: "[t]he following management's discussion and analysis of financial condition and results of operations ("MD&A") should be read in conjunction with the MD&A included in our Annual Report on Form 10-K for the year ended December 31, 2003."

415.    Defendants Battenberg and Dawes submitted both Officer Certifications and Sarbanes-Oxley Certifications, which certified, *inter alia,* that the 1Q 2004 10-Q accurately

106

portrayed the Company's financial condition and that each had inspected the Company's internal controls and found them to be effective.

416.    The statements referenced above were each false and misleading because, as described above, they materially misstated the Company's financial results by continuing to conceal and failing to account for Delphi's fraudulent transactions and improper accounting in earlier periods.    Nowhere in its 1Q 2004 Press Release or 1Q 2004 10-Q does Delphi disclose that its results for the quarter were affected by frauds it had committed in earlier periods. Specifically, its results were misstated by the Company's admitted (i) premature recognition of rebate income; (ii) improper accounting of payments made to and credits received from GM for warranty and pension obligations; (iii) improper accounting for accruals and other adjustments; and (iv) off-balance sheet financing transactions involving indirect materials.

**U.    Second Quarter 2004**

417.    On July 16, 2004, Delphi issued a press release announcing its financial results for the quarter ended June 30, 2004 ("2Q 2004 Press Release"), as well as its Form 10-Q for the quarter ending June 30, 2004 ("2Q 2004 10-Q").    In the release, Defendant Dawes again stressed the Company's historic performance, saying "Delphi maintained its track record of strong operating cash flow generation, demonstrating our operational strength...."

418.    The 2Q 2004 10-Q also re-reported its previously issued financial results for the quarter and six month-period ended June 30, 2003, as well as the year ended December 31, 2003. In fact, the MD&A section states: "The following management's discussion and analysis of financial condition and results of operations ("MD&A") should be read in conjunction with the MD&A included in our Annual Report on Form 10-K for the year ended December 31, 2003."

419.    On July 16, 2004, Battenberg and Dawes submitted both Officer Certifications and Sarbanes-Oxley Certifications, which certified, *inter alia,* that the 2Q 2004 10-Q accurately

107

portrayed the Company's financial condition and that each had inspected the Company's internal controls and found them to be effective.

420.    The statements referenced above were each false and misleading because, as described above, they materially misstated the Company's financial results by continuing to conceal and failing to account for Delphi's fraudulent transactions and improper accounting in earlier periods. Nowhere in its 2Q 2004 Press Release or 2Q 2004 10-Q does Delphi disclose that its results for the quarter were affected by frauds it had committed in earlier periods. Specifically, its results were misstated by the Company's admitted (i) premature recognition of rebate income; (ii) improper accounting of payments made to and credits received from GM for warranty and pension obligations (iii) improper accounting for accruals and other adjustments; and (iv) off-balance sheet financing transactions involving indirect materials.

421.    In its 2Q 2004 Press Release, the Company reported net liquidity at June 30, 2004 of $ (2.3) billion excluding off-balance sheet sales of accounts receivable. This was false and misleading because, as Delphi has admitted, it did not disclose certain factoring facilities as sources of short-term liquidity in its non-GAAP measures of net liquidity. Specifically, in the 2Q 2004 Press Release, it understated its negative liquidity by $571 million or 19.9%.

## V.    Third Quarter and Fourth Quarter 2004

422.    Between September 29, 2004 and the close of the Class Period, Delphi was presented with several opportunities to level with investors about its earlier accounting manipulations. Facing scrutiny by the SEC for its IT rebate accounting chicanery, Delphi should have disclosed publicly the full extent of its accounting irregularities. Nevertheless, despite knowing that grave troubles were just beyond the horizon, Delphi carefully orchestrated a series of press releases intended to reassure investors. The result was that its stock price remained at inflated levels through the remainder of 2004 and the rest of the Class Period.

423.    On September 29, 2004, Delphi filed a Form 8-K Current Report ("September

108

2004 8-K"), announcing, in pertinent part:

> In late July 2004, Delphi Corporation (the "Company") received a
> subpoena from the Securities Exchange Commission (the "Commission")
> requesting information regarding the Company's agreements with
> Electronic Data Systems Corporation ("EDS"), a long time supplier of
> information technology services to the Company. In August 2004, the
> Company received a copy of the formal order of investigation from the
> Commission indicating that the staff of the Commission ("the Staff") had
> commenced a non-public fact-finding inquiry regarding transactions
> between Delphi and EDS, including the accounting treatment of payments
> made and credits given by EDS to Delphi during 2000 and 2001, and
> certain payments made and credits given by EDS to Delphi during 2000
> and 2001, and certain payments made by Delphi to EDS for system
> implementation services in 2002 and in early 2003. The Staff has
> subsequently advised that they are also reviewing the accounting treatment
> of payments received by Delphi from other suppliers of information
> technology services....

424.    This statement was materially false and misleading because it excluded facts

necessary to make it not materially false and misleading. Specifically, the Company failed to

disclose the full extent of its fraudulent accounting for transactions with EDS and other suppliers

of information technology, as explained in detail above in Section VII.B.3. In addition, Delphi

excluded its other improper and fraudulent activities, as explained in detail above in Section VII.

425.    Moreover, the Company sought to assuage investors by falsely stating at the end

of the release that "[u]ntil the Staff's investigation and our review are complete, we are not able

to predict the potential effect they will have on Delphi." This statement was false because the

Company knew full well that their practice of engaging in accounting manipulations in order to

mislead investors about Delphi's financial results had been discovered and would inevitably be

more fully illuminated.

426.    On October 5, 2004, the Company issued a press release ("October 5, 2004 Press

Release") which revised downward its guidance for the third quarter that had just closed the

week before. By attributing the reduced guidance to certain operational challenges, the

Company's release was false and misleading because it did not disclose that those "challenges"

were in fact attributable in large part to the Company's fraudulent accounting earlier in the Class Period.

427.    On October 18, 2004, Delphi filed an 8-K Current Report, ("October 18, 2004 Press Release"), which noted that the Company had met the revised earnings guidance announced two weeks earlier.

428.    Defendant Battenberg stated, "As we discussed on Oct. 5, the third quarter was a more challenging environment than we experienced in the first half of 2004, with increased commodity pressures, low production volumes, product launch issues and lower attrition...." Defendant Dawes referred to "near-term headwinds" that posed challenges for the Company.

429.    Also on October 18, 2004, the Company filed a separate 8-K Current Report (the "October 2004 Financial Release") containing financial and other information for the three and nine months ended September 30, 2004. The Company reiterated the financial results set forth in the October 18, 2004 Press Release, and explained that it was filing the October 18, 2004 Financial Release instead of a quarterly report on Form 10-Q because:

> The interim financial statements contained in a Form 10-Q are required to have been reviewed by an independent registered public accounting firm pursuant to Rule 10-01(d) of the Securities and Exchange Commission's Regulation S-X. Deloitte & Touche LLP ("Deloitte"), the Company's independent registered public accounting firm, has informed us that due to the ongoing status of an internal review by the Audit Committee of the Board of Directors into the accounting treatment accorded to certain transactions with suppliers, including those for information technology services, it has not completed its review of the unaudited Consolidated Financial Statements included herein for the three and nine months ended September 30, 2004. The internal review was initiated in response to an investigation commenced by the staff of the Securities and Exchange Commission that was disclosed on a Form 8-K filed on September 29, 2004....

> The Company has therefore determined to file financial and other information for the third quarter without the review having been completed. The Company is making this filing on Form 8-K in order to

110

provide information to the investing public about the third quarter while the investigation continues....

The Company has not included the disclosure relating to "Controls and Procedures" in this Form 8-K which would normally be found under Part I, Item 4 of a Form 10-Q because, due to the ongoing investigation, the evaluation of such controls and procedures is ongoing. Additionally, the Company has not provided any of the certifications, which would be required in the filing of a Form 10-Q.

430.    The foregoing statements by Delphi on October 18, 2004 were materially false and misleading because they omitted to state facts necessary to make them not materially false and misleading. Specifically, the Company omitted to disclose the full extent of its fraudulent accounting for transactions with EDS and other suppliers of information technology, as explained in detail in Section VII.B.3 above.  Moreover, Delphi failed to disclose its other improper and fraudulent activities, as explained in detail in Section VII.B above.

431.    On November 10, 2004, the Company filed a Form NT 10-Q, Notification of Late Filing of Form 10-Q ("November 2004 NT 10-Q").  In the November 2004 NT 10-Q, the Company reiterated that it was unable to file a Form 10-Q for the third quarter of 2004 based on the ongoing status of the SEC's investigation into its transactions with EDS, the Audit Committee's investigation, and Deloitte's inability to complete its review of the Company's unaudited financial statements for the quarter.

432.    Delphi's November 2004 NT 10-Q was materially false and misleading because it excluded facts necessary to make it not materially false and misleading.  Specifically, Delphi omitted facts regarding the full extent of its fraudulent accounting for transactions with EDS and other suppliers of information technology, as explained in detail in Section VII.B.3 above. Moreover, Delphi failed to disclose its other improper and fraudulent activities, as explained in detail in Section VII.B above.

111

## IX. DELPHI'S HIGHLY RISKY AND ILLEGAL
## ACCOUNTING AND BUSINESS PRACTICES

A.    **Delphi's Financial Statements Failed to Comply with GAAP and SEC Regulations Prohibiting False and Misleading Public Filings**

433.    GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.  Those principles are the official standards accepted by the SEC and promulgated in part by the American Institute of Certified Public Accountants ("AICPA"), a private professional association, through three successor groups it established: the Committee on Accounting Procedure; the Accounting Principles Board (the "Board"), and the Financial Accounting Standards Board (the "FASB") with the permission of the SEC (Accounting Series Release 150).

434.    The SEC requires that public companies prepare their financial statements in accordance with GAAP. As set forth in SEC Rule 4-01(a) of SEC Regulation S-X, "[f]inancial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1).  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210 10-01(a). Management is responsible for preparing financial statements that conform with GAAP. As noted by AICPA auditing standards ("AU"), § 110.02:

> Financial statements are management's responsibility ... [M]anagement is responsible for adopting sound accounting policies and for establishing and maintaining internal controls that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities and equity are within the direct knowledge and control of management... Thus, the fair presentation of financial statements in

112

> conformity with Generally Accepted Accounting Principles is an implicit
> and integral part of management's responsibility.

435.    The SEC also regulates statements by companies "that can reasonably be
expected to reach investors and the trading markets, whoever the intended primary audience."
SEC Release No. 33-6504, 3 Fed. Sec. L. Rep. (CCH) 23,120, at 17,095-3, 17 C.F.R.
§ 241.20560 (Jan. 13, 1984).  Under SEC regulations, the management of a public company has
a duty "to make full and prompt announcements of material facts regarding the company's
financial condition." SEC Release No. 34-8995, 3 Fed. Sec. L. Rep. (CCH) 23,120A, at 17,095,
17 C.F.R. § 241.8995 (Oct. 15, 1970).  The SEC has emphasized that "[i]nvestors have
legitimate expectations that public companies are making, and will continue to make, prompt
disclosure of significant corporate developments." SEC Release No. 18271, [1981-1982 Transfer
Binder] Fed. Sec. L. Rep. (CCH) 83,049, at 84,618 (Nov. 19, 1981).

436.    In Securities Act Release No. 6349 (Sept. 8, 1981), the SEC stated that:

> [I]t is the responsibility of management to identify and address those key
> variables and other qualitative and quantitative factors which are peculiar
> to and necessary for an understanding and evaluation of the individual
> company.

437.    In Accounting Series Release 173, the SEC reiterated the duty of management to
present a true representation of a company's operations:

> [I]t is important that the overall impression created by the financial
> statements be consistent with the business realities of the company's
> financial position and operations.

438.    Item 7 of Form 10-K and Item 2 of Form 10-Q, Management's Discussion and
Analysis of Financial Condition and Results of Operations, require the issuer to furnish
information required by Item 303 of Regulation S-K [17 C.F.R. § 229.303].

439.    On May 18, 1989, the SEC issued an interpretive release (Securities Act Release
No. 6835 -May 18, 1989) which stated, in relevant part:

113

> The MD&A requirements are intended to provide, in one section of a filing, material historical and prospective textual disclosure enabling investors and other users to assess the financial condition and results of operations of the registrant, with particular emphasis on the registrant's prospects for the future. As the Concept Release states:

> The Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance. MD&A is intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long term analysis of the business of the company. The Item asks management to discuss the dynamics of the business and to analyze the financials.

440.    The SEC has thus stated, "[i]t is the responsibility of management to identify and address those key variables and other qualitative and quantitative factors which are peculiar to and necessary for an understanding and evaluation of the individual company."

441.    SEC Staff Accounting Bulletin No. 101 ("SAB 101"), Revenue Recognition in Financial Statements, drawing from Regulation S-K, Article 303, and Financial Reporting Release No. 36, also reiterated the importance of the MD&A in financial statements:

> Management's Discussion & Analysis (MD&A) requires a discussion of liquidity, capital resources, results of operations and other information necessary to obtain an understanding of a registrant's financial condition, changes in financial condition and results of operations. This includes unusual or infrequent transactions, known trends, or uncertainties that have had, or might reasonably be expected to have, a favorable or unfavorable material effect on revenue, operating income or net income and the relationship between revenue and the costs of the revenue. Changes in revenue should not be evaluated solely in terms of volume and price changes, but should also include an analysis of the reasons and factors contributing to the increase or decrease. The Commission stated in Financial Reporting Release (FRR) 36 that *MD&A should "give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future."* (Emphasis added; footnotes omitted.)

114

442.    Delphi's accounting during the Class Period violated fundamental principles of GAAP and the disclosures by management contained in its financial statements were misleading and failed to comply with the SEC regulations identified above.

443.    As set forth more fully below, Delphi's accounting violated the following fundamental principles of GAAP:

a.    The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions. (FASB Statement of Financial Accounting Concepts "FASCON" No. 1).

b.    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events, and circumstances that change resources and claims to those resources. (FASCON No. 1).

c.    The principle that financial reporting should provide information about an enterprise's financial performance during a certain time period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance. (FASCON No. 1).

d.    The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements. (APB No. 28, &10).

115

e.    The principle that the quality of reliability and, in particular, of representational faithfulness leaves no room for accounting representations that subordinate substance to form. (FASCON No. 2).

f.    The principle that information should be reliable as well as relevant is a notion that is central to accounting. (FASCON No. 2).

g.    The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions. (FASCON No. 2).

h.    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent. (FASCON No. 2).

i.    The principle that revenue should not be recognized until it is realized or realizable and earned.  (FASCON No. 5).

j.    The principle that gains should not be accrued without sufficient certainty of their collectibility. (FASCON No. 5)

k.    The principle that a full set of financial statements should show cash flows during the period. (FASCON No. 5).

l.    The principle that the statement of cash flows directly or indirectly reflects an entity's cash receipts classified by major sources and its cash payments classified by major uses during a period, including cash flow information about its operating, financing, and investing activities. (FASCON No. 5).

m.    The principle that expenses have to be matched with revenues as long as it is reasonable to do so. (FASCON No. 6).

116

444.    In violating these basic requirements of GAAP, along with more specific principles listed below, and in issuing, or omitting material information from its MD&A disclosures, Delphi's internal controls were wholly lacking.  As admitted by Delphi's Audit Committee, the Company was completely deficient in internal controls which could have prevented the accounting manipulations and machinations that inflated Delphi's financial results. Delphi's Audit Committee identified the following critical failings in Delphi's internal controls during the Class Period:

      a.    "Insufficient numbers of personnel having appropriate knowledge, experience and training in the application of GAAP at the divisional level, and insufficient personnel at the Company's headquarters to provide effective oversight and review of financial transactions;"

      b.    "Ineffective or inadequate accounting policies to ensure the proper and consistent application of GAAP throughout the organization;"

      c.    "Ineffective or inadequate controls over the administration and related accounting treatment for contracts;" and

      d.    "An ineffective 'tone' within the organization related to the discouragement, prevention or detection of management override, as well as inadequate emphasis on thorough and proper analysis of accounts and financial transactions."

445.    These gross deficiencies in internal controls over Delphi's accounting revealed by the Audit Committee allowed Delphi's management to intentionally and willfully distort Delphi's financial results through the following accounting manipulations and fraudulent transactions:

      a.    inflating Delphi's earnings by immediately recognizing rebates and credits received from suppliers in the periods in which these payments were

117

received rather than over the period during which the services were performed or products purchased;

b.     improperly deferring the recording of the expense for payments made for system implementation services with the effect that Delphi's expenses were materially understated and earnings materially overstated in 2002;

c.     inflating cash flow from operating activities and income through the fictitious "sales" of assets and inventories to third party entities, with which Delphi, through related transactions, had reciprocal, and undisclosed, arrangements to repurchase the same assets and inventories;

d.     misclassifying a $202 million dollar payment to GM in 2000 as an adjustment for post-retirement obligations, which could be amortized over time, deferring expenses, when in fact the payment was for warranty liabilities that should have been immediately expensed, as well as accelerating recognition of substantial portions of an $85 million warranty credit received from GM in 2001 and 2002, instead of recognizing those credits when utilized. The effect of these accounting manipulations was to artificially inflate Delphi's earnings between 2000 and 2002; and

e.     improperly failing to accrue for obligations and recording adjustments in the wrong period in the amount of $69 million, during the Class Period, thus inflating Delphi's EPS.

