Hearing Date And Time: May 24, 2012 at 10:00 a.m. (prevailing Eastern Time)
Response Date And Time: May 17, 2012 at 4:00 p.m. (prevailing Eastern Time)

James B. Sumpter, Pro se
21169 Westbay Circle
Noblesville, IN 46062
Telephone: (317) 877-0736
Facsimile: (317) 877-1070
jsump@ieee.org

Salaried Retiree of Debtors

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - .x Chapter 11 Case No. 05-44481 (RDD)

In re:

DELPHI CORPORATION, et. al.,

                     : (Jointly Administered) :

    Debtors.            : :
                      : :

- - - - - - - - - - - -x

## Vesting Motion Regarding Extended Disability Benefits For Salaried Employees And Salaried Retirees

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................ 2

TABLE OF AUTHORITIES ......................................................................................................... 4

Definitions ..................................................................................................................................... 5

    Disabled Beneficiaries .............................................................................................................. 5

    Coverage .................................................................................................................................... 5

    Insurance ................................................................................................................................... 5

    SPD ........................................................................................................................................... 6

    Welfare Plan ............................................................................................................................. 6

    Vesting ...................................................................................................................................... 6

I.     Jurisdiction ........................................................................................................................... 8

II.    Issues to be Resolved ........................................................................................................... 9

    Disability Benefit Vesting ........................................................................................................ 9

    Fiduciary Failure of Delphi (DPHH) ....................................................................................... 9

III.   Background ........................................................................................................................... 9

IV.   Impact on beneficiaries ...................................................................................................... 11

V.   ARGUMENT ...................................................................................................................... 12

    Disability Benefits Are Vested And Cannot Be Retroactively Terminated ........................... 12

        Vesting Granted Through The SPD ..................................................................................... 13

        Vesting Granted Through Contract Law ............................................................................. 14

Vested Benefits Cannot Be Retroactively Terminated ......................................................... 15

Delphi Prior Actions Demonstrate That It Operated With The Knowledge That Disability

Benefits Are Vested ................................................................................................................. 16

Some Disability Beneficiaries Are Covered By Supplemental Extended Disability Benefits

(SEDB)...................................................................................................................................... 19

Supplemental Disability Coverage Is Not Superior To Extended Disability Coverage ...... 20

Article III - Section 8.1(a) Of Amended Plan Does Not Apply................................................ 21

DPHH Has No Authority To Change Terms Of Vested Disability Payments ......................... 21

Delphi Has Failed To Meet Its Fiduciary Responsibility To Disabled Beneficiaries.............. 22

VI.      Relief Sought .................................................................................................................. 25

VII.     Benefit of Relief.............................................................................................................. 26

VIII.    No Prior Request............................................................................................................. 26

Appendix A:      DPHH Employee and Retiree Termination Letters ......................................... 28

Appendix B:      SPD Sections on Disability Benefits............................................................... 42

Appendix C:      Unjust Enrichment Analysis ......................................................................... 50

Appendix D:      Monthly Medicare premiums for 2012 ........................................................... 52

Appendix E:      Meeting Your Fiduciary Responsibilities (by U. S. DOL) .............................. 54

Appendix F:      DPHH Response Letter to Inquiry by James Sumpter (Movant) .................... 57

# TABLE OF AUTHORITIES

## Cases

Blackshear v. Reliance Standard Life Ins. Co., 509 F.3d 641 (4th Cir. 2007) ...................... 15, 22

Chiles, 95 F.3d at 1510 ..................................................................................................... 14, 15, 16

Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co., 231 Conn. 276, 282, 649 A.2d

518 (1994); In re Michael DEPINNA and Karen DePinna, Debtors;450 B.R. 337

(Bkrtcy.D.Conn. 2011) .............................................................................................................. 49

Leibowitz v. Cornell Univ., 584 F.3d 487, n.9, 509 (2d Cir. 2009) ............................................ 49

Member Services Life Insurance Company V. American National Bank And Trust Company

Of Sapulpa 130 F.3d 954 (10th Cir. 1997) ................................................................. 14, 15, 16

Wheeler, 62 F.3d at 640 .................................................................................................... 14, 15, 16

Wulf v. Quantum Chem. Corp., 26 F.3d 1368, 1377-78 (6th Cir. 1994) ..................................... 16

# Definitions

## Disabled Beneficiaries

This term, as used in this brief, refers to Disabled Employees and Disabled Retirees, inclusively.

## Coverage

The risks that are included in the terms of an insurance contract for protection under the policy; the amount and type of insurance.

An insurance policy provides coverage for particular losses, such as theft, fire, or accidents. The provisions of each individual policy determine the duration, extent, and nature of the coverage.

**West's Encyclopedia of American Law, edition 2. Copyright 2008 The Gale Group, Ine.**

## Insurance

A contract whereby, for specified consideration, one party undertakes to compensate the other for a loss relating to a particular subject as a result of the occurrence of designated hazards.

**West's Eneyclopedia of American Law, edition 2. Copyright 2008 The Gale Group, Inc.**

## OPEB

Other Post-Employment Benefits obligations – Which are Salaried Retiree Health Care Benefits, Medicare Part B special benefits, Health Savings Account benefits and Life Insurance benefits.

5

## SPD

Summary Plan Document

## Welfare Plan

ERISA defines an employee welfare plan as "any plan, fund or program ... established or

maintained by an employer ... for the purpose of providing for its participants or their

beneficiaries, through the purchase of insurance or otherwise, (a) medical, surgical, or

hospital care or benefits, or benefits in the event of sickness, accident, disability, death or

unemployment...." 29 U.S.C. Sec. 1002(1)

## Vesting

To give an immediate, fixed right of present or future enjoyment.

The term *vest* is significant in the law, because it means that a person has an absolute

right to some present or future interest in something of value. When a right has *vested*,

the person is legally entitled to what has been promised and may seek relief in court if the

benefit is not given.

In contemporary U.S. law the term *vesting* refers to the right that an employee acquires to

various employer-contributed benefits, such as a Pension, after having been employed for

a requisite number of years. The federal Employee Retirement Income Security Act

(ERISA) of 1974 (29 U.S.C.A. § 1001 et seq.) governs the funding, vesting,

administration, and termination of employee benefit plans. ERISA was enacted as a

result of congressional dissatisfaction with private pension plans. Under some plans an

employee's pension benefits did not vest before retirement or vested only after such a

long period of time (as long as thirty years) that few employees ever became entitled to

6

them. ERISA ensures that all pension benefits will vest within a reasonable time. Once
pension benefits are vested, an employee has the right to them even if the employment
relationship terminates before the employee retires.

In Constitutional Law *vested rights* are those that are so completely and definitely settled
in a person that they are not subject to defeat or cancellation by the act of any other
private person. Once a person can prove to a court the validity of the vested rights, the
court will recognize and protect these rights so as to prevent injustice.

West's Encyclopedia of American Law, edition 2. Copyright 2008 The Gale Group, Inc.

7

## Vesting Motion Regarding Extended Disability Benefits For Salaried Employees And Salaried Retirees

1.      This motion is a request for a ruling that Disability Benefits for current beneficiaries of the DPHH(formerly Delphi) Extended and Supplemental Extended Benefits plans are vested and cannot be terminated. In such case, this motion also seeks the establishment of a fully funded Disability Benefit trust fund.

# I.              Jurisdiction

2.      **WHEREAS,** the Bankruptcy Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding under 28 U.S.C. § 157(b) (2) (B), (F) and (O).

3.      **In regards to 28 U.S.C. § 1334:**

This is a matter arising in the case under the bankruptcy code in that the proceeding, which seeks to determine that disability benefits are vested is a proceeding related to debtor's bankruptcy case.

4.      **In regards to 28 U.S.C. § 157(b)(2):**

~ (B) This Vesting motion would exempt property from the estate.

-       (F) this proceeding is to determine, or recover preferences.

~ (O) The determination of Disability Benefit vesting results in the adjustment of the debtor-creditor relationship.

8

5.      To the extent that there are any issues that are determined to be non-core, the Movant consents to having this court enter final judgment.

6.      For the reasons set forth herein, the relief requested is warranted and necessary. In support of the "Vesting Motion", the Movant respectfully represents as follows:

## II.                          Issues to be Resolved

### Disability Benefit Vesting

7.      Are the Extended and Supplemental Disability Benefits of Disabled Salaried Employees and Disabled Salaried Retirees vested; and therefore protected from retroactive modification?

### Fiduciary Failure of Delphi (DPHH)

8.      Has Delphi (DPHH) failed in its fiduciary duty, through either negligence or a conflict of interest, to protect the benefits of the Disabled Beneficiary?

## III.                         Background

9.      On 8-OCT-2005 Delphi et al. filed a petition for chapter 11 bankruptcy. On 25-APR-2009, Delphi while under supervision of the bankruptcy court, terminated what Delphi termed other post-employment benefit obligations (OPEB) for Salaried Retirees, which included Health Care Benefits, Medicare Part B special benefits, Health Savings Account benefits and Life Insurance benefits.

9

10.     However, it should be noted that Delphi did not terminate disability benefits.
The question of whether Disability Benefits were cancelled when the OPEB benefits were
cancelled was raised in the Recoupment Motion Hearing (Docket # 21609). However, it was
definitively established in post hearing communications (Docket #'s 21696 and 21603) that
Disability benefits were not terminated and were continued to be paid by DPHH.

11.     In his ruling from the 24-FEB-2009 OPEB Termination Hearing, the Hon. Judge
Drain ordered the establishment of a limited 1114 committee, with the specific charge to identify
vested obligations among the terminated OPEB benefits [1].

12.     No vested benefits were found. However, it is important to note that a search for
vested **Disability Benefits** was not done, since these benefits were not being terminated.

13.     Article III, Section 8.1(a) of the Amended plan indicated that all executory
contracts not rejected would be automatically assumed [2]. However Exhibit 8.1(a) rejects all
employee contracts [3]. Thus it is clear that DPHH has reserved, for itself, the authority to
terminate the Disability Program.

14.     Recently, DPHH (formerly Delphi) sent certified letters to Disabled Retirees and
Disable Employees (Disabled Beneficiaries), which informed them that DPHH was
discontinuing the Disability Benefit Program **(See Appendix A1 and A2 respectively)**. In

---

[1] See transcript OPEB termination transcript (Docket # 16451) page 144 and 145.

[2] All executory contracts and unexpired leases as to which any of the Debtors is a party shall be deemed
automatically assumed in accordance with the provisions and requirements of sections 365 and 1123 of
the Bankruptcy Code as of the Effective Date, unless such executory contracts or unexpired leases...(iv)
are listed on the schedule of rejected executory contracts or unexpired leases attached hereto as Exhibit
8.1(a) *(From Amended Plan, page 50)*

[3] **Executory Contracts And Unexpired Leases To Be Rejected...** 2. All employment agreements
between the Debtors and any current or former salaried employee entered into prior to the Petition Date.
**(From Exhibit 8.1(a) of the Amended Plan)**

10

addition, the letter sought to induce the disabled beneficiary to accept a lump sum payment that is approximately 50% of what is due each disabled beneficiary through the end of their disability eligibility, which in most cases continues to the end of the month the beneficiary turns age 66.

