KLESTADT & WINTERS, LLP
John E. Jureller, Jr.
570 Seventh Avenue, 17th Floor
New York, NY 10018
Telephone: (212) 972-3000
Facsimile: (212) 972-2245

*Counsel to Ontario Specialty Contracting, Inc.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| DELPHI CORPORATION, et al. | Case No. 05-44481 (RDD) |
| Debtors. | (Jointly Administered) |

**MOTION OF ONTARIO SPECIALITY CONTRACTING, INC. FOR ALLOWANCE OF AN ADMINISTRATIVE CLAIM PURSUANT TO 11 U.S.C. § 503(b)(1)(A), OR IN THE ALTERNATIVE, FOR LEAVE TO FILE A LATE ADMINISTRATIVE EXPENSE CLAIM PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 9006(b)**

Ontario Specialty Contracting, Inc. ("OSC") hereby respectfully moves this Court for allowance of its administrative expense claim (the "OSC Claim", defined more fully below) pursuant to 11 U.S.C. § 503(b)(1)(A), or in the alternative, for leave to file a late administrative expense claim pursuant to Federal Rule of Bankruptcy Procedure 9006(b) and deem the OSC Claim timely filed *nunc pro tunc*. In support of the Motion, OSC respectfully states as follows:

**BACKGROUND**

1.     On October 8, 2005, Delphi Corporation ("Delphi Corp.") and certain of its subsidiaries, including Delphi Automotive Systems, LLC, (collectively as "Delphi" and/or "Debtors") filed voluntary petitions under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

1

2.      The Debtors' bankruptcy cases are jointly administered for procedural purposes under *In re Delphi Corporation, et al.* Case No. 05-44481 (RDD) (Bankr. S.D.N.Y).

3.      By order dated January 25, 2008, this Court confirmed the Debtors' First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-in-Possession (the "Initial Plan").

4.      On June 16, 2009, this Court entered the Modifications Procedure Order establishing July 15, 2009 as the Initial Administrative Claim Bar Date (the "Initial Administrative Claim Bar Date") for parties to file administrative expense claims based on post-petition claims against the Debtors that ***arose, accrued or that were incurred on or before June 1, 2009***.[1]  OSC has no record of receipt of the Initial Administrative Claim Bar Date, although it would not have been relevant to OSC, as it did not yet have a ripe claim at that time.

5.      On July 30, 2009, this Court approved the Debtors Proposed Modifications to the First Amended Joint Plan of Reorganization of the Debtors (the "Modified Plan").

6.      Pursuant to a Notice of (A) Order Approving Modifications to First Amended Joint Plan of Reorganization of Delphi Corp. and certain affiliates, Debtors and Debtors in Possession; and (B) Occurrence of Effective Date (the "Notice"), the effective date of the Debtors' confirmed Modified Plan was October 6, 2009 (the "Effective Date").  That Notice contained a provision that required ***all administrative claims incurred after June 1, 2009 be filed on or before November 5, 2009*** (the "Final Administrative Claim Bar Date").

***The Project:***

---

[1] On July 15, 2009, this Court amended the Initial Administrative Claim Bar Date, and required parties to submit their administrative expense claim forms for administrative claim expenses for the period from the commencement of these cases through May 31, 2009 rather than June 1, 2009.

2

7.  In or about late 2007 and early 2008, Delphi issued several requests for quotations ("RFQ") for the demolition of its Rochester Die Casting Building (the "Project"). The RFQs contained a target price calling for payment from the contractor to Delphi, on the basis that the value of the scrap metals at the Project site were believed to exceed the costs incurred by a contractor in performing the demolition work.[2]

8.  On or about July 9, 2008, OSC responded to Delphi's final RFQ.

9.  On or about July 24, 2008, Delphi issued a Purchase Order to OSC (the "Purchase Order"). A true and correct copy of the Purchase Order, including General Terms and Conditions incorporated by reference, is attached as Exhibit B to the OSC Claim[3] (the "Contract").

10. During the course of the Project, an increased amount (i.e. 10X the amount represented to be present by Delphi) of asbestos containing materials was found, resulting in substantial extra costs and significant impact on OSC's scheduling, performance and ability to complete demolition and metal salvage work on the Project.

