UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: : | |
| : | Chapter 11 |
| DELPHI CORPORATION, et al. : | |
| : | Case No. 05-44481 (RDD) |
| Debtors. : | |
| : | (Jointly Administered) |
| : | |

**DECLARATION OF JAMES F. WILLIAMS IN SUPPORT OF
CLAIMANT ONTARIO SPECIALTY CONTRACTING INC.'S MOTION FOR
RECOGNITION OF ITS PURPORTEDLY LATE ADMINISTRATIVE CLAIM
(CLAIM NO. 19873)**

STATE OF NEW YORK    )
                     ) SS:
COUNTY OF ERIE       )

**JAMES F. WILLIAMS,** under penalty of perjury, declares the following:

1.  I am the Vice President of claimant Ontario Specialty Contracting, Inc. ("OSC") and submit this Declaration in support of OSC's motion for allowance of its administrative expense claim or alternatively, for leave to file a late-filed administrative claim (the "Motion"). I make this Declaration based upon personal knowledge, along with the business records of OSC issued, received and maintained in the regular course of its business, including those attached to and submitted with the Motion.

2.  OSC is a demolition and environmental remediation contractor based in Western New York.

3.  In or about late 2007 and early 2008, Delphi Automotive Systems, LLC ("Delphi" or "Debtor") issued several requests for quotations ("RFQ") for the demolition of its Rochester Die Casting Building (the "Project"). The RFQs contained a target price calling for payment from the contractor to Delphi, on the basis that the value of the scrap metals at the

1

Project site were believed to exceed the costs incurred by a contractor in performing the demolition work.

  4.  On or about July 9, 2008, OSC responded to the Delphi's final RFQ.

  5.  As required by New York law, in conjunction with that demolition project and for purposes of bidding, Delphi, as owner, provided OSC with survey documents which indicated the presence of 1,600 s.f. of asbestos containing materials to be encountered in the Project.

  6.  Asbestos removal work is heavily regulated and impacts the scheduling and performance of other project work, including the subsequent demolition work and metal salvage operations.

  7.  On or about July 24, 2008, Delphi issued OSC a purchase order for performance of the work by OSC.

  8.  Notably, OSC was not informed and did not know at that time that the Delphi entity which issued the Delphi/OSC contract was part of or a debtor under any Delphi entity bankruptcy proceeding.

  9.  Significant to this case, however, the Delphi/OSC contract also contained general terms and conditions language addressing scope of work and schedule changes and expressly provided that "Buyer [Delphi] will equitably determine any adjustment in price or delivery schedules resulting from such changes."

  10.  While performing the work, OSC discovered that, rather than simply encountering the 1,600 s.f. of asbestos containing materials as represented by Delphi, there was 15,600 s.f. (a 10-fold increase) of asbestos containing materials which resulted in substantial extra costs, and even more significantly, impacted the scheduling, performance and ability to complete demolition and metal salvage work on the project.

11. In addition, Delphi also added utility and other work to the scope of OSC's work.

12. All of this additional work had an impact on the project costs, schedule and scope, and pushed and delayed the work schedule from a good/average scrap market period into a period of substantial decline.

13. During the period of Delphi's delays and interference, the scrap metal market took an unprecedented and unanticipated decline from approximately $460/ton at the start of the project to a low of approximately $80/ton.

14. On account of the extra work directed by Delphi, interference and delays, at least $424,708 in project funding was lost and no longer available to OSC to pay for its work.

15. Per the contract terms below, OSC continued with its work and requested equitable adjustment from Delphi.

3. SPECIFICATION, DESIGN AND SCOPE CHANGES:

***Buyer [Delphi] may at any time require Seller [OSC] to implement changes to the specifications or design of the goods or to the scope of any services or work covered by this Contract***, including work related to inspection, testing or quality control. While Buyer [Delphi] will endeavor to discuss any such changes with Seller [OSC] as early as practical, Seller [OSC] will promptly implement such changes. ***Buyer [Delphi] will equitably determine any adjustment in price or delivery schedules resulting from such changes***, including Buyer's [Delphi's] payment of reasonable costs of modifications to Seller's Equipment (as defined in Article 16) necessary to implement such changes. In order to assist in the determination of any equitable adjustment in price or delivery schedules, Seller [OSC] will, as requested, provide information to Buyer [Delphi], including documentation of changes in Seller's [OSC's] cost of production and the time to implement such changes. ***In the event of any disagreement arising out of such changes, Buyer [Delphi] and Seller [OSC] will work to resolve the disagreement in good faith, provided, however, that Seller [OSC] will continue performing under this Contract, including the manufacture and delivery of goods and prompt implementation of changes required by Buyer [Delphi], while Buyer [Delphi] and Seller [OSC] resolve any disagreement arising out of such changes.***

*See* Exhibit B to OSC Claim.

