| **United States Bankruptcy Court**<br>Southern District of New York<br><br>Delphi Corporation et al. Claims Processing<br>c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue<br>El Segundo, California 90245 | **Administrative<br>Claim Request<br>Form** | |
|---|---|---|

| Debtor against which Administrative Claim is asserted :<br><br>Delphi Automotive Systems, LLC | Case Name and Number<br>In re Delphi Corporation., *et al.* 05-44481<br>Chapter 11, Jointly Administered | |
|---|---|---|

NOTE: This form should not be used to make a claim in connection with a request for payment for goods or services provided to the Debtors prior to the commencement of the case. This Administrative Claim Request Form is to be used solely in connection with a request for payment of an administrative expense arising after June 1, 2009, pursuant to 11 U.S.C. § 503.

| Name of Creditor<br>*(The person or other entity to whom the debtor owes money or property)*<br><br>Ontario Specialty Contracting, Inc.<br><br>Name and Address Where Notices Should be Sent<br><br>c/o 1800 Main Place Tower<br>350 Main Street; Buffalo, NY 14202<br><br>Telephone No.    Attn: Matthew Beck<br>     (716) 856-3333 | ☐  Check box if you are aware that anyone else has filed a proof of claim relating to your Administrative Claim. Attach copy of statement giving particulars.<br>☐  Check box if you have never received any notices from the bankruptcy court in this case.<br>☐  Check box if the address differs from the address on the envelope sent to you by the court. | **THIS SPACE IS FOR<br>COURT USE ONLY** |
|---|---|---|

| ACCOUNT OR OTHER NUMBER BY WHICH CREDITOR IDENTIFIES DEBTOR:<br>     N/A | Check here if this Administrative Claim   ☐ replaces<br>                                                         ☐ amends a previously filed claim, dated: _____ | |
|---|---|---|

| 1. BASIS FOR ADMINISTRATIVE CLAIM<br>☐  Goods sold<br>☒  Services performed<br>☐  Money loaned<br>☐  Personal injury/wrongful death<br>☐  Taxes<br>☐  Other (Describe briefly) | ☐<br>☐ | Retiree benefits as defined in 11 U.S.C. § 1114(a)<br>Wages, salaries, and compensation (Fill out below)<br>Your social security number _____<br>Unpaid compensation for services performed<br>from _____ to _____<br>         (date)                    (date) |
|---|---|---|

| 2. DATE DEBT WAS INCURRED<br>          08/04/08 – 05/09 | 3. IF COURT JUDGMENT, DATE OBTAINED:<br>                              N/A |
|---|---|

4. TOTAL AMOUNT OF ADMINISTRATIVE CLAIM: $ not less than $288,751.25, plus interest
☐ Check this box if Administrative Claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all additional charges.

5. BRIEF DESCRIPTION OF ADMINISTRATIVE CLAIM (attach any additional information):

SEE Administrative Claim Request for Payment and Rider filed herewith

| 6. **CREDITS AND SETOFFS**: The amount of all payments on this Administrative Claim has been credited and deducted for the purpose of making this Administrative Claim request. In filing this Administrative Claim request, claimant has deducted all amounts that claimant owes to debtor. | **THIS SPACE IS FOR<br>COURT USE ONLY** |
|---|---|

7. **SUPPORTING DOCUMENTS**: *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, or evidence of security interests. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary. Any attachment must be 8-1/2" by 11".

8. **DATE-STAMPED COPY**: To receive an acknowledgement of the filing of your Administrative Claim, enclose a stamped, self-addressed envelope and copy of this Administrative Claim request.

| Date<br><br>10/28/09 | Sign and print the name and title, if any, of the creditor or other person authorized to file this Administrative Claim (attach copy of power of attorney, if any)<br><br>Ontario Speciality Contracting, Inc.<br>By: _____ President | |
|---|---|---|

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------

In re:                                      :   Chapter 11
                                            :
DELPHI CORPORATION, et al.                  :   Case No. 05-44481 (RDD)
                                            :
                               Debtors.     :   (Jointly Administered)
                                            :
--------------------------------------------------------

## RIDER TO PROOF OF CLAIM

ONTARIO SPECIALTY CONTRACTING, INC. ("OSC" and/or "Claimant")

hereby asserts claims against certain debtors in the above captioned bankruptcy cases, as set

forth in the attached official proof of claim form, this Rider and the exhibits thereto (collectively,

the "Proof of Claim").

1.    On October 8, 2005 (the "Filing Date"), the Debtors commenced proceedings

under chapter 11 of the Bankruptcy Code by filing chapter 11 petitions with this Court. Upon

information and belief, Delphi Automotive Systems, LLC is a subsidiary of, affiliate of or

otherwise associated with Delphi Corporation and subject to this jointly administered bankruptcy

proceeding (hereinafter Delphi Automotive Systems, LLC is referred to as "Delphi" and/or

"Debtor").

2.    The Debtor bankruptcy cases are jointly administered for procedural purposes

under *In re Delphi Corporation, et al.* Case No. 05-44481 (RDD) (Bankr. S.D.N.Y.).

3.    Post bankruptcy petition, Delphi issued several requests for quotations ("RFQ")

for the demolition of its Rochester Die Casting Building (the "Project"). The RFQs contained a

target price calling for payment from the contractor to Delphi, on the basis that the value of the

scrap metals at the Project site were believed to exceed the costs incurred by a contractor in

1

performing the demolition work. The RFQ forms established by Delphi, expressly required the
contractor to identify the total amount of "material reclamation/savage value" credited to Delphi
against the Project costs.  The "material reclamation/savage value" attributable to the scrap
metals derived from the Project site was material to funding the demolition work on the Project.

4.     On or about July 9, 2008, OSC responded to Delphi's final RFQ seeking a target
price of "($305,000 USD) or better proposal", with a response of ($271,033).  Attached hereto as
**Exhibit A** is a copy of the OSC's July 7, 2008 response to Delphi's RFQ.  The line items within
that response include a $1,189,999 credit to Delphi for "material reclamation/savage value."

5.     Based on asbestos disclosure documents provided to OSC by Delphi (which are
required by New York law), OSC's response included a line item of $35,265 in costs for asbestos
abatement.

6.     On or about July 24, 2008, Delphi issued a Purchase Order (the "Purchase
Order") to OSC based on the above RFQ and accepting OSC's July 7, 2008 response.  Attached
hereto as **Exhibit B** is a true and correct copy of the Purchase Order, including General Terms
and Conditions incorporated by reference.

7.     Under the terms of the Purchase Order, OSC was to make four (4) separate
progress payments to Delphi of $67,758.25 each.  OSC made the first payment of $67,758.25 at
or about the start of work on the Project.

8.     The original project completion date under the Purchase Order was December 15,
2008. Certain work, which included asbestos abatement and utility related work, was required to
be completed prior to demolition of the physical structures on the Project site. The scrap metals
could not be removed from the physical structures on the Project site until the asbestos
abatement and other pre-demolition work was completed.

2

9.    OSC immediately mobilized and began pre-demolition work during the week of August 4, 2008. The pre-demolition work was scheduled to be complete on or before September 1, 2008.

10.    Due to an error within the asbestos disclosure documents provided by Delphi, certain pre-demolition asbestos abatement work on the Project went from a quantity of 1,600 s.f. to 15,600 s.f. of asbestos containing materials. In other words, there was almost ten (10) times more asbestos containing materials present than represented by Delphi. Delphi has acknowledged this extra asbestos abatement work in writing and agreed to pay OSC at least $42,000.00 for the performance of such work.

11.    There was also extra pre-demolition utility work required on the Project. Delphi has acknowledged this extra utility work in writing and agreed to pay OSC at least $7,315.00 for the performance of such work.

12.    Delphi is additionally liable for the delays, interference and impact costs resulting from this extra work. As a result of the extra asbestos and utility work, and the time it took Delphi to address and respond to said issues, OSC's progress on the Project was delayed, interfered with and impacted. As a result of the extra asbestos and utility work, and the time it took Delphi to address and respond to said issues, OSC was delayed in its ability to sell and remove the scrap metals from the Project site to fund the Project work.

13.    During the period of Delphi's delays, the scrap metal market took an unprecedented and unanticipated decline from approximately $460/ton at the start of the Project to a low of approximately $80/ton.

14.    On or about September 1, 2008, when OSC would have been able to sell and

3

establish dealer pricing arrangements for the Project under the original schedule, and thereafter

begin immediate delivery of scrap metals, the market price under established scrap metal pricing

indexes was $405/ton. By approximately November 18, 2008, when OSC was able to begin

selling scrap metals on account of the above extras and delays, the market price under

established scrap metal pricing indexes had dropped to only $80/ton and many scrap dealers

would not even place orders or take materials.

15.     On account of the extra work directed by Delphi, interference and delays, at least

$424,708 in Project funding was lost and not paid to OSC.

16.     The terms of the Purchase Order, provide at General Term and Condition number

3:

### 3. SPECIFICATION, DESIGN AND SCOPE CHANGES

> Buyer [Delphi] may at any time require Seller [OSC] to implement
> changes to the specifications or design of the goods or to the scope of any
> service or work covered by this Contract, including work related to
> inspection, testing or quality control. While Buyer [Delphi] will endeavor
> to discuss any such changes will Seller [OSC] as early as practical, Seller
> [OSC] will promptly implement such changes. *Buyer [Delphi] will
> equitably determine any adjustment in price* or delivery schedules
> *resulting from such changes*, including Buyer's [Delphi's] payment of
> reasonable costs of modifications to Seller's Equipment (as defined in
> Article 16) necessary to implement such changes. In order to assist in the
> determination of any equitable adjustment in price or delivery schedules,
> Seller [OSC] will, as requested, provide information to Buyer [Delphi],
> including documentation of changes in Seller's [OSC's] cost of production
> and the time to implement such changes. In the event of any disagreement
> arising out of such changes, Buyer [Delphi] and Seller [OSC] will work to
> resolve the disagreement in good faith, provided, however, that Seller
> [OSC] will continue performing under this Contract, including the
> manufacture and delivery of goods and prompt implementation of changes
> required by Buyer [Delphi], while Buyer [Delphi] and Seller [OSC]
> resolve any disagreement arising out of such changes.

Exhibit B (emphasis added).

4

17.     Moreover, the Purchase Order does not contain a no-damages-for-delay clause. In breach of the Purchase Order, Delphi has failed and refused to equitably adjust the contract price between the parties. Although it has been acknowledged that additional pre-demolition work was directed by Delphi, it refused make adjustment to the contract price to account for the impact of such extra work and delays.

18.     On or about November 3, 2008, as the pre-demolition work was coming to a close, OSC wrote to Delphi. OSC pointed out the delays attributable to Delphi, and sought an equitable adjustment of the contract price. Attached hereto as **Exhibit C** is a copy of a letter issued by OSC on or about November 3, 2008. On or about December 3, 2008, OSC again wrote to Delphi on this subject. Delphi representatives, repeatedly assured OSC that an equitable adjustment of the contract price would be made and requested that OSC continue performance.

19.     On or about January 12, 2009, OSC again wrote to Delphi on this subject. Attached hereto as **Exhibit D** is a copy of OSC's January 12, 2009 letter.

20.     On February 3, 2009, Delphi responded in writing stating, in essence, that it was discussing the matter internally and would get back to OSC shortly. OSC was expressly asked for its "patience and understanding." Attached hereto as **Exhibit E** is a copy of the February 3, 2009 email received from Delphi. During the time period that Delphi was discussing this subject internally, OSC continued its performance per Delphi's request.

21.     On March 17, 2009, Delphi requested further information relating to the extra work that it required OSC to perform and asked OSC to "accept [its] apologies for the delay on the Delphi formal reply to your request to change the existing contract to the Rochester Die Cast demolition project." Attached hereto as **Exhibit F** is a copy of Delphi's March 17, 2009 email.

22.     Meanwhile, Delphi continued to request that OSC continue performance and

5

informally advised that an equitable adjustment would be forthcoming. OSC provided the additional information requested by letter dated April 22, 2009. Attached hereto as **Exhibit G** is a copy of OSC's April 22, 2009 letter. On May 7, 2009, Delphi sent an email stating that it would respond shortly. Attached hereto as **Exhibit H** is a copy of Delphi's May 7, 2009 email.

23.     On May 11, 2009, Delphi responded.  While offering additional time to allow the scrap metal market to recover, Delphi stated "Because Delphi itself is experiencing great financial difficulty, as a result of being in Chapter 11 since 2005 and due to current economic conditions, it is impossible for Delphi to commit any payments to Ontario Specialty Contracting." Attached hereto as **Exhibit I** is a copy of Delphi's May 11, 2009 letter.

24.     By the time Delphi finally responded on May 11, 2009, substantially all of the scrap metals had been sold (in the depressed market) and, shortly thereafter, OSC was also substantially complete with the Project work. The May 11, 2009 Delphi letter expressly acknowledges the extra asbestos and utility work directed by Delphi.

25.     Despite demand, OSC has not received remuneration for at least $474,023.00 of work performed at Delphi's request.

26.     Delphi breached its contract with OSC. Under the terms of the contract, Delphi is liable to and obligated to pay OSC an amount not less than $288,751.25, plus interest. Alternatively, in quantum meruit, Delphi is obligated to OSC in an amount not less than $474,023.00, plus interest.

27.     On account of Delphi's conduct, a subcontractor on the Project filed a mechanic's lien. Said mechanic's lien, prompted Delphi to commence an action on August 28, 2009 within the New York State Supreme Court, Erie County (Index No. I 2009-010438). Attached hereto as **Exhibit J** is a copy of Delphi's Complaint in the New York action.

6

28.     On account of Delphi's, upon information and belief, waiver of jurisdiction as to
the dispute between these parties by filing suit within the New York State Court, OSC asserted
counterclaims demanding the same monetary relief requested herein in that action and
additionally filed this administrative claim. Attached hereto as **Exhibit K** is a copy of OSC's
Answer to Delphi's Complaint in the New York action (Note that the sub-exhibits have been
excluded as they are duplicative of the exhibits provided herein).

29.     Upon information and belief, Delphi waived the jurisdiction within this Court as
to the dispute between these parties by filing suit within the New York State Court system, and
thus, OSC asserted counterclaims demanding the same monetary relief requested herein in that
action and additionally filed this administrative claim. (See Exhibit K to OSC Administrative
Claim).

30.     OSC reserves the right to (a) amend, update, or supplement this Proof of Claim
(including, without limitation, to add additional amounts due and owing) at any time and in any
respect; (b) file additional proofs of claim; and (c) file a request for payment of administrative or
priority expenses in accordance with Bankruptcy Code sections 503 and 507. OSC reserves the
right to amend this Proof of Claim (and any other proofs of claims it may file in the Debtors'
chapter 11 cases) by virtue of its right to offset or recoup the amount thereof under Bankruptcy
Code section 553 against any claims, defenses, or offsets the Debtor may assert against OSC.

31.     By filing this Proof of Claim, OSC (a) does not submit to the jurisdiction of this
Court for any purpose other than with respect to this Proof of Claim, (b) does not waive (and
expressly reserves) all of its procedural and substantive defenses to any claim that may be
asserted against it by the Debtors, their estates, any successor entities, or any other person,
including, without limitation, any defense based upon the lack of jurisdiction of this Court to

7

entertain any such claim, (c) does not waive (and expressly reserves) any right to any security,

held by or on behalf of OSC or any right of OSC to claim specific assets or any other claim,

right, or right of action that OSC has or might have against the Debtors, their estates, any

successor entities, or any other person, whether such claim, right, or action arises prior to, upon,

or after the Petition Date, and (d) does not waive (and expressly reserves) any and all other rights

that OSC may have pursuant to applicable law or agreement.

WHEREFORE, for the foregoing reasons, Claimant respectfully requests that this Court

allow him an administrative priority claim in an amount not less than $288,751.25, plus interest,

pursuant to 11 U.S.C. §§ 503 and 507, and grant such other and further relief as may be just and

appropriate under the circumstances.

Dated:  Buffalo, New York
       October 29, 2009

                Respectfully submitted,

                Ontario Specialty Contracting, Inc.

By:_____
                James F. Williams, its Vice President
                333 Ganson Street
                Buffalo, New York 14203

                Notice Address:
                Ontario Specialty Contracting, Inc.
                c/o 1800 Main Place Tower
                350 Main Street
                Buffalo, New York 14202

8

# Exhibit "A"

# Exhibit "A"



REQUEST FOR
QUOTATION NOT AN
ORDER

TARGET ROUND #:     2                                          Date:   July 9, 2008

Subject:   Target Pricing For              2008-HM66
           Quotation

           Description:   Rochester Die Casting Building Demolition

Thank you for your response to the RFQ shown above. Please re-evaluate your quotation based on the targets shown below.

Your response is required no later than Wednesday July 9th, 2008 before 5:00 PM (EST). Quote responses received after the required due date/time may not be considered. The last received quote will be considered your *best and final* offer.

