**Hearing Date and Time:  June 14, 2012 at 10:00 a.m. (prevailing Eastern time)**
**Response Date and Time:  June 7, 2012 at 4:00 p.m. (prevailing Eastern time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, Illinois 60606
Albert L. Hogan, III
Ron E. Meisler

- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036

Attorneys for DPH Holdings Corp., et al.,
Reorganized Debtors, and Delphi Automotive LLP

DPH Holdings Corp. Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

DPH Holdings Corp. Legal Information Website:
http://www.dphholdingsdocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
|  | : |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| DPH HOLDINGS CORP., et al., | : | Case No. 05-44481 (RDD) |
|  | : |  |
| Reorganized Debtors. | : | (Jointly Administered) |
|  | : |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - :

NOTICE OF DPH HOLDINGS CORP.'S AND DELPHI AUTOMOTIVE LLP'S
JOINT MOTION FOR ENTRY OF AN ORDER ENFORCING MODIFIED PLAN
AND PLAN MODIFICATION ORDER

PLEASE TAKE NOTICE that on May 24, 2012, DPH Holdings Corp. ("DPH Holdings") and certain of its affiliated reorganized debtors in the above-captioned cases (collectively, the "Reorganized Debtors"), successors to Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, former debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), and Delphi Automotive LLP and its subsidiaries, including without limitation Delphi Automotive Systems, LLC, ("New Delphi" and, together with the Reorganized Debtors, the "Movants"), filed a Joint Motion for Entry of an Order Enforcing Modified Plan and Plan Modification Order (the "Motion").

PLEASE TAKE FURTHER NOTICE that a hearing to consider approval of the Motion will be held on June 14, 2012 at 10:00 a.m. (prevailing Eastern time) (the "Hearing") before the Honorable Robert D. Drain, United States Bankruptcy Court for the Southern District of New York, 300 Quarropas Street, Courtroom 118, White Plains, New York 10601-4140.

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion must (a) be in writing, (b) conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York, the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered March 20, 2006 (Docket No. 2883) ("Supplemental Case Management Order"), and the Nineteenth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered July 16, 2010 (Docket No. 20189) (together with the Supplemental Case Management Order, the "Case Management Orders"), (c) be filed with the Bankruptcy Court in accordance with General Order M-242 (as amended) –

2

registered users of the Bankruptcy Court's case filing system must file electronically, and all

other parties-in-interest must file on a 3.5 inch disk (preferably in Portable Document Format

(PDF), WordPerfect, or any other Windows-based word processing format), (d) be submitted in

hard-copy form directly to the chambers of the Honorable Robert D. Drain, United States

Bankruptcy Judge, and (e) be served upon (i) DPH Holdings Corp., 5725 Delphi Drive, Troy,

Michigan 48098 (Att'n: President), (ii) Delphi Automotive LLP, 5725 Delphi Drive, Troy,

Michigan 48098 (Att'n: David M. Sherbin), (ii) counsel to the Movants, Skadden, Arps, Slate,

Meagher & Flom LLP, 155 North Wacker Drive, Chicago, Illinois 60606 (Att'n: Albert L.

Hogan, III and Ron. E. Meisler), (iii) the Office of the United States Trustee for the Southern

District of New York, 33 Whitehall Street, Suite 2100, New York, New York 10004 (Att'n:

Brian S. Masumoto), and (iv) counsel for the agent under the Debtors' former postpetition credit

facility, Davis Polk & Wardwell, 450 Lexington Avenue, New York, New York 10017 (Att'n:

Donald S. Bernstein and Brian M. Resnick) in each case so as to be **received** no later than

**4:00 p.m. (prevailing Eastern time) on June 7, 2012.**

PLEASE TAKE FURTHER NOTICE that only those objections made as set forth herein and in accordance with the Case Management Orders will be considered by the Bankruptcy Court at the Hearing. If no objections to the Motion are timely filed and served in accordance with the procedures set forth herein and in the Case Management Orders, the Bankruptcy Court may enter an order granting the Motion without further notice.

Dated:   New York, New York
          May 24, 2012

Respectfully submitted,

SKADDEN, ARPS, SLATE, MEAGHER
    & FLOM LLP

By:   /s/ Ron E. Meisler
      Albert L. Hogan III
      Ron E. Meisler
      155 North Wacker Drive
      Chicago, Illinois 60606

      - and -

      Four Times Square
      New York, New York 10036

Attorneys for DPH Holdings Corp., et al.,
Reorganized Debtors, and Delphi Automotive
LLP

**Hearing Date And Time:  June 14, 2012 at 10:00 a.m. (prevailing Eastern time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, Illinois 60606
Albert L. Hogan III
Ron E. Meisler

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036

Attorneys for DPH Holdings Corp., et al.,
Reorganized Debtors, and Delphi Automotive LLP

DPH Holdings Corp. Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

DPH Holdings Corp. Legal Information Website:
http://www.dphholdingsdocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                               :
        In re                      :     Chapter 11
                                 :
DPH HOLDINGS CORP., et al.,    :     Case No. 05-44481 (RDD)
                               :
                               :     (Jointly Administered)
          Reorganized Debtors.    :
                               :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DPH HOLDINGS CORP.'S AND DELPHI AUTOMOTIVE LLP'S
JOINT MOTION FOR ENTRY OF AN ORDER
<u>ENFORCING MODIFIED PLAN AND PLAN MODIFICATION ORDER</u>**

DPH Holdings Corporation ("DPH Holdings") and certain of its affiliated reorganized

debtors in the above-captioned cases (together with DPH Holdings, the "Reorganized Debtors")

and Delphi Automotive LLP and its subsidiaries, including without limitation Delphi

Automotive Systems, LLC, ("New Delphi" and, together with the Reorganized Debtors, the

"Movants") hereby submit this joint motion (the "Motion"), pursuant to 11 U.S.C. §§ 105(a) and

1141, for entry of an order enforcing the Modified Plan and Plan Modification Order.  In support

of this Motion, the Movants respectfully represent as follows:

## **Preliminary Statement**

1.      The Reorganized Debtors and New Delphi bring this joint Motion to enforce the

Modified Plan[1] and Plan Modification Order and to enjoin antitrust litigation (the "Antitrust

Actions") commenced by various plaintiffs against certain Reorganized Debtors and New Delphi,

which Antitrust Actions have been consolidated for pretrial purposes in the United States District

Court of the Eastern District of Michigan, Southern Division (the "Michigan District Court"),

Case No. 12-md-02311-MOB.  Plaintiffs in the Antitrust Actions allege that the Reorganized

Debtors and New Delphi, among other defendants, engaged in a conspiracy to unlawfully fix and

artificially raise the prices of electrical distribution systems used to direct and control electronic

components, wiring, and circuit boards in automotive vehicles ("Automotive Wire Harness

Systems").

2.      In the Antitrust Actions, plaintiffs assert federal and state statutory and common

law claims premised on a purported conspiracy that spanned the years 2000 through

---

[1]     Capitalized terms not defined in the Preliminary Statement are defined later in the Motion.
Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Modified
Plan and the Plan Modification Order.

approximately February 2010.  The Reorganized Debtors and New Delphi deny participating in

any alleged conspiracy and are confident that continued litigation of the Antitrust Actions would

exonerate them.[2]  But, because the actions violate the plan injunctions entered by this Court in its

Plan Modification Order, neither the Reorganized Debtors nor New Delphi should be forced to

incur the expense of defending against the Antitrust Actions.  In particular, plaintiffs' fact-based

allegations against the Reorganized Debtors and New Delphi are premised entirely on alleged

pre-Effective Date conduct and conspiracies.  This Court previously discharged the Reorganized

Debtors of any liability related to or arising from pre-Effective Date conduct.  Consistent with 11

U.S.C. §§ 363(f) and 1141(c), the Court also ordered that New Delphi's purchase of the Debtors'

assets would be free and clear of any and all claims – including, without limitation, claims

premised on successor liability or theories of antitrust – shielding New Delphi of any claims or

liability related to or arising from pre-Effective Date conduct as well.  Consequently, New

Delphi's liability for conduct violative of antitrust laws, if any, must be limited to conduct that

took place on or after the Effective Date of the Plan.

 3. In accordance with the plan discharge and the free and clear order memorialized

in this Court's order confirming and approving the Debtors' Modified Plan of Reorganization

(Docket No. 18707) (the "Plan Modification Order"), this Court imposed two injunctions against

the prosecution of pre-Effective Date claims.  The first enjoins all persons from prosecuting

---

[2]    In the Michigan District Court, the Antitrust Actions should be dismissed for additional independent
reasons, not raised here. To the extent that this Court denies any portion of the relief requested herein,
then, on or before July 13, 2012, the Reorganized Debtors and New Delphi will file in the Michigan
District Court a motion to dismiss, inter alia, pursuant to Federal Rule of Civil Procedure 12(b)(6) for
failure to state a claim upon which relief may be granted because the antitrust plaintiffs fail to allege
facts that could show that either the Reorganized Debtors or New Delphi participated in a conspiracy
or from which their participation in a conspiracy may be inferred.  See, e.g., Bell Atl. Corp. v.
Twombly, 550 U.S. 544 (2007); Toys "R" Us, Inc. v. Fed. Trade Comm'n, 221 F.3d 928 (7th Cir.
2000).

claims that were discharged against the Reorganized Debtors.  (See Plan Modification Order,

¶ 22.)  The second enjoins all persons from prosecuting those discharged claims against New

Delphi.  (See id. ¶¶ 10(b), 22(d).)  In the face of these injunctions, the antitrust plaintiffs should

not be able to proceed at this time against either New Delphi or the Reorganized Debtors in the

Michigan District Court.

4.      Not only are the claims enjoined, but because none of the antitrust plaintiffs filed

a claim in this Court prior to the general or administrative bar dates, their claims against the

Reorganized Debtors are barred.  In addition, plaintiffs' claims against New Delphi are also

barred because those claims are premised entirely on pre-Effective Date conduct and are, in

effect, disguised successor liability claims barred by the Modified Plan and Plan Modification

Order, and are merely an attempt to circumvent the plain language of this Court's order.  Thus,

on the current record and absent an order lifting the plan injunctions, plaintiffs cannot maintain

the Antitrust Actions against either the Reorganized Debtors or New Delphi.  Any contrary

conclusion would, in effect, unravel the Plan Modification Order because it would render

meaningless the discharge, free and clear order, and injunction provisions of this Court's Plan

Modification Order – three of the order's most essential attributes – and it would amount to a

determination that New Delphi assumed successor liability claims along with its purchase of the

Debtors' assets.

5.      It is fundamental to bankruptcy policy that a confirmation order must be a final

order that can be relied upon by a buyer, the reorganized debtors, and all of their creditors and

constituents.  See, e.g., In re Cross Media Marketing Corp., 367 B.R. 435, 447 (Bankr. S.D.N.Y.

2007) ("It is well settled that a bankruptcy court's order confirming a chapter 11 plan is treated as

a final judgment on the merits with full res judicata effect.").  In this instance, the Movants' need

4

to rely on the Modified Plan and the Plan Modification Order cannot be understated. The free and clear order was a fundamental component and a condition of New Delphi's bid to acquire certain assets from the Debtors and was memorialized in the Master Disposition Agreement, which was incorporated into the Debtors' Modified Plan and approved pursuant to the Plan Modification Order. (<u>See</u> Master Disposition Agreement, art. 10.1.1.) Without the free and clear order, the Modified Plan likely would not have been consummated. (<u>See</u> Plan Modification Order, ¶ H.4.) Thus, this Court's Plan Modification Order establishes a bar against successor liability in no less than five different provisions. (<u>See</u> <u>id.</u> ¶¶ H.2, H.4, 9, 10(a), 10(b).)

6.      Allowing plaintiffs to proceed with the Antitrust Actions against New Delphi and the Reorganized Debtors constitutes a direct attack on the Plan Modification Order. Permitting such an attack would erode the Plan Modification Order by extinguishing a central tenet of the Modified Plan upon which all parties agreed and relied and eviscerating a condition precedent to the transaction consummated under the Modified Plan. Indeed, the intensely-negotiated terms of the Master Disposition Agreement were so important to New Delphi and the Debtors that they agreed that, even post-Effective Date, they would collectively take "all such necessary action" to carry out the purposes of Master Disposition Agreement. (Master Disposition Agreement, art. 9.15.) Accordingly, with this Motion, the Movants jointly request that the Court enjoin prosecution of the Antitrust Actions against the Reorganized Debtors and New Delphi, and direct the antitrust plaintiffs to cause those actions to be dismissed.

### <u>Background</u>

**A.      The Chapter 11 Filings.**

7.      On October 8 and 14, 2005, Delphi Corporation and certain of its subsidiaries and affiliates (collectively, the "Debtors") filed voluntary petitions in this Court for reorganization

relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then

amended (the "Bankruptcy Code").

8.    On December 10, 2007, the Debtors filed their first amended joint plan of

reorganization (Docket No. 11386) (the "Confirmed Plan") and related disclosure statement

(Docket No. 11388).  The Court entered an order confirming the Confirmed Plan (as modified)

(Docket No. 12359) (the "Confirmation Order") on January 25, 2008.

9.    On October 3, 2008, the Debtors filed a motion under section 1127 of the

Bankruptcy Code for an order approving (i) certain modifications to the Confirmed Plan and

related disclosure statement and (ii) related procedures for re-soliciting votes on the Confirmed

Plan, as modified (Docket No. 14310) (the "Plan Modification Motion").  On June 1, 2009, the

Debtors filed a supplement to the Plan Modification Motion (the "Motion Supplement"), which

sought approval of (i) certain modifications to the Confirmed Plan (the "Modified Plan"),

(ii) supplemental disclosure, and (iii) procedures for re-soliciting votes on the Modified Plan.

After holding a final plan modification hearing on July 29 and 30, 2009, this Court entered the

Plan Modification Order on July 30, 2009, which confirmed and approved the Modified Plan.

10.    On October 6, 2009, the Debtors substantially consummated the Modified Plan,

the Effective Date occurred, and the transactions under the Master Disposition Agreement and

related agreements closed.  In connection therewith, DIP Holdco 3, LLC, a Delaware limited

liability company and the predecessor in interest to New Delphi, acquired certain of the Debtors'

global core businesses (the "New Delphi Acquired Assets"), and GM Components Holdings,

LLC, a Delaware limited liability company, acquired the Debtors' steering business and certain

other U.S. manufacturing plants.

6

11.    Pursuant to the Master Disposition Agreement and the Plan Modification Order, New Delphi acquired the New Delphi Acquired Assets "free and clear" of any and all claims, including, without limitation, claims premised on successor liability or theories of antitrust.  (See Master Disposition Agreement, art. 14.6; Plan Modification Order, ¶¶ H.2, H.4, 10(a)-(b).)  New Delphi acquired the Debtors' assets used in the Automotive Wire Harness Systems business, which is the subject of the Antitrust Actions, as part of the New Delphi Acquired Assets.  As a result of this acquisition, the Reorganized Debtors ceased to be involved with the Automotive Wire Harness Systems business and, since the October 6, 2009 Effective Date, New Delphi has operated that business.

12.    The Reorganized Debtors have emerged from chapter 11 as DPH Holdings Corporation and affiliates and remain responsible for the post-Effective Date administration and eventual closing of these chapter 11 cases as well as the disposition of certain retained assets and payment of certain retained liabilities as provided for under the Modified Plan.

**B.    Bar Date Orders.**

13.    On April 12, 2006, the Court entered an order (the "Bar Date Order") (Docket No. 3206), which established July 31, 2006 (the "General Bar Date") as the last date for filing pre-petition proofs of claim against the Debtors.

14.    On June 16, 2009, the Court entered an order (the "Modification Procedures Order") (Docket No. 17032), which established July 15, 2009 as the last date to file proof of administrative expense for the purpose of asserting administrative expense claims against the Debtors under 11 U.S.C. § 503(b) for the period from the commencement of these chapter 11 cases through May 31, 2009 (the "First Administrative Expense Bar Date").

15.    On July 30, 2009, this Court entered its Plan Modification Order (Docket No. 18707), which provided that any requests for the payment of an administrative expense claim

7

arising on or after June 1, 2009 until the Effective Date must be filed no later than 30 days after

notice of the Effective Date is filed on the docket in these chapter 11 cases.  (Plan Modification

Order, ¶ 47.)  Notice of the Effective Date was filed on October 6, 2009 (Docket No. 18958), and

the bar date for filing administrative expense claims arising on or after June 1, 2009 was

recognized as November 5, 2009 (the "Final Administrative Expense Bar Date").

## C.    The Antitrust Actions.

16.    On October 5, 2011, almost two years after the Effective Date, the first of many

plaintiffs initiated a putative class action against various defendants, including New Delphi, in

the Michigan District Court, alleging that the defendants engaged in a decade-long conspiracy to

unlawfully fix and artificially raise the prices of Automotive Wire Harness Systems.  See

LaCava v. Delphi Automotive LLP, et al., No. 2:11-cv-14399-MOB-MKM (E.D. Mich.).

17.    Since October 5, 2011, 49 cases have been initiated in various jurisdictions

nationwide against, variably, New Delphi, DPH Holdings, and certain of their wholly-owned

subsidiaries, among others.  The plaintiffs in the antitrust cases consist of three groups:

(1) consumers who allegedly purchased automobiles containing Automotive Wire Harness

Systems indirectly from one or more defendants in the antitrust cases (the "End-Payor

Plaintiffs"); (2) automobile dealerships that allegedly purchased both automobiles containing

Automotive Wire Harness Systems and Automotive Wire Harness Systems themselves indirectly

from one or more defendants in the antitrust cases (the "Automobile Dealer Plaintiffs"); and

(3) entities that allegedly purchased Automotive Wire Harness Systems directly from one or

more of the defendants in the antitrust cases (the "Direct Purchaser Plaintiffs," and, together with

the End-Payor Plaintiffs and the Automobile Dealer Plaintiffs, the "Plaintiffs").

18.    In February 2012, the Judicial Panel on Multidistrict Litigation ordered the

transfer of the various Antitrust Actions to the Michigan District Court for coordinated and

8

consolidated pretrial proceedings.  See In re Automotive Wire Harness Sys. Antitrust Litig., No.

2:12-md-02311-MOB (E.D. Mich.) (Docket Nos. 2, 9, 12, 13).

19.    On March 29, 2012, the Michigan District Court overseeing the multidistrict

litigation entered a case management order ordering that all "Direct Purchaser Actions" would be

consolidated for pretrial purposes, all "Automobile Dealer Actions" would be consolidated for

pretrial purposes, and all "End-Payor Actions" would be consolidated for pretrial purposes.  Id.

(Docket No. 73).  The Michigan District Court also ordered that the Direct Purchaser Actions,

Automobile Dealer Actions, and End-Payor Actions would be coordinated for pretrial purposes.

Id.

20.    In accordance with the applicable case management order, on May 14, 2012, the

End-Payor Plaintiffs, the Automobile Dealer Plaintiffs, and the Direct Purchaser Plaintiffs each

filed a consolidated, amended complaint in the Michigan District Court.  True and correct copies

of the End-Payor, Automobile Dealer, and Direct Purchaser complaints (collectively, the

"Complaints") are attached hereto as **Exhibits A through C**, respectively.  The Automobile

Dealer and Direct Purchaser Complaints name Delphi Automotive LLP, Delphi Automotive

Systems, LLC, DPH Holdings Corporation, and Delphi Furukawa Wiring Systems LLC ("Delphi

Furukawa")[3] as defendants.  (See Ex. B, ¶¶ 86-90; Ex. C, ¶¶ 23-27.)  The End-Payor Complaint

---

[3]    On October 6, 2009, Delphi Furukawa emerged from chapter 11 as a subsidiary of reorganized DPH
Holdings, and was renamed DPH Furukawa Wiring Systems LLC ("DPH Furukawa").  (See Ex. D
(Certificate of Amendment to Certificate of Formation).)  DPH Furukawa's bankruptcy case closed on
December 20, 2010 (Docket No. 21026), and the company dissolved on January 24, 2011 (see Ex. E
(Certificate of Cancellation)).  New Delphi did not continue the Debtors' joint venture with Furukawa.
(See Ex. A, ¶¶ 75-81.)

names Delphi Automotive LLP and Delphi Automotive Systems, LLC as defendants.  (See Ex. A, ¶¶ 72-74.)[4]

21.    According to the Complaints, the Antitrust Actions were precipitated by governmental investigations into a conspiracy to rig bids for and to fix the prices of the sale of Automotive Wire Harness Systems, which investigations began in at least February 2010.  (Ex. A, ¶ 6 (alleging that "[c]ompetition authorities in the United States, the European Union, and Japan" have been investigating "since at least February 2010"); Ex. B, ¶ 6 (same); see also Ex. C, ¶¶ 115-20 (describing investigations).)  As a result of these investigations, on September 29, 2011, the first of five antitrust defendants – Furukawa Electric Co. Ltd. ("Furukawa Electric") – agreed to plead guilty to participating in an Automotive Wire Harness Systems cartel that spanned January 2000 to January 2010.  (See Ex. A, ¶¶ 7, 172-74, 179; Ex. B, ¶¶ 7, 183-86; Ex. C, ¶¶ 123, 132.)  Four more antitrust defendants – Yazaki Corporation, Denso Corporation, G.S. Electech, Inc., and Fujikura Ltd. – followed suit, admitting to participating in a cartel until February 2010.  (Ex. A, ¶¶ 7, 182, 184-86; Ex. B, ¶¶ 9-11, 197, 207, 210-12; Ex. C, ¶¶ 134, 136-37.)  New Delphi has not been criminally charged with anticompetitive conduct and steadfastly maintains its innocence.

22.    Nevertheless, Plaintiffs attempt to implicate the Reorganized Debtors and New Delphi in their civil Complaints.  However, Plaintiffs' Delphi-specific allegations are patently

---

[4]    In addition to Delphi entities, the Complaints also name, variably, the following defendants:  Denso Corporation, Denso International America, Inc., Asmo Co. Ltd., Fujikura, Ltd., Fujikura America, Inc., Furukawa Electric, American Furukawa, Inc., Furukawa Wiring Systems America, Inc., Lear Corporation, Kyungshin-Lear Sales and Engineering, LLC, Leoni AG, Leoni Wiring Systems, Inc., Leonische Holding Inc., Leoni Kabel GmbH, Leoni Wire Inc., Sumitomo Electric Industries, Ltd., Sumitomo Wiring Systems, Ltd., Sumitomo Electric Wiring Systems, Inc., K&S Wiring Systems, Inc., Sumitomo Wiring Systems (U.S.A.) Inc., Sumitomo Electric Wintec America, Inc., S-Y Systems Technologies Europe GmbH, Yazaki Corporation, S-Y Systems Technologies America, LLC, Yazaki North America, Inc., TRAM, Inc., Tokai Rika Co., Ltd., G.S. Electech, Inc., G.S. Wiring Systems Inc., and G.S.W. Manufacturing Inc.  (Ex. A, ¶¶ 83-120; Ex B, ¶¶ 91-126; Ex. C, ¶¶ 28-63.)

insufficient to overcome the Plan Modification Order.  Plaintiffs allege that the Reorganized

Debtors and New Delphi "manufactured Automotive Wire Harness Systems that were sold

and/or purchased in the United States during the Class Period."  (Ex. A, ¶¶ 72-73; see also Ex. B,

¶¶ 86-89; Ex. C, ¶¶ 23-26.)  Plaintiffs also allege that, as of 2009, Delphi was the third largest

maker of Automotive Wire Harness Systems, controlling 16.71 percent of the global market.

(See Ex. A, ¶¶ 143, 146, 162; Ex. B, ¶¶ 144, 165; Ex. C, ¶ 101.)  Additionally, Plaintiffs allege

that, in December 2004, Delphi Corporation formed a joint venture with Furukawa Electric

called Delphi Furukawa.  (Ex. A, ¶ 76; Ex. B, ¶ 89; Ex. C, ¶ 26.)  The End Payor Plaintiffs allege

that Delphi Furukawa was based in Warren, Ohio, and was "responsible for the sales and

engineering of activities for the Wiring Harness, which both Delphi and Furukawa Electric . . .

agreed upon for Toyota programs in North America."  (Ex. A, ¶ 76; see also Ex. B, ¶ 89.)  The

End-Payor Plaintiffs additionally allege that, in 2006, Delphi Furukawa opened a Customer

Service Center in Ann Arbor, Michigan near the Toyota Technical Center, which New Delphi

continues to operate post-Effective Date.  (Ex. A, ¶¶ 78, 81.)  Finally the End-Payor Plaintiffs

allege – in the form of a legal conclusion – that:

> Following the Effective Date, the Delphi Defendants continued to sell
> Automotive Wire Harness Systems pursuant to, and as part of their participation
> in furtherance of, the conspiracy alleged [in the End-Payor Complaint].  From and
> after October 6, 2009, the Delphi Defendants sold a significant number of
> Automotive Wire Harness Systems in the United States at supra-competitive
> prices.  For 2010 alone Delphi Automotive LLP reported $5.6 billion in total sales
> for its Electronic/Electronic Architecture business segment, which included
> significant sales for Automotive Wire Harness Systems in the United States
> pursuant to the conspiracy.

(Id. ¶ 82.)  The Automobile Dealer and Direct Purchaser Complaints contain even less robust,

but similarly conclusory allegations regarding New Delphi's post-Effective Date conduct.  (See

Ex. B, ¶¶ 86-88 (alleging only that New Delphi "manufactured, marketed and/or sold

11

Automotive Wire Harness Systems that were purchased throughout the United States . . . during

the Class Period"); Ex. C, ¶¶ 23-26 (same).)

23.        In effect, Plaintiffs allege that the Reorganized Debtors and New Delphi are guilty

by association because (a) Delphi Corporation sold, and New Delphi currently sells, Automotive

Wire Harness Systems; and (b) prior to and during its bankruptcy Delphi Corporation shared

ownership in a joint venture with Furukawa.  See supra n.3 (describing evolution of Delphi

Furukawa).  These allegations are insufficient to override the Plan Modification Order.

## Jurisdiction and Venue

24.        This Court has subject matter jurisdiction to consider this matter pursuant to 28

U.S.C. §§ 157 and 1334, Article XIII of the Modified Plan, and paragraph 56 of the Modification

Approval Order.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

25.        Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

26.        Pursuant to Fed. R. Bankr. P. 7001(7), the relief sought by the Movants in this

Motion is properly brought by motion as a contested matter pursuant to Fed. R. Bankr. P. 9014,

rather than in a separate adversary proceeding.  Specifically, because the Movants are merely

seeking to enforce provisions of the Modified Plan and Plan Modification Order, under Fed. R.

Bankr. P. 7001(7), no adversary proceeding is required.  See In re Continental Airlines, Inc., 236

B.R. 318, 327 (Bankr. D. Del. 1999), aff'd, Nos. 90-932, ADV., 99-47, Civ. A., 99-795-SLR,

2000 WL 1425751 (D. Del. Sep. 12, 2000), aff'd, 279 F.3d 226 (3rd Cir. 2002).

## Relief Requested

27.        Pursuant to sections 105 and 1141 of the Bankruptcy Code, Rules 3020(d) and

7001(7) of the Federal Rules of Bankruptcy Procedure, and this Court's Plan Modification Order,

the Movants hereby seek entry of an order (a) enforcing the Modified Plan and Plan

Modification Order, including the claim bar dates, discharge, free and clear order, and plan injunctions; (b) enjoining the Plaintiffs from prosecuting the Antitrust Actions; and (c) directing Plaintiffs to take such action necessary to dismiss the Antitrust Actions as against the Reorganized Debtors and New Delphi.

## Basis for Relief

28.     The Reorganized Debtors and New Delphi have a profound interest in ensuring that unambiguous provisions of the Modified Plan and Plan Modification Order are enforced. By proceeding with the Antitrust Actions without having filed a motion in this Court to lift the plan injunctions or to seek approval to file a late claim, Plaintiffs seek to litigate claims in the Michigan District Court that have been discharged, barred, and enjoined, violating both the Plan Modification Order and the Modified Plan.  This Court should exercise its jurisdiction and enforce the plan injunctions because "[a] bankruptcy court is undoubtedly the best qualified to interpret and enforce its own orders, including those providing for discharge and injunction and therefore should not abstain from doing so."  Texaco Inc. v. Sanders (In re Texaco, Inc.), 182 B.R. 937, 947 (Bankr. S.D.N.Y. 1995).

## Applicable Authority

29.     The Complaints at issue fail to allege any actionable conduct, pre- or post- Effective Date, against any Delphi entity, and are subject to motions to dismiss on numerous grounds.[5]  At best, the Complaints allege only claims premised on pre-Effective Date conduct, which this Court previously discharged and enjoined.  Indeed, the End-Payor Plaintiffs correctly acknowledge (and the other Plaintiffs cannot deny) that the Reorganized Debtors did not sell any

---

[5]     See supra n.2. This Motion does not ask the Court to resolve antitrust issues; rather, this Motion asks the Court to interpret and enforce its own Plan Modification Order.

Automotive Wire Harness Systems post-Effective Date.  (<u>See</u> Ex. A, ¶¶ 75-82.)  Moreover, each

of the Complaints effectively admits that all Automotive Wire Harness Systems sold by New

Delphi during the class period were sold pursuant to contracts negotiated pre-Effective Date.

(<u>See</u> Ex. A, ¶ 139; Ex. B, ¶ 135; Ex. C, ¶ 95.)  Accordingly, as explained more fully below, the

Antitrust Actions necessarily violate the plan injunctions embodied in the Plan Modification

Order and this Court should order Plaintiffs to cause the actions to be dismissed.

**A.**      **The Antitrust Actions Cannot Be Maintained Against The Reorganized Debtors.**

      **i.**      **The Antitrust Actions Violate the Modified Plan and the Plan Modification
Order.**

      30.      As against the Reorganized Debtors, including without limitation DPH Holdings

and DPH Furukawa, the Antitrust Actions plainly contravene the clear and unambiguous

language of the Modified Plan and the Plan Modification Order.  Upon the Effective Date, the

Reorganized Debtors were discharged of all liability for pre-Effective Date claims and causes of

actions against them, whether known or unknown, including Plaintiffs' antitrust claims.

Specifically, Article 11.2 of the Modified Plan provides that:

> Pursuant to section 1141(d) of the Bankruptcy Code . . . the distributions and
> rights that are provided in this Plan shall be in complete satisfaction, discharge,
> and release, effective as of the Effective Date, of Claims and Causes of Action,
> whether known or unknown, against, liabilities of, liens on, obligations of, rights
> against, and Interests in the Debtors or any of their assets or properties . . . .  The
> Confirmation Order shall be a judicial determination of the discharge of all
> Claims against and Interests in the Debtors, subject to the occurrence of the
> Effective Date.

(Modified Plan, art. 11.2.)

      31.      This Court expressly approved this provision of the Modified Plan in its Plan

Modification Order:

> Pursuant to applicable law, including sections 105(a) and 1123(b)(3) and (6) of
> the Bankruptcy Code, the discharge of the Debtors and any of their assets or
> properties provided in Article 11.2 of the Modified Plan . . . [is] deemed

incorporated in this order as if set forth in full herein and [is] hereby approved as an integral part of the Modified Plan and [is] fair, equitable, reasonable and in the best interests of the Debtors, their estates, and holders of Claims and Interests . . . .

(Plan Modification Order, ¶ 20.)

32.    In addition, upon the Effective Date, an injunction was imposed: the Modified Plan and Plan Modification Order permanently enjoin, among other things, the commencement or continuation of any action to recover against any claim against the Reorganized Debtors that arose prior to October 6, 2009, the Effective Date of the Modified Plan. Section 11.14 of the Modified Plan provides that discharge of the Debtors "shall act as an injunction against any Person commencing or continuing any action, employment of process, or act to collect, offset, or recover any Claim, Interest, or Cause of Action . . . discharged under this Plan to the fullest extent authorized or provided by the Bankruptcy Code . . . ."  (Modified Plan, art. 11.14.)

33.    Thus, the Plan Modification Order precludes and permanently enjoins all Persons, on and after the Effective Date from "commencing or continuing in any manner any Claim, action, employment of process, or other proceeding of any kind with respect to any Claim, Interest, Cause of Action, or any other right or Claim against the Reorganized Debtors, which they possessed or may possess prior to the Effective Date . . . ."  (Plan Modification Order, ¶ 22.)

34.    The Antitrust Actions plainly constitute "claims" within the meaning the Bankruptcy Code, which were discharged by the Plan Modification Order.  See 11 U.S.C. § 101(5) (defining "claim" as any "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured").  Specifically, as Judge Gropper recently found when enforcing the Lear plan injunction against these same Plaintiffs, antitrust plaintiffs "hold 'claims' where the conduct constituting an alleged antitrust violation takes place before plan confirmation."  In re Lear Corp., No. 09-14326 (ALG), 2012 WL 443951, at *8 (Bankr. S.D.N.Y.

15

Feb. 10, 2012) (citing <u>In re Envirodyne Indus., Inc.</u>, 214 B.R. 338 (N.D. Ill. 1997) and <u>In re Penn Cent. Transp. Co.</u>, 771 F.2d 762 (3d Cir. 1985)).

35.      In <u>Lear</u>, reorganized Lear Corporation ("Lear") sought entry of an order enforcing the discharge provisions of its plan of reorganization against Plaintiffs and directing dismissal of the Antitrust Actions.  <u>In re Lear Corp.</u>, 2012 WL 443951, at *1.  Judge Gropper found that antitrust claims constitute "claims" within the meaning of the Bankruptcy Code, and the fact that Plaintiffs did not discover those claims prior to confirmation of the Lear plan "'would not be a ground for exception from the discharge.'" <u>Id.</u> at *8-9 (quoting <u>In re Penn Cent. Transp. Co.</u>, 42 B.R. 657, 675 (E.D. Pa. 1984)).  As such, Judge Gropper enjoined Plaintiffs from prosecuting the Antitrust Actions against reorganized Lear to the extent that the actions were premised on Lear's pre-effective date conduct.  <u>Id.</u> at *11.

36.      Here, as against the Reorganized Debtors, there can be no question that the Antitrust Actions arise from alleged pre-Effective Date conduct.  The Reorganized Debtors sold the Automotive Wire Harness Systems assets – including the assets owned by Delphi Furukawa – to New Delphi upon the Effective Date and, subsequent to that time, the Reorganized Debtors had no further or other involvement with that line of business.  Because the Plaintiffs' claims against the Reorganized Debtors necessarily arose pre-Effective Date, this Court may properly enjoin their prosecution.  <u>See</u> <u>In re Lear Corp.</u>, 2012 WL 443951, at *11 (enjoining, in the context of the same Antitrust Actions, "the Antitrust Plaintiffs and all similarly situated plaintiffs from commencing or continuing the prosecution of claims based on conduct by the Reorganized Debtors that occurred before the Effective Date" as such claims had been discharged pursuant to plan of reorganization).  If the Plaintiffs wish to proceed against the Reorganized Debtors, their only alternative is to seek permission to file a late proof of claim in this Court.  <u>See</u> <u>id.</u> at *9

16

(explaining that antitrust Plaintiffs' recourse against reorganized debtor is to request permission to file late proof of claim).

> ii.     **Plaintiffs Were Properly Served With Notice of the General and Administrative Clam Bar Dates.**

37.     Plaintiffs are bound by the Debtors' discharge and the plan injunction because Plaintiffs received proper notice at all stages of the Debtors' reorganization.  The bankruptcy record demonstrates that the Debtors provided actual and constructive notice of the bar dates and the Effective Date.  Specifically, the Debtors gave notice of the General Bar Date by (a) publication in the New York Times (national edition), the Wall Street Journal (national, European, and Asian editions), USA Today (worldwide), the Automotive News (national edition), and in local editions of the following:  the Adrian Daily Telegram, the Arizona Daily Star, the Buffalo News, the Chicago Sun Times, the Clinton News, the Columbus Dispatch, the Daily Leader, the Dayton Daily News, the Detroit Free Press, the El Paso Times, the Fitzgerald Herald Leader, The Flint Journal, the Gadsen Times, the Grand Rapids Press, the Greensville News, the Indianapolis Star, the Kansas City Star, the Kokomo Tribune, the Lansing State Journal, the Laurel Leader, the Los Angeles Daily News, the Milwaukee Journal Sentinel, the Mobile Beacon, The Mobile Register, the Oakland Press, the Olathe Daily News, the Rochester Democrat and Chronicle, the Saginaw News, the Sandusky Register, the Tribune Chronicle, the Tulsa World, The Tuscaloosa News, and the Vindicator; and (b) electronically through posting on the Delphi legal information website, www.delphidocket.com.  (See Affs. of Publication (Docket Nos. 3513, 3516, 3518, 3522-3526, 3528-3535, 3537, 3663-3674, 3676-3684, 3708).)

38.     The Debtors gave notice of the First Administrative Bar Date by (a) publication in the Detroit Free Press, the New York Times (national edition), the Wall Street Journal (national, European, and Asian editions), and USA Today (worldwide) and (b) electronically through

17

posting on the Delphi legal information website, www.delphidocket.com.  (Affs. of Publication
(Docket Nos. 17407-17415); see also Plan Modification Order, ¶ F.2 (finding that "Debtors
published the Modification Approval Notice in the Detroit Free Press, the New York Times
(national edition), the Wall Street Journal (national, European, and Asian editions), and USA
Today (worldwide) on or before June 26, 2009").)

39.    The Debtors published notice of the Plan Modification Order, the occurrence of
the Effective Date, and the Final Administrative Expense Bar Date in the New York Times, USA
Today (national and international editions), and the Wall Street Journal (national and global
editions) on October 15, 2009.  (See Affs. of Publication (Docket Nos. 18989-18990, 19001).)

40.    Finally, the Debtors served certain Direct Purchaser Plaintiffs who, for whatever
reason, appeared in the Debtors' accounts payable and account receivable registers – including
Martinez Manufacturing, Inc., Mexican Industries in Michigan, Inc., Craft-Co Enterprises, Inc.,
Findlay Industries, Inc., and South Star Corporation – with actual notice of the General Bar Date,
the First Administrative Expense Bar Date, the Final Modification Hearing, the occurrence of the
Effective Date, and the Final Administrative Expense Bar Date.[6]  (See Aff. of Service of Evan
Gershbein re: 1) Notice of Bar Date for Filing Proofs of Claim; and 2) Proof of Claim Form
(Docket No. 3501); Aff. of Service of Evan Gershbein for Solicitation Materials Served On or
Before June 20, 2009 (Docket No. 17267); Aff. of Service of Evan Gershbein re: Notice of
(A) Order Approving Modifications to First Amended Joint Plan of Reorganization of Delphi

---

[6]    Of the Direct Purchaser Plaintiffs only two – Paesano Connecting Systems, Inc. and Cesar-Scott, Inc.
– were not served with actual notice of the bar dates.  These Plaintiffs do not allege that they were
Delphi customers.  (See Ex. C, ¶¶ 17, 20.)  Moreover, neither has challenged the sufficiency of
publication notice as to them.

Corp. and Certain Affiliates, Debtors and Debtors-in-Possession and (B) Occurrence of Effective

Date (Docket No. 18978).)[7]

41.    Notice of the claims bar dates was proper under the circumstances because, as

admitted in the Complaints, nearly all Plaintiffs were unknown (and not reasonably knowable) to

the Debtors. (See Ex. A, ¶ 205 (alleging End-Payor Plaintiffs had "no direct contact or

interaction with any of the Defendants"); Ex. B, ¶¶ 23, 25, 27, 29, 31, 33, 35, 37, 39, 41, 43, 45,

47, 49, 51, 53, 55, 57, 59, 61, 63, 65, 67, 69, 71, 73, 75, 77, 79, 81, 83, 85 (alleging Automobile

Dealer Plaintiffs purchased Automotive Wire Harness Systems indirectly through vehicle

manufacturers).)  Generally, publication notice is adequate to inform unknown creditors of an

impending claims bar date.  See, e.g., Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306,

317 (1950) ("This Court has not hesitated to approve of resort to publication as a customary

substitute in another class of cases where it is not reasonably possible or practicable to give more

adequate warning."); In re Union Hosp. Ass'n of the Bronx, 226 B.R. 134, 139 (Bankr. S.D.N.Y.

1998) (determining publication notice constituted sufficient notice to unknown creditors).

42.    Despite receiving proper notice of the bar dates, none of the Plaintiffs filed a

proof of claim in these chapter 11 proceedings.  More importantly, despite admitting that they

were on notice of their antitrust claims since at least September 29, 2011 (or, even as early as

February 2010) none of the Plaintiffs has requested leave to file a late proof of claim against the

---

[7]    The relevant portions of these affidavits are attached to this Motion as Exhibits F through H.

Reorganized Debtors.[8]  (See Ex. A, ¶ 205 (alleging Plaintiffs learned of conspiracy on September 29, 2011); Ex B, ¶ 234 (alleging Plaintiffs learned of conspiracy in February 2010); Ex. C, ¶ 138 (alleging Plaintiffs learned of conspiracy in February 2010).)  Accordingly, as against the Reorganized Debtors, Plaintiffs' claims are barred, discharged, and enjoined.  This Court should order Plaintiffs to cause the claims against the Reorganized Debtors in the Antitrust Actions to be dismissed without prejudice to Plaintiffs' right to seek leave of this Court to file a late proof of claim.

**B.    The Antitrust Actions Cannot Be Maintained Against New Delphi.**

**i.    New Delphi Acquired the New Delphi Acquired Assets Free and Clear of Claims.**

43.    A fundamental component and condition of New Delphi's agreement to acquire the New Delphi Acquired Assets, including the Automotive Wire Harness Systems assets, was the understanding that New Delphi would acquire those assets free and clear of any and all claims, including, without limitation, claims premised on successor liability or theories of antitrust.  All similarly situated buyers in the context of a bankruptcy seek the same protections.  In this instance, the buyers' demand for a free and clear order was particularly important because, due to the complex nature of the Debtors' business, it was impossible to quantify unknown and unmatured claims against the Debtors.  Not wanting to assume potentially limitless liability for the Debtors' pre-Effective Date conduct, New Delphi insisted on the free and clear language that

---

[8]    Even if Plaintiffs were to seek authorization to file late proofs of claim, they cannot demonstrate excusable neglect sufficient to justify such authorization.  See Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 395 (1993) (setting forth excusable neglect standard); Asbestos Personal Injury Plaintiffs v. Travelers Indem. Co. (In re Johns Manville Corp.), 476 F.3d 118, 120 (2d Cir. 2007) (adopting "strict" standard for excusable neglect).  For example, Plaintiffs cannot justify their lengthy (and ongoing) delay to file proofs of claim, especially in light of Judge Gropper's opinion in Lear in which he expressly instructed Plaintiffs that they must seek to file late proofs of claim if they wish to pursue the Antitrust Actions against a reorganized debtor.  See In re Lear Corp., 2012 WL 443951, at *9.

was included in the Master Disposition Agreement, incorporated into the Modified Plan, and

sanctioned by this Court's Plan Modification Order.  Indeed, if this Court had not issued the free

and clear order, it is unlikely that New Delphi would have purchased the New Delphi Acquired

Assets.  Thus, no less than five different provisions of the Plan Modification Order confirm that

those assets were purchased free and clear of liability for any and all claims.  (See Plan

Modification Order, ¶¶ H.2, H.4, 9, 10(a), 10(b).)

  44. As this Court explicitly recognized in the Plan Modification Order:

> The Purchasing Entities **would not have entered into the MDA Documents and
> would not consummate the transactions contemplated thereby**, thus adversely
> affecting the Debtors, their estates, and their creditors, **if the sale of the Acquired
> Assets and the Sale Securities to the Purchasing Entities**, the assignment of the
> Acquired Contracts to the Purchasing Entities, the assumption of the Assumed
> Liabilities, and any other liabilities specifically assumed under the Master
> Disposition Agreement or assumed and assigned pursuant to paragraphs 38 and
> 61 of this order, by the Purchasing Entities and the Company Sale Securities **were
> not free and clear of all Property Interests or if the Purchasing Entities would,
> or in the future could, be liable for any of the Property Interests**, other than
> Assumed Liabilities, any other liabilities specifically assumed under the Master
> Disposition Agreement or assumed and assigned pursuant to paragraphs 38 and
> 61 if this order, and Permitted Encumbrances.

(Id. ¶ H.4 (emphases added).)  Extinguishing successor liability claims is particularly appropriate

in such circumstances.  See In re Trans World Airlines, Inc., 322 F.3d 283, 292-93 (3d Cir. 2003)

(finding that asset sale was facilitated by free and clear order and that sale free and clear of

successor liability claims was necessary to preserve jobs and funding for benefits); see also In re

Grumman Olson Indus., Inc., 445 B.R. 243, 249 (Bankr. S.D.N.Y. 2011) (finding that extending

the "free and clear" provisions to in personam claims "serves two important bankruptcy policies":

(1) preventing the plaintiff from recovering from the successor while leaving other creditors to

recover from the proceeds of the asset sale; and (2) maximizing the value of assets sold); In re

White Motor Credit Corp., 75 B.R. 944, 951 (Bankr. N.D. Ohio 1987) ("The effects of successor

liability in the context of a corporate reorganization preclude its imposition.  The successor

liability specter would chill and deleteriously affect sales of corporate assets, forcing debtors to

accept less on sales to compensate for this potential liability.").

45.    Thus, the Master Disposition Agreement, as incorporated into the Modified Plan,

includes "free and clear" language, which expressly states that New Delphi did not incur

successor liability as a result of its purchase of the New Delphi Acquired Assets:

> Except where expressly prohibited under applicable law, upon the Closing, ***the Buyers shall not be deemed to***: (a) be the successor of the Filing Affiliates; (b) have, de facto, or otherwise, merged with or into the Filing Affiliates; (c) be a mere continuation or substantial continuation of the Filing Affiliates or the enterprise(s) of the Filing Affiliates; or (d) ***be liable for any acts or omissions of the Filing Affiliates in the conduct of the Business or arising under or related to the Acquired Assets*** other than as set forth in this Agreement.  Without limiting the generality of the foregoing, and except as otherwise provided in this Agreement, the Buyers shall not be liable for any Claims against the Filing Affiliates or any of their predecessors or affiliates, and ***the Buyers shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date***, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business or any obligations of the Filing Affiliates arising prior to the Closing Date . . . except as expressly provided in this Agreement.

(Master Disposition Agreement, art. 14.6 (emphases added).)

46.    Similarly, the Plan Modification Order includes "free and clear" language finding

and ordering that New Delphi would not incur successor liability upon acquisition of the New

Delphi Acquired Assets.  (See Plan Modification Order, ¶¶ H.2, H.4, 10(a)-(b).)

47.    Specifically, in its findings of fact and conclusions of law, the Court found that

the Purchasing Entities are not successors to the Debtors or their estates:

> None of the Purchasing Entities is a mere continuation of the Debtors or their estates. The Purchasing Entities are a separate and distinct group from the Debtors, and there is no continuity of ownership or enterprise between any of the Purchasing Entities and the Debtors following the Effective Date of the Modified Plan. None of the Purchasing Entities is holding itself out to the public as a continuation of the Debtors.  None of the Purchasing Entities is a successor to the Debtors or their estates and neither the consummation of the Modified Plan, nor the completion of the transaction contemplated under the MDA Documents,

22

amounts to a consolidation, merger, or de facto merger of any of the Purchasing Entities and the Debtors.

(<u>Id.</u> ¶ H.2.)

48.     The Court also found that the transfer of assets to the Purchasing Entities will vest

the Purchasing Entities

> with all right, title, and interest of the Sellers (as defined the Master Disposition Agreement) to the Acquired Assets and the Sale Securities ***free and clear*** . . . of liens, claims, encumbrances and other interests (collectively, the "Property Interests") including, but not limited to, . . . all debts or obligations arising in any way in connection with any agreements, acts, or failures to act, of any of the Debtors or any of the Debtors' predecessors or affiliates, Claims (as that term is defined in the Bankruptcy Code), obligations, liabilities, demands, guaranties, options, rights, contractual or other commitments, restrictions, interests, and matters of any kind and nature, whether known or unknown, contingent or otherwise, whether arising prior to or subsequent to the commencement of the Chapter 11 Cases, and whether imposed by agreement, understanding, law, equity or otherwise, ***including, but not limited to, Claims otherwise arising under doctrines of successor liability and related theories*** . . . .

(<u>Id.</u> ¶ H.4 (emphases added).)

49.     Upon making the foregoing findings of fact and conclusions of law, the Court

ordered that:

> Pursuant to the terms of the MDA Documents, sections 363 and 1123(a)(5) of the Bankruptcy Code, as applicable, and this order, on the Effective Date the Debtors shall consummate the transfer, ***free and clear*** of Property Interests, Claims, liens, and encumbrances pursuant to the terms of the MDA Documents and this order to the Purchasing Entities of the Acquired Assets . . . in accordance with the MDA Documents.

(<u>Id.</u> ¶ 9 (emphasis added).)

50.     The Court also ordered that:

> [F]ollowing consummation of the Modified Plan on the Effective Date, the Purchasing Entities shall not be liable for any Property Interests or Claims against the Debtors or any of their predecessors or Affiliates, and ***the Purchasing Entities shall have no successor or vicarious liability of any kind or character including, but not limited to, any theory of antitrust***, environmental, successor or transferee liability, labor law, de facto merger, substantial continuity, or product line, whether known or unknown as of the Closing (as defined in the Master

23

Disposition Agreement), now existing or hereafter arising, whether fixed or contingent, with respect to the Debtors or any obligations of the Debtors arising prior to the Closing.

(Id. ¶ 10(a) (emphasis added).)

51.    The Court additionally ordered that the "Debtors may sell the Acquired Assets and Sale Securities free and clear of all Property Interests because one or more the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code have been satisfied." (Id. ¶ 10(b).)  In this Circuit and District it is settled that free and clear orders issued pursuant to Section 363(f) of the Bankruptcy Code properly extinguish both "in personam claims, including any potential state successor or transferee liability claims . . . as well as in rem interests."  In re Chrysler LLC, 405 B.R. 84, 111 (Bankr. S.D.N.Y. 2009), aff'd, 576 F.3d 108 (2d Cir. 2009), vacated on other grounds, 556 U.S. 960 (2009); see also id. ("tort claims are interests in property such that they are extinguished by a free and clear sale under section 363(f)(5)") (following In re Trans World Airlines, Inc., 322 F.3d 283 (3d Cir. 2003)); In re Grumman Olson Indus., Inc., — B.R. —, 2012 WL 1038672, at *5 (S.D.N.Y. Mar. 29, 2012) ("Section 363(f) 'can be used to sell property free and clear of claims that could otherwise be assertable against the buyer of the assets under the common law doctrine of successor liability.'" (citation omitted)); In re General Motors Corp., 407 B.R. 463, 501, 504 (Bankr. S.D.N.Y. 2009) (finding that "property can be sold free and clear of successor liability claims" and noting that the "caselaw is not split in this Circuit and District").

52.    Thus, the Plan Modification Order permanently enjoins actions against New Delphi premised on pre-Effective Date conduct or theories of successor liability, including the Antitrust Actions:

Upon the Closing (as defined in the Master Disposition Agreement), *all Persons holding Property Interests against or in the Debtors, the Acquired Assets, or the Sale Securities of any kind or nature whatsoever shall be, and hereby are, forever barred, estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing such Property Interests of any kind or nature whatsoever*

24

> *against the Purchasing Entities*, their property, their successors and assigns, or the Acquired Assets, the Sale Securities, or any Person who the Sale Securities, as an alleged successor or otherwise, with respect to any Property Interest of any kind or nature whatsoever such Person or entity had, has, or may have against or in a Debtor, a Debtor's estate, their respective officers, directors, shareholders, the Acquired Assets, or the Sale Securities, other than as specifically set forth herein, including, without limitation, the right to enforce Assumed Liabilities under the MDA Documents.

(Plan Modification Order, ¶ 10(b) (emphasis added).)

53.     Each of the Plaintiffs is bound by the free and clear order, bar against successor

liability, and plan injunction because they received adequate notice of the sale of the New Delphi

Acquired Assets and the Final Modification Hearing.  As this Court already found:

> (i) proper, timely, adequate, and sufficient notice of the Auction, the sale under the MDA Documents, and the Final Modification Hearing [was] provided in accordance with Bankruptcy Rules 2002, 6004(a), and 6006(c) and in compliance with the Modification Procedures Order, (ii) such notice was good and sufficient, and appropriate under the particular circumstances, and reasonably calculated to reach and apprise all parties in interest of the Procedures . . . the Auction, and the sale under the MDA Documents, or the Final Modification Hearing [as] necessary.

(Id. ¶ F.5; see also supra ¶¶ 37-40 (setting forth Debtors' notice of bar dates).)

### ii.     As Against New Delphi, the Antitrust Actions Are Disguised Successor Liability Claims Enjoined by the Plan Modification Order.

54.     The Antitrust Actions violate the free and clear order and injunction because they

are premised on pre-Effective Date conduct and, as such, are merely disguised successor liability

claims.  The Complaints acknowledge that the complained-of conspiracy was formed pre-

Effective Date.  (See Ex. A, ¶¶ 174, 179, 182, 184-86 (alleging certain defendants formed or

entered conspiracy in January 2000, January 2003, or January 2006); Ex. B, ¶¶ 185, 194, 197,

207, 212 (same); Ex. C, ¶¶ 134, 136-37 (same).).  Moreover, as Plaintiffs recognize, New Delphi

did not continue or acquire the Debtors' joint venture with Furukawa.  (See Ex. A, ¶¶ 75-81.)

Thus, New Delphi's participation in a cartel cannot be inferred from the existence of this wholly

pre-Effective Date relationship.  Perhaps most importantly, the Complaints allege that the

25

bidding process for Automotive Wire Harness Systems typically begins approximately three years prior to the start of production of a new car model.  (Ex. A, ¶ 139; Ex. B, ¶ 135; Ex. C, ¶ 95.)  By this allegation, Plaintiffs effectively *admit* that New Delphi's post-Effective Date sales of Automotive Wire Harness Systems occurred pursuant to contracts negotiated pre-Effective Date.  Plaintiffs have not come forward with any post-Effective Date actions taken by New Delphi in furtherance of the alleged conspiracy.  Allowing the Antitrust Actions to proceed despite these deficiencies would be tantamount to a determination that, contrary to this Court's findings of fact and conclusions of law, New Delphi purchased antitrust liability along with the New Delphi Acquired Assets.  This would turn bankruptcy policy on its head.

55.      In order to overcome the free and clear order and injunction, Plaintiffs would need to point to facts demonstrating that New Delphi entered the conspiracy on or after October 6, 2009.  In particular, Plaintiffs must show that New Delphi entered into the purported conspiracy, post-Effective Date, with knowledge of its alleged co-conspirators' past wrongful acts *and* with the intent to pursue the same objectives.  See Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 764 (1984) (holding that antitrust plaintiff must prove alleged conspirator "'had a conscious commitment to a common scheme designed to achieve an unlawful objective.'" (citation omitted)); Tunis Bros. v. Ford Motor Co., 763 F.2d 1482, 1491 (3d Cir. 1985) (explaining that joint and several liability may be imposed where antitrust defendant "with knowledge of the conspiracy, aid[s] or assist[s] in carrying out the purposes of the conspiracy"), vacated on other grounds, 475 U.S. 1105 (1986); Havaco of Am., Ltd. v. Shell Oil Co., 626 F.2d 549, 554 (7th Cir. 1980) ("It is well recognized that a co-conspirator who joins a conspiracy with knowledge of what has gone on before and with an intent to pursue the same objectives may, in the antitrust context, be charged with the preceding acts of its co-conspirators."); Tri-R Sys., Ltd. v. Friedman

& Son, Inc., 518 F. Supp. 1271, 1277 (D. Colo. 1981) ("A person does not become liable as a conspirator unless he knows of the existence of the conspiracy, agrees to become a party and with that knowledge commits some act in furtherance thereof.").

56.    Plaintiffs have failed to meet this burden.  At most, the Complaints allege that New Delphi manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased during the Class Period, including post-Effective Date.  (See Ex. A, ¶¶ 72-73, 82; Ex. B, ¶¶ 86-89; Ex. C, ¶¶ 23-26.)  Of course this is true; New Delphi bought the assets and assumed certain contracts that comprised this business.  These actions alone cannot be sufficient to override the free and clear order and the bar against successor liability, especially when unaccompanied by *any* allegations of post-Effective Date knowledge and intent.

57.    If the Antitrust Actions are allowed to proceed against New Delphi as currently pled, without specific allegations of post-Effective Date conduct, then, as a practical matter, the free and clear order is illusory because the moment New Delphi sold an Automotive Wire Harness System (i.e., the very moment it acquired the New Delphi Acquired Assets), it incurred potential liability as a successor to the Debtors.  This plainly contravenes the plain language of the Court's order, as well as its spirit and intent.  Moreover, allowing Plaintiffs to proceed in the face of the free and clear order and injunction would undermine sound bankruptcy policy that seeks to ensure that (a) debtors receive top value for their assets and (b) confirmation orders are final orders.  See In re Grumman Olson Indus., Inc., 445 B.R. at 249 (finding that extending free and clear order to in personam claims serves important bankruptcy policy of maximizing value of assets sold); In re Cross Media Marketing Corp., 367 B.R. at 447 (confirmation orders are final judgments with full res judicata effect); see also In re Winn-Dixie Stores, Inc., 377 B.R. 322, 331 (M.D. Fla. 2007) (noting the "strong public policy in favor of upholding the finality of

confirmation orders" (citing In re Continental Airlines, 91 F.3d 553, 565 (3d Cir. 1996)).  If

buyers develop a concern that asset sale orders absolving them of successor liability are

meaningless, then buyers will factor potential successor liability into the price they are willing to

pay for debtors' assets, thereby reducing the value of those assets and, concomitantly, the value

of the debtors' estates and the recovery to creditors.

58.    This Court should not set such precedent.  Rather, this Court can and should

enforce the free and clear order embodied in the Plan Modification Order by enjoining Plaintiffs

from prosecuting their veiled successor liability claims against New Delphi.  See In re Old Carco

LLC (f/k/a Chrysler LLC), Case No. 09-50002 (AJG) (Bankr. S.D.N.Y. Aug. 31, 2009) (Docket

No. 5272) (granting motion to enforce "free and clear" provisions of asset sale order and

enjoining automobile dealers from bringing state administrative proceedings against purchaser),

aff'd, Case Nos. 09-8875 (CM), 09-8887 (CM) (S.D.N.Y. Jul. 2, 2010) (Docket No. 35), aff'd,

Case Nos. 10-3093, 10-3127 (2d Cir. Nov. 15, 2011) (Docket No. 159); see also In re Paris Indus.

Corp., 132 B.R. 504, 506 (D. Me. 1991) (affirming injunction against products liability claims

premised on successor liability); In re P.K.R. Convalescent Ctrs., Inc., 189 B.R. 90, 96 (Bankr.

E.D. Va. 1995) (preemptively enjoining successor liability claims against prospective purchaser

of assets); In re White Motor Credit Corp., 75 B.R. at 947 (enjoining continued prosecution of

state product liability, contribution and indemnity actions against purchaser of assets); Am.

Living Sys. v. Bonapfel (In re All Am. of Ashburn, Inc.), 56 B.R. 186, 188-89 (Bankr. N.D. Ga.

1986) (enjoining continued prosecution of product liability action against purchaser of assets),

aff'd, 805 F.2d 1515 (11th Cir. 1986).

59.    Specifically, this Court should find, like Judge Gropper recently did in Lear, that

Plaintiffs cannot continue to prosecute the Antitrust Actions against New Delphi "based on

28

conduct . . . that occurred before the Effective Date." In re Lear, 2012 WL 443951, at *11

(enforcing discharge provision of plan of reorganization against same Plaintiffs).  Moreover,

because this case is distinguishable from Lear in that it involves an asset sale as opposed to a

reorganization, this Court should also find that Plaintiffs' conclusory allegations of liability are

insufficient to override the free and clear order and bar against successor liability, even though

they carry a post-Effective Date label.  Compare id. at *10 (concluding that antitrust court should

determine sufficiency of conclusory allegation that, post-emergence, Lear continued to sell

Automotive Wire Harness Systems at supra-competitive prices in furtherance of conspiracy),

with Ex. A, ¶ 82 (alleging that, post-Effective Date, New Delphi continued to sell Automotive

Wire Harness Systems at supra-competitive prices in furtherance of conspiracy).

60.    New Delphi, unlike the reorganized debtors in Lear, was formed by the buyers of

the New Delphi Acquired Assets, who bargained for and obtained a clean slate by way of the

free and clear order and the bar against successor liability claims.  Compare In re Lear Corp., No.

09-14326 (ALG) (Bankr. S.D.N.Y., Nov. 5, 2009) (Docket No. 1070) (confirming plan

providing for all of debtors' assets to vest in reorganized debtors), with Plan Modification Order

(confirming plan providing for Debtors' retained assets to vest in Reorganized Debtors, and

approving sale of New Delphi Acquired Assets to New Delphi free and clear of liens and claims,

including successor liability claims, under Bankruptcy Code section 363(f) and finding that New

Delphi is not a successor to Debtors).  In this case, the sale of the New Delphi Acquired Assets

and, ultimately, the Debtors' ability to emerge from bankruptcy protection, hinged on the buyers'

ability to obtain an order that New Delphi would not assume liability for pre-Effective Date

conduct.  The price the buyers paid for the Debtors' assets took into account this fundamental

pre-condition to the sale, and five separate provisions of the Plan Modification Order ensure that

29

the buyers received the benefit of that bargain.  (See Plan Modification Order, ¶¶ H.2, H.4, 9, 10(a), 10(b).)  The threadbare allegation that New Delphi sold Automotive Wire Harness Systems post-Effective Date (and pursuant to assumed, pre-Effective Date contracts) should not be enough force New Delphi to defend against the Antitrust Actions in the Michigan District Court, thereby unraveling the deal the buyers struck and this Court approved.

61.    Because the free and clear order and injunctive provisions of the Plan Modification Order that pertain to New Delphi were "absolutely central to confirmation and implementation of the plan," "the applicability of the injunction is and should be treated as a gate keeping issue."  See In re DPH Holdings Corp., Feb. 25, 2010 Hr'g Tr. at 89.  Accordingly, in order to safeguard the Modified Plan as conceived and ordered, this Court should require that, prior to attempting to amend their claims against New Delphi, Plaintiffs must first return to this Court to demonstrate that their allegations have some basis in fact and that renewed actions against New Delphi are not violative of the Modified Plan and Plan Modification Order.  This Court imposed a similar requirement upon the Debtors' salaried retirees when they attempted to sue General Motors LLC ("New GM") in the Michigan District Court for causes of action that had been released under the Plan Modification Order and the Modified Plan.  Id. at 98.  Although the salaried retirees argued that their claims against New GM were not subject to the exculpation and release provisions of the Modified Plan because "willful misconduct" is exempted from those provisions, this Court found that conclusory allegations of willfulness were insufficient to overcome the express provisions of the Plan Modification Order.  Id. at 97.  Accordingly, the Court issued an order declaring that the salaried retirees' continued prosecution of the Michigan District Court action against New GM violates the plan injunction and may not proceed.  Id. at

98.  But, that declaration was "without prejudice to the [salaried] retirees' right to come back to this [C]ourt to show additional facts as to willful misconduct." Id.

62.    Similarly here, Plaintiffs should not be allowed to proceed in the Michigan District Court on "the hope that whatever [is] 'enough'" to show actionable post-Effective Date conduct "would at some point in the future be established." Id. at 97.  Rather, Plaintiffs should first proceed against the other antitrust defendants (some of whom are admittedly guilty), and, in the unlikely event that discovery reveals a viable cause of action against New Delphi, then return to this Court to demonstrate that they can proceed against New Delphi without violating the Plan Modification Order.[9]  Unless and until Plaintiffs can make this showing, this Court should order Plaintiffs to cause the Antitrust Actions to be dismissed, as against New Delphi, without prejudice.

**C.    This Court Has Authority to Enforce the Modified Plan and Plan Modification Order.**

63.    "It is well-settled that a bankruptcy court retains jurisdiction to interpret and enforce its prior orders, especially where . . . the bankruptcy court expressly retains jurisdiction to do so." In re Grumman Olson Indus., Inc., 445 B.R. at 247-48 (citing Travelers Indem. Co. v. Bailey, 557 U.S. 137, 151 (2009)); see also, e.g., In re Lear Corp., 2012 WL 443951, at *4 ("A bankruptcy court retains post-confirmation jurisdiction to interpret and enforce its own orders, particularly when disputes arise over a bankruptcy plan of reorganization." (citing Luan Inv. S.E. v. Franklin 145 Corp. (In re Petrie Retail, Inc.), 304 F.3d 223, 230 (2d Cir. 2002)); In re

---

[9]    If such evidence exists – and New Delphi denies that it does – it should not be difficult for Plaintiffs to discover, even if prosecution of the Antitrust Actions against New Delphi and the Reorganized Debtors is enjoined.  The Plaintiffs have named as defendants 30 other alleged co-conspirators from whom that can discover information, including five defendants who have already admitted to participating in a cartel.

31

Continental Airlines, Inc., 236 B.R. 318, 325 (D. Del. 1999) ("It is axiomatic that a court

possesses the inherent authority to enforce its own orders."); Back v. AM Gen. Corp. (In re

Chateaugay Corp.), 213 B.R. 633, 640, 641 (S.D.N.Y. 1997) (finding bankruptcy court has

"inherent jurisdiction to enjoin state court successor liability actions against purchaser of debtors'

assets). Indeed, "the retention of jurisdiction is particularly appropriate where, as here, the

bankruptcy court expressly retains jurisdiction under the plan." In re Lear Corp., 2012 WL

443951, at *5 (citing LTV Corp. v. Back (In re Chateaugay Corp.), 201 B.R. 48, 66 (Bankr.

S.D.N.Y. 1996)).

        64.    Moreover, section 105 of the Bankruptcy Code provides that [t]he court may issue

any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the

Bankruptcy Code]." 11 U.S.C. 105(a); see also In re Chateaugay Corp., 213 B.R. at 640 (finding

that section 105 "codif[ies] the bankruptcy court's inherent power to enforce its own orders").

Substantial consummation of a plan of reorganization does not divest the bankruptcy court of this

power. See In re Continental Airlines, 236 B.R. at 326 ("In the bankruptcy context, courts have

specifically and consistently held that the bankruptcy court retains jurisdiction, inter alia, to

enforce its confirmation order." (collecting cases)); see also Fed. R. Bankr. P. 3020(d)

("Notwithstanding the entry of the order of confirmation, the court may issue any other order

necessary to administer the estate.").

        65.    In the circumstances here, the Court can and should enforce the Plan Modification

Order by enjoining Plaintiffs from prosecuting the Antitrust Actions against the Reorganized

Debtors and New Delphi. This Court expressly retained "jurisdiction to enforce and implement

the terms and provisions of [the Plan Modification Order and] the MDA Documents" and should

exercise that jurisdiction here. (See Plan Modification Order, ¶ 56 (retaining "exclusive

jurisdiction as provided in the Modified Plan over all matters arising out of, and related to, the

Chapter 11 Cases and the Modified Plan to the fullest extent permitted by law").)  Moreover, it is

especially appropriate for this Court to exercise its power to enforce the Plan Modification Order

in this case because, by filing the Antitrust Actions, Plaintiffs have "act[ed] potentially in

violation of an injunction without seeking permission from the Court that issued the injunction."

In re DPH Holdings Corp., Feb. 25, 2010 Hr'g Tr. at 89.

**D.    The Reorganized Debtors and New Delphi Will Suffer Harm If Plaintiffs Continue
to Prosecute the Antitrust Actions.**

66.    Under settled law, when a party unilaterally violates a bankruptcy court order, that

violation, standing alone, constitutes the only harm necessary for a renewed injunction. See, e.g.,

Balanoff v. Glazier (In re Steffan), 97 B.R. 741, 746 (Bankr. N.D.N.Y. 1989) ("Since injunctions

in bankruptcy cases are authorized by statute, the usual equitable grounds for relief, such as

irreparable damage, need not be shown." (citation omitted)).

67.    The Movants have been harmed by having to litigate claims in Michigan District

Court that were permanently enjoined by the Plan Modification Order. The Movants have

already been forced to incur fees and costs in defending the Antitrust Actions and in bringing this

Motion. The Movants would be harmed further in the (unlikely) event that the Michigan District

Court entered a judgment against them in favor of Plaintiffs.  The Movants also may have to

defend a dismissal of the Antitrust Actions on appeal. Under all scenarios, the Movants are faced

with both the threat of liability and the expense of attorneys' fees. These harms arise from the

direct violation of the Modified Plan and this Court's Plan Modification Order.

68.    Additionally, continued prosecution of the Antitrust Actions may be harmful to all

creditors of the Reorganized Debtors.  Specifically, if the Reorganized Debtors incur a large

administrative claim as a result of the Antitrust Actions, it could impair their ability to satisfy all

33

administrative claims in full as required under the Modified Plan.  This would be highly prejudicial to all creditors who had no expectation of the Plaintiffs' claims.  See In re DPH Holdings Corp., Dec. 18, 2009 Hr'g Tr. at 71 ("[A]llowing a late claim after a plan has been confirmed, materially alters the distribution to creditors that would prejudice the creditors who relied on the disclosed distributions when voting to accept or reject the plan.").

69.    The Reorganized Debtors and New Delphi should be able to rely on the Modified Plan and the Plan Modification Order.  They should not be compelled to litigate disallowed and discharged claims in the Antitrust Actions, especially where Plaintiffs have not sought relief in this Court from the plan injunctions.

## Conclusion

70.    This Court should issue the requested injunction.  If Plaintiffs are allowed to proceed with the Antitrust Actions the efficacy of the Modified Plan and the Plan Modification Order will come into question.  This will irreparably harm not only the Movants – who will be forced to incur the expense and risk associated with defending against claims that were extinguished – but also the creditors of the Reorganized Debtors, all of whom should be able to rely on the finality of Modified Plan and the Plan Modification Order.

## Notice

Notice of this Motion has been provided in accordance with the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered March 20, 2006 (Docket No. 2883), and the Twenty-Sixth Supplemental Order Under 11 U.S.C. §§ 102(l) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management,

And Administrative Procedures, entered January 20, 2012 (Docket No. 21816).  In light of the

nature of the relief requested, the Movants submit that no other or further notice is necessary.

### Prior Request

No prior request for the relief sought in this Motion has been made to this or any other

Court.

WHEREFORE, the Movants respectfully request that this Court enter an order

(a) enforcing the Modified Plan and Plan Modification Order; (b) enjoining Plaintiffs from

prosecuting the Antitrust Actions against the Reorganized Debtors and New Delphi; (c) directing

Plaintiffs to take such action necessary to dismiss the Antitrust Actions as against the

Reorganized Debtors and New Delphi; and (d) granting the Movants such other and further relief

as is just.

Dated:  New York, New York
         May 24, 2012

Respectfully submitted,

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP


By:   /s/ Ron E. Meisler
      Albert L. Hogan III
      Ron E. Meisler
      155 North Wacker Drive
      Chicago, Illinois 60606

      - and -

      Four Times Square
      New York, New York 10036

      Attorneys for DPH Holdings Corp., et al.,
      Reorganized Debtors, and Delphi Automotive
      LLP

35

**EXHIBIT A**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| IN RE AUTOMOTIVE WIRE HARNESS SYSTEMS ANTITRUST LITIGATION | : | Master File No. 12-md-02311 |
|  | : |  |
|  | : | CONSOLIDATED AMENDED CLASS ACTION COMPLAINT |
| THIS DOCUMENT RELATES TO: | : |  |
|  | : |  |
| END-PAYOR ACTIONS | : | JURY TRIAL DEMANDED |
|  | : |  |

Plaintiffs Rebecca Lynn Morrow; Erica Shoaf; Ifeoma Adams; Melissa Barron; John

Hollingsworth; Meetesh Shah; Gary Arthur Herr; Michael Tracy; Jane Taylor; Jennifer Chase;

Darrel Senior; AGA Realty LLC;  James Marean; Ron Blau; Roger Olson; Susan Olson; Nilsa

Mercado; Darcy Sherman; Curtis Gunnerson; David Bernstein; Ellis Winston McInnis; Thomas

Wilson; Lauren C Primos; Robert Klingler; Jessica DeCastro; Lori Curtis; Virginia Pueringer;

Nathan Croom; Richard Stoehr; Edward Muscara; Michael Wick; Ian Groves; Tenisha Burgos;

Jason Grala; Peter Brook; Kathleen Tawney; Kelly Klosterman; Melinda Harr DDS PC; Cindy

Prince; Paul Gustafson; Frances Gammell Roach; William Picotte; Phillip Young; Becky

Bergeson; Jessee Powell; Alena Farrell; Jane FitzGerald; Arthur Stukey; Janne Rice; Robert

Rice, Jr.; Stacey Nickell; Carol Ann Kashishian; and Susan LaCava (collectively, "Plaintiffs"),

on behalf of themselves and all others similarly situated (the "Classes" as defined below), upon

personal knowledge as to the facts pertaining to them and upon information and belief as to all

other matters, and based on the investigation of counsel, bring this class action for damages,

injunctive relief and other relief pursuant to federal antitrust laws and state antitrust, unfair

competition, and consumer protection laws, Plaintiffs demand a trial by jury, and allege as

follows:

## NATURE OF ACTION

1.     This lawsuit is brought as a proposed class action against Defendants, the largest suppliers of Automotive Wire Harness Systems (defined below) globally and in the United States, for engaging in a massive, decade-long conspiracy to unlawfully fix and artificially raise the prices of these products.  Defendants' conspiracy successfully targeted the long-struggling United States automotive industry, raising prices for car manufacturers and consumers alike.

2.     Plaintiffs seek to represent consumers who purchased or leased new motor vehicles containing Automotive Wire Harness Systems or replacement Automotive Wire Harness Systems during the period from and including January 1, 2000 through such time as the anticompetitive effects of Defendants' conduct ceased (the "Class Period").

3.     "Automotive Wire Harness Systems" are automotive electrical distribution systems used to direct and control electronic components, wiring, and circuit boards in an automotive vehicle.  Essentially, Automotive Wire Harness Systems serve as the "central nervous system" of a motor vehicle.   "Automotive Wire Harness Systems" include the following:  automotive electrical wiring, lead wire assemblies, cable bond, automotive wiring connectors, automotive wiring terminals, electronic control units, fuse boxes, relay boxes, junction blocks, power distributors, and speed sensor wire assemblies.

4.     The Delphi Defendants, the Denso Defendants, the Fujikura Defendants, the Furukawa Defendants, the Lear Defendants, the Leoni Defendants, the Sumitomo Defendants, S-Y Systems, the Yazaki Defendants, the Tokai Rika Defendants, and the G.S. Electech Defendants (all as defined below, and collectively "Defendants") manufacture, market, and sell Automotive Wire Harness Systems throughout the United States.  The manufacture and sale of Automotive Wire Harness Systems is a multi-billion dollar industry.

5.      Defendants and other co-conspirators (as yet unknown) agreed, combined, and conspired to inflate, fix, raise, maintain, or artificially stabilize prices of Automotive Wire Harness Systems.

6.      Competition authorities in the United States, the European Union, and Japan have been investigating a conspiracy in the market for Automotive Wire Harness Systems since at least February 2010.  As part of its criminal investigation, the United States Department of Justice ("DOJ") is seeking information about anticompetitive conduct in the market for Automotive Wire Harness Systems, and the Federal Bureau of Investigation ("FBI") has participated in raids, pursuant to search warrants, carried out in at least some of the Defendants' offices.  The European Commission Competition Authority ("EC") has also conducted dawn raids at the European offices of several of the Defendants.

7.      As hereafter more fully alleged, Defendants Furukawa Electric Co. Ltd., Yazaki Corporation, Denso Corporation, G.S. Electech, Inc., and Fujikura Ltd., have pleaded guilty to participating in the Automotive Wire Harness Systems cartel during the Class Period and have agreed to pay substantial fines for their unlawful conduct.  These Defendants and their co-conspirators participated in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of Automotive Wire Harness Systems sold to automobile manufacturers and others in the United States.  The combination and conspiracy engaged in by these Defendants and their co-conspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

8.      As part of their plea agreements, Defendants have agreed to assist the DOJ in its ongoing criminal investigation into the automotive parts industry.

9.      As a direct result of the anti-competitive and unlawful conduct alleged herein,

Plaintiffs and the Classes paid artificially inflated prices for Automotive Wire Harness Systems

during the Class Period and have thereby suffered antitrust injury to their business or property.

## JURISDICTION AND VENUE

10.      Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to

secure equitable and injunctive relief against Defendants for violating Section 1 of the Sherman

Act (15 U.S.C. § 1).   Plaintiffs also assert claims for actual and exemplary damages pursuant to

state antitrust, unfair competition, and consumer protection laws, and seek to obtain restitution,

recover damages and secure other relief against Defendants for violation of those state laws.

Plaintiffs and the Classes also seek attorneys' fees, costs, and other expenses under federal and

state law.

11.      This Court has jurisdiction over the subject matter of this action pursuant to

Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Act (15 U.S.C. § 1),

and Title 28, United States Code, Sections 1331 and 1337.  This Court has subject matter

jurisdiction of the state law claims pursuant to 28 U.S.C. §§ 1332(d) and 1367, in that:  (i) this is

a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of

interests and costs, and in which some members of the proposed Classes are citizens of a state

different from some Defendants; and (ii) Plaintiffs' state law claims form part of the same case

or controversy as their federal claims under Article III of the United States Constitution.

12.      Venue is proper in this district pursuant to Section 12 of the Clayton Act (15

U.S.C. § 22), and 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events

giving rise to Plaintiffs' claims occurred in this district, a substantial portion of the affected

interstate trade and commerce discussed below has been carried out in this district, and one or

more of the Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this district.

13.     This Court has *in personam* jurisdiction over each of the Defendants because each Defendant, either directly or through the ownership and/or control of its United States subsidiaries, *inter alia*: (a) transacted business in the United States, including in this district; (b) directly or indirectly sold or marketed substantial quantities of Automotive Wire Harness Systems throughout the United States, including in this district; (c) had substantial aggregate contacts with the United States as a whole, including in this district; or (d) were engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this district.  Defendants also conduct business throughout the United States, including in this district, and they have purposefully availed themselves of the laws of the United States.

14.     Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial and reasonably foreseeable and intended anti-competitive effects upon interstate commerce within the United States.

15.     The activities of Defendants and their co-conspirators were within the flow of, were intended to, and did have, a substantial effect on interstate commerce of the United States. Defendants' products are sold in the flow of interstate commerce.

16.     Automotive Wire Harness Systems manufactured abroad by Defendants and sold for use in automobiles that were either manufactured in the United States or manufactured abroad and sold in the United States are goods brought into the United States for sale, and therefore constitute import commerce.  To the extent any Automotive Wire Harness Systems are

purchased in the United States, and such Automotive Wire Harness systems do not constitute import commerce, Defendants' unlawful activities with respect thereto, as more fully alleged herein during the Class Period, had, and continue to have, a direct, substantial and reasonably foreseeable effect on United States commerce.  The anticompetitive conduct, and its effect on United States commerce described herein, proximately caused antitrust injury to Plaintiffs and members of the Classes in the United States.

17.     By reason of the unlawful activities hereinafter alleged, Defendants substantially affected commerce throughout the United States, causing injury to Plaintiffs and members of the Classes.  Defendants, directly and through their agents, engaged in activities affecting all states, to fix or inflate prices of Automotive Wire Harness Systems, which conspiracy unreasonably restrained trade and adversely affected the market for Automotive Wire Harness Systems.

18.     Defendants' conspiracy and wrongdoing described herein adversely affected persons in the United States who purchased Automotive Wire Harness Systems for personal use, including Plaintiffs and members of the Classes.

**PARTIES**

19.     Plaintiff Rebecca Lynn Morrow is a Glendale, Arizona resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

20.     Plaintiff Erica Shoaf is a Phoenix, Arizona resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

21.     Plaintiff Ifeoma Adams is a Hercules, California resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

22.     Plaintiff Melissa Barron is an Oakland, California resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

23.     Plaintiff John Hollingsworth is a Saratoga, California resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

24.     Plaintiff Meetesh Shah is a Daly City, California resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

25.     Plaintiff Gary Arthur Herr is an Orlando, Florida resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

26.     Plaintiff Michael Tracy is a Pensacola, Florida resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

27.     Plaintiff Jane Taylor is a Kapaa, Hawaii resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

28.     Plaintiff Jennifer Chase is a Waterloo, Iowa resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

29.     Plaintiff Darrel Senior is a Lenexa, Kansas resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

30.     Plaintiff AGA Realty LLC, a Limited Liability Company with its principal place of business in Portland, Maine, purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

31.     Plaintiff James Marean is a Westbrook, Maine resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

32.     Plaintiff Ron Blau is a Newton Highlands, Massachusetts resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

33.     Plaintiff Roger Olson is a South Haven, Michigan resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

34.     Plaintiff Susan Olson is a South Haven, Michigan resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

35.     Plaintiff Nilsa Mercado is a Waterford, Michigan resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

36.     Plaintiff Darcy Sherman is a Minneapolis, Minnesota resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

37.     Plaintiff Curtis Gunnerson is a South Haven, Minnesota resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

38.     Plaintiff David Bernstein is a Minnetonka, Minnesota resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

39.     Plaintiff Ellis Winton McInnis is a Flowood, Mississippi resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

40.     Plaintiff Thomas Wilson is a Tupelo, Mississippi resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

41.     Plaintiff Lauren C. Primos is a Flowood, Mississippi resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

42.     Plaintiff Robert Klingler is a Manchester, Missouri resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

43.     Plaintiff Jessica DeCastro is a St. Louis, Missouri resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

44.     Plaintiff Lori Curtis is a St. Louis, Missouri resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

45.     Plaintiff Virginia Pueringer is a Billings, Montana resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

46.     Plaintiff Nathan Croom is an Omaha, Nebraska resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

47.     Plaintiff Richard Stoehr is a Henderson, Nevada resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

48.     Plaintiff Edward Muscara is a Manchester, New Hampshire resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

49.     Plaintiff Michael Wick is a Rio Rancho, New Mexico resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

50.     Plaintiff Ian Groves is an Albuquerque, New Mexico resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

51.     Plaintiff Tenisha Burgos is a Bronx, New York resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

52.     Plaintiff Jason Grala is a Holbrook, New York resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

53.     Plaintiff Peter Brook is a Bayside, New York resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

54.     Plaintiff Kathleen Tawney is a Charlotte, North Carolina resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

55.     Plaintiff Kelly Klosterman is a Mooreton, North Dakota resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

56.    Plaintiff Melinda Harr DDS PC, a corporation with its principal offices in Fargo, North Dakota, purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

57.    Plaintiff Cindy Prince is a Langlois, Oregon resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

58.    Plaintiff Paul Gustafson is a Milwaukie, Oregon resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

59.    Plaintiff Frances Gammell Roach is a Warwick, Rhode Island resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

60.    Plaintiff William Picotte is a former resident of South Dakota who purchased Automotive Wire Harness Systems indirectly from one or more Defendants in South Dakota during the Class Period.

61.    Plaintiff Phillip Young is a Bon Aqua, Tennessee resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

62.    Plaintiff Becky Bergeson is a Merry, Utah resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

63.    Plaintiff Jesse Powell is a Lehi, Utah resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

64.    Plaintiff Alena Farrell is a South Burlington, Vermont resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

65.    Plaintiff Jane FitzGerald is a Milton, Vermont resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

66.     Plaintiff Arthur Stukey is a Montpelier, Vermont resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

67.     Plaintiff Janne Rice is a Kenova, West Virginia resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

68.     Plaintiff Robert Rice, Jr. is a Kenova, West Virginia resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

69.     Plaintiff Stacey Nickell is a Beckley, West Virginia resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

70.     Plaintiff Carol Ann Kashishian is a Milwaukee, Wisconsin resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

71.     Plaintiff Susan LaCava is a Madison, Wisconsin resident who purchased Automotive Wire Harness Systems indirectly from one or more Defendants.

**The Delphi Defendants**

72.     Defendant Delphi Automotive LLP is headquartered in Troy, Michigan and is a limited liability partnership incorporated under the laws of England and Wales.  Delphi Automotive LLP, together with its subsidiaries and affiliates, manufactured Automotive Wire Harness Systems that were sold and/or purchased in the United States during the Class Period, including in this District.

73.     Defendant Delphi Automotive Systems, LLC is incorporated in Delaware and headquartered in Troy, Michigan.  Delphi Automotive Systems, LLC manufactured Automotive Wire Harness Systems that were sold and/or purchased in the United States during the Class Period, including in this District.

74.     Defendants Delphi Automotive LLP and  Delphi Automotive Systems, LLC shall collectively be referred to herein as the "Delphi Defendants" or "Delphi."

75.     Delphi Automotive LLP and Delphi Automotive Systems, LLC were both formed in 2009 to acquire certain automotive parts assets from Delphi Corporation and its subsidiaries which were then in bankruptcy.  Delphi Automotive LLP and Delphi Automotive Systems, LLC continued the Automotive Wire Harness Systems business that had been conducted by Delphi Corporation and its subsidiaries prior to their entry into the bankruptcy proceedings hereinafter more fully described.

76.     In December 2004, for example, Delphi Corporation and Furukawa Electric (defined below) announced the creation of a joint venture responsible for selling Automotive Wiring Harness Systems to Toyota in North America.  The joint venture – named Delphi Furukawa Wiring Systems LLC – was based in Warren, Ohio.  As Furukawa Electric stated in a press release:

> Delphi Furukawa Wiring Systems LLC has the abilities for design, development and quality control of Wiring Harness succeeded from Furukawa Electric and the abilities for system integration, manufacturing and customer support in North America from Delphi, in order to meet and exceeds [sic] the customer's expectations. The joint venture is responsible for the sales and engineering activities for the Wiring Harness, which both Delphi and Furukawa Electric have agreed upon for Toyota programs in North America, and it will take charge of sales activities directly to the customer.  Regarding the manufacturing of Wiring Harness, the joint venture will utilize existing Delphi's operation facility under its direction, in order to put know-how from the both parent companies.

77.     In October, 2005, Delphi Corporation and certain U.S. subsidiaries and affiliates, including Delphi Furukawa Wiring Systems LLC, filed 42 petitions for Chapter 11 bankruptcy protection.  These proceedings were jointly administered in the United States Bankruptcy Court for the Southern District of New York.  *See* Docket Nos. 05-44481 (Delphi Corporation); 05-47452 (Delphi Furukawa Wiring Systems LLC).

78.     In 2006, Delphi Furukawa Wiring Systems LLC opened a 5,500 square foot Customer Service Center at 2311 Green Road in Ann Arbor, Michigan, near the Toyota Technical Center.

79.     On July 30, 2009, the bankruptcy court approved a modified plan of reorganization.  [Docket No. 05-44481, Doc. No. 18707].  The modified plan of reorganization became effective on October 6, 2009 (the "Effective Date").

80.     On October 6, 2009, Delphi Corporation (which in bankruptcy had changed its name to DPH Holdings Corporation) substantially consummated the terms of the modified plan of reorganization.  On that date, Delphi Automotive LLP, through subsidiaries and affiliates owned and controlled by it, acquired substantially all of the bankrupt Delphi entities' global core businesses, including the portion of the bankrupt Delphi entities' Automotive Wire Harness Business.

81.     Following the Effective Date, the Delphi Defendants continued the Automotive Wire Harness Systems supply relationships that had been developed by the bankrupt entities, including, for example, Delphi Furukawa Wiring Systems LLC's supply relationship with Toyota.  Delphi Automotive Systems, LLC currently maintains and operates the Delphi Ann Arbor Customer Service Center in Ann Arbor, Michigan near the Toyota Technical Center.  On March 15, 2011, Toyota recognized "Delphi Automotive" as one of its top suppliers for 2010, noting "wire harness" among the products supplied.

82.     Following the Effective Date, the Delphi Defendants continued to sell Automotive Wire Harness Systems pursuant to, and as part of their participation in furtherance of, the conspiracy alleged herein.  From and after October 6, 2009, the Delphi Defendants sold a significant number of Automotive Wire Harness Systems in the United States at supra-

competitive prices.  For 2010 alone, Delphi Automotive LLP reported $5.6 billion in total sales

for its Electronic/Electronic Architecture business segment, which included significant sales for

Automotive Wire Harness Systems in the United States pursuant to the conspiracy.

**The Denso Defendants**

83.     Defendant Denso Corp. is a Japanese corporation.  Defendant Denso Corp. –

directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured,

marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the

United States, including in this district, during the Class Period.

84.     Defendant Denso International America, Inc. is a Delaware corporation with its

principal place of business in Southfield, Michigan.  It is a subsidiary of and wholly owned

and/or controlled by its parent, Denso Corp.  Defendant Denso International America, Inc.

manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased

throughout the United States, including in this district, during the Class Period.  At all times

during the Class Period, its activities in the United States were under the control and direction of

its Japanese parent.

85.     Defendants Denso Corp., and Denso International America, Inc. shall collectively

be referred to herein as the "Denso Defendants" or "Denso."

**The Fujikura Defendants**

86.     Defendant Fujikura Ltd. is a Japanese corporation.  Defendant Fujikura Ltd. –

directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured,

marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the

United States, including in this district, during the Class Period.

87.     Defendant Fujikura America, Inc. is a Delaware corporation with its principal place of business in Atlanta, Georgia.  It is a subsidiary of and wholly owned and/or controlled by its parent, Fujikura Ltd.  Defendant Fujikura America, Inc. manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent.

88.     Defendants Fujikura Ltd. and Fujikura America, Inc. shall collectively be referred to herein as the "Fujikura Defendants" or "Fujikura."

**The Furukawa Defendants**

89.     Defendant Furukawa Electric Co., Ltd. ("Furukawa Electric") is a Japanese corporation.  Defendant Furukawa Electric – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

90.     Defendant American Furukawa, Inc. ("American Furukawa") is a Delaware corporation with its principal place of business in Plymouth, Michigan.  It is a subsidiary of and wholly owned and/or controlled by its parent, Furukawa Electric.  Defendant American Furukawa manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent.

91.     Defendant Furukawa Wiring Systems America, Inc. f/k/a Furukawa Lear Corporation and Lear Furukawa Corporation ("Furukawa Wiring") is a Delaware corporation

with its principal place of business in El Paso, Texas.  Defendant Furukawa Wiring is 60%

owned by Furukawa Electric and 40% owned by American Furukawa.  During the Class Period,

Furukawa Wiring operated as a joint venture between Lear Corporation and Furukawa Electric

that manufactured, distributed or sold Wire Harness Products in the United States.  In June 2010,

Furukawa Electric purchased all of Lear's remaining interest.

92.     Defendants Furukawa Electric, American Furukawa and Furukawa Wiring shall

collectively be referred to herein as the "Furukawa Defendants" or "Furukawa."

**The Lear Defendants**

93.     Defendant Lear Corp. is a Delaware corporation with its principal place of

business in Southfield, Michigan.  Defendant Lear – directly and/or through its subsidiaries,

which it wholly owned and/or controlled – manufactured, marketed and/or sold Automotive

Wire Harness Systems that were purchased throughout the United States, including in this

district, during the Class Period.

94.     Defendant Kyungshin-Lear Sales and Engineering, LLC is a Delaware

corporation with its principal place of business in Selma, Alabama.  It is a joint venture between

Defendant Lear Corp. and Kyungshin Corporation of South Korea.  Defendant Kyungshin-Lear

Sales and Engineering, LLC manufactured, marketed and/or sold Automotive Wire Harness

Systems that were purchased throughout the United States, including in this district, during the

Class Period.

95.     Defendants Lear Corp. and Kyungshin-Lear Sales and Engineering, LLC shall

collectively be referred to herein as the "Lear Defendants" or "Lear."

96.     Lear filed for Chapter 11 bankruptcy protection on July 7, 2009.  After their

emergence from Chapter 11 bankruptcy proceedings on November 9, 2009, Lear continued to

sell Automotive Wire Harness Systems pursuant to and as part of its participation in furtherance of the conspiracy alleged herein.  From and after November 2009, Lear had significant Automotive Wire Harness Systems sales in the United States at supra-competitive prices.  In 2010 alone, Lear had $2.5593 billion in total sales in its electric power and management systems, which includes significant sales for Automotive Wire Harness Systems in the United States pursuant to the conspiracy hereinafter alleged.

**The Leoni Defendants**

97.    Defendant Leoni AG is a German corporation.  Defendant Leoni AG – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

98.    Defendant Leoni Wiring Systems, Inc. is a Delaware corporation with its principal place of business in Tucson, Arizona.  It is a subsidiary of and wholly owned and/or controlled by its parent, Leoni AG.  Defendant Leoni Wiring Systems, Inc. manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its German parent.

99.    Defendant Leonische Holding, Inc. is a Delaware corporation with its principal place of business in Tucson, Arizona.  It is a subsidiary of and wholly owned and/or controlled by its parent, Leoni AG.  Defendant Leonische Holding, Inc. manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including

in this district, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its German parent.

100.    Defendant Leoni Wire Inc. is a Massachusetts corporation with its principal place of business in Chicopee, Massachusetts.  It is a subsidiary of and wholly owned and/or controlled by its parent Leoni AG.   Defendant Leoni Wire Inc. manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its German parent.

101.    Defendant Leoni Kabel GmbH is a German corporation   Defendant Leoni Kabel GmbH manufactured, marketed  or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.

102.    Defendants Leoni AG, Leoni Wiring Systems, Inc., Leonische Holding, Inc., and Leoni Kabel GmbH shall collectively be referred to herein as the "Leoni Defendants" or "Leoni."

**The Sumitomo Defendants**

103.    Defendant Sumitomo Electric Industries, Ltd. is a Japanese corporation.  Defendant Sumitomo Electric Industries, Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled –  manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

104.    Defendant Sumitomo Electric Wintec America, Inc. is a Kentucky corporation with its principal place of business in Edmonton, Kentucky.  It is a subsidiary of and wholly owned and/or controlled by its parent, Sumitomo Electric Industries, Ltd.  Defendant Sumitomo

Electric Wintec America, Inc. manufactured, marketed and/or sold Automotive Wire Harness
Systems that were purchased throughout the United States, including in this district, during the
Class Period.  At all times during the Class Period, its activities in the United States were under
the control and direction of its Japanese parent.  Defendant Sumitomo Electric Wintec America,
Inc. manufactured, marketed or sold Wire Harness Products that were purchased throughout the
United States, including in this District, during the Class Period.  At all times during the Class
Period, its activities in the United States were under the control and direction of its Japanese
parent.

     105.    Defendant Sumitomo Wiring Systems, Ltd. is a Japanese corporation. Defendant
Sumitomo Wiring Systems, Ltd. has asserted that it is "proud to hold the world's top share in the
automobile wiring harness field."  It – directly and/or through its subsidiaries, which it wholly
owned and/or controlled – manufactured, marketed and/or sold Automotive Wire Harness
Systems that were purchased throughout the United States, including in this district, during the
Class Period.

     106.    Defendant Sumitomo Electric Wiring Systems, Inc. is a Delaware corporation
with its principal place of business in Bowling Green, Kentucky.  It is a joint venture between
Defendants Sumitomo Electric Industries, Ltd. and Sumitomo Wiring Systems, Ltd.  Defendant
Sumitomo Electric Wiring Systems, Inc. manufactured, marketed and/or sold Automotive Wire
Harness Systems that were purchased throughout the United States, including in this district,
during the Class Period.  At all times during the Class Period, its activities in the United States
were under the control and direction of its Japanese joint venture participants.

     107.    Defendant K&S Wiring Systems, Inc. is a Delaware corporation with its principal
place of business in La Vergne, Tennessee.  It is a subsidiary of and wholly owned and/or

controlled by its parent, Sumitomo Electric Industries, Ltd. Defendant K&S Wiring Systems, Inc. manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent.

108.    Defendant Sumitomo Wiring Systems (U.S.A.) Inc. is a Michigan corporation with its principal place of business in Novi, Michigan. It is a joint venture between Defendants Sumitomo Electric Industries, Ltd. and Sumitomo Wiring Systems, Ltd. Defendant Sumitomo Wiring Systems (U.S.A.) Inc. manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period. At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese joint venture participants.

109.    Defendants Sumitomo Electric Industries, Ltd., Sumitomo Electric Wintec America, Inc., Sumitomo Wiring Systems, Ltd., Sumitomo Electric Wiring Systems, Inc., K&S Wiring Systems, Inc. and Sumitomo Wiring Systems (U.S.A.) Inc. shall collectively be referred to herein as the "Sumitomo Defendants" or "Sumitomo."

**S-Y Systems and the Yazaki Defendants**

110.    Defendant S-Y Systems Technologies Europe GmbH ("S-Y Systems") is a German corporation. Defendant S-Y Systems – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

111.    Defendant Yazaki Corporation is a Japanese corporation.  Defendant Yazaki

Corporation – directly and/or through its subsidiaries, which it wholly owned and/or controlled –

manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased

throughout the United States, including in this district, during the Class Period.

112.    Defendant S-Y Systems Technologies America, LLC ("S-Y Systems")  is a

Delaware corporation with its principal place of business in Dearborn, Michigan.  It is currently

a wholly owned subsidiary of and/or controlled by its parent Defendant Yazaki Corporation, but

was formerly a wholly owned subsidiary of and/or controlled by Defendant S-Y Systems.

Defendant S-Y Systems Technologies America, LLC manufactured, marketed and/or sold

Automotive Wire Harness Systems that were purchased throughout the United States, including

in this district, during the Class Period.  At all times during the Class Period, its activities in the

United States were under the control and direction of either its German parent, during the time it

was owned and controlled by S-Y Systems, or its current Japanese parent, Yazaki Corporation.

113.    Defendant Yazaki North America, Inc. is an Illinois corporation with its principal

place of business in Canton Township, Michigan.  It is a subsidiary of and wholly owned and/or

controlled by its parent, Yazaki Corporation.  Defendant Yazaki North America Inc.

manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased

throughout the United States, including in this district, during the Class Period.  At all times

during the Class Period, its activities in the United States were under the control and direction of

its Japanese parent.

114.    Yazaki Corporation, Yazaki North America, Inc. and S-Y Systems Technologies

America, LLC are herein referred to as shall collectively be referred to herein as the "Yazaki

Defendants" or "Yazaki."

**The Tokai Rika Defendants**

115.    Defendant Tokai Rika, Ltd. is a Japanese company with its principal place of business in Toyota, Japan.  Defendant Tokai Rika, Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

116.    Defendant  TRAM, Inc. d/b/a Tokai Rika U.S.A. Inc. is a Michigan Corporation with its principal place of business in Plymouth, Michigan.  It is a subsidiary of and wholly owned and/or controlled by its parent Tokai Rika, Ltd.  During the Class Period, Defendant TRAM, Inc. d/b/a Tokai Rika U.S.A. manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including this district, during the Class Period.

117.    Tokai Rika, Ltd. and TRAM, Inc. d/b/a Tokai Rika U.S.A. Inc. are herein referred collectively as the " Tokai Rika Defendants" or "Tokai Rika."

**G.S. Electech Defendants**

118.    Defendant GS Electech, Inc. is a Japanese corporation with its principal place of business in Toyota, Japan.   Defendant GS Electech, Inc. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

119.    Defendant G.S. Wiring Systems Inc. is an Ohio corporation based in Findlay, Ohio.  Upon information and belief, it is a subsidiary of and wholly owned and/or controlled by its parent G.S. Electech, Inc.  G.S. Wiring Systems Inc. manufactured, marketed and/or sold

Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

120.     Defendant G.S.W. Manufacturing Inc. is an Ohio corporation based in Findlay, Ohio.  Upon information and belief, it is a subsidiary of and wholly owned and/or controlled by its parent G.S. Electech, Inc.  G.S.W. Manufacturing Inc. represents itself as a Tier 1 and 2 supplier of Automotive Wire Harness Systems.   G.S.W. Manufacturing Inc. manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

## AGENTS AND CO-CONSPIRATORS

121.     Each Defendant acted as the principal of or agent for other Defendants with respect to the acts, violations, and common course of conduct alleged.

122.     Various persons, partnerships, sole proprietors, firms, corporations and individuals not named as Defendants in this lawsuit, and individuals, the identities of which are presently unknown, have participated as co-conspirators with Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy or in furtherance of the anti-competitive conduct.

123.     Whenever in this Complaint reference is made to any act, deed or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's or limited liability entity's business or affairs.

## FACTUAL ALLEGATIONS

**A.**      **The Automotive Wire Harness System Industry**

124.      Automotive Wire Harness Systems comprise the "central nervous system" of an automotive vehicle and consist of the wires or cables and data circuits that run throughout the vehicle.  To ensure safety and basic functions (e.g., going, turning, and stopping), as well as to provide comfort and convenience, automobiles are equipped with various electronics that operate using control signals running on electrical power supplied from the battery.  The Automotive Wire Harness System is the conduit for the transmission of these signals and electrical power.  See Figures 1 and 2.



Figure 1.



Figure 2.

125.    Automotive electrical wiring is the wiring that runs throughout the vehicle.

126.    High voltage wiring is integral to vehicles equipped with hybrid, fuel-cell or electric-powered powertrains.

127.    Lead wire assembles connect a wire carrying electrical current from the power source to an electrode holder or a group clamp.

128.    Cable bonds are the electrical connection between the armor or sheath of one cable and that of an adjacent cable or across a wire in the armor.

129.    Automotive wiring connectors connect various types of wires in an automobile. Wire connectors that carry reduced amps tend to be small, while those connectors that are handling heavy loads tend to be much larger. Automotive wiring connectors can snap, slide, or clip together.

130.    Automotive wiring terminals are the ends of a wire that provide a point of connection to external circuits.

131.    Electrical control units are embedded modules or systems that control one or more of the electrical systems or subsystems in a motor vehicle. Motor vehicles are equipped with a

large number of electronic control units which operate various automotive functions and exchange large volumes of data with one another.

132.    Fuse boxes are modules that hold the fuses for the various electrical circuits, all of which are routed through the fuse box.  The primary purpose of an electrical fuse is to help protect components on a circuit from damage in the event of a short circuit or a current spike or overload.  Vehicles have several fuses that are necessary to safeguard electrical circuits.

133.    Relay boxes are modules that hold the electrical switches that transit impulses from one component to another, and can be used to connect or break the flow of the current in a circuit.  Once a relay is activated it connects an electrical or other data supply to a particular component or accessory.

134.    Junction blocks are used as electrical connection points for the distribution power or distribution of a ground.

135.    Power distributors serve to distribute power at varying levels to various electrical components.

136.    Speed sensor wire assemblies are installed on automobiles with Antilock Brake Systems ("ABS").  The speed sensor wire assemblies connect a sensor on each tire to the ABS and carry electrical signals from the sensors to the ABS to instruct it when to engage.

137.    Automotive Wire Harness Systems are installed by automobile original equipment manufacturers ("OEMs") in new cars as part of the automotive manufacturing process.  They are also installed in cars to replace worn out, defective or damaged Automotive Wire Harness Systems.

138.    For new cars, the OEMs—mostly large automotive manufacturers such as Honda, Toyota, Volvo, and General Motors—purchase Automotive Wire Harness Systems directly from

Defendants.  Automotive Wire Harness Systems may also be purchased by component manufacturers who then supply such systems to OEMs.  These component manufacturers are also called "Tier 1 Manufacturers" in the industry.  Tier I Manufacturers supply Automotive Wire Harness Systems directly to an OEM.

139.    When purchasing Automotive Wire Harness Systems and related products, OEMs issue Requests for Quotation ("RFQs") to automotive parts suppliers.  Automotive parts suppliers submit quotations, or bids, to OEMs in response to RFQs, and the OEMs usually award the business to the selected automotive parts supplier for four to six years.  Typically, the bidding process begins approximately three years prior to the start of production of a new model.  Japanese OEMs procure parts for U.S.-manufactured vehicles both in Japan and the United States.

140.    Defendants and their co-conspirators supplied Automotive Wire Harness Systems to OEMs for installation in vehicles manufactured and sold in the United States and elsewhere.  Defendants and their co-conspirators manufactured Automotive Wire Harness Systems (a) in the United States for installation in vehicles manufactured and sold in the United States, (b) in Japan for export to the United States and installation in vehicles manufactured and sold in the United States, and (c) in Japan for installation in vehicles manufactured in Japan for export to and sale in the United States.

141.    Plaintiffs and members of the proposed Classes purchased Automotive Wire Harness Systems indirectly from one or more of the Defendants.  By way of example, an owner of a vehicle may indirectly purchase an Automotive Wire Harness System from Defendants as part of purchasing or leasing the new vehicle.   An owner of a vehicle may also indirectly

purchase a replacement Automotive Wire Harness System from Defendants when repairing a

damaged vehicle or where the vehicle's Automotive Wire Harness System is defective.

142.    The global Automotive Wire Harness Systems market size reached US $21.9

billion in 2009, and increased by 32.2% to US $29 billion in 2010.  According to Research in

China, a leading source for international market research and market data, the Automotive Wire

Harness Systems market is steadily growing, and is expected to be US $32 billion in 2012.

143.    The global Automotive Wire Harness Systems market is dominated and

controlled by large manufacturers, the top six of which are Defendants who control almost 90%

of the global market; of those, four control almost 77% of the global market.  See Figures 3 and

4.

**Market Shares of World's Major Manufacturers of Automotive Wiring Harness, 2009**



Figure 3.

**Ranking by Revenue of Automotive Wiring Harness Manufacturers Worldwide, 2009**

|          | Revenue in 2009 (US$ M) |
|----------|-------------------------|
| Yazaki   | 7,548                   |
| Sumitomo | 6,172                   |
| Delphi   | 4,230                   |
| Leoni    | 1,531                   |
| Furukawa | 914                     |
| Lear     | 1,190                   |
| Coroplast| 400                     |
| THB Group| 136                     |
| Fujikura | 682                     |
| YURA     | 404                     |
| Comba    | 98                      |
| Others   | 2,012                   |

Figure 4.

144.     Yazaki controlled almost 30% of the global market for Automotive Wire Harness Systems as of 2009.  As it states on its website, its Automotive Wire Harness Systems are "used by every carmaker in Japan," and it "commands a top share in the global market."  In fact, 77% of Yazaki's sales are from Automotive Wire Harnesses, and 37% of its 2007 sales were in the Western Hemisphere.  Yazaki's largest customers are Toyota, followed by Chrysler, Ford, Renault-Nissan, Honda, and finally General Motors.  In the Western Hemisphere, it supplies Chrysler, Ford, General Motors, Honda, Isuzu, Mazda, Mitsubishi, Nissan, Renault, Subaru, and Toyota.

145.     Defendant Sumitomo is the second largest manufacturer of Automotive Wire Harness Systems, and controls 24% of the global market.

30

146.    Defendant Delphi is the third largest maker of Automotive Harness Systems as of 2009. It controls 16.71% of the global market. Its two largest customers are General Motors and Ford.

147.    Defendant Lear controls almost 5% of the global market for Automotive Wire Harness Systems. Lear supplies Toyota, General Motors, Ford, and BMW.

148.    Defendant Furukawa controls almost 4% of the global market for Automotive Wire Harness Systems.

149.    Defendant Leoni controls 6% of the global market for Automotive Wire Harness Systems.

150.    By virtue of their market shares, Defendants are the dominant manufacturers and suppliers of Automotive Wire Harness Systems in the United States and the world.

### B.    Defendants Increased Prices for Automotive Wire Harness Systems Despite Steady Costs

151.    In a competitive market, falling material and labor costs would lead to decreased prices because each competitor would be afraid that other competitors would attempt to take advantage of their lower costs to lower their prices in order to capture market share. The only economically rational action in such a situation is for each competitor to lower its own prices.

152.    In a market where competitors have engaged in a conspiracy to fix prices, however, competitors do not lower prices even when faced with steady or decreasing input costs. Such price decreases are unnecessary because the conspirators know that they will not lose sales to lower-priced competitors.

153.    The price of Automotive Wire Harness Systems increased during the Class Period, while major input costs virtually remained the same. In fact, according to Research in China, Sumitomo and Furukawa own their own copper mines and effectively control their copper

31

input costs.  Copper is a major input cost component in the manufacture of Automotive Wire Harness Systems.  In a competitive market, steady input costs should not have resulted in rising prices to Defendants' customers for Automotive Wire Harness Systems.  Such anti-competitive price increases have resulted in Plaintiffs and members of the Classes paying supra-competitive prices.

### C.     The Structure and Characteristics of the Automotive Wire Harness Systems Market Render the Conspiracy More Plausible

154.    The structure and other characteristics of the Automotive Wire Harness Systems market in the United States are conducive to a price-fixing agreement, and have made collusion particularly attractive in this market.  Specifically, the Automotive Wire Harness Systems market: (1) has high barriers to entry; (2) has inelasticity of demand; (3) is highly concentrated; and (4) is rife with opportunities to conspire.

### 1.     The Automotive Wire Harness Systems Market Has High Barriers to Entry

155.    A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing.  Where, however, there are significant barriers to entry, new entrants are less likely to enter the market.  Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

156.    There are substantial barriers that preclude, reduce, or make more difficult entry into the Automotive Wire Harness Systems market.  A new entrant into the business would face costly and lengthy start-up costs, including multi-million dollar costs associated with manufacturing plants and equipment, energy, transportation, distribution infrastructure, skilled labor, and long-standing customer relationships.

157.    In addition, OEMs cannot change Automotive Wire Harness Systems suppliers randomly after they choose one because the OEMs design the features of their vehicles so that the Automotive Wire Harness System it purchases for a vehicle is then integrated with the electronics, mechanics, thermal distribution and other features of the particular vehicle model. Thus, the design must be synergized by Automotive Wire Harness Systems manufacturers and OEMs.  It would be difficult for a new market entrant to do so.

### 2.    There is Inelasticity of Demand for Automotive Wire Harness Systems

158.    "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other.  For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any.  In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase despite a price increase.

159.    For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices.  Otherwise, increased prices would result in declining sales, revenues and profits, as customers purchased substitute products or declined to buy altogether.  Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

160.    Demand for Automotive Wire Harness Systems is highly inelastic.  Demand for Automotive Wire Harness Systems is inelastic because there are no close substitutes for these products.  In addition, customers must purchase Automotive Wire Harness Systems as an essential part of a vehicle, even if the prices are kept at a supra-competitive level.

### 3. The Market for Automotive Wire Harness Systems Is Highly Concentrated

161.    A highly concentrated market is more susceptible to collusion and other anti-competitive practices.

162.    As discussed above, Defendants dominate the Automotive Wire Harness Systems market.  Six of the Defendants control almost 90% of the global market, and four of the Defendants control almost 77% of the global market: Yazaki controls almost 30%; Sumitomo controls 24%; Delphi controls 16.71%; Lear controls almost 5%; Furukawa controls almost 4%; and Leoni controls 6%.

### 4. Defendants had Ample Opportunities to Conspire

163.    Defendants attended industry events where they had the opportunity to meet, have improper discussions under the guise of legitimate business contacts, and perform acts necessary for the operation and furtherance of the conspiracy.  For example, Defendants and their co-conspirators have regularly attended the annual North American International Auto Show ("NAIAS") in Detroit, Michigan and the Automotive Aftermarket Products Expo in Las Vegas, Nevada.  Indeed, according to the NAIAS website, Defendant Denso was a premier sponsor of the 2012 event, held January 9 to January 22.

### D.    <u>Government Investigations</u>

164.    A globally coordinated antitrust investigation is taking place in the United States, Europe, and Japan, aimed at suppliers of Automotive Wire Harness Systems.

165.    The probe originated in Europe as the result of several European OEMs coming together to bring a complaint to the European Commission ("EC").  One carmaker is said to have failed to attract competitive bids for Automotive Wire Harness Systems, leading the company to join with other carmakers to take their complaint to the EC.

166.    On February 8, 2010, the EC executed surprise raids at the European offices of certain Defendants as part of an investigation into anti-competitive conduct related to the manufacturing and sale of Automotive Wire Harness Systems.  The EC also carried out additional raids at the European offices of several suppliers of Automotive Wire Harness Systems on June 7, 2010.  Specifically, EC investigators raided the offices of Leoni, S-Y Systems, and Yazaki.  "The Commission has reason to believe that the companies concerned may have violated European Union antitrust rules that prohibit cartels and restrictive business practices," an EC official said in a statement.

167.    Defendants S-Y Systems and Leoni have admitted that they are cooperating with the antitrust investigators.  Lear's Chief Executive Officer Bob Rossiter has stated that Lear was notified by the EC that it is part of an investigation into anticompetitive practices among automotive electrical and electric component suppliers.  In addition, Delphi has admitted to having "received a request for information from antitrust authorities at the European Commission seeking information about conduct by us in connection with an investigation in the European Union related to the electrical and electronic components market."  Delphi stated that it is cooperating fully with the European competition authorities.  Leoni has also stated that it is cooperating with the antitrust investigators.

168.    In February 2010, Japan's Fair Trade Commission raided the Tokyo offices of Furukawa, Sumitomo, and Yazaki as part of an expansive investigation into collusion in the industry dating back to at least 2003.

169.    The DOJ has stated that it is conducting an investigation of potential antitrust activity and coordinating its investigation with antitrust regulators in Europe.  "The antitrust

division is investigating the possibility of anticompetitive cartel conduct of automotive electronic component suppliers," Justice Department Spokeswoman Gina Talamona said.

170.   Indeed, on February 23, 2010, around the same time as the raids by the Japanese and European competition authorities, investigators from the FBI raided three Detroit-area Japanese auto parts makers as part of a federal antitrust investigation.  The FBI executed warrants and searched the offices of these companies, including Defendants Denso, Tokai Rika, as well as Yazaki's subsidiary in Canton Township, Michigan.  Special Agent Sandra Berchtold said the affidavits supporting issuance of the warrants were sealed in federal court.

171.   To obtain search warrants, the United States was legally required to have probable cause, accepted by a magistrate, to believe that it would obtain evidence of an antitrust violation as a result of executing the search warrant – that is, the United States had to have evidence sufficient to warrant a person of reasonable caution to believe that raiding the offices of a seemingly lawful business would uncover evidence of antitrust violations and that claimed evidence must have been examined and accepted by a magistrate.  That belief, which was recounted in sworn affidavits or testimony, must be grounded on reasonably trustworthy information.

### E.   Guilty Pleas

172.   On September 29, 2011, the DOJ announced that Defendant Furukawa Electric had agreed to plead guilty and to pay a $200 million fine for its role in a criminal price-fixing and bid-rigging conspiracy involving the sale of Automotive Wire Harness Systems to automobile manufacturers.

173.   Furukawa Electric is charged with price fixing in violation of the Sherman Act.

174.   Furukawa Electric has pleaded guilty for its role in a conspiracy to rig bids for and to fix the prices of the sale of Automotive Wire Harnesses and related products sold to

automobile manufacturers in the United States and elsewhere.  The DOJ announced in a press release that Furukawa Electric participated in the conspiracy from at least as early as January 2000, until at least January 2010.

175.    The plea agreements discussed herein are an outgrowth of the DOJ's first charges in its ongoing international cartel investigation of price fixing and bid rigging in the auto parts industry.  According to four separate one-count felony charges filed in the Unites States District Court for the Eastern District of Michigan in Detroit, Furukawa Electric and its executives – Junichi Funo, Hirotsugu Nagata, and Tetsuya Ukai – engaged in a conspiracy to rig bids for and to fix, stabilize and maintain the prices of Automotive Wire Harness Systems sold to customers in the United States and elsewhere.

176.    According to the Information filed, Furukawa Electric and its co-conspirators carried out the conspiracy by:

(a)    participating in meetings, conversations, and communications in the United States and Japan to discuss the bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

(b)    agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

(c)    agreeing, during those meetings, conversations, and communications, to allocate the supply of Automotive Wire Harness Systems sold to automobile manufacturers in the United States and elsewhere on a model-by-model basis;

(d)      agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by automobile manufacturers in the United States and elsewhere;

(e)      submitting bids, price quotations, and price adjustments to automobile manufacturers in the United States and elsewhere in accordance with the agreements reached;

(f)      selling Automotive Wire Harness Systems to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(g)      accepting payment for Automotive Wire Harness Systems sold to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(h)      engaging in meetings, conversations, and communications in the United States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme; and

(i)      employing measures to keep their conduct secret, including but not limited to using code names and meeting at private residences or remote locations.

177.     "As a result of this international price-fixing and bid-rigging conspiracy, automobile manufacturers paid noncompetitive and higher prices for parts in cars sold to U.S. consumers," said Sharis A. Pozen, Acting Assistant Attorney General in charge of the Department of Justice's Antitrust Division.  "This cartel harmed an important industry in our nation's economy, and the Antitrust Division with the Federal Bureau of Investigation will continue to work together to ensure that these kinds of conspiracies are stopped."

178.     "When companies partner to control and price fix bids or contracts, it undermines the foundation of the United States' economic system," said FBI's Special Agent in Charge

Andrew G. Arena.  "The FBI is committed to aggressively pursuing any company involved in antitrust crimes."

179.    At its November 14, 2011 Plea and Sentencing hearing, Defendant Furukawa Electric pleaded guilty, and was ordered to pay its $200 million fine within 45 days.  At the hearing, Defendant Furukawa Electric described its participation in the conspiracy as follows:

> From the time period listed in the Information, that is, approximately from January, 2000 to January, 2010, officers and employees of my company had discussions with employees of competitors that also manufactured and sold automotive wire harness products. . . .  These discussions took place in face-to-face meetings or by telephone.  The discussions took place in the United States and elsewhere.
>
> During . . . such meetings and conversations, a conspiracy was formed and agreements were reached to allocate the supply of automotive wire harnesses and related products sold to automobile manufacturers on a model-by-model basis and to rig bids quoted to automobile manufacturers for automotive wire harnesses and related products.
>
> Therefore, as a result of these meetings, my company produced and sold automotive wire harnesses and related products that were the subject of the illegal price fixing agreements that my company had made with competitors.  Those products and the payments for those products traveled in interstate and foreign commerce and substantially affected interstate and foreign trade and commerce.
>
> For the purposes of this plea agreement, during the time period of January, 2000 to January, 2010, our sales of automotive wire harnesses and related products affecting U.S. auto manufacturers totaled approximately $839 million.
>
> Finally, we note to the Court that some of the products affected by the conspiracy were sold to automobile manufacturers by one of our subsidiaries [American Furukawa], which is located here in the Eastern District of Michigan.
>
>  – Plea & Sentencing, *United States v. Furukawa Electric Co.*, No. 11-cr-20612 (E.D. Mich.), at 14-16.

180.    Furukawa Electric's executives Funo, Nagata, and Ukai also admitted their

participation in the unlawful cartel in open court:

(a)    At his October 24, 2011 Guilty Plea Hearing, Furukawa executive Junichi

Funo admitted that he participated in a conspiracy to restrain trade.  Mr. Funo admitted entering

into agreements with competitors – *i.e.*, Defendants herein – in order to set prices and maintain

them, including rigging bids that were solicited from customers.  The agreements also sought to

control, and did control, price adjustments.  In Mr. Funo's own words, he "did price fixing for

automotive parts."  That price fixing "generally involved . . . wiring harnesses and related

products."  The price fixing affected the sales of goods throughout the United States.  Mr. Funo

was personally present at meetings during which such unlawful agreements were reached,

including meetings that occurred in the Eastern District of Michigan.  Pursuant to his plea, Mr.

Funo was sentenced to one year of prison, fined $20,000, and pledged to cooperate in the DOJ's

ongoing investigation.

(b)    At his October 24, 2011 Guilty Plea Hearing, Furukawa executive

Hirotsugu  Nagata admitted that he participated in "an agreement to submit non-competitive bids

in an amount greater than $100 million."  The purpose of the agreement was to "suppress and

eliminate competition in the automotive parts industry."  In Mr. Nagata's own words, he

furthered the unlawful conspiracy with Defendants by having "a meeting [with] co-conspirators

and some agreement [on] price for automobile manufacturing parts" – primarily Automotive

Wire Harness Systems.  He personally participated in "several" unlawful meetings to further the

conspiracy, at which Defendants made agreements on pricing for Automotive Wire Harness

Systems, including rigging bids.  Some of the meetings occurred within the Eastern District of

Michigan, and Mr. Nagata conceded that the unlawful agreements would impact businesses with

their principal place of business within the Eastern District of Michigan.  Mr. Nagata noted that

the price-fixed Automotive Wire Harness Systems were being sold in a number of different

states in the United States, and undermined and prevented competition within the United States.

Pursuant to his plea, Mr. Nagata was sentenced to serve 15 months in prison, fined $20,000, and

pledged to cooperate with the DOJ's ongoing investigation.

        (c)      At his November 10, 2011 Guilty Plea and Sentencing Hearing, Furukawa

executive Tetsuya Ukai stated that he "fix[ed] price[s] over parts – auto parts with other

suppliers."  He acknowledged that he met with competitors "in order to fix prices and rig bids

with respect to wire harnesses and related products," and conceded that the price-fixing meetings

occurred both within the United States and elsewhere.  He also acknowledged that the price-

fixing would affect commerce in the United States and elsewhere, including in the Eastern

District of Michigan through a Furukawa subsidiary – presumably American Furukawa.  In

addition, Mr. Ukai agreed that the commerce affected exceeded $100 million.  As part of his

plea, Mr. Ukai agreed to serve 18 months in prison and pay a $20,000 fine for his role in the

conspiracy.

        181.    Defendant Furukawa Electric, as well as Messrs. Funo, Nagata and Ukai, have all

agreed to assist the DOJ in its ongoing investigation into the automotive parts industry.

        182.    On January 30, 2012, the DOJ announced that Defendant Yazaki Corporation had

agreed to pay a $470 million fine and to plead guilty to a three-count criminal information

charging Yazaki Corporation with:  (1) participating in a combination and conspiracy with its co-

conspirators to suppress and eliminate competition in the automotive parts industry by agreeing

to rig bids for, and to fix, stabilize, and maintain the prices of, automotive wire harnesses and

related products sold to certain automobile manufacturers in the United States and elsewhere

from at least as early as January 2000 and continuing until at least February 2010 in violation of

the Sherman Act, 15 U.S.C. § 1; (2) participating in a combination and conspiracy with its co-

conspirators to suppress and eliminate competition in the automotive parts industry by agreeing

to rig bids for, and to fix, stabilize, and maintain the prices of, instrument panel clusters sold to

certain automobile manufacturers in the United States and elsewhere from at least as early as

December 2002 and continuing until at least February 2010 in violation of the Sherman Act, 15

U.S.C. § 1; and (3)  participating in a combination and conspiracy with its co-conspirators to

suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for,

and to fix, stabilize, and maintain the prices of fuel senders sold to certain automobile

manufacturers in the United States and elsewhere from at least as early as March 2004 and

continuing until at least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1.

183.    In addition to Yazaki Corporation, four executives from Yazaki Corporation (all

Japanese nationals) – Tsuneaki Hanamura, Ryoji Kuwai, Shigeru Ogawa, and Hisamitsu Takada

– agreed to plead guilty to their participation in a conspiracy to suppress and eliminate

competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and

maintain the prices of automotive wire harnesses sold to certain automobile manufacturers in the

United States and elsewhere in violation of the Sherman Act, 15 U.S.C. § 1.  These four

executives of Yazaki Corporation will serve prison time ranging from 15 months to two years.

The two-year sentences would be the longest term of imprisonment imposed on a foreign

national voluntarily submitting to U.S. jurisdiction for a Sherman Act antitrust violation.

184.    On March 26, 2012, the DOJ announced that Defendant Denso Corporation

agreed to plead guilty and pay a total of $78 million in criminal fines to a two-count criminal

information charging Denso with:  (1) participating in a combination and conspiracy with its co-

conspirators to suppress and eliminate competition in the automotive parts industry by agreeing

to rig bids for, and to fix, stabilize, and maintain the prices of electronic control units sold to an

automobile manufacturer in the United States and elsewhere from at least as early as January

2000 and continuing until at least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1;

(2) participating in a combination and conspiracy with its co-conspirators to suppress and

eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix,

stabilize, and maintain the prices of heater control panels sold to an automobile manufacturer in

the United States and elsewhere from at least as early as January 2000 and continuing until at

least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1.  The "electronic control

units" referenced herein are included within the definition of Automotive Wire Harness Systems

alleged in this Complaint (see *supra*, paragraph 3).

185.    On April 3, 2012, the DOJ announced that Defendant G.S. Electech Inc. agreed to

plead guilty and pay a $2.75 million criminal fine to a one-count criminal information charging

G.S. Electech Inc. with participating in a combination and conspiracy to suppress and eliminate

competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and

maintain the prices of speed sensor wire assemblies sold to an automobile manufacturer in the

United States and elsewhere from at least as early as January 2003 and continuing until at least

February 2010 in violation of the Sherman Act, 15 U.S.C. § 1.  The "speed sensor wire

assemblies" referenced herein are included within the definition of Automotive Wire Harness

Systems alleged in this Complaint (see *supra*, paragraph 3).

186.    On April 23, 2012, the DOJ announced that Defendant Fujikura Ltd. has agreed to

plead guilty and pay a $20 million criminal fine to a one-count criminal information charging

Fujikura with participating in a combination and conspiracy with its co-conspirators to suppress

and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of automotive wire harnesses and related products sold to an automobile manufacturer in the United States and elsewhere from at least as early as January 2006 and continuing until at least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1.

187.    To date, Defendants that have pleaded guilty to their participation in the Automotive Wire Harness Systems cartel have agree to pay criminal fines totaling $770.75 million, among the largest criminal cartels ever obtained by the DOJ.

## CLASS ACTION ALLEGATIONS

188.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All persons and entities that indirectly purchased or leased in the United States, during the Class Period, Automotive Wire Harness Systems, for personal use and not for resale, including the purchase of Automotive Wire Harness Systems as a stand-alone replacement product or as a component of a new motor vehicle purchased or leased from any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator.

189.    Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the antitrust, unfair competition, consumer protection, and unjust enrichment laws of the states whose laws are identified in Paragraphs 236-276  below ("Plaintiffs' States").  These claims are brought by Plaintiffs on behalf of themselves and persons and entities in Plaintiffs' States as follows (the "Damages Class"):

> All persons and entities that indirectly purchased or leased in the Plaintiffs' States, during the Class Period, Automotive Wire Harness Systems, for personal use and not for resale, including the

purchase of Automotive Wire Harness Systems as a stand-alone replacement product or as a component of a new motor vehicle purchased or leased from any Defendant or any current or former subsidiary or affiliate thereof, or any co-conspirator.

190.    The Nationwide Class and the Damages Class are referred to herein as the "Classes."  Excluded from the Classes are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased Automotive Wire Harness Systems directly or for resale.

191.    While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are (at least) thousands of members in each Class.

192.    Common questions of law and fact exist as to all members of the Classes.  This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole.  Such questions of law and fact common to the Classes include, but are not limited to:

(a)    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize the prices of Automotive Wire Harness Systems sold in the United States;

(b)    The identity of the participants of the alleged conspiracy;

(c)    The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)    Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Claim for Relief;

(e)     Whether the alleged conspiracy violated state antitrust and unfair competition law, and/or state consumer protection law,  as alleged in the Second and Third Claims for Relief;

(f)     Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Claim for Relief;

(g)     Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

(h)     The effect of the alleged conspiracy on the prices of Automotive Wire Harness Systems sold in the United States during the Class Period;

(i)     Whether any of the Plaintiffs knew, or had any reason to know, of the conspiracy engaged in by Defendants;

(j)     Whether the Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from the Plaintiffs and the members of the Classes;

(k)     The appropriate injunctive and related equitable relief for the Nationwide Class; and

(l)     The appropriate class-wide measure of damages for the Damages Class.

193.    Plaintiffs' claims are typical of the claims of the members of the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes.  Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid

artificially inflated prices for Automotive Wire Harnesses purchased indirectly from Defendants or their co-conspirators.

194.    Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes.  Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

195.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

196.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

197.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## PLAINTIFFS AND THE CLASSES SUFFERED ANTITRUST INJURY

198.    Defendants' price-fixing conspiracy had the following effects, among others:

(a)    Price competition has been restrained or eliminated with respect to Automotive Wire Harness Systems;

(b)   The prices of Automotive Wire Harness Systems have been fixed, raised, maintained, or stabilized at artificially inflated levels; and

(c)   Indirect purchasers of Automotive Wire Harness Systems have been deprived of free and open competition.

199.   During the Class Period, Plaintiffs and the members of the Classes paid supra-competitive prices for Automotive Wire Harness Systems.

200.   The markets for Automotive Wire Harness Systems and the market for cars are inextricably linked and intertwined because the market for Automotive Wire Harness Systems exists to serve the vehicle market.  Without the vehicles, the Automotive Wire Harness Systems have little to no value because they have no independent utility.  Indeed, the demand for vehicles creates the demand for Automotive Wire Harness Systems.  As Lear stated in its 2010 Annual Report: "Our sales are driven by the number of vehicles produced by the automotive manufacturers, which is ultimately dependent on consumer and fleet demand for automotive vehicles."

201.   Automotive Wire Harness Systems are identifiable, discrete physical products that remain essentially unchanged when incorporated into a vehicle.  As a result, Automotive Wire Harness Systems follow a traceable physical chain of distribution from the Defendants to Plaintiffs and the members of the Classes, and any costs attributable to Automotive Wire Harness Systems can be traced through the chain of distribution to Plaintiffs and the members of the Classes.

202.   By reason of the alleged violations of the antitrust laws, Plaintiffs and the members of the Classes have sustained injury to their businesses or property, having paid higher prices for Automotive Wire Harness Systems than they would have paid in the absence of

Defendants' illegal contract, combination, or conspiracy, and, as a result, have suffered damages

in an amount presently undetermined.  This is an antitrust injury of the type that the antitrust

laws were meant to punish and prevent.

## PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS

### A.      The Statute of Limitations Did Not Begin to Run Because Plaintiffs Did Not and Could Not Discover Their Claims

203.    Plaintiffs repeat and reallege the allegations set forth above.

204.    Plaintiffs and the members of the Classes had no knowledge of the combination

or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims

set forth herein, until shortly before the initial complaint was filed in this multi-district litigation.

Plaintiffs and the members of the Classes did not discover, and could not have discovered

through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until

September 29, 2011, at the earliest, the date that the DOJ announced that Defendant Furukawa

Electric had agreed to plead guilty for its role in the criminal price-fixing and bid-rigging

conspiracy alleged herein.

205.    Plaintiffs and the members of the Classes are consumers who purchased or leased

automobiles or purchased Automobile Wire Harness Systems to replace or repair damaged or

defective Wire Harness Systems in their automobiles. They had no direct contact or interaction

with any of the Defendants in this case and had no means from which they could have

discovered the combination and conspiracy described in this Complaint before the DOJ's

September 29, 2011 announcement alleged above.

206.    No information in the public domain was available to the Plaintiffs and the

members of the Classes prior to the DOJ's announcement on September 29, 2011 that revealed

sufficient information to suggest that any one of the Defendants was involved in a criminal

conspiracy to price-fix and rig bids for Automotive Wire Harness Systems. Plaintiffs and the members of the Classes had no means of obtaining any facts or information concerning any aspect of Defendants' dealings with OEMS or other direct purchasers, much less the fact that they had engaged in the combination and conspiracy alleged herein.

207. For these reasons, the statute of limitations as to Plaintiffs and the Classes' claims did not begin to run, and has been tolled with respect to the claims that Plaintiffs and the members of the Classes have alleged in this Complaint.

**B.   Fraudulent Concealment Tolled the Statute of Limitations**

208. In the alternative, application of the doctrine of fraudulent concealment tolled the statute of limitations on the claims asserted herein by Plaintiffs and the Classes. Plaintiffs and the members of the Classes did not know and could not have known of the existence of the conspiracy and unlawful combination alleged herein until September 29, 2011 at the earliest, the date that the DOJ announced that Defendant Furukawa Electric had agreed to plead guilty for its role in the criminal price-fixing and bid-rigging conspiracy alleged herein.

209. Before that time, Plaintiffs and members of the Classes were unaware of Defendants' unlawful conduct, and did not know before then that that they were paying supra-competitive prices for Automotive Wire Harness Systems throughout the United States during the Class Period. No information, actual or constructive, was ever made available to Plaintiffs and the members of the Classes that even hinted to Plaintiffs that they were being injured by Defendants' unlawful conduct.

210. The affirmative acts of the Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

211.    By its very nature, Defendants' anti-competitive conspiracy and unlawful

combinations were inherently self-concealing.  Automotive Wire Harness Systems are not

exempt from antitrust regulation and, thus, Plaintiffs and the members of the Classes reasonably

considered it to be a competitive industry.  Defendants met and communicated in secret and

agreed to keep the facts about their collusive conduct from being discovered by any member of

the public or by the OEMs and other direct purchasers with whom they did business.

212.    For instance, the DOJ charged Defendants Fujikura Ltd., Furukawa Electric, G.S.

Electech, Inc. and Yazaki Corporation with, among other unlawful acts, "employing measures to

keep their conduct secret, including but not limited to using code names and meeting at private

residences or remote locations."  These corporate Defendants have since pleaded guilty to

charges levied against them by the DOJ.

213.    In addition, the DOJ charged individual corporate officers of certain Defendants

with using code names and engaging in secret, conspiratorial meetings to hide Defendants'

conspiracy from the public and competition authorities.  To date, Junichi Funo from Furukawa

and Tsuneaki Hanamura, Ryoji Kawai, Shigeru Ogawa, and Hisamitsu Takada from Yazaki

Corporation have all pleaded guilty to charges levied against them by the DOJ.  Accordingly, a

reasonable person under the circumstances would not have been alerted to investigate the

lawfulness of Defendants' Automotive Wire Harness Systems prices.

214.    Plaintiffs and the members of the Classes could not have discovered the alleged

combination or conspiracy at an earlier date by the exercise of reasonable diligence because of

the deceptive practices and techniques of secrecy employed by the Defendants and their co-

conspirators to avoid detection of, and fraudulently conceal, their conduct.

215.    Throughout the course of the conspiracy, the Defendants met and communicated in secret  in order to conceal their conspiracy from the public and avoid detection thereof.  Above and beyond their acts in furtherance of the conspiracy, such as acts of bid rigging, Defendants engaged in surreptitious activity such as using code names and meeting at private residences or remote locations.   The exact dates and times of these meetings are within the knowledge of the Defendants, including those Defendants and executives of those Defendants who have pleaded guilty in this Court to criminal violations of the Sherman Act.   These Defendants have not provided any documents and information about these admitted acts of concealment to Plaintiffs or the members of the Classes.

216.    Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiffs and the members of the Classes had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until September 29, 2011, at the earliest, the date that the DOJ announced that Defendant Furukawa Electric had agreed to plead guilty for its role in the criminal price-fixing and bid-rigging conspiracy alleged herein.

217.    For these reasons, the statute of limitations applicable to Plaintiffs' and the Classes' claims was tolled and did not begin to run until September 29, 2011.

**FIRST CLAIM FOR RELIEF**
**Violation of Section 1 of the Sherman Act**
**(on behalf of Plaintiffs and the Nationwide Class)**

218.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

219.    Defendants and unnamed conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

220.     The acts done by each of the Defendants as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

221.     At least as early as January 2000, and continuing through the filing of this Complaint, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially fix, raise, stabilize, and control prices for Automotive Wire Harness Systems, thereby creating anticompetitive effects.

222.     The anti-competitive acts were intentionally directed at the United States market for Automotive Wire Harness Systems and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for Automotive Wire Harness Systems throughout the United States.

223.     The conspiratorial acts and combinations have caused unreasonable restraints in the market for Automotive Wire Harness Systems.

224.     As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated indirect purchasers in the Nationwide Class who purchased Automotive Wire Harness Systems have been harmed by being forced to pay inflated, supra-competitive prices for Automotive Wire Harness Systems.

225.     In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth herein.

226.     Defendants' conspiracy had the following effects, among others:

(a)    Price competition in the market for Automotive Wire Harness Systems has been restrained, suppressed, and/or eliminated in the United States;

(b)    Prices for Automotive Wire Harness Systems sold by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

(c)    Plaintiffs and members of the Nationwide Class who purchased Automotive Wire Harness Systems indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

227.    Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for Automotive Wire Harness Systems purchased indirectly from Defendants and the co-conspirators than they would have paid and will pay in the absence of the conspiracy.

228.    The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

229.    Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

**SECOND CLAIM FOR RELIEF**
**Violation of State Antitrust Statutes**
**(on behalf of Plaintiffs and the Damages Class)**

230.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

231.    From as early as January 2000 until at least the filing of this Complaint, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of Automotive Wire Harness Systems in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

232.    The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supra-competitive prices for Automotive Wire Harness Systems and to allocate customers for Automotive Wire Harness Systems in the United States.

233.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

(a)    participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price Automotive Wire Harness Systems at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to Automotive Wire Harness Systems sold in the United States;

(b)    allocating customers and markets for Automotive Wire Harness Systems in the United States in furtherance of their agreements; and

(c)    participating in meetings and conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

234.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, decrease, or stabilize prices and to allocate customers with respect to Automotive Wire Harness Systems.

235.    Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the following state antitrust statutes.

236.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Arizona Revised Statutes, §§ 44-1401, *et seq*.

(a)       Defendants' combinations or conspiracies had the following effects:  (1)
Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated
throughout Arizona; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained
and stabilized at artificially high levels throughout Arizona; (3) Plaintiffs and members of the
Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of
the Damages Class paid supracompetitive, artificially inflated prices for Automotive Wire
Harness Systems.

(b)       During the Class Period, Defendants' illegal conduct substantially affected
Arizona commerce.

(c)       As a direct and proximate result of defendants' unlawful conduct,
Plaintiffs and members of the Damages Class have been injured in their business and property
and are threatened with further injury.

(d)       By reason of the foregoing, Defendants entered into agreements in
restraint of trade in violation of Ariz. Rev. Stat. §§ 44-1401, *et seq.*  Accordingly, Plaintiffs and
members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-
1401, *et seq.*

237.    Defendants have entered into an unlawful agreement in restraint of trade in
violation of the California Business and Professions Code, §§ 16700, *et seq.*

(a)       During the Class Period, Defendants and their co-conspirators entered into
and engaged in a continuing unlawful trust in restraint of the trade and commerce described
above in violation of Section 16720, California Business and Professions Code.  Defendants, and
each of them, have acted in violation of Section 16720 to fix, raise, stabilize, and maintain prices
of, and allocate markets for, Automotive Wire Harness Systems at supracompetitive levels.

(b)      The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among the defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of, and to allocate markets for, Automotive Wire Harness Systems.

(c)      For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in any way limited to the acts, practices and course of conduct set forth above and the following:  (1) Fixing, raising, stabilizing, and pegging the price of Automotive Wire Harness Systems; and (2) Allocating among themselves the production of Automotive Wire Harness Systems.

(d)      The combination and conspiracy alleged herein has had, inter alia, the following effects:  (1) Price competition in the sale of Automotive Wire Harness Systems has been restrained, suppressed, and/or eliminated in the State of California; (2) Prices for Automotive Wire Harness Systems sold by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California and throughout the United States; and (3) Those who purchased Automotive Wire Harness Systems directly or indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

(e)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for Automotive Wire Harness Systems than they otherwise would have paid in the absence of Defendants' unlawful conduct.  As a result of defendants' violation of Section

16720 of the California Business and Professions Code, Plaintiffs and members of the Damages

Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant

to Section 16750(a) of the California Business and Professions Code.

238.     Defendants have entered into an unlawful agreement in restraint of trade in

violation of the District of Columbia Code Annotated §§ 28-4501, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:  (1)

Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated

throughout the District of Columbia; (2) Automotive Wire Harness Systems prices were raised,

fixed, maintained and stabilized at artificially high levels throughout the District of Columbia;

(3) Plaintiffs and members of the Damages Class were deprived of free and open competition;

and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated

prices for Automotive Wire Harness Systems.

(b)     During the Class Period, Defendants' illegal conduct substantially affected

District of Columbia commerce.

(c)     As a direct and proximate result of defendants' unlawful conduct,

Plaintiffs and members of the Damages Class have been injured in their business and property

and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in

restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq.*

Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available

under District of Columbia Code Ann. §§ 28-4501, *et seq.*

239.     Defendants have entered into an unlawful agreement in restraint of trade in

violation of the Iowa Code §§ 553.1, *et seq.*

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout Iowa; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Wire Harness Systems.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.

(c)     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code §§ 553.1, *et seq.*.

240.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Kansas Statutes Annotated, §§ 50-101, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout Kansas; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of

the Damages Class paid supracompetitive, artificially inflated prices for Automotive Wire

Harness Systems.

    (b)  During the Class Period, Defendants' illegal conduct substantially affected

Kansas commerce.

    (c)  As a direct and proximate result of defendants' unlawful conduct,

Plaintiffs and members of the Damages Class have been injured in their business and property

and are threatened with further injury.

    (d)  By reason of the foregoing, Defendants have entered into agreements in

restraint of trade in violation of Kansas Stat. Ann. §§ 50-101, *et seq.* Accordingly, Plaintiffs and

members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. §§ 50-

101, *et seq.*

   241.  Defendants have entered into an unlawful agreement in restraint of trade in

violation of the Maine Revised Statutes, Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*

    (a)  Defendants' combinations or conspiracies had the following effects: (1)

Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated

throughout Maine; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained

and stabilized at artificially high levels throughout Maine; (3) Plaintiffs and members of the

Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of

the Damages Class paid supracompetitive, artificially inflated prices for Automotive Wire

Harness Systems.

    (b)  During the Class Period, Defendants' illegal conduct substantially affected

Maine commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct,
Plaintiffs and members of the Damages Class have been injured in their business and property
and are threatened with further injury.

(d)    By reason of the foregoing, defendants have entered into agreements in
restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§ 1101, *et seq.*  Accordingly,
Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat.
Ann. 10, §§ 1101, *et seq.*

242.    Defendants have entered into an unlawful agreement in restraint of trade in
violation of the Massachusetts Antitrust Act, Mass. Gen. Laws Ann. 93 §§ 1, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects:  (1)
Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated
throughout Massachusetts; (2) Automotive Wire Harness Systems prices were raised, fixed,
maintained and stabilized at artificially high levels throughout Massachusetts; (3) Plaintiffs and
members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs
and members of the Damages Class paid supracompetitive, artificially inflated prices for
Automotive Wire Harness Systems.

(b)    During the Class Period, Defendants' illegal conduct substantially affected
Massachusetts commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct,
Plaintiffs and members of the Damages Class have been injured in their business and property
and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in
restraint of trade in violation of Mass. Gen. Laws Ann. 93 §§ 1, *et seq.*  Accordingly, Plaintiffs

and members of the Damages Class seek all relief available under Mass. Gen. Laws Ann. 93 §§ 1, *et seq.*

243.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Michigan Compiled Laws Annotated §§ 445.771, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects:  (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Wire Harness Systems.

(b)    During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

(c)    As a direct and proximate result of defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. §§ 445.771, *et seq.*

244.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Minnesota Annotated Statutes §§ 325D.49, *et seq.*

(a)       Defendants' combinations or conspiracies had the following effects:  (1)
Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated
throughout Minnesota; (2) Automotive Wire Harness Systems prices were raised, fixed,
maintained and stabilized at artificially high levels throughout Minnesota; (3) Plaintiffs and
members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs
and members of the Damages Class paid supracompetitive, artificially inflated prices for
Automotive Wire Harness Systems.

(b)       During the Class Period, Defendants' illegal conduct substantially affected
Minnesota commerce.

(c)       As a direct and proximate result of defendants' unlawful conduct,
Plaintiffs and members of the Damages Class have been injured in their business and property
and are threatened with further injury.

(d)       By reason of the foregoing, defendants have entered into agreements in
restraint of trade in violation of Minnesota Stat. §§ 325D.49, *et seq.*  Accordingly, Plaintiffs and
members of the Damages Class seek all relief available under Minnesota Stat. §§ 325D.49, *et
seq.*

245.    Defendants have entered into an unlawful agreement in restraint of trade in
violation of the Mississippi Code Annotated §§ 75-21-1, *et seq.*

(a)       Defendants' combinations or conspiracies had the following effects:  (1)
Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated
throughout Mississippi; (2) Automotive Wire Harness Systems prices were raised, fixed,
maintained and stabilized at artificially high levels throughout Mississippi; (3) Plaintiffs and
members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs

and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Wire Harness Systems.

(b)    During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. § 75-21-1, *et seq.*

246.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nebraska Revised Statutes §§ 59-801, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects:  (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Wire Harness Systems.

(b)    During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce.

(c)      As a direct and proximate result of defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nebraska Revised Statutes §§ 59-801, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq.*

247.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nevada Revised Statutes Annotated §§ 598A.010, *et seq.*

(a)      Defendants' combinations or conspiracies had the following effects:  (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout Nevada; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Wire Harness Systems.

(b)      During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

(c)      As a direct and proximate result of defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A, *et seq.*  Accordingly, Plaintiffs

and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. §§ 598A, *et seq.*

248.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Hampshire Revised Statutes §§ 356:1, *et seq*.

(a)   Defendants' combinations or conspiracies had the following effects:  (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Wire Harness Systems.

(b)   During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce.

(c)   As a direct and proximate result of defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)   By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Hampshire Revised Statutes §§ 356:1, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes §§ 356:1, *et seq*.

249.   Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Mexico Statutes Annotated §§ 57-1-1, *et seq*.

66

(a)      Defendants' combinations or conspiracies had the following effects:  (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Wire Harness Systems.

(b)      During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

(c)      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann.§§ 57-1-1, *et seq*.

250.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New York General Business Laws §§ 340, *et seq*.

(a)      Defendants' combinations or conspiracies had the following effects:  (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout New York; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs

and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Wire Harness Systems when they purchased vehicles containing Automotive Wire Harness Systems, or purchased products that were otherwise of lower quality, than would have been absent the conspirators illegal acts, or were unable to purchase products that they would have otherwise have purchased absent the illegal conduct.

(b)     During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

(c)     As a direct and proximate result of defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)     By reason of the foregoing, defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq*.  The conduct set forth above is a per se violation of the Act.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq*.

251.     Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes §§ 75-1, *et seq*.

(a)     Defendants' combinations or conspiracies had the following effects:  (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Wire Harness Systems.

(b)    During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1, *et seq*.  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. §§ 75-1, *et. seq*.

252.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Dakota Century Code §§ 51-08.1-01, *et seq*.

(a)    Defendants' combinations or conspiracies had the following effects:  (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Wire Harness Systems.

(b)    During the Class Period, defendants' illegal conduct had a substantial effect on North Dakota commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code §§ 51-08.1-01, *et seq.*

253.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Oregon Revised Statutes §§ 646.705, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects:  (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout Oregon; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Wire Harness Systems.

(b)    During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of S Oregon Revised Statutes §§ 646.705, *et seq.* Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes §§ 646.705, *et seq.*

254.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Dakota Codified Laws §§ 37-1-3.1, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects:  (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Wire Harness Systems.

(b)    During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. §§ 37-1, *et seq.*

255.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Tennessee Code Annotated §§ 47-25-101, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects:  (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) Automotive Wire Harness Systems prices were raised, fixed,

maintained and stabilized at artificially high levels throughout Tennessee; (3) Plaintiffs and

members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs

and members of the Damages Class paid supracompetitive, artificially inflated prices for

Automotive Wire Harness Systems.

(b)    During the Class Period, Defendants' illegal conduct had a substantial

effect on Tennessee commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct,

Plaintiffs and members of the Damages Class have been injured in their business and property

and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in

restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101, *et seq.*  Accordingly,

Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code

Ann. §§ 47-25-101, *et seq.*

256.    Defendants have entered into an unlawful agreement in restraint of trade in

violation of the Utah Code Annotated §§ 76-10-911, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects:  (1)

Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated

throughout Utah; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained

and stabilized at artificially high levels throughout Utah; (3) Plaintiffs and members of the

Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of

the Damages Class paid supracompetitive, artificially inflated prices for Automotive Wire

Harness Systems.

(b)    During the Class Period, defendants' illegal conduct had a substantial effect on Utah commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Utah Code Annotated §§ 76-10-911, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated §§ 76-10-911, *et seq.*

257.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Vermont Stat. Ann. 9 §§ 2453, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects:  (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Wire Harness Systems.

(b)    During the Class Period, Defendants' illegal conduct had a substantial effect on Vermont commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2453, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 §§ 2453, *et seq.*

258.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the West Virginia Code §§ 47-18-1, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects:  (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Wire Harness Systems.

(b)    During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of West Virginia §§ 47-18-1, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia §§ 47-18-1, *et seq.*

259.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes §§ 133.01, *et seq.*

(a)    Defendants' combinations or conspiracies had the following effects:  (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Wire Harness Systems.

(b)    During the Class Period, Defendants' illegal conduct had a substantial effect on Wisconsin commerce.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

(d)    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§ 133.01, *et seq.*  Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. §§ 133.01, *et seq*.

260.    Plaintiffs and members of the Damages Class in each of the above states have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement.  Plaintiffs and members of the Damages Class have paid more for Automotive Wire Harness Systems than they otherwise would have paid in the absence of Defendants' unlawful conduct.  This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

261.     In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of members of the Plaintiffs and the members of the Damages Class.

262.     Accordingly, Plaintiffs and the members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys fees, to the extent permitted by the above state laws.

**THIRD CLAIM FOR RELIEF**
Violation of State Consumer Protection Statutes
(on behalf of Plaintiffs and the Damages Class)

263.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

264.     Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

265.     Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq.*

(a)     During the Class Period, Defendants committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

(b)     This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these defendants for acts, as

alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

(c)    The Defendants' conduct as alleged herein violated Section 17200.  The acts, omissions, misrepresentations, practices and non-disclosures of defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, et seq., including, but not limited to, the following:  (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of Section 16720, et seq., of the California Business and Professions Code, set forth above;

(d)    Defendants' acts, omissions, misrepresentations, practices, an non-disclosures, as described above, whether or not in violation of Section 16720, *et seq.*, of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent;

(e)    Defendants' acts or practices are unfair to consumers of  Automotive Wire Harness Systems (or vehicles containing them) in the State of California within the meaning of Section 17200, California Business and Professions Code; and

(f)    Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and professions Code.

(g)    Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by defendants as a result of such business acts or practices.

(h)     The illegal conduct alleged herein is continuing and there is no indication that defendants will not continue such activity into the future.

(i)     The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and the members of the Damages Class to pay supracompetitive and artificially-inflated prices for Automotive Wire Harness Systems (or vehicles containing them).  Plaintiffs and the members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition.

(j)     The conduct of defendants as alleged in this Complaint violates Section 17200 of the California Business and Professions Code.

(k)     As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by defendants' unfair competition.  Plaintiffs and the members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by defendants as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

266.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*

(a)     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which Automotive Wire Harness Systems was sold, distributed or obtained in the District of Columbia.

(b)    The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904.

(c)    Defendants' unlawful conduct had the following effects:  (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained, and stabilized at artificially high levels  throughout the District of Columbia; (3) Plaintiffs and the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the Damages Class paid supra-competitive, artificially inflated prices for Automotive Wire Harness Systems.

(d)    As a direct and proximate result of the Defendants' conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.* , and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

267.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq*.

(a)    Defendants' unlawful conduct had the following effects:  (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout Florida; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of

the Damages Class paid supracompetitive, artificially inflated prices for Automotive Wire Harness Systems.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers.

(c)     As a direct and proximate result of defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.

(d)     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

268.     Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Hawaii Revised Statutes Annotated §§ 480-1, *et seq*.

(a)     Defendants' unlawful conduct had the following effects:  (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Hawaii; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Wire Harness Systems.

(b)     During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers.

(c)    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.

(d)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Hawaii Rev. Stat. § 480, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

269.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Mass. G.L. c. 93A, §2.

(a)    Defendants were engaged in trade or commerce as defined by G.L. c. 93A.

(b)    Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market which includes Massachusetts, by affecting, fixing, controlling and/or maintaining at artificial and non-competitive levels, the prices at which Automotive Wire Harness Systems were sold, distributed, or obtained in Massachusetts and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(c)    Defendants' unlawful conduct had the following effects:  (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout Massachusetts; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Wire Harness Systems.

(d)    As a direct and proximate result of defendants' unlawful conduct, Plaintiffs and members of the Damages Class were injured and are threatened with further injury.

(e)    Certain of the Defendants have been served with a demand letter in accordance with G.L. c. 93A, § 9, or, upon information and belief, such service of a demand letter was unnecessary due to the defendant not maintaining a place of business within the Commonwealth of Massachusetts or not keeping assets within the Commonwealth.  More than thirty days has passed since such demand letters were served, and each Defendant served has failed to make a reasonable settlement offer.

(f)    By reason of the foregoing, Defendants engaged in unfair competition and unfair or deceptive acts or practices, in violation of G.L. c. 93A, §2. Defendants' and their co-conspirators' violations of Chapter 93A were knowing or willful, entitling Plaintiffs and members of the Damages Class to multiple damages.

270.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et. seq.*

(a)    Missouri Plaintiff and members of this Damages Class purchased Automotive Wire Harness Systems for personal, family, or household purposes.

(b)    Defendants engaged in the conduct described herein in connection with the sale of Automotive Wire Harness Systems in trade or commerce in a market that includes Missouri.

(c)    Defendants agreed to, and did in fact affect, fix, control, and/or maintain, at artificial and non-competitive levels, the prices at which Automotive Wire Harness Systems were sold, distributed, or obtained in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to Plaintiffs and members of the Damages Class.

(d)    Defendants concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Damages Class concerning defendants' unlawful activities and artificially inflated prices for Automotive Wire Harness Systems.  The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Damages Class as they related to the cost of Automotive Wire Harness Systems they purchased.

(e)    Defendants misrepresented the real cause of price increases and/or the absence of price reductions in Automotive Wire Harness Systems by making public statements that were not in accord with the facts.

(f)    Defendants' statements and conduct concerning the price of Automotive Wire Harness Systems were deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the Damages Class to believe that they were purchasing Automotive Wire Harness Systems at prices established by a free and fair market.

(g)    Defendants' unlawful conduct had the following effects:  (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout Missouri; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Missouri; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Wire Harness Systems.

(h)    The foregoing acts and practices constituted unlawful practices in violation of the Missouri Merchandising Practices Act.

(i)      As a direct and proximate result of the above-described unlawful practices, Plaintiffs and members of the Damages Class suffered ascertainable loss of money or property.

(j)      Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce…," as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010, *et seq.*, 15 CSR 60-8.010, *et seq.*, and 15 CSR 60-9.010, *et seq.*, and Mo. Rev. Stat. § 407.025, which provides for the relief sought in this count.

271.   Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, §§ 30-14-103, *et seq*., and §§ 30-14-201, *et. seq.*

(a)      Defendants' unlawful conduct had the following effects:  (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout Montana; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for Automotive Wire Harness Systems.

(b)      During the Class Period, defendants' illegal conduct substantially affected Montana commerce and consumers.

(c)      As a direct and proximate result of defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury.

(d)      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code, §§ 30-14-103, *et seq*., and §§ 30-14-201, *et. seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

272.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq*.

(a)      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which Automotive Wire Harness Systems was sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)      The aforementioned conduct on the part of the Defendants constituted "unconscionable trade practices," in violation of N.M.S.A. Stat. § 57-12-3, in that such conduct, inter alia, resulted in a gross disparity between the value received by Plaintiffs and the members of the Damages Class and the prices paid by them for Automotive Wire Harness Systems as set forth in N.M.S.A., § 57-12-2E.

(c)      Defendants' unlawful conduct had the following effects:  (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico; (3) Plaintiffs and the members of

the Damages Class were deprived of free and open competition; and (4) Plaintiffs and the

members of the Damages Class paid supra-competitive, artificially inflated prices for

Automotive Wire Harness Systems.

(d)    During the Class Period, Defendants' illegal conduct substantially affected

New Mexico commerce and consumers.

(e)    As a direct and proximate result of the unlawful conduct of the

Defendants, Plaintiffs and the members of the Damages Class have been injured and are

threatened with further injury.

(f)    Defendants have engaged in unfair competition or unfair or deceptive acts

or practices in violation of New Mexico Stat. § 57-12-1, *et seq.*, and, accordingly, Plaintiffs and

the members of the Damages Class seek all relief available under that statute.

273.    Defendants have engaged in unfair competition or unfair, unconscionable, or

deceptive acts or practices in violation of  N.Y. Gen. Bus. Law § 349, *et seq.*

(a)    Defendants agree to, and did in fact, act in restraint of trade or commerce

by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the

prices at which Automotive Wire Harness Systems were sold, distributed or obtained in New

York and took efforts to conceal their agreements from Plaintiffs and members of the Damages

Class.

(b)    The conduct of the defendants described herein constitutes consumer-

oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which

resulted in consumer injury and broad adverse impact on the public at large, and harmed the

public interest of New York State in an honest marketplace in which economic activity is

conducted in a competitive manner.

(c)    Defendants' unlawful conduct had the following effects:  (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout New York; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Wire Harness Systems.

(d)    During the Class Period, Defendants' illegal conduct substantially affected New York commerce and consumers.

(e)    During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed Automotive Wire Harness Systems in New York.

(f)    Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349 (h).

274.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*.

(a)    Defendants agree to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which Automotive Wire Harness Systems was sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.

(b)    The conduct of the defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in

consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner.

(c)    Defendants' unlawful conduct had the following effects:  (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Wire Harness Systems.

(d)    During the Class Period, defendants' illegal conduct substantially affected North Carolina commerce and consumers.

(e)    During the Class Period, each of the Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed Automotive Wire Harness Systems in North Carolina.

(f)    Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, et seq., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

275.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act, R.I. Gen. Laws §§ 6-13.1-1, *et seq.*

(a)     Members of this Damages Class purchased Automotive Wire Harness Systems for personal, family, or household purposes.

(b)     Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Automotive Wire Harness Systems were sold, distributed, or obtained in Rhode Island.

(c)     Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Automotive Wire Harness Systems. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business consumer, Defendants breached that duty by their silence. Defendants misrepresented to all consumers during the Class Period that defendants' Automotive Wire Harness Systems prices were competitive and fair.

(d)     Defendants' unlawful conduct had the following effects:  (1) Automotive Wire Harness Systems price  competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Wire Harness Systems.

(e)     As a direct and proximate result of the Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of defendants' use or employment of unconscionable and deceptive commercial

practices as set forth above. That loss was caused by defendants' willful and deceptive conduct, as described herein.

(f)    Defendants' deception, including its affirmative misrepresentations and omissions concerning the price of Automotive Wire Harness Systems, likely misled all consumers acting reasonably under the circumstances to believe that they were purchasing Automotive Wire Harness Systems at prices born by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of Automotive Wire Harness Systems they purchased.

(g)    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. § 6-13.1-1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

276.    Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of  9 Vermont § 2451, *et seq.*

(a)    Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Vermont, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which Automotive Wire Harness Systems were sold, distributed, or obtained in Vermont.

(b)    Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for Automotive Wire Harness Systems.  Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business consumer, defendants breached that duty by their silence. Defendants misrepresented to all consumers

during the Class Period that defendants' Automotive Wire Harness Systems prices were competitive and fair.

(c)     Defendants' unlawful conduct had the following effects:  (1) Automotive Wire Harness Systems price competition was restrained, suppressed, and eliminated throughout Vermont; (2) Automotive Wire Harness Systems prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont; (3) Plaintiffs and members of the Damages Class were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supra-competitive, artificially inflated prices for Automotive Wire Harness Systems.

(d)     As a direct and proximate result of the Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of defendants' use or employment of unconscionable and deceptive commercial practices as set forth above.  That loss was caused by defendants' willful and deceptive conduct, as described herein.

(e)     Defendants' deception, including its affirmative misrepresentations and omissions concerning the price of Automotive Wire Harness Systems, likely misled all consumers acting reasonably under the circumstances to believe that they were purchasing Automotive Wire Harness Systems at prices born by a free and fair market. Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of 9 Vermont § 2451, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

## FOURTH CLAIM FOR RELIEF
### Unjust Enrichment
### (on behalf of Plaintiffs and the Damages Class)

277.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

278.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched.  Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of Automotive Wire Harness Systems.

279.    Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiffs of the members of the Damages Class for Automotive Wire Harness Systems.

280.    Plaintiffs and the members of the Damages Class are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct. Plaintiffs and the members of the Damages Class are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and the members of the Damages Class may make claims on a pro rata basis.

## PRAYER FOR RELIEF

Accordingly, Plaintiffs respectfully request that:

A.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Classes;

B.      That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed:

(a)     An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

(b)     A *per se* violation of Section 1 of the Sherman Act;

(c)     An unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and

(d)     Acts of unjust enrichment by Defendants as set forth herein.

C.      Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiffs and the members of the Damages Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

D.      Plaintiffs and the members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

E.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

F.     Plaintiffs and the members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment;

G.     Plaintiffs and the members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

H.     Plaintiffs and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

I.     Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

DATED:  May 14, 2012

**THE MILLER LAW FIRM, P.C.**

By   /s/ E. Powell Miller
E. Powell Miller (P39487)
950 W. University Dr., Ste. 300
Rochester, Michigan 48307
Telephone:  (248) 841-2200
Facsimile:  (248) 652-2852
epm@millerlawpc.com

*Attorneys for Plaintiffs and Interim
Liaison Counsel for the Proposed End-
Payor Plaintiffs Classes*

Hollis Salzman
Bernard Persky
William V. Reiss
**LABATON SUCHAROW LLP**
140 Broadway
New York, NY 10005
Telephone:  (212) 907-0700
Facsimile:  (212) 883-7058
hsalzman@labaton.com
bpersky@labaton.com
wreiss@labaton.com

Marc M. Seltzer
Steven G. Sklaver
**SUSMAN GODFREY L.L.P.**
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067-6029
Telephone:  (310) 789-3100
Facsimile:  (310) 789-3150
mseltzer@susmangodfrey.com
ssklaver@susmangodfrey.com

Terrell W. Oxford
Warren T. Burns
**SUSMAN GODFREY L.L.P.**
901 Main Street, Suite 5100
Dallas, Texas 75202
Telephone:  (214) 754-1900
Facsimile:  (214)754-1933
toxford@susmangodfrey.com
wburns@susmangodfrey.com

Joseph W. Cotchett
Steven N. Williams
Adam J. Zapala
Gene W. Kim
**COTCHETT, PITRE &
McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone:  (650) 697-6000
Facsimile:  (650) 697-0577
jcotchett@cpmlegal.com
swilliams@cpmlegal.com
jcotchett@cpmlegal.com
swilliams@cpmlegal.com

*Attorneys for Plaintiffs and Interim Co-
Lead Class Counsel for  the Proposed
End-Payor Plaintiffs Classes*

## JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil

Procedure, of all issues so triable.

DATED:  May 14, 2012                    **THE MILLER LAW FIRM, P.C.**

                                        By   /s/ E. Powell Miller
                                        E. Powell Miller (P39487)
                                        950 W. University Dr., Ste. 300
                                        Rochester, Michigan 48307
                                        Telephone:  (248) 841-2200
                                        Facsimile:  (248) 652-2852
                                        epm@millerlawpc.com

                                        *Attorneys for Plaintiffs and Interim*
                                        *Liaison Counsel for the Proposed End-*
                                        *Payor Plaintiffs Classes*

                                        Hollis Salzman
                                        Bernard Persky
                                        William V. Reiss
                                        **LABATON SUCHAROW LLP**
                                        140 Broadway
                                        New York, NY 10005
                                        Telephone:  (212) 907-0700
                                        Facsimile:  (212) 883-7058
                                        hsalzman@labaton.com
                                        bpersky@labaton.com
                                        wreiss@labaton.com

                                        Marc M. Seltzer
                                        Steven G. Sklaver
                                        **SUSMAN GODFREY L.L.P.**
                                        1901 Avenue of the Stars, Suite 950
                                        Los Angeles, CA 90067-6029
                                        Telephone:  (310) 789-3100
                                        Facsimile:  (310) 789-3150
                                        mseltzer@susmangodfrey.com
                                        ssklaver@susmangodfrey.com

Terrell W. Oxford
Warren T. Burns
**SUSMAN GODFREY L.L.P.**
901 Main Street, Suite 5100
Dallas, Texas 75202
Telephone:  (214) 754-1900
Facsimile:  (214)754-1933
toxford@susmangodfrey.com
wburns@susmangodfrey.com

Joseph W. Cotchett
Steven N. Williams
Adam J. Zapala
Gene W. Kim
**COTCHETT, PITRE &
McCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone:  (650) 697-6000
Facsimile:  (650) 697-0577
jcotchett@cpmlegal.com
swilliams@cpmlegal.com
jcotchett@cpmlegal.com
swilliams@cpmlegal.com

*Attorneys for Plaintiffs and Interim Co-
Lead Class Counsel for  the Proposed
End-Payor Plaintiffs Classes*

**EXHIBIT B**

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

|  |  |
|---|---|
| _____ | : Master File No. 12-md-02311 |
| IN RE AUTOMOTIVE WIRE | : |
| HARNESS SYSTEMS ANTITRUST | : Hon. Marianne O. Battani |
| LITIGATION | : Hon. Mona Majzoub |
| _____ | : |
|  | : |
| THIS DOCUMENT RELATES TO: | : |
|  | : **Jury Trial Demanded** |
| All Automobile Dealer Actions | : |
| _____ | : |

## AUTOMOBILE DEALERS
## CONSOLIDATED CLASS COMPLAINT

Plaintiffs Martens Cars of Washington, Inc. ("Plaintiff Martens"), Landers Auto Group

No. 1, Inc., d/b/a Landers Toyota ("Plaintiff Landers"), Hammett Motor Company, Inc.

("Plaintiff Hammett"), Superstore Automotive, Inc. ("Plaintiff Superstore"), Lee Pontiac-

Oldsmobile-GMC Truck, Inc. ("Plaintiff Lee"), Westfield Dodge City, Inc. ("Plaintiff

Westfield"), V.I.P. Motor Cars Ltd. ("Plaintiff V.I.P."), Desert European Motorcars, Ltd.

("Plaintiff Desert"), Landers McLarty Fayetteville TN, LLC ("Plaintiff Fayetteville"), Dale

Martens Nissan Subaru, Inc. ("Plaintiff Dale Martens"), Green Team of Clay Center Inc.

("Plaintiff Green Team"), McGrath Automotive Group, Inc. ("Plaintiff McGrath"), Table Rock

Automotive, Inc., d/b/a Todd Archer Hyundai ("Plaintiff Table Rock"), Archer-Perdue, Inc.,

d/b/a/ Archer-Perdue Suzuki ("Plaintiff Archer-Perdue"), Lee's Summit Chrysler Jeep Dodge

("Plaintiff Lee's Summit"), Bonneville and Son, Inc. ("Plaintiff Bonneville"), Holzhauer Auto

and Truck Sales, Inc. ("Plaintiff Holzhauer"), Pitre, Inc., d/b/a/ Pitre Buick GMC ("Plaintiff

Pitre"), Patsy Lou Chevrolet, Inc. ("Plaintiff Patsy Lou"),  John Greene Chrysler Dodge Jeep,

LLC ("Plaintiff John Greene"), SLT Group II, Inc., d/b/a Planet Nissan Subaru of Flagstaff

("Plaintiff Planet Nissan"), Herb Hallman Chevrolet, Inc., d/b/a/ Champion Chevrolet ("Plaintiff

Champion"), Charles Daher's Commonwealth Motors, Inc., d/b/a Commonwealth Chevrolet,

Commonwealth Kia, Commonwealth Honda ("Plaintiff Commonwealth Motors"),

Commonwealth Volkswagen, Inc., d/b/a Commonwealth Volkswagen ("Plaintiff Commonwealth

Volkswagen"), Commonwealth Nissan, Inc., d/b/a Commonwealth Nissan ("Plaintiff

Commonwealth Nissan"), Ramey Motors, Inc. ("Plaintiff Ramey"), Thornhill Superstore, Inc.,

d/b/a Thornhill GM Superstore ("Plaintiff Thornhill"), Dave Heather Corporation, d/b/a

Lakeland Toyota Honda Mazda Subaru ("Plaintiff Lakeland"), Central Salt Lake Valley GMC

Enterprises, LLC, d/b/a Salt Lake Valley Buick GMC ("Plaintiff Salt Lake Valley"), Capitol

Chevrolet Cadillac, Inc. ("Plaintiff Capitol Chevrolet"), Capitol Dealerships, Inc., d/b/a Capitol

Toyota ("Plaintiff Capitol Toyota"), Beck Motors, Inc. ("Plaintiff Beck") (collectively

"Plaintiffs"), file this Consolidated Class Complaint on behalf of themselves and all others

similarly situated (the "Classes" as defined below).

This Automobile Dealers Consolidated Class Complaint is intended to supersede the

complaints in the transferor forums where certain Plaintiffs filed their original actions against

Defendants, and to replace those complaints in said forums, becoming the operative complaint in

all actions initiated by any Plaintiffs in this multidistrict litigation prior to transfer and

consolidation.[1]  Plaintiffs bring this class action for damages, injunctive relief, and other relief

---

[1] The actions in which this Consolidated Complaint is intended to replace certain Plaintiffs'
complaints are as follows: *Hammett Motor Co., Inc. v. Delphi Automotive LLP, et al.*, 3:11-CV-
00647 (S.D. Miss.) (Filed Oct. 18, 2011); *Landers Auto Group No. 1 Inc. d/b/a Landers Toyota
v. Delphi Automotive LLP, et al.*, 4:11-CV-00757 (E.D. Ark.) (Filed Oct. 18, 2011); *Superstore
Automotive, Inc. v. Delphi Automotive LLP, et al.*, 11-CV-03092 (D. Minn.) (Filed Oct. 19,
2011); *Martens Cars of Washington Inc. v. Furukawa Electric Co., Ltd., et al.*, 1:11-CV-01892
(D.D.C.) (Filed Oct. 27, 2011).

pursuant to federal antitrust laws and state antitrust, unfair competition, and consumer protection laws, demand a trial by jury, and allege as follows:

## Nature of Action

1.      This lawsuit is brought as a proposed class action against Defendants, the largest suppliers of Automotive Wire Harness Systems (defined below) globally and in the United States, for engaging in a massive, more than decade-long conspiracy to unlawfully fix and artificially raise the prices of these products.  Defendants' conspiracy successfully targeted the long-struggling United States automotive industry, raising prices for car manufacturers and consumers alike.

2.      Plaintiffs bring this action on behalf of themselves and all automobile dealers that, during the period January 1, 2000, to September 30, 2011, (the "Class Period"):

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator, or

b) purchased vehicles[2] containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator,

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

3.      "Automotive Wire Harness Systems" are automotive electrical distribution systems used to direct and control electronic components, wiring, and circuit boards in an automotive vehicle.  Essentially, Automotive Wire Harness Systems serve as the "central

---

[2] "Vehicles" as used here, means any new vehicles sold by automobile dealers throughout the United States, including but not limited to sedans, trucks and sport utility vehicles.

nervous system" of a motor vehicle. "Automotive Wire Harness Systems" include the following: automotive wire harnesses, speed sensor wire assemblies, automotive electrical wiring, lead wire assemblies, cable bond, automotive wiring connectors, automotive wiring terminals, electronic control units, fuse boxes, relay boxes, junction blocks, high voltage wiring and power distributors.

4.      The Delphi Defendants, the Fujikura Defendants, the Furukawa Defendants, the Lear Defendants, the Leoni Defendants, the Sumitomo Defendants, the S-Y Systems Defendants, the Tokai Rika Defendants, the Yazaki Defendants and the G.S. Electech Defendants (all as defined below, and collectively "Defendants") manufacture, market, and sell Automotive Wire Harness Systems throughout the United States. The manufacture and sale of Automotive Wire Harness Systems is a multi-billion dollar industry.

5.      Defendants and other co-conspirators (as yet unknown) agreed, combined, and conspired to inflate, fix, raise, maintain, or artificially stabilize prices of Automotive Wire Harness Systems.

6.      Competition authorities in the United States, the European Union, and Japan have been investigating a conspiracy in the market for Automotive Wire Harness Systems since at least February 2010. As part of its criminal investigation, the Department of Justice ("DOJ") is seeking information about anticompetitive conduct in the market for Automotive Wire Harness Systems, and the Federal Bureau of Investigation ("FBI") has participated in raids, pursuant to search warrants, carried out in at least some of the Defendants' offices. The European Commission Competition Authority ("EC") has also conducted dawn raids at the European offices of several of the Defendants.

4

7.      Defendant Furukawa Electric Co. Ltd. ("Furukawa Electric"), and three of its executives have pleaded guilty to participating in the Automotive Wire Harness Systems cartel from at least as early as January 2000 and continuing until at least January 2010, and Furukawa Electric has agreed to pay a $200 million fine related to its unlawful conduct. Furukawa Electric and its co-conspirators participated in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, Automotive Wire Harness Systems sold to automobile manufacturers in the United States. The combination and conspiracy engaged in by Furukawa Electric and its co-conspirators was an unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

8.      As part of their plea agreements, Furukawa Electric and its three executives have agreed to assist the DOJ in its ongoing criminal investigation into the automotive parts industry.

9.      Defendant Yazaki Corporation ("Yazaki Corporation"), and four of its executives, have also pleaded guilty to fixing prices, rigging bids and allocating customers for Automotive Wire Harness Systems, between January 2000 and February 2010. Yazaki Corporation has agreed to pay a $470 million fine, the second highest fine ever paid for a criminal antitrust violation, for its agreements to restrain prices for Automotive Wire Harness Systems, as well as several other automotive components.

10.      Defendant Fujikura, Inc. has admitted to engaging in the conspiracy to restrain competition for Automotive Wire Harness Systems between January 2006 and February 2010. Fujikura Inc. has agreed to plead guilty to fixing prices, rigging bids and allocating the supply of Automotive Wire Harness Systems and to pay a $20 million fine for its participation in the Automotive Wire Harness Systems conspiracy.

11.     Defendant G.S. Electech Inc. has agreed to plead guilty to engaging in a conspiracy to fix prices, rig bids and allocate supply for speed sensor wire assemblies, which comprise the ABS/speed sensor wire harness, a portion of the Automotive Wire Harness System, between January 2003 and February 2010.  G.S. Electech has agreed to pay $2.75 million for engaging in these violations of the Sherman Act.

12.     As a direct result of the anti-competitive and unlawful conduct alleged herein, Plaintiffs and the Classes paid artificially inflated prices for Automotive Wire Harness Systems or vehicles containing Automotive Wire Harness Systems that they purchased from firms that directly purchased Automotive Wire Harness Systems from one or more Defendants or their co-conspirators during the Class Period.  Plaintiffs and the Classes members have thereby suffered antitrust injury to their business or property.

## Jurisdiction and Venue

13.     Plaintiffs bring this action under Section 16 of the Clayton Act (15 U.S.C. § 26) to secure equitable and injunctive relief against Defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1).  Plaintiffs also assert claims for actual and exemplary damages pursuant to state antitrust, unfair competition, and consumer protection laws, and seek to obtain restitution, recover damages and secure other relief against Defendants for violation of those state laws. Plaintiffs and the Classes also seek attorneys' fees, costs, and other expenses under federal and state law.

14.     This Court has jurisdiction over the subject matter of this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Act (15 U.S.C. § 1), and Title 28, United States Code, Sections 1331 and 1337.  This Court has subject matter jurisdiction over the state law claims in this action, pursuant to 28 U.S.C. §§ 1332(d) and 1367,

as this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interests and costs, and in which some members of the proposed Classes are citizens of different states than some Defendants.

15.    Venue is proper in this district pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this district, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this district, and one or more of the Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this district.

16.    This Court has *in personam* jurisdiction over each of the Defendants because each Defendant, either directly or through the ownership and/or control of its United States subsidiaries, *inter alia:* (a) transacted business in the United States, including in this district; (b) directly or indirectly sold or marketed substantial quantities of Automotive Wire Harness Systems throughout the United States, including in this district; (c) had substantial aggregate contacts with the United States as a whole, including in this district; and/or (d) was engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout the United States.  Defendants also conduct business throughout the United States, including in this district, and they have purposefully availed themselves of the laws of the United States and this district.

17.    Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial, reasonably foreseeable and intended anti-competitive effects upon

interstate commerce within the United States, and upon import trade and commerce within the United States.

18.    The activities of Defendants and their co-conspirators were within the flow of, were intended to, and did have, a substantial effect on interstate commerce of the United States. Defendants' products are sold in the flow of interstate commerce.

19.    Automotive Wire Harness Systems manufactured abroad by Defendants and sold for use in automobiles either manufactured in the United States or manufactured abroad and sold in the United States are goods brought into the United States for sale, and therefore constitute import commerce.  To the extent any Automotive Wire Harness Systems are purchased in the United States, and such Automotive Wire Harness Systems do not constitute import commerce, Defendants' unlawful activities with respect thereto, as more fully alleged herein during the Class Period, had, and continue to have, a direct, substantial and reasonably foreseeable effect on United States commerce.  The anticompetitive conduct, and its effect on United States commerce described herein, proximately caused antitrust injury to Plaintiffs and members of the Classes in the United States.

20.    By reason of the unlawful activities hereinafter alleged, Defendants substantially affected commerce throughout the United States, causing injury to Plaintiffs and members of the Classes.  Defendants, directly and through their agents, engaged in activities affecting all states, to fix or inflate prices of Automotive Wire Harness Systems, and that conspiracy unreasonably restrained trade and adversely affected the market for Automotive Wire Harness Systems.

21.    Defendants' conspiracy and wrongdoing described herein adversely affected persons in the United States who purchased Automotive Wire Harness Systems, including Plaintiffs and the Classes.

## Parties

22.    Plaintiff Martens is a Maryland corporation with its principal place of business in the District of Columbia.  Plaintiff Martens is an authorized Volvo and Volkswagen dealer, who sells Volvo- and Volkswagen- brand vehicles (e.g., Passat and Jetta), containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

23.    During the Class Period Plaintiff Martens purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Volvo- and Volkswagen-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.  Plaintiff Martens also purchased Automotive Wire Harness Systems, for its repair and service business, during the Class Period, from manufacturers of Volvo- and Volkswagen-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.

24.    Plaintiff Hammett is a Mississippi corporation with its principal place of business in Durant, Mississippi.  Plaintiff Hammett is an authorized Ford dealer who sells Ford-brand vehicles containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

25.    During the Class Period Plaintiff Hammett purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Ford-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.  Plaintiff Hammett also purchased Automotive Wire Harness Systems, for its repair

and service business, during the Class Period, from manufacturers of Ford-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.

26.    Plaintiff Landers is an Arkansas corporation with its principal place of business in Little Rock, Arkansas.  Plaintiff Landers is an authorized Toyota dealer who sells Toyota-brand vehicles containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

27.     During the Class Period Plaintiff Landers purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Toyota-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.  Plaintiff Landers also purchased Automotive Wire Harness Systems, for its repair and service business, during the Class Period, from manufacturers of Toyota-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.

28.    Plaintiff Superstore is a Minnesota company, with its principal place of business in White Bear Lake, Minnesota.  Plaintiff Superstore is an authorized Buick/GMC dealer, doing business under the name White Bear Lake Superstore.  Plaintiff Superstore sells Buick- and GMC-brand vehicles containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

29.    During the Class Period Plaintiff Superstore purchased vehicles containing Automotive Wire Harness Systems from manufacturers of GMC-brand vehicles, who purchased

10

Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators. Plaintiff Superstore also purchased Automotive Wire Harness Systems, for its repair and service business, during the Class Period, from manufacturers of GMC-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more of the Defendants or their co-conspirators.

30.      Plaintiff Lee is a Florida corporation, with its principal place of business in Fort Walton Beach, Florida. Plaintiff Lee is presently an authorized GMC dealer. During the Class Period, Plaintiff Lee was also an authorized Pontiac, Oldsmobile and Jeep dealer. Plaintiff Lee sells GMC-brand vehicles containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators. During the Class Period, Plaintiff sold Pontiac-, Oldsmobile- and Jeep-brand vehicles containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

31.      During the Class Period Plaintiff Lee purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Pontiac-, Oldsmobile-, GMC- and Jeep-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators. Plaintiff Lee also purchased Automotive Wire Harness Systems, for its repair and service business, during the Class Period, from manufacturers of Pontiac-, Oldsmobile-, GMC- and Jeep-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more of the Defendants or their co-conspirators.

32.    Plaintiff Westfield is a New York company with its principal place of business in Westfield, New York.  Plaintiff Westfield is an authorized Chrysler dealer, who sells Chrysler-, Dodge- and Jeep-brand vehicles containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

33.    During the Class Period Plaintiff Westfield purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Chrysler-, Dodge- and Jeep-brand vehicles, who directly purchased Automotive Wire Harness Systems from one or more Defendants or their co-conspirators.  Plaintiff Westfield also purchased Automotive Wire Harness Systems, for its repair and service business, during the Class Period, from manufacturers of Chrysler-, Dodge- and Jeep-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more of the Defendants or their co-conspirators.

34.    Plaintiff V.I.P. is a California company with its principal place of business in Palm Springs, California.  Plaintiff VIP is an authorized Mercedes, BMW, Infiniti, and Hyundai dealer who sells Mercedes-, BMW-, Infiniti-, and Hyundai-brand vehicles containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

35.    During the Class Period Plaintiff V.I.P. purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Mercedes-, BMW-, Infiniti-, and Hyundai-brand vehicles, who directly purchased Automotive Wire Harness Systems from one or more Defendants or their co-conspirators.  Plaintiff V.I.P. also purchased Automotive Wire Harness Systems, for its repair and service business, during the Class Period, from manufacturers

12

of Mercedes-, BMW-, Infiniti-, and Hyundai-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more of the Defendants or their co-conspirators.

36.     Plaintiff Desert is a California company, with its principal place of business in Rancho Mirage, California.  Plaintiff Desert is an authorized Rolls Royce, Bentley, Aston Martin, Maserati, Porsche, Jaguar, Land Rover, Audi, Lotus and Spyker dealer who sells Rolls Royce-, Bentley-, Aston Martin-, Maserati-, Porsche-, Jaguar-, Land Rover-, Audi-, Lotus- and Spyker-brand vehicles containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

37.     During the Class Period, Plaintiff Desert purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Rolls Royce-, Bentley-, Aston Martin-, Maserati-, Porsche-, Jaguar-, Land Rover-, Audi-, Lotus- and Spyker-brand vehicles who directly purchased Automotive Wire Harness Systems from one or more Defendants or their co-conspirators.  Plaintiff Desert also purchased Automotive Wire Harness Systems, for its repair and service business, during the Class Period, from manufacturers of Rolls Royce-, Bentley-, Aston Martin-, Maserati-, Porsche-, Jaguar-, Land Rover-, Audi-, Lotus- and Spyker-brand vehicles who purchased such Automotive Wire Harness Systems directly from one or more of the Defendants or their co-conspirators.

38.     Plaintiff Fayetteville is an Arkansas corporation, with its principal place of business in Fayetteville, Tennessee.  Plaintiff Fayetteville is an authorized Toyota dealer, who sells Toyota-brand cars containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

39.     During the Class Period Plaintiff Fayetteville purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Toyota-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.  Plaintiff Fayetteville also purchased Automotive Wire Harness Systems, for its repair and service business, during the Class Period, from manufacturers of Toyota-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.

40.     Plaintiff Dale Martens was a Kansas corporation, with its principal place of business in Lawrence, Kansas during the Class Period.  Plaintiff Dale Martens was an authorized Nissan and Subaru dealer during the Class Period, who, during the Class Period, sold Nissan- and Subaru-brand vehicles containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

41.     During the Class Period Plaintiff Dale Martens purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Nissan- and Subaru-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.  Plaintiff Dale Martens also purchased Automotive Wire Harness Systems, for its repair and service business, during the Class Period, from manufacturers of Nissan- and Subaru-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.

42.     Plaintiff Green Team is a Kansas corporation, with its principal place of business in Clay Center, Kansas.  Plaintiff Green Team is an authorized Chrysler, Jeep, Dodge and Ram dealer, who sells Chrysler-, Jeep-, Dodge- and Ram-brand vehicles containing Automotive Wire

Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

43.    During the Class Period Plaintiff Green Team purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Chrysler-, Jeep-, Dodge- and Ram-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.  Plaintiff Green Team also purchased Automotive Wire Harness Systems, for its repair and service business, during the Class Period, from manufacturers of Chrysler-, Jeep-, Dodge- and Ram-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.

44.    Plaintiff McGrath is a Delaware corporation, with its principal place of business in Cedar Rapids, Iowa.  Plaintiff McGrath is an authorized Buick, GMC, Chevrolet, Chrysler, Dodge, Jeep, Ram, Kia and Cadillac dealer, who sells Buick-, GMC-, Chevrolet-, Chrysler-, Dodge-, Jeep-, Ram-, Kia- and Cadillac-brand cars containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

45.    During the Class Period Plaintiff McGrath purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Buick-, GMC-, Chevrolet-, Chrysler-, Dodge-, Jeep-, Ram-, Kia- and Cadillac-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.  Plaintiff McGrath also purchased Automotive Wire Harness Systems, for its repair and service business, during the Class Period, from manufacturers of Buick-, GMC-, Chevrolet-, Chrysler-, Dodge-,

15

Jeep-, Ram-, Kia- and Cadillac-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.

46.   Plaintiff Table Rock is a Nebraska corporation, with its principal place of business in Bellevue, Nebraska. Plaintiff Table Rock is an authorized Hyundai dealer, who sells Hyundai-brand cars containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

47.   During the Class Period Plaintiff Table Rock purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Hyundai-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators. Plaintiff Table Rock also purchased Automotive Wire Harness Systems, for its repair and service business, during the Class Period, from manufacturers of Hyundai-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.

48.   Plaintiff Archer-Perdue is a Nebraska corporation, with its principal place of business in Omaha, Nebraska. Plaintiff Archer-Perdue is an authorized Suzuki dealer, who sells Suzuki-brand cars containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

49.   During the Class Period Plaintiff Archer-Perdue purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Suzuki-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators. Plaintiff Archer-Perdue also purchased Automotive Wire Harness Systems, for its

repair and service business, during the Class Period, from manufacturers of Suzuki-brand
vehicles, who purchased such Automotive Wire Harness Systems directly from one or more
Defendants or their co-conspirators.

50.    Plaintiff Lee's Summit is a Missouri corporation, with its principal place of
business in Lee's Summit, Missouri.  Plaintiff Lee's Summit is an authorized Chrysler, Dodge,
Jeep and Ram dealer, who sells Chrysler-, Dodge-, Jeep- and Ram-brand vehicles containing
Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-
conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the
Defendants or their co-conspirators.

51.    During the Class Period Plaintiff Lee's Summit purchased vehicles containing
Automotive Wire Harness Systems from manufacturers of Chrysler-, Dodge-, Jeep- and Ram-
brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more
Defendants or their co-conspirators.  Plaintiff Lee's Summit also purchased Automotive Wire
Harness Systems, for its repair and service business, during the Class Period, from manufacturers
of Chrysler-, Dodge-, Jeep- and Ram-brand vehicles, who purchased such Automotive Wire
Harness Systems directly from one or more Defendants or their co-conspirators.

52.    Plaintiff Bonneville is a New Hampshire corporation, with its principal place of
business in Manchester, New Hampshire.  Plaintiff Bonneville is an authorized Dodge, Chrysler,
Jeep and Ram dealer, who sells Chrysler-, Dodge-, Jeep- and Ram-brand vehicles containing
Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-
conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the
Defendants or their co-conspirators.

53.     During the Class Period Plaintiff Bonneville purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Chrysler-, Dodge-, Jeep- and Ram-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.  Plaintiff Bonneville also purchased Automotive Wire Harness Systems, for its repair and service business, during the Class Period, from manufacturers of Chrysler-, Dodge-, Jeep- and Ram-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.

54.     Plaintiff Holzhauer is a Delaware corporation, with its principal place of business in Nashville, Illinois.  Plaintiff Holzhauer is an authorized Dodge, Chrysler and Jeep dealer, who sells Dodge-, Chrysler- and Jeep-brand vehicles containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

55.     During the Class Period Plaintiff Holzhauer purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Dodge-, Chrysler- and Jeep-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.  Plaintiff Holzhauer also purchased Automotive Wire Harness Systems, for its repair and service business, during the Class Period, from manufacturers of Dodge-, Chrysler- and Jeep-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.

56.     Plaintiff Pitre is a New Mexico corporation, with its principal place of business in Albuquerque, New Mexico.  Plaintiff Pitre is an authorized Buick and GMC dealer, who sells Buick- and GMC-brand vehicles containing Automotive Wire Harness Systems manufactured by

one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

57.    During the Class Period Plaintiff Pitre purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Buick- and GMC-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.  Plaintiff Pitre also purchased Automotive Wire Harness Systems, for its repair and service business, during the Class Period, from manufacturers of Buick- and GMC-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.

58.    Plaintiff Patsy Lou is a Michigan corporation, with its principal place of business in Flint, Michigan.  Plaintiff Patsy Lou is an authorized Chevrolet dealer, who sells Chevrolet-brand vehicles containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

59.    During the Class Period Plaintiff Patsy Lou purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Chevrolet-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.  Plaintiff Patsy Lou also purchased Automotive Wire Harness Systems, for its repair and service business, during the Class Period, from manufacturers of Chevrolet-brand brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.

60.    Plaintiff John Greene is a North Carolina corporation, with its principal place of business in Morganton, North Carolina.  Plaintiff John Greene is an authorized Chrysler, Dodge,

19

Jeep and Ram dealer, who sells Chrysler-, Dodge-, Jeep- and Ram-brand vehicles containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

61.    During the Class Period Plaintiff John Greene purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Chrysler-, Dodge-, Jeep- and Ram-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.  Plaintiff John Greene also purchased Automotive Wire Harness Systems, for its repair and service business, during the Class Period, from manufacturers of Chrysler-, Dodge-, Jeep- and Ram-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.

62.    Plaintiff Planet Nissan is an Arizona corporation, with its principal place of business in Flagstaff, Arizona.  Plaintiff Planet Nissan is an authorized Nissan and Subaru dealer, who sells Nissan- and Subaru-brand vehicles containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

63.    During the Class Period Plaintiff Planet Nissan purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Nissan- and Subaru-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.  Plaintiff Planet Nissan also purchased Automotive Wire Harness Systems, for its repair and service business, during the Class Period, from manufacturers of Nissan- and Subaru-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.

64.     Plaintiff Champion is a Nevada corporation, with its principal place of business in Reno, Nevada.  Plaintiff Champion is an authorized Chevrolet dealer, who sells Chevrolet-brand vehicles containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

65.     During the Class Period Plaintiff Champion purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Chevrolet-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.  Plaintiff Champion also purchased Automotive Wire Harness Systems, for its repair and service business, during the Class Period, from manufacturers of Chevrolet-brand brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.

66.     Plaintiff Commonwealth Motors is a Delaware corporation, with its principal place of business in Lawrence, Massachusetts.  Plaintiff Commonwealth Motors is an authorized Chevrolet, Honda and Kia dealer, who sells Chevrolet- Honda- and Kia-brand vehicles containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

67.     During the Class Period Plaintiff Commonwealth Motors purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Chevrolet-, Honda- and Kia-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.  Plaintiff Commonwealth Motors also purchased Automotive Wire Harness Systems, for its repair and service business, during the Class Period,

from manufacturers of Chevrolet-, Honda- and Kia-brand brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.

68.    Plaintiff Commonwealth Volkswagen is a Massachusetts corporation with its principal place of business in Lawrence, Massachusetts.  Plaintiff Commonwealth Volkswagen is an authorized Volkswagen dealer, who sells Volkswagen-brand vehicles containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

69.    During the Class Period Plaintiff Commonwealth Volkswagen purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Volkswagen-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.  Plaintiff Commonwealth Volkswagen also purchased Automotive Wire Harness Systems, for its repair and service business, during the Class Period, from manufacturers of Volkswagen-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.

70.    Plaintiff Commonwealth Nissan is a Massachusetts corporation with its principal place of business in the Lawrence, Massachusetts.  Plaintiff Commonwealth Nissan is an authorized Nissan dealer, who sells Nissan-brand vehicles containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

71.     During the Class Period Plaintiff Commonwealth Nissan purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Nissan-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.  Plaintiff Commonwealth Nissan also purchased Automotive Wire Harness Systems, for its repair and service business, during the Class Period, from manufacturers of Nissan-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.

72.     Plaintiff Ramey is a West Virginia company with its principal place of business in Princeton, West Virginia.  Plaintiff Ramey is an authorized Chrysler, Dodge, Jeep and Ram dealer, who sells Chrysler-, Dodge-, Jeep- and Ram-brand vehicles containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

73.     During the Class Period Plaintiff Ramey purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Chrysler-, Dodge-, Jeep- and Ram-brand vehicles, who directly purchased Automotive Wire Harness Systems from one or more Defendants or their co-conspirators.  Plaintiff Ramey also purchased Automotive Wire Harness Systems, for its repair and service business, during the Class Period, from manufacturers of Chrysler-, Dodge-, Jeep- and Ram-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more of the Defendants or their co-conspirators.

74.     Plaintiff Thornhill is a West Virginia corporation, with its principal place of business in Chapmanville, West Virginia.  Plaintiff Thornhill is an authorized Chevrolet, Buick and GMC dealer, who sells Chevrolet-, Buick- and GMC-brand vehicles containing Automotive

Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

75.    During the Class Period Plaintiff Thornhill purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Chevrolet-, Buick- and GMC-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.  Plaintiff Thornhill also purchased Automotive Wire Harness Systems, for its repair and service business, during the Class Period, from manufacturers of Chevrolet-, Buick- and GMC-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.

76.    Plaintiff Lakeland is a Wisconsin corporation with its principal place of business in Sheboygan, Wisconsin.  Plaintiff Lakeland is an authorized Toyota, Honda, Mazda and Subaru dealer who sells Toyota- Honda-, Mazda- and Subaru-brand vehicles containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

77.    During the Class Period Plaintiff Lakeland purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Toyota- Honda-, Mazda- and Subaru-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.  Plaintiff Lakeland also purchased Automotive Wire Harness Systems, for its repair and service business, during the Class Period, from manufacturers of Toyota- Honda-, Mazda- and Subaru-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.

1:12-md-02311-MOB    Doc # 85-1    Filed 03/14/12    Pg 25 of 37    Pg ID 936

78.     Plaintiff Salt Lake Valley is a Utah company, with its principal place of business in Salt Lake City, Utah.  Plaintiff Salt Lake Valley is an authorized Buick and GMC dealer, who sells Buick- and GMC-brand vehicles containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

79.     During the Class Period Plaintiff Salt Lake Valley purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Buick- and GMC-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.  Plaintiff Salt Lake Valley also purchased Automotive Wire Harness Systems, for its repair and service business, during the Class Period, from manufacturers of Buick- and GMC-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.

80.     Plaintiff Capitol Chevrolet is an Oregon corporation, with its principal place of business in Salem, Oregon.  Plaintiff Capitol Chevrolet is an authorized Chevrolet, Cadillac and Subaru dealer, who sells Chevrolet-, Cadillac- and Subaru-brand vehicles containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

81.     During the Class Period Plaintiff Capitol Chevrolet purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Chevrolet-, Cadillac- and Subaru-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.  Plaintiff Capitol Chevrolet also purchased Automotive Wire Harness Systems, for its repair and service business, during the Class Period, from manufacturers

of Chevrolet-, Cadillac- and Subaru-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.

82.     Plaintiff Capitol Toyota is an Oregon corporation with its principal place of business in Salem, Oregon.  Plaintiff Capitol Toyota is an authorized Toyota dealer who sells Toyota-brand vehicles containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

83.     During the Class Period Plaintiff Capitol Toyota purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Toyota-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.  Plaintiff Capitol Toyota also purchased Automotive Wire Harness Systems, for its repair and service business, during the Class Period, from manufacturers of Toyota-brand vehicles, who purchased such Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.

84.     Plaintiff Beck is a South Dakota corporation, with its principal place of business in Pierre, South Dakota.  Plaintiff Beck is an authorized Chevrolet and Cadillac dealer, who sells Chevrolet- and Cadillac-brand vehicles containing Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators, as well as Automotive Wire Harness Systems manufactured by one or more of the Defendants or their co-conspirators.

85.     During the Class Period Plaintiff Beck purchased vehicles containing Automotive Wire Harness Systems from manufacturers of Chevrolet- and Cadillac-brand vehicles, who purchased Automotive Wire Harness Systems directly from one or more Defendants or their co-conspirators.  Plaintiff Beck also purchased Automotive Wire Harness Systems, for its repair and

service business, during the Class Period, from manufacturers of Chevrolet- and Cadillac-brand

vehicles, who purchased such Automotive Wire Harness Systems directly from one or more

Defendants or their co-conspirators.

**The Delphi Defendants**

86.     Defendant Delphi Automotive LLP is a partnership organized under the laws of

England and Wales, with its principal place of business in London, England.  It was formed in

2009 to buy assets of Troy, Michigan-based Delphi Corporation, which filed for bankruptcy

protection in 2005.  Defendant Delphi LLP, directly or through its subsidiaries which it wholly

owned or controlled, manufactured, marketed and/or sold Automotive Wire Harness Systems that

were purchased throughout the United States, including in this district, during the Class Period.

87.     Defendant Delphi Automotive Systems LLC ("Delphi LLC") is a Delaware

corporation with its principal place of business in Troy, Michigan.  It is a subsidiary or wholly

owned and/or controlled by its parent Delphi Automotive LLP.  Officers from Defendant Delphi

Automotive LLP work out of the Michigan offices of Defendant Delphi LLC.  Defendant Delphi

LLC manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased

throughout the United States, including in this district, during the Class Period.

88.     Defendant DPH Holdings Corporation (f/k/a Delphi Corporation) is a Delaware

corporation with its principal place of business in Warren, Ohio.  It is a subsidiary of and wholly

owned and/or controlled by its parent, Delphi Automotive LLP.  Defendant DPH Holdings

Corporation manufactured, marketed and/or sold Automotive Wire Harness Systems that were

purchased throughout the United States, including in this district, during the Class Period.

89.     Defendant Delphi Furukawa Wiring Systems LLC is a limited liability company

created in 2004 through a joint venture with Delphi Corporation and Furukawa Electric with its

principal place of business in Ann Arbor, Michigan.  The joint venture was responsible for sales

and engineering activities for Automotive Wire Harness Systems, with a focus on sales to Toyota

in North America.  The joint venture used existing Delphi Corporation operation facilities.

90.     Defendants Delphi Automotive LLP, Delphi LLC, DPH Holdings Corporation and

Delphi Furukawa Wiring Systems LLC are collectively referred to herein as the "Delphi

Defendants" or "Delphi."

**The Fujikura Defendants**

91.     Defendant Fujikura, Ltd. is a Japanese company with its principal place of

business in Tokyo, Japan.  Defendant Fujikura Ltd., directly and/or through its subsidiaries, which

it wholly owned and/or controlled, manufactured, marketed and/or sold Automotive Wire Harness

Systems that were purchased throughout the United States, including in this district, during the

Class Period.

92.     Defendant Fujikura America, Inc. is a Delaware company with locations in Santa

Clara, California and Farmington Hills, Michigan.  It is a subsidiary of and wholly owned and/or

controlled by its parent, Defendant Fujikura Ltd.  Defendant Fujikura America Inc. manufactured,

marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the

United States, including in this district, during the Class Period.  At all times during the Class

Period, its activities in the United States were under the control and direction of its Japanese

parent.

93.     Defendants Fujikura Ltd. and Fujikura America, Inc. are collectively referred to

herein as "Fujikura Defendants" or "Fujikura."

28

**The Furukawa Defendants**

94.    Defendant Furukawa Electric is a Japanese corporation, with its principal place of business in Tokyo, Japan.  Defendant Furukawa Electric, directly and/or through its subsidiaries, which it wholly owned and/or controlled, manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

95.    Defendant American Furukawa, Inc. ("American Furukawa") is a Delaware corporation, with its principal place of business in Plymouth, Michigan.  It is a subsidiary of and wholly owned and/or controlled by its parent, Furukawa Electric.  Defendant American Furukawa manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent.

96.    Defendant Furukawa Wiring Systems, America, Inc. ("Furukawa Wiring") is a Delaware corporation with its principal place of business in El Paso, Texas.  Furukawa Electric owns 60% of Furukawa Wiring's shares and American Furukawa owns 40%.  Furukawa Wiring, operating under the names, Furukawa Lear Corporation and Lear Furukawa Corporation, was a joint venture, between Furukawa Electric and Lear Corporation.  In 1987, Furukawa Electric and a Lear Corporation corporate predecessor began Furukawa Wiring as a joint venture to manufacture and sell wire harnesses to Japanese automobile manufacturers in North America.  Lear held an 80% stake in the venture, with Furukawa holding the remaining 20%.  In April 2009, Furukawa purchased an additional 60% of the joint venture, raising its stake to 80%, and changed the joint venture's name to Furukawa Lear Corporation.  In June 2010, Furukawa Lear Corporation became

a wholly owned subsidiary of Furukawa called Furukawa Wiring. Defendant Furukawa Wiring and its predecessors manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

97.     Defendants Furukawa Electric, American Furukawa and Furukawa Wiring are referred to collectively herein as "Furukawa Defendants" or "Furukawa."

**The Lear Defendants**

98.     Defendant Lear Corporation is a Delaware corporation with its principal place of business in Southfield, Michigan. Defendant Lear Corporation, directly or through its subsidiaries, which it wholly owned and/or controlled, manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

99.     Defendant Kyungshin-Lear Sales and Engineering, LLC is a Delaware corporation with its principal place of business in Selma, Alabama. It is a joint venture between Defendant Lear Corporation and Kyungshin Corporation of South Korea. Defendant Kyungshin-Lear Sales and Engineering, LLC manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

100.     Defendant Lear Corporation and Kyungshin-Lear Sales and Engineering, LLC are collectively referred to herein as the "Lear Defendants" or "Lear."

101.     Defendant Lear Corporation filed for Chapter 11 bankruptcy protection on July 7, 2009. After their emergence from Chapter 11 bankruptcy proceedings on November 9, 2009, Lear Corporation continued to sell Automotive Wire Harness Systems pursuant to and as part of its participation in furtherance of the conspiracy. From and after November 2009, Lear

Corporation had significant Automotive Wire Harness Systems sales in the United States at supra-competitive prices.  In 2010 alone, Lear Corporation had $2.5593 billion in total sales in its electric power and management systems, which includes significant sales for Automotive Wire Harness Systems in the United States pursuant to the conspiracy hereinafter alleged.

**The Leoni Defendants**

102.   Defendant Leoni AG is a German corporation, with its principal place of business in Nuremberg, Germany.  Defendant Leoni AG, directly or through its subsidiaries, which it wholly owned and/or controlled, manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

103.   Defendant Leoni Wiring Systems, Inc. is a Delaware corporation with its principal place of business in Tucson, Arizona.  It is a subsidiary of and wholly owned and/or controlled by its parent, Leoni AG.  Defendant Leoni Wiring Systems Inc. manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its German parent.

104.   Defendant Leonische Holding, Inc. is a Delaware corporation with its principal place of business in Tucson, Arizona.  It is a subsidiary of and wholly owned and/or controlled by its parent, Leoni AG.  Defendant Leonische manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its German parent.

105.    Defendant Leoni Kabel, GMBH is a German corporation with its principal place of business in Roth, Germany.  Defendant Leoni Kabel, GMBH directly or through its affiliates or subsidiaries, manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

106.    Defendant Leoni Wire Inc. is a Massachusetts company with its principal place of business in Chicopee, Massachusetts.  Leoni Wire Inc. is a wholly-owned and controlled subsidiary of Defendant Leoni AG.  Defendant Leoni Wire Inc. manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

107.    Defendants Leoni AG, Leoni Wiring Systems, Inc., Leoni Kabel, GMBH and Leoni Wire Inc. are referred to collectively as "Leoni Defendants" or "Leoni."

**The Sumitomo Defendants**

108.    Defendant Sumitomo Electric Industries, Ltd. ("Sumitomo Electric") is a Japanese corporation with its principal place of business in Osaka, Japan.  Defendant Sumitomo Electric Industries, Ltd. manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

109.    Defendant Sumitomo Wiring Systems, Ltd. is a Japanese corporation, with its principal place of business in Yokkaichi, Japan.  Defendant Sumitomo Wiring Systems, Ltd. has asserted that it is "proud to hold the world's top share in the automobile wiring harness field." Sumitomo Wiring Systems, Ltd. is a subsidiary of Sumitomo Electric Industries, Ltd. and is controlled by Sumitomo Electric Industries, Ltd.  Defendant Sumitomo Wiring Systems, Ltd. manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

110.    Defendant Sumitomo Electric Wiring Systems, Inc. is a Delaware corporation with its principal place of business in Bowling Green, Kentucky.  It is a joint venture between Defendants Sumitomo Electric Industries, Ltd. and Sumitomo Wiring Systems, Ltd.  Defendant Sumitomo Electric Wiring Systems, Inc. manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese joint venture participants.

111.    Defendant K&S Wiring Systems, Inc. is a Delaware corporation with its principal place of business in La Vergne, Tennessee.  It is a subsidiary of and wholly owned and/or controlled by its parent, Sumitomo Electric Industries, Ltd.  Defendant K&S Wiring Systems, Inc. manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent.

112.    Defendant Sumitomo Wiring (U.S.A.) Inc. is a Michigan corporation with its principal place of business in Novi, Michigan.  It is a joint venture between Defendants Sumitomo Electric Industries, Ltd. and Sumitomo Wiring Systems, Ltd.  Defendant Sumitomo Wiring (U.S.A.) Inc. manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese joint venture participants.

113.    Defendant Sumitomo Electric Wintec America, Inc. is a Delaware company with its principal place of business in Edmonton, Kentucky.  Sumitomo America is a wholly-owned

and controlled subsidiary of Defendant Sumitomo Electric Industries, Ltd.  Defendant Sumitomo

Electric Wintec America, Inc. manufactured, marketed and/or sold Automotive Wire Harness

Systems that were purchased throughout the United States, including in this district, during the

Class Period.

114.    Defendants Sumitomo Electric Industries, Ltd., Sumitomo Electric Wintec

America, Inc., Sumitomo Wiring Systems, Ltd., Sumitomo Electric Wiring Systems, Inc., K&S

Wiring Systems, Inc. and Sumitomo Wiring Systems (U.S.A.) Inc., are collectively referred to

herein as "Sumitomo Defendants" or "Sumitomo."

### The S-Y Systems and Yazaki Defendants

115.    Defendant S-Y Systems Technologies Europe, GMBH, ("S-Y Systems

Technologies") is a German corporation with its principal place of business in Regensburg,

Germany.  Defendant S-Y Systems Technologies is a joint venture between Yazaki Corporation

and Continental AG.  During the Class Period, S-Y Systems Technologies was at least partially

controlled by Yazaki Corporation.  Defendant S-Y Systems Technologies, directly and/or through

its subsidiaries, which it wholly owned and/or controlled, manufactured, marketed and/or sold

Automotive Wire Harness Systems that were purchased throughout the United States, including in

this district, during the Class Period.

116.    Defendant Yazaki Corporation is a Japanese corporation with its principal place of

business in Tokyo, Japan.  Defendant Yazaki Corporation directly and/or through its subsidiaries,

which it wholly owned and controlled, manufactured, marketed and/or sold Automotive Wire

Harness Systems that were purchased throughout the United States, including in this district, during

the Class Period.

117.    Defendant S-Y Systems Technologies, America, LLC, is a Delaware corporation, with its principal place of business in Dearborn, Michigan.  It is currently a wholly owned subsidiary of and/or controlled by its parent Defendant Yazaki Corporation, having been purchased by Yazaki Corporation in 2005, before which time it was a joint venture between Siemens VDO Automotive AG and Yazaki Corporation and wholly owned subsidiary and/or controlled by Defendant S-Y Systems Technologies Europe, GMBH.  Defendant S-Y Systems Technologies, America, LLC manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.  At all times during the Class Period, its activities in the United States were under the control and direction of either its German parent, during the time it was owned and controlled by S-Y Systems Technologies Europe, GMBH, or its current Japanese parent, Yazaki Corporation.

118.    Defendant Yazaki North America, Inc. ("Yazaki North America") is an Illinois corporation and has its principal place of business in Canton Township, Michigan.  It is a subsidiary of and owned and controlled by its parent, Yazaki Corporation.  Defendant Yazaki North America manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

119.    Defendants S-Y Systems Technologies Europe, GMBH and S-Y Systems Technologies, America, LLC will be collectively referred to herein as "S-Y Systems Defendants" or "S-Y Systems."

120.    Defendants Yazaki Corporation and Yazaki North America, Inc. are herein collectively referred to as "Yazaki Defendants" or "Yazaki."

**The Tokai Rika Defendants**

121.    Defendant TRAM, Inc. ("TRAM") is a Michigan corporation with its principal place of business in Plymouth, Michigan. Defendant TRAM is a subsidiary of and controlled by Tokai Rika Co., Ltd. Defendant TRAM, Inc. manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

122.    Defendant Tokai Rika Co., Ltd. is a Japanese company with its principal place of business in Niwa-gun, Japan. Defendant Tokai Rika Co., Ltd. manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

123.    Defendants TRAM and Tokai Rika Co., Ltd. are herein collectively referred to as "Tokai Rika Defendants" or "Tokai Rika."

**The G.S. Electech Defendants**

124.    Defendant G.S. Electech, Inc. is a Japanese company with its principal place of business in Toyota City, Japan. Defendant G.S. Electech, Inc. manufactured, marketed and/or sold portions of Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

125.    Defendant G.S.W. Manufacturing, Inc. is an Ohio corporation, with its principal place of business in Findlay, Ohio. It is a subsidiary of and owned and controlled by its parent, G.S. Electech, Inc. At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent. Defendant G.S.W. Manufacturing, Inc. manufactured, marketed and/or sold portions of Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

126.    Defendants G.S. Electech, Inc. and G.S.W. Manufacturing, Inc. are collectively referred to as "G.S. Electech Defendants" or "G.S. Electech."

## Agents and Co-Conspirators

127.    Each Defendant acted as the principal of or agent for other Defendants with respect to the acts, violations, and common course of conduct alleged.

128.    Various persons, partnerships, sole proprietors, firms, corporations and individuals not named as Defendants in this lawsuit, the identities of which are presently unknown, have participated as co-conspirators with Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy or in furtherance of the anti-competitive conduct.

129.    Whenever in this Complaint reference is made to any act, deed or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's or limited liability entity's business or affairs.

## Factual Allegations

### A.    The Automotive Wire Harness System Industry

130.    Automotive Wire Harness Systems comprise the "central nervous system" of an automotive vehicle and consist of the wires or cables and data circuits that run throughout the vehicle.  To ensure safety and basic functions (e.g., moving, turning and stopping), as well as to provide comfort and convenience, automobiles are equipped with various electronics which operate using control signals running on electrical power.  The Automotive Wire Harness System is the conduit for the transmission of these signals and electrical power.

131.    Automotive vehicles contain masses of wires that can amount to several kilometers in length.  A vehicle's wiring system is organized into multiple wire harnesses.  Wire harnesses provide organized connection points for multiple wiring configurations.  The harness feature binds wires and cables into a bundle, which provides protection against deterioration or damage from vibration, abrasions, and moisture.

132.    Wire harnesses have color coded wires that are designed to support specific electrical and electronic motor vehicle features.  Most, if not all, electrical and electronic devices in a vehicle rely on a wire harness to provide electric current and data transmission for operation.

133.    Automotive Wire Harness Systems are installed by automobile original equipment manufacturers ("OEMs") in new vehicles as part of the automotive manufacturing process.  They are also installed in vehicles to replace worn out, defective or damaged Automotive Wire Harness Systems.

134.    For new vehicles, the OEMs—mostly large automotive manufacturers such as Honda, Toyota, Volvo, and General Motors—purchase Automotive Wire Harness Systems directly from auto parts suppliers such as Defendants.  Automotive Wire Harness Systems may also be purchased by component manufacturers who then supply such systems to OEMs.  These component manufacturers are also called "Tier Manufacturers" in the automotive industry.  A Tier I manufacturer supplies Automotive Wire Harness Systems directly to an OEM.

135.    When purchasing Automotive Wire Harness Systems, OEMs issue Requests for Quotation ("RFQs") to the automotive parts suppliers.  Auto parts suppliers submit quotations, or bids, to OEMs in response to RFQs, and the OEMs usually award the business to the selected automotive parts supplier for four to six years, or the life of the model at issue.  Typically, the

bidding process begins approximately three years prior to the start of production of a new model. Foreign OEMs procure parts for U.S.-manufactured vehicles both abroad and the United States.

136.    Automotive Wire Harness Systems manufactured, distributed and sold for a particular make and model of a vehicle or other product by Defendants during the Class Period are not qualitatively distinguishable in any material way.

137.    Defendants comprise the majority of auto parts suppliers who manufacture Automotive Wire Harness Systems for sale to OEMs.

138.    Defendants and the co-conspirators supplied Automotive Wire Harness Systems to OEMs for installation in vehicles manufactured and sold in the United States and elsewhere. Defendants and their co-conspirators manufactured Automotive Wire Harness Systems (a) in the United States (including in all of the states having laws permitting recovery of damages by indirect purchasers, as listed *infra*), for installation in vehicles manufactured and sold in the United States (including all of the states having laws permitting recovery of damages by indirect purchasers as listed *infra*), (b) in Japan, and possibly other countries, for export to the United States (including all of the states having laws permitting recovery of damages by indirect purchasers, as listed *infra*) and installation in vehicles manufactured and sold in the United States (including all of the states having laws permitting recovery of damages by indirect purchasers as listed *infra*), and (c) in Japan, and possibly other countries, for installation in vehicles manufactured in Japan, and possibly other countries, for export to and sale in the United States (including all of the states having laws permitting recovery of damages by indirect purchasers, as listed *infra*).

139.    Plaintiffs and members of the proposed Classes purchased Automotive Wire Harness Systems indirectly from one or more of the Defendants, having purchased new vehicles containing Automotive Wire Harness Systems or Automotive Wire Harness Systems themselves

39

from OEMs in the United States (including in each state having laws permitting recovery of damages by indirect purchasers, as listed *infra*), who in turn purchased Automotive Wire Harness Systems from Defendants.

140.    The global Automotive Wire Harness System market size reached US $21.9 billion in 2009, and increased by 32.2% to US $29 billion in 2010.  According to *ResearchInChina*, a leading source for international market research and market data, the Automotive Wire Harness System market is steadily growing, and is expected to be US $32 billion in 2012.

141.    The global Automotive Wire Harness System market is dominated and controlled by large manufacturers, the top six of which are six of the Defendants, who control almost 90% of the global market; of those, four control almost 77% of the global market.

142.    Yazaki controlled almost 30% of the global market for Automotive Wire Harness Systems as of 2009.  As Yazaki states on its website, its Automotive Wire Harness Systems are "used by every carmaker in Japan," and it "commands a top share in the global market."  In fact, 77% of Yazaki's sales are from Automotive Wire Harnesses, and 37% of its 2007 sales were in the Western Hemisphere.  Yazaki's largest customers are Toyota, followed by Chrysler, Ford, Renault-Nissan, Honda, and General Motors.  In the Western Hemisphere, Yazaki supplies Volvo, Chrysler, Ford, General Motors, Honda, Isuzu, Mazda, Mitsubishi, Nissan, Renault, Subaru, Suzuki and Toyota.

143.    Sumitomo is the second largest manufacturer of Automotive Wire Harness Systems, and controls 24% of the global market.  Sumitomo supplies Volkswagen, Toyota, Honda and Nissan.

144.     Delphi was the third largest maker of Automotive Wire Harness Systems as of
2009.  It controls 16.71% of the global market.  Its two largest customers are General Motors and
Ford.

145.     Leoni controls 6% of the global market for Automotive Wire Harness Systems.

146.     Lear controls almost 5% of the global market for Automotive Wire Harness
Systems.  Lear supplies Toyota, General Motors, Ford, and BMW.

147.     Furukawa controls almost 4% of the global market for Automotive Wire Harness
Systems.

148.     Fujikura controls 2.69% of the global market for Automotive Wire Harness
Systems.  Fujikura supplies Volkswagen and Subaru, among other OEMs.

149.     Tokai Rika supplies Toyota, among other OEMs.

150.     S-Y Systems supplies Ford, among other OEMs.

151.     By virtue of their market shares, Defendants are the dominant manufacturers and
suppliers of Automotive Wire Harness Systems in the United States and the world.

## B.     Defendants Increased Prices for Automotive Wire Harness Systems Despite Steady Costs

152.     In a competitive market, falling material and labor costs, or the stabilization of
material and labor costs over time, as well as the existence of and the desire to maintain
economies of scale, would lead to decreased prices because each competitor would be afraid that
other competitors would attempt to take advantage of their lower or predictably steady costs to
lower their prices in order to capture market share.  The only economically rational action in
such a situation is for each competitor to lower its own prices.

153.     In a market where ostensible competitors have engaged in a conspiracy to fix
prices and refrain from competing for customers, however, competitors do not lower prices even

when faced with steady or decreasing input costs. Such price decreases are unnecessary because the conspirators know that they will not lose sales to any lower-priced competitors.

154.    The price of Automotive Wire Harness Systems increased during the Class Period, while major input costs virtually remained the same. In fact, according to *ResearchInChina*, Sumitomo and Furukawa own their own copper mines and effectively control their copper input costs. Copper is a major input cost component in the manufacture of Automotive Wire Harness Systems. Thus, both of these Defendants had the power to effectively keep their costs steady and knew that due to their control of a key input in Automotive Wire Harness Systems, the costs of manufacture would likely remain steady. In a competitive market, such steady input costs should have caused Defendants to lower prices for Automotive Wire Harness Systems. But in a market where Defendants have agreed not to compete on price, such steady input costs have no effect on price.

155.    Defendants' unwarranted, anti-competitive price increases have resulted in Plaintiffs and members of the Classes paying supra-competitive prices.

## C.    The Structure and Characteristics of the Automotive Wire Harness System Market Render the Conspiracy More Plausible

156.    The structure and other characteristics of the Automotive Wire Harness System market in the United States are conducive to a price-fixing agreement, and have made collusion particularly attractive in this market. Specifically, the Automotive Wire Harness System market: (1) has high barriers to entry; (2) has inelasticity of demand; (3) is highly concentrated; and (4) is rife with opportunities to conspire.

1.    **The Automotive Wire Harness System Market Has High Barriers to Entry**

157.    A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing.  Where, however, there are significant barriers to entry, new entrants are less likely to join the industry and increase competition.  Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

158.    There are substantial barriers that preclude, reduce or make more difficult entry into the Automotive Wire Harness Systems market.  A new entrant into the business would face high and continuous start-up costs, including multi-million dollar costs associated with manufacturing plants, equipment, energy, transportation, distribution infrastructure, skilled labor and long-standing customer relationships.

159.    In addition, OEMs cannot change Automotive Wire Harness System suppliers randomly after they choose one because the OEMs design the features of their vehicles so that the Automotive Wire Harness System they purchase for a vehicle is then integrated with the electronics, mechanics, thermal distribution and other features of the particular vehicle model.  Thus, a new manufacturer of Automotive Wire Harness Systems entering the market would likely have to wait until the next cycle of vehicles was being manufactured by any given OEM to even have a chance at obtaining the bid for any model of car and take advantage of the lack of competitive prices for Automotive Wire Harness Systems, by offering more competitive prices to OEMs.  Also, the design of an Automotive Wire Harness System must be synergized by Automotive Wire Harness System manufacturers and OEMs.  Designing Automotive Wire Harness Systems pursuant to such stringent specifications involves a great degree of sunk costs and resources.

43

160.    Also it is important for parts suppliers to maintain minimum viable scale in order to efficiently produce parts within the price and quantity parameters established by the major OEMs.

## 2.    There is Inelasticity of Demand for Automotive Wire Harness Systems

161.    "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other.  For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any.  In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase despite a price increase.

162.    For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices.  Otherwise, increased prices would result in declining sales, revenues and profits, as customers purchased substitute products or declined to buy altogether.  Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

163.    Demand for Automotive Wire Harness Systems is highly inelastic.  This is because there are no close substitutes for these products.  Automobile manufacturers, and the automobile dealers who buy their stock from automobile manufacturers, must purchase Automotive Wire Harness Systems as an essential part of a vehicle—no vehicles are or can be sold without them— even if the prices are kept at a supracompetitive level.

## 3.    The Market for Automotive Wire Harness Systems Is Highly Concentrated

164.    A highly concentrated market is more susceptible to collusion and other anti-competitive practices, because the fewer competitors there are, the easier collusion is to coordinate.

165.     As discussed above, Defendants dominate the Automotive Wire Harness Systems market.  Six of the Defendants control almost 90% of the global market, and four of the Defendants control almost 77% of the global market: Yazaki controls almost 30%; Sumitomo controls 24%; Delphi controls 16.71%; Leoni controls 6%; Lear controls almost 5% and Furukawa controls almost 4%.

### 4.     Defendants had Ample Opportunities to Conspire

166.     Defendants attended industry events where they had the opportunity to meet, have improper discussions under the guise of legitimate business contacts and perform acts necessary for the operation and furtherance of the conspiracy.

167.     For example, Defendants have regularly attended the annual North American International Auto Show ("NAIAS") in Detroit, Michigan, which provided the means and opportunity to further the conspiracy alleged herein.  Defendants have also regularly attended the Automotive Aftermarket Products Expo in Las Vegas, Nevada.

### D.     Government Investigations

168.     A globally coordinated antitrust investigation is taking place in the United States, Europe, and Japan, aimed at suppliers of Automotive Wire Harness Systems.

169.     The probe originated in Europe as the result of several European OEMs coming together to bring a complaint to the EC.  One carmaker is said to have failed to attract competitive bids for Automotive Wire Harness Systems, leading the company to join with other carmakers to take their complaint to the EC.

170.     In February 2010, the EC executed surprise raids at the European offices of certain Defendants as part of an investigation into anticompetitive conduct related to the manufacturing and sale of Automotive Wire Harness Systems.  The EC also carried out additional raids at the

European offices of several suppliers of Automotive Wire Harness Systems on June 7, 2010. Specifically, EC investigators raided the offices of Leoni AG, S-Y Systems Technologies, Lear Corporation's French subsidiary, a European office of Delphi LLC and Yazaki Corporation. "The Commission has reason to believe that the companies concerned may have violated European Union antitrust rules that prohibit cartels and restrictive business practices," an EC official said in a statement.

171.    S-Y Systems Technologies has admitted that it is cooperating with the antitrust investigators.  Lear Corporation's Chief Executive Officer Bob Rossiter has stated that Lear Corporation was notified by the EC that it is part of an investigation into anticompetitive practices among automotive electrical and electric component suppliers.  In addition, Delphi LLC has admitted to having "received a request for information from antitrust authorities at the European Commission seeking information about conduct by us in connection with an investigation in the European Union related to the electrical and electronic components market."  Delphi LLC stated that it is cooperating fully with the European competition authorities.  Leoni AG has also stated that it is cooperating with the antitrust investigators.  Leoni Kabel GMBH is also being investigated by EC authorities.

172.    In February 2010, Japan's Fair Trade Commission ("JFTC") raided the Tokyo offices of Furukawa Electric, Sumitomo Electric and Yazaki Corporation as part of an expansive investigation into collusion in the industry dating back to at least 2003.

173.    The DOJ has stated that it is conducting an investigation of potential antitrust activity and coordinating its investigation with antitrust regulators in Europe. "The antitrust division is investigating the possibility of anticompetitive cartel conduct of automotive electronic component suppliers," Justice Department Spokeswoman Gina Talamona said.

174.    On February 23, 2010, around the same time as the raids by the Japanese and European competition authorities, investigators from the FBI raided three Detroit-area Japanese auto parts makers as part of a federal antitrust investigation.  The FBI executed warrants and searched the offices of these companies, including Yazaki Corporation's subsidiary in Canton Township, Michigan, Yazaki North America.  Special Agent Sandra Berchtold said the affidavits supporting issuance of the warrants were sealed in federal court.

175.    In 2010, the FBI also raided the offices of TRAM and executed search warrants related to unfair competition, price-fixing and bid rigging of Automotive Wire Harness Systems.

176.    To obtain search warrants, the United States was legally required to have probable cause, accepted by a magistrate, to believe that it would obtain evidence of an antitrust violation as a result of executing the search warrant—that is, the United States had to have evidence sufficient to warrant a person of reasonable caution to believe that raiding the offices of a seemingly lawful business would uncover evidence of antitrust violations and that claimed evidence must have been examined and accepted by a magistrate.  That belief, which was recounted in sworn affidavits or testimony, must be grounded on reasonably trustworthy information.

### E.    JFTC Cease and Desist Orders

177.    On January 19, 2012, the JFTC issued Cease and Desist orders against Fujikura Ltd., and Yazaki Corporation, and fined Sumitomo Electric, Fujikura Ltd., and Yazaki Corporation, after investigating the companies' bidding practices with regard to wire harnesses and related products.

178.    The JFTC press release regarding the orders states "the JFTC gave the enterprises in question an advance notification on the contents of the orders and an opportunity to present

their views and to submit evidence. Considering the views and evidence from them, the JFTC

issued the orders."[3]

179.    Having evaluated all of the evidence before it, including rebuttal evidence from

the accused companies, the JFTC determined that the companies had engaged in illegal

anticompetitive activities.  Finding that Sumitomo Electric, Fujikura Ltd. and Yazaki

Corporation all violated Japan's Antimonopoly Act by rigging bids to OEMs Toyota, Honda,

Nissan and Fuji (manufacturer of Subaru-brand vehicles) on wire harnesses and related products,

the JFTC stated that that Sumitomo Electric, Fujikura Ltd. and Yazaki Corporation carried out

their conspiracy by "appointing the designated successful bidder and managing to have the

designated successful bidder win the bidding."

180.    The JFTC stated that the conspiracy began as early as July 2000.

181.    The JFTC thus ordered each Defendant to make surcharge payments totaling 12.9

billion yen.

182.    The JFTC explained, in its press release, that Furukawa Electric had also

participated in the described bid-rigging conspiracy, in violation of the Antimonopoly Act.

## F.    Guilty Pleas

### 1.    Guilty Pleas of Furukawa Electric, Junichi Funo, Hirotsugu Nagata and Tetsuya Ukai

183.    On September 29, 2011, the DOJ announced that Defendant Furukawa Electric

had agreed to plead guilty and to pay a $200 million fine for its role in a criminal price-fixing

and bid-rigging conspiracy involving the sale of Automotive Wire Harness Systems to

---

[3] Available at http://www.jftc.go.jp/en/pressreleases/uploads/2012_Jan_19.pdf (Last accessed May 8, 2012).

automobile manufacturers.  Three Furukawa executives, who are Japanese nationals, also agreed to plead guilty and to serve prison time in the United States.

184.    Furukawa Electric is charged with price fixing, bid rigging and allocating customers, in violation of the Sherman Act.

185.    Furukawa Electric has pleaded guilty for its role in a conspiracy to rig bids, allocate customers and fix the prices of Automotive Wire Harness Systems sold to automobile manufacturers in the United States and elsewhere.  The DOJ announced in its information that Furukawa Electric participated in the conspiracy from at least as early as January 2000, until at least January 2010.

186.    Furukawa Electric stated in its press release regarding the plea agreement that "[a]fter analyzing the applicable laws and facts as a whole, Furukawa Electric has decided to enter into a plea agreement with the US Department of Justice."[4]

187.    The plea agreements are an outgrowth of the DOJ's first charges in its ongoing international cartel investigation of price fixing and bid rigging in the auto parts industry. According to four separate one-count felony charges filed in the Unites States District Court for the Eastern District of Michigan in Detroit, Furukawa Electric and its executives—Junichi Funo ("Funo"), Hirotsugu Nagata ("Nagata") and Tetsuya Ukai ("Ukai")—engaged in a conspiracy to rig bids for and to fix, stabilize and maintain the prices of Automotive Wire Harness Systems sold to customers in the United States and elsewhere.

188.    Nagata was employed at American Furukawa in Plymouth, Michigan and a related joint venture from January 2004 until June 2009.

---

[4] Available at http://www.furukawa.co.jp/english/what/2011/kei_110930.pdf (Last accessed January 28, 2012).

189.    Funo worked at Furukawa Electric, in Japan and at American Furukawa from April 2003 until at least July 2009.

190.    Ukai worked at Furukawa Electric in Japan from April 2003 until at least July 2009.

191.    According to the criminal Informations filed, Furukawa Electric and its co-conspirators carried out the conspiracy by:

a)    Participating in meetings, conversations, and communications in the United States and Japan to discuss the bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

b)    Agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

c)    Agreeing, during those meetings, conversations, and communications, to allocate the supply of Automotive Wire Harness Systems sold to automobile manufacturers in the United States and elsewhere on a model-by-model basis;

d)    Agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by automobile manufacturers in the United States and elsewhere;

e)    Submitting bids, price quotations, and price adjustments to automobile manufacturers in the United States and elsewhere in accordance with the agreements reached;

f)    Selling Automotive Wire Harness Systems to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

g)    Accepting payment for Automotive Wire Harness Systems sold to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

h)    Engaging in meetings, conversations, and communications in the United States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme; and

i)    Employing measures to keep their conduct secret, including but not limited to using code names and meeting at private residences or remote locations.

192.    "As a result of this international price-fixing and bid-rigging conspiracy, automobile manufacturers paid noncompetitive and higher prices for parts in cars sold to U.S. consumers," said Sharis A. Pozen, Acting Assistant Attorney General in charge of the Department of Justice's Antitrust Division.  "This cartel harmed an important industry in our nation's economy, and the Antitrust Division with the Federal Bureau of Investigation will continue to work together to ensure that these kinds of conspiracies are stopped."

193.    "When companies partner to control and price fix bids or contracts, it undermines the foundation of the United States' economic system," said FBI's Special Agent in Charge Andrew G. Arena. "The FBI is committed to aggressively pursuing any company involved in antitrust crimes."

194.    At its November 14, 2011, Plea and Sentencing hearing, Defendant Furukawa Electric pleaded guilty, and was ordered to pay its $200 million fine within 45 days.  At the hearing, Defendant Furukawa Electric described its participation in the conspiracy as follows:

> From the time period listed in the Information, that is, approximately from January, 2000 to January, 2010, officers and employees of my company had discussions with employees of competitors that also manufactured and sold automotive wire harness products. . . .  These discussions took place in face-to-face meetings or by telephone.  The discussions took place in the United States and elsewhere.
>
> During . . . such meetings and conversations, a conspiracy was formed and agreements were reached to allocate the supply of automotive wire harnesses and related products sold to automobile manufacturers on a model-by-model basis and to rig bids quoted to automobile manufacturers for automotive wire harnesses and related products.
>
> Therefore, as a result of these meetings, my company produced and sold automotive wire harnesses and related products that were the subject of the illegal price fixing agreements that my company had made with competitors.  Those products and the payments for those products traveled in interstate and foreign commerce and substantially affected interstate and foreign trade and commerce.

For the purposes of this plea agreement, during the time period of January, 2000 to January, 2010, our sales of automotive wire harnesses and related products affecting U.S. auto manufacturers totaled approximately $839 million.

Finally, we note to the Court that some of the products affected by the conspiracy were sold to automobile manufacturers by one of our subsidiaries [American Furukawa], which is located here in the Eastern District of Michigan.

– Plea & Sentencing, *United States v. Furukawa Electric Co.*, No. 11-cr-20612 (E.D. Mich.), at

14-16.

195.    Furukawa Electric executives Funo, Nagata, and Ukai also admitted their

participation in the unlawful cartel in open court:

(a)    At his October 24, 2011, Guilty Plea Hearing, Mr. Nagata admitted that he

participated in "an agreement to submit non-competitive bids in an amount greater than

$100 million."  The purpose of the agreement was to "suppress and eliminate competition

in the automotive parts industry."  In Mr. Nagata's own words, he furthered the unlawful

conspiracy with Defendants by having "a meeting [with] co-conspirators and some

agreement [on] price for automobile manufacturing parts" primarily Automotive Wire

Harness Systems.  He personally participated in "several" unlawful meetings to further

the conspiracy, at which Defendants made agreements on pricing for Automotive Wire

Harness Systems, including rigging bids.  Some of the meetings occurred within the

Eastern District of Michigan, and Mr. Nagata conceded that the unlawful agreements

would impact businesses with their principal place of business within the Eastern District

of Michigan.  Mr. Nagata noted that the price-fixed Automotive Wire Harness Systems

were being sold in a number of different states in the United States, and undermined and

prevented competition within the United States.  The plea contemplates a prison sentence

of 15 months for Mr. Nagata, a $20,000 fine, and a promise of cooperation from Nagata in the ongoing investigation.

(b)    At his October 24, 2011, Guilty Plea Hearing, Furukawa Electric executive Junichi Funo admitted that he participated in a conspiracy to restrain trade. Mr. Funo admitted entering into agreements with competitors i.e., Defendants herein, in order to set prices and maintain them, including rigging bids that were solicited from customers. The agreements also sought to control, and did control, price adjustments. In Mr. Funo's own words, he "did price fixing for automotive parts." That price fixing "generally involved . . . wiring harnesses and related products." The price fixing affected the sales of goods throughout the United States. Mr. Funo was personally present at meetings during which such unlawful agreements were reached, including meetings that occurred in the Eastern District of Michigan. The plea contemplates a prison sentence of 1 year for Mr. Funo, a $20,000 fine and a promise of cooperation from Funo in the ongoing investigation.

(c)    At his November 10, 2011, Guilty Plea and Sentencing Hearing, Furukawa Electric executive Tetsuya Ukai stated that he "fix[ed] price[s] over parts – auto parts with other suppliers." He acknowledged that he met with competitors "in order to fix prices and rig bids with respect to wire harnesses and related products," and conceded that the price-fixing meetings occurred both within the United States and elsewhere. He also acknowledged that the price-fixing would affect commerce in the United States and elsewhere, including in the Eastern District of Michigan through a Furukawa subsidiary – presumably American Furukawa. In addition, Mr. Ukai agreed that the commerce affected exceeded $100 million. As part of his plea, Mr. Ukai agreed to serve 18 months in prison and pay a $20,000 fine for his role in the conspiracy.

196.    The plea agreement stipulated that the DOJ would not bring charges against any of Furukawa Electric's directors, aside from Funo, Nagata and Ukai, the separately charged executives, and Shuji Hayashida, the Chief Executive Officer of American Furukawa from 2001 to 2010.

### 2.    Guilty Pleas of Yazaki Corporation, Tsuneaki Hanamura, Ryoji Kawai, Shigeru Ogawa and Hisamitsu Takada

197.    On January 30, 2012, Yazaki Corporation and four of its executives, Tsuneaki Hanamura ("Hanamura"), Ryoji Kawai ("Kawai"), Shigeru Ogawa ("Ogawa") and Hisamitsu Takada ("Takada"), agreed to plead guilty to conspiring to rig bids, fix prices and allocate customers for Automotive Wire Harness Systems from January 2000 until at least February 2010.

198.    Like Furukawa Electric, Yazaki Corporation agreed to confess to:

a)    Participating in meetings, conversations, and communications in the United States and Japan to discuss the bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

b)    Agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

c)    Agreeing, during those meetings, conversations, and communications, to allocate the supply of Automotive Wire Harness Systems sold to automobile manufacturers in the United States and elsewhere on a model-by-model basis;

d)    Agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by automobile manufacturers in the United States and elsewhere;

e)    Submitting bids, price quotations, and price adjustments to automobile manufacturers in the United States and elsewhere in accordance with the agreements reached;

f)    Selling Automotive Wire Harness Systems to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

<blockquote>

g)      Accepting payment for Automotive Wire Harness Systems sold to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

h)      Engaging in meetings, conversations, and communications in the United States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme; and

i)      Employing measures to keep their conduct secret, including but not limited to using code names and meeting at private residences or remote locations.

</blockquote>

199.     Yazaki Corporation agreed to pay a fine of $470 million for its conspiracy with regard to Automotive Wire Harness Systems and several other automotive components, "the second largest criminal fine obtained for a Sherman Act antitrust violation," according to the DOJ press release describing Yazaki Corporation's agreement to plead guilty to the allegations of anticompetitive conduct.

200.     Yazaki Corporation has pleaded guilty to three counts of violations of Sherman Act, §1.

201.     Yazaki Corporation stated, with regard to its plea agreement that, "Yazaki Corporation concluded a plea agreement with the United States Department of Justice to the effect that the company acknowledges the allegations, pleads guilty and pays a fine of US$ 470 million in the criminal proceedings relating to cartel activities with certain competitors for automotive wire harnesses and related products."[5]  It also asserted that, "Yazaki Corporation has been faithfully cooperating with the DOJ investigation since its inception on February 23, 2010." *Id.*

202.     In addition to Yazaki Corporation, four executives from Yazaki (all Japanese nationals)–Hanamura, Kawai, Ogawa, and Takada–agreed to plead guilty to their participation in a conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing

---

[5] http://www.yazaki-group.com/global/topics/005.html

to rig bids for, and to fix, stabilize, and maintain the prices of Automotive Wire Harness Systems

sold to certain automobile manufacturers in the United States and elsewhere in violation of the

Sherman Act, 15 U.S.C. § 1.  These four executives of Yazaki will serve prison time ranging

from 15 months to two years.  The two-year sentences would be the longest term of

imprisonment ever imposed on a foreign national voluntarily submitting to U.S. jurisdiction for a

Sherman Act antitrust violation.

203.    Hanamura worked at Yazaki Corporation from January 2000 until at least

February 2010, during part of which time he worked in the United States, for Yazaki

Corporation's American subsidiary, Yazaki North America.

204.    Kawai worked for Yazaki Corporation from January 2000 until February 2010,

during part of which time he worked in the United States, for Yazaki Corporation's American

subsidiary, Yazaki North America.

205.    Ogawa worked for Yazaki Corporation from January 2002 until at least February

2010, during part of which time he worked in the United States, for Yazaki Corporation's

American subsidiary, Yazaki North America.

206.    Takada worked for Yazaki Corporation from September 2003 until at least

February 2010, during part of which time he worked in the United States, for Yazaki

Corporation's American subsidiary, Yazaki North America.

### 3.    Plea Agreement of Fujikura, Inc.

207.    On April 23, 2012, Fujikura, Inc. agreed to plead guilty to participating in the conspiracy to fix prices, rig bids and allocate supply with regard to Automotive Wire Harness Systems,[6] between January 2006 and February 2010.

208.    Like Furukawa Electric and Yazaki Corporation, Fujikura Inc. admitted to agreeing with its co-conspirators on "on bids and price quotations to be submitted to an automobile manufacturer in the United States and elsewhere," "to allocate the supply of automotive wire harnesses and related products sold to an automobile manufacturer in the United States and elsewhere on a model-by-model basis" and to "coordinate price adjustments requested by automobile manufacturers in the United States and elsewhere."

209.    Fujikura, Inc. agreed to pay a fine of $20 million for its anticompetitive conduct.

### 4.    Plea Agreement of G.S. Electech, Inc.

210.    On April 3, 2012, G.S. Electech Inc. agreed to plead guilty to "participat[ing] in a combination and conspiracy to suppress and eliminate competition in the automotive industry by agreeing to rig bids for, and to fix stabilize, and maintain the prices of, speed sensor wire assemblies sold to an automobile manufacturer in the United States and elsewhere."

211.    Speed sensor wire assemblies are installed on vehicles with antilock brake systems ("ABS").  Their function is to connect a sensor on each tire of the vehicle to the ABS and carry electrical signals from those sensors to the ABS to alert it as to when to engage.  Speed sensor wire assemblies comprise the ABS/Speed sensor wire harness, a portion of the Automotive Wire Harness System.

---

[6] In the Fujikura Inc. Information "related products" are defined as cable bond, automotive wiring connectors, automotive wiring terminations and fuse boxes.

212.    G.S. Electech Inc. admitted to agreeing during meetings, conversations and communications to rig bids, fix prices and price quotations, and allocate the supply of speed sensor wire assemblies on a model-by-model basis between January 2003 and February 2010, to an automobile manufacturer in the United States and elsewhere.

213.    G.S. Electech Inc. agreed to $2.75 million for its violations.

## G.    Damage to Plaintiffs and Other Automobile Dealers Caused by Defendants' Illegal Activities

214.    The impact of Defendants' conspiracy on Plaintiffs' businesses was substantial. Analysis of automobile dealer profit margins and other data indicates that automobile dealers were substantially injured by higher but for prices regardless of the pass on of some portion of such prices to end users.

215.     Given the nature of their business, Plaintiffs and similarly situated automobile dealers had to and did absorb a significant portion of the overcharges that they paid due to Defendants' illegal activities.  Plaintiffs and similarly situated automobile dealers did not "pass on" all of the overcharges or higher but for prices caused by Defendants' illegal activities.

216.    Plaintiffs have standing, and have suffered damage, in the states where they reside, compensable by indirect purchaser laws, and they and members of the classes they seek to represent have sustained significant damage and injury as a result of Defendants' conspiracy and unlawful and unfair trade practices.

## Class Action Allegations

217.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

All automobile dealers that, during the period January 1, 2000 to September 30,
2011,
a) purchased Automotive Wire Harness Systems manufactured by one of the
Defendants or any current or former subsidiary or affiliate thereof, or any co-
conspirator or
b) purchased vehicles containing Automotive Wire Harness Systems
manufactured by one of the Defendants or any current or former subsidiary or
affiliate thereof, or any co-conspirator
from firms who purchased such Automotive Wire Harness Systems from one of
the Defendants or any current or former subsidiary or affiliate thereof, or any co-
conspirator.

218.    Plaintiffs also bring this action on behalf of themselves and as a class action under

Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the

state antitrust, unfair competition, and consumer protection laws on behalf of the following class

(the "Damages Class"):

All automobile dealers that, during the period January 1, 2000 to September 30,
2011, in states (as listed herein) having laws permitting recovery of damages by
indirect purchasers,
a) purchased Automotive Wire Harness Systems manufactured by one of the
Defendants or any current or former subsidiary or affiliate thereof, or any co-
conspirator or
b) purchased vehicles containing Automotive Wire Harness Systems
manufactured by one of the Defendants or any current or former subsidiary or
affiliate thereof, or any co-conspirator
from firms who purchased such Automotive Wire Harness Systems from one of
the Defendants or any current or former subsidiary or affiliate thereof, or any co-
conspirator.

219.    Alternatively, Plaintiffs bring Damages Classes on behalf of all persons similarly

situated pursuant to Rule 23 of the Federal Rules of Civil Procedure and/or respective state

statute(s), on behalf of all members of the following classes (collectively, the "State Classes"),

referred to together with the Damages Class as " Damages Classes":

(a)    **Arizona**:  All automobile dealers that, during the period January 1, 2000
to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or
b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

(b)     **Arkansas**: All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or
b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof or any co-conspirator.

(c)     **California:**  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or
b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

(d)     **District of Columbia:**  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or

b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

(e)    **Florida:**  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or
b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

(f)    **Hawaii:**  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof or any co-conspirator, or
b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

(g)    **Illinois:**  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or
b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

(h)    **Iowa:**  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or
b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

(i)    **Kansas:**  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or
b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

(j)    **Maine:**  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or
b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

(k) **Massachusetts:**  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or
b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

(l) **Michigan:**  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or
b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

(m) **Minnesota:**  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or
b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

(n) **Mississippi:**  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or

b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

(o) **Missouri:**  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or

b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

(p) **Montana:**  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or

b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

(q) **Nebraska:**  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or

b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof or any co-conspirator.

(r)     **Nevada:**  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator, or
b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

(s)     **New Hampshire:**  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or
b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

(t)     **New Mexico:**  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or
b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

(u)   **New York:**  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or
b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

(v)   **North Carolina:**  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or
b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

(w)   **North Dakota:**  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or
b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

(x)   **Oregon:** All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

   a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or
   b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

   from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

(y)   **South Carolina:** All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

   a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or
   b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

   from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

(z)   **South Dakota:** All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

   a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or
   b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

   from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

(aa)   **Tennessee:** All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or
b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

(bb)   **Utah:** All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or
b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

(cc)   **Vermont:** All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or
b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

(dd)   **West Virginia:** All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or

b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

(ee)   **Wisconsin:**  All automobile dealers that, during the period January 1, 2000 to September 30, 2011,

a) purchased Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator or
b) purchased vehicles containing Automotive Wire Harness Systems manufactured by one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator

from firms who purchased such Automotive Wire Harness Systems from one of the Defendants or any current or former subsidiary or affiliate thereof, or any co-conspirator.

220.    The Nationwide Class and the Damages Classes are referred to herein as the "Classes." Excluded from the Classes are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, and persons who purchased Automotive Wire Harness Systems directly from Defendants.

221.    While Plaintiffs do not know the exact number of the members of the Classes, Plaintiffs believe there are at least thousands of members in each Class.

222.    Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of the Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

a)    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain or stabilize the

prices of or rig bids for Automotive Wire Harness Systems sold in the United States;

b)    Whether Defendants and their co-conspirators agreed to allocate the supply of Automotive Wire Harness Systems sold in the United States on a model-by-model basis;

c)    The identity of the participants of the alleged conspiracy;

d)    The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

e)    Whether the conspiracy violated the Sherman Act, as alleged in Count I;

f)    Whether the conspiracy violated state antitrust and unfair competition laws, as alleged in Count II;

g)    Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Damages Classes to disgorgement of all benefits derived by Defendants, as alleged in Count III;

h)    Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

i)    The effect of the conspiracy on the prices of Automotive Wire Harness Systems sold in the United States during the Class Period;

j)    Whether the Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from the Plaintiffs and the members of the Classes;

k)    The appropriate injunctive and related equitable relief for the Nationwide Class; and

l)    The appropriate class-wide measure of damages for the Damages Classes.

223.    Plaintiffs' claims are typical of the claims of the members of the Classes, and Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for Automotive Wire Harness Systems and vehicles containing

Automotive Wire Harness Systems purchased from firms who purchased Automotive Wire Harness Systems from Defendants or their co-conspirators.

224.    Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

225.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

226.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other reasons, such treatment will permit a large number of similarly situated entities and persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including the provision to injured entities and persons of a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

227.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## Plaintiffs and the Classes Suffered Antitrust Injury

228.    Defendants' price-fixing conspiracy had the following effects, among others:

    a)      Price competition has been restrained or eliminated with respect to Automotive Wire Harness Systems;

        b)      The prices of Automotive Wire Harness Systems have been fixed, raised, maintained, or stabilized at artificially inflated levels; and

        c)      Entities purchasing Automotive Wire Harness Systems and vehicles containing Automotive Wire Harness Systems from auto manufacturers have been deprived of free and open competition.

229.    During the Class Period, Plaintiffs and the members of the Classes paid supra-competitive prices for Automotive Wire Harness Systems.

230.    The market for Automotive Wire Harness Systems and the market for vehicles are inextricably linked and intertwined because the market for Automotive Wire Harness Systems exists to serve the vehicle market. Without the vehicles, the Automotive Wire Harness Systems have little to no value because they have no independent utility. Indeed, the demand for vehicles creates the demand for Automotive Wire Harness Systems. As Lear Corporation stated in its 2010 Annual Report: "Our sales are driven by the number of vehicles produced by the automotive manufacturers, which is ultimately dependent on consumer and fleet demand for automotive vehicles."

231.    Automotive Wire Harness Systems are identifiable, discrete physical products that remain essentially unchanged when incorporated into a vehicle. As a result, Automotive Wire Harness Systems follow a traceable physical chain of distribution from the Defendants to Plaintiffs and the members of the Classes, and any costs attributable to Automotive Wire Harness Systems can be traced through the chain of distribution to Plaintiffs and the members of the Classes.

232.    By reason of the alleged violations of the antitrust laws and unlawful and unfair trade practices, Plaintiffs and the members of the Classes have sustained injury to their businesses or property, having paid higher prices for Automotive Wire Harness Systems or vehicles

containing Automotive Wire Harness Systems (in states including all of the states having laws permitting recovery of damages by indirect purchasers as listed *supra*,) than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and, as a result, Plaintiffs have suffered damages in an amount presently undetermined.  This is demonstrated by the fact, among others, that during the conspiracy, (since 2000) auto dealers' gross profits on new car sales declined sharply.  Plaintiffs' injuries are antitrust injuries of the type that the antitrust laws were meant to punish and prevent.

233.    The alleged conspiracy inflated, fixed and stabilized the prices of Automotive Wire Harness Systems and vehicles containing Automotive Wire Harness Systems and restrained competition in the United States, including in all of the states having laws permitting recovery of damages by indirect purchasers, as listed *supra*, and therefore had substantial effects on the commerce of the United States, including all of the states having laws permitting recovery of damages by indirect purchasers, as listed *supra*.

## Fraudulent Concealment

234.    Plaintiffs and the members of the Classes did not discover, and could not discover through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until February 2010, at the earliest, when the EC raids were first publicly reported.

235.    Because Defendants' agreements, understandings and conspiracies were kept secret until February 2010, Plaintiffs and members of the Classes were unaware of Defendants' unlawful conduct before that time, and they did not know until February 2010 that they were paying supra-competitive prices for Automotive Wire Harness Systems or vehicles containing Automotive Wire Harness Systems, throughout the United States, during the Class Period.

236.     The affirmative acts of the Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

237.     By its very nature, Defendants' anti-competitive conspiracy was inherently self-concealing.  Automotive Wire Harness Systems and vehicles containing Automotive Wire Harness Systems are not exempt from antitrust regulation, and thus, before February 2010, Plaintiffs reasonably considered the Automotive Harness Systems industry to be a competitive industry.  Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' prices for Automotive Wire Harness Systems before February 2010.

238.     As explained in the informations filed against several of the Defendants, the conspirators concealed their activities from the authorities by using code names and arranging meetings at private residences and remote locations.

239.     Plaintiffs and the members of the Classes could not have discovered the alleged contract, conspiracy and combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by the Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, combination and conspiracy.

240.     Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, including through fraudulent misrepresentations, Plaintiffs and members of the Classes had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until February 2010, when reports of the investigations

into anti-competitive conduct concerning Automotive Wire Harness Systems were first publicly disseminated.

241.    As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs and the members of the Classes have alleged in this Complaint.

## Count I
## Violation of Section 1 of the Sherman Act
## (on behalf of Plaintiffs and the Nationwide Class)

242.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

243.    Defendants and unnamed conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

244.    The acts done by each of the Defendants as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

245.    At least as early as January 2000, and continuing through at least September 30, 2011, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to rig bids for and to artificially fix, raise, stabilize and control prices for Automotive Wire Harness Systems thereby creating anticompetitive effects.

246.    The anti-competitive acts were intentionally directed at the United States market for Automotive Wire Harness Systems and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for Automotive Wire Harness Systems throughout the United States.

247.    The conspiratorial acts and combinations have caused unreasonable restraints in the market for Automotive Wire Harness Systems.

248.    As a result of Defendants' and their co-conspirators' unlawful conduct, Plaintiffs and other similarly situated members of the Nationwide Class who purchased Automotive Wire Harness Systems or vehicles containing Automotive Wire Harness Systems from firms who purchased Automotive Wire Harness Systems from Defendants or their co-conspirators have been harmed by being forced to pay inflated, supra-competitive prices for such products.

249.    In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices and courses of conduct set forth herein.

250.    Defendants' conspiracy had the following effects, among others:

a)    Price competition in the market for Automotive Wire Harness Systems has been restrained, suppressed and/or eliminated in the United States;

b)    Prices for Automotive Wire Harness Systems sold by Defendants and their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, noncompetitive levels throughout the United States; and

c)    Plaintiffs and members of the Nationwide Class who purchased Automotive Wire Harness Systems, or vehicles containing Automotive Wire Harness Systems from firms who purchased Automotive Wire Harness Systems from Defendants and their co-conspirators have been deprived of the benefits of free and open competition and have been forced to pay artificially inflated prices for such products.

251.    Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for Automotive Wire Harness Systems or vehicles containing Automotive Wire Harness Systems purchased from firms who purchased such Automotive Wire Harness Systems from Defendants and their co-conspirators than they would have paid and will pay in the absence of the conspiracy.

252.     The alleged contract, combination, or conspiracy is *a per se* violation of the federal antitrust laws.

253.     Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, pursuant to 15 U.S.C. §26, preventing and restraining the violations alleged herein.

## Count II
## Violation of State Antitrust and Consumer Protection Statutes
## (on behalf of Plaintiffs and the Damages Classes)

254.     Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

255.     From as early as January 2000 through at least September 30, 2011, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of Automotive Wire Harness Systems in an unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

256.     The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain artificially supra-competitive prices for Automotive Wire Harness Systems and to allocate customers for Automotive Wire Harness Systems in the United States.

257.     In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

a)     Participating in meetings and conversations among themselves during which they agreed to price Automotive Wire Harness Systems at certain levels and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Classes with respect to Automotive Wire Harness Systems sold in the United States;

b)     Allocating customers and markets and rigging bids for Automotive Wire Harness Systems in the United States in furtherance of their agreements; and

    c)    Participating in meetings and conversations among themselves to implement, adhere to and police the unlawful agreements they reached.

258.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, decrease, or stabilize prices, to rig bids and to allocate customers with respect to Automotive Wire Harness Systems.

259.    The anti-competitive acts were intentionally directed at the market for Automotive Wire Harness Systems in all states allowing indirect purchasers to collect damages, as listed *infra*, and had a substantial and foreseeable effect on intrastate commerce by raising and fixing prices for Automotive Wire Harness Systems throughout those states.

260.    Defendants' anticompetitive, unfair acts described above were knowing, willful and constitute violations or flagrant violations of the below-listed state antitrust and consumer protection statutes.

261.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Arizona Revised Statutes, §§ 44-1401, *et seq.*

262.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-107(a)(10).

263.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the California Business and Professions Code, §§ 16700, *et seq.* and §§ 17200 *et seq.*

264.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the District of Columbia Code Annotated §§ 28-4501, *et seq.*

265.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*

266.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Hawaii Revised Statutes Annotated §§ 480-1, *et seq.*

267.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act, 740 Illinois Compiled Statutes 10/1, *et seq.*

268.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Iowa Code §§ 553.1, *et seq.*

269.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Kansas Statutes Annotated, §§ 50-101, *et seq.*

270.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Maine Revised Statutes, 10 M.R.S. §§ 1101, *et seq.*

271.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Massachusetts Gen. Laws, Ch 93 A, § II.  Leoni Wire, Inc., the Defendant that has its place of business in Massachusetts was served with a demand letter 30 days prior to the filing of this Complaint.

272.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Michigan Compiled Laws §§ 445.771, *et seq.*

273.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Minnesota Annotated Statutes §§ 325D.49, *et seq.*

274.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Mississippi Code Annotated §§ 75-21-1, *et seq.*

275.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Missouri Statutes Annotated, V.A.M.S. §§ 407.010, *et seq.*

276.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, §§ 30-14-103, *et seq.*

277.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nebraska Revised Statutes §§ 59-801, *et seq.*

278.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Nevada Revised Statutes Annotated §§ 598A.010, *et seq.*

279.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Hampshire Revised Statutes §§ 356:1, *et seq.*

280.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New Mexico Statutes Annotated §§ 57-1-1, *et seq.*

281.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the New York General Business Laws §§ 340, *et seq.*

282.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes §§ 75-1, *et seq.*

283.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Dakota Century Code §§ 51-08.1-01, *et seq.*

284.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Oregon Revised Statutes §§ 646.705*, et seq.*

285.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq.*

286.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the South Dakota Codified Laws §§ 37-1-3.1, *et seq.*

287.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Tennessee Code Annotated §§ 47-25-101, *et seq.*

288.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Utah Code Annotated §§ 76-10-911, *et seq.*

289.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Vermont Statutes Annotated §§ 2453, *et seq.*

290.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the West Virginia Code §§ 47-18-1, *et seq.*

291.    Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes §§ 133.01, *et seq.*

292.    Plaintiffs and members of the Damages Classes in each of the above states have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement.  Plaintiffs and members of the Damages Classes have paid more for Automotive Wire Harness Systems or vehicles containing Automotive Wire Harness Systems than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from Defendants' unlawful conduct.

293.    Defendants' violations of the above-listed state laws have proximately caused the injuries sustained by Plaintiffs and the members of the Damages Classes.

294.    In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of the Plaintiffs and the members of the Damages Classes.

295.    Accordingly, Plaintiffs and the members of the Damages Classes in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust or consumer protection law,

and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

## Count III
## Unjust Enrichment
## (on behalf of Plaintiffs and the Damages Classes)

296.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs.

297.    As a result of their unlawful conduct described above, Defendants have been and will continue to be unjustly enriched.  Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of Automotive Wire Harness Systems.

298.    Defendants have benefited from their unlawful acts, at the expense of Plaintiffs and the Damages Classes, and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiffs or the members of the Damages Classes for Automotive Wire Harness Systems and vehicles containing Automotive Harness Systems.   The amounts of such overpayments lawfully belong to Plaintiffs and the Damages Classes.

299.    Plaintiffs and the members of the Damages Classes are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust and inequitable conduct. Plaintiffs and the members of the Damages Classes are entitled to the establishment of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and the members of the Damages Classes may make claims on a pro rata basis.

300.    Pursuit of any remedies against the OEMs from whom Plaintiffs and the Class members purchased vehicles containing Automotive Wire Harness Systems and Automotive Wire

Harness Systems subject to Defendants' conspiracy would have been futile, given that the OEMs did not take part in Defendants' conspiracy.

## Prayer for Relief

Accordingly, Plaintiffs respectfully request that:

A.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Classes;

B.    That the unlawful conduct, contract, conspiracy or combination alleged herein be adjudged and decreed:

   1.    An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

   2.    A *per se* violation of Section 1 of the Sherman Act;

   3.    An unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and

   4.    Acts of unjust enrichment by Defendants as set forth herein.

C.    Plaintiffs and the members of the Damages Classes recover damages, to the maximum extent allowed under such laws, and that a joint and several judgment in favor of Plaintiffs and the members of the Damages Classes be entered against Defendants in an amount to be trebled to the extent such laws permit;

D.    Plaintiffs and the members of the Damages Classes recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

E.       Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy or combination alleged herein, or from entering into any other contract, conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect;

F.       Plaintiffs and the members of the Damages Classes be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment;

G.       Plaintiffs and the members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

H.       Plaintiffs and the members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

I.       Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

## **JURY DEMAND**

Plaintiffs hereby demand trial by jury.

Dated this 14th day of May, 2012.

By___/s/ Gerard V. Mantese_____
Gerard V. Mantese (Michigan Bar No. P34424)
David Hansma (Michigan Bar No. P71056)
Brendan Frey (Michigan Bar No. P70893)
Joshua Lushnat (Michigan Bar No. P75319)
Mantese Honigman Rossman
 and Williamson, P.C.
1361 E. Big Beaver Road
Troy, Michigan 48083
Phone: (248) 457-9200 ext. 203
Fax: (248) 457-9201
Email: gmantese@manteselaw.com
        dhansma@manteselaw.com
        bfrey@manteselaw.com
        jlushnat@manteselaw.com

Don Barrett
David McMullan
Brian Herrington
Barrett Law Group, P.A.
P.O. Box 927
404 Court Square
Lexington, MS 39095
Telephone: (662) 834-2488
Email: dbarrett@barrettlawgroup.com
bherrington@barrettlawgroup.com
dmcmullan@barrettlawgroup.com

Dewitt Lovelace
Alex Peet
Lovelace Law Firm, P.A.
12870 US Hwy 98 West, Ste. 200
Miramar Beach, FL 32550
Telephone: (850) 837-6020
Email: dml@lovelacelaw.com
alex@lovelacelaw.com

Richard Barrett
Law Offices of Richard R. Barrett, PLLC
2086 Old Taylor Road. Ste. 1011
Oxford, Mississippi 38655
Phone:(662) 380-5018
Fax:   (866) 430-5459
Email:  rrb@rrblawfirm.net

Phillip Duncan
Richard Quintus
Duncan Firm, P.A.
900 S. Shackleford, Suite 725
Little Rock, AR 72211
Telephone:  (501) 228-7600
Email: phillip@duncanfirm.com
richard@duncanfirm.com

George A. Barton
Stacey Burrows
Law Offices of George A. Barton, P.C.
4435 Main St.
Suite 920
One Main Plaza
Kansas City, MO

Jonathan W. Cuneo
Victoria Romanenko
Cuneo Gilbert & LaDuca, LLP
507 C Street, N.E.
Washington, DC 20002
Phone:  (202) 789-3960
Fax: (202) 789-1813
Email: jonc@cuneolaw.com
Vicky@cuneolaw.com

Shawn M. Raiter
Paul A. Sand
Larson • King, LLP
2800 Wells Fargo Place
30 East Seventh Street
St. Paul, MN  55101
Telephone: (651) 312-6500
Email: sraiter@larsonking.com
psand@larsonking.com

Thomas P. Thrash
Thrash Law Firm, P.A.
1101 Garland Street
Little Rock, AR 72201
Telephone: (501) 374-1058
Email: tomthrash@sbcglobal.net

Charles Barrett
Charles Barrett, P.C.
6518 Highway 100
Suite 210
Nashville, Tennessee 37205
Telephone: (615) 515-3393
Email: charles@cfbfirm.com

Joel Davidow
Daniel Cohen
Cuneo Gilbert & LaDuca, LLP
Bethesda, Maryland
8120 Woodmont Ave
Suite 810
Bethesda, MD 20814
Phone: (202) 789-3960
Email: joel@cuneolaw.com

64111
Phone: (816) 300-6253
Fax: (816) 300-6259
Email: gab@georgebartonlaw.com
stacy@georgebartonlaw.com

*Additional Counsel for Dale Martens Nissan
Subaru, Inc., Green Team of Clay Center, Inc.
and Herb Hallman Chevrolet, Inc. d/b/a
Champion Chevrolet*

danielc@cuneolaw.com

Michael J. Flannery
Cuneo Gilbert & LaDuca, LLP
300 North Tucker Boulevard
Suite 801
St. Louis, MO 63101
Phone: (202) 789-3960
Fax: (202) 789-1813
Email: mflannery@cuneolaw.com

Gregory Johnson
G. Johnson Law, PLLC
6688 145th Street West,
Apple Valley, MN 55124
Telephone: (952) 930-2485
Email: greg@gjohnsonlegal.com

*Attorneys for Plaintiffs and Proposed Class*

**EXHIBIT C**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

|  |  |
|---|---|
| IN RE AUTOMOTIVE WIRE HARNESS SYSTEMS ANTITRUST LITIGATION | : Master File No. 12-md-02311 |
| THIS DOCUMENT RELATES TO: | : |
| All Direct Purchaser Actions | : |

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

## SUMMARY OF THE CASE

1.     Plaintiffs, individually and on behalf of the Class described below, bring this class action against Defendants for damages and injunctive relief under the antitrust laws of the United States on behalf of direct purchasers who, during the Class Period, purchased Wire Harness Products, as defined below, in the United States from one or more of the Defendants.  Defendants are manufacturers or sellers of Wire Harness Products that are manufactured or sold in the United States.

2.     Plaintiffs allege that Defendants conspired to rig bids for, and to raise fix, maintain, or stabilize the prices of, Wire Harness Products sold in the United States from at least as early as January 1, 2000 until at least February 28, 2010 in violation of Section 1 of the Sherman Act.  Plaintiffs further allege that Defendants fraudulently concealed their conspiracy.

3.    As a result of Defendants' unlawful conduct, Plaintiffs and members of the Class paid higher prices for Wire Harness Products than they would have paid in a competitive market.

## JURISDICTION AND VENUE

4.    Plaintiffs bring this action to obtain injunctive relief and to recover damages, including treble damages, costs of suit and reasonable attorneys' fees, as a result of Defendants' violations of  Section 1 of the Sherman Act, 15 U.S.C. § 1.

5.    The Court has jurisdiction over the subject matter of this action pursuant to Sections 4(a) and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331 and 1337.  Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b), (c) and (d) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce has been carried out in this District, and one or more of the Defendants reside in this District.

6.    This Court has personal jurisdiction over each of the Defendants because each Defendant, either directly or through the ownership or control of its United States subsidiaries: (a) transacted business in the United States, including in this District; (b) directly or indirectly sold or marketed substantial quantities of Wire Harness Products throughout the United States, including in this District; (c) had substantial aggregate contacts with the United States as a whole, including in this District; or (d) was engaged in an illegal price-fixing conspiracy that was

2

directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District. Defendants conduct business throughout the United States, including in this District, and they have purposefully availed themselves of the laws of the United States.

7. Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial and reasonably foreseeable and intended anti-competitive effects upon interstate commerce within the United States.

8. Alternatively, there is jurisdiction over foreign Defendants pursuant to Federal Rule of Civil Procedure 4(k)(2).

## DEFINITIONS

9. The "Class Period" is from January 1, 2000 through the present.

10. The term "Wire Harness Products", as used in this Complaint, refers to wire harnesses and the following related products: automotive electrical wiring, lead wire assemblies, cable bond, automotive wiring connectors, automotive wiring terminals, high voltage wiring, electronic control units, fuse boxes, relay boxes, junction blocks, and power distributors used in motor vehicles.

11. Wire harnesses are electrical distribution systems used to direct and control electronic components, wiring, and circuit boards in motor vehicles.

12.    "Defendant" or "Defendants" as used herein, includes all of the named
Defendants' predecessors during the Class Period.

## TRADE AND COMMERCE

13.    During the Class Period each Defendant sold Wire Harness Products
in the United States, in a continuous and uninterrupted flow of interstate
commerce.

14.    During the Class Period, Defendants collectively controlled a majority
of the market for Wire Harness Products, both globally and in the United States.

15.    The business activities of the Defendants substantially affected
interstate trade and commerce in the United States.

## THE PARTIES

### Plaintiffs

16.    Plaintiff Mexican Industries in Michigan, Inc. by and through Timothy
Miller, its Trustee in Bankruptcy ("Mexican Industries") is a Michigan corporation
with its principal place of business in Detroit, Michigan.  Plaintiff Mexican
Industries purchased Wire Harness Products directly from one or more of the
Defendants during the Class Period.

17.    Plaintiff Paesano Connecting Systems, Inc. ("Paesano") is a
Pennsylvania corporation with its principal place of business in Ridgway,
Pennsylvania.  Plaintiff Paesano purchased Wire Harness Products directly from
one or more of the Defendants during the Class Period.

2:12-md-02311-MOB    Doc #86    Filed 05/02/12    Pg 18 of 46    Pg ID 1003

18.     Plaintiff Craft-Co Enterprises, Inc. ("Craft-Co") is a Mississippi corporation with its principal place of business in Brandon, Mississippi.  Plaintiff Craft-Co purchased Wire Harness Products directly from one or more of the Defendants during the Class Period.

19.     Plaintiff Findlay Industries, Inc. ("Findlay") is an Ohio corporation with its principal place of business in Findlay, Ohio.  Plaintiff Findlay purchased Wire Harness Products directly from one or more of the Defendants during the Class Period.

20.     Plaintiff Cesar-Scott, Inc. ("Cesar-Scott") is a Texas corporation with its principal place of business in El Paso, Texas.  Plaintiff Cesar-Scott purchased Wire Harness Products directly from one or more of the Defendants during the Class Period.

21.     Plaintiff Martinez Manufacturing, Inc. ("Martinez") is an Illinois corporation with its principal place of business in Cary, Illinois.  Plaintiff Martinez purchased Wire Harness Products directly from one or more of the Defendants during the Class Period.

22.     Plaintiff South Star Corporation ("South Star") is a Virginia corporation with its principal place of business in Elliston, Virginia.  Plaintiff South Star purchased Wire Harness Products directly from one or more of the Defendants during the Class Period.

## The Delphi Defendants

23.    Defendant Delphi Automotive LLP is a partnership organized under the laws of England and Wales. It was formed in 2009 to buy assets of Troy, Michigan-based Delphi Corporation, which filed for bankruptcy protection in 2005. Defendant Delphi Automotive LLP – directly or through its subsidiaries, which it wholly owned or controlled – manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.

24.    Defendant Delphi Automotive Systems, LLC is a Delaware corporation with its principal place of business in Troy, Michigan. It is a subsidiary of and wholly owned or controlled by its parent, Delphi Automotive LLP. Officers from Defendant Delphi Automotive LLP work out of the Michigan offices of Defendant Delphi Automotive Systems, LLC. Defendant Delphi Automotive Systems, LLC manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.

25.    Defendant DPH Holdings Corporation (f/k/a Delphi Corporation) is a Delaware corporation with its principal place of business in Warren, Ohio. It is a subsidiary of and wholly owned or controlled by its parent, Delphi Automotive LLP. Defendant DPH Holdings Corporation manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.

26.     Defendant Delphi Furukawa Wiring Systems LLC is a limited liability company created in 2004 as a joint venture between Delphi Corporation and Furukawa Electric Co., Ltd. with its principal place of business in Ann Arbor, Michigan.  Delphi Furukawa Wiring Systems LLC manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.

27.     Defendants Delphi Automotive LLP, Delphi Automotive Systems, LLC, DPH Holdings Corporation and Delphi Furukawa Wiring Systems LLC shall collectively be referred to herein as the "Delphi Defendants" or "Delphi."

**The Denso Defendants**

28.     Defendant Denso Corporation is a Japanese corporation.  Defendant Denso Corporation – directly or through its subsidiaries, which it wholly owned or controlled – manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.

29.     Defendant Denso International America, Inc. is a Delaware corporation with its principal place of business in Southfield, Michigan.  It is a subsidiary of and wholly owned or controlled by its parent, Denso Corporation. Defendant Denso International America, Inc. manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.  During the Class Period, its activities in the United States were under the control and direction of Denso Corporation.

7

30.     Defendant Asmo Co. Ltd. ("Asmo") is a Japanese corporation with its principal place of business in Japan.  Asmo is a wholly-owned and controlled subsidiary of Defendant Denso Corporation.  Defendant Asmo manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.  During the Class Period, its activities in the United States were under the control and direction of Denso Corporation.

31.     Defendants Denso Corporation, Denso International America, Inc. and Asmo Co., Ltd. shall collectively be referred to herein as the "Denso Defendants" or "Denso."

**The Fujikura Defendants**

32.     Defendant Fujikura Ltd. is a Japanese corporation.  Defendant Fujikura Ltd. – directly or through its subsidiaries, which it wholly owned or controlled – manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.

33.     Defendant Fujikura America, Inc. is a Delaware corporation with its principal place of business in Atlanta, Georgia.  It is a subsidiary of and wholly owned or controlled by its parent, Fujikura Ltd.  Defendant Fujikura America, Inc. manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.

During the Class Period, its activities in the United States were under the control and direction of Fujikura Ltd.

34.    Defendants Fujikura Ltd. and Fujikura America, Inc. shall collectively be referred to herein as the "Fujikura Defendants" or "Fujikura."

**The Furukawa Defendants**

35.    Defendant Furukawa Electric Co., Ltd. is a Japanese corporation. Defendant Furukawa Electric Co., Ltd. – directly or through its subsidiaries, which it wholly owned or controlled – manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.

36.    Defendant American Furukawa, Inc. is a Delaware corporation with its principal place of business in Plymouth, Michigan.  It is a subsidiary of and wholly owned or controlled by its parent, Furukawa Electric Co. Ltd.  Defendant American Furukawa, Inc. manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.  During the Class Period, its activities in the United States were under the control and direction of Furukawa Electric Co., Ltd.

37.    Defendant Furukawa Wiring Systems America, Inc. f/k/a Furukawa Lear Corporation and Lear Furukawa Corporation is a Delaware corporation with its principal place of business in El Paso, Texas.  Defendant Furukawa Wiring Systems America, Inc. is 60% owned by Furukawa Electric Co., Ltd. and 40% owned by American Furukawa, Inc.  During the Class Period, Furukawa Wiring Systems

9

America, Inc. operated as a joint venture between Lear Corporation and Furukawa Electric Co., Ltd. that manufactured, distributed or sold Wire Harness Products that were purchased throughout United States, including in this District.  In June 2010, Furukawa Electric Co., Ltd. purchased all of Lear's Corporation's remaining interest.

38.     Defendants Furukawa Electric Co., Ltd. American Furukawa, Inc. and Furukawa Wiring Systems America, Inc. shall collectively be referred to herein as the "Furukawa Defendants" or "Furukawa."

**The Lear Defendants**

39.     Defendant Lear Corporation is a Delaware corporation with its principal place of business in Southfield, Michigan.  Defendant Lear Corporation – directly or through its subsidiaries, which it wholly owned or controlled – manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.

40.     Defendant Kyungshin-Lear Sales and Engineering, LLC is a Delaware corporation with its principal place of business in Selma, Alabama.  It is a joint venture between Defendant Lear Corporation and Kyungshin Corporation of South Korea.  Defendant Kyungshin-Lear Sales and Engineering, LLC manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.

41.     Defendants Lear Corporation and Kyungshin-Lear Sales and
Engineering, LLC shall collectively be referred to herein as the "Lear Defendants"
or "Lear."

42.     Lear filed for Chapter 11 bankruptcy protection on July 7, 2009. After
its emergence from Chapter 11 bankruptcy proceedings on November 9, 2009, Lear
continued to sell Wire Harness Products pursuant to and as part of its participation
in furtherance of the conspiracy. From and after November 2009, Lear had
significant Wire Harness Products sales in the United States at supra-competitive
prices. In 2010 alone, Lear had $2.56 billion in total sales in its electric power and
management systems, which includes significant sales of Wire Harness Products in
the United States pursuant to the conspiracy.

**The Leoni Defendants**

43.     Defendant Leoni AG is a German corporation. Defendant Leoni AG –
directly or through its subsidiaries, which it wholly owned or controlled –
manufactured, marketed or sold Wire Harness Products that were purchased
throughout the United States, including in this District, during the Class Period.

44.     Defendant Leoni Wiring Systems, Inc. is a Delaware corporation with
its principal place of business in Tucson, Arizona. It is a subsidiary of and wholly
owned or controlled by its parent, Leoni AG. Defendant Leoni Wiring Systems Inc.
manufactured, marketed or sold Wire Harness Products that were purchased
throughout the United States, including in this District, during the Class Period.

During the Class Period, its activities in the United States were under the control and direction of Leoni AG.

45.    Defendant Leonische Holding, Inc. is a Delaware corporation with its principal place of business in Tucson, Arizona.  It is a subsidiary of and wholly owned or controlled by its parent, Leoni AG.  Defendant Leonische Holding, Inc. manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period. During the Class Period, its activities in the United States were under the control and direction of Leoni AG.

46.    Defendant Leoni Kabel GmbH is a German corporation.  Defendant Leoni Kabel GmbH manufactured, marketed  or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.

47.    Defendant Leoni Wire Inc. is a Massachusetts corporation with its principal place of business in Chicopee, Massachusetts.  Leoni Wire Inc. is a wholly-owned and controlled subsidiary of Defendant Leoni AG.  Defendant Leoni Wire Inc. manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period. During the Class Period, its activities in the United States were under the control and direction of Leoni AG.

48.    Defendants Leoni AG, Leoni Wiring Systems, Inc., Leonische Holding, Inc., Leoni Kabel GmbH and Leoni Wire Inc. shall collectively be referred to herein as the "Leoni Defendants" or "Leoni."

**The Sumitomo Defendants**

49.    Defendant Sumitomo Electric Industries, Ltd. is a Japanese corporation.  Defendant Sumitomo Electric Industries, Ltd. – directly or through its subsidiaries, which it wholly owned or controlled – manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.

50.    Defendant Sumitomo Wiring Systems, Ltd. is a Japanese corporation. Defendant Sumitomo Wiring Systems, Ltd. – directly or through its subsidiaries, which it wholly owned or controlled – manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.

51.    Defendant Sumitomo Electric Wiring Systems, Inc. is a Delaware corporation with its principal place of business in Bowling Green, Kentucky.  It is a joint venture between Defendants Sumitomo Electric Industries, Ltd. and Sumitomo Wiring Systems, Ltd.  Defendant Sumitomo Electric Wiring Systems, Inc. manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period. During the Class Period, its activities in the United States were under the control

and direction of Sumitomo Electric Industries, Ltd. and Sumitomo Wiring Systems, Ltd.

52.     Defendant K&S Wiring Systems, Inc. is a Delaware corporation with its principal place of business in La Vergne, Tennessee.  It is a subsidiary of and wholly owned or controlled by its parent, Sumitomo Electric Industries, Ltd. Defendant K&S Wiring Systems, Inc. manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.  During the Class Period, its activities in the United States were under the control and direction of Sumitomo Electric Industries, Ltd.

53.     Defendant Sumitomo Wiring Systems (U.S.A.) Inc. is a Michigan corporation with its principal place of business in Novi, Michigan.  It is a joint venture between Defendants Sumitomo Electric Industries, Ltd. and Sumitomo Wiring Systems, Ltd.  Defendant Sumitomo Wiring Systems (U.S.A.) Inc. manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period. During the Class Period, its activities in the United States were under the control and direction of Sumitomo Electric Industries, Ltd. and Sumitomo Wiring Systems, Ltd.

54.     Defendant Sumitomo Electric Wintec America, Inc. is a Kentucky corporation with its principal place of business in Edmonton, Kentucky.  Sumitomo Electric Wintec America, Inc. is a wholly-owned and controlled subsidiary of

Defendant Sumitomo Electric Industries, Ltd. Defendant Sumitomo Electric Wintec America, Inc. manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.  During the Class Period, its activities in the United States were under the control and direction of Sumitomo Electric Industries, Ltd.

55.     Defendants Sumitomo Electric Industries, Ltd., Sumitomo Wiring Systems, Ltd., Sumitomo Electric Wiring Systems, Inc., K&S Wiring Systems, Inc., Sumitomo Wiring Systems (U.S.A.) Inc., and Sumitomo Electric Wintec America, Inc. shall collectively be referred to herein as the "Sumitomo Defendants" or "Sumitomo."

**The Yazaki Defendants**

56.     Defendant Yazaki Corporation is a Japanese corporation.  Defendant Yazaki Corporation – directly or through its subsidiaries, which it wholly owned or controlled – manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.

57.     Defendant Yazaki North America, Inc. is an Illinois corporation with its principal place of business in Canton Township, Michigan.  It is a subsidiary of and wholly owned or controlled by its parent, Yazaki Corporation.  Defendant Yazaki North America Inc. manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District,

during the Class Period.  During the Class Period, its activities in the United States were under the control and direction of Yazaki Corporation.

58.    Defendant S-Y Systems Technologies Europe GmbH is a German corporation.  S-Y Systems Technologies Europe GmbH was formed as a joint venture between Siemens and Yazaki Corporation.  Defendant S-Y Systems Europe GmbH – directly or through its subsidiaries, which it wholly owned or controlled – manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.

59.    Defendant S-Y Systems Technologies America, LLC is a Delaware corporation with its principal place of business in Dearborn, Michigan.  It is currently a wholly owned subsidiary of or controlled by its parent Defendant Yazaki Corporation, but was formerly a joint venture between Siemens VDO Automotive AG and Yazaki Corporation.  Defendant S-Y Systems Technologies America, LLC manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.  During the Class Period, its activities in the United States were under the control and direction of Siemens and Yazaki Corporation, or its current Japanese parent, Yazaki Corporation.

60.    Yazaki Corporation, Yazaki North America, Inc., S-Y Systems Technologies Europe GmbH, and S-Y Systems Technologies America, LLC are herein referred to as shall collectively be referred to herein as the "Yazaki Defendants" or "Yazaki."

## The Tokai Rika Defendants

61.    Defendant Tokai Rika Co., Ltd. is a Japanese corporation.  Defendant Tokai Rika Co., Ltd. manufactured, marked or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period.

62.    Defendant TRAM, Inc. ("TRAM") is a Michigan corporation with its principal place of business in Plymouth, Michigan.  TRAM is a wholly-owned and controlled subsidiary of Defendant Tokai Rika Co., Ltd. Defendant TRAM manufactured, marketed or sold Wire Harness Products that were purchased throughout the United States, including in this District, during the Class Period. During the Class Period, its activities in the United States were under the control and direction of Tokai Rika Co., Ltd.

63.    Defendants Tokai Rika Co., Ltd. and TRAM, Inc. are collectively referred to herein as "Tokai Rika."

## DEFENDANTS' CO-CONSPIRATORS AND AGENTS

64.    Various persons or firms not named as Defendants herein have participated as co-conspirators in the violations alleged herein and have performed acts and made statements in furtherance thereof.  The Defendants are jointly and severally liable for the acts of their co-conspirators whether named or not named as Defendants in this Complaint.

65.    Each Defendant acted as the agent or joint venturer of or for other Defendants with respect to the acts, violations and common course of conduct alleged by Plaintiffs.

## CLASS ACTION ALLEGATIONS

66.    Plaintiffs bring this action both on behalf of themselves and all others similarly situated (the "Class") pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2) and (b)(3).  The Class is defined as follows:

> All individuals and entities that purchased Wire Harness Products in the United States directly from one or more Defendants or co-conspirators from January 1, 2000 through the present.

67.    Plaintiffs do not know the exact number of Class members, such information being in the exclusive control of Defendants.  Due to the nature of the trade and commerce involved, however, Plaintiffs believe that the Class is so numerous and geographically dispersed throughout the United States that joinder of all Class members is impracticable.

68.    There are questions of law or fact common to the class:

a.    Whether Defendants engaged in a contract, combination, or conspiracy to rig bids for, or to raise, fix, maintain, or stabilize prices of Wire Harness Products sold in the United States;

b.    Whether Defendants agreed to allocate the supply of Wire Harness Products sold to certain direct purchasers in the United States on a model-by-model basis;

18

    c.       Whether Defendants' conduct caused Wire Harness Products to be sold in the United States at artificially high prices;

    d.       Whether Plaintiffs and other members of the Class were injured by Defendants' conduct, and, if so, the appropriate class-wide measure of damages for Class members; and

    e.       Whether Plaintiffs and other members of the Class are entitled to injunctive relief and, if so, the nature and extent of such relief.

69.    These questions of law and fact are common to the Class and predominate over any questions affecting only individual Class members.

70.    Plaintiffs' claims are typical of the claims of the Class because Plaintiffs directly purchased Wire Harness Products from one or more of the Defendants, all Class members were damaged by the same conspiracy alleged herein, and the relief sought by Plaintiffs is common to the Class.

71.    Plaintiffs will fairly and adequately represent the interests of the Class in that Plaintiffs are direct purchasers of Wire Harness Products and have no conflict with any other members of the Class. Furthermore, Plaintiffs have retained competent counsel experienced in antitrust, class action, and other complex litigation.

72.    Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

73.     A class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy.  Prosecution of this matter as a class action will eliminate the possibility of repetitive litigation and there are no inherent barriers to managing the case as a class action.

74.     The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying outcomes.

75.     The Class is also readily definable and is one for which records likely exist in the files of Defendants and their co-conspirators.

## INDUSTRY BACKGROUND

76.     Wire harnesses are systems of electrical and electronic cables, wires and connectors used to transmit informational signals or operating currents to electronic control units, wiring, circuit boards, and other components in motor vehicles.

77.     Wire harness assemblies consist of raw, coiled wire, which is cut to length and terminated.  Individual circuits are assembled together on a jig or table, inserted into connectors and wrapped or taped to form wire harness assemblies.

78.     Wire harnesses have color coded wires that are designed to support specific electrical and electronic motor vehicle features.  Most, if not all, electrical and electronic devices in a vehicle rely on a wire harness to provide electric current and data transmission for operation.

79.     Motor vehicles contain masses of wires that can amount to several kilometers in length.  A motor vehicle's wiring system is organized into multiple

wire harnesses. Wire harnesses provide organized connection points for multiple wiring configurations. The harness feature binds wires and cables into a bundle, which provides protection against deterioration or damage from vibration, abrasions, and moisture.

80. Wire Harness Products are installed by manufacturers in new vehicles as part of the manufacturing process. Also, Wire Harness Products are installed in vehicles to replace worn out, defective or damaged parts.

81. Automotive electrical wiring is the wiring that runs throughout the vehicle.

82. High voltage wiring is integral to vehicles equipped with hybrid, fuel-cell or electric-powered powertrains.

83. Lead wire assemblies connect a wire carrying electrical current from the power source to an electrode holder or a group clamp.

84. Cable bonds are the electrical connection between the armor or sheath of one cable and that of an adjacent cable or across a wire in the armor.

85. Automotive wiring connectors connect various types of wires in a motor vehicle.

86. Automotive wiring terminals are the ends of a wire that provide a point of connection to external circuits.

87. Electronic control units ("ECUs") are embedded modules or systems that control one or more of the electrical systems or subsystems in a motor vehicle.

2-12-md-02311-MOB   Doc #566   Filed 05/24/12   Pg 22 of 46   Pg ID 020

Motor vehicles are equipped with a large number of ECUs that operate various motor vehicle functions and exchange large volumes of data with one another.

88.     Fuse boxes are modules that hold the fuses for the various electrical circuits, all of which are routed through the fuse box.  The primary purpose of an electrical fuse is to help protect components on a circuit from damage in the event of a short circuit or a current spike or overload.

89.     Relay boxes are modules that hold the electrical switches that transmit impulses from one component to another, and can be used to connect or break the flow of the current in a circuit.  Once a relay is activated it connects an electrical or other data supply to a particular component or accessory.

90.     Junction blocks are used as electrical connection points for the distribution power or distribution of a ground.

91.     Power distributors serve to distribute power at varying levels to various electrical components.

<u>Requests For Quotation</u>

92.     Motor vehicle Original Equipment Manufacturers ("OEMs") require multiple sources for motor vehicle parts.  As part of their supply chain and procurement process, OEMs issue Requests for Quotation ("RFQs") to parts suppliers on a model-by-model basis for model specific Wire Harness Products.

93.     RFQs are a standard business practice that allow parts suppliers to submit price quotations or bids on specific products or services.

94.   Foreign OEMs participate in RFQs to procure parts for U.S.-manufactured vehicles both abroad and in the United States.

95.   Generally, OEMs issue Wire Harness Products RFQs to begin the bidding process approximately three years prior to production of a motor vehicle.

96.   OEMs' RFQs typically include specifications and other relevant information for each motor vehicle product.  In response to RFQs, parts suppliers submit price quotations, or bids, to OEMs to be considered for an award.

97.   After receiving responses to RFQs from each respective bidder, OEMs then award the business to the selected parts suppliers generally for the life of the vehicle model and further confirmed with annual purchase orders.

98.   Suppliers to OEMs have been required to directly purchase Wire Harness Products from Defendants at prices established by the OEMs and Defendants in the bidding process.

**The Wire Harness Products Industry**

99.   It was important to the success of the cartel alleged herein that its members control and manipulate the prices paid by OEMs in order to control the prices paid by all other direct purchasers of Wire Harness Products.

100.   The Wire Harness Products industry is heavily concentrated.  Wire Harness Products manufacturers are all capable of producing Wire Harness Products for use in any motor vehicle.

101.   During the Class Period the top four automotive Wire Harness

Products manufacturers controlled 76.95% of the global market, and the top seven,

all of which are Defendants, controlled 87.95% of the global market.  See Figure 1.

**Market Shares of World's Major Manufacturers of Automotive Wiring Harness, 2009**

| | |
|---|---|
| Yazaki | 29.81% |
| Sumitomo | 24.38% |
| Delphi | 16.71% |
| Leoni | 6.05% |
| Lear | 4.70% |
| Furukawa | 3.61% |
| Fujikura | 2.69% |

Figure 1.

102.   According to *Research in China*, an international market research and

market data firm, the global automotive wiring harness market reached U.S. $25.3

billion in 2009, and grew by 6.6% to $26.9 billion in 2010.  By 2013, the global

automotive wiring harness market is projected to increase to almost U.S. $33

billion.  See Figure 2.

**Global Automotive Wiring Harness Market Scale, 2007-2013**



|  | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|
| Market Scale (US$ million) | 29,302 | 24,980 | 25,317 | 26,982 | 29,380 | 30,010 | 32,980 |
| Growth Rate | 16.9% | -14.7% | 1.3% | 6.6% | 9.3% | 9.0% | 3% |

Figure 2.

103.    There are high barriers to entry in the Wire Harness Products market due to high capital investment in plant and machinery and technical expertise. It is critically important for parts suppliers to maintain minimum viable scale in order to efficiently produce parts within the price and quantity parameters established by the OEMs. As such, loss of one's position as a supplier of choice could have severe consequences to the business models of Defendants and their co-conspirators.

104.   In a competitive market, economies of scale and decreasing costs would lead to lower prices because manufacturers typically will reduce pricing rather than lose market share.  In a market subject to a conspiracy to fix prices, however, competitors do not have the same incentive to lower prices despite steady or decreasing input costs because, based on a conspiratorial agreement, there is a smaller risk of losing sales to lower-priced competitors.

105.   During the Class Period, the prices of Wire Harness Products increased, while the primary manufacturing input costs remained steady.  In fact, the Yazaki, Sumitomo, Leoni, Furukawa, Delphi, Lear and Fujikura Defendants have extensive experience in wiring production and are able to control associated input costs.

## Opportunities To Conspire

106.   Defendants and their co-conspirators attended industry events that provided the opportunity to meet, disguise their improper discussions, and perform acts in furtherance of the conspiracy.  For example, Defendants and their co-conspirators have regularly attended the annual North American International Auto Show ("NAIAS") in Detroit, Michigan and the Automotive Aftermarket Products Expo in Las Vegas, Nevada.

## The Conspiracy

107.   During the Class Period, Defendants and their co-conspirators formed an international cartel to suppress and eliminate competition for Wire Harness

Products by agreeing to rig bids for, and to raise, fix, stabilize, or maintain the prices of, Wire Harness Products.

108.    Defendants and their co-conspirators participated in meetings, conversations, and communications in the United States and abroad to discuss bids and price quotations for Wire Harness Products to be submitted to automobile manufacturers in the United States.

109.    Defendants and their co-conspirators agreed during those meetings, conversations, and communications to allocate the supply of Wire Harness Products sold to automobile manufacturers in the United States on a model-by-model basis.

110.    Defendants and their co-conspirators also agreed during meetings, conversations, and communications to coordinate price adjustments requested by automobile manufacturers in the United States.

111.    Defendants and their co-conspirators submitted bids, price quotations, and price adjustments to automobile manufacturers in the United States in accordance with their conspiratorial agreements.

112.    Defendants' pricing actions regarding their sales of Wire Harness Products to automobile manufacturers had an impact on prices for Wire Harness Products for all direct purchasers of Wire Harness Products throughout the United States.

113.    Defendants and their co-conspirators held meetings and conversations in the United States to monitor and police the agreed-upon bid-rigging and price-fixing conspiracy.

114.    Defendants and their co-conspirators undertook measures to maintain the secretive nature of their unlawful conduct, including but not limited to, using code names and meeting at private residences or remote locations.

**Government Investigations**

115.    Various U.S. and international governmental authorities, including the U.S. Department of Justice ("DOJ") via its Antitrust Division, are currently investigating anticompetitive conduct in connection with the Wire Harness Products industry.

116.    On February 23, 2010, the Federal Bureau of Investigation's ("FBI") Detroit division and the DOJ raided the U.S. offices of Denso, Yazaki, and TRAM. DOJ spokeswoman Gina Talamona said that "[t]he antitrust division is investigating the possibility of anticompetitive cartel conduct. . . . We are coordinating with the European Commission and other foreign competition authorities."

117.    On February 24, 2010, officials from the Competition Directorate of the EC raided the offices of Wire Harness Products manufacturers and a February 25, 2010 EC press release disclosed that the "Commission confirms investigation into suspected cartel in the sector of automotive electrical and electronic components suppliers. . . . The Commission has reason to believe that the companies concerned may have violated EU antitrust rules that prohibit cartels and restrictive business practices."  Reports indicated that the EU's investigation included Leoni AG, Leoni Kabel GmbH, Lear Automotive France, Delphi, Yazaki and S-Y Systems.

28

118.    Also on February 24, 2010, it was reported that the Japanese Fair
Trade Commission ("JFTC") raided three Japanese wire harness manufacturers
suspected of participating in a price-fixing cartel: Yazaki Corporation, Sumitomo
Electric Industries, Ltd., and Furukawa Electric Co., Ltd.  The three manufacturers
have a combined 90% share of the Japanese wire harness market.

119.    On June 30, 2011, Defendant Fujikura Ltd. announced that it received
an advance notice of disciplinary action against the company from the JFTC for
violating antitrust laws regarding the trading of wiring harnesses.  Fujikura Ltd.
was ordered to pay 1.2 billion yen (U.S. $14.8 million).

120.    On July 20, 2011, the JFTC raided seven Japanese auto parts makers,
including Defendants Denso Corporation and its wholly-owned subsidiary Asmo.
The *Japan Times* reported that the JFTC "suspects the parts manufacturers had
meetings from 2002 or earlier to set parts prices and decided which companies
would win contracts before bidding for orders from automakers."

121.    On July 27, 2011, Defendant Delphi announced in its consolidated
second quarter 2011 financial statements that it "received a request from antitrust
authorities at the European Commission seeking information about conduct by
Delphi in connection with an investigation in the European Union related to the
electrical and electronic components market" and is cooperating with European
authorities.

122.    On September 29, 2011, the DOJ charged Defendant Furukawa
Electric Co., Ltd. and three of its executives with participating in a "combination

and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of automotive wire harnesses and related products" in violation of the Sherman Antitrust Act.

123.    Also on September 29, 2011, Defendant Furukawa Electric Co., Ltd. and its three executives agreed to plead guilty for their involvement in a criminal price-fixing and bid-rigging conspiracy in connection with the sale of Wire Harness Products.  Furukawa Electric Co., Ltd. agreed to pay a $200 million fine while three of its executives agreed to serve prison time in the United States ranging from a year and a day to eighteen months.

124.    The DOJ described these as the "first charges as a result of its ongoing international cartel investigation of price fixing and bid rigging in the auto parts industry."

125.    In a September 29, 2011 DOJ press release, Sharis A. Pozen, Acting Assistant Attorney General of the DOJ's Antitrust Division stated that "[t]his cartel harmed an important industry in our nation's economy, and the Antitrust Division with the Federal Bureau of Investigation will continue to work together to ensure that these kinds of conspiracies are stopped."

126.    FBI Special Agent in Charge Andrew G. Arena also said that "[w]hen companies partner to control and price fix bids or contracts, it undermines the foundation of the United States' economic system."  "The FBI is committed to aggressively pursuing any company involved in antitrust crimes."

127.   According to the DOJ, Defendant Furukawa Electric Co., Ltd. and its co-conspirators manufactured automotive Wire Harness Products (a) in the United States for installation in vehicles manufactured and sold in the United States, (b) in Japan for export to the United States and installation in vehicles manufactured and sold in the United States, and (c) in Japan for installation in vehicles manufactured in Japan for export to and sale in the United States.

128.   The DOJ alleges that Furukawa Electric Co., Ltd. and its co-conspirators: (a) had meetings and communications in the United States and Japan to discuss bids and price quotations to be submitted to automobile manufacturers in the United States, (b) agreed on bids and price quotations to be submitted to automobile manufacturers in the United States, (c) agreed to allocate the supply of automotive wire harnesses and related products sold in the United States on a model-by-model basis, (d) agreed to coordinate price adjustments requested by automobile manufacturers in the United States, (e) submitted bids, price quotations, and price adjustments to automobile manufacturers in the United States in accordance with the agreements reached, (f) sold Wire Harness Products to automobile manufacturers in the United States at collusive and noncompetitive prices, and (g) participated in meetings and communications to monitor the conspiracy and conceal their unlawful conduct, including but not limited to using code names and meeting at private residences or remote locations.

129.   On October 24, 2011, Hirotsugu Nagata pleaded guilty to a conspiracy to restrain trade in the market for Wire Harness Products in violation of the

Sherman Act before Judge George Steeh of the U.S. District Court for the Eastern District of Michigan.  Nagata was employed at Furukawa America in Plymouth, Michigan as General Manager of Sales from January 2004 to November 2007, Chief Financial Officer from January 2004 until March 2009, and Marketing Manager for a related joint venture from January 2004 until June 2009.  Nagata admitted in his guilty plea that during meetings and conversations with co-conspirators, "agreements were reached to allocate the supply of automotive wire harnesses and related products sold to automobile manufacturers on a model-by-model basis, rig bids quoted to automobile manufacturers for automotive wire harnesses and related products, and to fix, stabilize, and maintain the prices" for Wire Harness Products sold in the United States.

130.    On October 24, 2011, Junichi Funo pleaded guilty to a conspiracy to restrain trade in the market for Wire Harness Products in violation of the Sherman Act before Judge George Steeh of the U.S. District Court for the Eastern District of Michigan.  Funo worked at Furukawa Electric Co., Ltd. in Japan as a Honda Sales Division representative from April 2003 to August 2003, then as Assistant General Manager for Honda Sales at Furukawa America from August 2003 to March 2009, and also as Manager of the Honda Sales Division in Japan from March 2009 until at least July 2009.  Funo admitted in his guilty plea that during meetings and conversations with co-conspirators, "agreements were reached to allocate the supply of automotive wire harnesses and related products sold to automobile manufacturers on a model-by-model basis, rig bids quoted to automobile

manufacturers for automotive wire harnesses and related products, and to fix, stabilize, and maintain the prices" for Wire Harness Products sold in the United States.

131.    On November 10, 2011, Tetsuya Ukai pleaded guilty to a conspiracy to restrain trade in the market for Wire Harness Products in violation of the Sherman Act before Judge George Steeh of the U.S. District Court for the Eastern District of Michigan.  Ukai worked at Furukawa Electric Co., Ltd. in Japan as a Manager in the Honda Sales Division from April 2003 to July 2005, Unit Chief in the Honda Sales Division from July 2005 to April 2007, and then General Manager of the Honda Sales Division from April 2007 until at least July 2009.  Ukai admitted in his guilty plea that during meetings and conversations with co-conspirators, "agreements were reached to allocate the supply of automotive wire harnesses and related products sold to automobile manufacturers on a model-by-model basis, rig bids quoted to automobile manufacturers for automotive wire harnesses and related products, and to fix, stabilize, and maintain the prices" for Wire Harness Products sold in the United States.

132.    On November 14, 2011, Defendant Furukawa Electric Co., Ltd. pleaded guilty for its involvement in a criminal price-fixing and bid-rigging conspiracy in connection with the sale of Wire Harness Products.  Furukawa Electric Co., Ltd. admitted in its guilty plea that during the relevant period, "agreements were reached to allocate the supply of automotive wire harnesses and related products sold to automobile manufacturers on a model-by-model basis, rig

bids quoted to automobile manufacturers for automotive wire harnesses and related products, and to fix, stabilize, and maintain the prices" for Wire Harness Products sold in the United States.  Furukawa Electric Co., Ltd. agreed to pay a $200 million fine.

133.   On January 19, 2012, the JFTC issued cease and desist orders to Defendants Yazaki Corporation and Fujikura Ltd.  The JFTC also fined Yazaki Corporation, Sumitomo Electric Industries Ltd. and Fujikura Ltd.  The JFTC's cease and desist orders and fines against these Defendants were based on their involvement in a price-fixing and bid-rigging conspiracy in connection with the sale of Wire Harness Products in violation of Article 3 of the Japanese Antimonopoly Act.  According to a JFTC press release, Yazaki Corporation, Sumitomo Electric Industries Ltd., Fujikura Ltd., and Furukawa Electric Co., Ltd. "substantially restrained competition . . . [by] appointing the designated successful bidder and managing to have the designated successful bidder win the bidding."  The JFTC fined Yazaki Corporation approximately $125.8 million, Sumitomo Electric Industries Ltd. $27.5 million, and Fujikura Ltd. $14.4 million.  Furukawa Electric Co., Ltd. admitted to its participation in a price-fixing and bid-rigging conspiracy, but was not fined because it provided information to the JFTC that led to the investigation.

134.   On January 30, 2012, the DOJ announced that Defendant Yazaki Corporation had agreed to pay a $470 million fine and to plead guilty to a three-count criminal information charging Yazaki Corporation with, among other things,

participating in a combination and conspiracy with its co-conspirators to suppress and eliminate competition by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, Wire Harnesses Products sold to certain automobile manufacturers in the United States and elsewhere from at least as early as January 2000 and continuing until at least February 2010 in violation of Section 1 of the Sherman Act. On March 1, 2012, Defendant Yazaki Corporation pleaded guilty to this charge.

135.   In addition to Yazaki Corporation, four Yazaki executives, Tsuneaki Hanamura, Ryoji Kuwai, Shigeru Ogawa, and Hisamitsu Takada, agreed to plead guilty to antitrust violations arising from their participation in a conspiracy to suppress and eliminate competition by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of Wire Harness Products sold to certain automobile manufacturers in the United States and elsewhere. The four executives of Yazaki Corporation will serve prison time ranging from 15 months to two years. The two-year sentences would be the longest term of imprisonment imposed on a foreign national voluntarily submitting to U.S. jurisdiction for a Sherman Act violation.

136.   On January 30, 2012, the DOJ also announced that Defendant Denso Corporation agreed to plead guilty and pay a total of $78 million in criminal fines to a two-count criminal information charging Denso Corporation with, among other things, participating in a combination and conspiracy with its co-conspirators to suppress and eliminate competition by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of certain ECUs sold to an automobile manufacturer in the

United States and elsewhere from at least as early as January 2000 and continuing until at least February 2010 in violation of Section 1 of the Sherman Act. ECUs are Wire Harness Products as alleged in this Complaint and are "essential to the wiring, circuit boards, gauges and fuel tanks of automobiles." On March 5, 2012, Denso Corporation pleaded guilty to this charge.

137. On April 23, 2012, the DOJ announced that Defendant Fujikura Ltd. had agreed to plead guilty to a one-count criminal information charging it with participating in a combination and conspiracy with its co-conspirators to suppress and eliminate competition by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of Wire Harnesses Products sold to an automobile manufacturer in the United States and elsewhere from at least as early as January 2006 and continuing until at least February 2010 in violation of Section 1 of the Sherman Act. Fujikura Ltd. also agreed to pay a $20 million fine for its role in the conspiracy.

## FRAUDULENT CONCEALMENT

138. Defendants affirmatively and wrongfully concealed their anti-competitive conduct from Plaintiffs and the Class from at least January 1, 2000 through at least February 2010, when the antitrust investigations of the Wire Harness Products manufacturers became public. During that time, Plaintiffs and the Class did not learn or discover the operative facts giving rise to their claims, despite due diligence. Thus, Defendants' fraudulent concealment tolled the statute of limitations through at least February 2010.

139.    Defendants represented publicly, both to customers and otherwise, that their pricing and bidding activities were unilateral. In making those false representations, Defendants misled Plaintiffs and members of the Class as to the true, collusive, and coordinated nature of their bid-rigging, customer allocation, and price-fixing activities.

140.    Defendants' wrongful conduct was carried out in part through means and methods that were designed to avoid detection, and which, in fact, successfully precluded detection.

141.    In particular, Defendants participated in meetings, conversations, and communications to discuss the bids and price quotations to be submitted to customers in the United States and elsewhere.

142.    During these meetings, conversations, and communications, Defendants agreed upon bids and price quotations to be submitted to customers in the United States and elsewhere.

143.    Defendants likewise agreed to allocate the supply of Wire Harness Products sold to customers in the United States and elsewhere.

144.    Defendants also agreed to coordinate price adjustments requested by customers in the United States and elsewhere.

145.    In accordance with the agreements reached by Defendants, they submitted collusive bids, price quotations, and price adjustments to customers in the United States and elsewhere.

146.    As a result of such coordinated actions, and unbeknownst to Plaintiffs, Defendants sold Wire Harness Products to purchasers in the United States at collusive and noncompetitive prices.

147.    To keep the sale of Wire Harness Products at collusive and noncompetitive prices a secret, Defendants employed certain measures, including but not limited to, using code names and meeting at private residences or remote locations.

148.    Moreover, Defendants' successful contract, combination, or conspiracy was by its nature inherently self-concealing.

149.    Despite due diligence, Plaintiffs had no knowledge of Defendants' unlawful contract, combination, or conspiracy.

150.    In the course of purchasing Wire Harness Products, Plaintiffs studied prices of the specific products involved.

151.    Plaintiffs received from one or more Defendants various pricing information.  Plaintiffs had no way to know that Defendants' prices were higher than they should have been due to the conspiracy alleged herein.

152.    Plaintiffs did not and could not have discovered Defendants' unlawful contract, combination, or conspiracy at any earlier date, despite due diligence. Defendants undertook affirmative acts of concealment of their contract, combination, or conspiracy, including their attendance at secret meetings, making misrepresentations to Plaintiffs and the Class of the reasons for the prices charged,

and engaging in secret conversations concerning the allocation of customers, bid-rigging, and price-fixing of Wire Harness Products.

## ANTITRUST INJURY

153.   Defendants' conspiracy caused injury to Plaintiffs and members of the Class by suppressing price competition among Wire Harness Products manufacturers, thereby depriving purchasers of Wire Harness Products of the benefits of a competitive market and setting prices of Wire Harness Products at artificially high levels.

154.   As a direct result of Defendants' conspiracy, Plaintiffs and members of the Class have been injured in their business or property in that they paid more for Wire Harness Products than otherwise would have been the case in a competitive market.

## CLAIM FOR RELIEF

### (Sherman Act Section 1 – Horizontal Price-Fixing Against All Defendants)

155.   Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

156.   During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, combination or conspiracy in restraint of trade to artificially raise, fix, maintain, or stabilize prices for Wire Harness Products sold in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

157.   The contract, combination or conspiracy resulted in an agreement, understanding or concerted action between and among the Defendants and their co-

conspirators in furtherance of which the Defendants and their co-conspirators fixed, raised, maintained, or stabilized prices for Wire Harness Products sold in the United States.  Such contract, combination, or conspiracy constitutes a *per se* violation of the federal antitrust laws.

158.   Defendants succeeded in rigging bids, fixing, raising, maintaining and stabilizing the prices of Wire Harness Products sold in the United States during the Class Period.

159.   For purposes of formulating and effectuating their conspiracy, Defendants and their co-conspirators did those things they conspired to do, including:

<ol type="a" start="1">
<li>Participating in meetings and conversations in the United States and elsewhere to discuss the bids and price quotations of Wire Harness Products to be submitted to direct purchasers in the United States;</li>
<li>Agreeing on bids and price quotations to be submitted to direct purchasers in the United States;</li>
<li>Agreeing to manipulate prices and allocate supply of Wire Harness Products sold in the United States in a manner that deprived direct purchasers of free and open competition;</li>
<li>Agreeing to coordinate price adjustments in the United States;</li>
</ol>

    e.       Submitting bids, price quotations, and price adjustments to direct purchasers of Wire Harness Products in accordance with the agreements reached;

    f.       Selling Wire Harness Products to direct purchasers in the United States at noncompetitive prices; and

    g.       Employing measures to conceal the true nature of their unlawful conduct from Plaintiffs and other members of the Class in furtherance of the conspiracy.

160.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the other members of the Class have been injured in their businesses or property in that they have paid more for Wire Harness Products than they otherwise would have paid in a competitive market.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment on their behalf and on behalf of the Class herein, and respectfully request the following relief:

A.    That the Court determine that this action may proceed as a class action under Rule 23 of the Federal Rules of Civil Procedure, with Plaintiffs as the designated Class representatives and their counsel as Class Counsel;

B.    That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators as alleged in this complaint, be adjudicated and decreed a *per se* violation of Section 1 of the Sherman Act;

C.     That Plaintiffs and members of the Class recover damages sustained by them, as provided by the federal antitrust laws, and that a joint and several judgment in favor of Plaintiffs and the Class be entered against the Defendants in an amount to be trebled in accordance with 15 U.S.C. §15(a);

D.     That Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy or agreement alleged herein;

E.     That Plaintiffs and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law;

F.     That Plaintiffs and members of the Class be awarded pre-judgment and post-judgment interest; and

G.     That Plaintiffs and members of the Class receive such other or further relief as may be just and proper.

## JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury of all issues so triable.

Dated:  May 14, 2012

/s/ David H. Fink
David H. Fink (P28235)
Darryl Bressack (P67820)
FINK + ASSOCIATES LAW
100 West Long Lake Road, Ste. 111
Bloomfield Hills, MI 48304
(248) 971-2500
dfink@finkandassociateslaw.com
dbressack@finkandassociateslaw.com

Direct Purchaser Interim Liaison
Counsel

Gregory P. Hansel
Randall B. Weill
Joshua R. Carver
PRETI, FLAHERTY, BELIVEAU
   & PACHIOS LLP
One City Center, P.O. Box 9546
Portland, ME  04112-9546
Telephone:  (207) 791-3000
ghansel@preti.com
rweill@preti.com
jcarver@preti.com

Joseph C. Kohn
William E. Hoese
Douglas A. Abrahams
KOHN, SWIFT & GRAF, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA  19107
Telephone:  (215) 238-1700
jkohn@kohnswift.com
whoese@kohnswift.com
dabrahams@kohnswift.com

Michael J. Freed
Steven A. Kanner
William H. London
Michael L. Silverman
FREED KANNER LONDON
   & MILLEN LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL  60015
Telephone:  (224) 632-4500
mfreed@fklmlaw.com
skanner@fklmlaw.com
blondon@fklmlaw.com
msilverman@fklmlaw.com

Eugene A. Spector
William G. Caldes
Jonathan M. Jagher
Jeffrey L. Spector
SPECTOR ROSEMAN KODROFF
   & WILLIS, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone:  (215) 496-0300
espector@srkw-law.com
bcaldes@srkw-law.com
jjagher@srkw-law.com
jspector@srkw-law.com

Direct Purchaser Interim Lead Counsel

W. Joseph Bruckner
LOCKRIDGE GRINDAL
   NAUEN P.L.L.P.
100 Washington Avenue South
Minneapolis, MN 55401
Telephone: (612) 339-6900
wjbruckner@locklaw.com

Robert Bonsignore
Richard Kirchner
Brian Hagen
Paula Flannery
Lisa Sleboda
BONSIGNORE & BREWER
193 Plummer Hill Road
Belmont, NH 03220
Telephone: (781) 856-7650
rbonsignore@class-actions.us
rkirchner@class-actions.us
bhagen@class-actions.us
pflannery@class-actions.us
lsleboda@class-actions.us

Brian Murray
Lee Albert
MURRAY FRANK LLP
275 Madison Avenue, Suite 801
New York, NY 10016
Telephone: (212) 682-1818
bmurray@murrayfrank.com
lalbert@murrayfrank.com

Garret Blanchfield
REINHARDT, WENDORF
   & BLANCHFIELD
E-1250 First National Bank Bldg.
332 Minnesota St.
St. Paul, MN 55101
Telephone: (651) 287-2100
g.blanchfield@rwblawfirm.com

Solomon B. Cera
GOLD BENNETT CERA
  & SIDENER LLP
595 Market Street, Suite 2300
San Francisco, CA 94105
Telephone: (415) 777-2230
scera@gbcslaw.com

James F.B. Daniels
MCDOWELL, RICE, SMITH
  & BUCHANAN, P.C.
605 West 47th Street, Suite 350
Kansas City, MO 64112-1005
Telephone: (816) 753-5400
jdaniels@mcdowellrice.com

Manuel John Dominguez
COHEN MILSTEIN SELLERS & TOLL
  PLLC
3507 Kyoto Gardens Drive
Suite 200
Palm Beach Gardens, FL 33410
Telephone: (561) 578-6850
jdominguez@cohenmilstein.com

Vincent J. Esades
HEINS MILLS & OLSON, P.L.C.
310 Clifton Avenue
Minneapolis, MN 55403
Telephone: (612) 338-4605
vesades@heinsmills.com

Karlos F. Finley
BOTELER, FINLEY & WOLFE, P.C.
1252 Dauphin Street
Mobile, AL 36604
Telephone: (251)433-7766
karlos@bfw-lawyers.com

Joseph M. Fischer
CARSON FISCHER, P.L.C.
4111 Andover Road West - Second Floor
Bloomfield Hills, MI 48302-1924
Telephone: (248) 644-4840
jfischer@carsonfischer.com

Bruce E. Gerstein
GARWIN GERSTEIN & FISHER LLP
1501 Broadway, Suite 1416
New York, NY 10036
Telephone: (212) 398-0055
bgerstein@garwingerstein.com

Lewis Goldfarb
MCELROY, DEUTSCH, MULVANEY
 & CARPENTER, LLP
1300 Mount Kemble Avenue
P.O. Box 2075
Morristown, NJ 07962-2075
Telephone: (973) 425-8689
lgoldfarb@mdmc-law.com

Jeffrey S. Goldenberg
GOLDENBERG SCHNEIDER, LPA
35 East Seventh Street, Suite 600
Cincinnati, OH 45202
Telephone: (513) 345-8291
jgoldenberg@gs-legal.com

Steve Greenfogel
LITE DEPALMA GREENBERG, LLC
1521 Locust Street
Philadelphia, PA 19102
Telephone: (215) 564-5182
sgreenfogel@litedepalma.com

Steven D. Irwin
LEECH TISHMAN FUSCALDO
 & LAMPL, LLC
525 William Penn Place, 30th Floor
Pittsburgh, PA 15219
Telephone: (412) 261-1600
sirwin@leechtishman.com

Irwin B. Levin
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Telephone: (317) 636-6481
ilevin@cohenandmalad.com

Daniel J. Mogin
THE MOGIN LAW FIRM, P.C.
707 Broadway, Suite 1000
San Diego, CA 92101
Telephone: (619) 687-6611
dmogin@moginlaw.com

D. Michael Noonan
SHAHEEN & GORDON, P.A.
P.O. Box 977
140 Washington Street, 2nd floor
Dover, NH 03821
Telephone: (603) 749-5000
mnoonan@shaheengordon.com

Linda P. Nussbaum
Robert G. Eisler
GRANT & EISENHOFER P.A.
485 Lexington Avenue, 29th Floor
New York, NY 10017
Telephone: (646) 722-8500
lnussbaum@gelaw.com

Dustin M. Roach
VAN GILDER & TRZYNKA, P.C.
436 E. Wayne Street
Fort Wayne, IN 46802
Telephone: (260) 424-8132
droach@vgtlaw.com


Wesley Steury
BURT BLEE DIXON SUTTON &
BLOOM, LLP
200 East Main Street, Suite 1000
1st Source Banking Center
Fort Wayne, IN 46802
Telephone: (260) 426-1300
Wsteury@burtblee.com


Stephen M. Smith
JOSEPH SMITH, LTD.
2100 Kecoughtan Road
Hampton, VA 23661
Telephone: (757) 244-7000 Ext. 123
ssmith@braininjurylawcenter.com


Robert Peurach
DAKMAK PEURACH, P.C.
615 Griswold Street, Suite 600
Detroit, MI 48226
Telephone: (866) 732-9522
rpeurach@gdakmak.com


R. Alexander Saveri
Cadio Zirpoli
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, CA 94111
Telephone: (415) 217-6810
rick@saveri.com
cadio@saveri.com


Michael T. Smith
LAW OFFICES OF
MICHAEL T. SMITH
440 West Irving Park Road
Roselle, IL 60172
Telephone: (847) 380-5899
lawoffice0724@sbcglobal.net


Jason J. Thompson
Lance A. Young
SOMMERS SCHWARTZ PC
2000 Town Center, Suite 900
Southfield, MI 48075
Telephone: (248) 355-0300
jthompson@sommerspc.com
lyoung@sommerspc.com

**EXHIBIT D**



PAGE  1

*The First State*

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF AMENDMENT OF "DELPHI FURUKAWA WIRING SYSTEMS LLC", CHANGING ITS NAME FROM "DELPHI FURUKAWA WIRING SYSTEMS LLC" TO "DPH FURUKAWA WIRING SYSTEMS LLC", FILED IN THIS OFFICE ON THE SIXTH DAY OF OCTOBER, A.D. 2009, AT 12:48 O'CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE EFFECTIVE DATE OF THE AFORESAID CERTIFICATE OF AMENDMENT IS THE SIXTH DAY OF OCTOBER, A.D. 2009, AT 11:59 O'CLOCK P.M.

3892165  8100

090904323

You may verify this certificate online
at corp.delaware.gov/authver.shtml

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 7568041

DATE: 10-06-09

10/06/2009    12:40    SKARDEL LLC → 913027393673                                      NO.871    P02

State of Delaware
Secretary of State
Division of Corporations
Delivered 12:48 PM 10/06/2009
FILED 12:48 PM 10/06/2009
SRV 090904323 - 3892165 FILE

## CERTIFICATE OF AMENDMENT

### TO

## CERTIFICATE OF FORMATION

### OF

## DELPHI FURUKAWA WIRING SYSTEMS LLC

Pursuant to Section 18-202 of the
Delaware Limited Liability Company Act

1.  The name of the limited liability company is Delphi Furukawa Wiring Systems LLC (the "Company").

2.  The Certificate of Formation of the Company is hereby amended to change the name of the Company to DPH Furukawa Wiring Systems LLC.

3.  Accordingly, Article 1. of the Certificate of Formation shall, as amended, read as follows:

"1.  The name of the limited liability company is DPH Furukawa Wiring Systems LLC."

4.  This Certificate of Amendment shall become effective at 11:59 PM on October 6, 2009.

IN WITNESS WHEREOF, the undersigned authorized person has executed this Certificate of Amendment this 6 day of October, 2009.

Delphi Furukawa Wiring Systems LLC

By: _____
Name: David Sherbin
Title: Authorized Person

**EXHIBIT E**



## Delaware

PAGE   1

### The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT
COPY OF THE CERTIFICATE OF CANCELLATION OF "DPH FURUKAWA WIRING
SYSTEMS LLC", FILED IN THIS OFFICE ON THE TWENTY-FOURTH DAY OF
JANUARY, A.D. 2011, AT 11:23 O'CLOCK A.M.

3892165   8100

110070606

You may verify this certificate online
at corp.delaware.gov/authver.shtml

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 8513092

DATE: 01-24-11

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 11:48 AM 01/24/2011*
*FILED 11:23 AM 01/24/2011*
*SRV 110070606 - 3892165 FILE*

# STATE OF DELAWARE
## CERTIFICATE OF CANCELLATION

1.     The name of the limited liability company is DPH Furukawa Wiring Systems LLC.

2.     The Certificate of Formation of the limited liability company was filed on December 7, 2004.


IN WITNESS WHEREOF, the undersigned has executed this Certificate of Cancellation this 10th day of January, A.D. 2011.

John C. Brooks II, President

# STATE OF DELAWARE
# CERTIFICATE OF CANCELLATION

1.    The name of the limited liability company is DPH Furukawa Wiring Systems LLC.

2.    The Certificate of Formation of the limited liability company was filed on December 7, 2004.

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Cancellation this 10th day of January, A.D. 2011.



_____
John C. Brooks II, President



**EXHIBIT F**

IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                            :
        In re                               :    Chapter 11
                                            :
DELPHI CORPORATION, et al.,                 :    Case No. 05-44481 (RDD)
                                            :
                          Debtors.          :    (Jointly Administered)
                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
```

<u>AFFIDAVIT OF SERVICE</u>

I, Evan Gershbein, being duly sworn according to law, depose and say that I am employed by Kurtzman Carson Consultants, LLC, the Court appointed claims and noticing agent for the Debtors in the above-captioned cases.

On or before April 20, 2006, I caused to be served the documents listed below upon the parties listed on <u>Exhibit A</u> hereto via postage pre-paid U.S. mail:

1) Notice of Bar Date for Filing Proofs of Claim [a copy of which is attached hereto as Exhibit B]

2) Proof of Claim form [a copy of which is attached hereto as Exhibit C]

Dated: April 28, 2006

<span style="float:right">　　<i>/s/ Evan Gershbein</i>　　　　　</span>

Evan Gershbein

Subscribed and sworn to (or affirmed) before me on this 28th day of April, 2006, by Evan Gershbein, personally known to me or proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature : 　<i>/s/ Amy Lee Huh</i>　　　　　

Commission Expires: 　<i>3/15/09</i>

# EXHIBIT A

**Delphi Service List**

| CreditorName | CreditorNoticeName | Address1 | Address2 | Address3 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|---|
| Crabtree Ernest | | 6740 St Rt 122 So | | | Eaton | OH | 45320 | |
| Crabtree Ernest | | 6740 St Rt 122 South | | | Eaton | ON | 45320 | |
| Crabtree Heather | | 399 Rutledge Ct | | | Perrysburg | OH | 43551 | |
| Crabtree Heather | | 399 Ruttedge Ct | | | Perrysburg | OH | 43551 | |
| Crabtree J | | 58 Homestall Rd | Norris Green | | Liverpool 11 | | L11 2TX | United Kingdom |
| Crabtree Jay | | 302 Aberdeen Ave | | | Oakwood | OH | 45419 | |
| Crace & Associates | | Dale Carnegie Training | 325 118th Ave Se 104 | | Bellevue | WA | 98005-3536 | |
| Crace and Associates Dale Carnegie Training | | 325 118th Ave Se 104 | | | Bellevue | WA | 98005-3536 | |
| Cracraft Larry F | | 510 Rudgate Ln | | | Kokomo | IN | 46901-3816 | |
| Cracraft Larry F | | 510 Rudgate Ln | | | Kokomo | IN | 46901-3816 | |
| Craddock Brent E | | 3275 Towhee St | | | Inglewood | FL | 34224-9030 | |
| Craddock Daniel | | 7159 Akron Rd | | | Lockport | NY | 14094 | |
| Cradit Gregory | | 7051 Trinkline | | | Saginaw | MI | 48609 | |
| Cradlebaugh Matthew | | 16356 Oak Hill Dr | | | Fenton | MI | 48430 | |
| Cradlebaugh Terry L | | 11385 Oregon Cir | | | Fenton | MI | 48430-2432 | |
| Craft Ben | | 2233 Drummond Dr | | | Xenia | OH | 45385 | |
| Craft Carl G | | 615 Holl Rd Ne | | | North Canton | OH | 44720-1773 | |
| Craft Caryn | | 707 Frazer | | | Owosso | MI | 48867 | |
| Craft Chris | | 5332 Rootstown Rd | | | Ravenna | OH | 44266 | |
| Craft Co Enterprises Inc | | 3269 Hwy 80 W | | | Morton | MS | 39117 | |
| Craft Co Enterprises Inc | | Hwy 80 West PO Box 289 | Rmt Chg 9 03 Mh | | Morton | MS | 39117 | |
| Craft Co Enterprises Inc | | Hwy 80 West PO Box 289 | Rmt Chg 903 Mh | | Morton | MS | 39117 | |
| Craft Co Enterprises Inc | | PO Box 67000 Dept 259101 | | | Detroit | MI | 48267-2591 | |
| Craft Dion | | 5220 Brookmill Ct | | | Dayton | OH | 45414 | |
| Craft Farms Gulf Shores | | 3750 Gulf Shores Pkwy | | | Gulf Shores | AL | 36542 | |
| Craft James | | PO Box 1091 | | | Raleigh | MS | 39153 | |
| Craft Karen | | 1505 Roslyn Rd | | | Grosse Pointe Woods | MI | 48236 | |

**Delphi Service List**

| CreditorName | CreditorNoticeName | Address1 | Address2 | Address3 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|---|
| Findlay Ann | | 1348 N Block Rd | | | Reese | MI | 48757-9310 | |
| Findlay David | | 1348 N Block Rd | | | Reese | MI | 48757 | |
| Findlay Industries | | 4000 Fostoria Ave | | | Findlay | OH | 45840 | |
| Findlay Industries | Accounts Payable | 18036 Eads Ave | | | Chesterfield | MO | 63017 | |
| Findlay Industries | Accounts Payable | 4000 Fostoria Rd | | | Findlay | OH | 45840 | |
| Findlay Industries De Mexico | | Parque Industrial Finsa Nave 22a | Autopista Mexico Puebla Km 117 | | Cuatlancingo Pue | | 72710 | Mexico |
| Findlay Industries Inc | | 1957 Crooks Rd | | | Troy | MI | 48084 | |
| Findlay Industries Inc | | 217 South Alex | | | West Carrollton | OH | 45449 | |
| Findlay Industries Inc | | 5500 Fostoria Rd | | | Findlay | OH | 45840 | |
| Findlay Industries Inc | | Molded Products Div | 2100 C Fostoria Ave | | Findlay | OH | 45840 | |
| Findlay Industries Inc | | Plant 1 | 4000 Fostoria Rd | | Findlay | OH | 45840-8733 | |
| Findlay Industries Inc | | PO Box 711987 | | | Cincinnati | OH | 45271-1987 | |
| Findlay Industries Inc | | Service Products Div | 5500 Fostoria Rd | | Findlay | OH | 45840 | |
| Findlay Industries Inc | Accounts Payable | 217 South Alex Rd | | | West Carrollton | OH | 45449 | |
| Findlay Industries Inc | attn Joe Holliger | 4000 Fostoria Rd | | | Findlay | OH | 45840 | |
| Findlay Industries Inc Eft | | 4000 Fostoria Rd | | | Findlay | OH | 45840 | |
| Findlay Industries Inc Eft | | PO Box 711987 | | | Cincinnati | OH | 45271-1987 | |
| Findlay Industries Inc Lake Wales | | 1230 North Scenic Hwy | | | Lake Wales | FL | 33853 | |
| Findlay Judith E | | 7190 N Us 1 202 | | | Cocoa | FL | 32927-5062 | |
| Findlay Machine & Tool Inc | | Addr 1 99 | 1950 Industrial Rd | | Findlay | OH | 45839 | |
| Findlay Machine and Tool Inc | | PO Box 1562 | | | Findlay | OH | 45839 | |
| Findlay Machine Tool Inc | | Fmt | 1950 Industrial Dr | | Findlay | OH | 45840 | |
| Findlay Municipal Court | | PO Box 826 | | | Findlay | OH | 45839 | |
| Findlay Truck Line | | 420 Trenton Ave | | | Findlay | OH | 45840-3796 | |
| Findley Hilda L | | 1303 Post Rd | | | Clinton | MS | 39056-4047 | |
| Findley Janice | | 2258 Fairway Pines Ct 4 | | | Bay City | MI | 48706 | |
| Findley Robyn | | 249 Shank Ave | | | Trotwood | OH | 45426 | |
| Findley Thomann Phyllis | | 1272 Hurd Rd | | | Clio | MI | 48420 | |
| Findlow Filtration Inc | Alex Findlow | 149 Commerce Blvd. | | | Loveland | OH | 45140 | |

| CreditorName | CreditorNoticeName | Address1 | Address2 | Address3 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|---|
| Martinez Luis | | 569 Plymouth Ave | | | Buffalo | NY | 14213 | |
| Martinez Luis | | 911 S 4th St | | | Milwaukee | WI | 53204-1726 | |
| Martinez Luis | | PO Box 417 | | | Olcott | NY | 14126 | |
| Martinez Manuel | | 16114 Silverwood Dr | | | Fenton | MI | 48430 | |
| Martinez Manufacturing Inc | | 1175 Alexander Ct | | | Gary | IL | 60013 | |
| Martinez Marcos | | 4795 S Washington Rd | | | Saginaw | MI | 48601-7205 | |
| Martinez Marcos | | 4795 S Washington Rd | | | Saginaw | MI | 48601-7205 | |
| Martinez Marcos | | 4795 S Washington Rd | | | Saginaw | MI | 48601-7205 | |
| Martinez Marcos | | 4795 S Washington Rd | | | Saginaw | MI | 48601-7205 | |
| Martinez Maria | | 100 Hoffman Blvd Apt1c | | | New Brunswick | NJ | 08901 | |
| Martinez Maria | | 1003 S Winter | | | Adrian | MI | 49221 | |
| Martinez Maria | | 823 South Alta Ln | | | Olathe | KS | 66061 | |
| Martinez Mario | | 212 39th St | | | Bay City | MI | 48708 | |
| Martinez Mary | | 20221 Winfred Dr | | | Tanner | AL | 35671-3534 | |
| Martinez Micheal | | 323 S Frost | | | Saginaw | MI | 48603 | |
| Martinez Misty | | 4716 Orangeburg Dr | | | Columbus | OH | 43228 | |
| Martinez Misty | | 4716 Orangeburg Dr | | | Columbus | OH | 43228 | |
| Martinez Nicholas | | 1512 Sw 22nd | | | Blue Springs | MO | 64015 | |
| Martinez Nicolas | | 4733 Karel Jean Ct Sw | | | Wyoming | MI | 49509-4529 | |
| Martinez Noemi | | 93 Burnet St | | | New Brunswick | NJ | 08901 | |
| Martinez Ochoa Rosa Maria | | Inspection De Partes Industria | Av Hidalgo 842 6 Centro | | Torreon | | 27000 | Mexico |
| Martinez Ochoa Rosa Maria Eft | | Av Hidalgo 873 Ote | Torreon Coahuila | | | | | Mexico |
| Martinez Oralia C | | 812 S Plate St | | | Kokomo | IN | 46901-5676 | |
| Martinez Ricardo | | 920 Nhelena St | | | Anaheim | CA | 92805 | |
| Martinez Richard | | 4730 Colonial Dr Apt 3 | | | Saginaw | MI | 48603 | |
| Martinez Ricky | | 1513 Emily St | | | Saginaw | MI | 48601-3037 | |
| Martinez Rivera Juan | | Marques De Las Cruces No 122 | Col Lomas Del Marques | | Queretaro | | 76146 | Mexico |
| Martinez Rivera Juan Eft | | Marques De Las Cruces 122 Col | Lomas Del Marques Queretaro | | Cp 76146 Mexico | | | Mexico |

| CreditorName | CreditorNoticeName | Address1 | Address2 | Address3 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|---|
| Metzler Judy A | | 40 So Grand Ave203 | | | Ft Lupton | CO | 80527 | |
| Metzler Melvin F | | 312 Claranna Ave | | | Dayton | OH | 45419-1738 | |
| Metzler Ronald H | | 958 Ottawa Dr | | | Youngstown | OH | 44511-1419 | |
| Meunier Elect Supplykok | Amy Corlette | 3409 E. Washington St | | | Indianapolis | IN | 46201 | |
| Meunier Elect Supplykok | Tina Denham | 3409 E. Washington St | | | Indianapolis | IN | 46201 | |
| Meunier Electronic Supply | | 3409 E Washington | | | Indianapolis | IN | 46201 | |
| Meunier Electronic Supply Eft | | Inc | 3409 E Washington St | | Indianapolis | IN | 46201 | |
| Meunier Electronic Supply Inc | | 3409 E Washington St | | | Indianapolis | IN | 46201 | |
| Meunier Electronics Suppl | | 3409 E Washington St | | | Indianapolis | IN | 46201-4313 | |
| Meunier Electronics Suppl | Amy | 3409 E. Washington St | | | Indianapolis | IN | 46201 | |
| Meunier Electronics Suppl | Amy Corlette | 3409 E Washington St | | | Indianapolis | IN | 46201 | |
| Meunier Electronics Supply | | 3409 E Washington St | | | Indianapolis | IN | 46201-431 | |
| Meunier Electronics Supply | Amy Corlette | 3409 E Washington St | | | Indianapolis | IN | 46201 | |
| Meunier Electronics Supply | Jeff Davis | 3409 E Washington St | | | Indianapolis | IN | 46201 | |
| Meunier Electronics Supply Inc | | 8245 Taunton Rd | | | Indianapolis | IN | 46260 | |
| Mevis Elaine | | 9260 S Nicholson Rd | | | Oak Creek | WI | 53154-4652 | |
| Mevis Spa | | Via Borgo Tocchi 28 32 | | | Rosa | | 36027 | Italy |
| Mevis Spa | | Via Borgo Tocchi 28 32 | 36027 Rosa It | | | | | Italy |
| Mexcoat Sa De Cv | | Ote 3 Mz 7 Lots 10 | Co Industrial Tizayoco Hgo | | | | | Mexico |
| Mexcoat Sa De Cv | | Ote 3 Mz 7 Lots 10 | Co Industrial Tizayoco Hgo | | | | | Mexico |
| Mexcoat Sa De Cv Eft | | Ote 3 Mz 7 Lots 10 | Co Industrial Tizayoco Hgo | | | | | Mexico |
| Mexican American Products Ltd | | 40 Silverdome Industrial Pk | | | Pontiac | MI | 48342 | |
| Mexican American Products Ltd | | Map Ltd | 40 Silverdome Industrial Pk | | Pontiac | MI | 48342 | |
| Mexican American Products Ltd Map Ltd | | 40 Silverdome Industrial Pk | | | Pontiac | MI | 48342 | |
| Mexican Industries In Mich Eft Inc | | 1801 Howard St | | | Detroit | MI | 48216 | |
| Mexican Industries In Mich Inc | | Dexter Corporation | 1801 Howard St | Inactivate Per Legal 8 26 03 | Detroit | MI | 48216 | |

*Delphi Service List*

| CreditorName | CreditorNoticeName | Address1 | Address2 | Address3 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|---|
| Mexican Industries In Michigan | | 1801 Howard St | | | Detroit | MI | 48216 | |
| Mexican Industries In Michigan | | 5200 Stecker | | | Dearborn | MI | 48126 | |
| Mexican Industries In Michigan | | C o Coyne & Associates | 17320 W 12 Mile Rd Ste 100 | | Southfield | MI | 48076 | |
| Mexican Industries In Michigan | | C o Freehan Bocci & Co | 909 Haynes St | | Birmingham | MI | 48009 | |
| Mey James A | | 13664 Baumgartner Rd | | | St Charles | MI | 48655-8631 | |
| Mey Miura | | 790 Rodney Dr | | | San Leandro | CA | 94577-3827 | |
| Mey Randall | | 11911 Baumgartner Rd | | | Saint Charles | MI | 48655-9675 | |
| Meyaldyne Corp | | 47603 Halyard Dr | | | Plymouth | MI | 48170 | |
| Meyco Machine & Tool Inc | | 11579 Martens River Circle | | | Fountain Valley | CA | 92708 | |
| Meyer & Njus | | 111 N State St 11th Flr Ste 93 | | | Chicago | IL | 60602 | |
| Meyer & Njus | | 17340 W 12 Mile Rd Ste 200 | | | Southfield | MI | 48076 | |
| Meyer & Njus | | Act Of G Gaines Gc 96 0617 | 29532 Southfield Ste 200 | | Southfield | MI | 37152-4035 | |
| Meyer A Zieldorff | | 627 North Thomas Rd | | | Bad Axe | MI | 48413-9784 | |
| Meyer Amanda | | 14574 Grass Lake Rd | | | Grass Lake | MI | 49240 | |
| Meyer and Njus | | 17340 W 12 Mile Rd Ste 200 | | | Southfield | MI | 48076 | |
| Meyer and Njus | | 17340 W 12 Mile Rd Ste. 200 | | | Southfield | MI | 48076 | |
| Meyer and Njus Act Of G Gaines Gc 96 0617 | | 29532 Southfield Ste 200 | | | Southfield | MI | 48076 | |
| Meyer Billy | | 3539 Cozy Camp Rd | | | Moraine | OH | 45439 | |
| Meyer Bradley | | 4122 Willow Run Dr | | | Beavercreek | OH | 45430 | |
| Meyer Brent | | 3163 Foss Dr | | | Saginaw | MI | 48603 | |
| Meyer Building Site Trust | | C O Johnson & Bell Nl Obsalvo | 222 N Lasalle Ste 2200 | | Chicago | IL | 60601-1104 | |
| Meyer Building Site Trust C O Johnson and Bell Nl Obsalvo | | 222 N Lasalle Ste 2200 | | | Chicago | IL | 60601-1104 | |
| Meyer C Rosen | | 23 Penn Ave | | | Newton | NJ | 07860-9774 | |
| Meyer Christopher | | 6240 Gentry Woods Dr | | | Centerville | OH | 45459 | |
| Meyer Conrad | | 13516 Iroquois Woods Dr | | | Fenton | MI | 48430 | |
| Meyer Cooperberg and Helen | | Cooperberg Jt Ten | 16 34 Seagirt Blvd | | Far Rockaway | NY | 11691-4511 | |

**Delphi Service List**

| CreditorName | CreditorNoticeName | Address1 | Address2 | Address3 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|---|
| P & A Conveyor Sales Inc | | PO Box 2145 | | | Riverview | MI | 48192 | |
| P & A Industries Inc | | PO Box 631005 | | | Cincinnati | OH | 45263-1005 | |
| P & A Industries Inc Eft | | PO Box 631005 | | | Cincinnati | OH | 45263-1005 | |
| P & B Transportation Inc | | 601 Marco Rd | | | Apollo | PA | 15613-8854 | |
| P & B Trucking Inc | | 1038 N 2nd St | | | Decatur | IN | 46733 | |
| P & E Microcomputer Systems | | Inc | PO Box 2044 | | Woburn | MA | 018882044 | |
| P & E Microcomputer Systems | | Inc | PO Box 2044 | | Woburn | MA | 01888-2044 | |
| P & H Auto Electric | | PO Box 25889 | | | Baltimore | MD | 21224-0589 | |
| P & H Auto Electric Bdc | | 7990 92 E Baltimore St | | | Baltimore | MD | 21224-2010 | |
| P & J Delivery Service Inc | | PO Box 2975 | | | Grand Rapids | MI | 49501 | |
| P & J Indiustries Inc | | 6841 Commerce St | | | El Paso | TX | 79901 | |
| P & J Industries Inc | | 4934 Lewis Ave | | | Toledo | OH | 43612 | |
| P & J Industries Inc | | 4934 Lewis Ave | Remit Uptd 03 2000 | | Toledo | OH | 43612 | |
| P & J Industries Inc | | 4934 Lewis Ave | | | Toledo | OH | 43612 | |
| P & J Manufacturing Co | | 1644 Campbell St | | | Toledo | OH | 43607 | |
| P & J Manufacturing Inc | | 1644 Campbell St | | | Toledo | OH | 43607-4381 | |
| P & M Process Equipment Inc | | 2005 W Detroit | | | Broken Arrow | OK | 74012-3616 | |
| P & M Products Eft | | Div Of Findlay Industries | 155b Malow | | Mt Clemens | MI | 48043 | |
| P & M Trucking Inc | | Payload Account | 3181 Krafft Rd | PO Box 910360 | Fort Gratiot | MI | 48059 | |
| P & O Nedlloyd | | 12th Fl One Meadowlands | Plaza | | East Rutherford | NJ | 07073 | |
| P & O Nedlloyd | | 12th Fl One Meadowlands | Plaza | | East Rutherford | NJ | 07073 | |
| P & O Nedlloyd | | Scwscacpocl | 1 Meadowlands Plaza | | E Rutherford | NJ | 07073 | |
| P & P Transport | | PO Box 1710 | | | Delran | NJ | 08075 | |
| P & R Communications Service | | 731 E 1st St | | | Dayton | OH | 45402 | |
| P & R Communications Service | | Inc | 731 E 1st St | Rmt Chng 08 25 05 Cs | Dayton | OH | 45402 | |
| P & R Communications Service | | Inc | 731 E 1st St | Rmt Chng 082505 Cs | Dayton | OH | 45402 | |
| P & R Communications Service I | | 700 E 1st St | | | Dayton | OH | 45402-1383 | |

**Delphi Service List**

| CreditorName | CreditorNoticeName | Address1 | Address2 | Address3 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|---|
| P and M Products Eft Div Of Findlay Industries | | PO Box 931544 | | | Cleveland | OH | 44193-5016 | |
| P and P Transport | | PO Box 1710 | | | Delran | NJ | 08075 | |
| P and R Communications | John Vlahos | 731 E. First St | | | Dayton | OH | 45401 | |
| P and R Communications Serv | John jill | 700 E. First St | PO Box 1444 | | Dayton | OH | 45401 | |
| P and R Fasteners Inc | | 325 Pierce St | | | Somerset | NJ | 08873 | |
| P B & S Chemical Company Inc | | 755 Browns Lock Rd | | | Bowling Green | KY | 42101 | |
| P B Guglielmi | | 1283 Colvin Blvd | | | Buffalo | NY | 14223-1401 | |
| P Bailey Williams | | Box 108 | | | Laurens | SC | 29360-0108 | |
| P Barnett Construction Co Ltd | | Lock Box D 860542 | | | Orlando | FL | 32886-0542 | |
| P Barnett Construction Co Ltd | | Ph00515101 Tbuick001 Lbu1001 | D 860542 | | Orlando | FL | 32886-0542 | |
| P Bradford Cheney Cust | Philip Brooke Cheney | Unif Gift Min Act Ct | Box 147 | 294 Senexet Rd | E Woodstock | CT | 06244-0147 | |
| P Burke Welldon and Marjorie V | | Welldon Jt Ten Wright Of | Survship and Not Ten Com | Harbor Lights Cr 344 | Islesboro | ME | 04848 | |
| P C Henderson | | 1222 Vernon Dr | | | Dayton | OH | 45407-1714 | |
| P C Quote Inc | | 300 S Wacker Dr Ste 300 | | | Chicago | IL | 60606 | |
| P C S Company | | 34488 Doreka | | | Fraser | MI | 48026-3438 | |
| P Cavils Tire & Auto Cntr | | 1200 W 14 Mile Rd | | | Clawson | MI | 48017 | |
| P Colin Janke | | 735 Quantico Ln | | | Plymouth | MN | 55447-3774 | |
| P Cookie Farrell | | 2742 Trett Springs | | | Marietta | GA | 30062 | |
| P D A Inc | | 8080 Southpark Ln | | | Littleton | CO | 80120-5640 | |
| P D George Co | | Off Eft Per Vendor 11 10 98 | PO Box 66756 | | St Louis | MO | 63166 | |
| P D George Co | | PO Box 503703 | | | St Louis | MO | 63150-3703 | |
| P D Kloess | | 1740 Wooded Oak Trl | | | East Carondelet | IL | 62240-1546 | |
| P D Nellis | | 129 133w 147 St Apt 11d | | | New York | NY | 10039 | |
| P D Q Transport Inc | | PO Box 246 | | | Cheyenne | WY | 82003 | |
| P D Todd | | 549 W College Ave | | | Stanton | KY | 40380-2229 | |
| P Dan Okray | | 2010 N Elizabeth | | | Dearborn | MI | 48128-1372 | |
| P Dean Corbae Cust Bethany | | Lia Corbae Under The Ia | Unif Transfers To Minors Act | 2061 Beechwood Blvd | Pittsburg | PA | 15217-1705 | |

| CreditorName | CreditorNoticeName | Address1 | Address2 | Address3 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|---|
| South East Tool Co Inc | | 901 Springfield St | | | Dayton | OH | 45403-134 | |
| South East Tool Company Inc | | 901 Springfield St | | | Dayton | OH | 45403 | |
| South Easton Cemetery Corp | | Co Cheryl Macuch | 69 Depot St | | South Easton | MA | 02375-1162 | |
| South Euclid Municipal Court | | 1349 South Green Rd | | | South Euclid | OH | 44121 | |
| South Franklin Twp E I T C | | 100 Municipal Rd | | | Washington | PA | 15301 | |
| South Georgia Catering | | & Barbecue | PO Box 71383 | | Albany | GA | 31708 | |
| South Georgia Catering & Barbe | | Gus Port A Pit Barbecue | 2347 Dawson Rd | | Albany | GA | 31707 | |
| South Georgia Catering and Barbecue | | PO Box 71383 | | | Albany | GA | 31708 | |
| South Georgia Media Group | | PO Box 968 | | | Valdasta | GA | 31603 | |
| South Georgia Medical | | Oncology Associates Pc | PO Box 7570 | | Tifton | GA | 31793-7570 | |
| South Georgia Medical Oncology Associates Pc | | PO Box 7570 | | | Tifton | GA | 31793-7570 | |
| South Harold | | 6047 Glen Trace Ln | | | West Chester | OH | 45069 | |
| South Haven Coil Inc | Accounts Payable | PO Box 409 | | | South Haven | MI | 49090 | |
| South Haven Coil Incorporated | | PO Box 409 | | | South Haven | MI | 49090-0409 | |
| South India Watch Industries | | Pvt Ltd | 655 1st Fl 11th Main Hal 2nd | Stage Indiranagar 560 008 | Bangalore | | | India |
| South India Watch Industries Pvt Ltd | | 655 1st Fl 11th Main Hal 2nd | Stage Indiranagar 560 008 | | Bangalore India | | | India |
| South James | | 3385 Pembrook Circle | | | Davison | MI | 48423 | |
| South Jessica | | 535 Adams St Apt 1 | | | Dayton | OH | 45410 | |
| South John D | | 892 Apt G Revere Village Ct | | | Centerville | OH | 45458 | |
| South Pak Inc | | PO Box 28090 | | | Birmingham | AL | 35228 | |
| South Pak Inc | J D Tidwell Xt224 | 660 Bessemer Super Hwy | | | Midfield | AL | 35228 | |
| South Pak Inc | Jd Tidwell | 660 Bessemer Super Hwy | | | Midfield | AL | 35228-0000 | |
| South Plainfield Adult School | | 305 Cromwell Pl | | | South Plainfield | NJ | 07080 | |
| South Shore Electric | | 589 Ternes St | | | Elyria | OH | 44035 | |
| South Shore Electric | | PO Box 321 | | | Elyria | OH | 44036 | |
| South Shore Electric Inc | | 589 Ternes St | | | Elyria | OH | 44035 | |
| South Star Corporation | | PO Box 264 | | | Salem | VA | 24153 | |

*Delphi Service List*

| CreditorName | CreditorNoticeName | Address1 | Address2 | Address3 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|---|
| South Star Corporation | Accounts Payable | PO Box 264 | | | Salem | VA | 24153 | |
| South Suburban College | | Accounts Rec | 15800 S State St | | S Holland | IL | 60473 | |
| South Suburban College Accounts Rec | | 15800 S State St | | | S Holland | IL | 60473 | |
| South Texas Community College | | Business Office | PO Box 9701 | | Mcallen | TX | 78502-9701 | |
| South Texas Community College Business Office | | PO Box 9701 | | | Mcallen | TX | 78502-9701 | |
| South Texas Distribution | | 3219 Davis Ave | | | Laredo | TX | 78040 | |
| South Texas Xpress | | 943 N Expressway 15 Pmb 151a | | | Brownsville | TX | 78520 | |
| South Trust Bank Fbo | | Lary E Pker | 11672 Union Grove Rd | | Union Grove | AL | 35175 | |
| South Washington County School | | District 833 | 8400 E Point Douglas Rd S | | Cottage Grove | MN | 55016-3025 | |
| South Washington County School District 833 | | 8400 E Point Douglas Rd S | | | Cottage Grove | MN | 55016-3025 | |
| South Water Street Limited | | Partnership | Co Barbara Harris | | Providence | RI | 02906-2240 | |
| South West Ohio Self Insurance | | Association Fmly Swosia | 7942 Celestial Circle | Chg Add Per Afc 07 25 03 Vc | Middletown | OH | 45044 | |
| South West Ohio Self Insurance Association | | 7942 Celestial Circle | | | Middletown | OH | 45044 | |
| South West Ohio Water | | Environment Association | Urs Corporation | 36 East 7th St Ste 2300 | Cincinnati | OH | 45202-4434 | |
| South West Ohio Water Environment Association | | Urs Corporation | 36 East 7th St Ste 2300 | | Cincinnati | OH | 45202-4434 | |
| Southampton College | | 239 Montauk Hwy | | | Southampton | NY | 11968-4198 | |
| Southard Anthony | | 6264 Dorchester Rd | | | Lockport | NY | 14094 | |
| Southard Charles E | | 18530 Hwy 140 | | | Elrod | AL | 35458-2606 | |
| Southard Dale | | 373 E Keegan St | | | Deerfield | MI | 49238 | |
| Southard Michael | | 11 Teresa Cir | | | Rochester | NY | 14624 | |
| Southard Shannon | | 901 Greenwood Ct | | | Trenton | OH | 45067 | |
| Southco | Anita | 2373 John R Rd | | | Troy | MI | 48083 | |
| Southco Graphics Systems Ges | | Inc Dahlgren | Graphic & Engraving Solutions | | Norcross | GA | 30071 | |
| Southco Graphics Systems Ges Inc Dahlgren | | Graphic and Engraving Solutions | 6190 Rengency Pkwy Ste 310 | | Norcross | GA | 30071 | |
| Southco Inc | | 210 N Brinton Lake Rd | | | Concordville | PA | 19331 | |

# EXHIBIT B

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                     :

      In re                  :      Chapter 11
                      :

DELPHI CORPORATION, et al.,    :      Case No. 05-44481 (RDD)
                      :

              Debtors.   :      (Jointly Administered)
                      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

<u>NOTICE OF BAR DATE FOR FILING PROOFS OF CLAIM</u>

TO ALL CREDITORS OF THE DEBTORS, AND OTHER PARTIES-IN-INTEREST:

PLEASE TAKE NOTICE THAT:

        In accordance with an order entered on April 12, 2006 by the United
States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court")
in the above-captioned chapter 11 cases (the "Bar Date Order"), **5:00 p.m. Eastern Time
on July 31, 2006** (the "General Bar Date") has been established as the last date for each
person or entity (including individuals, partnerships, corporations, limited liability
companies, estates, trusts, unions, indenture trustees, the United States Trustee, and
governmental units) (individually, a "Person" or "Entity," and collectively, "Persons" or
"Entities") to file a proof of claim in the chapter 11 cases of the above-captioned debtors
and debtors-in-possession (collectively, the "Debtors").  A list of all Debtors in these
chapter 11 cases is attached hereto as Exhibit A.

        On October 8, 2005, Delphi and certain of its U.S. subsidiaries filed
voluntary petitions in the Bankruptcy Court for reorganization relief under chapter 11 of
title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy
Code").  On October 14, 2005, three additional U.S. subsidiaries of Delphi filed
voluntary petitions in the Bankruptcy Court for reorganization relief under the
Bankruptcy Code.  The term "Petition Date" shall mean the date on which each Debtor
filed its chapter 11 bankruptcy petition as set forth on Exhibit A attached hereto.  The
General Bar Date and the procedures set forth below for filing proofs of claim apply to all
claims against the Debtors that arose before the applicable Petition Date, except for those
holders of the claims listed in Section 4 below which are specifically excluded from the
General Bar Date filing requirement.

**1.      Who Must File A Proof Of Claim**

        You MUST file a proof of claim to vote on a chapter 11 plan filed by the
Debtors or to share in distributions from the Debtors' bankruptcy estates if you have a
claim against any of the Debtors that arose prior to the applicable Petition Date, and such
claim is not one of the types of claim described in Section 4 below.  Claims based on acts
or omissions of the Debtors that occurred before the applicable Petition Date must be

filed on or prior to the General Bar Date, even if such claims are not now fixed, liquidated, or certain or did not mature or become fixed, liquidated, or certain before the applicable Petition Date.

Under section 101(5) of the Bankruptcy Code and as used in this Notice, the word "claim" means (a) a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, or (b) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

2.      **What To File**

The Debtors are enclosing a proof of claim form which you may use to file any claim you may have in these cases.  If the Debtors scheduled you as a creditor in any of the Debtors' schedules of assets and liabilities (as amended from time to time, the "Schedules"), the form sets forth the amount of your claim as scheduled and whether the claim is scheduled as disputed, contingent, or unliquidated.  Additional proof of claim forms may be obtained at http://www.uscourts.gov/bkforms/index.html or at http://www.delphidocket.com.

All proofs of claim must be signed by the claimant or, if the claimant is not an individual, by a claimant's authorized agent.  All proofs of claim must be written in English and be denominated in United States currency.  You should attach to your completed proof of claim any documents on which the claim is based (if voluminous, attach a summary) or an explanation as to why the documents are not available.

If any supporting documentation provided with any proof of claim contains confidential information, such documentation will be subject to examination only by the party asserting the claim, the Debtors, the Debtors' counsel and advisers, the United States Trustee, counsel and advisers to the official committee of unsecured creditors appointed in these chapter 11 cases, Kurtzman Carson Consultants, LLC, the claims and noticing agent in these chapter 11 cases, and any personnel of the United States Bankruptcy Court for the Southern District of New York in the performance of their official duties, and such entities have been ordered to maintain the confidentiality of all supporting documentation to any proof of claim and the information contained therein.

Any holder of a claim against more than one Debtor must file a separate proof of claim with respect to each such Debtor and each holder of a claim must identify on its proof of claim the specific Debtor against which its claim is asserted and the case number of that Debtor's reorganization case.  A list of the names of the Debtors and their reorganization case numbers is attached hereto as Exhibit A.

3.      **When And Where To File**

Except as provided for herein, all proofs of claim must be filed so as to be received no later than **5:00 p.m. Eastern Time on July 31, 2006** at the following address:

If sent by mail:                                  If sent by messenger or overnight courier:

United States Bankruptcy Court         United States Bankruptcy Court
Southern District of New York           Southern District of New York
Delphi Corporation Claims                Delphi Corporation Claims
Bowling Green Station                      One Bowling Green
P.O. Box 5058                                  Room 534
New York, New York 10274-5058        New York, New York 10004-1408

**Proofs of claim will be deemed filed only when actually received at the addresses above on or before the General Bar Date.** Proofs of claim may not be delivered by facsimile, telecopy, or electronic mail transmission.

Governmental units must file proofs of claims in these chapter 11 cases on or prior to the General Bar Date.

4.      **Who Need Not File A Proof Of Claim**

You do not need to file a proof of claim on or prior to the General Bar Date if you are:

(a)      Any Person or Entity (i) which agrees with the nature, classification, and amount of its Claim set forth in the Schedules and (ii) whose Claim against a Debtor is not listed as "disputed," "contingent," or "unliquidated" in the Schedules;

(b)      Any Person or Entity which has already properly filed a proof of claim against the correct Debtor;

(c)      Any Person or Entity which asserts a Claim allowable under sections 503(b) and 507(a)(1) of the Bankruptcy Code as an administrative expense of the Debtors' chapter 11 cases;

(d)      Any Person or Entity which asserts a Claim solely on the basis of future pension or other post-employment benefits, including, without limitation, retiree health care and life insurance; provided, however, that any such Person or Entity which wishes to assert a Claim against any of the Debtors based on anything other than

future pension or other post-employment benefits must file a proof of claim on or prior to the General Bar Date;[1]

(e)    Any Debtor or any direct or indirect subsidiary of any of the Debtors in which the Debtors in the aggregate directly or indirectly own, control or hold with power to vote, 50 percent or more of the outstanding voting securities of such subsidiary;

(f)    Any Person or Entity whose Claim against a Debtor previously has been allowed by, or paid pursuant to, an order of the Bankruptcy Court;

(g)    Any holder of a Claim arising under or in respect of any of the following issuances of Delphi Corporation senior and junior subordinated unsecured debt (each, a "Noteholder"): (i) those certain senior unsecured securities bearing interest at 6.55% and maturing on June 15, 2006; (ii) those certain senior unsecured securities bearing interest at 6.50% and maturing on May 1, 2009; (iii) those certain senior unsecured securities bearing interest at 6.50% and maturing on August 15, 2013; (iv) those certain senior unsecured securities bearing interest at 7.125% and maturing on May 1, 2029; (v) those certain 8.25% junior subordinated notes due 2033; or (vi) those certain adjustable-rate junior subordinated notes due 2033  (collectively, the "Unsecured Securities"), other than the indenture trustees of the Unsecured Securities; provided, however, that any Noteholder who wishes to assert a Claim against the Debtors that is not based solely upon the outstanding prepetition principal and interest due on account of its ownership of such Unsecured Securities must file a proof of claim on or prior to the General Bar Date in respect of such Claim; and

(h)    Any holder of equity securities of, or other interests in, the Debtors solely with respect to such holder's ownership interest in or possession of such equity securities, or other interest; provided, however, that any such holder which wishes to assert a Claim against any of the Debtors that is not based solely upon its ownership of the Debtors' securities, including, but not limited to, Claims for damages or recision based on the purchase or sale of such securities, must file a proof of claim on or prior to the General Bar Date in respect of such Claim.

This notice is being sent to many persons and entities which have had some relationship with or have done business with the Debtors but may not have an unpaid claim against the Debtors.  The fact that you have received this Notice does not

---

[1] The bar date for the filing of Proofs of Claim on account of Claims arising from modification to or termination of future pension or other post-employment benefits will be determined pursuant to an order of the Bankruptcy Court approving such modification or termination.

necessarily mean that you have a claim or that the Debtors or the Bankruptcy Court believe that you have a claim against the Debtors.

**5.       Executory Contracts And Unexpired Leases**

Any person or entity which has a claim arising from the rejection of an Executory Contract must file a proof of claim on account of such claim against the Debtors on or before the later of (a) the General Bar Date or (b) 30 calendar days after the effective date of such rejection or such other date as fixed by the Bankruptcy Court in an order authorizing such rejection.

**6.       Amended Schedule Bar Date**

If the Debtors amend the Schedules on or after the date of this Notice (listed below) to reduce the undisputed, noncontingent, and liquidated amounts or to change the nature or classification of a claim against a Debtor reflected therein, the bar date for filing a proof of claim in respect of such amended schedule claim is the later of (a) the General Bar Date or (b) 30 calendar days after a claimant is served with notice that the Debtors have amended their Schedules.

**7.       Consequences Of Failure To File A Proof Of Claim By The General Bar Date**

ANY HOLDER OF A CLAIM WHICH IS NOT EXCEPTED FROM THE REQUIREMENTS OF THIS NOTICE, AS SET FORTH IN SECTION 4 ABOVE, AND WHICH FAILS TO TIMELY FILE A PROOF OF CLAIM IN THE APPROPRIATE FORM, WILL BE BARRED FROM ASSERTING SUCH CLAIM AGAINST THE DEBTORS AND THEIR CHAPTER 11 ESTATES, FROM VOTING ON ANY PLAN OF REORGANIZATION FILED IN THESE CASES, AND FROM PARTICIPATING IN ANY DISTRIBUTION IN THE DEBTORS' CASES ON ACCOUNT OF SUCH CLAIM.

**8.       The Debtors' Schedules And Access Thereto**

You may be listed as the holder of a claim against the Debtors in any of the Debtors' Schedules of Assets and Liabilities and/or Schedules of Executory Contracts and Unexpired Leases.

To determine if and how you are listed on any of the Schedules, please refer to the descriptions set forth on the enclosed proof of claim forms regarding the nature, amount, and status of your claim(s).

As set forth above, if you agree with the nature, amount, and status of your claim as listed in any of the Debtors' Schedules, and if your claim is not described as "disputed," "contingent," or "unliquidated," you need not file a proof of claim. Otherwise, or if you decide  to file a proof of claim, you must do so before the General Bar Date in accordance with the procedures set forth in this Notice.

Copies of any of the Debtors' Schedules are available for inspection online at http://www.delphidocket.com or on the Court's Internet Website at

http://www.nysb.uscourts.gov.  A login and password to the Court's Public Access to
Electronic Court Records ("PACER") are required to access this information on the
Court's Internet Website and can be obtained through the PACER Service Center at
http://www.pacer.psc.uscourts.gov.  No login or password is required to access this
information on the Debtors' Legal Information Website (http://www.delphidocket.com).
Copies of any of the Schedules may also be examined between the hours of 9:00 a.m. and
4:30 p.m., Monday through Friday at the Office of the Clerk of the Bankruptcy Court,
One Bowling Green, Room 511, New York, New York 10004-1408.

        A holder of a possible claim against any of the Debtors should consult an
attorney regarding any matters not covered by this Notice, such as whether the holder
should file a proof of claim.

Dated: New York, New York                            BY ORDER OF THE COURT
       April 12, 2006

       SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
       John Wm. Butler, Jr.
       John K. Lyons
       Ron E. Meisler
       333 West Wacker Drive, Suite 2100
       Chicago, Illinois  60606

        - and -

       Kayalyn A. Marafioti (KM 9632)
       Thomas J. Matz (TM 5986)
       Four Times Square
       New York, New York 10036


       Attorneys for Delphi Corporation, et al.,
        Debtors and Debtors-in-Possession



**For additional information:**

Delphi Restructuring Information Hotline:
Toll Free:  (866) 688-8740
International:  (248) 813-2602

Delphi Legal Information Website:
http://www.delphidocket.com

## EXHIBIT A

| | Entity | Tax / Federal ID Number | Case Number | Address | Date Of Petition Filing |
|---|---|---|---|---|---|
| 1. | Delphi NY Holding Corporation | 20-3383408 | 05-44480 | 5725 Delphi Drive Troy, MI 48098 | October 8, 2005 |
| 2. | Delphi Corporation | 38-3430473 | 05-44481 | 5725 Delphi Drive Troy, MI 48098 | October 8, 2005 |
| 3. | ASEC Manufacturing General Partnership | 73-1474201 | 05-44482 | 1301 Main Parkway Catoosa, OK 74015 | October 8, 2005 |
| 4. | ASEC Sales General Partnership | 73-1474151 | 05-44484 | 1301 Main Parkway Catoosa, OK 74015 | October 8, 2005 |
| 5. | Environmental Catalysts, LLC | | 05-44503 | 5725 Delphi Drive Troy, MI 48098 | October 8, 2005 |
| 6. | Delphi Medical Systems Colorado Corporation | 84-1524184 | 05-44507 | 4300 Road 18 Longmont, CO 80504 | October 8, 2005 |
| 7. | Delphi Medical Systems Texas Corporation | 20-2885110 | 05-44511 | 5725 Delphi Drive Troy, MI 48098 | October 8, 2005 |
| 8. | Delphi Medical Systems Corporation | 32-0052827 | 05-44529 | 5725 Delphi Drive Troy, MI 48098 | October 8, 2005 |
| 9. | Specialty Electronics International Ltd. | 66-0522490 | 05-44536 | 69A Kronprindsens Gade (Third Floor) P.O. Box 1858 St. Thomas, VI | October 8, 2005 |
| 10. | Specialty Electronics, Inc. | 57-0755068 | 05-44539 | 19200 Asheville Highway P.O. Box 519 Landrum, SC 29356 | October 8, 2005 |
| 11. | Delphi Liquidation Holding Company | 95-4359324 | 05-44542 | 5725 Delphi Drive Troy, MI 48098 | October 8, 2005 |
| 12. | Delphi Electronics (Holding) LLC | 95-4554161 | 05-44547 | One Corporate Center Kokomo, IN 46904 | October 8, 2005 |
| 13. | Delphi Technologies, Inc. | 38-3430681 | 05-44554 | 5725 Delphi Drive Troy, MI 48098 | October 8, 2005 |
| 14. | Delphi Automotive Systems Tennessee, Inc. | 38-3319836 | 05-44558 | 5725 Delphi Drive Troy, MI 48098 | October 8, 2005 |
| 15. | Delphi Mechatronic Systems, Inc. | 38-3589834 | 05-44567 | 5725 Delphi Drive Troy, MI 48098 | October 8, 2005 |
| 16. | Delphi Automotive Systems Risk Management Corp. | 38-3575299 | 05-44570 | 5725 Delphi Drive Troy, MI 48098 | October 8, 2005 |
| 17. | Exhaust Systems Corporation | 38-3211473 | 05-44573 | 4800 S. Saginaw Street Flint, MI 48501 | October 8, 2005 |
| 18. | Delphi China LLC | 38-3196159 | 05-44577 | 5725 Delphi Drive Troy, MI 48098 | October 8, 2005 |
| 19. | Delphi Automotive Systems Korea, Inc. | 38-2849490 | 05-44580 | 5725 Delphi Drive Troy, MI 48098 | October 8, 2005 |
| 20. | Delphi International Services, Inc. | 38-3439894 | 05-44583 | 5725 Delphi Drive Troy, MI 48098 | October 8, 2005 |

| | Entity | Tax / Federal ID Number | Case Number | Address | Date Of Petition Filing |
|---|---|---|---|---|---|
| 21. | Delphi Automotive Systems Thailand, Inc. | 38-3379709 | 05-44586 | 5725 Delphi Drive Troy, MI 48098 | October 8, 2005 |
| 22. | Delphi Automotive Systems International, Inc. | 38-3280289 | 05-44589 | 5725 Delphi Drive Troy, MI 48098 | October 8, 2005 |
| 23. | Delphi International Holdings Corp. | 38-3449527 | 05-44591 | 5725 Delphi Drive Troy, MI 48098 | October 8, 2005 |
| 24. | Delphi Automotive Systems Overseas Corporation | 38-3318021 | 05-44593 | 5725 Delphi Drive Troy, MI 48098 | October 8, 2005 |
| 25. | Delphi Automotive Systems (Holding), Inc. | 38-3422378 | 05-44596 | 5725 Delphi Drive Troy, MI 48098 | October 8, 2005 |
| 26. | Delco Electronics Overseas Corporation | 38-2638990 | 05-44610 | 5725 Delphi Drive Troy, MI 48098 | October 8, 2005 |
| 27. | Delphi Diesel Systems Corp. | 38-3505001 | 05-44612 | 5725 Delphi Drive Troy, MI 48098 | October 8, 2005 |
| 28. | Delphi LLC | 37-1438255 | 05-44615 | 5725 Delphi Drive Troy, MI 48098 | October 8, 2005 |
| 29. | Aspire, Inc. | 36-4392806 | 05-44618 | U.S. Route 1 Morrisville, PA 19067 | October 8, 2005 |
| 30. | Delphi Integrated Service Solutions, Inc. | 38-3473261 | 05-44623 | 1322 Rankin Street Troy, MI 48083 | October 8, 2005 |
| 31. | Delphi Connection Systems | 95-2563022 | 05-44624 | 17150 Von Karman Avenue Irvine, CA 92614 | October 8, 2005 |
| 32. | Packard Hughes Interconnect Company | 33-0595219 | 05-44626 | 17150 Von Karman Avenue Irvine, CA 92614 | October 8, 2005 |
| 33. | DREAL, Inc. | 38-3457411 | 05-44627 | 5725 Delphi Drive Troy, MI 48098 | October 8, 2005 |
| 34. | Delphi Automotive Systems Services LLC | 38-3568834 | 05-44632 | 5725 Delphi Drive Troy, MI 48098 | October 8, 2005 |
| 35. | Delphi Services Holding Corporation | 20-0577653 | 05-44633 | 5725 Delphi Drive Troy, MI 48098 | October 8, 2005 |
| 36. | Delphi Automotive Systems Global (Holding), Inc. | 38-3547659 | 05-44636 | 5725 Delphi Drive Troy, MI 48098 | October 8, 2005 |
| 37. | Delphi Foreign Sales Corporation | 66-0564421 | 05-44638 | Chase Trade, Inc. Post Office Box 309420 55-11 Conacao Gade Charlotte Amalie St. Thomas, VI 00803-9420 | October 8, 2005 |
| 38. | Delphi Automotive Systems Human Resources LLC | 38-3547664 | 05-44639 | 5725 Delphi Drive Troy, MI 48098 | October 8, 2005 |
| 39. | Delphi Automotive Systems LLC | 38-3431131 | 05-44640 | 5725 Delphi Drive Troy, MI 48098 | October 8, 2005 |
| 40. | Delphi Furukawa Wiring Systems LLC | 20-2478586 | 05-47452 | 5725 Delphi Drive Troy, MI 48098 | October 14, 2005 |

| | Entity | Tax / Federal ID Number | Case Number | Address | Date Of Petition Filing |
|---|---|---|---|---|---|
| 41. | Delphi Receivables LLC | 61-1446224 | 05-47459 | 5725 Delphi Drive Troy, MI 48098 | October 14, 2005 |
| 42. | MobileAria, Inc. | 31-1695929 | 05-47474 | 800 West El Camino Real Suite 240 Mountain View, CA 94040 | October 14, 2005 |

# EXHIBIT C

| UNITED STATES BANKRUPTCY COURT ___ **Southern** ___ DISTRICT OF ___ **New York** ___ | PROOF OF CLAIM |
|---|---|

| Name of Debtor | Case Number |
|---|---|

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

| Name of Creditor (The person or other entity to whom the debtor owes money or property):<br><br>Name and address where notices should be sent:<br><br><br>Telephone number: | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br>☐ Check box if you have never received any notices from the bankruptcy court in this case.<br>☐ Check box if the address differs from the address on the envelope sent to you by the court. | THIS SPACE IS FOR COURT USE ONLY |
|---|---|---|

| Account or other number by which creditor identifies debtor: | Check here ☐ replaces<br>if this claim ☐ amends a previously filed claim, dated:_____ |
|---|---|

**1. Basis for Claim**
- ☐ Goods Sold / Services Performed
- ☐ Customer Claim
- ☐ Taxes
- ☐ Money Loaned
- ☐ Personal Injury
- ☐ Other _____

- ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
- ☐ Wages, salaries, and compensation (fill out below)
  Last four digits of SS #: _____
  Unpaid compensation for services performed
  from _____ to _____
  (date)            (date)

**2. Date debt was incurred:**

**3. If court judgment, date obtained:**

**4. Total Amount of Claim at Time Case Filed: $** _____ _____ _____ _____
(unsecured)       (secured)       (priority)       (Total)

If all or part of your claim is secured or entitled to priority, also complete Item 5 or 7 below.
☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**5. Secured Claim.**
☐ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
- ☐ Real Estate     ☐ Motor Vehicle
- ☐ Other_____

Value of Collateral: $_____

Amount of arrearage and other charges at time case filed included in secured claim, if any: $_____

**6. Unsecured Nonpriority Claim** $_____

☐ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority.

**7. Unsecured Priority Claim.**
☐ Check this box if you have an unsecured priority claim
  Amount entitled to priority $_____
  Specify the priority of the claim:
- ☐ Wages, salaries, or commissions (up to $10,000),* earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(3).
- ☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(4).
- ☐ Up to $2,225* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(6).
- ☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. § 507(a)(7).
- ☐ Taxes or penalties owed to governmental units-11 U.S.C. § 507(a)(8).
- ☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(____).
*Amounts are subject to adjustment on 4/1/07 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment. $10,000 and 180-day limits apply to cases filed on or after 4/20/05. Pub. L. 109-8.

**8. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**9. Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**10. Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim

THIS SPACE IS FOR COURT USE ONLY

| Date | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any): |
|---|---|

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

FORM B10 (Official Form 10) (04/04)

# INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In particular types of cases or circumstances, such as bankruptcy cases that are not filed voluntarily by a debtor, there may be exceptions to these general rules.*

### — DEFINITIONS —

**Debtor**

The person, corporation, or other entity that has filed a bankruptcy case is called the debtor.

**Creditor**

A creditor is any person, corporation, or other entity to whom the debtor owed a debt on the date that the bankruptcy case was filed.

**Proof of Claim**

A form telling the bankruptcy court how much the debtor owed a creditor at the time the bankruptcy case was filed (the amount of the creditor's claim). This form must be filed with the clerk of the bankruptcy court where the bankruptcy case was filed.

**Secured Claim**

A claim is a secured claim to the extent that the creditor has a lien on property of the debtor (collateral) that gives the creditor the right to be paid from that property before creditors who do not have liens on the property.

Examples of liens are a mortgage on real estate and a security interest in a car, truck, boat, television set, or other item of property. A lien may have been obtained through a court proceeding before the bankruptcy case began; in some states a court judgment is a lien. In addition, to the extent a creditor also owes money to the debtor (has a right of setoff), the creditor's claim may be a secured claim. (See also *Unsecured Claim.*)

**Unsecured Claim**

If a claim is not a secured claim it is an unsecured claim. A claim may be partly secured and partly unsecured if the property on which a creditor has a lien is not worth enough to pay the creditor in full.

**Unsecured Priority Claim**

Certain types of unsecured claims are given priority, so they are to be paid in bankruptcy cases before most other unsecured claims (if there is sufficient money or property available to pay these claims). The most common types of priority claims are listed on the proof of claim form. Unsecured claims that are not specifically given priority status by the bankruptcy laws are classified as *Unsecured Nonpriority Claims.*

## Items to be completed in Proof of Claim form (if not already filled in)

**Court, Name of Debtor, and Case Number:**

Fill in the name of the federal judicial district where the bankruptcy case was filed (for example, Central District of California), the name of the debtor in the bankruptcy case, and the bankruptcy case number. If you received a notice of the case from the court, all of this information is near the top of the notice.

**Information about Creditor:**

Complete the section giving the name, address, and telephone number of the creditor to whom the debtor owes money or property, and the debtor's account number, if any. If anyone else has already filed a proof of claim relating to this debt, if you never received notices from the bankruptcy court about this case, if your address differs from that to which the court sent notice, or if this proof of claim replaces or changes a proof of claim that was already filed, check the appropriate box on the form.

**1. Basis for Claim:**

Check the type of debt for which the proof of claim is being filed. If the type of debt is not listed, check "Other" and briefly describe the type of debt. If you were an employee of the debtor, fill in the last four digits of your social security number and the dates of work for which you were not paid.

**2. Date Debt Incurred:**

Fill in the date when the debt first was owed by the debtor.

**3. Court Judgments:**

If you have a court judgment for this debt, state the date the court entered the judgment.

**4. Total Amount of Claim at Time Case Filed:**

Fill in the applicable amounts, including the total amount of the entire claim. If interest or other charges in addition to the principal amount of the claim are included, check the appropriate place on the form and attach an itemization of the interest and charges.

**5. Secured Claim:**

Check the appropriate place if the claim is a secured claim. You must state the type and value of property that is collateral for the claim, attach copies of the documentation of your lien, and state the amount past due on the claim as of the date the bankruptcy case was filed. A claim may be partly secured and partly unsecured. (See DEFINITIONS, above).

**6. Unsecured Nonpriority Claim:**

Check the appropriate place if you have an unsecured nonpriority claim, sometimes referred to as a "general unsecured claim". (See DEFINITIONS, above.) If your claim is partly secured and partly unsecured, state here the amount that is unsecured. If part of your claim is entitled to priority, state here the amount **not** entitled to priority.

**7. Unsecured Priority Claim:**

Check the appropriate place if you have an unsecured priority claim, and state the amount entitled to priority. (See DEFINITIONS, above). A claim may be partly priority and partly nonpriority if, for example, the claim is for more than the amount given priority by the law. Check the appropriate place to specify the type of priority claim.

**8. Credits:**

By signing this proof of claim, you are stating under oath that in calculating the amount of your claim you have given the debtor credit for all payments received from the debtor.

**9. Supporting Documents:**

You must attach to this proof of claim form copies of documents that show the debtor owes the debt claimed or, if the documents are too lengthy, a summary of those documents. If documents are not available, you must attach an explanation of why they are not available.

**EXHIBIT G**

IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                          :
        In re                             :    Chapter 11
                                          :
DELPHI CORPORATION, et al.,               :    Case No. 05-44481 (RDD)
                                          :
                            Debtors.      :    (Jointly Administered)
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
```

AFFIDAVIT OF SERVICE

I, Evan Gershbein, being duly sworn according to law, depose and say that I am employed by Kurtzman Carson Consultants LLC, the Court appointed claims and noticing agent for the Debtors in the above-captioned cases. I submit this Affidavit in connection with the service of the solicitation materials for the **First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-In-Possession (As Modified)** [Docket No. 17030] ("the Plan").

On December 1, 2005, the Court signed and entered an Order Pursuant to 28 U.S.C. § 156(c) Authorizing Retention and Appointment of Kurtzman Carson Consultants LLC as Claims, Noticing and Balloting Agent for Clerk of Bankruptcy Court [Docket No. 1374] designating KCC as the official Balloting Agent.

KCC is charged with the duty of printing and distributing Solicitation Packages to creditors and other interested parties pursuant to the instructions set forth in the **Order (A)(I) Approving Modifications to Debtors' First Amended Plan of Reorganization (as Modified) and Related Disclosures and Voting Procedures and (II) Setting Final Hearing Date to Consider Modifications to Confirmed First Amended Plan of Reorganization and (B) Setting Administrative Expense Claims Bar Date and Alternative Transaction Hearing Date ("Modification Procedures Order")** [Docket No. 17032] ("Modification Procedures Order") as entered by the Court on June 16, 2009.

The various solicitation materials consist of the following documents:

1) Ballot for Accepting or Rejecting First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-In-Possession (As Modified) (Class A Secured Claims) ("Class A Ballot") (attached hereto as Exhibit A);

2) Ballot for Accepting or Rejecting First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-In-Possession (As Modified) (Class C-1 General Unsecured Claims) ("Class C-1 Ballot") (attached hereto as Exhibit B);

3) Ballot for Accepting or Rejecting First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-In-Possession (As Modified) (Class C-2 Pension Benefit Guaranty Corporation Claims) ("Class C-2 Ballot") (attached hereto as <u>Exhibit C</u>);

4) Ballot for Accepting or Rejecting First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-In-Possession (As Modified) (Class D General Motors Corporation Claim) ("Class D Ballot") (attached hereto as <u>Exhibit D</u>);

5) Notice of (1) Approval of Supplement; (2) Hearing on Modifications to Plan; (3) Deadline and Procedures for Filing Objections to Modifications of Plan; (4) Deadline and Procedures for Temporary Allowance of Certain Claims for Voting Purposes; (5) Treatment of Certain Unliquidated, Contingent, or Disputed Claims for Noticing, Voting, and Distribution Purposes; (6) Record Date; (7) Voting Deadline for Receipt of Ballots; and (9) Proposed Releases, Exculpation, and Injunction in Modified Plan ("Final Modification Hearing Notice") (attached hereto as <u>Exhibit E</u>);

6) a letter from the Delphi Corporation Official Committee of Unsecured Creditors ("Creditors' Committee Letter") (attached hereto as <u>Exhibit F</u>);

7) First Amended Disclosure Statement Supplement with Respect to First Amended Plan of Reorganization (As Modified), Modification Procedures Order and December 10, 2007 Solicitation Procedures Order, in CD-ROM format ("CD-ROM")

8) Notice of Non-Voting Status with Respect to Certain Claims and Interests ("Notice of Non-Voting Status") (attached hereto as <u>Exhibit G</u>);

9) Notice to Unimpaired Creditors of (I) Filing of Proposed Modified Plan of Reorganization, (II) Treatment of Claims Under Modified Plan, (III) Hearing on Approval of Modified Plan, and (IV) Deadline and Procedures for Filing Objections Thereto ("Unimpaired Notice") (attached hereto as <u>Exhibit H</u>);

10) a memorandum from Kurtzman Carson Consultants to additional notice parties of ballot recipients ("Ballot Notice Party Memo") (attached hereto as <u>Exhibit I</u>);

11) Notice of Bar Date for Filing Proofs of Administrative Expense ("Administrative Bar Date Notice") (attached hereto as <u>Exhibit J</u>); and

12) Administrative Expense Claim Form ("Administrative Expense Claim Form") (attached hereto as <u>Exhibit K</u>).

On or before June 20, 2009, I caused to be served a personalized Class A Ballot, Final Modification Hearing Notice, Creditors' Committee Letter, CD-ROM, Administrative Bar Date Notice, Administrative Expense Claim Form and a pre-addressed, postage pre-paid return envelope upon the parties listed on <u>Exhibit L</u> via postage pre-paid U.S. mail.

On or before June 20, 2009, I caused to be served a personalized Class C-1 Ballot, Final Modification Hearing Notice, Creditors' Committee Letter, CD-ROM, Administrative Bar Date Notice, Administrative Expense Claim Form and a pre-addressed, postage pre-paid return envelope upon the parties listed on <u>Exhibit M</u> via postage pre-paid U.S. mail.

On or before June 20, 2009, I caused to be served a personalized Class C-2 Ballot, Final Modification Hearing Notice, Creditors' Committee Letter, CD-ROM, Administrative Bar Date Notice, Administrative Expense Claim Form and a pre-addressed, postage pre-paid return envelope upon the party listed on <u>Exhibit N</u> via postage pre-paid U.S. mail.

On or before June 20, 2009, I caused to be served a personalized Class D Ballot, Final Modification Hearing Notice, Creditors' Committee Letter, CD-ROM, Administrative Bar Date Notice, Administrative Expense Claim Form and a pre-addressed, postage pre-paid return envelope upon the party listed on <u>Exhibit O</u> via postage pre-paid U.S. mail.

On or before June 20, 2009, I caused to be served the Final Modification Hearing Notice, Creditors' Committee Letter, CD-ROM, Administrative Bar Date Notice and Administrative Expense Claim Form upon the parties listed on <u>Exhibit P</u> via postage pre-paid U.S. mail.

On or before June 20, 2009, I caused to be served the Final Modification Hearing Notice, Notice of Non-Voting Status, Administrative Bar Date Notice and Administrative Expense Claim Form upon the parties listed on <u>Exhibit Q</u> via postage pre-paid U.S. mail.

On or before June 20, 2009, I caused to be served the Final Modification Hearing Notice, Creditors' Committee Letter, CD-ROM, Unimpaired Notice, Administrative Bar Date Notice and Administrative Expense Claim Form upon the parties listed on <u>Exhibit R</u> via postage pre-paid U.S. mail.

On or before June 20, 2009, I caused to be served the Final Modification Hearing Notice, Creditors' Committee Letter, CD-ROM, Notice of Non-Voting Status, Administrative Bar Date Notice and Administrative Expense Claim Form upon the parties listed on <u>Exhibit S</u> via postage pre-paid U.S. mail.

On or before June 20, 2009, I caused to be served the Final Modification Hearing Notice, Creditors' Committee Letter, CD-ROM, Ballot Notice Party Memo, Administrative Bar Date Notice and Administrative Expense Claim Form upon the parties listed on <u>Exhibit T</u> via postage pre-paid U.S. mail.

3

On or before June 20, 2009, I caused to be served the Final Modification Hearing Notice, Administrative Bar Date Notice and Administrative Expense Claim Form upon the parties listed on Exhibit U via postage pre-paid U.S. mail.

Dated: June 23, 2009

_____
Evan Gershbein

State of California
County of Los Angeles

Subscribed and sworn to (or affirmed) before me on this 23rd day of June, 2009, by Evan Gershbein, proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature _____

Commission Expires: _10-1-09_

L. MAREE SANDERS
Commission # 1610322
Notary Public - California
Los Angeles County
My Comm. Expires Oct 1, 2009

4

# EXHIBIT M

Delphi Corporation
Class 1C-1 Ballots

| Name | CreditorNoticeName | Address1 | Address2 | Address3 | City | State | Zip | Country |
|------|-------------------|----------|----------|----------|------|-------|-----|---------|
| Feldspar Corp | | PO Box 116885 | | | Atlanta | GA | 30368-6885 | |
| Felice Frances T | | 3108 Creekwood Circle | | | Bay City | MI | 48706-5628 | |
| Fell Lyle E | | 39 Briarlee Dr | | | Tonawanda | NY | 14150-4305 | |
| Felters Group | | 5965 Hwy 221 | PO Box 228 | | Roebuck | SC | 29376 | |
| Fenn Technologies | | 300 Fenn Rd | | | Newington | CT | 06111 | |
| Ferguson Enterprises Inc | | 12500 Jefferson Ave | | | Newport News | VA | 23602-4314 | |
| Fernandez Racing LLC | | 6835 Guion Rd | | | Indpls | IN | 46268 | |
| Ferre Plana Sa | | 08970 Saint Joan Despi | | | Barcelona | | | Spain |
| Fertile Plan International Eft Ltd | Attn Mr Jeff Peng | G9 Bldg 2 2nd Donghuan Rd 10th Yousong | Indstrl Dist Lonhua Baoan | | Shenzhen | | | China |
| Festo Pneumatic S A Avenida De La Raza 5297 | | Col Los Lagos Codigo Postal | 32320 Cd Juarez Chihuahua | | | | | Mexico |
| FET Engineering Inc | Ken Haverly | 903 Nutter Dr | | | Bardstown | KY | 40004 | |
| Fey Industries Inc dba Blackbourn Media Packaging | Fey Industries Inc | 200 4th Ave N | | | Edgerton | MN | 56128-1286 | |
| Fiamm Technologies Inc | | 1550 Lesson Ave | | | Cadillac | MI | 49601 | |
| Fibrox Technology Ltd | | 930 Pie X1 | Canada | | Thetford Mines | | G6G 7M4 | Canada |
| Fico Trim & Form Systems Ratio 6 | | PO Box 234 | Ae Duiven | | | | 6920 | Netherlands |
| Fidelity Investments Institutional Operations Company Inc | | 300 Puritan Way | | | Marlborough | MA | 01752 | |
| Fidler Dana | | 1743 Stony Creek Dr | | | Rochester | MI | 48307 | |
| Fidler Dana | | 1743 Stony Creek Dr | | | Rochester | MI | 48307 | |
| Fiduciary Counselors Inc as independent fiduciary for Delphi Corporation Retirement Program for Salaried Employees | Neil Hennessy | 700 12th St NW Ste 700 | | | Washington | DC | 20005 | |
| Fiduciary Counselors Inc as independent fiduciary for Delphi Hourly Rate Employees Pension Plan | Neil Hennessy | 700 12th St NW Ste 700 | | | Washington | DC | 20005 | |
| Fiduciary Counselors Inc as independent fiduciary for Packard Hughes Interconnect Bargaining Retirment Plan | Neil Hennessy | 700 12th St NW Ste 700 | | | Washington | DC | 20005 | |
| Fielding & Platt International | | PO Box 10 | Atland Works Gloucester | | Gl15rf Great Britain | | | United Kingdom |
| Fies Scales & Systems Inc | Fies Scales & Systems Inc | 570 Leo St | | | Dayton | OH | 45404-1506 | |
| Fife Claudine | | PO Box 2431 | | | Saginaw | MI | 48605-2431 | |
| Fife Claudine | | PO Box 2431 | | | Saginaw | MI | 48605-2431 | |
| Fike Corporation | | PO Box 610 | | | Blue Spgs | MO | 64013 | |
| Filtration Concepts Inc | | PO Box 426 | | | Lannon | WI | 53046 | |
| Filtrona Extrusion Inc | | 12858 Collections Ctr Dr | | | Chicago | IL | 60693 | |
| Fin Machine Co Ltd Salters Lane | | Sedgefield Stockton On Tees | Cleveland Ts213eb | | Great Britain | | | United Kingdom |
| Findlay Industries Inc | | PO Box 1087 | | | Findlay | OH | 45839 | |
| Findley Thomann Phyllis | | 1272 Hurd Rd | | | Clio | MI | 48420 | |
| Fine Line Stencil Inc | | 2840 Janitell Rd | | | Colorado Springs | CO | 80906-4141 | |
| FINGER LAKES EXTRUSION CORP | | PO BOX 558 | | | UNION SPRINGS | NY | 13160 | |
| Finishing Services Inc | | 877 Ann St | | | Ypsilanti | MI | 48197 | |
| FINK WILLIAM C | | 173 SALIGUIGI WAY | | | LOUDON | TN | 37774 | |
| Finley William D | | 1307 7th Ave Nw | | | Athens | AL | 35611-4770 | |
| Finnveden Metal Structures Ab | | Galvanovagen 4 | Se 330 12 Forsheda | | | | | Sweden |
| Fiorvento Libero | | W 135 N 6463 Lakewood Ct | | | Menomonee Falls | WI | 53051 | |
| Firefoe Corporation | | 999 Trumbull Ave | | | Girard | OH | 44420 | |
| Firelands Regional Medical Ctr Main Campus | | 1101 Decatur St | | | Sandusky | OH | 44870-8005 | |
| Firestone C & F | | 5400 Old Montgomery Hwy | | | Tuscaloosa | AL | 35405 | |
| Firetto John P | | 7929 Mount Tremblant | | | Clarkston | MI | 48348-3724 | |
| First Farmers Bank & Trust Co | c/o Bingham Farrer & Wilson PC Attorneys at Law | Michael E Farrer | PO Box 494 | | Elwood | IN | 46036 | |
| First Intermed Corporation Dba Mea Medical Clinics | | 1515 Jefferson St | | | Laurel | MS | 39440 | |
| FIRST TECHNOLOGY HOLDINGS INC AND AFFILIATES AND SUBSIDIARIES AND CONTROL DEVICES INC AND FIRST INERTIA SWITCH LIMITED | THOMAS SKIBINSKI | CONTROL DEVICES INC AND FIRST INERTIA SWITCH | C O SENSATA TECHNOLOGIES INC | 529 PLEASANT ST MS B 1 | ATTLEBORO | MA | 02703 | |
| Firstenergy Solutions Corp | Bankruptcy Analyst | 395 Ghent Rd | | | Akron | OH | 44333 | |
| Fischer Special Tooling | Kevin Johnson | 7219 Commerce Dr | | | Mentor | OH | 44060 | |
| Fischer Tech Ltd | | No 12 Loyang Way | 4 Layang Industrial Estate | | Singapore | | 507602 | |
| Fischer Technology Inc | | PO Box 40000 Dept 476 | | | Hartford | CT | 06151-0476 | |
| Fishbeck Thompson Carr & Huber | | 1515 Arboretum Dr Se | | | Grand Rapids | MI | 49546 | |
| Fisher Heinrich | | 2714 Witters St | | | Saginaw | MI | 48602 | |
| Fisher Nancy | | 221 W Stockdale Street | | | Flint | MI | 48503 | |
| Fisher Scientific | Gary Barnes | Regional Credit Manager | 2000 Park Ln | | Pittsburgh | PA | 15275 | |
| Fisher Unitech Inc | | 1150 Stephenson Hwy | | | Troy | MI | 48083-1187 | |
| Fisher Unitech Inc | | 1150 Stephenson Hwy | | | Troy | MI | 48083-1187 | |
| Fisher Unitech Inc | | 1150 Stephenson Hwy | | | Troy | MI | 48083 | |
| Fite Fire & Safety | Safety Instrumentation Inc dba Fite Fire & Safety | 3012 W Kentucky Ave | | | Midland | TX | 79701 | |
| Fitzgerald Water Light & Bond | Law Offices of John T Croley Jr | PO Box 690 | | | Fitzgerald | GA | 31750 | |
| Flagg Sonia | | G3237 Arlene Dr | | | Flint | MI | 48504 | |
| Flambeau Inc | | 801 Lynn Ave | | | Baraboo | WI | 53913 | |
| FLANAGAN JAMES P | | 1124 WIND RIDGE DR | | | EL PASO | TX | 79912-7461 | |
| Fleischman Jim J Fleischman Advertising | | 2315 W Applewood Ln | | | Milwaukee | WI | 53209 | |
| Flex Pac Inc | | 7113 S Mayflower Pk Dr | | | Zionsville | IN | 46077 | |
| Flex Tech Services | Brent Robinson | 5601 Oak Blvd | | | Austin | TX | 78735 | |
| Flex Technologies Inc | | 104 Flex Dr | | | Portland | TN | 37148-150 | |
| Flex Technologies Inc | | Mount Eaton Div | 16183 E Main St | | Mount Eaton | OH | 44659 | |
| Flex Technologies Inc | | 104 Flex Dr | | | Portland | TN | 37148 | |

# EXHIBIT U

Delphi Corporation
Disallowed Claims Service List

| Name | CreditorNoticeName | Address1 | Address2 | Address3 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|---|
| Filter Products Corp | | 5825 S Palo Verde Rd | | | Tucson | AZ | 85706-7737 | |
| Financial Services of America LLC | c/o Sallee Law Firm | 4739 Belleview Ste 304 | | | Kansas City | MO | 64112 | |
| Findlay Industries Inc | attn Joe Holliger | 4000 Fostoria Rd | | | Findlay | OH | 45840 | |
| Fineline Mold & Design Ltd | Fineline Mold & Design Ltd | 5060 Ure St | | | Oldcastle | Ontario | NOR1L0 | Canada |
| Finishing Technology Inc | Finishing Technology Inc | PO Box 393 | | | Westchester | OH | 45071 | |
| Finter John | | 3 Cadence Court | | | Penfield | NY | 14526 | |
| Fiorito Lisa | | 4424 Bennetts Corners Rd | | | Holley | NY | 14470 | |
| Fire Fighter Sales and Svc Inc | | 3015 Madison Ave Se | | | Grand Rapids | MI | 49548 | |
| First Choice Heating & Cooling Inc | | 8147 Islandview Dr | | | Newaygo | MI | 49337 | |
| First National Bank Of | Monterey Trustee Ua Dtd | 123181 For Charles B | Keitzer And Lenore M Keitzer | Memorial Trust C | Monterey | IN | 46960 | |
| First Technology Holdings Inc and Affiliates and Subsidiaries | John D Hertzberg | 30150 Telegraph Rd Ste 444 | | | Bingham Farms | MI | 48025 | |
| Fischer Austin R | | 3307 Bowman Rd | | | Bay City | MI | 48706-1766 | |
| Fischer Austin R | | 3307 Bowman Rd | | | Bay City | MI | 48706-1766 | |
| Fisher Nancy | | 221 W Stockdale Street | | | Flint | MI | 48503 | |
| Fisher Scientific | Gary Barnes | Regional Credit Manager | 2000 Park Ln | | Pittsburgh | PA | 15275 | |
| Fitzgerald Water Light & Bond | | Commission | PO Box F | | Fitzgerald | GA | 31750 | |
| Fitzsimmons Hood Jr | | 24056 Windridge Ln | | | Novi | MI | 48374-3651 | |
| Flagg Sonia | | G3237 Arlene Dr | | | Flint | MI | 48504 | |
| Flanners Audio & Video Inc | | 16271 W Lincoln Ave | | | New Berlin | WI | 53151-2834 | |
| Fleming D Roach Tr | | Fleming D Roach Revocable | Living Trust Ua 022500 | 6000 San Jose Blvd Apt 1201 | Jacksonville | FL | 32217 | |
| Fleming Joseph A | Thomas L Peterson Esq | Adorno & Yoss Llp | 1233 20th St NW Ste 500 | | Washington | DC | 20036-2376 | |
| Fletcher Debra | | 7065 Meisner Rd | | | China | MI | 48054 | |
| Flex Tech Services | Brent Robinson | 5601 Oak Blvd | | | Austin | TX | 78735 | |
| Flex Technologies Inc | | 108 Brattontown Cir | | | Lafayette | TN | 37083 | |
| Flexico Industrial Serv | Cheong So | Blk 1014 02 192 | Geylang East Ave 3 | | Singapore | | 389729 | |
| Flexlink Systems Inc | | 6580 Snowdrift Rd Ste 200 | | | Allentown | PA | 18106 | |
| Flextronics Asia Pacific International Ltd et al | c/o Steven J Reisman Esq | Curtis Mallet Prevost Colt & Mosle LLP | 101 Park Ave | | New York | NY | 10178-0061 | |
| Flextronics Asia Pacific International Ltd et al | c/o Steven J Reisman Esq | Curtis Mallet Prevost Colt & Mosle LLP | 101 Park Ave | | New York | NY | 10178-0061 | |
| Flextronics Asia Pacific International Ltd et al | c/o Steven J Reisman Esq | Curtis Mallet Prevost Colt & Mosle LLP | 101 Park Ave | | New York | NY | 10178-0061 | |
| Floform Ltd | Joseph R Sgroi | Honigman Miller Schwartz and Cohn LLP | 2290 First National Bldg | 660 Woodward Ave | Detroit | MI | 48226 | |
| Florence B Sherwood | | 770 West Cooper Dr | | | Lexington | KY | 40502-2276 | |
| Florence Palmer Sterrett | Steve Davies | Mellon Private Wealth Mgmt | Three Mellon Center Ste 1215 | | Pittsburgh | PA | 15259 | |
| Florence Sandoval | | 3734 Lake Blue Dr North West | | | Winter Haven | FL | 33881-1085 | |
| Florence V Maddocks and | | Florence Law Jt Ten | 741 Pebble Beach Ave Ne | | Palm Bay | FL | 32905 | |
| Florence V Maddocks and James | | N Maddocks Jt Ten | 741 Pebble Beach Ave Ne | | Palm Bay | FL | 32905 | |
| Florence V Maddocks and Joseph | | B Maddocks Jt Ten | 741 Pebble Beach Ave Ne | | Palm Bay | FL | 32905 | |
| Florentine Dearman | | 1609 Westover Ln | | | Mansfield | OH | 44906-3342 | |
| Floriana Giuffre Montagnese | | Via Deiverdi 5 Isolato 283 | 98100 Messina | Sicily | | | | Italy |
| Florida Production Eng Eft Ernie Green Industries Inc | | 1785 Big Hill Rd | | | Dayton | OH | 45439-2219 | |
| Floyd B Hopkins III | | 208 Ogden Parma Townline Rd | | | Spencerport | NY | 14559 | |
| Floyd G Butterfield | | 10080 South 17 Rd | | | Cadillac | MI | 49601 | |
| Floyd Lee Haddix and Wilma | | Jean Haddix Jt Ten | 8234 Potter Rd | | Davison | MI | 48423-8146 | |
| Floyd Manufacturing Co Inc | Scott D Rosen | Cohn Birnbaum & Shea PC | 100 Pearl St 12th Fl | | Hartford | CT | 06103 | |
| Floyd W Peterson | | Schleissheimer Ste 264 | 80809 Munich | | | | | Germany |
| Fluid Transfer Systems Inc | | 22545 Heslip | | | Novi | MI | 48375-4144 | |
| Fluidtrols Corporation  Eft | | PO Box 80226 | | | Fort Wayne | IN | 46898 | |
| Fluke Biomedical Llc | | 22865 Network Pl | | | Chicago | IL | 60673-1228 | |
| Fluor Corporation | c/o Bailey Cavalieri LLC | Sarah E Lynn | 10 West Brd St 21St Fl | One Columbus | Columbus | OH | 43215 | |
| Fluor Corporation | c/o Bailey Cavalieri LLC | Sarah E Lynn | 10 West Brd St 21St Fl | One Columbus | Columbus | OH | 43215 | |

| CreditorName | CreditorNoticeName | Address1 | Address2 | Address3 | Address4 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|---|---|
| CPI WIRECLOTH & SCREENS, INC | | 2425 ROY RD | | | | PEARLAND | TX | 77581 | |
| CPL RETAIL ENERGY | | PO BOX 22136 | | | | TULSA | OK | 74121-2136 | |
| CPP INC | | 3803 E BAYSHORE RD | | | | PALO ALTO | CA | 94303 | |
| CPP INC  DAVIES BLACK PUBLISHING | | PO BOX 49156 | | | | SAN JOSE | CA | 95161-9156 | |
| CPP INC DAVIES BLACK | | PUBLISHING | PO BOX 10096 | 3803 E BAYSHORE RD | | PALO ALTO | CA | 94303 | |
| CPR III INC | | PREFERRED ENGINEERING | 380 SOUTH ST | | | ROCHESTER | MI | 48307 | |
| CPR III INC | | 380 SOUTH ST | | | | ROCHESTER | MI | 48307 | |
| CPS ELECTRONICS | | PO BOX 52165 | | | | IRVINE | CA | 92619 | |
| CPS ENGINEERING INC | | 820 THOMPSON AVE STE 41 | | | | GLENDALE | CA | 91201 | |
| CPS ENGINEERING INC | | 820 THOMPSON AVE UNIT 41 | | | | GLENDALE | CA | 91201 | |
| CPS PROGRAMMIER SERVICE GMBH | | KOENIGSBERGER STRASSE 3 | | | | LINDHORST | | 31698 | GERMANY |
| CPS SOUTHWEST | | 1940 B PETRA LN | | | | PLACENTIA | CA | 92870 | |
| CPS TRUCKING INC | | PO BOX 69 | | | | ALTO | GA | 30510 | |
| CPU OPTIONS INC | | 9401 WINNETKA AVE N | | | | BROOKLYN PK | MN | 55445-1618 | |
| CR DANIELS INC | | 3451 ELLICOTT CTR DR | | | | ELLICOTT CITY | MD | 21043 | |
| CR DIESEL & TURBO INC | | 2000 WOODBURN RD | | | | CAMPBELL RIVER | BC | V9W 7A7 | CANADA |
| CR DIT AGRICOLE ASSET MANAGEMENT SA | MS VERONIQUE VIGNER | 90 BLVD PASTEUR | SERVICE DOCUMENTATION ECONOMIQUE | | | PARIS | | 75015 | FRANCE |
| CR MICROFILM CENTER INC EFT | | 2100 AUSTIN ST | | | | MIDLAND | MI | 48642 | |
| CRA HOLDINGS INC | | 651 COLBY DR | | | | WATERLOO | ON | N2V 1C2 | CANADA |
| CRA INTERNATIONAL | | PO BOX 845960 | | | | BOSTON | MA | 022845960 | |
| CRABB CLARA | | 94 BLANCHARD LN | | | | MARTINSBURG | WV | 25401 | |
| CRABB RICHARD | | 94 BLANCHARD LN | | | | MARTINSBURG | WV | 25401 | |
| CRABILL MATTHEW | | 1828 KING AVE | | | | DAYTON | OH | 45420 | |
| CRABILL MONTY | | 11630 MARQUART RD | | | | NEW CARLISLE | OH | 45344 | |
| CRABLE DILLARD DIANA | | 1565 BELVOIR BLVD | | | | COLUMBUS | OH | 43228 | |
| CRABLE SANDRA | | 1023 E DIXON ST | | | | KOKOMO | IN | 46901 | |
| CRABTREE AMANDA | | 1067 BERTRAM AVE | | | | DAYTON | OH | 45406 | |
| CRABTREE AND ASSOCIATES | JOHN | 7326 E CHOLLIA LN | | | | SCOTTSDALE | AZ | 85250 | |
| CRABTREE ANTHONY | | 12395 FRANK LARY RD | | | | NORTHPORT | AL | 35476 | |
| CRABTREE BONITA | | 4552 BELVEDERE PK | | | | COLUMBUS | OH | 43228-6273 | |
| CRABTREE C T | | 34 GREENFIELD RD | SCARSBRICK | | | SOUTHPORT | | PR8 5LX | UNITED KINGDOM |
| CRABTREE CATERING | | 23656 VAN DYKE | | | | WARREN | MI | 48089 | |
| CRABTREE DAVID N | | 327 GAYWOOD DR | | | | CHESTERFIELD | IN | 46017-1325 | |
| CRABTREE ERNEST | | 6740 ST RT 122 SO | | | | EATON | OH | 45320 | |
| CRABTREE ERNEST | | 6740 ST RT 122 SOUTH | | | | EATON | OH | 45320 | |
| CRABTREE HEATHER | | 399 RUTLEDGE CT | | | | PERRYSBURG | OH | 43551 | |
| CRABTREE HEATHER | | 399 RUTTEDGE CT | | | | PERRYSBURG | OH | 43551 | |
| CRABTREE J | | 58 HOMESTALL RD | NORRIS GREEN | | | LIVERPOOL 11 | | L11 2TX | UNITED KINGDOM |
| CRABTREE JAY | | 302 ABERDEEN AVE | | | | OAKWOOD | OH | 45419 | |
| CRACE & ASSOCIATES | | DALE CARNEGIE TRAINING | 325 118TH AVE SE 104 | | | BELLEVUE | WA | 98005-3536 | |
| CRACE AND ASSOCIATES DALE CARNEGIE TRAINING | | 325 118TH AVE SE 104 | | | | BELLEVUE | WA | 98005-3536 | |
| CRACRAFT LARRY F | | 510 RUDGATE LN | | | | KOKOMO | IN | 46901-3816 | |
| CRACRAFT LARRY F | | 510 RUDGATE LN | | | | KOKOMO | IN | 46901-3816 | |
| CRADDOCK BRENT E | | 3275 TOWHEE ST | | | | INGLEWOOD | FL | 34224-9030 | |
| CRADDOCK DANIEL | | 7159 AKRON RD | | | | LOCKPORT | NY | 14094 | |
| CRADDOCK FINISHING CORPORATION | PAMELA ALEXANDER | PO BOX 269 | | | | EVANSVILLE | IN | 47702 | |
| CRADIT GREGORY | | 7051 TRINKLINE | | | | SAGINAW | MI | 48609 | |
| CRADLEBAUGH MATTHEW | | 16356 OAK HILL DR | | | | FENTON | MI | 48430 | |
| CRADLEBAUGH TERRY L | | 11385 OREGON CIR | | | | FENTON | MI | 48430-2432 | |
| CRADLEBAUGH, MATTHEW G | | 16356 OAK HILL DR | | | | FENTON | MI | 48430 | |
| CRAFT BEN | | 2233 DRUMMOND DR | | | | XENIA | OH | 45385 | |
| CRAFT CARL G | | 615 HOLL RD NE | | | | NORTH CANTON | OH | 44720-1773 | |
| CRAFT CARYN | | 707 FRAZER | | | | OWOSSO | MI | 48867 | |
| CRAFT CHRIS | | 5332 ROOTSTOWN RD | | | | RAVENNA | OH | 44266 | |
| CRAFT CO ENTERPRISES INC | | PO BOX 4126 | | | | BRANDON | MS | 39047-4126 | |
| CRAFT CO ENTERPRISES INC | | PO BOX 67000 DEPT 259101 | | | | DETROIT | MI | 48267-2591 | |
| CRAFT DION | | 5220 BROOKMILL CT | | | | DAYTON | OH | 45414 | |
| CRAFT FARMS GULF SHORES | | 3750 GULF SHORES PKWY | | | | GULF SHORES | AL | 36542 | |
| CRAFT JAMES | | PO BOX 1091 | | | | RALEIGH | MS | 39153 | |
| CRAFT KAREN | | 1505 ROSLYN RD | | | | GROSSE POINTE WOODS | MI | 48236 | |
| CRAFT KAREN | | 1505 ROSLYN RD | | | | GROSSE POINTE WOODS | MI | 48236 | |
| CRAFT KATHY | | 25185 OAK GROVE RD | | | | ATHENS | AL | 35613-3062 | |
| CRAFT MARY | | 11444 OLDS RD | | | | OTISVILLE | MI | 48463-0000 | |

Delphi Corporation

| CreditorName | CreditorNoticeName | Address1 | Address2 | Address3 | Address4 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|---|---|
| FINANZAMT BONN INNENSTADT | | WELSCHNONNENSTR 15 | | | | BONN | | 53111 | GERMANY |
| FINANZAMT BONN INNENSTADT | | WELSCHNONNENSTR 15 | | | | BONN | | 53111 | GERMANY |
| FINANZAMT GUMMERSBACH | | MUHLENBERGWEG 5 | | | | GUMMERSBACH | | 51645 | GERMANY |
| FINANZAMT GUMMERSBACH | | MUHLENBERGWEG 5 | | | | GUMMERSBACH | | 51645 | GERMANY |
| FINANZAMT GUMMERSBACH | | MUHLENBERGWEG 5 | | | | GUMMERSBACH | | 51645 | GERMANY |
| FINANZAMT SPANDAU/BERLIN | | NONNENDAMMALLEE 15 21 | | | | BERLIN | | 13599 | GERMANY |
| FINANZAMT SPANDAU/BERLIN | | NONNENDAMMALLEE 15 21 | | | | BERLIN | | 13599 | GERMANY |
| FINANZAMT SPANDAU/BERLIN | | NONNENDAMMALLEE 15 21 | | | | BERLIN | | 13599 | GERMANY |
| FINANZAMT WALDSASSEN | | JOHANNISPLATZ 13 | | | | WALDSASSEN | | 95652 | GERMANY |
| FINANZAMT WALDSASSEN | | JOHANNISPLATZ 13 | | | | WALDSASSEN | | 95652 | GERMANY |
| FINANZAMT WALDSASSEN | | JOHANNISPLATZ 13 | | | | WALDSASSEN | | 95652 | GERMANY |
| FINANZAMT WUPPERTAL ELBERFELD | | KASINOSTR 12 | | | | WUPPERTHAL | | 42103 | GERMANY |
| FINANZAMT WUPPERTAL ELBERFELD | | KASINOSTR 12 | | | | WUPPERTHAL | | 42103 | GERMANY |
| FINANZAMT WUPPERTAL ELBERFELD | | KASINOSTR 12 | | | | WUPPERTHAL | | 42103 | GERMANY |
| FINATERI CHRISTINE | | 721 BLANCHARD AVE | | | | FLINT | MI | 48503 | |
| FINCH AUTOMATION EFT | | 7264 GEORGETOWN RD | | | | INDIANAPOLIS | IN | 46268 | |
| FINCH AUTOMATION EFT | | FMLY FINCH AIR CONTROLS INC | 7264 GEORGETOWN RD | | | INDIANAPOLIS | IN | 46268 | |
| FINCH AUTOMATION INC | | 7264 GEORGETOWN RD | | | | INDIANAPOLIS | IN | 46268 | |
| FINCH AUTOMATION INCKOK | JERRI JIM | 7264 GEORGETOWN RD | | | | INDIANAPOLIS | IN | 46268 | |
| FINCH BAYLESS | | PO BOX 30028 | | | | OMAHA | NE | 68103-1128 | |
| FINCH CAROL ANN | | 319 ORCHARD LN | | | | COURTLAND | OH | 44410 | |
| FINCH CHARLES | | 1134 N 31ST ST | | | | SAGINAW | MI | 48601-6125 | |
| FINCH DAVID | | 108 CHESTNUT CIRCLE WEST | | | | DAVISON | MI | 48423 | |
| FINCH DELMAR | | 950 PINECREEK DR | | | | DAYTON | OH | 45458 | |
| FINCH DONNA J | | 6377 N SEYMOUR RD | | | | FLUSHING | MI | 48433-1087 | |
| FINCH GREGORY | | 6839 SOUTHERN VISTA DR | | | | ENON | OH | 45377 | |
| FINCH JR JAMES | | 10126 DENNISON ASHTABULA RD | | | | EAST ORWELL | OH | 44076 | |
| FINCH MICHAEL D | | 4260 ISLAND VIEW DR | | | | FENTON | MI | 48430-9144 | |
| FINCH PAUL | | 319 ORCHARD LN | | | | CORTLAND | OH | 44410 | |
| FINCH PRUYN & COMPANY INC | | 1 GLEN ST | | | | GLENS FALLS | NY | 12801 | |
| FINCH PRUYN & COMPANY INC | | 1 GLEN ST | | | | GLENS FALLS | NY | 12801 | |
| FINCH PRUYN & COMPANY INC | | 1 GLEN ST | | | | GLENS FALLS | NY | 12801 | |
| FINCH RENTAL INC | | 1930 KUNTZ RD | | | | DAYTON | OH | 45404 | |
| FINCH RENTAL INC | | 1930 KUNTZ RD | | | | DAYTON | OH | 45404-1237 | |
| FINCH ROBERT | | 2017 CLEARSTREAM WAY | | | | CLAYTON | OH | 45315 | |
| FINCHER KEITH | | 13438 NEEDHAM PL NW | | | | PICKERINGTON | OH | 43147 | |
| FINCHER LARRY | | 2420 KATHY LN SW | | | | DECATUR | AL | 35603 | |
| FINCHER, KATHY | | 2420 KATHY LN SW | | | | DECATUR | AL | 35603 | |
| FINCHER, LARRY W | | 2420 KATHY LN S W | | | | DECATUR | AL | 35603 | |
| FINDLAY & TAIT | | SA RESERVE BANK BLDG | 60 ST GEORGES MALL | 8000 CAPE TOWN | | | | | SOUTH AFRICA |
| FINDLAY AND TAIT SA RESERVE BANK BLDG | | PO BOX 248 | 8000 CAPE TOWN | | | | | | SOUTH AFRICA |
| FINDLAY ANN | | 1348 N BLOCK RD | | | | REESE | MI | 48757-9310 | |
| FINDLAY CHEVROLET | | 6800 S TORREY PINES DR | | | | LAS VEGAS | NV | 89118-3267 | |
| FINDLAY DAVID | | 1348 N BLOCK RD | | | | REESE | MI | 48757 | |
| FINDLAY INDUSTRIES | | 4000 FOSTORIA AVE | | | | FINDLAY | OH | 45840 | |
| FINDLAY INDUSTRIES | ACCOUNTS PAYABLE | 18036 EADS AVE | | | | CHESTERFIELD | MO | 63017 | |
| FINDLAY INDUSTRIES | ACCOUNTS PAYABLE | 4000 FOSTORIA RD | | | | FINDLAY | OH | 45840 | |
| FINDLAY INDUSTRIES DE MEXICO | | PARQUE INDUSTRIAL FINSA NAVE 22A | AUTOPISTA MEXICO PUEBLA KM 117 | | | CUATLANCINGO PUE | | 72710 | MEXICO |
| FINDLAY INDUSTRIES INC | | 1957 CROOKS RD | | | | TROY | MI | 48084 | |
| FINDLAY INDUSTRIES INC | | 217 SOUTH ALEX | | | | WEST CARROLLTON | OH | 45449 | |
| FINDLAY INDUSTRIES INC | | 5500 FOSTORIA RD | | | | FINDLAY | OH | 45840 | |
| FINDLAY INDUSTRIES INC | | MOLDED PRODUCTS DIV | 2100 C FOSTORIA AVE | | | FINDLAY | OH | 45840 | |
| FINDLAY INDUSTRIES INC | | PLANT 1 | 4000 FOSTORIA RD | | | FINDLAY | OH | 45840-8733 | |
| FINDLAY INDUSTRIES INC | | PO BOX 711987 | | | | CINCINNATI | OH | 45271-1987 | |
| FINDLAY INDUSTRIES INC | | SERVICE PRODUCTS DIV | 5500 FOSTORIA RD | | | FINDLAY | OH | 45840 | |
| FINDLAY INDUSTRIES INC | ACCOUNTS PAYABLE | 217 SOUTH ALEX RD | | | | WEST CARROLLTON | OH | 45449 | |
| FINDLAY INDUSTRIES INC EFT | | 4000 FOSTORIA RD | | | | FINDLAY | OH | 45840 | |
| FINDLAY INDUSTRIES INC EFT | | PO BOX 711987 | | | | CINCINNATI | OH | 45271-1987 | |
| FINDLAY INDUSTRIES INC LAKE WALES | | 1230 NORTH SCENIC HWY | | | | LAKE WALES | FL | 33853 | |
| FINDLAY JUDITH E | | 7190 N US 1 202 | | | | COCOA | FL | 32927-5062 | |
| FINDLAY MACHINE & TOOL INC | | ADDR 1 99 | 1950 INDUSTRIAL RD | | | FINDLAY | OH | 45839 | |
| FINDLAY MACHINE AND TOOL INC | | PO BOX 1562 | | | | FINDLAY | OH | 45839 | |
| FINDLAY MACHINE TOOL INC | | FMT | 1950 INDUSTRIAL DR | | | FINDLAY | OH | 45840 | |

Delphi Corporation

| CreditorName | CreditorNoticeName | Address1 | Address2 | Address3 | Address4 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|---|---|
| MARTINDALE BARRY | | 221 WEST MILL ST BOX 253 | | | | ELDORADO | OH | 45321 | |
| MARTINDALE DONALD | | 5467 NAUGHTON DR | | | | HUBER HEIGHTS | OH | 45424-6001 | |
| MARTINDALE ELECTRIC CO | | 1369 75 HIRD AVE | | | | CLEVELAND | OH | 44107 | |
| MARTINDALE ELECTRIC CO EFT | | 1375 HIRD AVE | | | | LAKEWOOD | OH | 44107 | |
| MARTINDALE ELECTRIC CO EFT | | BOX 430 EDGEWATER BRANCH | | | | CLEVELAND | OH | 44107-0430 | |
| MARTINDALE JAIME | | 136 HIGHLAND DR | | | | GLENBEULAH | WI | 53023-1114 | |
| MARTINDALE PAUL | | 13707 E GOLDFINCH DR | | | | CARMEL | IN | 46032 | |
| MARTINDALE ROBERT | | 4267 CONFERENCE RD | | | | BELLBROOK | OH | 45305 | |
| MARTINDALE ROBERT A | | 136 HIGHLAND DR | | | | GLEN BULAH | WI | 53023 | |
| MARTINDALE WILLIAM | | 813 BELLA CUMBRE | | | | EL PASO | TX | 79912 | |
| MARTINDALE, PAUL R | | 13707 E GOLDFINCH DR | | | | CARMEL | IN | 46032 | |
| MARTINDALE, WILLIAM R | | 813 BELLA CUMBRE | | | | EL PASO | TX | 79912 | |
| MARTINEAU BETTY J | | 1340 LAFAYETTE AVE | | | | NIAGARA FALLS | NY | 14305-1132 | |
| MARTINEAU, TONIA | | 9359 FAIR LN | | | | FREELAND | MI | 48623 | |
| MARTINELLE NICHOLAS | | 36 N DEQUINCY ST | | | | INDIANAPOLIS | IN | 46201-3750 | |
| MARTINELLO MATTHEW | | 734 AUBURN AVE | | | | BUFFALO | NY | 14222 | |
| MARTINELLO, MATTHEW | | 346 BEDFORD AVE APT 1 | | | | BUFFALO | NY | 14216 | |
| MARTINES KEITH | | 9394 ISABELLE LN | | | | DAVISON | MI | 48423 | |
| MARTINES KENNETH | | 3140 RISEDORPH AVE | | | | FLINT | MI | 48506-3047 | |
| MARTINEZ ADRIAN | | 6837 CANYON VIEW | | | | EL PASO | TX | 79912 | |
| MARTINEZ ALVARO | | 411 WALNUT ST 2525 | | | | GREEN COVE SPRINT | FL | 32043 | |
| MARTINEZ ALVARO | | 615 BRIGGS | | | | ERIE | CO | 80516-0211 | |
| MARTINEZ ANGEL | | 151 SO WAGNER | | | | BAY CITY | MI | 48708-9144 | |
| MARTINEZ ANGELICA | | 1199 S BOULDER RD 48 | | | | LAFAYETE | CO | 80026 | |
| MARTINEZ ANGELINA | | 905 GLEN DALE | | | | DACONO | CO | 80514 | |
| MARTINEZ ANTHONY | | 1203 LISA LN | | | | BURKBURNETT | TX | 76354 | |
| MARTINEZ ANTHONY | | 1203 LISA LN | | | | BURKBURNETT | TX | 76354 | |
| MARTINEZ BILLIE | | 10133 PINEHURST AVE | | | | SOUTH GATE | CA | 90280 | |
| MARTINEZ CARLOS | | 2115 BRO MOR | | | | SAGINAW | MI | 48602 | |
| MARTINEZ CARLOS | | G&C MOLD CO | 11430 CEDAR OAK DR | | | EL PASO | TX | 79936 | |
| MARTINEZ CAROLYN | | 5445 KATHERINE CT | | | | SAGINAW | MI | 48603 | |
| MARTINEZ CAYETANA R | | 2576 MOONGLOW ST | | | | SAGINAW | MI | 48603-2532 | |
| MARTINEZ DANIEL | | 1 VIA PLACITA | | | | EL PASO | TX | 79927 | |
| MARTINEZ DANIEL | | 3020 NORTHWEST DR | | | | SAGINAW | MI | 48603 | |
| MARTINEZ DANIEL | | DELNOSA MCALLEN TRADE ZONE 12 | 6901 S 33RD ST BLDG T | PO BOX 2287 | | MCALLEN | TX | 78501 | |
| MARTINEZ DIMAS | | 6225 WILSHIRE RD | | | | SAGINAW | MI | 48601 | |
| MARTINEZ DONNIE | | 15727 WINTERS LN | | | | RIVERSIDE | CA | 92504 | |
| MARTINEZ DORA L | | PO BOX 351 | | | | FREDERICK | CO | 80530 | |
| MARTINEZ ELIZABETH | | 11928 CREWE ST | | | | NORWALK | CA | 90650 | |
| MARTINEZ ELVIA | | 38471 N EMERALD LN | | | | WESTLAND | MI | 48185 | |
| MARTINEZ FABIAN | | 3070 BAY | | | | UNIONVILLE | MI | 48767 | |
| MARTINEZ GLORIA | | 1574 DARTMOUTH RD | | | | ST HELEN | MI | 48656 | |
| MARTINEZ GLORIA | | 1574 DARTMOUTH RD | | | | ST HELEN | MI | 48656 | |
| MARTINEZ GROUP INC | | 1175 ALEXANDER COURT | | | | CARY | IN | 60013 | |
| MARTINEZ GUSTAVO | | 9200 VICKSBURG | | | | EL PASO | TX | 79924 | |
| MARTINEZ JANICE | | 325 WILCOX ST | | | | ROCHESTER | MI | 48307 | |
| MARTINEZ JAVIER | | 345 PLANET ST | | | | ROCHESTER | NY | 14606-3044 | |
| MARTINEZ JAVIER | | 345 PLANET ST | | | | ROCHESTER | NY | 14606-3044 | |
| MARTINEZ JIM LEE | | 20608 BRANA RD | | | | RIVERSIDE | CA | 92508 | |
| MARTINEZ JOHN | | 1003 S WINTER ST | | | | ADRIAN | MI | 49221 | |
| MARTINEZ JOHN RICHARD | | 1426 LAMPLIGHTER DR | | | | LONGMONT | CO | 80501 | |
| MARTINEZ JOSE | | 1901 JOSLIN ST | | | | SAGINAW | MI | 48602-1124 | |
| MARTINEZ JOSE ANGEL MATA | C/O EVERARDO ABREGO | 944 W NOLANA | STE C | | | PHARR | TX | 78577 | |
| MARTINEZ JOSE ANGEL MATA | C/O EVERARDO ABREGO | 944 W NOLANA | STE C | | | PHARR | TX | 78577 | |
| MARTINEZ JOSE ANGEL MATA | CARLOS HERNADEZ ESQ | LAW OFFICE OF CARLOS E HERNADEZ | JR 101 N 10TH ST | | | EDINBURG | TX | 78539 | MEXICO |
| MARTINEZ JOSE ANGEL MATA | EVERADO ABREGO ESQ | 944 W NOLANA | STE C | | | PHARR | TX | 78577 | MEXICO |
| MARTINEZ JOSE ANGEL MATA | NORMAN JOLLY ESQ | 1018 PRESTON | 4TH FL | | | HOUSTON | TX | 77002 | MEXICO |
| MARTINEZ JR , JOHN | | 1426 LAMPLIGHTER DR | | | | LONGMONT | CO | 80501 | |
| MARTINEZ JR , RICKY | | 1513 EMILY | | | | SAGINAW | MI | 48601 | |
| MARTINEZ JR SAMUEL | | 4627 MOURNING DOVE LN | | | | WICHITA FALLS | TX | 76306 | |
| MARTINEZ KATHERINE | | 2797 SAKEY | | | | SAGINAW | MI | 48601-9217 | |
| MARTINEZ LOUIS | | 478 FORT GRAY DR | | | | LEWISTON | NY | 14092-1940 | |
| MARTINEZ LUIS | | PO BOX 417 | | | | OLCOTT | NY | 14126 | |
| MARTINEZ LUIS | | 2238 CYBELLE CT | | | | MIAMISBURG | OH | 45342 | |
| MARTINEZ LUIS | | 569 PLYMOUTH AVE | | | | BUFFALO | NY | 14213 | |
| MARTINEZ LUIS | | 911 S 4TH ST | | | | MILWAUKEE | WI | 53204-1726 | |
| MARTINEZ LUIS | | PO BOX 417 | | | | OLCOTT | NY | 14126 | |
| MARTINEZ MANUEL | | 16114 SILVERWOOD DR | | | | FENTON | MI | 48430 | |
| MARTINEZ MANUFACTURING INC | | 1175 ALEXANDER CT | | | | GARY | IL | 60013 | |
| MARTINEZ MARCOS | | 4795 S WASHINGTON RD | | | | SAGINAW | MI | 48601-7205 | |

| CreditorName | CreditorNoticeName | Address1 | Address2 | Address3 | Address4 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|---|---|
| MEUNIER ELECTRONICS SUPPL | AMY CORLETTE | 3409 E WASHINGTON ST | | | | INDIANAPOLIS | IN | 46201 | |
| MEUNIER ELECTRONICS SUPPLY | | 3409 E WASHINGTON ST | | | | INDIANAPOLIS | IN | 46201-431 | |
| MEUNIER ELECTRONICS SUPPLY | JEFF DAVIS | 3409 E WASHINGTON ST | | | | INDIANAPOLIS | IN | 46201 | |
| MEUNIER ELECTRONICS SUPPLY INC | | 8245 TAUNTON RD | | | | INDIANAPOLIS | IN | 46260 | |
| MEVIS ELAINE | | 9260 S NICHOLSON RD | | | | OAK CREEK | WI | 53154-4652 | |
| MEVIS SPA | | VIA BORGO TOCCHI 28 32 | 36027 ROSA IT | | | | | | ITALY |
| MEVIS SPA | | VIA BORGO TOCCHI 28 32 | | | | ROSA | | 36027 | ITALY |
| MEXCOAT SA DE CV | | OTE 3 MZ 7 LOTS 10 | CO INDUSTRIAL TIZAYOCO HGO | | | | | | MEXICO |
| MEXCOAT SA DE CV | | ORIENTE 3 MZ 7 LOTE 10 | | | | TIZAYUCA | HG | 43800 | MX |
| MEXCOAT SA DE CV | | OTE 3 MZ 7 LOTS 10 | CO INDUSTRIAL TIZAYOCO HGO | | | | | | MEXICO |
| MEXCOAT SA DE CV EFT | | OTE 3 MZ 7 LOTS 10 | CO INDUSTRIAL TIZAYOCO HGO | | | | | | MEXICO |
| MEXICAN AMERICAN PRODUCTS LTD | | 40 SILVERDOME INDUSTRIAL PK | | | | PONTIAC | MI | 48342 | |
| MEXICAN AMERICAN PRODUCTS LTD | | MAP LTD | 40 SILVERDOME INDUSTRIAL PK | | | PONTIAC | MI | 48342 | |
| MEXICAN INDUSTRIES IN MICH EFT INC | | 1801 HOWARD ST | | | | DETROIT | MI | 48216 | |
| MEXICAN INDUSTRIES IN MICH INC | | DEXTER CORPORATION | 1801 HOWARD ST | INACTIVATE PER LEGAL 8 26 03 | | DETROIT | MI | 48216 | |
| MEXICAN INDUSTRIES IN MICHIGAN | | 1801 HOWARD ST | | | | DETROIT | MI | 48216 | |
| MEXICAN INDUSTRIES IN MICHIGAN | | 5200 STECKER | | | | DEARBORN | MI | 48126 | |
| MEXICAN INDUSTRIES IN MICHIGAN | | C/O COYNE & ASSOCIATES | 17320 W 12 MILE RD STE 100 | | | SOUTHFIELD | MI | 48076 | |
| MEXICAN INDUSTRIES IN MICHIGAN | | C/O FREEHAN BOCCI & CO | 909 HAYNES ST | | | BIRMINGHAM | MI | 48009 | |
| MEXICAN INTERNATIONAL INC | | 1420 CRUMLIN RD | | | | LONDON | ON | N5V 1S1 | CANADA |
| MEXICAN INTERNATIONAL INC | | 627 FORT ST | | | | PORT HURON | MI | 48060-3904 | |
| MEXIDEC SA DE CV | | AV DE LAS FUENTES NO 27 | | | | EL MARQUES | QRO | 76246 | MX |
| MEXIDEC SA DE CV | | PARQUE INDUSTRIAL BERNARDO QUINTANA | | | | EL MARQUES | QRO | 76246 | MX |
| MEY JAMES A | | 13684 BAUMGARTNER RD | | | | ST CHARLES | MI | 48655-8631 | |
| MEY RANDALL | | 11911 BAUMGARTNER RD | | | | SAINT CHARLES | MI | 48655-9675 | |
| MEYALDYNE CORP | | 47603 HALYARD DR | | | | PLYMOUTH | MI | 48170 | |
| MEYCO MACHINE & TOOL INC | | 11579 MARTENS RIVER CIRCLE | | | | FOUNTAIN VALLEY | CA | 92708 | |
| MEYER & NJUS | | 111 N STATE ST 11TH FLR STE 93 | | | | CHICAGO | IL | 60602 | |
| MEYER & NJUS | | 17340 W 12 MILE RD STE 200 | | | | SOUTHFIELD | MI | 48076 | |
| MEYER & NJUS | | ACT OF G GAINES GC 96 0617 | 29532 SOUTHFIELD STE 200 | | | SOUTHFIELD | MI | 37152-4035 | |
| MEYER AMANDA | | 14574 GRASS LAKE RD | | | | GRASS LAKE | MI | 49240 | |
| MEYER AND NJUS | | 17340 W 12 MILE RD STE 200 | | | | SOUTHFIELD | MI | 48076 | |
| MEYER AND NJUS ACT OF G GAINES GC 96 0617 | | 29532 SOUTHFIELD STE 200 | | | | SOUTHFIELD | MI | 48076 | |
| MEYER BILLY | | 3539 COZY CAMP RD | | | | MORAINE | OH | 45439 | |
| MEYER BRADLEY | | 4122 WILLOW RUN DR | | | | BEAVERCREEK | OH | 45430 | |
| MEYER BRENT | | 3163 FOSS DR | | | | SAGINAW | MI | 48603 | |
| MEYER BUILDING SITE TRUST | | C/O JOHNSON & BELL NL OBSALVO | 222 N LASALLE STE 2200 | | | CHICAGO | IL | 60601-1104 | |
| MEYER BUILDING SITE TRUST C O JOHNSON AND BELL NL OBSALVO | | 222 N LASALLE STE 2200 | | | | CHICAGO | IL | 60601-1104 | |
| MEYER CHRISTOPHER | | 6240 GENTRY WOODS DR | | | | CENTERVILLE | OH | 45459 | |
| MEYER CONRAD | | 13516 IROQUOIS WOODS DR | | | | FENTON | MI | 48430 | |
| MEYER DARRAGH BUCKLER BEBENEK | | & ECK | 120 LAKEMONT PK BLVD | | | ALTOONA | PA | 16602 | |
| MEYER DARRAGH BUCKLER BEBENEK | | & ECK | 2000 FRICK BLDG | | | PITTSBURGH | PA | 15219 | |
| MEYER DARRAGH BUCKLER BEBENEK | | & ECK | 800 1 VALLEY SQUARE | | | CHARLESTON | WV | 25301-1640 | |
| MEYER DARRAGH BUCKLER BEBENEK | | & ECK PLLC | 120 LAKEMONT PK BLVD | | | ALTOONA | PA | 16602 | |
| MEYER DARRAGH BUCKLER BEBENEK | | & ECK PLLC | 2000 FRICK BLDG | | | PITTSBURGH | PA | 15219-6194 | |
| MEYER DARRAGH BUCKLER BEBENEK | | AND ECK | 800 1 VALLEY SQUARE | | | CHARLESTON | WV | 25301-1640 | |
| MEYER DARRAGH BUCKLER BEBENEK AND ECK | | 120 LAKEMONT PK BLVD | | | | ALTOONA | PA | 16602 | |
| MEYER DARRAGH BUCKLER BEBENEK AND ECK | | 2000 FRICK BLDG | | | | PITTSBURGH | PA | 15219 | |
| MEYER DARRAGH BUCKLER BEBENEK AND ECK PLLC | | 120 LAKEMONT PK BLVD | | | | ALTOONA | PA | 16602 | |
| MEYER DARRAGH BUCKLER BEBENEK AND ECK PLLC | | 2000 FRICK BLDG | | | | PITTSBURGH | PA | 15219-6194 | |

| CreditorName | CreditorNoticeName | Address1 | Address2 | Address3 | Address4 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|---|---|
| OZBOLT MARK | | 31 LIVINGSTONE LN | | | | DECATUR | AL | 35603-5752 | |
| OZCUHACI OZKAN | | 25 STONE FENCE CIR | | | | ROCHESTER | NY | 14626 | |
| OZCUHACI, OZKAN | | 25 STONE FENCE CIR | | | | ROCHESTER | NY | 14626 | |
| OZDEMIR BULENT | | 1748 LANGFORD DR | | | | TROY | MI | 48083 | |
| OZELL BENJAMIN | | 18580 DEQUINDRE ST | | | | DETROIT | MI | 48234 | |
| OZEN S A | | 53 AVE GABRIEL VOISIN | B P NO 8 | 71700 TOURNUS | | | | | FRANCE |
| OZEN S A 53 AVENUE GABRIEL VOISIN | | B P NO 8 | 71700 TOURNUS | | | | | | FRANCE |
| OZEN S A 53 AVENUE GABRIEL VOISIN | | B P NO 8 | 71700 TOURNUS | | | | | | FRANCE |
| OZEN SA | | 53 RUE GABRIEL VOISIN | | | | TOURNUS | | 71700 | FRANCE |
| OZIMEK JOHN | | 4645 EAGLE CREEK RD | | | | LEAVITTSBURG | OH | 44430 | |
| OZINGA TRANSPORTATION C/O OZINGA ILLINOIS RMC INC | | 18825 OLD LAGRANGE RD | | | | MOKENA | IL | 60448 | |
| OZINGA TRANSPORTATION C/O OZINGA ILLINOIS RMC INC | | 18825 OLD LAGRANGE RD | | | | MOKENA | IL | 60448 | |
| OZINGA TRANSPORTATION C/O OZINGA ILLINOIS RMC INC | | 18825 OLD LAGRANGE RD | | | | MOKENA | IL | 60448 | |
| OZINGA TRANSPORTATION SYS INC | | 21900 S CENTRAL AVE | | | | MATTESON | IL | 60443 | |
| OZKAYNAK, TARIK | | 39 TERESA CIR | | | | ROCHESTER | NY | 14624 | |
| OZMENT MELODY A | | 643 S BELL ST | | | | KOKOMO | IN | 46901-5526 | |
| OZOGAR DONALD | | 4305 BROOKSIDE DR | | | | KOKOMO | IN | 46902 | |
| OZONE AUTO SVC INC | | 87 19 ROCKAWAY BLVD | | | | OZONE PK | NY | 11416 | |
| OZSOYLU SUAT | | 1660 RIDGECREST | | | | ROCHESTERHILLS | MI | 48306 | |
| OZSOYLU, SUAT A | | 1660 RIDGECREST | | | | ROCHESTERHILLS | MI | 48306 | |
| OZTURKOGLU, ORHAN | | 489 STONE RD | | | | ROCHESTER | NY | 14616 | |
| OZUNA ELLA | | 12388 N MESQUITE CREST | | | | ORO VALLEY | AZ | 85737 | |
| P & A CONVEYOR SALES INC | | 18999 QUARRY RD | | | | RIVERVIEW | MI | 48192 | |
| P & A CONVEYOR SALES INC | | PO BOX 2145 | | | | RIVERVIEW | MI | 48192 | |
| P & A INDUSTRIES INC EFT | | PO BOX 631005 | | | | CINCINNATI | OH | 45263-1005 | |
| P & B TRANSPORTATION INC | | 601 MARCO RD | | | | APOLLO | PA | 15613-8854 | |
| P & B TRUCKING INC | | 1038 N 2ND ST | | | | DECATUR | IN | 46733 | |
| P & E MICRO COMPUTER SYSTEMS | | PO BOX 2044 | | | | WOBURN | MA | 01888 | |
| P & E MICRO COMPUTER SYSTEMS INC | | 656 BEACON ST STE 2 | | | | BOSTON | MA | 02215-2006 | |
| P & E MICROCOMPUTER SYSTEMS | | 98 GALEN ST 2ND FL | | | | WATERTOWN | MA | 02472-4502 | |
| P & E MICROCOMPUTER SYSTEMS INC | | 98 GALEN ST 2ND FL | | | | WATERTOWN | MA | 02472-4502 | |
| P & G STEEL PRODUCTS CO INC | | 54 GRUNER RD | | | | BUFFALO | NY | 14227-1007 | |
| P & H AUTO ELECTRIC | | PO BOX 25889 | | | | BALTIMORE | MD | 21224-0589 | |
| P & H AUTO ELECTRIC BDC | | 7990 92 E BALTIMORE ST | | | | BALTIMORE | MD | 21224-2010 | |
| P & J INDUSTRIES INC | | 6841 COMMERCE ST | | | | EL PASO | TX | 79901 | |
| P & J INDUSTRIES INC | | 44 BUTTERFIELD CIR | | | | EL PASO | TX | 79906 | |
| P & J INDUSTRIES INC | | 4934 LEWIS AVE | REMIT UPTD 03 2000 | | | TOLEDO | OH | 43612 | |
| P & J INDUSTRIES INC | | 4934 LEWIS AVE | | | | TOLEDO | OH | 43612 | |
| P & J MANUFACTURING CO | | 1644 CAMPBELL ST | | | | TOLEDO | OH | 43607 | |
| P & J MANUFACTURING INC | | 1644 CAMPBELL ST | | | | TOLEDO | OH | 43607-4381 | |
| P & M PROCESS EQUIPMENT INC | | 2005 W DETROIT | | | | BROKEN ARROW | OK | 74012-3616 | |
| P & M PRODUCTS EFT | | DIV OF FINDLAY INDUSTRIES | 155B MALOW | | | MT CLEMENS | MI | 48043 | |
| P & M TRUCKING INC | | PAYLOAD ACCOUNT | 3181 KRAFFT RD | PO BOX 910360 | | FORT GRATIOT | MI | 48059 | |
| P & O NEDLLOYD | | 12TH FL ONE MEADOWLANDS | PLAZA | | | EAST RUTHERFORD | NJ | 07073 | |
| P & O NEDLLOYD | | 1 MEADOWLANDS PLZ | | | | EAST RUTHERFORD | NJ | 7073 | |
| P & O NEDLLOYD | | SCWSCACPOCL | 1 MEADOWLANDS PLAZA | | | E RUTHERFORD | NJ | 07073 | |
| P & O NEDLLOYD | | 12TH FL ONE MEADOWLANDS | PLAZA | | | EAST RUTHERFORD | NJ | 07073 | |
| P & O NEDLLOYD | | 12TH FL ONE MEADOWLANDS | PLAZA | | | EAST RUTHERFORD | NJ | 07073 | |
| P & P INDUSTRIES INC | | 14729 SPRING VALLEY RD | | | | MORRISON | IL | 61270-9791 | |
| P & P TRANSPORT | | PO BOX 1710 | | | | DELRAN | NJ | 08075 | |
| P & R COMMUNICATIONS SERVICE | | 731 E 1ST ST | | | | DAYTON | OH | 45402 | |
| P & R COMMUNICATIONS SERVICE | | INC | 731 E 1ST ST | RMT CHNG 082505 CS | | DAYTON | OH | 45402 | |
| P & R COMMUNICATIONS SERVICE I | | 700 E 1ST ST | | | | DAYTON | OH | 45402-1383 | |
| P & R COMMUNICATIONS SERVICE INC | | 700 E FIRST ST | | | | DAYTON | OH | 45402 | |
| P & R FASTENERS INC | | 5 HOLLYWOOD CT | | | | SOUTH PLAINFIELD | NJ | 07080 | |
| P & R FASTENERS INC | | C/O OLDFORD & ASSOCIATES | 3555 WALNUT ST | | | PORT HURON | MI | 48060 | |
| P & R FASTENERS INC EFT | | 325 PIERCE ST | | | | SOMERSET | NJ | 08873 | |

| CreditorName | CreditorNoticeName | Address1 | Address2 | Address3 | Address4 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|---|---|
| P & R FASTENERS INC EFT | | 325 PIERCE ST | | | | SOMERSET | NJ | 08873-1229 | |
| P & R FASTENERS INC EFT | | 325 PIERCE ST | | | | SOMERSET | NJ | 08873 | |
| P & R INDUSTRIES INC | | 1524 N CLINTON AVE | | | | ROCHESTER | NY | 14621-220 | |
| P & R INDUSTRIES INC EFT | ACCOUNTS RECEIVABLE | 1524 CLINTON AVE N | | | | ROCHESTER | NY | 14621 | |
| P & R INDUSTRIES INC EFT | ACCOUNTS RECEIVABLE | PO BOX 8000 DEPT 850 | UPDT 3 2000 LETTER | | | BUFFALO | NY | 14267 | |
| P A C EQUIPMENT CO INC | | 2600 ARBOR GLEN DR STE 206 | | | | TWINSBURG | OH | 44087 | |
| P A INDUSTRIES INC | | 522 COTTAGE GROVE RD | | | | BLOOMFIELD | CT | 06002 | |
| P A INDUSTRIES INC | | 522 COTTAGE GROVE RD | RMT 11 00 LETTER KL | | | BLOOMFIELD | CT | 06002 | |
| P A INDUSTRIES INC | | LOCKBOX 5056 PO BOX 30000 | | | | HARTFORD | CT | 06150-5056 | |
| P A T PRODUCTS INC | | 44 CENTRAL ST | | | | BANGOR | ME | 04401-5106 | |
| P AND  M PRECISION MACHINING INC | | 65 BUCK RD | | | | HUNTINGDON VALLEY | PA | 19006 | |
| P AND  W MARKETING INC | | PO BOX 4866 | | | | YOUNGSTOWN | OH | 44515 | |
| P AND A CONVEYOR SALES INC | | PO BOX 2145 | | | | RIVERVIEW | MI | 48192 | |
| P AND B TRANSPORTATION INC | | 601 MARCO RD | | | | APOLLO | PA | 15613-8854 | |
| P AND B TRUCKING INC | | 1038 N 2ND ST | | | | DECATUR | IN | 46733 | |
| P AND E MICROCOMPUTER SYSTEMS INC | | 98 GALEN ST 2ND FL | | | | WATERTOWN | MA | 02472-4502 | |
| P AND G MACHINE | | 99 JEFFERSON AVE | | | | BAYSHORE | NY | 11706 | |
| P AND J MANUFACTURING INC | | 1644 CAMPBELL ST | | | | TOLEDO | OH | 43607-4381 | |
| P AND M PRODUCTS EFT DIV OF FINDLAY INDUSTRIES | | PO BOX 931544 | | | | CLEVELAND | OH | 44193-5016 | |
| P AND P TRANSPORT | | PO BOX 1710 | | | | DELRAN | NJ | 08075 | |
| P AND R COMMUNICATIONS | JOHN VLAHOS | 731 E. FIRST ST | | | | DAYTON | OH | 45401 | |
| P AND R COMMUNICATIONS SERV | JOHN JILL | 700 E. FIRST ST | PO BOX 1444 | | | DAYTON | OH | 45401 | |
| P AND R FASTENERS INC | | 325 PIERCE ST | | | | SOMERSET | NJ | 08873 | |
| P B & S CHEMICAL COMPANY INC | | 755 BROWNS LOCK RD | | | | BOWLING GREEN | KY | 42101 | |
| P BARNETT CONSTRUCTION CO LTD | | LOCK BOX D 860542 | | | | ORLANDO | FL | 32886-0542 | |
| P BARNETT CONSTRUCTION CO LTD | | PH00515101 TBUICK001 LBU1001 | D 860542 | | | ORLANDO | FL | 32886-0542 | |
| P C QUOTE INC | | 300 S WACKER DR STE 300 | | | | CHICAGO | IL | 60606 | |
| P C S COMPANY | | 34488 DOREKA | | | | FRASER | MI | 48026-3438 | |
| P CAVILS TIRE & AUTO CNTR | | 1200 W 14 MILE RD | | | | CLAWSON | MI | 48017 | |
| P D A INC | | 8080 SOUTHPARK LN | | | | LITTLETON | CO | 80120-5640 | |
| P D GEORGE CO | | 5200 N 2ND ST | | | | SAINT LOUIS | MO | 63147 | |
| P D GEORGE CO | | OFF EFT PER VENDOR 11 10 98 | PO BOX 66756 | | | ST LOUIS | MO | 63166 | |
| P D GEORGE CO | | PO BOX 503703 | | | | ST LOUIS | MO | 63150-3703 | |
| P D GEORGE COMPANY | JIM MCMILLIN | 5200 N SECOND ST | | | | ST LOUIS | MO | 63147 | |
| P D Q TRANSPORT INC | | PO BOX 246 | | | | CHEYENNE | WY | 82003 | |
| P E HANDLEY WALKER INC | | 6000 FREEDOM SQUARE DR | STE 140 | | | INDEPENDENCE | OH | 44131 | |
| P F MARKEY INC EFT | | 2880 UNIVERSAL DR | | | | SAGINAW | MI | 48603 | |
| P F MARKEY INC EFT | | PO BOX 5769 | | | | SAGINAW | MI | 48603 | |
| P G AUTO PARTS INC | | DBA AUTOMATE WAREHOUSE | 1313 NATIONAL AVE | | | SAN DIEGO | CA | 92101 | |
| P H GLATFELTER COMPANY F/K/A/ BERGSTROM PAPER CO | C/O BALLARD SPAHR ANDREWS & INGERSOLL | MORRIS CHESTON | 1735 MARKET ST | 51ST FL | | PHILADELPHIA | PA | 19103-7599 | |
| P H GLATFELTER COMPANY F/K/A/ BERGSTROM PAPER CO | PATRICK ZAEPFEL | 96 SOUTH GEORGE ST | STE 500 | | | YORK | PA | 17401-1434 | |
| P H GLATFELTER COMPANY F/K/A/ BERGSTROM PAPER CO | PATRICK ZAEPFEL | 96 SOUTH GEORGE ST | STE 500 | | | YORK | PA | 17401-1434 | |
| P H GLATFELTER COMPANY F/K/A/ BERGSTROM PAPER CO | PATRICK ZAEPFEL | 96 SOUTH GEORGE ST | STE 500 | | | YORK | PA | 17401-1434 | |
| P H PRECISION PRODUCTS CORP | | 340 COMMERCE WAY | | | | PEMBROKE | NH | 03725 | |
| P I INC SEALTECH DIVISION | JAMES WINDER | 213 DENNIS ST | | | | ATHENS | TN | 37303 | |
| P J EXPRESS INC | | PO BOX 196 | | | | SEWARD | NE | 68434 | |
| P J FITZPATRICK INC | | 21 INDUSTRIAL BLVD | | | | NEW CASTLE | DE | 19720 | |
| P J SPRING CO INC | | 1180 ATLANTIC DR | | | | W CHICAGO | IL | 60185 | |
| P J SPRING CO INC | | 1180 ATLANTIC DR | | | | WEST CHICAGO | IL | 60185 | |
| P JOHNSON | | 76 FOUGERON ST | | | | BUFFALO | NY | 14211 | |
| P K G EQUIPMENT INC | | 367 PAUL RD | | | | ROCHESTER | NY | 14624 | |
| P K TOOL | | 4700 W LEMOYNE ST | | | | CHICAGO | IL | 60651 | |
| P K TOOL & MANUFACTURING CO | | 4700 W LEMOYNE ST | | | | CHICAGO | IL | 60651 | |
| P K TOOL & MANUFACTURING CO | | 4700 WEST LEMOYNE ST | | | | CHICAGO | IL | 60651-1682 | |
| P K TOOL & MANUFACTURING CO | | 4700 W LE MOYNE ST | | | | CHICAGO | IL | 60651 | |
| P K TOOL & MANUFACTURING CO | | 4700 W LE MOYNE ST | | | | CHICAGO | IL | 60651-1682 | |
| P K TOOL & MANUFACTURING CO | | 4700 W LEMOYNE ST | | | | CHICAGO | IL | 60651 | |
| P K TOOL & MFG CO | | 2800 AIRPORT RD STE D | | | | SANTA TERESA | NM | 88008 | |
| P M C SALES INC | | P M C MACHINERY | 15800 CENTENNIAL DR | ADD CHNG LTR MW 3 08 02 | | NORTHVILLE | MI | 48167 | |
| P M G POLMETASA S A | | CALLE ARABA ETORBIDEA 30 | | | | ARRASATE MONDRAGON | 20 | 20500 | ES |
| P M TRUCKING | | ADR CHG 10 3 96 | RR 4 PO BOX 470 | | | EMPORIUM | PA | 15834 | |

Delphi Corporation

| CreditorName | CreditorNoticeName | Address1 | Address2 | Address3 | Address4 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|---|---|
| SOUTH CENTRAL COMPANY INC | | 3055 STATE ST | | | | COLUMBUS | IN | 47201-7453 | |
| SOUTH CENTRAL COMPANY INC | | PO BOX 367 | | | | COLUMBUS | IN | 47202-0367 | |
| SOUTH CENTRAL DIESEL | MR JIM WISER | 115 S EAST AVE | | | | HOLDREGE | NE | 68949 | |
| SOUTH CENTRAL OHIO MINORITY BU | | 37 N HIGH ST | | | | COLUMBUS | OH | 43215 | |
| SOUTH CENTRAL REGIONAL MEDICAL | | CTR WELLNESS CTR | PO BOX 607 | | | LAUREL | MS | 39441 | |
| SOUTH CENTRAL REGIONAL MEDICAL CTR WELLNESS CENTER | | PO BOX 607 | | | | LAUREL | MS | 39441 | |
| SOUTH CHESTER TUBE CO INC | | SOUTHCO | 210 BRINTON LAKE RD | | | CONCORDVILLE | PA | 19331 | |
| SOUTH CHESTER TUBE COMPANY | | 210 N BRINTON LAKE RD | | | | CONCORDVILLE | PA | 19331 | |
| SOUTH COAST AIR QUALITY | | 21865 COPLEY | | | | DIAMOND BAR | CA | 91765 | |
| SOUTH COAST AIR QUALITY | | MANAGEMENT DISTRICT | PO BOX 4943 | 21865 E COPLEY DR | | DIAMOND BAR | CA | 91765-0933 | |
| SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT | | 21865 COPLEY DR | | | | DIAMOND BAR | CA | 91765-4178 | |
| SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT | | 21865 E COPLEY DR | PO BOX 4943 | | | DIAMOND BAR | CA | 91765-4182 | |
| SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT | | 21865 COPLEY DR | | | | DIAMOND BAR | CA | 91765-4178 | |
| SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT | | 21865 COPLEY DR | | | | DIAMOND BAR | CA | 91765-4178 | |
| SOUTH COASTAL OPERATIONS | | 34551 PUERTO PL | | | | DANA POINT | CA | 92629 | |
| SOUTH COLLEGE | | 1760 NORTH CONGRESS AVE | | | | WEST PALM BEACH | FL | 33409 | |
| SOUTH DAKOTA SECRETARY OF | | STATE | 500 E CAPITOL | | | PIERRE | SD | 57501-5077 | |
| SOUTH DAKOTA SECRETARY OF STATE | | 500 E CAPITOL | | | | PIERRE | SD | 57501-5077 | |
| SOUTH EAST TOOL CO INC | | 901 SPRINGFIELD ST | | | | DAYTON | OH | 45403-134 | |
| SOUTH EAST TOOL COMPANY INC | | 901 SPRINGFIELD ST | | | | DAYTON | OH | 45403 | |
| SOUTH EUCLID MUNICIPAL COURT | | 1349 SOUTH GREEN RD | | | | SOUTH EUCLID | OH | 44121 | |
| SOUTH FRANKLIN TWP E J T C | | 100 MUNICIPAL RD | | | | WASHINGTON | PA | 15301 | |
| SOUTH GEORGIA CATERING | | & BARBECUE | PO BOX 71383 | | | ALBANY | GA | 31708 | |
| SOUTH GEORGIA CATERING & BARBE | | GUS PORT A PIT BARBECUE | 2347 DAWSON RD | | | ALBANY | GA | 31707 | |
| SOUTH GEORGIA CATERING AND BARBECUE | | PO BOX 71383 | | | | ALBANY | GA | 31708 | |
| SOUTH GEORGIA MEDIA GROUP | | PO BOX 968 | | | | VALDASTA | GA | 31603 | |
| SOUTH GEORGIA MEDICAL | | ONCOLOGY ASSOCIATES PC | PO BOX 7570 | | | TIFTON | GA | 31793-7570 | |
| SOUTH HAROLD | | 6047 GLEN TRACE LN | | | | WEST CHESTER | OH | 45069 | |
| SOUTH HAVEN COIL INC | ACCOUNTS PAYABLE | PO BOX 409 | | | | SOUTH HAVEN | MI | 49090 | |
| SOUTH HAVEN COIL INCORPORATED | | PO BOX 409 | | | | SOUTH HAVEN | MI | 49090-0409 | |
| SOUTH INDIA WATCH INDUSTRIES | | PVT LTD | 655 1ST FL 11TH MAIN HAL 2ND | STAGE INDIRANAGAR 560 008 | | BANGALORE | | | INDIA |
| SOUTH INDIA WATCH INDUSTRIES PVT LTD | | 655 1ST FL 11TH MAIN HAL 2ND | STAGE INDIRANAGAR 560 008 | | | BANGALORE INDIA | | | INDIA |
| SOUTH JAMES | | 3385 PEMBROOK CIRCLE | | | | DAVISON | MI | 48423 | |
| SOUTH JESSICA | | 535 ADAMS ST APT 1 | | | | DAYTON | OH | 45410 | |
| SOUTH JOHN D | | 892 APT G REVERE VILLAGE CT | | | | CENTERVILLE | OH | 45458 | |
| SOUTH OAKLAND SHELTER | | 431 N MAIN ST | | | | ROYAL OAK | MI | 48067 | |
| SOUTH PAK INC | | PO BOX 28090 | | | | BIRMINGHAM | AL | 35228 | |
| SOUTH PAK INC | J D TIDWELL XT224 | 660 BESSEMER SUPER HWY | | | | MIDFIELD | AL | 35228 | |
| SOUTH PAK INC | JD TIDWELL | 660 BESSEMER SUPER HWY | | | | MIDFIELD | AL | 35228-0000 | |
| SOUTH PLAINFIELD ADULT SCHOOL | | 305 CROMWELL PL | | | | SOUTH PLAINFIELD | NJ | 07080 | |
| SOUTH SHORE ELECTRIC | | 589 TERNES ST | | | | ELYRIA | OH | 44035 | |
| SOUTH SHORE ELECTRIC | | PO BOX 321 | | | | ELYRIA | OH | 44036 | |
| SOUTH SHORE ELECTRIC INC | | 589 TERNES ST | | | | ELYRIA | OH | 44035 | |
| SOUTH STAR CORPORATION | ACCOUNTS PAYABLE | PO BOX 264 | | | | SALEM | VA | 24153 | |
| SOUTH SUBURBAN COLLEGE | | ACCOUNTS REC | 15800 S STATE ST | | | S HOLLAND | IL | 60473 | |
| SOUTH TEXAS COMMUNITY COLLEGE | | BUSINESS OFFICE | PO BOX 9701 | | | MCALLEN | TX | 78502-9701 | |
| SOUTH TEXAS DISTRIBUTION | | 3219 DAVIS AVE | | | | LAREDO | TX | 78040 | |
| SOUTH TEXAS XPRESS | | 943 N EXPRESSWAY 15 PMB 151A | | | | BROWNSVILLE | TX | 78520 | |
| SOUTH TOWNS STAPLE SUPPLY INC | | 7172 ELLICOTT RD | | | | ORCHARD PARK | NY | 14127-3438 | |
| SOUTH WASHINGTON COUNTY SCHOOL | | DISTRICT 833 | 8400 E POINT DOUGLAS RD S | | | COTTAGE GROVE | MN | 55016-3025 | |
| SOUTH WEST OHIO SELF INSURANCE | | ASSOCIATION FMLY SWOSIA | 7942 CELESTIAL CIRCLE | CHG ADD PER AFC 07 25 03 VC | | MIDDLETOWN | OH | 45044 | |
| SOUTH WEST OHIO WATER | | ENVIRONMENT ASSOCIATION | URS CORPORATION | 36 EAST 7TH ST STE 2300 | | CINCINNATI | OH | 45202-4434 | |

**EXHIBIT H**

IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                 :
          In re                      :      Chapter 11
                                   :
    DELPHI CORPORATION, et al.,       :      Case No. 05-44481 (RDD)
                                   :
                  Debtors.    :      (Jointly Administered)
                                   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

AFFIDAVIT OF SERVICE

      I, Evan Gershbein, being duly sworn according to law, depose and say that I am employed by Kurtzman Carson Consultants LLC, the Court appointed claims and noticing agent for the Debtors in the above-captioned cases.

      On or before October 9, 2009, I caused to be served the document listed below upon the parties listed on Exhibit A hereto via postage pre-paid U.S. mail:

      Notice of (A) Order Approving Modifications to First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiilicates, Debtors and Debtors-in-Possession and (B) Occurrence of Effective Date (Docket No. 18958)

      On or before October 13, 2009, I caused to be served the appropriate number of copies of the document listed below (i) upon the service list attached hereto as Exhibit B, for subsequent distribution to beneficial holders of Common Stock, CUSIP 172737 10 8; 6 ½% Notes due 2009, CUSIP 247126 AB 1; 7 1/8% Notes due 2029, CUSIP 247126 AC 9; 6.55% Notes due 2006, CUSIP 247126 AD 7; 6.50% Notes due 2013, CUSIP 247126 AE 5; 8 ¼% Adjustable Rate Subordinated Note due 2033, CUSIP 247126 AF 2; and 6.197% Junior Subordinated Note due 2033, CUSIP 247126 AG 0, via Overnight mail and hand delivery; (ii) upon the parties set forth on Exhibit C via postage pre-paid U.S. Mail; (iii) upon the registered holders of Common Stock listed on Exhibit D, provided by Computershare as transfer agent, via postage pre-paid U.S. Mail; and (iv) upon the service list attached hereto as Exhibit E via Electronic mail.

      Notice of (A) Order Approving Modifications to First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiilicates, Debtors and Debtors-in-Possession and (B) Occurrence of Effective Date (Docket No. 18958)

Dated: October 14, 2009

_____ */s/ Evan Gershbein* _____
Evan Gershbein

State of California
County of Los Angeles

Subscribed and sworn to (or affirmed) before me on this 14th day of October, 2009, by
Evan Gershbein, proved to me on the basis of satisfactory evidence to be the person who
appeared before me.

Signature: _ */s/ Shannon J. Spencer* _____

Commission Expires: *6/20/10* _____

2

# EXHIBIT A

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Calfee, Halter & Griswold LLC | Jean R. Robertson, Esq. | 1400 McDonald Investment Ctr | 800 Superior Ave | Cleveland | OH | 44114 | | 216-622-8404 | 216-241-0816 | jrobertson@calfee.com | Counsel to Brush Engineered materials |
| Calinoff & Katz, LLp | Dorothy H. Marinis-Riggio Robert Calinoff | 140 East 45th Street | 17th Floor | New York | NY | 10017 | | 212-826-8800 | 212-644-5123 | dhriggio@gmail.com rcalinoff@candklaw.com | Counsel to Computer Patent Annuities Limited Partnership, Hydro Aluminum North America, Inc., Hydro Aluminum Adrian, Inc., Hydro Aluminum Precision Tubing NA, LLC, Hydro Alumunim Ellay Enfield Limited, Hydro Aluminum Rockledge, Inc., Norsk Hydro Canada, I |
| Carson Fischer, P.L.C. | Joseph M Fischer Patrick J Kukla | 4111 Andover Road | West 2nd Floor | Bloomfield Hills | MI | 48302 | | 248-644-4840 | | brcy@carsonfischer.com | Counsel to Bing Metals Group, LLC; Behr America, Inc.; Findlay Industries; Vitec, LLC |
| Carson Fischer, P.L.C. | Robert A. Weisberg | 4111 Andover Road | West 2nd Floor | Birmingham | MI | 48302 | | 248-644-4840 | 248-644-1832 | rweisberg@carsonfischer.com brcy@carsonfischer.com | Counsel to Cascade Die Casting Group, Inc.; Behr America, Inc. |
| Carter Ledyard & Milburn LLP | Aaron R. Cahn | 2 Wall Street | | New York | NY | 10005 | | 212-732-3200 | 212-732-3232 | cahn@clm.com | Counsel to STMicroelectronics, Inc. |
| Chadbourne & Parke LLP | Douglas Deutsch, Esq. | 30 Rockefeller Plaza | | New York | NY | 10112 | | 212-408-5100 | 212-541-5369 | ddeutsch@chadbourne.com | Counsel to EagleRock Capital Management, LLC |
| Clark Hill PLC | Joel D. Applebaum | 500 Woodward Avenue | Suite 3500 | Detroit | MI | 48226-3435 | | 313-965-8300 | 313-965-8252 | japplebaum@clarkhill.com | Counsel to 1st  Choice Heating & Cooling, Inc.; BorgWarner Turbo Systems Inc.; Metaldyne Company, LLC |
| Clark Hill PLC | Shannon Deeby | 500 Woodward Avenue | Suite 3500 | Detroit | MI | 48226-3435 | | 313-965-8300 | 313-965-8252 | sdeeby@clarkhill.com | Counsel to BorgWarner Turbo Systems Inc.; Metaldyne Company, LLC |
| Clark Hill PLLC | Robert D. Gordon | 500 Woodward Avenue | Suite 3500 | Detroit | MI | 48226-3435 | | 313-965-8572 | 313-965-8252 | rgordon@clarkhill.com | Counsel to ATS Automation Tooling Systems Inc. |
| Cleary Gottlieb Steen & Hamilton LLP | Deborah M. Buell | One Liberty Plaza | | New York | NY | 10006 | | 212-225-2000 | 212-225-3999 | maofiling@cgsh.com | Counsel to Arneses Electricos Automotrices, S.A.de C.V.; Cordaflex, S.A. de C.V. |
| Cleary, Gottlieb, Steen & Hamilton LLP | James L. Bromley | One Liberty Plaza | | New York | NY | 10006 | | 212-225-2000 | 212-225-3999 | maofiling@cgsh.com | Counsel to Bear, Stearns, Co. Inc.; Citigroup, Inc.; Credit Suisse First Boston; Deutsche Bank Securities, Inc.; Goldman Sachs Group, Inc.; JP Morgan Chase & Co.; Lehman Brothers, Inc.; Merrill Lynch & Co.; Morgan Stanley & Co., Inc.; UBS Securities, LLC |
| Cohen & Grigsby, P.C. | Thomas D. Maxson | 11 Stanwix Street | 15th Floor | Pittsburgh | PA | 15222-1319 | | 412-297-4706 | 412-209-1837 | tmaxson@cohenlaw.com | Counsel to Nova Chemicals, Inc. |
| Cohen, Weiss & Simon LLP | Joseph J. Vitale Babette Ceccotti | 330 West 42nd Street | | New York | NY | 10036 | | 212-356-0238 | 646-473-8238 | jvitale@cwsny.com bceccotti@cwsny.com | Counsel to International Union, United Automobile, Areospace and Agriculture Implement Works of America (UAW) |
| Cohn Birnbaum & Shea P.C. | Scott D. Rosen, Esq. | 100 Pearl Street, 12th Floor | | Hartford | CT | 06103 | | 860-493-2200 | 860-727-0361 | srosen@cb-shea.com | Counsel to Floyd Manufacturing Co., Inc. |
| Conlin, McKenney & Philbrick, P.C. | Bruce N. Elliott | 350 South Main Street | Suite 400 | Ann Arbor | MI | 48104 | | 734-971-9000 | 734-971-9001 | Elliott@cmplaw.com | Counsel to Brazeway, Inc. |
| Connolly Bove Lodge & Hutz LLP | Jeffrey C. Wisler, Esq. | 1007 N. Orange Street | P.O. Box 2207 | Wilmington | DE | 19899 | | 302-658-9141 | 302-658-0380 | jwisler@cblh.com | Counsel to ORIX Warren, LLC |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 4 of 22

10/13/2009 3:43 PM
Combined (430)

| CreditorName | CreditorNoticeName | Address1 | Address2 | Address3 | Address4 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|---|---|
| CRADDOCK DANIEL | | 7159 AKRON RD | | | | LOCKPORT | NY | 14094 | |
| CRADDOCK FINISHING CORPORATION | PAMELA ALEXANDER | PO BOX 269 | | | | EVANSVILLE | IN | 47702 | |
| CRADIT GREGORY | | 7051 TRINKLINE | | | | SAGINAW | MI | 48609 | |
| CRADLEBAUGH MATTHEW | | 16356 OAK HILL DR | | | | FENTON | MI | 48430 | |
| CRADLEBAUGH TERRY L | | 11385 OREGON CIR | | | | FENTON | MI | 48430-2432 | |
| CRADLEBAUGH, MATTHEW G | | 16356 OAK HILL DR | | | | FENTON | MI | 48430 | |
| CRAFT BEN | | 2233 DRUMMOND DR | | | | XENIA | OH | 45385 | |
| CRAFT CARL G | | 615 HOLL RD NE | | | | NORTH CANTON | OH | 44720-1773 | |
| CRAFT CARYN | | 707 FRAZER | | | | OWOSSO | MI | 48867 | |
| CRAFT CHRIS | | 5332 ROOTSTOWN RD | | | | RAVENNA | OH | 44266 | |
| CRAFT CO ENTERPRISES INC | | PO BOX 4126 | | | | BRANDON | MS | 39047-4126 | |
| CRAFT CO ENTERPRISES INC | | PO BOX 67000 DEPT 259101 | | | | DETROIT | MI | 48267-2591 | |
| CRAFT DION | | 5220 BROOKMILL CT | | | | DAYTON | OH | 45414 | |
| CRAFT FARMS GULF SHORES | | 3750 GULF SHORES PKWY | | | | GULF SHORES | AL | 36542 | |
| CRAFT JAMES | | PO BOX 1091 | | | | RALEIGH | MS | 39153 | |
| CRAFT KAREN | | 1505 ROSLYN RD | | | | GROSSE POINTE WOODS | MI | 48236 | |
| CRAFT KAREN J | | 1505 ROSLYN ROAD | | | | GROSSE POINTE WOODS | MI | 48236 | |
| CRAFT KATHY | | 25185 OAK GROVE RD | | | | ATHENS | AL | 35613-3062 | |
| CRAFT LINE INC | | PO BOX 217 | | | | HAZEL PK | MI | 04803-0 02 | |
| CRAFT MARY | | 11444 OLDS RD | | | | OTISVILLE | MI | 48463-0000 | |
| CRAFT PRECISION PRODUCTS INC | | 3008 FLOYD ST | | | | BURBANK | CA | 91504 | |
| CRAFT RODGER | | 25185 OAK GROVE RD | | | | ATHENS | AL | 35613-3062 | |
| CRAFT ROOSEVELT | | 2006 BARBARA DR | | | | FLINT | MI | 48504-1642 | |
| CRAFT SHIRRLEEN | | 209 BARLEY DR | | | | CLAYTON | OH | 45415 | |
| CRAFT TIMOTHY | | PO BOX 73 | | | | EASTAHUCHIE | MS | 39436 | |
| CRAFT, CHRIS S | | 5332 ROOTSTOWN RD | | | | RAVENNA | OH | 44266 | |
| CRAFT, CHRISTOPHER | | 650 CAMPBELL ST | | | | FLINT | MI | 48507 | |
| CRAFT, KAREN J | | 390 PROVENCAL RD | | | | GROSSE POINTE FARMS | MI | 48236 | |
| CRAFT, KATHY | | 25185 OAK GROVE RD | | | | ATHENS | AL | 35613 | |
| CRAFT, KEVIN | | 6635 CAMPBELL BLVD | | | | LOCKPORT | NY | 14094 | |
| CRAFTECH CORPORATION | ALFREDO BONETTO | 2941 EAST LAJOLLA ST | | | | ANAHEIM | CA | 92806 | |
| CRAFTECH CORPORATION | ALFREDO BONETTO | 2941 LA JOLLA | | | | ANAHEIM | CA | 92806 | |
| CRAFTECH INDUSTRIES INC | | AQUENT FINANCIAL SERVICES | PO BOX 457 | | | HUDSON | NY | 12534 | |
| CRAFTON TULL & ASSOCIATES | | 2448 EAST 81ST STE 1700 | | | | TULSA | OK | 74137 | |
| CRAFTS F W | | 6757 ELM BEACH RD | | | | OVID | NY | 14521 | |
| CRAFTS JAMES | | 26640 PEPPER RD | | | | ATHENS | AL | 35613 | |
| CRAFTSMAN CREDIT UNION | | 2444 CLARK ST | | | | DETROIT | MI | 48209 | |
| CRAFTSMAN CREDIT UNION | | EFT REJECT | 2444 CLARK ST | | | DETROIT | MI | 48209 | |
| CRAGEN BRIAN | | 1011 E MERIDIAN ST | | | | SHARPSVILLE | IN | 46068 | |
| CRAGG TERRY | | 1932 AUBURN | | | | DAYTON | OH | 45406 | |
| CRAGO DONITA | | 3718 BURTON PL | | | | ANDERSON | IN | 46013 | |
| CRAGUN CHARLOTTE | | PO BOX 3071 | | | | KOKOMO | IN | 46904-3071 | |
| CRAHEN EVAN | | 11646 HOWE RD | | | | AKRON | NY | 14001 | |
| CRAIB D S | | 2132 POPLAR ST | | | | ANDERSON | IN | 46012-1736 | |
| CRAIB LYNNETTE | | PO BOX 2058 | | | | ANDERSON | IN | 46018-2058 | |
| CRAIG A OSTERDAY | | 8924 DEEP FOREST LANE | | | | DAYTON | OH | 45458-2814 | |
| CRAIG ADAM | | 718 HIGHLAND SPRINGS CT | | | | KOKOMO | IN | 46902 | |
| CRAIG ALEX | | 802 ASHBERRY DR | | | | BELPRE | OH | 45714 | |
| CRAIG ALEXANDER | | 33 S MONMOUTH ST | | | | DAYTON | OH | 45403 | |
| CRAIG AMANDA | | PO BOX 72061 | | | | TUSCALOOSA | AL | 35407 | |
| CRAIG BATTERIES INC | | 401 S HOUSTON | | | | ATHENS | AL | 35611 | |
| CRAIG BATTERIES INC | | 401 S HOUSTON ST | | | | ATHENS | AL | 35611-2584 | |
| CRAIG BATTERIES SALES AND SERVICE INC | | 401 S HOUSTON | | | | ATHENS | AL | 35611 | |
| CRAIG BLENDA | | 5802 BALDWIN BLVD | | | | FLINT | MI | 48505 | |
| CRAIG BRENDA | | 10721 MORSE HWY | | | | JASPER | MI | 49248 | |
| CRAIG BRUCE | | 31 SOUTH MAIN ST APT 1 | | | | FORTVILLE | IN | 46040 | |
| CRAIG C HICKS | | 25260 PARSONS DR | | | | SOUTHFIELD | MI | 36556-5325 | |
| CRAIG C HICKS | | 25260 PARSONS DR | | | | SOUTHFIELD | MI | 48075 | |
| CRAIG CHARLES | | 1377 CRANBROOK | | | | WARREN | OH | 44484 | |
| CRAIG DAVID | | 11088 SHORT CUT RD | | | | LESTER | AL | 35647-3830 | |
| CRAIG DAVID | | 2025 SOMERVILLE | | | | ROCHESTER HILLS | MI | 48307 | |
| CRAIG DAVID AND CO INC | | BANK IV STE 1420 | | | | TOPEKA | KS | 66603 | |
| CRAIG DAVID L | | 4245 W OLD US 40 | | | | KNIGHTSTOWN | IN | 46148-9640 | |
| CRAIG ELIZABETH | | 10095 LINCOLN AVE | | | | HUNTINGTON WOODS | MI | 48070 | |
| CRAIG ENGERER | | PO BOX 470 | | | | FREELAND | MI | 48623 | |
| CRAIG FRANK | | 3742 MONTCLAIR DR | | | | COLUMBUS | OH | 43219 | |
| CRAIG GREGORY | | 465 S SILVER ST | | | | BAD AXE | MI | 48413-1439 | |
| CRAIG JACK | | 2315 CEDAR BND | | | | ANDERSON | IN | 46011-1082 | |
| CRAIG JAMES | | 18751 WHITCOMB PL | | | | NOBLESVILLE | IN | 46060 | |
| CRAIG JAMES | | 2493 WILLOWDALE DR | | | | BURTON | MI | 48509-1358 | |
| CRAIG JAMES | | 4220 ST CHARLES ST | | | | ANDERSON | IN | 46013 | |
| CRAIG JIM | | 5106 COUNCIL RING BLVD | | | | KOKOMO | IN | 46902 | |
| CRAIG JOHN L | | 222 E TREEHAVEN RD | | | | BUFFALO | NY | 14215-1411 | |
| CRAIG JOSEPH | | 76 HABERSAC AVE | | | | PATASKALA | OH | 43062-7538 | |
| CRAIG JR CHARLES E | | 1377 CRANBROOK NE | | | | WARREN | OH | 44484-0000 | |
| CRAIG KENNETH | | 4738 S 450 W | | | | RUSSIAVILLE | IN | 46979-9802 | |
| CRAIG KENNETH L | | 4738 S 450 W | | | | RUSSIAVILLE | IN | 46979-9461 | |
| CRAIG LINDA | | 90 SIMMS ST | | | | MOULTON | AL | 35650 | |
| CRAIG LOUIS DIMAGGIC | | 6592 CRABAPPLE DR | | | | TROY | MI | 48098 | |
| CRAIG MARGARET B | | 48 WALTER JONES BLVD | | | | EL PASO | TX | 79906 | |
| CRAIG MICHAEL | | 9443 COMMONS DR | | | | HICKORY HILLS | IL | 60457 | |
| CRAIG NELSON | | PO BOX 214406 | | | | AUBURN HILLS | MI | 48321 | |
| CRAIG PHELPS STANDING TRUSTEE | | ACCT OF CATHY RAYBON | CASE 91 B 20536 | PO BOX 2193 | | CHICAGO | IL | 35558-8698 | |
| CRAIG PHELPS STANDING TRUSTEE | | ACCT OF DENNIS RHYNE | CASE 95 B 10757 | PO BOX 2193 | | CHICAGO | IL | 35538-1949 | |

| CreditorName | CreditorNoticeName | Address1 | Address2 | Address3 | Address4 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|---|---|
| FINANCIAL CREDIT CORP | | PO BOX 2040 | | | | WARREN | MI | 48090 | |
| FINANCIAL EXECUTIVES INTL | | 200 CAMPUS DR STE 200 | | | | FLORHAM PK | NJ | 079320674 | |
| FINANCIAL EXECUTIVES INTL | | PO BOX 10408 | | | | NEWARK | NJ | 07193-0408 | |
| FINANCIAL INSTITUTION PRODUCTS | | FIPCO TIN | PO BOX 1667 | | | MADISON | WI | 53701 | |
| FINANCIAL INSTITUTION PRODUCTS CORP FIPCO | | PO BOX 1667 | | | | MADISON | WI | 53701 | |
| FINANCIAL PACIFIC LEASING LLC | | 3455 S 344TH WAY PO BOX 4568 | | | | FEDERAL WAY | WV | 98063 | |
| FINANCIAL PARTNERS CU | | 7800 E IMPERIAL HWY | | | | DOWNEY | CA | 90241 | |
| FINANCIAL PLUS | | FEDERAL CREDIT UNION | G 3381 VAN SLYKE RD | | | FLINT | MI | 48507 | |
| FINANCIAL PLUS FCU | | G3381 VAN SLYKE RD | | | | FLINT | MI | 48507 | |
| FINANCIAL PLUS FEDERAL CREDIT | | UNION | G 3381 VAN SLYKE RD | PO BOX 7006 | | FLINT | MI | 48507 | |
| FINANCIAL PLUS FEDERAL CREDIT UNION | | G 3381 VAN SLYKE RD. | | | | FLINT | MI | 48507 | |
| FINANCIAL SERVICES OF AMERICA LLC | C/O SALLEE LAW FIRM | 4739 BELLEVIEW STE 304 | | | | KANSAS CITY | MO | 64112 | |
| FINANCIAL SERVICES OF AMERICA LLC | C/O SALLEE LAW FIRM | FRANK F SALLEE ESQ | 4739 BELLVIEW | STE 304 | | KANSAS CITY | MO | 64112-1364 | |
| FINANCIERE DE L AVRE COMPAGNIE | | RTE DE DAMPIERRE | | | | SAINT LUBIN DES JONCHERETS | 28 | 28350 | FR |
| FINANCIERE ROBOLIX | | ROUTE DE SAINT GERMIER | | | | COLOGNE | 32 | 32430 | FR |
| FINANCIERE SNOP DUNOIS | | AVE DAUVERGNE | | | | BRIOUDE | 43 | 43100 | FR |
| FINANZAMT BOCHUM SUD | | KONIGSALLEE 21 | | | | BOCHUM | | 44789 | GERMANY |
| FINANZAMT BONN INNENSTADT | | WELSCHNONNENSTR 15 | | | | BONN | | 53111 | GERMANY |
| FINANZAMT GUMMERSBACH | | MUHLENBERGWEG 5 | | | | GUMMERSBACH | | 51645 | GERMANY |
| FINANZAMT SPANDAU BERLIN | | NONNENDAMMALLEE 15 21 | | | | BERLIN | | 13599 | GERMANY |
| FINANZAMT WALDSASSEN | | JOHANNISPLATZ 13 | | | | WALDSASSEN | | 95652 | GERMANY |
| FINANZAMT WUPPERTAL ELBERFELD | | KASINOSTR 12 | | | | WUPPERTHAL | | 42103 | GERMANY |
| FINATERI CHRISTINE | | 721 BLANCHARD AVE | | | | FLINT | MI | 48503 | |
| FINCH AUTOMATION EFT | | 7264 GEORGETOWN RD | | | | INDIANAPOLIS | IN | 46268 | |
| FINCH AUTOMATION EFT | | FMLY FINCH AIR CONTROLS INC | 7264 GEORGETOWN RD | | | INDIANAPOLIS | IN | 46268 | |
| FINCH AUTOMATION INC | | 7264 GEORGETOWN RD | | | | INDIANAPOLIS | IN | 46268 | |
| FINCH AUTOMATION INCKOK | JERRI JIM | 7264 GEORGETOWN RD | | | | INDIANAPOLIS | IN | 46268 | |
| FINCH BAYLESS | | PO BOX 30028 | | | | OMAHA | NE | 68103-1128 | |
| FINCH CAROL ANN | | 319 ORCHARD LN | | | | COURTLAND | OH | 44410 | |
| FINCH CHARLES | | 1134 N 31ST ST | | | | SAGINAW | MI | 48601-6125 | |
| FINCH DAVID | | 108 CHESTNUT CIRCLE WEST | | | | DAVISON | MI | 48423 | |
| FINCH DELMAR | | 950 PINECREEK DR | | | | DAYTON | OH | 45458 | |
| FINCH DONNA J | | 6377 N SEYMOUR RD | | | | FLUSHING | MI | 48433-1087 | |
| FINCH GREGORY | | 6839 SOUTHERN VISTA DR | | | | ENON | OH | 45377 | |
| FINCH JR JAMES | | 10126 DENNISON ASHTABULA RD | | | | EAST ORWELL | OH | 44076 | |
| FINCH MICHAEL D | | 4260 ISLAND VIEW DR | | | | FENTON | MI | 48430-9144 | |
| FINCH PAUL | | 319 ORCHARD LN | | | | CORTLAND | OH | 44410 | |
| FINCH PRUYN & COMPANY INC | | 1 GLEN ST | | | | GLENS FALLS | NY | 12801 | |
| FINCH RENTAL INC | | 1930 KUNTZ RD | | | | DAYTON | OH | 45404 | |
| FINCH RENTAL INC | | 1930 KUNTZ RD | | | | DAYTON | OH | 45404-1237 | |
| FINCH ROBERT | | 2017 CLEARSTREAM WAY | | | | CLAYTON | OH | 45315 | |
| FINCHER KEITH | | 13438 NEEDHAM PL NW | | | | PICKERINGTON | OH | 43147 | |
| FINCHER LARRY | | 2420 KATHY LN SW | | | | DECATUR | AL | 35603 | |
| FINCHER, KATHY | | 2420 KATHY LN SW | | | | DECATUR | AL | 35603 | |
| FINCHER, LARRY W | | 2420 KATHY LN S W | | | | DECATUR | AL | 35603 | |
| FINDLAY & TAIT | | SA RESERVE BANK BLDG | 60 ST GEORGES MALL | 8000 CAPE TOWN | | | | | SOUTH AFRICA |
| FINDLAY AND TAIT SA RESERVE BANK BLDG | | PO BOX 248 | 8000 CAPE TOWN | | | | | | SOUTH AFRICA |
| FINDLAY ANN | | 1348 N BLOCK RD | | | | REESE | MI | 48757-9310 | |
| FINDLAY CHEVROLET | | 6800 S TORREY PINES DR | | | | LAS VEGAS | NV | 89118-3267 | |
| FINDLAY DAVID | | 1348 N BLOCK RD | | | | REESE | MI | 48757 | |
| FINDLAY INDUSTRIES | | 4000 FOSTORIA AVE | | | | FINDLAY | OH | 45840 | |
| FINDLAY INDUSTRIES | ACCOUNTS PAYABLE | 18036 EADS AVE | | | | CHESTERFIELD | MO | 63017 | |
| FINDLAY INDUSTRIES | ACCOUNTS PAYABLE | 4000 FOSTORIA RD | | | | FINDLAY | OH | 45840 | |
| FINDLAY INDUSTRIES DE MEXICO | | PARQUE INDUSTRIAL FINSA NAVE 22A | AUTOPISTA MEXICO PUEBLA KM 117 | | | CUATLANCINGO PUE | | 72710 | MEXICO |
| FINDLAY INDUSTRIES INC | | 1957 CROOKS RD | | | | TROY | MI | 48084 | |
| FINDLAY INDUSTRIES INC | | 217 SOUTH ALEX | | | | WEST CARROLLTON | OH | 45449 | |
| FINDLAY INDUSTRIES INC | | 5500 FOSTORIA RD | | | | FINDLAY | OH | 45840 | |
| FINDLAY INDUSTRIES INC | | MOLDED PRODUCTS DIV | 2100 C FOSTORIA AVE | | | FINDLAY | OH | 45840 | |
| FINDLAY INDUSTRIES INC | | PLANT 1 | 4000 FOSTORIA RD | | | FINDLAY | OH | 45840-8733 | |
| FINDLAY INDUSTRIES INC | | PO BOX 1087 | | | | FINDLAY | OH | 45839 | |
| FINDLAY INDUSTRIES INC | | PO BOX 711987 | | | | CINCINNATI | OH | 45271-1987 | |
| FINDLAY INDUSTRIES INC | | SERVICE PRODUCTS DIV | 5500 FOSTORIA RD | | | FINDLAY | OH | 45840 | |
| FINDLAY INDUSTRIES INC | ACCOUNTS PAYABLE | 217 SOUTH ALEX RD | | | | WEST CARROLLTON | OH | 45449 | |
| FINDLAY INDUSTRIES INC EFT | ATTN JOE HOLLIGER | 4000 FOSTORIA RD | | | | FINDLAY | OH | 45840 | |
| FINDLAY INDUSTRIES INC EFT | | 4000 FOSTORIA RD | | | | FINDLAY | OH | 45840 | |
| FINDLAY INDUSTRIES INC EFT | | PO BOX 711987 | | | | CINCINNATI | OH | 45271-1987 | |
| FINDLAY INDUSTRIES INC LAKE WALES | | 1230 NORTH SCENIC HWY | | | | LAKE WALES | FL | 33853 | |
| FINDLAY JUDITH E | | 7190 N US 1 202 | | | | COCOA | FL | 32927-5062 | |
| FINDLAY MACHINE & TOOL INC | | ADDR 1 99 | 1950 INDUSTRIAL RD | | | FINDLAY | OH | 45839 | |
| FINDLAY MACHINE AND TOOL INC | | PO BOX 1562 | | | | FINDLAY | OH | 45839 | |
| FINDLAY MACHINE TOOL INC | | FMT | 1950 INDUSTRIAL DR | | | FINDLAY | OH | 45840 | |
| FINDLAY MUNICIPAL COURT | | PO BOX 826 | | | | FINDLAY | OH | 45839 | |
| FINDLAY TRUCK LINE | | 420 TRENTON AVE | | | | FINDLAY | OH | 45840-3796 | |
| FINDLAY, MARK | | 3332 S VAN BUREN RD | | | | REESE | MI | 48757 | |
| FINDLEY HILDA L | | 1303 POST RD | | | | CLINTON | MS | 39056-4047 | |
| FINDLEY JANICE | | 2258 FAIRWAY PINES CT 4 | | | | BAY CITY | MI | 48706 | |
| FINDLEY ROBYN | | 249 SHANK AVE | | | | TROTWOOD | OH | 45426 | |
| FINDLEY THOMANN PHYLLIS | | 1272 HURD RD | | | | CLIO | MI | 48420 | |
| FINDLOW FILTRATION INC | ALEX FINDLOW | 149 COMMERCE BLVD. | | | | LOVELAND | OH | 45140 | |
| FINE ARTS ENGRAVING CO | | 135 S LASALLE DEPT 1831 | | | | CHICAGO | IL | 60674 | |
| FINE ARTS ENGRAVING COMPANY | | 109 SHORE DR | RM CHG PER LETTER 03 31 04 AM | | | BURR RIDGE | IL | 60521 | |

| CreditorName | CreditorNoticeName | Address1 | Address2 | Address3 | Address4 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|---|---|
| MARTINEZ CARLOS | | 2115 BRO MOR | | | | SAGINAW | MI | 48602 | |
| MARTINEZ CARLOS | | G&C MOLD CO | 11430 CEDAR OAK DR | | | EL PASO | TX | 79936 | |
| MARTINEZ CAROLYN | | 5445 KATHERINE CT | | | | SAGINAW | MI | 48603 | |
| MARTINEZ CAYETANA R | | 2576 MOONGLOW ST | | | | SAGINAW | MI | 48603-2532 | |
| MARTINEZ DANIEL | | 1 VIA PLACITA | | | | EL PASO | TX | 79927 | |
| MARTINEZ DANIEL | | 3020 NORTHWEST DR | | | | SAGINAW | MI | 48603 | |
| MARTINEZ DANIEL | | DELNOSA MCALLEN TRADE ZONE 12 | 6901 S 33RD ST BLDG T | PO BOX 2287 | | MCALLEN | TX | 78501 | |
| MARTINEZ DIMAS | | 6225 WILSHIRE RD | | | | SAGINAW | MI | 48601 | |
| MARTINEZ DONNIE | | 15727 WINTERS LN | | | | RIVERSIDE | CA | 92504 | |
| MARTINEZ DORA L | | PO BOX 351 | | | | FREDERICK | CO | 80530 | |
| MARTINEZ ELIZABETH | | 11928 CREWE ST | | | | NORWALK | CA | 90650 | |
| MARTINEZ ELVIA | | 38471 N EMERALD LN | | | | WESTLAND | MI | 48185 | |
| MARTINEZ FABIAN | | 3070 BAY | | | | UNIONVILLE | MI | 48767 | |
| MARTINEZ GLORIA | | 1574 DARTMOUTH RD | | | | ST HELEN | MI | 48656 | |
| MARTINEZ GROUP INC | | 1175 ALEXANDER COURT | | | | CARY | IN | 60013 | |
| MARTINEZ GUSTAVO | | 9200 VICKSBURG | | | | EL PASO | TX | 79924 | |
| MARTINEZ JANICE | | 325 WILCOX ST | | | | ROCHESTER | MI | 48307 | |
| MARTINEZ JAVIER | | 345 PLANET ST | | | | ROCHESTER | NY | 14606-3044 | |
| MARTINEZ JIM LEE | | 20608 BRANA RD | | | | RIVERSIDE | CA | 92508 | |
| MARTINEZ JOHN | | 1003 S WINTER ST | | | | ADRIAN | MI | 49221 | |
| MARTINEZ JOHN RICHARD | | 1426 LAMPLIGHTER DR | | | | LONGMONT | CO | 80501 | |
| MARTINEZ JOSE | | 1901 JOSLIN ST | | | | SAGINAW | MI | 48602-1124 | |
| MARTINEZ JOSE ANGEL MATA | C/O EVERARDO ABREGO | 944 W NOLANA | STE C | | | PHARR | TX | 78577 | |
| MARTINEZ JOSE ANGEL MATA | CARLOS HERNADEZ ESQ | LAW OFFICE OF CARLOS E HERNADEZ | JR 101 N 10TH ST | | | EDINBURG | TX | 78539 | MEXICO |
| MARTINEZ JOSE ANGEL MATA | EVERADO ABREGO ESQ | 944 W NOLANA | STE C | | | PHARR | TX | 78577 | MEXICO |
| MARTINEZ JOSE ANGEL MATA | NORMAN JOLLY ESQ | 1018 PRESTON | 4TH FL | | | HOUSTON | TX | 77002 | MEXICO |
| MARTINEZ JR , JOHN | | 1426 LAMPLIGHTER DR | | | | LONGMONT | CO | 80501 | |
| MARTINEZ JR , RICKY | | 1513 EMILY | | | | SAGINAW | MI | 48601 | |
| MARTINEZ JR SAMUEL | | 4627 MOURNING DOVE LN | | | | WICHITA FALLS | TX | 76306 | |
| MARTINEZ KATHERINE | | 2797 SAKEY | | | | SAGINAW | MI | 48601-9217 | |
| MARTINEZ LOUIS | | 478 FORT GRAY DR | | | | LEWISTON | NY | 14092-1940 | |
| MARTINEZ LUIS | | 2238 CYBELLE CT | | | | MIAMISBURG | OH | 45342 | |
| MARTINEZ LUIS | | 569 PLYMOUTH AVE | | | | BUFFALO | NY | 14213 | |
| MARTINEZ LUIS | | 6103 WALNUT ST | | | | NEWFANE | NY | 14108-1317 | |
| MARTINEZ LUIS | | 911 S 4TH ST | | | | MILWAUKEE | WI | 53204-1726 | |
| MARTINEZ MANUEL | | 16114 SILVERWOOD DR | | | | FENTON | MI | 48430 | |
| MARTINEZ MANUFACTURING INC | | 1175 ALEXANDER CT | | | | GARY | IL | 60013 | |
| MARTINEZ MARCOS | | 4795 S WASHINGTON RD | | | | SAGINAW | MI | 48601-7205 | |
| MARTINEZ MARIA | | 1003 S WINTER | | | | ADRIAN | MI | 49221 | |
| MARTINEZ MARIA | | 100 HOFFMAN BLVD APT1C | | | | NEW BRUNSWICK | NJ | 08901 | |
| MARTINEZ MARIA | | 823 SOUTH ALTA LN | | | | OLATHE | KS | 66061 | |
| MARTINEZ MARIO | | 212 39TH ST | | | | BAY CITY | MI | 48708 | |
| MARTINEZ MARY | | 20221 WINFRED DR | | | | TANNER | AL | 35671-3534 | |
| MARTINEZ MICHEAL | | 323 S FROST | | | | SAGINAW | MI | 48603 | |
| MARTINEZ MISTY | | 4716 ORANGEBURG DR | | | | COLUMBUS | OH | 43228 | |
| MARTINEZ NICHOLAS | | 1512 SW 22ND | | | | BLUE SPRINGS | MO | 64015 | |
| MARTINEZ NICOLAS | | 4733 KAREL JEAN CT SW | | | | WYOMING | MI | 49509-4529 | |
| MARTINEZ NOEMI | | 93 BURNET ST | | | | NEW BRUNSWICK | NJ | 08901 | |
| MARTINEZ OCHOA ROSA MARIA | | INSPECTION DE PARTES INDUSTRIA | AV HIDALGO 842 6 CENTRO | | | TORREON | | 27000 | MEXICO |
| MARTINEZ OCHOA ROSA MARIA EFT | | AV HIDALGO 873 OTE | TORREON COAHUILA | | | | | | MEXICO |
| MARTINEZ ORALIA C | | 812 S PLATE ST | | | | KOKOMO | IN | 46901-5676 | |
| MARTINEZ RICARDO | | 920 NHELENA ST | | | | ANAHEIM | CA | 92805 | |
| MARTINEZ RICHARD | | 4730 COLONIAL DR APT 3 | | | | SAGINAW | MI | 48601 | |
| MARTINEZ RICKY | | 1513 EMILY ST | | | | SAGINAW | MI | 48601-3037 | |
| MARTINEZ RIVERA JUAN | | MARQUES DE LAS CRUCES NO 122 | COL LOMAS DEL MARQUES | | | QUERETARO | | 76146 | MEXICO |
| MARTINEZ RIVERA JUAN EFT | | MARQUES DE LAS CRUCES 122 COL | LOMAS DEL MARQUES QUERETARO | | | CP 76146 | | | MEXICO |
| MARTINEZ RIVERA JUAN EFT | | MARQUES DE LAS CRUCES 122 COL | LOMAS DEL MARQUES QUERETARO | | | CP 76146 MEXICO | | | MEXICO |
| MARTINEZ ROBERT | | 9142 MALACHITE AVE | | | | RNCHO CUCAMONGA | CA | 91730 | |
| MARTINEZ ROBERTO | | 4041 PEDLEY RD 57 | | | | RIVERSIDE | CA | 92509 | |
| MARTINEZ ROBERTO | | 5178 DEWBERRY DR | | | | SAGINAW | MI | 48603-1107 | |
| MARTINEZ ROGELIO | | 812 S PLATE ST | | | | KOKOMO | IN | 46901-5676 | |
| MARTINEZ ROSALINDA | | 726 PLAINFIELD CT | | | | SAGINAW | MI | 48609 | |
| MARTINEZ RUDOLPH | | PO BOX 202 | | | | VASSAR | MI | 48768-0202 | |
| MARTINEZ SONIA | | 5563 WANDA WAY | | | | HAMILTON | OH | 45011 | |
| MARTINEZ STACY | | 4776 W 100 N | | | | KOKOMO | IN | 46901 | |
| MARTINEZ VICTOR L | | DBA VICMAR CONSULTING | 6413 CREEKDALE DR | | | THE COLONY | TX | 75056 | |
| MARTINEZ VICTOR L | | VICMAR CONSULTING | 6413 CREEKDALE DR | | | COLONY | TX | 75056 | |
| MARTINEZ VICTORIA | | 1330 NONAHAM LN | | | | ERIE | CO | 80516 | |
| MARTINEZ YOMARA | | 6137 VINEVALE AVE | | | | MAYWOOD | CA | 90270 | |
| MARTINEZ ZUNIGA ROSARIO | | 46 SANTEE RIVER DR | | | | ADRIAN | MI | 49221 | |
| MARTINEZ, DANIEL A | | 1 VIA PLACITA | | | | EL PASO | TX | 79927 | |
| MARTINEZ, GLORIA | | PO BOX 274 | | | | BRIDGEPORT | MI | 48722 | |
| MARTINEZ, ISABEL | | 1938 S JEFFERSON | | | | SAGINAW | MI | 48601 | |
| MARTINEZ, LUIS | | 6103 WALNUT ST | | | | NEWFANE | NY | 14108 | |
| MARTINEZ, LUIS G | | 1432 ADOLPH CARSON PL | | | | EL PASO | TX | 79936 | |
| MARTINEZ, MAGALYS | | 1611 ROSEWOOD ST | | | | JENISON | MI | 49428 | |
| MARTINEZ, MARGARET | | 2505 E 101ST CT | | | | THORNTON | CO | 80229 | |
| MARTINEZ, MARK | | 1401 BELVEDERE DR | | | | KOKOMO | IN | 46902 | |
| MARTINEZ, OSMIL ALFONSO | | 5044 S WEBSTER APT C | | | | KOKOMO | IN | 46902 | |
| MARTINHO NANCY | | 129 W BOLIVAR AVE | | | | MILWAUKEE | WI | 53207 | |
| MARTINI PATRICIA A | | 8286 SUNNYSIDE CIRCLE | | | | FREELAND | MI | 48623-8659 | |
| MARTINI STEVEN | | 4261 STONEYBROOK DR SE | | | | WARREN | OH | 44484 | |
| MARTINICH GREGORY | | W179 S6765 MUSKEGO DR | | | | MUSKEGO | WI | 53150-9692 | |

| CreditorName | CreditorNoticeName | Address1 | Address2 | Address3 | Address4 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|---|---|
| METZLER RONALD H | | 958 OTTAWA DR | | | | YOUNGSTOWN | OH | 44511-1419 | |
| METZLER, SHAWN A | | 3940 SYLVIA LN | | | | YOUNGSTOWN | OH | 44511 | |
| MEULENDYK, ROBERT | | 2844 EDGEMERE DR | | | | ROCHESTER | NY | 14612 | |
| MEUNIER ELECT SUPPLYKOK | AMY CORLETTE | 3409 E. WASHINGTON ST | | | | INDIANAPOLIS | IN | 46201 | |
| MEUNIER ELECTRONIC SUPPLY | | 3409 E WASHINGTON | | | | INDIANAPOLIS | IN | 46201 | |
| MEUNIER ELECTRONIC SUPPLY EFT | | INC | 3409 E WASHINGTON ST | | | INDIANAPOLIS | IN | 46201 | |
| MEUNIER ELECTRONIC SUPPLY INC | | 3409 E WASHINGTON ST | | | | INDIANAPOLIS | IN | 46201 | |
| MEUNIER ELECTRONICS SUPPL | | 3409 E WASHINGTON ST | | | | INDIANAPOLIS | IN | 46201-4313 | |
| MEUNIER ELECTRONICS SUPPL | AMY | 3409 E WASHINGTON ST | | | | INDIANAPOLIS | IN | 46201 | |
| MEUNIER ELECTRONICS SUPPL | AMY CORLETTE | 3409 E WASHINGTON ST | | | | INDIANAPOLIS | IN | 46201 | |
| MEUNIER ELECTRONICS SUPPLY | | 3409 E WASHINGTON ST | | | | INDIANAPOLIS | IN | 46201-431 | |
| MEUNIER ELECTRONICS SUPPLY | JEFF DAVIS | 3409 E WASHINGTON ST | | | | INDIANAPOLIS | IN | 46201 | |
| MEUNIER ELECTRONICS SUPPLY INC | | 8245 TAUNTON RD | | | | INDIANAPOLIS | IN | 46260 | |
| MEVIS ELAINE | | 9260 S NICHOLSON RD | | | | OAK CREEK | WI | 53154-4652 | |
| MEVIS SPA | | VIA BORGO TOCCHI 28 32 | 36027 ROSA IT | | | | | | ITALY |
| MEVIS SPA | | VIA BORGO TOCCHI 28 32 | | | | ROSA | | 36027 | ITALY |
| MEXCOAT SA DE CV | | OTE 3 MZ 7 LOTS 10 | CO INDUSTRIAL TIZAYOCO HGO | | | | | | MEXICO |
| MEXCOAT SA DE CV | | ORIENTE 3 MZ 7 LOTE 10 | | | | TIZAYUCA | HG | 43800 | MX |
| MEXCOAT SA DE CV EFT | | OTE 3 MZ 7 LOTS 10 | CO INDUSTRIAL TIZAYOCO HGO | | | | | | MEXICO |
| MEXICAN AMERICAN PRODUCTS LTD | | 40 SILVERDOME INDUSTRIAL PK | | | | PONTIAC | MI | 48342 | |
| MEXICAN AMERICAN PRODUCTS LTD | | MAP LTD | 40 SILVERDOME INDUSTRIAL PK | | | PONTIAC | MI | 48342 | |
| MEXICAN INDUSTRIES IN MICH EFT INC | | 1801 HOWARD ST | | | | DETROIT | MI | 48216 | |
| MEXICAN INDUSTRIES IN MICH INC | | DEXTER CORPORATION | 1801 HOWARD ST | INACTIVATE PER LEGAL 8 26 03 | | DETROIT | MI | 48216 | |
| MEXICAN INDUSTRIES IN MICHIGAN | | 1801 HOWARD ST | | | | DETROIT | MI | 48216 | |
| MEXICAN INDUSTRIES IN MICHIGAN | | 5200 STECKER | | | | DEARBORN | MI | 48126 | |
| MEXICAN INDUSTRIES IN MICHIGAN | | C/O COYNE & ASSOCIATES | 17320 W 12 MILE RD STE 100 | | | SOUTHFIELD | MI | 48076 | |
| MEXICAN INDUSTRIES IN MICHIGAN | | C/O FREEHAN BOCCI & CO | 909 HAYNES ST | | | BIRMINGHAM | MI | 48009 | |
| MEXICAN INTERNATIONAL INC | | 1420 CRUMLIN RD | | | | LONDON | ON | N5V 1S1 | CANADA |
| MEXICAN INTERNATIONAL INC | | 627 FORT ST | | | | PORT HURON | MI | 48060-3904 | |
| MEXIDEC SA DE CV | | AV DE LAS FUENTES NO 27 | | | | EL MARQUES | QRO | 76246 | MX |
| MEXIDEC SA DE CV | | PARQUE INDUSTRIAL BERNARDO QUINTANA | | | | EL MARQUES | QRO | 76246 | MX |
| MEY JAMES A | | 13664 BAUMGARTNER RD | | | | ST CHARLES | MI | 48655-8631 | |
| MEY RANDALL | | 11911 BAUMGARTNER RD | | | | SAINT CHARLES | MI | 48655-9675 | |
| MEYALDYNE CORP | | 47603 HALYARD DR | | | | PLYMOUTH | MI | 48170 | |
| MEYCO MACHINE & TOOL INC | | 11579 MARTENS RIVER CIRCLE | | | | FOUNTAIN VALLEY | CA | 92708 | |
| MEYER & NJUS | | 111 N STATE ST 11TH FLR STE 93 | | | | CHICAGO | IL | 60602 | |
| MEYER & NJUS | | 21415 CIVIC CTR DR STE 301 | | | | SOUTHFIELD | MI | 48076-3954 | |
| MEYER & NJUS | | ACT OF G GAINES GC 96 0617 | 29532 SOUTHFIELD STE 200 | | | SOUTHFIELD | MI | 37152-4035 | |
| MEYER AMANDA | | 14574 GRASS LAKE RD | | | | GRASS LAKE | MI | 49240 | |
| MEYER AND NJUS | | 21415 CIVIC CTR DR STE 301 | | | | SOUTHFIELD | MI | 48076-3954 | |
| MEYER AND NJUS ACT OF G GAINES GC 96 0617 | | 29532 SOUTHFIELD STE 200 | | | | SOUTHFIELD | MI | 48076 | |
| MEYER BILLY | | 3539 COZY CAMP RD | | | | MORAINE | OH | 45439 | |
| MEYER BRADLEY | | 4122 WILLOW RUN DR | | | | BEAVERCREEK | OH | 45430 | |
| MEYER BRENT | | 3163 FOSS DR | | | | SAGINAW | MI | 48603 | |
| MEYER BUILDING SITE TRUST | | C/O JOHNSON & BELL NL OBSALVO | 222 N LASALLE STE 2200 | | | CHICAGO | IL | 60601-1104 | |
| MEYER BUILDING SITE TRUST C O JOHNSON AND BELL NL OBSALVO | | 222 N LASALLE STE 2200 | | | | CHICAGO | IL | 60601-1104 | |
| MEYER CHRISTOPHER | | 6240 GENTRY WOODS DR | | | | CENTERVILLE | OH | 45459 | |
| MEYER CONRAD | | 13516 IROQUOIS WOODS DR | | | | FENTON | MI | 48430 | |
| MEYER DARRAGH BUCKLER BEBENEK | | & ECK | 120 LAKEMONT PK BLVD | | | ALTOONA | PA | 16602 | |
| MEYER DARRAGH BUCKLER BEBENEK | | & ECK | 2000 FRICK BLDG | | | PITTSBURGH | PA | 15219 | |
| MEYER DARRAGH BUCKLER BEBENEK | | & ECK | 800 1 VALLEY SQUARE | | | CHARLESTON | WV | 25301-1640 | |
| MEYER DARRAGH BUCKLER BEBENEK | | & ECK PLLC | 120 LAKEMONT PK BLVD | | | ALTOONA | PA | 16602 | |
| MEYER DARRAGH BUCKLER BEBENEK | | & ECK PLLC | 2000 FRICK BLDG | | | PITTSBURGH | PA | 15219-6194 | |
| MEYER DARRAGH BUCKLER BEBENEK | | AND ECK | 800 1 VALLEY SQUARE | | | CHARLESTON | WV | 25301-1640 | |
| MEYER DARRAGH BUCKLER BEBENEK AND ECK | | 120 LAKEMONT PK BLVD | | | | ALTOONA | PA | 16602 | |
| MEYER DARRAGH BUCKLER BEBENEK AND ECK | | 2000 FRICK BLDG | | | | PITTSBURGH | PA | 15219 | |
| MEYER DARRAGH BUCKLER BEBENEK AND ECK PLLC | | 120 LAKEMONT PK BLVD | | | | ALTOONA | PA | 16602 | |
| MEYER DARRAGH BUCKLER BEBENEK AND ECK PLLC | | 2000 FRICK BLDG | | | | PITTSBURGH | PA | 15219-6194 | |
| MEYER DAVID | | 4671 DOGWOOD LN | | | | SAGINAW | MI | 48603 | |
| MEYER DAVID E | | 4201 MEADOWBROOK DR | | | | FREELAND | MI | 48623-8840 | |
| MEYER DEAN | | PO BOX 1605 | | | | MIDLAND | MI | 48641 | |
| MEYER DENISE | | 5600 W BIRCH RUN RD | | | | SAINT CHARLES | MI | 48655-9627 | |
| MEYER DENNIS E | | 3271 WINTERGREEN DR E | | | | SAGINAW | MI | 48603-1942 | |
| MEYER DIDIER | | 7166 EDGEWATER PL | | | | INDIANAPOLIS | IN | 46240 | |
| MEYER DONALD | | 1289 WOODFIELD TRAIL | | | | HEMLOCK | MI | 48626 | |
| MEYER DONALD | | 1741 W SYCAMORE ST | | | | KOKOMO | IN | 46901 | |
| MEYER ELIZABETH | | 469 ESSEX DR | | | | ROCHESTER HILLS | MI | 48307 | |
| MEYER EUGENE | | 2347 E BENNETT AVE | | | | MILWAUKEE | WI | 53207-2919 | |
| MEYER FRANK | | 14489 BLUE SKIES | | | | LIVONIA | MI | 48152 | |
| MEYER GENE | | 1604 MILLS RD | | | | PRESCOTT | MI | 48756 | |
| MEYER GREGORY | | 201 S ALBRIGHT ST | | | | ARCANUM | OH | 45304-1203 | |
| MEYER H | | 11676 LUCAS FERRY RD | | | | ATHENS | AL | 35611 | |
| MEYER JAMES | | 1416 ANGELA DR W | | | | SAGINAW | MI | 48609-4222 | |
| MEYER JAMES | | 5600 W BIRCH RUN RD | | | | SAINT CHARLES | MI | 48655-9627 | |
| MEYER JEFFREY | | 7122 TIMBERCREEK DR | | | | ALLENDALE | MI | 49401 | |
| MEYER JEWELRY COMPANY | | FOR ACCT OF LEONARD E SNIPE | CASE 93 3994 GC | | | | | 37580-5374 | |
| MEYER JEWELRY COMPANY ACCT OF CHARLES M ROGERS | | CASE 93 2660 93 113 194 | | | | | | | |
| MEYER JEWELRY COMPANY FOR ACCT OF LEONARD E SNIPE | | CASE 93 3994 GC | | | | | | | |
| MEYER JIM | | 4276 TWIN TOWNSHIP RD | | | | LEWISBURG | OH | 45338 | |

| CreditorName | CreditorNoticeName | Address1 | Address2 | Address3 | Address4 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|---|---|
| OYLER JUDITH | | PO BOX 313 | | | | BURLINGTON | IN | 46915-0313 | |
| OYLER, BARTON | | 810 W WOODLAND ST | | | | KOKOMO | IN | 46902 | |
| OZ OPTICS | | 219 WESTBROOK RD | | | | CARP ONTARIO | | | CANADA |
| OZ OPTICS | SAIDOU KANE | 219 WESTBROOK RD | | | | CARP | ON | | CANADA |
| OZ OPTICS LTD | | 219 WESTBROOK RD | | | | CARP CANADA | ON | K0A 1L0 | CANADA |
| OZ OPTICS LTD | | 219 WESTBROOK RD | | | | CARP | ON | K0A 1L0 | CANADA |
| OZAK ELEKTRONIK SAN TIC A | ALI UZ | BEYLIKDUZU MEVKII | BAKIRCILAR VE PLRINCILER | SAN SITESI ORKIDE SOK NO7 | | 34900 BUYUKCEKMECE | | | TURKEY |
| | | | | | | ISTANBUL | | | |
| OZALID CORP | | 9730 C MARTIN LUTHER KING HWY | | | | LANHAM | MD | 20706 | |
| OZANICH RANDY | | 2325 BENNETT AVE | | | | FLINT | MI | 48506-3656 | |
| OZARK MOTOR LINES | | 3934 HOMEWOOD RD | | | | MEMPHIS | TN | 38118 | |
| OZARK MOTOR LINES INC | | PO BOX 181077 | | | | MEMPHIS | TN | 38181-1077 | |
| OZARK MOTOR LINES INC | | SCAC OZRK | 3934 HOMEWOOD RD | | | MEMPHIS | TN | 38118 | |
| OZARK PUMPS & PARTS INC | | 44 SWANGE DR | | | | BELLA VISTA | AR | 72715 | |
| OZARKA NATURAL SPRING WATER | | 16420 NORTH IH 35 | | | | AUSTIN | TX | 78728 | |
| OZARKA NATURAL SPRING WATER | | PO BOX 856680 | | | | LOUISVILLE | KY | 40285-6680 | |
| OZBOLT MARK | | 31 LIVINGSTONE LN | | | | DECATUR | AL | 35603-5752 | |
| OZCUHACI OZKAN | | 25 STONE FENCE CIR | | | | ROCHESTER | NY | 14626 | |
| OZDEMIR BULENT | | 1748 LANGFORD DR | | | | TROY | MI | 48083 | |
| OZELL BENJAMIN | | 18580 DEQUINDRE ST | | | | DETROIT | MI | 48234 | |
| OZEN S A | | 53 AVE GABRIEL VOISIN | B P NO 8 | 71700 TOURNUS | | | | | FRANCE |
| OZEN S A 53 AVENUE GABRIEL VOISIN | | B P NO 8 | 71700 TOURNUS | | | | | | FRANCE |
| OZEN SA | | 53 RUE GABRIEL VOISIN | | | | TOURNUS | | | FRANCE |
| OZIMEK JOHN | | 4645 EAGLE CREEK RD | | | | LEAVITTSBURG | OH | 44430 | |
| OZINGA TRANSPORTATION C/O OZINGA ILLINOIS RMC INC | | 18825 OLD LAGRANGE RD | | | | MOKENA | IL | 60448 | |
| OZINGA TRANSPORTATION SYS INC | | 21900 S CENTRAL AVE | | | | MATTESON | IL | 60443 | |
| OZKAYNAK, TARIK | | 39 TERESA CIR | | | | ROCHESTER | NY | 14624 | |
| OZMENT MELODY A | | 643 S BELL ST | | | | KOKOMO | IN | 46901-5526 | |
| OZOGAR DONALD | | 4305 BROOKSIDE DR | | | | KOKOMO | IN | 46902 | |
| OZONE AUTO SVC INC | | 87 19 ROCKAWAY BLVD | | | | OZONE PK | NY | 11416 | |
| OZSOYLU SUAT | | 1660 RIDGECREST | | | | ROCHESTERHILLS | MI | 48306 | |
| OZSOYLU, SUAT A | | 1660 RIDGECREST | | | | ROCHESTERHILLS | MI | 48306 | |
| OZTURKOGLU, ORHAN | | 489 STONE RD | | | | ROCHESTER | NY | 14616 | |
| OZUNA ELLA | | 12388 N MESQUITE CREST | | | | ORO VALLEY | AZ | 85737 | |
| P & A CONVEYOR SALES INC | | 18999 QUARRY RD | | | | RIVERVIEW | MI | 48192 | |
| P & A CONVEYOR SALES INC | | PO BOX 2145 | | | | RIVERVIEW | MI | 48192 | |
| P & A INDUSTRIES INC | | PO BOX 631005 | | | | CINCINNATI | OH | 45263-1005 | |
| P & A INDUSTRIES INC EFT | | PO BOX 631005 | | | | CINCINNATI | OH | 45263-1005 | |
| P & B TRANSPORTATION INC | | 601 MARCO RD | | | | APOLLO | PA | 15613-8854 | |
| P & B TRUCKING INC | | 1038 N 2ND ST | | | | DECATUR | IN | 46733 | |
| P & E MICRO COMPUTER SYSTEMS | | PO BOX 2044 | | | | WOBURN | MA | 01888 | |
| P & E MICRO COMPUTER SYSTEMS INC | | 656 BEACON ST STE 2 | | | | BOSTON | MA | 02215-2006 | |
| P & E MICROCOMPUTER SYSTEMS | | 98 GALEN ST 2ND FL | | | | WATERTOWN | MA | 02472-4502 | |
| P & E MICROCOMPUTER SYSTEMS INC | | 98 GALEN ST 2ND FL | | | | WATERTOWN | MA | 02472-4502 | |
| P & G STEEL PRODUCTS CO INC | | 54 GRUNER RD | | | | BUFFALO | NY | 14227-1007 | |
| P & H AUTO ELECTRIC | | PO BOX 25889 | | | | BALTIMORE | MD | 21224-0589 | |
| P & H AUTO ELECTRIC BDC | | 7990 92 E BALTIMORE ST | | | | BALTIMORE | MD | 21224-2010 | |
| P & J DELIVERY SERVICE INC | | PO BOX 2975 | | | | GRAND RAPIDS | MI | 49501 | |
| P & J INDUSTRIES INC | | 6841 COMMERCE ST | | | | EL PASO | TX | 79901 | |
| P & J INDUSTRIES INC | | 44 BUTTERFIELD CIR | | | | EL PASO | TX | 79906 | |
| P & J INDUSTRIES INC | | 4934 LEWIS AVE | REMIT UPTD 03 2000 | | | TOLEDO | OH | 43612 | |
| P & J INDUSTRIES INC | | 4934 LEWIS AVE | | | | TOLEDO | OH | 43612 | |
| P & J MANUFACTURING CO | | 1644 CAMPBELL ST | | | | TOLEDO | OH | 43607 | |
| P & J MANUFACTURING INC | | 1644 CAMPBELL ST | | | | TOLEDO | OH | 43607-4381 | |
| P & M PROCESS EQUIPMENT INC | | 2005 W DETROIT | | | | BROKEN ARROW | OK | 74012-3616 | |
| P & M PRODUCTS EFT | | DIV OF FINDLAY INDUSTRIES | 155B MALOW | | | MT CLEMENS | MI | 48043 | |
| P & M TRUCKING INC | | PAYLOAD ACCOUNT | 3181 KRAFFT RD | PO BOX 910360 | | FORT GRATIOT | MI | 48059 | |
| P & O NEDLLOYD | | 12TH FL ONE MEADOWLANDS | PLAZA | | | EAST RUTHERFORD | NJ | 07073 | |
| P & O NEDLLOYD | | 1 MEADOWLANDS PLZ | | | | EAST RUTHERFORD | NJ | 7073 | |
| P & O NEDLLOYD | | SCWSCACPOCL | 1 MEADOWLANDS PLAZA | | | E RUTHERFORD | NJ | 07073 | |
| P & P INDUSTRIES INC | | 14729 SPRING VALLEY RD | | | | MORRISON | IL | 61270-9791 | |
| P & P TRANSPORT | | PO BOX 1710 | | | | DELRAN | NJ | 08075 | |
| P & R COMMUNICATIONS SERVICE | | 731 E 1ST ST | | | | DAYTON | OH | 45402 | |
| P & R COMMUNICATIONS SERVICE | | INC | 731 E 1ST ST | RMT CHNG 08 25 05 CS | | DAYTON | OH | 45402 | |
| P & R COMMUNICATIONS SERVICE | | 700 E 1ST ST | | | | DAYTON | OH | 45402-1383 | |
| P & R COMMUNICATIONS SERVICE | | 700 E FIRST ST | | | | DAYTON | OH | 45402 | |
| P & R COMMUNICATIONS SERVICE INC | | 731 E 1ST ST | | | | DAYTON | OH | 45402 | |
| P & R FASTENERS INC | | 5 HOLLYWOOD CT | | | | SOUTH PLAINFIELD | NJ | 07080 | |
| P & R FASTENERS INC | | C/O OLDFORD & ASSOCIATES | 3555 WALNUT ST | | | PORT HURON | MI | 48060 | |
| P & R FASTENERS INC EFT | | 325 PIERCE ST | | | | SOMERSET | NJ | 08873 | |
| P & R FASTENERS INC EFT | | 325 PIERCE ST | | | | SOMERSET | NJ | 08873-1229 | |
| P & R INDUSTRIES INC | | 1524 N CLINTON AVE | | | | ROCHESTER | NY | 14621 | |
| P & R INDUSTRIES INC | | 1524 N CLINTON AVE | | | | ROCHESTER | NY | 14621-220 | |
| P & R INDUSTRIES INC EFT | ACCOUNTS RECEIVABLE | 1524 CLINTON AVE N | | | | ROCHESTER | NY | 14621 | |
| P & R INDUSTRIES INC EFT | ACCOUNTS RECEIVABLE | PO BOX 8000 DEPT 850 | UPDT 3 2000 LETTER | | | BUFFALO | NY | 14287 | |
| P A C EQUIPMENT CO INC | | 2600 ARBOR GLEN DR STE 206 | | | | TWINSBURG | OH | 44087 | |
| P A INDUSTRIES INC | | 522 COTTAGE GROVE RD | | | | BLOOMFIELD | CT | 06002 | |
| P A INDUSTRIES INC | | 522 COTTAGE GROVE RD | | | | BLOOMFIELD | CT | 06002 | |
| P A INDUSTRIES INC | | LOCKBOX 5056 PO BOX 30000 | RMT 11 00 LETTER KL | | | HARTFORD | CT | 06150-5056 | |
| P A T PRODUCTS INC | | 44 CENTRAL ST | | | | BANGOR | ME | 04401 | |
| P AND  M PRECISION MACHINING INC | | 65 BUCK RD | | | | HUNTINGDON VALLEY | PA | 19006 | |
| P AND  W MARKETING INC | | PO BOX 4866 | | | | YOUNGSTOWN | OH | 44515 | |
| P AND A CONVEYOR SALES INC | | PO BOX 2145 | | | | RIVERVIEW | MI | 48192 | |

| CreditorName | CreditorNoticeName | Address1 | Address2 | Address3 | Address4 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|---|---|
| P AND B TRANSPORTATION INC | | 601 MARCO RD | | | | APOLLO | PA | 15613-8854 | |
| P AND B TRUCKING INC | | 1038 N 2ND ST | | | | DECATUR | IN | 46733 | |
| P AND E MICROCOMPUTER SYSTEMS INC | | 98 GALEN ST 2ND FL | | | | WATERTOWN | MA | 02472-4502 | |
| P AND G MACHINE | | 99 JEFFERSON AVE | | | | BAYSHORE | NY | 11706 | |
| P AND J MANUFACTURING INC | | 1644 CAMPBELL ST | | | | TOLEDO | OH | 43607-4381 | |
| P AND M PRODUCTS EFT DIV OF FINDLAY INDUSTRIES | | PO BOX 931544 | | | | CLEVELAND | OH | 44193-5016 | |
| P AND P TRANSPORT | | 45 E PARK DR | | | | MOUNT HOLLY | NJ | 08060 | |
| P AND R COMMUNICATIONS | JOHN VLAHOS | 731 E. FIRST ST | | | | DAYTON | OH | 45401 | |
| P AND R COMMUNICATIONS | JOHN VLAHOS | 731 E FIRST ST | | | | DAYTON | OH | 45401 | |
| P AND R COMMUNICATIONS SERV | JOHN JILL | 700 E. FIRST ST | PO BOX 1444 | | | DAYTON | OH | 45401 | |
| P AND R FASTENERS INC | | 325 PIERCE ST | | | | SOMERSET | NJ | 08873 | |
| P B & S CHEMICAL COMPANY INC | | 755 BROWNS LOCK RD | | | | BOWLING GREEN | KY | 42101 | |
| P BARNETT CONSTRUCTION CO LTD | | LOCK BOX D 860542 | | | | ORLANDO | FL | 32886-0542 | |
| P BARNETT CONSTRUCTION CO LTD | | PH00515101 TBUICK001 LBU1001 | D 860542 | | | ORLANDO | FL | 32886-0542 | |
| P C QUOTE INC | | 300 S WACKER DR STE 300 | | | | CHICAGO | IL | 60606 | |
| P C S COMPANY | | 34488 DOREKA | | | | FRASER | MI | 48026-3438 | |
| P CAVILS TIRE & AUTO CNTR | | 1200 W 14 MILE RD | | | | CLAWSON | MI | 48017 | |
| P D A INC | | 8080 SOUTHPARK LN | | | | LITTLETON | CO | 80120-5640 | |
| P D GEORGE CO | | 5200 N 2ND ST | | | | SAINT LOUIS | MO | 63147 | |
| P D GEORGE CO | | OFF EFT PER VENDOR 11 10 98 | 5200 N 2ND ST | | | ST LOUIS | MO | 63147-3122 | |
| P D GEORGE CO | | PO BOX 503703 | | | | ST LOUIS | MO | 63150-3703 | |
| P D GEORGE COMPANY | JIM MCMILLIN | 5200 N SECOND ST | | | | ST LOUIS | MO | 63147 | |
| P D Q TRANSPORT INC | | PO BOX 246 | | | | CHEYENNE | WY | 82003 | |
| P E HANDLEY WALKER INC | | 6000 FREEDOM SQUARE DR | STE 140 | | | INDEPENDENCE | OH | 44131 | |
| P F MARKEY INC EFT | | 2880 UNIVERSAL DR | | | | SAGINAW | MI | 48603 | |
| P F MARKEY INC EFT | | PO BOX 5769 | | | | SAGINAW | MI | 48603 | |
| P G AUTO PARTS INC | | DBA AUTOMATE WAREHOUSE | 1313 NATIONAL AVE | | | SAN DIEGO | CA | 92101 | |
| P H GLATFELTER COMPANY F/K/A/ BERGSTROM PAPER CO | C/O BALLARD SPAHR ANDREWS & INGERSOLL | MORRIS CHESTON | 1735 MARKET ST | 51ST FL | | PHILADELPHIA | PA | 19103-7599 | |
| P H GLATFELTER COMPANY F/K/A/ BERGSTROM PAPER CO | PATRICK ZAEPFEL | 96 SOUTH GEORGE ST | STE 500 | | | YORK | PA | 17401-1434 | |
| P H PRECISION PRODUCTS CORP | | 340 COMMERCE WAY | | | | PEMBROKE | NH | 03725 | |
| P INC SEALTECH DIVISION | JAMES WINDER | 213 DENNIS ST | | | | ATHENS | TN | 37303 | |
| P J EXPRESS INC | | PO BOX 196 | | | | SEWARD | NE | 68434 | |
| P J FITZPATRICK INC | | 21 INDUSTRIAL BLVD | | | | NEW CASTLE | DE | 19720 | |
| P J SPRING CO INC | | 1180 ATLANTIC DR | | | | W CHICAGO | IL | 60185 | |
| P J SPRING CO INC | | 1180 ATLANTIC DR | | | | WEST CHICAGO | IL | 60185 | |
| P J SPRING CO INC | ATTN PATRICK BUCKLEY | 1100 ATLANTIC DR | | | | W CHICAGO | IL | 60185 | |
| P JOHNSON | | 76 FOUGERON ST | | | | BUFFALO | NY | 14211 | |
| P K G EQUIPMENT INC | | 367 PAUL RD | | | | ROCHESTER | NY | 14624 | |
| P K TOOL | | 4700 W LEMOYNE ST | | | | CHICAGO | IL | 60651 | |
| P K TOOL & MANUFACTURING CO | | 4700 WEST LEMOYNE ST | | | | CHICAGO | IL | 60651-1682 | |
| P K TOOL & MANUFACTURING CO | | 4700 W LEMOYNE ST | | | | CHICAGO | IL | 60651 | |
| P K TOOL & MANUFACTURING CO | | 4700 W LE MOYNE ST | | | | CHICAGO | IL | 60651-168 | |
| P K TOOL & MANUFACTURING CO | | 4700 W LE MOYNE ST | | | | CHICAGO | IL | 60651-1682 | |
| P K TOOL & MFG CO | | 2800 AIRPORT RD STE D | | | | SANTA TERESA | NM | 88008 | |
| P M C SALES INC | | P M C MACHINERY | 15800 CENTENNIAL DR | ADD CHNG LTR MW 3 08 02 | | NORTHVILLE | MI | 48167 | |
| P M G POLMETASA S A | | CALLE ARABA ETORBIDEA 30 | | | | ARRASATE MONDRAGON | 20 | 20500 | ES |
| P M TRUCKING | | ADR CHG 10 3 96 | RR 4 PO BOX 470 | | | EMPORIUM | PA | 15834 | |
| P N P EXPRESS | | PO BOX 254 | | | | SCOTTSBURG | IN | 47170 | |
| P P E ASSOC | | PLASTIC PROCESS ENGINEERING | 75 MANCHESTER AVE | | | KEYPORT | NJ | 07735 | |
| P P E ASSOCIATES | | PLASTIC PROCESS ENGINEERING AS | 75 MANCHESTER AVE | | | KEYPORT | NJ | 07735 | |
| P P E INC | | 710 TAYLOR ST | | | | ELYRIA | OH | 44035 | |
| P SCOTT LOWERY PC | | 10375 EAST HARVARD AVE | | | | DENVER | CO | 80231 | |
| P SCOTT LOWERY PC | | 10375 E HARVARD AVE STE410 | STE 410 | | | DENVER | CO | 80231 | |
| P SEAN WIGGINS | | 3027 E MADISON ST | | | | BALTIMORE | MD | 21205 | |
| P T I ENGINEERED PLASTIC INC | | 44850 CENTRE COURT E | | | | CLINTON TOWNSHIP | MI | 48038 | |
| P TEC AUTOMOTIVE LTD | | P TEC 6 SOLWAY CT ELECTRA WAY | | | | CREWE | CH | CW1 6LD | GB |
| P TECH CORPORATION | AMBER CAMPBELL | 2405 COMMERCE CIR | | | | ALAMOSA | CO | 81101 | |
| P TECH CORPORATION | AMBER CAMPBELL | 2405 COMMERCE CIRCLE | | | | ALAMOSA | CO | 81101 | |
| P TEES ELECTRIC MOTORS | | PO BOX 3058 | | | | GALLUP | NM | 87305 | |
| P TOOL & DIE CO INC | | 3535 UNION ST | | | | N CHILI | NY | 14514 | |
| P TOOL & DIE CO INC | | 3535 UNION ST | | | | NORTH CHILI | NY | 14514 | |
| P TOOL & DIE CO INC | | PO BOX 326 | | | | N CHILI | NY | 14514 | |
| P&A INDUSTRIES INC | | 600 CRYSTAL AVE | | | | FINDLAY | OH | 45840 | |
| P&A INDUSTRIES INC | | MIDWAY PRODUCTS | 1 LYMAN HOYT DR | | | MONROE | MI | 48161 | |
| P&E MICRO COMPUTER SYSTEMS | | 656 BEACON ST | 2ND FL | | | BOSTON | MA | 02215 | |
| P&E MICRO COMPUTER SYSTEMS INC | | 656 BEACON ST 2ND FL | | | | BOSTON | MA | 02215 | |
| P&E MICRO COMPUTER SYSTEMS INC | | 710 COMMONWEALTH AVE 4TH FL | | | | BOSTON | MA | 02215 | |
| P&M PRECISION MACHINING INC | | 65 BUCK RD | | | | HUNTINGDON VALLEY | PA | 19006 | |
| P&M PRODUCTS CO | | 155 B MALOW ST | | | | MOUNT CLEMENS | MI | 48043-2114 | |
| P&O NEDLLOYD | PAUL FRANK | 1 MEADOWLANDS PLAZA 14TH FL | | | | EAST RUTHERFORD | NJ | 07073 | |
| P&R DISPOSAL SERVICES LTD | | ST HELENS | BRINDLEY RD | | | ST HELENS | | WA94HY | UNITED KINGDOM |
| P&R FASTENERS INC | | 325 PIERCE ST | | | | SOMERSET | NJ | 08873-122 | |
| P&R INDUSTRIES INC | JOSEPH E SIMPSON | HARTER SECREST & EMERY LLP | 1600 BAUSCH & LOMB PL | | | ROCHESTER | NY | 14604-2711 | |
| P&R SUPPLY CO INC | | PO BOX 690094 | | | | TULSA | OK | 77169 | |
| P&W MARKETING INC | | 150 VICTORIA RD | | | | YOUNGSTOWN | OH | 44515-0866 | |
| P/A INDUSTRIES INC | | 522 COTTAGE GROVE RD | | | | BLOOMFIELD | CT | 06002-3111 | |
| P3 PORTABLE POWER PRODUCTS EF | | LLC | 7480 WOODMONT AV | | | NAVARRE | FL | 32566 | |
| P3 PORTABLE POWER PRODUCTS LLC | | CARLSON CONSULTING | 7480 WOODMONT ST | | | GULF BREEZE | FL | 32566 | |
| PA BUILDING LLC | | 32255 NORTHWESTERN HWY STE 196 | | | | FARMINGTON HILLS | MI | 48334 | |
| PA BUILDING LLC | | 32255 NORTHWESTERN HWY STE 196 | ADD CHG 1 20 04 VC | | | FARMINGTON HILLS | MI | 48334 | |

| CreditorName | CreditorNoticeName | Address1 | Address2 | Address3 | Address4 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|---|---|
| SOUTH CAROLINA DEPARTMENT HEALTH AND ENVIRONMENT CENTER | | 2600 BULL ST | | | | COLUMBIA | SC | 29201 | |
| SOUTH CAROLINA DEPARTMENT OF | | REVENUE | CORPORATION RETURN | | | COLUMBIA | SC | 29214-0100 | |
| SOUTH CAROLINA DEPARTMENT OF HEALTH & ENVIRONMENTAL CONTROL | | 2600 BULL ST | | | | COLUMBIA | SC | 29201 | |
| SOUTH CAROLINA DEPT HEALTH | | & ENVIRONMENTAL | 17650 DUVAN DR | | | TINLEY PK | IL | 60477 | |
| SOUTH CAROLINA DEPT HEALTH AND ENVIRONMENTAL | | 17650 DUVAN DR | | | | TINLEY PK | IL | 60477 | |
| SOUTH CAROLINA DEPT OF HEALTH AND ENVIRONMENTAL CONTROL | | 2600 BULL ST | | | | COLUMBIA | SC | 29201 | |
| SOUTH CAROLINA DEPT OF REVENUE | | CORPORATION | | | | COLUMBIA | SC | 29214-0006 | |
| SOUTH CAROLINA DEPT OF REVENUE | | CORPORATION TENTATIVE | | | | COLUMBIA | SC | 29214-0006 | |
| SOUTH CAROLINA DEPT OF REVENUE | | PROCESSING CTR | PO BOX 101105 | | | COLUMBIA | SC | 29211-0105 | |
| SOUTH CAROLINA DEPT OF REVENUE PROCESSING CENTER | | PO BOX 101105 | | | | COLUMBIA | SC | 29211-0105 | |
| SOUTH CAROLINA DEPT REVENUE | | POBOX 125 | | | | COLUBIA | SC | 29214 | |
| SOUTH CAROLINA SECRETARY OF | | STATE | PO BOX 11350 | | | COLUMBIA | SC | 29211 | |
| SOUTH CAROLINA STATE | | UNIVERSITY | 300 COLLEGE ST NORTHEAST | POST OFFICE BOX 7425 | | ORANGEBURG | SC | 29117 | |
| SOUTH CAROLINA TAX COMM | | | | | | | | 03900 | |
| SOUTH CAROLINA TAX COMMISSION | | ACCT OF DAVID COHEN | CASE 71083760-0 | PO BOX 21588 ATTN C PITTS | | COLUMBIA | SC | 25090-8435 | |
| SOUTH CAROLINA TAX COMMISSION | | PO BOX 125 | | | | COLUMBIA | SC | 29214-0101 | |
| SOUTH CAROLINA TAX COMMISSION ACCT OF DAVID COHEN | | CASE 71083760 0 | PO BOX 21588 ATTN C PITTS | | | COLUMBIA | SC | 29221 | |
| SOUTH CENTRAL CO INC | | 3008 N WALNUT | | | | MUNCIE | IN | 47303 | |
| SOUTH CENTRAL COMPANY INC | | 3055 STATE ST | | | | COLUMBUS | IN | 47201-7453 | |
| SOUTH CENTRAL COMPANY INC | | PO BOX 367 | | | | COLUMBUS | IN | 47202-0367 | |
| SOUTH CENTRAL DIESEL | | 115 S EAST AVE | | | | HOLDREGE | NE | 68949 | |
| SOUTH CENTRAL OHIO MINORITY BU | MR JIM WISER | 37 N HIGH ST | | | | COLUMBUS | OH | 43215 | |
| SOUTH CENTRAL REGIONAL MEDICAL | | CTR WELLNESS CTR | PO BOX 607 | | | LAUREL | MS | 39441 | |
| SOUTH CENTRAL REGIONAL MEDICAL CTR WELLNESS CENTER | | PO BOX 607 | | | | LAUREL | MS | 39441 | |
| SOUTH CHESTER TUBE CO INC | | SOUTHCO | 210 BRINTON LAKE RD | | | CONCORDVILLE | PA | 19331 | |
| SOUTH CHESTER TUBE COMPANY | | 210 N BRINTON LAKE RD | | | | CONCORDVILLE | PA | 19331 | |
| SOUTH COAST AIR QUALITY | | 21865 COPLEY | | | | DIAMOND BAR | CA | 91765 | |
| SOUTH COAST AIR QUALITY | | MANAGEMENT DISTRICT | PO BOX 4943 | 21865 E COPLEY DR | | DIAMOND BAR | CA | 91765-0933 | |
| SOUTH COAST AIR QUALITY | | SCAQ MANAGEMENT DISTRICT | | | | | | | |
| SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT | | 21865 COPLEY DR | | | | DIAMOND BAR | CA | 91765-4178 | |
| SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT | | 21865 E COPLEY DR | PO BOX 4943 | | | DIAMOND BAR | CA | 91765-4182 | |
| SOUTH COASTAL OPERATIONS | | 34551 PUERTO PL | | | | DANA POINT | CA | 92629 | |
| SOUTH COLLEGE | | 1760 NORTH CONGRESS AVE | | | | WEST PALM BEACH | FL | 33409 | |
| SOUTH DAKOTA SECRETARY OF | | STATE | 500 E CAPITOL | | | PIERRE | SD | 57501-5077 | |
| SOUTH EAST TOOL CO INC | | 901 SPRINGFIELD ST | | | | DAYTON | OH | 45403-134 | |
| SOUTH EAST TOOL COMPANY INC | | 901 SPRINGFIELD ST | | | | DAYTON | OH | 45403 | |
| SOUTH EUCLID MUNICIPAL COURT | | 1349 SOUTH GREEN RD | | | | SOUTH EUCLID | OH | 44121 | |
| SOUTH FRANKLIN TWP E I T C | | 100 MUNICIPAL RD | | | | WASHINGTON | PA | 15301 | |
| SOUTH GEORGIA CATERING | | & BARBECUE | PO BOX 71383 | | | ALBANY | GA | 31708 | |
| SOUTH GEORGIA CATERING & BARBE | | GUS PORT A PIT BARBECUE | 2347 DAWSON RD | | | ALBANY | GA | 31708 | |
| SOUTH GEORGIA CATERING AND BARBECUE | | PO BOX 71383 | | | | ALBANY | GA | 31708 | |
| SOUTH GEORGIA MEDIA GROUP | | PO BOX 968 | | | | VALDASTA | GA | 31603 | |
| SOUTH GEORGIA MEDICAL | | ONCOLOGY ASSOCIATES PC | PO BOX 7570 | | | TIFTON | GA | 31793-7570 | |
| SOUTH HAROLD | | 6047 GLEN TRACE LN | | | | WEST CHESTER | OH | 45069 | |
| SOUTH HAVEN COIL INC | ACCOUNTS PAYABLE | PO BOX 409 | | | | SOUTH HAVEN | MI | 49090 | |
| SOUTH HAVEN COIL INCORPORATED | | PO BOX 409 | | | | SOUTH HAVEN | MI | 49090-0409 | |
| SOUTH INDIA WATCH INDUSTRIES | | PVT LTD | 655 1ST FL 11TH MAIN HAL 2ND | STAGE INDIRANAGAR 560 008 | | BANGALORE | | | INDIA |
| SOUTH INDIA WATCH INDUSTRIES PVT LTD | | 655 1ST FL 11TH MAIN HAL 2ND | STAGE INDIRANAGAR 560 008 | | | BANGALORE INDIA | | | INDIA |
| SOUTH JAMES | | 3385 PEMBROOK CIRCLE | | | | DAVISON | MI | 48423 | |
| SOUTH JESSICA | | 535 ADAMS ST APT 1 | | | | DAYTON | OH | 45410 | |
| SOUTH JOHN D | | 892 APT G REVERE VILLAGE CT | | | | CENTERVILLE | OH | 45458 | |
| SOUTH OAKLAND SHELTER | | 431 N MAIN ST | | | | ROYAL OAK | MI | 48067 | |
| SOUTH PAK INC | | PO BOX 28090 | | | | BIRMINGHAM | AL | 35228 | |
| SOUTH PAK INC | J D TIDWELL XT224 | 660 BESSEMER SUPER HWY | | | | MIDFIELD | AL | 35228 | |
| SOUTH PAK INC | JD TIDWELL | 660 BESSEMER SUPER HWY | | | | MIDFIELD | AL | 35228-0000 | |
| SOUTH PLAINFIELD ADULT SCHOOL | | 305 CROMWELL PL | | | | SOUTH PLAINFIELD | NJ | 07080 | |
| SOUTH SHORE ELECTRIC | | 589 TERNES ST | | | | ELYRIA | OH | 44035 | |
| SOUTH SHORE ELECTRIC | | PO BOX 321 | | | | ELYRIA | OH | 44036 | |
| SOUTH SHORE ELECTRIC INC | | 589 TERNES ST | | | | ELYRIA | OH | 44035 | |
| SOUTH STAR CORPORATION | ACCOUNTS PAYABLE | PO BOX 264 | | | | SALEM | VA | 24153 | |
| SOUTH SUBURBAN COLLEGE | | ACCOUNTS REC | 15800 S STATE ST | | | S HOLLAND | IL | 60473 | |
| SOUTH TEXAS COLLEGE | | PO BOX 178 | | | | EDINBURG | TX | 78540 | |
| SOUTH TEXAS COLLEGE | DIANE W SANDERS | LINEBARGER GOGGAN BLAIR & SAMPSON LLP | 1949 SOUTH IH 35 78741 | PO BOX 17428 | | AUSTIN | TX | 78760-7428 | |
| SOUTH TEXAS COLLEGE | DIANE W SANDERS | LINEBARGER GOGGAN BLAIR & SAMPSON LLP | THE TERRACE II 2700 VIA FORTUNA DR STE 400 | PO BOX 17428 | | AUSTIN | TX | 78760-7428 | |
| SOUTH TEXAS COLLEGE | SOUTH TEXAS COLLEGE | PO BOX 178 | | | | EDINBURG | TX | 78540 | |
| SOUTH TEXAS COMMUNITY COLLEGE | | BUSINESS OFFICE | PO BOX 9701 | | | MCALLEN | TX | 78502-9701 | |
| SOUTH TEXAS DISTRIBUTION | | 3219 DAVIS AVE | | | | LAREDO | TX | 78040 | |
| SOUTH TEXAS ISD | | PO BOX 178 | | | | EDINBURG | TX | 78540 | |
| SOUTH TEXAS ISD | DIANE W SANDERS | LINEBARGER GOGGAN BLAIR & SAMPSON LLP | THE TERRACE II 2700 VIA FORTUNA DR STE 400 | PO BOX 17428 | | AUSTIN | TX | 78760-7428 | |
| SOUTH TEXAS ISD | SOUTH TEXAS ISD | PO BOX 178 | | | | EDINBURG | TX | 78540 | |
| SOUTH TEXAS XPRESS | | 943 N EXPRESSWAY 15 PMB 151A | | | | BROWNSVILLE | TX | 78520 | |