Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 05-44481-rdd

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6   DPH HOLDINGS CORP, et al. and DIP HOLDCO, LLP d/b/a

7   DELPHI AUTOMOTIVE, LLP,

8           Debtors.

9   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

10  Adversary No. 07-02236-rdd

11  In the Matter of:

12  DELPHI CORPORATION, ET AL.

13  V.

14  DSSI, et al.

15  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

16                 United States Bankruptcy Court

17                 One Bowling Green

18                 New York, New York

19                 May 24, 2012

20                 10:13 a.m.

21

22  B E F O R E :

23  HON ROBERT D. DRAIN

24  U.S. BANKRUPTCY JUDGE

25  ECR OPERATOR:  LONNIE WEBB

Page 2

1    Notice of Agenda Proposed by Fifty-Fourth Claims Hearing

2    Agenda

3

4    Sufficiency Hearing Regarding Proofs of Claim Numbers 15514,

5    15525 and 15526

6

7    Notice of Agenda Proposed Seventy-Sixth Omnibus Hearing

8    Agenda

9

10   Motion by James Sumpter Regarding Extending Disability

11   Benefits for Salaried Employees and Salaried Retirees -

12   Vesting Motion Regarding Extending Disability Benefits for

13   Salaried Employees and Salaried Retirees

14

15   Motion by James Sumpter for Preliminary Injunction Regarding

16   Salaried Disability - Expedited Request for Preliminary

17   Injunction to Prohibit DPHH from Terminating Salaried

18   Disability Plan

19

20   Motion by Ontario Specialty Contracting, Inc. for Allowance

21   of an Administrative Claim Pursuant to 11 U.S.C.

22   503(B)(1)(A), or in the Alternative, for Leave to File a

23   Late Administrative Expense Claim Pursuant to Federal Rule

24   of Bankruptcy Procedure 9006(b)

25

1    Motion by James Grail to Lift Stay

2

3    Motion to Dismiss Adversary Proceeding Motion of the DSSI

4    Defendants For An Order Denying Plaintiffs' Motion to Amend

5    the Complaint and, to the Extent Necessary, Dismissing the

6    Adversary Proceeding With Prejudice.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sherri L. Breach, CERT*D-397

**Page 4**

```
 1   A P P E A R A N C E S :

 2   SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

 3        Attorneys for Debtors

 4        155 North Wacker Drive

 5        Chicago, Illinois 60606-1720

 6

 7   BY:  JOHN K. LYONS, ESQ.

 8        LOUIS S. CHIAPPETTA, ESQ.

 9

10   BUTZEL LONG

11        Attorneys for DPH Holdings Corp.

12        Suite 100

13        150 West Jefferson

14        Detroit, Michigan 48226

15

16   BY:  DAVID J. DEVINE, ESQ.

17        CYNTHIA J. HAFFEY, ESQ.

18

19   BUTZEL LONG

20        Attorneys for DPH Holdings Corp.

21        22nd Floor

22        380 Madison Avenue

23        New York, New York 10017

24

25   BY:  MARIA CACERES-BONEAU, ESQ.
```

Page 5

1   KLESTADT & WINTERS, LLP

2          Attorneys for Ontario Specialty Contracting

3          570 Seventeenth Avenue

4          17th Floor

5          New York, New York 10018

6

7   BY:  PATRICK J. ORR, ESQ.

8

9   FOX ROTHSHILD, LLP

10          Attorneys for DSSI defendants

11          75 Eisenhower Parkway

12          Suite 200

13          Roseland, New Jersey 07068

14

15   BY:  RICHARD M. METH, ESQ.

16

17   DUANE MORRIS, LLP

18          Attorneys for ACE American Insurance Co.

19          30 South 17th Street

20          Philadelphia, Pennsylvania 19103-4196

21

22   BY:  LEWIS R. OLSHIN, ESQ.

23

24

25

Page 6

1  STATE OF MICHIGAN

2  BILL SCHUETTE, ATTORNEY GENERAL

3       Attorneys for Joint Michigan Defendants

4       Labor Division

5       5th Floor G. Mennen Williams Building

6       525 West Ottawa Street

7       P.O. Box 30736

8       Lansing, Michigan 48909

9

10  BY:  SUSAN PRZEKOP-SHAW, ESQ.

11       DENNIS J. RATERINK, ESQ.

12

13  GREENEBAUM DOLL & MCDONALD, PLLC

14       Attorneys for DSSI Defendants

15       3500 National City Tower

16       101 South Fifth Street

17       Louisville, Kentucky 40202

18

19  BY:  CLAUDE R. "CHIP" BOWLES, JR., ESQ.

20

21  APPEARED TELEPHONICALLY:

22  NICK CAMPANARIO

23  RENU SHAW

24  DOUG VETTER

25

Page 7

1                    P R O C E E D I N G S

2              THE COURT:  Please be seated.

3              Okay.  Good morning.  In re: DPH Holdings.

4              MR. CHIAPPETTA:  Yes.  Good morning, Your Honor.

5    Louis Chiappetta of Skadden Arps on behalf of the

6    reorganized debtors, here with my colleague, John Lyons.  On

7    the line is Nick Campanario, also of Skadden, Arps.  Also

8    here with me is Cyndi Haffey, Maria Caceres-Boneau and David

9    DeVine of Butzel-Long, and Denon Rue (ph) is here on behalf

10   of the company.

11             Your Honor, there are no contested matters for the

12   scheduled fifty-fourth claims hearing.  We resolved the one

13   matter last night and a stipulation was sent to Your Honor.

14             THE COURT:  That was with --

15             MR. CHIAPPETTA:  One --

16             THE COURT:  That was with Johnson Controls?

17             MR. CHIAPPETTA:  Correct.

18             THE COURT:  Right.

19             MR. CHIAPPETTA:  One contested matter scheduled

20   for the seventy-sixth omnibus hearing and one contested

21   matter for the adversary hearing.

22             THE COURT:  Okay.

23             MR. CHIAPPETTA:  We filed proposed agendas for the

24   seventy-sixth omnibus hearing and the fifty-fourth claims

25   hearing at docket numbers 21890 and 21891, and with your

Page 8

1    permission I would like to proceed with those.

2              THE COURT:  That's fine.

3              MR. CHIAPPETTA:  Okay.

4              So, as I said, we were able to resolve the one

5    matter that was contested, Johnson Controls, Inc. regarding

6    proof of claim numbers 15514, 15525 and 15526, and that

7    stipulation was submitted to Your Honor -- Your Honor last

8    night.

9              Just wanted to update you on the progress of the

10   claims, Your Honor.  We are down to seven prepetition claims

11   out of over 20,000 claims that were filed in this case.  We

12   have 21 administrative claims.  Out of the original 42

13   debtors we've closed 30 of them, and there are three of the

14   12 remaining that are ready to be closed.  So we're making

15   significant claims in the claims and I just wanted to --

16             THE COURT:  Okay.

17             MR. CHIAPPETTA:  -- let you know about that.

18             THE COURT:  All right.

19             MR. CHIAPPETTA:  I'm going to proceed with the

20   seventy-sixth omnibus hearing.

21             There are three uncontested matters.  Matters 1

22   and 2 were the motions by James Sumpter filed at docket

23   numbers 21860 and 21867.  Those were resolved pursuant to

24   the orders entered by Your Honor at docket numbers 21876 and

25   21877.

1               THE COURT:  Right.

2               MR. CHIAPPETTA:  The last uncontested matter is

3       the amended motion of James Grail at docket number 21682,

4       and I want to update Your Honor on this matter.

5               We've mentioned this at several hearings before;

6       that there's several parties to this stipulation.  The

7       reorganized debtors have been able to reach out and have

8       conversations regarding the proposed stipulation with

9       General Motors, the ACE Insurance Companies, the Michigan

10      defendants, everyone except for Mr. Grail's attorney, Mr.

11      Dowd (ph).  We've made several phone calls.  We've sent

12      overnight versions of the stipulation to Mr. Dowd.  We've --

13      don't have a working email address for him, so we requested

14      --

15              THE COURT:  Because that's -- that's funny because

16      I thought he was actually on board with the whole concept.

17      He was one of the first people that was behind this idea of

18      a stipulation.

19              MR. CHIAPPETTA:  This is why we're -- we're asking

20      Your Honor for guidance.  We're --

21              THE COURT:  Okay.

22              MR. CHIAPPETTA:  -- we're trying to get Mr. Dowd

23      to engage.  He has not provided us with a working email

24      address so we've been overnight mailing versions to him.

25              THE COURT:  All right.

1           MR. CHIAPPETTA:  At this point --

2           THE COURT:  Well, have you mailed it to his

3   office?

4           MR. CHIAPPETTA:  Yes, we have.

5           THE COURT:  And you haven't gotten any response?

6           MR. CHIAPPETTA:  No response, followed up with

7   phone calls days after the we've sent the proposed

8   stipulation, and --

9           THE COURT:  Have you reached out to Mr. Grail

10   himself?

11           MR. CHIAPPETTA:  We've not reached out to Mr.

12   Grail --

13           THE COURT:  I -- I know that you would be

14   reluctant --

15           MR. CHIAPPETTA:  -- himself.

16           THE COURT:  -- to do that because he's represented

17   by counsel.

18           MR. CHIAPPETTA:  Exactly.

19           THE COURT:  But if you can't reach counsel, which

20   you're telling me, I -- I authorize you to do that.  Maybe

21   he knows where -- where Mr. Dowd is.  And my other reaction

22   to this is that if you still can't reach him in the

23   relatively near future, you should, I think, settle, by

24   notice of presentment, a copy of the stipulation and order

25   and just take his name off of it.  And this would resolve

Page 11

1    it, and put it on notice to him and to Mr. Grail.

2              MR. CHIAPPETTA:  I believe, Your Honor, that the

3    Michigan defendants are on the line and may -- may have a

4    response to that.

5              THE COURT:  Okay.

6              MR. RATERINK:  Yeah.  Your Honor, Dennis Raterink

7    here on behalf of the Michigan Funds Administration.  Good

8    morning.

9              THE COURT:  Morning.

10             MS. PRZEKOP-SHAW:  And I'm Susan Przekop-Shaw here

11   on behalf of the Michigan Workers' Compensation Agency.

12   Good morning.

13             THE COURT:  Good morning.

14             MR. RATERINK:  You know, as to the first issue,

15   Judge, we just found out last night about the problems that

16   have been going on in contacting Mr. Dowd.  As we are in

17   Michigan, we may have some better efforts.  We do have some

18   bit of a preexisting relationship with him and we can --

19             THE COURT:  Okay.

20             MR. RATERINK:  -- make attempts as well to --

21             THE COURT:  No.  That's great.  I -- I'm glad

22   you're doing that.  I mean --

23             MR. RATERINK:  Yeah.

24             THE COURT:  -- the most -- the most preferable

25   course would be to actually get a hold of him because I

Page 12

1  don't think he'll be a problem since he, again, was behind

2  this concept in the first place.

3          MR. RATERINK:  Right.  And we're not sure what the

4  -- what the holdup has been on -- on -- in terms of contact

5  from him. But we will make efforts to reach out to him as

6  well.

7          THE COURT:  Okay.  Great.

8          MR. RATERINK:  As to the stipulation, we just

9  wanted to put -- put the Court on notice of a couple of

10  things.

11          Number one, we're still having considerable

12  difficulties, both mine and -- and my client and Susan's

13  client regarding the concept of a stipulation.  As Your

14  Honor is well aware, we have been litigating issues

15  regarding subject matter jurisdiction and sovereign immunity

16  regarding Michigan's involvement, the workers' compensation

17  system's interaction with this Court for -- for some time

18  now.  And we're very hesitant and reluctant to -- to engage

19  in a stipulation which we don't feel is necessary to obtain

20  the release that -- that's being sought by Mr. Dowd in this

21  case.

22          What we were proposing, and were talking to

23  counsel about last night, was the idea that apart from Mr.

