Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3

4    - - - - - - - - - - - - - - - - - - -x

5    In the Matter of:

6    DPH HOLDINGS CORP., ET AL              CASE NO. 05-44481-rdd

7            Debtors.

8    - - - - - - - - - - - - - - - - - - -x

9    In the Matter of:

10   ACE AMERICAN INSURANCE COMPANY ET AL

11   v                                     CASE NO. 09-01510-rdd

12   DELPHI CORPORATION ET AL

13   - - - - - - - - - - - - - - - - - - -x

14

15                    U.S. Bankruptcy Court

16                    300 Quarropas Street

17                    White Plains, New York

18

19                    October 16, 2012

20                    10:08 AM

21

22   B E F O R E:

23   HON. ROBERT D. DRAIN

24   U.S. BANKRUPTCY JUDGE

25   ECRO - WILLIE RODRIGUEZ, ET AL

Page 2

1   HEARING re Notice of Agenda - Proposed Seventh-Ninth Omnibus

2   Hearing Agenda

3

4   HEARING re Notice of Agenda - Proposed Fifty-Seventh Claims

5   Hearing Agenda

6

7   HEARING re Adversary Proceeding - Defendant's State of Michigan

8   Worker's Compensation Agency and State Michigan Funds

9   Administration's Statement Pursuant to Local Rule 7056-1 of

10  Undisputed Facts in Support of Their Motion for Summary

11  Judgment (related document(s) 148)

12

13  Affidavit of Kevin A. Elsenheimer (related document(s) 147,

14  148) filed by Melanie L. Cyganowski on behalf of State of

15  Michigan Funds Administration, State of Michigan Workers'

16  Compensation Insurance Agency (related document(s) 159)

17

18  Declaration of Richard G. Haddad, Esq. in support of Defendants

19  State of Michigan Workers' Compensation Agency's and State of

20  Michigan Funds Administration's Motion for Summary Judgment and

21  in Opposition to Plaintiffs' Motion for Summary Judgment

22  (related document(s) 150)

23

24

25

Page 3

1    Memorandum of Law of Michigan Workers' Compensation Agency and

2    Michigan Funds Administration in Support of their Motion for

3    Summary Judgment and in Opposition to Plaintiffs' Motion for

4    Summary Judgment (related document(s) 151)

5

6    Opposition/Defendants State of Michigan Workers' Compensation

7    Agency's and State of Michigan Funds Administration's Responses

8    to Plaintiffs' Rule 7056-1 Statement and Statement of Disputed

9    Facts that precludes Summary Judgment in favor of Plaintiffs

10   (related document(s) 152)

11

12   Motion for Summary Judgment Statement of Undisputed Facts

13   (Related document(s) 39, 38, 37, 40) filed by Robert G. Kamenec

14   on behalf of ACE American Insurance Company, Pacific Employers

15   Insurance Company (related document(s) 41)

16

17   Motion for Summary Judgment Memorandum of Law (related

18   document(s) 40)

19

20   Motion for Summary Judgment Statement of Undisputed Facts

21   (related document(s) 39, 37, 38)

22

23   Motion for Summary Judgment filed by Robert G. Kamenec on

24   behalf of ACE  American Insurance Company, Pacific Employers

25   Insurance Company (related document(s) 38)

Page 4

1    Motion for Summary Judgment Statement of Undisputed Facts

2    (related document(s) 37, 38) filed by Robert G. Kamenec on

3    behalf of ACE American Insurance Company, Pacific Employers

4    Insurance Company (related document(s) 39)

5

6    Motion for Summary Judgment filed by Robert G. Kamenec on

7    behalf of ACE American Insurance Company, Pacific Employers

8    Insurance Company (related document(s) 38)

9

10   Motion for Summary Judgment Notice filed by Robert G. Kamenec

11   on behalf of ACE American Insurance Company, Pacific Employers

12   Insurance Company (related document 37)

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sheila Orms

Page 5

1    A P P E A R A N C E S:

2    DUANE MORRIS LLP

3         Attorneys for the ACE Insurance and Pacific

4         1540 Broadway

5         New York, NY 10036

6

7    BY:  WILLIAM C. HEUER, ESQ.

8         LEWIS OLSHIN, ESQ.

9         CATERINE BEDEMAN, ESQ.

10

11   FIRST ASSISTANT ATTORNEY GENERAL

12        Attorneys for the State of Michigan

13        Labor Division

14        5th Floor

15        G. Mennen Williams Bldg.

16        525 West Ottawa Street

17        Lansing, MI

18

19   BY:  DENNIS J. RATERINK, ESQ.

20

21

22

23

24

25

Page 6

1    OTTERBOURG, STEINDLER, HOUSTON & ROSEN, P.C.

2          Attorneys for Michigan Defendants

3          230 Park Avenue

4          New York, NY

5

6    BY:  RICHARD G. HADDED, ESQ.

7          MELANIE L. CYGANOWSKI, ESQ.

8

9    PLUNKETT COONEY

10         Attorneys for ACE Insurance and Pacific

11         38505 Woodward Avenue

12         Suite 2000

13         Bloomfield Hills, MI

14

15   BY:  ROBERT G. KAMENEC, ESQ.

16         ELAINE M. POHL, ESQ.

17

18   ALLISON & BIRD LLP

19         Attorneys for ACE Insurance

20         90 Park Avenue

21         New York, NY

22

23   BY:  MARTIN G. BUNIN

24

25

1   SKADDEN ARPS SLATE MEAGHER & FLOM

2        Attorneys for DPH Holdings Corp

3        4 Times Square

4        New York, NY  10036

5

6   BY:  LOUIS C. CHIAPPETTA, ESQ. (TELEPHONICALLY)

7        AL HOGAN, ESQ.

8

9   TELEPHONIC APPEARANCES:

10

11        SEAN CORCORAN, DELPHI CORPORATION

12        MICHAEL P. DOUD, JAMES GRAI

13

14

15

16

17

18

19

20

21

22

23

24

25

1            P R O C E E D I N G S

2            THE COURT:  Please be seated.  All right.  Good

3     morning, DPH Holdings.

4            MR. OLSHIN:  Your Honor, Lou Olshin for ACE American

5     Insurance Company and Pacific Employers Insurance Company.  Do

6     you prefer that we speak from the podium or?

7            THE COURT:  Wherever you're comfortable.

8            MR. OLSHIN:  Well, since as Your Honor knows there are

9     a lot of documents here --

10           UNIDENTIFIED:  I'm sorry, are we taking appearances

11     are we're just getting ready?

12           THE COURT:  Well, people can state their name or

13     should state their name and who they represent when they speak.

14           MR. DOUD:  Michael Doud on behalf of James Grai, Your

15     Honor, good morning.

16           THE COURT:  And that actually prompts something.  We

17     have both the omnibus and the claims hearing agenda.  There's

18     really nothing on the claims hearing agenda, correct?

19           MR. HOGAN:  Your Honor, this is Al Hogan for DPH

20     Holdings.  I believe that the summary judgment proceedings in

21     the ACE matter are the only thing that's --

22           THE COURT:  The only thing that's on?

23           MR. HOGAN:  That's correct.

24           THE COURT:  Which is in the omnibus agenda?

25           MR. HOGAN:  That's correct.

Page 9

1          THE COURT:  All right.  So we should go ahead with the

2     dueling summary judgment motions and I'll hear from the

3     insurers first.

4          MR. OLSHIN:  Thank you, Your Honor, good morning.  As

5     Your Honor indicated we're here on ACE/Pacific's motion for

6     summary judgment and the Michigan Defendant's Cross Motion.

7          ACE/Pacific asked the Court for three forms of relief

8     in its motion for summary judgment.  First, with respect to the

9     deductible policies, we asked for a declaration that they did

10    not provide coverage for Delphi Corporation self-insured

11    operations.  Alternatively and related to the first claim was a

12    request for the remedy of reformation in the event that that

13    remedy was appropriate.

14         And third, we asked that the retention policies be

15    declared that they do not drop down, that is, that they don't

16    provide coverage until their self-insured retention amounts are

17    satisfied.

18         Just a few housekeeping items.  We believe that it's

19    undisputed that with respect to the first issue, related to the

20    deductible policies, that the undisputed facts show that there

21    was no deductible policy issued for the period October 1, 2002

22    to October 1, 2003, and therefore, summary judgment is

23    appropriately entered with respect to that deductible policy.

24         Next, with respect to the third issue, with respect to

25    the retention policies, we've not seen any contest or argument

1   contrary to the legal authorities we provided with respect to

2   the retention policies.  And, therefore, we believe it's

3   appropriate that under Michigan law the Court enter summary

4   judgment that those retention policies do not drop down and

5   that they don't provide coverage until their self-insured

6   retention limits are satisfied.

7           Your Honor, I'd like to --

8           THE COURT:  Well, before we move on, both of those

9   points seem to me to be correct, but let me hear from the

10  Michigan defendants on that.

11          MR. HADDAD:  Yes, good morning, Your Honor, Richard

12  Haddad from Otterbourg, Steindler, Houston & Rosen.  I'll be

13  speaking on behalf of the Michigan defendants.

14          With me this morning is my colleague and partner,

15  Melanie Cyganowski, Dennis Raterink from the Attorney with the

16  Michigan Funds Administration, and I'd also like to introduce

17  Your Honor to Kevin Elsenheimer, who is the Director of the

18  Workers' Compensation Agency and one of the three trustees of

19  the Michigan Funds Administration.

20          With respect to those points, I'm not sure what

21  summary judgment there is to give on the 2002/2003 because we

22  don't know that there is a policy, but we certainly don't

23  contest that there is a deductible policy or that there is a

24  policy for that 2002/2003 year.

25          THE COURT:  Okay.  Well, but I thought the only basis

1  for the request -- the only defense to the request for summary

2  judgment is that deductible policies provide for coverage.

3           MR. HADDAD:  Except for that one year.

4           THE COURT:  Oh, okay.  So that's --

5           MR. HADDAD:  So what Mr. Olshin began was saying as to

6  one particular year --

7           THE COURT:  Right.

8           MR. HADDAD:  -- and --

9           THE COURT:  But is there any other basis for that

10  particular year?

11          MR. HADDAD:  No.

12          THE COURT:  Okay.  All right.

13          MR. HADDAD:  But with respect to the excess

14  policies --

15          THE COURT:  Right.

16          MR. HADDAD:  -- we do agree and there is common ground

17  that there is no drop down.  In other words, to the extent that

18  it is a policy in excess of $5 million of underlying liability,

19  then it should be enforceable and in accordance with its terms

20  to cover liability in excess of the $5 million.

21          THE COURT:  Okay.

22          MR. HADDAD:  And I think there is -- that is our

23  position.

24          THE COURT:  All right.  So partial summary judgment

25  should be granted then on the insurers' motion on those two

1    points, i.e., that Ace and Pacific have no liability for the

2    October -- it was October?

3            MR. OLSHIN:  It's October 1, 2002 to October 1, 2003.

4            THE COURT:  October 1, 2002 to October 1, 2003 period

5    under any policy and secondly, that they should be granted a

6    partial summary judgment on whether -- on the request for a

7    declaration that there's no liability under the retention

8    policies until the applicable SIR is satisfied.

9            MR. OLSHIN:  Thank you, Your Honor.  Appreciate

10   getting those housekeeping items resolved up front.

11            I'd like to turn now to what remains with respect to

12   the deductible policy issues.  Over the course of the last

13   several years, Your Honor knows that there have been pleadings

14   filed by both the Michigan defendants, the Agency and the

15   Funds, and Delphi Corporation in all of those pleadings have

16   indicated that Delphi Corporation was self-insured in the State

17   of Michigan.

18            There's also been pleadings that have been filed with

19   Your Honor that Delphi and ACE/Pacific intended that the

20   majority of the operations of Delphi Corporation in the State

21   of Michigan be self-insured, and that only small subsidiaries

22   that did not obtain self-insured authority be covered under the

23   deductible policies.

24            What I and my colleagues wanted to try to do today,

25   Your Honor, is accomplish several things.  One, I wanted to

Page 13

1   provide Your Honor with an analytical framework to assist the

2   Court in trying to organize the material that the Court's been

3   provided with, to the extent that there is any questions with

4   respect to specific policies.  I'm here to deal with those.

5          To the extent the Court needs additional information

6   with respect to affidavits or other evidentiary issues, my

7   partner, Bill Hauer will address those issues, and to the

8   extent we need to get to the issue of reformation, Mr. Kamenec

9   from the Plunkett Cooney law firm will get to those issues.

10          I think the analytical framework to sort of put into

11   focus the information that the Court's been provided with

12   really present the following issues.  The first issue, since

13   we've talked about this Delphi insurance program and its

14   structure is, whether under Michigan law the Delphi insurance

15   program structure is appropriate; i.e., whether the law permits

16   a qualified self-insured parent to insure 90 so percent of its

17   operations and then leave other affiliates or subsidiaries to

18   obtain insurance under a deductible program because those

19   affiliates or subsidiaries have not obtained self-insured

20   authority.  I think that's the first issue.

21          I think the second issue, Your Honor, is what is the

22   source of that authority for that structure.  If, in fact, you

23   can create a structure like that, is there authority under

24   Michigan law to allow a Court to conclude that it's

25   appropriate.

Page 14

1          The third issue I think is if there is authority, and

2     it is lawful, how does a carrier and an insured utilize or

3     apply that authority to achieve the intended result.  And I

4     think, Your Honor, that the fourth issue, which is the issue

5     that we sort of delve into with a lot of documents is did that

6     intended result actually occur.

7          Now, as an overview to the first issue, that is

8     whether it's appropriate under Michigan law to have the Delphi

9     insurance program as it was structured, I think the Court as an

10    overview can consider Mr. Elsenheimer's testimony in his

11    deposition found at pages 133 and 134, and Mr. Strock (ph), who

12    I understand was the administrator of the funds at pages 23 and

13    24.  DPH Holdings attached those transcripts as Exhibit A and B

14    to their papers, which is document 165 in the adversary

15    proceeding.

16         And both Mr. Strock and Mr. Elsenheimer agree that a

17    parent company like Delphi Corporation can obtain self-insured

18    authority, and have certain subsidiaries or affiliates that are

19    not self-insured.

20         So we know in the first instance that at least the

21    director of the agency and the director of the funds agree that

22    the road that ACE and Pacific and Delphi Corporation went down

23    back in 2000 to create the structure is something that actually

24    Michigan law recognizes.

25              THE COURT:  Well, they don't agree they went down that

DPH HOLDINGS CORP, ET AL

Page 15

1    road, but I think they do agree that you can -- if you do it

2    properly, you can do it, right?

3             MR. HADDAD:  Yes, Your Honor, you can do it; of

4    course, as the document show, as the evidence that we've shown

5    establishes, that's not what they did.

6             THE COURT:  All right.  I understand.

7             MR. OLSHIN:  Now, to me it's somewhat ironic and we'll

8    get into the specifics that the State of Michigan and the

9    Agencies and the Funds were all participants in how the program

10   actually operated.  And they were participants in the following

11   respects.  One, they approved the policy through the Michigan

12   Insurance Department that ACE and Pacific utilized, and that

13   comes from the affidavit of Mr. Grody, who was involved in that

14   approval process.  That's reply Exhibit 2.

15            They granted Delphi Corporation self-insured authority

16   through an application process whereby Delphi Corporation

17   designated those entities for which it asks that self-insured

18   authority be granted, and they designated for purchase by

19   Delphi Corporation the terms of the retention policies that ACE

20   and Pacific actually issued.  And those documents can be found

21   in reply Exhibit 6, 7, 17, 18, 29, 30, 31 and 32.

22            When we look at how the authority and structure is put

23   together under the statute and what ACE and Pacific did, one

24   must I think, begin with the statute.  And the relevant statute

25   we believe is MCL 418 621 and there's two parts to that

1    statute, Your Honor.

2         There is a section -- well, there's at least two that

3    are relevant to our discussion, a Section 2 and a Section 4.

4    And I have copies of statutes in this small binder because it

5    may be helpful to look at.

6         THE COURT:  That's okay.

7         MR. OLSHIN:  Now, the Michigan defendants really never

8    discuss MCL 418.621(2), nor do they discuss the provisions of

9    the ACE Delphi policy other than the Michigan insurance -- I'm

10   sorry, the Michigan law endorsement.  And they don't really

11   discuss any of the other conditions in that policy.  And we

12   think it is important to give focus to those provisions.

13        While the Michigan defendants have attempted to allude

14   to this concept of double coverage and whether it's permissible

15   or not, we think the real legal issue is whether Michigan law

16   allows an insurer to issue a deductible policy which does not

17   insure approved self-insured employers and locations.  We think

18   the answer to that is definitely yes.  We think it's controlled

19   by 418.621(2), and we think the Michigan defendants have, in

20   fact, indicated that that is an appropriate structure.

21        THE COURT:  Right.  No, they've agreed to that.

22        MR. OLSHIN:  Now, when you read that statute, it

23   provides, the State Accident Fund and each insurer issuing an

24   insurance policy to cover any employer not permitted to be a

25   self-insurer under 611, shall insure, cover and protect in the

1    same policy all businesses, employees, enterprises, and

2    activities of the employer.

3           Thus, under the statute, the obligation for an insurer

4    to insure all businesses does not apply to a self-insured

5    employer, and did not apply to the Delphi Corporation itself.

6           THE COURT:  Right.  It's not based on corporate groups

7    or anything like that.  It's by an individual employer.

8           MR. OLSHIN:  Yes, Your Honor.  In fact, there is a

9    statute that I believe specifies under Michigan law that an

10   employer is defined as an entity that basically employs, I

11   think it's, three or more employees.  My Michigan counsel is

12   shaking their head in the affirmative.

13          So we then turn to the Michigan law endorsement

14   argument.  And we believe, Your Honor, that that argument is

15   based on a misreading of one portion of the statute.  The

16   Michigan law endorsement is actually found in 418.621 paragraph

17   4.  So in order to interpret that statute, one must give effect

18   to the wording of the entire statute, in particular 618.621(2).

19          And Michigan law requires under its ruling of

20   statutory interpretation that the Court must begin with the

21   statute's language.  If the statute is clear and unambiguous,

22   the Court assumes that the legislature intended its plain

23   meaning, and the Court should enforce the statute as written.

24   That's the People versus Stone case, 463 Michigan 562, 621 NW2d

25   702, it's a Michigan Supreme Court case from 2001.

Page 18

1              And the Supreme Court in Michigan has further said

2     that in reviewing the statute's language, every word has to be

3     given meaning, and a Court should avoid a construction that

4     would render any part of the statute surplusage or nugatory.

5     And that's the Wickens versus Oakwood Healthcare System case,

6     465 Michigan 53, 31 NW2d 686, Michigan 2001, and the Altman

7     versus Meridian Township case, at 439 Michigan 623, 487 NW2d

8     155.

9              Thus, Your Honor, in order to examine the Michigan law

10    endorsement, the language of which is set forth 48.621(4), you

11    must read it in the context of the entire statute because it is

12    part of that statute, and a complete reading of the entire

13    statute does not support the Michigan defendants' reading.

14             Firstly, the Michigan law endorsement as noted, is one

15    paragraph.  And when you read it in combination with paragraph

16    2, it's clear from the language in paragraph 2 that insurers

17    are not required to insure all of the businesses and employees

18    of a self-insured employer like Delphi.  And accordingly,

19    ACE/Pacific and Delphi Corporation did not do so.

20             Reading paragraph 4 in this context, and giving the

21    meaning to the entire statute, it's clear that paragraph 4, the

22    Michigan law endorsement applies to the issuance of an

23    insurance policy to those employers who are not authorized as

24    self-insured.  Accordingly, it only applies to the subsidiaries

25    of Delphi Corporation named in the Michigan extension of

DPH HOLDINGS CORP, ET AL

Page 19

1    information page which were authorized not to be -- I'm sorry,

2    which were not authorized to be self-insured.

3            THE COURT:  Well, I guess the one area here that I'm

4    not sure the Michigan defendants agree with you on is whether

5    the endorsement literally only applies to entities that are not

6    self-insured or whether instead it applies to any entity where

7    there is, in fact, third party insurance.  I.e., they say, you

8    could have self-insurance and insurance both.  And if you have

9    both, I think they're saying the endorsement applies to the

10   extent of the insurance supplied by the third party.

11           MR. OLSHIN:  Well, I think Your Honor --

12           THE COURT:  Is that your summary of where you are?

13           MR. HADDAD:  Yes, Your Honor, and I can speak to, you

14   know, the 621.2 point or I can wait until Mr. Olshin has

15   completed.

16           THE COURT:  Okay.

17           MR. HADDAD:  But whatever Your Honor prefers.

18           THE COURT:  What is your response to that?

19           MR. OLSHIN:  My response, Your Honor, is that you have

20   to read the endorsement as a whole and the policy as a whole.

21           THE COURT:  Can I interrupt you?

22           MR. OLSHIN:  Yes.

23           THE COURT:  I think they would agree with you that the

24   fact that ACE or some other insurer provides insurance to

25   subsidiary X, does not mean that under the Michigan rule

1    endorsement, it's somehow sucked in to providing insurance to

2    every subsidiary or every business related to subsidiary X, but

3    only to subsidiary X.  I think they'd agree with that, right?

4            MR. HADDAD:  Yes.

5            THE COURT:  It's not some black hole that you get

6    pulled into by if you provide insurance to any entity.  On the

7    other hand, I think they would say that if you do agree to

8    provide insurance to subsidiary X, then you have -- then you're

9    stuck with the Michigan endorsement for that subsidiary --

10           MR. OLSHIN:  Well --

11           THE COURT:  I think you don't agree with -- I don't

12   think you disagree with either?

13           MR. OLSHIN:  No, we agree that the Michigan law

14   endorsement, the first line of which, refers the reader to the

15   information page of the policy because it says in the Michigan

16   law endorsement that this endorsement is part of the policy

17   because the information page at item 3(a) --

18           THE COURT:  Well, let's not get into the information

19   page.

20           MR. OLSHIN:  Well --

21           THE COURT:  I'm just now talking about the statute.  I

22   don't think the statute --

23           MR. OLSHIN:  I'm talking about the statute, Your

24   Honor, and I'm talking about it in the context that the statute

25   is clear that an insurer is not insuring self-insured

1    employers.  So the way the endorsement --

2            THE COURT:  I'm not sure I agree with that.  Does it

3    actually say that an insurer can never insure self-insured

4    employers?  I don't think that's right.

5            MR. OLSHIN:  I think what it's saying is that the

6    language of the statute is that you're issuing a policy that's

7    not covering self-insured employers, and the way we know that

8    is that the Michigan Insurance Department approved the general

9    section of the policy which indicates under the location

10   section that it doesn't cover self-insured locations.

11           THE COURT:  Yeah, but that's a separate -- that's a

12   contract interpretation issue.  I'm just focusing on the

13   statute right now.  I think that, again, the Michigan

14   defendants agree with you that the Michigan endorsement

15   statute, which is echoed in the Michigan law endorsement in the

16   policies, does not pull an insurer into insuring every

17   subsidiary or affiliate of an insured, and that it only

18   requires the insurer to provide the coverage for its insured.

19           And so I think you both agree on that.  What I'm

20   trying to explore is whether you contend that the Michigan

21   statute literally says it's a binary choice, you either are

22   self-insured, in which case the Michigan law endorsement

23   doesn't apply, or you're insured, but you can never be covered

24   by the Michigan law endorsement for a subsidiary that is self-

25   insured even if you've issued insurance for that subsidiary.

Page 22

1    And I think that's where they would disagree with you, because

2    they're saying, under the policies, you did issue insurance for

3    these entities.

4              MR. OLSHIN:  And I'm saying several things.  One, I'm

5    saying that 621(2) in combination with 418.611, which provides

6    the either or choice of coverage provides the writing of this

7    policy so that in fact it doesn't cover and protect in that

8    same policy all businesses, employees, enterprises and

9    activities of the self-insured employer.

10             And secondarily I'm saying, that considering the

11   policy, and I don't think you can separate out, Your Honor, one

12   page from a 400 page policy that has an insuring agreement

13   which excludes self-insured locations which is consistent with

14   418.621(2).  So these pieces of the policy, again all approved

15   by the Michigan Insurance Department, work in combination.

