Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 05-44481-rdd

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   DPH Holdings Corp., et al.,

8

9          Debtor.

10

11  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12

13                  U.S. Bankruptcy Court

14                  One Bowling Green

15                  New York, New York

16

17

18                  December 18, 2012

19                  10:06 AM

20

21  B E F O R E :

22  HON ROBERT D. DRAIN

23  U.S. BANKRUPTCY JUDGE

24

25

Page 2

1    Hearing re:  Notice of Agenda Proposed Fifty-Eighth Claims

2    Hearing Agenda

3

4    Hearing re:  Notice of Agenda Proposed Eightieth Omnibus

5    Hearing Agenda

6

7    Hearing re:  Adversary proceeding: 07-02236-rdd Delphi

8    Corporation, et al. v. DSSI, et al. Notice of Agenda

9    Proposed Adversary Proceedings Hearing Agenda

10

11   Hearing re:  Reorganized Debtors' Motion For Leave To File

12   Modified Amended Complaint

13

14   Hearing re:  Certificate of Service Regarding Re-Notice of

15   Reorganized Debtors Motion For Leave To File Modified

16   Amended Complaint

17

18

19

20

21

22

23

24

25   Transcribed by:  Rebecca Sharp

1    A P P E A R A N C E S :

2    BUTZEL LONG

3         Attorneys for Debtor

4         Suite 100

5         150 West Jefferson

6         Detriot, MI   48226

7

8    BY:   CYNTHIA J. HAFFEY, ESQ.

9         DAVID DEVINE, ESQ.

10        BRUCE SENDEK, ESQ.

11

12

13   BINGHAM GREENEBAUM DOLL, LLP.

14        Attorneys for DSSI

15        3500 National City Tower

16        101 South Fifth Street

17        Louisville, KY 40202

18

19   BY:   CLAUDE RAY (CHIP) BOWLES, ESQ.

20

21

22

23

24

25

1   FOX ROTHSCHILD, LLP

2        75 Eisenhower Parkway, Suite 200

3        Roseland, NJ 07068

4

5   BY:  RICHARD M. METH, ESQ.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1            P R O C E E D I N G S

2            THE COURT:  Okay.  In re: DPH Holdings.

3            MS. HAFFEY:  Good morning, Your Honor.  This is

4    Cynthia Haffey on behalf of the Plaintiff.  And Your Honor,

5    if I could I'll first go through the Agenda for the day.

6    There are no continued or adjourned matters, and there are

7    no uncontested, agreed, withdrawn, or settled matters,

8    uncontested, agreed, withdrawn, or settled matters.  So

9    before you today is the contested matter regarding the

10   reorganized debtors motion for leave to file an amended

11   complaint against DSSI.

12            Before I proceed on our motion for leave to amend,

13   I would like to give the Court an update on where we, the

14   status of the preference actions in total are.  It's been

15   about seven months since we were before the Court and gave

16   our last update.

17            THE COURT:  Okay.

18            MS. HAFFEY:  At that time, and that was in May of

19   2012, there were 43 actions remaining.  Since that time the

20   parties have been working diligently in trying to resolve

21   the cases and today there are 21 cases remaining.  Two of

22   those 21 have been resolved in principle and I anticipate

23   that we'll have a stipulated order of dismissal before the

24   Court if not before the end of the year, just shortly after

25   the new year.  Five of those 21 cases are what I refer to as

Page 6

1    inactive cases.  They are cases where the defendants are no

2    longer actively in business.  They did initial file an

3    answer to this complaint, but they have since stopped doing

4    business.  So that really leaves 14 active cases.  And of

5    those 14 we have meet and confers scheduled with three of

6    the defendants this week, and another two scheduled between

7    now and mid-January.  We have potential mediation scheduled

8    also at the end of January.

9            So if we remain as successful as we have been in

10   meeting and conferring and the parties working together, I'm

11   optimistic that by the end of January we will have reduced

12   that number to less then ten active cases remaining.

13           THE COURT:  And are those proceeding pursuant to

14   the procedure's order?

15           MS. HAFFEY:  They are, Your Honor.

16           THE COURT:  Okay.

17           MS. HAFFEY:  The first process under the

18   procedure's order is for the parties to conduct a meet and

19   confer.  And if the meet and confer is not successful we

20   have then moved on to mediation.  In a couple of those

21   matters, well actually several of the matters, the parties,

22   the counsel have been working together prior to the formal

23   meet and confer to try to narrow the issues so that when our

24   clients get together --

25           THE COURT:  Okay.

Page 7

1           MS. HAFFEY:  -- we can really have a very meaty

2      and substantive discussion.  Those discussions, pursuant to

3      the order, can be telephonic.  But we have held several in

4      person with counsel and that has definitely helped the

5      process.

6           THE COURT:  But the nine that are not in the meet

7      and confer/mediation stage, have they gone past it?  Or are

8      they still waiting for it?

