**Hearing Date And Time:  July 25, 2013 at 10:00 a.m. (prevailing Eastern time)**
**Objection Date And Time:  July 18, 2013 at 4:00 p.m. (prevailing Eastern time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, Illinois 60606
John Wm. Butler, Jr.
John K. Lyons
Albert L. Hogan III
Ron E. Meisler

     - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036

Attorneys for DPH Holdings Corp., et al.,
    Reorganized Debtors

DPH Holdings Corp. Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

DPH Holdings Corp. Legal Information Website:
http://www.dphholdingsdocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  | : |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| DPH HOLDINGS CORP., et al., | : | Case No. 05-44481 (RDD) |
|  | : |  |
|  | : | (Jointly Administered) |
| Reorganized Debtors. | : |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**REORGANIZED DEBTORS' MOTION FOR FINAL DECREE AND ORDER**
**PURSUANT TO 11 U.S.C. §§ 105, 350(a), AND 1142, FED. R. BANKR. P.**
**3022, AND LOCAL BANKR. R. 3022-1 CLOSING THE BANKRUPTCY**
**CASES AND PROVIDING RELATED RELIEF**

DPH Holdings Corp. ("DPH Holdings"), on behalf of itself and certain of its

affiliated reorganized debtors in the above-captioned cases (together with DPH Holdings, the

"Reorganized Debtors"), formerly known as Delphi Corporation ("Delphi") and certain of its

subsidiaries and affiliates, former debtors and debtors-in-possession in the above-captioned cases

(collectively, the "Debtors"), hereby submits this Motion For Final Decree And Order Pursuant

To 11 U.S.C. §§ 105, 350(a), and 1142, Fed. R. Bankr. P. 3022, and Local Bankr. R. 3022-1

Closing The Bankruptcy Cases And Providing Related Relief (the "Motion"), for an order,

substantially in the form attached hereto (the "Case Closing Order") (i) closing the Chapter 11

Cases (defined below) that remain open[1] subject to completion of the administrative tasks

described in paragraphs 20-27 and other ministerial actions set forth herein; (ii) authorizing the

Reorganized Debtors to complete certain outstanding administrative tasks as detailed below

following entry of the Case Closing Order; (iii) discharging and releasing the Plan

Implementation Parties (defined below); (iv) setting a status hearing date in December 2013 to

report the resolution of the administrative tasks described herein and to report that the Open

Cases have been fully administered (the "Closing Status Hearing"); (v) approving the form and

manner of notice of the relief requested in the Motion; and (vi) retaining jurisdiction to enforce

or interpret its own orders pertaining to the Chapter 11 Cases including, but not limited to, the

Modified Plan (defined below), the Plan Modification Order (defined below), and the Case

Closing Order.  In support of this Motion, the Reorganized Debtors respectfully represent as

follows:

---

[1] Several of the Chapter 11 Cases have already been closed. Pursuant to this Motion, the Reorganized Debtors seek
to close the Chapter 11 Cases that remain open, consisting of: (1) DPH Holdings, Inc. (Case No. 05-44481), (2)
Delphi Medical Systems Colorado Corporation (Case No. 05-44507), (3) Delphi Medical Systems Texas
Corporation (Case No. 05-44511), (4) Delphi Mechatronic Systems, Inc. (Case No. 05-44567), and (5) Delphi
Automotive Systems (Case No. 05-44640) (collectively, the "Open Cases").

## PRELIMINARY STATEMENT

Following its separation from General Motors Corporation in 1999, Delphi was one of the world's largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. Delphi developed a diverse customer base, including many of the major global original equipment manufacturers in the automobile industry. The company also expanded its offerings by pursuing opportunities in adjacent markets such as communications, computer components, automotive aftermarket, consumer electronics, energy, and medical devices. Nevertheless, the Debtors' financial performance deteriorated as a result of, among other things, unsustainable legacy liabilities and operational restrictions, heavy competition in the United States automobile industry, and increasing commodity prices. As a result, the Debtors filed the Chapter 11 Cases in October 2005.

For the next two years, through intensive negotiations with their various constituents, the Debtors executed a broad transformation plan. By September 2007, the Debtors had filed a plan of reorganization, an amended version of which was confirmed by the Court in January 2008. On April 4, 2008, the Debtors announced that they had met the conditions to consummate the confirmed plan, but were unable to close after their plan investors declined to fund their obligations under the plan. The plan investors' decision not to fund the confirmed plan turned out to be a precursor of one of the most challenging historical periods in the global financial markets. While the Debtors' sought alternative financing sources and reevaluated their strategic paths to emerge from chapter 11, global credit markets froze. On October 3, 2008, the Debtors filed proposed modifications to the confirmed plan, approximately two weeks after Lehman Brothers filed for chapter 11 protection and the same day that the United States House

of Representatives approved the Troubled Asset Relief Program, or "TARP." The Debtors found

themselves in the midst of the Great Recession. The ensuing financial crisis hit the United States

automobile industry particularly hard. By April 2009, Chrysler had filed for chapter 11, followed

by GM in June 2009.

Despite the turmoil, the Debtors never stopped working with their constituents,

particularly their debtor-in-possession lenders and GM, to maximize value of the estates and

formulate a global resolution of the Chapter 11 Cases. These efforts culminated in the approval

on June 16, 2009, of supplemental disclosure and solicitation procedures for modifications to the

confirmed plan. The central feature of the modified plan was a master disposition agreement,

which provided for the transfer of the Debtors operating businesses to GM and an acquisition

entity owned primarily by lenders under the debtor-in-possession credit facility, GM, and the

Pension Benefit Guaranty Corporation (such entity now known as Delphi Automotive PLC and

referred to herein as "New Delphi"). GM received certain North American plants and facilities,

and New Delphi received the other operating businesses and assets. Among other payments and

assumption of liabilities, the key consideration provided by GM and New Delphi for the transfer

of the Debtors' core businesses included a full credit bid of the approximately $3.5 billion

debtor-in-possession credit facility, New Delphi's obligation to distribute up to $300 million to

general unsecured creditors, and a $50 million facility provided by GM to fund the wind down of

the Reorganized Debtors. The assets not transferred to GM or New Delphi, which included

certain noncore assets and avoidance actions, were retained by the Reorganized Debtors. The

Reorganized Debtors were tasked with monetizing those assets, fulfilling their obligations under

the modified plan, and bringing these Chapter 11 Cases to a close by the end of calendar year

2013 when GM's obligations to fund the wind down terminate.[2]

On July 30, 2009, the Court approved the modified plan. The Reorganized

Debtors consummated the modified plan and emerged from chapter 11 on October 6, 2009. Since

that time, New Delphi has found great success. At the time of this Motion, New Delphi's stock

trades for more than $50 per share, an increase of approximately 250% since going public in

November 2011, and the company has a market capitalization of approximately $16.25 billion.

