JONES DAY
51 Louisiana Ave, NW
Washington, D.C. 20001
(202) 839-3939
Kevin Holewinski, *pro hac vice*
Daniella Einik, *pro hac vice*

*Counsel for DPH Holdings Corp., et al.,*
    *Reorganized Debtors*

DPH Holdings Corp. Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

DPH Holdings Corp. Legal Information Website:
http://www.dphholdingsdocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                               :
In re                                          :         Chapter 11
                                               :
DPH HOLDINGS CORP., et al.,                    :         Case No. 05-44481 (RDD)
                                               :
            Reorganized Debtors.               :         (Jointly Administered)
                                               :
------------------------------------------------------------x

**REORGANIZED DEBTORS' NOTICE OF CLAIMS OBJECTION AND
STATEMENT OF DISPUTED ISSUES WITH RESPECT TO ENVIRONMENTAL
CLAIM NUMBERS 15785, 18956, 19539, AND 19786 AND ALL OTHER
ENVIRONMENTAL ISSUES AT THE SITES OWNED BY THE REORGANIZED
DEBTORS**

("ENVIRONMENTAL CLAIMS AND ISSUES OBJECTION")

## TABLE OF CONTENTS

I.      BACKGROUND ............................................................................................. 5

II.     DISPUTED ISSUES ...................................................................................... 9

        A.      The Ohio Environmental Protection Agency Does Not Have an Interest in
        Resolution of the Environmental Claims. ........................................................ 9

        B.      The Environmental Claims Are Dischargeable Prepetition Claims. ............... 9

        C.      The Environmental Agencies Are Not Entitled to Administrative Expense
        Claim Priority Because the Environmental Sites Pose no Imminent or Identifiable
        Harm. .......................................................................................................... 13

        D.      The Environmental Agencies Are Not Entitled to Administrative Expense
        Claim Priority Because They Have Not Incurred any Costs to Abate Contamination
        at the Environmental Sites. ........................................................................... 17

        E.      28 U.S.C. § 959(b) Is Not Applicable Because the Reorganized Debtors Are
        Not Operating and Managing the Properties. .................................................. 18

        F.      The EPA Is Not Entitled to Administrative Priority for its Costs at the Delphi
        VOC Site in Dayton, Ohio. ........................................................................... 20

        G.      If the Environmental Agencies Have an Administrative Expense Claim, the
        Reorganized Debtors' Dispute the Value of That Claim. .................................. 21

III.    CONCLUSION ............................................................................................ 21

# TABLE OF AUTHORITIES

**Page**

CASES

*ABB Indus. Sys., Inc. v. Prime Tech., Inc.*,
    120 F.3d 351 (2d Cir. 1997)................................................................11

*Connecticut Fisherman's Ass'n v. Remington Arms Co.*,
    989 F.2d 1305 (2d Cir. 1993)..............................................................11

*In re Drexel Burnham Lambert Grp. Inc.*,
    134 B.R. 482 (Bankr. S.D.N.Y. 1991)..................................................13

*In re Insilco Techs., Inc.*,
    309 B.R. 111 (Bankr. D. Del. 2004).....................................................20

*In re Lehal Realty Assocs.*,
    101 F.3d 272 (2d Cir. 1996)................................................................19

*In re Mahoney-Troast Constr. Co.*,
    189 B.R. 57 (Bankr. D.N.J. 1995) ...................................14, 15, 16, 18

*In re McCrory Corp.*,
    188 B.R. 763 (Bankr. S.D.N.Y. 1995)............................................14, 15

*In re Microfab, Inc.*,
    105 B.R. 161 (Bankr. D. Mass. 1989) ..................................................17

*In re N.P. Mining Co.*,
    124 B.R. 846 (Bankr. N.D. Ala. 1990) ................................................17

*In re N.P. Mining Co., Inc.*,
    963 F.2d 1449 (11th Cir. 1992) ..........................................................19

*In re Oklahoma Refining Co.*,
    63 B.R. 562 (W.D. Okla. 1986) ..........................................................14

*In re Oldco M Corp.*,
    438 B.R. 775 (Bankr. S.D.N.Y. 2010)............................................17, 20

*In re Sheffield Oil Co.*,
    162 B.R. 339 (Bankr. M.D. Ala. 1993)................................................15

*In re Shore Co.*,
    134 B.R. 572 (Bankr. E.D. Tex. 1991) ...........................................15, 17

*In re Smith-Douglass, Inc.*,
    856 F.2d 12 (4th Cir. 1988) ...........................................................14, 15

*In re Southern Int'l Co.,*
   165 B.R. 815 (E.D. Va. 1994) ............................................................................................15

*In re St. Lawrence Corp.,*
   248 B.R. 734 (D.N.J. 2000) ...............................................................................................15

*In re Valley Steel Prods. Co., Inc.,*
   157 B.R. 442 (Bankr. E.D. Mo. 1993) ..............................................................................19

