**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                        :
In Re:                                  :
                                        :       Chapter 11
    DPH HOLDINGS CORP., et al.,       :
                                        :       Case No. 05-44481 (RDD)
          Reorganized Debtors.       :
                                        :       (Jointly Administered)
                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**RESPONSE OF THE ENVIRONMENTAL AGENCIES TO THE REORGANIZED
DEBTORS' NOTICE OF CLAIMS OBJECTION AND STATEMENT OF
DISPUTED ISSUES WITH RESPECT TO ENVIRONMENTAL CLAIM
NUMBERS 15785, 19539, AND 19786 AND ALL OTHER ENVIRONMENTAL
ISSUES AT THE SITES OWNED BY THE REORGANIZED DEBTORS**


          PREET BHARARA
          United States Attorney for the
          Southern District of New York
          *Attorney for the United States of America*


CRISTINE IRVIN PHILLIPS
Assistant United States Attorney
86 Chambers Street, Third Floor
New York, New York 10007
Telephone: (212) 637-2696
Facsimile: (212) 637-2702
Email: cristine.phillips@usdoj.gov

     —Of Counsel —

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................1

FACTUAL BACKGROUND ...............................................................................3

ARGUMENT .......................................................................................................8

I.     As Owners of the Contaminated Sites, Reorganized Debtors
Are Legally Obligated to Clean Up Those Sites.......................................8

     A.     A Reorganized Debtor Owning Property Has the Same
Cleanup Obligations as Any Other Owner of Property,
Notwithstanding Any Alleged Discharge in Bankruptcy, and the
Confirmation Order Expressly Preserves These Obligations......................8

     B.     Reorganized Debtor's Cleanup Obligations at These
Contaminated Sites Are Not Claims and Thus Could
Not Have Been Discharged .....................................................................10

          1.     Reorganized Debtors' Cleanup Obligations at the
Contaminated Sites Are Not Claims Where the
Statutory Provisions Under Which the Environmental
Agencies are Proceeding Do Not Afford a Monetary
Remedy ........................................................................................11

          2.     Reorganized Debtors' Cleanup Obligations at the
Flint and Rootstown Sites Are Not Claims...................................13

          3.     Reorganized Debtors' Mandatory Cleanup Obligations
At the Saginaw Site Under Part 201 of the NREPA
Are Not Claims ............................................................................14

          4.     Reorganized Debtors' Cleanup Obligations at the
Contaminated Sites Are Not Claims Because
Reorganized Debtors Continue to Own Those
Sites and There Is Ongoing Pollution ...........................................15

II.     The Laws Under Which the Environmental Agencies Are
Proceeding Require the Reorganized Debtors to Clean Up the
Contaminated Sites ................................................................................17

III.     Reorganized Debtors Must Use Their Remaining Wind-Down
Funds to Provide for Cleanup at the Contaminated Sites ......................19

IV.     Under 28 U.S.C. § 959(B) and the Limits on Abandonment Power
Set Forth In *Midlantic*, the Reorganized Debtors Must Clean Up the
Contaminated Sites ...............................................................................20

        A.     Under Section 959(b), a Liquidating Trust Cannot Avoid
Compliance With Non-Bankruptcy Law .....................................21

        B.     Debtors May Not Abandon the Contaminated Sites..................25

V.      Even if the Court Were to View Reorganized Debtors' Cleanup
Obligations as Administrative Expenses, Reorganized Debtors
Must Pay These Costs ............................................................................27

VI.    EPA is Entitled to Administrative Priority for the Costs Claimed
for the VOC Dayton Site........................................................................28

VII.   Because Reorganized Debtors Have Cleanup Obligations at the
Rootstown Site, the State of Ohio Is a Proper Party to This Litigation ................29

CONCLUSION ..............................................................................................29

## TABLE OF AUTHORITIES

**Case**            **Page**

*Austrian v. Williams,*
216 F.2d 278 (2d Cir. 1954), cert. denied, 348 U.S. 953 (1955) ...................................2

*In re Chateaugay Corp.*, 944 F.2d 997 (2d Cir. 1991) ............................................. passim

*In re Chicago Rapid Transit Co.,*
129 F.2d 1 (7th Cir.), cert. denied, 317 U.S. 683 (1942) ............................................23

*City of New York v. Exxon Corp.,*
932 F.2d 1020 (2d Cir. 1991)........................................................................................8

*In re CMC Heartland Partners,*
966 F.2d 1143 (7th Cir. 1992) .................................................................................8, 9

*Commonwealth of Pa. Department of Environmental Resources v. Conroy,*
24 F.3d 568 (3d Cir. 1994)..........................................................................................26

*Crawford v. Duluth St. Railway,*
60 F.2d 212 (7th Cir. 1932) ........................................................................................23

*In re General Motors Corp.,*
407 B.R. 463 (Bankr. S.D.N.Y. 2009) ..........................................................................7

*In re Guterl Special Steel Corp.,*
198 B.R. 128 (W.D. Pa. 1996)....................................................................................26

*In re Insilco Technologies, Inc.,*
309 B.R. 111 (Bankr. D. Del. 2004) ...........................................................................28

*In re Kennise Diversified Corp.,*
34 B.R. 237 (Bankr. S.D.N.Y. 1983)............................................................................9

*Leavell v. Karnes,*
143 B.R. 212 (S.D. Ill 1990).......................................................................................26

*Mark IV,*
460 B.R. at 471 ...........................................................................................................13

*Mark IV Industrial v. N.M. Environment Department (In re Mark IV Industrial),*
438 B.R. 460 (Bankr. S.D.N.Y. 2010).........................................................................10

*Mark IV Industrial v. N.M. Environment Department (In re Mark IV Industrial)*,
    459 B.R. 173 (S.D.N.Y. 2011)............................................................................ passim

*In re McCrory Corp.*,
    188 B.R. 763 (Bankr. S.D.N.Y. 1995)........................................................................27

*Midlantic National Bank v. New Jersey Department of Environmental Protection*,
    474 U.S. 502 (1986)........................................................................................... passim

*In re Mitchell*,
    249 B.R. 55 (Bankr. S.D.N.Y. 2000)........................................................................11

*Ohio v. Kovacs*,
    469 U.S. 274 (1985)...................................................................................7, 11, 19

*Otte v. United States*,
    419 U.S. 43 (1974)........................................................................................21

*Palmer v. Massachusetts*,
    308 U.S. 79 (1939)........................................................................................23

*In re Craig's Stores of Texas, Inc.*,
    266 F.3d 388, 390 (5th Cir. 2001) ...........................................................................23

*In re Peerless Plating Co.*,
    70 B.R. (Bankr. W.D. Mich. 1987)............................................................................26

*Reiter v. Sonotone Corp.*,
    442 U.S. 330 (1979)........................................................................................21

*SEC v. American Board of Trade, Inc.*,
    830 F.2d 431 (2d Cir. 1987)................................................................................12

*In re Shearin Family Investment*,
    418 B.R. 584 (Bankr. E.D.N.C.2009)........................................................................11

*In re Stevens*,
    68 B.R. 774 (D. Maine 1987) .................................................................................26

*Swarts v. Hammer*,
    194 U.S. 441 (1904)........................................................................................21

*In re Torwico Electronics, Inc.*,
    8 F.3d 146, 151 (3d Cir. 1993)..................................................................9, 12, 13, 17

*United States v. Apex Oil Co.*,
    579 F.3d 734 (7th Cir. 2009) ................................................................12, 13, 14, 17

*United States v. United Mine Workers of America*,
    330 U.S. 258 (1947) .....................................................................................................12

*In re Wall Tube & Metal Products Co.*,
    831 F.2d 118 (6th Cir. 1987) .......................................................................................26