446.    Each of these accounting manipulations had the immediate effect of boosting Delphi's earnings and EPS and misleading investors about the true financial performance of Delphi. Moreover, as set forth below, each of the accounting manipulations identified above involved departures from fundamental principles of GAAP.

118

1.    **Delphi's Failure to Maintain Adequate Internal Controls Violated SEC Regulations**

447.    Delphi's Audit Committee investigation revealed that during the Class Period, Delphi's internal controls were fraught with material weaknesses that were wholly insufficient to ensure that Delphi's accounting was conducted in compliance with GAAP. Yet, in each of Delphi's Forms 10-K filed with the SEC during the Class Period, Delphi's senior managers certified that they had reviewed Delphi's internal controls and that these controls were adequate. For example, in a signed statement set forth in the 2000 Form 10-K, filed with the SEC on February 9, 2001, Defendants Battenberg and Dawes signed the following statement regarding the effectiveness of Delphi's internal controls:

> The Board of Directors, through the Audit Committee (composed entirely of outside Directors) is responsible for assuring that management fulfills its responsibilities in the preparation of the consolidated financial statements. The Audit Committee selects the independent auditors and reviews the scope of the audits and the accounting principles being applied in financial reporting. *The independent auditors, representatives of management, and the General Auditor meet regularly (separately and jointly) with the Audit Committee to review the activities of each, to ensure that each is properly discharging its responsibilities, and to assess the effectiveness of internal control. It is management's conclusion that internal control at December 31, 2000 provides reasonable assurance that the books and records reflect the transactions of Delphi and that the businesses comply with established policies and procedures.* To ensure complete independence, Deloitte & Touche LLP has full and free access to meet with the Audit Committee, without management representatives present, to discuss the results of the audit, the adequacy of internal control, and the quality of financial reporting.

(Emphasis added.)

448.    Defendants Battenberg and Dawes signed the following statement regarding the effectiveness of Delphi's internal controls and Deloitte's access and review of Delphi's financial results in Delphi's 2001 Form 10-K, filed with the SEC on February 12, 2002:

> The Board of Directors, through the Audit Committee (composed entirely of outside Directors) is responsible for assuring that management fulfills

119

its responsibilities in the preparation of the consolidated financial statements. The Audit Committee selects the independent auditors and reviews the scope of the audits and the accounting principles being applied in financial reporting. The independent auditors, representatives of management, and the General Auditor meet regularly (separately and jointly) with the Audit Committee to review the activities of each, to ensure that each is properly discharging its responsibilities, and to assess the effectiveness of internal control. *Each quarter, the Audit Committee meets with management and privately with the independent auditors in advance of the public release of operating results, and filing of annual or quarterly reports with the Securities and Exchange Commission. It is management's conclusion that internal control at December 31, 2001 provides reasonable assurance that the books and records reflect the transactions of Delphi and that the businesses comply with established policies and procedures.* To ensure complete independence, Deloitte & Touche LLP has full and free access to meet with the Audit Committee, without management representatives present, to discuss the results of the audit, the adequacy of internal control, and the quality of financial reporting.

(Emphasis added.)

449.    In a signed statement set forth in Item 8 of the 2002 10-K, Defendants Battenberg and Dawes signed the following statement regarding the effectiveness of Delphi's internal controls and Deloitte's access and review of Delphi's financial results:

The Board of Directors, through the Audit Committee (composed entirely of independent Directors) is responsible for assuring that management fulfills its responsibilities in the preparation of the consolidated financial statements. The Audit Committee selects the independent auditors (subject to shareholder ratification) and reviews the scope of the audits and the accounting principles being applied in financial reporting. *The independent auditors, representatives of management, and the Vice President of Audit Services and Corporate Auditor meet regularly (separately and jointly) with the Audit Committee to review the activities of each, to ensure that each is properly discharging its responsibilities, to review any significant findings or recommendations, and to assess the effectiveness of internal controls. Each quarter, the Audit Committee meets with management and privately with the independent auditors in advance of the public release of operating results, and filing of annual and quarterly reports with the Securities and Exchange Commission. It is management's conclusion that internal controls at December 31, 2002 provide reasonable assurance that the books and records reflect the*

120

> *transactions of Delphi and that the businesses comply with established*
> *policies and procedures.* To ensure complete independence, Deloitte &
> Touche LLP has full and free access to meet with the Audit Committee,
> without management representatives present, to discuss the results of the
> audit, the adequacy of internal control, and the quality of financial
> reporting.

(Emphasis added.)

450.    Each of these statements by Defendants Battenberg and Dawes was materially
false and misleading because, as confirmed by the Audit Committee's investigation in
connection with the Restatement, Delphi's internal controls were, in fact, wholly lacking and
essentially non-existent. Thus, in representing to shareholders that they had conducted a review
of internal controls and assessed them to "provide reasonable assurance that the books and
records reflect transactions of Delphi and that the businesses comply with established policies
and procedures," these Defendants either made knowingly false statements or recklessly
disregarded the truth, as any review of Delphi's internal controls should have revealed severe
deficiencies in Delphi's internal controls.

451.    As noted by AU § 110.02:

> [M]anagement is responsible for adopting sound accounting policies and
> for establishing and maintaining internal controls that will, among other
> things, record, process, summarize, and report transactions (as well as
> events and conditions) consistent with management's assertions embodied
> in the financial statements . . . the fair presentation of financial statements
> in conformity with Generally Accepted Accounting Principles is an
> implicit and integral part of management's responsibility.

452.    In failing to establish and maintain adequate internal controls, Delphi's
management created an environment that allowed them to easily control the improper accounting
for certain transactions and to fraudulently create others in order to manipulate the Company's
earnings.

### 2.    Delphi's Accounting For IT service provider and non-IT supplier rebates

453.    During the Class Period, as described more fully above, Delphi artificially inflated its income and earnings by prematurely recording payments and credits received, and failing to receive liabilities, in connection with service contracts it maintained with information technology service providers.   In addition, during the Class Period, Delphi manipulated its income and earnings by improperly accounting for rebate payments and credits received from its inventory suppliers.

454.    Delphi's accounting for IT service supplier and non-IT supplier rebates violated two basic principles of GAAP: "matching" and "proper revenue recognition." GAAP's "matching principle" is described in FASCON No. 6 and requires that associated revenues and expenses be recorded in the same period.

455.    The "revenue recognition principle" is described in FASCON No. 5.  GAAP's revenue recognition principle requires companies to record revenue when realized or realizable and earned, not when cash is received. According to FASCON No. 5, paragraph 83(b):

> An entity's revenue-earning activities involve delivering or producing goods, rendering services, or other activities that constitute its ongoing major or central operations, and revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues. [Footnotes omitted].

456.    SEC Staff Accounting Bulletin No. 101, affirms the application of the matching principle and revenue recognition principles to financial statements filed with the SEC. Statement of Accounting Standards ("FAS") No. 5, Accounting for Contingencies, states in paragraph 17, that "contingencies that might result in gains usually are not reflected in the accounts," and that "adequate disclosure shall be made for contingencies that might result in gains, but care shall be exercised to avoid misleading implications as to the likelihood of realization."

122

457.    Delphi's accounting for IT service supplier and non-IT supplier rebates violated FASCON No. 6, FASCON No. 5 and FAS No. 5 because in both types of transactions, Delphi improperly accelerated the recognition of income from payments and/or credits by recognizing these payments when received rather than over the period during which the services for which these payments and/or credits were performed or products purchased.

458.    With respect to liabilities incurred relating to Delphi's IT service provider contracts, Delphi failed to accrue for these liabilities during the periods in which the service relating to these liabilities was performed. FAS 5 requires that an expense be recorded when it is probable that an expense has been incurred and when the amount can be reasonably estimated.

459.    Delphi's accounting for IT service supplier and non-IT supplier rebates also violated the GAAP requirements that revenue should not be recognized unless it is "collectible." Under basic GAAP guidelines, when collectibility of revenue cannot be reasonably assured, revenue recognition should be deferred until actual receipt of the payment. See APB Opinion No. 10. FASCON No. 5 states that if "collectibility of assets received for product, services, or other assets is doubtful, revenues and gains may be recognized on the basis of cash received." Similarly, under Accounting Research Bulletin ("ARB") No. 43, a profit may not be realized unless circumstances are such that the collection of the sale price is reasonably assured.

460.    In violation of these basic GAAP provisions governing the collectibility of revenues, Delphi recognized income from credits against future services where there was no reasonable assurance that these credits would ever be earned.

461.    The net effect of these accounting manipulations was to boost income and earnings prior to December 31, 2001 to the detriment of reduced earnings in subsequent years. As such, Delphi's originally reported pre-tax income for Fiscal Year 2001 and prior periods was inflated by approximately $86 million over the actual restated amounts, while its pre-tax income in 2002 and 2003 was understated by $15 and $8 million respectively.

123

### 3.    Warranty Settlements and Pension Obligations

462.    Delphi's admitted misclassification of a $202 million warranty expense as a
pension obligation in the fourth quarter of 2000 was fraudulent and clearly designed to
understate Delphi's expenses, thus inflating income, for Fiscal Year 2000. Had Delphi properly
recorded the $202 million payment to GM for what it was – a settlement of a warranty claim and
not a payment under a pension settlement agreement – GAAP's matching principle set forth in
FASCON No. 6 would have required that the payment be recognized immediately rather than as
deferred and amortized over time.

463.    By intentionally misclassifying this payment, however, Delphi spread the expense
out over future periods instead of immediately recognizing the bulk of the expense in 2000. The
effect of Delphi's accounting manipulation was to overstate income in 2000 by $202 million.
Had Delphi properly recognized the $202 million payment as a warranty expense, Delphi would
have had to record an immediate expense, thus reducing pre-tax income by this amount.

464.    Delphi has also admitted to receiving $85 million in warranty credits from GM in
2001, substantial portions of which were improperly recorded as a reduction in expenses in 2001
and 2002. In this case, Delphi violated the matching principle by improperly using the credits to
reduce expenses for warranty obligations that had yet to be incurred. Under GAAP's matching
principle, set forth in FASCON No. 6, these credits should have been recognized only when the
corresponding warranty obligations were utilized. By intentionally recognizing substantial
portions of the $85 million credit as a reduction in expenses in 2001 and 2002, Delphi was able
to inflate its income substantially for 2001 and 2002.

465.    In the first quarter of 2003, Delphi failed to recognize a $10 million warranty
obligation to GM. Under GAAP, pursuant to FAS 5, ¶ 8, an estimated loss shall be accrued by a
charge to income when available information indicates that it is probable that a liability has been
incurred at the date of the financial statement and the loss can be reasonably estimated. As with
Delphi's other GAAP violations, Delphi's failure to accrue for this expense, when it was

124

probable and estimable, in the first quarter of 2003, allowed it to inflate its income in that quarter by $10 million.

### 4.    Improperly Deferring Expenses from System Implementation Services

466.    Delphi has admitted to improperly deferring the recording of expenses for payments made for system implementation services in 2002. Of the total payments of $40.5 million for system implementation services paid in 2002, Delphi improperly deferred the recognition of $22 million of this amount that should have been immediately recorded as expense in fiscal year 2002.

467.    As with Delphi's other failures to record expenses when incurred, such as its failure to record its $10 million warranty obligation to GM in Q1 2003, Delphi's failure to record its system implementation expenses also violated FAS No. 5. Pursuant to this principle, Delphi was required to record a loss (or expense) when it is probable that the expense has been incurred and when the loss can be reasonably estimated.

468.    In addition to violating the clear requirements of FAS No. 5, Delphi's failure to record the expenses for its system implementation services also violated the specific GAAP applicable to software implementation expenses, namely EITF 97-13: Accounting for Costs Incurred in Connection with a Consulting Contract or an Internal Project that Combines Business Process Reengineering and Information Technology Transformation, and Statement of Position ("SOP") 98-1, *Accounting for the Costs of Computer Software Developed or Obtained for Internal Use.*

469.    Under EITF 97-13, the cost of business process reengineering activities, whether done internally or by third parties, is to be expensed "as incurred." The rule also applies "when the business process reengineering activities are part of a project to acquire, develop, or implement internal-use software." SOP 98-1 provides explicit guidelines on how costs associated with computer software developed or obtained for internal use should be recorded and

125

in what circumstances such expenses may be capitalized. It specifically states that such costs should be expensed "when incurred."

470.     In this case, Delphi clearly incurred a system implementation expense of $22 million in 2002, but rather than recognize this expense immediately, elected to boost its pre-tax income by failing to record the expense when it was incurred. The effect of Delphi's improper deferral of expenses was to artificially inflate Delphi's pre-tax income in 2002 by $22 million. Delphi finally recognized the expense in 2003 thereby artificially reducing its pre-tax income by $22 million.

### 5.     Indirect Material Dispositions/Asset Dispositions

471.     Between 1999 and 2002, Delphi improperly recorded income from the disposal of inventories and indirect materials transactions that were nothing more than financing arrangements which served to inflate Delphi's income and earnings and cash from operating activities while also artificially reducing assets and inventories that Delphi carried on its balance sheet. In sum, as explained more fully in Section VII, Delphi entered into illicit agreements with third party entities wherein Delphi sold unneeded, obsolete, or excess indirect materials (such as raw materials and metals) or inventory to these companies with an agreement that Delphi would repurchase these inventories or materials at a later date. The money that Delphi received for these purported dispositions was falsely recorded as income from operating activities, which inflated Delphi's net income during the time period while the removal of these indirect materials and inventory from Delphi's balance sheet created the perception that the Company was efficiently and effectively managing excess assets and inventories.

472.     In 2000 and 2001, Delphi aggressively pushed efforts aimed at reducing its inventories. In fact, Delphi's 2000 10-K touted that Delphi's gross margin improved to 15.1% in 2000 compared to 14.2% in 1999. According to Delphi's MD&A Section, "the improvement reflects the results of our continuing cost reduction efforts and lean manufacturing initiatives that

126

are being implemented in response to industry pricing pressures and ***aggressive inventory management***." (Emphasis added.)

473. Delphi's disclosure, or lack thereof, violated the SEC's requirement under Item 303 of Regulation S-K [17 C.F.R. § 229.303] that a Company's Form 10-K (Item 7) and Form 10-Q (Item 2) "provide such other information that the registrant believes to be necessary to an understanding of its financial condition, changes in financial condition and results of operations." As noted above, the MD&A requirements are intended to provide, in one section of a filing, material historical and prospective textual disclosure enabling investors and other users to assess the financial condition and results of operations of the registrant, with particular emphasis on the registrant's prospects for the future.

474. Delphi's MD&A nonetheless failed to disclose that much of its cost reduction efforts and inventory management were the result of financing arrangements that only temporarily removed Delphi's assets and inventories from Delphi's balance sheets. Nowhere did Delphi disclose that it had a corresponding obligation to repurchase these assets and inventories at later dates, and that these arrangements were nothing more than financing arrangements secured by the inventory and assets that were purportedly "sold."

475. In addition, Delphi violated the SEC's MD&A disclosure requirements by failing to disclose the substance of its inventory disposal and asset disposal transactions. Delphi's accountings for these transactions were flagrant violations of GAAP and point to an intentional effort on the part of Delphi's management to inflate earnings and deflate inventories and assets.

476. GAAP, specifically FASCON No. 2, prohibits accounting representations that subordinate substance over form. Moreover, FASCON No. 2 requires that financial reporting be reliable in that it represents what it purports to represent and that nothing should be left out of the information that may be necessary to insure that it validly represents underlying events and conditions.

127

477.    In addition to these general principles, FAS 49 provides specific criteria for determining when an arrangement involving the sale of inventory is, in substance, a financing arrangement. It states, "a product financing arrangement is a transaction in which an enterprise sells and agrees to repurchase inventory with the repurchase price equal to the original sale price plus carrying and financial costs, or other similar transactions." Under this standard, "if a sponsor sells a product to another entity and, in a related transaction, agrees to repurchase the product . . . the sponsor shall record a liability at the time the proceeds are received from the other entity to the extent that the product is covered by the financing arrangement. The sponsor shall not record the transaction as a sale and not remove the covered product from its balance sheet." FAS No. 49 at ¶ 8.

478.    Despite these explicit GAAP requirements, Delphi recorded a $200 million sale of inventory to a third party in the fourth quarter of 2000, and repurchased these materials in January 2001. As stated above, this transaction had the desired effect of boosting Delphi's 2000 earnings and operating cash flow.

479.    Again in the fourth quarter of 2000, Delphi engaged in a transaction similar to the transaction described in ¶ 156. In this deal, Delphi recorded a $70 million sale of inventory to a third party, with which it had pre-arranged to buy-back the inventory at a later date. This transaction allowed Delphi to manipulate its financials to appear more profitable, to eliminate inventory from its balance sheets, and to obtain additional cash from financing activities without alerting the securities markets to its increased debt load.

480.    An additional party also entered into deals with Delphi that permitted the Company to remove approximately $145 million in unwanted assets from its books and to inflate its cash flows from operating activities. As explained above, the company agreed that Delphi would buy back the "indirect materials" at a later date. Upon information and belief, the value of

128

the goods transferred from Delphi to the unidentified company bore little relation to the cash amounts that it had paid to Delphi.

481.    As a result of the fraudulent transactions with these companies, Delphi violated the provisions of FAS No. 95, Statement of Cash Flows, which requires that a statement of cash flows report the cash effects during a period of an enterprise's operations, its investing transactions, and its financing transactions. FAS No. 95 further states that borrowing money and repaying amounts borrowed are financing activities.