15.     The benefit termination letter and the lump sum offer was crafted in such way, so as to lead the Disabled Beneficiary to believe that there is no option but to take the lump sum. In addition, the lump sum contract is crafted so that, should a beneficiary accept the offer, he looses all legal rights that might be associated with his disability benefits. The contract also requires an unreasonable and unnecessary confidentiality agreement, for which DPHH's only justification is that a "non-disclosure provision is a common provision in a release agreement." (See Item # 11 in Debtor response letter, Appendix F)

## IV.             Impact on beneficiaries

16.     Accepting the terms of the Termination letter will reduce disability payments to beneficiaries to about 50% of what they are entitled. For many beneficiaries, the lump sum payment will cause an additional loss because of the change in tax bracket and the increased income tax liability. In the case of the Movant, the net tax liability would change from about 12.4 % to 28 % and result in an additional loss of $20,217. As a result, the net benefit reduction is more than 50%. (In the case of the Movant, the effective benefit reduction would be 57 %.)

17.     The lump sum payment will also cause Disabled Beneficiaries, who also receive Medicare, to have substantial Medicare premium increases for 2013. In the case of the Movant, the premium increase would be $3000.

11

18.    Accepting the Termination Offer would also cause the Disabled Beneficiary to assign away all the related legal protections that were intended by Congress.

19.    Accepting the termination offer would also impose an unreasonable and unnecessary non-disclosure agreement on the Disabled Beneficiary.

The Termination Offer release also contains a fiction under the section **"Knowing and Voluntary Acceptance"**:

>    *(a) Knowing and Voluntary Acceptance. Retiree (Employee) has carefully read this Agreement, understands it, and is entering it knowingly and voluntarily, which means no one is forcing or pressuring Retiree(Employee) to sign it.*

20.    The Lump sum offer is in fact coercive. It presents the Disabled Beneficiary with the option of either signing the letter or losing 100% of his disability benefit. Therefore, there is nothing voluntary about deciding between an externally imposed bad option and a worse option.

21.    Thus, The Movant argues that the DPHH letter is a deceptive attempt to deny beneficiaries benefits that have already vested and that it is an immoral attempt to unjustly enrich DPHH at the expense of the Disabled Beneficiary.

## V.                       ARGUMENT

### Disability Benefits Are Vested And Cannot Be Retroactively Terminated

22.    ERISA rules permit employers to amend the terms of a welfare benefit plan or terminate it entirely[4]; and DPHH has reserved the right to terminate its benefit plans in the

---

[4] ERISA regulates two types of benefit plans, pension benefit plans that create vested rights and welfare benefit plans that need not create vested rights. See Chiles v. Ceridian Corp., 95 F.3d 1505, 1510 (10th

12

Amended Plan. (See § 13 <sup>above</sup>·) Thus, the Movant does not dispute DPHH's right to modify or

terminate the disability plan for future (not currently disabled) beneficiaries. However the

ERISA rules do not permit retroactive modification or termination of vested benefits.

23.    Thus, the Movant argues that Disability Benefits are vested both; because of the

Benefit Plans description in the SPD, and because of the rules of general contract law [5] .

## Vesting Granted Through The SPD

24.    Pages 75- 79 of the SPD (December 2001) list the requirements necessary to

receive disability benefits. (See **Appendix B.**) These requirements are:

   i.   Length of employment service at the commencement of Disability

   ii.  The Beneficiary must be (1) totally disabled so as to be unable to engage in any

        regular employment with Delphi at the location where they last worked, (2) not

        working elsewhere.

   iii. The Beneficiary must be totally disabled thereby preventing you from performing

        the duties of your occupation and must give written notice of any sickness or

        injury within 20 days after the onset of disability.

---

Cir.1996). The plan at issue here is a welfare benefit plan. As such it is "exempt from the statutory vesting
requirements that ERISA imposes on pension benefits. Accordingly, an employer may amend the terms of
a welfare benefit plan or terminate it entirely." Wheeler v. Dynamic Eng'g, Inc., 62 F.3d 634, 637 (4th
Cir.1995) (citations omitted).

[5] "However, benefits under a welfare benefit plan may vest under the terms of the plan itself." Id. at 637-
38. Because, as MSA agrees, an amendment to any ERISA plan may not operate retroactively if that
amendment deprives a beneficiary of a vested benefit, see Chiles, 95 F.3d at 1510; Wheeler, 62 F.3d at
640... **Member Services Life Insurance Company V. American National Bank And Trust
Company Of Sapulpa 130 F.3d 954 (10th Cir. 1997)**

13

> Generally, Sickness and Accident benefits begin after a seven-day waiting
> period, provided you have been treated by a physician legally licensed to practice
> medicine or the plant medical department during the first seven-days of disability.

25.     In particular, the table on page 79 clearly indicates that the benefits are based on
the years of service at the commencement of disability (In *Appendix B: See SPD page 79 and
foot note (1)*). Thus the Plan conveys vested rights for disability by specifying that the duration
of the benefit **"at the commencement of disability"** is based on the length of service [6].

26.     Thus, the disability benefits vest under the terms of the plan itself, and therefore
can not be amended retroactively. [7]

### Vesting Granted Through Contract Law

27.     In Blackshear v. Reliance Standard Life Ins. Co. the 4th Circuit ruled that ...
*"Under general principles of insurance contract law ... such benefits do vest when performance
is due under the contract. At that point, the contract is no longer executory and must be
performed in accordance with the terms then in existence." Member Servs., 130 F.3d at 956. )"*.
***Blackshear v. Reliance Standard Life Ins. Co., 509 F.3d 641 (4th Cir. 2007)***

28.     Also, in Blackshear v. Reliance Standard Life Ins. Co. the 4th Circuit ruled that
insurance vested at the moment the triggering event under the policy occurred[8 below].

---

[6] Note: "Length of Service" is a primary legal standard as articulated in § 2 of "Vesting" definition, pg 6.

[7]      "However, benefits under a welfare benefit plan may vest under the terms of the plan itself." Id. at
637-38. Because, as MSA agrees, an amendment to any ERISA plan may not operate retroactively if that
amendment deprives a beneficiary of a vested benefit, see Chiles, 95 F.3d at 1510; Wheeler, 62 F.3d at
640. **Member Services Life Insurance Company V. American National Bank And Trust Company
Of Sapulpa 130 F.3d 954 (10th Cir. 1997)**

## Vested Benefits Cannot Be Retroactively Terminated

29.    In addition, several courts, in particular the 4th Circuit[9], 10th Circuit[10] and 6th

Circuit[11], have ruled that vested welfare benefits cannot be retroactively terminated.

30.    It should also be noted that the 4th Circuit stated *"Numerous courts have taken,*

*in a wide array of circumstances, a similarly dim view of any amendment that attempts to*

*retroactively eliminate vested welfare benefit rights."* The 4th Circuit also went on to cite

several cases to make the point[8] above.

---

[8] We concluded that the beneficiary's rights under a welfare benefit plan providing medical insurance vested at the moment the triggering event under the policy occurred and that the plan could not be amended to deny coverage after that point. *See id.* At 638-40. Numerous courts have taken, in a wide array of circumstances, a similarly dim view of any amendment that attempts to retroactively eliminate vested welfare benefit rights. *See Member Servs. Life Ins. Co. v. American Nat'l Bank & Trust Co. of Sapulpa, 130 F.3d 950, 954-57 (10th Cir. 1997); Filipowicz v.American Stores Benefit Plans Comm., 56 F.3d 807, 815 (7th Cir. 1995); Bartlett v. Martin Marietta Operations Support, Inc. Life Ins. Plan, 38 F.3d 514, 517 (10th Cir. 1994); Wulf v. Quantum Chem. Corp., 26 F.3d 1368, 1377-78 (6th Cir. 1994); Confer v. Custom Eng'g Co.,* 952 F.2d 41, 43 (3d Cir. 1991) (per curiam). **Blackshear v. Reliance Standard Life Ins. Co., 509 F.3d 640, 641 (4th Cir. 2007)**

[9] Once an employer or plan sponsor grants vested rights under a welfare benefit plan, however, it may not retroactively amend the plan to deprive a beneficiary of a vested benefit. *See Wheeler,* 62 F.3d at 638, 640 **Blackshear v. Reliance Standard Life Ins. Co., 509 F.3d 640 (4th Cir. 2007)**

[10] ...an amendment to any ERISA plan may not operate retroactively if that amendment deprives a beneficiary of a vested benefit, see Chiles, 95 F.3d at 1510; Wheeler, 62 F.3d at 640... **Member Services Life Insurance Company V. American National Bank And Trust Company Of Sapulpa 130 F.3d 954 (10th Cir. 1997)**

[11] As then Chief Judge Hillman stated in Edward W. Sparrow Hospital Ass'n, Inc. v. Industrial Welding, Inc., 1990 U.S. Dist. LEXIS 9194 (W.D. Mich., July 19, 1990), "Once a participant became entitled to coverage under the then existing terms of the Plan, it would be entirely illusory to allow [the employer] to essentially divest them of that right by retroactively deleting the benefit." **Wulf v. Quantum Chem. Corp., 26 F.3d 1368, 1377-78 (6th Cir. 1994)**

31. Furthermore in the OPEB Termination Hearing, the Hon. Judge Drain (Bk-SDNY) paid special attention to the protection of vested benefits. As a result (as noted in the background section of this motion), Judge Drain established a limited 1114 committee for Salaried Retirees, which was principally tasked with identifying vested benefits that might be affected. (See OPEB termination transcript Docket # 16451, pages 143-144 )

32. Judge Drain's references to "disability benefits potentially being vested benefits" can be found on pages 80, 123 and 130 of the OPEB transcript. However, as far as vesting issues and the 1114 Committee are concerned, the OPEB benefits did not include disability. Not withstanding that Judge Drain had some pre-established concerns about Disability Benefits being vested, the termination of disability benefits was not part of the charter of the limited 1114 committee, and was not addressed.

## Delphi Prior Actions Demonstrate That It Operated With The Knowledge That Disability Benefits Are Vested

33. Delphi prior actions demonstrate that it operated with the knowledge that the disability benefits are vested.

34. On at least two occasions Salaried Retirees petitioned the court to authorize an 1114 Committee. Delphi vigorously and successfully challenge each of these motions.