11. Delphi also added utility and other work to OSC's scope of work for the Project under the Contract.

12. Further, during the period of these delays resulting from this additional work, the scrap metal market took an unprecedented and unanticipated decline from approximately $460/ton at the start of the Project to a low of approximately $80/ton. A true and correct copy of the AMM Pricing Report for the relevant scrap metal market during the relevant time frame is annexed hereto as Exhibit C.

---

[2] The relevant facts are set forth more fully in the Declaration of James F. Williams, attached hereto as Exhibit A.
[3] The OSC Claim is attached hereto as Exhibit B.

3

13. On account of the delays and extra work directed by Delphi, at least $424,708 in project funding was lost and no longer available to OSC to pay for its work.

14. Paragraph 3 of the Contract, entitled SPECIFICATION, DESIGN AND SCOPE CHANGES, provided that:

> ***Buyer [Delphi] may at any time require Seller [OSC] to implement changes to the specifications or design of the goods or to the scope of any services or work covered by this Contract***, including work related to inspection, testing or quality control. While Buyer [Delphi] will endeavor to discuss any such changes with Seller [OSC] as early as practical, Seller [OSC] will promptly implement such changes. ***Buyer [Delphi] will equitably determine any adjustment in price or delivery schedules resulting from such changes***, including Buyer's [Delphi's] payment of reasonable costs of modifications to Seller's Equipment (as defined in Article 16) necessary to implement such changes. In order to assist in the determination of any equitable adjustment in price or delivery schedules, Seller [OSC] will, as requested, provide information to Buyer [Delphi], including documentation of changes in Seller's [OSC's] cost of production and the time to implement such changes. ***In the event of any disagreement arising out of such changes, Buyer [Delphi] and Seller [OSC] will work to resolve the disagreement in good faith, provided, however, that Seller [OSC] will continue performing under this Contract, including the manufacture and delivery of goods and prompt implementation of changes required by Buyer [Delphi], while Buyer [Delphi] and Seller [OSC] resolve any disagreement arising out of such changes.***

See Exhibit B to the OSC Claim, ¶ 3 (emphasis added).

15. Pursuant to Paragraph 3 of the Contract, OSC continued with its work and requested equitable adjustment in the price from Delphi. On several occasions, Delphi acknowledged the interference, scope of the changes, and delays attributable to it, and expressly asked OSC for "patience and understanding" in modifying the pricing on the Contract. OSC proceeded to work with Delphi in "good faith" as required by the express contract terms.

16. By letter dated May 11, 2009, a copy of which is attached as Exhibit I to the OSC Claim, Delphi acknowledged the changes identified by OSC, offering to resolve the equitable adjustment in price and delivery schedule issues by, *inter alia*, extending due dates and payment

4

dates, providing for on-site storage of the scrap metal, and reviewing scrap market values going forward, to dates up to November 30, 2009.  The letter states, in pertinent part, as follows (emphasis added):

> While Delphi certainly acknowledges that the scrap market has experienced a drastic and rapid decline we, like Ontario Specialty Contracting, cannot predict future values or when a market recovery may occur.  As a result, we are willing to assist OSC with the following:
>
> 1.      We agree to revise the completion date from December 15, 2008 to *November 30, 2009* to allow time for the scrap market conditions (scrap values) to improve. . . . We will allow OSC to store prepared scrap metals onsite provided the following conditions are met:
>
>> b. Bi-monthly meetings between OSC, on-site Delphi and, Delphi Purchasing Representatives will be held to review market outlook, scrap values and, scrap quantities from the demolition. . . . Obviously a greater quantity of metal to be reclaimed would reduce the financial impact of reduced market values on the project.  Both parties will agree on a standard index to be used to determine current scrap values….
>
> 2.      Because Delphi itself is experiencing great financial difficulty, as a result of being in Chapter 11 since 2005 and due to current economic conditions, it is impossible to commit any payments to Ontario Special[ty] Contracting…
>
> 4.      Milestone dates for two equal payments to Delphi for the balance due will be established. One payment will be on June 30, 2009 and the second on *November 30, 2009*.  Scrap market values, material sold and, project financials up to each date will be reviewed.