16. Delphi acknowledged the interference, scope changes and delays attributable to it on several occasions, and expressly asked OSC for "patience and understanding" in modifying the pricing on the Delphi/OSC contract.

17. OSC proceeded to work with Delphi in "good faith", as required by the express contract terms, to establish the equitable adjustment of price, and in the interim continued performance of the Project while Delphi took its time in responding to same.

18. By letter dated May 11, 2009, Delphi acknowledged the changes identified by OSC, offering to resolve the equitable adjustment in price and delivery schedules by, among other things, extending due dates and payment dates, providing for on-site storage of the scrap metal, and reviewing scrap market values going forward, to dates up to November 30, 2009. Delphi did not dispute the impact of its changes upon the value of the scrap metal at the site, but merely indicated that it did not have a source of additional funding to address this issue and was itself experiencing great financial difficulty. In fact, due in part to its then-current inability to make payment, Delphi had offered to adjust the Project schedules until November 30, 2009 in an effort to resolve the equitable adjustment of price issue. These discussions sought, in effect, to delay the valuation of the equitable adjustment of pricing in the hopes the market would adjust itself.

19. On account of Delphi's conduct, a subcontractor on the Project filed a mechanic's lien. Said mechanic's lien prompted Delphi to commence an action against OSC on August 28, 2009 within the New York State Supreme Court, Erie County, alleging breach of contract and unjust enrichment (Index No. I 2009-010438). On or about September 2, 2009, OSC was served with a copy of the Summons and Complaint.

20. Per the express Delphi/OSC contract terms, and as a direct result of the State

4

Court Action, the parties had further communications and ultimately scheduled a meeting to be held on September 10, 2009 to resolve the disagreement concerning, among other things, the adjustment of price resulting from the changes and impacts per the contract protocol. The meeting was scheduled, in part, because it was required under the contract terms and is common practice in the contracting industry to "true up" any amounts at the end of the work.

21.     The parties met on September 10, 2009, and discussed the issues for approximately two (2) hours, but did not obtain resolution in the manner provided for in the Delphi/OSC contract, resulting in the OSC Claim.

22.     On or about October 13, 2009, OSC received the "Notice of (A) Order Approving Modifications to First Amended Joint Plan of Reorganization of Delphi Corp. and certain affiliates, Debtors and Debtors in possession; and (B) Occurrence of Effective Date." This notice informed OSC of the Final Administrative Claim Bar Claim under the Modified Plan, i.e. November 5, 2009. Prior to this notice, OSC has no record of receiving any notice, including any notice in or around June 2009, regarding the Initial Administrative Claim Bar Date.

23.     On October 30, 2009, OSC duly filed its proof of claim and a supporting rider, which was designated claim number 19873 ("OSC Claim"). The OSC Claim reflected a total amount due of $288,751.25 in relation to demolition and related services provided to Delphi post-petition.

24.     Based on the foregoing, OSC believes the OSC Claim was timely filed pursuant to Article 10.5 because while the majority of the work on the Project took place between July 2008 and May 2009, the OSC Claim did not accrue until thereafter due to the agreed delay in establishing the equitable adjustment of price under the Delphi/OSC Contract, and in particular the OSC Claim accrued after the September 10, 2009 meeting when the parties failed to resolve

the equitable adjustment of price.

25.  To the extent the Court determines that OSC Claim was subject to the Initial Administrative Claim Bar Date of July 15, 2009, then OSC requests entry of an order permitting the late-filed claim and deeming the OSC Claim as timely filed *nun pro tunc.*

SIGNATURE PAGE TO FOLLOW

Sworn to under penalty of perjury this 3rd day of May 2012.

                                                                  */s/ James F. Williams*
                                                                   James F. Williams