Please fill out the information below and sign / date at the bottom of this page.

| Line Item | Description | Target Price Dollars | Expected Delivery | Supplier Response (include price/delivery) |
|---|---|---|---|---|
| 1 | Rochester Die Casting Bldg Demolition | Contractor to refund Delphi ($305,000.00 usd) Or better proposal | Per request | ($271,033) |
| | | | | |

Supplier Representative Signature: _____          Date:   7/9/08

Peter Harbury
Ontario Speciality Contracting

                                               Hugo Martinez
                                               Facilities Lead Buyer
                                          Delphi Global Supply Management
                                     Phone: 915. 612. 8775 Fax: 866. 348. 8465
                                          Hugo.f.martinez@delphi.com

## BID PROPOSAL BREAKDOWN FORM

The Owner requires that the following bid breakdown be provided for quotation comparison purposes. The breakdown will likely also form the basis for the Project's Schedule of Values and be utilized in evaluation of the Contractor's progress payment requests.

| | |
|---|---|
| Mobilization/Demobilization /Site Services (Supervisory personnel, safety personnel, job trailers, utilities, project management, etc) | $ 28,092 |
| Asbestos Abatement | $ 35,265 |
| Equipment Preparation for Transfer, or Salvage (tank, hydraulic system, and gearbox drainage, exterior cleaning, chip removal, etc) | $ 38,065 |
| Building Decommissioning (industrial cleaning of pits, trenches, sumps, steam booths, floors, sewers, mercury removal, bulb and ballast removal, waste collection, etc) | $ 171,673 |
| CFC Recovery (recovery of CFC's from ice machines, chillers, drinking fountains, air conditioning, etc) | $ 5,176 |
| PCB Capacitor/Ballast | $ 3,893 |
| Utilities relocation | $ 60,415 |
| Exterior wall construction | $ 84,591 |
| Demolition | $ 374,657 |
| Material reclamation/salvage value credit | $ (1,189,999) |
| Other (specify)    Restoration | $ 117,139 |
| | $ |
| GRAND TOTAL (Base Bid) | $ (271,033) |

*[signature]*
Jake Flushing
Ontario Specialty Contractors
11/9/08

# Exhibit "B"

# Exhibit "B"

# DELPHI
———————————————————————— Energy & Chassis Systems

Page  1  of  6

**Buyer:**
DELPHI AUTOMOTIVE SYSTEMS LLC
DELPHI ENERGY & CHASSIS DIV
3000 University Drive
Auburn Hills  MI  48326

Deliver to:
DELPHI ENERGY & CHASSIS SYSTEMS
ROCHESTER OPER-IN1C
DOCK 87/88/89 -7AM-3PM
1000 LEXINGTON AVE
ROCHESTER  NY  14606

ONTARIO SPECIALTY CONTRACTING
333 GANSON ST
BUFFALO  NY  14203-3062

## Purchase Order

| PO Number | Date Issued |
|---|---|
| 450751581 | 24-Jul-2008 |
| Version | |
| 24-Jul-2008  12:22:27 | |

Delivery date:  01-DEC-2008

| Vendor No: | 1033101 |
|---|---|
| DUNS No: | 178523494 |

| **Payment Terms:** ZMN3 | **Currency:** USD |
|---|---|
| Payment settled on 2nd day of 3rd Month | |

**Incoterms:**  FOB- Freight Collect

| Item No. | Material No/Item Identifier No | Total Order Quantity | Plant | | | |
|---|---|---|---|---|---|---|
| | Description | | Requester | | | |
| 00010 | PR13390208 00010 | 1.000 | E401 DELPHI   E & C   ROCHESTER | | | |
| | DECOMMISSIONING & DEMOLITION OF DIE | | R.RANDAZZO | | | |
| | CASTING BUILDING PER DELPHI SPECIFICATION PE-1386 AND INQUIRY 2008-HM66. GENERAL TERMS & CONDITIONS FOR OUTSIDE CONTRACTS SHALL APPLY. SUPPLIER TO PAY DELPHI $271,033. | | | | | |

| Delivery Date | Scheduled Quantity | Price | Price Unit | UOM | Value |
|---|---|---|---|---|---|
| 01-DEC-2008 | 1.000 | 1.00 | 1 | EA | 1.00 |
| Net Line Item Value | | | | USD | 1.00 |

| **Total net value** | USD | 1.00 |
|---|---|---|

Purchasing Contact: Martinez, Hugo
Phone:  915 612-8775
Fax:  915 612-1146

Buyer Email:hugo.f.martinez@delphi.com

Contact Address:

Buyer, Delphi Corporation
Hernamos Escobar 5756,
32310 Juarez

# DELPHI

_____ Energy & Chassis Systems

Page   2   of   6

ONTARIO SPECIALTY CONTRACTING
333 GANSON ST
BUFFALO  NY  14203-3062

## Purchase Order

| PO Number | Date Issued |
|---|---|
| 450751581 | 24-Jul-2008 |
| Version | |
| 24-Jul-2008  12:22:27 | |

| Item No. | Material No/Item Identifier No | Total Order Quantity | Plant |
|---|---|---|---|
| | Description | | Requester |

**Notes:**

Purchase order is issued as per Ontario specialty response to RFQ No. 2008-HM-66 - Rochester Die Casting Building Demolition and subsequent responses to target price letters.

Ontario Specialty Contracting will pay Delphi the amount of $271,033.00 usd under the following schedule:

25% ($67,758.25) at issuance of work permits . start of physical work

25% ($67,758.25) at start of structural Demolition

25% ($67,758.25) at completion of Demolition

25% ($67,758.25) at sign off of the work

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
IMPORTANT NOTICE TO SUPPLIERS:
PLEASE COMPLY STRICTLY WITH DELPHI'S ENVIRONMENTAL REQUIREMENTS AS STATED IN THE ENVIRONMENTAL REQUIREMENTS FOR CONTRACTORS / SUPPLIERS / VENDORS.  A COPY OF THE ENVIRONMENTAL REQUIREMENTS IS AVAILABLE UPON WRITTEN REQUEST TO THE BUYER.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Delphi requires 100% on time delivery performance from suppliers.  If you anticipate problems in delivering materials and/or completing services by the date specified on the Buyer's purchase order, the Delphi Buyer should be notified immediately.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Restricted, toxic, and hazardous materials - Suppliers are required to comply with current governmental and safety constraints on restricted, toxic and hazardous materials; as well as environmental, electrical and electromagnetic considerations applicable to the country of manufacture and sale.  This relates to both the salable product and the manufacturing processes. (Refer also to Terms and Conditions No. 8 "Ingredients Disclosure and Special Warnings Instructions").
Commencement of any work or service under this order shall constitute seller's acceptance of these responsibilities.  If you do not accept these responsibilities, please contact the appropriate Delphi's Buyer.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Seller acknowledges and agrees that Buyer's General Terms and Conditions and Delphi Customer Specific Requirements are incorporated in, and a part of, this contract and each purchase order, release, requisition, work order, shipping instruction, specification and other document issued by Buyer or accepted in writing by Buyer, whether expressed in written form or by electronic data interchange, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as this "Contract").  A copy of Buyer's General Terms and Conditions and Delphi Customer Specific Requirements are available upon written request to Buyer or via the internet at Delphi's website, delphi.com.  Seller acknowledges and agrees that it has read and understands Buyer's General Terms and Conditions and Delphi Customer Specific Requirements .  If Seller accepts this Contract in writing or commences any of the work or services which are the subject of this Contract, Seller will be deemed to have accepted this Contract and Buyer's General Terms and Conditions and Delphi Customer Specific Requirements  in their entirety without modification.  Any additions to, changes in, modifications of, or revisions of this Contract (including Buyer's General Terms and Conditions and and Delphi Customer Specific Requirements ) which Seller proposes will be deemed to be rejected by Buyer except to the extent that Buyer expressly agrees to accept any such proposals in writing.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# DELPHI

_____ Energy & Chassis Systems

Page  3  of  6

ONTARIO SPECIALTY CONTRACTING
333 GANSON ST
BUFFALO NY 14203-3062

## Purchase Order

| PO Number | Date Issued |
|---|---|
| 450751581 | 24-Jul-2008 |
| Version | |
| 24-Jul-2008 12:22:27 | |

| Item No. | Material No/Item Identifier No | Total Order Quantity | Plant |
|---|---|---|---|
| | Description | | Requester |

---

Notes Continued:

All wood packaging must be compliant with the International Standard Phytosanitary Measure #15 in the treatment of wood packaging material.  Please reference the "Requirements for the treatment of wood packaging materials" section of the Supplier Community Portal found on www.delphi.com for further details.
************************************************************
************************************************************
************************************************************


*********************
Title to goods shall transfer from seller to buyer upon arrival at buyer's consuming plant.
*********************

************************************************************
************************************************************
If this is your first purchase order with Delphi under this DUNS number or your remittance information has changed, you need to establish a payment link with the following:

Delphi Corporation EAG Disbursements Center
Vendor Name and Address Group
PO Box 972930
El Paso, Texas  79997-2930
Fax 915-612-7152
Attention: Vendor Master Group

Delphi Accounts Payable Help Desk Phone Number is (888)856 6779 or E-mail at juarez.delphi.helpdesktieriiusacctspay@delphi.com.

You will need to provide a copy of invoice or letterhead showing, company name, correct remittance and correspondence addresses, contract number and "ship from" DUNS number.

You should have received an EFT Agreement from your buyer.  But you can obtain a copy of the EFT Agreement forms at Website at www.delphi.com <http://www.delphi.com> Double Click on "Supplier Portal" in the bottom right of the screen, then click "HERE" under How to Become a Supplier.  Then click on "Doing Business with Delphi" under Frequently Used Documents.  Click on "Delphi Customer Specific Requirements".  Scroll to the Payment Section.  Then can Click on "EFT Payment Authorization Form" to download.

You can now view payment status on-line using e*DELPHIPAY.  For new users, the registration instructions are at http://delphi.covisint.com  under the Registration tab.  Please contact the Delphi Help Desk at 877-7DELPHI for any technical questions.

This order will pay on receipt.  Please do not send an invoice unless specifically requested on the order.  This is an invoice less system, which generates payment, based on receipt.

If this P.O. is in error, please advise the buyer listed below before shipping.

Payment issues and questions regarding shipped material should be directed to the Delphi Accounts Payable Help Desk at (877)349 3417.

# DELPHI

Energy & Chassis Systems

Page   4   of   6

---

ONTARIO SPECIALTY CONTRACTING
333 GANSON ST
BUFFALO NY 14203-3062

## Purchase Order

| PO Number | Date Issued |
|---|---|
| 450751581 | 24-Jul-2008 |
| Version | |
| 24-Jul-2008  12:22:27 | |

---

| Item No. | Material No/Item Identifier No | Total Order Quantity | Plant |
|---|---|---|---|
| | Description | | Requester |

---

Notes Continued:

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Do not bill sales or use tax on items delivered to locations within the states listed below. Delphi Automotive Systems, LLC (" DELPHI ") holds direct pay authority with these states. As a result, in all of the identified states DELPHI will remit directly to taxing authorities, all sales or use tax liability related to its purchase and use of tangible personal property and services. Therefore, effective immediately, this tax clause supersedes all tax code information found on this order except for those states not identified below. For those states not identified below, please continue to follow the specific tax code instructions found on this order. Listed below are Direct Pay Permit or Sales Tax License numbers for the eleven (11) states, or DELPHI locations within a state, where DELPHI holds direct pay authority:

Alabama -------------------805
New Jersey ----------------383-431-131/000
Georgia -------------------300-45870-8
New York ------------------DP-3487
Indiana -------------------1018702130011
Ohio ----------------------98-0002667
Kansas --------------------98-0003a
Texas ---------------------1-38-3431131-1
Michigan ------------------38-3431131
Wisconsin -----------------WDP-99-01-010037
Mississippi ---------------4375

If this order relates to a construction contract for real property, all applicable sales and use taxes are the responsibility of the contractor, and should be included in the contractor's bid as required pursuant to Section 7 of the DELPHI 1638 (8/00 Rev A), "Construction General Conditions", unless the responsibility for payment of sales & use taxes are otherwise specifically outlined in the contract.

Questions should be directed to:  Delphi Disbursement - Customer Service Phone: (248) 874-4636

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
A PROPERLY COMPLETED CERTIFICATE OF ORIGIN,
NAFTA CERTIFICATE WHERE APPLICABLE (CUSTOMS FORM 434)
AND A MANUFACTURERS AFFIDAVIT STATING THE COUNTRY OF
ORIGIN BE INCLUDED WITH THE SHIPPING DOCUMENTS FOR
THE MATERIAL ON THIS PURCHASE ORDER.          (NT)
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# DELPHI

Energy & Chassis Systems

ONTARIO SPECIALTY CONTRACTING
333 GANSON ST
BUFFALO NY 14203-3062

## Purchase Order

| PO Number | Date Issued |
|---|---|
| 450751581 | 24-Jul-2008 |
| Version | |
| 24-Jul-2008  12:22:27 | |

| Item No. | Material No/Item Identifier No | Total Order Quantity | Plant |
|---|---|---|---|
| | Description | | Requester |

---

Notes Continued:

**************************************************
CERTIFICATE OF INSURANCE GENERAL

CONTRACTOR SHALL OBTAIN AND MAINTAIN CONSISTENT WITH THE PROVISIONS OF THIS CONTRACT, AT ITS SOLE EXPENSE, THE FOLLOWING TYPES OF INSURANCE COVERAGE, TO REMAIN IN FORCE DURING THE TERM OF THIS CONTRACT, WITH MINIMUM LIMITS AS SET FORTH BELOW:
1.
COMMERCIAL GENERAL LIABILITY COVERING LIABILITY ARISING FROM PREMISES, OPERATIONS, INDEPENDENT CONTRACTORS, PRODUCTS - COMPLETED OPERATIONS, PERSONAL AND ADVERTISING INJURY, AND BLANKET CONTRACTUAL LIABILITY - US $5,000,000 EACH OCCURRENCE.
2.
BUSINESS AUTOMOBILE LIABILITY COVERING ALL OWNED, HIRED AND NON-OWNED VEHICLES - US $5,000,000 EACH OCCURRENCE, INCLUDING ALL APPLICABLE STATUATORY COVERAGES.
3.
WORKERS COMPENSATION - STATUTORY LIMITS FOR ALL STATES OF OPERATION.
4.
EMPLOYERS LIABILITY - US $1,000,000 EACH EMPLOYEE FOR BODILY INJURY BY ACCIDENT AND US $1,000,000 EACH EMPLOYEE FOR BODILY INJURY BY DISEASE.
5.
PROFESSIONAL/ERRORS AND OMISSIONS LIABILITY INSURANCE APPROPRIATE TO THE CONTRACTOR'S PROFESSION. COVERAGE SHOULD ALSO BE FOR A PROFESSIONAL ERROR, ACT OR OMISSION ARISING OUT OF THE SCOPE OF SERVICES SHOWN IN THIS CONTRACT - US $1,000,000 PER OCCURRENCE (ONLY IF PERFORMING CONSULTING ALONG WITH ACTUAL SITE WORK, IF NO CONSULTING, THIS PROVISION CAN BE DELETED)
ALL POLICIES OF INSURANCE PROCURED BY CONTRACTOR HEREIN SHALL BE WRITTEN AS PRIMARY POLICIES; NOT CONTRIBUTING WITH OR IN EXCESS OF COVERAGE THAT DELPHI MAY CARRY. IF CONTRACTOR'S LIABILITY POLICIES DO NOT CONTAIN THE STANDARD SEPARATION OF INSURED'S PROVISION, OR A SUBSTANTIALLY SIMILAR CLAUSE, THEY SHALL BE ENDORSED TO PROVIDE CROSS-LIABILITY COVERAGE CONTRACTOR SHALL AGREE TO WAIVE THEIR INSURER'S RIGHT SUBROGATION UNDER ITS POLICIES. DELPHI SHALL BE AN ADDITIONAL INSURED UNDER CONTRACTOR'S INSURANCE POLICY (EXCEPT WORKER'S COMPENSATION AND EMPLOYER'S LIABILITY), AND AT DELPHI'S REQUEST, CONTRACTOR SHALL PROVIDE DELPHI WITH A CERTIFICATE OF INSURANCE EVIDENCING COMPLIANCE WITH THE LIMITS, INSURANCE REQUIREMENTS AND WAIVER OF SUBROGATION SET FORTH ABOVE. SUCH CERTIFICATE SHALL BE IN A FORM ACCEPTABLE TO, AND UNDERWRITTEN BY AN INSURANCE COMPANY REASONABLY SATISFACTORY TO DELPHI AND WITH AN A.M.BEST COMPANY RATING OF A- OR ABOVE. BY REQUIRING INSURANCE HEREIN, DELPHI DOES NOT REPRESENT THAT COVERAGE AND LIMITS WILL NECESSARILY BE ADEQUATE TO PROTECT CONTRACTOR. THE PURCHASE OF APPROPRIATE INSURANCE COVERAGE BY CONTRACTOR OR THE FURNISHING OF A CERTIFICATE OF INSURANCE SHALL NOT RELEASE CONTRACTOR FROM ITS RESPECTIVE OBLIGATIONS OR LIABILITIES UNDER THE AGREEMENT.

MAIL ABOVE TO THE BUYER OF RECORD NOTED AT THE BOTTOM OF
OF THE PURCHASING DOCUMENT.
(FAX, PHONE AND ADDRESS BE PROVIDED)

# DELPHI

_____ Energy & Chassis Systems

Page  6  of  6

ONTARIO SPECIALTY CONTRACTING
333 GANSON ST
BUFFALO  NY  14203-3062

## Purchase Order

| PO Number | Date Issued |
|---|---|
| 450751581 | 24-Jul-2008 |
| Version | |
| 24-Jul-2008  12:22:27 | |

| Item No. | Material No/Item Identifier No Description | Total Order Quantity | Plant Requester |
|---|---|---|---|

**Notes Continued:**

CONTRACTORS ARE ADVISED THAT THEIR EMPLOYEES MAY HAVE
THE POTENTIAL OF EXPOSURE TO WORKPLACE CHEMICALS.
CONCERNS REGARDING THIS MATTER CAN BE DIRECTED TO
DELPHI CORP ENGINEERING DEPT. CONTACT YOUR BUYER OF RECORD
FOR A LOCAL CONTACT NUMBER.

**************************************************************
**************************************************************

Work described herein shall be performed in accordance with Delphi Corporation Construction General Conditions Delphi 1638 (including Insurance Coverages
and Certification Requirements), provided with the initial request for quotation.  Contractor Specifications and the safety rules and precautions are established by
the Contracting Delphi Site's Safety Department.

**************************************************************



REQUEST FOR
QUOTATION NOT AN
ORDER

Date:    July 9, 2008

TARGET ROUND #:    2

2008-HM66

Subject:    Target Pricing For
Quotation

Description:    Rochester Die Casting Building Demolition

Thank you for your response to the RFQ shown above.  Please re-evaluate your quotation based on the targets shown below.

Your response is required no later than Wednesday July 9th, 2008 before 5:00 PM (EST).  Quote responses received after the required due date/time may not be considered. The last received quote will be considered your *best and final* offer.