24  Dowd, most of the parties seem to have a general agreement

25  as to about 70 cases that are -- that -- that we've narrowed

Page 13

1    this down to.  We think that we can simply contact the

2    appropriate state officials, the chief magistrate of the

3    board of magistrates who oversees these cases as well as the

4    workers' comp agency director, give them guidance and say,

5    you know, look, the parties -- the parties that are at issue

6    here are in agreement on this and -- and all agree that the

7    ACE proceedings, the ACE litigation is having no impact and

8    should not be considered in terms of the ongoing litigation

9    of those files.

10          We can tell you that in the research and

11   investigation that we've done -- like I indicated, we've

12   narrowed this down to 70 files -- we cannot identify any of

13   them at this point that are being held up because of the ACE

14   interaction issue.  Fifty-five of the files are being -- are

15   on a status that the workers' comp agency refers to as await

16   other status, but they're in that status because of an issue

17   involving General Motors in a coordination of benefits issue

18   that's being litigated in -- in federal court in Michigan,

19   completely separate and unrelated to the Delphi or ACE

20   issues.

21          The other cases we have a listing of them.

22   Several are -- are awaiting resolution because of what's

23   called a CMS issue or where they're trying to take the

24   Medicare systems interests into account.  Four of the cases

25   on the list have been completely settled out and redeemed.

Page 14

1    Two are -- two are just erroneous, we believe, because they

2    are non-Delphi employers, nothing in the automotive system

3    or automotive area at all.  Two do involve ACE as a listed

4    party, so we -- we're trying to resolve that issue to make

5    -- get them off of the list.

6           We find three cases only that are in active

7    litigation and there's no indication that those three active

8    files are actually being held up because of the ACE/Delphi

9    litigation.

10          So we would propose to -- like we -- like we

11   indicated, to just simply contact the appropriate state

12   officials with this information so that everybody has all

13   the same information and they can go forward and -- and Mr.

14   Dowd, hopefully, should be happy with that, knowing that the

15   ACE stay is having no effect on these cases.

16          THE COURT:  Well, I -- I can't speak for the

17   relevant hearing officers or the -- whoever you would be

18   contacting, but I can tell you that if I were in their

19   position I would be uncomfortable with just a -- a contact

20   without something to back it up.  I know this is Michigan

21   and not Missouri, but I would say, show me.

22      (Laughter)

23          THE COURT:  And so I -- you know, I -- again, I

24   understand your -- fully the issue about jurisdiction, et

25   cetera.  But I thought the stipulation -- I mean, the whole

Page 15

1    point of the stipulation was that it would -- it made it

2    clear that it had no effect whatsoever on those arguments;

3    that it was not going to in any way have any bearing on --

4    on those issues.

5         I just think it -- it's -- it's a lot cleaner if

6    you actually have an order that says this is -- this is

7    fine.  It doesn't violate any stay or anything like that,

8    and the only hold up, I guess, is that people can't locate

9    Mr. Dowd, but maybe -- I mean, hopefully we can or -- or you

10   can or the debtors can over the next, you know, week or two.

11        But it would seem to me that -- that -- I mean,

12   it's his motion, ultimately --

13        MR. RATERINK:  Certainly.

14        THE COURT:  The way to resolve it would be by this

15   order, which could be done by a notice of presentment.  And

16   -- and if he's not able to sign it, then at least he -- you

17   know, we -- we would -- or we could actually have it on for

18   the next hearing date.  I mean, we've been carrying his

19   motion.  We could just have it on for the next hearing date

20   and propose that order as -- with enough time so that, you

21   know, anyone could -- could object to it.

22        But maybe this is all moot because you'll be able

23   to locate him.  But I -- but I -- failing that, I think that

24   -- that the alternative is probably the way to go.

25        MR. CHIAPPETTA:  The only thing that would, we

1    would like to comment, Your Honor, is without Mr. Dowd's

2    signature, we don't have a way to bind the individuals that

3    they will not implicate the policies going forward.  That's

4    something that we're concerned about, which is why without

5    --

6             THE COURT:  Well, he -- he purported to represent

7    them as part of this motion, right?

8             MR. CHIAPPETTA:  He did.

9             THE COURT:  So we can -- I can issue that order as

10   part of resolution of the motion.  They're parties to the

11   motion.

12            MR. RATERINK:  Actually, then that -- that

13   language, Your Honor -- this is Dennis Raterink again -- is

14   part of the reason that -- that we have a -- at this point

15   at least are unable to sign onto the stipulation as proposed

16   because the order goes beyond simply a notice to the

17   Michigan system and it attempts and purports to bind these

18   claimants to a course of action that the Michigan

19   administrative system would not require them to do.

20            THE COURT:  But -- but they sought relief --

21            MR. RATERINK:  And -- I'm sorry.  Go ahead.

22            THE COURT:  But they sought relief in the court.

23            MR. RATERINK:  No.  I understand, Your Honor.  And

24   in the protection, I think, though that's already there is

25   the stay order.  If they were to amend their claims and

Page 17

1    change the dates of injury alleged, the Michigan Funds

2    Administration, the insureds and -- and DPH attorneys are

3    already under an obligation to this Court to come back and

4    inform you if any cases are attempting to implicate the

5    policies in question.

6              THE COURT:  Right.  But -- but didn't their --

7              MR. RATERINK:  So --

8              THE COURT:  I mean, but didn't their motion seek

9    relief specifically for a finding that they -- that they

10   could go ahead without implicating?  I mean, this is -- this

11   is the relief they wanted, so I --

12             MR. RATERINK:  It does.  And I think when you --

13   and that's one of the things that we had proposed to be

14   added to this stipulation if it was -- if it was going to be

15   entered without our signature was that this is -- any

16   indication that we can give to you and give to this Court as

17   to the current status of these claims, it's just that.  It's

18   a snapshot.  It's the way these cases are being addressed

19   right now because of what's being alleged in those claims.

20             But in the Michigan Administrative System, they --

21   as I said, they have full freedom to amend an alleged

22   different dates of injury at any time with no penalty.  And

23   by doing that, again, that could change this status.  We can

24   tell you that of those 70 files that only two of them

25   implicate the ACE at this point, but that could change

Page 18

1   tomorrow.  That could change --

2           THE COURT:  All right.

3           MR. RATERINK:  -- next week.

4           THE COURT:  Well, I haven't -- I haven't seen -- I

5   haven't reviewed the proposed stipulation and order,

6   obviously.  But I was of the belief that it was -- it was

7   proceeding ahead and that it would -- it was basically going

8   to be ready to be executed.

9           But, you know, I think we should just actually put

10  it on the calendar for the next -- next hearing so we can

11  deal with it.

12          MR. CHIAPPETTA:  Very well, Your Honor.

13          THE COURT:  Okay.

14          MR. OLSHIN:  Your Honor, this is Lou Olshin.  I

15  represent ACE, and hearing Mr. Raterink I was wondering if h

16  would mind sharing with me the names of the 70 claimants

17  that he apparently has identified as well as any other

18  proposed changes to the stipulation which, to date, I have

19  not seen.

20          But I would say, as Your Honor mentioned

21  initially, that not having the Michigan defendants sign onto

22  the stipulation does create a level of discomfort,

23  particularly given what was just said; that if these cases

24  moved forward, the claimants might be free to change dates

25  of injury which would then implicate the ACE policies.

Page 19

1           THE COURT:  All right.  Well, I -- I guess I find

2      that hard to believe that Mr. Dowd has just vanished from

3      the face of the earth.  So why don't we -- why don't we --

4      why don't you all put most of your effort in trying to find

5      him.

6           MS. PRZEKOP-SHAW:  Susan Przekop-Shaw, Your Honor.

7           Mr. Olshin just talked about the stipulation and

8      we had acquired that from Nick Campanario and he also

9      attached to that list the cases that he felt were subject to

10     this particular motion.  So I'm kind of surprised to hear

11     that Mr. Olshin hasn't seen that list.

12          And we don't have any knowledge of any other

13     stipulation than what was presented to us, and there really

14     is no --

15          THE COURT:  Okay.

16          MS. PRZEKOP-SHAW:  -- protective language in

17     there.  So I think --

18          THE COURT:  All right.  So why don't you all just

19     --

20          MS. PRZEKOP-SHAW:  -- we need a little

21     communication.

22          THE COURT:  Why don't you all -- yeah.  That's

23     fine.  Why don't you all just follow up on the -- on that

24     offline?

25          MS. PRZEKOP-SHAW:  Thank you.

Page 20

1              THE COURT:  Okay.  Thanks.

2              MR. CHIAPPETTA:  Thank you, Your Honor.

3              That takes us to the last matter on the -- that's

4     listed on the seventy-sixth omnibus hearing agenda, which is

5     the motion by Ontario Specialty Contracting for leave to

6     file a late administrative claim.

7              This is Ontario's motion so with Your Honor's

8     permission I'll cede the podium to opposing counsel to

9     present their motion.

10             THE COURT:  Okay.  That's fine.  Thank you.

11             MR. ORR:  Good morning, Your Honor.  Thank you.

12    Patrick Orr from Klestadt and Winters on behalf of Ontario

13    Specialty Contracting, Incorporated.

14             Your Honor, I'm happy to report that I think we

15    may have a way to get around what would be otherwise a

16    contested hearing this morning.  In order to do that, I

17    think it may make sense for me to briefly give you some

18    background as to some of the events that occurred between

19    the filing of the papers that Your Honor may have already

20    seen and today, really within the last week or so.

21             The claim arises from a purchase order that was

22    issued by the debtor after a request for quotes that was

23    issued to Ontario Specialty.  The purchase order sought

24    Ontario's services with respect to a plant in Rochester

25    where Ontario would come in, remove and demolish the inside

Page 21

1    of the plant, take all the scrap out of it, and due to the

2    value of the scrap, at least the anticipated value of the

3    scrap at the time of the contract, my client would actually

4    pay the debtor to do the demolition work in exchange for the

5    value of the scrap.

6           That purchase order was issued on July 24th of

7    2008.  During the course of the next year, as work continued

8    at this Rochester facility, the amount of asbestos that

9    needed to be removed from the facility was much greater than

10   what the parties anticipated.  The purchase order itself

11   provides that to the extent the work is greater or more

12   elaborate than what was contemplated, the parties would

13   agree to agree to an adjustment to the contract terms.

14          During the course of the year discussions ensued.

15   Ultimately, the debtor commenced a lawsuit in Eerie County,

16   New York against my client.  That lawsuit was commenced on

17   August 28th of 2009.

18          Your Honor, that action is still pending and on

19   May 15th, last week, the plaintiff in that action, which was

20   previously the debtor, filed an amended complaint seeking to

21   replace Delphi with GM components as the plaintiff in the

22   case.

23          At that point my client's local counsel in New

24   York engaged with GM Components' counsel in New York, and

25   earlier this week we were given a -- an email was sent to

Page 22

1    our -- our local counsel indicating that GM Components would

2    be willing to enter into a stipulation in -- in the Eerie

3    County court which essentially says that all liability

4    arising from the underlying cause of action related to

5    assets and liabilities that were assumed by GM Components in

6    connection with a transaction that took place in this court.

7           As of today we're told that that attorney is

8    drafting a stipulation.  We're hoping to get that within the

9    Next week.  Assuming it says what they say it will say, we

10   would be -- we think that that would resolve all issues in

11   -- in this court.

12          THE COURT:  Maybe you wouldn't have a claim

13   anymore in this court?

14          MR. OLSHIN:  Exactly.  We would be comfortable

15   that we would be able to recover to the extent that we -- we

16   -- we are ultimately successful in that litigation or it is

17   -- or it settles, if the plaintiff in that litigation, who

18   is not a debtor in this court, is willing to stipulate to

19   that, then we're okay.  We would withdraw this motion --

20          THE COURT:  Well, but -- but when you say the

21   plaintiff you mean the new plaintiff, the --

22          MR. OLSHIN:  The new plaintiff, GM Components.

23          THE COURT:  Right.

24          MR. OLSHIN:  That's right, Your Honor.

25          We approached the debtors' counsel with this

Page 23

1    earlier this week, but they were unwilling to adjourn

2    today's hearing on consent.  So we thought it was wise to --

3    to get you up to speed as to what happened in the last week

4    or so.