16             THE COURT:  All right.  So it's not -- it's really not

17   418.621(4) you're relying on.  You're relying on the 418.611.

18             MR. OLSHIN:  Well, I'm relying on 611 and I'm also

19   relying on 621(2).

20             THE COURT:  But --

21             MR. OLSHIN:  And I'm relying on the wording of the

22   endorsement itself, which says, go to the information page of

23   the policy, look at item 3(a).  Item 3(a) lists Michigan.  Now

24   in some years, in fact, the 2001 --

25             THE COURT:  All right.  Before we get to the policy, I

Page 23

1    just think we should nail this down.  I don't see a statutory

2    basis in 418.621(2) or (4) for saying that the Michigan

3    endorsement doesn't apply to any insurer that insures a self-

4    insured debtor company.  I just don't -- it's not there.

5            MR. OLSHIN:  Well, Your Honor, we --

6            THE COURT:  I mean it gives you authority.  It does

7    say that the endorsement only applies where you're issuing

8    insurance.  I get that.  It's covered by the policy.  But I

9    don't see the corollary argument that I think you're trying to

10   make, which is that if you provide a policy to a self-insured,

11   you don't have to comply with 621.  I mean --

12           MR. OLSHIN:  Well, I think 621(2) --

13           THE COURT:  -- how do you even get to that?

14           MR. OLSHIN:  -- says to cover any employer not

15   prevented to be a self-insured.  And it's saying it's a self-

16   insurer, you don't have to cover and protect in the same

17   policy, all the businesses, employees, and enterprises.

18           THE COURT:  But 621(2) doesn't say anything about the

19   endorsement.

20           MR. OLSHIN:  Well --

21           THE COURT:  It just says that --

22           MR. OLSHIN:  I think our point, Your Honor, is you

23   can't read 621(4) in a vacuum.  You have to read it in

24   combination with the very section of the statue which proceeds

25   item 4.  Because it's saying in the Michigan law endorsement

Page 24

1    that it's providing coverage in accordance with the policy.

2    When you look at the policy, the policy's general section

3    provides that self-insured locations aren't covered.  When

4    you --

5              THE COURT:  But, wait, that's not in 621, right?  What

6    in 621 says that?

7              MR. OLSHIN:  Well, the endorsement that they're

8    relying upon says that.

9              THE COURT:  No, but -- all right.  I'm going to do

10   this very slowly, okay, maybe I'm missing something here.  621,

11   paragraph 2 says "The state accident fund and each insurer

12   issuing an insurance policy to cover any employer not permitted

13   to be a self-insurer, shall insure, cover and protect in the

14   same insurance policy all the businesses, employees,

15   enterprises, and activities of the employer."

16             Okay.  So you're saying here that this requirement

17   only applies where you're not permitted to be a self-insurer?

18   That's really what you're saying?

19             MR. OLSHIN:  Yes.

20             THE COURT:  Okay.

21             MR. OLSHIN:  If you're a self-insurer, then under

22   621(2) you don't have an obligation in the policy to insure,

23   cover, and protect in the same policy all the businesses.  And

24   that's not overridden by 621(4).  And 621(1) talks about

25   insurance --

Page 25

```
 1              THE COURT:  But can I stop you?

 2              MR. OLSHIN:  Yes.

 3              THE COURT:  2 says that you have to, unless the

 4     employer is a self-insurer --

 5              MR. OLSHIN:  Correct.

 6              THE COURT:  -- the insurer issuing the insurance

 7     policy for the employer has to cover everything, okay.  Has to

 8     cover --

 9              MR. OLSHIN:  Then if you're not a self-insured --

10              THE COURT:  -- all the businesses, employees,

11     enterprises, and activities of the employer.

12              MR. OLSHIN:  I just want to make sure I understand

13     what Your Honor said.  So if you posit the hypothetical where

14     you issue a policy to an entity that's not an approved self-

15     insurer --

16              THE COURT:  Right.

17              MR. OLSHIN:  -- you cover everything.

18              THE COURT:  Right.

19              MR. OLSHIN:  We agree with that.  Because the --

20              THE COURT:  You can't just cover half the employees,

21     you have to cover them all.

22              MR. OLSHIN:  Right.  Because the intent of the

23     Michigan law endorsement which is similar in most states --

24              THE COURT:  Well, let's stop for a second.

25              MR. OLSHIN:  -- is you don't want an employee to move
```

Page 26

1    or an employer to move employees to some other location --

2              THE COURT:  Right.

3              MR. OLSHIN:  -- and create some sort of a false

4    employer and --

5              THE COURT:  Right.

6              MR. OLSHIN:  -- say they're not covered under the Act.

7              THE COURT:  Right, okay.

8              MR. OLSHIN:  That's the intent.

9              THE COURT:  It does not say that you may not issue

10   insurance.  You may not issue a policy to an entity that is a

11   self-employer -- I mean, a self-insurer.  It doesn't prohibit

12   the issuance of insurance to an entity that is a self-insurer.

13             MR. OLSHIN:  Well, I think 621(1) says your issuance

14   of compensation provided in this Act, and the compensation

15   provided in this Act takes you to 611.  611 --

16             THE COURT:  Well, before we get to 611, I just want to

17   focus on 621.

18             MR. OLSHIN:  I am focusing on 621.

19             THE COURT:  Okay.

20             MR. OLSHIN:  Because I'm saying you have to read --

21             THE COURT:  All right.

22             MR. OLSHIN:  -- all the sections --

23             THE COURT:  But before we get there --

24             MR. OLSHIN:  -- of the --

25             THE COURT:  -- I think your argument does depend on

Page 27

1    interpretation of 611, but I want to make sure that that's the

2    only thing it depends on.  Because when you go -- so 2 does not

3    prohibit the issuance of insurance for a self-insurer, except

4    by one's reference to the other provisions of this Act, right?

5    There's nothing in 2 that prohibits the issuance of -- by ACE

6    of insurance to a self-insurer.

7              MR. OLSHIN:  Well, it doesn't use the word prohibit

8    but I think the fair meaning of that is it's talking about

9    insurers that are issuing insurance policies to employers who

10   are not authorized self-insurers.

11             THE COURT:  Okay.

12             MR. OLSHIN:  That's what I think 2 is saying.

13             THE COURT:  All right.  That's fine.  And then 4 says,

14   "each policy of insurance covering worker's compensation shall

15   contain this endorsement."  So, I mean, unless some other

16   statutory provision prohibits the issuance of a policy to a

17   self-insured, then I think 4 applies.

18             MR. OLSHIN:  Well, we don't think it applies because

19   we think one, 621(1) talks about every contract for insurance

20   of the compensation provided in this Act.

21             THE COURT:  Right.

22             MR. OLSHIN:  And when you go to 611, which talks about

23   what are the options of what kinds of insuring arrangements are

24   appropriate, that's where you get into the either or concept.

25             THE COURT:  Well, it doesn't say or.  It doesn't say

Page 28

1    or.

2            MR. OLSHIN:  Well, it's either you're an employer who

3    obtains insurance through a private insurer --

4            THE COURT:  Right.

5            MR. OLSHIN:  -- or you're an authorized self-insurer,

6    and the Michigan defendants pointed out, you can also have a

7    pooling arrangement for authorized self-insurers, but that's

8    not really relevant to this case.

9            THE COURT:  But it doesn't say "or," so I think you're

10   putting a lot of emphasis on the "either" and suggesting that

11   this is in the disjunctive.  I mean no one's cited any cases to

12   say that you're prohibited from doing this.  Right?

13           MR. OLSHIN:  Well, I think we cited the McQueen case

14   where someone tried to argue that somehow there was a drop down

15   and they found there wasn't one because under the statute, you

16   can't read 621(4) in the self-insured arena to require a drop

17   down.

18           THE COURT:  Okay.  But that's -- because the statute

19   -- because the policy didn't have a drop down.

20           MR. OLSHIN:  Well, they were trying to argue there was

21   one, and they obviously came to the conclusion that there

22   wasn't.  And that 621(4) didn't require that there was a drop

23   down.

24           THE COURT:  Okay.  But I mean we know that, and in

25   fact, this happened with the retention policies.  Under the

Page 29

1    statute, Michigan can require a self-insured to get more

2    insurance, to get insurance from a third party, among other

3    things.

4              MR. OLSHIN:  They could only require certain forms of

5    insurance.  They can't require the obtaining of a deductible

6    policy.  If you read the statute, it's very direct that the

7    type of security or policies that the Michigan defendants, and

8    particularly the Agency or Funds, could require an approved

9    self-insured to obtain as a condition of obtaining that

10   approval.

11             THE COURT:  Well, which -- can we turn to that

12   section?

13             MR. OLSHIN:  I need to find it for Your Honor, but

14   there is a section that provides that.  I apologize not to have

15   it handy.

16             THE COURT:  I probably do need your book on this one.

17             UNIDENTIFIED:  611(1)(a).

18             MR. OLSHIN:  Huh?

19             UNIDENTIFIED:  611(1)(a).

20             MR. OLSHIN:  611(1)(a).

21             THE COURT:  Oh, okay.

22             MR. OLSHIN:  Yeah, it says, "If the director

23   determines it to be necessary, the director shall require the

24   furnishing of a bond or other security in reasonable form and

25   amount.  Such security as may be required by the director may

Page 30

1   be provided by furnishing specific excess insurance, aggregate

2   insurance coverage through a carrier authorized to write in the

3   state in an amount acceptable to the director, a security bond,

4   an irrevocable letter of credit in the format acceptable to the

5   bureau, and claims payment guarantees."

6           So they're not talking about deductible policies, and

7   the reason they're not is because as Your Honor will recall

8   from the insurance agreement motion, when you obtain this kind

9   of deductible policy, the insured is required to post

10  collateral to secure the deductible obligation.

11          So the program would not make any sense in terms of

12  self-insurance if the Michigan defendants could approve self-

13  insured authority, assess the insured on the basis of granting

14  that authority, and then require the insured to obtain what is

15  a fairly significant cost-sensitive product, a deductible

16  policy, which requires, in and of itself, collateral.

17          So that concept sort of butts heads against one

18  another because the employer then would say, why get self-

19  insured authority if I have to buy a deductible policy, I'll

20  just buy a deductible policy.  It would make no sense to

21  have --

22          THE COURT:  Well, if the State felt that it needed

23  more assurance that there would actually be payment because of

24  the financial condition of the insured.

25          MR. OLSHIN:  Well, they could do what was authorized

1    in the statute.  They could either one, preclude them from

2    being a self-insured, which then would force them into a

3    deductible program, which would make sense.  Or allow them to

4    -- or require them like occurred here, to purchase a self-

5    insured retention policy which comparatively is significantly

6    less expensive than having a deductible.  Because the other

7    sort of conflict here is to say the Funds will collect for a

8    period of time, I think the numbers are when you add them up

9    from our reply exhibits, $6.6 million.  While we obtain premium

10   of $14,000 based on our charging premium to the small

11   subsidiaries that weren't authorized to be self-insured.

12          And then to come full circle and say, guess what,

13   Delphi, we collected these assessments for 9 or 10 years, but

14   you, ACE, take the risk.

15          THE COURT:  Well, let me -- I want to explore that

16   too.  But -- on the premiums.  But on the issue of whether

17   418.611(1) precludes using more than one of the three methods,

18   Mr. Eisenberger (ph) says in his declaration that, in fact,

19   there are many instances where a self-insured also has

20   insurance.

21          MR. OLSHIN:  I think the ratio, as I understand the

22   numbers, is something like a comparison of roughly 2,000 to

23   200.

24          THE COURT:  Right.  But it's not -- I guess the issue

25   is, they don't seem to think it's precluded by the statute.

Page 32

1           MR. OLSHIN:  Well, I think the reality is that they

2    looked at some records, and some of the records they gave us

3    basically said, oh, you know what, you're self-insured up to

4    point A, and then the period of self-insurance was like 1 to 30

5    days, where it apparently appeared that the employer

6    transitioned from a period of self-insured approval to a period

7    of obtaining private insurance.

8           So I don't think you can draw any conclusion as to the

9    legality based on those records.  I think all you can do is

10   look at it and say, can you issue a policy and is it

11   appropriate under Michigan law to issue a policy where you're

12   not insuring all of the entities because they are self-insured.

13   And I think the answer is yes, and our policy gets you there

14   when you consider all of its terms and conditions.

15          THE COURT:  Well, no, that's -- I mean, that's -- I

16   thought you were going somewhere else, which is we're precluded

17   from insuring self-insured entities.

18          MR. OLSHIN:  Well, we think we are precluded, and we

19   think we're precluded because that's the way the Michigan

20   Insurance Department approved our policy.

21          THE COURT:  Well, except they -- Mr. Elsenheimer says

22   they've approved other policies where there's insurance for

23   self-insureds.

24          MR. OLSHIN:  Well, I don't think there's any evidence

25   that there's been an approval.

Page 33

1          THE COURT:  That's --

2          MR. OLSHIN:  I think the only evidence is what

3   occurred with respect to the ACE specific policy, which is the

4   policy that was approved.  And whether they approved, even if

5   they did, some other policy formulation is really irrelevant --

6          THE COURT:  Well, no, he says, "In fact, I'm aware of

7   other entities in addition to Delphi who were both approved

8   self-insurers and who have also obtained coverage from a third

9   party insurer."

10          MR. OLSHIN:  Well, maybe, Your Honor, I misinterpreted

11   your statement.  What I was responding to is the fact that our

12   policy approved by the Michigan Insurance Department versus

13   Grody reply Exhibit 2, provides what it does.  And what it

14   provides is that self-insured locations are not insured.

15          THE COURT:  Okay.  But that's -- again, I'm just --

16          MR. OLSHIN:  No, I understand but I think --

17          THE COURT:  You all made a statutory argument besides

18   the interpretation of the policy.

19          MR. OLSHIN:  We did --

20          THE COURT:  The statutory -- and the statutory

21   argument is that, in fact, Delphi or the Delphi entities that

22   were self-insured were prohibited from obtaining third party

23   insurance.

24          MR. OLSHIN:  And that's what we think the statutes in

25   combination mean.

Page 34

1           THE COURT:  Okay.

2           MR. OLSHIN:  And that's why we think our policy was

3   written the way it was written and approved the way it was

4   approved.

5           THE COURT:  Okay.  Now, on the latter point, there is

6   a contradictory statement in the evidence, so it really just is

7   a matter of statutory interpretation for purposes of a summary

8   judgment motion.

9           MR. OLSHIN:  I don't think there is any contradictory

10  evidence about the approval of insurance policies.  There may

11  be this small universe of entities that Mr. Elsenheimer is

12  saying somehow obtained what they considered to be double

13  coverage.  But that doesn't mean that -- we've never seen those

14  policies.

15          THE COURT:  Right.

16          MR. OLSHIN:  We don't know what they say whether

17  approved, not approved.

18          THE COURT:  Well, no, but that's what a trial would be

19  for.

20          MR. OLSHIN:  Well, I don't think you need a trial on

21  that point because I think what you have to determine is what

22  does this policy say.

23          THE COURT:  Well, okay, that's a separate point.

24  We'll get to that, believe me.  Then on the -- but I'm sure Mr.

25  Haddad will address the "either" and whether it means

Page 35

1   disjunctive or not.

2          But the second point, you were talking about the

3   unfairness on the premiums.

4          MR. OLSHIN:  I'm saying the evidence is undisputed,

5   that Delphi never paid a premium for a deductible policy that

6   covered all of Delphi --

7          THE COURT:  Right, $14 or $316.

8          MR. OLSHIN:  I think it's like $14,000 that they

9   paid --

10          THE COURT:  A total of $14,000 but for individual

11   policies it was tiny.

12          MR. OLSHIN:  Correct.

13          THE COURT:  So on that score, I think what the

14   Michigan defendants argue is the following.  That was perfectly

15   appropriate as a premium when it looked like Delphi was going

16   to be the primary one, that it was going to pay because it was

17   in good financial shape, and Delphi was just getting this extra

18   policy as a back-up.  And that's why the premium would be so

19   low because in all likelihood Delphi would pay.  What is your

20   response to that?

21          MR. OLSHIN:  Well, my response is several points.  One

22   is they certainly didn't assess their self-insured assessments

23   on that basis, that oh, there's the possibility of double

24   coverage here.  So therefore, we will charge Delphi a less

25   amount than --

Page 36

1          THE COURT:  On its --

2          MR. OLSHIN:  On its assessments on the basis that

3     somehow there's double coverage.  Because these forms, of

4     course, were at the Agency, according to them, since the year

5     2000.

6          My second response would be is that it's clear from

7     the documentation that the only premiums assessed were the

8     premiums assessed for the non-approved self-insured employers,

9     and you know that, Your Honor, from the Michigan information

10    pages which sets forth the individual entities and with respect

11    to those individual entities, it sets forth the individual

12    premiums.

13         So you know just looking at the very -- you don't even

14    have to go outside to extrinsic evidence, you know from looking

15    at reply Exhibits 11, 12, 21, 37, 22, 23, and 24, when you find

16    the Michigan extension of information pages, that the entity

17    reference on Reply Exhibit 11 for 2000 to 2001 deductible

18    policy, Packard Hughes Interconnect and Delphi Diesel System

19    Corp, which were the only two entities listed and the only

20    premiums calculated for, that there was no indication that the

21    entire company was being insured and rated.

22         Similarly, if you go to the 2001/2002 policy, which is

23    Reply Exhibit 12, you'll find the specific entities Allied

24    Single Environmental Catalyst, Packard Hughes Interconnect,

25    Delphi Diesel System Corporation with the individual

1    calculation of what their estimated premium is.  Again, no

2    reference at all to a premium calculation for the entire

3    Delphi.

            And that's true with respect to all of the policies

4    that are provided in Reply Exhibits 11, 12, 21, 37, 22, 23 and

5    24.

6            THE COURT:  So if -- and then your second point I

7    guess is that if at this point the two insurers were found to

8    have insured not only the self -- I'm sorry, the non-self-

9    insured entities against which those premiums were calculated,

10   but the self-insured ones as well, the insurers would be left

11   holding the bag because they're stuck with the premiums they

12   paid.

13           MR. OLSHIN:  We'd be left holding a bag or don't want

14   to go there in this proceeding, we have an administrative

15   expense claim, but.

16           THE COURT:  But what is that for?

17           MR. OLSHIN:  That's for potential calculation if

18   there's some conclusion that, in fact, we have responsibility

19   under the policies.

20           THE COURT:  So would you -- you would recalculate the

21   premiums then or?

22           MR. OLSHIN:  No, I didn't say we'd recalculate it.

23   We'd proceed with our administrative expense claim.

24           THE COURT:  But how would --

25           MR. OLSHIN:  Well, we would be left effectively not

1    being able to collect a premium that we would've collected.

2    And not being able to collect collateral that we would have

3    obtained to secure the deductible policies.

4              THE COURT:  Well, let me make sure I understand that.

5    Because there wasn't collateral posted?

6              MR. OLSHIN:  Correct.

7              THE COURT:  Then there wouldn't be collateral.

8              MR. OLSHIN:  The collateral that was posted was based

9    on the concept --

10             THE COURT:  On the uninsured ones, the non-self-

11   insured ones.

12             MR. OLSHIN:  Correct.

13             THE COURT:  And what would the administrative claim be

14   for?

15             MR. OLSHIN:  The administrative claim relates to

16   claims that may -- claims that we may have to pay that would

17   arise if, in fact, we had the exposure that the Michigan

18   defendants are alleging we had.

19             THE COURT:  But is that -- so is -- but what -- is

20   that based on what, subrogation, or what?

21             MR. OLSHIN:  That would be the amounts that would be

22   within the deductible obligation of the policy.

23             THE COURT:  The deductible amounts.

24             MR. OLSHIN:  Right.

25             THE COURT:  Okay.  All right.  Because you would be

Page 39

```
 1   paying those.

 2            MR. OLSHIN:  Correct.  And the way the --

 3            THE COURT:  Under the endorsement?

 4            MR. OLSHIN:  Under the --

 5            THE COURT:  If the endorsement were said to apply,

 6   you'd be paying those deductible amounts.

 7            MR. OLSHIN:  Correct.

 8            THE COURT:  And your argument is that that's a

 9   different -- that that's not anything like a premium?

10            MR. OLSHIN:  Correct.

11            THE COURT:  The insurance would be based upon some

12   theory that you'd be reimbursed for the deductible amounts?

13            MR. OLSHIN:  Right.

14            THE COURT:  Insurance is always based on a calculation

15   of what an appropriate premium is.

16            MR. OLSHIN:  And coming back to your question about

17   what are the other indications that the full Delphi wasn't

18   paying a premium, I guess we have to give some credence to the

19   fact that Delphi, DPH Holding itself says that, in fact, was

20   the case.  That they were paying premium based upon the

21   entities that were not authorized to be self-insured, and in

22   addition to the policy, the other way you know that, and we

23   supplied some of this information in the reply exhibits.

24            If you look at the Aon Delphi submission in 2001 and

25   2004, they clearly break out Delphi as a self-insurer from the
```

1    small entities that they intended to be covered under the

2    policy, and in fact, the entities that were listed on the

3    Michigan extension of information page.

4            THE COURT:  Okay.  Well, I think we should next turn

5    to the policies themselves, but before we do that, maybe it

6    makes sense it deal with the statutory argument, the argument

7    that 418.611 precludes self-insured entities from obtaining

8    insurance.

9            MR. HADDAD:  Your Honor, thank you, Richard Haddad.

10   I'm happy to speak to that.  We do think the issues are

11   somewhat interrelated, but to come focus right to Your Honor's

12   question --

13           THE COURT:  Okay.

14           MR. HADDAD:  -- the statute doesn't say it.  The

15   statute doesn't say it's exclusive.  No case has so held that

16   it is exclusive.  McQueen certainly doesn't address the issues

17   whatsoever.  And thirdly, it's undisputed, undisputed and

18   recognizing that we're here today on a summary judgment, it's a

19   burden to lay bare your proof, it is undisputed that, in fact,

20   a couple of a hundred Michigan employers choose for whatever

21   reason to be self-insured and get third party insurance for a

22   period of time.

23           In some instances, it's a short period of time.  In

24   other instances, it is a long period of time, and Mr.

25   Elsenheimer references --

Page 41

1          THE COURT:  Well, do I know anything about the period

2    of time?  I just have I think the one paragraph in his

3    declaration.

4          MR. HADDAD:  Well, we did the --

5          THE COURT:  I know both of you have been talking about

6    this.

7          MR. HADDAD:  There's one paragraph in his moving

8    declaration that Your Honor read from.  Mr. Elsenheimer also

9    submitted on Friday, trying to think what day that was, on

10   Friday a reply declaration, in which he put forth the list of

11   211 employers who have chosen to be both insured and self-

12   insured.  And we produced, in response to the ACE document

13   request, the Agency's records establishing each of those

14   companies over a period of time.

15         THE COURT:  But that list doesn't say what type of

16   insurance it was or how long it lasted.

17         MR. HADDAD:  It does so.  It would show the amount of

18   length of time because you have the documents, the State's

19   records do reflect the point in time, both that someone's an

20   approved self-insurer and also the point in time that they have

21   third party insurance.  So it does -- the documents that we

22   produced do reflect that.  What we've attached to the affidavit

23   is the list, the list of employers.

24         THE COURT:  But the list of -- I mean, I don't have

25   that.  I don't have the list of the names.

Page 42

1              MR. HADDAD:  You don't have the list of the names,

2       that's correct.  We didn't give you the burden.  There was

3       hundreds and hundreds of pages of records that show that this

4       happens.  You know, does every employer choose to do it, no,

5       everyone doesn't choose to do it.

6              And I think Your Honor's questions of Mr. Olshin did

7       answer -- address some of those points, that both 611 does not

8       preclude it, it is not exclusionary.  621 similarly --

9              THE COURT:  Well, before we --

10             MR. HADDAD:  Okay.

11             THE COURT:  Before we get -- I mean, just on 611 --

12             MR. HADDAD:  Yeah.

13             THE COURT:  -- what is your response to his point that

14      paragraph 1 seems to limit what the commissioner can impose on

15      a self-insured when there's a feeling of financial insecurity.