9           MS. HAFFEY:  Only one has gone past it and that's

10     the one that will likely have the mediation at the end of

11     January.  That's the date that the parties are talking --

12          THE COURT:  Okay.  All right.

13          MS. HAFFEY:  -- and we've already started talking

14     about selection of the mediator.  And I apologize, Your

15     Honor, I woke up this morning with a head cold.

16          THE COURT:  Okay.

17          MS. HAFFEY:  So I apologize.  With me today are my

18     colleagues Bruce Sendek and David DeVine.  And depending on

19     the issues that are before The Court, The Court would like

20     to have addressed, they may also be participating today.

21          THE COURT:  Okay.

22          MS. HAFFEY:  So briefly a procedural history, just

23     to remind The Court.  We originally filed a motion for leave

24     to amend, and it was heard by The Court in June of 2011.

25     And at that time The Court found, with one small exception,

1   that the form of the DAS complaint met the Twombly Iqbal

2   pleading standards.  And that one narrow exception was to

3   DSSI and as to whether or not we had pled antecedent to

4   that.  Subsequent to that --

5            THE COURT:  And that's because the chart attached

6   to that complaint was basically blank on that issue with

7   regard to DSSI?

8            MS. HAFFEY:  There was a chart attached to the

9   back of the complaint and it did provide the obligor

10  information and it did provide dates and the transfer

11  amounts.  What it didn't provide, as did most of the other

12  complaints, was a list of either invoices or purchase

13  orders.

14           THE COURT:  What it was on account of?

15           MS. HAFFEY:  That's correct.

16           THE COURT:  Right.

17           MS. HAFFEY:  So subsequent to the June hearing,

18  the parties were before the Court on another matter in

19  October of 2011.  And as part of that hearing this Court

20  ordered the parties to get together and to negotiate a

21  procedures order.  And that's the procedures order we were

22  talking about just a moment ago.  It took the parties

23  several months to negotiate the procedures order because of

24  the number of defendants and their involvement.  DSSI was

25  invited to participate.  They did in some extent participate

Page 9

1    by providing mediator names.  And the procedures order then

2    was entered by The Court, I don't have the date in front of

th

3    me right now.  Was it February?  February 12 .  And in the

4    procedures order it did provide that DPH could provide that

5    antecedent, that information if it was missing in any

6    particular complaint exhibit.

7         Prior to the Court entering the procedures order,

8    however, DSSI did file a motion to dismiss with prejudice.

th

9    And that motion was heard on May 12  of this year.  And

10   during that hearing, and it is, I've got the transcript in

11   front of us, I think that the Court was clear that what was

12   left and remaining, we were provided the opportunity by the

13   Court to file a motion to seek leave to modify the amended

14   complaint.  And what would be remaining as to whether or not

15   we have now met that Twombly Iqbal standard in pleading

16   antecedent.  And in fact the Court asked the parties to

17   please meet for us to know counsel for DSSI the exhibit.

18   And this Court said that, and hopefully if the parties could

19   agree, and stipulated that it now passed Rule 12 muster,

20   that we would move on and that DSSI would be subject to the

21   procedures order.

22        THE COURT:  I also, I think there's one missing

23   step in all of this, although maybe you were going to get to

24   it, which is, at least as I recall, there wasn't an order

25   submitted, proposed order submitted after the June, 2011

Page 10

1  hearing specifically denying without prejudice for leave to

2  amend the first motion by DPH for leave to amend as to DSSI.

3  And so that was sort of hanging there open.

4        MS. HAFFEY:  And I think equally the Court on the

      th

5  May 12  hearing also said to the defendants that defendants

6  had not entered an order dismissing their action as they

7  believed had happened during the June hearing.  And Your

8  Honor stated at that hearing that he could understand how

9  there was this misconception between the parties.  And we

10 were working then towards the procedures order and felt that

11 we had tied that up.  Because the procedures order has a

12 process for defendants that are referred to as Rule 15

13 defendants that did make prejudice arguments.  And after the

14 meet and confer, mediation, the next step then is a Rule 15

15 hearing with The Court.  Or another track is for those

16 defendants that didn't make defenses as to Rule 15, and they

17 move right into a merits track and go right from the meet

18 and confer mediation right into a trial with this Court.

                                th

19       So my understanding of the May 12  hearing was

20 that Your Honor recognized that there was some confusion

21 amongst both counsel.  And we thought that we had taken care

22 of it through the procedures order but the Court recognized

23 that DSSI understood differently.  And the Court permitted

24 us to file this motion, again, on that narrow issue as to

25 whether or not we have now sufficiently pled the antecedent

Page 11

1    debt.