The Reorganized Debtors have now substantially completed those tasks. As

described in greater detail below, the Reorganized Debtors have disposed of nearly all of their

assets. Only a small number of the more than 20,000 prepetition and postpetition claims filed in

the Chapter 11 Cases and nearly 200 adversary proceedings remain. Final distributions on the

open claims will be made prior to the Closing Status Hearing—the Reorganized Debtors are not

responsible for other future distributions under the modified plan, such as New Delphi's payment

obligations to general unsecured creditors. And other than certain administrative tasks, the affairs

of the Reorganized Debtors have concluded.[3] Accordingly, the Reorganized Debtors believe that

they are in a position to close the Chapter 11 Cases as planned.

The purpose of this Motion is to provide the blueprint for the final months of the

Chapter 11 Cases so that final decrees can be entered by December 2013 prior to the termination

of GM's obligation to fund the Reorganized Debtors' wind down. Thus, the Motion provides a

timetable for concluding the remaining claims and adversary proceedings no later than

November. The Motion also details important wind down mechanics, such as the funding of trust

---

[2] The parameters of GM's wind down obligations have themselves apparently become the subject of dispute, as to which the Reorganized Debtors are represented separately by Togut, Segal & Segal LLP.

[3] The Reorganized Debtors are not presently involved in the ongoing investigation by the Office of the Special Inspector General for the Troubled Asset Relief Program regarding supplements made by GM to New Delphi's pension plans for the benefit of some, but not all, retirees.

and reserve accounts to satisfy claims and fulfill the statutory requirements for the dissolution of DPH Holdings.

To facilitate an open and efficient process, the Motion proposes two separate hearings and two orders.[4] At the conclusion of the July hearing on the Motion (the "Case Closing Hearing"), the Reorganized Debtors seek entry of the proposed Case Closing Order attached hereto. The Case Closing Order, among other things, will establish the process and the milestones that must be reached prior to the Closing Status Hearing that the Reorganized Debtors are requesting to be scheduled in December. At the Closing Status Hearing, the Reorganized Debtors intend to report that all of the conditions described in the Motion and in the Case Closing Order have been satisfied and request entry of the final decrees in the Open Cases.

## JURISDICTION AND PREDICATES

The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The Court also retains jurisdiction to resolve matters relating to the Modified Plan pursuant to Section 14.16 thereof and paragraph 56 of the Plan Modification Order. The statutory predicates for relief requested herein are 11 U.S.C. §§ 105(a), 350(a), and 1142, Federal Rule of Bankruptcy Procedure 3022, and Local Bankruptcy Rule 3022-1.

---

[4] There is another pressing reason for the bifurcated case-closing process sought by the Reorganized Debtors. Pursuant to paragraph 56 of the Plan Modification Order and section 14.16 of the MDA (defined below), after July 30, 2013, this Court may no longer have jurisdiction to interpret and enforce provisions of the MDA that are relevant to the final distributions to be made under the Modified Plan. To avoid unnecessary controversy over jurisdiction, not to mention the disarray that would certainly result if another tribunal were to be involved at this late stage, the Reorganized Debtors seek to have the Case Closing Order entered by July 30.

# BACKGROUND

## A.    The Chapter 11 Cases

1.    On October 8 and 14, 2005, (the "Petition Dates"), the Debtors filed voluntary petitions under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York. This Court ordered joint administration of the Debtors' chapter 11 cases (the "Chapter 11 Cases").

2.    On December 10, 2007, the Debtors filed their first amended joint plan of reorganization (Docket No. 11386) (the "Plan") and related disclosure statement (Docket No. 11388).  On January 25, 2008, the Court entered an order (Docket No. 12359) (the "Confirmation Order") confirming the Plan (as modified) (the "Confirmed Plan"), and the Confirmation Order became final on February 4, 2008.

3.    On October 3, 2008, the Debtors filed a motion under 11 U.S.C. § 1127 for an order approving (i) certain modifications to the Confirmed Plan and related disclosure statement and (ii) related procedures for re-soliciting votes on the Confirmed Plan, as modified (Docket No. 14310) (the "Plan Modification Motion"). On June 1, 2009, the Debtors filed a supplement to the Plan Modification Motion, which sought approval of (i) certain modifications to the Confirmed Plan (the "Modified Plan"), (ii) supplemental disclosure, and (iii) procedures for re-soliciting votes on the Modified Plan. This Court entered an order approving the Modified Plan (Docket No. 18707) (the "Plan Modification Order") on July 30, 2009, which became final on August 9, 2009. On October 6, 2009 (the "Effective Date"), the Debtors substantially consummated the Modified Plan.

4.    On the Effective Date, the Debtors also closed the transactions under the Master Disposition Agreement, dated as of July 30, 2009, by and among Delphi, GM

Components Holdings, LLC, General Motors Company, Motors Liquidation Company (f/k/a

General Motors Corporation), DIP Holdco 3, LLC (which assigned its rights to what is now New

Delphi), and the other sellers and buyers party thereto (as amended, modified, and supplemented,

the "MDA"). Among other things, the MDA, in conjunction with sections 7.10 and 7.14 of the

Modified Plan, provides for post-closing funding mechanisms to fund certain distributions under

the Modified Plan, including payment of (1) certain administrative claims, (2) a contingent

distribution to general unsecured creditors and (3) liquidation and wind-down costs. Among

other post-closing funding provisions, pursuant to section 3.1.1.E of the MDA, GM Components

Holdings, LLC agreed to fund the liquidation and wind-down costs of DPH Holdings and its

subsidiaries up to an aggregate amount of $50 million (the "GM Wind Down Facility").[5] DPH

Holdings is entitled to receive an advance from GM up to twice each month, until December 31,

2013, in order to fund liquidation and wind-down costs of DPH Holdings and its subsidiaries.

**B.      DPH Holdings**

      5.      On the Effective Date, the Debtors emerged from chapter 11 as DPH

Holdings, a Delaware corporation, and its reorganized affiliates. In addition to providing

transition services to GM and New Delphi after the closing of the MDA, DPH Holdings was

charged with the purpose of winding down the Debtors' remaining assets and affairs, including (i)

the disposition of assets not transferred to New Delphi or GM under the MDA, (ii) the resolution

of prepetition and administrative expense claims, and (iii) the prosecution of avoidance actions.