*Quincy Mall, Inc. v. Parisian, Inc.,*
   117 F. Supp. 2d 784 (C.D. Ill. 2000) .................................................................................9

*U.S. v. Apex Oil,*
   579 F.3d 734 (7th Cir. 2009) ............................................................................................12

*U.S. v. LTV Corp. (In re Chateaugay Corp.),*
   944 F.2d 997 (2d Cir. 1991) ........................................................................................10, 11

## STATUTES

11 U.S.C. § 101(5) ....................................................................................................................10

11 U.S.C. § 503(b) ...................................................................................................................13

11 U.S.C. § 507 ........................................................................................................................13

28 U.S.C. § 959(b) ..............................................................................................................18, 19

42 U.S.C. § 9607(a) .................................................................................................................12

Mich. Comp. Laws §§ 324.20101 et seq. ...............................................................................12

## OTHER AUTHORITIES

40 C.F.R. pt. 264 ......................................................................................................................16

Office of Enforcement and Compliance Assurance, EPA, Guidance on the Use of Section
   7003 of RCRA (Oct. 1997) ...............................................................................................12

Fed. R. Bankr. P. 6007 .............................................................................................................14

DPH Holdings Corp. and its affiliated reorganized debtors in the above-captioned cases (collectively, the "Reorganized Debtors"), hereby submit this Notice of Claims Objection and Statement of Disputed Issues with Respect to Environmental Claim Numbers 15785, 18956, 19539, and 19786 and All Other Environmental Issues at the Sites Owned by the Reorganized Debtors and respectfully represent as follows:

## I.    BACKGROUND

1.    On October 8 and 14, 2005 (the "Petition Date"), Delphi Corporation ("Delphi") and certain of its affiliates, including Delphi Automotive Systems LLC ("DAS LLC"), former debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), now known as the Reorganized Debtors, filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended.

2.    On October 6, 2009, the Debtors substantially consummated the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession, As Modified (the "Modified Plan"), which had been approved by this Court pursuant to an order entered on July 30, 2009 (Docket No. 18707), and emerged from chapter 11 as the Reorganized Debtors.  Article 9.6(a) of the Modified Plan provides that "[t]he Reorganized Debtors shall retain responsibility for administering, disputing, objecting to, compromising, or otherwise resolving all Claims against, and Interests in, the Debtors and making distributions (if any) with respect to all Claims and Interests."

3.    On August 2, 2006, the Michigan Department of Environmental Quality ("MDEQ") filed proof of claim number 15785 (the "MDEQ Claim") against DAS LLC asserting a general unsecured claim in the amount of $64,329.64 relating to incurred

unreimbursed prepetition environmental response costs for which MDEQ alleges the Debtors
are jointly and severally liable.

4.      On July 15, 2009, the Environmental Protection Agency (the "EPA," together
with MDEQ the "Environmental Agencies") filed proof of administrative expense claim
numbers 18956 and 19539 and on November 5, 2009, EPA filed proof of administrative
expense claim number 19786 (collectively the "EPA Claims," together with the MDEQ Claim
the "Environmental Claims") against Delphi asserting administrative expense priority claims for
incurred and future unincurred post-petition response costs relating to sites owned by Delphi,
including a claim for $220,000 in costs allegedly incurred by the EPA at the Delphi VOC Site in
Dayton, Ohio.  In addition, the claims were asserted in a protective fashion reserving the EPA's
rights to enforce the Debtor's alleged injunctive obligations to comply with environmental work
requirements imposed by environmental statutes.

5.      On November 6, 2009, the Reorganized Debtors objected to the MDEQ Claim
pursuant to the Reorganized Debtors' Thirty-Eighth Omnibus Objection Pursuant To 11 U.S.C. §
502(b) And Fed. R. Bankr. P. 3007 To (I) Expunge Certain (A) Equity Interests, (B) Books And
Records Claims, (C) Untimely Claims, (D) Pension, Benefit, And OPEB Claims, And (E)
Workers' Compensation Claims And (II) Modify And Allow Certain Claims ("Thirty-Eighth
Omnibus Claims Objection").

6.      On December 2, 2009, MDEQ filed its Response to Reorganized Debtors' Thirty-
Eighth Omnibus Claims Objection Pursuant To 11 U.S.C. § 502(B) and Fed R. Bankr. P. 3007 to
(I) Expunge Certain (A) Equity Interests, (B) Books And Records Claims,(C) Untimely Claims
(D) Pension, Benefits and OPEB Claims, and (E) Worker's Compensation Claims and (II)
Modify and Allow Certain Claims (Docket No. 19132) (the "MDEQ Response").