## **Statutes**

2 U.S.C. § 702(e)(3)(C)(i) ....................................................................................................19

5 U.S.C. App. 202(f)(3)(C)(i) ..............................................................................................19

11 U.S.C. § 101(5) ...............................................................................................9, 10, 11, 12

11 U.S.C. §§ 105 ......................................................................................................................6

11 U.S.C. §§ 350(a) .................................................................................................................6

11 U.S.C. § 363 ........................................................................................................................7

11 U.S.C. § 503 ...............................................................................................................24, 25

11 U.S.C. § 554 .....................................................................................................2, 18, 22, 23

11 U.S.C. § 1101 *et seq.* ..........................................................................................................2

11 U.S.C. §§ 1123(a)(5) ....................................................................................................1, 17

11 U.S.C. § 1127 ......................................................................................................................3

11 U.S.C. § 1141(d) .................................................................................................................9

28 U.S.C. § 959(b) ..............................................................................................................2, 18

29 U.S.C. §§ 1103(a), 1105(b)(2)(B) ...................................................................................19

42 U.S.C. § 6901, *et seq.* ..........................................................................................................4

42 U.S.C. § 6925(a) .................................................................................................................4

42 U.S.C. § 9601, *et seq.* ..........................................................................................................4

MCL §§ 324.20101 *et seq.* .....................................................................................................15

MCL § 324.20102(f), (g) ...................................................................................15

MCL § 324.20114(1) ........................................................................................15

Ohio Admin. Code § 3745-20-07 .............................................................13, 16

Ohio Rev. Code § 6111.............................................................................13, 16

**Rules & Regulations**

40 C.F.R. Part 270.........................................................................................17

18 Cong. Rec. 2542-2543 (1887)....................................................................20

The Bankruptcy Act of 1867,
    ch. 176, 14 Stat. 517...............................................................................20

Act of Mar. 3, 1887,
    ch. 373, § 2, 24 Stat. 554........................................................................20

**Miscellaneous**

*Collier on Bankruptcy* § 0.05 (14th ed. 1978) .................................................23

R. Clark, *The Law and Practice of Receivers* §§ 855-857 (3d ed. 1959) .........................23

G. Glenn. *The Law Governing Liquidation* §§ 149-172 (1935) .......................................23

## INTRODUCTION

The United States Environmental Protection Agency ("EPA"), by its attorney, Preet

Bharara, United States Attorney for the Southern District of New York, joins with the Michigan

Department of Environmental Quality ("MDEQ") and the Ohio Environmental Protection

Agency ("Ohio EPA" and, collectively, the "Environmental Agencies") in responding to the

Reorganized Debtors' *Notice of Claims Objection and Statement of Disputed Issues With Respect*

*to Environmental Claim Numbers 15785, 19539, and 19786 and All Other Environmental Issues*

*at the Sites Owned by the Reorganized Debtors* (the "Objection").[1]

Notwithstanding the representation of DPH Holdings Corporation and its affiliated

reorganized debtors (collectively, the "Reorganized Debtors"), made to the Court in their *Motion*

*for Final Decree and Order Pursuant to 11 U.S.C. §§ 105, 350(a), and 1142, Fed. R. Bankr. P.*

*3022, and Local Bankr. R. 3022-1 Closing the Bankruptcy Cases and Providing Related Relief*

(the "Motion to Close"), that the appropriate resolution of Reorganized Debtors' outstanding

obligations to clean up four contaminated sites (the "Contaminated Sites"), which they have

failed to sell despite an extensive marketing process (*see* Mot'n to Close at 13 n.7), was to

transfer those sites to an environmental response trust along with funding "necessary to fund

cleanup costs and other expenses relating to administration of the trust" (Mot'n to Close at ¶

13(iv)), Reorganized Debtors now have taken the position that, in fact, they are under no legal

obligation to clean up (or fund the cleanup of) the Contaminated Sites.  In an effort to support

this unsupportable position, Reorganized Debtors misconstrue and even ignore applicable

bankruptcy and non-bankruptcy law requiring them to provide fully for the cleanup of these sites.

---

[1] MDEQ and Ohio EPA have authorized EPA to represent that they join EPA on this brief.

As set forth herein, Reorganized Debtors cannot avoid their legal obligations to clean-up the contaminated sites, which create the same obligations for Reorganized Debtors as any owner of property.  Despite Reorganized Debtors' emphasis on the Environmental Agencies' claims, the Reorganized Debtors' clean-up obligations are not claims and so operate independently of the dischargeability provisions in the Bankruptcy Code – this is true because (i) Reorganized Debtors' environmental clean-up obligations arise from ownership of contaminated property after emergence, and even if discharged have subsequently "sprung anew," and (ii) in any event, in this case, the obligations in question are not 'claims' within the meaning of 101(5) of the Bankruptcy Code, and therefore are not subject to discharge.  Each of the statutes under which the Environmental Agencies are proceeding requires Reorganized Debtors to perform cleanup at the Contaminated Sites; furthermore, these costs are non-dischargeable injunctive obligations that must be funded through the expenditure of wind-down funds available to the Reorganized Debtors, as set forth in the Trust Agreement (defined below).  To the extent Reorganized Debtors rely upon the legal standards in either 28 U.S.C. § 959(b) or 11 U.S.C. § 554, neither is applicable, but if either were applicable, Reorganized Debtors' cleanup obligations would continue to exist under either standard.  Additionally, and in part, in the alternative as explained below, the administrative expense claim filed by EPA should be allowed as a valid administrative expense claim.  Finally, despite Reorganized Debtors' arguments to the contrary, Ohio EPA, as the agency tasked with enforcing state environmental laws, including with respect to Reorganized Debtors' cleanup obligations at the Rootstown Site, is indisputably a proper party to this action.

## FACTUAL BACKGROUND

On October 8 and 14, 2005 (the "Petition Date"),  Delphi Automotive Systems LLC and its affiliates (collectively, "Debtors") filed voluntary petitions for relief (the "Chapter 11 Cases") under Chapter 11, Title 11 of the United States Code, 11 U.S.C. § 1101 *et seq.*, as amended (the "Bankruptcy Code").

On August 2, 2006, MDEQ filed a proof of claim designated as claim number 15785 (the "MDEQ claim"), seeking $64,329.64 in pre-petition environmental response costs incurred by MDEQ pursuant to state and federal environmental laws.  The MDEQ reserved its argument that the environmental response activities required under state and federal law to be performed by the debtors are not subject to discharge and also cited "possible natural resource damages that may have resulted from releases of hazardous substances for which Delphi Automotive is liable."

On January 25, 2008, the Court issued an order confirming Debtors' first amended joint plan of reorganization (as modified) (the "Plan").  On April 4, 2008, the Debtors announced that they had met the conditions to consummate the confirmed Plan, but were unable to close.

On October 3, 2008, Debtors filed a motion under 11 U.S.C. § 1127 for an order, *inter alia*, approving certain modifications to the confirmed plan.  On June 1, 2009, Debtors filed a supplement to their previous motion for approval of certain modifications to the confirmed plan (the "Modified Plan").  Section 11.1 of the Modified Plan states:

> As of and following the Effective Date, the Reorganized Debtors may operate their businesses and use, acquire, and dispose of property and settle and compromise Claims or Interests without supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by this Plan, the Confirmation Order, and the Modification Approval Order.

3

On July 30, 2009, the Court entered an order approving the Modified Plan (the "Plan Modification Order"), which Debtors substantially consummated on October 6, 2009 (the "Effective Date"), on which date the Reorganized Debtors emerged from bankruptcy. Paragraph 64(i) of the Plan Modification Order contained language preserving the Reorganized Debtors' environmental obligations and the Environmental Agencies' right to enforce them.