482.    Delphi has admitted that it improperly accounted for the transactions with these companies as asset dispositions when they should have been accounted for as financing transactions. As the result, Delphi overstated cash flows from operations and understated cash flows from financing in 1999 and 2000 by $138 million and $233 million, respectively, and understated cash flows from operations and overstated cash flows from financing in 2001 by $200 million.

483.    Delphi's fraudulent inventory disposition transactions, as explained above, also enabled the Company to recognize $100 million in "paper" income from Last-In-First-Out ("LIFO") gains in the fourth quarter of 2000.[126] Delphi's fraudulent inventory dispositions in the fourth quarter of 2000 allowed the Company to reduce inventory levels enough so that it was able to recognize a gain of over $100 million in the fourth quarter of 2000 from improved margins resulting from lower priced, older inventories being used to determine cost of sales. As a result, pre-tax income for the fourth quarter was inflated by over $107 million from the combination of a fictitious asset sale and a resultant LIFO gain.

---

[126] The book value of inventories used in the manufacturing process are deducted from revenue as the cost of sales of producing that revenue. Where identical inventory is used over time to manufacture the same product, and the cost of the inventory has increased over time, LIFO accounting requires that the cost of sales be determined by the newer, more expensive, inventory. That is, the cost of the last inventory purchased by the manufacturer is used to determine the cost of sales.

129

### 6.    Delphi Failed to Write-off Obsolete Inventory

484.    With regard to Delphi's restatement adjustments relating to the improper indirect
material dispositions, the Company admitted that in 2002 and 2003, they repurchased the indirect
materials purported to be sold, and a portion of the material repurchased was immediately
written-off. Upon information and belief, the inventory and materials that were the subject of the
undocumented financing arrangements were primarily obsolete inventories. Delphi violated
GAAP by not properly writing down the value of the inventory to their proper market value
beginning in 1999. Under ARB 43, Chapter 4, Statement 5:

> [I]n accounting for inventories, a loss should be recognized whenever the
> utility of goods is impaired by damage, deterioration, obsolescence,
> changes in price levels, or other causes. The measurement of such losses is
> accomplished by applying the rule of pricing inventories at cost or market,
> whichever is lower. This provides a practical means of measuring utility
> and thereby determining the amount of the loss to be recognized and
> accounted for in the current period.

485.    Delphi purposefully disposed of obsolete inventory through staged financing
transactions to avoid having to take a charge to its current expenses for this obsolete inventory.
Instead of recording the fraudulent dispositions of the materials and inventories, Delphi should
have written off obsolete materials of up to $145 million in 1999 and 2000 and inventories of up
to $277 million in the fourth quarter of 2000 and in 2001, as well as any additional obsolete
inventories not subject to the staged financing agreements uncovered through the investigation
and restatement.

### 7.    Omitted Period-end Accruals and Other Out of Period Adjustments

486.    Delphi's Restatement identified obligations that were not properly accrued for at
the end of an accounting period, and other accounting adjustments that were not recorded in the
proper period.

487.    The omission or improper recording of these transactions was a clear violation of
FASCON No. 6, which requires that expenses and/or losses be recorded in the same period as the

130

associated revenue.  GAAP requires that expenses be recorded in the same period in which the income from the service or product that resulted in the expense is recorded.  Additionally, Delphi violated FAS No. 5, which requires that an expense be recorded when it is probable that a loss contingency has been incurred and when the amount can be reasonably estimated.

488.    These omitted or improper adjustments overstated originally reported pre-tax income by $14 million and $34 million in 2002 and 2003, respectively.

489.    Delphi restated its financial statements for Fiscal Years 2002, 2003 and the first and second quarters of 2004, in addition to its originally reported retained earnings from December 2001.  This constitutes an admission that the financial statements issued for each of these periods, as described above, were false and that the overstatements of income were material.    GAAP provides that financial statements should only be restated in limited circumstances; that is, when there is a change in the reporting entity, there is a change in accounting principles used, or to correct an error in previously issued financial statements.  Accounting Principles Board ("APB") No. 20.  Delphi's restatement was not due to a change in reporting entity or a change in accounting principles, but rather to correct errors in previously issued financial statements.    Therefore, the restatement is an admission by Delphi that its previously issued financial results and its public statements regarding those results were materially false.

### X. THE DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES

#### A.    The Director Defendants had actual knowledge of the misconduct.

490.    Throughout the Class Period the Director Defendants knew that because of the accounting irregularities at Delphi, Delphi's financial statements were materially false and misleading and did not fairly present in all material respects the financial condition, results of operation and cash flows of Delphi during the Class Period.    The Director Defendants further

131

knew that as a result of these irregularities, Delphi common stock was inflated in price and no longer a suitable investment for the Plans.

### 1.    Defendant Battenberg

491.    As Delphi's President, Chief Executive Officer and Chairman of the Board of Delphi, Defendant Battenberg spearheaded Delphi's launch as a public company and steered the fledgling company throughout the Class Period.  In December 1999, he appointed Defendant Dawes as a member of the Board of Directors and established direct reporting relationships with Dawes.

492.    Defendant Battenberg ran Delphi with the assistance of the remaining Delphi Directors, as well as the Officers of the Company until February 23, 2005, when he announced his intention to retire, barely one week before Delphi's Audit Committee released the preliminary findings of its internal investigation, which uncovered widespread fraudulent accounting practices at Delphi dating back to 1999.

493.    Defendant Battenberg spent more than forty-five years in the automobile industry, starting at the GM Institute in 1961, and working his way up to President of Delphi's GM predecessor division in 1995, and to President, Chief Executive Officer and Chairman of the Board of Delphi in 1999.  Battenberg also was named to lead the initial public offering and spin-off of Delphi in 1999.  Through his experience at GM and Delphi, Battenberg was intimately familiar with all aspects of the Company's business and finances, including its accounting for warranties, rebates and rebate credits from suppliers and inventory financing transactions.

494.    Defendant Battenberg had a tremendous stake in Delphi's success and indeed his reputation was intimately connected with the success of the Company.  Delphi's bonus structure awarded him huge bonuses based on Delphi's performance.

495.    Upon information and belief, Defendants Battenberg and Dawes together pressured their accounting executives to make the numbers work.  Battenberg, along with

132

Dawes, had a "well-known habit," when presented with financial analysis that they did not like, of saying "I don't like this picture" or "I don't like what this picture is telling me," which were known to mean, "change the numbers, go change it, rework it."

496.    Upon information and belief, Defendant Battenberg knew about Delphi's off-balance sheet financing transactions of indirect materials with a third party. Upon information and belief, Delphi's Electronics & Safety Division's treatment of indirect materials was considered such a success within the Company that Delphi instituted a corporate wide program where individuals from other divisions in the Company were sent to the Electronics & Safety Division to see how they disposed of their indirect materials and to learn from their methods. Further, upon information and belief, Battenberg was aware of a Company-wide memo extolling the success of the indirect materials disposal program, which was nothing more than a improperly accounted for off-balance sheet financing transaction.

497.    With respect to other aspects of the Company's accounting, Defendant Battenberg received information and regular reports from Defendant Dawes. As demonstrated below, Dawes had extensive knowledge regarding the Company's accounting for, among others things, its inventory financing transactions, warranty obligations and credits and rebates and rebate and credits received from the Company's suppliers.

**2.    Defendant Dawes**

498.    As Delphi's Vice Chairman, CFO and a member of the Board of Directors, positions he held for over five years, Defendant Dawes knew virtually every fact regarding the Company's financial position, including its accounting practices. Indeed, Dawes learned information and received direct reports from the individuals he supervised, including former Vice President of Treasury, Mergers and Acquisitions John G. Blahnik, former Chief Accounting Officer and Controller, Paul R. Free, Delphi's Chief Accounting Officer and Controller, and Delphi's Vice President and Chief Information Officer Peter Janak.

133

499.    Defendant Dawes' all-encompassing knowledge of the Company's accounting practices and his complicity in perpetrating the fraud alleged herein was admitted by the Delphi when it forced him to resign after uncovering pervasive fraud Company-wide.

500.    Specifically, on March 4, 2005, the Audit Committee announced that it had (i) met with culpable persons with knowledge or supervisory responsibility over these accounting manipulations and improper transactions and (ii) accepted the resignation of Defendant Dawes because the Audit Committee "had expressed a loss of confidence in him."

501.    Upon information and belief, Defendant Dawes, as the head of Delphi's financial team, ordered or knew of orders given by his finance staff to division financial personnel to record Delphi's worthless, obsolete inventory on the books as valuable inventory.

502.    Upon information and belief, Defendant Dawes had direct knowledge regarding Delphi's improper accounting for the three fictitious sales involving million of dollars of inventory.  According to *The Wall Street Journal,* these transactions were handled by, among others, Defendants Dawes.

503.    Upon information and belief, Defendant Dawes knew that Delphi improperly accounted for inventory by intentionally not recording receipt of high-dollar inventory supplies. Dawes also received the May 2004 Audit Report that detailed how Delphi improperly recorded inventory and determined that it was necessary for Delphi to "[r]ecord receipt of material in a timely manner."

504.    Upon information and belief, Dawes knew that Delphi fraudulently accounted for approximately $46 million in rebate transactions with EDS.  Upon information and belief, all of Delphi's accounting for its EDS rebate transactions was handled in the finance department by Dawes and his staff.  In terms of the payments, credits and rebates between Delphi and EDS, nothing was ever done without the full knowledge of everybody at Delphi, including Dawes and Delphi's Chief Information Officer, Pete Janak, who reported to Dawes.

134

505. Similarly, upon information and belief, Dawes also knew that Delphi fraudulently accounted for approximately $22 million in payments made to EDS for system implementation services rendered in 2002. Upon information and belief, Dawes and the finance department handled all accounting aspects of the Delphi-EDS transactions.

506. Upon information and belief, Dawes knew that $202 million, or 85% of Delphi's $237 million payment to GM in 2000 to settle warranty claims, was improperly accounted for as post-retirement obligations and that $30 million in credits received from GM in 2001 were improperly recorded as a reduction to expense in 2001 and 2002. Indeed, upon information and belief, the accounting issues with GM were handled and resolved "at the highest financials levels involving the CFOs of both companies."

**B.    Executive Committee Defendants either had actual knowledge, or had sufficient information so as to be charged with actual knowledge, of the misconduct.**

507. The Executive Committee Defendants all served as members of the Audit Committee during the Class Period as described above in ¶ 24. As members of the Audit Committee during the Class Period, the Executive Committee Defendants, according to the Schedule 14 A Proxy Statement filed on March 27, 2000, played a vital role in monitoring Delphi's financial reporting process, including:

> (i)    overseeing the preparation of financial reports provided by Delphi to the government and the public;
>
> (ii)    discussing with Delphi management and Delphi's outside auditors the quality of Delphi's internal accounting and financial controls;
>
> (iii)    assisting the Board of Directors in overseeing management's conduct of Delphi's financial reporting process; and
>
> (iv)    monitoring the independence of Delphi's outside auditors.

508. In this regard, the Executive Committee Defendants, had actual knowledge, or had sufficient information so as to be charged with actual knowledge, that the Company's

135

financial statements were materially false and misrepresented the Company's true financial condition.

509.    As set forth above, Delphi engaged in numerous unusual transactions during the Class Period in order to manipulate its financial results so as to artificially inflate its stock price. Had the Executive Committee Defendants in their capacity as Audit Committee members undertaken to investigate any of these transactions, as the Audit Committee did once it became aware of the SEC's investigation into Delphi's suspicious accounting, they would have discovered the unlawful acts and woefully inadequate internal controls that caused the Audit Committee to dismiss several senior Delphi executives and to restate Delphi's financial statements. That the Audit Committee was easily able to uncover the fraud once under threat of governmental investigation, demonstrates that the Executive Committee Defendants knew or should have known that Delphi had falsified its financial results over the extended period set forth above.

510.    Additionally, given the Executive Committee Defendants' knowledge of the auto industry's declining market during the Class Period, and Delphi's need to vastly expand its non-GM sales despite that declining market, Delphi's continued reported success should have prompted an investigation by the Executive Committee Defendants. In their capacity as Audit Committee members, the Executive Committee Defendants failed to inquire as to how Delphi continued to meet and exceed expectations in spite of the massive production declines of its primary customer, GM. Had the Executive Committee Defendants undertaken any investigation, they would have revealed that the Company's reported success was based on a massive accounting scheme perpetrated by Defendants Battenberg and Dawes and other Delphi senior executives, as detailed above.

136

C.     The Director Defendants Failed to Disclose the Imprudence of the Investment in
       Delphi Stock to other Fiduciaries of the Plans.

511.    As Plan fiduciaries, the Director Defendants had an obligation to communicate
the information known to them regarding the true financial condition of Delphi to other
fiduciaries of the Plans including the Executive Committee Defendants, IPC Defendants,
GMIMCo and State Street, and any other fiduciaries of the Plans who were responsible for
reviewing the investment options offered by the Plans, including the Delphi Common Stock
Fund, for the investment of Plans' assets. The disclosure of such information to other fiduciaries
of the Plans was necessary in order to apprise such fiduciaries of the risks associated with
investing in Delphi common stock so that such fiduciaries, to the extent they had fiduciary
obligations to do so, could make an informed decision as to the suitability of Delphi common
stock as an investment option for the Plans.

512.    Despite these obligations the Director Defendants failed to communicate to other
fiduciaries of the Plans complete and accurate information regarding the financial condition of
the Company and the fiduciaries of the Plans continued to offer the Delphi Common Stock Fund
as an investment option throughout the Class Period even though Delphi stock was artificially
inflated in price and no longer a suitable investment for the Plan.

513.    As a result of the foregoing failures of the Director Defendants to communicate
complete and accurate information regarding Delphi's financial condition, the fiduciaries of the
Plans responsible for reviewing the suitability of the investment options offered by the Plans
were unable to make informed decisions regarding whether Delphi common stock was a suitable
investment for the Plans and their participants. As a consequence, during the Class Period the
Plans continued to offer the Delphi Common Stock Fund as an investment option and the Plans
continued to acquire and retain Delphi common stock despite the fact that the stock was
artificially inflated in price and no longer a suitable investment for the Plans and their
participants.

137

## XI. THE RELEVANT LAW

514.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a plan participant for relief under ERISA § 409, 29 U.S.C. § 1109.

515.    ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

516.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes individual plan participants to seek equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, and other monetary relief.

517.    ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

518.    These fiduciary duties under ERISA §§ 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." They include, among other things:

        (a)    The duty to conduct an independent and thorough investigation into, and to continually monitor, the merits of all the investment alternatives of a plan, including in

138

this instance the Delphi Common Stock Fund and the GM Stock Funds, to ensure that each investment is a suitable option for the plans; and

(b)      The duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

519.    ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for Breach by Co-Fiduciary," provides, in pertinent part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
>
> (2) if, by his failure to comply with section 404(a)(1), 29 U.S.C. § 1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

520.    Co-fiduciary liability is an important part of ERISA's regulation of fiduciary responsibility. Because ERISA permits the fractionalization of the fiduciary duty, there may be, as in this case, several ERISA fiduciaries involved in a given issue, such as the role of company stock in a plan. In the absence of co-fiduciary liability, fiduciaries would be incentivized to limit their responsibilities as much as possible and to ignore the conduct of other fiduciaries. The result would be a setting in which a major fiduciary breach could occur, but the responsible party could not easily be identified. Co-fiduciary liability obviates this. Even if a fiduciary merely knows of a breach, a breach he had no connection with, he must take steps to remedy it:

139

> [I]f a fiduciary knows that another fiduciary of the plan has committed a breach, and the first fiduciary knows that this is a breach, the first fiduciary must take reasonable steps under the circumstances to remedy the breach. . . . [T]he most appropriate steps in the circumstances may be to notify the plan sponsor of the breach, or to proceed to an appropriate Federal court for instructions, or bring the matter to the attention of the Secretary of Labor. The proper remedy is to be determined by the facts and circumstances of the particular case, and it may be affected by the relationship of the fiduciary to the plan and to the co- fiduciary, the duties and responsibilities of the fiduciary in question, and the nature of the breach.

1974 U.S.C.C.A.N. 5038, 1974 WL 11542, at 5080.

521.    Plaintiffs therefore bring this action under the authority of ERISA § 502(a)(2) for relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by the Defendants for violations under ERISA § 404(a)(1) and ERISA § 405(a).

## XII.  ERISA § 404(C) DEFENSE INAPPLICABLE

522.    ERISA § 404(c) is an affirmative defense that provides a limited exception to fiduciary liability for losses that result from participants' exercise of control over investment decisions.  In order for § 404(c) to apply, participants must in fact exercise "independent control" over investment decisions, and the fiduciaries must otherwise satisfy the numerous procedural and substantive requirements of ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated under it.

523.    ERISA § 404(c) does not apply here for several reasons.  First, ERISA § 404(c) does not and cannot provide any defense to the fiduciaries' imprudent decision to select and continue offering Delphi and GM stock, or to continue matching in Delphi stock, as these are not decisions that were made or controlled by the participants.  *See* Final Reg. Regarding Participant Directed Individual Account Plans (ERISA Section 404(c) Plans) ("Final 404(c) Reg."), 57 Fed. Reg. 46906-01, 1992 WL 277875, at *46924 n.27 (Oct. 13, 1992) (codified at 29 C.F.R. pt. 2550) (noting that "the act of limiting or designating investment options which are intended to constitute all or part of the investment universe of an ERISA § 404(c) plan is a fiduciary function

140

which, whether achieved through fiduciary designation or express plan language, is not a direct or necessary result of any participant direction of such plan").