35. The two instance seeking 1114 Committee status were:

    i. Motion to appointment of official committee of retirees (Docket # 0874)

    ii. OPEB benefits Terminations Hearing (Docket # 16451)

16

36.    In the case of OPEB benefit termination, Delphi terminated all retiree benefits,

**except Disability Benefits**.

37.    There is significant text, from the hearing transcript, that indicates that Delphi

was terminating all "at-will" or discretionary benefits:

*Comments From Mr. Butler, Delphi's attorney at the OPEB termination hearing*

*24-FEB-2009 (Docket # 16451):*

a.  Mr. Butler Page 105: Line 12

*"That's really where the company is at right now. And that's why after having*
*provided some forty-two months of welfare coverage here on an at-will basis the*
*company has concluded that this motion is necessary."*

b.  Mr. Butler (Page 105: Line 25 thru Page 106: Line 16 of the transcript):

*"That starts with the DIP lenders and the DIP steering committee that's been*
*formed. ...They made it very clear -- in their view, actually, they think the*
*company has a fiduciary duty to terminate these at-will benefits. We have*
*pushed back on their interpretation, but nonetheless it is clear to the company,*
*as Mr. Miller testified to in his declaration that the stakeholders with the*
*economic interest at the top of the absolute priority waterfall that have to be*
*dealt with in this case, in the circumstances we find ourselves in, simply will not*
*support and will not countenance having discretionary liabilities of this*
*magnitude on the reorganized balance sheet of the company -- reorganized*
*company's balance sheet".*

c.  Mr. Butler Page 119: Line 10

*"But the fact of the matter is, and we fought for forty-two months to keep these*
*discretionary benefits in place. The reality is we simply cannot do that any*
*more in light of where we are and what we need to do in order to be able to*

*preserve this company, and in preserving this company, preserve the continuity of supply in the global automotive business. If we don't do this right, there's going to be a real problem."*

38.     Thus, Mr. Butler, representing Delphi, indicates that there was significant business pressure to terminate all at–will or discretionary benefits. Therefore, had Delphi considered Disability benefits discretionary and non-vested, they would have been included in the definition of OPEB benefits.

39.     Delphi argued that it was terminating OPEB benefits out of business necessity. Therefore, on that basis there would have been no reason not to terminate all retiree benefits including Disability benefits, if disability benefits had been considered discretionary

40.     In the OPEB hearing ( docket # 16451) , Delphi acknowledged that any attempt to terminate vested benefits would entitled retirees to an 1114 committee.

a) Mr. Butler page 112: Lines 19 & 23:

*"...in fact if these were vested benefits, there would be an 1114 committee."*

*"...even though if you follow the majority rule, you only appoint an 1114 committee if there are vested benefits."*

41.     It's clear from the hearing that Delphi was not interested in the retirees having an 1114 committee.

42.     Thus, Delphi chose not to terminate Disability Benefits, when it terminated other retiree benefits, because the terminating the vested Disability Benefits would have precipitated

18

the one outcome it had consistently sought to avoid - having retirees represented by an 1114

committee and possibly serving on the Creditors Committee.

## Some Disability Beneficiaries Are Covered By Supplemental Extended Disability Benefits (SEDB)

43.     If an employee (on January 1 of the Plan year) has credited service that is at least

six months but less than 10 years, Supplemental Disability coverage he may **purchased** with Pre

tax dollars.

44.     Thus some Disabled Beneficiaries, including the Movant, are now receiving this

benefit. Having been purchased as insurance coverage, Supplemental Disability vest like any

other policy, at the time performance is due[13 below].

45.     As a result, it's also not consistent with insurance contract law that a vested

benefit can be retroactively reduced or eliminated. However, in the Response Letter from DPHH

(Appendix F). Delphi attorney makes that claim in item # 4:

> *Supplemental extended disability benefit ("SEDB') was apart of the Plan*
> *which was self-insured by DPHH. You may have made contributions*
> *toward the cost of the Plan, but you were not purchasing insurance.*

46.     This response does not seem credible and appears to be an attempt to use a

semantic gyration to redefine insurance. The assertion by DPHH is inconsistent with the

definition of **insurance,** or **coverage** (See page 5 in Definition Section). In addition, the SPD

specifically states that employees may **purchase** Supplemental Disability Coverage (See par.

43). The SPD, on page 115, also states the following:

19

> *Benefits made available by Delphi, the full costs of which are borne by employees, are Optional Life Insurance, Dependent Life Insurance, Personal Accident Insurance, flexible spending accounts, Supplemental Extended Disability Benefit, and sponsored dependent medical coverage.*

47. Thus, contrary to the statements in the DPHH response letter (Appendix F), as this section of the SPD proves, DPHH does not pay any part of the cost of Supplemental Extended Disability Coverage. This is further evidence that SEDB is an insurance product and vest as any insurance product would.

## Supplemental Disability Coverage Is Not Superior To Extended Disability Coverage

48. Supplemental Extended Disability Benefits coverage is intended to supplement the Delphi Extended Disability Benefits for shorter service employees (those with less than 10 years of service) with the same protection of longer service employees[12].

49. Thus, it is inconsistent with the benefit purpose, that SEDB insurance would offer a benefit superior to Extended Disability Coverage.

50. Therefore, it's logical to infer that both coverages vest similarly, at the time performance is due.

---

[12] From SPD page 77

51.    Furthermore, for the reasons stated in paragraphs 22 thru 42 , once vested,
Supplemental Disability benefits and Extended Disability benefits cannot be retroactively
modified or terminated.

## Article III - Section 8.1(a) Of Amended Plan Does Not Apply

52.    Article III - Section 8.1(a) of Amended Plan of Reorganization states that
Executory contracts and Unexpired leases shall be deemed automatically assumed, unless they
appear on the schedule of rejected contracts listed in Exhibit 8.1(a) of the Amended Plan.
Exhibit 8.1(a) appears to reject all employment related executory contracts. However, in the
case of vested disability benefits, the contract (the disability benefit plan) is no longer
executory [13].

53.    Thus, Article III - Section 8.1(a) of Amended Plan of Reorganization does not
apply to vested disability benefits and, as a result, Delphi's obligation to pay Disability Benefits
to Disabled Beneficiaries continues.

## DPHH Has No Authority To Change Terms Of Vested Disability Payments

54.    Because disability benefits are vested, Delphi has no authority to unilaterally
change the terms of benefits payments. Delphi must perform in accordance with the contract
(Disability Section and disability retirement sections of the of the SPD).[13]

---

[13] Under "general principles of insurance contract law ... such benefits do vest when performance is due
under the contract. At that point, the contract is no longer executory and must be performed in accordance
with the terms then in existence.( *Member Servs.*, 130 F.3d at 956. ).    **Blackshear v. Reliance Standard
Life Ins. Co., 509 F.3d 641 (4th Cir. 2007)**

## Delphi Has Failed To Meet Its Fiduciary Responsibility To Disabled Beneficiaries

55.    A Fiduciary is required to Act solely in the interest of plan participants and their

beneficiaries; and with the exclusive purpose of providing benefits to them[14]. Thus, DPHH has

failed to meet its fiduciary duties to Disabled beneficiaries. This is evident based on two

significant failures:

  i.    The recent letters to disability beneficiaries(Lump Sum Letters), which ignores

         that disability benefits are vested and fails to follow the terms of the benefit plan;

         and

  ii.    The failure to Retire or inform disabled retirees that disability retirement was

         available, which deprived disabled retirees of additional benefits.

56.    In Regards to the Lump Sum Letter:

  i.    Delphi has sought to deprive beneficiaries of at least 50% of vested benefits

  ii.    Delphi has sought to force unilateral changes in payment terms on beneficiaries

         (lump sum).

  iii. Delphi has sought its own unjust enrichment at the expense of Disability

         Beneficiaries ( **See Appendix C for unjust enrichment analysis** ).

---

[14] See Appendix E: Meeting Your Fiduciary Responsibilities (by U. S. DOL)

22

    iv. DPHH has also failed to follow the terms of the plan document [15] by offering a

        lump sum. The Disability plan makes no provisions for a lump sum payment (full

        or partial).

    v. There is a clear conflict of interest, with the result being that Delphi has neglected

       to protect beneficiaries from the negative impact of lump sum payments, which

       include:

        a.   A 50% reduction in vested gross benefits

        b.   An Increase tax liability, which would result in a net reduction, in

            addition to the lump sum 50% reduction in benefits [16].

        c.   Increase Medicare premium liabilities, which result from a substantial

            increase in income resulting from the lump sum [17] ( **See Appendix D**

            **for Medicare premium rate schedule**).

57.    In the case of Disable Employees' retirement; Delphi failed to retire the Disable

Employees, or inform them that disability retirement was available. Historically, Delphi has

required Disabled Employees to retire after they have been disabled for twelve months.

---

[15] **"Following the terms of the plan document is also an important responsibility."** See Appendix E: Meeting Your Fiduciary Responsibilities (by U. S. DOL)

[16] In regards to the Movant, the tax liability would increase from 12.4 % to at least 28%. This would result in a net reduction in benefits (relative to the lump sum) of at least $20, 217.00

[17] In regards to the Movant, the Medicare premium increase for year 2013 would be $3000.00 This would result in a net reduction in benefits (relative to the lump sum) of at least $23, 217.00, when tax implications are also considered.

58.     Retirement had the effect of offsetting disability payments being made by Delphi by Part A and Part B payments from the pension, which was often a benefit to Delphi and no financial impact to the Disabled Retiree . However, when retired, Disabled Employees also receives Part B Primary Benefit payments, which increase their net disability retirement income[18]

59.     Thus, some and perhaps all Disabled Employees have gone several years with a benefit which has been less than what they were entitled to receive.

60.     DPHH, by its actions seeks to withdraw as the plan fiduciary. However the proper course is not to attempt to terminate vested benefits, retroactively. Instead, DPHH is required to insure that there is a competent Fiduciary in place, consistent with Department of Labor regulations.[19]

---

[18] The Part B retirement Primary Benefit is derived from an after tax contributions by the employee and supplements retirement benefits (including disability retirement) from DPHH -- See Appendix B: SPD page 84

[19] See Appendix E: "Meeting Your Fiduciary Responsibilities (by U. S. DOL)" -  **Can A Fiduciary Terminate Its Fiduciary Duties?**

## VI.                           Relief Sought

61.     As a result, this motion seeks:

i.    A ruling that affirms that Disability Benefits for current beneficiaries are vested
and, as a result, they are exempt from Article III - Section 8.1(a) of the Amended
Plan, and

ii.   A ruling that affirms that its obligation to pay the Vested Disability Benefits
cannot be terminated by DPHH.

62.     This motion also requests:

i.    A ruling that the Termination Letter is an invalid attempt to unjustly enrich
DPHH at the expense of the Disabled Beneficiary

ii.   An order that permanently enjoins DPHH or its successors from implementing
any terms of its termination letter and

iii.  An order that enjoins DPHH and its successors from any future attempts to
reduce payments to the Disable Beneficiary.

63.     This motion also requests that DPHH provide contact information (in Excel
spreadsheet format) of all Disability Beneficiaries, so that they can be fully informed of the
Courts ruling and that an effective communication network can be established among Disabled
Beneficiaries, so that they can more easily be informed, and act in unison to protect their
benefits.

64.     This motion also requests that the Court order the establishment of a fully funded Disability Trust to hold all funds for their proper distribution to the Disabled Beneficiary.

65.     This motion also requests that the court approve appropriate administrative expenses to pay for establishing and operating the trust and that the court also authorize appropriate administrative expenses so that attorneys, accountants and other such professionals can be hired to ensure that the trust is properly established for the benefit of the Disabled Beneficiary.

## VII.          Benefit of Relief

66.     The benefit of the relief requested is that it protects beneficiaries from the loss of Vested Disability Benefits, while establishing a fully funded Trust to insure that benefits are overseen by an independent fiduciary, who is not encumbered with the interest conflicts demonstrated by DPHH.