See Exhibit I to the OSC Claim.

17.     In its May 11, 2009 letter, Delphi did not dispute the impact of its changes upon the value of the scrap metal at the site, the project funding and the project schedule, but merely indicated that it did not have a source of additional funding to address this issue and was itself experiencing great financial difficulty. While OSC was not in full agreement with Delphi's proposal, the parties nonetheless continued their discussion to establish the adjustment in pricing as per the Contract.

5

18.     On account of Delphi's conduct, a subcontractor on the Project filed a mechanic's lien. Said mechanic's lien prompted Delphi to commence an action ("<u>State Court Action</u>") on August 28, 2009, in the New York State Supreme Court, Erie County alleging breach of contract and unjust enrichment against OSC (Index No. 2009-010438). On or about September 2, 2009, OSC was served with a copy of Delphi's Summons and Complaint. A true and correct copy of the Delphi's Summons and Complaint in the NYS Litigation is attached to the OSC Claim as Exhibit J.

19.     Pursuant to the express Contract terms, and as a direct result of the State Court Action, Delphi and OSC scheduled a meeting to be held on September 10, 2009 to resolve the disagreements, including the equitable adjustment in price resulting from the changes and impacts caused by Delphi.

20.     The parties met on September 10, 2009, discussed the issues for approximately two (2) hours, but did not obtain resolution in the manner provided for in the Contract.

21.     By Notice dated October 6, 2009, the Debtors provided notice of the Final Administrative Claim Bar Date under the Modified Plan. As a result, OSC immediately contacted bankruptcy counsel and duly filed ***<u>the now ripe</u>*** OSC claim.

*The OSC Claim:*

22.     Administrative Claims are discussed in Article 10 of the Modified Plan. Article 10.5 entitled "Other Administrative Claims" provides that:

> All other requests for payment of an Administrative Claim (other than claims under the DIP Facility or as set forth in Article 10.1, Article 10.2, Article 10.3, or Article 10.4 of this Plan) must be filed, in substantially the form of the Administrative Claim Request Form attached hereto as Exhibit 10.5, with the Claims Agent and served on counsel for the Debtors and the Creditors' Committee ***no later than 30 days after the Effective Date***. . . . ***Unless the Debtors or the Reorganized Debtors object to an Administrative Claim within 180 days after the Administrative Claims Bar Date*** (unless such objection period

6

>is extended by the Bankruptcy Court), ***such Administrative Claim shall be deemed allowed in the amount requested***.

See Modified Plan, Article 10.5 (emphasis added).

23.     On October 30, 2009, OSC duly filed its proof of claim and a supporting rider, which was designated claim number 19873 (the "OSC Claim"). The OSC Claim reflected a total amount due of not less than $288,751.25 plus interest, in relation to demolition and related post-petition services provided to Delphi under the Project. A copy of the OSC Claim is attached hereto as Exhibit B.

### *The Debtors' Objection to the OSC Claim:*

24.     Pursuant to Article 10.5 of the Modified Plan, the Debtors thereafter had 180 days from the Effective Date to file an objection, if any, to the OSC Claim. On January 22, 2010, the Debtors filed their objection (the "Objection") to the OSC Claim, seeking to disallow and expunge the OSC Claim and stating "Basis for Objection – Books and Records Claim." A copy of the Objection is attached hereto as Exhibit D.[4] At no time did the Debtors assert any objection based upon the timeliness of the filing of the OSC Claim. The time to raise any further objection has expired.

25.     Thereafter, on February 16, 2010, OSC filed its response to the Objection, setting forth the facts and basis for the OSC Claim (the "Response"). A copy of the Response is attached hereto as Exhibit E.[5]

26.     To date, there has been no hearing or order on the Objection, despite more than two (2) years having passed since the Objection was filed by the Debtors.

---

[4] Exhibit D (Debtors' Objection), as attached, includes only the relevant exhibit page (page 15 of Exhibit M) due to size. For a copy of the full Objection, please refer to Docket. No. 19356.