Please fill out the information below and sign / date at the bottom of this page.

| Line Item | Description | Target Price Dollars | Expected Delivery Per request | Supplier Response (include price/delivery) |
|---|---|---|---|---|
| 1 | Rochester Die Casting Bldg Demolition | Contractor to refund Delphi ($305,000.00 usd) Or better proposal | | ($271,033) |
| | | | | |

Supplier Representative
Signature:

*Peter Harlury*
*Oshorn Specialty Contracting*

Date:    7/9/08

Hugo Martinez
Facilities Lead Buyer
Delphi Global Supply Management
Phone: 915. 612. 8775 Fax: 866. 348. 8465
Hugo.f.martinez@delphi.com

Rochester Die Casting

BID PROPOSAL BREAKDOWN FORM

The Owner requires that the following bid breakdown be provided for quotation comparison purposes. The breakdown will likely also form the basis for the Project's Schedule of Values and be utilized in evaluation of the Contractor's progress payment requests.

Mobilization/Demobilization /Site Services
(Supervisory personnel, safety
personnel, job trailers, utilities, project                     $    28,092
management, etc)

                                                                $    35,265

Asbestos Abatement

Equipment Preparation for Transfer, or
Salvage (tank, hydraulic system, and gearbox drainage,          $    38,065
exterior cleaning, chip removal, etc)

Building Decommissioning (industrial cleaning of pits,
trenches, sumps, steam booths, floors, sewers, mercury          $    171,673
removal, bulb and ballast removal, waste collection, etc)

CFC Recovery (recovery of CFC's from ice machines,              $    5,176
chillers, drinking fountains, air conditioning, etc)
                                                                $    3,893

PCB Capacitor/Ballast
                                                                $    60,415

Utilities relocation
                                                                $    84,591

Exterior wall construction
                                                                $    374,657

Demolition
                                                                $    (1,189,999)

Material reclamation/salvage value credit
                                                                $    117,139

Other (specify) ___ Restoration ___
                                                                $

GRAND TOTAL (Base Bid)                                          $    (271,033)

## DELPHI CORPORATION
## General Terms and Conditions

### 1. ACCEPTANCE

Seller acknowledges and agrees that these General Terms and Conditions are incorporated in, and a part of, this contract and each purchase order, release, requisition, work order, shipping instruction, specification and other document, whether expressed in written form, by electronic data interchange or other tangible format, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as this "Contract"). Seller acknowledges and agrees that it has read and understands these General Terms and Conditions. If Seller accepts this Contract in writing or commences any of the work or services which are the subject of this Contract, Seller will be deemed to have accepted this Contract and these General Terms and Conditions in their entirety without modification. Any additions to, changes in, modifications of, or revisions of this Contract (including these General Terms and Conditions) which Seller proposes will be deemed to be rejected by Buyer except to the extent that an authorized employee of Buyer expressly agrees to accept any such proposals in writing.

### 2. SHIPPING AND BILLING

2.1. Shipping. Seller will (a) properly pack, mark and, ship goods as instructed by Buyer or any carriers and in accordance with any applicable laws or regulations, (b) route shipments as Buyer instructs, (c) not charge for costs relating to handling, packaging, storage or transportation (including duties, taxes, fees, etc.) unless otherwise expressly stated in this Contract, (d) provide packing slips with each shipment that identify Buyer's contract and release number and the date of the shipment, and (e) promptly forward the original bill of lading or other shipping receipt with respect to each shipment as Buyer instructs. Seller will include on bills of lading or other shipping receipts the correct classification identification of the goods shipped as Buyer or the carrier requires. The marks on each package and identification of the goods on packing slips, bills of lading and invoices must enable Buyer to easily identify the goods.

2.2. Billing. Seller will (a) accept payment based upon Buyer's Evaluated Receipt Record/Self-Billed Invoice unless Buyer requests that Seller issue and deliver an invoice and (b) accept payment by electronic funds transfer. Payment terms established by this contract are from the date the Buyer receives the goods or services. Buyer may withhold payment for any goods or services until Buyer receives evidence, in such form and detail as Buyer requires, of the absence of any liens, encumbrances and claims on such goods or services.

2.3. Taxes. Unless otherwise stated in this Contract, the price includes all applicable federal, state, provincial, and local taxes other than sales, value added, or similar turnover taxes or charges. Seller will separately invoice Buyer for any sales, value added, or similar turnover taxes or charges that Seller is required by law to collect from Buyer. Seller will provide Buyer with whatever information and documentation that is required under local law in order to enable Buyer to recover any sales, value added, or similar turnover taxes or charges. Invoices shall also be in the appropriate form as required by local law to permit deduction of payments for income tax purposes by the Buyer.

2.4. Withholding of Taxes by Buyer. If Buyer is required by law to make any deduction or withholding from any sum otherwise payable to Seller under this Contract, Buyer shall be entitled to deduct or withhold such amount and effect payment thereof to the applicable tax authority. Buyer will, upon request from Seller, provide Seller official tax receipts or other evidence issued by the applicable tax authorities sufficient to establish that any taxes which are withheld have been paid.

2.5. Delivery Schedules. Deliveries will be made in the quantities, on the dates, and at the times specified by Buyer in this Contract or any subsequent releases or instructions Buyer issues under this Contract. Time is of the essence with respect to all delivery schedules Buyer establishes. Buyer will not be required to pay for any goods that exceed the quantities specified in Buyer's delivery schedules or to accept goods that are delivered in advance of the delivery date specified in Buyer's delivery schedules. Seller bears the risk of loss of all goods delivered in advance of the delivery date specified in Buyer's delivery schedules. If the requirements of Buyer's customers or market, economic or other conditions require changes in delivery schedules, Buyer may change the rate of scheduled shipments or direct temporary suspension of scheduled shipments without entitling Seller to a price adjustment or other compensation.

Effective February 1st, 2008

## DELPHI CORPORATION
## General Terms and Conditions

2.6. <u>Premium Shipments</u>. If Seller fails to have goods ready for shipment in time to meet Buyer's delivery schedules using the method of transportation originally specified by Buyer and, as a result, Buyer requires Seller to ship the goods using a premium (more expeditious) method of transportation, Seller will ship the goods as expeditiously as possible. Seller will pay, and be responsible for, the entire cost of such premium shipment, unless Buyer's actions caused Seller to fail to meet Buyer's delivery schedules, in which case Buyer will pay any costs for premium shipment.

2.7. <u>Volume Forecasts</u>. Buyer may provide Seller with estimates, forecasts or projections of its future anticipated volume or quantity requirements for goods. Seller acknowledges that any such forecasts are provided for informational purposes only and, like any other forward looking projections, are based on a number of economic and business factors, variables and assumptions, some or all of which may change over time. Buyer makes no representation, warranty, guaranty or commitment of any kind or nature, express or implied, regarding any such forecasts provided to Seller, including with respect to the accuracy or completeness of such forecasts.

## 3. SPECIFICATION, DESIGN AND SCOPE CHANGES

Buyer may at any time require Seller to implement changes to the specifications or design of the goods or to the scope of any services or work covered by this Contract, including work related to inspection, testing or quality control. While Buyer will endeavor to discuss any such changes with Seller as early as practical, Seller will promptly implement such changes. Buyer will equitably determine any adjustment in price or delivery schedules resulting from such changes, including Buyer's payment of reasonable costs of modifications to Seller's Equipment (as defined in Article 16) necessary to implement such changes. In order to assist in the determination of any equitable adjustment in price or delivery schedules, Seller will, as requested, provide information to Buyer, including documentation of changes in Seller's cost of production and the time to implement such changes. In the event of any disagreement arising out of such changes, Buyer and Seller will work to resolve the disagreement in good faith, provided, however, that Seller will continue performing under this Contract, including the manufacture and delivery of goods and prompt implementation of changes required by Buyer, while Buyer and Seller resolve any disagreement arising out of such changes.

## 4. QUALITY AND INSPECTION

Seller will participate in Buyer's supplier quality and development program(s) and comply with all engineering release and validation requirements and procedures, including Buyer's production part approval processes, which Buyer specifies from time to time. Seller will permit Buyer and its representatives and consultants to enter Seller's facilities at reasonable times to inspect such facilities and any goods, inventories, work-in-process, materials, machinery, equipment, tooling, fixtures, gauges and other items and processes related to Seller's performance of this Contract. No such inspection by Buyer will constitute acceptance by Buyer of any work-in-process or finished goods.

## 5. NON-CONFORMING GOODS

Buyer is not required to perform incoming inspections of any goods, and Seller waives any right to require Buyer to conduct any such inspections. Seller will not substitute any goods for the goods covered by this Contract unless Buyer consents in writing. If Buyer rejects any goods as non-conforming, Buyer may, at its option, (a) reduce the quantities of goods ordered under this Contract by the quantity of non-conforming goods, (b) require Seller to replace the non-conforming goods, and/or (c) exercise any other applicable rights or remedies. If Seller fails to inform Buyer in writing of the manner in which Seller desires that Buyer dispose of non-conforming goods within forty-eight (48) hours of notice of Buyer's rejection of non-conforming goods (or such shorter period as is reasonable under the circumstances), Buyer will be entitled to dispose of the non-conforming goods without liability to Seller, provided, however, that in any event Buyer may elect to arrange for the shipment of any non-conforming goods back to Seller at Seller's expense. Seller will bear all risk of loss with respect to all non-conforming goods and will promptly pay or reimburse all costs incurred by Buyer to return, store or dispose any non-conforming goods. Buyer's payment for any non-conforming goods will not

Effective February 1st, 2008

## DELPHI CORPORATION
## General Terms and Conditions

constitute acceptance by Buyer, limit or impair Buyer's right to exercise any rights or remedies, or relieve Seller of responsibility for the non-conforming goods.

## 6. FORCE MAJEURE

If Seller is unable to produce, sell or deliver any goods or services covered by this Contract, or Buyer is unable to accept delivery, buy or use any goods or services covered by this Contract, as a result of an event or occurrence beyond the reasonable control of the affected party and without such party's fault or negligence, then any delay or failure to perform under this Contract that results from such event or occurrence will be excused for only so long as such event or occurrence continues, provided, however, that the affected party gives written notice of each such delay (including the anticipated duration of the delay) to the other party as soon as possible after the event or occurrence (but in no event more than three (3) days thereafter). Such events and occurrences may include, by way of example and not limitation, natural disasters, fires, floods, windstorms, severe weather, explosions, riots, wars, sabotage, labor problems (including lockouts, strikes and slowdowns), equipment breakdowns and power failures. During any delay or failure to perform by Seller, Buyer may (i) purchase substitute goods from other available sources, in which case the quantities under this Contract will be reduced by the quantities of such substitute goods and Seller will reimburse Buyer for any additional costs to Buyer of obtaining the substitute goods compared to the prices set forth in this Contract and/or (ii) have Seller provide substitute goods from other available sources in quantities and at times Buyer requests and at the prices set forth in this Contract. If Seller fails to provide adequate assurances that any delay will not exceed thirty (30) days or if any delay lasts more than thirty (30) days, Buyer may terminate this Contract without any liability to Seller or obligation to purchase raw materials, work-in-process or finished goods under Section 11. Before any of Seller's labor contracts expire and as soon as Seller anticipates or learns of any impending strike, labor dispute, work stoppage or other disruption at Seller's facilities that might affect the delivery of goods to Buyer, Seller will produce (and locate in an area that will not be affected by any such disruption) a finished inventory of goods in quantities sufficient to ensure the supply of goods to Buyer for at least thirty (30) days after such disruption commences.

## 7. WARRANTY

7.1.  General.  Seller warrants and guarantees to Buyer, its successors, assigns and customers that the goods and services covered by this Contract will (a) conform to the then current release/revision level (based on date Buyer's release is issued to Seller) of Buyer's applicable specifications and drawings, (b) conform to all samples, descriptions, brochures and manuals furnished by Seller or Buyer, (c) be merchantable, (d) be of good material and workmanship, (e) be free from defect, and (f) be fit and sufficient for the particular purposes intended by Buyer and any customer of Buyer.  If requested by Buyer, Seller will enter into a separate agreement for the administration or processing of warranty chargebacks for nonconforming goods.

7.2.  Warranty Period.  In the case of goods supplied for use as, or incorporation into, parts, components or systems for automotive vehicles or other finished products, the period for each of the foregoing warranties will commence upon delivery of the goods to Buyer and, except as provided in Section 7.4 or as otherwise expressly agreed in writing by an authorized employee of Buyer, end forty-eight (48) months following the date the vehicle or other finished product on which such parts, components or systems are installed is first sold and delivered or otherwise utilized for consumer or commercial purposes, provided, however, that if Buyer offers and provides a longer warranty to its customers with respect to any such parts, components or systems, then such longer warranty period will apply to the goods.  In the case of goods supplied for other uses, the period for each of the foregoing warranties will be that provided by applicable law unless otherwise expressly agreed in writing by an authorized employee of Buyer.

7.3.  Remedies and Damages.  If any goods are reasonably determined (including by use of statistical analysis or other sampling methodology) to fail to conform to the warranties set forth in this Contract, Seller shall reimburse Buyer for all reasonable losses, costs and damages caused by such nonconforming goods.  Such costs and damages may include, without limitation, costs, expenses and losses of Buyer and/or its customers arising from (i) inspection, sorting, repair or replacement of any nonconforming goods or any

Effective February 1st, 2008
3 of 11

## DELPHI CORPORATION
## General Terms and Conditions

system or component that incorporates such nonconforming goods, (ii) production interruptions or slowdowns, (iii) offlining of vehicles or component systems, and (iv) field service campaigns and other corrective service actions, including, without limitation, the amounts paid to distributors and/or dealers for materials and replacement parts (including reasonable markup to recover administrative costs or other capital expenses) and the labor costs to perform such work.

7.4. Recalls. Notwithstanding the expiration of the warranty period set forth in Section 7.2, if Buyer and/or the manufacturer of the vehicles (or other finished product) on which the goods, or any parts, components or systems incorporating the goods, are installed, voluntarily or pursuant to a government mandate, makes an offer to owners of such vehicles to provide remedial action to address a defect that relates to motor vehicle safety or the failure of the vehicle to comply with any applicable law, safety standard or guideline (a so-called "recall"), Seller will nonetheless be liable for costs and damages associated with the conduct of such recall to the extent that such recall is based upon a reasonable determination (including by use of statistical analysis or other sampling methodology) that the goods fail to conform to the warranties set forth in this Contract.

## 8. INGREDIENTS AND HAZARDOUS MATERIALS

If Buyer requests, Seller will promptly furnish to Buyer, in such form and detail as Buyer directs: (a) a list of all ingredients in the goods, (b) the amount of all ingredients, and (c) information concerning any changes in or additions to the ingredients. Prior to, and together with, the shipment of the goods, Seller will furnish to Buyer and all carriers sufficient written warning and notice (including appropriate labels on the goods, containers and packing) of any hazardous material that is an ingredient or a part of any of the goods, together with all special handling instructions, safety measures and precautions as may be necessary to comply with applicable law, to inform Buyer and all carriers of any applicable legal requirements and to best allow Buyer and all carriers to prevent bodily injury or property damage in the handling, transportation, processing, use or disposal of the goods, containers and packing.

## 9. INSOLVENCY OF SELLER

In any of the following or any similar events Buyer may immediately terminate this Contract without any liability to Seller or obligation to purchase raw materials, work-in-process or finished goods under Section 11:  (a) insolvency or financial difficulties of Seller, (b) filing of a voluntary petition in bankruptcy by Seller, (c) filing of any involuntary petition in bankruptcy against Seller, (d) appointment of a receiver or trustee for Seller, (e) execution of an assignment for the benefit of creditors by Seller, or (f) any accommodation by Buyer, financial or otherwise, not contemplated by this Contract, that are necessary for Seller to meet its obligations under this Contract. Seller will reimburse Buyer for all costs Buyer incurs in connection with any of the foregoing whether or not this Contract is terminated, including, but not limited to, all attorney or other professional fees.

## 10. TERMINATION FOR BREACH

Buyer may terminate all or any part of this Contract without any liability to Seller or obligation to purchase raw materials, work-in-process or finished goods under Section 11 if Seller (a) repudiates, breaches, or threatens to breach any of the terms of this Contract, including Seller's warranties, (b) fails to perform or threatens not to perform services or deliver goods in accordance with this Contract or (c) fails to assure timely and proper completion of services or delivery of goods.

## 11. TERMINATION FOR CONVENIENCE

In addition to any other rights of Buyer to terminate this Contract, Buyer may immediately terminate all or any part of this Contract, at any time and for any reason, by notifying Seller in writing. Upon such termination, Buyer may, at its option, purchase from Seller any or all raw materials, work-in-process and finished goods inventory related to the goods under this Contract which are useable and in a merchantable condition. The purchase price for such finished goods, raw materials and work-in-process, and Seller's sole and exclusive recovery from Buyer (without regard to the legal theory which is the basis for any claim by Seller) on account of

Effective February 1st, 2008
4 of 11

## DELPHI CORPORATION
## General Terms and Conditions

such termination, will be (a) the contract price for all goods or services that have been completed in accordance with this Contract as of termination date and delivered and accepted by Buyer and not previously paid for, plus (b) the actual costs of work-in-process and raw materials incurred by Seller in furnishing the goods or services under this Contract to the extent such costs are reasonable in amount and are properly allocable or apportionable under generally accepted accounting principles to the terminated portion of this Contract less (c) the reasonable value or cost (whichever is higher) of any goods or materials used or sold by Seller with Buyer's written consent. In no event will Buyer be required to pay for finished goods, work-in-process or raw materials which Seller fabricates or procures in amounts that exceed those Buyer authorizes in delivery releases nor will Buyer be required to pay for any goods or materials that are in Seller's standard stock or that are readily marketable. Payments made under this Article will not exceed the aggregate price for finished goods that would be produced by Seller under delivery or release schedules outstanding at the date of termination. Within sixty (60) days after the effective date of termination, Seller will submit a comprehensive termination claim to Buyer, with sufficient supporting data to permit an audit by Buyer, and will thereafter promptly furnish any supplemental and supporting information Buyer requests.

## 12. TECHNICAL INFORMATION

12.1. <u>Information Disclosed by Seller</u>. Seller will create, maintain, update, and provide to Buyer, in compliance with Buyer's drafting and math data standards, all technical information about the goods and their manufacture which is reasonably necessary or requested by Buyer in connection with its use of the goods, including, without limitation, the engineering validation and qualification of the goods for automotive production and other applications and compliance with any legal or regulatory requirements. Such technical information will not be subject to any use or disclosure restrictions, except as provided in Section 12.2 below.