5              THE COURT:  Okay.

6              MR. LYONS:  Good morning, Your Honor.  J

7              THE COURT:  Good morning.

8              MR. LYONS:  John Lyons on behalf of DPH.

9              Your Honor, this claim, the DPH has the

10   responsibility for administering claims that have been

11   filed.  You know, we understand that there's this -- this

12   other state court action and GM Components, you know, may

13   well be transferring in as a party for DPH.

14             As Your Honor has seen from the briefs, this claim

15   is clearly, in our view, late.  I mean, the face of the

16   proof of claim says it arose prior to June 1, 2009.  It's a

17   fairly clear case.  You know, again, when we -- when we had

18   the request, we had already incurred the expense of filing

19   the briefs.  Mr. Chiappetta was already here in New York.

20   Mr. Rue had already paid for his ticket, so we just don't

21   see any --

22             THE COURT:  Well, but it -- but on the other hand,

23   if, in fact, it's not anymore a claim against any of the

24   Delphi debtors because it's been a -- assumed by GM, I don't

25   really have jurisdiction over it.

Page 24

1          MR. LYONS:  No.  No.  No.  Your Honor, the way

2     that it works under the plan is we still have the obligation

3     to administer and object to claims.  They may -- you know,

4     they were assigned to GM Components under the plan.

5          THE COURT:  Right.

6          MR. LYONS:  But -- but DPH still has the

7     responsibility to administer the claims --

8          THE COURT:  That's part of the --

9          MR. LYONS:  -- that were filed in this case.

10          THE COURT:  That's part of the GM deal?

11          MR. LYONS:  Yes.  That's part of the -- of the

12     MDA.

13          And, Your Honor, you know, frankly, they can -- if

14     they want to work out whatever deal they want outside of the

15     plan and in their business relationship, that doesn't

16     concern DPH.  But we still have a proof of claim here that's

17     on file through this estate, through this plan that --

18          THE COURT:  Well --

19          MR. LYONS:  -- that, you know, in our view, again,

20     was clearly late.

21          THE COURT:  But can the estate bear any

22     responsibility to GM for not objecting to this type of

23     claim?

24          MR. LYONS:  Well, Your Honor, the duty is on DPH

25     to object to claims that have been filed on the register, so

Page 25

1   --

2          THE COURT:  Under the MDA?

3          MR. LYONS:  Under the MDA.  So -- so we have the

4   duty to -- and we have the duty to clean-up the claims

5   register before --

6          THE COURT:  So --

7          MR. LYONS:  -- we close the case.

8          THE COURT:  Well, but -- but -- I mean, that's a

9   separate point because counsel said that there's a

10  reasonably good chance that the register will be cleaned up

11  by the GM entity stating that it assumes full responsibility

12  for the claim.

13         MR. LYONS:  And, Your Honor, we have had no

14  conversations with GM Components.  I -- as I said I don't

15  doubt in any way what counsel is saying, but -- but, you

16  know, again, we're -- we're ready to go now.  We think it's

17  an easy call and, you know, perhaps Your Honor could

18  provisionally rule and if they want to withdraw it before

19  Your Honor enters the decision, but then we won't have to

20  come back here again if something falls apart between GM

21  Components and --

22         THE COURT:  All right.

23         MR. LYONS:  -- and Ontario.

24         THE COURT:  Okay.  Well, that's fair.  I mean, I

25  -- not only the parties, but I've spent a fair amount of

Page 26

1    time preparing for this.

2            MR. ORR:  Your Honor, if -- if I may, you know, I

3    -- I kind of cut to the chase with respect to what's

4    happened in the last week.  We --

5            THE COURT:  Right.

6            MR. ORR:  -- we disagree that it's an easy call.

7            THE COURT:  No.  I -- I understand that.  I'm just

8    -- I understand that.  We're not getting into the merits

9    yet.  I'm just trying to --

10           MR. ORR:  I mean, Your Honor, we're not asking --

11           THE COURT:  Do you have any -- anything in writing

12   for me to look at?

13           MR. ORR:  I can present you with an email that we

14   received from -- from GM Components' counsel and -- and

15   Rochester.

16           THE COURT:  Okay.  Let me take a look at that.

17           MR. ORR:  Sure.

18       (Pause)

19           MR. LYONS:  Does counsel have a copy of that or I

20   -- I'm happy to --

21           MR. ORR:  I'm sorry.  I don't have an extra copy.

22           MR. LYONS:  Okay.  Your Honor, well --

23       (Pause)

24           THE COURT:  Well, I mean, this really goes to -- I

25   mean, I'll show it to Mr. Lyons.  But it appears to me that

Page 27

1    this email really goes to who's the proper party in the

2    state court litigation, not -- not whether GM, in fact,

3    absolves Delphi of its responsibility to deal with the claim

4    in the bankruptcy case.  And I didn't -- the one aspect of

5    this -- you can give that to Mr. Lyons if you want.

6           The one aspect of preparing for this hearing that

7    I didn't spend a whole lot of time on was the state court

8    complaint, but my impression was that that was largely

9    separate and apart from this claim objection.  I mean,

10   otherwise the parties would have said, I should have

11   abstained or something, you know, to -- to defer to the

12   state court.  It just seems to me that he's not really

13   saying that; that Delphi doesn't have to do anything in this

14   -- in this litigation.  In fact, I'm not sure he even knows

15   about this claim objection.

16          MR. ORR:  Your Honor, I -- I agree that -- you

17   know, our -- our hope was that through the -- once we

18   received a draft of the stipulation it would be reworked

19   through various iterations and it would be something that we

20   could live with.

21          If it is, as I said earlier, then we would

22   withdraw our administrative claim in this case and the

23   motion compelling payment and then we're done.  If it does

24   not, then we can come back in and have a hearing on this.  I

25   think there's enough facts raised by both of the pleadings

Page 28

1    that it's not as clear a case as -- as the debtors' counsel

2    would have it.

3                Certainly, the work occurred during a certain

4    period --

5                THE COURT:  Well, that's -- that's a separate

6    issue.  I mean, I -- I'm just -- I don't want to get into

7    the merits.  I wouldn't be putting this off because it's

8    difficult -- if it was difficult or -- or deciding it

9    because it's easy.  If someone else is willing to pay your

10   client for it, that's -- you know, that's fine.

11               Would your client be prepared to pay the costs of

12   these people coming out here for this hearing to put it off?

13               MR. ORR:  No.  I -- no, Your Honor, because we

14   contacted them earlier this week and said that we were -- we

15   were prepared to adjourn the hearing for a brief period of

16   time to resolve this.  So, you know, we would have preferred

17   to have not come today.  We're here at the debtors' behalf.

18               THE COURT:  Well, there was no request to adjourn

19   it to me.

20               MR. ORR:  Our -- our understanding, Your Honor,

21   was that if it wasn't on consent, we were expected to be

22   here today.  And --

23               THE COURT:  Well, you could have asked for an

24   adjournment.

25               MR. LYONS:  And, you know, Your Honor, also, we

Page 29

1    had already incurred a lot of the costs.  You know, I mean,

2    again, it's the motion that we filed --

3                THE COURT:  Well, this can -- this came up at the

4    last minute so that's -- that's a separate --

5                MR. LYONS:  Right.

6                THE COURT:  -- that's a separate point.  I mean,

7    you're never going to get those costs back one way or the

8    other.

9                MR. LYONS:  I mean, one other option, Your Honor,

10   is -- is perhaps both parties could waive any further

11   argument.  Your Honor could decide on the papers if they

12   don't, you know, file a notice of withdrawal so we don't

13   have to come back, and you could just, you know, decide on

14   the papers.

15               I think Your Honor is pretty -- I mean, again, I

16   -- again, we've had a number of late claims with Your Honor

17   and -- and this one I think is -- is pretty straightforward.

18               THE COURT:  All right.  This is what I'll do.  I

19   will -- I will hear argument today.  I'll give you my

20   preliminary ruling.  If -- if you're able to memorialize a

21   stipulation with the GM entity that -- where they take on

22   responsibility, then -- you know, within 30 days then the

23   ruling will just stay preliminary and of no force or effect.

24   If you're not able to do that, then it will become my final

25   ruling.

Page 30

1           MR. ORR:  Very good, Your Honor.

2           THE COURT:  Okay.

3           MR. ORR:  With respect to -- with respect to

4    arguments, I -- you know, there's -- our papers, there have

5    been a -- several iterations of papers filed before the

6    Court.  I think that the point that I would impress upon the

7    Court in considering the motion and the administrative claim

8    itself is that the debtor seems to be focusing on -- on the

9    fact that certain work occurred during a certain period of

10   time.

11          The fact remains that this initially was a

12   contract that contemplated my client paying the debtor.  As

13   -- as the magnitude of the asbestos that was located in this

14   Rochester facility became aware to the parties that there

15   was more work that needed to be done to remove the asbestos

16   and as the market for scrap continued to decline through

17   2008, things shifted.  So it's not so much just an analysis

18   of -- of when the work occurred, but it was the market --

19   market forces that were impacting what my client would

20   ultimately be able to recover under the contract.

21          It's not as clear cut.  It's just the debtor

22   taking a statement from our papers that the services were

23   rendered during a certain date.  I think things are a little

24   bit more in play than that, and I think that it wasn't until

25   the parties got together in September of 2009, went into a

Page 31

1    room and came out of a room that -- that the debtors'

2    position at that time was we're not paying, and my client's

3    position was, you need to pay, that we felt the claim had

4    fully matured.

5                    THE COURT:  Well --

6                    MR. ORR:  But you --

7                    THE COURT:  -- I don't understand that since the

8    May 27th, 2009 letter says Delphi's offer is unacceptable.

9    And that's the fourth letter laying out this claim dispute.

10   It's all pre-June 1.

11                   MR. ORR:  There -- there certainly were settlement

12   discussions, Your Honor.  My client's view as that until

13   those negotiations had -- had terminated and it became clear

14   that this was going to litigation, it was at that point that

15   they felt that the claim had matured.

16                   THE COURT:  Well, but --

17                   MR. ORR:  It just so happens that the notice of

18   bar date -- the October notice of bar date for 2009 came

19   several weeks -- several weeks after that, which prompted

20   them to then file the administrative claim in advance of

21   what they thought was the bar date.  But certainly September

22   of 2009 is well after July 15th of 2009.

23                   THE COURT:  Well, let -- let me just posit a

24   hypothetical with you.

25                   Party X has a contract with Party Y.  Party Y

Page 32

1   breaches the contract, but the parties engage in settlement

2   discussions.  When does the claim arise; would those

3   settlement discussions finish or when Party Y breaches the

4   contract?

5            MR. ORR:  Your Honor, it's -- it depends on the

6   facts, but, typically, it would be upon the breach of the

7   contract.

8            THE COURT:  So, I mean, that's what's being

9   alleged here, although, frankly, I -- I think that, as a

10  separate matter, this -- this issue about delay is -- is

11  nowhere apparent in the letters.  The letters all talk about

12  mutually mistaken belief that the scrap metal market

13  wouldn't collapse and the economic affect of the scrap metal

14  market.  They were always willing to pay you for the

15  asbestos and the -- you know, the -- basically $50,000.

16           It's the -- it's the change in the market that

17  they weren't particularly willing to pay for except to be

18  maybe accommodating since it appears that there was no -- no

19  harm to them for letting your client keep the scrap there

20  hoping that the market would turn around within a certain

21  period.

22           So it may well be that your client came up with

23  this rationale after the fact.  But it was alleging that it

24  wanted to get out of the contract based on these facts

25  starting in November of '08.  November 3 '08 is the -- is

Page 33

1    the first letter.   And then there's one from April of '09,

2    and then there's a Delphi response from May of '09, which is

3    the proposal for dealing with the issues that OSC raises,

4    and then there's the May 27th letter which says this is

5    unacceptable.

6              So, I mean -- I mean, you -- it's pretty clear the

7    dispute was in existence going back to '08, but in any

8    event, it was a dispute that was not going to be resolved in

9    -- before June of '09.