16      Would you say that's just dealing with that specific situation?

17             MR. HADDAD:  I think it does.  It says, you can

18      require an excess policy which was done here.  It doesn't say

19      you can't do other things, but putting that aside, the question

20      here is not what was -- you know, whether Delphi was required

21      to be both self-insured and to get insurance.  But, in fact,

22      what is Your Honor to do when presented with a situation where,

23      in actuality, Delphi was both insured and got self-insurance.

24      Because 621(4) says, "Each policy of insurance covering

25      worker's compensation in this state shall contain the following

1    provisions."  It doesn't say --

2          THE COURT:  So it's just tied to a policy.  It

3    doesn't --

4          MR. HADDAD:  Each policy.  It's not limited to each if

5    you're self-insured or if you're not self-insured, it says

6    each.  And 621(2) that Mr. Olshin referenced, and I think Your

7    Honor read the whole section, and I think it's correct to read

8    the entirety of 621(2) because you can't just stop halfway

9    through, and certainly can't assume the converse, which is what

10   the ACE argument is here.

11         But what 621(2) says is that if you are not an

12   approved self-insurer, then you can only get a single policy.

13   If they want the same insurance policy, the company wants to

14   make sure you get -- the state wants to make sure that if

15   you're not a self-insurer, you get one policy, the same single

16   policy that covers all the businesses within the state.  621(2)

17   is not limited of 621(4).  If anything, 621(4) is expansive,

18   because 621(4) reads very clearly, each policy of insurance

19   covering worker's compensation shall contain the following

20   provisions.

21         And, in fact, and in fact, as a matter of contract,

22   and I know Your Honor doesn't want to jump to the contract just

23   yet, but in fact, each policy that we're talking about today

24   contains those very policy provisions signed by the authorized

25   agent of ACE and incorporated in and made part and parcel of

Page 44

```
 1   each and everyone of those policies.

 2          THE COURT:  Okay.  All right.  So why don't we turn to

 3   the policies which --

 4          MR. OLSHIN:  I'd be happy to do, Your Honor.  I would

 5   like to respond to one thing in clarification of opposing

 6   counsel.  And that was the statement that each policy in 621(4)

 7   includes even retention policies.  That's just fundamentally

 8   wrong, because in fact, you can look at all of our retention

 9   policies.  None of them have the Michigan law endorsement, and

10   the reason they don't have the Michigan law endorsement is

11   because of 621(2).  Because those are policies that are issued

12   to self-insured employers and the way the Act we believe works

13   is in combination between 621(1), (2) and (4) and 611, you're

14   basically picking one of the two systems because 621(4) is not

15   an override of any of the other sections.  You have to read it

16   in combination with it.  And that's what Michigan statutory

17   construction law provides for.

18          MR. HADDAD:  May I just --

19          THE COURT:  yes.

20          MR. HADDAD:  Just -- and I don't like to interrupt,

21   but to --

22          THE COURT:  No, that's --

23          MR. HADDAD:  -- focus Your Honor specifically on this.

24   The excess policy is not a provision of worker's compensation,

25   it's a reimbursement provision designed to provide additional
```

Page 45

1   protection to the State to make sure that they're good for any

2   liability that exceeds the underlying amounts on the primary

3   insurance.

4        So the excess policies don't have this endorsement,

5   but that's just not the nature of what excess policy is.  I

6   mean, if everybody went -- if an insurer went belly up, the

7   self-insurance is still responsible.  I mean, you know, you

8   have to look at it -- what's the nature of excess insurance.

9   It doesn't alleviate the underlying liability and we've agreed

10  as to what the effect of the excess insurance is here in this

11  case.

12        MR. OLSHIN:  Well, I was --

13        THE COURT:  Let me just --

14        MR. OLSHIN:  I was responding to the comment that

15  somehow you could read 621(4) to include -- and the use of the

16  word "each" as having some sort of expansive reach as to

17  everything, and it clearly does not.  And that's why we believe

18  that our interpretation of the statute is correct.

19        THE COURT:  Well, the -- I mean, the retention

20  policies do refer to worker's compensation, that's what they

21  cover.

22        MR. HADDAD:  Well, as opposed to, you know, a car

23  crash or a D&O or anything else, sure, that's -- and they

24  reference an amount in excess of a -- you have to come -- you

25  have to tie it back to some factual scenario clearly, you know,

1    a particular type of insurance.

2         THE COURT:  But the -- I mean, 621(4) says, "Each

3    policy of insurance covering worker's compensation."

4         MR. HADDAD:  But it's excess.  It's not the primary

5    level of coverage.  And if the excess carrier were to go belly

6    up, it doesn't relieve the self-insurer.  I mean, that's sort

7    of the credit risk that the State takes, when they assess the

8    self-insurance application.

9         MR. OLSHIN:  Which really, Your Honor, I think gets to

10   the point in 621(1) that talks about "insurance of the

11   compensation provided in this Act," and in the case of a self-

12   insurer like Delphi Corporation, neither the deductible policy

13   nor the retention policy was providing compensation to self-

14   insurers because that worker's compensation is not required

15   under the Act, because they become authorized self-insurers.

16        THE COURT:  Okay.  So why don't we turn to the

17   policies then.  My exhibit book is a little bit out of order,

18   it has 2001 and then 2008.

19        MR. OLSHIN:  Well, it's not out of order, I did that

20   purposely.

21        THE COURT:  Well, no, I was going to say out of order

22   chronologically, but I think I understand the reason.

23        MR. OLSHIN:  All right.  So perhaps I could run Your

24   Honor through.

25        THE COURT:  Okay.

1          MR. OLSHIN:  If you have -- do you have the binder

2     that has Reply --

3          THE COURT:  Yeah.

4          MR. OLSHIN:  -- Exhibit 11 in it?

5          THE COURT:  Well, I have the binder with all the

6     policies in it, so.

7          MR. OLSHIN:  All right.

8          THE COURT:  That's what I've marked up.

9          MR. OLSHIN:  Well, I'll refer --

10         THE COURT:  The first one is Exhibit 11 which is in

11    this binder which is the 2000 policy.

12         MR. OLSHIN:  Right.  What we tried to do, Your Honor,

13    if you attempted to navigate the CD, you'll know that these

14    policies are like I don't know, 2 or 300 pages long because as

15    Your Honor is aware, Delphi had operations throughout the

16    United States, and these were multi-state policies that were

17    designed to cover specific Delphi operations in those states

18    that didn't that didn't qualify as self-insurers.

19         So the way this policy is set up, if you begin with

20    the 2000 policy, is you have the first page which is Bates

21    number ACE policy 00254, and in this case, you'll see on the

22    information page which we term it item 1, the insured, Delphi

23    Automotive System Corporation, and you have some handwriting

24    above it, that says Packard Hughes, Delphi Diesel, see audit.

25    It's a little hard to read see audit, but I think that's what

DPH HOLDINGS CORP, ET AL

Page 48

1    it says.

2            And then you have under the classifications the

3    various states that are insured under this policy or the

4    operations in the insured, and you'll notice that, in fact,

5    this is a multi-state policy listing several states, one of

6    which is Michigan where the estimated annual premium is a grand

7    total of $316.

8            So the question then becomes how does this --

9            THE COURT:  I'm sorry.  You're going to have to go

10   back because maybe my book doesn't have everything.

11           For 2001, I have, again it's Bates stamped 00254.

12           MR. OLSHIN:  Okay.

13           THE COURT:  Which is -- and you're right, it says item

14   1, the insured and it lists Packard Hughes/Delphi Diesel and it

15   lists Delphi Automotive System Corporation.

16           MR. OLSHIN:  Right.  And then there's a block in the

17   center --

18           THE COURT:  And item 3 says -- 3A, "a worker's

19   compensation insurance Part 1 of the policy --" I'm sorry, 3A,

20   "worker's compensation insurance: Part 1 of the policy applies

21   to the worker's compensation law of the states listed here per

22   information page attached."

23           MR. OLSHIN:  Right.

24           THE COURT:  Okay.

25           MR. OLSHIN:  So that is referring the reader from the

Page 49

1    very first page of the policy to what is called the individual

2    state information pages.  And in this policy, if you were to

3    look at it, you would find in alphabetical order every state

4    beginning with Alabama through Washington.  So what we've

5    included in here is the excerpts for Michigan.  When you turn

6    to the Michigan information page, it's Bates number ACE policy

7    00348.  And you'll see in the middle section under item 3, it's

8    designating the State of Michigan.  And in the classification

9    sections, it's listed Packard Hughes Engineering Service and

10   then it has some information.  It's basically telling you what

11   kind of employees are being rated.  For Packard Hughes, it's

12   architects or engineers.  And then it has Delphi Diesel

13   Systems, and it lists the kinds of employees that are rated

14   under this policy.  In this case, it's sales persons,

15   collectors, messengers, folks in that category.

16            THE COURT:  Okay.

17            MR. OLSHIN:  And --

18            THE COURT:  How do I know that this is the Michigan

19   information page?

20            MR. OLSHIN:  Because in item 3.1, it specifies

21   Michigan.  Item 3, it says "worker's comp insurance part 1 of

22   the policy applies to the worker's compensation law of the

23   states listed here, Michigan."

24            THE COURT:  Okay.  And you're representing to me that

25   there are other pages to this policy that would list say

1       Florida or New York or et cetera?

2              MR. OLSHIN:  Yes.  You know that from the very first

3       page of the policy, 254, so if you'd opened up the CD and you

4       walked through the policy, they're basically all set up in the

5       same way.  In the first part of the policy there is the general

6       insuring agreement, the most relevant section of which is found

7       at, in this policy, page 257, ACE policy 257.  That has the

8       locations provisions that I made reference to previously.

9              And if you walk through the policy, you would find

10      state information pages for each of the states, Alabama or

11      Arizona, California, Colorado, they're all in alphabetical

12      order, and then eventually you would get to Michigan.  And

13      after Michigan, obviously there would be the other states.

14             But in this case, page 348 is the Michigan information

15      page, and on that information page, you find the rating of the

16      entities that are covered under the policy.  And in this

17      particular case, it's Packard Hughes Engineering Service and

18      Delphi Diesel Systems.

19             And if you turn the page, you'll -- where it says,

20      Your Honor, "premium basis, estimated total, annual

21      remuneration," that's essentially the estimated payroll for the

22      classification of employees under those particular employers.

23      So you'll find that, you know, compared to the size of Delphi

24      Corporation, you're talking about deminimus payroll.  And when

25      you calculate out the premium you'll find on the next page on

1    349, ACE policy 349, you'll go down and unfortunately in very

2    small print, it says, "total estimated annual premium $316."

3    That's on sort of the right-hand column about 80 percent down

4    the page.

5         THE COURT:  Okay.  So can we go back to the general

6    section, the general terms?

7         MR. OLSHIN:  Yes, sir.

8         THE COURT:  Okay.  So A and B both say essentially the

9    same thing.  A says, it is -- this policy, it is a contract of

10   insurance between you (the employer named in item 1 of the

11   information page) and us, the insurer named on the information

12   page).

13        Then B says, "you are insured if you are the employer

14   named in item 1 of the information page."  I guess to be more

15   complete, E says, "this policy covers all of your work places

16   listed on 1 or 4 of the information page, and it covers all

17   other work places in item 3A," and states, "unless you have

18   other insurance or are a self-insured for such work places."

19        But I want to focus on A and B where it says that

20   "this is a contract of insurance between you and the employer

21   named in item 1 of the information page."

22        MR. OLSHIN:  Uh-huh.

23        THE COURT:  So if Bates 000348 is the Michigan

24   information page, why doesn't item 1 mean that Delphi

25   Automotive System Corporation is the insured?

Page 52

1          MR. OLSHIN:  Because they're the named insured on this

2     multi-state policy.

3          THE COURT:  On everything?

4          MR. OLSHIN:  Correct.  But as item A says in the first

5     sentence, the policy includes, at its effective date, "the

6     information page and all the endorsements and schedules listed

7     therein, or listed there," I'm sorry.

8          THE COURT:  All right.

9          MR. OLSHIN:  So I think read in the total context,

10    what the policy is saying is, and I agree, this is a policy

11    which I guess one could at least say, is complex.  So as you

12    work through the pages, and look at them all in context, we

13    think you come out in the place where you're going to the

14    information page.  Because if you look at the Michigan law

15    endorsement, which is 353, it says at the top, "this

16    endorsement applies only to the insurance provided by this

17    policy," so it's talking about what's provided, because

18    Michigan is shown in item 3A of the information page.

19          Now, in this particular policy, when you go to the

20    first page, which is the information page, Michigan doesn't

21    appear.  What it tells you to do is to go to the individual

22    state information page, which is the document that Your Honor

23    and I were discussing at 348.

24          THE COURT:  So if you go back to the first page of the

25    policy --

DPH HOLDINGS CORP, ET AL

Page 53

1          MR. OLSHIN:  Right.

2          THE COURT:  -- which is 000254, 3A does say part 1 of

3    the policy applies to the worker's compensation law of the

4    states listed here, and that sends you to the information page.

5    So I guess I understand the argument, which is that it's what's

6    listed in 3A.  Part 1 is what's really listed in 3A.

7          MR. OLSHIN:  Right.  And in this particular policy,

8    there is an added endorsement which is the very last page of

9    the section 404, which reads, "The following," and it has a

10   number of boxes, and the first item says, "insured's name."

11   And if you go down to the end it says, "is changed to read" and

12   it basically provides the names Packard Hughes and Delphi

13   Diesel.

14         THE COURT:  Okay.

15         MR. OLSHIN:  And so all those documents read in

16   combination we believe are conclusive of the fact that this

17   2000 policy was only rated for and only applies to Packard

18   Hughes and Delphi Diesel.

19         THE COURT:  And you're turning to the Michigan law

20   endorsement?

21         MR. OLSHIN:  Yes, sir.

22         THE COURT:  You say that that doesn't expand the

23   coverage because by its terms it applies only to the insurance

24   provided by the policy.

25         MR. OLSHIN:  Correct.  And we believe that the

1    insurance provided by this policy is consistent with 621(2) as

2    the policy terms and conditions were approved by the Michigan

3    Insurance Department.

4           THE COURT:  So you say that the -- obviously at the

5    top of that endorsement, it says the named insured is Delphi

6    Automotive System Corporation.

7           MR. OLSHIN:  Correct.

8           THE COURT:  But you're saying that's not the employer?

9           MR. OLSHIN:  We're saying that's a self-insured

10   employer.

11          THE COURT:  But the terms of the endorsement all refer

12   to you as the insured employer, and you're saying well, it's

13   not insured by the policy.  The only ones that are insured by

14   the policy are --

15          MR. OLSHIN:  On the information page.

16          THE COURT:  -- the Hughes and --

17          MR. OLSHIN:  The Michigan information page.

18          THE COURT:  Right.

19          MR. OLSHIN:  Yes, sir.

20          THE COURT:  Which would be Delphi Diesel Systems

21   and --

22          MR. OLSHIN:  I think in this policy it's -- yes, it's

23   Packard Hughes Engineering Service and Delphi Diesel System.

24          THE COURT:  Okay.  All right.  I want to hear you

25   after we're done with all of these, but I think I -- in looking

Page 55

1    at these, the 2000 policy seems to fit your argument the best;

2    maybe that's why it came first.  But why don't we turn then to

3    2001.

4           MR. OLSHIN:  Yes, sir.

5           THE COURT:  Okay.

6           MR. OLSHIN:  It's basically set up --

7           THE COURT:  And again, this is a reference to -- it

8    has again the cross-reference in 3A on the first page, which is

9    000741, it says "Part 1 of the policy applies to the worker's

10   compensation law of the states listed here: per information

11   page attached."

12          MR. OLSHIN:  Correct.

13          THE COURT:  And you're saying that --

14          MR. OLSHIN:  That gets you to page 830.

15          THE COURT:  Right, 00830, 000830, which references the

16   State of Michigan.

17          MR. OLSHIN:  Correct, yes, Your Honor.  And on that

18   document, you'll find -- in this particular case, in the 2001

19   year, the policy Michigan information page is actually pages

20   830 and 831, so it's actually two pages.  But it's set up

21   basically the same way in terms of, in this case, indicating

22   that the only entity that's insured is Allied Signal

23   Environmental Catalyst, and with respect to this policy, the

24   premium is then calculated and you find it in the same place on

25   831, the estimated premium is $14.

1          THE COURT:  Okay.  Now, this one is different than the

2     2011 -- I'm sorry, the 2000 exhibit because it doesn't contain

3     the policy page endorsement; is that right?

4          MR. OLSHIN:  Well, we think it's --

5          THE COURT:  Policy provision page endorsement.

6          MR. OLSHIN:  Well, we think it's slightly different

7     because it doesn't have that, and on this particular

8     information page, unlike the others that come later on in the

9     years, Delphi Automotive Systems appears on the Michigan

10    information page.

11         So what we did for Your Honor was to provide --

12         THE COURT:  Well, I'm sorry.  It appears in item 1.

13         MR. OLSHIN:  It appears in item 1 on the Michigan

14    information page.

15         THE COURT:  But that's the -- it also appears on -- in

16    the 2000 Michigan information page on item 1.

17         MR. OLSHIN:  Correct.  And I guess what I was pointing

18    out is it doesn't appear in the later years --

19         THE COURT:  Okay.

20         MR. OLSHIN:  -- of the Michigan information page.  But

21    we think the policy terms written as a whole work the same way

22    because you're going from the Michigan law endorsement, which

23    is 837, and you're basically referred back --

24         MR. HADDAD:  It's 835.

25         THE COURT:  Sorry?

```
 1              MR. HADDAD:  It's 835, not 837.

 2              THE COURT:  Right.

 3              MR. OLSHIN:  Oh, I'm sorry, Richard, I misspoke.

 4    Thank you.  Where it says in the first line, "this endorsement

 5    applies only to the insurance provided by the policy holder"

 6    because Michigan is shown in item 3A of the information page.

 7              THE COURT:  Well, it doesn't say policy holder, it

 8    says by the policy.

 9              MR. OLSHIN:  By the policy.

10              THE COURT:  So you're saying that the policy only

11    applies to the 3A listed entities in the Michigan information

12    page.

13              MR. OLSHIN:  Right.  And in this case, this policy

14    information page is the same as in 2000 Michigan isn't listed.

15    It refers you back to the page 830, which is the Michigan

16    information page.

17              THE COURT:  All right.  Well, it doesn't specifically.

18    I'm sorry, are we still on the Michigan endorsement?

19              MR. OLSHIN:  I'm sorry?

20              THE COURT:  What refers you back?

21              MR. OLSHIN:  Maybe I --

22              THE COURT:  The Michigan endorsement doesn't refer you

23    back.

24              MR. OLSHIN:  Maybe I missed your question, Your Honor.

25              THE COURT:  Okay.  Well, you said something refers you
```

1    back.

2           MR. OLSHIN:  Yeah, the Michigan law endorsement says

3    "this endorsement applies only to the insurance provided by the

4    policy --"

5           THE COURT:  Oh, in 3A.

6           MR. OLSHIN:  -- because Michigan is shown in item 3A

7    of the information page.

8           THE COURT:  Right.

9           MR. OLSHIN:  And when you go to the information page

10   on this particular policy, Michigan isn't listed.  What it does

11   say, "per information page attached."  So that's how you know

12   you've got to go to page 830, which in fact, is the Michigan

13   information page.

14          MR. HADDAD:  I'm sorry, I missed that, where did it

15   say per the -- in item 3A, where does it say per information

16   page attached?

17          MR. OLSHIN:  If you look at the --

18          THE COURT:  On the first page 000741, it says "per

19   information page attached."

20          MR. HADDAD:  Right.

21          THE COURT:  And then you go to 000830.

22          MR. OLSHIN:  Right.

23          THE COURT:  Which is 3A.

24          MR. OLSHIN:  And you know that's Michigan on 830

25   because the word Michigan appears under item 3.

1            THE COURT:  Okay.  So let's turn then to 2008, which I

2       think is -- I won't say anything.  Let's go to 2008 then.

3            MR. OLSHIN:  That's under tab 15 of the reply

4       exhibits.

5            THE COURT:  Right.

6            MR. OLSHIN:  The first page of which is 2475.  And the

7       policy is essentially set up the same way, although the front

8       page looks a little different from the prior years.

9            THE COURT:  Well, the front page doesn't send you to

10      an information page.

11           MR. OLSHIN:  Well, what it says is, part 1 of the

12      policy -- I'm looking at 3A, applies to the worker's

13      compensation law of the states listed here.

14           THE COURT:  Right.

15           MR. OLSHIN:  And the states are listed.  And then item

16      4 says, "the premium for this policy will be determined by the

17      manual of rules classification rates and rating plans, all

18      information required below is subject to verification and

19      change by audit.  See extension of information page

20      classifications."

21           So you then go to something called the extension of

22      information page classifications --

23           THE COURT:  We can stop, though, for a second?

24           MR. OLSHIN:  Yes, sir.

25           THE COURT:  If we go again to the -- what I find to be

Page 60

1    different here, although, in 2000 and 2001, first page, it says

2    "Part 1 of the policy applies to the worker's compensation law

3    of the states listed here, per information page attached."  So

4    it says part 1, see the information page.  And that's what

5    governs.

6         This one, item 1 says, Delphi Corporation is the

7    insured, and then it says for other named insured, see

8    extension of information page.  So at least the implication to

9    me of that is that they're both named insured, they're both the

10   insured.  And then item 3A just refers you to the fact that

11   part 1 of the policy applies to the worker's compensation law

12   of the states listed here, including Michigan.

13        So it's not as clear to me that the same construct

14   applies, that you then go to the extension of information page

15   and that's what governs.  But even if you do go to the

16   extension of information page, Delphi Corporation, a lot of

17   Michigan entities are on it.  So I --

18        MR. OLSHIN:  I want to make sure Your Honor and I are

19   looking at the same page.

20        THE COURT:  Okay.

21        MR. OLSHIN:  I'm looking at Bates number 2647,

22   extension of information page, classifications, Michigan.

23        MR. HADDAD:  I was looking at 2516.

24        THE COURT:  Well, I mean, there are a lot of other

25   pages that list --

Page 61

1          MR. OLSHIN:  And we'll talk about the other pages, I

2    just want to make sure Your Honor and I are looking at the same

3    page, so that I can answer your question.

4          THE COURT:  Well, okay.  As long as you go back also

5    to --

6          MR. OLSHIN:  I'd be happy to.

7          THE COURT:  -- 2156 and 2519 and --

8          MR. OLSHIN:  Sure.

9          THE COURT:  -- 2520, 2521.  But which is the one you

10   want to focus on?

11         MR. OLSHIN:  Well, I'll focus on those first if Your

12   Honor --

13         THE COURT:  Okay.

14         MR. OLSHIN:  -- prefers I do that.

15         THE COURT:  All right.  So --

16         MR. OLSHIN:  I think what happens under this policy is

17   that this is a multi-state policy it's covering Delphi

18   operations in, if I counted the number of states correctly, at

19   one point, I think the number's like 32.

20         THE COURT:  Right.

21         MR. OLSHIN:  So it's not surprising that, in fact,

22   those other entities would be named because they are picked up

23   in various states depending upon where those entities operated.

24         THE COURT:  But these are Michigan entities.

25         MR. OLSHIN:  Some of them are, some of them aren't.

1            THE COURT:  So are you saying this only covers their

2    liabilities if someone who works at the Michigan, let's just

3    you know pick one, Glen Hill workplace gets injured in

4    California?

5            MR. OLSHIN:  No, that's not what I'm saying.

6            THE COURT:  Okay.  So --

7            MR. OLSHIN:  I thought you were referring to the list

8    in general, and what I said was, some of them are Michigan and

9    some of them are not.

10           THE COURT:  Right.

11           MR. OLSHIN:  And to determine which workplaces are

12   covered under this endorsement, you look first to the general

13   section, which indicates that self-insured entities aren't

14   covered, and you look at the designated workplace exclusion

15   endorsement, which is ACE policy 2794, it's the last page --

16           THE COURT:  Well, we'll get to the exclusion

17   endorsement --

18           MR. OLSHIN:  All right.

19           THE COURT:  -- but I want to unpack what you just said

20   a little bit.

21           How -- from page 1 --

22           MR. OLSHIN:  Yes.

23           THE COURT:  -- how do you -- what supports the

24   statement that self-insured entities aren't covered?

25           MR. OLSHIN:  I think the general locations section of

Page 63

 1    the general section of the policy.