2            THE COURT:  Okay.

3            MS. HAFFEY:  And --

4            THE COURT:   The order itself, and there was some

5    back and forth on this and so there is actually a corrected

6    order from August of 2012, but that reflects the back and

7    forth from the parties in response to the first order that

8    was entered in May.  But -- I'm sorry, in June of 2012.  But

9    the order itself doesn't limit the objection to the Rule 15

10   issue, just to the issue of antecedent debt.  But looking

11   back as far as the 2011 hearing, I think that that frankly

12   was the reason that I did not grant the motion to amend and

13   instead had the dismissal without prejudice.

14           MS. HAFFEY:  And it's my reading on DSSI's briefs,

15   and I'm sure they will speak for themselves on this matter,

16   but in their reply they do say that that is their

17   understanding as well, at least that's my reading of it.

18   And that they did make those additional arguments that the

19   Court had originally heard in June of 2011 to preserve them

20   for appeal.  So again, the issue for the Court today is

21   whether or not the new exhibit and the complaint does state

22   a claim against DSSI.  So if we could jump right to that,

23   Your Honor?  Unless you have any questions beforehand?

24           The complaint, the modified first amended

25   complaint is in the form, substantially the form of the

Page 12

1    complaint that this Court reviewed in June of 2011, and

2    again in which the Court found that we had sufficiently

3    stated a claim.  As to the exhibit, we have provided we

4    believe more information than what was provided on those

5    complaints that The Court found was sufficient back in 2011.

6    The first exhibit again is a chart which provides the

7    transfer, the obligor, the transferee, the date of the

8    transfer, and the amount of the transfer, the type of

9    transfer.  And this, Your Honor, is Exhibit No. 1 to the

10   proposed amended complaint.

11           THE COURT:  It's actually Exhibit No. 1, but it's

12   Exhibits No. 1A through 1F.

13           MS. HAFFEY:  That's correct.

14           THE COURT:  Because you have sent them transfers.

15           MS. HAFFEY:  The page that I'm referring, the

16   specific document I'm referring to right now is the one

17   that's just under Tab 1.

18           THE COURT:  Right.

19           MS. HAFFEY:  And were provided to the obligors and

20   the dates and the transfer amounts.  And those are the same

21   transfer amounts that were on the original complaint and the

22   dates that were on the original complaint.  What we've added

23   then in the antecedent debt column is a reference then to

24   exhibits, to this document.  So if you were then to turn to

25   Exhibit No. 1A, and again this is to show that the debt was

Page 13

1    antecedent.  It provides in this document that this is

2    payment to DSSI to cover, and this is -- I'm sorry, what,

3    the Court?

4            THE COURT:  No, go ahead.

5            MS. HAFFEY:  It's in the second line of an email.

6    And it says to, payment for invoice, past due invoices.  And

7    it references Delphi Mexico, TNI, and ENS.  All divisions,

8    Your Honor, of DAS.  And we've attached additional

9    information on this, behind 1A.  On the next is an email

10   between the parties, and it's specifically from Margaret

11   Waddington (ph) who, I believe, her email states that she

12   was the Controller of DSSI at the time.  And the subject

13   line talks about that we need your, basically your bank wire

14   information to pay wire advances on those past due invoices.

15   So again, reflecting that this is an owed debt by the

16   Plaintiff to DSSI.  And it's in the dollar amount that is

17   pled in the complaint.  And then next we have a document

18   that we refer to as a wire room document.  And again, still

19   under 1A.  And it is from DAS.  Cynthia Hewlitt (ph) is

20   authorizing the payment to DSSI.  And it's to their bank,

21   Bank One.  It did have their ABA number on there.  But

22   because of, we were filing this, you know, as a public

23   record, I redacted that banking number for DSSI's, you know,

24   didn't want to put their wire information out there.  But

25   that was their ABA number.  And if you'll notice, there's a

Page 14

1   notation down in the bottom box that says past due.  So all

2   combined these several documents under Tab 1A I think

3   clearly reflect that the transfer made on that date to DSSI

4   by DAS were for past due invoices.

5          We have the same scenario to 1B, then.  And again

6   to 1B, going back to the Exhibit No. 1, is for a transfer on

              th

7   September 19  in the amount of $2,000,616.  And again it

8   talks about it is a wire.  And this document again

9   discusses, on let's see where, they are talking here about

10   executing an agreement for payment on past due invoices.

11   And in the subsequent page again is a DAS document showing

12   that DAS is authorizing the transfer of the payment to DSSI

13   for $2,000,600 and some odd change.  And if you flip back to

              th

14   the next page, which is dated September 19 , it again talks

15   about this payment going to, from an MNS2 payment cycle to

16   what they call a net immediate, but it's not a net immediate

17   in a COD sense, as DSSI is trying to state in their brief to

18   the Court.  It is a net immediate meaning that we are moving

19   from MSN 2 payments to something quicker.  But it's still a

20   past, it's still a payable.  MNS2, the Court is probably

21   familiar but let me just remind the Court, means that it's a

22   payment that is made second, on the second day of the second

23   month after the services are received.  So in other words,

24   if the service, a service is performed in August, the normal

              nd

25   payment for that would be October 2 .  If the payment, if

Page 15

1   the service was received in July, the payment then would be

nd

2   on September 2 .  So here what they are saying is we are

3   moving from MNS2 payments to a quicker payment timeframe.