As set forth in section 7.9 of the Modified Plan, the sole shareholder of DPH Holdings

Corporation is the Post-Consummation Reorganized DPH Holdings Share Trust (the "DPH

---

[5] This funding obligation was assumed by General Motors Company as part of General Motors Corporation's own
chapter 11 cases. Order Granting (I) Authorizing Sale Of Assets Pursuant to Amended And Restated Master Sale
And Purchase Agreement With NGMCO, Inc., A U.S. Treasury-Sponsored Purchaser; (II) Authorizing Assumption
And Assignment of Certain Executory Contracts And Unexpired Leases In Connection With The Sale; And (III)
Granting Related Relief, In re Motors Liquidation Company, No. 09-50026 (Bankr. S.D.N.Y. July 5, 2009) (Docket
No. 2968). General Motors Company and its predecessors are referred to herein collectively as "GM."

Holdings Share Trust"). John C. Brooks is the President of DPH Holdings. Mr. Brooks has

served as DPH Holdings' only authorized representative since the Effective Date, and has

overseen the wind down of its affairs.

**C.      DPH Holdings Share Trust**

6.      Pursuant to section 7.9 of the Modified Plan, on the Effective Date, the

Debtors executed the Delphi Post-Confirmation Trust Agreement (the "Trust Agreement") and

established the DPH Holdings Share Trust. Butzel Long, a professional corporation, is the trustee

and plan administrator (the "Plan Administrator") under the Trust Agreement. In addition to

being the sole shareholder of DPH Holdings, the DPH Holdings Share Trust was established for

purposes of directing DPH Holdings to make distributions to holders of claims under the

Modified Plan and to other beneficiaries under the Modified Plan and the MDA.

**D.      Claims and Administrative Expenses**

7.      On April 12, 2006, this Court entered an order establishing July 31, 2006, as the

deadline for all persons and entities, including governmental units, to file prepetition claims

against the Debtors in the Chapter 11 Cases. On June 16, 2009, this Court set July 15, 2009, as

the deadline for asserting administrative expense claims for the period from the commencement

of these Chapter 11 Cases through June 1, 2009. Finally, pursuant to the Modified Plan and the

Plan Modification Order, this Court established a bar date thirty days after the Effective Date, or

November 5, 2009, as the deadline for asserting administrative expense claims arising on or after

June 1, 2009.

8.      As of the date of this Motion, seventeen claims and administrative expenses

remain of the more than 20,000 proofs of claim and proofs of administrative expense claim that

have been filed against the Debtors in the Chapter 11 Cases.[6] The remaining claims fall into

three categories:

      i.     <u>Workers' Compensation Claims</u>. There are four open administrative
expense claims relating to workers' compensation payments: one asserted by the Michigan Self-
Insurers' Security Fund (No. 19281) (the "Michigan Workers' Compensation Claim"), one
asserted by the Mississippi Workers' Compensation Guaranty Individual Self-Insurer Guaranty
Association on behalf of claimant Joe N. Swan (No. 19571) (the "Mississippi Workers'
Compensation Claim"), and two asserted by the New Jersey Self-Insurers' Guaranty Association
(Nos. 18602 and 19712, corresponding with the two separate administrative expense bar dates)
(the "New Jersey Workers' Compensation Claims," and together with the Michigan Workers'
Compensation Claim and the Mississippi Workers' Compensation Claim, the "Workers'
Compensation Claims").

      ii.     <u>ACE Insurance Claims</u>. There are ten remaining claims that were filed by
ACE American Insurance Company and two of its affiliates—Pacific Employers Insurance
Company and Illinois Union Insurance Company (the "ACE Insurance Claims"). Eight of these
claims (Nos. 13018, 13080, 13309, 18900, 19192, 19270, 19633, 19671) relate to the Debtors'
prepetition and postpetition insured obligations. The remaining two claims (Nos. 19715 and
19716) are related to ongoing litigation between ACE American Insurance Company and Pacific
Employers Insurance Company, on the one hand, and the State of Michigan Workers'
Compensation Insurance Agency and the State of Michigan Funds Administration, on the other.

      iii.     <u>Environmental Claims</u>.  There are three remaining claims for
environmental clean-up obligations filed by the Michigan Department of Environmental Quality
and the U.S. Department of Environmental Protection(Nos. 15785, 18956, and 19539) (the
"Environmental Claims," and together with the Workers' Compensation Claims and the ACE
Insurance Claims, the "Remaining Claims"). These claims are related to the Reorganized
Debtors' properties in Rootstown, Ohio, and in Flint and Saginaw, Michigan.

**E.      Prosecution of Avoidance Actions**

      9.     Pursuant to section 7.19 of the Modified Plan, the Reorganized Debtors retained

177 avoidance actions, including adversary proceeding to avoid and recover fraudulent and

preferential transfers, to recover improper withholds, setoffs, and reductions from amounts owed

---

[6] In addition, certain other claims relating to avoidance actions were opened for administrative purposes pursuant to the Reorganized Debtors' Forty-Fourth Omnibus Objection Pursuant To 11 U.S.C. § 502(b) And (d) And Fed. R. Bankr. P. 3007 To (I) Modify And Allow (A) Certain Modified And Allowed Claims, (B) A Partially Satisfied Claim, And (C) Certain Partially Satisfied Scheduled Liabilities, (II) Disallow And Expunge (A) Certain Fully Satisfied Scheduled Liabilities, (B) Certain MDL-Related Claims, (C) Certain Union Claims, (D) Certain Personal Injury Claims, And (E) A Duplicate Claim, (III) Object To Certain (A) Preference-Related Claims And (B) Preference-Related Scheduled Liabilities, And (IV) Modify Certain SERP-Related Scheduled Liabilities (Docket No. 19395) (the "Forty-Fourth Omnibus Claims Objection"). The Fourth-Fourth Omnibus Claims Objection has been withdrawn, or will be withdrawn prior to the Closing Status Hearing, for all claims addressed therein.

to the Debtors, and to recover payments otherwise due to the Debtors. Since the Effective Date,

the Reorganized Debtors have worked to resolve substantially all of these avoidance actions,

either through consensual negotiations or through proceedings with this Court. By the time of the

Case Closing Hearing, the Reorganized Debtors expect that less than ten avoidance actions will

remain (the "Remaining Adversary Proceedings") and that all will be disposed of by the time of

the Closing Status Hearing.