7.      On December 12, 2009,  a hearing on the MDEQ Claim was adjourned to a future

date to be noticed by the Reorganized Debtors pursuant to the Court's Order Pursuant to 11

U.S.C. § 502(b) and Fed. R. Bankr. P. 3007 to (I) Expunge Certain (A) Equity Interests, (B)

Books and Records Claims, (C) Untimely Claims, (D) Pension, Benefit, and OPEB Claims, and

(E) Workers' Compensation Claims and (II) Modify and Allow Certain Claims ("Thirty-Eighth

Omnibus Claims Objection Order").

8.      On March 19, 2010, the Reorganized Debtors objected to the EPA Claims

pursuant to the Reorganized Debtors' Forty-Sixth Omnibus Objection Pursuant to 11 U.S.C. §

503(B) and Fed. R. Bankr. P. 3007 to (I) Disallow and Expunge Certain Administrative Expense

(A) Books and Records Claims, (B) Methode Electronics Claims, (C) State Workers'

Compensation Claims, (D) Duplicate State Workers' Compensation Claims, (E) Workers'

Compensation Claims, (F) Transferred Workers' Compensation Claims, (G) Tax Claims, (H)

Duplicate Insurance Claims, and (I) Severance Claims, (II) Disallow and Expunge (A) a Certain

Duplicate Workers' Compensation Claim, (B) A Certain Duplicate Tax Claim, And (C) a Certain

Duplicate Severance Claim, (III) Modify Certain Administrative Expense (A) State Workers'

Compensation Claims and (B) Workers' Compensation Claims, and (IV) Allow Certain

Administrative Expense Severance Claims (the "Forty-Sixth Omnibus Claims Objection").

9.      On April 16, 2010, the EPA filed its Response of the United States of America to

Reorganized Debtors' Objection to the Administrative Expense Claims of the United States

Environmental Protection Agency (Claim Nos. 18956, 19539, And 19786) (Docket No. 19870)

(the "EPA Response").

10.      On April 27, 2010, a hearing on the EPA Claims was adjourned to a future date to

be noticed by the Reorganized Debtors pursuant to the Court's Order Pursuant to 11 U.S.C. §

503(B) and Fed. R. Bankr. P. 3007 (I) Disallowing and Expunging Certain Administrative

Expense (A) Books and Records Claims, (B) State Workers' Compensation Claims, (C)

Duplicate State Workers' Compensation Claims, (D) Workers' Compensation Claims, (E)

Transferred Workers' Compensation Claims, (F) Tax Claims, (G) Duplicate Insurance Claims,

and (H) Severance Claims, (II) Disallowing and Expunging (A) A Certain Duplicate Workers'

Compensation Claim, (B) A Certain Duplicate Tax Claim, and (C) A Certain Duplicate

Severance Claim, (III) Modifying and Allowing Certain Administrative Expense Workers'

Compensation Claims, and (IV) Allowing Certain Administrative Expense Severance Claims

("Forty-Sixth Omnibus Claims Objection Order").

11.    On August 6, 2013, the Court entered the Order Pursuant to 11 U.S.C. §§

205, 350(a), and 1142, Fed. R. Bankr. P. 3022, and Local Bankr. R. 3022-1 Concerning

Closing the Bankruptcy Cases and Providing Related Relief ordering, among other things,

the resolution of the Environmental Claims ("Case Closing Order").

12.    On September 3, 2013,  the Court entered the Order Establishing Procedures

Governing  the Resolution of Environmental Claim Numbers 15785, 18956, 19539, and 19786

and All Other Environmental Issues at the Sites Owned by the Reorganized Debtors (the

"Environmental Claims and Issues Procedure Order") scheduling a hearing for the litigation of

the issues addressed in the Environmental Claims at the sites owned by the Reorganized

Debtors in Rootstown, Ohio; Flint, Michigan;[1] and Saginaw, Michigan (the

"Environmental Sites") for November 14, 2013.  The November 14, 2013 hearing will

proceed in accordance with the procedures provided in the Environmental Claims and

---

[1] The Flint Michigan property includes two adjacent sites known as Plant 400 and Plant 500.

Issues Procedure Order, unless such procedures are revised by the Court upon application

by either party and good cause shown.

## II.   DISPUTED ISSUES

### A.   The Ohio Environmental Protection Agency Does Not Have an Interest in Resolution of the Environmental Claims.

As a preliminary matter, the Ohio Environmental Protection Agency (the "Ohio EPA")

does not have a right to participate in resolution of the Environmental Claims because it is not a

creditor of any of the Environmental Claims.

The Ohio EPA filed five proofs of claim in the above captioned bankruptcy (Claim

Numbers 15345, 15346, 15347, 16354, and 16355).  Four of the five claims were disallowed

(Claim Numbers 15346, 15347, 16354, and 16355) and the final claim (Claim Number 15345)

was withdrawn with prejudice pursuant to a stipulation entered into with the Reorganized

Debtors on July 7, 2011 (Docket No. 21431).  As a result, the Ohio EPA no longer has any

unsettled claims with the Reorganized Debtors and thus, there is no open issue between the Ohio

EPA and the Reorganized Debtors to be resolved in this proceeding.