On July 15, 2009, EPA timely filed an application for administrative expenses for the period from the Petition Date to June 1, 2009 (the "July 15 EPA Application"), which was subsequently designated claim numbers 18956 and 19539. As the July 15 EPA Application evidences, Debtors' liability for these administrative expenses flows from post-petition environmental response and oversight costs incurred or to be incurred at the properties (collectively, the "Facilities") listed on page S-xviii of Debtors' *Supplement to First Amended Disclosure Statement with Respect to First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors and Debtors-in-Possession (As Modified)* ("First Amended Disclosure Statement") [Docket No. 17031] under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. § 9601, *et seq*. These costs include, but are not limited to, approximately $220,000 incurred in connection with a site previously owned by Debtors in Dayton, Ohio (the "Dayton Site"). *See* July 15 EPA Application at ¶ 3.

The July 15 EPA Application also indicates that Debtors have or may have environmental obligations for properties that are part of the bankruptcy estate and/or for the migration of hazardous substances from the property of the bankruptcy estates, and that Debtors have voluntary corrective action agreements pursuant to schedules approved by the EPA for certain

4

facilities.  *See* July 15 EPA Application at ¶ 8.  The July 15 EPA Application also reserves

EPA's right to seek estimated future expenses and other costs, in the event that a court found that

Debtors' work obligations imposed by environmental statutes, regulations, court orders,

administrative orders, or permits were claims within the meaning of the Bankruptcy Code,

including with respect to compliance and work obligations under the Resource Conservation and

Recovery Act ("RCRA"), 42 U.S.C. § 6901, *et seq.*  *See* July 15 EPA Application at ¶¶ 6-7.

On November 5, 2009, EPA timely filed an amended application for administrative

expense (the "November 5 EPA Application"), which was subsequently designated claim

number 19786.  The expenses listed in the attachment to the November 5 EPA Application are

substantially similar to those in the attachment to the July 15 EPA Application, but for the more

recent time period of June 1, 2009, through the Effective Date of October 6, 2009.  The

attachment to the November 5 EPA Application indicates that the United States has incurred an

additional $8,003.01 in expenses in connection with the Dayton Site between June 1, 2009, and

October 6, 2009.

In October 2012, the Reorganized Debtors initiated settlement negotiations with the

United States and the States of Michigan and Ohio regarding the funding of an environmental

response trust for transfer and cleanup of the Contaminated Sites, which are owned by a trust

acting as sole shareholder of DPH Holdings (the "Trust"), which was established pursuant to the

Modified Plan.  The Contaminated Sites include two adjacent sites in Flint, Michigan (the "Flint

400 Site" and the "Flint 500 Site"), a site in Saginaw, Michigan (the "Saginaw Site") and a site in

Rootstown, Ohio (the "Rootstown Site").

The Flint 400 Site is a former manufacturing facility known as the Dort Highway Facility

of Delphi Energy & Chassis Systems, a Division of Delphi Automotive Systems, LLC, located at

1300 North Dort Highway, Flint, Michigan, EPA ID Number MID005356647.  The Flint 400

Site has several types of contamination including potential off-site migration of chlorinated

compounds in groundwater, chromium in groundwater, and light non-aqueous phase liquid

("LNAPL") contamination sources under several areas of the property.

The Flint 500 Site is a former manufacturing facility known as the Delphi Flint-East Plant

500 Facility, located at the former Delphi Automotive Systems, LLC, Plant 500-Engineering

Complex at 1601 North Averill Avenue, Flint, Michigan, EPA ID Number MID980568620.

Contamination at the Flint 500 Site consists of volatile organic compounds in soil and

groundwater contamination, and site-wide arsenic, cobalt and manganese in soil.

The Saginaw Site is a former manufacturing facility known as the Delphi Saginaw

Division Plant 2, located at 1400 Holmes, Saginaw, Michigan, EPA ID Number MID990760282.

The Saginaw Site is contaminated above Michigan's residential and non-residential criteria with

petroleum products, PCBs, chlorinated solvents, non-aqueous phase liquid ("NAPL"), and

metals, in soil and groundwater with contaminants migrating off-site.  The NAPL under the floor

of the former plant building is currently being contained by an operating recovery system that

prevents it from rising up and spreading over the ground surface.

The Rootstown Site is an inactive asbestos landfill covering approximately 66 acres on

the western portion of the facility formerly operating under the Delphi Packard

Electric/Electronic Architecture Division of Delphi Corporation located at 5245 South Prospect

Street, Rootstown, Ohio.  Exposed asbestos-containing pipe is located above-ground throughout

the site. Groundwater across the Rootstown Site has elevated levels of total petroleum

hydrocarbons, volatile organic hydrocarbons, semi-volatile organic hydrocarbons, and inorganic contamination; this includes manganese and thallium above drinking water standards and thallium above groundwater-surface-water interaction criteria.

On August 6, 2013, the Court entered the Order Pursuant to 11 U.S.C. §§ 105, 350(a), and 1142, Fed. Bankr. P. 3022, and Local Bankr. P. 3022-1 Concerning Closing the Bankruptcy Cases and Providing Related Relief (the "Case Closing Order"), which states, among other things, that the Environmental Agencies reserve the right to contest the closing of the bankruptcy cases based upon the "failure to resolve any of the Reorganized Debtors' obligations under the environmental laws."

On September 3, 2013, the Court entered the Order Establishing Procedures Governing the Resolution of Environmental Claim Numbers 15785, 18956, 19539, and 19786 and All Other Environmental Issues at the Sites Owned by the Reorganized Debtors (the "Environmental Claims and Issues Procedure Order") which sets forth procedures for the litigation of those issues, culminating in a hearing in November 2013.

# ARGUMENT[2]

**I.     As Owners of the Contaminated Sites, Reorganized Debtors Are Legally Obligated to Clean Up Those Sites**

**A.     A Reorganized Debtor Owning Property Has the Same Cleanup Obligations as Any Other Owner of Property, Notwithstanding Any Alleged Discharge in Bankruptcy, and the Confirmation Order Expressly Preserves These Obligations**

Reorganized Debtors' Objection misses the fundamental point that its ownership of the Contaminated Sites creates the same obligation to clean up those sites, in accordance with applicable environmental laws, that any owner of environmentally contaminated property would have. *See, e.g., In re CMC Heartland Partners*, 966 F.2d 1143, 1146-47 (7th Cir. 1992) (where a reorganized company continues to own contaminated property post-bankruptcy, liabilities arise anew based on post-bankruptcy ownership). Were a reorganized debtor permitted to own or operate property without having to comply with environmental laws that apply to all owners and operators of property, the public would be placed at risk. *See Ohio v. Kovacs*, 469 U.S. 274, 285 (1985) (a debtor plainly may not maintain a nuisance, pollute the waters of the State or refuse to remove the source of such conditions). Thus, even where liabilities of a debtor have been discharged in bankruptcy – which, as discussed below, is not the case with the liabilities at issue here – continued ownership of property after emergence results in the environmental obligations of ownership "springing anew" and attaching to the debtor. *CMC Heartland*, 966 F.2d at 1146-47; *In re Lewis*, 215 B.R. 880, 881 (Bankr. D. Alaska 1997) ("The requirement to clean up the property cannot be discharged when the debtors remain in possession of such property."); *see*

---

[2] Each of the arguments set forth herein represents the current, pre-discovery position of the Environmental Agencies; these positions will be provided in greater detail, including additional factual support, in the Environmental Agencies' pre-trial brief, set to be filed on November 7, 2013, per the terms of the Environmental Claims and Issues Procedure Order.