524.    Second, ERISA § 404(c) does not apply to any company stock in the Plans over which the participant did not have even nominal control, such as the employer match. Additionally, it does not apply because at times during the Class Period, participants' ability to divest their Plan investments in Delphi stock was restricted, which prevented true participant control over their Plan investment in Delphi stock.

525.    Third, even as to participant directed investment in Delphi stock, ERISA § 404(c) does not apply because Defendants failed to ensure effective participant control by providing complete and accurate material information to participants regarding Delphi stock. *See* 29 C.F.R. § 2550.404c-1(b)(2)(i)(B) (the participant must be provided with "sufficient information to make informed decisions"). As a consequence, participants in the Plans did not have informed control over the portion of the Plans' assets that were invested in Delphi stock as a result of their investment directions, and the Defendants remained entirely responsible for losses that result from such investment.

526.    Because ERISA § 404(c) does not apply here, the Defendants' liability to the Plans, the Plaintiffs and the Class (as defined below) for losses caused by the Plans' investment in Delphi stock is established upon proof that such investments were or became imprudent and resulted in losses in the value of the assets in the Plans during the Class Period.

## XIII. CAUSES OF ACTION

### A.    Count I: Breach of Fiduciary Duty of Prudence

527.    Plaintiffs incorporate by this reference the paragraphs above.

528.    This Count alleges fiduciary breach against the following Defendants: the Executive Committee Defendants, the IPC Committee Defendants, GMIMCo and State Street (the "Prudence Defendants").

141

529.    As alleged above, during the Class Period the Prudence Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

530.    As alleged above, the scope of the fiduciary duties and responsibilities of these Defendants included managing the assets of the Plans for the sole and exclusive benefit of Plan participants and beneficiaries, and with the care, skill, diligence, and prudence required by ERISA. The Prudence Defendants were directly responsible for, among other things:

(a)    **The Executive Committee**:  as the Named Fiduciary of the Salaried and Hourly Plans, the Executive Committee had numerous plan fiduciary duties as described above in paragraphs ¶¶ 108-112 *supra*.  The IPC made annual recommendations to the Executive Committee regarding investment policy guidelines for the assets of the Plans, and, upon information and belief, the Executive Committee acted upon such recommendations.

(b)    **GMIMCo**: as the Investment Manager of the Plans and the Plans' Named Fiduciary for purposes of investment of Plans' assets, GMIMCo was responsible for all its fiduciary duties except to the extent that it effectively delegated them to State Street. Those fiduciary duties included, as referenced in ¶¶ 120-130 *supra*: preparing an annual report for each investment fund; selecting, hiring, and monitoring investment managers, as well as establishing investment guidelines for the investment managers that it appoints; allocating assets among investment managers and strategies; conducting comprehensive studies of the Plan's investment objective and risk tolerance; reviewing the investment policy guidelines.

(c)    **IPC Defendants**: as reference in ¶¶ 113-119 *supra*, the IPC Defendants, as *de facto* fiduciaries, had the authority to remove a portion of the assets of the Plans

142

from the investment control and authority of GMIMCo, and direct how those removed funds are to be invested.

(d)    **State Street**: as explained in ¶¶ 131-135 *supra*, State Street was the Investment Manager of the single equity stock funds in the Plans, including the Delphi Common Stock Fund, was "responsible in its sole judgment and discretion for the management and investment" of the Delphi Common Stock Fund.

531.    Contrary to their duties and obligations under the Plans' documents and ERISA, these Defendants failed to prudently manage the assets of the Plans. During the Class Period, these Defendants continued to offer Delphi stock as an investment option in the Plans, and for participant and employer contributions until March 11, 2005. They did so despite the fact that there were numerous red flags pointing to the Company's likely inability to service its debt based on historical and anticipated cash flows, and despite the fact that the stock was no longer a prudent investment, including, but not limited to:

a.    From the beginning of the Class Period, Delphi faced challenges to grow its non-GM customer base per its separation agreement with GM and was saddled with expensive union contracts, creating manufacturing costs substantially greater than its competitors;

b.    As of 2000, Delphi faced a downturn in the economy generally, and massive production decreases by GM;

c.    On September 29, 2004, Delphi announced that it was being investigated by the SEC regarding certain transactions;

d.    On December 8, 2004, Delphi's Audit Committee announced an independent review of certain accounting practices by Delphi between 2000 and 2003;

143

e.     On December 10, 2004, Delphi announced that it would lay off 8,500 of its employees;

f.     On March 3, 2005, the Audit Committee announced the results of its internal investigation pointing to widespread accounting irregularities in Delphi's transactions dating back to 1999 and requiring the Company to restate its financial statements; these irregularities were sufficiently serious to result in Delphi suspending purchase of Delphi common stock by participants in the Plans on March 11, 2005, until such time as it filed corrected financial statements with the SEC;

g.     On March 5, 2005, Fitch downgraded Delphi's debt-rating to junk status based on the Company's revelation that Delphi had inflated its earnings and operating cash flow since 1999;

h.     On May 17, 2005, S&P downgraded Delphi's into lower junk status and in the days that followed, Moody's Investor Services ("Moody's") and Fitch downgraded Delphi's debt rating to "worse junk.";

i.     On August 5, 2005, Fitch downgraded Delphi's senior unsecured debt rating to CCC from B.

532.    Nevertheless, upon information and belief, the Prudence Defendants failed to evaluate the prudence of the Plans' investments, including the Delphi Common Stock Fund. Such an evaluation would have revealed to a reasonably prudent fiduciary the imprudence of continuing to make and maintain investment in Delphi stock under these circumstances. The Executive Committee Defendants' breach of the duty of prudence is particularly acute given that, as described above, they had actual knowledge, or had sufficient information so as to be charged with actual knowledge, that the Company's financial statements were materially false and

144

misrepresented the Company's true financial condition, and yet, they failed to protect the Plans and their participants and beneficiaries from millions of dollars of losses.

533.   Upon information and belief, the Executive Committee, the IPC, GMIMCo and State Street failed to evaluate the prudence of the Plans' investments, including the Delphi Common Stock Fund. Such an evaluation would have revealed to a reasonably prudent fiduciary the imprudence of continuing to make and maintain investment in Delphi stock under these circumstances.

534.   These Defendants' decisions respecting the Plans' investment in Delphi stock described above, under the circumstances alleged herein, abused their discretion as ERISA fiduciaries in that a prudent fiduciary acting under similar circumstances would have made different investment decisions. Specifically, based on the above, a prudent fiduciary could not have reasonably believed that further and continued investment of the Plans' contributions and assets in Delphi stock was in keeping with the Plan settlor's expectations of how a prudent fiduciary would operate.

535.   These Defendants were obligated to discharge their duties with respect to the Plans with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.   ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

536.   A fiduciary's investment or investment course of action is prudent if: a) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and b) he has acted accordingly.

145

537.    "Appropriate consideration" in this contex.

to:

- A determination by the fiduciary that the particular inv.

    of action is reasonably designed, as part of the portfolio (o.

    portion of the plan portfolio with respect to which the fiduci.

    duties), to further the purposes of the plan, taking into consideration .

    and the opportunity for gain (or other return) associated with the inve.

    investment course of action; and

- Consideration of the following factors as they relate to such  portion of the portfolio:

    o   The composition of the portfolio with regard to diversification;

    o   The liquidity and current return of the portfolio relative to   the anticipated
        cash flow requirements of the plan; and

    o   The projected return of the portfolio relative to the funding objectives of the
        plan.

538.    Given the conduct of the Company as described above, these Defendants could
not possibly have acted prudently when they continued to invest the Plans' assets in Delphi stock
because, among other reasons:

- The risk associated with the investment in Delphi stock during the Class Period was
    far above and beyond the normal, acceptable risk associated with investment in
    company stock;

- Knowing of this extraordinary risk, and knowing the participants did not know it,
    they had a duty to avoid permitting the Plans or any participant from investing the
    Plans' assets in Delphi stock; and

146

537.    "Appropriate consideration" in this context includes, but is not necessarily limited

to:

- A determination by the fiduciary that the particular investment or investment course
  of action is reasonably designed, as part of the portfolio (or, where applicable, that
  portion of the plan portfolio with respect to which the fiduciary has investment
  duties), to further the purposes of the plan, taking into consideration the risk of loss
  and the opportunity for gain (or other return) associated with the investment or
  investment course of action; and

- Consideration of the following factors as they relate to such portion of the portfolio:

    o The composition of the portfolio with regard to diversification;

    o The liquidity and current return of the portfolio relative to the anticipated
      cash flow requirements of the plan; and

    o The projected return of the portfolio relative to the funding objectives of the
      plan.

538.    Given the conduct of the Company as described above, these Defendants could
not possibly have acted prudently when they continued to invest the Plans' assets in Delphi stock
because, among other reasons:

- The risk associated with the investment in Delphi stock during the Class Period was
  far above and beyond the normal, acceptable risk associated with investment in
  company stock;

- Knowing of this extraordinary risk, and knowing the participants did not know it,
  they had a duty to avoid permitting the Plans or any participant from investing the
  Plans' assets in Delphi stock; and

146

- Further, knowing that the Plans were not diversified portfolios, but were heavily invested in company stock, they had a heightened responsibility to divest the Plans of company stock if it became or remained imprudent.

539.    Moreover, a fiduciary's duty of prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D). Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor allow others, including those whom they direct or who are directed by the plan, to do so.

540.    The Defendants named in this Count breached this duty by (1) continuing to offer Delphi stock as an investment option for the Plans for participant and employer contributions; (2) requiring contributions, or portions thereof, be in Delphi stock, in the Salaried, Hourly, and Mechatronic Plans; and, (3) for both employee and employer contributions to the Delphi Common Stock Fund, continuing to invest the assets of the Delphi Common Stock Fund in Delphi stock rather than in cash or other short-term investment options, and for each of these actions doing so when they knew or should have known that Delphi stock no longer was a prudent investment for participants' retirement savings.

541.    As a consequence of the Defendants' breaches of fiduciary duty alleged in this Count, the Plans suffered tremendous losses. If they had discharged their fiduciary duties to prudently invest the Plans' assets, the losses suffered by the Plans would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plans, and indirectly Plaintiffs and the other Class members, lost millions of dollars of retirement savings.

542.    Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3), the Defendants named in this Count are liable to restore the losses to the

147

Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**B.    Count II:   Breach of Duty to Act in Accordance with the Terms of the Investment Management Agreement and ERISA**

543.    Plaintiffs incorporate by this reference the paragraphs above.

544.    Plaintiffs allege this claim against State Street.

545.    At all relevant times, State Street was, and acted as, a fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), with respect to the Plans.

546.    One of the strict duties imposed upon fiduciaries such as the Defendants is the duty to act "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and Title IV." ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

547.    Pursuant to the Investment Management Agreement between GMIMCo and State Street, State Street was "responsible in its sole judgment and discretion for the management and investment" of the Delphi and GM Stock Funds.[127]

548.    By the express terms of the Investment Management Agreement between GMIMCo and State Street, State Street was to "discharge its duties under this Agreement solely in the interest of the participants of the [Plans] and their beneficiaries ... with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, [and] by diversifying the investments in the Investment Accounts so as to minimize the risk of large losses....".[128]    Pursuant to the Agreement, the Delphi Common Stock Fund and the GM Stock Funds are "Investment Accounts."[129]

---

[127] *See* GMIMCo and State Street Investment Management Agreement, Exhibit P, at GMIMCo, MDL-1725 000002.

[128] *Id.* at GMIMCo, MDL-1725 000007.

[129] *Id.* at GMIMCo, MDL-1725 000011.

549.    The Plan documents for the Salaried and Hourly Plans do not qualify this duty to diversify the Plans' assets, for example, by exempting employer securities from the duty of diversification, as is permitted to be done by statute. *See* ERISA § 404(a)(2), 29 U.S.C. § 1104(a)(2). Instead, the Plan documents for the Salaried and Hourly Plans state that the Delphi Common Stock Fund was designed to invest "primarily," in Delphi Stock, and do not otherwise specify parameters for the extent of the Delphi Common Stock Fund's investment in Delphi common stock.[130]

550.    Thus, under the Investment Management Agreement and subject to their duty of loyalty and the prudent man standard, State Street had a fiduciary responsibility to diversify the Delphi and GM Stock Funds.

551.    State Street, however, did nothing to comply with this key provision of the Plans or discharge its duty of prudence, with the result that throughout the relevant time period, the Plans were not diversified and were dangerously over-weighted in Delphi and GM stock.

552.    As a direct and proximate result of State Street's failure to follow the terms of the Plans and ERISA generally in this regard, the Plans, and indirectly the Plaintiffs and the Plans' other participants and beneficiaries, suffered losses in the hundreds of millions of dollars.

553.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), and ERISA § 409(a), 29 U.S.C. § 1109(a), State Street should, among other things, restore such losses to the Plans, and indirectly, the Plaintiffs and the Plans' other participants and beneficiaries caused by the Defendants' breaches of their fiduciary duties.

C.    **Count III: Failure to Monitor Fiduciaries**

554.    Plaintiffs incorporate by this reference the allegations above.

---

[130] *See* Salaried Plan Document, Exhibit A, at 104(b)-000036; 2004 Hourly Plan Document, Exhibit B, at 104(b)UAW-200035; ASEC Plan Document, Exhibit P, Article 9, Section 9.1(b)(1), at 104(b)-000479; Mechatronic Plan Document, Exhibit M, Article XVI, Section 2(B), at 104(b)-000843.

555.    This Count alleges fiduciary breach against the following Defendants: the Director Defendants, the Executive Committee Defendants, the IPC Committee Defendants, and GMIMCo (the "Monitoring Defendants").

556.    As alleged above, during the Class Period the Monitoring Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

557.    As alleged above, the scope of the fiduciary responsibilities of the Monitoring Defendants included the responsibility to appoint, and remove, and thus, monitor the performance of other fiduciaries, as follows:

| Monitoring Fiduciary | Monitored Fiduciary | Reference |
|---|---|---|
| Director Defendants | Executive Comm. | ¶ 106 |
| Director Defendants Executive Comm. IPC Committee | GMIMCo | ¶¶ 106, 110, 117 |
| Director Defendants | IPC Committee | ¶ 106 |
| GMIMCo | State Street | ¶¶ 125-128 |

558.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

559.    The monitoring duty further requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether the "hands-on" fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need).  In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their

150

· appointees were faithfully and effectively performing their obligations to plan participants or for deciding whether to retain or remove them.

560.    Furthermore, monitoring fiduciaries, such as the Director Defendants – who, as described above, knew that Delphi's financial statements were materially false and misleading and did not fairly present in all material respects the financial condition, results of operation and cash flows of Delphi, and knew accordingly that the stock was artificially inflated – must provide the monitored fiduciaries with complete and accurate information in their possession that they know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets, or that may have an extreme impact on the plan and the fiduciaries' investment decisions regarding the plan.

561.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things: (a) failing, at least with respect to the Plans' investment in company stock and GM stock, to monitor their appointees, to evaluate their performance, or to have any system in place for doing so, and standing idly by as the Plans suffered enormous losses as a result of their appointees' imprudent actions and inaction with respect to company stock; (b) failing to ensure that the monitored fiduciaries appreciated the true extent of Delphi's highly risky and inappropriate business and accounting practices, and the likely impact of such practices on the value of the Plans' investment in Delphi stock; (c) to the extent any appointee lacked such information, failing to provide complete and accurate information to all of their appointees such that they could make sufficiently informed fiduciary decisions with respect to the Plans' assets; and (d) failing to remove appointees whose performance was inadequate in that they continued to make and maintain investments in Delphi stock despite their knowledge of practices that rendered Delphi stock an imprudent investment during the Class Period for participants' retirement savings in the Plans, and who breached their fiduciary duties under ERISA.

151

562.    As a consequence of the Monitoring Defendants' breaches of fiduciary duty, the Plans suffered tremendous losses.  If the Monitoring Defendants had discharged their fiduciary monitoring duties as described above, the losses suffered by the Plans would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plans, and indirectly Plaintiffs and the other Class members, lost millions of dollars of retirement savings.

563.    Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3), the Monitoring Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**D.    Count IV: Breach of Duty To Disclose and Inform Other Fiduciaries of the Plans Incidental to the Defendants' Fiduciary Obligations as Fiduciaries of the Plans**

564.    Plaintiffs incorporate by this reference the paragraphs above.

565.    This Count alleges fiduciary breach against the Director Defendants.

566.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on a plan fiduciary a duty of loyalty – that is, a duty to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and its beneficiaries.

567.    ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B), imposes on a plan fiduciary a duty of prudence – that is, a duty to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

568.    The Director Defendants had a duty pursuant to the aforementioned sections of ERISA to disclose to and inform the other fiduciaries of the Plan, including the Executive

152

Committee and its members, the IPC, GMIMCo, and State Street, and any other fiduciaries to the

Plan, of information which such fiduciaries reasonably needed to know to fulfill their fiduciary

duties to the participants and beneficiaries, including their duties to determine the suitability of

the investment funds offered by the Plan, and their duty to disclose and to inform the participants

and beneficiaries of the Plan of all information material to the suitability of investments under

the Plan.

569.    The Director Defendants breached their duty to inform and disclose by failing to

provide to the other fiduciaries of the Plan complete and accurate information regarding the true

financial condition of the company and the risks of investing Delphi stock, when they knew, as

described above, that the Company was engaging in accounting irregularities which artificially

inflated the value of Delphi stock and rendered the stock an unsuitable retirement investment for

the Plan.