## VIII.         No Prior Request

67.     No prior motion for the relief sought herein has been made by the Movant to this or any other court. However, The Court should note that Appeal of the District Court ruling regarding the Amended Recoupment Motion is pending in the 2nd Circuit.[20] It's anticipated that an affirmative ruling regarding the Amended Recoupment Motion will increase the required contribution by DPHH to the requested Disabled Beneficiary Trust. Also, the Court should note

---

[20] USCA 2nd Circuit Case # 12-1242: related cases - District Court Case No. **1:11-cv-08443-PAE** . Amended Recoupment Motion – Bankruptcy Case No. **1:05-bk-44481(rdd)**;  Docket # 21566

that the Recoupment Appeal does not seek a review of Judge Drain's ruling as it pertains to an

improper recoupment request for an affirmative recovery.

68.    WHEREFORE, the Movant respectfully requests that this Court enter an order

granting the relief requested herein, and such other and further relief as may be just, necessary

and appropriate.

Dated: Noblesville, Indiana
April 6, 2012

By: _____
     James B. Sumpter

James B. Sumpter, Pro se
21169 Westbay circle
Noblesville, IN 46062
Telephone: (317) 877-0736
Facsimile: (317) 877-1070
jsump@ieee.org

Salaried Retiree of Debtors

# Appendix A: DPHH Employee and Retiree Termination Letters

**Appendix A-1**          **Retiree Cancellation Letter**

**Appendix A-2**          **Employee Cancellation Letter**

February, 2012                          **Appendix A-1**

Dear JAMES SUMPTER:

You are receiving this letter because you are a salaried retiree of DPH Holdings Corp. ("DPHH"), the entity formerly known as Delphi Corporation, and you are currently receiving disability benefits from DPHH. The purpose of this letter is to inform you of **important changes** regarding those benefits.

In October, 2010 we notified you that DPHH was in the process of winding down all of its remaining operations. Further, you were informed that **DPHH** had limited resources during the wind-down process and that it reserved the right to terminate its benefit programs.

We regret to inform you that effective midnight March 31, 2012, DPHH will terminate The DPH Holdings Corp. Life and Disability Benefits Program for Salaried Employees (the "Disability Plan") and all benefits provided under such Plan. This means that any disability benefits you currently receive or are eligible to receive will cease after March 31, 2012. The termination of the Disability Plan will not impact your continued receipt of any of the following: retirement benefits you may be receiving from the PBGC, Workers Compensation benefits, Social Security disability or retirement benefits, or any other disability-related benefits under State or Federal law.

**DPHH** is offering you a lump sum payment equal to $129,600, less applicable withholdings.   **You are eligible for the lump sum payment only if you sign the attached Separation and Release Agreement. The Release must be postmarked no later than April 9, 2012 and sent to DPH Holdings Corp., P.O. Box 5027, Troy, MI 48098. Assuming DPHH has timely received your signed Separation and Release Agreement, all lump sum payments will be paid in early May and sent to the address on file.**

Please direct any questions or concerns you may have regarding your benefits to DPHH's benefits administrator at 1-888-587-9648.

Sincerely,

**DPH** Holdings Corp.

# DPH Holdings Corp.

# Appendix A-1

## RELEASE AGREEMENT

This Release Agreement ("Agreement") is between JAMES SUMPTER for himself/herself, his/her heirs and personal representatives ("Retiree"), and DPH Holdings Corp., The DPHH Life and Disability Benefits Program for Salaried Retirees (the "Disability Plan") together with their current and former officers, directors, plan administrators, managers, shareholders, former employees, contractors, agents, parent companies, subsidiaries, affiliated entities, related entities including, attorneys, any other representatives, and successors in interest (collectively referred to as "DPHH").

## RECITALS

A.      Retiree has previously retired from active employment with DPHH, the entity formerly known as Delphi Corporation.

B.      DPHH is in the process of winding up its remaining operations. As part of the process of winding up the business, **DPHH** is terminating its benefit plans.

C.      Retiree is affected by the termination of the DPHH Life and Disability Benefits Program for Salaried Retirees.

D.      DPHH has decided to provide Retiree with a lump sum payment and in exchange Retiree has agreed to release and discharge DPHH of any and all liability claims.

Based on the foregoing Recitals, which Retiree and DPHH accept as true and as part of the basis for this Agreement, and in consideration of and in reliance upon the representations and promises in this Agreement, Retiree and DPHH agree as follows:

1.      **payments to Retiree.**

(a)      In exchange for Retiree's execution of this Release Agreement, **DPHH** will pay Retiree the sum of $129,600 less applicable withholding.

(b)      Consideration in Exchange for Retiree's Promises. The consideration set forth in Section 1 of this Agreement is not otherwise due and owing to Retiree and is fair and adequate consideration in exchange for Retiree's promises contained in this Agreement. DPHH will provide the consideration under this paragraph to Retiree only in exchange for Retiree's promises in this Agreement. Retiree will not receive this consideration unless Retiree signs this Agreement and returns it to the address below, post-marked no later than April 9, 2012.

2.      **Termination of Benefits.** The Retiree's participation in and receipt of benefits under The DPHH Life and Disability Benefits Program for Salaried Retirees shall be terminated effective midnight March 31, 2012.

# Appendix A-1

3.    <u>Release</u>

(a)    <u>General Release.</u>Retiree, to the fullest extent permitted by law, waives, releases, and discharges DPI-H-1 (as defined above and including The DPI-1H Life and Disability Benefits Program for Salaried Retirees) from any claims, arbitration demands, and causes of action related to, arising in the course of, or arising out of Retiree's employment with DPI-1H, the termination of Retiree's employment with DPHH or the termination of DPHH benefits under any state or federal regulation, law, and statute, including (a) the Age Discrimination in Employment Act or the Older Worker's Benefit Protection Act, 29 U.S.C. § 621, ~~Title VII of the Civil~~ Rights Act of 1964, as amended, the Rehabilitation Act of 1973, the Michigan Elliot Larsen Civil Rights Act, the Michigan Persons With Disabilities Civil Rights Act, the Family and Medical Leave Act, and the Americans With Disabilities Act, the Retiree Retirement Income Security Act (ERISA), 29 USC §1001 ~~(b) any and all claims pursuant to state or federal unemployment~~ laws, (c) any and all claims related to Michigan fair employment laws, (d) any and all claims pursuant to the Michigan Whistleblowers' Protection Act and/or claims or complaints pursuant to the federal Sarbanes-Oxley Act of 2002, the Dodd-Frank Act, and (e) any claim arising under common law.

Retiree and DPHH intend that, to the fullest extent permitted by law, this waiver, release, and discharge is a general release and it shall extinguish any claims, arbitration demand or cause of action by Retiree against DPHH about anything that occurred before the date of this Agreement. This Agreement includes a release of Retiree's right to file a lawsuit or to seek individual remedies or damages in any EEOC-filed court action, and this release will apply to any Charge of Discrimination about any events that occurred up to the date of the signing of this Agreement. Retiree and DPHH intend that, to the fullest extent permitted by law, these waivers, releases, and discharges will constitute a general release, will extinguish any claims and any causes of action, and will preclude any lawsuit or any other legal claim by Retiree against DPHH about anything that occurred before the date of the signing of this Agreement, including anything arising out of or relating to Retiree's employment with DPI-1H or the termination of benefits. This Agreement will not be construed to prohibit the filing of a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") or a state agency, but this Agreement includes a release of Retiree's right to file a lawsuit or to receive any monetary recovery and any other remedies if the EEOC or a state agency pursues any claims on Retiree's behalf.The only claims and causes of action that Retiree is not waiving, releasing, or discharging are for the consideration that Retiree will receive under Section 1 of this Agreement and any claims and causes of action that, as a matter of law, cannot be waived, released, or discharged.

(b)    <u>Accord and Satisfaction.</u>The consideration set forth in this Agreement is in full accord and satisfaction of any claims and any causes of action that Retiree has, may have, or may have had against DPHH related to, arising in the course of or arising out of Retiree's employment with DPHH or the termination of benefits.

# Appendix A-1

4.  **Knowing and Voluntary Acceptance**

    (a)    Knowing and Voluntary Acceptance. Retiree has carefully read this Agreement, understands it, and is entering it knowingly and voluntarily, which means no one is forcing or pressuring Retiree to sign it.

    (b)    Advice of Counsel. Retiree is advised to consult with an attorney of Retiree's choice, at Retiree's expense, before signing this Agreement.

    (c)    No Reliance on Any Other Representation. In signing this Agreement, Retiree has not relied upon any **DPHH** representation or statement, either oral or written, about the subject matter of this Agreement that is not set forth in this Agreement.

5.  **Non-admission of Liability.** This Agreement shall not be used or construed as an admission of liability or wrongdoing by either **DPHH** or Retiree.  **DPHH** denies that it acted unlawfully, tortiously, or in violation of any employment law affecting Retiree.

6.  **Severability.** If any one or more than one of the provisions contained in this Agreement are, for any reason, held to be invalid, illegal, or unenforceable in any respect, the rest of this Agreement will remain enforceable. This Agreement shall then be construed as if it never contained the invalid, illegal, or unenforceable provision.

7.  **Applicable Law.** This Agreement is to be interpreted, construed, and applied in accordance with the law of the State of Michigan.

8.  **Jurisdiction and Forum.** Any action arising out of this Agreement or the relationship between the parties established herein shall be brought only in the State of Michigan Courts of appropriate venue, or the United States District Court sitting in Michigan, and Retiree hereby consents to and submits himself or herself to the jurisdiction of such Courts.

9.  **Non-disclosure.** Retiree will not disclose the terms of this Agreement to any third party, other than Retiree's immediate family members (meaning spouse, mother, father or siblings only), except as required by law or as necessary for the purpose of receiving counsel from Retiree's attorney, accountant, or both. Retiree's immediate family members and professional advisors will be subject to the non-disclosure requirement of this paragraph.

10. **Successors and Assigns.** This Agreement is binding and shall take effect for the benefit of (i) **DPHH** and (ii) Retiree, Retiree's heirs, assigns, executors, administrators, other legal representatives, and successors.

11. **Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and all of which together shall constitute the same instrument.

12. **Entire Agreement.** This Agreement constitutes the entire agreement between the parties related to the termination of Retiree's benefits. There are no other agreements, promises,

000141814\0005\1293521-1                                                                 S6.R

# Appendix A-1

conditions, or understandings, either written or oral, between DPHH and Retiree either with respect to the subject matter of this Agreement or modifying the terms of this Agreement. Only a writing signed by Retiree and an authorized representative of DPHH that specifically refers to and expressly changes this Agreement can modify the terms of this Agreement.

**DPH HOLDINGS CORP.**                    **RETIREE**

By: _____          _____

Its: _____

Dated: _____, 2012    Dated: _____, 2012

**Return signed agreement postmarked
no later than April 9, 2012 to:**

DPH Holdings Corp.
P.O. Box 5027
Troy,                    MI                                        48098

4

**Appendix A-2**

February, 2012

Dear

You are receiving this letter because you are a salaried employee of DPH Holdings Corp. ("DPHH"), the entity formerly known as Delphi Corporation, and you are currently receiving health care and life insurance benefits from DPHH. The purpose of this letter is to inform you of **important changes** regarding those benefits and your continued employment with DPHH.

In October, 2010 we notified you that DPHH was in the process of winding down all of its remaining operations. Further, you were informed that DPHH had limited resources during the wind-down process and that it reserved the right to terminate its benefit programs.