[5] Exhibit E (the Response), as attached, does not include exhibits due to size and the fact that many of the exhibits are separately attached hereto. For a copy of the full Response, please refer to Docket No. 19426.

27.     On or about April 20, 2012, OSC received "Notice of Deadline to File Motion for Leave to File Late Administrative Expense Claim with Respect to Late Administrative Expense Claim Filed by Ontario Specialty Contracting, Inc. (Administrative Expense Claim No. 19873)." This is the first time the Debtors have asserted that the OSC Claim was untimely. Further, any purported objection fails to comply with Article 10.5 of the Modified Plan, which required any objection to an administrative claim to be filed within 180 days of the Final Administrative Claims Bar Date of November 5, 2009.

28.     By this Motion, OSC requests that the Court enter an order, granting (i) allowance of OSC's Claim pursuant to Article 10.5 of the Modified Plan, or (ii) in the alternative, leave to file a late-filed administrative claim and deeming the OSC Claim timely filed *nunc pro tunc*.

## RELIEF REQUESTED

A.     **The OSC Claim qualifies for administrative priority and is a valid allowed claim pursuant to Article 10.5 of the Modified Plan.**

29.     Section 503(b) of the Bankruptcy Code provides that "[a]fter notice and a hearing there shall be allowed administrative expenses . . . including-(1)(A) the actual, necessary costs and expenses of preserving the estate." "Administrative expenses are afforded this priority to facilitate the reorganization effort by encouraging third parties, who might otherwise be reluctant to deal with a debtor-in-possession, to transact such business." See In re Old Carco LLC f/k/a Chrysler, LLC, 424 B.R. 650, 656 (Bankr. S.D.N.Y. 2010).

30.     In order for a claim to be entitled to administrative priority, the claim must satisfy two elements: (a) the claim must arise out of a transaction with the debtor-in-possession, and (b) the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession. See In re Adelphia Bus. Solutions, Inc., 296 B.R. 656, 662 (Bankr. S.D.N.Y. 2003).

31.     The first prong can be met by proving that the Debtors induced the claimant to perform after the bankruptcy filing. Id. "Where a debtor-in-possession elects to continue to receive benefits from the other party to an executory contract pending a decision to assume or reject the contract, the debtor-in-possession is obligated to pay for the reasonable value of those services." See In re Worldcom, Inc., 308 B.R. 157, 166 (Bankr. S.D.N.Y. 2004) (citations omitted).

32.     The second prong requires a "benefit" to the estate that provides "a concrete, discernible benefit from actual use because a speculative benefit or the mere potential for benefit is not enough to warrant an administrative claim priority." See Adelphia, 296 B.R. at 662.

33.     As outlined above, the first prong is met as it is undisputed that the Contract was entered into between the parties post-petition, and in fact, after the Court had confirmed the Debtor's Initial Plan, based upon Delphi's RFQ. It also undisputed that all work was performed post-petition under the Contract.

34.     In demonstrating the second prong, pursuant to the Contract, Delphi received demolition and removal services under the Project, as well as payment of a portion of the revenues generated from valuable scrap metal from the Project, subject to equitable adjustment of price and agreement resulting from any changes in scope, material or schedule by Delphi. As such, it is clear that Delphi received a demonstrable benefit under the Contract and the services performed by OSC thereunder.

35.     Based on the above, the OSC Claim is entitled to administrative priority pursuant to Section 503(b)(1)(A) of the Bankruptcy Code.

36.     Pursuant to the Modified Plan, the bar date for the filing of the OSC Claim was set by Article 10.5, in that the claim accrued after June 1, 2009. While the majority of the work

9

on the Project took place between July 2008 and May 2009, the OSC Claim did not accrue until thereafter due to the required equitable adjustment of price under the Contract. In fact, Delphi, due in part to its then-current inability to make payment, had offered to adjust the Project schedules until November 30, 2009 in an effort to resolve the equitable adjustment of price issue. In fact, by its May 11, 2009 letter, Delphi suggested reviewing the scrap market conditions regularly up until the November 30, 2009 date, which acknowledges that the parties were looking to stay the adjustment in the hopes the market would adjust itself. As such, it is clear that the OSC Claim did not become ripe until in or about September 2009 when, at the meeting, it was determined that the parties could not resolve the issues related to, *inter alia*, the equitable adjustment of price and any "true up" related thereto.