12.2. <u>Waiver of Claims</u>. Seller agrees not to assert any claim (other than a claim for patent infringement) against Buyer, Buyer's customers or their respective suppliers with respect to any technical information that Seller shall have disclosed, or may hereafter disclose, in connection with the goods or services covered by this Contract.

12.3. <u>Repair and Rebuild</u>. Seller authorizes Buyer, its affiliates, agents and subcontractors, and Buyer's customers and their subcontractors to repair, reconstruct or rebuild the goods and products delivered under this Contract without payment of any royalty or other compensation to Seller.

12.4. <u>Software and Written Works</u>. Seller grants to Buyer a permanent, paid-up license to use, repair, modify and sell any operating software incorporated in the goods in conjunction with the use or sale of the goods. In addition, all works of authorship, including without limitation, software, computer programs and databases (including object code, micro code, source code and data structures), and all enhancements, modifications and updates thereof and all other written work products or materials, which are created in the course of performing this Contract, separately or as part of any goods and components, are "works made for hire" and the sole property of Buyer. To the extent that such works of authorship do not qualify under applicable law as works made for hire, Seller hereby assigns to Buyer all right, title and interest in any intellectual property rights in such works of authorship. If such assignment is not possible under any applicable law, Seller hereby grants an exclusive, royalty-free license to Buyer with respect to such works of authorship.

12.5. <u>Development, Engineering And Consulting Services</u>. Engineering, consulting or development services ("Development Services") funded under this Contract that result in any idea, invention, concept, discovery, work of authorship, patent, copyright, trademark, trade secret, know-how or other intellectual property ("IP") shall be the sole property of Buyer. Seller agrees to assign all right, title and interest in and to IP that results from Development Services ("Developed IP") to Buyer. Seller shall notify Buyer of the existence of Developed IP and assist Buyer in every reasonable way to perfect its right, title and interest in Developed IP, such as by executing and delivering all additional documents reasonably requested by Buyer in order to perfect, register, and/or enforce the same, and Buyer shall reimburse Seller for reasonable costs incurred by Seller in providing such assistance.

DELPHI CORPORATION
## General Terms and Conditions

### 13. INDEMNIFICATION

13.1. Infringement. Seller will defend, hold harmless and indemnify Buyer and its customers, and their respective successors and assigns, against any claims of infringement (including patent, trademark, copyright, moral, industrial design or other proprietary rights, or misuse or misappropriation of trade secret) and resulting damages and expenses (including, without limitation, attorney and other professional fees and disbursements) relating to the goods or services covered by this Contract, including any claims in circumstances where Seller has provided only part of the goods or services. Seller waives any claim against Buyer that any such infringement arose out of compliance with Buyer's specifications.

13.2. Activities on Buyer's Premises. Seller will defend, hold harmless, and indemnify Buyer from and against any liability, claims, demands, damages, costs or expenses (including, without limitation, reasonable attorney and other professional fees and disbursements) arising from or in connection with the performance of any service or work by Seller or its employees, agents, representatives and subcontractors on Buyer's or Buyer's customer's premises or the use of the property of Buyer or any customer of Buyer, except to the extent such liability arises out of the negligence or willful misconduct of Buyer or Buyer's customer.

13.3. Product Liability . Seller will defend, hold harmless, and indemnify Buyer from and against any liability and expenses (including, without limitation, attorney and other professional fees and disbursements) arising from or in connection with any third party claims or demands to recover for personal injury or death, property damage or economic loss caused by any of the goods or services supplied by Seller (regardless of whether such claim or demand arises under tort, negligence, contract, warranty, strict liability or any other legal theories), except to the extent such injury, damage or loss results from Buyer's specifications as to design or materials or from alteration or improper repair, maintenance or installation by any party other than Seller.

### 14. COMPLIANCE WITH LAWS

Seller, and any goods or services supplied by Seller, will comply with all applicable laws, rules, regulations, orders, conventions, ordinances and standards of the country(ies) of origin and destination or that relate to the manufacture, labeling, transportation, importation, exportation, licensing, approval, performance and/or certification of the goods or services, including, but not limited to, those relating to environmental matters, wages, hours and conditions of employment, subcontractor selection, discrimination, occupational health/safety and motor vehicle safety. Neither Seller nor any of its subcontractors will utilize slave, prisoner or any other form of forced or involuntary labor in the supply of goods or services under this Contract.   Upon Buyer's request, Seller will certify in writing its compliance with the foregoing. Seller will defend, hold harmless and indemnify Buyer from and against any liability, claims, demands, damages or expenses (including reasonable attorney or other professional fees and disbursements) arising from or relating to Seller's noncompliance with this Article.

### 15.   INSURANCE

Seller will maintain insurance coverage as required by applicable law or as reasonably requested by Buyer with carriers reasonably acceptable to Buyer.   With respect to any such insurance coverage, Seller will furnish to Buyer either a certificate evidencing satisfaction of the above-mentioned insurance requirements under this Contract or certified copies of all insurance policies within ten (10) days after Buyer requests. The certificate must provide that Buyer will receive thirty (30) days prior written notice from the insurer of any termination or reduction in the amount or scope of coverage.   The furnishing of certificates of insurance and purchase of insurance will not limit or release Seller from Seller's obligations or liabilities under this Contract.

### 16.   SELLER'S EQUIPMENT

Seller, at its expense, will furnish, keep in good condition, and replace when necessary all of its machinery and equipment, including related tooling, jigs, dies, gauges, fixtures, molds, patterns, fixtures and other accessories, required for the production of goods covered by this Contract (collectively, "Seller's Equipment").

Effective February 1st, 2008

## DELPHI CORPORATION
## General Terms and Conditions

Seller will insure Seller's Equipment with fire and extended coverage insurance for its full replacement value. Seller grants Buyer an irrevocable option to take possession of, and title to, all or part of Seller's Equipment that is specially designed or outfitted for the production of the goods covered by this Contract, in which event Buyer will, within 45 days following delivery of such Seller's Equipment to Buyer, pay to Seller of the lower of (i) the net book value of such Seller's Equipment (i.e., actual cost less amortization) or (ii) then current fair market value of such Seller's Equipment, in each case less any amounts that Buyer has previously paid to Seller on account of such Seller's Equipment. The foregoing option will not apply to the extent that Seller's Equipment is used to produce goods that are the standard stock of Seller and are then being sold by Seller to other customers. Buyer's right to exercise the foregoing option is not conditioned on Seller's breach or Buyer's termination of this Contract or upon payment of any other amounts due under this Contract.

## 17. BUYER'S PROPERTY AND INFORMATION

17.1. Acquisition of Tooling and Materials. To the extent that this Contract covers Buyer's purchase of, or reimbursement to Seller for, any tooling, jigs, dies, gauges, fixtures, molds, patterns, equipment, supplies, materials and other items (collectively, "Tooling and Materials") to be used in connection with Seller's actual or anticipated supply of goods to Buyer, Seller will acquire such Tooling and Materials as agent of Buyer and Buyer shall pay to or reimburse Seller the lower of (i) the amount specified in this Contract for such Tooling and Materials or (ii) Seller's actual out-of-pocket cost to acquire the Tooling or Materials from an unrelated third party or, if the Tooling and Materials are constructed or fabricated by Seller or any affiliate of Seller, the actual direct costs for materials, labor and overhead associated with such construction and fabrication. Seller shall assign to Buyer any contract rights or claims in which Seller has an interest with respect to such Tooling and Materials. Seller shall establish a reasonable accounting system that readily enables the identification of Seller's costs as described above. Buyer or its agents shall have the right to audit and examine all books, records, facilities, work, material, inventories and other items relating to any such Tooling and Materials. Upon Seller's acquisition of such Tooling and Materials, title thereto shall vest immediately in Buyer and such Tooling and Materials shall be held as "Buyer's Property" by Seller in accordance with this Article 17.

17.2. Bailment of Buyer's Property. All Tooling and Materials which Buyer furnishes, either directly or indirectly, to Seller or which Buyer buys from, or gives reimbursement to, Seller in whole or in part (collectively, "Buyer's Property") will be and remain the property of Buyer and be held by Seller on a bailment basis. Title to all replacement parts, additions, improvements and accessories purchased by Seller will vest in Buyer immediately upon attachment to or incorporation into Buyer's Property. When permitted by law, Seller waives any lien or other rights that Seller might otherwise have on or in any of Buyer's Property for work performed on, or utilizing, such property or otherwise.

17.3. Seller's Duties with Respect to Buyer's Property. While Buyer's Property is in Seller's possession and until Seller delivers Buyer's Property back to Buyer, Seller bears the risk of loss, theft and damage to Buyer's Property. Seller will be responsible for the cost of repairing or replacing Buyer's Property if it is stolen, damaged or destroyed regardless of cause or fault. Seller will at all times: (a) regularly inspect, maintain in good condition, and repair Buyer's Property at Seller's own expense, (b) use Buyer's Property only for the performance of this Contract, (c) deem Buyer's Property to be personal property, (d) conspicuously mark Buyer's Property as the property of Buyer and maintain such markings, (e) not commingle Buyer's Property with the property of Seller or with that of a third person, (f) not move Buyer's Property from Seller's applicable shipping location (as shown by the shipping address of Seller) without prior written approval from an authorized employee of Buyer, and (g) use Buyer's Property in compliance with Buyer's or the manufacturer's instructions and in compliance with all federal, state and local laws, ordinances and regulations. Buyer will have the right to enter Seller's premises at all reasonable times to inspect Buyer's Property and Seller's records with respect thereto. Seller will not sell, lend, rent, encumber, pledge, lease, transfer or otherwise dispose of Buyer's Property. Furthermore, Seller will not assert, or permit any person claiming an interest through Seller to assert any claims of ownership to or any other interest in Buyer's Property.

17.4. Return of Buyer's Property. Seller agrees that Buyer has the right, at any time and from time to time, with

## DELPHI CORPORATION
## General Terms and Conditions

or without reason and without payment of any kind, to retake possession of or request the return of Buyer's Property. Without further notice or court hearings, which rights, if any, are hereby waived, Buyer or its designee(s) will have the right to enter Seller's premises and take possession of any and all of Buyer's Property. Upon Buyer's request and in accordance with Buyer's instructions, Buyer's Property will be immediately released to Buyer or delivered to Buyer by Seller, either (i) Ex Works (IncoTerms 2000) at Seller's plant properly packed and marked in accordance with the requirements of the carrier selected by Buyer to transport such Buyer's Property or (ii) to any location Buyer designates, in which event Buyer will pay Seller the reasonable costs of delivering Buyer's Property to the location Buyer designates. If Seller does not release and deliver any Buyer's Property in accordance with this Article, Buyer may obtain an immediate writ of possession without notice and without the posting of any bond and/or enter Seller's premises, with or without legal process, and take immediate possession of Buyer's Property.

17.5. <u>Disclaimer of Warranties</u>.  Seller acknowledges and agrees that (i) Buyer is not the manufacturer of Buyer's Property nor the manufacturer's agent nor a dealer therein, (ii) Buyer is bailing Buyer's Property to Seller for Seller's benefit, (iii) Seller is satisfied that Buyer's Property is suitable and fit for its purposes, and (iv) BUYER HAS NOT MADE AND DOES NOT MAKE ANY WARRANTY OR REPRESENTATION WHATSOEVER, EITHER EXPRESS OR IMPLIED, AS TO THE FITNESS, CONDITION, MERCHANTABILITY, DESIGN OR OPERATION OF BUYER'S PROPERTY OR ITS FITNESS FOR ANY PARTICULAR PURPOSE.  Buyer will not be liable to Seller for any loss, damage, injury or expense of any kind or nature caused, directly or indirectly, by Buyer's Property, including, without limitation, the use or maintenance thereof, or the repair, service or adjustment thereof, or by any interruption of service or for any loss of business whatsoever or howsoever caused, including, without limitation, any loss of anticipatory damages, profits or any other indirect, special or consequential damages and/or personal injury or death.

17.6. <u>Use of Buyer's Information</u>.  Seller will (i) keep all Buyer's Information (as defined below) confidential and disclose it only to its employees who need to know such Buyer's Information in order for Seller to supply goods and services to Buyer under this Contract and (ii) use the Buyer's Information solely for the purpose of supplying goods and services to Buyer.  Goods manufactured based on Buyer's Information may not be used for Seller's own use or sold by Seller to third parties without prior express written consent from an authorized employee of Buyer.  "Buyer's Information" means all information provided to Seller by Buyer or its representatives or subcontractors in connection with the business, programs, goods and services covered by this Contract, including, without limitation, pricing and other terms of this Contract, specifications, data, formulas, compositions, designs, sketches, photographs, samples, prototypes, test vehicles, manufacturing, packaging or shipping methods and processes and computer software and programs (including object code and source code). Buyer's Information also includes any materials or information that contain, or are based on, any Buyer's Information, whether prepared by Buyer, Seller or any other person.

## 18. SERVICE AND REPLACEMENT PARTS

During the term of this Contract, Seller will sell to Buyer goods necessary to fulfill Buyer's service and replacement parts requirements to Buyer's customers at the then current production price(s) under this Contract.  If the goods are systems or modules, Seller will sell the components or parts that comprise the system or module at price(s) that will not, in the aggregate, exceed the price of the system or module less assembly costs.  If this Contract is in effect at the end of the vehicle production program into which the goods covered by the Contract are incorporated, Seller will also sell goods to Buyer to fulfill Buyer's and its customers' service and replacement parts requirements during the fifteen (15) year period following the end of such vehicle production program (the "Post-Production Period"), and this Contract will automatically remain in effect during the entire Post-Production Period.  During the initial five (5) years of the Post-Production Period, the price(s) for such goods will be the production price(s) which were in effect at the commencement of the Post-Production Period.  For the remainder of the Post-Production Period, the price(s) for such service goods will be as reasonably agreed to by the parties.  If requested by Buyer, Seller will also make service literature

Effective February 1st, 2008
8 of 11

## DELPHI CORPORATION
## General Terms and Conditions

and other materials available at no additional charge to support Buyer's service activities.

### 19.   REMEDIES AND INJUNCTIVE RELIEF

The rights and remedies reserved to Buyer in this Contract are cumulative with, and in addition to, all other or further remedies provided in law or equity. To the extent that this Contract is for the supply of goods for use as, or fabrication into, parts, components or systems, Seller acknowledges and agrees that money damages would not be a sufficient remedy for any actual, anticipatory or threatened breach of this Contract by Seller with respect to its delivery of goods to Buyer and that, in addition to all other rights and remedies which Buyer may have, Buyer shall be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach.

### 20. CUSTOMS AND EXPORT CONTROLS

20.1. Credits and Refunds. Transferable credits or benefits associated with or arising from goods purchased under this Contract, including trade credits, export credits or rights to the refund of duties, taxes or fees, belong to Buyer. Seller will, at its expense, provide all information necessary (including written documentation and electronic transaction records in Buyer-approved formats) to permit Buyer to receive these benefits, credits, or rights. Seller will furthermore, at its expense, provide Buyer with all information, documentation, and electronic transaction records relating to the goods necessary for Buyer to fulfill any customs -related obligations, origin marking or labeling requirements and certification or local content reporting requirements, to enable Buyer to claim preferential duty treatment for goods eligible under applicable trade preference regimes, and to make all arrangements that are necessary for the goods to be covered by any duty deferral or free trade zone program(s) of the country of import. Seller will, at its expense, provide Buyer or Buyer's nominated service provider with export documentation to enable the goods to be exported, and obtain all export licenses or authorizations necessary for the export of the goods unless otherwise indicated in this Contract, in which event Seller will provide all information as may be necessary to enable Buyer to obtain such licensees or authorization(s).

20.2. Customs-Trade Partnership Against Terrorism. To the extent any good covered by this Contract are to be imported into the United States of America, Seller shall comply with all applicable recommendations or requirements of the Bureau of Customs and Border Protection's Customs-Trade Partnership Against Terrorism ("C-TPAT") initiative. Upon request, Seller shall certify in writing its compliance with the C-TPAT initiative.

### 21. BUYER'S RECOVERY RIGHT

With respect to any monetary obligations of Seller or Seller's affiliates to Buyer or Buyer's affiliates, including, without limitation, direct and indirect losses, costs and damages resulting from Seller's failure to timely delivery goods or services, the failure of any goods or service to conform to applicable warranties or other breach by Seller of this Contract, Buyer may at any time, as applicable, recover, recoup or setoff such amounts by deducting such amounts from any sums that are, or will become, owing, due or payable to Seller or Seller's affiliates by Buyer or Buyer's affiliates.

### 22.   NO ADVERTISING

Seller will not, in any manner, advertise or publish that Seller has contracted to furnish Buyer the goods or services covered by this Contract or use any trademarks or trade names of Buyer in Seller's goods, advertising or promotional materials unless Buyer consents in writing.

### 23.   NO IMPLIED WAIVER

The failure of either party at any time to require performance by the other party of any provision of this Contract will not affect the right to require such performance at any later time, nor will the waiver by either party of a breach of any provision of this Contract constitute a waiver of any succeeding breach of the same or any other provision. No failure or delay in exercising any right or remedy will operate as a waiver thereof nor will any

## DELPHI CORPORATION
## General Terms and Conditions

single or partial exercise thereof preclude other or further exercise thereof.  No course of dealing or course of performance may be used to evidence a waiver or limitation of Seller's obligations under this Contract.

### 24.   ASSIGNMENT AND CHANGE IN CONTROL

Buyer may assign its rights and obligations under this Contract without Seller's prior written consent.  Seller may not assign or delegate its rights or obligations under this Contract without prior written consent from an authorized employee of Buyer. In addition, Buyer may terminate this Contract upon giving at least 60 days notice to Seller, without any liability to Seller or obligation to purchase raw materials, work-in-process or finished goods under Section 11, if Seller (i) sells, or offers to sell, a material portion of its assets or (ii) sells or exchanges, or offers to sell or exchange, or causes to be sold or exchanged, a sufficient amount of its stock or other equity interests that effects a change in the control of Seller or (iii) executes, or otherwise becomes subject to, a voting or other agreement or trust that effects a change in the control of Seller.