10             MR. ORR:  Your Honor, it's -- I can't -- I can't

11   contest any of the facts.   The facts are what they are.

12   Again, my client's good faith belief was that there was no

13   need to file a claim until negotiations had terminated and

14   they were headed to litigation.

15             THE COURT:  Okay.

16             MR. ORR:  You know, the -- those are the facts.

17   The equities are such that this is a post-confirmation

18   contract.   There was an expectation that payment would occur

19   in accordance with the contract without having to loop back

20   through the bankruptcy court.   Rightly or wrongly, those

21   were the expectations and it was when they received the

22   October notice of 2009 that they believed at the time, in an

23   abundance of caution they were filing an administrative

24   claim.

25             Now they're in a position where their ability to

Page 34

1   collect on that claim -- we don't know how things are going

2   to turn out with this stipulation in state court, but

3   they're now in a lawsuit where --

4            THE COURT:  What was different in October from --

5   from May?  Did they had -- they had one more meeting to try

6   to resolve this dispute?

7            MR. ORR:  Well, I -- I think -- yes, Your Honor.

8   That's -- that's what my client would testify to.  But what

9   happened in October is that when they received the new bar

10  date notice for the later bar date, they were now in a world

11  that was -- it became very clear to them that they were not

12  going to get paid on this contract --

13           THE COURT:  Why?

14           MR. ORR:  -- and that they were at a loss.

15           THE COURT:  Why was it any different from before?

16           MR. ORR:  Well, I think there was parties going to

17  settlement discussions with the hope that an agreement would

18  be reached.

19           THE COURT:  But they were already in settlement

20  discussions.

21           MR. ORR:  But at -- by October of 2009, those

22  discussions had terminated.  There was no -- the hope was

23  gone and litigation was eminent at that point.

24           THE COURT:  Well, I mean, the May letter -- the

25  May 27 letter says this offer is unacceptable.  In the

Page 35

1    absence of an agreement we will be forced to pursue legal

2    proceedings and will seek to recover the full claim.  It's

3    pretty -- pretty definitive.  They're certainly aware of a

4    claim.

5             I mean, frankly, I'm not sure there is a claim for

6    this anyway.  I mean, it really does -- the whole point is -

7    - is because the market collapsed that there's no guarantee

8    of the market collapsing and the idea of there being delay

9    appears nowhere in any of these letters as causing the

10   market to collapse.  They were aware of the market

11   collapsing shortly after the contract started to be

12   performed.

13            But that's, I guess, neither here nor there,

14   although it may go to the merits of the pioneer aspect of

15   this.

16            MR. ORR:  I think that's -- I think that's right,

17   Your Honor, and I think that those issues will ultimately be

18   -- be resolved in the state court litigation.  My concern is

19   that we're litigating with -- with both arms tied behind our

20   back and, you know, I understand that ultimately that may be

21   my client's fault, but that's -- that's what will happen.

22            THE COURT:  Okay.

23            All right.

24            MR. ORR:  Thanks.

25            MR. LYONS:  Just very briefly, Your Honor.  I

Page 36

1   mean, the face of the proof of claims that the date was

2   incurred between August 4th, 2008 and May 2009, and in the

3   responses they said the work was substantially complete by

4   May 2009.  So if you look at it from just goods and services

5   type of benefit to the estate, all the stuff was done before

6   the June 1 --

7            THE COURT:  Well, but -- but the claim itself

8   isn't really based on that.  It's based upon, basically,

9   50,000 change orders and another 400,000 because the market

10  collapsed.

11           MR. LYONS:  And that was before June 1, 2008.

12           THE COURT:  And that was clearly before June 1.

13           MR. LYONS:  Correct.  So we hope, you know, just

14  again, you know, we certainly discussed these factors with

15  Your Honor in the past, but because it certainly was within

16  the control which is the control of Ontario to file this

17  claim for June 1 --

18           THE COURT:  I mean, you're not -- you're not

19  disputing the amount that actually was provided -- I mean,

20  that -- that -- they didn't have to file a proof of claim

21  for the amounts that were being paid in the ordinary course,

22  right?  It's just for this dispute that they had to file a

23  proof of claim for?

24           MR. LYONS:  If there was something that was due in

25  the ordinary course after June 1, correct.  But -- but,

Page 37

1      again, Your Honor, this was all -- this controversy, this

2      dispute was fully teed up.  As -- you know, as discussed in

3      the May 27 letter, there was a dispute and there was a --

4      you know, and there was a live controversy between the

5      parties that, again, would clearly have made that claim

6      subject to the bar date.

7              THE COURT:  Okay.

8              MR. LYONS:  So other than that, Your Honor, we

9      would just rest on our papers unless Your Honor has any

10     questions.

11             THE COURT:  Well, I did have one -- one question

12     and it -- and it goes to -- to the May 11th letter, which

13     was from Delphi's representative to Mr. Harton (ph) of

14     Ontario Specialty Contracting.  Paragraph 3 of that letter

15     has three deductions and two additions to payments under the

16     contract.  It says, "Changes to payments due to Delphi for

17     additional work will be deducted from payments owed to

18     Delphi as outlined below."  And it's -- it's reducing it by

19     67,000 and change and then 42,000 which is part of the

20     claim, the 42,0000, and then by $73,115, which was also part

21     of the claim.  Those two components adding up to about

22     $9,000.  And then there are a couple of additions.

23             So my question is what -- under the -- under the

24     bar date order what is the status of that?  Is it part of an

25     integrated proposal and, therefore, not binding or do the

Page 38

1    parties actually agree to this aspect of it and you're

2    really just fighting about the scrap issue?

3           MR. LYONS:  Your Honor, I'm -- again, we -- we

4    really responded to the motion based up the timing of the

5    accrual of the claim --

6           THE COURT:  Right.

7           MR. LYONS:  -- and didn't really get into the, you

8    know, actual merits and dollars and sense.  I mean, to be

9    clear, Your Honor, if they have a defense.  And this is --

10   again, this is, you know, based upon Your Honor's ruling in

11   Plymouth Rubber, you know, we're not taking away any defense

12   they may have in that state court action for some of these

13   deductions.  We're just again seeking to -- to disallow the

14   claim and an affirmative claim against the estate.

15          THE COURT:  Okay.

16          MR. LYONS:  So I don't know if that answers

17   directly Your Honor's question, but I think it may -- it

18   certainly will be clear to Ontario that they still have

19   defense in the state court action.  They just cannot seek

20   affirmative recovery.

21          THE COURT:  Okay.  All right.  I guess that's

22   where I was coming out to; that -- that you propose

23   deductions and seem to have agreed to them subject to some

24   additions.  But then looking at -- at the response, it

25   doesn't really deal with those.  It just deals with the

Page 39

1    overall point on the -- on the market loss on the scrap

2    metal prices.  So --

3              THE COURT:  Right.  And Ontario's obviously free

4    to talk to GM Components about any kind of set off or

5    defense as they have in the state court action.

6              THE COURT:  Right.

7              Okay.  All right.  Anything more?

8         (No verbal response)

9              THE COURT:  Okay.

10             MR. ORR:  Nothing from Ontario, Your Honor.

11             THE COURT:  Okay.  I have before me a motion by

12   Ontario Specialty Contracting or OSC that seeks relief in

13   the alternative.  First, a determination that OSC is not

14   bound by the June 16th, 2009 administrative expense bar date

15   order entered by the Court that set a July 15th, 2009 bar

16   date for administrative expense claims arising before June

17   1st, 2009, which actually was subsequently amended to cover

18   claims arising through a May 31st, 2009 by my order of July

19   15th, 2009.

20             And, second, that even if that order does apply to

21   the administrative expense claim, that OSC concededly did

22   not file until October of 2009, i.e. late, that an order be

23   issued deeming such claim -- which, again, was filed on

24   October 30th, 2009, to be timely.  Notwithstanding that it

25   was filed after the May 31st, 2009 bar date.

Page 40

1          The debtors have objected to the motion and I find

2     and conclude that the debtors' objection should be granted.

3          With respect to OSC's first argument, OSC contends

4     that its proof -- I'm sorry -- that its claim for an

5     administrative expense, which it asserted in its

6     administrative expense claim of October 30th, 2009, did not

7     arise until after the May 31, 2009 period and, therefore, is

8     not covered by the June 16th, 2009 bar date order.

9          The claim is based upon a provision in paragraph 3

10    of the contract between the parties which states "Buyer" --

11    that is, Delphi -- "may at any time require seller" -- that

12    is OSC -- "to implement changes to the specifications or

13    designs of the goods or to the scope of any services or work

14    covered by this contract, including work related to

15    inspection, testing, or quality control.

16          "While buyer will endeavor to discuss any such

17    changes with seller as early as practical, seller will

18    promptly implement such changes.  Buyer will equitably

19    determine any adjustment to price or delivery schedules

20    resulting from such changes, including buyer's payment of

21    reasonable costs necessary to implement such changes.

22          "In order to assist in the determination of any

23    equitable adjustment in price or delivery schedules, seller

24    will, as requested, provide information to buyer, including

25    documentation of changes in seller's cost of production and

1    the time to implement such changes.

2        "In the event any disagreement arising out of such

3    changes, buyer and seller will work to resolve the

4    disagreement in good faith, provided, however, that seller

5    will continue performing under this contract, including the

6    manufacturing and delivery of goods and prompt

7    implementation of changes required by buyer while buyer and

8    seller resolve a disagreement arising out of such changes."

9        It's asserted in the proof of administrative

10    expense claim that this provision was breached by Delphi in

11    three ways and the motion reiterates that assertion.

12        First, it is asserted that Delphi learned with

13    OSC, after the contract was entered into, that additional

14    asbestos-containing materials beyond those projected by

15    Delphi when the contract was entered into were discovered at

16    the Rochester plant that was being demolished, which

17    resulted in substantial extra costs;

18        Second, Delphi also requested additional utility

19    and other work beyond the scope of work originally proposed;

20        Third, it is alleged that the underlying financial

21    basis for much of the contract, i.e. the market price for

22    scrap metal pursuant to which, on the net basis, OSC was

23    paying Delphi for the right to demolish the Rochester plant

24    and remove the scrap metal, changed so dramatically that the

25    contract should be revised.

Page 42

1            It's not clear to me at all that that last point

2      would fit in to paragraph 3 that I've previously read,

3      although it is asserted in the motion and in the claim that

4      delays caused by Delphi resulted in the decreased recovery

5      by OSC as a result of the steadily declining scrap metal

6      price.  I should note that although, as I'll note in a

7      moment, the several communications by OSC to Delphi with

8      respect to OSC's desire to renegotiate the contract all

9      refer to the decline in scrap metal prices, none of those

10     letters refer to that -- the harm to OSC being caused by

11     such decline as having resulted from Delphi's delay in any

12     way.

13            In any event, those are the three bases for the

14     administrative expense claim, and that is the provision of

15     the agreement pursuant to which the claim allegedly arises.

16     Reading that provision, it appears to me that if, in fact,

17     the condition for the equitable adjustment of the contract

18     price occurs, Delphi has an immediate obligation to honor

19     its obligation -- I'm sorry -- has an immediate obligation

20     to, at some point, adjust the price.  The timing of that

21     adjustment will depend upon the parties' exchange of

22     information.  However, the obligation arises when buyer

23     requires seller to implement changes which gives rise to an

24     equitable adjustment to the price.

25            It is clear from the parties' correspondence in

Page 43

1    respect of this issue of an adjustment to the contract price

2    that all of the grounds for the adjustment occurred before

3    May 31, 2009.  As set forth in OSC's proof of claim and,

4    more specifically, in the proof of claim, paragraph 18:

5              "On or about November 3, 2008, as the

6    predemolition work was coming to a close, OSC wrote to

7    Delphi.  OSC pointed out that the delays attributable to

8    Delphi and sought an equitable adjustment of the contract

9    price.  Attached hereto as Exhibit C is a copy of a letter

10   issued by OSC on or about November 3, 2008.

11             "On or about December 3, 2008, OSC again wrote to

12   Delphi on this subject.  Delphi representatives repeatedly

13   assured OSC that an equitable adjustment to the contract

14   price would be made and requested that OSC continue

15   performance.