 2            THE COURT:  Well, let's just take --

 3            MR. OLSHIN:  And the designated workplace exclusion

 4    endorsement together.

 5            THE COURT:  Okay.  But leaving aside the exclusion

 6    endorsement on 2475, what on this page shows that self-insured

 7    entities are not covered?

 8            MR. OLSHIN:  On this particular page, 2475 in and of

 9    itself?

10            THE COURT:  Right.

11            MR. OLSHIN:  There's nothing other than the fact that

12    the policy says on the first page, "see schedules and forms and

13    endorsements" which is about three-quarters of the way --

14            THE COURT:  Okay.

15            MR. OLSHIN:  -- and item 4 of the policy.

16            THE COURT:  All right.  So when you -- so again when

17    you go to the general section, it has the same language that I

18    quoted earlier: "You, the employer named in item 1 in the

19    information page."

20            MR. OLSHIN:  Right.

21            THE COURT:  But here, is there a -- I mean, there are

22    a lot of information pages.

23            MR. OLSHIN:  No doubt, I agree.

24            THE COURT:  And many of them list -- well, one of them

25    lists Delphi Corporation, one of them lists Delphi Automotive

DPH HOLDINGS CORP, ET AL

Page 64

1   Systems, Services, and then some other Delphi entities.

2           MR. OLSHIN:  Right.

3           THE COURT:  And then there's specific locations listed

4   in Michigan.

5           MR. OLSHIN:  Yes, sir.

6           THE COURT:  So unlike 2000 and 2001, is there a

7   specific Michigan information page?

8           MR. OLSHIN:  Yes, sir.

9           THE COURT:  And you'd say that's 2647?

10          MR. OLSHIN:  Give me one second to find it here.

11          It is 2647, that is correct.

12          THE COURT:  Okay.  But why would these -- why would

13  you have these other pages covering Michigan entities and

14  locations, and then separately have a Michigan information

15  page?

16          MR. OLSHIN:  Well, you would have a separate Michigan

17  information page to reflect which entities are actually being

18  rated under this policy.

19          THE COURT:  But --

20          MR. OLSHIN:  You would have the list.  Is there a

21  better way to prepare the list?  Maybe there could've been, but

22  in this case, the list was the entities which ACE/Pacific had

23  listed as potential Delphi entities, but you have to look at

24  the general section of the policy and the designated workplace

25  exclusion endorsement because to the extent --

Page 65

1          THE COURT:  I know I'm putting you off on the

2   exclusion endorsement --

3          MR. OLSHIN:  Right.

4          THE COURT:  -- but so just turning back again to 02519

5   through 02521, they list a lot of Michigan locations.  So what

6   is the purpose of this list, which is also an extension of

7   information page?

8          MR. OLSHIN:  I think read in context of this policy,

9   it's reflecting if something turns out not to be self-insured

10  because it's covered.  If it's self-insured, it's not covered.

11         THE COURT:  And you get there through the exclusion?

12         MR. OLSHIN:  I get there through the exclusion and the

13  general section of the policy.  Because the exclusion says,

14  "locations covered by the following policies are not covered

15  under this deductible policy," and in the State of Michigan, as

16  part of its self-insured approval process, Delphi provided a

17  list to the Agency and Funds, which specified exactly those

18  Delphi operations for which it required or requested self-

19  insurer authority to be approved.  And those were the entities

20  that were approved and locations.

21         THE COURT:  And this is 0002498?

22         MR. OLSHIN:  00 -- you mean, the designated workplace

23  exclusion endorsement, Your Honor?

24         THE COURT:  Yes.

25         MR. OLSHIN:  002794.

1            THE COURT:  Well, wait a minute.

2            MR. OLSHIN:  The first page of which is 002793 which

3    basically says --

4            THE COURT:  I'm sorry, let me get to that.  I don't

5    think I have that in my exhibit book.

6            MR. OLSHIN:  You don't?

7            THE COURT:  Oh, I'm sorry, I have it.

8            MR. OLSHIN:  It should be the very last page at tab

9    15.

10           THE COURT:  94, okay.  Oh, there's two of them here I

11   guess.  There's another one: 002498, designated workplaces

12   excluding endorsement.  Do you see that one, too?

13           UNIDENTIFIED:  (Indiscernible)

14           MR. OLSHIN:  I'm sorry, what?

15           UNIDENTIFIED:  The page right before (indiscernible).

16           THE COURT:  Do you see that?  It's right after the

17   general terms.

18           MR. OLSHIN:  You're correct, Your Honor, it was

19   actually in two places.  I was looking in the other place.

20           THE COURT:  Is it the same thing?

21           MR. OLSHIN:  I think it is.

22           THE COURT:  Yeah, it looks like it is.  So --

23           MR. OLSHIN:  Yeah, it is, Your Honor.

24           THE COURT:  -- you're representing to me that these --

25           MR. OLSHIN:  2498 and 2794 appear to be the same.

1          THE COURT:  So when you -- so this says, "The policy

2     does not cover work conducted at or from," and then it lists

3     three policies.  Right?  Is that what WCU, WCU and SCF means?

4          MR. OLSHIN:  Right, there's four, right.

5          THE COURT:  Four, excuse me.

6          MR. OLSHIN:  And one of them is the retention policy

7     that was issued for 2008 and 2009.

8          THE COURT:  And that's the SCF-1 I guess.

9          MR. OLSHIN:  I can tell you in two seconds.

10          It's the 135, Your Honor, the last three digits, the

11     third one down.

12          THE COURT:  So --

13          MR. OLSHIN:  Some of these others apply to other

14     states.

15          THE COURT:  So what is the import of listing these

16     four policies?

17          MR. OLSHIN:  It's telling the policy holder and the

18     reader that if you have self-insured locations, which is what

19     is covered under a self-insured retention policy, that those

20     locations are not covered under the deductible policy.

21          THE COURT:  But how do you get that from just the

22     listing of these four policies?

23          MR. OLSHIN:  Because you know from those policies that

24     Delphi Corporation self-insured locations in Michigan are in

25     fact covered, and that's in the cover page of the self-insured

Page 68

1    retention policy.

2           THE COURT:  I'm sorry, so let's just go -- which is

3    the one from Michigan of these four?

4           MR. OLSHIN:  The third one down, 0135.

5           THE COURT:  Okay.  So 0135 says what?

6           MR. OLSHIN:  It's the self-insured retention policy

7    for that policy year, which covers Delphi's self-insured

8    operations for that policy.  It's under -- it looks like it's

9    tab 16, Bates number ACE policy 224.  It's entitled "specific

10   excess worker's compensation --"

11          THE COURT:  So this covers, this covers -- tab 16,

12   that policy covers all of the self-insured locations, it's an

13   excess policy.

14          MR. OLSHIN:  Yes, sir.  And you know that under item 3

15   on page 224, states in which coverages apply, and one of the

16   states indicated is Michigan.

17          THE COURT:  Okay.  So --

18          MR. OLSHIN:  And an example of what I was talking

19   about earlier, Your Honor, with respect to the self-insured

20   application is the one that's under tab 18 --

21          THE COURT:  Right.

22          MR. OLSHIN:  -- which reflects at Bates number

23   MIWCAFOIA003774, the list of Michigan operations.

24          THE COURT:  So what you're saying is, notwithstanding

25   the references on page 1 of the policy, 002475, to the -- those

DPH HOLDINGS CORP, ET AL

1   named on the extension of information schedules, the reference

2   to this policy includes these forms -- or these endorsements

3   and schedules - "see schedules and forms of endorsements" --

4   that that includes the exclusion?

5          MR. OLSHIN:  Correct.

6          THE COURT:  Which modifies the general section?

7          MR. OLSHIN:  Well, works in combination with I guess

8   is what I would say.

9          THE COURT:  And so the policy doesn't really cover --

10          MR. OLSHIN:  Right.

11          THE COURT:  -- these locations.

12          MR. OLSHIN:  And the similar construct of this 2008

13   policy works for --

14          THE COURT:  2003, 2005 and 2006.

15          MR. OLSHIN:  Yes, sir.

16          THE COURT:  Okay.  So should we turn to 2007?

17          MR. OLSHIN:  Well --

18          THE COURT:  I'm not sure there's any difference with

19   2007 either.

20          MR. OLSHIN:  2007 works the same way.

21          THE COURT:  Okay.  And 2004?

22          MR. OLSHIN:  The difference in 2004 is those Michigan

23   extension of information pages that we've spent a lot of time

24   talking about.

25          THE COURT:  Right.

Page 70

1          MR. OLSHIN:  As well as any other information page in

2     that particular policy.  For some reason, a computer decided to

3     insert in every single information page, instead of the actual

4     name of the entity, it used the word "insured", i-n-s-u-r-e-d.

5     So if you would look at, and I've provided an example of one

6     which was Alabama, and I'm looking under tab 37, Your Honor.

7          THE COURT:  Right.

8          MR. OLSHIN:  It's ACE policy 1191.

9          THE COURT:  And what page?

10         MR. OLSHIN:  I'm sorry?

11         THE COURT:  And what page?

12         MR. OLSHIN:  It's ACE policy 001191, it's the --

13         THE COURT:  No, I know, but you were going to go to a

14    specific page in the --

15         MR. OLSHIN:  Oh, I apologize.  I'm sorry.

16         THE COURT:  That's okay.

17         MR. OLSHIN:  I've yet -- instead of giving you the

18    whole policy, I just wanted to make the point that they also

19    have the same.  So if you look for instance at ACE policy

20    001242, that is the worker's compensation and employer's

21    liability insurance policy information page for Alabama,

22    instead of indicating the entity, it just says insured, and

23    correspondingly if you look over at 1302, again for whatever

24    reason, the computer just stuck in the word insured for however

25    many states this policy is covering.  I think it's still

1    covering close to 30 some odd states.  That's what all the

2    information pages provide for.

3            THE COURT:  But again, I think given that there are

4    information pages that list Michigan addresses, you're really

5    relying on the exclusion again, aren't you?

6            MR. OLSHIN:  Well, I'm relying on the exclusion, and I

7    provided Your Honor under tab 38, Aon Delphi's submission,

8    which shows you, and that's the whole submission is Bates

9    number 1761 through 1768, this is the worker's compensation

10   submission.  And if you look at within tab 38, Reply Exhibit

11   38, 1766, you'll find that Delphi and Aon went to a lot of

12   trouble splitting out its insured obligations from it's self-

13   insured obligations.

14           THE COURT:  But in the policy itself, is there an

15   exclusion?

16           MR. OLSHIN:  In the -- yes, there is an exclusion.

17           THE COURT:  And where is that?  I'm trying to find it

18   here.

19           MR. OLSHIN:  I've got to find it for you.

20           THE COURT:  I thought I went through all these, but I

21   haven't gone through this one.  Oh, I see, it's 001212.

22           MR. OLSHIN:  1212, that's correct.

23           THE COURT:  Okay.

24           MR. OLSHIN:  It says, "The designated workplace

25   exclusion endorsement, this policy does not cover work

1    conducted at or from," and then it says, "this policy does not

2    cover work conducted at or from any workplace covered by the

3    following policies," and it gives two policy numbers.  And the

4    retention policy for 2004, 2005 is the -- is included in the

5    reply exhibits.

6         THE COURT:  Okay.  All right.

7         MR. OLSHIN:  So we provided the Aon Delphi submission

8    to show Your Honor that when you look at the words "insured,"

9    you can look at under Reply Exhibit 38, ACE 1766, which is part

10   of that submission, and if you go to Michigan you'll see that

11   there are two entities, ASEC, spelled A-S-E-C and Mechatronics,

12   M-e-c-h-a-t-r-o-n-i-c-s, and it provides for the Michigan

13   operations for ASEC, 877,742, and for Mechatronics, 1,294,164,

14   and if you look at the Michigan extension of information page,

15   and the rating you basically can track those numbers.

16        So we think the words "insured" are meant fairly to

17   represent those two entities.

18        THE COURT:  Okay.  All right.  So what is the Michigan

19   -- does anyone want to take a break?  I was going to ask the

20   Michigan defendants whether they -- you know, would want to

21   respond to this, but I'm happy to take a five minute break or

22   so.

23        MR. HADDAD:  Whatever Your Honor's pleasure is,

24   because I'm going to have a significant amount to say with

25   respect to each of these points.

Page 73

1          THE COURT:  All right.  Why don't we come back --

2          MR. HADDAD:  But I'm happy to proceed.

3          THE COURT:  -- around noon.

4  (Recessed at 11:55 a.m.; reconvened at 12:06 p.m.)

5          THE CLERK:  All rise.

6          THE COURT:  Be seated.

7          Okay.  We're back on the record in ACE America

8  Insurance Company and Pacific Employers Insurance Company

9  versus Delphi et al.

10         MR. HADDAD:  Thank you, Your Honor.  I have spoken a

11 little bit to the legal statutory issues, and I indicated at

12 that time that there's a combination of the statute and the

13 contract here which is being presented to Your Honor for

14 decision.  And what have here, Your Honor, is a unique scenario

15 of the insurance company trying to get out of paying by arguing

16 that the plain meaning of the words of its own policy should

17 not be interpreted as written.

18         Now, usually my experience has been with insurance

19 companies over the years is they try and catch with you with

20 some kind of hidden cottage deal, or ah, you don't win because

21 of the such and such endorsement.  And they're trying that

22 here.  They're saying you don't win because of one of these

23 exclusions that we just pointed to.

24         But here, and here is where they lose, as a matter of

25 law, as a matter of fact, as a matter of contractual

DPH HOLDINGS CORP, ET AL

Page 74

1    interpretation, the reason why they lose and why the Michigan

2    defendants are entitled to summary judgment is because each

3    policy contains the Michigan law endorsement.

4         And that Michigan law endorsement is admittedly

5    unambiguous, is attached to each policy.  The only links into

6    is Section 3A, which is the name of the state to which it

7    applies.  So all the references to Section 4, to item 4, to

8    premium calculations, to anything else, they don't apply.

9         And what the Michigan law endorsement says, it's got

10   an override clause, and it's got a nullified clause.  And the

11   override clause says, "notwithstanding any language elsewhere

12   contained in this contract or policy of insurance, the accident

13   fund or insurer issuing this policy hereby contracts and

14   agrees," and then they list the claims -- the coverage, and

15   they say we're providing compensation, and are providing

16   medical services, and we're providing rehabilitation services,

17   and we're providing funeral services.  And we're looking at the

18   conflict provision at the end, the nullified clause, clause H,

19   and it's attached in every single one of these policies.

20        It says, "Any provision of this contract which is not

21   in harmony with this paragraph, is to be construed as modified

22   hereby, and all conditions and limitations in this policy," all

23   conditions and limitations in this policy, "if any, conflicting

24   herewith, are hereby made null and void."  That's a requirement

25   of law and it's in every one of their contracts.

1          THE COURT:  What abut the introductory clause to the

2     whole thing?

3          MR. HADDAD:  Yep.

4          THE COURT:  Which says, "This endorsement applies only

5     to the insurance provided by the policy."

6          MR. HADDAD:  Right.  Because Michigan is shown in item

7     3A, the reason why it is, is because Michigan is shown in 3A,

8     and that's what links it to Michigan, otherwise, the Michigan

9     law endorsement would not apply, you'd have the Alabama

10    endorsement, or the Washington endorsement, or some other

11    endorsement.

12          What we're saying here is, since you have Michigan in

13    item 3A, then this endorsement applies.  The named insured is

14    Delphi.  You are the insured employer, and then it says

15    "notwithstanding any language elsewhere contained in this

16    contract."  And that's a very important clause.  The

17    "notwithstanding any language elsewhere contained in this

18    policy," because that language is routinely enforced, and in

19    our reply brief, in our moving brief, we've cited cases

20    including from the Michigan Supreme Court which say, when

21    there's a "notwithstanding" paragraph in your contract, it's

22    unambiguous.  Because even if you have something completely to

23    the contrary somewhere else in that policy, it is not to be

24    enforced as a matter of law.  And you must, you must enforce

25    the contract as written in the Michigan law endorsement.

DPH HOLDINGS CORP, ET AL

Page 76

1           Now, at Mr. Schrock's (ph) deposition and one of the

2     other side submitted the entirety of Mr. Schrock's deposition,

3     he gave a deposition a couple of weeks ago, they asked him "Do

4     you have a copy of the policy" because he was saying we were

5     having all these multiple assureds, he said, no, I don't have

6     the policy.  They said, well then how do you know what's in the

7     policy.  He says, well, and it's at Mr. Schrock's transcript at

8     page 35 and 36, he said, well, the terms of the policy are

9     governed by statute and these terms contained in this Michigan

10    law endorsement are verbatim out of 621 of the statute,

11    verbatim.  And it provides a minimum level of coverage that is

12    set forth by any insurer that writes a policy in Michigan.

13          When ACE decided, when ACE decided that they were

14    going to do business in Michigan, they -- when they signed up

15    to say, I'm going to be a worker's compensation insurer in

16    Michigan, they agreed to include this clause in every one of

17    their contracts.  In fact, they were compelled to.  They were

18    compelled to by statute, and beyond that, they in fact did.

19    They in fact did include this clause, this Michigan law

20    endorsement in each and every one of their contracts.

21          And I was deposing Mr. Groves (ph) of ACE.  He hadn't

22    supplied an affidavit on the motion; I had actually wanted to

23    depose the person who supplied the affidavit, they said that

24    person's not available, we'll get you Mr. Groves.  I said,

25    okay, we'll depose Mr. Groves, he's a senior guy at ACE, he

Page 77

1   knows a lot.  And he explained a number of things that are

2   very, very critical.  And we've cited to them in our moving

3   papers, attach it to my affidavit, and summarized it in our

4   moving memo of law.

5          He said, well, when we decided to go into Michigan, we

6   said we intend to comply with Michigan law, page 45, 44, 45.

7   He said, we included the required Michigan endorsement in every

8   policy.  And I walked him through a policy.  And when I walked

9   Mr. Groves through it at his deposition was the 2008 policy,

10  and I asked him was the -- how was this policy prepared.  And

11  he said, well, we have an underwriter and an assistant

12  underwriter, and they prepare instructions, and they give it to

13  ACE's central operations unit in Wilmington, Delaware and is

14  prepared by somebody there, and then they have a supervisor,

15  and a quality control process to ensure that the policies are

16  prepared in accordance with its intention, pages 30, 31 through

17  38 of Mr. Groves' deposition.

18         And he said then the policy is reviewed to coincide

19  with the issuance instructions from the underwriter, then it's

20  reviewed by the underwriter to make sure it's accurate.  And

21  then it's signed by yet another person who signs the policy,

22  and then they go ahead and file a Form 400 with the State of

23  Michigan.

24         Now, Your Honor's not asked to decide what is the

25  legal effect of the filing of the Form 400 with the State of

Page 78

1    Michigan.  But what is indisputably a fact is that Michigan --

2    is that ACE, in fact, filed Form 400 with the State of Michigan

3    saying, we've issued policies to Delphi Corporation or its

4    predecessor Delphi Automotive Systems Company.  And that's in

5    the record on this motion.

6            So, in fact, all these people prepared this policy and

7    included this.  And Mr. Groves testified, well, our intention

8    was to comply with Michigan law.  And I asked him, well, who's

9    the named insured.  He said, well, it's Delphi, page 50 of Mr.

10   Groves' testimony.  And it has Delphi's federal employer

11   insurance number.  And the schedule of the named insureds

12   includes Delphi.

13           And, in fact, if they wanted to delete somebody and if

14   you're looking at the 2008 policy, it's attached -- the

15   excerpts are attached as Exhibit A to Mr. Elsenheimer's

16   declaration.  Page 2156, name insured Delphi.

17           THE COURT:  But it is a named insured.

18           MR. HADDAD:  What's that?

19           THE COURT:  It is a named insured.

20           MR. HADDAD:  It is a named insured, exactly right.

21           THE COURT:  But --

22           MR. HADDAD:  They're trying to get out of that and

23   that's what Your Honor --

24           THE COURT:  Well, it's a named insured for, they say,

25   everything that's not excluded.

Page 79

1           MR. HADDAD:  No, but that's not what the policy says.

2    The policy doesn't say that precisely because, precisely

3    because the Michigan law endorsement says you only reference 3A

4    to find out the State of Michigan is implicated.  And after

5    that, it says, you are the insured employer, Delphi

6    Corporation, and, notwithstanding any language anywhere else in

7    this contract, we are making the following insurance.  And if

8    there's anything, all provisions of this contract, it's

9    paragraph H.  Paragraph H of the Michigan law endorsement to

10   nullify clause that says all provisions of this contract which

11   are not in harmony with this paragraph, all provisions of the

12   contract which are not in harmony with the Michigan law

13   endorsement, are to be construed to be modified hereby.  And --

14          THE COURT:  Well, I guess my question is, why isn't

15   the Michigan law endorsement in harmony with the insurer's

16   position here?

17          MR. HADDAD:  Because they are saying that you look to

18   premium calculation or claims or --

19          THE COURT:  No, no, leave that aside.

20          MR. HADDAD:  -- ratings or exclusions.

21          THE COURT:  Leave that aside.  They are saying that

22   the only insurance provided here is to the specific employer

23   either, under the 2000 and 2001 policies, listed on the

24   information sheet, or the non-excluded employer.

25          MR. HADDAD:  Because the policy says named insured

1   Delphi Corporation, you are the insured employer.  And when I

2   asked Mr. Groves, I said, is this ambiguous, he said no.  I

3   said --

4            THE COURT:  He didn't say what it means though.  He

5   just said it's not ambiguous.

6            MR. HADDAD:  No, actually he did say what it means,

7   because I go to that.  First -- and then Mr. Olshin interrupted

8   and said, well, the document speaks for itself, well, I do

9   agree, I do agree, the document speaks for itself, that's why

10  you must not consider those other provisions upon which he

11  relies.

12           But I think asked --

13           THE COURT:  No, you're right it does.  He says at line

14  16 that the insured employer is Delphi Corporation.

15           MR. HADDAD:  And on page 70 of my deposition of Mr.

16  Groves, I asked him, does this policy cover worker's

17  compensation liability for Delphi Corporation.  He said yes.

18           And I said, well, it's time for lunch because I think

19  I'm done.  He said yes, and then we gave him that transcript to

20  sign, and he reviewed that transcript, and he signed it, and he

21  didn't change that, after they knew what our position was on

22  this motion, mind you, which I think is very significant.  And

23  now in reply, after having not only so testified, after not

24  only having reviewed, signed, and returned his transcript

25  making other corrections, but not correcting this, he says,

1    well, I want to change something on page 66.

2         Well, let's suppose he's allowed to change something

3    on page 66 -- and I don't believe he is, because as a matter of

4    law, once you've signed your transcript, that's it, you're

5    bound to that testimony.  He's the officer of ACE Insurance

6    Company.  But he didn't say I want to change paragraphs -- I

7    don't want to change page 70.  He didn't run from his testimony

8    at page 70, that the policy covers worker's compensation

9    liability for Delphi Corporation, and the reason for that is it

10   plain does.  It plainly does on the face of the document.  And

11   when you're asked to interpret a contract, when parties present

12   to the Court the contract for interpretation, you look to

13   several things.

14        Now, here you look to the law, as well as the contract

15   itself.  And let me tell you why you look to the law first.

16   Worker's compensation and Mr. Elsenheimer's affidavit talks

17   about this, our moving papers talk about this, worker's

18   compensation is a unique kind of insurance.  It's not like D&O

19   insurance, it's not like lawyer's malpractice insurance, it is

20   insurance the terms of which are dictated by statute.  It is

21   designed to achieve a public policy purpose, it is required for

22   all employers having three or more employees in the State of

23   Michigan, and it is a very critical public policy objective of

24   the State, when they introduced and entered this legislation,

25   that the law of the State of Michigan was very important, it's

Page 82

1    designed to protect the employee and designed to protect the

2    employer, to say these are the benefits to which you are

3    employed and injured.

4          And in interpreting a contract for worker's

5    compensation insurance, and we cited to the Moss case versus --

6    New Amsterdam versus Moss, we cited that case, and they say, in

7    view of the unique nature of worker's compensation insurance,

8    we don't look to issues of meetings of the mind, or intent.  We

9    apply the insurance as required by law, as required by law.