4   And when it refers to an advance payment what it is

5   referring to is, again, we are moving in advance of what

nd

6   normally would be paid on, I think this one was October 2 .

7   We're moving it up quicker.  But it's already a past due

8   invoice.

9        THE COURT:  Is part of that interpretation based

10  upon the agreement that's attached as Exhibit No. 3?

11       MS. HAFFEY:  It is, Your Honor.

12       THE COURT:  Okay.

13       MS. HAFFEY:  Also in the body of the document that

14  I'm referring to does talk, however, about paying the

15  balance of past due invoices.

16        So then if we move on to tab C, which is four, the

th

17  third transfer that was made on September 28 .  And again,

18  these are the same transfer amounts and dates that were in

19  the original complaint.  This is a screen shot.  And I

20  apologize that it's not as easy to see when it's been

21  photocopied.  From the DAS payment records, and it's

22  showing, reflecting this amount being paid.  And the email

23  then that follows talks about this is for DSSI to cover

24  invoices for last week that should be set for immediate

25  payment per our settlement agreement.  And again, immediate

Page 16

1    payment does not mean COD.  Immediate payment according to

2    Exhibit, I think it's No. 3, of our complaint means, I think

3    it's seven to eight days.  Is that correct?  Seven days?  So

4    it's not COD.

5            THE COURT:  I'm sorry.  It's not, you said net?

6    Or not COD?

7            MS. HAFFEY:  It is not COD.

8            THE COURT:  Not COD, okay.

9            MS. HAFFEY:  So the last document in, under tab C,

10   again is one of those what we call wire room forms.  Again,

11   showing that it was DAS that was the obligor, making the

12   payment, making it to DSSI's bank.  I apologize, I did not

13   redact your ABA number there.  And it says in the bottom

14   payment of payables under payment terms, under deviation

15   request.  And of course, payables means something that is

16   already owed and due.

17           Similarly under Tab D, we have the same form.

18   Again, it reflects the amount of the line, I think it's the

19   fourth line down, which is for $220,538.  That is the amount

20   in this form.  Again, it's from DAS, from Ms. Cynthia

21   Hewlitt.  And again, they are wiring the money to DSSI and

22   down in the bottom, payment of payables.  Again, reflecting

23   that these are for amounts already owed.

24           E is for the, I think it's the fifth line down,

25   yes, and it is for an amount of $512,885.  Again, this is a

Page 17

1    screen shot as part of that payment.  The second one is hard

2    to see.  You can see it kind of in the whited out.  And

3    again, this says it covers payment originally requested for

4    Friday and not made, plus additional amounts due today, and

5    amounts shown as due on 11/2 but are now due under agreement

6    with DSSI.  So again, referencing the agreement with DSSI

                                   nd
7    that they would have been due on November 2  but that

8    payment has been moved up in advance.  And payments were

9    only due on MNS2 after services were provided.

10           And then we move on to F, which is $4,217,178.75.

11   Again, the same screen shot information.  The email itself

12   references invoices that are covered by this request.

13   Again, invoices only reflect payables that are out there.

14   And it has again information where it's going to DSSI's bank

15   account.  That the following form, again, is from DAS to Ms.

16   Hewlitt, again representing the dollar amount that I just

17   stated at $1,217,178.75.  And the indication at the bottom

18   says payment of invoices on net immediate terms to DSSI.

19   Again, net immediate does not mean COD.  Net immediate means

20   to be paid after seven days.

21           And then finally, G is for $546,990.  And that is

22   the dollar amount that is referenced again on Exhibit No. 1.

23   And this again is the wire room payment form that shows that

24   DAS made the payment on that date to DSSI, wired it to their

25   bank.  And the reason was for payment of invoices on net

Page 18

1    immediate terms to DSSI.  And again, things are only

2    invoiced when services were performed in net immediate under

3    that agreement and in seven days.

4            THE COURT:  Can I go back to E?  Is it E?

5            MS. HAFFEY:  Sure.

6            THE COURT:  If you look at the description on

7    this, it says this covers payment originally requested for

8    Friday and not made.  And that to me sounds like antecedent

9    debt.

10           MS. HAFFEY:  Right.

11           THE COURT:  And then it says plus additional

12   amounts due today, and amounts shown as due on 11/2 but due

13   now under our agreement with DSSI.  And the date of this

14   email is October 2.

15           MS. HAFFEY:  Correct.

16           THE COURT:  So how could those two categories be

17   antecedent debt?