**F.    Disposition of Assets**

10.    As part of the wind down, the Reorganized Debtors have engaged in a sales and

marketing process to dispose of all of the Reorganized Debtors' non-cash assets. The

Reorganized Debtors have completed sales of approximately twenty separate properties,

generating over $34 million in proceeds. Four properties remain, one of which the Reorganized

Debtors expect to sell before the Closing Status Hearing and, as described below, the last three

properties will be transferred to a trust along with funds to pay for environmental clean-up and

remediation costs. Any residual value remaining in the trust following the property remediation

will be transferred to GM or New Delphi, as provided by the MDA.

**RELIEF REQUESTED**

11.    By this Motion, the Reorganized Debtors request that the Court enter the Case

Closing Order (a) closing the Open Cases subject to completion of the administrative tasks set

forth herein; (b) authorizing the Reorganized Debtors to complete certain outstanding

administrative tasks, including those described in paragraphs 20-27, and certain other ministerial

actions as detailed below following entry of the Case Closing Order; (c) discharging and

releasing the Plan Implementation Parties; (d) setting a date in December 2013 for the Closing

Status Hearing to report that the administrative tasks described herein have been completed and

that the Open Cases have been fully administered; (e) approving the form and manner of notice

of the relief requested in the Motion; and (f) retaining jurisdiction to enforce or interpret its own

orders pertaining to the Chapter 11 Cases including, but not limited to, the Modified Plan, the

Plan Modification Order, and the Case Closing Order.

## BASIS FOR RELIEF

### A.    The Open Cases Should Be Closed

12.    The Reorganized Debtors have substantially administered the Modified

Plan, and will have completed administration of their obligations under the Modified Plan by the

time of the Closing Status Hearing. Accordingly, the Open Cases should be closed. Set forth

below are descriptions of the accomplishments that support such relief.

13.    <u>Claims Administration and Resolution</u>. Prior to the Closing Status Hearing,

the Reorganized Debtors will have completed their claims administration obligations under the

Modified Plan by prosecuting claims objections and settling, allowing, or otherwise disposing of

all prepetition and administrative expense claims. The Reorganized Debtors expect that each of

the Remaining Claims will be resolved in advance of the Closing Status Hearing as follows:

i.    The Reorganized Debtors believe that they have reached a settlement in principle to allow the Michigan Workers' Compensation Claim at an agreed amount. The parties are working to draft a stipulation that, upon entry by the Court, will finally resolve the Michigan Workers' Compensation Claim. Upon entry of the stipulation, the allowed amount of the claim will be paid from the Reorganized Debtors' unrestricted cash and/or proceeds from the GM Wind Down Facility.

ii.    The Reorganized Debtors believe that they have reached a settlement in principle to disallow and expunge the New Jersey Workers' Compensation Claims based on the sufficiency of the bond securing the Reorganized Debtors' obligations. The parties are working to draft a stipulation that, upon entry by the Court, will finally resolve the New Jersey Workers' Compensation Claim.

iii.    The liabilities asserted in the Mississippi Workers' Compensation Claim are covered by an excess insurance policy with ACE American Insurance Company, such that amounts paid by the Reorganized Debtors are subject to reimbursement by the insurer. The Reorganized Debtors are negotiating with ACE American Insurance Company and the Mississippi Workers' Compensation Guaranty Individual Self-Insurer Guaranty Association to assign the Reorganized Debtors' reimbursement rights to the Mississippi Workers'

Compensation Guaranty Individual Self-Insurer Guaranty Association. To resolve the Mississippi Workers' Compensation Claim, any additional amount required to satisfy liabilities not covered by the reimbursement policy will be paid from the Reorganized Debtors' unrestricted cash and/or proceeds from the GM Wind Down Facility.

iv.     To resolve the ACE Insurance Claims, the parties are conducting an actuarial analysis of the insured obligations to liquidate the insured liabilities relating to general liability, workers' compensation, and general liability policies. The liabilities asserted in the ACE Insurance Claims are secured by a cash collateralized letter of credit. The Reorganized Debtors believe that the ACE Insurance Claims are oversecured, such that the insured obligations will be satisfied by the collateral.

v.     The Environmental Claims will be resolved by transferring the Rootstown, Flint, and Saginaw properties into a trust created for the purpose of remediating any environmental contamination. The Reorganized Debtors are negotiating with the governmental agencies who have asserted the Environmental Claims to determine the amount necessary to fund clean-up costs and other expenses relating to administration of the trust. The amounts required to fund any trust created to resolve the Environmental Claims will be paid from the Reorganized Debtors' unrestricted cash and/or proceeds from the GM Wind Down Facility.

14.     <u>Monetization of DPH Holdings Assets</u>. The Reorganized Debtors have completed sales of nearly all of their properties, other than those three properties referenced above that will be transferred to a trust to resolve the Environmental Claims.[7] The final sale will be completed prior to the Closing Status Hearing. In addition, the Reorganized Debtors have prosecuted numerous avoidance actions and have collected the proceeds from such actions. The Reorganized Debtors have sold or otherwise disposed of any other non-cash assets.

15.     <u>Plan Distributions</u>. Substantially all of the property to be distributed under the Modified Plan has either been distributed or will soon be distributed. Distributions required to be made under the Modified Plan were made on or soon after the Effective Date in connection with the closing of the Modified Plan and the MDA. Since the Effective Date, the Reorganized Debtors periodically have made the remaining distributions as prepetition and administrative expense claims have been allowed. As noted above, only a limited number of administrative

---

[7] After an extensive marketing process, the Reorganized Debtors were not able to find a buyer willing to purchase the Rootstown, Flint, or Saginaw properties and assume the costs associated with the environmental clean-up.

expense claims remain for which the Reorganized Debtors are responsible for payment. Accordingly, the final distributions from the Reorganized Debtors under the Modified Plan will occur upon resolution of the Remaining Claims. Any value remaining after these final distributions and the wind down of DPH Holdings will be transferred to either GM or New Delphi, as provided by the MDA.

16.    As set forth in section 1.102 of the Modified Plan and section 3.2.3 of the MDA, any distributions to holders of General Unsecured Claims (as defined in the Modified Plan) are the responsibility of New Delphi and not the Reorganized Debtors.[8] In addition, obligations to make certain other payments under the Modified Plan—including tax claims and secured claims—were assumed by New Delphi and GM as part of the MDA. Because such distributions are not obligations of the Reorganized Debtors, these future payments should not be an impediment to closing the cases. And as set forth below, even after the Chapter 11 Cases are closed, this Court will continue to have jurisdiction to resolve any future disputes that might arise regarding distribution requirements under the Modified Plan.