In any event, the joint stipulation withdrawing Ohio EPA's final claim with prejudice

precludes the Ohio EPA from relitigating the issues raised by that claim.  *See Quincy Mall, Inc.*

*v. Parisian, Inc.*, 117 F. Supp. 2d 784, 788 (C.D. Ill. 2000) (citing *Klingman v. Levinson*, 831

F.2d 1292, 1296 (7th Cir. 1987)) (a withdrawal of a claim with prejudice pursuant to a joint

stipulation, "is considered a litigation of the issues for collateral estoppel purposes if the parties

could reasonably have foreseen the conclusive effect of their actions.").

### B.   The Environmental Claims Are Dischargeable Prepetition Claims.

Despite the fact that the EPA packages its claims as administrative expense priority

claims, the record supports a finding from this Court that the Environmental Claims are

prepetition claims that were discharged by the Modified Plan.[2]  Under Section 11.2 of the

Modified Plan (the "Plan Discharge"):

> the distributions and rights that are provided in this Plan shall be in
> complete satisfaction, discharge, and release, effective as of the
> Effective Date, of Claims[3] and Causes of Action, whether known
> or unknown, against, liabilities of, liens on, obligations of, rights
> against, and Interests in the Debtors or any of their assets or
> properties, regardless of whether any property shall have been
> distributed or retained pursuant to this Plan on account of such
> Claims, rights, and Interests, including, but not limited to, Claims
> and Interests that arose before the Effective Date...whether or not
> (a) a proof of claim or interest based upon such Claim, debt, right,
> or Interest is filed or deemed filed under section 501 of the
> Bankruptcy Code, (b) a Claim or Interest based upon such Claim,
> debt, right, or Interest is allowed under section 502 of the
> Bankruptcy Code, or (c) the holder of such a Claim, right, or
> Interest accepted this Plan.

The leading case in this Judicial Circuit on when environmental "claims" are deemed to

arise in bankruptcy is *U.S. v. LTV Corp. (In re Chateaugay Corp.)*, 944 F.2d 997 (2d Cir. 1991).

In *Chateaugay*, the Second Circuit held that claims of governmental entities against a chapter 11

debtor for unincurred post-petition environmental response costs are prepetition claims if (1) the

asserted liability is based on a prepetition release or threatened release of hazardous substances

and (2) the debtor had a prepetition relationship with the governmental entity such that the

governmental entity was "acutely aware of [the debtor] and vice versa" prior to the filing of the

debtor's bankruptcy petition regardless of (i) when such response costs were incurred and (ii)

whether the release of contaminants had yet been discovered by the governmental agency (or

---

[2] As designated, the MDEQ Claim is a proof of claim that is clearly a prepetition claim that was discharged by the Modified Plan.

[3] The Modified Plan defines "Claim" as "a claim against one of the Debtors (or all or some of them),whether or not asserted, as defined in section 101(5) of the Bankruptcy Code."  Modified Plan § 1.29.  In relevant part, the Bankruptcy Code defines "claim" as a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured."  11 U.S.C. § 101(5).

anyone else).  *Id.* at 1005.  In addition, under *Chateaugay*, a government claim for injunctive

relief is also a prepetition dischargeable claim to the extent it requires the debtor to remove

accumulated wastes at any time when the government could have done so itself and sought

response costs from the debtor.  *Id.* at 1008.  However, a claim for injunctive relief may not

constitute a prepetition dischargeable claim if the governmental entity directs the debtor to stop

or ameliorate ongoing pollution – but that is not the scenario in this case. *Id.*[4]

Smith *Chateaugay* counsels heavily in favor of finding as a matter of law that the

Environmental Claims, to the extent that they seek any unincurred environmental response costs

or any injunctive relief, are prepetition claims that were discharged by section 11.2 of the

Modified Plan.[5]  First, as to the property in Flint, Michigan, on information and belief, the EPA

Claims arise from prepetition releases of hazardous substances and hazardous wastes.  Moreover,

the Reorganized Debtors and EPA were acutely aware of each other in relation to the site prior to

the October 2005 bankruptcy filing because a Resource Conservation and Recovery Act

("RCRA") Voluntary Corrective Action Agreement between EPA and DAS LLC was entered

into more than three years before the Petition Date.  In addition, there is no "ongoing pollution"

at the site as contemplated by *Chateaugay* and other Second Circuit case law because the site is

no longer operating and the Reorganized Debtors are not actively or otherwise disposing of any

hazardous substances or hazardous waste onsite.  Finally, the EPA could have conducted

---

[4] The *Chateaugay* court does not define "ongoing pollution," but other courts in the Second Circuit have held that "ongoing pollution" does  not include ongoing migration or continuing decomposition of pollutants after operations at a site have ceased.  *See  Connecticut Fisherman's Ass'n v. Remington Arms Co.*, 989 F.2d 1305, 1312, 1315 (2d Cir. 1993) (holding that the "mere decomposition of pollutants" was not an ongoing violation of either RCRA or the Clean Water Act) and  *ABB Indus. Sys., Inc. v. Prime Tech., Inc.*, 120 F.3d 351, 357–58 (2d Cir. 1997) (holding that former owners are not liable under CERCLA for mere passive migration of hazardous substances during their ownership because disposal requires more active conduct by the liable party).