*also In re General Motors Corp.*, 407 B.R. 463, 508 (Bankr. S.D.N.Y. 2009) (same principle applies to a sale of property pursuant to 11 U.S.C § 363: ". . . New GM will be liable from the day it gets any such properties for its environmental responsibilities going forward.").

The policy rationales underlying *CMC Heartland* are equally applicable here:  unlike other types of pre-petition obligations, an environmental liability "reduces current welfare," *id.* at 1146, and so unlike pre-petition debts, obligations under the environmental laws run with the land, *id.*, or, as applicable, with the waste, *see In re Torwico Elecs*, 8 F.3d 146, 151 (3d Cir. 1993) ("Torwico is a generator of hazardous waste and as such has an ongoing responsibility for the wastes it disposes.").  Were a reorganized debtor entitled to shed its obligations under the environmental laws after emerging from bankruptcy, it would have gained special privileges by virtue of the bankruptcy that other property owners do not have.  *See CMC Heartland*, 966 F.2d at 1147; *see also City of New York v. Exxon Corp.*, 932 F.2d 1020, 1024 (2d Cir. 1991) (noting the need "to avoid frustrating 'necessary governmental functions by [allowing debtors to] seek[] refuge in bankruptcy court'") (citation omitted); *In re Kennise Diversified Corp.,* 34 B.R. 237, 245 (Bankr. S.D.N.Y. 1983) ("The provisions of the Bankruptcy Code do not and are not intended to provide an automatic mechanism for relieving property owners of the unpleasant effects of valid local laws embodying police and regulatory provisions.").

Further reinforcing the continuing nature of the Reorganized Debtors' obligations under the environmental laws is the language of the Plan Modification Order, which states, in relevant part, that:

> Nothing in this order or the Modified Plan: (i) discharges, releases, or precludes any environmental liability that is not a claim (as that term is defined in the Bankruptcy Code), or any environmental claim (as the term "claim" is defined in the Bankruptcy Code) of a governmental unit that arises on or after the Effective

9

Date; (ii) *releases the Debtors or Reorganized Debtors from liability under environmental law as the owner or operator of property that such persons own or operate after the Effective Date*; (iii) releases or precludes any environmental liability to a governmental unit on the part of any Persons other than the Debtors and Reorganized Debtors; or (iv) enjoins a governmental unit from asserting or enforcing, outside this Court, any liability described in this paragraph.

Plan Modification Order ¶ 64(i) (emphasis added).  The Plan Modification Order therefore further codifies Reorganized Debtors' existing obligations under the environmental laws.

      B.      Reorganized Debtor's Cleanup Obligations at These Contaminated Sites Are Not Claims and Thus Could Not Have Been Discharged

Although, as discussed above, even discharged liabilities related to the Reorganized Debtors' ownership of contaminated property post-emergence spring anew after emergence, here the Reorganized Debtors are wrong to suggest that they received a discharge for these cleanup obligations in the first place.  To the contrary, the cleanup obligations at each of the Contaminated Sites are not claims within the meaning of 11 U.S.C. § 101(5), and as such they passed through the bankruptcy and remain attached to the Reorganized Debtors, unaffected by the Plan.  Under the standard set forth in *In re Chateaugay Corp.*, 944 F.2d 997 (2d Cir. 1991), and *Mark IV Indus. v. N.M. Envtl. Dep't (In re Mark IV Indus.)*, 438 B.R. 460 (Bankr. S.D.N.Y. 2010), *aff'd* 459 B.R. 173, 186 (S.D.N.Y. 2011), as described in detail below, injunctive obligations under the environmental statutes are not claims where either (1) those statutory provisions do not afford the Environmental Agencies a monetary remedy, or (2) there is ongoing pollution at the relevant sites.

1.    Reorganized Debtors' Cleanup Obligations at the Contaminated Sites Are Not Claims Where the Statutory Provisions Under Which the Environmental Agencies are Proceeding Do Not Afford a Monetary Remedy

The only liabilities of a debtor discharged by Chapter 11 are those that meet the definition of a "claim" and arose before the date of confirmation.  *See* 11 U.S.C. § 1141(d) (providing that confirmation "discharges the debtor from any debt that arose before the date of . . . confirmation"); 11 U.S.C. § 101(12) (defining "debt" as "liability on a claim").  The language included in the Plan Modification Order, quoted in full above, underscores this point by stating, in relevant part:  "Nothing in this order or the Modified Plan . . . : (i) discharges, releases, or precludes any environmental liability that is not a claim (as that term is defined in the Bankruptcy Code) . . . ."

The cleanup obligations at the Contaminated Sites are not claims.  Section 101(5) of the Bankruptcy Code defines "claim" as:

> (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

> (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured . . . .

11 U.S.C. § 101(5).  With respect to an injunctive obligation created by statute, such as the obligations here to clean up the Contaminated Sites, the Second Circuit in *Chateaugay*, 944 F.2d at 1007, framed the relevant inquiry as, "whether the injunctions, alleged to give rise to dischargeable 'claims,' impose a remedy for a performance breach that gives rise to a right of payment."

11

In the context of an environmental statute creating a cleanup obligation, under the first part of the *Chateaugay* and *Mark IV* analysis, an obligation is not dischargeable if under the statutory provision under which the government is proceeding, the government does not have the right to recover the cost of the cleanup in the event of a breach of the obligation. *See id.* at 1008 ("[W]here there is no right to such payment for cleanup or other remedial costs, claims for injunctive relief are not dischargeable.") (citation omitted); *see also Mark IV*, 459 B.R. at 186 ("[T]he proper test for determining whether an enforcing agency has a 'right to payment' under section 101(5)(B) for an environmental injunction is to consider whether the enforcing agency has a right to cleanup and recover response costs under the statute pursuant to which the enforcing agency has obtained its injunction."). This standard also has been applied in other circuits: In *United States v. Apex Oil Co.*, 579 F.3d 734, 736-37 (7th Cir. 2009), the Seventh Circuit held RCRA does not provide a right to payment stemming from breach of a statutory cleanup obligation and concluded that, because "the plaintiff in our case (the government) is not seeking a payment of money and the injunction that it has obtained does not entitle it to payment," the injunctive obligation was not dischargeable. Similarly, in *Torwico*, 8 F.3d at 151, n.6, the Third Circuit held that because a cleanup "order was issued [by the State of New Jersey] under statutory sections which do not allow the state to perform the cleanup and then sue for reimbursement of its costs," the injunctive obligations created by that order are not claims.

The Bankruptcy Code does not focus on whether other forms of relief might have been available under other statutory causes of action that have not, in fact, been pursued by the party holding the equitable right. Rather, the Bankruptcy Code instead examines the cause of action actually asserted and the remedy that is in fact pursued. *See Kovacs*, 469 U.S. at 283 (focusing

12

on the actual actions taken by the State in remediating pollution, rather than examining hypothetical actions that the State might have taken); *Torwico*, 8 F.3d at 151 n.6 (focusing on causes of action actually pursued by the government, and deeming other rights that might have been available under different statutes "irrelevant"); *Mark IV*, 459 B.R. at 186 ("Second-guessing an agency's choice of which authority to proceed under could often force an agency to accept a 'suboptimal remedy,' which is inconsistent with the requirements of the Bankruptcy Code.") (citing *In re Davis*, 3 F.3d 113, 116 (5th Cir. 1993) (Section 101(5)(B) "does not require creditors entitled to an equitable remedy to select a suboptimal remedy of money damages")); *In re Mitchell*, 249 B.R. 55, 59- 60 (Bankr. S.D.N.Y. 2000); *In re Shearin Family Inv.*, 418 B.R. 584, 588 (Bankr. E.D.N.C. 2009).