570.    As a consequence of the Director Defendants' breaches of fiduciary duty, the

Plans suffered tremendous losses. If these Defendants had discharged their duties as described

above, the losses suffered by the Plans would have been minimized or avoided. Therefore, as a

direct and proximate result of the breaches of fiduciary duty alleged herein, the Plans, and

indirectly Plaintiffs and the other Class members, lost millions of dollars of retirement savings.

571.    Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and

1132(a)(2) and (a)(3), the Director Defendants are liable to restore the losses to the Plans caused

by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as

appropriate.

**E.    Count V: Co-Fiduciary Liability**

572.    Plaintiffs incorporate by this reference the allegations above.

573.    This Count alleges co-fiduciary liability against the following Defendants: all

Defendants except State Street (the "Co-Fiduciary Defendants").

153

574.    As alleged above, during the Class Period the Co-Fiduciary Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both. Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

575.    ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach.

576.    **Knowledge of a Breach and Failure to Remedy.** ERISA § 405(a)(3), 29 U.S.C. § 1105, imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if, he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

577.    The Director Defendants knew of the Company's highly risky and inappropriate business and accounting practices, and its consequences, including the artificial inflation of the value of Delphi stock, and therefore knew that Delphi stock was no longer a prudent investment for the Plans.

578.    Additionally, on information and belief, the Executive Committee Defendants, the IPC Defendants, and GMIMCo knew, based on public information, that the Company could not be expected to be able to service its debt based on historical and anticipated cash flows. Consequently, they knew that State Street was breaching its fiduciary duty by failing to divest Delphi stock.

579.    Yet, the Director Defendants, the Executive Committee Defendants, the IPC Defendants, and GMIMCo failed to undertake any effort to remedy State Street's breaches.

580.    **Enabling a Breach.** ERISA § 405(a)(2), 29 U.S.C. § 1105(2), imposes liability on a fiduciary if by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the

154

administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

581.    The IPC Defendants' failure to remove the Delphi and GM Stock Funds from the investment authority and control of GMIMCo, thereby enabling the breaches of GMIMCo and State Street.

582.    Additionally, the Monitoring Fiduciaries failure to monitor their fiduciary appointees enabled their appointees (*i.e.*, the Executive Committee Defendants, the IPC Defendants, GMIMCo and State Street) to breach their fiduciary duties.

583.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiffs and the Plans' other participants and beneficiaries, lost millions of dollars of retirement savings.

584.    Pursuant to ERISA §§ 409 and 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (a)(3), the Co-Fiduciary Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## XIV. CAUSATION

585.    The Plans suffered hundreds of millions of dollars in losses because substantial assets of the Plans were imprudently invested or allowed to be invested by Defendants in Delphi and GM stock during the Class Period, in breach of Defendants' fiduciary duties.

586.    Defendants are liable for the Plans' losses in this case because: (1) most of the Plans' investment in Delphi and GM stock was the result of the Prudence Defendants' decisions to invest matching contributions in Delphi stock, to require participants to invest their own contributions in Delphi stock, and to restrict the ability of participants to sell any of their Plan holdings in the stock; and (2) as to the portion of Plans assets invested in Delphi stock as a result of participant contributions, the Prudence Defendants are liable for the losses because they failed

155

to take the necessary and required steps to ensure effective and informed independent participant control over the investment decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder.

587.    The Prudence Defendants also are liable for losses that resulted from their decision to invest nearly all of the assets of the Delphi and GM Stock Funds in Delphi and GM stock rather than cash or other short-term investment options, and clearly prudent under the circumstances presented here.

588.    Had the Defendants properly discharged their fiduciary and co-fiduciary duties, including the provision of full and accurate disclosure of material facts concerning investment in Delphi stock to their fellow fiduciaries, monitoring and removal of fiduciaries who failed to satisfy their ERISA-mandated duties of prudence and loyalty, eliminating Delphi and GM stock as an investment alternative when it became imprudent, and divesting the Plans of Delphi and GM stock when maintaining such an investment became imprudent, the Plans would have avoided some or all of the losses that they, and indirectly, the participants suffered.

## XV.  REMEDY FOR BREACHES OF FIDUCIARY DUTY

589.    The Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plans' assets should not have been invested in Delphi or GM stock during the Class Period.

590.    As a consequence of the Defendants' breaches, the Plans suffered significant losses.

591.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary…who breaches any of the…duties imposed upon fiduciaries…to make good to such plan any losses to the plan…." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate…."

156

592.    With respect to calculation of the losses to the Plans, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Plans would not have made or maintained their investments in the challenged investment and, instead, prudent fiduciaries would have invested the Plans' assets in the most profitable alternative investment available to them.  Alternatively, losses may be measured not only with reference to the decline in stock price relative to alternative investments, but also by calculating the additional shares of Delphi and GM stock that the Plans would have acquired had the Plan fiduciaries taken appropriate steps to protect the Plans.  The Court should adopt the measure of loss most advantageous to the Plans.  In this way, the remedy restores the Plans' lost value and puts the participants in the position they would have been in if the Plans had been properly administered.

593.    Plaintiffs and the Class are therefore entitled to relief from the Defendants in the form of: (1) a monetary payment to the Plans to make good to the Plans the losses to the Plans resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a)(2) and (3), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (3); (3) injunctive and other appropriate equitable relief pursuant to ERISA § 502(a)(3), 29 U.S.C. 1132(a)(3) for knowing participation by a non-fiduciary in a fiduciary breach; (4) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (5) taxable costs and interest on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

594.    Under ERISA, each Defendant is jointly and severally liable for the losses suffered by the Plans in this case.

157

## XVI. CLASS ACTION ALLEGATIONS

595.    **Class Definition**.  Plaintiffs bring this action as a class action pursuant to Rules

23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves

and the following class of persons similarly situated (the "Class"):

> All persons, other than Defendants, who were (1) participants in or
> beneficiaries of the Salaried, Hourly, or ASEC Plans at any time between
> May 28, 1999 and November 1, 2005, or (2) participants in or
> beneficiaries of the Mechatronic Plan at any time between June 1, 2001
> and November 1, 2005, and whose accounts included investments in the
> Delphi and/or GM Stock Funds.

596.    **Class Period**.  The fiduciaries of the Plan knew or should have known that by

May 28, 1999, Delphi's stock could no longer be offered as a prudent investment for a retirement

Plans.

597.    **Numerosity**.  The members of the Class are so numerous that joinder of all

members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at

this time, and can only be ascertained through appropriate discovery, Plaintiffs believe there are,

based on the Plans' Form 5500s for Plan year 2003 more than 20,000 members of the Class who

participated in, or were beneficiaries of, the Plans during the Class Period.[131]

598.    **Commonality**.  Common questions of law and fact exist as to all members of the

Class and predominate over any questions affecting solely individual members of the Class.

Among the questions of law and fact common to the Class are:

(a)    whether Defendants each owed a fiduciary duty to Plaintiffs and members

of the Class;

---

[131] The Delphi Salaried Plan Form 5500, Mechatronic Plan Form 5500, and the ASEC Plan Form
5500 are publicly available at www.freeerisa.com. (The Hourly Plan's Form 5500 are
unavailable).

(b) .    whether Defendants breached their fiduciary duties to Plaintiffs and members of the Class by failing to act prudently and solely in the interests of the Plans' participants and beneficiaries;

(c)    whether Defendants violated ERISA; and

(d)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

599.    **Typicality**.  Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs' and the other members of the Class each sustained damages arising out of the Defendants' wrongful conduct in violation of federal law as complained of herein.

600.    **Adequacy**.  Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action, complex, and ERISA litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

601.    **Rule 23(b)(1)(B) Requirements**.  Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

242.    **Other Rule 23(b) Requirements**.  Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class

159

predominate over any questions affecting only individual members and a class action is superior
to the other available methods for the fair and efficient adjudication of this controversy.

### XVII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for:

A.  A Declaration that the Defendants, and each of them, have breached their ERISA
fiduciary duties to the participants;

B.  A Declaration that the Defendants, and each of them, are not entitled to the
protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C.  An Order compelling the Defendants to make good to the Plans all losses to the
Plans resulting from Defendants' breaches of their fiduciary duties, including losses to the Plans
resulting from imprudent investment of the Plans' assets, and to restore to the Plans all profits
the Defendants made through use of the Plans' assets, and to restore to the Plans all profits which
the participants would have made if the Defendants had fulfilled their fiduciary obligations;

D.  Imposition of a Constructive Trust on any amounts by which any Defendant was
unjustly enriched at the expense of the Plans as the result of breaches of fiduciary duty;

E.  An Order enjoining Defendants, and each of them, from any further violations of
their ERISA fiduciary obligations;

G.  Actual damages in the amount of any losses the Plans suffered;

H.  An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

I.  An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the
common fund doctrine; and

J.  An Order for equitable restitution and other appropriate equitable and injunctive
relief against the Defendants.

Dated this 3rd day of March 2006.

Respectfully submitted:

160

**KELLER ROHRBACK L.L.P.**

By:  /s/   Lynn Lincoln Sarko
Lynn Lincoln Sarko
Gary A. Gotto
Derek Loeser
Erin M. Riley
Cari Campen Laufenberg
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
(206) 623-1200 (Telephone)
(206) 623-3384 (Facsimile)

Jeffrey T. Meyers (P34348)
**MORGAN & MEYERS PLC**
3200 Greenfield, Suite 260
Dearborn, MI 48120-1802
(313) 961-0130 (Telephone)
(313) 961-8178 (Facsimile)
**Interim Liaison Counsel for Plaintiffs**

Marc I. Machiz
Bruce F. Rinaldi
**COHEN, MILSTEIN, HAUSFELD & TOLL
PLLC**
1100 New York Ave NW, Suite 500W
Washington, D.C. 20005
(202) 408-4600 (Telephone)
(202) 408-4699 (Facsimile)

Richard A. Lockridge
**LOCKRIDGE GRINDAL NAUEN PLLP**
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
(612) 339-6900 (Telephone)
(612) 339-0981 (Facsimile)

Jane B. Stranch
**BRANSTETTER, KILGORE, STRANCH
& JENNINGS**
227 Second Avenue North, Fourth Floor
Nashville, TN 37201-1631
(615) 254-8801 (Telephone)
(615) 255-5419 (Facsimile)

161

Elwood S. Simon
**ELWOOD S. SIMON & ASSOCIATES, P.C.**
355 S. Old Woodward Ave., Suite 250
Birmingham, MI  48009
(248) 636-9730 (Telephone)
(248) 258-2335 (Facsimile)

**Associated Counsel**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 3, 2006 I electronically filed the forgoing

Consolidated Class Action Complaint for Violations of the Employee Retirement Income

Security Act with the Clerk of the Court using the ECF system which will send notification of

such filing to Stuart Baskin, Patrick E. Cafferty, Michael P. Coakley, Timothy A. Duffy,

Christopher H. Giampapa, Gary S. Gaifman, Stuart M. Grant, Clark C. Johnson, Howard T.

Longman, Mathew J. Lund, Sara L. Madsen, J. Brian McTigue, Johnathan E. Moore, Marc L.

Newman, Sharan Nirmul, Joseph E. Papelian, John W. Reale, Richard A. Rossman, James J.

Sabella, Sherrie R. Savett, Scott T. Seabolt, Elwood S. Simon, Andrew W. Stern, Jane B.

Stranch, Ruth H. Swartout, W. Scott Turnbull, Jill M. Wheaton, and John P. Zuccarini and I

hereby certify that I have mailed, via first-class U.S. mail, the foregoing documents to the

following non-ECF participants:

Arthur N. Abbey
ABBEY GARDY, LLP
212 East 39th Street
New York, NY 10016

Regina M. Calcaterra
BARRACK, RODOS & BACINE
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103

Eric J. Belfi
MURRAY, FRANK & SAILER LLP
275 Madison Avenue, Ste. 801
New York, NY 10016

Frederick S. Fox, Sr.
KAPLAN FOX & KILSHEIMER LLP
805 Third Avenue, 22nd Floor
New York, NY 10022

Travis E. Downs, III
Amber Eck
DAVID T. WISSBROECKY
LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS, LLP
401 B. Street, Ste. 1600
San Diego, CA 92101

Stanley Grossman
POMERANTZ, HAUDEK, BLOCK
GROSSMAN & GROSS, LLP
100 Park Avenue, 26th Floor
New York, NY 10017

Hannah Greenwald
John P. Coffey
Matthew C. Molhlman
BERNSTEIN, LITOWITZ, BERGER &
GROSSMAN LLP
1285 Avenue of the Americas
New York, NY 10019-6028

Robert I. Harwood
WECHSLER HARWOOD LLP
488 Madison Avenue, Ste. 801
New York, NY 10022-5726

Robert A. Izard
SCHATZ & NOBEL, PC
20 Church Street, 17th Floor
Hartford, CT 06103

Christopher J. Keller
LABATON, SUCHAROW & RUDOFF, LLP
100 Park Avenue, 12th Floor
New York, NY 10017

Robert Kopecky
KIRKLAND & ELLIS
200 East Randolph Dr.
Chicago, IL 60601

Brad S. Karp
Christopher H. Giampapa
PAUL, WEISS, RIFKIND, WHARTON, &
GARRISON
1285 Avenue of the Americas
New York, NY 10019

Bruce F. Rinaldi
COHEN, MILSTEIN, HAUSFELD & TOLL
PLLC
1100 New York Avenue, NW
West Tower, Ste. 500
Washington, DC 20005-3934

Christopher S. Hinton
WOLD HALDENSTEIN ADLER FREEMAN
& HERZ
270 Madison Avenue, Ste. 801
New York, NY 10016

Dennis J. Johnson
JOHNSON & PERKINSON
1690 Williston Road
P.O. Box 2305
S. Burlington, VT 05403

Daniel F. Kolb
DAVID, POLK, & WARDWELL
450 Lexington Avenue
New York, NY 10017

Leigh R. Lasky
LASKY & RIFKIND, LDT.
100 Park Avenue, 12th Floor
New York, NY 10017

Jacqueline Sailer
MURRAY, FRANK & SAILER, LLP
275 Madison Avenue, Ste. 801
New York, NY 10016

Steven G. Schulman
MILBERG, WEISS, BERSHAD &
SCHULMAN LLP
One Pennsylvania Plaza, 49th Floor
New York, NY 10119-0165

Lee Squitieri
Squitieri & Fearon, LLP
32 East 57th Street, 12th Floor
New York, NY 10022

Samuel H. Rudman
LERACH COUGHTON STOIA GELLER
RUDMAN & ROBBINS
200 Broadhollow Road, Ste. 406
Melville, NY 11747

Michael Yarnoff
Sean M. Handler
Jodi C. Murland
SCHIFFRIN & BARROWAY, LLP
280 King of Prussia Road
Radnor, PA 19087

David R. Scott
SCOTT & SCOTT, LLC
108 Norwich Avenue
P.O. Box 192
Colchester, CT 06415

Evan Smith
BRODSKY & SMITH
Two Bala Plaza, Ste. 602
Bala Cynwyd, PA 19004

William W. Wickersham
ENTWISTLE & CAPPUCCI LLP
280 Park Avenue
26th Floor West
New York, NY 10017

Robert S. Scher
FOLEY & LARDNER LLP
90 Park Avenue
New York, NY 10016

Robert M. Stern
Bob Eccles
O'MELVENY & MYERS, LLP
1625 Eye Street, N.W.
Washington, D.C. 20006

Carl L. Stine
WOLF POPPER LLP
845 Third Avenue, 12th Floor
New York, NY 10022-6601

Jean-Marc Zimmerman
ZIMMERMAN & LEVI, LLP
226 St. Paul Street
Westfield, NJ 07090

Susan Whatley
Bradley E. Beckworth
Jeffrey J. Angelovich
NIX, PATTERSON & ROACH LLP
205 Linda Dr.
Dangerfield, TX 75638

A. Robert Pietrzak
Daniel A. McLaughlin
Donald P. Renaldo
SIDLEY, AUSTIN, BROWN & WOOD
787 Seventh Avenue
New York, NY 10019

Gregory S. Bruch
Foley & Lardner LLP
Washington Harbour, Ste. 500
3000 K Street, NW
Washington, DC 20007-5109

Geoffrey M. Johnson
SCOTT + SCOTT LLC
33 River Street
Chagrin Falls, OH 44022

Jeffrey T. Meyers
MORGAN & MEYERS PLC
3200 Greenfield, Suite 260
Dearborn, MI 48120-1802

Abraham Rappaport
LAW OFFICE OF ABRAHAM RAPPAPORT
3774 N.W. 3rd Avenue
Boca Raton, FL  33431

Wilber H. Boies
MCDERMOTT, WILL & EMERY LLP
227 West Monroe Street, Suite 4400
Chicago, IL  60606

s/ Lynn L. Sarko
Lynn L. Sarko
Keller Rohrback L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA  98101
Telephone:  (206) 623-1900
Facsimile:  (206) 623-3384

LABOR ADVOCATES WORKERS SOLUTION
Not for Profit Working for American Workers, Retirees, and Families
(kimshee97@att.net) (www.disputethis.org)
Patricia Meyer, Director
**P.O. Box 112**
West Olive, MI 49460
269-998-4609

Southwest Bankruptcy District Court
300 Quarropas
White Plains, New York 10601
Case #21-827

March 5, 2012

Judge Drain,

My name is Patricia Meyer, Director of L.A.W.S., Inc., a not-for profit organization that has been working for our workers, retirees and their families for the last 17 years. I am writing to day to ask that the included information be added to and docketed with the other information already docketed for my case #21-827 to be heard on March 22 in your chambers pertaining as to whether Delphi was ever truly a standalone company.