We regret to inform you that effective midnight March 31, 2012, DPHH will terminate your employment. DPHH is also terminating The DPH Holdings Corp. Life and Disability Benefits Program for Salaried Employees (the "Disability Plan") and The DPH Holdings Corp. Salaried Health Care Program (the "Health Plan") and all benefits provided under such Plans effective midnight March 31, 2012. This means that any life insurance and health insurance coverage you currently receive or are eligible to receive will cease after March 31, 2012.

DPHH is offering you a lump sum payment equal to $       , less applicable withholdings.  **You are eligible for the lump sum payment only if you sign the attached Separation and Release Agreement. The Release must be postmarked no later than April 9, 2012 and sent to DPH Holdings Corp., P.O. Box 5027, Troy, MI 48098. Assuming DPHH has timely received your signed Separation and Release Agreement, all lump sum payments will be paid in early May and sent to the address on file.**

<u>Life Insurance</u>

All DPHH-paid life insurance protection under the Disability Plan will terminate on midnight March 31, 2012. You have the option to convert your DPHH-paid life insurance coverage to an individual life insurance policy. If you are 55 or older and had at least 10 years of service on your last day worked, you will be able to continue any employee-paid life insurance coverage you may have purchased through DPHH. You will receive an information packet on how to convert or otherwise continue your life coverages in the next few weeks from Delphi Benefits, the benefit administrator for DPHH. You must follow the instructions in that information packet carefully because

**DPH Holdings Corp.**

there are specific time limits within which you must act in order to continue or convert any coverages.

### Health Insurance Termination — No COBRA Coverage

Your Health Plan benefits, which include medical, dental, vision and prescription drug coverage, will cease effective midnight March 31, 2012 assuming you have made timely premium payments through such date. You may be familiar with the Federal law known as COBRA, which allows qualified beneficiaries to continue employer-sponsored Health Care coverage at their own cost for up to eighteen (18) months.   **COBRA coverage is not available to you** because DPHH will not be maintaining any health plan after March 31, 2012.

This letter is also intended to satisfy the requirements of the Federal W.A.R.N. Act. No bumping rights exist for yourself or any of the other employees affected by this termination.

Please direct any questions or concerns you may have regarding your benefits to DPHH's benefits administrator at 1-888-587-9648.

Sincerely,

DPH Holdings Corp.

**DPH Holdings Corp.**          World Headquarters 5725 Delphi Drive, Troy, MI 48098 USA

**Appendix A-2**

## SEPARATION AND RELEASE AGREEMENT

This Separation and Release Agreement ("Agreement") is between                    for himself/herself, his/her heirs and personal representatives ("Employee"), and DPH Holdings Corp., The DPHH Life and Disability Benefits Program for Salaried Employees (the "Disability Plan") and The DPHH Salaried Health Care Program (the "Health Plan") together with their current and former officers, directors, plan administrators, managers, shareholders, employees, contractors, agents, parent companies, subsidiaries, affiliated entities, related entities including, attorneys, any other representatives, and successors in interest (collectively referred to as "DPHH").

### RECITALS

A.    Employee is on a leave of absence from active employment with DPHH, the entity formerly known as Delphi Corporation.

B.    DPHH is in the process of winding up its remaining operations. As part of the process of winding up the business, DPHH is terminating the employment status of all salaried individuals who are on leaves of absence and terminating its benefit plans.

C.    Employee is one of the individuals whose employment status will be terminated as part of this process.

D.    DPHH and Employee have amicably concluded they should end the employment relationship and provide for the orderly termination of Employee's benefits under The DPHH Life and Disability Benefits Program for Salaried Employees and The DPHH Salaried Health Care Program, and Employee has agreed to release and discharge DPHH of any and all liability claims.

Based on the foregoing Recitals, which Employee and DPHH accept as true and as part of the basis for this Agreement, and in consideration of and in reliance upon the representations and promises in this Agreement, Employee and DPHH agree as follows:

1.    **Payments to Employee.**

(a)    In exchange for Employee's execution of this Separation and Release Agreement, **DPHH** will pay Employee $         less applicable withholding.

(b)    Consideration in Exchange for Employee's Promises. The consideration set forth in Section 1 of this Agreement is not otherwise due and owing to Employee and is fair and adequate consideration in exchange for Employee's promises contained in this Agreement. **DPHH** will provide the consideration under this paragraph to Employee only in exchange for Employee's promises in this Agreement. Employee will not receive this consideration unless Employee signs this Agreement and returns it to the address below post-marked no later than April 9, 2012 and does not revoke it during the revocation period set forth in paragraph 5(a) of this Agreement.

**Appendix A-2**

**2.    Termination of Employment and Benefits.**The Employee's employment with
DPHH will terminate effective midnight March 31, 2012 and his/her participation in and receipt
of any benefits under The DPHH Life and Disability Benefits Program for Salaried Employees
and The DPHH Salaried Health Care Program shall end effective midnight March 31, 2012.
This means that any life insurance coverage, health care coverage and disability benefits you
currently receive or are eligible to receive will cease after midnight March 31, 2012.

**3.    Release**

(a)    General Release.Employee, to the fullest extent permitted by law,
waives, releases, and discharges DPHH (as defined above and including The **DPHH** Life and
Disability Benefits Program for Salaried Employees and The DPHH Salaried Health Care
Program) from any claims, arbitration demands, and causes of action related to, arising in the
course of, or arising out of Employee's employment with DPHH or the termination of
Employee's employment with DPHH or termination of DPHH benefits under any state or federal
regulation, law, and statute, including (a) the Age Discrimination in Employment Act or the
Older Worker's Benefit Protection Act, 29 U.S.C. § 621, *et seq.*, Title VII of the Civil Rights Act
of 1964, as amended, the Rehabilitation Act of 1973, the Michigan Elliot Larsen Civil Rights
Act, the Michigan Persons With Disabilities Civil Rights Act, the Family and Medical Leave
Act, and the Americans With Disabilities Act, the Employee Retirement Income Security Act
(ERISA), 29 USC §1001 *et seq.*, (b) any and all claims pursuant to state or federal wage payment
laws, (c) any and all claims related to Michigan fair employment laws, (d) any and all claims
pursuant to the Michigan Whistleblowers' Protection Act and/or claims or complaints pursuant
to the federal Sarbanes-Oxley Act of 2002, the Dodd-Frank Act, and (e) any claim arising under
common law.

Employee and DPHH intend that, to the fullest extent permitted by law, this waiver,
release, and discharge is a general release and it shall extinguish any claims, arbitration demand
or cause of action by Employee against DPHH. This Agreement includes a release of
Employee's right to file a lawsuit or to seek individual remedies or damages in any EEOC-filed
court action, and this release will apply to any Charge of Discrimination about any events that
occurred up to the date of the signing of this Agreement. Employee and DPHH intend that, to
the fullest extent permitted by law, these waivers, releases, and discharges will constitute a
general release, will extinguish any claims and any causes of action, and will preclude any
lawsuit or any other legal claim by Employee against DPHH about anything that occurred before
the date of the signing of this Agreement, including anything arising out of or relating to
Employee's employment with DPHH the termination of Employee' s employment or the
termination of benefits. This Agreement will not be construed to prohibit the filing of a Charge
of Discrimination with the Equal Employment Opportunity Commission ("EEOC") or a state
agency, but this Agreement includes a release of Employee's right to file a lawsuit or to receive
any monetary recovery and any other remedies if the EEOC or a state agency pursues any claims
on Employee's behalf. The only claims and causes of action that Employee is not waiving,
releasing, or discharging are for the consideration that Employee will receive under Section 1 of
this Agreement and any claims and causes of action that, as a matter of law, cannot be waived,
released, or discharged.

(b)    Accord and Satisfaction.The consideration set forth in this Agreement is
in full accord and satisfaction of any claims and any causes of action that Employee has, may

2

**Appendix A-2**

have, or may have had against **DPHH** related to, arising in the course of or arising out of Employee's employment with **DPHH** or the termination of Employee's employment status and benefits.

4. <u>**Knowing and Voluntary Acceptance**</u>

    (a)   <u>Advice of Counsel.</u>**DPHH** has advised Employee to consult with an attorney of Employee's choice, at Employee's expense, before signing this Agreement.

    (b)   <u>Sufficient Time to Review Agreement.</u>Employee has had a sufficient amount of time totaling at least forty-five (45) days to consider the terms of this Agreement, including Exhibit A Addendum, to discuss all aspects of this Agreement with Employee's attorney, if Employee chooses to do that, at Employee's expense, and to decide whether to accept it.No change to this Agreement, whether material or immaterial, will initiate a new forty-five (45) day period.

    (c)   <u>Early Submission of Agreement.</u>   Employee may voluntarily and knowingly sign, but is not required to sign, this Agreement before the end of the forty-five (45) day period. **DPHH** has made no promises, inducements, representations, or threats to cause Employee to sign this Agreement before the end of the forty-five (45) day period. If Employee voluntarily and knowingly signs this Agreement before the end of the forty-five (45) day period, the mandatory seven (7) day revocation period set forth in paragraph 5(a) will start on the day after the day on which Employee signs this Agreement.

    (d)   <u>Knowing and Voluntary Acceptance.</u>Employee has carefully read this Agreement, understands it, and is entering it knowingly and voluntarily, which means no one is forcing or pressuring Employee to sign it.

    (e)   <u>No Reliance on Any Other Representation.</u>In signing this Agreement, Employee has not relied upon any **DPHH** representation or statement, either oral or written, about the subject matter of this Agreement that is not set forth in this Agreement.

    (f)   <u>Procedural Requirements.</u>Employee agrees he/she had adequate time to review the procedural and substantive requirements for execution of this Agreement under the Older Worker Benefit Protection Act and Age Discrimination in Employment Act with Employee's legal counsel and further agrees that DPHH has complied with those procedural and substantive requirements.

5. <u>**Right to Revoke Acceptance of Agreement**</u>

    (a)   <u>Right to Revoke.</u>Employee is entitled to revoke this Agreement within seven (7) days after the date on which Employee signs it. The seven (7) days will start on the day after the day on which Employee signs this Agreement. The Agreement will not become effective or enforceable until after this revocation period has expired, and no revocation has occurred. DPHH will not pay Employee the payment described in Section 1 of this Agreement until after this revocation period has expired, and no revocation has occurred. If Employee revokes this Agreement during the seven (7) day revocation period, the Agreement will not be effective or enforceable, and Employee will not receive any of the consideration set forth in this Agreement.

**Appendix A-2**

(b)   Revocation Procedure.To be effective, any revocation must be in writing, addressed to **DPH Holdings Corp., P.O. Box 5027, Troy, Michigan 48098,** and either postmarked within the seven (7) day revocation period or hand delivered to **DPH Holdings Corp., 5725 Delphi Drive, Troy, Michigan 48098,** within the seven (7) day revocation period. If revocation is made by mail, mailing by certified mail return receipt requested is recommended to show proof of mailing.

(c)   Effect of Failure to Revoke.Employee understands that by signing this Agreement and by not revoking the Agreement during the seven (7) day revocation period, Employee shall be bound by this Agreement.