37. Thereafter, pursuant to the Debtors' Notice dated October 6, 2009, establishing the Final Administrative Claim Bar Date, OSC filed its claim on October 30, 2009; within thirty (30) days of the October 6, 2009 Effective Date, as required under the Modified Plan. As such, the OSC Claim is a timely filed administrative claim pursuant to Article 10.5 of the Modified Plan.

38. Within 180 days after the Final Administrative Claim Bar Date, on January 22, 2010 the Debtor objected to the OSC Claim. The Objection, however, was not based on the alleged lateness of the claim, but based on the Debtors "books and records." The first time OSC learned of the Debtors' objection to the timeliness of the OSC claim was April 20, 2012, approximately **2 ½ years** after the Final Administrative Claims Bar Date.

39. As such, the OSC Claim should be deemed an allowed Administrative Claim in the amount not less than $288,751.25.

    B.    **The Court should allow the administrative claim pursuant to Bankruptcy Rule 9006(b)(1)**

40.     Alternatively, if the Court finds that the bar date set forth in Article 10.5 of the Modified Plan does not apply to the OSC Claim, but instead the OSC Claim was subject to the Initial Administrative Claim Bar Date of July 15, 2009, then OSC respectfully requests the entry of an order pursuant to Federal Rule of Bankruptcy Procedure 9006(b) permitting the late-filed claim and deeming the OSC Claim as timely filed *nunc pro tunc*.

41.     Federal Rule of Bankruptcy Procedure 9006(b)(1) provides that a bankruptcy court in its discretion may accept a late-filed proof of claim where a claimant establishes that its failure to adhere to the Bar Date is attributable to "excusable neglect."  Specifically, Rule 9006(b) states, in pertinent part, that:

> [W]hen an act is required or allowed to be done at or within a specified period by these rules or by a notice given thereunder or by order of court, the court for cause shown may at any time in its discretion . . . on motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of ***excusable neglect***.

FED. R. BANKR. P. 9006(b)(1) (emphasis added); see also In re Dana Corp., 2007 WL 1577763, at *3 (Bankr. S.D.N.Y. 2007) (finding that the excusable neglect analysis applies to administrative expense claims under section 503).

42.     The seminal case interpreting "excusable neglect" is Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380 (1993).  In the Pioneer analysis, in permitting a creditor's late filing under Bankruptcy Rule 9006(b)(1), the Supreme Court held that the "determination [of excusable neglect] is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission." Id. at 395.

43.     These circumstances include (but are not limited to): (1) the danger of prejudice to the debtor; (2) the length of the delay and its potential impact on judicial proceedings; (3) the

11

reason for the delay, including whether it was in the reasonable control of the movant; and (4) whether the movant acted in good faith.  See id. at 395.

44.     The Southern District of New York has found that the factors are all relevant but "that they need not point in the same direction."  See In re Keene Corp., 188 B.R. 903, 909 (Bankr. S.D.N.Y. 1995).

45.     Applying Pioneer's equitable factors to the facts of this case makes clear that the Bankruptcy Court should determine that "excusable neglect" exists to justify granting OSC's Motion.  Although the Second Circuit applies the "hard line" test, it is submitted that OSC meets this standard in this matter.

### *i.     Reason for Delay*

46.     The Second Circuit has adopted what has been characterized as a "hard line" in applying the Pioneer Test.  See Midland Cogeneration Venture Ltd. P'ship v. Enron Corp., (In re Enron Corp.), 419 F.3d 115, 122 (2d Cir. 2005).  This "hard line" approach focuses primarily on the reason for the delay, and specifically whether the delay was in the reasonable control of the movant.  Id.  The Second Circuit has directed that the reason for the delay is the most significant of the Pioneer factors.  Id. at 122-23.