### 25.   RELATIONSHIP OF PARTIES

Seller and Buyer are independent contracting parties.  Nothing in this Contract makes either party the agent or legal representative of the other for any purpose whatsoever, nor grants either party any authority to assume or create any obligation on behalf of or in the name of the other party.

### 26. GOVERNING LAW AND JURISDICTION

26.1. U.S. Contracts.  If either (i) this Contract is issued by Buyer from a location within the United States of America or its territories (as shown by the issuing address of Buyer), (ii) this Contract is issued, in whole or part, for goods to be shipped to a Buyer location within the United States of America or its territories (as shown by the ship to or receiving address of Buyer) or (iii) Seller's applicable shipping location is within the United States of America or its territories (as shown by the shipping address of Seller), then: (a) this Contract is to be construed according to the laws of the United States of America and the State of Michigan, excluding the provisions of the United Nations Convention on Contracts for the International Sale of Goods and any choice of law provisions that require application of any other law, and (b) each party hereby agrees that the forum and venue for any legal or equitable action or proceeding arising out of, or in connection with, this Contract will lie in the appropriate federal or state courts in the State of Michigan and specifically waives any and all objections to such jurisdiction and venue.

26.2. Non-U.S. Contracts.  In all cases not covered by Section 26.1 above, (a) this Contract is to be construed according to the laws of the country (and state or province, if applicable) where Buyer's receiving location is located (as shown by the ship to or receiving address of Buyer), excluding the provisions of the United Nations Convention on Contracts for the International Sale of Goods and any choice of law provisions that require application of any other law; (b) any legal or equitable action or proceedings by Buyer against Seller arising out of, or in connection with, this Contract may be brought by Buyer in any court(s) having jurisdiction over Seller or, at Buyer's option, in any court(s) having jurisdiction over Buyer's receiving location, in which event Seller consents to such jurisdiction and venue, including service of process in accordance with applicable procedures; and (c) any legal or equitable actions or proceedings by Seller against Buyer arising out of, or in connection with, this Contract may be brought by Seller only in the court(s) having jurisdiction over the Buyer's receiving location.

### 27. SEVERABILITY

If any provision of this Contract is invalid or unenforceable under any statute, regulation, ordinance, executive order or other rule of law, such provision will be deemed reformed or deleted, as the case may be, but only to the extent necessary to comply with such statute, regulation, ordinance, order or rule, and the remaining provisions of this Contract will remain in full force and effect.

### 28.   RIGHT TO AUDIT AND INSPECT

Buyer, at its expense, has the right to audit and review all relevant books, records, income statements, balance

DELPHI CORPORATION
## General Terms and Conditions

sheets, cash flow statements, payroll data, receipts and other related supporting data, including Seller's administrative and accounting policies, guidelines, practices and procedures, in order to (i) substantiate any charges and other matters under this Contract and (ii) assess Seller's ongoing ability to perform its obligations under the Production Purchase Order. Seller will maintain and preserve all such documents for a period of four (4) years following final payment under this Contract. Seller will provide Buyer with reasonable access to its facilities and otherwise cooperate and facilitate any such audits by Buyer.

29.    ENTIRE AGREEMENT
This Contract, together with the attachments, exhibits, supplements or other terms of Buyer specifically referenced in this Contract, constitutes the entire agreement between Seller and Buyer with respect to the matters contained in this Contract and supersedes all prior oral or written representations and agreements. This Contract may only be modified by a written contract amendment issued by Buyer.  Notwithstanding anything to the contrary contained herein, Buyer explicitly reserves, and this Contract will not constitute a waiver or release of, any rights and claims against Seller arising out of, or relating to, any fraud or duress in connection with the formation of this Contract or any breach or anticipatory breach of any previously existing contract between Buyer and Seller (whether or not such previously existing contract related to the same or similar goods or subject matter as this Contract). All payments by Buyer to Seller under this Contract are without prejudice to Buyer's claims, rights, or remedies.

30.    TRANSLATIONS
Buyer may provide various translated versions of these General Terms and Conditions for informational purposes only. However, the original English language version of these General Terms and Conditions will apply in the event of any disagreement over the meaning or construction of any provisions of these General Terms and Conditions.

**Exhibit "C"**

**Exhibit "C"**

 **Ontario Specialty Contracting, Inc.**

Environmental Remediation  ☐  Demolition / Dismantlement

11/3/08

Mr. Robert Randazzo
Delphi
1000 Lexington Ave.
Rochester, New York

RE: DIE CAST DEMOLITION

Dear Bob,

I would like to open a discussion with Delphi concerning the state of the current scrap market and our contract with Delphi for the Demolition and Decommissioning of the Aluminum Die Cast Plant.

As I am sure you are well aware that scrap market has been on a rapid decline since the award of this project. OSC has submitted multiple proposals for this project dating back to August 24, 2007, then again on January 31, 2008 (including an expanded scope of work and additional salvage value to Delphi based on the upswing in the scrap market), the third proposal was on June 16, 2008 in response to RFP #2008-HM66 which limited the scope of work from the second proposal but significantly increased the salvage value to Delphi based on the scrap market, the fourth was in response to the first target price proposed by Delphi in which OSC was able to cut or base costs on the work and increase the salvage revenue to Delphi directly increasing OSC's risk of return on salvage value, the fifth proposal was again in response to a Delphi proposed target value in which OSC increased the salvage value to Delphi again raising our risk of return in order to secure the work. OSC provided Delphi with detailed information regarding the salvage value of the work and discussed OSC's expected market risk for the scrap. (Spreadsheets attached)

Since the award the value of the expected salvage materials has dropped from $1,326,850 to $378,110.

OSC values our relationship with Delphi as a client, and is committed to complete this project safety, and successfully. However, what we cannot do is complete the project under the current financial agreement, which requires us to pay Delphi for assets which no longer have a representative value.

OSC has continually worked with the onsite Delphi team to overcome the unforeseen obstacles present at the project (additional asbestos roofing material, air gapping of utilities, uncertainty of relocation of utilities, coordination with Delphi operations).

We therefore are requesting a meeting with Delphi to look at alternative options to complete the project which limits both parties risk during this period of instability in the commodity market.

Please contact me at your earliest convenience to set up a meeting with the appropriate parties.

Sincerely,

*PETER M. HARTUNG Jr.*

Peter M. Hartung Jr., P.E.
Sr. Project Manager
Ontario Specialty Contracting

## ONTARIO SPECIALTY CONTRACTING
### DELPHI DEMOLITION SCRAP BREAKDOWN
#### 6/28/2008

**Ferrous Metals**

| | Estimated Quantity (GT) | Price at Scrap Yard | Total Scrap Value | Value to Delphi Price / GT | Total value | Preparation Fee | Value to OSC Price / GT | Total value |
|---|---|---|---|---|---|---|---|---|
| Prepared Plate & Structural | 1080 | $ 450.00 | $ 486,000.00 | $ 390.00 | $ 421,200.00 | $ 35.00 | $ 25.00 | $ 27,000.00 |
| Unprepared - Miscellaneous | 1620 | $ 410.00 | $ 664,200.00 | $ 365.00 | $ 591,300.00 | $ - | $ 45.00 | $ 72,900.00 |
| Total | 2700 | $ 426.00 | $ 1,150,200.00 | $ 375.00 | $ 1,012,500.00 | | $ 37.00 | $ 99,900.00 |

**Non - Ferrous Metals**

| | Estimated Quantity (lbs) | Price at Scrap Yard | Total Scrap Value | Value to Delphi Price / lbs | Total value | Preparation Fee | Value to OSC Price / lbs | Total value |
|---|---|---|---|---|---|---|---|---|
| #1 Copper | 9500 | $ 2.85 | $ 27,075.00 | $ 2.50 | $ 23,750.00 | $ 0.10 | $ 0.25 | $ 2,375.00 |
| #2 Copper | 25000 | $ 2.45 | $ 61,250.00 | $ 2.15 | $ 53,750.00 | $ 0.12 | $ 0.18 | $ 4,500.00 |
| Miscellaneous Wire | 33000 | $ 2.00 | $ 88,325.00 | $ 1.75 | $ 57,750.00 | $ - | $ 0.25 | $ 6,875.00 |
| Total | 67500 | $ 2.62 | $ 176,650.00 | $ 2.00 | $ 135,250.00 | | $ 0.20 | $ 13,750.00 |

$ 1,326,850.00          $ 1,147,750.00          $ 113,650.00

## ONTARIO SPECIALTY CONTRACTING
### DELPHI DEMOLITION SCRAP BREAKDOWN
#### 10/29/2008

**Ferrous Metals**

| | Estimated Quantity (GT) | Price at Scrap Yard | Total Scrap Value | Value to Delphi Price / GT | Total value | Preparation Fee | Value to OSC Price / GT | Total value |
|---|---|---|---|---|---|---|---|---|
| Prepared Plate & Structural | 1080 | $ 150.00 | $ 162,000.00 | $ 390.00 | $ 421,200.00 | $ 35.00 | $ (215.00) | $ (232,200.00) |
| Unprepared - Miscellaneous | 1620 | $ 80.00 | $ 129,600.00 | $ 365.00 | $ 591,300.00 | $ - | $ (240.00) | $ (388,800.00) |
| Total | 2700 | $ 108.00 | $ 291,600.00 | $ 375.00 | $ 1,012,500.00 | | $ (230.00) | $ (621,000.00) |

**Non - Ferrous Metals**

| | Estimated Quantity (lbs) | Price at Scrap Yard | Total Scrap Value | Value to Delphi Price / lbs | Total value | Preparation Fee | Value to OSC Price / lbs | Total value |
|---|---|---|---|---|---|---|---|---|
| #1 Copper | 9500 | $ 1.29 | $ 12,255.00 | $ 2.50 | $ 23,750.00 | $ 0.10 | $ (0.96) | $ (9,120.00) |
| #2 Copper | 25000 | $ 1.24 | $ 31,000.00 | $ 2.15 | $ 53,750.00 | $ 0.12 | $ (0.73) | $ (18,260.00) |
| Miscellaneous Wire | 33000 | $ 0.70 | $ 43,255.00 | $ 1.75 | $ 57,750.00 | $ - | $ (0.80) | $ (27,370.00) |
| Total | 67500 | $ 1.28 | $ 86,510.00 | $ 2.00 | $ 135,250.00 | | $ (0.81) | $ (54,740.00) |

$ 378,110.00          $ 1,147,760.00          $ (675,740.00)

**Exhibit "D"**

**Exhibit "D"**

 Ontario Specialty Contracting, Inc.

Environmental Remediation   □   Demolition / Dismantlement

January 12, 2009

Mr. Robert Randazzo
Delphi Powertrain
1000 Lexington Ave.
Rochester, New York

RE: DIE CAST DEMOLITION

Dear Bob,

I would like to continue our discussion with Delphi concerning the state of the current scrap market and our contract with Delphi for the Demolition and Decommissioning of the Aluminum Die Cast Plant.

As we discussed, the Market value of the scrap metal funding the Demolition & Decommissioning of the Aluminum Die Cast Plant has dropped significantly from $1,326,850 to an estimated $451,750 (based on current pricing). This unprecedented drop is an unforeseen condition that could not have been reasonably predicted.

As a direct result of the change of condition, OSC is proposing the following:

- ➢ A revision to the Original Contract value from <$271,033> to $175,000
- ➢ A revision to the completion date from December 15, 2008 to January 30, 2010 (allowing OSC to store scrap metals onsite until market conditions improve) a bi-monthly review will be held between OSC and onsite Delphi Representatives to discuss market outlook
- ➢ A change order to be paid to OSC immediately for additional work completed
    - ▪ Additional Asbestos Abatement - $41,500
    - ▪ Additional Utility Work - $22,000

Based on the above OSC is expecting to lose $200,000 to 300,000 on the project, depending on the market conditions going forward. We have to date spent on a cash to cash basis approximately $600,000. OSC is continuing to complete the project and trying to mitigate expenses. However, this changed condition is too significant in scope and magnitude to overcome.

Please contact me at your earliest convenience to set up a meeting with the appropriate parties to discuss this issue.

Sincerely,

Peter M. Hartung Jr., P.E.
Sr. Project Manager
Ontario Specialty Contracting

ONTARIO SPECIALTY CONTRACTING
DELPHI DEMOLITION SCRAP BREAKDOWN
6/28/2008

| Ferrous Metals | Estimated Quantity (GT) | Price at Scrap Yard | Total Scrap Value | Value to Delphi Price /GT | Total value | Preparation Fee | Value to OSC Price /GT | Total value |
|---|---|---|---|---|---|---|---|---|
| Prepared Plate & Structural | 1080 | $ 450.00 | $ 486,000.00 | $ 390.00 | $ 421,200.00 | $ 35.00 | $ 25.00 | $ 27,000.00 |
| Unprepared - Miscellaneous | 1620 | $ 410.00 | $ 664,200.00 | $ 365.00 | $ 591,300.00 | - | $ 45.00 | $ 72,900.00 |
| Total | 2700 | $ 426.00 | $ 1,150,200.00 | $ 375.00 | $ 1,012,500.00 | | $ 37.00 | $ 99,900.00 |

| Non - Ferrous Metals | Estimated Quantity (lbs) | Price at Scrap Yard | Total Scrap Value | Value to Delphi Price /lbs | Total value | Preparation Fee | Value to OSC Price /lbs | Total value |
|---|---|---|---|---|---|---|---|---|
| #1 Copper | 9500 | $ 2.85 | $ 27,075.00 | $ 2.50 | $ 23,750.00 | $ 0.10 | $ 0.25 | $ 2,375.00 |
| #2 Copper | 25000 | $ 2.45 | $ 61,250.00 | $ 2.15 | $ 53,750.00 | $ 0.12 | $ 0.18 | $ 4,500.00 |
| Miscellaneous Wire | 33000 | $ 2.00 | $ 88,325.00 | $ 1.75 | $ 57,750.00 | - | $ 0.25 | $ 6,875.00 |
| Total | 67500 | $ 2.62 | $ 176,650.00 | $ 2.00 | $ 135,250.00 | | $ 0.20 | $ 13,750.00 |

$ 1,326,860.00          $ 1,147,750.00

ONTARIO SPECIALTY CONTRACTING
DELPHI DEMOLITION SCRAP BREAKDOWN
1/12/2009

| Ferrous Metals | Estimated Quantity (GT) | Price at Scrap Yard | Total Scrap Value | Value to Delphi Price /GT | Total value | Preparation Fee | Value to OSC Price /GT | Total value |
|---|---|---|---|---|---|---|---|---|
| Prepared Plate & Structural | 1080 | $ 130.00 | $ 140,400.00 | $ 390.00 | $ 421,200.00 | $ 35.00 | $ (235.00) | $ (253,800.00) |
| Unprepared - Miscellaneous | 1620 | $ 130.00 | $ 210,600.00 | $ 365.00 | $ 591,300.00 | - | $ (190.00) | $ (307,600.00) |
| Total | 2700 | $ 130.00 | $ 351,000.00 | $ 375.00 | $ 1,012,500.00 | | $ (208.00) | $ (561,600.00) |

| Non - Ferrous Metals | Estimated Quantity (lbs) | Price at Scrap Yard | Total Scrap Value | Value to Delphi Price /lbs | Total value | Preparation Fee | Value to OSC Price /lbs | Total value |
|---|---|---|---|---|---|---|---|---|
| #1 Copper | 9500 | $ 1.75 | $ 16,625.00 | $ 2.50 | $ 23,750.00 | $ 0.10 | $ (0.50) | $ (4,750.00) |
| #2 Copper | 25000 | $ 1.35 | $ 33,750.00 | $ 2.15 | $ 53,750.00 | $ 0.12 | $ (0.62) | $ (15,500.00) |
| Miscellaneous Wire | 33000 | $ 0.80 | $ 50,375.00 | $ 1.75 | $ 57,750.00 | - | $ (0.70) | $ (20,250.00) |
| Total | 67500 | $ 1.49 | $ 100,750.00 | $ 2.00 | $ 135,250.00 | | $ (0.60) | $ (40,500.00) |

$ 461,750.00          $ 1,147,750.00

# Exhibit "E"

# Exhibit "E"

## Peter Hartung

**From:**    Martinez, Hugo Federico [hugo.f.martinez@delphi.com]
**Sent:**    Tuesday, February 03, 2009 4:33 PM
**To:**       phartung@ontariospecialty.com
**Cc:**       Randazzo, Robert J; Goodwin, Mark E; Juarez, Alfredo B.
**Subject:** Delphi Rochester project

Peter:

This note is just to let you know that we are currently working along to our engineering team evaluating Ontario Specialty Contracting request to modify terms on contract 450751581, as per your letter dated January 12, 2009 and addressed to Robert Randazzo.

OSC will get a formal answer as soon as we finalize our internal discussion on this matter. I ask you for your patience and understanding.

Thanks

Hugo F. Martínez G.
*Delphi GSM- Construction*
*US (915) 612-8775*
*Fax (866) 348 8465*
*MX (656) 6297000 x 58775*
*hugo.f.martinez@delphi.com*

5/18/2009

# Exhibit "F"

# Exhibit "F"

## Peter Hartung

**From:** Martinez, Hugo Federico [hugo.f.martinez@delphi.com]
**Sent:** Tuesday, March 17, 2009 6:35 PM
**To:** phartung@ontariospecialty.com
**Subject:** Rochester Die Cast demo project

Pete:

Please accept my apologies for the delay on the Delphi formal reply to your request to change the existing contract to the Rochester Die Cast demolition project.

In order to complete the information that I need to complete before I can send you our company's formal answer, I will appreciate if you provide me with a formal quote for the changes on the original scope of work as communicated by our engineering group:

- Additional asbestos abatement work due to the typo on H&A report for considered area.
- Gas line additional work
- Asbestos abatement monitoring.
- Final and formal proposal for the additional die cast molds not considered on original proposal.
- Air monitoring for asbestos removal.

Thanks for your support

Hugo F. Martínez G.
*Delphi GSM- Construction*
*US (915) 612-8775*
*Fax (866) 348 8465*
*MX (656) 6297000 x 58775*
*hugo.f.martinez@delphi.com*

**Exhibit "G"**

**Exhibit "G"**

 Ontario Specialty Contracting, Inc.