16             New Paragraph 19:  "On or about January 12, 2009,

17   OSC again wrote to Delphi on this subject."

18             The November 3, 2008 letter does highlight OSC's

19   contention that Delphi should modify the contract price in

20   light of the fact "we could not"  -- "what we cannot do" --

21   this is OSC's representative writing -- "what we cannot do

22   is complete the project under the current financial

23   agreement" based upon -- based upon the fact that the

24   expected salvage materials' value has dropped from

25   $1,326,850 to $378,110.

Page 44

1          The second letter from January 12th, 2009 from OSC

2    to the debtors that's attached as an exhibit again refers to

3    the drop in the value of scrap metal and makes a proposal by

4    OSC which interestingly is one whereby OSC is proposing a

5    delay of performance under the agreement in the hope that in

6    the meantime scrap metal prices will improve.

7          In addition, OSC makes a specific claim for

8    additional asbestos abatement of $41,500 and additional

9    utility work of $22,000.

10          There's also an April 22, 2009 letter from OSC

11   again asserting the foregoing claims and providing more

12   detail in respect to them, in respect of the utility work

13   and the asbestos work and, again, focusing on the scrap

14   market price.

15          Finally, there's a response by Delphi attached as

16   an exhibit of May 11, 2009 where Delphi proposes a

17   resolution of the scrap metal price issue by partially

18   accepting or accepting in a revised way OSC's proposal to

19   delay performance of the contract and also proposing

20   monetary deductions from OSC's payments under the contract

21   in respect of, among other things, additional asbestos

22   abatement for $42,000 and additional utilities' works --

23   work of $7,315.

24          OSC promptly responds to that letter in an exhibit

25   that's also attached to the motion dated May 11th, 2009 --

Page 45

1   I'm sorry, excuse me -- dated May 27th, 2009 in which

2   Ontario Specialty Contracting senior project matter, Mr.

3   Harton, informs the Delphi representative that Delphi's

4   offer is unacceptable, refers to the parties' mutually

5   mistaken belief that the scrap metal market would not

6   collapse and, therefore, proposing that the contract should

7   be revised in a specific monetary amount in favor of OSC

8   over the current contract price of approximately $195,000.

9           The letter closes by saying, in the absence of

10  agreement we will be forced to pursue legal proceedings and

11  will seek to recover the full claim.

12          It's clear from all of the foregoing

13  correspondence that by May 27th, 2009 and, frankly, clearly,

14  well before then OSC believed that it had a post-petition

15  right to recovery under the contract from Delphi on the

16  three grounds that are asserted in its October 30, 2009

17  (sic) proof of administrative expense claim.  All of the

18  conduct giving rise to that claim or the facts giving rise

19  to it have occurred before May 31, 2009, the cutoff date for

20  the bar date order; that is, the extra work for asbestos

21  removal, the extra utility work, and the drop in scrap metal

22  prices all occurred before May 31, 2009.

23          And under the parties' contract, paragraph 3, when

24  it occurred Delphi had an obligation to equitably adjust the

25  parties' agreement to reflect any loss that would, in fact,

Page 46

1    be equitable as a result of such occurrence fitting within,

2    if it did, the terms of the agreement.

3            The definition of a claim under Section 1015(a) of

4    the Bankruptcy Code includes a right to payment whether

5    contingent or otherwise.  An administrative expense, which

6    is here, the type of claim that was covered by the June

7    16th, 2009 bar date order is a slightly different animal.

8    Administrative expenses arise under the bankruptcy Code

9    under two circumstances:

10           One is where there is a post-petition transaction

11   with the debtor that gives rise to -- I'm sorry -- where the

12   consideration supporting the claimant's right to payment was

13   both supplied to and beneficial to the debtor-in-possession

14   and the operation of its business.  See Trustees of

15   Amalgamated (Ph) Insurance Fund versus McFarlin's, Inc., 789

16   F.2d 98, 101 (2d. Cir. 1986) or where there has been a post-

17   petition tort or wrong to the claimant, reading V. Brown as

18   decided by the Supreme Court.

19           Here, the contract between the parties was a post-

20   petition contract satisfying the transaction requirement and

21   its provisions governed the parties' rights post-petition

22   and a post-petition breach of that contract would constitute

23   administrative expense claim or the claim for post-petition

24   breach would constitute an administrative expense claim.

25           But that breach, if it occurred, did, in fact,

Page 47

1    occur before May 31, 2009, the cut-off date in the bar date

2    order as reflected by the parties' correspondence and the

3    facts and, therefore, would be an administrative expense

4    claim that would need to be asserted as arising under the

5    contract before May 1, 2009 in order to be timely under the

6    June 16th, 2009 order.

7              Turning, then, to the second basis for the motion,

8    which is that OSC's filing of the admittedly late

9    administrative expense claim should be excused under

10   Bankruptcy Rule 9006(b)(1) based on excusable neglect, I

11   conclude that that aspect of the motion should be denied

12   also in that OSC has not established under the relevant case

13   law that it had the level of excusable neglect necessary to

14   obtain relief from the bar date order.

15             First, I should note that OSC asserts that it did

16   not receive notice of the June 16th, 2009 order.  However,

17   it is asserted and supported by an affidavit of service in

18   the debtors' objection that, in fact, OSC did get notice of

19   that bar date order.  Given the foregoing, there is a very

20   strong presumption under federal law that can only be

21   rebutted by specific facts and not by invoking another

22   presumption or by a mere affidavit to the contrary that, in

23   fact, OSC did receive notice of the bar date.  See In re:

24   O.W. Hubble and Sons, Inc., 180 B.R. 31, 34-35 (NDNY 1995);

25   In re: PT-Communications, Inc., 412 B.R. 85, 93-94,(BK EDNY

Page 48

1   2009); and In re: R.H. Macy and Company, Inc., 161 B.R. 355,

2   360 (BK SNDY 1993); see generally In re: Data Corp., 2007

3   Bankruptcy Lexus 1934, Pages 13-15, (BK SDNY May 30, 2007).

4          OSC's motion does not set forth any of the types

5   of facts that would be necessary to rebut such presumption.

6   Therefore, it needs to show excusable neglect.  Bankruptcy

7   Rule 9006(b)(1) permits a claimant to file a late proof of

8   claim if the failure to submit a timely proof of claim was

9   due to "excusable neglect."  The burden of proving excusable

10  neglect is on the claimant seeking to extend the bar date.

11  In re: H.R. Macy and Company, 161 B.R. 260.

12         The Supreme Court has developed a two-step test

13  for determining whether a claim filed after the bar date was

14  due to excusable neglect in Pioneer Investment Services

15  Company v Brunswick Associates Limited Partnership, 507 U.S.

16  380 (1993).

17         First, the movant must show that its failure to

18  file a timely claim constituted neglect as opposed to

19  willfulness or a knowing admission.  Neglect generally being

20  attributed to a movants inadvertence, mistake or careless.

21  Id. at 387-88.

22         After establishing neglect as opposed to

23  willfulness or knowledge or the bar date and the failure to

24  show any unknowing basis for neglecting it, the movant must

25  show, by a preponderance of the evidence, that neglect was

Page 49

1    excusable.

2            That analysis is to be undertaken on a case by

3    case basis, although the Court is to be guided by and make

4    the determination in light of the following factors:

5            The danger or prejudice to the debtor; the length

6    of delay and whether or not it would impact the case; the

7    reason for the delay and, in particular, whether the delay

8    was within the control of the movant; and, finally, whether

9    the movant acted in good faith.  Id at 395.

10           This -- I'm sorry.  The Second Circuit in Midland

11   Cogeneration Venture, LLP v Enron Corp, In re: Enron Corp.

12   419 F.3d 115 (2d. Cir. 2005) has stated that the court "has

13   taken a hard line in opine -- in applying the Pioneer test.

14   In a typical case, three of the Pioneer factors -- the

15   length of the delay, the danger of prejudice and the

16   movants' good faith -- usually weigh in favor of the party

17   seeking the extension.

18           "We noted, though, that we and other circuits have

19   focused on the third factor, the reason for the delay,

20   including whether it was within the reasonable control of

21   the movant and we caution that the equities will rarely, if

22   ever, favor a party who fails to follow the clear dictates

23   of the court rule, and that where the rule is entirely clear

24   we continue to expect that a party claiming the excusable

25   neglect will, in the ordinary course, lose under the Pioneer

Page 50

1    test."  Id. at 122-123.

2           See, also, In re: Northwest Airlines Corporation,

3    2007 Bankruptcy Lexus 521 at page 13 -- I'm sorry -- at Page

4    10-11, (BK SDNY 2007) noting that the Midland approach has

5    also been adopted by other circuits throughout the country;

6    and In re: Musicland Holding Corp., 2006 Bankruptcy Lexus

7    3315 at Pages 10-11 (BK SDNY 2006) in which then Chief Judge

8    Bernstein stated that the Second Circuit focuses on the

9    reason for the delay in determining excusable neglect under

10   Pioneer and that the other factors are relevant only in

11   close cases.

12          I conclude here that OSC's failure to file its

13   claim by the bar date was not willful or knowing.

14   Therefore, it -- it was neglectful.  However, it appears to

15   me to be clear that the late filing of the claim was clearly

16   in the control of OSC.  It was very focused on the claim and

17   threatening legal action on it before May 31st, in fact,

18   just five days before May 31st of 2009.  It had articulated

19   the claim in numerous letters leading up to that May 27th,

20   2009 letter threatening legal action.

21          The only excuse offered by OSC is that it believed

22   it was still in settlement discussions with the debtor and,

23   therefore, didn't need to file the proof of claim.  However,

24   it is well established that the fact that parties are in

25   settlement discussions without more in the form of the

Page 51

1    debtors' waiving the filing of a bar date is not sufficient

2    to toll the bar date or to give a basis for excusable

3    neglect.  See In re: Northwest Airlines Corp., 2007

4    Bankruptcy Lexus 521 at Page 14, "It cannot properly ground

5    its excusable neglect argument on the fact that it conducted

6    an investigation and tried to resolve the issue by good

7    faith negotiations.  All of this can be done after a filing

8    is first made and rights are preserved."

9           See, also, In Re: Enron Corp., 298 B.R. 513, 526

10   (BK SDNY 2003) where the claimant asserted that it was

11   distracted by extensive negotiations prior to the filing of

12   the proof of claim.  That decision was ultimately affirmed

13   in the Midland case at 419 F.3d. 115 that I previously

14   cited.

15          The cases cited by OSC in its motion are clearly

16   distinguishable in both In Re: Hudson Oil Company, Inc., 100

17   B.R. 72 (BK D. Kansas 1989) and In Re: Infiltrator Systems,

18   Inc., 241 B.R. 278 (BK D. Connecticut 1999).  The creditor

19   either didn't know it had a claim because its claim was

20   likened, or it was given an ambiguous or misleading notice

21   with respect to the type of claim that it needed to file --

22   the type of claim that one would have that would require a

23   filing by the bar date.

24          So I conclude that the most important and

25   generally dispositive factor has not been established by

Page 52

1   OSC.

2          With respect to the other remaining factors, I

3   conclude that OSC, as is generally the case in these

4   matters, acted in good faith.  However, I believe that the

5   danger of prejudice and the length of delay factors are, at

6   best, neutral and arguably tip in favor of the debtors.

7   When the debtors' plan as modified was approved in July of

8   2009, the debtor was facing a serious cash flow crisis.  The

9   feasibility of the modified plan was jeopardized by the

10  possibility of unanticipated or larger administrative

11  expense claims which would have to be provided for in 100

12  cent dollars for the plan to be confirmed.

13         It was important, therefore, as I've ruled in

14  prior rulings on bar date issues that the universe of

15  administrative expense claims be quantified.  That was why

16  anticipating a July confirmation date, the debtors

17  established an administrative bar date in June of 2009.  The

18  plan was confirmed on the premise that the administrative

19  claims would fall within the limits contemplated by the

20  debtors and those investing in the plan.