10         And, in fact, they said we don't even care about the

11   premiums.  There was a debate in that case in the Moss versus

12   the New Amsterdam case, there was a debate about well, who paid

13   the premiums and what premiums were being paid.  The Court said

14   the premiums don't matter, it's a matter between them, between

15   ACE and Delphi.  It's not a matter with respect to the state or

16   the injured employees, that is not an issue of concern to us.

17         That was a number of years ago.  But more recently,

18   this year, the Michigan Supreme Court again spoke to a type of

19   insurance, in the Titan case, and we referenced it in our reply

20   brief.

21         In the Titan case, there was a car insurance, so it's

22   not worker's compensation, but the State of Michigan had

23   mandated 20/40 minimum coverage, and the person committed some

24   kind of misrepresentation of fraud in getting 100/300 policy.

25   The Court said, well, with respect to that which policy is

1    mandated by the terms of the statute, which affected that

2    policy, in other words, any car insurance policy that an

3    insurance company issues in the State of Michigan, it's got to

4    be 20/40, so you can't get out of that.  But as to this other

5    stuff, you can go have it on terms of fraud or equitable

6    remedies.

7            Here, each policy, that's why I said the contract is

8    linked into the law, here our statute says that each policy for

9    worker's compensation has to provide these very terms.  And, in

10   fact, this policy does, these policies do, each and every one

11   of these policies do.  Each and every one of these policies

12   says Delphi Corporation or its predecessor Delphi Automotive in

13   the Michigan law endorsement.

14           There's no qualification, there's no limitation.  In

15   fact, it's got the antithesis of qualification or limitation.

16   And he said -- Mr. Olshin was arguing and pointing to premiums

17   and classifications and none of that matters.  Because you have

18   an unambiguous term here, an unambiguous Michigan law

19   endorsement which prohibits us from looking outside this

20   endorsement in interpreting it.  Prohibits it.

21           They then say and I heard Mr. Olshin argue again this

22   morning, well, look at this, the broker did some kind of

23   calculation.

24           THE COURT:  No, leave that aside.  I just -- again, I

25   want to come back to what the Michigan law endorsement says.

Page 84

1    First, it says, "This endorsement applies only to the insurance

2    provided by the policy, because Michigan is shown in item 3A of

3    the information page."

4            MR. HADDAD:  Right.

5            THE COURT:  Now, you contend I guess that "only"

6    modifies "because."

7            MR. HADDAD:  Yeah, because you have a --

8            THE COURT:  As opposed to the word right in front of

9    it which is "the insurance."

10           MR. HADDAD:  Well, it provides -- applies only to the

11   insurance provided by the policy because Michigan -- so you

12   have this giant policy, Your Honor, it has -- I don't think you

13   have the policy --

14           THE COURT:  Yeah.  People have misused this often, but

15   usually "only" modifies what it's in front of as opposed to

16   something down the line.  But leave that aside --

17           MR. HADDAD:  Putting that aside, it can still --

18           THE COURT:  -- I can see it be read both ways on that

19   point.

20           MR. HADDAD:  I still come back to, I still come right

21   back to, you are the insured employer.

22           THE COURT:  Right.

23           MR. HADDAD:  You are the insured employer, Delphi

24   Corporation.  And now we cannot look beyond the scope --

25           THE COURT:  But the question is --

Page 85

1          MR. HADDAD:  -- of this.

2          THE COURT:  -- who is "you."

3          MR. HADDAD:  You, you right there, you are the insured

4    employer.  Look at the top, named insured, Delphi Corporation.

5    Mr. Groves testified Delphi Corporation.

6          THE COURT:  But the policy doesn't say that.  The

7    policy doesn't say that Delphi Corporation is the insured

8    employer.

9          MR. HADDAD:  Right.  The policy certainly lists -- I

10   don't know how you can get around named insured --

11         THE COURT:  It says it is an insured employer for

12   certain specific locations.

13         MR. HADDAD:  Well, I don't know why they listed every

14   one of the Delphi --

15         THE COURT:  Well, if you take your exclusion, if you

16   accept the exclusion.

17         MR. HADDAD:  I mean that's kind of silly to say let's

18   take inclusions and exclusions.

19         THE COURT:  All right.  But --

20         MR. HADDAD:  Given the unambiguous language of this

21   document --

22         THE COURT:  Well --

23         MR. HADDAD:  -- which is how they've acknowledged it

24   to be.  I mean, that's the testimony, and I think that's what

25   it is on its face.

1          THE COURT:  The language says that, and the statutory

2     language is what's under the headings --

3          MR. HADDAD:  Notwithstanding.

4          THE COURT:  -- that "it will pay to the persons that

5     may become entitled thereto all workman's compensation for

6     which the insured employer may become liable under the

7     provisions of --"

8          MR. HADDAD:  It's a little more than that actually.

9          THE COURT:  "Under the Michigan's Workman's

10    Compensation Act for all compensable injuries or compensable

11    occupation diseases happening to its employees during the life

12    of this contract policy."  And then it has several other

13    paragraphs also referring to the "insured employer."

14          So I think the issue for me is, does this endorsement

15    cause -- I'm not asking you to accept that ACE's interpretation

16    is correct, that the insured employer for purposes of these

17    policies is limited by either the exclusionary provision or the

18    -- for 2000, 2001, the information page.  But let's assume for

19    the moment that the insured employer under the policies is

20    limited by those terms.

21          You're arguing to me that this provision, this

22    endorsement, in essence then, modifies the policy?

23          MR. HADDAD:  I'm saying it is the policy.

24          THE COURT:  It is the policy?  Okay.

25          MR. HADDAD:  By their interpretation --

Page 87

1          THE COURT:  And you're saying the reason for that is

2     that it's required by Michigan law.

3          MR. HADDAD:  It is required by Michigan law, and it

4     says, "you."  So the question doesn't say some other entity

5     that may be covered within the scope of some other policy, it

6     says "you."  There's no ambiguity in the word "you."

7          THE COURT:  Well --

8          MR. HADDAD:  You is the only name that --

9          THE COURT:  -- I think there is.  I clearly think that

10    you could easily say, in fact, and this is consistent with the

11    policy that this applies to "you," "whoever you are, as the

12    insured employer."  Because that's what the policy provides

13    for.  "You are the insured employer."

14         MR. HADDAD:  The only name appearing on this document

15    is Delphi Corporation and the only witness that they --

16         THE COURT:  But we are the -- you -- no --

17         MR. HADDAD:  -- set forward to testify about this said

18    it was Delphi Corporation.

19         THE COURT:  But we are the insurer issuing this

20    policy.  The policy only applies, again, accepting the

21    hypothetical, the policy only applies to, as far as the

22    Michigan locations are concerned, the ones enumerated.  So

23    that's -- we -- it only applies to us, and we are the only

24    insurer under that policy, not for the whole policy.

25         MR. HADDAD:  Your hypothetical with respect is not the

Page 88

1    fact.

2              THE COURT:  Let me give you an example.  Let's just

3    say that, for example, this policy said that Delphi Corporation

4    is the insured and very clearly covered only one location in

5    Michigan, you know, the clerical office space in Lansing.  And

6    then went on to say it applies to Alabama and Arkansas and

7    Alaska and every other state in the union.

8              Would all of Delphi's locations really be -- would

9    they really be the insured in issuing this policy?

10             MR. HADDAD:  Yes.  Because if you look at --

11             THE COURT:  So the Michigan statute is -- where ACE

12   insures workers in Alabama, the Michigan statute's purpose is

13   to incorporate it into Michigan for all workers?

14             MR. HADDAD:  I thought you said Lansing.  I'm sorry.

15   And other -- then I misunderstood Your Honor.

16             THE COURT:  No, there's one location --

17             MR. HADDAD:  I thought you said that it was clericals

18   -- I misunderstood the context.

19             THE COURT:  It's having a blanket policy --

20             MR. HADDAD:  Yep.

21             THE COURT:  -- and except for one location in Lansing,

22   Michigan, which is specifically named, and it excludes all

23   other locations in Michigan, but it issues a blanket policy

24   which includes the other 49 states in the country, you're

25   saying that because it issued worker's comp insurance for

1    Alaska, even though the policy doesn't cover anything in

2    Michigan other than Lansing, that the fact that it issued that

3    insurance means that it is, in fact, the insurer under this

4    policy, and therefore, it has to provide worker's comp for

5    every location?

6              MR. HADDAD:  In the State of Michigan?

7              THE COURT:  Yes.

8              MR. HADDAD:  Not Alaska, and I'll tell you why, I'll

9    tell you that it's because of E, scope of contract.  This

10   insurance contract shall for all purposes be held and deemed to

11   cover all the businesses of said -- that the said employer is

12   engaged in at the time of the issuance of this contract, and

13   all other policies that it may engage in during the lifetime.

14             THE COURT:  All right.  So let me -- I agree with --

15             MR. HADDAD:  So it's actually yes.

16             THE COURT:  So I agree with you on that point.  But

17   let's vary it now.

18             MR. HADDAD:  Okay.

19             THE COURT:  Let's say that it issues a policy that

20   covers Delphi everywhere in the country except Michigan, and it

21   covers Packard Hughes in Michigan.  So has it issued insurance

22   for Delphi in Michigan?

23             MR. HADDAD:  I would say the answer is -- given that

24   hypothetical -- what does it say is who the named insured is on

25   the Michigan law endorsement?  Because if it says Delphi, then

1    I think the answer is yes.

2              THE COURT:  Well, you're saying that the endorsement

3    covers and not the policy?

4              MR. HADDAD:  I'm saying that the endorsement covered

5    -- that the endorsement is essentially the policy --

6              THE COURT:  Even though there's a perfectly good

7    explanation of why it was "the insured," which is that it was

8    the insured in Alabama and Arkansas and Alaska?

9              MR. HADDAD:  Well then they wouldn't have listed all

10   of those separate addresses, and they wouldn't have provided

11   this document and said, the named insured is Delphi

12   Corporation.  They didn't say Packard Hughes.

13             THE COURT:  But it's --

14             MR. HADDAD:  It's not what they said, Your Honor, and

15   they filed a Form 400 with the State of Michigan saying we

16   insure Delphi Corporation, to announce to the whole word that

17   that's who's insured.  And you can't --

18             THE COURT:  But that's -- but you can make that

19   argument elsewhere.

20             MR. HADDAD:  Well, as a matter of evidence, I think

21   it's an evidence of fact.

22             THE COURT:  As a matter of evidence --

23             MR. HADDAD:  I'm not asking you, for you to interpret

24   that because as a matter of law it's a fact.

25             THE COURT:  But I'm just trying -- I'm trying to

1    interpret the endorsement, and it's an endorsement to a

2    specific policy, if the policy doesn't cover the employer, I

3    don't see how it can be an endorsement to the policy.

4            MR. HADDAD:  Because the policy as they are now trying

5    to argue is that there is a clause or an exclusion or something

6    else that is inconsistent with the endorsement.

7            THE COURT:  But why is it inconsistent if the

8    endorsement covers a specific policy?  You're -- it seems to me

9    you're putting all the weight on "the named insured," right?

10           MR. HADDAD:  I'm putting all the weight on the named

11   insured and who's the insured employer, which it says "you,"

12   and you can only mean Delphi, because that's the only people --

13   that's the only company that's discussed and it doesn't --

14           THE COURT:  But it's attached --

15           MR. HADDAD:  And it doesn't tie --

16           THE COURT:  But it's attached --

17           MR. HADDAD:  It's attached to a very large policy.

18           THE COURT:  Which refers to other entities.

19           MR. HADDAD:  It does, it refers to it, but the reason

20   -- the only thing that we're talking about here is --

21           THE COURT:  So are the other entities not covered by

22   this?  Wouldn't the other entities have to be listed here too

23   under your logic?

24           MR. HADDAD:  I don't know.

25           THE COURT:  Well, they would, obviously, because "you"

Page 92

1    doesn't refer to them under your logic.

2              MR. HADDAD:  I mean --

3              THE COURT:  The only logical place it refers to is the

4    entities covered by the policy.

5              MR. HADDAD:  Okay.  But the entities covered by the

6    policy is modified and clarified unambiguously we submit by

7    this endorsement, because it says anything -- any provision of

8    this contract, and any conditional limitation that conflicts

9    here is made null and void.  So the limitation that they're

10   asking for --

11             THE COURT:  Well, that assumes there's a conflict,

12   though.  Why would there be a conflict?

13             MR. HADDAD:  Because --

14             THE COURT:  If "you" refers to the policy -- the

15   person covered by the policy, the employer covered by the

16   policy, there's no conflict at all.  Because Hughes -- Packard

17   Hughes, this policy does, in fact, cover all of Packard Hughes'

18   employees, as is the purpose of the statute.  So you're not

19   splitting it up.

20             MR. HADDAD:  This document --

21             THE COURT:  And this isn't, you know, in contrast to

22   the case you cited, this isn't a case where either there's no

23   insurance (because they're self-insured) or, alternatively,

24   someone splitting up the insurance, because that's not

25   happening, either.  So the purpose of the endorsement is under

1    the ACE interpretation, is completely consistent with their

2    analysis.

3            MR. HADDAD:  The purpose -- the ACE interpretation I

4    submit, Your Honor, is completely inconsistent not only with

5    the document and with their own witnesses and testimony --

6            THE COURT:  Well, what is the --

7            MR. HADDAD:  -- and with their own conduct in issuing

8    the Form 400 and with --

9            THE COURT:  But what is the purpose --

10           MR. HADDAD:  -- issuing this policy.

11           THE COURT:  What is the purpose of the endorsement?

12   What is the purpose of the statute?

13           MR. HADDAD:  To avoid this very dispute, Your Honor.

14           THE COURT:  Why -- no, why is -- isn't --

15           MR. HADDAD:  It's to make it --

16           THE COURT:  Isn't the fact that you're supposed to

17   cover everything, isn't that the purpose of the statute that

18   you're supposed to insure all of the employees of the covered

19   employer?

20           MR. HADDAD:  Yes.

21           THE COURT:  All right.  And so --

22           MR. HADDAD:  And when you say that you're covered --

23   and to be clear as to who's your covered employer, you look to

24   your Michigan law endorsement.  We don't even get the policy.

25   I mean, let's move back a bit.

Page 94

1          THE COURT:  Where does it say that?

2          MR. HADDAD:  Mr. Schrock so testified and that is

3    undisputed.

4          THE COURT:  That's an issue of law, that's not a -- I

5    mean --

6          MR. HADDAD:  I mean, it's a fact that we don't get the

7    policy and it's -- it is an undisputed fact that we don't get

8    the policy.  They comment about from Mr. Grudy's (ph) reply

9    declaration says that the form was approved, well, sure the

10   form's approved.  So long as you've got your endorsement the

11   form's approved.  We don't care about exclusions because the

12   exclusions don't apply.  Exclusions don't apply to worker's

13   compensation in Michigan.  You sign up, you issue the policy --

14         THE COURT:  Exclusions don't apply if you're excluding

15   out part of the employees.  But if you're going company-by-

16   company, there's nothing that says they don't apply.  I mean,

17   we went through that.  You can insure one subsidiary and not

18   another.

19         MR. HADDAD:  Right, and what they --

20         THE COURT:  And that's all the exclusion does, right?

21         MR. HADDAD:  Well, what they chose to do here, and I

22   know I keep coming back to the same place, and the reason why I

23   keep coming back to the same place, is that it's essentially

24   the be all and the end all of the analysis is you are the

25   insured employer, they listed it as Delphi Corporation, their

Page 95

1    witness so testified, it's unambiguous.  Anything to the

2    contrary cannot be used to interpret this policy either as a

3    matter of fact, as a matter of law, or as a matter of

4    contractual construction.  You can't look to this parole

5    evidence.  You can't look there because it's excluded by law.

6    Okay.

7              THE COURT:  I'm not looking to --

8              MR. HADDAD:  And I think --

9              THE COURT:  I think frankly if I were to look at the

10   parole evidence there would be a whole different story, I'm

11   just looking at the agreements.

12             MR. HADDAD:  And the agreements has the override

13   clause: "notwithstanding any language elsewhere contained in

14   this contract of policy of insurance."

15             THE COURT:  Okay.  Well, is there any --

16             MR. HADDAD:  We insure through the insurer.

17             THE COURT:  -- other basis for objecting or stating

18   that the plaintiff's construction of the policies is incorrect?

19             MR. HADDAD:  Other than the words of the policy

20   itself?

21             THE COURT:  Well, under the --

22             MR. HADDAD:  Under the --

23             THE COURT:  Other than the endorsement.

24             MR. HADDAD:  The endorsement, the testimony is --

25             THE COURT:  But is there anything beyond the

Page 96

1    endorsement?

2           MR. HADDAD:  It's the case law that I've -- that we've

3    cited in our briefs including the New Amsterdam versus Moss

4    case.

5           THE COURT:  But again, Moss was a case where there

6    wasn't going to be insurance, right?  Here the -- there is

7    insurance, it's just that Delphi's bankrupt or insolvent.  But

8    the statute sets up the Agency, SIP to pay --

9           MR. HADDAD:  Well, no, but --

10          THE COURT:  SIF to pay if it's insolvent.  So it's

11   not --

12          MR. HADDAD:  No, actually what the statutes does is if

13   the insured -- the self-insured does not pay, and in 2009 after

14   saying for years that they were going to pay it, and in fact,

15   after continuing to pay, which is perhaps why, as Your Honor

16   suggested, there was no large premium there for all those

17   years, either before or during the bankruptcy, what the self-

18   insurance fund does is they look, and this is undisputed, both

19   in Mr. Elsenheimer's affidavit and also Mr. Schrock's

20   testimony, is you look primarily to the self-insured during the

21   period of time that they are an approved self-insurer, and so

22   long as they are carrying out their function, we're fine with

23   that.

24          Here -- and once they stop, you look to see who else

25   is on the risk for this and you --

Page 97

1          THE COURT:  I understand that but --

2          MR. HADDAD:  -- come to a Delphi -- to ACE, and they

3   filed these forms for the agency, they issued these policies,

4   and --

5          THE COURT:  I'm just addressing the following point.

6   The Michigan statute does not -- let's put it this way.  The

7   Michigan statute is complied with if an employer is approved as

8   a self-insurer notwithstanding that it is later insolvent or

9   bankrupt.  So they have complied with that statute that far,

10  right?

11         MR. HADDAD:  Up through a point in 2009 when the self-

12  insurance was revoked by the director --

13         THE COURT:  Right.

14         MR. HADDAD:  -- at which point the insurer comes up --

15         THE COURT:  But to me that's --

16         MR. HADDAD:  -- because they have to have --

17         THE COURT:  So -- but leave that aside.  But to me

18  that distinguishes Moss.

19         MR. HADDAD:  No, because --

20         THE COURT:  Because there's insurance.  It didn't pay

21  because it was insolvent, but the statute recognizes that.  Now

22  I understand that if there is additional insurance, obviously

23  the state has the right to enforce that insurance, no question.

24  But the issue is whether there is additional insurance.

25         MR. HADDAD:  And under 621.4, each policy of insurance

1    covering worker's compensation in this state shall contain the

2    following provisions.  The very first thing it says is

3    notwithstanding any language elsewhere contained in this

4    contract or policy, the insurer issuing this policy, hereby

5    contracts and agrees with the insured employer, and that

6    insured employer is set forth right here in this document on

7    the Michigan law endorsement as being Delphi --

8              THE COURT:  But --

9              MR. HADDAD:  -- and as Mr. Groves so testified it's

10   Delphi, and we cannot disregard that testimony.

11             THE COURT:  But the policy doesn't go to anyone other

12   than the --

13             MR. HADDAD:  Well, that's what they chose --

14             THE COURT:  -- who it's issued to.

15             MR. HADDAD:  Well, that's how they chose to do it and

16   that's one of the questions Your Honor had earlier with respect

17   to well, what does this mean for the bankruptcy case.  And, you

18   know, whatever that means as between ACE and Delphi --

19             THE COURT:  But again, it says the insurer issuing the

20   policy hereby contracts and agrees with the "insured employer."

21             MR. HADDAD:  Right.

22             THE COURT:  So if you're not insured, again, if you

23   are not Packard Hughes, but you're Delphi, then you don't fit

24   within 4.

25             MR. HADDAD:  But that's not what the policy says.

DPH HOLDINGS CORP, ET AL

Page 99

1           THE COURT:  Well --

2           MR. HADDAD:  On this endorsement or under the Form 400

3      or the testimony of the witness.  I mean, I don't see how we

4      can interpret a policy to ignore --

5           THE COURT:  Well --

6           MR. HADDAD:  -- each of those fundamental evidentiary

7      points here --

8           THE COURT:  All right.

9           MR. HADDAD:  -- on a motion for summary judgment.

10          THE COURT:  On --

11          MR. HADDAD:  The only way you can interpret it is our

12     way.

13          THE COURT:  Well you certainly -- not only can you,

14     you must if the plain language of the policy is clear.

15          MR. HADDAD:  Well, I think it says "Delphi."

16          THE COURT:  Because the testimony wouldn't come in,

17     and the Form 400 wouldn't come in as evidence.  It might be a

18     separate basis for a liability, but that's not in front of me,

19     but it wouldn't come in as evidence.  So again, I think I'm

20     just coming back to the meaning of this endorsement.  And since

21     it's tied into and required by a statute, which says the

22     insurer issuing this policy hereby contracts and agrees with

23     the insured employer, you know, if the policy doesn't make sure

24     the particular employer, I don't see how the insurer could be

25     issuing the policy or someone else could be viewed to be

Page 100

1    covered by this provision.  It doesn't fit.

2         It would basically create a new obligation.  Now, I

3    understand your point that because they've listed Delphi as the

4    named insured, they may be doing that in this provision.

5         MR. HADDAD:  They've done that not only -- I mean, not

6    just in this provision, but with the exception of the first

7    year or so --

8         THE COURT:  Well, no, I understand.

9         MR. HADDAD:  -- every other year, they listed them in

10   the schedule of additional named insureds, they listed Delphi

11   Corporation, and then they listed all those locations.  So

12   that's --

13        THE COURT:  Well, but I'm asking is there anything

14   else in the policy besides the endorsement --

15        MR. HADDAD:  Well --

16        THE COURT:  -- that shows or that contradicts the

17   plaintiff's argument that, in fact, everything other than what

18   is covered by the -- I'm sorry, put it -- everything that it

19   excludes the locations covered by the access policy, the

20   retention policy.

21        MR. HADDAD:  Well, then went ahead and listed all

22   those other locations of Delphi Corporation --

23        THE COURT:  But they have an exclusion.  They have an

24   exclusion provision.

25        MR. HADDAD:  And that's why you come back to, Your

1    Honor, we keep coming back to the endorsement which says, don't

2    look to those, don't look to those, because you're creating the

3    very ambiguity that the statute and the policy and the public

4    policy of the state is designed to prevent.

5            THE COURT:  But the statute doesn't -- I don't -- the

6    statute doesn't -- to me the policy of the statute doesn't --

7    isn't, offended by this.  It would be offended in my first

8    hypothetical, where they go by location, but it isn't offended

9    if you go by entity.  Because the purpose of the statute is not

10   to split up entities.  I'm sorry, not to split up locations.

11   Split up entities by location, as opposed to go by entity-by-

12   entity.

13           MR. HADDAD:  Well, this entity says -- I mean, I don't

14   know how many times you want me to say it, Your Honor, it says

15   Delphi Corporation plain as day, that's what their witness --

16           THE COURT:  But it is -- that is the --

17           MR. HADDAD:  -- has so testified.

18           THE COURT:  -- insured.  I mean, the policy was

19   obtained by Delphi Corporation.

20           MR. HADDAD:  Yeah, and it says you're the named -- you

21   are the insured employer --

22           THE COURT:  Well, it doesn't say that.

23           MR. HADDAD:  Well, it says -- well, it says you are

24   the insured employer.

25           THE COURT:  But that's doesn't explain who -- you're

1     supposed to know who "you" are.  "You" are the one who's

2     insured.

3              MR. HADDAD:  Well, you know, we don't get the

4     policies.  What we get is the Form 400, so from what the public

5     records reflect is, it's Delphi Corporation.  And for year

6     after year after year for policy after policy after policy,

7     that's what ACE decided to file with the State of Michigan as a

8     matter of evidence --

9              THE COURT:  Well --

10             MR. HADDAD:  -- to the extent that you believe that

11    perhaps they didn't mean that, then what explanation is there

12    for why they did that.  There's no affidavit from any person

13    from ACE explaining how this policy was prepared, who's --

14             THE COURT:  But again --

15             MR. HADDAD:  -- the insured employer.

16             THE COURT:  -- that's if the plain meaning doesn't

17    apply here.