18           MS. HAFFEY:  Well a payment that would have been

                                    rd
19   due today, that Monday, October 3 , would have been a normal

20   MNS2 payment.  So it would have been services that were

21   provided in August.

22           THE COURT:  Okay.  Or at least --

23           MS. HAFFEY:  And then --

24           THE COURT:  Yeah, because it's October 3 --

25           MS. HAFFEY:  Exactly.  And because it's a Monday

1    it wasn't the 2nd, it was the 3rd for that month.

2            THE COURT:  And what about the last thing?

3            MS. HAFFEY:  The last one, where it says on 11/2,

4    that means services were performed in September and the

5    email --

6            THE COURT:  Well it says 11/2, though.

7            MS. HAFFEY:  Well that's what it's saying.  They

8    normally would be due on 11/2, because that's the MNS2 date

9    for services in September.  The second month after.  And

10    because this email is dated October 3rd, we know those

11    services were already performed.

12            THE COURT:  You say they would originally be

13    payable on November 2nd?

14            MS. HAFFEY:  Under the old MNS2 terms.

15            THE COURT:  Okay.

16            MS. HAFFEY:  So we believe those documents alone,

17    Your Honor, provide fair evidence of the antecedent debt

18    here.  Those documents, maybe not every single one of them,

19    but definitely a selection for each of the line items, were

20    provided to DSSI's counsel before that June, 2011 hearing if

21    you recall my telling you that at that time.

22            We attached Exhibit No. 2 so we could provide DSSI

23    for the purchase orders that, for the full complement of the

24    wires, the amount transferred, those are the purchase

25    unders, those are the dates of the services, and the amount

Page 20

1    of the transfer.  And then third, we provided to The Court

2    the agreement that we have been referring to here.

3                 THE COURT:  Let me make sure in Exhibit No. 2 I

4    understand this.  The first seven items correspond to the

5    items on Exhibit No. 1?

6                 MS. HAFFEY:  That's correct.

7                 THE COURT:  And then under the column purchase

8    order it says see below.  So you are saying that the see

9    below is when you get down to specific orders, those orders

10   are covered by the see below language?

11                MS. HAFFEY:  It's the detail that make up those

12   wire transfers and invoices that were paid under --

13                THE COURT:  So see below is a cross reference to

14   these actual purchase order numbers?

15                MS. HAFFEY:  That's correct.

16                THE COURT:  There are four other transfers that

17   say see below.  So I guess, that are below the first seven.

18   I guess I'm assuming those are also, the detail is also for

19   those?  You know, there is one for $29,273, then one for

20   $33,000.  They are not by wire transfer, they are by it says

21   AFC 46722 for the first one there?

22                MS. HAFFEY:  That is my understanding, Your Honor,

23   that that is correct.

24                THE COURT:  So there is detail for those also

25   below?

Page 21

1              MS. HAFFEY:  That is my understanding.

2              THE COURT:  Okay.  Okay.  And then Exhibit No. 3

3    is the settlement agreement between Delphi Corporation and

4    DSSI, LLC?

5              MS. HAFFEY:  And it's actually a settlement

6    agreement, an agreement, Your Honor, not a settlement, an

7    agreement between Delphi Corporation together with its

8    affiliates and its subsidiaries.

9              THE COURT:  Right.  Which are all collectively

10   defined as Delphi.

11             MS. HAFFEY:  That's correct.  So it includes DAS.

12   So --

13             THE COURT:  And then the payment obligations are

14   by Delphi?

15             MS. HAFFEY:  I'm sorry?

16             THE COURT:  All of the references then in the

17   agreement itself, as well as the recitals where it says for

18   example company, which is DSSI, believes that Delphi, which

19   is Delphi Corp. and its subsidiaries.

20             MS. HAFFEY:  That's right.

21             THE COURT:  Yeah.

22             MS. HAFFEY:  So Delphi Corp. and its subsidiaries,

23   the reading of this agreement shows that DAS is an obligor

24   under this agreement, alone as to any payment that came

                        th
25   after September 16 .  But as I stated earlier --

```
 1              THE COURT:  Well it doesn't necessarily say that,

 2      but one could infer that.

 3              MS. HAFFEY:  That's correct.

 4              THE COURT:  And then for example the payment

 5      provision, there's one payment provision in paragraph 2A

 6      that says Delphi shall pay.  So I guess there's an inference

 7      from that that some Delphi entity shall make that payment.

 8      And you are saying that you have the record of DAS making

 9      the payment?

10              MS. HAFFEY:  That's correct.

11              THE COURT:  Okay.  And you are saying DAS is the

12      creditor because they made the payment?

13              MS. HAFFEY:  That is correct.

14              THE COURT:  They wouldn't have done so otherwise.

15              MS. HAFFEY:  It was the obligor, that's correct.

16              THE COURT:  They are not in the business of making

17      gifts.

18              MS. HAFFEY  And we have purchase orders that I

19      could share with the Court if necessary that shows, you

20      know, purchase orders between DSSI and some of these DAS

21      divisions that I referred to earlier.  The ENS and the TNA.

22              THE COURT:  But they are not necessarily divisions

23      of DAS.  That there maybe other entities too, like this

24      Mexican company.

25              MS. HAFFEY:  Those divisions that are referred to
```

1    are divisions of DAS?