17.    <u>Motions, Contested Matters, and Adversary Proceedings</u>. Other than outstanding objections relating to the Remaining Claims and the Remaining Adversary Proceedings, all other motions, contested matters, and adversary proceedings filed or arising in the Chapter 11 Cases have been fully and finally resolved, or will be at the time of the Closing Status Hearing. As set forth below, prior to the Closing Status Hearing the Reorganized Debtors intend to resolve, either consensually or before this Court, all matters relating to both the Remaining Claims and the Remaining Adversary Proceedings. The Reorganized Debtors are not aware of any new matters that should be raised or which could arise in the Chapter 11 Cases.

---

[8] New Delphi's obligation to distribute up to $300 million to General Unsecured Creditors is triggered once New Delphi's distributions to its own members exceeds the $7.2 billion threshold provided for in the Modified Plan and the MDA.

**B.      Resolution of Remaining Claims and Remaining Adversary Proceedings**

18.    In the event that any of the Remaining Adversary Proceedings cannot be

resolved by August 1, 2013, the Reorganized Debtors will notice such unresolved Remaining

Adversary Proceedings for disposition. The Reorganized Debtors request that the procedures

governing such Remaining Adversary Proceedings be expedited in accordance with this Court's

Order Pursuant to 11 U.S.C. §§ 105(d), 544, 547, and 548 and Fed. R. Bankr. P. 7016

Establishing (I) Dates for Hearings Regarding Adversary Proceedings and (II) Notices and

Procedures Governing Adversary Proceedings Hearings ("Adversary Proceedings Procedures

Order") (Docket No. 21833). Moreover, subject to the Court's availability, it may be necessary

to schedule additional court dates in October and November 2013 to provide adequate time to

accommodate the Remaining Adversary Proceedings.

19.    The Reorganized Debtors request that a similar timetable be adopted for

any of the Remaining Claims that are not resolved by September 1, 2013. At that time, the

Reorganized Debtors will notice any unresolved Remaining Claims for disposition.  The

Reorganized Debtors will continue to use the existing claims resolution procedures that have

proven to be so successful throughout these Chapter 11 Cases, such that any of the Remaining

Claims that can be resolved on a sufficiency basis will be noticed for the scheduled October 24,

2013, omnibus and claims hearing date and that any of the Remaining Claims that must be

resolved on an evidentiary basis will be noticed for the scheduled November 14, 2013, omnibus

and claims hearing date.

**C.      Administrative Tasks to Be Completed After Entry of Case Closing Order**

20.    The Reorganized Debtors respectfully request court authorization to

complete certain outstanding administrative tasks following the entry of the Case Closing Order.

As described above, the Reorganized Debtors need to complete certain tasks, including (1)

resolution of the Remaining Claims and the Remaining Adversary Proceedings in accordance

with the proposed case closing mechanics described below, (2) disposition of any remaining

assets, (3) creation and funding of certain trust accounts and reserve accounts to resolve the

Remaining Claims and satisfy other administrative and wind down expenses, (4) dissolution of

DPH Holdings in accordance with applicable law, and (5) other administration, including, but

not limited to, the filing of tax returns and payment of any taxes, professional fees, and other

administrative costs.  The Reorganized Debtors will report on the completion of the foregoing

administrative tasks at the Closing Status Hearing.

      21.    <u>Establishment of Trust and Reserve Accounts</u>. As discussed above, the

Reorganized Debtors will establish a trust to resolve the Environmental Claims. Additional

reserve or security accounts will be established to fund other necessary wind down expenses,

including taxes, professional fees, security required by applicable law for the dissolution of DPH

Holdings, and other administrative costs. Such accounts will be funded by the Reorganized

Debtors' unrestricted cash and proceeds from the GM Wind Down Facility. Any residual

amounts remaining once the purpose of the trust or reserve accounts has been fulfilled will be

transferred to the GM or New Delphi, as provided by the MDA (i.e., amounts funded into a trust

from the GM Wind Down Facility will be repaid first from any residual trust assets, and any

remaining assets will be transferred to New Delphi).

      22.    The Reorganized Debtors anticipate that some of these tasks for which

trust and reserve accounts are required may occur after the Closing Status Hearing. Because the

tasks are administrative in nature, the Reorganized Debtors nevertheless request that the Court

enter an order closing the case and grant authority to the Reorganized Debtor to complete the

outstanding administrative tasks after the entry of the Case Closing Order, and if necessary,

following the Closing Status Hearing and entry of the final decrees.

23.     <u>Dissolution of DPH Holdings</u>. Prior to the Closing Status Hearing, the

Reorganized Debtors will dissolve DPH Holdings in accordance with Delaware and other

applicable law. Pursuant to section 275 of the Delaware General Corporation Law, a Delaware

corporation may dissolve upon: (1) (A) a majority vote of the outstanding shareholders of the

corporation at a shareholder's meeting brought pursuant to section 275 or (B) consent in writing

by all stockholders, and (2) the execution, acknowledgment, and filing of a certificate of

dissolution with the Delaware Secretary of State. 8 Del. C. § 1-275(1)(b).

24.     DPH Holdings will provide notice to its creditors of the dissolution,

including by publication, and engage in a claims resolution procedure provided for under

Delaware law. Pursuant to section 278 of the Delaware General Corporation Law, once a

corporation is dissolved, the corporation has a period of three years to wind-down and to

prosecute and defend suits. To this end, Delaware law requires that a dissolving company must

pay claims that are due and offer security for contingent, conditional, or unmatured claims.

8 Del. C. §§ 1-280, 281. The claims must be paid in full if there are sufficient assets available,

and if assets are insufficient, the claims or obligations are paid according to their priority.

25.     As noted above, to the extent that the Reorganized Debtors' unrestricted

cash is insufficient to pay wind down obligations, funds from the GM Wind Down Facility may

be used to pay costs related to the wind down of DPH Holdings. Accordingly, the Reorganized

Debtors expect to use funds from the GM Wind Down Facility to pay claims and post security as

required for the dissolution of DPH Holdings under Delaware law.