[5] Nothing contained herein constitutes a waiver of any right or claim in favor of the Reorganized Debtors against any third party including, without limitation, the Reorganized Debtors' rights and claims under the Modified Plan and the Master Disposition Agreement that was approved by, and as part of, the Modified Plan.

remedial activities at the site and sought recovery of the costs from the Reorganized Debtors.
*See* 42 U.S.C. § 9607(a); Office of Enforcement and Compliance Assurance, EPA, Guidance on
the Use of Section 7003 of RCRA 22–23 (Oct. 1997)[6] (EPA "may use Section 7003 [of RCRA,
42 U.S.C. § 6973,] to recover from responsible persons costs expended to address a potential
endangerment"); *cf U.S. v. Apex Oil*, 579 F.3d 734 (7th Cir. 2009) (holding that RCRA does not
provide for cost recovery by governmental entities).

Second, as to the property in Saginaw, Michigan, the MDEQ Claims appear to involve
prepetition releases of hazardous substances and hazardous wastes because the plant on the
Saginaw property was demolished in 2002, so operations ceased years prior to the 2005 Petition
Date.  In addition, the Environmental Agencies were acutely aware of the Reorganized Debtors'
activities at the Saginaw site prior to filing because the Reorganized Debtors had been owners of
this regulated industrial site for years prior to the Petition Date.  There is no ongoing pollution at
the Saginaw site because operations have ceased and the Reorganized Debtors are not actively
disposing of hazardous substances onsite.  As a Michigan "Part 201" property under Michigan's
Natural Resources and Environmental Protection Act,[7]  the MDEQ had the authority to clean up
the site and seek reimbursement of any response costs incurred.  Mich. Comp. Laws §
324.20126(a).

Finally, as to the Rootstown Ohio Site, as a preliminary matter, the EPA Claims do not
cover the Rootstown property because the EPA Claims only cover facilities listed on page S-xviii
of the Supplement to the First Amended Disclosure Statement with Respect to the First Amended
Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-

---

[6] Available at http://www.epa.gov/compliance/resources/policies/civil/rcra/rcrasect7003-rpt.mem.pdf.

[7] Mich. Comp. Laws §§ 324.20101 et seq.

in-Possession (As Modified) (Docket No. 17031) ("Supplement to First Amended Disclosure Statement") and the Rootstown property is not listed as a facility on that page of the disclosure statement.  To the extent the Court determines that the EPA Claims do cover the Rootstown property, those claims would also be dischargeable prepetition claims.  Any claims as to Rootstown involve prepetition releases of hazardous material and the parties had the necessary prepetition relationship because the EPA and General Motors, then-owner of the property, entered into an Administrative Order on Consent regarding the property in 1982 – approximately 23 years before the Petition Date.  Any claim asserted by the Environmental Agencies would not be seeking to ameliorate ongoing pollution at the Rootstown site.  The Rootstown property was already an inactive disposal site when Delphi acquired it from GM and there is no reason to believe that the site is not currently in compliance with the law.

Based upon the foregoing, the Environmental Claims should be found to have been discharged by the Modified Plan as prepetition claims.

### C.    The Environmental Agencies Are Not Entitled to Administrative Expense Claim Priority Because the Environmental Sites Pose no Imminent or Identifiable Harm.

In addition to the foregoing, the Environmental Claims should not be elevated to administrative expense priority due to a separate and independent legal deficiency: the Environmental Agencies cannot make the requisite showing that the expenses are the "actual, necessary costs and expenses of preserving the estate."  11. U.S.C. § 503(b).

11 U.S.C. § 503(b) provides for the allowance of administrative expenses, after notice and hearing, for, among other things, "the actual, necessary costs and expenses of preserving the estate."  Administrative expenses are entitled to priority, 11 U.S.C. § 507, and the claimant has the burden of proving entitlement to that priority.  *In re Drexel Burnham Lambert Grp. Inc.*, 134 B.R. 482, 489 (Bankr. S.D.N.Y. 1991).  Courts have found that environmental response costs

13

incurred by environmental agencies post-petition based on prepetition environmental damage are

entitled to administrative expense treatment only "if the damage constitutes an 'imminent and

identifiable' harm to the public health or safety." *In re McCrory Corp.*, 188 B.R. 763, 768

(Bankr. S.D.N.Y. 1995) (citing *Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Prot.*, 474

U.S. 494 (1986)); *see also In re Mahoney-Troast Constr. Co.*, 189 B.R. 57, 60 (Bankr. D.N.J.