   2.  Reorganized Debtors' Cleanup Obligations at the Flint and Rootstown Sites Are Not Claims

  Reorganized Debtors' cleanup obligations at the Flint 400 Site and Flint 500 Site arise under RCRA, a statute that, as stated *supra*, creates injunctive obligations that are not claims. *See Apex*, 579 F.3d at 736-37.  Under RCRA, EPA does not have a mechanism to clean up the sites itself and then seek cost recovery; RCRA does not, therefore, afford Reorganized Debtors a monetary remedy that the Court could construe as a claim under 11 U.S.C. § 101(5).  *See Chateaugay*, 944 F.2d at 1008 ("[I]f EPA could have itself incurred the costs of removing such wastes and then sued [the debtor] to recover the response costs, such an order is a 'claim' under the Code."); *Mark IV*; 459 B.R. at 187 (determining that the dispositive factor is "whether [the government] could recover the cost of the cleanup effort from [the debtor]").

  In their Objection, Reorganized Debtors mistakenly attempt to argue that RCRA does, in fact, allow EPA to perform cleanup activities and then seek compensation.  *See* Obj. at 12 (citing

Office of Enforcement and Compliance Assurance, EPA, Guidance on the Use of Section 7003 of RCRA 22-23 (Oct. 1997 (the "1997 Guidance")). To the contrary, as the Seventh Circuit has held, RCRA itself only imposes injunctive obligations on a defendant (or debtor), and only gives the United States the right to pursue such injunctive remedies. *See Apex,* 579 F.3d at 736-37. While it is true that *once* a court issues an injunction, if the defendant breaches that injunction, the government may seek penalties for the breach of that injunction, in that scenario it is not a breach of RCRA that gives rise to a payment but rather a breach of a court order. *See United States* v. *United Mine Workers of Am.*, 330 U.S. 258, 303-04 (1947) ("Judicial sanctions in civil contempt proceedings may . . . compensate the complainant for losses sustained."); *SEC* v. *American Bd. of Trade, Inc.*, 830 F.2d 431, 441-42 (2d Cir. 1987) (affirming a civil contempt sanction that was designed "to restore [injured parties] to the position they would have been in if the injunction had been obeyed."). "Breach of performance" of obligations under RCRA does not itself "give[] rise to a right to payment." 11 U.S.C. § 101(5)(b). Accordingly, RCRA obligations are not dischargeable. *See Apex,* 579 F.3d at 736-37.

Reorganized Debtors' cleanup obligations at the Rootstown Site arise from Ohio Rev. Code § 6111 (as to groundwater) and Ohio Admin. Code § 3745-20-07 (as to asbestos-containing materials), neither of which contains a cost recovery option or other monetary remedy of any kind. As with RCRA, these statutes simply put injunctive-type obligations on a debtor to address site contamination, and do not provide Ohio EPA with a cost-recovery remedy.

      3.      Reorganized Debtors' Mandatory Cleanup Obligations at the Saginaw Site Under Part 201 of the NREPA Are Not Claims

Reorganized Debtors' cleanup obligations at the Saginaw Site arise from Part 201 of Michigan's Natural Resources and Environmental Protection Act ("NREPA"), PA 451 of 1994,

MCL §§ 324.20101 *et seq*.  The clear intent of Part 201 of NREPA as stated in its legislative

declaration, is for liable owners to address environmental contamination. MCL § 324.20102(f),

(g).  Section 20114(1) imposes mandatory duties on liable owners to perform.[3]  While Section

201 contains a cost recovery provision, this should not lead to the conclusion that the cleanup

obligations at the Saginaw site have been converted to a claim.  The statute places an affirmative

obligation upon liable owners to clean up sites in the first instance and Rule 299.5115 requires

the state to notify a liable owner and give them the opportunity to act before expending state

funds except in an emergency situation.  As such, this is not the type of obligation that should be

dischargeable under *Chateaugay*.

> 4.    Reorganized Debtors' Cleanup Obligations at the Contaminated Sites Are
>       Not Claims Because Reorganized Debtors Continue to Own Those Sites
>       and There Is Ongoing Pollution

The Second Circuit in *Chateaugay* stated that "since there is no option to accept payment

in lieu of continued pollution, any order that to any extent ends or ameliorates continued

pollution is not an order for breach of an obligation that gives rise to a right of payment and is for

that reason not a "claim."  944 F.2d at 1008; *see also Mark IV*, 459 B.R. at 188 ("[A] cleanup

order, which is addressed even in part to 'stopping or ameliorating ongoing pollution emanating

from accumulated wastes' is not dischargeable.") (internal citation omitted).  The Second Circuit

thus concluded that a cleanup order issued under CERCLA "that accomplishes the dual

objectives of removing accumulated wastes and stopping or ameliorating ongoing pollution

emanating from such wastes is not a dischargeable claim."  *Id.*  Under this standard, even if the

---

[3] This duty to perform exists independently of participation by MDEQ unless an administrative
order or judicial decree is in place and requires otherwise.  MCL § 324.20114(2) and MCL §
324.20114a(1).

15

Court were to determine that any of the statutes creating Reorganized Debtors' cleanup obligations as to the Contaminated Sites afforded a monetary remedy, those obligations still would not constitute claims under the test set forth in *Chateaugay* and *Mark IV* because there is ongoing pollution at each of the Contaminated Sites.

Under *Chateaugay*, "ongoing pollution" includes "hazardous substances, previously deposited, [that] are currently contributing to pollution."  944 F.2d at 1009; *see also Mark IV*, 459 B.R. at 186 (noting that "'residual' waste, even if already cleaned up, can cause 'ongoing pollution' under *Chateaugay*").  Under the test in *Chateaugay*, the conditions at each of the Contaminated Sites constitute "ongoing pollution" that is not a "claim" in bankruptcy.  Three of the Contaminated Sites – the two Flint Sites and the Saginaw Site – have groundwater contaminated with LNAPLs and dense non-aqueous phase liquids ("DNAPLs"), which the Reorganized Debtors are keeping at bay through active groundwater collection systems; were Reorganized Debtors to stop operating these systems, the contaminated groundwater would migrate.  The fourth site, the Rootstown Site, also has groundwater contamination that may be migrating.

*Chateaugay* requires a debtor not just to cease actively polluting, but also to "stop[] or ameliorat[e] ongoing pollution emanating from [accumulated wastes]."  *Id.* at 1008. As an example of such, the Second Circuit posited a situation in which a debtor was required "to clean up a toxic waste site from which hazardous substances are leaching into nearby water supplies," as such an order also "requires the defendant to 'stop polluting,' *i.e.*, to stop the run-off of hazardous substances from its property . . . ."  *Id.* at 1007.  Reorganized Debtors' arguments that there is no ongoing pollution at the Contaminated Sites because Reorganized

16

Debtors are no longer actively conducting business there (*see* Obj. at 11-13) are, therefore, inapposite:  active operations of the debtor are not relevant to determine whether there is an ongoing obligation to perform cleanup or to cease ongoing pollution.  *See Apex,* 579 F.3d at 736-37 (debtor was no longer actively operating at the time of the court's analysis); *Torwico,* 8 F.3d at 151 (same); *Mark IV*, 459 B.R. 173, 186 (same).  Because there is ongoing pollution at the Contaminated Sites, in the form of solid waste and contaminated groundwater, the Reorganized Debtors' obligation to clean up this contamination is not a claim.[4]

## II.    The Laws Under Which the Environmental Agencies Are Proceeding Require the Reorganized Debtors to Clean Up The Contaminated Sites

At each of the Contaminated Sites, the applicable environmental law (as set forth in the previous section, *supra*) requires the Reorganized Debtors to engage in cleanup.  At the two Flint Sites, Reorganized Debtors are obligated to perform corrective action activities in order to come into compliance with RCRA under a 2002 voluntary cleanup agreement.  Furthermore, as owners of the site, Reorganized Debtors are subject to the issuance of an order pursuant to RCRA 3008(h) at any time, such order having been held temporarily in abeyance by the Reorganized Debtors' initiation of settlement negotiations with the Environmental Agencies in October 2012. Additionally, upon information and belief, because there was a disposal of hazardous waste without a permit after 1980, Reorganized Debtors are liable to conduct corrective action under RCRA Section 3005(a), 42 U.S.C. § 6925(a), and 40 C.F.R. Part 270.