Thank you for your help. I look forward to meeting with you on March 22, 2012.

Sincerely,

Patricia Meyer



Courtesy of
## automotive digest
*Online Coverage of Significant Events and Activities in the Automotive Industry*

P  310 265 7225    F  310 798 4581
E  Webitor@automotivedigest.com
425 32nd St   Manhattan Beach, CA 90266

Subscribe at www.automotivedigest com

Sourced From: Detroit Free Press, March 5, 2005
## Delphi CFO Ousted Amid Claim of Cooked Books

### SITUATION

1. #1 supplier Delphi Corp admits overstated profits, annual cash intake

2. Scandal results amid departure of vice-chair/CFO Alan Dawes, controller Paul Free

3. Dawes was seen as potential CEO upon retirement of JT Battenberg III at year-end

4. Probe uncovers numerous accounting "errors" in every year since 1999 spinoff from GM

5. Total "padding" amount put at $166M pre-tax profit over 6-year period

6. Overstated cash yield of $446.5M in same period

### SIGNIFICANT POINTS

1. Already battered supplier industry stung by rising number of bankruptcies

2. Under new federal guidelines, Battenberg/Dawes signed accuracy testimonials

3. Battenberg announced surprise retirement only 10 days ago

4. Battenberg, Delphi board insist CEO retirement unrelated to scandal

5. Battenberg/Dawes could be prosecuted if SEC finds them aware of puffed-up reports

6. Delphi Corp employs 185K workers worldwide at $27B year parts-maker

### SAYS

1. "Now he [Battenberg] must channel his energies into ensuring that he leaves a company able to stand on its own, with the books to prove it." -- *Detroit Free Press editorial, March 5, 2005*

2. "Well, you have a Big Three in GM, Ford and Chrysler, and among suppliers you have a Big Two -- Delphi and Visteon. This announcement today just drags down every auto supplier." -- *Chris Whall, Whall Group, Auburn Hills, MI firm specializing in finding fraud*

### WEB SOURCE

http //www freep com/money/autonews/delphi5e_20050305 htm

http //www.delphi com



Courtesy of
## automotive digest
**Online Coverage of Significant Events and Activities in the Automotive Industry**

P 310 285 2225    F 310 798 4591
E Webster@automotivedigest.com
425 32nd St   Manhattan Beach  CA 90266

Subscribe at www.automotivedigest.com

Sourced From: Management Briefing Seminar, Traverse City, MI, August 3, 2005
## Delphi COO Calls Bankruptcy Course 'Unthinkable'

### SITUATION

1. Delphi COO Rodney O'Neal addresses Management Briefing Seminars in Traverse City

2. O'Neal rules out bankruptcy filing as "unthinkable B-word option"

3. Delphi performance abroad "flawless," says O'Neal; N America requires drastic relief

4. Overseas results reflected by gains of 100% in Asia, 70% Europe, 50% S America

5. Delphi pursuing new products in number of promising sectors, says O'Neal

### SIGNIFICANT POINTS

1. Storm clouds still overhang Delphi as #1 supplier negotiates cost-savings w/ GM, UAW

2. Bankruptcy prospect brought up by hiring of Steve Miller as CEO last month

3. Miller key figure in bankruptcies of suppliers Federal-Mogul and Bethlehem Steel

4. Troy, MI-based Delphi works to weave closer ties to supplier, keep growing

5. Delphi to unveil 322 new products over next two years, says O'Neal

### WEB SOURCE

http://www.delphi.com/

http://www.cargroup.org/mbs2005/index.htm

SEC Investigating Delphi-BBK Inventory Transactions                    Page 1 of 2



Courtesy of ·
**automotive digest**
*Online Coverage of Significant Events and Activities
in the Automotive Industry*

P 310 285 2224    F 310 798 4561
E. Webitor @automotivedigest com
426 22nd St. Manhattan Beach, CA 90266

Subscribe at www.automotivedigest.com



Sourced From: The Wall Street Journal, April 8, 2005
## SEC Investigating Delphi-BBK Inventory Transactions

### SITUATION

1. SEC conducting broad inquiry into accounting practices of Delphi, 1 of world's largest auto-parts suppliers

2. Delphi disclosed details of 3 deals w/ BBK which bought and then sold back $89M of inventory

3. Delphi said it improperly accounted for transactions as disposals instead of financing transactions 

4. Delphi had touted ability to moderate impact of 4th Q order declines partly by "aggressive inventory management"

5. BBK worked mostly w/ "troubled suppliers" group in Delphi's treasury department

6. One of BBK's main goals to keep assembly lines running by helping cash-strapped suppliers

### SIGNIFICANT POINTS

1. BBK CEO says company has turned over information to SEC but can't discuss investigation

2. Delphi said it arranged financing for 3 inventory purchases in 2000 and 2001 and that 4th Q deals allowed increasing pretax income for quarter

3. Delphi recorded amounts as receivables, then let 3rd party settle using cash from Delphi-arranged financing

4. Delphi beat Wall Street estimates by $.04/share in 4th quarter 2000

5. Delphi claims CEO's retirement announcement not related to on-going investigation

6. BBK is longtime supplier to General Motors, Delphi's former parent

### BACKGROUND

1. BBK founded as Bahadur & Associates in 1977 to help debtors and creditors resolve issues

2. Became Bahadur Balan & Kazerski but latter 2 partners have since left company

### WEB SOURCE

http://online.wsj.com/article/0,,SB111291307127001332,00.html



## automotive digest
Operating Knowledge of Significant Events and Activities
in the Automotive Industry
Subscribe at www automotivedigest com

P 310 285 2225   F 310 798 4591
E Webitor@automotivedigest com
425 32nd St   Manhattan Beach, CA 90266

Sourced From Bloomberg, Detroit News  May 17, 2006

## Delphi Accounting Probe Claims More Execs

**SITUATION**

1  Delphi is being investigated by US regulators over accounting mistakes

2 . As a result of Delphi's own internal probe, 2 finance execs just resigned

3 . Also, a VP has been demoted; all totaled, 4 execs, including CFO, have resigned

4  Numerous Delphi officials have been served w/ subpoenas by SEC

**SIGNIFICANT POINTS**

1 . Delphi considering shareholder request to sue current and former officers

2 . Meeting w/ investors to discuss restructuring and get up to $3B in financing

3 . SEC investigating transactions w/ numerous vendors, including EDS and GM

4 . Looking at timing of payments and when revenue was recorded

5  FBI and postal inspectors also opening criminal investigations

**SAYS**

1 . "I would imagine that this is part of the general cleanup since they are making progress with the
banks and starting to release some additional financial line items." – Glenn Reynolds, CEO,
CreditSights Inc.

**WEB SOURCE**

http //www freep com/money/autonews/delphi17e_20060517.htm

http //www delphi com

http //www creditsights com

Shakeup at Delphi Follows Internal Accounting Review



**Courtesy of**
# automotive digest
*Online Coverage of Significant Events and Activities in the Automotive Industry*

P: 310.266.2226   F: 310.788.4581
E: Webiter@automotivedigest.com
426 22nd St., Manhattan Beach, CA 90166

Subscribe at www.automotivedigest.com

Sourced From: Automotive News, Detroit News , March 4, 2005;
## Shakeup at Delphi Follows Internal Accounting Review

### SITUATION

1 . Delphi Corp CFO Alan Dawes quit his job Friday

2 . Audit committee of Delphi's board of directors said it had lost confidence in him

3 . Paul Free, former chief accountant/controller, left Delphi

4 . John Blahnik reassigned to non-officer position

5 . Internal review found cash flow from operations improperly inflated by $200M in 2000

6 . Pre-tax income inflated by $61M in 2001 by improper accounting for rebates

### SIGNIFICANT POINTS

1 . Shakeup comes just after CEO JT Battenberg III, 61, announced he would retire

2 . Last year, Delphi lost $36M; expected to lose as much as $200M in 2005

3 . Delphi said it will cut 8,500 jobs this year

### WEB SOURCE

http://www.autonews.com/news.cms?newsid=11731

http://www.detnews.com/2005/autosinsider/0503/04/autos-107803.htm

http://www.delphi.com

http://www.sec.gov

GM Pension Fund $31 Billion Short, Says US Pension Agency





*Courtesy of*

## automotive digest

*Online Coverage of Significant Events and Activities*
*in the Automotive Industry*

P  310 285 2226    F  310 798 4591
E  Webiter@automotivedigest.com
426 32nd St   Manhattan Beach  CA 90266

Subscribe at www.automotivedigest.com

Sourced From: New York Times, October 3 2005

## GM Pension Fund $31 Billion Short, Says US Pension Agency

### SITUATION

1 . US Pension Benefit Guaranty Corp finds GM pension fund $31B underfunded

2 . GM denies charge, insisting fund is "fully funded"

3 . Conflict arises, since both methods of tracking pensions legally acceptable **Who is Accountable?**

4 . GM fund made up of 2 plans, reported to have $2B surplus at end of 2004

### SIGNIFICANT POINTS

1 . GM takes pension obligations very seriously, in released statement

2 . Bill moving through Congress could favor agency method of calculating pension

3   Agency method measures funds on hand on basis of immediate cessation

4 . Matter would be of prime importance if GM were to declare bankruptcy

### SAYS

1 . "There is no reason to expect that G.M.'s pension plans will be terminated, and to assume
otherwise is to unnecessarily alarm the many thousands of people who rely upon those plans for
their retirement." -- *Jerry Dubrowski, spokesman, General Motors*

### WEB SOURCE

http://www.nytimes.com/2005/10/03/business/03GM.html

http://www.gm.com/

http://www.pbgc.gov/

GM Accused of Investor Fraud



Courtesy of
**automotive digest**

*Online Coverage of Significant Events and Activities in the Automotive Industry*

P 310 265 2225   F 310 796 4591
E Webitor@automotivedigest com
425 12nd St   Manhattan Beach CA 90266

Subscribe at www automotivedigest com

Sourced From: Detroit Free Press, September 20 2005

## GM Accused of Investor Fraud

### SITUATION

1. NYC Federal District Court site of suit charging GM w/ investor fraud

2. Folksam Asset Management says GM inflated price of securities w/ misleading statements

3. GM also omitted "material facts" in financial reports, says bill of complaint

4. Complaint cites misleading forecast of annual profit, 4th Q 2004 profit restated

5. GM should have known that Jan 20, 2004 report of "solid overall results" deceptive

### SIGNIFICANT POINTS

1. No immediate comment by GM spokeswoman Geri Lama as shares fell by $1.17 on news

2. Shares fell 14% on March 16 when restatement release was issued

3. Suit represents GM bondholders/shareholders on record from Feb, 2002

### WEB SOURCE

http.//www freep com/money/autonews/gm20e_20050920 htm

http://www gm com/

Delphi Restates Financials, 2004 Losses Widen to $4.8 Billion



**automotive digest**

*Online Coverage of Significant Events and Activities in the Automotive Industry*

Sourced From: Detroit Free Press; Detroit News, July 1, 2005

# Delphi Restates Financials, 2004 Losses Widen to $4.8 Billion

## SITUATION

1. Delphi posts auto industry's biggest annual loss ($4.8B) since Ford's $5.45B loss in 2001

2. Accounting procedures triggered 2 federal investigations and ouster of 5 execs

3. 10-month internal investigation by company uncovered improper accounting transactions

4. Report found ineffective accounting procedures, insufficient qualified personnel, inadequate control at corporate level

5. SEC probe to determine if company officials intentionally involved in fraudulent accounting

6. Company announces continued restructuring to restore profitability

## SIGNIFICANT POINTS

1. Restatements reduced 2001 earnings $265M, cut 2002 net income $24M and reduced 2003 net loss $46M

2. Delphi forced to cope w/ declining revenue as biggest customer, GM, cuts production

3. Raw material costs and uncompetitive wages also undermining earnings

4. Delphi to cut 8500 jobs by year's end   *Wagoner says "liquidate North America Operations"*

5. Replacement for retiring chairman JT Battenberg III is Robert "Steve" Miller, Chairman, Federal-Mogul Corp

6. Incoming CEO is financial expert w/reputation for rescuing troubled companies

## BACKGROUND

1. Spun off by GM in 1999, Delphi is world's largest auto parts manufacturer, maker of XM Satellite radios

## SAYS

1. "A clean set of financials allows the company to focus on ongoing issues that are affecting the company. The issues, like its high-cost structure, are quite substantial." – *Joe Amaturo, analyst, Calyon Securities (USA) Inc.*

2. "While it is regrettable to have had to undergo this process, the board and the entire team at Delphi are poised to integrate the lessons learned into the company's internal controls and channel all efforts and resources toward Delphi's transformation." – *Robert H. Brust, chairman, Delphi audit committee and executive VP and CFO, Eastman Kodak Co.*

3. "The important thing about getting all this out is it will tell us how bad it was and why they turned to someone like him [Miller], whose reputation is for rescuing very troubled companies. Delphi may be more troubled than we thought." – *Walter McManus, director, Office for the Study of Automotive Transportation, U of Michigan*

http:                                                                                      7/2007

Don't Sell or Buy GM Stock, Execs and Finance Staff Told              Page 1 of 1



Courtesy of
**automotive digest**
*Online Coverage of Significant Events and Activities
in the Automotive Industry*
P  310.265.2225    F  310.796.4581
E: Webitor@automotivedigest.com
425 32nd St., Manhattan Beach, CA 90266
Subscribe at www.automotivedigest.com

Sourced From: Detroit News, June 27, 2005
## Don't Sell or Buy GM Stock, Execs and Finance Staff Told

### SITUATION

1. GM orders most senior execs, finance staffer not to buy or sell GM stock

2. Indefinite deadline set to prevent illegal insider trading based on non-public info

3. Similar action taken at Delphi Corp, all following accounting scandals at Enron

4. Action taken to comply w/ 2002 Sarbanes-Oxley law regarding corporate oversight

### SIGNIFICANT POINTS

1. Researcher David Cole: This is delicate time for GM, in talks w/ UAW

2. SEC served GM w/ records request April 8 regarding 2 transactions w/ Delphi

3. GM suspended its profit guidance for the year in April, seen as negative move

4. GM doesn't want employee trades to duplicate flurry set by Kirk Kerkorian

### SAYS

1. "It's [clampdown] more restricted than usual due to the fact that we are no longer providing earnings guidance." — *Toni Simonetti, spokeswoman , General Motors*

### WEB SOURCE

http://www.detnews.com/2005/autosinsider/0506/27/A01-229262.htm

P.4



Legal Battle Likely if GM Cuts Retiree Benefits

Page 1 of 1



Courtesy of
**automotive digest**

Online Coverage of Significant Events and Activities
in the Automotive Industry

P: 310.285.2225   F: 310.798.4581
E: Webitor@automotivedigest.com
425 32nd St , Manhattan Beach, CA 90266

Subscribe at www.automotivedigest.com

Sourced From Detroit News, June 26, 2005

## Legal Battle Likely if GM Cuts Retiree Benefits

### SITUATION

1 . Bitter legal fight likely if GM tries to pare retiree benefits on its own

2 . GM told UAW it can cut medical coverage without returning to the bargaining table

3 . Legal experts say it's unclear whether GM has standing to do so

4 . Experts also say UAW initiated strike over benefits cut is illegal

5 . 6th Circuit Court of Appeals (includes Michigan) says benefits are "lifetime"

### SIGNIFICANT POINTS

1 . Legal experts differ on rights/standing of both parties, GM and labor union

2 . 3rd Circuit Court of Appeal ruled against retiree benefits in 1983 ruling

3 . A judge in United Airlines bankruptcy case did allow company to shed retiree benefits

### SAYS

1 . "The UAW will produce documents that show GM has acted in a manner that suggests that GM saw this as a commitment. to continue to honor the benefits." – *Fred Feinstein, professor, University of Maryland School of Public Policy*

2 . "GM language has become pretty good in terms of amending or suspending benefits. If this is litigated to the end, a lot of people believe GM is in good shape." – *Jordan Schreier, attorney, Butzel Long, Ann Arbor, MI*

### WEB SOURCE

http.//www detnews.com/2005/autosinsider/0506/26/A01-228368.htm



*Courtesy of*
**automotive digest**

*Online Coverage of Significant Events and Activities
in the Automotive Industry*

P  310 265 2725    F  310 796 4591
E  Web for @automotivedigest com
425 32nd St  Manhattan Beach, CA 90266

Subscribe at www automotivedigest com

Sourced From  Wall Street Journal, April 5, 2005

## Auto Pension Plans Underfunded, Headed for Trouble

### SITUATION

1. Automaker/supplier pension plans are seriously "underfunded"

2. Federal Pension Benefit Guaranty Corp says plans fall short by $45B-$50B

3. 6 suppliers in bankruptcy proceedings may hand over plans to PBGC for payment

4. Delphi Corp, largest auto supplier, has "worst" spread w/ pension commitment

### SIGNIFICANT POINTS

1. More Chapter 11 bankruptcy filings could result, as seen in steel/airlines

2. PBGC guarantees annual pension around $45,614, at age 65, though plan may be higher

3. 26 automakers have plans w/ assets falling at least $50M short

4. At least 12 automaker suppliers' rating have been downgraded to junk level

5. PBGC created in 1974 by Congress to insure defined-benefit pension plans

### WEB SOURCE

http //online.wsj.com/article/0,,SB111266264576197911,00.html

http //www pbgc gov



Courtesy of
## automotive digest
Online Coverage of Significant Events and Activities
in the Automotive Industry

P  310 285 2225    F  310 796 4591
E  Webitor@automotivedigest.com
425 32nd St   Manhattan Beach  CA 90288

Subscribe at www.automotivedigest.com

Sourced From: Business Week, August 8, 2005
## Delphi Bankruptcy Option Could Pose Problem for GM

### SITUATION

1  Delphi Corp hired Steve Miller, Jr as chairman, hopeful turnaround specialist could help

2 . Profit-squeezed GM still buys $15B annually from trouble-laden supplier

3 . Miller could stick GM w/$9B pension/benefits bill guaranteed under spinoff

4 . Delphi riding out current crisis after $408M loss in 1st Q

### SIGNIFICANT POINTS

1 . Miller says Delphi board wants to avoid bankruptcy, but it is still an option

2 . Miller will look to rid company poor performing units, sell off assets

3 . Miller needs UAW approval to unload underperforming plants

4 . Delphi in talks w/ GM/UAW, work deal for GM to take back workers, buy them out

### SAYS

1 . We don't have any easy solutions. Frankly, subsidizing suppliers is not one of them." – *John M. Devine, Vice-Chairman and Chief Financial Officer, General Motors*

### WEB SOURCE

http //www businessweek.com/magazine/content/05_32/b3946057_mz011 htm

http //www.delphi.com

http //www gm com

http //www uaw org

05-44481-rdd    Doc 21841    Filed 03/07/12    Entered 03/07/12 15:34:28    Main Document
Pg 187 of 199
P. 01
9897907623

Feds take on Delphi for retirement losses

Page 1 of 3

Capital One  No Hassle Miles

Apply

Subscribe Now  |  Pay Bill  |  Place an Ad  |  Contact Customer Service  |  Contact The Detroit News

Archive: Wed | Thu | Fri |

**Home    News    Local    Sports    Autos    Business    Entertainment    Lifestyle    Opinion                    Classifi**

**Autos Insider    Drive    Auto Shows    Joyrides    Auto Photos    Auto Blogs    Auto Talk**

## Autos Insider

RSS Feeds        Email Headline

Article Tools:    Print        Email        Comment        Text Size: ◄ A  A  A ►        Save            Share

Wednesday, October 24, 2007

# Feds take on Delphi for retirement losses

### David Shepardson / The Detroit News

**WASHINGTON** – The U.S. Labor Department went to court Tuesday to force Delphi Corp. to repay 11,000 retirees and employees $3.1 million in retirement-funds losses.