(d)   Effective Date.   The Agreement will become effective after the Revocation period described within Section 5 and only if both parties sign the Agreement.

**6.**   **Non-admission of Liability.**This Agreement shall not be used or construed as an admission of liability or wrongdoing by either DPHH or Employee. DPHH denies that it acted unlawfully, tortiously, or in violation of any employment law affecting Employee.

**7.**   **Severability.**If any one or more than one of the provisions contained in this Agreement are, for any reason, held to be invalid, illegal, or unenforceable in any respect, the rest of this Agreement will remain enforceable. This Agreement shall then be construed as if it never contained the invalid, illegal, or unenforceable provision.

**8.**   **Applicable Law.**This Agreement is to be interpreted, construed, and applied in accordance with the law of the State of Michigan.

**9.**   **Jurisdiction and Forum.**Any action arising out of this Agreement or the relationship between the parties established herein shall be brought only in the State of Michigan Courts of appropriate venue, or the United States District Court sitting in Michigan, and Employee hereby consents to and submits himself or herself to the jurisdiction of such Courts.

**10.**   **Non-disclosure.**Employee will not disclose the terms of this Agreement to any third party, other than Employee's immediate family members (meaning spouse, mother, father or siblings only), except as required by law or as necessary for the purpose of receiving counsel from Employee's attorney, accountant, or both. Employee's immediate family members and professional advisors will be subject to the non-disclosure requirement of this paragraph.

**11.**   **Successors and Assigns.**This Agreement is binding and shall take effect for the benefit of (i) DPHH and (ii) Employee, Employee's heirs, assigns, executors, administrators, other legal representatives, and successors.

**12.**   **Counterparts.**This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and all of which together shall constitute the same instrument.

**13.**   **Entire Agreement.**This Agreement constitutes the entire agreement between the parties related to termination of Employee's employment and benefits with DPHH. There are no

4

**Appendix A-2**

other agreements, promises, conditions, or understandings, either written or oral, between DPHH and Employee either with respect to the subject matter of this Agreement or modifying the terms of this Agreement. Only a writing signed by Employee and an authorized representative of DPHH that specifically refers to and expressly changes this Agreement can modify the terms of this Agreement.

**DPH HOLDINGS CORP.**                     **EMPLOYEE**


By: _____                _____


Its: _____


Dated: _____, 2012      Dated: _____, 2012


**Return signed agreement postmarked no later than April 9, 2012 to:**

DPH Holdings Corp.
P.O. Box 5027
Troy, MI 48098

**Appendix A-2**

### ADDENDUM TO SEPARATION AND RELEASE AGREEMENT

The following information is being provided to employees eligible to receive lump sum payments in exchange for a release of claims in connection with the termination program instituted by DPHH. This information is provided to comply with the federal Age Discrimination in Employment Act and the Older Workers Benefit Protection Act.

The decisional unit that has resulted in employment loss consisted of all salaried employees on leave of absence as of March 31, 2012 ("decisional unit"). DPHH is terminating all salaried employees on leave of absence as part of the winding up of the business. Employees in the decisional unit who have been offered an Agreement, which includes an offer of lump sum payments, are indicated below.

| Job Title | Abe | Offered or not offered a lump sum payment in an Agreement containin  a release |
|---|---|---|
| Accountant I | 49 | N |
|  | 43 | N |
| Assoc Designer II | 62 |  |
| Assoc Engrg Technician III | 49 | Y' |
| Assoc Maintenance Supervisor | 50 | V |
| Assoc Operations Supervisor III | 56 | V |
| Assoc Program Coordinator III | 59 |  |
| Asst Designer I | 64 |  |
| Clerk I | 65 | Irl |
|  | 60 |  |
| Engrg Specialist II | 59 | Y |
| En. r. Technician I | 60 | Y |
| Eng re Technician I | 63 |  |
| Health & Safet  Coordinator III | 54 | Y |
| Logistics Specialist II |  | Y |
| Maintenance Supervisor III | 65 | Y |
| Maintenance Supervisor III | 62 | V |
| Marketing Anal st I | 58 |  |
| Mfg Engrg Supervisor III | 58 | 'Y |
| Operations Supervisor II | 64 | N' |
| Operations Supervisor II | 58 | Ne |
| Operations Supervisor II | 51 | V |
| Operations Supervisor II | 47 | 'Y |
| Operations Supervisor II | 59 | ,. |
| Operations Supervisor II | 45 |  |
| Operations Supervisor II | 56 |  |
| Operations Supervisor II | 67 | N |
| Operations Supervisor II | 66 | N |
| Packa ir- Engineer II | 58 | V |
| Product Engineer III | 43 | 1( |
| Production Control Supervisor 1 | 48 |  |
| Production Control Supervisor II | 65 |  |
| Production Control Supervisor II | 59 |  |
| Production Control Supervisor II | 58 |  |
| Purchasing Coordinator III | 43 |  |
| Sr Account Mana.er III | 46 |  |
| Sr Manufacturing Engineer II | 55 | V |
| Sr Manufacturing Engineer H | 47 | V |
| Sr Marketing Analyst II | 56 | V |
| Sr Mechanical Engineer III | 61 | 'it |
| Sr Nurse III | 67 | V |
| Sr Product Engineer I | 66 | N |
| Sr Qualit  Engineer II | 58 | N' |
| Sr Software Engineer III | 56 |  |
| Staff Product Engineer II | 57 | V |
| Validation Analysis Engineer I | 50 |  |

# Appendix B: SPD Sections on Disability Benefits

# *Sickness and Accident Benefits*

## *If You Are in a Classified Salaried Position*

You are covered for Sickness and Accident benefits on the first day of the sixth month following the month in which you commence working with Delphi. If you are not actively at work on the day your coverage otherwise would start, coverage commences on the day you return to active work.

While you are unable to work because of sickness or injury and you are being treated by a physician legally licensed to practice medicine, Sickness and Accident benefits may be payable for as long as 12 months. Sickness and Accident benefits also may be payable if you are

     (1)    disabled from surgery for sterilization, or

     (2)    hospitalized for testing to determine your suitability to be a donor for an organ or tissue transplant.

**To receive Sickness and Accident benefits,** you must be totally disabled thereby preventing you from performing the duties of your occupation and must give written notice of any sickness or injury within 20 days after the onset of disability. Generally, Sickness and Accident benefits begin after a seven-day waiting period, provided you have been treated by a physician legally licensed to practice medicine or the plant medical department during the first seven-days of disability. Your salary may be continued during the seven-day waiting period. If you have not been treated within the first seven days of disability, sickness and accident benefits would be payable as of your first date of treatment. Also, you must provide proof of your injury or sickness to the Carrier within 90 days after the termination of the period for which monthly benefits are payable.

Monthly benefit amounts are determined by your monthly base salary. Base salary, for purposes of Sickness and Accident benefits, includes the premium for necessary continuous seven-day operations, but does not include overtime, night-shift premium, or any other payments.

Benefits generally are payable on your regular payday. These benefits may be supplemented by salary continuation, as shown in the table on page 79.

Your monthly benefit amount is equal to 75% of your monthly base salary for periods of disability commencing after you attain one year's length of service. Your monthly benefit amount is equal to 60% of your monthly base salary for periods of disability commencing prior to your attainment of one year's length of service.

Sickness and Accident benefits are payable for a period based on your (1) Delphi length of service, or (2) years of participation under the Life and Disability Benefits Program, if greater (see page 77).

For each month of service, you may receive one monthly benefit, up to a total of 12 monthly benefits. If your Delphi service is less than 12 months, benefits may continue up to 12 months while you are hospitalized, or receiving workers' compensation payments from Delphi.

If you return to work before the end of the maximum period for which you are eligible to receive Sickness and Accident benefits, and are absent again within three months because of the same or a related disability, benefits resume where they left off. For example, if you were disabled and received Sickness and Accident benefits for four months, returned to work and then became disabled again two months later from the same or a related condition, you would be eligible for eight additional months of benefits, without a new waiting period. If your second period of disability results from a different cause, the first absence does not affect the benefits, or waiting period, for the second absence.

**75**

Sickness and accident benefits are reduced by:

- Primary Social Security Disability Insurance Benefits (SSDIB) or unreduced Social Security Old Age Insurance (including retroactive amounts paid for the same period of disability);

- Certain workers' compensation payments;

- Any unemployment compensation payments to which you are entitled for the same period you receive Sickness and Accident benefits;

- Any payments made under the Corporation's salary continuation policy or any other salary payments that may be made in connection with any Corporation incentive separation plan or the Separation Allowance Plan.

You may be required to apply for SSDIB if your disability is expected to continue for a year or longer.

**You may be required to be examined** by a doctor, clinic, or other medical authority for the purpose of verifying disability, at any time you may be eligible to receive Sickness and Accident benefits, Extended Disability Benefits; Supplemental Extended Disability Benefits, or Personal Accident Insurance benefits. Generally, if you are found able to work, your benefits will be discontinued. Failure to report for the examination may affect any eligibility you may have for benefits. You will be reimbursed, upon request, at 31¢ per mile for travel to and from the examination, if your residence is more than 40 miles (one-way) from the examiners office.

 To apply for **Sickness and Accident Benefits**, you must complete a claim form provided by the **National Benefit Center**.

You may contact the center, toll-free, at **1-800-734-0346 or 1-800-882-3563 for the hearing or speech impaired**.

In certain states, employees in either classified or executive salaried positions may be eligible under a statutory disability benefits law for disability benefits for time lost from work. **If you are an employee working in California, New Jersey, or New York**, certain modifications in your Sickness and Accident benefits, or salary continuation payments during disability, are explained in a special enclosed insert.

# *Extended Disability Benefits and Supplemental Extended Disability Benefits*

If you continue to be disabled after you receive Sickness and Accident benefits and/or salary continuation payments for the maximum period and you continue to be a Delphi employee, you may be eligible to receive monthly Extended Disability Benefits.

**You are covered** for Extended Disability Benefits on the first day of the sixth month following the month in which you commence working with Delphi. If you are not actively at work on the day your coverage otherwise would start, coverage commences on the day you return to active work.

**To receive Extended Disability Benefits,** you must (1) be totally disabled so as to be unable to engage in any regular employment with Delphi at the location where you last worked, and (2) not be working elsewhere.

**Monthly benefit amounts** are determined by your monthly base salary. Base salary, for purposes of Extended Disability Benefits, includes the premium for necessary continuous seven-day operations, but does not include overtime, night-shift premium, or any other payments.

Your monthly benefit amount is equal to 60% of your monthly base salary.

**Extended Disability Benefits are payable** for a period based on your Delphi years of participation under the Life and Disability Benefits Program (see page 116).

- **If you have 10 or more years of participation when you become disabled,** benefits are payable until recovery or death, but not beyond age 65."

- **If you have less than 10 years of participation when you become disabled,** benefits are payable until recovery, death, or, if less, for a period equal to your years of participation at the commencement of disability (less the period during which Sickness and Accident benefits or salary continuation payments are received), but not beyond age 65."

  * *However, if you become disabled at or after age 63, you may receive Extended Disability Benefits for a period of time beyond age 65.*

In addition, **if you are covered for Extended Disability Benefits, but have less than 10 years of participation in the Life and Disability Benefits Program,** you may elect to purchase Supplemental Extended Disability Benefits coverage under the Delphi Options! Program.