47.     Courts have found excusable neglect where the claim accrued *after* the claims bar date had expired.  See In re Infiltrator Sys. Inc., 241 B.R. 278, 280-81 (Bankr. D. Conn. 1999) (allowing leave to file untimely proof of claim where claimant's system was functioning properly at the time it received the notice and did not fail until after the bar date); In re Hudson Oil Co., 100 B.R. 72, 78 (Bankr. D. Kan 1989) (allowing movant leave to file a new claim outside the bar date where the events surrounding the claim occurred after the bar date set by the court and, as such, the "delay was beyond the reasonable control of the movant").

12

48.  Here, while the Project work principally took place between July 2008 and May 2009, the OSC Claim, which is based upon the equitable adjustment of price under the Contract due to reduction in the scrap metal market, did not become ripe until after the July 15, 2009 bar date. As of May 11, 2009, Delphi offered, and the parties were considering, alternatives with regards to the equitable adjustment including extension of the work schedule under the Project, storage of the scrap metal on-site, and bi-monthly reviews of the scrap metal markets through November 30, 2009. These discussions sought, in effect, to delay the valuation of the equitable adjustment of pricing to allow for adjustment of the market and Delphi's acknowledged inability to pay at the time. It was not until the State Court Action was filed and served by Delphi, and the subsequent September 10, 2009 "good faith" meeting, that the parties determined that they could not agree upon any such adjustment, resulting in the OSC Claim.

49.  Nonetheless, even if the Court finds that the OSC Claim accrued before the Initial Administrative Claim Bar Date, OSC has no record of receiving any notice informing them of the Initial Administrative Claim Bar Date.

ii.   *Claimant's Good Faith*

50.  There can be no dispute that OSC acted in good faith. There was no tactical decision to file this purported late claim which might raise any issue of bad faith, and in fact there could be no reason for same. Its failure to comply with the Initial Administrative Claim Bar Date Order, if applicable, was due to the fact that per the Contract terms it was still determining the equitable adjustment of price, which would ultimately be the basis for the OSC Claim. As previously discussed, the OSC Claim did not accrue until September of 2010, when the "good faith" meeting was unsuccessful, and Delphi asserted the causes of action against OSC in the State Court Action (with respect to the mechanics lien). Thereafter, OSC filed the OSC

13

Claim prior to the Final Administrative Claim Bar Date pursuant to the Notice and the Modified Plan.

### iii.   *The Danger of Prejudice to the Debtor*

51.   Prejudice needs to be more than "a simple dollar-for-dollar depletion of assets otherwise available for timely filed claims." In re Enron, Inc., 419 F.3d at 130.  At the same time, however, the size of the claim must be considered in the analysis and some courts take into account whether allowing a late claim would force the return of amounts already paid out under the confirmed plan and whether allowing the claim would open the floodgates to similar claims. Id.

52.   Courts have weighed a number of considerations in determining if the debtor will be prejudiced by a late filing, including

> (1) the size of the late claim in relation to the estate, (2) whether a disclosure statement or plan has been filed or confirmed with knowledge of the existence of the claim, and (3) the disruptive effect that the late filing would have on a plan close to completion or upon the economic model upon which the plan was formulated and negotiated.

See In re XO Commc'ns, Inc., 301 B.R. 782, 796 (Bankr. S.D.N.Y. 2003).

54.   Furthermore, courts may also consider the ***debtor's actions or inactions*** as a factor.  See, e.g., In re Robinson Foundry, Inc., 347 B.R. 781, 783 n. 1 (Bankr. M.D. Ala 2006) (discussing possibility that debtor acted in bad faith, but refusing to draw any conclusions where creditors failed to raise the issue in its Rule 9006 motion); In re Spring Ford Indus., No. 02-15015, 2003 WL 21785960, at *4 (Bankr. E.D. Pa. July 25, 2003) (stating that "if the Debtor is prejudiced, it is partially of its own doing" and ultimately concluding that claimants demonstrated excusable neglect).

55.     Courts have found no prejudice to the debtor where a proof of claim was filed after the plan had been confirmed without the debtor's knowledge of such claim, the claim was not substantial in relation to the rest of the claims filed against the debtor's estate and the amount at issue would not have any disruptive impact on the plan process.  See In re XO Commc'ns, Inc., 301 B.R. at 797.