Environmental Remediation □ Demolition / Dismantlement

April 22, 2009

Mr. Hugo Martinez
*Delphi GSM- Construction*

RE: DIE CAST DEMOLITION ROCHESTER, NY – ADDITIONAL INFORMATION

Dear Hugo,

In response to you request for additional information dated 3-19 as shown below:

In order to complete the information that I need to complete before I can send you our company's formal answer, I will appreciate if you provide me with a formal quote for the changes on the original scope of work as communicated by our engineering group:

1. Additional asbestos abatement work due to the typo on H&A report for considered area.
2. Gas line additional work
3. Asbestos abatement monitoring.
4. Final and formal proposal for the additional die cast molds not considered on original proposal.
5. Air monitoring for asbestos removal.

I have provided the following documents:

1. Documentation showing the original surveyed quantities and the actual quantities found in the field. The original stated quantity of roofing to be removed was 1600 sf; the actual quantity was 15,600 sf leaving a difference of 14,000 sf. OSC had agreed with Bob Randazzo to perform this work for $3.00 per sf and therefore OSC is asking for $42,000.
2. A drawing showing the location of the contract gas line scope of work and the location of the requested additional gas line to provide gas to the pump house, as well as the quote from our subcontractor for performing the work. The entire gas line portion was $14,630 for a total of 420 LF of pipe. This equates to $34.83 per LF therefore the value of the additional 320 lf is $11,146. (Direct cost) add 15% for Overhead for a total to Delphi of $12,817.
3. I have not received the Invoice from the Asbestos Abatement Monitoring from Delphi, as per the contract this was a cost to be paid by OSC; it was my understanding that it was approximately $5000.
4. OSC agreed by email to pay $280 per GT for the die cast molds based on a $350 scrap market, these molds transferred to OSC after the market price began to fall and we sold them at $145 /GT, therefore we can credit the project $145/ GT minus a $15 handling fee. The stated weight was 100 GT therefore the credit should be $13,000.

I have also attached out January 12th request for you reference.

Thank you for you time and consideration to this issue.

Sincerely,

Peter M. Hartung Jr., P.E.
Sr. Project Manager
Ontario Specialty Contracting

# Exhibit "H"

# Exhibit "H"

## Peter Hartung

**From:** Martinez, Hugo Federico [hugo.f.martinez@delphi.com]

**Sent:** Thursday, May 07, 2009 5:18 PM

**To:** Peter Hartung

**Subject:** RE: Die Cast Demoltion

Peter, I have received your information. I will be sending back our response shortly.

Thanks

*Hugo M.*

---

**From:** Peter Hartung [mailto:phartung@ontariospecialty.com]
**Sent:** Wednesday, May 06, 2009 9:32 AM
**To:** Martinez, Hugo Federico
**Subject:** Die Cast Demoltion

Hugo,
Please confirm your receipt of the additional information requested by Delphi regarding the Changes to the Contract for the Die cast Demolition Project. OSC will complete the project at the end of May and we would like to have a resolution and path forward for the close out.

Thank you

**Peter Hartung, P.E.**
*Sr. Project Manager*

 OSC-PN

Ontario Specialty Contracting, Inc.
333 Ganson Street, Buffalo, New York 14203
O-716-856-3333 ext. 320 F-716-842-1630 C-716-570-9077
www.ontariospecialty.com

```
***********************************************************************************
Note:   If the reader of this message is not the intended recipient, or an employee c
***********************************************************************************
***********************************************************************************
Note:   If the reader of this message is not the intended recipient, or an employee c
***********************************************************************************
```

5/18/2009

# Exhibit "I"

# Exhibit "I"

## Peter Hartung

| | |
|---|---|
| **From:** | Martinez, Hugo Federico [hugo.f.martinez@delphi.com] |
| **Sent:** | Monday, May 11, 2009 11:55 AM |
| **To:** | Peter Hartung |
| **Cc:** | Randazzo, Robert J |
| **Subject:** | Delphi Die Cast Demolition |

**Attachments:** Delphi response to OSC Jan 2008 Letter.doc

Peter,

Please find attached the Delphi response letter in regards to Ontario Specialty Contracting proposal dated January 12, 2009 for the Delphi Rochester Die Cast demolition project reference Delphi purchase order 450751581.

Please contact me if you have any comments in this regard.

Hugo F. Martínez G.
*Delphi GSM- Construction*
*US (915) 612-8775*
*Fax (866) 348 8465*
*MX (656) 6297000 x 58775*
*hugo.f.martinez@delphi.com*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Note: If the reader of this message is not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribu or copying of this communication is strictly prohibited. If you have received this communication in error please notify us immediately by replying to the message and deleting it from your computer. Thank you.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

5/18/2009



Powertrain Systems
Gas Engine Management Systems

May 11, 2009

Peter M. Hartung Jr., P.E.
Sr. Project Manager
Ontario Specialty Contracting

RE: DIE CAST DEMOLITION

Dear Peter,

We have reviewed your letter/proposal dated January 12, 2009.

While Delphi certainly acknowledges that the scrap market has experienced a drastic and rapid decline we, like Ontario Specialty Contracting, cannot predict future values or when a market recovery may occur. As a result, we are willing to assist OSC with the following:

1. We agree to revise the completion date from December 15, 2008 to November 30, 2009 to allow time for scrap market conditions (scrap values) to improve. No extensions beyond this date will be granted. Recyclable scrap material left after this date will be owned by Delphi. We will allow OSC to store prepared scrap metals onsite provided the following conditions are met:

   a. Prepared scrap metals will be maintained in a neat, orderly fashion either within the project site footprint or, in the empty north parking lot currently used by OSC for project staging. Delphi will not be responsible for materials stored in the parking lot.

   b. Bi-monthly meetings between OSC, on-site Delphi and, Delphi Purchasing Representatives will be held to review market outlook, scrap values and, scrap quantities from the demolition. Actual weights of scrap material removed from the job site will be compared to quantities used by OSC for development of their Delphi accepted project bid. Obviously a greater quantity of metal to be reclaimed would reduce the financial impact of reduced market values on the project. Both parties will agree on a standard index to be used to determine current scrap values.

   c. No third party (i.e; City of Rochester, DEC, etc) requires, orders or otherwise requests action that the site be cleared/cleaned to expedite project completion prior to November 30, 2010.

2. Because Delphi itself is experiencing great financial difficulty, as a result of being in Chapter 11 since 2005 and due to current economic conditions, it is impossible for Delphi to commit any payments to Ontario Special Contracting.

3. Changes to payments due to Delphi for additional work will be deducted from payments owed to Delphi as outlined below:

| | | |
|---|---:|---|
| | $271,033.00 | Total payments due to Delphi per original contract |
| - | $ 67,758.25 | 1 of 4 payments received |
| - | $ 42,000.00 | Additional Asbestos Abatement |
| - | $ 7,315.00 | Additional Utilities Work |
| + | $ 5,197.50 | Third Party Air Monitoring for Asbestos Abatement |
| + | $ 28,000.00 | 100 GT @$280 per GT Scrap Die Cast Molds |
| | $ 187,657.25 | **Balance Due to Delphi** |

4. Milestone dates for two equal payments to Delphi for the balance due will be established. One payment will be on June 30, 2009 and the second on November 30, 2009. Scrap market values, materials sold and, project financials up to each date will be reviewed.

Sincerely,

Hugo Martinez

# Exhibit "J"

# Exhibit "J"

COMMERCIAL DIVISION OF THE SUPREME COURT
ERIE COUNTY, STATE OF NEW YORK

*Answer Due 9/23*

_____

DELPHI AUTOMOTIVE SYSTEMS LLC
5825 DELPHI DRIVE
TROY, MICHIGAN 48098,

                    PLAINTIFF,

-vs-                                                **SUMMONS**

                                                    INDEX NO.: *I 2009 010438*

ONTARIO SPECIALTY CONTRACTING, INC.
*333* ~~222~~ GANSON STREET
BUFFALO, NEW YORK 14203-3062,

                    DEFENDANT.

_____

**TO THE ABOVE-NAMED DEFENDANT:**

        **YOU ARE HEREBY SUMMONED AND REQUIRED** to serve upon Goldberg Segalla
LLP, attorneys for plaintiff, Delphi Automotive Systems LLC, an answer to the complaint in this
action within TWENTY (20) days after the service of this summons, exclusive of the day of service,
or within THIRTY (30) days after service is complete if this summons is not personally delivered to
you within the State of New York. In case of your failure to answer, judgment will be taken against
you by default for the relief demanded in the complaint.

        The basis of the venue designated is the defendant's residence, which has a principal office
located in the County of Erie, State of New York.

DATED:        Buffalo, New York
              August 28, 2009

                              GOLDBERG SEGALLA LLP

                              By: _____
                                  Richard A. Braden
                                  Jeffrey A. Carlino
                                  *Attorneys for Plaintiff*
                                  665 Main Street, Suite 400
                                  Buffalo, New York 14202
                                  Tel. No. (716) 566-5400

520288.1

COMMERCIAL DIVISION OF THE SUPREME COURT
ERIE COUNTY, STATE OF NEW YORK

_____

DELPHI AUTOMOTIVE SYSTEMS, LLC,

PLAINTIFF,

-vs-

ONTARIO SPECIALTY CONTRACTING, INC.,

DEFENDANT.

_____

**COMPLAINT**

INDEX NO.:  $\mathcal{I}\ 2009010438$

Plaintiff, Delphi Automotive Systems, LLC ("Delphi") by its attorneys, Goldberg Segalla

LLP, for its complaint against defendant in this action alleges as follows:

1.    Delphi is a limited liability company organized and existing under the laws of the

State of Delaware.  Delphi is authorized to do business in the State of New York and has offices,

and a place of business, located in Lockport, New York.

2.    Upon information and belief, defendant, Ontario Specialty Contracting, Inc. is a

domestic business corporation organized and existing under the laws of the State of New York,

with offices, and a principal place of business, located in the County of Erie, State of New York.

3.    On or about July 24, 2008, representatives for Delphi and defendant entered into a

written agreement under which defendant agreed to perform demolition services with respect to

Delphi's Die Casting Building, located at 891 Driving Park Avenue and 1000 Lexington Avenue

in the City of Rochester, State of New York, for the total amount of $1.00 (the "Demolition

Project"), with a further promise that defendant would pay Delphi a total amount of $271,033.00

for the unconditional right to sell all scrap metal recovered during the Demolition Project, as set

forth in Purchase Order No. 450751581.  A copy of Purchase Order No. 450751581 is attached

at **Exhibit A** (hereinafter referred to as the "Demolition Project Agreement"). [1]

4.    Pursuant to the Demolition Project Agreement, defendant was required to complete the Demolition Project by December 15, 2008.

5.    By letter dated January 12, 2009, defendant notified Delphi that it wanted to adjust the material terms of the Demolition Project Agreement, purportedly due to the then-existing state of the "scrap market," by reducing the total amount of defendant's payment obligation from $271,033.00 to $0.00, with a concomitant request for a $175,000.00 payment in defendant's favor.    Defendant also sought permission for an extension of the Demolition Project's completion date from December 15, 2008 to January 30, 2010.

6.    Defendant's January 12, 2009 letter further requested a change order for entitlement to a $41,500.00 payment/credit from Delphi for "additional asbestos abatement" work and an additional $22,000.00 payment/credit for "additional utility work." A copy of defendant's January 12, 2009 letter to Delphi is attached at **Exhibit B**.

7.    Delphi ultimately responded to defendant's January 12, 2009 request for modifications to the Demolition Project Agreement by letter dated May 11, 2009, under which Delphi conditionally agreed to extend the completion date to November 30, 2009 and to revise payments due with a total amount owing to Delphi of $187,657.25. A copy of Delphi's May 11, 2009 letter is attached at **Exhibit C**.

8.    By letter dated May 27, 2009, defendant rejected Delphi's conditional offer to modify the terms of the Demolition Project Agreement.    A copy of defendant's May 27, 2009 rejection letter is attached at **Exhibit D**.

---

[1]  The Demolition Project Agreement also includes Delphi's "General Terms and Conditions" for outside contracts and its "Customer Specific Requirements" which may be accessed at www.delphi.com (specifically: https://delphi.portal.covisint.com/web/portal/fud/-/journal_content/56_INSTANCE_WREV/107627/114795).

2

9.    As a result, the terms and conditions of the Demolition Project Agreement remain in full force and effect.

10.    To date, defendant has failed and refused to pay Delphi all amounts due and owing under the Demolition Project Agreement and has failed to timely complete its demolition services by December 2008.

11.    In addition, and upon information and belief, defendant has failed to pay one or more of its sub-contractors for their work on the Demolition Project, and at least one of those subcontractors has filed a mechanic's lien against Delphi's real property, located at 891 Driving Park Avenue and 1000 Lexington Avenue in the City of Rochester, State of New York (hereinafter the "Demolition Project Property"), in the amount of $86,000.00, in violation of defendant's obligations under the Demolition Project Agreement.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Breach of Contract)

12.    Delphi repeats and realleges each and every allegation set forth in paragraphs 1 through 11 of this complaint as if fully set forth herein.

13.    As set forth above, defendant owes contractual obligations to Delphi pursuant to the Demolition Project Agreement.

14.    Defendant has materially breached its obligations under the Demolition Project Agreement by, *inter alia,* failing to pay Delphi three out of the four $67,758.25 installments due and owing, failing to timely complete all demolition obligations, and by permitting one or more sub-contractors to file mechanic's liens against Delphi's real property.

15.    Delphi has fully performed under the Demolition Project Agreement, and all conditions precedent (to the extent any exist) have been satisfied.

16.    As a direct and proximate result of defendant's material breaches of obligations

3

owing under the Demolition Project Agreement, Delphi has suffered damages in the amount of not less than \$194,274.75, plus other damages, including the costs and fees incurred in removing or discharging mechanic's liens filed against the Demolition Project Property, in an amount to be proved at trial.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Unjust Enrichment)

17.     Delphi repeats and realleges each and every allegation contained in paragraphs 1 through 16 of this complaint as if fully set forth herein.

18.     During the Demolition Project, defendant recovered large quantities of scrap metal (including copper tubing and wire).

19.     Upon information and belief, defendant sold the scrap metal that it recovered during the Demolition Project for large sums of money.

20.     Pursuant to the Demolition Project Agreement, defendant's payment obligations are not indexed to scrap market prices, conditions, or fluctuations and, once the Demolition Project Agreement's terms were established, up or down variations in scrap metal market values were solely at defendant's advantage or risk.

21.     Upon information and belief, defendant received large sums of money based upon its sale of scrap metal removed from the Demolition Project.

22.     Defendant, having received large sums of money for scrap metal that it recovered during the Demolition Project, has refused and neglected, and continues to refuse and neglect, to pay monies due and owing to Delphi and, upon information and belief, has refused and neglected to pay subcontractors resulting in the filing of one or more mechanic's liens against the Demolition Project Property.

23.     Defendant has been unjustly enriched at Delphi's expense.

4

24.    As a direct and proximate result of defendant's misconduct, Delphi has suffered the damages complained of herein.

WHEREFORE, Delphi demands that this Court grant judgment in its favor and against defendant in an amount no less than $194,274.75, plus interest at the statutory rate, attorneys' fees, costs, and disbursements associated with, among other things, the removal or discharge of all liens asserted against the Demolition Project, and such other and further relief as provided by law and rule and as the court deems just and proper.

Dated: Buffalo, New York
August 28, 2009

GOLDBERG SEGALLA LLP

Richard A. Braden
Jeffrey A. Carlino
*Attorneys for Plaintiff*
665 Main Street, Suite 400
Buffalo, New York 14203
Telephone: (716) 566-5400

520303.1

5

# EXHIBIT A

# DELPHI

Energy & Chassis Systems

Page  1  of  6

**Buyer:**

DELPHI AUTOMOTIVE SYSTEMS LLC
DELPHI ENERGY & CHASSIS DIV
3000 University Drive
Auburn Hills MI 48326

**Deliver to:**

DELPHI ENERGY & CHASSIS SYSTEMS
ROCHESTER OPER-IN1C
DOCK 87/88/89 -7AM-3PM
1000 LEXINGTON AVE
ROCHESTER NY 14606

ONTARIO SPECIALTY CONTRACTING
333 GANSON ST
BUFFALO NY 14203-3062

**Purchase Order**

| PO Number | Date Issued |
|---|---|
| 45075158L | 24-Jul-2008 |
| Version | |
| 24-Jul-2008 12:22:27 | |

Delivery date:  01-DEC-2008

| Vendor No: 1033101 | |
|---|---|
| DUNS No:  178523494 | |
| **Payment Terms:** ZMN3 | **Currency:**  USD |
| Payment settled on 2nd day of 3rd Month | |
| **Incoterms:**  FOB- Freight Collect | |

| Item No. | Material No/Item Identifier No   Description | Total Order Quantity | Plant Requester | | | | |
|---|---|---|---|---|---|---|---|
| 00010 | PR13390208 00010 | 1.000 | E401 DELPHI   E & C   ROCHESTER | | | | |
| | DECOMMISSIONING & DEMOLITION OF DIE CASTING BUILDING PER DELPHI SPECIFICATION PE-1386 AND INQUIRY 2008-HM66.  GENERAL TERMS & CONDITIONS FOR OUTSIDE CONTRACTS SHALL APPLY. SUPPLIER TO PAY DELPHI $271.033 | | R.RANDAZZO | | | | |

| Delivery Date | Scheduled Quantity | Price | Price Unit | UOM | Value |
|---|---|---|---|---|---|
| 01-DEC-2008 | 1.000 | 1.00 | 1 | EA | 1.00 |
| Net Line Item Value | | | | USD | 1.00 |

| **Total net value** | USD | 1.00 |
|---|---|---|

Purchasing Contact: Martinez, Hugo
Phone: 915 612-8775
Fax:  915 612-1146

Buyer Email: hugo.f.martinez@delphi.com

Contact Address:

Buyer, Delphi Corporation
Hermanos Escobar 5756,
32310 Juarez

Date and Time Printed.  24-Jul-2008 12:22:27

# DELPHI

ONTARIO SPECIALTY CONTRACTING
333 GANSON ST
BUFFALO NY 14203-3062

## Purchase Order

PO Number
450751581
Version
24-Jul-2008 12:22:27

Date Issued
24-Jul-2008

| Item No. | Material No/Item Identifier No | Total Order Quantity | Plant |
|----------|-------------------------------|---------------------|-------|
| | Description | | Requester |

Notes:

Purchase order is issued as per Ontario specialty response to RFQ No 2008-HM-66 - Rochester Die Casting Building Demolition and subsequent responses to target price letters.