21         Therefore, the delay in asserting the claim until

22  October, after the plan had been confirmed and gone

23  effective, is material even though it's a matter of a few

24  months.  Moreover, certainly at the time the amount at issue

25  was meaningful as well as the integrity of the bar date

Page 53

1   itself.

2           So I find and conclude that OSC has not carried

3   its burden under Rule 9006 and Pioneer, and that its claim

4   is not timely.

5           OSC finally has argued in its motion that the

6   debtor itself is bound by a bar date of a sort.  The debtors

7   objected to OSC's claim originally on the basis that it was

8   unmerited.  They did that within the 180-day deadline set

9   for objecting to claims and never sought an extension of

10  that deadline with respect to OSC's claim.  OSC then argues

11  that the amended objection, which adds the bar date

12  objection, is untimely.

13          However, I conclude that under the modified plan

14  -- again, which was approved on July 30th, 2009 and went

15  effective in October of 2009 -- that with respect to

16  objections based on untimeliness, the debtors did not have

17  to object to a administrative claim.  Paragraph 10.2 of the

18  modified plan provides, "Any request for a payment of an

19  administrative claim shall be disallowed automatically

20  without the need for any objection from the debtors or the

21  reorganized debtors."

22          The plan governs on this point and, therefore, the

23  deadline to object to claims does not apply to objections

24  based upon untimely administrative claims like OSC's claim.

25  It applies only to objections based on other grounds,

Page 54

1    including as was, in fact, filed here the underlying merits

2    of the claim.

3              So for those reasons, OSC's motion will be denied.

4              As I noted during oral argument and as actually

5    Mr. Lyons pointed out, the motion is denied and the claim is

6    disallowed as an affirmative claim against the debtors'

7    estate.  It is possible, although I'm not ruling either way

8    on this, that notwithstanding the bar date order and the

9    lateness of the proof of claim, OSC would still have rights

10   of recoupment under the contract or defenses under the

11   contract that it might still be able to assert from or

12   against the current contract party.

13             But, again, I'm not ruling on that issue today.

14   I'm merely denying OSC's motion and approving the debtors'

15   objection to the claim.

16             So the debtors can submit an order consistent with

17   that ruling.

18             MR. LYONS:  Thank you, Your Honor.

19             THE COURT:  Thank you.

20             You don't need to settle it on Klestadt and

21   Winters, but you should email Mr. Orr with a copy before you

22   email it to chambers.

23             MR. LYONS:  We will, Your Honor.

24             THE COURT:  Okay.  Thanks.

25             MR. CHIAPPETTA:  Thank you, Your Honor.

1           That concludes the seventy-sixth omnibus hearing

2   with respect to all matters other than the adversary

3   proceeding.

4           THE COURT:  Okay.

5           MR. CHIAPPETTA:  We respectfully ask that Mr.

6   Lyons and I be excused and we'll turn the podium over to Ms.

7   Haffey.

8           THE COURT:  That's fine.

9           MR. CHIAPPETTA:  Thank you.

10          MR. LYONS:  Thank you, Your Honor.

11          MR. ORR:  Thank you, Your Honor.

12          THE COURT:  Okay.  Now I said something about the

13  -- this being a preliminary ruling.  I guess I'm -- before

14  we -- we turn over to the -- Ms. Haffey, I'm prepared to do

15  that.  If you have some resolution of everything within 30

16  days, but I am going to ask you to let me know that and

17  maybe that's when you should submit your order.

18          MR. LYONS:  Will do.

19          THE COURT:  I mean, not maybe.  That's when you

20  should submit your order, 30 days from today.

21          MR. ORR:  We would appreciate that, Your Honor,

22  and we'll -- we'll certainly keep the Court updated.

23          THE COURT:  All right.

24          MR. ORR:  Thank you.

25          THE COURT:  Thank you.

1          Okay.

2               MS. HAFFEY:  Good morning, Your Honor.

3               THE COURT:  Good morning.

4               MS. HAFFEY:  Cynthia Haffey from Butzel Long on

5     behalf of DPH Holdings, Corp. and as stated before with me

6     today is Maria Caceres-Boneau and David DeVine.

7               Your Honor, we have -- I have before me the

8     adversary proceedings hearing agenda.  Before I proceed with

9     giving the Court the agenda, though, I would like to give

10    the Court a status on the adversary proceedings.

11              THE COURT:  Okay.

12              MS. HAFFEY:  The last time we provided the Court a

13    status I -- in fact, I think Mr. Butler did it on our behalf

14    -- was in October of 2011.  Since that time, Your Honor, we

15    have settled 15 additional cases.  They have not -- some of

16    those settlements are still in the works.  We're dotting our

17    I's and crossing our T's in them, but we have settlements in

18    principal on them.  There are 10 cases which I call inactive

19    cases.  Six of those are the subject of motions for entry of

20    default judgment today that are before the Court.  So we

21    have 33 active preference cases.

22              THE COURT:  Okay.  Including those six default

23    motions?

24              MS. HAFFEY:  Not including those, Your Honor.

25              THE COURT:  Not including those.  Okay.

Page 57

1           MS. HAFFEY:  Not including those.

2           THE COURT:  All right.  All right.

3           MS. HAFFEY:  Okay.  We have the default motions,

4     Your Honor.  we have --

5           THE COURT:  And I -- I'm sure everyone's read the

6     Interstate Bakeries' case.

7           MS. HAFFEY:  I'm sorry.

8           THE COURT:  I'm sure everyone's read the

9     Interstate Bakeries' case.  Well, let me give you the cite.

10          MS. HAFFEY:  Please.

11          THE COURT:  In Re: Interstate Bakeries' Corp., 460

12    B.R. 222, (8th Cir. Bap 2011).  It deals with Rule 4, very

13    similar facts.

14          MS. HAFFEY:  Thank you, Your Honor.

15          THE COURT:  Okay.

16          MS. HAFFEY:  The first motion, Your Honor, is a

17    motion by the reorganized debtors for entry of default

18    judgment in the Access Electronics, Inc. adversary

19    proceedings.  There have been no responses filed and no

20    reply filed.

21          THE COURT: Okay.

22          MS. HAFFEY:  And that is moving forward today.

23          THE COURT:  All right.  And it's -- it's doing so

24    consistent with the February 15th, 2012 order --

25          MS. HAFFEY:  That's correct, Your Honor.

1          THE COURT:  -- and the adversary proceedings

2     procedures orders.  And I -- I've reviewed it and it will be

3     granted.

4          MS. HAFFEY:  I'm sorry.

5          THE COURT:  It will be granted.

6          MS. HAFFEY:  Thank you, Your Honor.

7          The second motion is the motion by the reorganized

8     debtors for entry of default motion in the Anarbor Machine

9     Company adversary proceeding.  And there have been no

10    responses filed, therefore, we didn't file a reply.

11         THE COURT:  Right.  And I -- again, for the same

12    reasons and on the same basis I've reviewed the motion and

13    I'll grant it.

14         MS. HAFFEY:  Thank you, Your Honor.

15         Third is the motion by reorganized debtors for

16    entry of default judgment in the Applied Biosystems

17    adversary proceeding.  Similarly, we've had no response

18    filed, so we did not file a reply.

19         THE COURT:  All right.  And, again, I'll grant the

20    motion for the same reasons after my review of the motion.

21         MS. HAFFEY:  The fourth motion, Your Honor, is for

22    entry of default judgment in the Lanaco Engineering

23    adversary proceeding.  Lanaco Engineering has not filed a

24    response.  Therefore, we had no reply to file.

25         THE COURT:  All right.  And, again, I'll grant

Page 59

1    that motion and enter default judgment based on my review of

2    the motion.

3              MS. HAFFEY:  The fifth motion, Your Honor, is for

4    entry of default judgment in the Production Specialty Group

5    adversary proceeding.  Again --

6              THE COURT:  Right.

7              MS. HAFFEY:  -- no response was filed and,

8    therefore, we filed no reply.

9              THE COURT:  And, again, I'll grant that motion for

10   the same reasons based on my review of the motion.

11             MS. HAFFEY:  And the sixth motion, Your Honor, is

12   for entry of default judgment in the Viking Polymer

13   Solutions, LLC adversary proceeding.  Viking Polymer did not

14   file a response and, therefore, we filed no reply.

15             THE COURT:  Okay.  And, again, I'll grant the

16   motion based on my review of the motion.

17             MS. HAFFEY:  Okay.  The seventh motion, Your

18   Honor, that we had on the hearing today for entry of default

19   judgment in the see -- in the adversary proceeding we are

20   adjourning that motion.  There --

21             THE COURT:  Okay.

22             MS. HAFFEY:  -- have been some additional facts

23   that have come to our attention, so we are adjourning that.

24             THE COURT:  Okay.  All right.

25             MS. HAFFEY:  And then lastly, Your Honor, is the

Page 60

1    motion by DSSI defendants for an order denying plaintiffs'

2    motion to amend and dismissing the adversary proceeding.

3    And that is Mr. Meth's motion so I will let him move

4    forward.

5               THE COURT:  Okay.

6               MS. HAFFEY:  Thank you, Your Honor.

7               MR. METH:  May it please the Court, Your Honor,

8    appearing in the courtroom Richard M. Meth, Fox Rothschild,

9    LLP, local counsel for the DSSI defendants.  I would also

10   like to thank the Court and chambers for allowing Mr.

11   Bowles, primary counsel for the DSSI defendants to appear

12   telephonically.  Due to a variety of reasons Mr. Bowles was

13   unable to appear personally before Your Honor today.  And so

14   we -- we thank Your Honor for that accommodation.

15              And with the Court's permission, I will make my

16   presentation from counsel table if that's all right.

17              THE COURT:  Okay.  Mr. Bowles, can you hear okay?

18              MR. BOWLES:  Yes, Your Honor.  Thank you very much

19   --

20              THE COURT:  All right.

21              MR. BOWLES:  -- for the Court's consideration.

22              THE COURT:  Sure.  Okay.

23              So you can go ahead, Mr. Meth.

24              MR. METH:  Your Honor, the matter that comes on

25   before the Court this morning is actually quite simple.  The

1    issue may be stated as such:  Whether the DSSI defendants

2    are entitled to the entry of a written order in conformity

3    with this Court's June 21, 2011 ruling with respect to the

4    September 7th, 2010 motion to amend that was filed by the --

5    by the debtors.

6              It is clear, based on the numerous portions of

7    colloquy and the -- and in particular the specific

8    statements by the Court and the discussion that Your Honor

9    and I had on pages 181 and 182 of that transcript that

10   although we wanted two forms of relief entered on that -- on

11   that date, that the Court clearly did deny the motion to

12   amend that was filed by the debtors, but set down for some

13   later date the potential filing of a new motion to amend by

14   the debtors should they choose to do so.

15             It is quite interesting that notwithstanding that

16   very simple issue, there has been a significant volume of

17   paper filed in response to our motion.

18             THE COURT:  Well, can I -- can I interrupt you

19   just for a second?

20             MR. METH:  Certainly, Your Honor.

21             THE COURT:  The motion sought actually two things.

22   It sought an order dismissing the adversary proceeding and,

23   also, that that dismissal be with prejudice.

24             MR. METH:  Yes, Your Honor.

25             THE COURT:  I don't -- there's nothing in the

Page 62

 1    transcript to suggest it would be with prejudice?

 2              MR. METH:  No, there was not, Your Honor.

 3              THE COURT:  All right.  And -- and, frankly, the

 4    reason that we -- that we sought to, at least that we

 5    requested prejudice was because of the significant length of

 6    time that elapsed between the June hearing and the January

 7    27th filing of our motion.  We also noted that our motion

 8    was quite similar to the relief that had previously been

 9    sought by Microchip Technologies when they filed similar

10    requests for relief on October 7th and which we joined.

11              But we recognize that Your Honor did not

12    specifically and, in fact, did not --

13              THE COURT:  And what happened --

14              MR. METH:  -- state that the dismissal -- the

15    denial would be with prejudice.  Your Honor reserved for a

16    later date should the debtors choose to renew their motion

17    to then address it on its -- on its facts and on the

18    circumstances at that later time.