18             MR. HADDAD:  You couldn't -- I mean on this -- in

19    looking at these two pages, the plain meaning -- there's no

20    other meaning, frankly, Your Honor, that that could reach.

21             THE COURT:  Of course there is.  Of course there is.

22             MR. HADDAD:  From looking at these two pages --

23             THE COURT:  Of course there is.  We know that there

24    are other entities who are employers who are insured here.

25    They didn't list them.

Page 103

1              MR. HADDAD:  We're only talking about this one

2      particular one, Delphi, and you know, we didn't take discovery

3      on --

4              THE COURT:  Well, that means then you're saying that

5      the others aren't insured?

6              MR. HADDAD:  No, we haven't got -- I haven't looked

7      into that.  I don't know if there's been a claim at issue or an

8      adversary proceeding brought by ACE to fight that, I have no

9      idea.

10             THE COURT:  Well, just -- look, to me, you should know

11     who "you" are; you're the one who's insured.

12             MR. HADDAD:  Well, I think that --

13             THE COURT:  It's in this policy, which refers to 3A,

14     which says who you're insuring, who's insured, which is the

15     ones who are listed.

16             MR. HADDAD:  No, now let's -- hold -- no.  3A just

17     says Michigan.

18             THE COURT:  Right.

19             MR. HADDAD:  Full stop.  It doesn't go anywhere beyond

20     that.  I think this is a very important point because --

21             THE COURT:  Well, as -- for 2000 and 2001 it does list

22     them.

23             MR. HADDAD:  It does.

24             THE COURT:  You're right.  But for the other ones, you

25     have to go to the exclusion.

DPH HOLDINGS CORP, ET AL

Page 104

1          MR. HADDAD:  And you shouldn't go to the exclusions,

2   because the only thing that the endorsement says is you look to

3   3A, you don't look to 4, you don't look to exclusions, you

4   don't look to other endorsements, you don't look to premiums,

5   and you don't look to classifications, and you don't look to --

6   you don't look to any of that.  You don't look to any of that

7   under this endorsement under the Michigan law, because you

8   can't have a situation where the employer -- where the insurer

9   is saying, you know, that policy we issued said Delphi

10  Corporation and filed that Form 400, just kidding, you can't

11  have that situation, Your Honor.

12          THE COURT:  Why?

13          MR. HADDAD:  Why?

14          THE COURT:  Yeah, as a matter of --

15          MR. HADDAD:  Because that would wreck havoc upon -- I

16  was thinking --

17          THE COURT:  No, no, separate and apart from the Form

18  400 argument.

19          MR. HADDAD:  All right.  That's a pretty big argument

20  as a matter of evidence.

21          THE COURT:  No, no, no, I'm just -- I'm focusing on

22  the plain meaning at this point.  The purpose of the Michigan

23  law endorsement again is not based on 621, is not to, again,

24  act as a black hole to pull an insurer in wherever one entity

25  in Michigan is insured.

1          MR. HADDAD:  And the insurer can --

2          THE COURT:  That's not the -- the reason is, again,

3     not to split up insurance within an insured entity.

4          MR. HADDAD:  The insurer can issue a policy to

5     subsidiary A and ignore the parent company if they so choose.

6          THE COURT:  Right.

7          MR. HADDAD:  They chose not to.  You know why?  I

8     don't know why, but when I'm looking at this policy --

9          THE COURT:  But how did they choose not to?  Other

10    than --

11         MR. HADDAD:  I'm looking at this policy and I say,

12    wow, look at this, this covers worker's compensation insurance

13    and employer liability insurance and all other state's

14    insurance, and it lists all kinds of states, and all kinds of

15    different things.  It has lots of stuff in it.  I mean, it's

16    hundreds of pages, it has lots of different provisions in it.

17         THE COURT:  Right.

18         MR. HADDAD:  One of the things that they decided is

19    well, we're going to do worker's compensation in Michigan.  And

20    if they want to issue this policy, and in 3A, 2008, and the

21    earlier years, they just say Michigan.  Okay.  Well, if they

22    want to play in that arena, if they want to issue those

23    policies in the State of Michigan, then they have to comply

24    with that statute, and they have to provide this level of

25    insurance because every employer, every employee needs to know

Page 106

```
 1    that --

 2            THE COURT:  But why haven't they complied with the

 3    statute?

 4            MR. HADDAD:  I think they have complied with it, they

 5    just don't want to pay.

 6            THE COURT:  No, no, let's assume that they're correct

 7    in their argument that they only insured the specific entities

 8    that were not self-insured.  Why didn't that comply with the

 9    statute?

10            MR. HADDAD:  Well, it's Delphi's job to comply with

11    the statute.

12            THE COURT:  Right.

13            MR. HADDAD:  It's ACE's job to issue a policy that

14    conforms with that statute and is enforceable in accordance

15    thereof.

16            THE COURT:  Well, why didn't Delphi comply with the

17    statute?

18            MR. HADDAD:  I don't think we're saying --

19            THE COURT:  They did, didn't they?

20            MR. HADDAD:  I don't think we're saying Delphi didn't

21    comply with the statute --

22            THE COURT:  But why didn't the insurance comply?

23            MR. HADDAD:  -- until they stopped paying.

24            THE COURT:  Yeah.  But why didn't the insurers comply

25    with it?
```

 1          MR. HADDAD:  When they said they're not paying, that's

 2    the point.  Up till then they filed their Form 400 --

 3          THE COURT:  No --

 4          MR. HADDAD:  -- they run the risk and as long as

 5    someone's paying.

 6          THE COURT:  Okay.  But they don't have to be on the

 7    risk to comply with the statute.  They can exclude themselves

 8    from the risk and still be complying with the statute.

 9          MR. HADDAD:  But they chose not to by doing precisely

10    what they did here, by issuing this policy with this

11    endorsement by filing that Form 400, year after year after

12    year.

13          THE COURT:  Well, again, the Form 400 is not part of

14    this --

15          MR. HADDAD:  I think it's --

16          THE COURT:  -- as part of a plain meaning analysis.

17    If I get into parole evidence, it will be, but it's not part of

18    plain meaning analysis.  So again, it seems to be you're

19    putting the cart before the horse by saying they haven't

20    complied when --

21          MR. HADDAD:  No, I didn't say -- you asked me what are

22    they doing to not comply, not paying.  The issuance of the

23    policy that includes this endorsement, in fact, does comply.

24    That is compliance with the statute, by issuing this

25    endorsement with these words on it, and with those terms, that

Page 108

```
 1    complies with the statute, and now they've just to go to do

 2    what they've committed to do.  They just have to actually do

 3    this.  They have to agree with the -- they have to agree and

 4    make those payments, provide those cases, provide the medical

 5    services and the rehab and the compensation, and you know,

 6    those unfortunate situations, the funeral services.  That's

 7    what they're required to do after having signed up for

 8    insurance in the State of Michigan.  That's what they have to

 9    do.

10            THE COURT:  Okay.  Anything else?

11            MR. HADDAD:  I mean, we have another points that we

12    made in our papers --

13            THE COURT:  Well, let's assume we're not on the -- I

14    mean, I understand that there are issues with respect to the

15    reformation argument in the summary judgment context, but I'm

16    really not focusing on anything beyond plain meaning at this

17    point.

18            MR. HADDAD:  Well, the plain meaning, you know, going

19    back to E, it says "the scope of the contract is all the

20    businesses that the said employer is engaged in at the time of

21    the issuance of this contract."

22            THE COURT:  Right.

23            MR. HADDAD:  All the businesses.

24            THE COURT:  Right, but it's the "employer."

25            MR. HADDAD:  Well, if you're going to allow them to
```

```
 1    nine years later, see that policy, just kidding, that's not who

 2    we meant, that's not who we meant in employees of Delphi,

 3    that's not who we meant, State of Michigan.  We can't allow

 4    that to happen.

 5            I was thinking of different types of analogies as

 6    driving over this morning, it's like the recording act with the

 7    mortgages, it doesn't matter that you had some other thought in

 8    your mind, if you don't file that mortgage, you don't get the

 9    coverage.  It's like a letter of credit, it doesn't matter

10    what's going on in the third side, you have to -- between the

11    third party.  You have to comply with the strict terms of the

12    document, you have to comply with the strict terms of the

13    statute, and an insurance company that issues this endorsement

14    year after year after year, has to be held to comply with it,

15    because it says right there, plain as day, Delphi Corporation.

16    And that's what their witness says it means.  And for them to

17    ask for summary judgment on the --

18            THE COURT:  But they're --

19            MR. HADDAD:  -- basis that their own witness says

20    that's not what that means, well, that is -- I don't see that.

21            THE COURT:  They're only not complying with it if in

22    fact they're the employer.

23            MR. HADDAD:  If, in fact, the named insured is --

24            THE COURT:  Delphi is the employer.

25            MR. HADDAD:  If, in fact, they would come up with a
```

Page 110

1    new interpretation of the document to say that Delphi

2    Corporation doesn't (indiscernible) corporation, it meant some

3    other subsidiary of Delphi Corporation whose name you cannot

4    divine from looking at these two pages.

5            THE COURT:  Okay.

6            MR. HADDAD:  And I don't think that that's a basis,

7    and quite frankly it's the opposite.  I think that under the

8    basis of what we have here, the Michigan defendants are

9    entitled to summary judgment.

10           THE COURT:  Okay.

11           MR. HADDAD:  And we have put forth, as I said a number

12   of other arguments in our papers, so I think we're --

13           THE COURT:  I mean, besides the arguments that go

14   after a plain reading argument, I think the only one you raised

15   is the standing point or more appropriately the necessary party

16   point.  But isn't -- I mean, isn't it right that the interest

17   of the injured employees, the employees entitled to worker's

18   comp is completely represented here by the Michigan defendants?

19           MR. HADDAD:  No.  I mean, I certainly think that Ms.

20   Cyganowski and myself, Mr. Raterink and my colleagues have

21   adequately explained why summary judgment should be granted in

22   favor of our clients, but I think that when you look at the

23   statute, 418.651, each employee is entitled, in his or her own

24   name, to enforce their rights directly against the insurance --

25           THE COURT:  I understand they have --

DPH HOLDINGS CORP, ET AL

Page 111

1              MR. HADDAD:  So that is a --

2              THE COURT:  -- the direct right, but the -- they're

3    going to get paid one way or the other, right, so they have

4    less of an incentive than the Michigan defendants do.  The

5    Michigan defendants are the one that really want to win there,

6    because it's their money if it wasn't the insurers' money.  But

7    one way or another, the worker's comp claim is going to get

8    paid.

9              MR. HADDAD:  I'm not sure.

10             THE COURT:  Well, what, because the State of Michigan

11   is insolvent?  I mean, it seems that they've been --

12             MR. HADDAD:  You know, if they want to -- if the goal

13   here is to increase the taxes on every employer in the State of

14   Michigan, I don't know.  But it seems to me that when you have

15   a statute that provides a party with a right, you can't take

16   away that's party's rights without noticing here, Your Honor.

17             THE COURT:  Well, the case law says just the opposite.

18   For purposes of the necessary party rule, if the Michigan

19   defendants are adequately representing the interests of those

20   parties, then they don't have to be joined.

21             MR. HADDAD:  I -- you know, I think you have to defer

22   to the individuals to see how they felt about that.

23             THE COURT:  All right.

24             MR. HADDAD:  But from our perspective, I mean, I think

25   we have demonstrated to this Court and to Your Honor why the

1   summary judgment can and should be granted in favor of the

2   Michigan defendants, compelling ACE to live up to the terms of

3   its own policy it puts in the endorsement.  I mean, from that

4   perspective, I think that Your Honor can issue summary judgment

5   in favor of the Michigan defendants.  I don't see it working

6   the other way.  I don't see it working the other way when their

7   own witness contradicted the very position that they're seeking

8   to take on this motion.  When they say something is clear, when

9   their own witness testified to the contrary, and the document

10  doesn't say that either.

11          And he said the policy covers -- page 70, this policy

12  covers worker's compensation liability for Delphi Corporation.

13  That's the witness' testimony, and they're bound by the

14  testimony of their own witness.  You can't avoid that, Your

15  Honor.  You can't avoid that.

16          THE COURT:  On an issue of law?

17          MR. HADDAD:  It doesn't matter what its issue is.

18  It's an issue of what does this policy insure, that's the issue

19  that's presented to this Court, and their witness said Delphi

20  Corporation.  The question wasn't objected to, it wasn't

21  corrected at the time, thereafter in his errata sheet or any

22  other time.  And I don't see how we can disregard that

23  testimony.

24          THE COURT:  Okay.

25          MR. HEUER:  Your Honor, I'm happy to address the Court

Page 113

1   if you have any questions for us.  But our interests are

2   adequately represented.  We've said that.

3            THE COURT:  All right.

4            MR. HEUER:  William Heuer, Duane Morris.

5            THE COURT:  Okay.  Well, why don't we -- I'm -- I'd

6   like to hear from plaintiffs and maybe Delphi on the issue of

7   endorsement, but first on the Grove deposition, the Groves

8   deposition.

9            Are the plaintiffs bound by Mr. Groves' testimony that

10  the insured employer is Delphi Corporation?

11           MR. OLSHIN:  I think Mr. Heuer will address that

12  issue, Your Honor.

13           MR. HEUER:  William Heuer, Duane Morris.  Your Honor,

14  first, the case law is clear that where an opponent goes back,

15  an affiant goes back and amplifies or explains their testimony,

16  that's entirely acceptable.

17           When we look at the deposition transcript, it's

18  important to read what was asked, and what was said, not only

19  at the two points in time referenced by counsel, but also when

20  the questioning was brought on by my colleague, Ms. Welsh (ph).

21  Because at first, the question goes to exactly what you've been

22  talking about for the last few minutes, what name is on top of

23  that endorsement.  Delphi Corporation is on top of it.

24           The follow-up question, there's another follow-up that

25  reads off the page, it says, points to the page and says, what

Page 114

1    does it say there.  Fine.  Go back to page 86 of the

2    deposition, because that's where the question is specific, and

3    it's relevant.  The question talks about which entities are

4    shown as being insured in the State of Michigan.  It's not a

5    broad question of who's the named insured, he's not pointing to

6    Delphi Corporation as being on the top of the page, and asking

7    about the insured (indiscernible), it's very specific.  Which

8    are the insured entities in Michigan?  And the answer there was

9    specific, Delphi Diesel, Mechatronics and PHI.

10        Now, the affiant got his deposition transcript.  He

11   sent it in, he signed it, and came back with a supplemental

12   affidavit.  That affidavit explains that the points he made

13   later in his deposition are exactly what he meant.  He explains

14   the testimony.  That's precisely what is provided for in case

15   law.

16        There are a number of cases in the Second Circuit that

17   go right into this.  One case in particular, Langman, L-a-n-g-

18   m-a-n, Fabrics v Graph California, it's at 160 F.3d 106.  There

19   you had a situation that had multiple depositions, one

20   affidavit, a second affidavit, and the question was, does that

21   affidavit contradict, because you can, where it's a sham

22   affidavit situation is the word the case law used, disregard

23   it.

24        But where it explains, it amplifies, where the

25   question that was asked originally wasn't really precise or

Page 115

 1   doesn't really get to the issue, you can explain that through a

 2   supplemental affidavit.  That's exactly what was done here.  It

 3   was permissible in Langman.  In fact, in Langman, the Second

 4   Circuit said it was error for the district court not to allow

 5   that supplemental testimony.  So we believe that supports our

 6   position, Your Honor.

 7           MR. HADDAD:  Your Honor, can I speak to that, Your

 8   Honor?

 9           THE COURT:  Sure.

10           MR. HADDAD:  At page 86 of Mr. Groves' --

11           THE COURT:  He's not talking about the endorsement,

12   he's talking about something else.

13           MR. HADDAD:  No, at page 46 of the -- at page 86 of

14   the transcript, he was shown the exclusion page, and one narrow

15   page.  He wasn't talking to the entirety of the policy, he was

16   talking to that one little page, page 2647.

17           THE COURT:  I think you were going to say something

18   else, which is that he wasn't talking about the Michigan law

19   endorsement.

20           MR. HADDAD:  And he also was not talking about the

21   Michigan law endorsement.  He was talking about page 2647.

22   That's exactly what he was talking about.

23           MR. HEUER:  He was talking about --

24           MR. HADDAD:  Not the endorsement or the policy itself,

25   which my question on page 70 was.  It was about the policy.

1           MR. HEUER:  But with due respect --

2           THE COURT:  But the question wasn't about the policy.

3    Read your question, it was about the endorsement.

4           MR. HADDAD:  The page 86 was responding to Mr.

5    Olshin's testimony -- questions.

6           THE COURT:  No, I understand, but your question on 66

7    was about the endorsement, not about the policy as a whole.

8           MR. HADDAD:  Page 70 was about the policy.  Page 70,

9    the last question before we broke for lunch was very

10   specifically --

11          THE COURT:  Yeah, but it does.

12          MR. HADDAD:  -- was the --

13          THE COURT:  That doesn't bother me, because it's not

14   qualified by Michigan.  It does cover worker's compensation

15   liability of Delphi.  I mean, in --

16          MR. HADDAD:  So that's -- wow, that's an interesting

17   interpretation.

18          THE COURT:  Well, I mean, it's what it says.  You

19   know, the first rule is just answer the question.

20          MR. HADDAD:  He answered the question.  With respect

21   to each time I asked about the policy and the endorsement it

22   said Delphi was the named insured, and was the insured

23   employer, that's what he said.

24          THE COURT:  Well, on 67 --

25          MR. HADDAD:  On 66.

DPH HOLDINGS CORP, ET AL

1          THE COURT:  -- no, he -- as far as --

2          MR. HADDAD:  And after he corrected his testimony

3     once, and you get a shot at correcting your testimony, that's

4     what Rule 30 provides, you get a shot at correcting it.  You

5     don't keep getting shots.  I mean, you don't keep getting

6     shots.  Gee, when I read it, that's not what I meant, but I

7     still didn't correct it until now in reply on summary judgment.

8     I don't know that that -- I don't see a case that so provides.

9          MR. HEUER:  Your Honor, the question was clear, "What

10    entities are shown for being insured in the State of Michigan?"

11    The answer was very clear.

12         THE COURT:  That's fine.

13         MR. HADDAD:  (indiscernible)

14         THE COURT:  I didn't understand that.

15         MR. HADDAD:  On 2647.

16         THE COURT:  Okay.  So on the Michigan law endorsement,

17    why isn't "you," as used in paragraph 2 there, Delphi

18    Corporation as opposed to someone else?

19         MR. OLSHIN:  I'm sorry, Your Honor, I didn't hear the

20    question.

21         THE COURT:  What Mr. Haddad is arguing is that in the

22    Michigan law endorsement, it states, "to help you understand

23    the paragraph, the following definitions are added."  Number 2,

24    "You are the insured employer."

25         MR. OLSHIN:  Right.

Page 118

1          THE COURT:  So Mr. Haddad says, well, "you" must be,

2    mean Delphi Corporation because it's the only name on this

3    endorsement, besides the insurer.

4          MR. OLSHIN:  I think Your Honor hit the nail on the

5    head.  I mean, I think you have to go back and look at who was

6    actually the insured employer in the State of Michigan.

7          THE COURT:  So you're saying "you" means "you know who

8    you are, you're the one who's insuring."

9          MR. OLSHIN:  Yes, and you know who you are because

10   you're listed on the Michigan extension of information page by

11   name.  Otherwise, their position is illogical.  Because Delphi

12   had ten or so entities that were at various times, and you

13   named some of them, Packard Hughes, Delphi Diesel.  So to use

14   their interpretation, what this endorsement would do is it

15   would make those entities not covered by the policy, because

16   their name doesn't appear on this piece of paper, even though

17   it appears on the Michigan information page.  Because their

18   reading of the policy is, you don't look at the policy as a

19   whole, you just look at this piece of paper.

20          Secondly, I think if you follow opposing counsel's

21   logic to an extreme, then the endorsement doesn't apply at all

22   to 2001, 2002, and I'm sorry, 2000, 2001 and 2003, because

23   Michigan doesn't appear on the information page on page 1 of

24   those individual policies.

25          That can't be the intent of what is happening here.

1  The intent has to be -- I know the other side doesn't like to

2  talk about intent, but when you read the policy as a whole, a

3  policy that's approved by the Michigan Insurance Department.

4  So from a carrier's point of view, the only reason we're using

5  this document is because a regulator has told us we can.

6         And the regulator based, on Mr. Grody's (ph)

7  affidavit, Exhibit 2, which is uncontested, approved not only

8  the general section of the policy, but also approved the

9  designated workplace exclusion endorsement.

10         So one would think that if those concepts were

11  contrary to Michigan law, the regulator who's charged with

12  approving policy forms would have rejected those policies, and

13  not allowed us to issue them in the State of Michigan.

14         I think, Your Honor, the only conclusion you can draw

15  is, the only logical way to read this policy is that this

16  endorsement is part of a whole.  And you have to interpret the

17  whole.  And there's nothing inconsistent between this

18  endorsement and the concept that these entities which weren't

19  approved to be self-insured are now the employer insured under

20  the policy.  It runs totally together.

21         The general conditions of the policy which exclude

22  other insured and self-insured locations are consistent with

23  the concept, as is the designated workplace exclusion

24  endorsement.

25         MR. HADDAD:  Two quick responses here.  They're trying

1   to read way too much into submitting a form to a regulator.

2   The policy wasn't approved, the form was approved.  You can put

3   any exclusion you want in your form so long as your Michigan

4   law endorsement that's part of it, which is part of any

5   submission.  So long as you have that, the exclusionary

6   language that you put in the back pages of it don't apply.

7           THE COURT:  I mean other than --

8           MR. HADDAD:  So that doesn't address the issue of this

9   policy.

10          THE COURT:  Right, but let me interrupt you.  Other

11  than the point, and I do take that seriously, believe me, that

12  the named insured is listed as Delphi, there's nothing in

13  Michigan law or in the endorsement that would require the

14  endorsement to expand the coverage.  It all hinges on who "you"

15  is, right, who the reference to the employer is.

16          MR. HADDAD:  Right.  And what -- let's look at this

17  from the big picture from the State, the point was earlier is

18  the State qualified to advance the interests of the employees

19  here.  Let's look at it from the State's perspective from the

20  big picture.

21          We get a Form 400, that's the only thing we get.  We

22  don't get these policies.  We don't get the policies until

23  years later if there's a dispute.  So as far as we're

24  concerned, Delphi Corporation is an insured employer, and

25  that's what they told us from -- every year from 2000 all the

Page 121

1    way up until 2009.  That's what ACE said, we didn't tell them

2    that.  They said it.

3           We cannot -- this Court cannot, and we submit no court

4    should be in a position to tell the State of Michigan, now all

5    of a sudden if you want to make sure that people are doing this

6    the right way, you now have to start reading every single

7    policy of every single employer in the State of Michigan to

8    decide whether or not there's an exclusion, this, that, or the

9    other thing.  Your Honor sees how big these policies are.

10          THE COURT:  No, I don't --

11          MR. HADDAD:  We only need to know, we only need to

12   know that we have this.  Once we have this, as Mr. Schrock

13   testified, once we know that the policy's been issued, the

14   name's Delphi, we know what the terms of that insurance are.

15   It covers all their businesses in all the locations --

16          THE COURT:  But what is --

17          MR. HADDAD:  -- in that state.

18          THE COURT:  But what -- let's just assume that, in

19   fact, the employer is Delphi.

20          MR. HADDAD:  I'm sorry?

21          THE COURT:  Let's assume for the moment --

22          MR. HADDAD:  Right.

23          THE COURT:  -- that for purposes of this endorsement,

24   it means that the covered employer is Delphi?