2            THE COURT:  The invoices are all divisions of DAS?

3            MS. HAFFEY:  When I spoke earlier in regards to

4    the one email that was attached, I think, as to tab 1A,

5    referred to ENS and TNI.  And I think it's Delphi Mexico.

6    And I know that DSSI has taken the entities other than DAS,

7    and those are divisions of DAS.

8            THE COURT:  Well, I was asking a slightly

9    different question.  Which is the invoice numbers that are

10   attached, do they have the, are they to the specific

11   obligor?  I mean, can you see from the invoice numbers who

12   it is to?  I'm assuming you can, because it's an invoice.

13           MS. HAFFEY:  They are actually purchase order

14   numbers that are on Exhibit No. 2.

15           THE COURT:  I'm sorry.  Purchase numbers and

16   therefore have a specific purchaser, excuse me.  Right?  Or

17   not?

18           MS. HAFFEY:  Again, it would very likely reflect

19   under DAS the division of DAS.

20           THE COURT:  Okay.

21           MS. HAFFEY:  So Delphi having its energy and

22   systems, I think, that my client just showed me?  That's a

23   division of DAS.

24           THE COURT:  Okay.

25           MS. HAFFEY:  So the divisions and plants

Page 24

1    themselves issue purchase orders.

2            THE COURT:  Okay.

3            MS. HAFFEY:  Unless you have any further

4    questions, Your Honor?

5            THE COURT:  Okay.

6            MR. BOWLES:  Chip Bowles, Bingham Greenebaum Doll

7    for DSSI.  And I'm going to start with basically an

8    overview, which is, my clients, Your Honor, have generally

9    been confused in this case.  And when Ms. Haffey was going

10   back in the record, let me just start with the fact that if

11   you might remember way back in June, 2011 we were sort of

12   decided as the unique person.  And we were unique not

13   because there were blanks in our Exhibit No. 1.  We didn't

14   even have a column, Your Honor, for antecedent debt.  We

15   were more unique because there were several other people

16   situated like that.  Because DAS, as the Plaintiff,

17   affirmatively stated in that first amended complaint motion,

18   and in the first amended complaint, that they had no

19   evidence of antecedent debt.  They stated that the only

20   evidence they believed that might exist was on information

21   and belief held by my client, DSSI.

22            At the June hearing, and at the last May hearing,

23   you said when we were discussing about this, my clients

24   don't have to prove their case for them.  And that's what

25   we've been faced with all along.  Because Your Honor, you

1    are correct that the main issues here are antecedent debt.

2    But it still comes down to two forms of antecedent debt.

3    And when I say that, you know, we've been confused, Ms.

4    Haffey's presentation has sort of confused us more.  Because

5    one thing she said, and we are looking at the documents

6    filed in this case, is that Delphi Mexico is a subsidiary of

7    DAS.

8              THE COURT:  No, she said it was a division.

9              MR. BOWLES:  A division of DAS.  But looking at

10   the org chart filed in this case, I believe all

11   international ones came under a different division other

12   than DAS.  So I'm not certain that, you know, and certainly

13   there's no allegations in the third amended complaint as to

14   that fact.

15             THE COURT:  Does it matter if DAS made the

16   payment?

17             MR. BOWLES:  Yes it does, Your Honor, for two

18   reasons.  Remember, Your Honor, this is a unique case in

19   another reason.  If this was a normal case, like the Enron

20   case, you would have either preferences or you would have

21   constructed fraudulent conveyance where the debtor entity

22   who was the transferor paid a debt it did not owe.  One is

23   either going to be constructed fraudulent conveyance because

24   they got no benefit, or it's going to be a preference

25   because they paid a debt they owe.  Remember Your Honor, DAS

1    and all the other Delphi entities decided for reasons a long

2    time ago to waive all constructed fraudulent conveyances.

3    So it does become very important.

4              The only way they can prevail here, Your Honor, is

5    to specifically be able to show under Iqbal and Twombley

6    that there is an antecedent debt owed by either DSI or DTI.

7    Remember, this isn't one where they said DAS and other

8    entities.  They simply said DAS and DTI are the only ones

9    that have entered into service agreements here.