26.     <u>Termination of the Trust</u>. The Trust Agreement provides for the termination of the Trust upon full administration and distribution of the Trust Property. Under section 3.1 of the Trust Agreement, the Trust "shall terminate upon . . . the full administration and distribution of the Trust Property in accordance with the Plan, the Modification Approval Order, and this Agreement and the full performance of all other duties and functions of the Plan Administrator set forth in the Plan, the Modification Approval Order, and this Agreement." Section 3.1 further provides that the Trust should be terminated "as soon as practicable." Accordingly, the Trust will terminate upon dissolution of DPH Holdings. Following termination of the Trust, section 3.2 of the Trust Agreement provides that the Plan Administrator will continue to have responsibilities for liquidating and winding up the affairs of the Trust.

27.     <u>Reversion of Trust Property Upon Termination of the Trust</u>. Upon termination of the Trust Agreement, any remaining Trust Property (as defined in the Trust Agreement) would revert to New Delphi, pursuant to the terms of the Trust Agreement and the MDA. Section 4.2(c) of the Trust Agreement provides that, upon termination of the Trust, "the Plan Administrator shall distribute any [Trust Proceeds] not yet distributed from the Trust in accordance with the terms of [the Trust Agreement] and the MDA." Moreover, section 2.1.4.W of the MDA provides that the assets acquired by New Delphi from the Debtors includes "all assets of the [Reorganized Debtors] remaining after the wind-down of the remaining business of [the Reorganized Debtors]." Accordingly, to implement the intent of the Modified Plan, the MDA, and the Trust Agreement after the dissolution of DPH Holdings and the termination of the Trust, the Reorganized Debtors request that the Case Closing Order provide that any assets remaining after the conclusion of the post-dissolution claims administration procedures required by Delaware law revert to New Delphi.

**D.**      **Releases for Plan Implementation Parties**

28.      The Reorganized Debtors submit that the releases for any current or former officers and directors of DPH Holdings, including Mr. Brooks, and the Plan Administrator (collectively, the "Plan Implementation Parties"), are appropriate under the circumstances. Upon the entry of a final decree, the Plan Implementation Parties will have fulfilled all requirements set forth in the Modified Plan and the Plan Modification Order, and have taken reasonable and appropriate actions to maximize the value of the Debtors' estates and to administer appropriately the Debtors' assets in compliance with the Modified Plan and the Plan Modification Order. Thus, the Reorganized Debtors submit that the Plan Implementation Parties be released and discharged to the fullest extent permissible under applicable law from any and all claims that (a) have been, could have been, or which may be in the future be asserted against any of the Plan Implementation Parties for any act or omission occurring through the date of entry of the final decree in these Chapter 11 Cases, and (b) relate to the Debtors, the Reorganized Debtors, the Trust, the Modified Plan, or the Chapter 11 Cases, including, without limitation, any claims relating to or arising out of the implementation or administration of the Modified Plan, the actions or omissions of any of the Plan Implementation Parties after the date of confirmation of the Modified Plan, the assets or liabilities of the Debtors, the Reorganized Debtors, or the Trust, or the responsibilities or obligations of any of the Plan Implementation Parties with respect to the Modified Plan, the Trust, the Debtors, or the Reorganized Debtors. The Reorganized Debtors further request that the Plan Implementation Parties be expressly discharged from any further obligation or responsibility to take any additional action in connection with the administration of the Debtors' estates, other than the outstanding administrative tasks outlined in this Motion or, with respect to the Plan Administrator, under the Trust Agreement.

29.    Articles 6 and 7 of DPH Holdings' certificate of incorporation provides Mr. Brooks broad exculpation and indemnity rights by DPH Holdings. Similarly, section 7.5 of the Trust Agreement grants the Plan Administrator broad indemnification rights against the Trust. Such indemnification and exculpation obligations will be rendered moot, however, by the relief requested by this Motion—final distribution of all of the Reorganized Debtors' assets, dissolution of DPH Holdings, and termination of the trust. Absent an affirmative release, the Plan Implementation parties could potentially be forced to incur the costs and distractions resulting from litigation that in all likelihood would be frivolous in light of the provisions in the Modified Plan and the actions of the Plan Implementation Parties, but for which they would have no possibility of reimbursement.[9] Accordingly, the discharge and release requested herein is reasonable and justified under the circumstances.

30.    Most, if not all, of the factors cited in support of closing the Open Cases also support the relief requested herein with respect to the Plan Implementation Parties. In particular, the Plan Implementation Parties have completed substantially all of their respective obligations under the Modified Plan, including, among other tasks, pursuing, recovering, liquidating, and maximizing the value of the Debtors' material assets and administering, disputing, objecting to, compromising and otherwise resolving over 20,000 claims. The Plan Implementation Parties have substantially administered the Debtors' estates, the Trust, and DPH Holdings, and therefore, upon the entry of a final decree, the Plan Implementation Parties should be discharged and released.

---

[9] The Plan Administrator, in connection with its continuing obligations under the Trust Agreement relating to the dissolution of DPH Holdings, also will be entitled to a release under Delaware law upon complying with the statutory dissolution and claims resolution requirements. 8 Del. C. § 1-281(c).

**E.      Form and Manner of Notice of the Motion**

31.    The Reorganized Debtors seek approval of the form and manner of notice for the Motion and the Proposed Order. A copy of this Motion, including the Proposed Order, will be provided in the usual manner to (i) the Master Service List and (ii) the Rule 2002 Service List. In addition, a copy of this Motion, including the proposed Case Closing Order, will be served via overnight mail to (a) all holders of the Remaining Claims and parties to the Remaining Adversary Proceedings and (b) all known creditors of DPH Holdings.[10] Copies of the Motion and the Proposed Order will also be available on the claims agent's website, http://www.dphholdingsdocket.com/dph. The Reorganized Debtors submit that, under the circumstances, no other or further notice need be given.

**F.      Scheduling a Closing Status Hearing for December**

32.    The Reorganized Debtors respectfully request that this Court set the Closing Status Hearing for the omnibus hearing presently scheduled to occur on December 18, 2013, at 10:00 a.m. (prevailing Eastern time). The proposed case closing mechanics described above will ensure that all claims and open avoidance actions are resolved prior to the Closing Status Hearing. At that time, the Reorganized Debtors will report on the resolution of the Remaining Claims, the Remaining Adversary Proceedings, and the other outstanding administrative tasks, and seek entry of final decrees in the Open Cases.