1995) ("post-petition costs of remediating a prepetition environmental injury are properly

classified as administrative expenses…when the prepetition environmental contamination also

poses an identifiable and imminent harm in the post-petition period").[8]  However, when there is

no identifiable and imminent harm, "environmental compliance costs which arise from the

debtor's pre-petition conduct are treated as general unsecured claims."  189 B.R. at 60.

Simply showing that there is contamination, even significant contamination, at a site

that is actionable under federal or state environmental law is insufficient to demonstrate

imminent and identifiable harm when that contamination is not directly impacting the public.

*E.g., In re Smith-Douglass, Inc.*, 856 F.2d 12, 16 (4th Cir. 1988) (finding that there is no

imminent and identifiable harm even though waters on the site were contaminated in violation

of state environmental law); *In re Shore Co.*, 134 BR 572, 578 (Bankr. E.D. Tex. 1991)

(finding no imminent and identifiable harm despite the fact that the site was contaminated with

chromium, cadmium and lead likely in violation of state and federal laws); *In re Oklahoma*

---

[8] The same legal and factual arguments that establish that the Environmental Agencies' request for
administrative claim priority cannot be sustained, also demonstrate that the Reorganized Debtors would be entitled
to ask the Court at the November 14, 2013 hearing, upon notice under Rule 6007, to authorize abandonment of the
Environmental Sites, in the event ongoing settlement discussions fail to reach agreement on the creation of an
Environmental Response Trust for those Sites.  *See In re McCrory Corp.*, 188 B.R. at 766.  Indeed, the
Environmental Claims and Issues Procedure Order contemplates: i) all the necessary disclosures, fact, expert and
other discovery needed for the November 14 hearing will be finished prior to the November 14, 2013 hearing; and ii)
the hearing, as necessary, will cover all environmental issues at the Environmental Sites involving the Reorganized
Debtors and the Environmental Agencies, including possibly the abandonment scenario.

*Refining Co.*, 63 B.R. 562, 563-65 (W.D. Okla. 1986) (finding no imminent and identifiable

harm because contamination of the local aquifer was not "immediate and menacing").

Additionally, the mere risk that individuals might come into contact with

contaminated soil or groundwater in the future is insufficient in the context of this Court's

decision because the harm must be identifiable, meaning that it must be actually realized –

not just speculative.  *In re Southern Int'l Co.,* 165 B.R. 815, 823 (E.D. Va. 1994)

(speculative risk insufficient for finding imminent harm); *In re Sheffield Oil Co.*, 162 B.R.

339, 341 (Bankr. M.D. Ala. 1993) ("The restriction does not encompass a 'speculative' or

'indeterminate future violation.'").

For most bankruptcy courts, a primary factor for determining whether there is "imminent

and identifiable" harm at a particular site is whether the government has taken any enforcement

or response actions to address the harm.  Most courts have held that there is no identifiable and

imminent harm when a government fails to take action.  *See, e.g., In re Smith-Douglass,* 856

F.2d at 16  (finding the lack of enforcement action by the state environmental protection agency

as indicative of a lack of imminent harm); *In re Mahoney-Troast Constr. Co.,* 189 B.R. at 61

(citing the lack of any regulatory authority order to the debtor to undertake cleanup as a factor

supporting a lack of imminent threat to the public); *In re McCrory Corp.,* 188 BR at 769 ("the

fact that the state agency never attempted to expedite the clean-up . . . indicate[s] that this was

not the type of 'imminent' harm to public health or safety that would preclude the trustee from

abandoning the Property"); *In re St. Lawrence Corp.,* 248 B.R. 734, 742 (D.N.J. 2000) ("Inaction

or delay by the [state environmental agency] to act provides support for the conclusion that no

imminent threat of harm to the public existed."); *In re Shore Co.,* 134 B.R. at 579 (placing "great

weight on the lack of activity on the part of the state agency charged with protecting the health

and welfare of the people of the [s]tate" in concluding that there was no immediate threat to the public and allowing abandonment).

In this case, the Environmental Agencies have had full knowledge of conditions at the Environmental Sites, yet failed to take any meaningful enforcement action at any of the sites in recent years to address any alleged harms.  The Environmental Agencies have shown no interest in the Flint, Michigan site since providing comments on the Reorganized Debtors' RCRA Facility Investigation report[9] in 2009, despite the fact that the Reorganized Debtors have continued to submit annual site reports for more than four years.[10]  Similarly, at the Rootstown, Ohio site, there has been no regulatory activity at the site since the Reorganized Debtors obtained ownership of the property from General Motors in 1999.   Finally, at the Saginaw, Michigan site, the Environmental Agencies have not issued any orders asserting that conditions at the site warrant intervention.[11]  As a result, the Environmental Agencies cannot credibly argue that contamination at the Environmental Sites suddenly presents an "imminent harm" when the Environmental Agencies themselves have failed (for years) to take any meaningful actions to address the contamination at these sites.  Because the Environmental Agencies cannot show that there is an "imminent and identifiable" harm on the sites, the Environmental Claims should be reclassified to general unsecured claims discharged by the Modified Plan.  *See In re Mahoney-Troast Constr. Co.*,  189 B.R. at 60 (When there is no identifiable and imminent harm,

---

[9] 40 C.F.R. part 264.