---

[4] The question of "ongoing pollution" presents factual issues to be developed in discovery and tried at the November 2013 hearing.  Although, as noted above, the Court will not need to reach this issue because the obligations of the Reorganized Debtors exist regardless of discharge, and because there was no discharge, the Environmental Agencies reserve the right to raise all available arguments on "ongoing pollution" that may be warranted by the factual record after discovery.

17

At both the Saginaw and Rootstown Sites, Reorganized Debtors are obligated to perform a cleanup pursuant to the applicable state environmental statutes, NREPA § 201, Ohio Rev. Code § 6111 and Ohio Admin. Code § 3745-20-07.  In Michigan, NREPA creates cleanup obligations for owners where hazardous substances previously have been released.  *See* NREPA §§ 20114(1), 20126.  In Ohio, Ohio Rev. Code protects the waters of the state from contamination and creates an obligation to remedy any such contamination, and Ohio Admin. Code § 3745-20-07 governs the treatment of inactive asbestos landfills, including by requiring that the owner take steps to protect the public safety.

Reorganized Debtors' argument, that what it claims to be a lack of recent activity by the Environmental Agencies somehow impacts the enforceability of the environmental obligations at issue, is both factually inaccurate (overlooking, among other things, the Reorganized Debtors' ongoing cleanup activities at the Contaminated Sites, which will cease upon termination of the Trust, as well as the settlement negotiations between the parties, which have been ongoing for almost a year) and ignores this legal framework.  Furthermore, the doctrine of laches may not be asserted against the government when it is acting in its sovereign capacity to protect the public welfare.  *See Utah Power & Light Co. v. United States*, 243 U.S. 389, 409 (1917) ("[L]aches or neglect of duty on the part of officers of the government is no defense to a suit by it to enforce a public right or to protect a public interest."); *United States v. Rohm & Haas Co.*, 939 F. Supp. 1142, 1152, 1155 (D.N.J. 1996) (the defense is inconsistent with the explicit language of CERCLA and congressional intent); *see also Massachusetts v. EPA*, 549 U.S. 497, 527 (2007) ("[A]n agency has broad discretion to choose how best to marshal its limited resources and personnel to carry out its delegated responsibilities.").

### III.    Reorganized Debtors Must Use Their Remaining Wind-Down Funds to Provide for Clean Up at the Contaminated Sites

The First Amended Joint Plan of Reorganization of Delphi Corporation and Certain Affiliates, Debtors, and Debtors-in-Possession (the "Modified Plan") directs the Debtors to execute a Post-Confirmation Trust Agreement (the "Trust Agreement"), attached as an Exhibit to the Modified Plan, which establishes the Trust, which "shall become the sole shareholder of Reorganized DPH Holdings." The Trust Agreement, in turn, governs the actions of the Trust and the Plan Administrator, including by specifying that the Trust cannot terminate until it has properly disposed of all of its property, among which are the Contaminated Sites. *See* Trust Agreement § 3.1. The Trust Agreement also provides for the provision of $50 million in funding to the Reorganized Debtors by certain components of General Motors, for the purpose of accomplishing the "winding up of the Debtors' estates." *See* Trust Agreement at 2.

Were the Modified Plan and Trust Agreement not to have provided adequately for wind-down of the Trust, the Plan would have been unconfirmable because it would have failed to provide adequate means for its implementation and compliance with applicable legal requirements, *see* 11 U.S.C. §§ 1123(a)(5), 1129(a)(11), and thus would not have been feasible; it also would have contained terms that are forbidden by law, *see* 11 U.S.C. 1129(a)(3), 28 U.S.C. § 959(b). And among the necessary wind-down expenses of the Trust is providing for the disposition of the Contaminated Sites, which the Trust must accomplish in accordance with its obligations under non-bankruptcy law. *See Midlantic National Bank v. New Jersey Department of Environmental Protection*, 474 U.S. 502, 505 (1986) (bankruptcy law does not supplant obligations under non-bankruptcy law).

19

Indeed, the Reorganized Debtors have admitted that the establishment of an environmental response trust along with funding for the environmental and administrative costs of the trust is a legitimate wind-down expense, which Reorganized Debtors listed in their wind-up budget in July 2012. *See Reorganized Debtors' Motion for an Order to Compel Compliance With and to Implement the Modified Plan, Plan Modification Order and Related Documents* [Dkt. No 22075], at 10. Accordingly, the Court should direct the Reorganized Debtors to fully fund the cleanup of the Contaminated Sites using their funds available for wind-down expenses.

The Environmental Agencies will be prepared to prove at trial the amount of wind-down funding required to provide for the cleanup of these sites.

## IV.    Under 28 U.S.C. § 959(b) and the Limits on Abandonment Power Set Forth in *Midlantic*, the Reorganized Debtors Must Clean Up the Contaminated Sites

The Modified Plan was substantially consummated more than four years ago; since then, the Reorganized Debtors have been operating as an entity free from bankruptcy and have not been debtors-in-possession. It is therefore the case that neither 28 U.S.C. § 959(b) nor the abandonment powers of 11 U.S.C. § 554 apply to the Court's analysis here, as the Reorganized Debtors cannot avail themselves of the provisions of the Bankruptcy Code four years after emerging from bankruptcy. *See In re Craig's Stores of Texas, Inc.*, 266 F.3d 388, 390 (5th Cir. 2001) ("Once the bankruptcy court confirms a plan of reorganization, the debtor . . . is without the protection of the bankruptcy court. It may not come running to the bankruptcy judge every time something unpleasant happens.") Instead, the Reorganized Debtors are directly subject to all of the obligations imposed by applicable law, as described above.

To the extent that the Court does conclude that either 28 U.S.C. § 959(b) or 11 U.S.C. § 554 is applicable, however, under either standard, Reorganized Debtors must fully fund the cleanup of the Contaminated Sites, for the reasons set forth below.

A.      Under Section 959(b), a Liquidating Trust Cannot Avoid Compliance With Non-Bankruptcy Law

Again, the Court need not reach a Section 959(b) analysis because the Reorganized Debtors have already emerged from bankruptcy and are subject to the same legal obligations as any other entity.  *See supra*, Point I.  However, even if the Court were to deem Section 959(b) to supply the relevant framework, the Reorganized Debtors are nonetheless obligated to conduct the cleanup of the Contaminated Sites under this analysis because a liquidation trust, like any other entity, must generally comply with non-bankruptcy law.  *See Kovacs,* 469 U.S. at 285 (trustee "in possession" of a hazardous waste site must comply with state environmental laws); *see also Otte v. United States,* 419 U.S. 43, 52 (1974) (trustee must comply with IRS recordkeeping requirements); *Swarts v. Hammer,* 194 U.S. 441, 444 (1904) (trustee must pay state and local property taxes).