The decision follows a yearlong investigation by the Department of Labor into a mistake Troy-based Delphi made in investing some of its retirement funds. The company failed to properly disclose or correct the error, the government said.

Between 2000 and 2003, Delphi's plan administrator, Fidelity Investments, mistakenly invested dividends in General Motors Corp. stock, rather than in a less-risky income fund.



Advertisement

## Fed Lowers Interest Rate

### $90,000 Mortgage for Under $499/Month!

Select Your State
AL ▼

Calculate New Payment

Lower My Bills.com

Because of steep losses in GM stock, Delphi Corp. employees were out $3.9 million as of October 2005. About 1,500 Delphi employees were repaid about $856,500 in 2004 after being notified of their right to seek repayment.

That leaves 11,000 employees who still are out $3.1 million.

"After discovering the multi-million injury caused by its four-year fiduciary failure to follow the plan's terms, Delphi added insult to that injury by choosing not to simply reverse the error and make all of the affected participants whole, but instead took steps calculated to serve its own interests," wrote Peter D.

05-44481-rdd · Doc 21841 · Filed 03/07/12 · Entered 03/07/12 15:34:28 Main Document
Pg 188 of 199
9897907623
P.02

Feds take on Delphi for retirement losses

Page 2 of 3

Broitman, a lawyer for the U.S. Department of Labor.

The Labor Department's request was filed in U.S. Bankruptcy Court in New York.

Delphi sent a complicated notice to employees and retirees to "discourage participants from choosing the only option that made them whole, but like a dishonest butcher who puts his thumb on the scale when his customer's back is turned, it did so only when the IRS wasn't looking," Broitman wrote.

Delphi benefits attorney Frank Kuplicki told a Labor investigator in April 2006 that the company considered the problem "to be Fidelity's fault and Fidelity's problem to fix."

Delphi spokesman Lindsay Williams declined to comment, saying the company will respond in court.

Article Tools:    Print        Email        Comment

## In the Blogs...

### Daniel Howes' Blog



Daniel Howes: The updraft lifting Detroit Auto's prospects and the spate of troubles dinging Toyota Motor Corp.'s image of invincibility are spawning some revealing assessments, the m ... Continued

### Wings Blog

Ted Kulfan: Forgot to post this earlier in the day, but yes, Hasek back in net Wednesday against VAncouver. Not much of a surprise, he played well in Phoenix and the Wings would like ... Continued



### MichMoms Blog



Grace Stanczak: You know those rental services like Netflix that allow you to select, view and return movies without ever needing to travel farther than your mailbox? Well, my frien ... Continued

More blogs

---

MORE IN: AUTOS INSIDER

UAW goes all-out for pact OK - 10/24/2007

Ruling unlocks Porsche VW bid - 10/24/2007

Let weak yen trade freely, Big 3 economists tell Japan - 10/24/2007

Feds take on Delphi for retirement losses - 10/24/2007

Honda to focus on hybrids - 10/24/2007

Auto briefs - 10/24/2007

Toyota slips behind GM, loses No. 1 rank - 10/23/2007

Saving some Ford factories on table - 10/23/2007

Chrysler contract narrowly ahead - 10/23/2007

GM to cut third shift, idling 1,000 - 10/23/2007

Drivers get behind wheel of the future - 10/23/2007

Auto briefs - 10/23/2007



# Bloomberg.com

## Delphi and Calpine Bondholders Undermined by Subprime Seizure

By Christopher Scinta and Tiffany Kary



Oct. 16 (Bloomberg) -- Delphi Corp. and Calpine Corp. bondholders, who were promised returns of 20 cents or more on the dollar in cash plus stock for their investments in the bankrupt companies, can blame the subprime-induced seizure in the credit markets if they end up with a lot less.

Delphi, the largest U.S. auto-parts maker, hasn't been able to secure the $7.1 billion in debt financing it needs to pay creditors including former parent company General Motors Corp. and exit court protection. Calpine, a California power producer, said its $8 billion financing package may fall through if it doesn't complete its reorganization by Jan. 31.



``Problems finding exit financing in the current capital markets are profound," said David Pauker, a reorganization adviser at Goldin Associates in New York. ``It is something all of us in the restructuring community are dealing with."

When bankrupt companies are forced to take smaller exit loans, there is less cash to distribute and higher-ranking creditors will get more stock or bonds. Lower-ranking creditors may have their recoveries reduced or eliminated altogether. Calpine said that finding new financing could cost it $800 million more in interest.

Bondholders prefer cash to securities because ``even if you get close to the same recovery, it's going to take longer," said Henry Owsley, founding partner of New York investment bank Gordian Group LLC. ``It's the time value of money."

Calpine spokesman Mel Scott said the company is ``on track to exit bankruptcy and looks forward to emerging from bankruptcy by the end of January 2008." He declined to comment on the exit financing beyond what the company said previously.

### Delphi Response

Claudia Piccinin, a Delphi spokeswoman, didn't return calls seeking comment.

Delphi lawyer John Butler Jr. disclosed the problems acquiring financing at U.S. Bankruptcy Court hearings in New York on Sept. 27 and Oct. 3. The company may change payouts to some creditors as a result, he said. He didn't return a call yesterday seeking comment.

San Jose, California-based Calpine's plan to pay bondholders and creditors in full with something left over for shareholders will be threatened if the company can't complete its reorganization by Jan. 31 when its financing package expires. The record $8 billion bankruptcy loan, arranged by Goldman Sachs Group Inc., is supposed to help pay creditors.

If the loan falls through, Calpine likely won't be able to pay holders of $4 billion in second lien bonds with cash, Morgan Suckow, a vice president with Calpine's financial adviser Miller Buckfire & Co., said in a court filing. That may force Calpine to rework the terms of its reorganization plan, he said.

## Vote Delay

The committee representing Calpine's shareholders and some creditors of its Calpine Generating Co. unit are trying to stall a vote on the turnaround plan by creditors, saying Calpine hasn't provided fresh enough data about its value, which Miller Buckfire pegged at $20.3 billion in June.

If the financing falls through, replacing the loan would cost Calpine another $800 million in interest, attorney Jeffrey Powell of Kirkland & Ellis said at an Oct. 4 court hearing.

``The exit financing is a critical element to debtors' emergence and considerably more favorable than any financing available today -- if any is available today," Powell told the judge overseeing the case. Powell didn't return a call seeking comment.

Calpine filed the biggest bankruptcy of 2005, topping Delphi, Delta Air Lines Inc. and Northwest Airlines Corp.

## Solutia's Package

Another company, Solutia Inc., said yesterday that due to ``historically high volatility" in the debt markets, it may have to pay higher interest rates on its $2 billion exit financing package, leading to ``reductions in free cash flow."

One problem for Calpine and Delphi is the size of their exit loans. Banks that have committed to the financing are having a hard time selling pieces of the loans to a broader group of lenders, said J. Scott Victor, a senior managing director at National City Investment Bank.

The market for large syndicated loans suffered a severe retrenchment in July, and lenders that had the opportunity to change the interest rates and covenants on their loans took it, said Colin Cross, a managing director of Crystal Capital in Chicago and chairman of Turnaround Management Association.

On Oct. 5, Delphi asked for court permission to transfer $650 million from overseas units to reduce the loan it needs to get out of Chapter 11 and said it is in talks with creditors about changing its turnaround plan. That could result in some creditors, including General Motors Corp. and senior noteholders, getting Delphi securities instead of cash.

## Changed Outlook

Delphi attorney Butler said the credit market troubles have changed the Troy, Michigan-based company's outlook on how much exit financing it can get.

``We need to look at what deal will clear the market," he told a federal judge overseeing Delphi's bankruptcy.

The weak credit markets triggered by the crisis in subprime mortgage lending have already scuttled one reorganization plan.

Marcal Paper Mills Inc. said it will seek a buyer for its business after Merrill Lynch & Co. refused to extend its offer to provide a $110 million exit loan package, citing a deteriorating credit market and the need to syndicate the loan.

Under the turnaround plan, New Jersey-based Marcal would have paid unsecured creditors as much as 52 percent of what they were owed in cash using a $95 million term loan and $15 million revolving credit line from Merrill. Now the price Marcal's business brings in a sale will determine the return.

With less exit financing available, ``companies won't reorganize, more will be sold," the Gordian Group's Owsley said. ``If you can't give everyone what they want and take creditors out for cash, it makes sense to sell instead."

To contact the reporters on this story: Christopher Scinta in New York bankruptcy court at cscinta@bloomberg.net ; Tiffany Kary in New York bankruptcy court at tkary@bloomberg.net .

*Last Updated: October 16, 2007 00:07 EDT*



## Transcript of Deputy Attorney General Paul J. McNulty at the Press Conference on Bankruptcy Fraud

### October 18, 2006

**1:34 P.M. EDT**

**DEPUTY ATTORNEY GENERAL McNULTY:** Good afternoon. I apologize for keeping you waiting and thank you for your patience. I'm Paul McNulty, the Deputy Attorney General, and with me is Cliff White, the Acting Director of the Executive Office for U.S. Trustees, and Chip Burrus, the Assistant Director for Criminal Investigations Division of the FBI.

We are here today to mark the anniversary of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, and we're announcing the results of a major crackdown on bankruptcy fraud.

Over the past two months, the Department of Justice has charged more than 78 defendants in 36 districts with bankruptcy fraud and related counts, including 15 indictments and three criminal complaints just yesterday.

This initiative and these unprecedented enforcement results reflect the commitment and teamwork of the FBI, the United States Attorneys and the United States Trustees program. Together with our partners at the Postal Inspection Service, IRS, Criminal Investigation, the Offices of the Inspectors General for the Department of Housing and Urban Development, and the Social Security Administration, and the United States Secret Service.

We are calling this large interagency effort Operation Truth or Consequences, because that's the essence of what's at stake when the bankruptcy process is abused. Tell the truth, or face the consequences.

This enforcement effort is important because bankruptcy fraud hits at the heart of what the bankruptcy system was created for: to give honest people a fresh start. But criminals take advantage of the system by either defrauding the very debtors the system was designed to help, or by defrauding creditors by using the law to discharge debts they should not otherwise be able to discharge. In the end, we all wind up paying for fraud in the form of higher interest rates and fees from companies that offer credit and loans.

In addition, the bankruptcy filing is often the last step in a series of crimes that may include health care fraud, bank fraud, mail fraud, money laundering, government program fraud, embezzlement, mortgage fraud and perjury. That's why this enforcement effort required the hard work of all our interagency law enforcement partners. And that's why it's so important that we focus on catching those who abuse the system.

Bankruptcy fraud can be the mere tip of the criminal iceberg. Many of the cases included in Operation Truth or Consequences illustrate this link between bankruptcy fraud and other white collar crimes. Let me just give you a few examples of such cases.

In the Northern District of Illinois, two cases have been charged in which bankruptcy lawyers engaged in schemes promising to save the homes of victims facing foreclosure. In fact, in at least one case, the defendant simply stole the homeowner's equity before the homes were lost to foreclosure.

In the Southern District of California, an attorney who filed bankruptcy concealed a chateau in France and other property worth $1.5 million. And in a case in the District of Delaware, two sisters collected their deceased mother's Social Security and veterans' benefits, filed bankruptcy, and then failed to disclose the bank account where they had deposited the funds.

These crimes are shameful as well as illegal. Prosecution of these individuals sends a message to anyone who

OCT-03-2007 06:02 PM   4243.33224r3        999r901623

05-44481-rdd   Doc 21841   Filed 03/07/12   Entered 03/07/12 15:34:28   Main Document
Transcript of Deputy Attorney General Paul J. McNulty at the Press Conference on Bankr...   Page 2 of 6
                                    Pg 192 of 199

may consider breaking these laws. Our enforcement tools are powerful, and we do not hesitate to use them.

We are also proud to announce today a new bankruptcy fraud Internet hotline that will make it easier for the public to reporting bankruptcy crimes. Tips from the public are often an important source of information to help us identify bankruptcy fraud. And this hotline will provide the Department with a more efficient method for the public to work with us. Cliff White will tell you more about the opening of the hotline.

Today's announcements are the latest in a strong Administration record of commitment to criminal enforcement of the bankruptcy laws, including the 2003 establishment of a specialized criminal enforcement unit in the United States Trustee program. In the last year alone, this unit trained approximately 1,500 law enforcement officers, federal prosecutors, United States Trustee personnel and others in detecting, investigating and prosecuting bankruptcy crimes.

In addition, United States Attorneys now chair approximately 50 bankruptcy fraud working groups that include representatives from each of these law enforcement partners. Together, they are committed to a nationwide effort to identify, investigate and prosecute those who willfully misuse and undermine the integrity of the bankruptcy system.

So, to those who think they can get away with bankruptcy fraud, the message from the Justice Department and our law enforcement partners is clear: You won't. Today we are packaging together these cases in order to emphasize the fact that so much enforcement work is happening and that this is something that we are committed to stopping.

Those who commit this fraud, you will be identified, you will be investigated, you will be prosecuted, you will be brought to justice. We have stepped up audit efforts now underway in order to detect even more criminal conduct.

The key is we have to strive for integrity in this system. We have to have an honest reporting of debts. We have to have people serving those who are trying to get a fresh start acting honestly. Our bankruptcy system must operate with integrity.

I'd like now to recognize Chip Burrus from the FBI, our Assistant Director for Criminal Investigations, to say a few words. Chip?

**MR. BURRUS:** Thank you, Paul. A fresh start. That's what the bankruptcy system is designed to offer an individual or a company. Our bankruptcy system rests on good faith. It depends on the integrity of the debtor and the idea that there exists a reasonable notion that loaned money should be repaid. The abuse of this system by an individual debtor or a professional within the system undermines not only the rehabilitation aspect of the bankruptcy system, but the integrity of the system as a whole.

Monies defrauded from bankruptcy never reach the pockets of deserving creditors or investors. As these frauds occur, these creditors and investors lose faith that their interests will be protected. This can have a ripple effect in the economy as the costs are relayed to consumers like you and me through increased interest rates, reduction in services, and additional administrative fees.

The FBI is working hard to combat bankruptcy fraud problem with our partners at the United States Attorney's Office and with the United States Trustees Office to restore confidence in the system.

In the case of bankruptcy fraud, the FBI has primary investigative jurisdiction, and continues to work closely with the United States Trustees Office on these matters. Bankruptcy fraud is a violation that can further other criminal activity such as mortgage fraud, identity theft and bank fraud. Since August 1st, the FBI has charged 48 subjects through information, indictment or criminal complaint. As of today, 11 of those have been arrested.

The FBI's strategy for reducing the number of fraudulent filings concentrates on three areas. First, the targeting of individuals and businesses who conceal assets. Second, the targeting of serial filers who make fraudulent, multiple interstate bankruptcy filings, and third, bankruptcy fraud where it's associated with another criminal enterprise.

The FBI, in collaboration with our law enforcement partners, including the Postal Inspection Service, the United States Secret Service, the IRS, the Housing and Urban Development Office of Inspector General and the Social Security Administration Inspector General, will continue to aggressively pursue those individuals who attempt to use our nation's bankruptcy system as their own personal piggy bank and to further their criminal intents.