As the name implies, Supplemental Extended Disability Benefits coverage is intended to supplement the Delphi Extended Disability Benefits for shorter service employees. You may elect Supplemental Extended Disability Benefits during the Delphi Options! Program enrollment period, **only** if on January 1 of the following year, you will have **at least six months but less than 10 years of participation.** If eligible, Supplemental Extended Disability Benefits would be available to you on a pre-tax, self-paid basis. Employee contributions and coverage for Supplemental Extended Disability Benefits would not commence until you have acquired 13 months of credited service under the Retirement Program for salaried employees.

All Extended Disability Benefits plan provisions also apply to Supplemental Extended Disability Benefits. However, receipt of Supplemental Extended Disability Benefits does not extend eligibility for health care and life and disability coverage.

To be eligible for a Supplemental Extended Disability Benefits payment, you must have
(1) elected Supplemental Extended Disability Benefits under the Delphi Options! Program,
(2) made at least one monthly contribution, and
(3) exhausted maximum Extended Disability Benefits.

**77**

If you are eligible, Supplemental Extended Disability Benefits provides you with disability benefits equal to 60% of your monthly base salary in effect as of September 1 of the year prior to your first day of disability. Supplemental Extended Disability Benefits will begin when your Extended Disability Benefits are exhausted. The length of time the benefit is paid may continue until the earliest of recovery from your qualifying disability, age 65, or death. This additional coverage will provide you with the maximum duration of Extended Disability Benefits available to employees with 10 or more years of credited service.

**Extended Disability Benefits and Supplemental Extended Disability Benefits are reduced by:**

- Any monthly Part A benefits and Part B supplementary benefits (see pages 84 - 98) for which you may be eligible under the Delphi Salaried Retirement Program;

- Any benefit for which you are eligible under any other Delphi retirement or pension plan;

- Any salary payments that may be made in connection with any Corporation separation plan;

- Governmental benefits, such as workers' compensation;

- Certain social security benefits; and

- Any federal or state lost-time disability benefits.

Increases in any of these benefits payable after Extended Disability Benefits or Supplemental Extended Disability Benefits commence will not be deducted, unless the increase represents an adjustment in the original determination of the amount of such benefit. **A retroactive award of any of these benefits will create an overpayment of Extended Disability Benefits or Supplemental Extended Disability Benefits that were paid for the same period of disability. (See page 115 for Recovery of Benefit Overpayments.)**

For both Extended Disability Benefits and Supplemental Extended Disability Benefits, you will be required to apply for Social Security Disability Insurance Benefits (SSDIB) under a special procedure designed to handle the offset of SSDIB against Extended Disability Benefits. You also will be required to repay any overpayment incurred due to receipt of an SSDIB award.

## *Social Security Disability Insurance Benefits*

If you become disabled before age 65, you may be eligible for disability insurance benefits from Social Security. Your nearest Social Security office can tell you if you qualify. Benefits may be payable after you have been disabled for five full calendar months.

The amount of Social Security benefits payable because of disability generally is in accordance with the schedule set forth on page 95 for benefits payable at age 65.

It is important for you to apply for Social Security Disability Insurance Benefits (SSDIB) for these reasons:

- Failure to obtain an SSDIB award may result in a lesser Social Security old age benefit.

- Your dependents also may qualify for Social Security benefits.

- Your Social Security benefits may be increased annually to reflect cost-of-living increases.

- You become eligible for Medicare after receiving 24 months of SSDIB. If you become enrolled in Medicare Part B, you may become eligible for payment of a monthly Special Benefit under the Delphi Salaried Health Care Program (see page 66).

- If you are receiving SSDIB and return to work you may be eligible to continue these benefits, in addition to your salary, up to 12 months. You should contact your nearest Social Security office for additional information.

- SSDIB awards are given favorable federal tax treatment, under current tax laws.

If you are receiving Sickness and Accident, Extended Disability Benefits or Supplemental Extended Disability Benefits, you may be required to complete an authorization form that allows the Social Security Administration to inform Delphi of the status of your claim for Social Security Disability Insurance Benefits. If you fail to complete this authorization, your Sickness and Accident or Extended Disability Benefits or Supplemental Extended Disability Benefits will be suspended until the authorization is received.

 To apply for **Extended Disability Benefits**, you must complete a claim form provided by the **National Benefit Center**. You may contact the center, toll-free, at **1-800-734-0346** or **1-800-882-3563 for the hearing or speech impaired.**

## *Illustration of Salary Continuation, Sickness and Accident Benefits (S&A), and Extended Disability Benefits (EDB) for Eligible Salaried Employees*

| Types of Disability Payments for Periods Shown Below | | | | |
|---|---|---|---|---|
| Length of Service[1] | Full Salary[2] | S&A and Salary Combined Equal to Full Salary[3] | Maximum S&A Benefits Payable | Maximum EDB Payable |
| Less than 1 year | 1st week | — | Up to 12 months | None[4] |
| 1 year but less than 5 years | 1st week | Next 7 weeks | 12 months | For a period equal to years of participation (if under 10) less the period S&A and/or salary continuation paid[5] but not beyond age 65[6] |
| 5 years but less than 10 years | 1st week | Next 12 weeks | 12 months | |
| 10 or more years | 1st week | Next 25 weeks | 12 months | To age 65[6] (if years of participation are 10 or more) |

(1) At commencement of disability.
(2) For this purpose, full salary includes base salary and the premium for necessary continuous seven-day operations, but does not include overtime, night-shift premium, or any other payment.
(3) The combined payments equal 25% salary continuation and 75% Sickness and Accident benefits. For this purpose, full salary includes base salary and the premium for necessary continuous seven-day operations, but does not include overtime, night-shift premium, or any other payment.
(4) If you elected Supplemental Extended Disability Benefits, employee contributions and coverage will not begin until you have acquired 13 months of credited service under the Retirement program for salaried employees.
(5) If you are covered for Extended Disability Benefits, but have less than 10 years of participation in the Life and Disability Benefits Program, you may elect to purchase Supplemental Extended Disability Benefit coverage under the Delphi Options! Program.
(6) If you become disabled at or after age 63, you may receive Extended Disability Benefits for a period of time beyond age 65.

## Example of Delphi Disability Income Benefits

A Delphi employee with more than 10 years of service becomes totally and permanently disabled in February 2001. The following table illustrates the monthly benefits the employee would receive assuming a final monthly base salary of $4,100.

| Period Payable | Type of Disability Income Benefit | Monthly Benefit Amount |
|---|---|---|
| 1st 6 months | Salary continuation (25%) | $1,025.00 |
| | Sickness and accident (75%) | $3,075.00 |
| | **Total** | $4,100.00 |
| 2nd 6 months | Sickness and accident (75%) | $3,075.00 |
| After 12 months | Extended disability (60%) | $2,460.00 |

This employee also may be eligible to receive:
- Monthly total and permanent disability benefits under the Retirement Program (see page 89).
- Their entire account balance under the Savings-Stock Purchase Program after one year of disability.

# Your Delphi Retirement Program Is Made Up of Two Parts

**Part A** is non-contributory. Delphi Automotive Systems pays the entire cost. Part A provides monthly benefits for all employees who have five or more years of credited service and retire or receive deferred vested benefits under the Program. Monthly retirement benefits also are payable when you retire at age 65, or older, based on your credited service. Part A may consist of:

- Basic benefits;

- Temporary benefits; and

- Supplements.

**Part B** is contributory. To receive full Part B benefits, you must (1) contribute at all times while eligible, and (2) leave your contributions in the Program. Part B provides you with an opportunity to build up substantial additional monthly benefits, consisting of:

- Supplementary benefits, which are based on your (1) years of Part B credited service, and (2) average monthly base salary over the highest 60 months during the 120 months immediately preceding retirement; and

- Primary benefits, which are based on the amount you contribute.

While you are required to contribute to participate in Part B of the Program, Delphi also contributes in the aggregate, about 85% of the cost of this part of the Program.

## Eligibility

**■   To Participate**
*In general you are eligible to participate in Part A automatically when you become a regular Delphi salaried employee.*

**■   Part B**
*You are eligible to contribute under Part B when you have attained (1) age 21, and (2) six months of continuous service.*

*Your Part B contribution is 1.25% of your eligible monthly base salary in excess of $3,000. When you elect to participate in Part B, your contribution is deducted (after-tax) from your salary each month. Your Part B contributions are limited to 35 years.*

**■   To Retire**
*You are eligible to retire under normal retirement provisions when you attain age 65.*

*You may retire voluntarily at (1) any age if you have 30 or more years of credited service\*, or (2) age 55 with 10 or more years of credited service.*

*If you have 10 or more years of credited service, you may retire at any age prior to age 65 if totally and permanently disabled.*

*\* This provision is not applicable to a salaried employee hired on or after January 1, 1988.*

49                                                                        **84**

# Appendix C: Unjust Enrichment Analysis

# Appendix C: Unjust Enrichment Analysis

1.        "A claimant seeking relief under a theory of unjust enrichment in New York must demonstrate (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." Leibowitz v. Cornell Univ., 584 F.3d 487, n.9, 509 (2d Cir. 2009)

2.        "... A right of recovery under the doctrine of unjust enrichment is essentially equitable; its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another..." *Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co.,* 231 Conn. 276, 282, 649 A.2d 518 (1994); In re Michael DEPINNA and Karen DePinna, Debtors;450 B.R. 337 (Bkrtcy.D.Conn. 2011)

3.        Thus as it pertains to DPHH and the Disabled Beneficiaries:

   (1) The Debtor will benefited by inducing Beneficiaries to accept as lump sum payment of disability benefits that is 50% of what the company is obligated to pay and 50% of the vested benefit that the Disabled Beneficiary should rightfully receive.

   (2) Clearly a 50% reduction in disability payments is at the expense of the Disabled Beneficiary.

   (3) Equity and good conscience require that DPHH not be allowed to avoid its obligation to Disabled Beneficiaries; who are dependent on these vested, contracted benefits, and because of their health limitations are not able to engage in any wage producing activity.

## Appendix D: Monthly Medicare premiums for 2012

# Appendix D: Monthly Medicare premiums for 2012

The standard Part B premium for 2012 is $99.90. If you are single and filed an individual tax return, or married and filed a joint tax return, the following chart applies to you:

| Modified Adjusted Gross Income (MAGI) | Part B monthly premium amount | Prescription drug coverage monthly premium amount |
|---|---|---|
| Individuals with a MAGI of $85,000 or less Married couples with a MAGI of $170,000 or less | **2012 standard premium=$99.90** | **Your plan premium** |
| Individuals with a MAGI above $85,000 up to $107,000 Married couples with a MAGI above $170,000 up to $214,000 | Standardpremium + $40.00 | Your plan premium + $11.60 |
| Individuals with a MAGI above $107,000 up to $160,000 Married couples with a MAGI above $214,000 up to $320,000 | Standardpremium + $99.90 | Your plan premium + $29.90 |
| Individuals with a MAGI above $160,000 up to $214,000 Married couples with a MAGI above $320,000 up to $428,000 | Standardpremium + $159.80 | Your plan premium + $48.10 |
| Individuals with a MAGI above $214,000 Married couples with a MAGI above $428,000 | Standard premium + $219.80 | Your plan premium + $66.40 |
| Individuals with a MAGI above $85,000 up to $129,000 | Standard premium + $159.80 | Your plan premium + $48.10 |
| Individuals with a MAGI above $129,000 | Standard premium + $219.80 | Your plan premium + $66.40 |

**http://www.ssa.gov/pubs/10536.pdf**

**Appendix E:**    **Meeting Your Fiduciary Responsibilities (by U. S. DOL)**
*From Department of Labor "Meeting Your Fiduciary Responsibilities"*

**Appendix E:     Meeting Your Fiduciary Responsibilities (by U. S. DOL)**
*From Department of Labor "Meeting Your Fiduciary Responsibilities"*

## What Is The Significance Of Being A Fiduciary?

Fiduciaries have important responsibilities and are subject to standards of conduct because they act on behalf of participants in a retirement plan and their beneficiaries. These responsibilities include:

- Acting solely in the interest of plan participants and their beneficiaries and with the exclusive purpose of providing benefits to them;

- Carrying out their duties prudently;

- Following the plan documents (unless inconsistent with ERISA);

- Diversifying plan investments; and

- Paying only reasonable plan expenses.

The duty to act prudently is one of a fiduciary's central responsibilities under ERISA. It requires expertise in a variety of areas, such as investments. Lacking that expertise, a fiduciary will want to hire someone with that professional knowledge to carry out the investment and other functions. Prudence focuses on the *process* for making fiduciary decisions. Therefore, it is wise to document decisions and the basis for those decisions. For instance, in hiring any plan service provider, a fiduciary may want to survey a number of potential providers, asking for the same information and providing the same requirements. By doing so, a fiduciary can document the process and make a meaningful comparison and selection.

Following the terms of the plan document is also an important responsibility. The document serves as the foundation for plan operations. Employers will want to be familiar with their plan document, especially when it is drawn up by a third-party service provider, and periodically review the document to make sure it remains current. For example, if a plan official named in the document changes, the plan document must be updated to reflect that change.

Diversification – another key fiduciary duty – helps to minimize the risk of large investment losses to the plan. Fiduciaries should consider each plan investment as part of the plan's entire portfolio. Once again, fiduciaries will want to document their evaluation and investment decisions.

# Appendix E - Meeting Your Fiduciary Responsibilities (by U. S. DOL)
*From Department of Labor "Meeting Your Fiduciary Responsibilities"*

## Can A Fiduciary Terminate Its Fiduciary Duties?

Yes, but there is one final fiduciary responsibility. Fiduciaries who no longer want to serve in that role cannot simply walk away from their responsibilities, even if the plan has other fiduciaries. They need to follow plan procedures and make sure that another fiduciary is carrying out the responsibilities left behind. It is critical that a plan has fiduciaries in place so that it can continue operations and participants have a way to interact with the plan.

# Appendix F: DPHH Response Letter to Inquiry by James Sumpter (Movant)



**Appendix F: DPHH Response Letter to Inquiry by James Sumpter (Movant)**

*a professional corporation*

Roberta P. Granadier
248 593 3020
granadier@butzel.com

Stoneridge West
41000 Woodward Avenue
Bloomfield Hills, Michigan 48304
T: 248 258 1616 F: 248 258 1439
butzel.com

March 30, 2012

<u>**Via Federal Express**</u>

James B. Sumpter 21169
Westbay Circle
Noblesville, IN 46062

Re:     Termination of DPHH Salaried Retiree Disability Benefits
        Claim #920201298582

Dear Mr. Sumpter:

Our firm is legal counsel to DPH Holdings Corp. ("DPHH") and this letter will respond to your correspondence dated March 20, 2012, relating to the DPHH termination of salaried retiree disability benefits under the DPH Holdings Corp. Life and Disability Benefits Program for Salaried Employees (the "Plan").

1.     What happens if I don't accept the lump sum offer?

   A.   *The lump sum payment offer is completely voluntary. You may choose to accept it or not. The lump sum payment is conditioned upon your execution of the Release Agreement you received on February 16, 2012. The Release Agreement must be returned to DPHH, postmarked no later than April 9, 2012. Please note that the April 9 deadline will not be extended.*

2.     What other options are available to me?

   A.   *Your question is unclear. If you are asking what other options you may have to obtain disability benefits or disability insurance, we are not in a position to advise you. You may wish to contact an insurance broker. DPHH's decision to terminate the Plan and benefits under the Plan is final.*

Ann Arbor     Bloomfield Hills     Detroit     Lansing     New York     Washington D.C.

Alliance Offices     Beijing     Shanghai     Mexico City     Monterrey     Member Lex Mundi     www.butzel.com

James B. Sumpter
March 30, 2012
Page 2

> **Appendix F: DPHH Response Letter to
> Inquiry by James Sumpter (Movant)**

3. My belief is that for a disabled retiree, disability benefits are vested, and are therefore protected. Please confirm this statement or provide documentation that disproves it.

    A.                    *Your understanding is not correct. Employee welfare benefits under ERISA are not subject to vesting if the plan document contains a reservation of rights clause. I am attaching a copy of the Plan. Please see Article III, Section 3.05(b)(1) on page 111-7 where DPHH has reserved the right to, "amend, modify, suspend or terminate the Program in whole or in part at any time." Since DPHH is in the process of liquidation and winding-up all if its liabilities and affairs, it has decided to terminate all benefit programs, including the Disability Plan, effective March 31, 2012.*

4. What are the implications of the fact that I paid a premium for supplemental extended disability benefits as it pertains to the size of the lump-sum offer?

    A.                    *Supplemental extended disability benefit ("SEDB') was a part of the Plan which was self-insured by DPHH. You may have made contributions toward the cost of the Plan, but you were not purchasing insurance. Because the Plan is being terminated effective March 31, 2012, all disability benefits will cease. The amount of the proposed lump sum is based on the benefits you received from DPHH under the Plan.*

5. Is it correct that no deductions other than tax withholdings will be made from the lump-sum?

    A.                    *Your lump sum payment will be reduced for applicable tax withholdings such as federal, state and employment taxes.*

6. If I were to consider the lump-sum offer ($129,600) as it is currently configured, it would have significant negative tax implications, which would result in a significant increase to my 2012 net tax rate. It would also raise my Medicare cost for 2013 by $3,000. Can arraignments be made through a trust fund, annuity, or some other mechanism so that the funds can be distributed in six yearly increments, so as to avoid the severe tax implications of the lump-sum?

    A.                    *There is no option to receive the proposed amount other than in a single lump sum payment.*

    1348207

59

James B. Sumpter
March 30, 2012
Page 3

**Appendix F: DPHH Response Letter to Inquiry by James Sumpter (Movant)**

7.   Is DPHH willing to gross up the lump-sum so as to offset the negative tax and Medicare implications?

     A.   *No gross up is available.*

8.   What justification does DPHH have for only offering 51.4% of my expected benefit between April 1, 2012 and normal age 66 termination?

     A.   *The proposed lump sum payment amount is determined based on the benefits you received from DPHH prior to Plan termination. Each individual payment is different.*

9.   Why is DPHH not offering to pay, as a lump-sum, my full to age 66 benefit of $252, 014.00?

     A.   *DPHH is not required to offer any lump sum payment. It recognizes that terminating disability benefits presents a hardship and it has agreed to pay an amount it feels is fair and reasonable.*

10.  Does DPHH (or Delphi) have an agreement or other arrangement with the PBGC regarding the continuation, payment, and/or termination of Salaried Retiree Disability benefits? If so, what is the agreement?

     A.   *No.*

11.  Why is DPHH requiring a non-disclosure agreement with the acceptance of the lump-sum offer?

     A.   *A non-disclosure provision is a common provision in a release agreement.*

If you have any additional questions, please do not hesitate to contact the undersigned.

Sincerely,

BUTZEL LONG
a professional corporation

*Roberta Granadier*

Enclosure                        Roberta Granadier

cc:
     John Brooks
     Cynthia J. Haffey, Esq.

1348207

60

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

----------------------------------------x Chapter 11 Case No. 05-44481 (RDD)

In re:                                     :

DELPHI CORPORATION, et. al.,               :(Jointly Administered)
                                           :
    Debtors.                           : :
                                           : :

----------------------------------------x

## AFFIDAVIT OF SERVICE

I, James B. Sumpter, do herby state that relative to the Motion:

## Vesting Motion Regarding Extended Disability Benefits For Salaried Employees And Salaried Retirees

I served copies of the above motion on the entities listed in Exhibit A, via Email and
U.S. Mail n 9-APR-2012. A paper copy was also sent via FED EX overnight to the clerk
of the court on 9-APR-2012.


/s/ James B. Sumpter

James B. Sumpter                          **9/APR/2012**
21169 Westbay circle                      Date
Noblesville, IN  46062
Telephone: (317) 877-0736
Facsimile: (317) 877-1070
jsump@ieee.org


1

## AFFIDAVIT OF SERVICE

## Serving Date - April 9, 2012

Hon. Robert D. Drain
United States Bankruptcy Court
for the Southern District of New York
300 Quarropas Street
White Plains, NY 10601-4140
Telephone: (914) 390-4155

Cynthia Haffey & Chester E. Kasiborski, Jr
Butzel Long
150 W. Jefferson
Suite 100
Detroit, MI 48236
Telephone: 313-225-7064
haffey@butzel.com

Counsel to the Debtors
Skadden, Arps, Slate, Meagher & Flom LLP
155 North Wacker Drive, Suite 2700
Chicago, Illinois 60606
Attn: Ron E. Meisler
Telephone: (312) 407-0700
rmeisler@skadden.com

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attn: Harvey R. Miller
        Robert J. Lemons
Telephone: (212) 310-8500
harvey.miller@weil.com
robert.lemons@weil.com

Honigman Miller Schwartz and Cohn LLP
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226-3583
Attn: Frank L. Gorman, Esq. &
        Robert B. Weiss, Esq.
Telephone: 313-465-7000
fgorman@honigman.com
rweiss@honigman.com

DPH Holdings Corp.
5725 Delphi Drive
Troy, MI 48098
Attn: John Brooks
Telephone: 312-357-1313
john.brooks@delphi.com

Ruskin Moscou Faltischek PC
1425 RXR Plaza, 15th Floor
Uniondale, NY 11556
Attn: Jeffrey A. Wurst, Esq.
Telephone: (516) 663-6535
jwurst@rmfpc.com

Delphi Automotive Systems LLP
5725 Delphi Drive
Troy, MI 48098
Attn:    Sean Corcoran
        Karen Craft
        David M. Sherbin
Telephone: 248-813-2000
sean.p.corcoran@delphi.com
karen.j.craft@delphi.com
david.sherbin@delphi.com

2

## AFFIDAVIT OF SERVICE

## Serving Date - April 9, 2012

Office of the United States Trustee
Southern District of New York
33 Whitehall Street, 21st floor
New York, New York 10004
Attn: Brian Masumoto
Telephone: (212) 510-0500

Barnes & Thornburg LLP
One N Wacker Drive
Suite 4400
Chicago, IL 60606
Telephone: 312-357-1313
dthorne@btlaw.com
kmatsoukas@btlaw.com