56.     The Debtor had actual knowledge of the post-petition Contract, the equitable adjustment of price under the Contract and assertion of same by OSC, and the OSC Claim as of the meeting in September of 2010 after the mandated "good faith" meeting amongst the parties failed to produce a consensual equitable adjustment of price under the Contract.  The Effective Date of the Plan did not occur until October 6, 2009, and as such, the Debtors knew about the equitable adjustment issue prior to the Effective Date.  In addition, the Debtor had actual knowledge of the OSC Claim on October 30, 2009, the date the claim was filed, and the Debtors in fact filed an Objection thereto.  Yet, the Debtors waited over **2 ½ years** to assert that the OSC Claim was not timely filed.  The prejudice to the Debtors, if any, was caused by the Debtors' inactions in failing to assert a timely objection to the OSC Claim.

57.     The Debtors' bankruptcy, with its sheer size and hundreds of millions of dollars at issue, is certainly not prejudiced by the filing of OSC's claim of an amount of not less than $288,751.25.

58.     Further, the Debtors' Modified Plan specifically takes into account administrative expense claims accrued and filed after June 1, 2009.  Pursuant to Article 10.5, the Final Administrative Claim Bar Date was established, permitting certain parties to file administrative expense claims up until November 5, 2009.

   *iii.*  *Length of the Delay and its Potential Impact on Judicial Proceedings*

15

58.     While bar dates serve as an important part of the reorganization or liquidation process, courts have not adopted a bright-line rule governing when the lateness of a claim will be considered substantial.  See In re Enron, 419 F.3d at 127-28.  The length of the delay must be considered in the context of the proceeding as a whole.  Id. at 128.  Generally, a delay is substantial if it "may disrupt the judicial administration of the case."  Id. (citing In re Infiltrator Sys., 241 B.R. at 281).

59.     A relevant consideration is whether a reorganization or liquidation plan has been filed or confirmed by the time the late claim is filed.  Id.  If a plan has been confirmed, courts have taken into consideration whether allowing a late claim would force the return of amounts already paid out under the confirmed plan.  Id. at 1130 (citing In re O'Brien Envtl. Energy, Inc., 188 F.3d, 116, 128 (3d Cir. 1999)).

60.     The length of the delay should also take into account the party's reason for the delay.  Id. at 129.  "Thus, a long delay (presumably more likely in circumstances to occasion more disruption) with a strong explanation might be more acceptable than a short delay with a weak explanation."  Id.

61.     In this case, the length of the delay (approximately 3 ½ months, if applicable) is insignificant and the allowance of the OSC Claim will have no impact on these judicial proceedings.  This is evidenced by the fact that the OSC Claim was filed before the Final Administrative Claim Bar Date.  Clearly, the Debtors expected administrative expense claims up until November 5, 2009.

62.     The facts of this case are sufficiently unique that allowing the OSC Claim will not open the floodgates to similar claims.  Further, any delay was the direct result of the Debtor's

16

actions and misrepresentations under the Contract, and OSC's continued compliance with the Contract terms by negotiation of the equitable adjustment of price in good faith with the Debtor.

63.     To the extent required, OSC asserts that it has met the standard for its claim to be entitled to administrative priority, and also the <u>Pioneer</u> standard to allow a late-filed claim.  The equities of this case favor OSC, who agreed to and continued to provide services and benefits to the Debtors during the post-petition, post-confirmation period.

**WHEREFORE**, OSC respectfully moves the Court to grant the Motion for allowance of an administrative claim, or in the alternative, for leave to file a late administrative expense claim and deem the OSC Claim timely filed *nunc pro tunc*, together with such other and further relief as the Court may deem just and proper.

Dated: New York, New York
       May 4, 2012

KLESTADT & WINTERS, LLP

By: */s/ John E. Jureller, Jr.*
    John E. Jureller, Jr.
570 Seventh Avenue, 17th Floor
New York, NY 10018
Telephone (212) 972-3000

*Counsel to Ontario Specialty Contracting, Inc.*