Ontario Specialty Contracting will pay Delphi the amount of $271,033.00 usd under the following schedule

25% ($67,758.25) at issuance of work permits  start of physical work

25% ($67,758.25) at start of structural Demolition

25% ($67,758.25) at completion of Demolition

25% ($67,758 25) at sign off of the work


************************************************************
IMPORTANT NOTICE TO SUPPLIERS:
PLEASE COMPLY STRICTLY WITH DELPHI'S ENVIRONMENTAL REQUIREMENTS AS STATED IN THE ENVIRONMENTAL REQUIREMENTS FOR CONTRACTORS / SUPPLIERS / VENDORS. A COPY OF THE ENVIRONMENTAL REQUIREMENTS IS AVAILABLE UPON WRITTEN REQUEST TO THE BUYER.
************************************************************

Delphi requires 100% on time delivery performance from suppliers. If you anticipate problems in delivering materials and/or completing services by the date specified on the Buyer's purchase order, the Delphi Buyer should be notified immediately.
************************************************************

Restricted, toxic, and hazardous materials - Suppliers are required to comply with current governmental and safety constraints on restricted, toxic and hazardous materials; as well as environmental, electrical and electromagnetic considerations applicable to the country of manufacture and sale. This relates to both the salable product and the manufacturing processes. (Refer also to Terms and Conditions No. 8 "Ingredients Disclosure and Special Warnings Instructions").
Commencement of any work or service under this order shall constitute seller's acceptance of these responsibilities. If you do not accept these responsibilities, please contact the appropriate Delphi's Buyer.


************************************************************
Seller acknowledges and agrees that Buyer's General Terms and Conditions and Delphi Customer Specific Requirements are incorporated in, and a part of, this contract and each purchase order, release, requisition, work order, shipping instruction, specification and other document issued by Buyer or accepted in writing by Buyer, whether expressed in written form or by electronic data interchange, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as this "Contract"). A copy of Buyer's General Terms and Conditions and Delphi Customer Specific Requirements are available upon written request to Buyer or via the internet at Delphi's website, delphi.com. Seller acknowledges and agrees that it has read and understands Buyer's General Terms and Conditions and Delphi Customer Specific Requirements . If Seller accepts this Contract in writing or commences any of the work or services which are the subject of this Contract, Seller will be deemed to have accepted this Contract and Buyer's General Terms and Conditions and Delphi Customer Specific Requirements  in their entirety without modification. Any additions to, changes in, modifications of, or revisions of this Contract (including Buyer's General Terms and Conditions and Delphi Customer Specific Requirements ) which Seller proposes will be deemed to be rejected by Buyer except to the extent that Buyer expressly agrees to accept any such proposals in writing.
************************************************************

# DELPHI

Energy & Chassis Systems

Page  3  of  6

ONTARIO SPECIALTY CONTRACTING
333 GANSON ST
BUFFALO NY 14203-3062

## Purchase Order

PO Number
450751581
Version
24-Jul-2008  12:22:27

Date Issued
24-Jul-2008

| Item No. | Material No/Item Identifier No | Total Order Quantity | Plant |
| --- | --- | --- | --- |
| | Description | | Requester |

Notes Continued:

All wood packaging must be compliant with the International Standard Phytosanitary Measure #15 in the treatment of wood packaging material. Please reference the "Requirements for the treatment of wood packaging materials" section of the Supplier Community Portal found on www.delphi.com for further details.
••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••
••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

••••••••••••••••••••

Title to goods shall transfer from seller to buyer upon arrival at buyer's consuming plant.
••••••••••••••••••••

••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••
••••••••••••••••••••••••••••••••••••••••••••••••••

If this is your first purchase order with Delphi under this DUNS number or your remittance information has changed, you need to establish a payment link with the following:

Delphi Corporation EAG Disbursements Center
Vendor Name and Address Group
PO Box 972930
El Paso, Texas 79997-2930
Fax 915-612-7152
Attention: Vendor Master Group

Delphi Accounts Payable Help Desk Phone Number is (888)856 6779 or E-mail at juarez.delphia.helpdesktienuusacctspay@delphi.com.

You will need to provide a copy of invoice or letterhead showing, company name, correct remittance and correspondence addresses, contract number and "ship from" DUNS number.

You should have received an EFT Agreement from your buyer. But you can obtain a copy of the EFT Agreement forms at Website at www.delphi.com <http://www.delphi.com> Double Click on "Supplier Portal" in the bottom right of the screen, then click "HERE" under How to Become a Supplier. Then click on "Doing Business with Delphi" under Frequently Used Documents. Click on "Delphi Customer Specific Requirements". Scroll to the Payment Section. Then can Click on "EFT Payment Authorization Form" to download.

You can now view payment status on-line using e*DELPHIPAY. For new users, the registration instructions are at http://delphi.covisint.com under the Registration tab  Please contact the Delphi Help Desk at 877-7DELPHI for any technical questions

This order will pay on receipt. Please do not send an invoice unless specifically requested on the order. This is an invoice less system, which generates payment, based on receipt.

If this P O  is in error, please advise the buyer listed below before shipping.

Payment issues and questions regarding shipped material should be directed to the Delphi Accounts Payable Help Desk at (877)349 3417.

# DELPHI

Energy & Chassis Systems

Page  4  of  6

ONTARIO SPECIALTY CONTRACTING
333 GANSON ST
BUFFALO NY 14203-3062

## Purchase Order

| PO Number | Date Issued |
|---|---|
| 450751581 | 24-Jul-2008 |
| Version | |
| 24-Jul-2008 12:22:27 | |

| Item No. | Material No/Item Identifier No | Total Order Quantity | Plant |
|---|---|---|---|
| | Description | | Requester |

---

Notes Continued:

••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

Do not bill sales or use tax on items delivered to locations within the states listed below. Delphi Automotive Systems, LLC (" DELPHI ") holds direct pay authority with these states. As a result, in all of the identified states DELPHI will remit directly to taxing authorities, all sales or use tax liability related to its purchase and use of tangible personal property and services. Therefore, effective immediately, this tax clause supersedes all tax code information found on this order except for those states not identified below. For those states not identified below, please continue to follow the specific tax code instructions found on this order. Listed below are Direct Pay Permit or Sales Tax License numbers for the eleven (11) states, or DELPHI locations within a state, where DELPHI holds direct pay authority:

Alabama -------------------805
New Jersey -----------------383-431-131/000
Georgia -------------------300-45870-8
New York ------------------DP-3487
Indiana -------------------1018702130011
Ohio ----------------------98-0002667
Kansas --------------------98-0003a
Texas ---------------------1-38-3431131-1
Michigan ------------------38-3431131
Wisconsin -----------------WDP-99-01-010037
Mississippi ----------------4375

If this order relates to a construction contract for real property, all applicable sales and use taxes are the responsibility of the contractor, and should be included in the contractor's bid as required pursuant to Section 7 of the DELPHI 1638 (8/00 Rev A), "Construction General Conditions", unless the responsibility for payment of sales & use taxes are otherwise specifically outlined in the contract

Questions should be directed to: Delphi Disbursement - Customer Service Phone: (248) 874-4636

••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

••••••••••••••••••••••••••••••••••••••••••••••••••••••

A PROPERLY COMPLETED CERTIFICATE OF ORIGIN,
NAFTA CERTIFICATE WHERE APPLICABLE (CUSTOMS FORM 434)
AND A MANUFACTURERS AFFIDAVIT STATING THE COUNTRY OF
ORIGIN BE INCLUDED WITH THE SHIPPING DOCUMENTS FOR
THE MATERIAL ON THIS PURCHASE ORDER.        (NT)
••••••••••••••••••••••••••••••••••••••••••••••••••••••••



_____ Energy & Chassis Systems

Page  5  of  6

ONTARIO SPECIALTY CONTRACTING
333 GANSON ST
BUFFALO NY 14203-3062

## Purchase Order

| PO Number | Date Issued |
|---|---|
| 450751581 | 24-Jul-2008 |
| Version | |
| 24-Jul-2008  12:22:27 | |

| Item No. | Material No/Item Identifier No | Total Order Quantity | Plant |
|---|---|---|---|
| | Description | | Requester |

---

Notes Continued:

••••••••••••••••••••••••••••••••••••••••••••••••••
CERTIFICATE OF INSURANCE GENERAL

CONTRACTOR SHALL OBTAIN AND MAINTAIN CONSISTENT WITH THE PROVISIONS OF THIS CONTRACT, AT ITS SOLE EXPENSE, THE FOLLOWING TYPES OF INSURANCE COVERAGE, TO REMAIN IN FORCE DURING THE TERM OF THIS CONTRACT, WITH MINIMUM LIMITS AS SET FORTH BELOW:
1.
COMMERCIAL GENERAL LIABILITY COVERING LIABILITY ARISING FROM PREMISES, OPERATIONS, INDEPENDENT CONTRACTORS, PRODUCTS - COMPLETED OPERATIONS, PERSONAL AND ADVERTISING INJURY, AND BLANKET CONTRACTUAL LIABILITY - US $5,000,000 EACH OCCURRENCE.
2.
BUSINESS AUTOMOBILE LIABILITY COVERING ALL OWNED, HIRED AND NON-OWNED VEHICLES - US $5,000,000 EACH OCCURRENCE, INCLUDING ALL APPLICABLE STATUATORY COVERAGES.
3.
WORKERS COMPENSATION - STATUTORY LIMITS FOR ALL STATES OF OPERATION
4.
EMPLOYERS LIABILITY - US $1,000,000 EACH EMPLOYEE FOR BODILY INJURY BY ACCIDENT AND US $1,000,000 EACH EMPLOYEE FOR BODILY INJURY BY DISEASE.
5.
PROFESSIONAL/ERRORS AND OMISSIONS LIABILITY INSURANCE APPROPRIATE TO THE CONTRACTOR'S PROFESSION. COVERAGE SHOULD ALSO BE FOR A PROFESSIONAL ERROR, ACT OR OMISSION ARISING OUT OF THE SCOPE OF SERVICES SHOWN IN THIS CONTRACT - US $1,000,000 PER OCCURRENCE (ONLY IF PERFORMING CONSULTING ALONG WITH ACTUAL SITE WORK. IF NO CONSULTING, THIS PROVISION CAN BE DELETED)
ALL POLICIES OF INSURANCE PROCURED BY CONTRACTOR HEREIN SHALL BE WRITTEN AS PRIMARY POLICIES; NOT CONTRIBUTING WITH OR IN EXCESS OF COVERAGE THAT DELPHI MAY CARRY. IF CONTRACTOR'S LIABILITY POLICIES DO NOT CONTAIN THE STANDARD SEPARATION OF INSURED'S PROVISION, OR A SUBSTANTIALLY SIMILAR CLAUSE, THEY SHALL BE ENDORSED TO PROVIDE CROSS-LIABILITY COVERAGE CONTRACTOR SHALL AGREE TO WAIVE THEIR INSURER'S RIGHT SUBROGATION UNDER ITS POLICIES. DELPHI SHALL BE AN ADDITIONAL INSURED UNDER CONTRACTOR'S INSURANCE POLICY (EXCEPT WORKER'S COMPENSATION AND EMPLOYER'S LIABILITY), AND AT DELPHI'S REQUEST, CONTRACTOR SHALL PROVIDE DELPHI WITH A CERTIFICATE OF INSURANCE EVIDENCING COMPLIANCE WITH THE LIMITS, INSURANCE REQUIREMENTS AND WAIVER OF SUBROGATION SET FORTH ABOVE. SUCH CERTIFICATE SHALL BE IN A FORM ACCEPTABLE TO, AND UNDERWRITTEN BY AN INSURANCE COMPANY REASONABLY SATISFACTORY TO DELPHI AND WITH AN A.M.BEST COMPANY RATING OF A- OR ABOVE. BY REQUIRING INSURANCE HEREIN, DELPHI DOES NOT REPRESENT THAT COVERAGE AND LIMITS WILL NECESSARILY BE ADEQUATE TO PROTECT CONTRACTOR. THE PURCHASE OF APPROPRIATE INSURANCE COVERAGE BY CONTRACTOR OR THE FURNISHING OF A CERTIFICATE OF INSURANCE SHALL NOT RELEASE CONTRACTOR FROM ITS RESPECTIVE OBLIGATIONS OR LIABILITIES UNDER THE AGREEMENT.


MAIL ABOVE TO THE BUYER OF RECORD NOTED AT THE BOTTOM OF
OF THE PURCHASING DOCUMENT.
(FAX, PHONE AND ADDRESS BE PROVIDED)

# DELPHI

Energy & Chassis Systems

Page 6 of 6

---

ONTARIO SPECIALTY CONTRACTING
333 GANSON ST
BUFFALO NY 14203-3062

### Purchase Order

| PO Number | Date Issued |
|---|---|
| 450751581 | 24-Jul-2008 |
| Version | |
| 24-Jul-2008 12:22:27 | |

---

| Item No. | Material No/Item Identifier No | Total Order Quantity | Plant |
|---|---|---|---|
| | Description | | Requester |

---

Notes Continued:

CONTRACTORS ARE ADVISED THAT THEIR EMPLOYEES MAY HAVE
THE POTENTIAL OF EXPOSURE TO WORKPLACE CHEMICALS
CONCERNS REGARDING THIS MATTER CAN BE DIRECTED TO
DELPHI CORP ENGINEERING DEPT. CONTACT YOUR BUYER OF RECORD
FOR A LOCAL CONTACT NUMBER.

•••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

•••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

Work described herein shall be performed in accordance with Delphi Corporation Construction General Conditions Delphi 1638 (including Insurance Coverages and Certification Requirements), provided with the initial request for quotation. Contractor Specifications and the safety rules and precautions are established by the Contracting Delphi Site's Safety Department.

•••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

# EXHIBIT B

 **Ontario Specialty Contracting, Inc.**

Environmental Remediation / Demolition / Dismantlement

January 12, 2009

Mr. Robert Randazzo
Delphi Powertrain
1000 Lexington Ave.
Rochester, New York

RE: DIE CAST DEMOLITION

Dear Bob,

I would like to continue our discussion with Delphi concerning the state of the current scrap market and our contract with Delphi for the Demolition and Decommissioning of the Aluminum Die Cast Plant.

As we discussed, the Market value of the scrap metal funding the Demolition & Decommissioning of the Aluminum Die Cast Plant has dropped significantly from $1,326,850 to an estimated $451,750 (based on current pricing). This unprecedented drop is an unforeseen condition that could not have been reasonably predicted.

As a direct result of the change of condition, OSC is proposing the following:

- ➢ A revision to the Original Contract value from <$271,033> to $175,000
- ➢ A revision to the completion date from December 15, 2008 to January 30, 2010 (allowing OSC to store scrap metals onsite until market conditions improve) a bi-monthly review will be held between OSC and onsite Delphi Representatives to discuss market outlook
- ➢ A change order to be paid to OSC immediately for additional work completed
    - Additional Asbestos Abatement - $41,500
    - Additional Utility Work - $22,000

Based on the above OSC is expecting to lose $200,000 to 300,000 on the project, depending on the market conditions going forward. We have to date spent on a cash to cash basis approximately $600,000. OSC is continuing to complete the project and trying to mitigate expenses. However, this changed condition is too significant in scope and magnitude to overcome.

Please contact me at your earliest convenience to set up a meeting with the appropriate parties to discuss this issue.

Sincerely,


Peter M. Hartung Jr., P.E.
Sr. Project Manager
Ontario Specialty Contracting

---

333 Ganson Street      Buffalo, New York 14203      Phone: (716) 856-3333  :1  FAX: (716) 842-1630

# EXHIBIT C

**DELPHI**

Powertrain Systems
Gas Engine Management Systems

May 11, 2009

Peter M. Hartung Jr., P.E.
Sr. Project Manager
Ontario Specialty Contracting

RE: DIE CAST DEMOLITION

Dear Peter,

We have reviewed your letter/proposal dated January 12, 2009.

While Delphi certainly acknowledges that the scrap market has experienced a drastic and rapid decline we, like Ontario Specialty Contracting, cannot predict future values or when a market recovery may occur. As a result, we are willing to assist OSC with the following:

1. We agree to revise the completion date from December 15, 2008 to November 30, 2009 to allow time for scrap market conditions (scrap values) to improve. No extensions beyond this date will be granted. Recyclable scrap material left after this date will be owned by Delphi. We will allow OSC to store prepared scrap metals onsite provided the following conditions are met:

   a. Prepared scrap metals will be maintained in a neat, orderly fashion either within the project site footprint or, in the empty north parking lot currently used by OSC for project staging. Delphi will not be responsible for materials stored in the parking lot.

   b. Bi-monthly meetings between OSC, on-site Delphi and, Delphi Purchasing Representatives will be held to review market outlook, scrap values and, scrap quantities from the demolition. Actual weights of scrap material removed from the job site will be compared to quantities used by OSC for development of their Delphi accepted project bid. Obviously a greater quantity of metal to be reclaimed would reduce the financial impact of reduced market values on the project. Both parties will agree on a standard index to be used to determine current scrap values.

   c. No third party (i.e; City of Rochester, DEC, etc) requires, orders or otherwise requests action that the site be cleared/cleaned to expedite project completion prior to November 30, 2010.

2. Because Delphi itself is experiencing great financial difficulty, as a result of being in Chapter 11 since 2005 and due to current economic conditions, it is impossible for Delphi to commit any payments to Ontario Special Contracting.

3. Changes to payments due to Delphi for additional work will be deducted from payments owed to Delphi as outlined below:

|   | | |
|---|---|---|
| | $271,033.00 | Total payments due to Delphi per original contract |
| - | $ 67,758.25 | 1 of 4 payments received |
| - | $ 42,000.00 | Additional Asbestos Abatement |
| - | $ 7,315.00 | Additional Utilities Work |
| + | $ 5,197.50 | Third Party Air Monitoring for Asbestos Abatement |
| + | $ 28,000 .00 | 100 GT @$280 per GT Scrap Die Cast Molds |
| | $ 187,657.25 | **Balance Due to Delphi** |

4. Milestone dates for two equal payments to Delphi for the balance due will be established. One payment will be on June 30, 2009 and the second on November 30, 2009. Scrap market values, materials sold and. project financials up to each date will be reviewed.

Sincerely,

Hugo Martinez

# EXHIBIT D

 Ontario Specialty Contracting, Inc.

Environmental Remediation  |  Demolition / Dismantlement

May 27, 2009

Hugo Martinez
Delphi GSM – Construction

Re:   Equitable Adjustment to Rochester Die Casting Building Demolition Contract

Dear Hugo:

I write in response to your letter of May 11, 2009.  Delphi's offer is unacceptable.  Please recall that Delphi expressly negotiated this contract on the premise that the scrap metals would fund approximately $1.2M of the project costs and sought a credit for such materials.  As the market increased, Delphi continuously demanded a larger scrap credit.

As your letter acknowledges, that scrap credit and source of project funding did not hold true, through no fault of Ontario Specialty Contracting ("OSC"), and turned this project completely upside down.  OSC proceeded in good faith and in reliance on representations from Delphi that an adjustment would be forthcoming.  Now that the project work is substantially complete, Delphi has refused adjustment and payment to OSC because "Delphi itself is experiencing great financial difficulty. . ."  That response is not palatable.

It is unconscionable to expect OSC to absorb a $728,165 loss in project funding on account of the parties' mutually mistaken belief that the scrap metal market would not collapse, and therefore would serve as a substantial funding source for the demolition work.  When the collapse occurred, the issue was immediately brought to Delphi's attention.  OSC continued to perform in reliance on Delphi's conduct and representations, and both parties were hopeful that the market would recover.  It did not.

We propose (without prejudice) that the parties equally absorb the loss of project funding in an effort to resolve this dispute.  Under that scenario, Delphi owes OSC $195,927.25, calculated as follows: ($728,165 loss in funding X .5) - $168,155.25 = $195,927.25).  In the absence of agreement, we will be forced to pursue legal proceedings and will seek to recover the full claim.

Please advise promptly as we have been carrying these costs for some time.

Very truly yours,

Peter Hartung
Sr. Project Manager
ONTARIO SPECIALTY CONTRACTING INC.

**Exhibit "K"**

**Exhibit "K"**

STATE OF NEW YORK
SUPREME COURT : ERIE COUNTY

---

DELPHI AUTOMOTIVE SYSTEMS, LLC

|                              Plaintiff | **ANSWER WITH** |
| v.                                     | **COUNTERCLAIMS** |

ONTARIO SPECIALTY CONTRACTING, INC.            **Index No. I 2009010438**

                              **Defendant**

---

Defendant Ontario Specialty Contracting, Inc. ("OSC") by and through its counsel,

DUKE, HOLZMAN, PHOTIADIS & GRESENS LLP, for its Answer with counterclaims to

plaintiff Delphi Automotive Systems, LLC's ("Delphi") Complaint alleges as follows:

1.      Denies the allegations of paragraphs 9, 10, 12, 14, 15, 16, 17, 20, 21, 22, 23,

and 24 of the Complaint.

2.      Admits the allegations of paragraphs 2, 4 and 18 of the Complaint.

3.      Denies knowledge and information sufficient to admit or deny paragraph 1of the

Complaint at present.

4.      As to paragraph 3 of the Complaint, admit that OSC did agree to provide certain

demolition services at the request of Delphi and refer the Court to the specific terms of the

contract and related bid documents between the parties for the terms of said agreement.

5.      As to paragraphs 5, 6, 7 and 8 of the Complaint, OSC refers the Court to the

specific terms of the identified communications for their content.

6.      As to paragraph 11 of the Complaint, OSC admits that one of its subcontractors

has filed a lien against the Demolition Project Property (on account of Delphi's breach of

DUKE, HOLZMAN,
PHOTIADIS & GRESENS, LLP
ATTORNEYS AT LAW
1800 MAIN PLACE TOWER
350 MAIN STREET
BUFFALO, NEW YORK 14202-3718
716-855-1111
FAX 716-855-0327

-1-

contract) and otherwise deny the allegations of paragraph 11.

7.    Paragraph 13 of the Complaint states a legal conclusion to which no response is required, and otherwise deny the allegations of paragraph 13.

8.    As to paragraph 19 of the Complaint, OSC admits that it sold scrap metal recovered during the Demolition Project and denies that it received large sums of money for such scrap metals.

9.    Denies any and all other allegations not specifically addressed above.

## FIRST DEFENSE & COUNTERCLAIM - BREACH OF CONTRACT

10.    Leading up to July 2008, Delphi issued several requests for quotations ("RFQ") for the demolition of its Rochester Die Casting Building (the "Project").

11.    Each RFQ contained a target price calling for payment from the contractor to Delphi, on the basis that the value of the scrap metals at the Project site were believed to exceed the costs incurred by a contractor in performing the demolition work.

12.    The RFQ forms established by Delphi, expressly required the contractor to identify the total amount of "material reclamation/savage value" credited to Delphi against the Project costs.

13.    The "material reclamation/savage value" attributable to the scrap metals derived from the Project site was material to funding the demolition work on the Project.

14.    Delphi repeatedly increased the target price as the scrap metal market increased.

15.    On or about July 9, 2008, OSC responded to Delphi's final RFQ seeking a target price of "($305,000 USD) or better proposal", with a response of ($271,033). Attached hereto as **Exhibit A** is a copy of the OSC's July 7, 2008 response to Delphi's RFQ.

DUKE, HOLZMAN,
PHOTIADIS & GRESENS, LLP
ATTORNEYS AT LAW
1800 MAIN PLACE TOWER
350 MAIN STREET
BUFFALO, NEW YORK 14202-3718
716-855-1111
FAX 716-855-0327

-2-

16.     The line items within that response include a $1,189,999 credit to Delphi for "material reclamation/savage value."

17.     Based on asbestos disclosure documents provided to OSC by Delphi (which are required by New York law), OSC's response included a line item of $35,265 in costs for asbestos abatement.

18.     On or about July 24, 2008, Delphi issued a Purchase Order (the "Purchase Order") to OSC based on the above RFQ and accepting OSC's July 7, 2008 response. Attached hereto as **Exhibit B** is a true and correct copy of the Purchase Order, including General Terms and Conditions incorporated by reference.

19.     Under the terms of the Purchase Order, OSC was to make four (4) separate progress payments to Delphi of $67,758.25 each. OSC made the first payment of $67,758.25 at or about the start of work on the Project.

20.     The original project completion date under the Purchase Order was December 15, 2008.

21.     Certain work, which included asbestos abatement and utility related work, was required to be completed prior to demolition of the physical structures on the Project site.

22.     The scrap metals could not be removed from the physical structures on the Project site until the asbestos abatement and other pre-demolition work was completed.

23.     OSC immediately mobilized and began pre-demolition work during the week of August 4, 2008.

24.     The pre-demolition work was scheduled to complete on or before September 1, 2008.

DUKE, HOLZMAN,
'HOTIADIS & GRESENS, LLP
ATTORNEYS AT LAW
1800 MAIN PLACE TOWER
350 MAIN STREET
UFFALO, NEW YORK 14202-3718
716-855-1111
FAX 716-855-0327

-3-

25. Due to an error within the asbestos disclosure documents provided by Delphi, the pre-demolition asbestos abatement work on the Project went from a quantity of 1,600 s.f. to 15,600 s.f. of asbestos containing materials.

26. In other words, there was almost ten (10) times more asbestos containing materials on site than represented by Delphi.

27. Delphi has acknowledged this extra asbestos abatement work in writing and agreed to pay OSC at least $42,000.00 for the performance of such work.

28. There was also extra pre-demolition utility work required on the Project.

29. Delphi has acknowledged this extra utility work in writing and agreed to pay OSC at least $7,315.00 for the performance of such work.

30. Delphi is additionally liable for the delays, interference and impact costs resulting from this extra work.

31. As a result of the extra asbestos and utility work, and the time it took Delphi to address and respond to said issues, OSC's progress on the Project was delayed, interfered with and impacted.

32. As a result of the extra asbestos and utility work, and the time it took Delphi to address and respond to said issues, OSC was delayed in its ability to sell and remove the scrap metals from the Project site intended to fund the Project work.

33. During the period of Delphi's delays, the scrap metal market took an unprecedented and unanticipated decline from approximately $460/ton at the start of the Project to a low of approximately $80/ton.

34. On or about September 1, 2008, when OSC would have been able to sell and

DUKE, HOLZMAN,
PHOTIADIS & GRESENS, LLP
ATTORNEYS AT LAW
1800 MAIN PLACE TOWER
350 MAIN STREET
BUFFALO, NEW YORK 14202-3718
716-855-1111
FAX 716-855-0327

-4-

establish dealer pricing arrangements for the Project under the original schedule, and thereafter begin immediate delivery of scrap metals, the market price under established scrap metal pricing indexes was $405/ton.

35.    By approximately November 18, 2008, when OSC was able to begin selling scrap metals on account of the above extras and delays, the market price under established scrap metal pricing indexes had dropped to only $80/ton and many scrap dealers would not even place orders or take materials.

36.    On account of the extra work directed by Delphi, interference and delays, OSC received at least $424,708+/- less in revenue from the sale of scrap metals to fund the Project work.

37.    The terms of the Purchase Order, provide at General Term and Condition number 3:

### 3. SPECIFICATION, DESIGN AND SCOP CHANGES

Buyer [Delphi] may at any time require Seller [OSC] to implement changes to the specifications or design of the goods or to the scope of any service or work covered by this Contract, including work related to inspection, testing or quality control. While Buyer [Delphi] will endeavor to discuss any such changes will Seller [OSC] as early as practical, Seller [OSC] will promptly implement such changes. *Buyer [Delphi] will equitably determine any adjustment in price or delivery schedules resulting from such changes*, including Buyer's [Delphi's] payment of reasonable costs of modifications to Seller's Equipment (as defined in Article 16) necessary to implement such changes. In order to assist in the determination of any equitable adjustment in price or delivery schedules, Seller [OSC] will, as requested, provide information to Buyer [Delphi], including documentation of changes in Seller's [OSC's] cost of production and the time to implement such changes. In the event of any disagreement arising out of such changes, Buyer [Delphi] and Seller [OSC] will work to resolve the disagreement in good faith, provided, however, that Seller [OSC] will continue performing under this Contract, including the manufacture and delivery of goods and prompt implementation of changes required by Buyer [Delphi], while Buyer [Delphi] and Seller [OSC] resolve any disagreement arising out of such changes.

DUKE, HOLZMAN,
PHOTIADIS & GRESENS, LLP
ATTORNEYS AT LAW
1800 MAIN PLACE TOWER
350 MAIN STREET
BUFFALO, NEW YORK 14202-3718
716-855-1111
FAX 716-855-0327

-5-

Exhibit B (emphasis added).

38.    In breach of the Purchase Order, Delphi has failed and refused to equitably adjust the contract price between the parties.

39.    Although it has been acknowledged that additional pre-demolition work was directed by Delphi, it refused make adjustment to the contract price to account for the impact of such extra work and delays.

40.    On or about November 3, 2008, as the pre-demolition work was coming to a close, OSC wrote to Delphi bringing the scrap metal market decline issues to Delphi's attention. OSC pointed out the delays attributable to Delphi, and sought an equitable adjustment of the contract price. Attached hereto as **Exhibit C** is a copy of a letter issued by OSC on or about November 3, 2008.

41.    On or about December 3, 2008, OSC again wrote to Delphi on this subject. OSC and Delphi also had several verbal communications on this subject between November and December 2008, and thereafter. Delphi representatives, repeatedly assured OSC that an equitable adjustment of the contract price would be made.

42.    On or about January 12, 2009, OSC again wrote to Delphi on this subject. Attached hereto as **Exhibit D** is a copy of OSC's January 12, 2009 letter.

43.    On February 3, 2009, Delphi responded in writing stating, in essence, that it was discussing the matter internally and would get back to OSC shortly. OSC was expressly asked for its "patience and understanding." Attached hereto as **Exhibit E** is a copy of the February 3, 2009 email received from Delphi.

44.    During the time period that Delphi was discussing this subject internally, OSC

DUKE, HOLZMAN,
PHOTIADIS & GRESENS, LLP
ATTORNEYS AT LAW
1800 MAIN PLACE TOWER
350 MAIN STREET
BUFFALO, NEW YORK 14202-3718
716-855-1111
FAX 716-855-0327

-6-

continued its performance per Delphi's request.

45.   On March 17, 2009, Delphi requested further information relating to the extra work that it required OSC to perform and asked OSC to "accept [its] apologies for the delay on the Delphi formal reply to your request to change the existing contract to the Rochester Die Cast demolition project." Attached hereto as **Exhibit F** is a copy of Delphi's March 17, 2009 email.

46.   Meanwhile, Delphi continued to request that OSC continue performance and informally advised that an equitable adjustment would be forthcoming.

47.   OSC provided the additional information requested by letter dated April 22, 2009. Attached hereto as **Exhibit G** is a copy of OSC's April 22, 2009 letter.

48.   On May 7, 2009, Delphi sent an email stating that it would respond shortly. Attached hereto as **Exhibit H** is a copy of Delphi's May 7, 2009 email.

49.   On May 11, 2009, Delphi responded.  While offering additional time to allow the scrap metal market to recover, Delphi stated "Because Delphi itself is experiencing great financial difficulty, as a result of being in Chapter 11 since 2005 and due to current economic conditions, it is impossible for Delphi to commit any payments to Ontario Specialty Contracting." Attached hereto as **Exhibit I** is a copy of Delphi's May 11, 2009 letter.

50.   By the time Delphi finally responded on May 11, 2009, substantially all of the scrap metals had been sold (in the depressed market) and, shortly thereafter, OSC was also substantially complete with the Project work.

51.   The May 11, 2009 Delphi letter expressly acknowledges the extra asbestos and utility work directed by Delphi.

52.   Delphi breached its contract with OSC.

DUKE, HOLZMAN,
'HOTIADIS & GRESENS, LLP
ATTORNEYS AT LAW
1800 MAIN PLACE TOWER
350 MAIN STREET
UFFALO, NEW YORK 14202-3718
716-855-1111
FAX 716-855-0327

-7-

53.    OSC has been damaged as a result of Delphi's breach.

54.    Delphi is liable to and should be directed to pay OSC monetary damages in an amount not less than $288,751.25, plus interest.

## SECOND DEFENSE AND SECOND COUNTERCLAIM - QUANTUM MERUIT

55.    OSC repeats and realleges all prior allegations.

56.    At the specific request of Delphi, OSC performed and provided labor, materials and demolition services to Delphi valued at not less than $968,281.

57.    Despite demand for payment, a balance of at least $474,023 remains due and owing to OSC from Delphi.

58.    Delphi is liable to and should be directed to pay OSC monetary damages in an amount not less than $474,023, plus interest.

## THIRD DEFENSE AND THIRD COUNTERCLAIM - UNJUST ENRICHMENT

59.    OSC repeats and realleges all prior allegations.

60.    At the specific request of Delphi, OSC performed and provided labor, materials and demolition services to Delphi valued at not less than $968,281.

61.    Despite demand for payment, a balance of at least $474,023 remains due and owing to OSC from Delphi.

62.    Delphi has been unjustly enriched at the expense of and to the detriment of OSC.

63.    Equity and good conscience require that Delphi is liable to and should be directed to pay OSC monetary damages in an amount not less than $474,023, plus interest.

## FOURTH DEFENSE

64.    Plaintiff's claims are barred by the doctrines of waiver, unclean hands and/or

DUKE, HOLZMAN,
PHOTIADIS & GRESENS, LLP
ATTORNEYS AT LAW
1800 MAIN PLACE TOWER
350 MAIN STREET
BUFFALO, NEW YORK 14202-3718
716-855-1111
FAX 716-855-0327

-8-

equitable estoppel.

## FIFTH DEFENSE

65.    Plaintiff's claims are subject to an offset and/or set-off.

## SIXTH DEFENSE

66.    Plaintiff fails to state a cause of action.

## SEVENTH DEFENSE

67.    Plaintiff's breach of and conduct under the contract, served to discharge any

obligations of OSC.

## EIGHTH DEFENSE

68.    Plaintiff's conduct with respect to the happening of the incident alleged in the

Complaint constitutes culpable conduct, contributory negligence and/or assumption of risk,

express or implied, attributable to plaintiff, which conduct contributed to the happening of the

plaintiff's damages, if any.

69.    The amount of damages, if any, otherwise recoverable by plaintiff shall be

diminished in the proportion to which the culpable conduct attributable to plaintiff and to others,

if any, for whose conduct this defendant is not responsible, bears to the culpable conduct which

caused plaintiff's damages.

## NINTH DEFENSE

70.    Plaintiff lacks standing and/or jurisdiction to commence suit within the Supreme

Court, Erie County.

## TENTH DEFENSE

71.    The Purchase Order is subject to rescission.

DUKE, HOLZMAN,
PHOTIADIS & GRESENS, LLP
ATTORNEYS AT LAW
1800 MAIN PLACE TOWER
350 MAIN STREET
BUFFALO, NEW YORK 14202-3718
716-855-1111
FAX 716-855-0327

## ELEVENTH DEFENSE

72.     The plaintiff's claims are barred by the doctrine of unconscionability.

**WHEREFORE,** defendant requests judgment against plaintiff:

1.      On its first counterclaim in an amount not less than $288,751.25, plus interest;

2.      On its second and third counterclaims in an amount not less than $474,023, plus interest;

3.      Dismissing plaintiff's Complaint;

4.      Granting such other and further relief as this Court sees just and proper.

Dated: September 22, 2009

DUKE, HOLAMAN, PHOTIADIS
& GRESENS LLP

Matthew J. Beck, Esq.
*Attorneys for Ontario Specialty Contracting, Inc.*
1800 Main Place Tower
350 Main Street
Buffalo, New York 14202
(716) 855-1111

DUKE, HOLZMAN,
PHOTIADIS & GRESENS, LLP
ATTORNEYS AT LAW
1800 MAIN PLACE TOWER
350 MAIN STREET
BUFFALO, NEW YORK 14202-3718
716-855-1111
FAX 716-855-0327

-10-