19              THE COURT:  Will you remind me what happened with

20    Microchip?

21              MR. METH:  Microchip was -- was, I think, settled

22    prior to the return date of their request.

23              THE COURT:  Okay.

24              MR. METH:  And I believe on February 27th of this

25    year Your Honor actually entered an order dismissing that

Page 63

1    adversary proceeding with prejudice.

2              THE COURT:  But that was based on --

3              MR. METH:  A settlement reached.

4              THE COURT:  -- a settlement.

5              MR. METH:  That's correct.

6              THE COURT:  Okay.

7              MR. METH:  So -- so --

8              THE COURT:  That -- that motion was never decided

9    then?

10             MR. METH:  That's correct.  It was not.

11             THE COURT:  All right.

12             MR. METH:  But it is -- it is clear and as noted

13   in the lengthy transcript that has been cited by both

14   parties and -- and many portions of which have been

15   presented to the Court, that Ms. Haffey and the debtors and

16   even the Court recognize that of all the then pending

17   adversary proceedings, the DSSI adversary -- the proposed

18   new DSSI adversary proceeding was unique among all others;

19   that it stood out; that if -- if -- with the Court's

20   indulgence the language that was cited or that was stated by

21   Ms. Haffey, for example, at page 110 of the transcript and

22   when it talks to -- with respect to, for example, a

23   particular paragraph that said, we don't have any documents

24   and -- but we believe that the defendant does.  Ms. Haffey

25   said, in part, "this particular complaint with the paragraph

Page 64

1    that was cited to you by counsel is a one of a kind and

2    unique complaint.  You won't see that language anywhere

3    else."  That's at Lines 11 through 14.

4          Thereafter in the transcript on page 114, the

5    Court said, "and so you're putting too, then, the task of

6    having to prove something and, you know, basically, just

7    crossing your fingers that they'll -- they won't."  And I

8    think that's what Twombley were designed not to do.  Ms.

9    Haffey then says, "Except in, again, DSSI is a unique" --

10   Your Honor responded, "I understand that" -- "situation in

11   its own."  And the Court then said, "Yes."

12         But when all is said and done, Your Honor, one

13   simply needs to go -- although we've cited various other

14   portions of the transcript -- up until the end of the

15   morning session, which is set forth at pages 181 and 182,

16   and the very end of the day's transcript at pages 321

17   through 323, that it was clear that the decision that was

18   made on that date with regard to the DSSI defendants was --

19   was undeniable; that Your Honor stated that there was no

20   compliance.

21         There wasn't even a -- the scintilla of compliance

22   with the requirements of the Court's prior order of July of,

23   I believe, 2010, with the requirements imposed by the filing

24   of the September 7th proposed motion to amend, and the Court

25   said I'm not going to grant this motion to amend with

Page 65

1    respect to the DSSI defendants.  It is clear.  I'm not going

2    to rule should you choose to subsequently file a motion, but

3    that's not before me for this day.

4           And so what I am here before Your Honor asking,

5    notwithstanding the quotation that we cited and the excerpt

6    of the transcript that we cited from page 321 where Your

7    Honor, in response to requests so on the record Your Honor

8    said, well, I generally don't do that, but everybody's going

9    to abide by this record and everybody knows what I ruled and

10   knows what I determined.

11          All I'm asking because of the debtors' acting as

12   if Your Honor never made that ruling on June 21st is to

13   confirm in writing.  We will put off for some other day a

14   decision should the debtors subsequently  decide to file yet

15   another motion to amend, the various defenses that we have

16   to that, both equitable and legal, and whether -- whether

17   they can even now satisfy the prior requirements imposed by

18   the Court, this Court, and the requirements imposed by -- by

19   case law not the least of which are the U.S. Supreme Court's

20   decisions in Ickball (ph) and Twombley.

21          I would note that -- and this is certainly our

22   view of things -- that the debtors make much ado about an

23   order that was subsequently entered by Your Honor on

24   February 15th, which is simply a procedures order.  The

25   procedures order as to which we have an agreement and an

1    understanding between counsel that to the extent that it

2    might be deemed to apply to the DSSI defendants, that all

3    time constraints, that all deadlines, that all requirements

4    there under will abide a ruling by this Court as to this

5    very motion because if, in fact, this Court enters the order

6    that we are asking to -- that will confirm and be -- be in

7    conformity with its prior decision, then everything else

8    under that order will abide subsequent events.

9            And what -- notwithstanding, also, the statements

10   by counsel that we were involved in significant negotiations

11   and played a major role in the determination of that order,

12   interestingly in their surreply, the only emails that they

13   can attach deal with our suggestions of mediators.

14           Now the Court may ask why we suggested three

15   mediators.  We fully expected that there was at least a

16   50/50 chance that the debtors might subsequently file yet

17   another motion to file an amended complaint.  And if that

18   motion were to be filed and if notwithstanding what we

19   believe are very, very significant defenses and very

20   significant opposition to this Court yet granting still a

21   third bite at the apple, that there would be, in fact, a

22   procedures order that would then in that eventuality be

23   applicable to us.

24           And we also knew from a practical perspective that

25   the likelihood of our ability, our being able to negotiate a

Page 67

1    completely separate independent and different procedures

2    order with regard to our, as of yet still to be recognized,

3    still to be filed, still to be pending amended complaint,

4    our ability to diverge from that would be virtually nil.

5              So we said if that should happen and if we should

6    end up in mediation either because we're unable to settle

7    independently and then say, let's go to mediation, or

8    otherwise be bound by a procedures order, we said, let us at

9    least have some input as to potential mediators.  That is

10   the sum and substance, that is the totality --

11             THE COURT:  Well, but -- but let me -- I mean, the

12   hearing you're relying on was on June 21st, 2011.

13             MR. METH:  That's correct, Your Honor.

14             THE COURT:  This motion wasn't made until January

15   27th, 2012.  I mean, normally, when someone wins on a motion

16   in front of me I -- I mean, always this is what I do, I say,

17   submit a proposed order.  Why didn't I get a proposed order

18   denying the motion?

19             MR. METH:  Your Honor, I -- I frankly anticipated

20   that would be your question.  And, in fact, that was

21   something that we weren't sure of and that's why we cited --

22   we pointed out the Court's own statement that everybody's

23   going to be relying on this order, number one.  Number two,

24   there --

25             THE COURT:  Yeah.  But I said --

 1              MR. METH:  -- were still --

 2              THE COURT:  No.  No.   That -- no.  That's not --

 3      look, let me be clear, and I -- this is my rule and I think

 4      it's consistent with the federal rules is bench transcripts

 5      are not orders.  You need an order in the docket.  That's

 6      what -- that's what counts.

 7              MR. METH:  That --

 8              THE COURT:  And particularly where one dismisses a

 9      complaint.  That can be a final order if -- if -- if leave

10      to amend is not granted.  So I -- I just -- you know, I

11      understand if -- that I -- that I ruled that the debtors'

12      complaint against DSSI would be dismissed, but I never got

13      an order dismissing it.

14              MR. METH:  Well -- well, I think --

15              THE COURT:  So I -- I -- what I'm -- maybe I can

16      cut through this.  It seems to me that both -- both parties

17      operated under the assumption that something else was going

18      on and that, procedurally, we were moving to a next -- the

19      next stage in the case.

20              Now I understand that you have a concern that you

21      don't want to lose your right to object to a request to

22      amend or for leave to amend, and that's appropriate.  But

23      other than that, I -- I don't really see where this is

24      going.

25              MR. METH:  Well, Your Honor, if I might, I think

1    from a -- Your Honor properly notes and Your Honor has

2    always abided by the rules and always expected counsel to --

3    to abide by the rules, and that's why, frankly, on October

4    7th we filed the joinder in the Microchip Technologies,

5    which -- which raised the very same problem that we had.

6              We, like they, expected that an order would be

7    entered and I looked at the transcript, read it quite

8    carefully, and although I frequently expect to see and often

9    am involved where the Court will say, submit an order, that

10   was not there.  It --

11             THE COURT:  Okay.

12             MR. METH:  -- may have been due to the fact that

13   it was an extraordinarily long day and, yes, under -- with

14   20/20 hindsight, Your Honor, should we perhaps have

15   presented -- have submitted an order under a notice of

16   presentment, yes.  However, by joining in October 7th we

17   noted our intention to request the entry of the order.

18             We subsequently, by virtue of filing our motion in

19   January, made it quite clear that we always expected that

20   the motion to amend that had been filed in September of 2010

21   was denied; that there was no pending complaint.  This Court

22   has never said, yes, this complaint is a pending complaint.

23   This Court has also made clear that the debtor has never

24   been precluded from filing a new motion in an effort to

25   correct the inadequacies of their original complaint and the

Page 70

```
 1   inadequacies of their complaint that was -- that was filed

 2   --

 3            THE COURT:  Well, so as a --

 4            MR. METH:  -- the proposed complaint.

 5            THE COURT:  -- so as a practical matter, what's --

 6   I mean, is there a big deal in your doing that at this

 7   point?

 8            MS. HAFFEY:  I'm sorry.  A big deal in our doing

 9   what, Your Honor?

10            THE COURT:  In -- in your filing a Rule 15 motion

11   at this point?

12            MS. HAFFEY:  Well, Your Honor, if -- if I could

13   just jump in here, procedurally what -- what happened after

14   that June 2011 hearing is this Court asked us -- it took

15   until October when we were here again on another matter, but

16   to get together with defense counsel and put together a

17   procedures order --

18            THE COURT:  Right.

19            MS. HAFFEY:  -- so that things could move forward

20   in all these cases.

21            THE COURT:  Right.

22            MS. HAFFEY:  And we did that.  And it -- took

23   months, frankly, if the Court recalls --

24            THE COURT:  No, that's clear.

25            MS. HAFFEY:  It -- and in that order we put in the
```

Page 71

```
1    order our ability -- and negotiated this with defense

2    counsel and -- and DSSI's counsel received that draft order

3    as early as December before they filed this motion

4    permitting us to present the amended complaint with that

5    information filled in.

6              THE COURT:  Right.

7              MS. HAFFEY:  And it's particularly interesting in

8    this case, Your Honor, because --

9              THE COURT:  But -- but let me -- but -- but let me

10   just -- I mean, all I -- I don't -- I don't really think

11   there's any basis here for dismissing with prejudice.  I

12   mean, I'm very clear on that.  Not -- and not just limited

13   to the fact that I didn't do that on June 21st.  I don't

14   think there's a basis to dismiss with prejudice today

15   because I think that the delay here is attributable to

16   things other than -- you know, I think the parties have been

17   working in good faith, put it that way, and there's really

18   been no prejudice.

19             MS. HAFFEY:  My --

20             THE COURT:  But -- but I -- I do think that in

21   looking at the procedures order --

22             MS. HAFFEY:  Uh-huh.

23             THE COURT:  -- the February order the order does

24   have this procedure for -- for, as you've said, in (F)(3)

25   for identifying in a proposed amended complaint, et cetera.
```

Page 72

1    But (H) says at the Rule 15/Rule 4(M) hearing the Court will

2    conduct an evidentiary hearing to the extent necessary and

3    solely determine matters of notice, prejudice and any unique

4    to that Rule 15/Rule 4(M) defendant Rule 15 issues that have

5    not been previously decided by the Court.

6              So at least as I rule that, I'm not going to rule

7    again on -- on DSSI's motion that I heard on June 21st.  I

8    think I've already dealt with that.

9              MS. HAFFEY:  I --

10             THE COURT:  As a practical matter, I don't think

11   there's much of a difference except that they have a right

12   to force you to make a separate motion under Rule 15 with a

13   complaint attached.

14             MS. HAFFEY:  Yeah.  The previously undecided by

15   the Court issues were if -- if the judge recalls was Mr.

16   Herman and Mr. Jacobs' request and it dealt with, I think,

17   things such as subject matter jurisdiction and other --

18             THE COURT:  Well, but I -- I did decide this

19   issue, too.

20             MS. HAFFEY:  I'm sorry.

21             THE COURT:  But I decided DSSI's issue.

22             MS. HAFFEY:  Well, in my review of the transcript

23   is is that you -- the Court clearly decided that the claim

24   -- the complaint as stated didn't state a claim as to

25   antecedent debt.

1          THE COURT:  Right.

2          MS. HAFFEY:  But the Court didn't make a

3    determination as, I think, Mr. Meth believes as to whether

4    or not we could then later either supplement or amend --

5          THE COURT:  Oh, no.  Absolutely.

6          MS. HAFFEY:  -- the objection.

7          THE COURT:  I agree with that.  So it --

8          MS. HAFFEY:  Right.

9          THE COURT:  -- seems to be this is -- this is

10   actually a fairly --

11         MS. HAFFEY:  So --

12         THE COURT:  -- narrow -- this motion raises a

13   fairly narrow issue as far as consequences, which is it

14   would appear to me to be the better reading of this set of

15   facts that I should enter an order dismissing the complaint,

16   but giving you within the time coincidentally that I think

17   you have under this procedures order to make a motion to

18   amend attaching an amended complaint.

19         MS. HAFFEY:  Well, and the only thing I would say

20   to that, Your Honor, is that we would -- under the

21   procedures order we believe that we covered our ability --

22         THE COURT:  You thought you covered  -- and I

23   understand that.

24         MS. HAFFEY:  -- our ability to do that.

25         THE COURT:  And I -- and I understand that

1    completely, and so it's kind of annoying because I think

2    you're going to get to the same place anyway.  But I guess

3    if, in fact, the complaint you attach still doesn't do the

4    trick, then they won't have to go through the rest of the

5    procedures order.

6              MS. HAFFEY:  Okay.

7              THE COURT:  I mean, I --

8              MS. HAFFEY:  We will file that motion, then, Your

9    Honor.

10             THE COURT:  I -- I mean, what I would suggest is

11   maybe you show the complaint to Mr. Meth and the exhibit and

12   maybe this -- maybe neither side will expand the money on --

13   on doing it.

14             MS. HAFFEY:  I have one today that I can show to

15   him.

16             THE COURT:  Well, I mean, he's not going to decide

17   today.  He's going to have to talk to his --

18             MS. HAFFEY:  No.  But --

19             THE COURT:  -- client.

20             MS. HAFFEY:  -- I'm just saying we already have

21   one prepared, Your Honor.

22             THE COURT:  Okay.  So --

23             MS. HAFFEY:  So it's a fairly simple --

24             THE COURT:  -- so, I mean, I think that's --

25   that's probably how we should do it.

1            MS. HAFFEY:  Okay.

2            THE COURT:  Again, I don't -- I really don't fault

3    the parties on this.  It's a -- it's a piece of a

4    complicated puzzle and, generally, that complicated puzzle

5    was dealt with in this procedures order.

6            MS. HAFFEY:  It took us months.

7            THE COURT:  And -- and the debtors could well, in

8    my mind, have been under the belief that that would have

9    taken care of this issue for DSSI, particularly given the --

10   that there wasn't a separate motion made beyond the joinder

11   until January, end of January, January 27th.

12           So I think that the timing point -- I could tell

13   you now I -- I cannot imagine a with prejudice denial based

14   on timing.  It would only be based on the complaint that's

15   attached still not being one that would pass muster under

16   Rule 12.

17           And it would seem to me that if you have a

18   complaint with an exhibit to show DSSI's counsel that would

19   clearly, at least for purposes of Rule 12, pass muster, that

20   we should just move onto the procedures order at that point

21   and -- and just say that that's going to be the complaint

22   and some form of stipulation.

23           MS. HAFFEY:  We -- and, actually, we would agree

24   with that, Your Honor.

25           THE COURT:  Okay.  All right.

Page 76

```
 1              MR. METH:  I will specifically ask the Court if

 2      the Court would like me to submit a new order --

 3              THE COURT:  Yes.  That's fine.  You -- you should

 4      --

 5              MR. METH:  -- with regard to the ruling on the

 6      motion.

 7              THE COURT:  Yes.

 8              MR. METH:  Okay.

 9              Now, Your Honor, and --

10              THE COURT:  Now as far as the amendment or the

11      motion to amend is concerned, what was your timing for --

12      well, you already have your exhibit, though, right, for

13      DSSI?

14              MS. HAFFEY:  That's correct.

15              THE COURT:  So I can give you, what, two weeks, 30

16      days?

17              MS. HAFFEY:  That's -- that's fair, Your Honor.

18              THE COURT:  All right.  Thirty days, although you

19      could certainly do it earlier if you want to fit them into

20      your schedule generally under this order.

21              MS. HAFFEY:  That's correct.

22              THE COURT:  And -- but that gives you a little

23      time to show it to Mr. Meth and he can share it with the

24      counsel and with his -- Mr. Bowles and maybe you don't have

25      to deal with that actual motion at that point.
```

1            MS. HAFFEY:  Very good, Your Honor.

2            THE COURT:  Thank you.  Okay.

3            MR. METH:  Now, Your Honor, I will this time

4    certainly submit a proposed form of order granting our

5    motion --

6            THE COURT:  Right.

7            MR. METH:  -- and denying their motion to amend

8    formally.  From a procedural standpoint --

9            THE COURT:  You don't need to settle it on -- on

10   counsel for the debtors.  You should just run it by them in

11   advance so they --

12           MR. METH:  Okay.

13           THE COURT:  -- they can look at it.

14           MR. METH:  The other question is --

15           THE COURT:  But, again,  it -- it -- what it does

16   is it denies their --

17           MR. METH:  September 7th motion to amend --

18           THE COURT:  -- their --

19           MR. METH:  -- without prejudice, I understand.

20           THE COURT:  -- without prejudice and gives them 30

21   days to make a motion under Rule 15 with the proposed

22   amended complaint attached.

23           And its denied for the reasons stated in the June

24   21st transcript.

25           MR. METH:  Now, Your Honor, in order to make it

Page 78

1    clear, I don't know whether -- whether the Court feels it's

2    necessary for us to specifically state in the order that the

3    -- in light of the denial of the motion, that any of the

4    deadlines in the procedures order apply.  I would submit

5    that they don't apply, but I want to make sure that we don't

6    --

7              THE COURT:  Well, where is your agreement --

8              MR. METH:  -- run afoul.

9              THE COURT:  -- on that memorialized about the

10   deadlines?

11             MS. HAFFEY:  We have an email exchange, Your

12   Honor, where DSSI's counsel requested the tolling of

13   deadlines --

14             THE COURT:  Well, why don't you --

15             MS. HAFFEY:  -- under this order.

16             THE COURT:  -- why don't you put in the order that

17   the deadlines start to run from the date of the order?

18             MR. METH:  Well, from the date of an order

19   allowing them to file an amended complaint.

20             THE COURT:  Oh, okay.

21             MR. METH:  Because right now --

22             THE COURT:  Yeah.  No.  That's -- that's fine.

23             MR. METH:  -- there's -- there's nothing pending.

24             THE COURT:  That's fine.

25             MR. METH:  So should we put anything in this order

Page 79

1    about that or --

2             THE COURT:  Yeah.  Why don't you -- I --

3             MR. METH:  -- identify the --

4             THE COURT:  -- I think there's enough -- I would

5    rather not just base it on emails.  Just put it in the

6    order, say that the deadlines in the procedures order will

7    run from the date of an order, if any --

8             MR. METH:  Okay.

9             THE COURT:  -- granting the -- however you want to

10   define it -- the subsequent Rule 15 motion.  Although,

11   again, I -- I strongly encourage the parties to -- if -- if

12   -- put it this way.  I won't be very happy if I see enough

13   of the exhibit so it's clear that it passes Rule 12 that

14   we've had to have a hearing on this.

15            MR. BOWLES:  Your Honor, this is Chip Bowles.

16   Just one thing.  I assume that the requirements you had

17   previously announced in this Court for what has to be a

18   showing of an antecedent debt will core supply to this -- to

19   any new motion to amend that they file?

20            THE COURT:  Well, I mean, I -- I don't -- broadly

21   stated, that's right.  I need to see whether there is enough

22   notice to you all that there was an antecedent debt.

23            MR. BOWLES:  Right.

24            THE COURT:  So that you're not forced to, in

25   essence, prove their case. But whether that requires a

Page 80

1    specific forum or not, you know, I need to see it.

2              MR. METH:  We do -- we also do, Your Honor, and --

3              THE COURT:  I mean, before it was blank.

4              MR. METH:  Well, no.  Before --

5              THE COURT:  And now --

6              MR. METH:  -- there were -- there weren't even any

7    columns at all.

8              THE COURT:  Well, I know.  It was a blank column.

9    So --

10             MR. METH:  No.  There weren't even blank columns.

11             THE COURT:  Well, I mean, it's the same thing.

12             MR. METH:  Yeah.

13             THE COURT:  But -- but I  -- I'm not saying today

14   what needs to be in the column.  I just need to be satisfied

15   that you're not -- you're not, you know, when did you last

16   stop beating your wife type of --

17             MR. METH:  No.  We --

18             THE COURT:  -- position.

19             MR. METH:  -- we understand.  I think we know from

20   -- from Your Honor's prior directives at the June 21 hearing

21   what the Court has been looking for and what the Court is

22   demanding of the parties.

23             THE COURT:  Okay.

24             All right.

25             MR. METH:  Thank you, Your Honor.

Page 81

1              THE COURT:  Very well.  Thank you.

2              MS. HAFFEY:  Thanks, Judge.

3              THE COURT:  Okay.

4         (Whereupon these proceedings were concluded at 12:05

5    p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 82

1                        I N D E X

2

3                          RULINGS

4     DESCRIPTION                          PAGE      LINE

5

6     Notice of Agenda Proposed by

7     Fifty-Fourth Claims Hearing Agenda        --        --

8

9     Sufficiency Hearing Regarding Proofs

10    of Claim Numbers 15514, 15525 and 15526   --        --

11

12    Notice of Agenda Proposed Seventy-Sixth

13    Omnibus Hearing Agenda                    --        --

14

15    Motion by James Sumpter Regarding

16    Extending Disability Benefits for Salaried

17    Employees and Salaried Retirees - Vesting

18    Motion Regarding Extending Disability

19    Benefits for Salaried Employees and Salaried

20    Retirees                                  --        --

21

22

23

24

25

Page 83

1                          I N D E X

2

3                          RULINGS

4    DESCRIPTION                                    PAGE        LINE

5    Motion by James Sumpter for Preliminary

6    Injunction Regarding Salaried Disability -

7    Expedited Request for Preliminary Injunction

8    to Prohibit DPHH from Terminating Salaried

9    Disability Plan                                --          --

10

11   Motion by Ontario Specialty Contracting, Inc.

12   for Allowance of an Administrative Claim

13   Pursuant to 11 U.S.C. 503(B)(1)(A), or in

14   the Alternative, for Leave to File a Late

15   Administrative Expense Claim Pursuant to

16   Federal Rule of Bankruptcy Procedure 9006(b)   40          1

17

18   Motion by James Grail to Lift Stay             --          --

19

20   Motion to Dismiss Adversary Proceeding

21   Motion of the DSSI Defendants For An Order

22   Denying Plaintiffs' Motion to Amend the

23   Complaint and, to the Extent Necessary,

24   Dismissing the Adversary Proceeding With

25   Prejudice.                                     77          15

Page 84

1                   C E R T I F I C A T I O N

2

3    I, Sherri L. Breach, CERT*D-397, certified that the

4    foregoing transcript is a true and accurate record of the

5    proceedings.

6

7    Sherri L Breach    Digitally signed by Sherri L Breach
                         DN: cn=Sherri L Breach, o, ou,
                         email=digital1@veritext.com,
8                        c=US
                         Date: 2012.05.29 16:26:47 -04'00'

         SHERRI L. BREACH

9

         AAERT Certified Electronic Reporter & Transcriber

10

         CERT*D -397

11

12

13

         Veritext

14

         200 Old Country Road

15

         Suite 580

16

         Mineola, NY 11501

17

18

         Date:  May 29, 2012

19

20

21

22

23

24

25