25          MR. HADDAD:  Okay.

Page 122

1          THE COURT:  What good does that do the regulator?

2          MR. HADDAD:  What good it does the regulator is

3     precisely this.  As soon as Delphi stops making good on its

4     self-insurance commitment, as soon as they are no longer an

5     approved self-insurer, we now know ACE Insurance Company, which

6     issued this policy on these dates year after year after year

7     filed its reports with the state, with this Form 400, year

8     after year after year, is on the hook and is going to pay these

9     people and the --

10         THE COURT:  But the statute doesn't say that.

11         MR. HADDAD:  I think the statute does say that.

12         THE COURT:  Where does the statute say that?

13         MR. HADDAD:  The statute says every policy for the

14    issuance of insurance in worker's compensation insurance in

15    this state will provide as follows.  And the first thing it

16    starts out with is notwithstanding the language to the contrary

17    --

18         THE COURT:  But, no, listen --

19         MR. HADDAD:  -- that's where it provides.

20         THE COURT:  -- maybe I wasn't clear.  There's no

21    reliance at the time by the regulator on this endorsement

22    saying one thing or the other.

23         MR. HADDAD:  You don't need reliance, Your Honor.  The

24    estoppel doesn't apply against --

25         THE COURT:  No, but I mean, I'm not talking about

SPRINT CONNGS CORP, ET AL

Page 123

```
 1   that.  I'm just saying it doesn't serve any purpose, other than
 2   to enforce the policy.
 3           MR. HADDAD:  My house fire insurance doesn't serve any
 4   purpose until my house burns down.  I mean, that's -- it's just
 5   there.  It's just there, and in the event something happens,
 6   then we look to it, and we say, I expect you to pay.  I expect
 7   you to pay because that's what you wrote in this policy.
 8           I mean the worker's compensation agency needs to know
 9   who's the insurer, all these employees, all the cases --
10           THE COURT:  I mean, I can see that argument for the
11   Form 400.  I guess I just don't really see it to something
12   that's attached to the policy itself.
13           MR. HADDAD:  Well, when it's attached to the policy
14   itself, in accordance with the Michigan law, and in accordance
15   with the statute, and it's unambiguous, and it says "you," and
16   the only other reference on this to "you" is Delphi
17   Corporation, you can't interpret it any other way.  You can't
18   interpret it any other way, Your Honor.  "You" means "you."  I
19   don't mean to talk (indiscernible).  What the definition of
20   "you" is, but "you" means "you," and "you" is Delphi.  Because
21   there is nobody else.  There is nobody else referred to here.
22   There's nobody else referred to in item 3A, on all those
23   policies from 2002 to the present.
24           THE COURT:  I just -- I follow you with this, but I
25   think you're changing the subject.  As far as saying that all
```

DPH HOLDINGS CORP, ET AL

Page 124

1   that counts is this endorsement, I'm having a hard time seeing

2   that.  There's no regulatory policy of that.

3            MR. HADDAD:  Oh, I disagree.  There absolutely is a

4   regulatory policy.  It's set forth in the statute, Your Honor.

5   And the statute says, we want to make sure that every policy

6   contains these terms --

7            THE COURT:  Right.

8            MR. HADDAD:  -- and is enforceable in accordance with

9   these terms, and we provide these terms, and we say Michigan

10  law requires that we attach this paragraph to your policy, and

11  the language specified by the statute.  And to help you

12  understand the paragraph, the following definitions are added,

13  and we are the insurer issuing this policy, and you've got to

14  look to where's the only -- well, it's ACE, because that's the

15  authorized agent at the end, issued by, name of insurance

16  company, and two -- look at the third line, issued by, name of

17  insurance company, ACE, that's we and you are the insured

18  employer.  There's no one else listed on this document.

19           THE COURT:  But the statute says that the insurer

20  "issuing" the policy hereby contracts and agrees with the

21  insured employer.  I mean --

22           MR. HADDAD:  Yeah, and the definition provides who the

23  insured employer is.  It can't be anyone else other than who it

24  says plain -- in black and white on the page.

25           THE COURT:  Okay.  I guess we disagree on that.  "You"

Page 125

1    are the one who's been insured.

2           MR. HADDAD:  I'm sorry?

3           THE COURT:  "You" means the one who's been insured.

4           MR. HADDAD:  You --

5           THE COURT:  "You" are the insured employer.  You are

6    the one that's been insured.  I mean, you're saying to me that

7    --

8           MR. HADDAD:  There's nothing in the definition of

9    "you" that refers you to anything other than this page.  It

10   doesn't you are the insured employer as defined in section such

11   and such, it does not say that.

12         THE COURT:  No, it says, you are the insured employer.

13         MR. HADDAD:  That's all it says, and the only name,

14   there's a you and a we.  Named insured, Delphi --

15         THE COURT:  We are the ones issuing the policy.

16         MR. HADDAD:  That's ACE.

17         THE COURT:  And that policy doesn't cover --

18         MR. HADDAD:  It covers you.  Covers you.  Who's you?

19         THE COURT:  Let's say they put down name of insured,

20   and let's just say the person was really having a bad day, so

21   she put down Mr. Haddad instead --

22         MR. HADDAD:  Uh-huh.

23         THE COURT:  -- this would control?  And the only one

24   insured is Mr. Haddad, employer of two employees in Michigan.

25   I mean, it can't be that.  That can't be right.

DPH HOLDINGS CORP, ET AL

Page 126

1           MR. HADDAD:  But you can't extend this to the absurd.

2           THE COURT:  This totally modifies the contract.

3           MR. HADDAD:  But this is named insured Delphi, they

4     did it every single year for year after year and you can't just

5     say dozens of people made dozens -- hundreds of mistakes going

6     through this year after year after year.

7           THE COURT:  With the Form 400s?

8           MR. HADDAD:  What's that?

9           THE COURT:  With the Form 400s?

10          MR. HADDAD:  With the Form 400s, yeah, I wasn't going

11    there, I was talking about the policy itself, which kept saying

12    you is Delphi, but we can read that into it.

13          THE COURT:  Delphi is the insured under the policy.

14    It's the insured.  That's why I'm not particularly -- I mean,

15    you did ask in a separate question, which is, is he the insured

16    employer.  But his first answer is right, Delphi was the

17    insured.

18          MR. HADDAD:  Yes.

19          THE COURT:  I mean, it was insured, it insured Delphi

20    in Alaska and Alabama.

21          MR. HADDAD:  Yeah, but I also asked him with respect

22    to this endorsement.

23          THE COURT:  I understand.

24          MR. HADDAD:  And that's the critical question.

25          THE COURT:  I understand, but I think --

1           MR. HADDAD:  I wasn't talking about Alabama and

2      Alaska, and they didn't interpret it that way either.

3           THE COURT:  So he got tripped up on that.

4           MR. HADDAD:  I don't think he was interpreting it that

5      way either.  He was very clear when I asked him those were the

6      questions that were put there, and in the global question at

7      the end, and individual questions, he keeps tying right back to

8      Delphi being the named insured, it's exactly what's in the

9      policy that was issued by this company.

10          I mean this authorized agent, the person whose name

11     appears here, we don't have an affidavit from that person

12     telling us what they thought when they signed this.  We don't

13     have anything like that, Your Honor.

14          THE COURT:  If I find it's clear, I'm not supposed to

15     get it.

16          MR. HADDAD:  Well, I understand that.  They're the

17     ones asking for reformation.  My view is --

18          THE COURT:  I'm not focusing on reformation.  I'm

19     really not --

20          MR. HADDAD:  -- I think it could be enforced in

21     accordance with that language because that's who the insured

22     is, Delphi.

23          THE COURT:  All right.  Anything else?

24          MR. HOGAN:  Your Honor, Al Hogan for DPH.  I've been

25     lucky enough to be here many times.  I think as in the past

DPH HOLDINGS CORP, ET AL

Page 128

1    Your Honor has apprehended all of the points with respect to

2    the Michigan law endorsement.

3           I think you apprehended later on, and I think you

4    posited a hypothetical, if the name insured up here instead of

5    saying Delphi Automotive Systems Corporation and Delphi

6    Corporation, if it had listed out Delphi Packard and Delphi

7    Hughes, the entities that were intended to be covered that were

8    the non-self insured entity, there would be no problem under

9    Michigan law.  And I don't think that the Michigan defendants

10   disagree with that.

11          And so then I think the only question you focused on

12   in the last few minutes is does the Michigan law endorsement

13   require you to read Delphi Corporation as the named insured as

14   also being insured employer.  And the reason why I don't think

15   you do that is because this Michigan law endorsement is not a

16   free standing policy, it's attached to a policy.  It actually

17   says that.

18          It says the Michigan law requires that we attach this

19   paragraph to your policy.  Again, it's referring to the "you."

20   Who is "you?"  I think you have to go and look at the policy.

21          This Michigan law endorsement is a form and in the

22   context of this policy which I'm sure there are some that it

23   was complicated, but not many that was complicated for Michigan

24   employers, I don't think you can lift this endorsement out,

25   look at one page and say, we can figure out who the insured

Page 129

1    employer is by looking exclusively at this page.

2         I think it's completely reasonable, as Your Honor has,

3    to focus on the entirety of the policy, and look at to who the

4    actual entities are that were covered under the Michigan

5    information page.  And then you said something that I think

6    really seals it, and that is, interpreted the way the Michigan

7    defendants would have it, the resulting policy would result in

8    a situation where you have the self-insured entity, Delphi

9    Corporation also covered by this duplicative coverage, but you

10   would have all of the non-self insured entities totally

11   unprotected.  The reading that they espouse would result in

12   finding that for its entire history, all of these various un-

13   self-insured entities were actually out there acting in

14   violation of the worker's compensation law.

15        And so when you read a contract, and you look at one

16   page and it leads up to an absurd result, but when you back up

17   and read the entire contract and it leads you to something that

18   is not inconsistent with the statute, and appears to line up

19   with exactly the way the rest of the policy works, I think

20   that's what contract interpretation is all about.  And I think

21   that's where the discussion has led us.

22        So we agree with ACE's reading of it, we agree with

23   your skepticism that the named insured somehow modifies the

24   entire policy for our purposes.

25        MR. HADDAD:  Your Honor, may I just respond to Mr.

Page 130

1    Hogan?

2          Two points.  If we want to talk about an absurd

3    result, an absurd result is not enforcing the contract as

4    written.  But beyond that, think about what occurred in the

5    Titan case from earlier this year, the Supreme Court.  The

6    insurance applicant committed fraud, he actually committed

7    actual deliberate intentional malicious fraud against the

8    insurance company and get the policy.  And the State said,

9    well, there's a minimum basis of insurance, and once you issue

10   a policy, you're bound to that minimum amount of coverage.

11   With respect to something beyond that, that's between you and

12   the insurance coverage, and I'll let you at least contest that

13   issue, but you're bound to this.

14          Applying that here, once they issue this policy,

15   they're bound to this level of coverage for Delphi.  How is the

16   State supposed to know otherwise?  What -- how are we supposed

17   to know oh, the fact that they filed this, the fact that they

18   prepared this, the fact that they issued this year after year

19   after year, we're going to come -- and the time comes to pay

20   that we're just not going to pay.

21          How is a State, how is --

22          THE COURT:  They'd read the policy.

23          MR. HADDAD:  We're going to read the policy of

24   hundreds of thousands of employees -- of employers in the

25   State.  As you can see, there are hundreds and hundreds of

1   pages long, or do we just apply the State's policy, public

2   policy as set forth in its own statutes by -- enacted by its

3   legislature, signed by its governor which says, every worker's

4   compensation policy will provide this.  That way everybody

5   knows.  Employers know, employees know, and insurer's --

6           THE COURT:  But it does provide this.  You're just

7   saying --

8           MR. HADDAD:  To whom?  To the person --

9           THE COURT:  -- that this means they are the employer.

10          MR. HADDAD:  That's what it says, that's what I'm

11  saying, and I don't see how a state can interpret it any other

12  way.  I don't see a state can be compelled to look behind that

13  -- how an agency can be compelled to look behind each and every

14  policy that's issued in the state to make sure what's in there,

15  what's excluded, what's not excluded.  It doesn't work that

16  way.

17          THE COURT:  It's going to sue on a policy.  It'll sue

18  on the policy.

19          MR. HADDAD:  It'll sue on the policy.  It needs to

20  know that this policy is going to be enforceable.  We're not

21  going to get into this question of the who is "you."  That not

22  is a question, that this statute's designed -- the statute is

23  designed to prevent that question before --

24          THE COURT:  The statute is designed to prevent you

25  having to go against two insurers for the same company.

05-44481-rdd   Doc 21986   Filed 11/08/12   Entered 11/09/12 11:32:07   Main Document
Pg 132 of 161
DELPHI HOLDINGS CORP., ET AL

Page 132

```
 1            MR. HADDAD:  Excuse me?

 2            THE COURT:  The statute is designed to prevent you -

 3    if, again, the insurance policy had provided that it was going

 4    to cover half the people at Packard Hughes, then that would not

 5    be enforceable.  They would be bound by this endorsement,

 6    because they're not allowed to cover half.  That's what binds

 7    them.  They have to cover everyone at the insured.  That's the

 8    purpose of the statute.

 9            MR. HADDAD:  To cover all of the employees --

10            THE COURT:  At the insured.

11            MR. HADDAD:  -- of "you," and "you" is Delphi, and we

12    can't look behind that, Your Honor.  I think that poses an

13    unreasonable burden on --

14            THE COURT:  I guess --

15            MR. HADDAD:  -- the State.  I think it's contrary to

16    the public policy as enunciated in the state and in the

17    legislature and in the --

18            THE COURT:  Why is -- there's nothing to say it's an

19    unreasonable burden.  I read these policies this morning.  I

20    read them between the hours of 8:30 and 9:30.  I went through

21    -- I think I asked pretty good questions and I got it.  You

22    know, I mean, it's not that burdensome.  And there's no pre-

23    regulatory purpose.  The pre-regulatory purpose is all based on

24    the dealing with self-insurers, and whether they're allowed to

25    self-insure.  This is just gravy.
```

Page 133

1          So other than not being able to split up people with

2     the insurer, yeah, look at the policy.  I mean, it doesn't

3     override the contract that way.  It doesn't say if you get it

4     wrong, you're bound.  It doesn't say that.  It doesn't say if

5     you put down the wrong name, you're bound.  It says that the --

6     again, it says that "the insurer issuing this policy hereby

7     contracts and agrees with the insured employer," and among

8     other things that in E --

9          MR. HADDAD:  Yep.

10          THE COURT:  -- "this insurance contract or policy

11     shall for all purposes be held and deemed to cover all the

12     business the said employer is engaged in."  But it doesn't

13     vouch, it doesn't say we represent and warrant that we are the

14     insurer and you are the employer.

15          MR. HADDAD:  Yeah, well, I would disagree with that.

16     It says --

17          THE COURT:  It doesn't say that.

18          MR. HADDAD:  -- we're the insurer issued by, name of

19     insurance company, ACE.

20          THE COURT:  Issuing this policy.

21          MR. HADDAD:  Issuing this policy, named insured,

22     Delphi Corporation.  You are the insured employer.  We now have

23     to look to hundreds of pages --

24          THE COURT:  All right.  That depends --

25          MR. HADDAD:  -- and I know Your Honor could do that

1    because --

2           THE COURT:  -- on who "you" is again.  That doesn't

3    depend on the fact that, you know, they've signed it.  I just

4    -- I don't -- you know, the policy says who it covers.  And

5    which is, you know, the employer.  It doesn't say that you are

6    the employer.

7           MR. HADDAD:  Well, it says, you are the insured

8    employer.

9           THE COURT:  Yeah.

10          MR. HADDAD:  It does say, you are the insured

11   employer.  It doesn't say Delphi Diesel is the insured

12   employer, it says "you," and the only "you" here is Delphi

13   Corporation, and to hold otherwise would be to read something

14   into this endorsement that does not apply, when the endorsement

15   itself says, any provision to the contrary in this policy, Your

16   Honor, any provision to the contrary elsewhere in this entire

17   policy is deemed modified hereby and conflicting provisions are

18   made null and void.

19          Anything not in harmony with this is deemed modified.

20   So if you want to say -- if this Court wants to say, if ACE

21   wants to say, well, there's provisions in this policy that

22   suggests that the insured employer is someone else, that's

23   modified by this.  That provision, Your Honor, H, conflicting

24   provision, that's a very critical provision here.  It modifies

25   everything else in those hundreds of pages to harmonize it

Page 135

1   right with this.  And that's the provision, Your Honor, we

2   pointed that out in my opening comments.  It all keeps coming

3   back to that.  The remainder of the stuff that Mr. Olshin's

4   colleagues point to in their papers, it has to be modified and

5   harmonized to comport with this, and this says "you" is Delphi.

6   And that's what that says, Your Honor.

7           THE COURT:  Okay.  All right.

8           Okay.  I have before me two motions for summary

9   judgment in this adversary proceeding.  I have a motion by the

10  Plaintiffs, ACE American Insurance Company and Pacific

11  Employers Insurance Company, which I sometimes refer to "ACE."

12  And I also have a motion for summary judgment by Defendants,

13  State of Michigan Worker's Compensation Agency, and State of

14  Michigan Funds Administration, which I sometimes refer to as

15  the "Michigan defendants."

16          As a threshold matter, it was contended in the first

17  time in this very long running adversary proceeding by the

18  Michigan defendants that I cannot determine this motion without

19  adding as a necessary party all of the ultimate beneficiaries

20  of the insurance policies at issue, and that is, all the actual

21  and potential worker's compensation claimants employed by any

22  of the arguable employers covered by the policies at issue.

23          I conclude, though, that such people are not

24  indispensable to this litigation, given that their interests

25  are adequately represented by the Michigan defendants.  Indeed

Page 136

1    it appears to me to be the case that the Michigan defendants,

2    in fact, have a greater interest in succeeding in this

3    litigation than the individual worker's compensation claimants.

4    That is because this litigation is about who will pay that

5    portion of the worker's compensation claims that is not paid in

6    tiny bankruptcy dollars by the Delphi debtors; i.e., whether

7    the insurer plaintiffs will pay or the Michigan defendants pay.

8           Either way, it appears clear to me that, although

9    payment has been delayed as a result of this litigation, the

10   worker's compensation claimants will ultimately be paid by

11   either the plaintiffs or the Michigan defendants.

12          Consequently, Michigan worker's compensation

13   claimants' interests are adequately represented in this

14   particular litigation as to who shall pay.  See generally

15   Continental Casualty Company v. American Home Assurance

16   Company, 2008 WL 1752231 S.D.N.Y. (April 14, 2008) at page 4.

17   See also National Union Fire Insurance Company of Pittsburgh v.

18   Mason Perrin and Kanovsky, 709 F.Supp. 411, 415 (S.D.N.Y 1989),

19   and Midwest Employers Casualty Company v. East Alabama Health

20   Care, 170 F.R.D. 195, 198 (MD Ala. 1996).

21          And turning to the summary judgment motions; under

22   Federal Rule of Civil Procedure 56(a), incorporated by

23   Bankruptcy Rule 7056, the Court shall grant summary judgment if

24   the movant shows that there's no genuine dispute as to any

25   material fact and is entitled to judgment as a matter of law.

1  Subject to the relevant sections of the Rule, a party asserting

2  that a fact cannot be raised as generally disputed must support

3  the assertion by citing to particular facts -- I'm sorry, to

4  particular parts of the record, including depositions,

5  documents, or electronically stored information, affidavits, or

6  declarations, stipulations, admissions, interrogatory answers,

7  or other materials, or by showing that the record does not

8  establish the absence or presence, as the case may be, of a

9  genuine dispute, Federal Rule of Civil Procedure 56(c)(1).

10       The movant bears the initial burden to satisfy each

11  material element of its claim or defense. Vermont Teddy Bear

12  Company v. 1-800-BEARGRAM Company, 373 F.3d 241, 244 (2d Cir.

13  2004); Isaac v City of New York, 701 F.Supp.2d 477, 485

14  (S.D.N.Y 2010), aff'd, 271 Fed. Appx. 60 (2d Cir. 2008).

15       To contest such a showing, the non-moving party must

16  provide evidence of a genuine issue of material fact to

17  successfully oppose the motion.  Matsushita Elec. Indus. Co. v.

18  Zenith Radio Corp, 475 U.S. 574, 586 (1986).  Facts are

19  material if they might affect the outcome of the suit under the

20  governing law.  Anderson v. Liberty Lobby, 477 U.S. 242, 248

21  (1986).  The Court is "not to weigh the evidence but is instead

22  required to view the evidence in the light most favorable to

23  the party opposing summary judgment, to draw all reasonable

24  inferences in favor of that party, and to eschew credibility

25  assessments." Amnesty Am. v. Town of W. Hartford, 361 F.3d 113,

1   122 (2d Cir. 2004).

2          Thus a summary judgment motion may not be defeated by

3   conclusory or self-serving statements, by simply raising

4   metaphysical doubts about a material fact, or by identifying

5   immaterial disputed facts, Anderson v. Liberty Lobby, 477 U.S.

6   at 247-48, and Matsuschita Electric, 475 U.S. 586, although "if

7   there is any evidence in the record from any source from which

8   a reasonable inference in the non-moving party's favor may be

9   drawn [on a material issue], the moving party simply cannot

10  obtain a summary judgment."  Binder & Binder PC v. Barnhart,

11  481 F.3d 141, 148 (2d Cir. 2007); see generally Matsashita

12  Electric, 475 U.S. at 586.

13         Of course, where the parties do not dispute the

14  material facts, disagreeing instead on the outcome based on

15  applicable law, the matter is appropriate for summary judgment.

16  Adirondack Transit Lines, Inc. v. United Transp. Union, 305

17  F.3d 82, 84 (2d Cir. 2002).  That is true, among other factual

18  contexts, in contexts where the parties are disputing the

19  plain, unambiguous meaning of a controlling document or

20  documents.  See Vermont Teddy Bear Company v. 1-800-BEARGRAM,

21  373 F.3d at 244.  That is because, "if a contract is

22  unambiguous on its face, its proper construction is a question

23  of law.  Metropolitan Life Insurance Company v. RJR Nabisco,

24  Inc., 906 F.2d 884, 889 (2d Cir. 1990).

25         In such situations, of course, the Court should not

1     look beyond the plain language of the contract to parol

2     evidence, Arcadian Phosphates, Inc. v. Arcadian Corp., 884 F.2d

3     69, 73 (2d Cir. 1989): see also In Re Ionosphere Clubs, Inc.,

4     147 B.R. 855, 861-62 (Bankruptcy S.D.N.Y. 1992).

5         Here, the ACE insurers' motion seeks summary judgment,

6     as Mr. Olshin noted, on three different issues.  First, it

7     seeks summary judgment on whether the insurers are liable under

8     deductible policies issued to Delphi Corporation or its

9     predecessor for years 2000, 2001, 2003, 2004, 2005, 2006, 2007,

10     2008 insofar as it is asserted that those deductible policies

11     insure claims against Delphi and its subsidiaries and

12     affiliates that are self-insured.

13         Separately, the ACE insurers' motion seeks summary

14     judgment declaring that if, for some reason, the foregoing

15     policies do not provide unambiguously for the limitations in

16     coverage that the motion asserts, that the policies should be

17     reformed under Michigan law to so provide.

18         And, third, the motion seeks a declaration on a

19     summary judgment basis that under separate, so-called retention

20     policies for the applicable years, the insurers have no

21     obligation until the self-insured retention is covered (those

22     policies being excess policies over the self-insurance carried

23     by the Delphi entities named in those policies).

24         The Michigan defendants seek summary judgment

25     declaring that, to the contrary, the deductible policies that

1   I've listed do, in fact, provide for insurance not only for un-

2   self-insured subsidiaries of Delphi, but also for Delphi and

3   its self-insured subsidiaries and affiliates.

4          As set forth at the start of this hearing, there's no

5   dispute that there is not a relevant deductible policy for the

6   October 1, 2002 through October 1, 2003 year, and, therefore,

7   that there's no basis for liability on the deductible policy

8   theory for the ACE insurers [for that year].

9          In addition, it's undisputed that the retention

10  policies do not create additional drop-down liability; i.e.,

11  that there's no coverage owed by the insurers until the self-

12  insured retention is satisfied.  Therefore, as far as those two

13  points are concerned, the insurers' summary judgment motion is

14  granted.

15         The insurers base their summary judgment motion in

16  respect of the deductible policies issue on three contentions,

17  which they combine together in an overall context, but which I

18  have uncoupled in light of my view that the applicable

19  deductible policies are in fact unambiguous and plainly provide

20  that they cover only the Delphi subsidiaries covered thereby

21  pursuant to the policies' plain terms, as I'll explain in a

22  moment.

23         I therefore conclude that it's inappropriate to

24  consider, in addition to the plain meaning arguments that the

25  ACE insurers make, the ACE insurers' arguments that parol

1    evidence, including documents submitted by underwriters and to

2    third parties, go to establish or help to establish their

3    interpretation of the contract.

4          I have considered the insurers' other argument,

5    however, which is a statutory argument but I did not base my

6    ruling on the insurers' statutory argument.  Rather, I base it

7    on my view of the plain meaning of the applicable policies.

8          But I should address the statutory argument first.

9    The insurer's contend that under the controlling statute which

10   is MCL 481, and, more specifically, MCL 481.611, and arguably

11   621, the Delphi entities were -- who are self-insured, were

12   precluded by law from separately obtaining insurance under the

13   deductible policies from the ACE insurers.

14         As I stated, this argument is primarily based on

15   Michigan Compiled Laws, Section 6.11.  That section states,

16   "Each employer under this Act [which is the Worker's Disability

17   Compensation Act], subject to the approval of the director,

18   shall secure the payment of compensation under this Act by

19   either of the following methods:  (a) by receiving

20   authorization from the director to be a self-insurer.  In the

21   case of an individual employer, the director may grant that

22   authorization upon a reasonable showing by the employer of the

23   employer's solvency and financial ability to pay the

24   compensation and benefits provided for by in this Act, and to

25   make payments directly to the employer's employees, as the

SPH HOLDINGS CORP, ET AL

Page 142

1  employees become entitled to receive the payment under the

2  terms and conditions of this Act, and pursuant to regulation

3  408.43(c) of the Michigan Administrative Code, if the director

4  determines it to be necessary, the director shall require the

5  furnishing of a bond or other security in a reasonable form and

6  amount.  Such security as may be required by the director may

7  be provided by furnishing specific excess insurance, aggregate

8  excess insurance coverage through a carrier authorized to write

9  in this state, in an amount acceptable to the director, a

10  surety bond, an irrevocable letter of credit format acceptable

11  to the bureau, and claims payment guarantees; (b) by insuring

12  against liability with an insurer authorized to transact the

13  business of worker's compensation insurance within the State of

14  Michigan."  And then it is also pointed out that insurance can

15  be obtained for worker's compensation obligations by a pooling

16  of insurance.

17       The ACE insurers contend that by using the word -- the

18  phrase "either of the following methods," the statute is

19  written in the disjunctive, so that only one of the following

20  methods may be used.

21       I do not read the statute so narrowly.  It doesn't

22  preclude a combination of the following methods.  Although it

23  is the case that where an individual employer does not make a

24  sufficient showing of its solvency and financial ability, the

25  director may require additional security only in the specified

1   means set forth in subsection (a), which does not include a

2   deductible policy like the ones at issue, nevertheless, I do

3   not believe that the plain reading of the statute specifically

4   precludes the issuance of insurance through a deductible policy

5   while at the same time the insured is self-insured for worker's

6   compensation.

7        The ACE insurers' interpretation is also belied,

8   although only as a matter of practice, not as a legal matter,

9   as a matter of interpretation of the statute, by the

10  Eisenheimer affidavit.  Now, Mr. Eisenheimer is in fact the

11  director, so I should accord deference to his interpretation of

12  the statute over which he's been placed as the director, and I

13  do so; and he notes that there are many instances, although a

14  minority, where, in fact, such a situation where a self-insured

15  employer also obtained insurance for worker's compensation

16  through a deductible policy.

17        All things considered, then, it appears to me that

18  there's not a plain meaning statutory preclusion to the

19  obtaining by the self-insured Delphi entities of additional

20  deductible insurance.  I'm not willing to place preclusive

21  emphasis on the word "either" under these circumstances,

22  somewhat additionally cautioned not to do so by the Supreme

23  Court's recent wrestling with the meaning of the word "or" in a

24  statute, Radlax Gateway Hotel LLC (ph) v Amalgamed Bank (ph),

25  132 S. Ct. 265 -- I'm sorry 2065 at page 2072 (2012).

DPH HOLDINGS CORP, ET AL

Page 144

1          I'm not persuaded that the other section of the

2    Worker's Disability Compensation Act cited by the ACE insurers

3    adds anything to their argument.  They state that MCL Section

4    418.621 bolsters their argument that a self-insured employer

5    cannot also obtain a deductible policy.  They rely on

6    418.621(2), which states, "The state accident fund and each

7    insurer issuing an insurance policy to cover any employer not

8    permitted to be a self-insurer under section 611, shall insure,

9    cover and protect in the same insurance policy, all the

10   businesses, employees, enterprises, and activities of the

11   employer."

12          And then they point also to Subsection 4 of that

13   section, which states, "except as modified by the director as

14   provided for herein, each policy of insurance covering worker's

15   compensation of this state shall contain the following

16   provisions."

17          Subsection 2 does not contain the preclusion of the

18   issuance of a separate policy.  It just states that a state

19   accident fund issuing an insurance policy to cover an employer

20   not permitted to be a self-insurer, as opposed to an insurer

21   under Section 611(1), shall insure all of the business,

22   employees or enterprises covered by that employer.

23          That is, I don't believe it has the preclusive effect

24   that is argued by the ACE insurers.  Clearly, there's no case

25   that makes that argument under Michigan law.

Page 145

1          It's argued by the insurers that the retention

2     policies that they issued don't have to have the Michigan law

3     endorsement set forth in Subsection 4 of 621; however, I don't

4     believe that that again is a bar to the issuance of a

5     deductible policy where an employer is self-insured.

6          So as a summary judgment matter, I do not find that

7     the Michigan statute -- statutory sections, relied upon by the

8     ACE insurers entitle them to the relief they're seeking in the

9     context of their administration by the Michigan worker's

10    compensation insurance structure.

11         I do, as I said, though, find and conclude that the

12    plain meaning of the applicable deductible policies requires

13    the grant of the ACE insurers' motion.  I have carefully gone

14    through each of the deductible policies as well as closely

15    questioned ACE's counsel on the meaning of their terms.  And it

16    is clear to me, from that review, that by their terms each of

17    the policies excludes Delphi Corporation or Delphi Automotive

18    System Corporation, it's predecessor, which is listed at the

19    top of each policy as the named insured, and its affiliates and

20    subsidiaries doing business in Michigan except as specifically

21    provided in each of the policies.

22         With the exception of relying upon the so-called

23    "Michigan law endorsement" that appears in each of the policies

24    in the same form (except with the changes to the named insured

25    as being Delphi Corporation) or Delphi Automotive Systems

Page 146

1    Corporation, the Michigan defendants do not contest the plain

2    meaning interpretation set forth by the ACE insurers.  Nor do I

3    believe they could given the plain meaning of the applicable

4    policies.

5          Most of the policies, that is all the policies besides

6    the 2000 and 2001 policies, specifically exclude from the

7    coverage of the policies in a designated workplace exclusion

8    endorsement all of the entities who are covered by the named

9    retention policy in the exclusion.  A sample exclusion, which

10   is in essence the same in each of the policies that I've

11   listed, that is, the policies other than 2000 and 2001, can be

12   found at Bates number 002498 in respect of the 2008 policy.

13         Page 1 of that policy and page 1 of the other policies

14   that have the exclusion specifically states, "this policy

15   includes these endorsements and schedules, see schedules of

16   forms and endorsements," which refers to, among other forms,

17   the designated workplaces exclusion endorsement.

18         With respect to the 2000 and 2001 policies, each

19   policy provides that part 1 of the policy applies to the

20   worker's compensation law of the states listed here, and refers

21   the reader either to "a per information page attached."  The

22   policies cover many states besides Michigan.  And certain

23   states including Michigan have their own information page

24   attached.

25         The information page attached for Michigan appears at

1    Bates number 000348 with a 2000 policy and Bates number 000830

2    for the 2001 policy.  It lists only specific entities in each

3    of those attachments or information pages. For the 2001 -- I'm

4    sorry, for the 2000 policy, Packard Hughes Engineering Service,

5    Delphi Diesel Systems are listed, and for 2001, Allied Signal

6    Environmental Catalyst is listed.

7            It is clear from that construct that the terms of the

8    policies and the insureds under the policies with respect to

9    Michigan entities, are limited, therefore, to those entities

10   and no others.

11           With respect to those two policies, that's supported

12   by general sections A and B of the policy which refer to the

13   employer named in item 1 of the information page, and again,

14   the face page of each of those policies states that part 1 of

15   the policy applies to the worker's compensation law of the

16   states listed here, "per information attached," or "information

17   page attached," excuse me.  It has not been argued to the

18   contrary with respect to those two policies by the Michigan

19   defendants.

20           The Michigan defendants did argue in their memoranda

21   that various other insureds' extension endorsements in the

22   other deductible policies and extension of information pages,

23   such as appear in the 2008 policy at Bates number 002520 and

24   2521, argue that those were places in Michigan and entities,

25   Delphi entities, doing work, and those places are covered by

Page 148

1   the policies, but I conclude that the exclusion page and

2   exclusion endorsement that appears in each of the policies

3   controls with respect to those policies, very clearly providing

4   that the policy does not cover, or conducted at or from the

5   entities listed in those policies that I referred to in the

6   exclusion endorsement.

7          At oral argument, the Michigan defendants made it

8   clear that they were relying as far as plain meaning is

9   concerned only on the Michigan law endorsement, which I

10  referred to earlier; and, again, a sample of that appears at

11  Bates number 002650.  The purpose of the Michigan law

12  endorsement is to comply with the section of the Michigan

13  Worker's Disability Compensation Act that I previously quoted,

14  Section 418.621.

15         That section and subsection 2, again, provides that

16  "[t]he state accident fund and each insurer issuing an

17  insurance policy to cover any employer not permitted to be a

18  self-insurer under Section 611, shall insure, cover and protect

19  in the same insurance policy, all the businesses, employees,

20  enterprises, and activities of the employer."

21         The insurers argue that this requirement only applies

22  to insurers issuing a policy that doesn't cover the self-

23  insurer, and therefore would not apply to the deductible

24  policies to the extent that it's argued by the Michigan

25  defendants that they actually do cover self-insurers.

1          Paragraph, or subparagraph 4 of subsection 621 states,

2     "Except as modified by the director as provided for herein,

3     each policy of insurance covering worker's compensation in this

4     state shall contain the following provisions."  And, in fact,

5     those provisions which appear in subsection 4 are then stated

6     in the Michigan law endorsement that appears in each of the

7     deductible policies.  Again the sample being 0002650.

8          That endorsement, as required by the statute, states,

9     "Notwithstanding any language elsewhere contained in this

10    contract or a policy of insurance, the accident fund or the

11    insurer issuing this policy hereby contracts and agrees with

12    the insured employer," and then subsections A through G set

13    forth the contract mandated by Section 418.621(4).

14         In each section, it is clear that the undertaking,

15    whether it's for compensation, medical services, rehabilitation

16    services, funeral services, scope of the contract, obligations,

17    assumed termination notice or the like, applies to obligations

18    for workers or workman's compensation or medical or

19    rehabilitation or funeral services or the like, which the

20    insured employer may become liable under the provisions of the

21    Michigan Worker's Compensation Act during the life of this

22    contract or policy.

23         That is, the contractual undertakings refer to the

24    "insured employer" under the specific contract or policy of

25    insurance.  For example, subsection E, "scope of contract,"

1    says, "that this insurance contract or policy shall for all

2    purposes be held and deemed to cover all the business the said

3    employer is engaged in at the time of the issuance of this

4    contract or policy, and all other business, if any, the

5    employer may engage in during the life thereof, and all

6    employees the employer may employ in any of his businesses

7    during the period covered by this policy."

8         And the last undertaking in the Michigan endorsement -

9    - H -- states, "That all the provisions of this contract, if

10   any, which are not in harmony with this paragraph are to be

11   construed as modified hereby, and all conditions and

12   limitations of the policy, if any, conflicting herewith, are

13   hereby made null and void."

14        The first clause of the Michigan law endorsement

15   states, "This endorsement applies only to the insurance

16   provided by the policy, because Michigan is shown in item 3(a)

17   of the information page."  My reading of that language means

18   that it applies literally only to the insurance provided by the

19   policy, the word "only" modifying the first noun after it,

20   which is "insurance provided by the policy."

21        I do not believe, as is argued by the Michigan

22   defendants, the word "only" modifies the word "because;" i.e.,

23   that this endorsement is being provided only because Michigan

24   requires it.  I believe that, consistent with all the

25   references to the policy and to the employer, the first clause

DPH HOLDINGS CORP, ET AL

Page 151

1   of the policy makes it clear, it applies only to the insurance

2   provided by the policy.  I.e., it does not create a new policy

3   as far as the insured and the insurer.  Instead, it requires

4   that the policy be modified as set forth in provisions A

5   through H of the endorsement.

6        Nevertheless, the Michigan defendants contend that

7   even if, as I've found to be the case, the applicable

8   deductible policies do not cover Delphi Corporation, and that

9   Delphi Corporation is not the insured employer under those

10  policies, the Michigan law endorsement renders Delphi

11  Corporation the insured employer.

12       The Michigan defendants contend this because above the

13  Michigan law endorsement is a field which states the named

14  insured is Delphi Corporation under a specific policy number,

15  with the effective date of the endorsement, and setting forth

16  the policy period and the insurer.

17       The listing of Delphi Corporation in that field again

18  lists it as the main insured.  It does not list it as the

19  insured employer.  And it is the insured employer, and then the

20  specific policy, that subsections A through H, which are

21  required under MCL 418.621(4), refer to.  However, the Michigan

22  law endorsement also includes the following provision,

23  "Michigan law requires that we attach this paragraph to your

24  policy in the language specified by the statute.  To help you

25  understand the paragraph, the following definitions are added.

DPH HOLDINGS CORP, ET AL

Page 152

1    (1) We are 'the insurer issuing this policy'; (2) You are the

2    'insured employer', 'Michigan Workman's Compensation Act means

3    the Workers Disability Compensation Act of 1969, Workman's

4    Compensation means worker's compensation, the Bureau of

5    Workman's Compensation means the Bureau of Worker's Disability

6    Compensation'."

7         The Michigan defendants contend that the statement

8    "You are the insured employer" refers to the named insured on

9    the page, Delphi Corporation, notwithstanding the fact, as I

10   found at least, that the insurance policies do not provide for

11   insurance for Delphi Corporation and instead provide for

12   insurance for specific entities that are listed on the Michigan

13   information pages for the 2000/2001 policies or are listed in

14   the information pages in the other policies to the extent not

15   excluded by the exclusion endorsement.

16        The Michigan defendants argue that the reference to

17   "you" in the Michigan law endorsement can only mean Delphi

18   Corporation.  I conclude, however, to the contrary.  I believe

19   the reference to "you" in this endorsement can apply only to

20   the you, the entity, that is, in fact, insured under the

21   applicable policy, consistent with all of the references to the

22   policy in the endorsement and, most specifically, consistent

23   with the fact that ACE American Insurance Company is the

24   insurer issuing this policy only in respect of a policy that

25   provides insurance coverage for a specific entity.

Page 153

1          And as I found none of the policies provide specific

2    insurance coverage for Delphi Corporation under the Michigan

3    worker's compensation statute, to read the Michigan law

4    endorsement as the Michigan defendants have argued, would have

5    the effect of actually excluding the entities who are, in fact,

6    insured under the applicable policies, since they are not

7    listed as the named insured in the field that is at the top of

8    the endorsement.

9          It is clear to me that the listing at the top of the

10   field for Delphi Corporation properly lists "the insured,"

11   since Delphi Corporation is "the insured" under the applicable

12   policy, but that it does not refer to the actual insured

13   employer for purposes of the Worker's Compensation Act of

14   Michigan because those employers are specifically identified in

15   the applicable policies.

16         In addition, the Michigan law endorsement is made part

17   of the insurance policy itself, and, in light of that, I find

18   that no provision of the policy in fact does conflict with the

19   Michigan law endorsement, in that the endorsement refers to the

20   specific insured employer under the specific policy and that,

21   or those, insured employers, as I believe are uncontroverted,

22   have not breached any of the undertakings set forth in

23   paragraphs A through G of the endorsement or as required by MCL

24   621 -- I'm sorry 418.621(4).

25         Consequently, I conclude that as a matter of law the

Page 154

1    plain meaning of the statute -- of the contracts, requires the

2    grant of the ACE insurers' motion, and the denial of the

3    Michigan defendants' motion, for summary judgment.  As noted,

4    interpretation of a contract is a matter of law; as a result, I

5    conclude that Mr. Groves' admission at line 16 of page 66 of

6    his declaration -- that the "insured employer" in paragraph 2

7    of the Michigan endorsement is Delphi Corporation is correct --

8    is irrelevant to my determination.

9         In addition, it is clear both from his deposition and

10   his supplemental declaration, which does not conflict with that

11   admission that I've just cited to that he, like ACE generally

12   takes the position that the applicable policy that he was being

13   questioned on does not provide for insurance for Delphi itself

14   but only for the specific entities that are not excluded and/or

15   that are covered on the extension of information page in the

16   policy.  See page 86 of his deposition.

17        I believe that in the context of the questioning, I

18   can and should consider his supplemental declaration, for what

19   it's worth.  But, again, ultimately, I conclude based on my

20   reading of the contract as a whole and the applicable statute

21   that requires the Michigan endorsement, that the plain meaning

22   of the contract is clear, and that the Michigan endorsement

23   does not rewrite the contract to provide for a different

24   insured employer, namely only Delphi Corporation but, rather,

25   provides that the contract, to the extent that it would provide

1   to the contrary, (and, in fact, it does not provide to the

2   contrary), but if it provided for the contrary, rewrites the

3   contract so that for the actual insured employers it conforms

4   with the undertaking set forth in paragraphs A through G of the

5   Michigan endorsement -- A through H, excuse me, as well as set

6   forth in A through H of Subsection 621(4) of Chapter 418 of the

7   Worker's Disability Compensation Act.

8        Given that interpretation of the contract on its plain

9   terms, or the contracts on their plain terms, it is unnecessary

10  for me, and frankly improper for me, to get into the issue of

11  reformation and evidence as to the parties' intent at the time

12  of forming the contracts, since as I've found, the parties'

13  intent is clear from the contracts themselves, and as I've

14  ruled, requires the grant of the insurers' motion.

15       So, I will ask counsel for ACE to submit an order

16  granting its motion for summary judgment in the three respects

17  that I've ruled on:  first as to the 2002 policy, second as to

18  the retention policies, and third as to the plain meaning of

19  the deductible policies, and consequently, denying the motion

20  for summary judgment by the Michigan defendants.

21       You don't need to settle that order formally on notice

22  to the Michigan defendants and DPH, but you should e-mail a

23  copy to them before you e-mail it to chambers so that they can

24  make sure it's consistent with my ruling.

25       MR. KAMENEC:  Yes, Your Honor.

1          THE COURT:  And you don't need to repeat all the

2     conclusions of law set forth in my bench ruling, just refer to

3     the bench ruling.

4          MR. KAMENEC:  We will do that, Your Honor.

5          THE COURT:  As I often do when I give a long bench

6     ruling, I will look at the transcript of the ruling, and I may

7     edit it, not only for typos, and miscitations but for content.

8     If I do that, I will file it separately as a separate bench

9     ruling, which won't be the transcript but rather an amended and

10    corrected bench ruling.  But the holding won't change so you

11    don't need to wait for that process before you can send up the

12    order.

13         MR. KAMENEC:  Understood, Your Honor.

14         THE COURT:  Okay.  Thank you.

15         MR. HOGAN:  Your Honor, if I could, just one brief

16    housekeeping matter, Al Hogan again for DPH Holdings.  Just in

17    terms of taking stock of where we are in the adversary

18    proceeding at this point for a moment --

19         THE COURT:  Right.

20         MR. HOGAN:  -- I believe that Your Honor's order today

21    will resolve all of the affirmative claims that the insurer

22    sought in the adversary proceeding, but I'll confer Mr. Olshin

23    on that.

24         I also believe that Your Honor's ruling will dispose

25    of the counterclaim that the Michigan defendants asserted in

1   their response to the adversary proceeding, and we can work

2   that out.

3         THE COURT:  To enforce the policy.

4         MR. HOGAN:  To enforce the policies.

5         THE COURT:  Right.

6         MR. HOGAN:  In addition, Your Honor, DPH Holdings

7   filed counterclaims and cross claims against the insurers and

8   the Michigan defendants, respectively, the basic point of which

9   was that assuming that Your Honor ruled that there was no

10  coverage under the deductible policies for subsidiaries that

11  were otherwise self-insured, then the insurers would have no

12  right of recovery that -- against DPH Holdings on an

13  administrative claim basis.

14        Stepping back, Your Honor, the reason we've been here

15  in this court --

16        THE COURT:  No, I understand.

17        MR. HOGAN:  Right.  And so we haven't filed a motion

18  on that yet.  I just wanted to flag the issue, but I don't

19  think Your Honor's ruling today necessarily, as a matter of

20  what you ruled today, disposes of all the claims.  Having said

21  that, what I'm going to do is I'm going to reach out to Mr.

22  Olshin, talk with him and see if it does.  If it doesn't, we'll

23  advise you of that, I'll advise you of that in some way, shape

24  or form.

25        I'll consider what the effect is on our cross claims

DPH HOLDINGS CORP, ET AL

Page 158

1   against Michigan.  They didn't respond to those directly, but I

2   don't' think they've ever asserted that under the Form 400

3   there was a way to come back against DPH.  The bottom line

4   point is here --

5           THE COURT:  That was the whole point of it being

6   separate.

7           MR. HOGAN:  That's right.  So the bottom line point is

8   I think this ruling may very well effectively end all of the

9   adversary proceeding.  I'll confer with counsel to see if

10  that's the case, and when Mr. Olshin submits the order, he may

11  indicate to here to whether that is in fact their final order.

12          THE COURT:  Well, if the order wants to contain a

13  provision that grants you your relief on the counterclaim,

14  that's fine with me.  Given the prior history in this case, I'm

15  quite confident that that is not going to be the last ruling,

16  and that there will be an appeal.  And I -- it isn't before me,

17  but it's likely that if it didn't, if the order didn't have

18  that tying up of that one loose end, I probably would still

19  permit an appeal under Rule 54, so I don't think that should

20  enter your strategy at all in dealing with this, I'm saying to

21  all of you.  It's really a pretty -- an issue from the Michigan

22  insurers' issue, so otherwise, you know, that's just off the

23  top of my head, but I have a feeling that I would permit an

24  appeal under Rule 54, notwithstanding that it would only be

25  resolving some and not all of the adversary.

1           MR. HOGAN:  I understand, Judge, and just flag the

2      issue.  We may have a resolution when the order --

3           THE COURT:  Right, and that's fine.

4           MR. HOGAN:  -- comes in and if we --

5           THE COURT:  I mean, it logically makes sense to tie

6      that up, as opposed to having -- tied up by stipulation.

7           MR. HOGAN:  Right.

8           THE COURT:  If you want to have a separate stipulation

9      too, it says, if in fact this order is final, then we waive,

10     you know, then DPH gets its judgment.

11          MR. HOGAN:  Okay.  Thank you, Judge.

12          THE COURT:  Thank you.

13     (Concluded at 2:34 PM)

14                         * * * * * *

15

16

17

18

19

20

21

22

23

24

25

Page 160

1

2                              I N D E X

3                            R U L I N G S

4    DESCRIPTION                                            PAGE

5    ACE/Pacific's motion for summary judgment              11

6    and the Michigan Defendant's Cross Motion

7

8    Insurer summary judgment motion for dates             140

9    October 1, 2002 through October 1, 2003

10

11   ACE insurer's motion for summary judgment             154

12

13   Michigan defendant's motion for summary judgment      154

14

15

16

17

18

19

20

21

22

23

24

25

Page 161

CERTIFICATION

I, Sheila G. Orms, certify that the foregoing is a
correct transcript from the official electronic sound recording
of the proceedings in the above-entitled matter.

Dated:  October 18, 2012

Signature of Approved Transcriber

Veritext

200 Old Country Road

Suite 580

Mineola, NY 11501