10             Your Honor, this is from their complaint.  I don't

11   have to go any further on that.  So going to the first issue

12   --

13             THE COURT:  Well they don't say DAS has entered

14   into service agreements.  They just say DAS became obligated

15   --

16             MR. BOWLES:  Actually what they say is if you look

17   at paragraph 13, Your Honor, they said Plaintiff was the

18   operating subsidiary of Delphi North America.  Plaintiff is

19   DAS.  And then you go to paragraph 13.  Plaintiff and DTI

20   entered into certain service agreements with the Defendants

21   for the performance of various services.

22             THE COURT:  And Plaintiff assumed or otherwise

23   became obligated --

24             MR. BOWLES:  Became obligated --

25             THE COURT:  -- so I read that to say Plaintiff

Page 27

1    entered into certain of them, DTI entered into certain of

2    them, it's not clear that both of them entered into all of

3    them.

4            MR. BOWLES:  Oh I'm not requiring both, but --

5            THE COURT:  But in any event, Plaintiff became

6    obligated for all the payment obligations --

7            MR. BOWLES:  But what you've hit on, Your Honor,

8    is the thing there are only two entities we are really

9    talking about.

10           THE COURT:  Right.

11           MR. BOWLES:  DTI and DAS itself.  If it went to

12   any other Delphi entity, that's not the subject of this

13   lawsuit.  At least, so if it went to --

14           THE COURT:  Unless DAS was obligated on it.

15           MR. BOWLES:  But remember, Your Honor, you said

16   that you wanted to have in your initial dismiss order an

17   identification of who was in fact the obligor, the

18   transferrer.  We know DAS paid the money.  But in this case

19   they decided to limit the world just to DAS and DTI.

20           THE COURT:  Right.

21           MR. BOWLES:  So one of the main issues there is

22   just looking at the corners and the list of things we have

23   here, there is nothing that really says that DAS and DTI

24   really owned this money that were the subject of any of

25   these transfers.

Page 28

```
 1            THE COURT:  paragraph 13 in the invoices.  Or the

 2   payment, or paragraph 13 and the payable numbers refer to --

 3            MR. BOWLES:  Ah, but the payable numbers, and that

 4   would be Exhibit No. 2, not Exhibit No. 1.  Our statement,

 5   and I'll go through Exhibit No. 1 later if you'd like Your

 6   Honor.  But all Exhibit No. 1 does is go through and set

 7   forth, here we want you to pay this money, DAS, to the

 8   Daycorp system.

 9            THE COURT:  Right.

10            MR. BOWLES:  If you want I can go through in

11   order.  I can address Exhibit No. 2 now.  But I'll go to

12   Exhibit No. 2.  Exhibit No. 2, Your Honor, is basically an

13   exhibit that has a few sets of columns on it.  The first and

14   most interesting is not really a column of Exhibit No. 2 but

15   is instead what they have not talked about.  Down in the

16   corner on Exhibit No. 2 you will find that there is a date,

17   and it shows a June date of 2012.

18            Now Your Honor, here is one of the issues we've

19   had which we've been going through all this.  This

20   information apparently did not exist in any usable form,

21   unless we believe that Ms. Haffey somehow misspoke at the

22   earlier thing, at the time the bankruptcy was being filed, I

23   mean the first amended complaint was being filed.  Because

24   they stated in their, under Rule 11, we have no evidence in

25   our possession, on information and belief we believe these
```

Page 29

1    orders exist in the hands of the Defendants.  Which Iqbal

2    Twombley and this Court has rightly said this is now what

3    they can do.

4              Your Honor, the reason that is important in this

5    case is this is going to be, if we ever have to get to it, a

6    case where we're looking for the antecedent debt.  We're not

7    here to defend just a transfer.  We're here to defend

8    whichever alleged debts each one of those seven transfers

9    dealt with.  The best Ms. Haffey has said is, gee, Exhibit

10   No. 2 purports to show preexisting debts.  But look at

11   Exhibit No. 2.  You've got a date column.  It doesn't say

12   anything about what that date is for.  Ms. Haffey orally

13   argued it was the date the services were provided.  But if

14   you read entirely Exhibit No. 2 and every inch of their

15   pleading, they don't say that.  In fact, Your Honor, if you

16   look at their pleading and go over to paragraph 22, where

17   they were talking about it, they don't even allege that the

18   Plaintiff owed the antecedent debt.  It says Plaintiff made,

19   or caused to be made, each transfer, the transfers were the

20   seven payments on Exhibit No. 1, for or in account of an

21   antecedent debt owed to each Defendant.  Not owed by DAS --

22             THE COURT:  They say it in paragraph 13.

23             MR. BOWLES:  But in, but look at paragraph 22.

24   Because paragraph 13, and this is where we are getting down

25   to factual versus the statements that were made in Iqbal and

Page 30

1    Twombley.  Here they only say that we entered into certain

2    service agreements.  They don't provide any evidence of

3    where those agreements exist.  On the service agreement

4    issue Ms. Haffey addressed in their reply a very simple, she

5    said, well wait a minute, service agreements means purchase

6    orders.  But Your Honor, in the June hearing you

7    differentiated between service agreements.  Because there

8    were many Defendants here, not us among them, who said wait

9    a minute, our service agreement, in other words an agreement

10   to provide you the services, agreement to provide goods,

11   agreement to provide whatever, would be assumed in its

12   entirety.  Ms. Haffey said no, there are two different

13   things.  A service agreement level and a purchase order

14   level.  They have not alleged that there were any agreements

15   between there.  So I don't think 13 gives you the factual

16   plausibility that you need to have on this.  Certainly even

17   if it refers to Exhibit No. 2, Your Honor, you still have

18   the problem of the date.

19            THE COURT:  Isn't a purchase order a payment

20   obligation?

21            MR. BOWLES:  Is a purchase order a payment

22   obligation?  As a general rule, yes.  But then the question

23   becomes who owes it?  Which there is still no obligor.

24            THE COURT:  All right.  So isn't step one show me

25   the purchase orders?  And then you make a summary judgment

Page 31

1    motion?

2           MR. BOWLES:  Well the answer to that, Your Honor,

3    is that would still have to go through discovery.  And

4    that's what Iqbal Twombley said.

5           THE COURT:  Yes, you do.  But does a complaint

6    have to actually attach the purchase orders?  No.

7           MR. BOWLES:  No.

8           THE COURT:  All right.  So this seems to me to be

9    pretty specious to me.  You know how to defend against this.

10   In fact, you have already started to.

11          MR. BOWLES:  No --

12          THE COURT:  You have started to allege that Delphi

13   Mexico is in fact a separate subsidiary and there was no

14   payment on account of antecedent debt.  Show me where DAS is

15   liable for it, and if they can't do it you win on summary

16   judgment.  You know what?  I said in the May transcript that

17   I would not be happy if I got a complaint that basically

18   gave you the information so that you can defend.  I'm not

19   happy.  I appreciate that this has taken a long time.  I was

20   very clear at the last hearing that the blame for that is on

21   both parties, but it's not really blame because I think both

22   parties have been dealing in faith.  But I just, to me this

23   is a valid complaint.

24          MR. BOWLES:  And if that is Your Honor's thing, I

25   will not waste The Court's time then.

Page 32

1          THE COURT:  Okay.  All right.  Good.  I rule in

2     favor of the debtors, having reviewed the exhibits and the

3     complaint.  To me, this passes Iqbal and Twombley.  I've

4     already laid out the standard Iqbal and Twombley ad nauseam.

5     It's also laid out in the Hydrogen (ph) case by Judge

6     Gonzalez, which completely agrees with what I've laid out on

7     the record.

8          These exhibits, combined with the complaint, may

9     or may not ultimately establish a case.  But they certainly

10    set forth the basis for the debtors asserting that this is

11    antecedent debt.  And clearly it is supplemented, although

12    it didn't have to be, but I believe it is supplemented by

13    Exhibit No. 3 which shows that there was enormous pressure

14    being placed on Delphi to pay antecedent debt.  So yes,

15    maybe ultimately you can show as a defense that it was

16    substantially contemporaneous, and intended by the parties

17    to be contemporaneous.  Or you can refute their allegation

18    that it was in respect of an antecedent debt of DAS.  But

19    the payments were by DAS.

20         They have asserted in Exhibit No. 2 that they have

21    purchase orders responding to those payments by DAS.  They

22    will show whether they are on behalf of DAS or one of its

23    divisions, or of a third party.  And they will have to show

24    then, obviously, some backup for their support that in fact

25    DAS was the party that assume obligations for this

Page 33

1   notwithstanding that.  But I'm not prepared to nip this in

2   the bud.  In essence under Rule 12(B)(6) and Rule 8 as part

3   of a motion under Rule 15 for leave to amend.  To me this

4   lays out sufficient factual support that these debts are

5   antecedent debts and that they are owed by the Plaintiff,

6   DAS.  So you can submit the order to make the motion.

7          MS. HAFFEY:  Thank you, Your Honor.

8          THE COURT:  Thank you.

9          MR. BOWLES:  Thank you, Your Honor.

10          MS. HAFFEY:  Thank you.

11      (Whereupon, proceedings concluded at 10:45 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 34

1                           I N D E X

2

3                            RULINGS

4                                            Page        Line

5    Motion of DPH For Leave To File          32           2

6    Modified Amended Complaint

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2

3    I, Rebecca Sharp, certified that the foregoing transcript is

4    a true and accurate record of the proceedings.

5

6

7

8

     Veritext

9

     200 Old Country Road

10

     Suite 580

11

     Mineola, NY 11501

12

     Date:  December 20, 2012

13

14

15

16

17

18

19

20

21

22

23

24

25