**G.      Retention of Jurisdiction**

33.    The Reorganized Debtors respectfully request that this Court continue to retain jurisdiction to enforce or interpret its own orders pertaining to the Chapter 11 Cases,

---

[10] The Reorganized Debtors submit that notice of this Motion is not required to other holders of claims against the Debtors who would receive payment under the Modified Plan from a party other than the Debtors. The Reorganized Debtors are not seeking to compromise the rights of such holders to receive such distributions under the Modified Plan, and the significant cost of providing service to such parties—including all holders of allowed general unsecured claims—outweighs any potential benefit.

including, but not limited to, the Plan Modification Order and the Case Closing Order.  Article

XIII of the Modified Plan states that "the Bankruptcy Court shall have exclusive jurisdiction of

all matters arising out of, and related to, the Chapter 11 Cases and this Plan," including, among

other things, the items enumerated in Article XIII of the Modified Plan. Further, Paragraph FF of

the Plan Modification Order allows the Court to retain jurisdiction as set forth in Article XIII of

the Modified Plan.

## APPLICABLE AUTHORITY

**H.      Closing the Reorganized Debtors' Cases is Authorized and Appropriate under the
         Circumstances**

34.      Section 350(a) of the Bankruptcy Code provides that "[a]fter an estate is

fully administered and the court has discharged the trustee, the court shall close the case."  11

U.S.C. § 350(a).  Bankruptcy Rule 3022 further provides that "[a]fter an estate is fully

administered in a chapter 11 reorganization case, the court, on its own motion or on a motion of a

party in interest, shall enter a final decree closing the case."  Fed. R. Bankr. P. 3022.

35.      The Bankruptcy Code, the Bankruptcy Rules, and the Second Circuit have

not defined the term "fully administered." However, courts have often considered, among other

things, the following six factors enumerated in the Advisory Committee Note to Bankruptcy

Rule 3022 to determine whether to close a case:

> (1) whether the order confirming the plan has become final, (2) whether deposits
> required by the plan have been distributed, (3) whether the property proposed by
> the plan to be transferred has been transferred, (4) whether the debtor or the
> successor of the debtor under the plan has assumed the business or the
> management of the property dealt with by the plan, (5) whether payments under
> the plan have commenced, and (6) whether all motions, contested matters, and
> adversary proceedings have been finally resolved.

Fed. R. Bankr. P. 3022 Advisory Committee Note (1991); see also, In re Kliegl Bros. Univ. Elec.

Stage Lighting Co., Inc., 238 B.R. 531, 542 (Bankr. E.D.N.Y. 1999). "[A]ll of the factors in

[Advisory Committee Note 3022] need not be present before the Court will enter a final decree.

Instead, [Advisory Committee Note 3022] and the factors listed therein merely serve as a guide in assisting the Court in its decision to close a case." In re Mold Makers, Inc., 124 B.R. 766, 768 (Bankr. N.D. Ill. 1990); Walnut Assocs. V. Saidel, 164 B.R. 487, 493 (E.D. Pa. 1994); see also, Kliegel, 238 B.R. at 542.

36.     Substantially all of the applicable factors enumerated in Advisory Committee Note 3022 have been satisfied and weigh in favor of closing the Open  Cases. Only the discrete tasks described above, largely administrative in nature, remain to be completed. The Plan Modification Order became final on August 9, 2009. Upon the Effective Date, the Debtors consummated the property transfers contemplated by the MDA, pursuant to the requirements of the Modified Plan. As described above, the Debtors retained certain Excluded Assets under the MDA and the Modified Plan. Some of the Excluded Assets have been sold. The Reorganized Debtors anticipate that the other Excluded Assets will be sold, placed in an environmental trust, or otherwise disposed of prior to the Closing Status Hearing. The cash payments to creditors required by the Modified Plan began on the Effective Date and are substantially complete.

37.     Moreover, any remaining disbursements under the Modified Plan should not prevent the Court from entering the Case Closing Order. Instead, the Advisory Committee Note to Bankruptcy Rule 3022 states that "[e]ntry of a final decree closing a chapter 11 case should not be delayed solely because the payments required by the plan have not been completed."  See also, In re Jay Bee Enter., Inc., 207 B.R. 536, 539 (Bankr. E.D. Ky. 1997) ("Rule 3022 allows the court flexibility. It does not require that a chapter 11 case be kept open until all awarded fees and allowed claims have been paid in accordance with the confirmed plan . . . ."). Nor should any pending appeals of matters decided in these Chapter 11 Cases or pending adversary proceedings prevent this Court from entering the Case Closing Order. In re

Ion Media Networks, Inc., 2010 Bankr. LEXIS 5585, at *2 (Bankr. S.D.N.Y. Dec. 22, 2010)

(where an appeal and adversary proceedings had not yet been resolved, court entered the final

decree closing the cases upon a finding that cases had been fully administered); see also, In re

W.A.R. LLP, 2011 Bankr. LEXIS 2650 at *4 (Bankr. D.D.C. July 11, 2011) ("Appeals of

various rulings are pending . . . . Nevertheless, a case should be closed when, as here, the estate

has been fully administered.") The Chapter 11 Cases may be reopened, if cause is shown under

section 350(b) of the Bankruptcy Code, to address the resolution of any pending appeals or

adversary proceedings. Ion Media Networks, Inc., 2010 Bankr. LEXIS at *2; see also, W.A.R.

LLP, 2011 Bankr. LEXIS at *4.

        38.     Further, the fact that this Court's jurisdiction could potentially be required

at some time in the future should not prevent the Court from closing the Open Cases and entering

a final decree. The Advisory Committee Note to Rule 3022 states:

> The court should not keep the case open only because of the possibility that the
> court's jurisdiction may be invoked in the future. A final decree closing the case
> after the estate is fully administered does not deprive the court of jurisdiction to
> enforce or interpret its own orders and does not prevent the court from reopening
> the case for cause pursuant to section 350(b) of the Code.

Fed. R. Bankr. P. 3022 Advisory Committee Note (1991). See also, In re Jordan Mfg. Co., Inc.,

138 B.R. 30, 35 (Bankr. C.D. Ill. 1992) ("If jurisdiction is present, the Advisory Committee

Notes to the current Bankruptcy Rule 3022 make it quite clear that the entry of a final decree

should not be delayed because the bankruptcy court's jurisdiction might be required in the future

and that the entry of a final decree does not deprive the bankruptcy court of jurisdiction . . . .").

In addition, the relief requested in this Motion would be without prejudice to any party's right to

reopen any case if necessary. See In re Gates Comm. Chapel of Rochester, 212 B.R. 220, 224

(Bankr. W.D.N.Y. 1997) ("[T]he entry of a final decree in no way completely deprives the court

of its jurisdiction to reopen the case, enforce or interpret an order, or determine a pertinent issue.").

39.    Furthermore, as long as the Open Cases remain open, the cases are an unnecessary burden upon the Court and the U.S. Trustee, which must administer and monitor such cases. By closing the Open Cases, the Court and the U.S. Trustee will no longer have to expend resources administering an unnecessary case in which there is no activity. Similarly, by closing the Open Cases, the Reorganized Debtors can avoid incurring further expenses. Pursuant to applicable law, the Reorganized Debtors are obligated to pay quarterly fees to the U.S. Trustee under 28 U.S.C. § 1930 for quarterly periods through the closure of its Chapter 11 Cases. Once the Open Cases are closed, the Reorganized Debtors will no longer have to pay quarterly fees to the U.S. Trustee.[11]

40.    Similar relief has been granted in comparable cases. See, e.g., In re APF Co, Case No. 98-1596 (PJW) (Bankr. D. Del. June 6, 2011); In re Hayes Lemmerz International, Inc., Case No. 01-11490 (MFW) (Bankr. D. Del. June 16, 2010); In re Russel-Stanley Holdings, Inc., Case No. 05-12339 (BLS) (Bankr. D. Del. Oct. 13, 2009); In re Phycor, Inc., Case No. 02-40278 (PCB) (Bankr. S.D.N.Y. July 8, 2008); In re Eagle Food Centers, Inc., Case No. 03-15299 (PSH) (Bankr. N.D. Ill. Aug. 29, 2007).

41.    Accordingly, the Reorganized Debtors request entry of a Case Closing Order closing the Open Cases.

**I.    The Related Relief Requested Herein is Also Authorized and Appropriate**

42.    Article XIII of the Modified Plan states that "the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Cases and

---

[11] See In re A.H. Robins Co, Inc., 219 B.R. 145, 149 (Bankr. E.D. Va. 1998) ("obligation to pay UST fees terminates upon closure, dismissal, or conversion of a Chapter 11 case, and will not be paid ad infinitum").

this Plan," including, among other things, the items enumerated in Article XIII of the Modified

Plan. Further, Paragraph FF of the Plan Modification Order allows the Court to retain jurisdiction

as set forth in Article XIII of the Modified Plan.

           43.    Furthermore, in the bankruptcy context, section 1142(b) of the Bankruptcy

Code specifically confers subject matter jurisdiction on bankruptcy courts to resolve

postconfirmation issues necessary to execute a confirmed Chapter 11 plan. Beal Bank, S.S.B. v.

Jack's Marine, Inc., 201 B.R. 376, Bankr. L. Rep. (CCH) ¶ 77060 (E.D. Pa. 1996).  The clear

intent of section 1142(b) is for the bankruptcy court to retain jurisdiction to assure that the terms

and provisions of a confirmed chapter 11 plan are carried out until the plan is completed and a

final decree is entered closing the case. In re Terracor, 86 B.R. 671 (D. Utah 1988).[18]  "The

bankruptcy court's authority under § 1142(b) extends to post-confirmation activities necessary to

complete performance under the plan and close the case." Pioneer Liquidating Corp. v. U.S. Tr.

(In re Consol. Pioneer Mortgage Entities), 248 B.R. 368, 384 (9th Cir. BAP 2000), aff'd, 264

F.3d 803 (9th Cir. 2001).  "[Section] 1142(b) provides authority for this Court to direct any

necessary party to perform any other act that is necessary for consummation of a confirmed

plan." Official Unsecured Creditors' Comm. of Erie Hilton Joint Venture v. Siskind (In re Erie

Hilton Joint Venture), 137 B.R. 165, 170 (Bankr. W.D. Pa. 1992). See also In re Legend Radio

Group, Inc., 248 B.R. 281, 286 (W.D. Va. 1999) ("The Bankruptcy Code provides that

confirmed plans shall be carried out.") (citations omitted).

---

[18] The use of 1142(b) in the equitable context is consistent with the well-established principle that a court possesses the inherent authority to enforce its own orders (e.g., the Confirmation Order). See, e.g., Kokkonen v. Guardian Life Ins. Co. of America, 511 U.S. 375, 379-80 (1994) (court has ancillary power to vindicate its authority and effectuate its decrees); Chambers v. NASCO, Inc., 501 U.S. 32, 43 (1991) ("Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose . . . submission to their lawful mandates."); In re Continental Airlines, Inc., 236 B.R. 318, 325-26 (Bankr. D. Del. 1999).

44.     Accordingly, this Court has the authority to issue the Case Closing Order, which, among other things, authorizes the Reorganized Debtors to complete certain outstanding administrative tasks following the entry of the Case Closing Order, approves the proposed case closing mechanics, approves the form and manner of notice of the Motion and notice thereof, discharges and releases the Plan Implementation Parties, sets the Closing Status Hearing for December 2013, approves the form and manner of notice of the Motion, and retains jurisdiction to enforce or interpret its own orders pertaining to the Chapter 11 Cases.

45.     The Reorganized Debtors submit that the relief requested herein in addition and related to closing of the Open Cases is reasonable and appropriate under the circumstances, is in the best interests of the Reorganized Debtors and their estates, creditors, and other parties in interest and, therefore, should be approved.

## NOTICE

46.     This Motion and notice thereof will be provided in the usual manner to (i) the Master Service List and (ii) the Rule 2002 Service List. In addition, a copy of this Motion, including the proposed Case Closing Order, will be served via overnight mail to (a) all holders of the Remaining Claims and parties to the Remaining Adversary Proceedings and (b) all known creditors of DPH Holdings. Copies of the Motion and notice thereof will also be available on the claims agent's website, http://www.dphholdingsdocket.com/dph. The Reorganized Debtors submit that, under the circumstances, no other or further notice need be given.

WHEREFORE, the Reorganized Debtors respectfully request that this Court enter

an Order, substantially in the form of the proposed Case Closing Order attached hereto, granting

(a) the relief sought herein and (b) such other and further relief as is just.

Dated:  New York, New York
        July 3, 2013

                            SKADDEN, ARPS, SLATE, MEAGHER
                                & FLOM LLP

                            By:  /s/ John Wm. Butler, Jr.
                                John Wm. Butler, Jr.
                                John K. Lyons
                                Albert L. Hogan III
                                Ron E. Meisler
                            155 North Wacker Drive
                            Chicago, Illinois 60606

                                - and -

                            Four Times Square
                            New York, New York 10036

                            Attorneys for DPH Holdings Corp., et al.,
                                Reorganized Debtors