[10] In July 2013, the MDEQ issued a Notice of Violation in connection with the Flint, Michigan facility. But this notice does not qualify as the kind of enforcement action that would enable a court to find "imminent and identifiable" harm as it concerns only minor issues all of which are being addressed.  Moreover, any argument by MDEQ that its Notice of Violation constitutes a claim should be dismissed as untimely.

[11] While the Reorganized Debtors and the MDEQ have been in correspondence regarding the environmental conditions at the Saginaw site, the MDEQ has not taken any enforcement action against the Reorganized Debtors in relation to conditions at the site.

"environmental compliance costs which arise from the debtor's prepetition conduct are treated as general unsecured claims.").

### D.    The Environmental Agencies Are Not Entitled to Administrative Expense Claim Priority Because They Have Not Incurred any Costs to Abate Contamination at the Environmental Sites.

Even if the Environmental Agencies could make the requisite showing of imminent and identifiable harm, they would still not be entitled to administrative expense priority because they are seeking to recover costs or expenses that they have not yet incurred and may never incur.

Courts have declined to award administrative expense priority to government claims for future unincurred response costs finding that such a decision would be premature because the costs are still speculative. *In re Oldco M Corp.*, 438 B.R. 775, 786 (Bankr. S.D.N.Y. 2010) (declining to award administrative expense priority to the government's estimated future response costs "[b]ecause MDNRE has not demonstrated that it has expended any money for response costs…, or that it will be required to do so in the future"); *see also In re Microfab, Inc.*, 105 B.R. 161, 162 (Bankr. D. Mass. 1989) (denying "as premature the Commonwealth's request for administrative expense status; the Commonwealth has not yet expended funds to clean the Site, and any ruling I might render on future expenses would be speculative"); *In re N.P. Mining Co.*, 124 B.R. 846, 850 (Bankr. N.D. Ala. 1990) (denying administrative expense priority to civil penalties assessed by the government because, among other things, the amount did not reflect "actual cost or expenditure of the State of Alabama in connection with these violations"); *In re Shore Co.*, 134 B.R. 572, 580 (Bankr. E.D. Tex. 1991) (finding that an award of administrative expense status is premature when the government had not yet expended any resources for remediation).

As clearly delineated in the Environmental Claims, the EPA and the MDEQ have not incurred any post-petition environmental removal or other recoverable response costs to abate

17

contamination at the Environmental Sites.  Both during and post-emergence, the Reorganized

Debtors have maintained the environmental remediation and safety systems at the Environmental

Sites and the Environmental Agencies have not had to expend any removal or other recoverable

response costs to abate contamination at any of the Environmental Sites.  As a result, the

Environmental Claims must be reclassified as general unsecured claims discharged by the

Modified Plan because any administrative expense claim for removal or other recoverable

response costs is entirely "speculative" at this point since it would have to be based upon a

flawed conceptual model of site conditions, unsupported cost projections, and flawed financial

discounting of the Environmental Claims.  *See In re Mahoney-Troast Constr. Co.*, 189 B.R. 57,

60 (Bankr. S.D.N.Y. 1995) (When there is no identifiable and imminent harm, "environmental

compliance costs which arise from the debtor's prepetition conduct are treated as general

unsecured claims.").

### E.    28 U.S.C. § 959(b) Is Not Applicable Because the Reorganized Debtors Are Not Operating and Managing the Properties.

The EPA argued in the EPA Claims that under 28 U.S.C. § 959(b)[12] the Reorganized

Debtors are "required to manage and operate estate property in accordance with non-bankruptcy

law, including all applicable environmental statutes" and that "[t]he cost of [Reorganized

Debtors'] compliance with environmental law is an administrative expense obligation of the

estate."

---

[12] 28 U.S.C. § 959(b) states that:

> a  trustee, receiver or manager appointed in any cause pending in any court of
> the United States, including a debtor in possession, shall manage and operate the
> property in his possession as such trustee, receiver or manager according to the
> requirements of the valid laws of the State in which such property is situated, in
> the same manner that the owner or possessor thereof would be bound to do if in
> possession thereof.

However, under Second Circuit case law, section 959(b) "does not apply where…a trustee acting in his official capacity conducts no business connected with the property other than to perform administrative tasks necessarily incident to the consolidation, preservation, and liquidation of assets in the debtor's estate." *In re Lehal Realty Assocs.*, 101 F.3d 272, 276 (2d Cir. 1996); *see also In re N.P. Mining Co., Inc.*, 963 F.2d 1449, 1460-61 (11th Cir. 1992) (§ 959(b) does not apply when a business's operations have ceased and its assets are being liquidated); *In re Valley Steel Prods. Co., Inc.*, 157 B.R. 442, 447 (Bankr. E.D. Mo. 1993) (§ 959(b) does not apply to a debtor that is liquidating its estate). The Eleventh Circuit has further clarified that the trustee does not need to be "entirely inactive" for the purposes of section 959 applicability but rather the important factor is whether the business was "being administered for the purpose of continuing operations" or whether the trustee's actions were "to protect [the] asset[s] of the estate" and to "essentially hold[] matters in the status quo." *In re NP Mining Co.*, 963 F.2d at 1460–61.

In this case, the Reorganized Debtors emerged from bankruptcy pursuant to the Modified Plan under which substantially all of its assets were sold to third parties, and the assets that were left with the Reorganized Debtors were to be administered and not operated. Despite the fact that the Modified Plan § 11.1 provides the Reorganized Debtors with the power to "operate their businesses," the Reorganized Debtors have never "operated" the Debtors' business at the Environmental Sites as contemplated by section 959, but rather the Reorganized Debtors have simply maintained the status quo and performed "administrative tasks necessarily incident to…liquidation of the assets." Thus, 28 U.S.C. § 959(b) does not apply to the Reorganized Debtors and cannot be a basis for the Environmental Agencies' claims for administrative expense.

19

F.      **The EPA Is Not Entitled to Administrative Priority for its Costs at the Delphi VOC Site in Dayton, Ohio.**[13]

In addition to the protective filing for future unincurred response costs, the EPA also asserts an administrative expense priority claim for costs it incurred at the Delphi VOC Site in Dayton, Ohio.  The Dayton, Ohio property has been idle since at least since June 2009.[14]  As a result, any costs claimed by EPA, since at least June 2009, are not entitled to priority because the costs cannot benefit the estate when the property is not operating.  In addition, the Reorganized Debtors sold this property in 2012 and, thus, the Reorganized Debtors no longer have an interest in the property.  Whether the EPA is entitled to administrative priority for costs incurred at a site that the Reorganized Debtors no longer own remains an open question within the Second Circuit.  *In re Oldco M Corp.*, 438 B.R. 775, 783 (Bankr. S.D.N.Y. 2010).  However, pursuant to analogous case law and commentary, the Reorganized Debtors would contend that such costs are not entitled to priority because the costs cannot benefit the estate when the property is no longer owned by the debtors.  *See In re Insilco Techs., Inc.*, 309 B.R. 111 (Bankr. D. Del. 2004) (finding that the government was not entitled to administrative expense priority for costs incurred at a site that was sold by the debtor prior to filing because such costs do not benefit the estate); *see also* 5 Collier on Bankruptcy ¶ 503.06[4][a] ("Administrative expense status is denied for cleanup costs on property no longer owned by the estate.").

---

[13] Based on the Court's Case Closing Order and subsequent Environmental Claims and Issues Procedure Order, the Reorganized Debtors do not concede that the EPA's claims as to the Delphi VOC Site are appropriately before the Court as part of these proceedings.

[14] Supplement to First Amended Disclosure Statement at S-xviii.

G.    **If the Environmental Agencies Have an Administrative Expense Claim, the Reorganized Debtors' Dispute the Value of That Claim.**

Notwithstanding the above arguments, to the extent the Court determines that the

Environmental Agencies do have valid administrative expense claims against the Reorganized

Debtors, the Reorganized Debtors and their experts dispute the total value of the claim and, as

indicated above, *see* Section II.D., *infra*, the Reorganized Debtors dispute the Environmental

Agencies' characterization of the value of the claim.

III.    **CONCLUSION**

For the reasons stated above, the Reorganized Debtors ask this Court to sustain its

objections and disallow the Environmental Claims.

**NOTICE**

This Notice Of Claims Objection And Statement Of Disputed Issues With Respect To

Environmental Claim Numbers 15785, 18956, 19539, And 19786 And All Other Environmental

Issues At The Sites Owned By The Reorganized Debtors has been provided in accordance with

the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(M),

9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case

Management, And Administrative Procedures, entered on March 20, 2006 (Docket No. 2883).

Copies of this filing will also be available on the claims agent's website,

http://www.dphholdingsdocket.com/dph.  The Reorganized Debtors submit that, under the

circumstances, no other or further notice need be given.

Dated: Washington, D.C.
September 6, 2013

DPH Holdings Corp., et al.,
By their Attorneys
JONES DAY
By:

/s/ Kevin Holewinski
KEVIN P. HOLEWINSKI, *pro hac vice*
DANIELLA EINIK, *pro hac vice*
51 Louisiana Ave, NW
Washington, D.C. 20001
(202) 879-3939