Reorganized Debtors contend that Section 959(b) is relevant only when the trustee is actually operating the business of the debtor, and not when he is liquidating it.  But this contention is inconsistent with the language of Section 959(b), which addresses both "management and operation" of property.  Courts "are obliged to give effect, if possible, to every word Congress used," *Reiter v. Sonotone Corp.,* 442 U.S. 330, 339 (1979), and Section 959(b), on its face, encompasses something more than "operation."[5]  There is no reason why the phrase

---

[5]   If Congress had wanted to restrict Section 959(b) to the operation of a business, it would have used the phrase "carrying on business," as it did in Section 959(a).  It has been held that that

"manage[ment of the] property," could not, in the abstract, describe a trustee's custodial care and disposition of property in a bankruptcy liquidation.  Congress typically uses the term "manage" in conjunction with the term "trustee" to describe a trustee's general activities in administering the trust corpus.  *See*, *e.g.,* 2 U.S.C. § 702(e)(3)(C)(i) (blind trusts for public officials); 5 U.S.C. App. 202(f)(3)(C)(i) (same); 29 U.S.C. §§ 1103(a), 1105(b)(2)(B) and (c)(3) (employee benefit plan trusts); *see also CFTC v. Weintraub,* slip op. 8  (stating, after surveying the trustee's various powers, that "the Bankruptcy Code gives the trustee wide-ranging *management authority* over the debtor" (emphasis added)).  Thus, Section 959(b)'s use of the term "manage," evaluated on its face, includes the bankruptcy trustee's general administration of property in his possession, including actions taken in liquidation of the estate.

The legislative history of Section 959(b) also supports this conclusion.  Section 959(b) originated in state objections raised in the late 19th century against perceived abuses of federal railroad receiverships.  Congress, responding to these concerns, adopted a provision expressly subjecting receivers to state law.  Act of Mar. 3, 1887, ch. 373, § 2, 24 Stat. 554. See 18 Cong. Rec. 2542-2543 (1887).  This provision eventually evolved into the present requirements of Section 959(b).  The origins of the section demonstrate that it was enacted to prevent federal receivers, and later trustees, from encroaching on general state prerogatives, not only in the operation of a business, but also in pursuing a liquidation.  Notably, the equity receivership was a debt management scheme that frequently contemplated either partial or complete liquidation of

---

phrase is limited to actions taken in the operation of a business. *Austrian v. Williams,* 216 F.2d 278, 285 (2d Cir. 1954), *cert. denied*, 348 U.S. 953 (1955).

assets.[6]  Indeed, at the time that the original provision was enacted, federal law did not expressly

provide for debtor reorganization, and partial or complete foreclosure was the likely prospect.[7]

And in all events, particular conduct that the provision without question was intended to reach,

such as the abandonment of state-regulated rail service,[8] was likely to occur in liquidation.  Thus,

Section 959(b)'s legislative origins fully support its application to actions taken by a trustee in

liquidating a bankruptcy estate.

The underlying purposes of Section 959(b) also requires its application to liquidation as

well as to the operation of ongoing businesses.  The section is intended to advance federalism

interests by limiting the power of federal court appointees to avoid state law.  There are no sound

reasons for requiring federal trustees to comply with state laws when operating a business, but

permitting them to disregard those same laws when liquidating the enterprise.  If a trustee seeks,

for example, to sell adulterated food, controlled substances, or dangerous products to the general

---

[6] *See generally* G. Glenn, *The Law Governing Liquidation* §§ 149-172 (1935); 7 *Moore's Federal Practice,* Pt. 2, at ¶ 66.09[1] (2d ed. 1985).

[7] The Bankruptcy Act of 1867, ch. 176, 14 Stat. 517 (repealed by Act of June 7, 1878, ch. 160, 20 Stat. 99 *et seq.*), did not provide viable mechanisms for forcing creditors to accept consolidation or composition of debts, and the United States had no general bankruptcy code from 1878 to 1898.  See 1 *Collier on Bankruptcy* § 0.05 (14th ed. 1978).  Thus, receiverships were originally instituted with full knowledge that a partial or complete foreclosure was a likely prospect.  See 3 R. Clark, *The Law and Practice of Receivers* §§ 855-857 (3d ed. 1959).  However, the railroads eventually became skilled at using the equity receivership for reorganization purposes, often to the detriment of creditors and the public.  See *Securities and Exchange Commission Report on the Study and Investigation, Personnel and Functions of Protective and Reorganization Committees:  Strategy and Techniques of Protective and Reorganization Committees,* Pt. 1 (May 10, 1937) (*reprinted in part in* H.R. Rep. 95-595, 95th Cong., 1st Sess. 242-44 (1977)).  The resulting abuses eventually led to the adoption of provisions in the 1930's for reorganization in bankruptcy.  See H.R. Rep. 95-595, *supra,* at 242, 244.

[8] See, *e.g., Palmer v. Massachusetts,* 308 U.S. 79 (1939); *In re Chicago Rapid Transit Co.,* 129 F.2d 1, 6 (7th Cir.), *cert. denied,* 317 U.S. 683 (1942); *Crawford v. Duluth St. Ry.,* 60 F.2d 212,

public, it should make little difference whether he is operating the debtor's business or liquidating its assets.

Reorganized Debtors incorrectly cite to *In re Lehal Realty Associates*, 101 F.3d 272 (2d Cir. 1996), for their contention that a trustee must conduct business at the property in order for Section 959(b) to apply – in fact, *Lehal* interprets Section 959(a), which addresses lawsuits against trustees and states that such suits are allowed where the trustee is "carrying on business connected with [the] property," and thus has no bearing on the "manage and operate" language in 959(b). The other cases cited by Reorganized Debtors, *see in re NP Mining Co., Inc.*, 963 F.2d 1449, 1460-61 (11th Cir. 1992); *In re Valley Steel Prods Co., Inc.*, 157 B.R. 442, 447 (Bankr. E.D. Mo. 1993), take a position inconsistent with the language, legislative history, and purpose of Section 959(b). *See, e.g.*, *In re Old Carco LLC*, 424 B.R. 650, 658 (Bankr. S.D.N.Y. 2010) ("[A] trustee's effort 'to marshall and distribute' estate assets is subject to the governmental interest in public health and safety.").

Finally, even if the Court were to adopt Reorganized Debtors' interpretation of Section 959(b), the premise of Reorganized Debtors' arguments regarding 959(b) contains a factual presumption that in the past four years since emerging from bankruptcy, the Trust has been entirely inactive other than to take steps necessary to liquidate the assets. Even assuming their interpretation of 959(b) were correct, they have adduced no factual evidence to support this proposition, which is their burden. Accordingly, at trial, they will be required to make such a factual showing.

---

215 (7th Cir. 1932).

B.        Debtors May Not Abandon the Contaminated Sites

Abandonment is governed by Section 554 of the Bankruptcy Code, 11 U.S.C. § 554,

which provides: "After notice and a hearing, the trustee may abandon any property of the estate

that is burdensome to the estate or that is of inconsequential value and benefit to the estate."  As

an initial matter, abandonment is not an option that is available to Reorganized Debtors because

Section 554 only allows for abandonment of property owned by the estate.  *See* 11 U.S.C. § 554

("[a]fter notice and a hearing, the trustee may abandon any property of the *estate* that is

burdensome to the *estate* or that is of inconsequential value and benefit to the *estate*.") (emphasis

added).  The Reorganized Debtors' property is not the property of the estate, which ceased to

exist upon the effective date of the Modified Plan.  *See* 11 U.S.C. § 1141(b) ("[E]xcept as

otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests

all of the property of the estate in the debtor," which then becomes the reorganized debtor).

In any event, the Supreme Court in *Midlantic*, 474 U.S. 494, limited a debtor's

abandonment power, holding that that "[a] trustee may not abandon property in contravention of

a state statute or regulation that is reasonably designed to protect the public health or safety from

identified hazards."  *Midlantic*, 474 U.S. at 505.  The Court noted the "repeated congressional

emphasis on its goal of protecting the environment from toxic pollution."  *Id.* (citation and

internal quotation marks omitted).  Citing RCRA and CERCLA, the Court explained that "[i]n

the face of Congress' undisputed concern over the risks of the improper storage and disposal of

hazardous and toxic substances, we are unwilling to presume that by enactment of § 554(a),

Congress implicitly overturned longstanding restrictions on the common-law abandonment

power."  *Id.* at 506.

25

The *Midlantic* Court thus instructed that "[t]he Bankruptcy Court does not have the

power to authorize an abandonment without formulating conditions that will adequately protect

the public's health and safety." *Id.* at 506-07; *see also Leavell v. Karnes*, 143 B.R. 212, 218 (S.D.

Ill 1990) (holding that in the event of an imminent and identifiable threat to public safety, "the

bankruptcy court may allow abandonment only after proper steps are taken to adequately protect

public health and safety").  In analyzing the applicability of *Midlantic* when debtors seeking

liquidation have sought to abandon contaminated property, several courts have held that

abandonment cannot be authorized if to do so would prevent the debtors from fulfilling their

obligations under an applicable environmental law designed to protect the public health or safety.

*See, e.g.*, *Commonwealth of Pa. Dep't of Envtl. Resources v. Conroy*, 24 F. 3d 568 (3d Cir.

1994); *In re Wall Tube & Metal Products Co.*, 831 F.2d 118 (6th Cir. 1987); *In re Guterl Special

Steel Corp.*, 198 B.R. 128 (W.D. Pa. 1996); *In re Peerless Plating Co.*, 70 B.R. (Bankr. W.D.

Mich. 1987); *In re Stevens*, 68 B.R. 774 (D. Maine 1987).

Here, pursuant to the *Midlantic* standard, the Court cannot allow Reorganized Debtors to

abandon the Contaminated Sites without first requiring them to adequately protect public health

and safety at those sites.  *See Midlantic*, 474 U.S. at 506-07.  Although the position of the

Environmental Agencies is that the Court need not reach this analysis because 11 U.S.C. § 554

does not govern the Reorganized Debtors, they cannot, in any event, argue that they can abandon

the Contaminated Sites without implementation of appropriate conditions to protect public health

and safety, thereby complying with applicable laws "designed to protect the public health or

safety from identified hazards."[9]  *Midlantic*, 474 U.S. at 505.

---

[9]  Although some courts have interpreted the *Midlantic* standard unduly narrowly, to encompass

V.      **Even if the Court Were to View Reorganized Debtors' Cleanup Obligations as Administrative Expenses, Reorganized Debtors Must Pay These Costs**

As described above in Sections I and II, the Reorganized Debtors are wrong to view their environmental liabilities at the Contaminated Sites as "claims." Instead, the Reorganized Debtors' cleanup obligations are liabilities deriving from their ownership of the Contaminated Sites that "sprang anew" after emergence, as well as non-claim liabilities that passed through the estate without discharge. *See supra*, Point I. Although EPA's claims for administrative expenses, designated as 19539 and 19786 (the "EPA Claims"), do make mention of the Reorganized Debtors' ongoing injunctive obligations at the Contaminated Sites under the bankruptcy laws, those claims also make clear that those obligations were asserted merely in a protective fashion, in case the Court deemed such obligations to be claims for administrative expenses, contrary to the position of the Environmental Agencies.

In the event, however, that the Court concludes that the Reorganized Debtors' environmental liabilities should be viewed as claims for administrative expenses, then Reorganized Debtors should nonetheless provide for a full cleanup for the reasons set forth in the EPA Claims. To the extent that the Court treats this matter as a claims dispute, then these costs are entitled to administrative priority as "actual, necessary costs and expenses of preserving the estate," under 11 U.S.C. § 503. *See Chateaugay*, 944 F.2d at 1009. Reorganized Debtors, in their Objection, attempt to downplay the extent and impact of the environmental contamination

---

only damage that "constitutes an imminent and identifiable harm to the public health or safety," *In re McCrory Corp.*, 188 B.R. 763, 768 (Bankr. S.D.N.Y. 1995) (citing *Midlantic*, 474 U.S. at 494), the conditions at the Contaminated Sites satisfy even this narrower standard, as will be demonstrated at the November hearing.

at issue, but the extent of that contamination will be shown at the November hearing, as will the existence of post-petition releases, which give rise to administrative liability.

## VI.    EPA Is Entitled to Administrative Priority for the Costs Claimed for the VOC Dayton Site

Reorganized Debtors have objected to the EPA's administrative expense claim in the amount of $228,003.01, for administrative costs incurred at an additional site in Dayton, Ohio, formerly owned by Reorganized Debtors, which is not one of the Contaminated Sites (the "Dayton VOC Site").  Reorganized Debtors argue that in their Objection that "any costs claimed by EPA since at least June 2009 are not entitled to priority."  Obj. at 20.  But the full amount of this claim is for pre-confirmation costs, which were listed in both EPA Claims.  Reorganized Debtors also attempt to argue that the claim is not entitled to administrative priority because Reorganized Debtors sold the property in 2012 (Obj. at 20); this ignores the fact that these administrative costs were incurred post-petition and claimed before the Reorganized Debtors sold the property, making Reorganized Debtors liable for the costs.  In this way, the case cited by Reorganized Debtors, which held that administrative priority is not granted for costs incurred at a site sold by the debtors prior to the filing of the bankruptcy, *see In re Insilco Techs, Inc.* 309 B.R. 111 (Bankr. D. Del. 2004), is irrelevant because here the Reorganized Debtors continued to own the property post-petition, and also because a government agency is the party-in-interest.  It is clear, therefore, that these post-petition administrative expenses are entitled to administrative priority as "actual, necessary costs and expenses of preserving the estate" under 11 U.S.C. § 503. *See Chateaugay*, 944 F.2d at 1009.

28

**VII.    Because Reorganized Debtors Have Cleanup Obligations at the Rootstown Site, the State of Ohio Is a Proper Party to This Litigation**

The Reorganized Debtors' cleanup obligations as to the Rootstown Site arise under Ohio law, *see supra* at Point I.B.2 and II, and because those obligations exist independently of the bankruptcy and are not claims within the meaning of 11 U.S.C. Section 101(5), Ohio EPA, which is the agency charged with enforcing those environmental statutes, is a proper party to this action. The Reorganized Debtors' argument to the contrary is based on their faulty premise that their liabilities at the Contaminated Sites are dischargeable claims rather than rather than (i) liabilities that exist regardless of any bankruptcy discharge and (ii) legal obligations that are not claims and therefore pass through the bankruptcy unaffected by the Plan.  The Reorganized Debtors therefore simply misunderstand the law.

## <u>CONCLUSION</u>

For the reasons set forth above,  the Reorganized Debtors must provide for full cleanup of the Contaminated Sites to protect public and health and safety as required by the law.  The Environmental Agencies therefore respectfully request that the Court direct Reorganized Debtors to provide for such cleanup, in an amount to be determined by the Court following the presentation of evidence and testimony at a hearing in November.

29

Dated: New York, New York
      September 16, 2013

Respectfully submitted,

PREET BHARARA
United States Attorney for the
Southern District of New York

By:    _s/ Cristine Irvin Phillips_____
CRISTINE IRVIN PHILLIPS
Assistant United States Attorney
86 Chambers Street, Third Floor
New York, New York 10007
Tel.: (212) 637-2696
Fax: (212) 637-2702
Email: cristine.phillips@usdoj.gov