I'd like to turn it over to the United States Trustees office for a few remarks.

**MR. WHITE:** Thank you, Chip. The U.S. Trustee program is the component of the Department of Justice whose mission is to protect the integrity of the bankruptcy system. And central to that mission is the enforcement of the civil and criminal bankruptcy laws.

Bankruptcy fraud must not be tolerated if our bankruptcy system is to serve its purpose of helping the honest debtor in need of financial relief. Operation Truth or Consequences highlights the commitment of the Department of Justice and our law enforcement partners to vigorously investigate and prosecute bankruptcy fraud wherever it occurs.

We're pleased to announce the launch of a new bankruptcy fraud Internet hotline to augment our criminal enforcement efforts. This hotline provides a more central mechanism for the public to report instances of bankruptcy fraud and abuse. We believe it will be helpful in our efforts to police the integrity of the system.

The graphic here on my left on the stage depicts a new notice that appears on the U.S. Trustee program's Internet home page. By clicking on the box, an individual is directed to a page on the website that details the type of information that is important for us to know and provides an e-mail link to submit information related to a suspected bankruptcy fraud.

All tips received via the hotline will be reviewed by U.S. Trustee program staff. Enforcement actions will be taken as appropriate, including referrals to the FBI or United States Attorney's offices.

I want to thank the United States Attorneys from the many districts represented in Operation Truth or Consequences, as well as our law enforcement partners for their support and assistance in ensuring the integrity of the bankruptcy system.

And now let me turn the podium back to the Deputy Attorney General.

**DEPUTY ATTORNEY GENERAL McNULTY:** Thanks, Cliff. And again, I want to emphasize that we are getting the word out on this, because we do want to achieve deterrence, and we that this is the kind of crime where deterrence can be achieved because of the recognition that there is a trail that will be discovered and can be investigated. So hopefully, we are going to see a decline in this area as an increase of law enforcement efforts are made.

I'm happy to answer any questions you might have.

**QUESTION:** I have one question on this, which is a big battle on Capitol Hill preceded passage of the bankruptcy law last year, and a lot of critics were concerned about its potential impact on honest debtors.

How many of these cases that you cite stem from the new provisions of the new law as opposed to fraud statutes that were already on the books prior to last year?

**DEPUTY ATTORNEY GENERAL McNULTY:** The vast majority of these cases relate to fraud statutes that already were on the books and were not created, a new criminal authority was not created in that legislation.

The legislation did a lot to change the civil system. The legislation, however, did a lot to push the priority of this enforcement or criminal side by, for example, requiring every U.S. Attorney's office to designate a coordinator for bankruptcy fraud investigations and prosecutions, which has raised the profile of this crime in U.S. Attorneys' offices.

So this fundamental criminal conduct was already proscribed prior to the passage of that legislation.

Do you want to add anything more to that?

**MR. WHITE:** No. That's fine.

**DEPUTY ATTORNEY GENERAL McNULTY:** Okay.

**QUESTION:** Can you provide us with an update on the Mark Foley investigation and also comment on the searches that were conducted against Congressman Weldon's daughter's house and relation to a Russian energy company down in Jacksonville, Florida in what is believed to be an influence peddling case?

**DEPUTY ATTORNEY GENERAL McNULTY:** I know this will come as a surprise, but I have no comment on either case.

**QUESTION:** Can you comment on the timing? Congressman Weldon called these searches three weeks before election time suspicious. And he's involved in a very close race in Pennsylvania. And when the FBI shows up at his daughter's house, that could seem as trying to influence an election at this point. Please comment at some angle on this.

**DEPUTY ATTORNEY GENERAL McNULTY:** I have heard those concerns expressed, but I don't have any comment about them. We are doing the job that we're required to do.

**QUESTION:** This week the Attorney General announced a new initiative to study and try to combat the spike in violent crime in some of the nation's cities. He announced it without being skewered. And I'm curious, who's going to be doing this survey? Because it seems – the announcement almost seemed rushed out. He didn't know which cities it was going to be in and he didn't say who was going to be conducting the survey to figure out which cities need to be studied the most. Can you answer – I mean, is it BJS or is it professionals who will be doing the survey?

**DEPUTY ATTORNEY GENERAL McNULTY:** Well, it's going to be a number of components at the Department of Justice involved in the process. It wasn't rushed out, but it is something that is moving along rapidly in the sense that we have the release of new information that just came out in September.

And that information, specifically the Uniform Crime Reports information, revealed that there is some increase in violent crime in certain cities that's more significant or extensive than it is in other places.

So the 2005 reported crime – on violent crime – shows a 1.3 percent increase in the rate of violent crime, which, while being the second lowest violent crime rate since 1977, is still an increase over last year. And so that was an area of focus to determine what might be happening there.

But then as you dig deeper into the numbers, you see that some cities actually had slight reductions. Others had increases. And the – so that occurred in September.

We had the IACP, the International Association of Chiefs of Police, meeting this week, and we thought it was a good opportunity to inform them as to what was going on.

In addition to that, we have the experiences of law enforcement concerning 2006 being expressed around the country in different ways. And so we know that there are some concerns about what's going on right now that aren't seen in data released on an annual basis that we have to wait for now for next year for 2006 numbers.

So, in order to address that sense of concern about what's happening and to let the law enforcement community know what we are trying to do, we wanted to take advantage of the opportunity that they were gathered, at least the police chiefs were gathered, in Boston. We also touched base with other law enforcement organizations as well.

We're looking at the data and selecting cities that will be reflective both geographically and statistically of the developments that we're noticing. So we'd want to see places that have increases in homicide and robbery and see that in different regions of the country where we can find it in different regions, so look for representative samples.

We are in the process of finalizing that list of cities. The Attorney General has directed me to oversee this project, and so we'll select those cities here or finalize the selection soon. We will look to have a blend of expertise in the Department involved.

You've mentioned Bureau of Justice Statistics, and we definitely want to include the statistics and analytical expertise of the Office of Justice programs. We also want to include policy types and enforcement types, prosecutors and others from within the Department, and we'll be reaching out to the law enforcement community in these cities and get their thoughts on what's going on.

information in several states or by using false information.            - October
- When a court-appointed trustee is bribed.                            - November
                                                                       - December

In addition, bankruptcy fraud often involves other serious crimes such
as mortgage fraud, identity theft, money laundering, and public
corruption.

"Bankruptcy fraud is often the tip of the criminal iceberg, and that
makes these prosecutions so important," said Deputy Attorney
General Paul J. McNulty.

Bankruptcy relief has become more widely accepted in the past
decade, as the stigma attached with filing for the protection has
diminished. The increase in filings, however, has led to more cases of
suspected fraud.

The FBI has initiated a three-prong strategy to reduce the number of
fraudulent filings.

- Targeting individuals and business that conceal assets;
- Targeting individuals who make fraudulent multiple interstate
  bankruptcy filings; and
- Targeting bankruptcy fraud where it is associated with another
  criminal enterprise.

**RELATED LINKS:**
- U.S. Trustee Program
- Stories on White Collar Crimes

Accessibility | eRulemaking | Freedom of Information Act | Legal Notices | Legal Policies and Disclaimers | Lir
Privacy Policy | USA.gov | White House

FBI.gov is an official site of the U.S. Federal Government, U.S. Department of Justice.

Page I

Claim No 29-71478

Corporation.

You should rely only on the information contained in this prospectus. We have not authorized anyone to de you with information different from that contained in this prospectus. We are offering to sell, and ng offers to buy, shares of common stock only in jurisdictions where offers and sales are permitted. The nation contained in this prospectus is accurate only as of the date of this prospectus, regardless of the of delivery of this prospectus or of any sale of common stock.

- **Relationship With GM.** We have become a leader in the global automotive parts industry by capitalizing on the extensive experience we have gained as the principal supplier of automotive parts to General Motors. General Motors currently owns all of our stock. After this offering, GM will own about 82.3% of our common stock and will continue to control our company. GM has announced that it intends to complete its divestiture of Delphi later in 1999, which we believe will enhance our ability to increase sales to other vehicle manufacturers over time.

MG>

- **Products.** We are primarily a "Tier 1" supplier, providing our products directly to vehicle manufacturers. We believe that we are one of the leading Tier 1 suppliers in each of our major product sectors:

does not take into account about 26,000,000 shares of our common stock that will be issuable upon exercise by our employees of "founders grant" stock options and restricted stock units and about 23,718,000 shares of our common stock that will be issuable upon exercise by our employees of stock options that will be substituted for GM stock options at the time of GM's divestiture of its shares of our common stock. The actual number of

## RECENT FINANCIAL RESULTS

Our consolidated financial results for the three months and years ended December 31, 1997 and 1998 are summarized as follows:

| | Three Months Ended December 31, | | Year Ended December 31, | |
|---|---|---|---|---|
| | 1997 | 1998 | 1997 | 1998 |
| | (in millions, except per share amounts) | | | |
| Net sales | $8,079 | $800 | $31,447 | $28,479 |
| Operating (loss) income | (877) | 63 | 352 | (221) |
| Net (loss) income | (521) | 88 | 215 | (93) |
| Basic and diluted (loss) earnings per share | (1.12) | 0.19 | 0.46 | (0.20) |

Claim No 29-7/4/93

### General Motors Will Control All Matters Affecting Our Company Prior to the Distribution

After the completion of this offering, GM will own about 82.3% of our outstanding shares of common stock, or about 80.2% if the U.S. underwriters exercise their over-allotment option in full. As long as GM owns a majority of our outstanding common stock, GM will continue to be able to elect our entire Board of Directors and to remove any director, with or without cause, and generally to determine the outcome of all corporate actions requiring stockholder approval. As a result, GM will be in a position to continue to control all matters affecting our company, including:

- the composition of our Board of Directors and, through it, any determination with respect to the direction and policies of our company, including the appointment and removal of officers;

- any determinations with respect to mergers or other business combinations involving our company;

- the acquisition or disposition of assets by our company;

- future issuances of common stock or other securities of our company;

- the incurrence of debt by our company;

- GM's ability to control the management and affairs of our company.

In the past we have been adversely affected by work stoppages that have led to the shutdown of GM's assembly plants. Strikes by the UAW, including at one of our facilities, led to the shutdown of most of GM's North American assembly plants in June and July 1998. In the event that one or more of our customers, including GM, experiences a material

### Substantial Sales of Our Common Stock Could Adversely Affect the Market Price

Sales by GM or others of substantial amounts of our common stock in the public market or the perception that such sales might occur could have a material adverse effect on the price of our common stock. After this offering, GM will own 465,000,000 shares of our common stock. If GM distributes these shares to the holders of its $1⅔ common stock, they would be eligible for immediate resale in the public market, other than any shares held by affiliates of Delphi. We cannot predict whether substantial amounts of our common stock will be sold in the open market in anticipation of, or following, any distribution of our shares by GM to holders of its $1⅔ common stock. GM has the sole discretion to determine the timing, structure and all terms of its distribution of our common stock, all of which may also affect the level of market transactions in our common stock. In addition, if GM does not distribute to the holders of its $1⅔ common stock all of the shares of Delphi common stock that GM owns, GM and its transferees will have the right to require us to register such shares of our common stock under the Securities Act for sale into the public market. See "Arrangements Between Delphi and General Motors—Registration Rights Agreement".

Electronics' expertise in electronics with our capabilities in automotive components and systems. Our Electronics & Mobile Communication product sector consists of the operations of our Delco Electronics subsidiary. From 1986 through 1997, Delco Electronics was operated by GM's Hughes Electronics Corporation subsidiary, which is a leader in satellite and wireless communications and space technology and was at that time also a leading defense electronics company. Unless we have indicated otherwise, the information contained in this prospectus assumes that Delco Electronics has been a part of our company for all periods presented.

GM has also advised us that, based on its current plans, in the event it decides to effect the Distribution through a split-off exchange offer and not enough of its $1⅔ common stockholders tender their shares to enable GM to divest itself of all of its shares of our common stock, it would distribute its remaining shares of Delphi common stock to the holders of GM's $1⅔ common stock in a spin-off.

Page III

Laim No 29-71478

- satisfaction that the Distribution will be tax-free to GM and its stockholders and as to the other tax consequences of the transactions;

- the absence of any court orders or regulations prohibiting or restricting the completion of the Distribution; and

- other conditions affecting the businesses of Delphi or GM that make it no longer in the best interests of such businesses to be fully separated.

On January 13, 1999, GM received a private letter ruling from the IRS to the effect that the Distribution would be tax-free to GM and its stockholders for U.S. federal income tax purposes.

Information Has Limited Relevance to Our Results As a Separate Company." You should also read the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section, which describes a number of factors which have affected our financial results, including significant price reductions as GM implemented its global sourcing initiative, labor disruptions at both GM and Delphi and charges associated with certain competitiveness initiatives.

After the Offering, General Motors will continue to own a significant portion of our common stock. As a result, GM will continue to include us as a "subsidiary" for various financial reporting, accounting and other purposes. Accordingly, we have agreed to certain covenants regarding the incurrence of debt. Specifically, so long as GM owns at least 50% of our outstanding shares of common stock, these covenants limit our

## Our Other Postretirement Employee Benefits and Underfunded Pension Obligations

In connection with our separation from General Motors, we have entered into several agreements relating to pensions and other postretirement employee benefits for our employees as well as certain employees associated with prior divestitures. See "Arrangements Between Delphi and General Motors—Employee Matters." Our pension obligations are based on the pension plans' assets, the expected investment return on those assets and the plans' expected liabilities. Under current economic conditions and federal government regulations, our pension obligations would be considered to be "underfunded." The amount of underfunding can vary from time to time, depending on factors such as discount rates, asset returns, contributions and other factors. As of September 30, 1998, Delphi's salaried and hourly other postretirement employee benefit obligation was about $4.5 billion and the underfunded pension obligation was about $1.9 billion.

Because of the underfunded nature of our pension plans, federal regulations will require that our contributions over time meet minimum funding requirements. Delphi is responsible for assuming the underfunded hourly pension liability associated with Delphi hourly employees or paying GM for underfunding relating to such employees.

services agreement with GM that are included in normal fixed price services and other ongoing payments to EDS that are attributable to work being performed in connection with Delphi's Year 2000 program is about $77 million (part of the estimated $300 million attributable to GM overall). This does not represent incremental spending to Delphi. None of our information technology projects has been delayed due to Year 2000.

Because of the underfunded nature of our pension plans, federal regulations will require us to make contributions over time to meet minimum funding requirements. Delphi is responsible for assuming the underfunded hourly pension liability associated with Delphi hourly employees or paying GM for underfunding relating to such employees.

We cannot accurately predict the amount or timing of contributions that will be required in the future or the related impact on our financial results and financial condition. These amounts may be affected by general economic conditions (including anticipated interest rates), the actual investment return on plan assets, the retirement rate of our employees, the attrition rate of our employees and other factors. In addition, we have agreed with General Motors that the obligations associated with certain employees who leave Delphi and join GM will be shared. The movement of employees from Delphi to GM, and changes in their status once they are at GM, may also have a material adverse effect on the funding status of the plans or payment obligations related to such employees.

**Inflation**

Inflation generally affects Delphi by increasing the cost of labor, equipment and raw materials. We believe that, because rates of inflation in countries where we have significant operations have been moderate during the periods presented, inflation has not had a significant impact on our results of operations.

**Year 2000**

Many computerized systems and microprocessors that are embedded in a variety of products either made or used by Delphi have the potential for operational problems if they lack the ability to handle the transition to the Year 2000. This issue has the potential to cause disruption to the business of Delphi and the companies that it supplies. In our capacity as principal supplier to and wholly owned subsidiary of GM, we are part of GM's comprehensive worldwide Year 2000 program. As part of that program, Delphi is identifying and remediating potential Year 2000 problems in its business information systems and other systems embedded in its engineering and manufacturing operations. Delphi, in conjunction with GM's supplier assessment and

remediation program, has also initiated communications and the assessments and the assessments with its suppliers and other third parties in order to assess and reduce the risk that Delphi's operations could be adversely affected by the failure of these third parties to adequately address the Year 2000 issue.

The Supply Agreement specifies that GM has the right to move its existing business with us to other suppliers in the event that we are not competitive in terms of quality, service, design or technology. In addition, GM has the right at all times to adopt new technology, whether or not such technology is available through us. If we are unable to provide the new technology or an equivalent technology acceptable to GM on a competitive basis, GM is free to move the business from us to another supplier. For more information regarding the terms of the Supply Agreement, see "Arrangements Between Delphi and General Motors—Supply Agreement."

• *Product Liability.* GM has retained responsibility for all product liability actions relating to products we manufactured prior to January 1, 1999 and sold or otherwise supplied to GM either before or after that date. Responsibility for product liability actions relating to products we manufacture on or after January 1, 1999 and sell to GM shall be determined in

*Preservation of the Tax-Free Status of the Distribution.* General Motors intends for the Distribution to qualify as a tax-free distribution under Section 355 of the Code to GM and its stockholders. On January 13, 1999, GM received from the IRS a private letter ruling (the "IRS Ruling") to such effect. In connection with GM's request for the IRS Ruling, we made certain representations and warranties to GM regarding our company and our business. We have also agreed to certain covenants in the IPO and Distribution Agreement intended to preserve the tax-free status of the Distribution. We may take any action otherwise prohibited by these covenants only if GM has determined, in its sole and absolute discretion, that such action would not jeopardize the tax-free status of the Distribution. See "—Cooperation on Tax Matters." Certain of these covenants are described in greater detail below: