# Attachment 2

# OPEB TRANSCRIPT

# Docket #16145

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 05-44481

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


DELPHI CORPORATION, ET AL.,


      Debtors.


- - - - - - - - - - - - - - - - - - - -x


        U.S. Bankruptcy Court

        One Bowling Green

        New York, New York


        February 24, 2009

        10:08 a.m.


B E F O R E:

HON. ROBERT D. DRAIN

U.S. BANKRUPTCY JUDGE



2

1    MOTION to Approved (I) Approving Bidding Procedures, (II)

2    Granting Certain Bid Protection, (III) Approving Form and

3    Manner of Sale Notices, and (IV) Setting Sale Hearing Date

4

5    MOTION to Approve Agreement to Modify Automatic Stay to Allow

6    Lautzenhiser Technologies, LLC to Assert Claims Against Delphi

7    Medical Systems Corporation in Pending Patent Litigation

8

9    MOTION for Order Authorizing Debtors to (I) Enter Into

10   Amendment to Accommodation Agreement With Certain Participating

11   DIP Lenders and (II)(A) Enter Into Related Documents and (B)

12   Pay  Fees and Expenses in Connection Therewith

13

14   MOTION for Order Authorizing Debtors to Enter Into (I) Third

15   Amendment to Arrangement With General Motors Corporation and

16   (II) Amendment to Partial Temporary Accelerated Payment

17   Agreement With General Motors Corporation

18

19   MOTION for Order Under 11 U.S.C. Sections 105, 363(b)(1), and

20   1108 Confirming Debtors' Authority to Terminate Employer-Paid

21   Postretirement Health Care Benefits and Employer-Paid Post-

22   Retirement Life Insurance Benefits

23

24   MOTION to Confirm Engagement and Retention of Special Counsel

25   in Connection With Plan Investor Litigation

3

1    APPLICATION to Appoint an Official Committee of Retired

2    Employees Receiving Retiree Benefits not Covered by Collective

3    Bargaining Agreement

4

5    MOTION to Shorten Notice with Respect to Affected Retirees'

6    Motion to Appoint Official Retiree Committee

7

8    MOTION to Appoint Official Retiree Committee

9

10   NOTICE of Supplement Amendment to Accommodation Agreement

11

12   NOTICE of Filing of Revised Proposed Accommodation Amendment

13   Order

14

15

16

17

18

19

20

21

22

23

24   Transcribed By:  Esther Accardi

25

4

1    A P P E A R A N C E S :

2    SKADDEN ARPS SLATE MEAGHER & FLOM, LLP

3         Attorneys for Debtors

4         333 West Wacker Drive

5         Chicago, Illinois 60606

6

7    BY:   JOHN WM. BUTLER, ESQ.

8         AL HOGAN, ESQ.

9

10

11   SKADDEN ARPS SLATE MEAGHER & FLOM, LLP

12        Attorneys for Debtors

13        4 Times Square

14        New York, New York 10036

15

16   BY:   KAYALYN A. MARAFIOTI, ESQ.

17

18

19   LATHAM & WATKINS, LLP

20        Attorneys for Creditors' Committee

21        885 Third Avenue

22        New York, New York 10022

23

24   BY:   ROBERT ROSENBERG, ESQ.

25        MICHAEL RIELA, ESQ.

5

1    A P P E A R A N C E S : (continued)

2    FARELLA BRAUN & MARTEL, LLP

3         Attorneys for Salaried Retirees Association

4         235 Montgomery Street

5         San Francisco, California 94104

6

7    BY:   DEAN M. GLOSTER, ESQ.

8

9

10    STAHL COWEN CROWLEY ADDIS, LLC

11         Attorneys for Higgins Group

12         55 West Monroe Street

13         Chicago, Illinois 60603

14

15    BY:   TRENT P. CORNELL, ESQ.

16

17

18    MCTIGUE & PORTER, LLP

19         Attorneys for Nicholson Group

20         4530 Wisconsin Avenue, NW

21         Washington, D.C. 20016

22

23    BY:   BRYAN T. VEIS, ESQ.

24

25

6

1   A P P E A R A N C E S : (continued)

2   SPENCER FANE BRITT & BROWNE, LLP

3       Attorneys for Nicholson Group

4       1 North Brentwood Blvd.

5       St. Louis, Missouri 63105

6

7   BY:   DANIEL D. DOYLE, ESQ.

8

9

10   COHEN WEISS AND SIMON, LLP

11       Attorneys for UAW

12       330 West 42nd Street

13       New York, New York  10036

14

15   BY:   BABETTE CECCOTTI, ESQ.

16

17

18   FRIEDMAN KAPLAN SEILER & ADELMAN, LLP

19       1633 Broadway

20       New York, New York 10019

21

22   BY:   WILLIAM P. WEINTRAUB, ESQ.

23

24

25

7

1    A P P E A R A N C E S : (continued)

2    WEIL GOTSHAL & MANGES, LLP

3         767 Fifth Avenue

4         New York, New York 10153

5

6    BY:   JOLEE ADAMICH, ESQ.

7

8

9    U.S. DEPARTMENT OF JUSTICE

10   OFFICE OF THE U.S. TRUSTEE

11        33 Whitehall Street

12        New York, New York 10004

13

14   BY:   DIANA G. ADAMS, ESQ.

15

16

17   DELPHI CORPORATION

18   BY:   MARK WEBER, ESQ.

19        BETH SAX, ESQ.

20        (Telephonically)

21

22

23   PENTWATER CAPITAL MANAGEMENT

24   BY:   JORDAN FISHER

25        (Telephonically)

8

1              P R O C E E D I N G S

2          THE COURT:  Be seated.  Okay, Delphi Corporation.

3          MR. BUTLER:  Your Honor, good morning.  Jack Butler,

4    Kayalyn Marafioti and Al Hogan here for the debtors, for their

5    fortieth omnibus hearing.

6              There are ten matters, Your Honor, on today's agenda.

7    We propose to take them in the order on the agenda.

8          THE COURT:  Okay.

9          MR. BUTLER:  Your Honor, the first matter on the

10   agenda is the debtors' salaried OPEB termination motion, at

11   docket number 14705.  Your Honor, there have been approximately

12   a little over 1600 objections that have been filed to this

13   motion.  Of those objections there are five that have been

14   filed by either entities or groups that are represented by

15   counsel, either objections or statements.  I'll discuss those

16   in a minute.

17             We have reviewed each of the balance of the

18   objections, which were filed in pro se, by affected parties.

19   And we have summarized those objections in the exhibit to our

20   reply that we filed last evening.  There are approximately

21   twenty-six, if you will, of subject matter objections that have

22   been made to the -- separate objections that have been made to

23   the motion, and we have dealt with those in our response.

24             Of the five that are here, that are represented by

25   counsel, those objections are docket number 14765, the Higgins

1    Group, which is a group of retirees, which we'll refer to as

2    the Higgins Group.  And Mr. Trent Cornell is in the courtroom

3    today representing their interests.

4         There is an objection at docket number 14782 filed by

5    a group of retirees headed by Mr. Nicholson and we'll refer to

6    them as the Nicholson Group.  And Mr. Bryan Veis and Mr. Dan

7    Doyle are here to represent their interests.

8         There was also an objection filed at docket number

9    14819 by an entity that was denominated the Delphi Salary

10   Retirees Association.  This is an unincorporated association,

11   it was formed earlier this month in response to the motion.

12   And they're interests are being represented by Mr. Dean

13   Gloster, who is here in the courtroom today.

14        In addition, there was a limited objection filed by

15   the UAW.  Ms. Ceccotti is here today and Mr. Rosenberg filed a

16   statement on behalf of the creditors' committee.  The UAW

17   limited objection is at docket number 14822 and Mr. Rosenberg's

18   statement is at docket number 14881.

19        As we do, Your Honor, in contested matters where

20   there's an evidentiary record, we won't make any opening

21   arguments today, but rather proceeding, with Your Honor's

22   permission, to the record.

23        THE COURT:  Okay.

24        MR. BUTLER:  First, Your Honor, I'd like to deal with

25   the evidence -- excuse me, the exhibits -- the documentary

1      evidence.  We have met and conferred with counsel.  There are

2      some ninety proposed joint exhibits.  The uncontested exhibits

3      consist of the objectors declaration at what will be Exhibits

4      Number 3 and 4.  My understanding is that Mr. Beach was unable

5      to be here today and that counsel's withdrawing Mr. Beach's

6      declaration.

7               MR. VEIS:  That's correct, Your Honor.  Bryan Veis

8      from the McTigue & Porter, Washington D.C.  Mr. Beach had a

9      medical emergency, was unable to attend.  We are withdrawing

10     Exhibit 5.

11              THE COURT:  Okay.

12              MR. BUTLER:  And, Your Honor, as a practical matter,

13     the substance of Mr. Beach's testimony in, in our view,

14     subsumed in declarations 3 and 4 that we are not objecting to.

15              THE COURT:  Okay.

16              MR. BUTLER:  Your Honor, the salaried OPEB plan

17     documents, Exhibit 6 through 13 are not objected to.  The

18     salaried OPEB summary plan descriptions and employee

19     communications are Exhibits 14 through 39, they're not objected

20     to.  The board materials of Exhibits 40 through 48 are not

21     objected to.  The materials issued by General Motors

22     Corporation, Exhibits 49 through 51 are not objected to.  The

23     Court documents at Exhibits 52 through 64 are, similarly, not

24     objected to.  And certain of the documents offered by objectors

25     at Exhibits 65, 86, 87, 88 and 90 also were not objected to.

11

1  These documents I've just described, these exhibits, have no

2  objection and we move for their admission, Your Honor, into the

3  evidentiary record, and be admitted subsequently for all

4  purposes the Court may choose to use them.

5          THE COURT:  Okay.  Hearing no objection to the

6  admission of those exhibits, I'll admit them.

7  (Salaried OPEB Plan Documents were hereby received as Hearing

8  Exhibit 6-13 for identification, as of this date.)

9  (Salaried OPEB Summary Plan Description and Employee

10  Communications were hereby received as Hearing Exhibit 14-39

11  for identification, as of this date.)

12  (Board Materials were hereby received as Hearing Exhibit 40-48

13  for identification, as of this date.)

14  (Court Documents were hereby received as Hearing Exhibit 52-64

15  for identification, as of this date.)

16  (Documents by Objectors were hereby received as Hearing

17  Exhibits 65, 86, 87, 88, 90 for identification, as of this

18  date.)

19          MR. BUTLER:  I'd like now, Your Honor, to cover some

20  evidentiary agreements that have been reached.  The debtors had

21  objected to Exhibit 66, which was a letter from Delphi's plan

22  administrator to the retirees on hearsay grounds.  There is an

23  agreement that Exhibit 66 can be admitted to show that the

24  communication exists and that it was sent to certain retirees

25  by Delphi's plan administrator.

1          THE COURT:  Okay.

2          MR. BUTLER:  With respect to Exhibits 67 through 75

3     and 79 through 85, which consists of benefit books and plan

4     communications from General Motors to retirees, there was an

5     objection on hearsay grounds.  Again, there is an agreement

6     that these can come in to represent that they reflect that

7     these communications existed, and that they were sent to

8     certain retirees by General Motors.

9          THE COURT:  Okay.

10          MR. CORNELL:  Your Honor, if I may be heard on that?

11          Your Honor, Trent Cornell on behalf of the Higgins

12     Group, as we're referring to it.

13          We had agreed that the documents at 66 through 75 --

14     excuse me, 67 through 75 were -- the debtors had agreed to the

15     authenticity of the documents, and we've reached that agreement

16     and we did not reach any further agreement beyond the

17     authenticity.  I'd like to offer that just for clarification.

18          THE COURT:  Well, is there still a hearsay objection

19     as well, or --

20          MR. BUTLER:  Yeah.  I mean, our hearsay objection was

21     settled based on the view that they can be admitted to show

22     that the communications existed and that they were sent to

23     certain retirees by General Motors.

24          MR. CORNELL:  Your Honor, under Federal Rule of

25     Evidence 80316, once the admissibility -- or the authentication

13

1   has been admitted to then -- these are documents that are over

2   twenty years old, they're no longer hearsay.  We had an

3   agreement on the authentication on it.  I don't know that we're

4   even going to go to the truth of the matter asserted, but I

5   just wanted to be clear as to what our position was.

6        THE COURT:  Well, do they make assertions as to facts

7   in the documents?

8        MR. CORNELL:  Your Honor, the documents speak for

9   themselves.  And what we're putting them in for is the notice

10  of information that was sent to retirees.  So I don't think

11  that we're even going to have a disagreement on it, but I

12  wanted to be clear as to what the agreement was that we had

13  reached.

14       MR. BUTLER:  Again, I think that the purpose of it --

15  and I think what counsel says, and I think we're agreeable to

16  this, they can be admitted to show that those communications

17  existed and they were sent to certain retirees of General

18  Motors.  We're settling our hearsay objection on that basis.  I

19  don't know what else -- and it sounds to me is what counsel

20  wants to use them for.

21     (Pause)

22       THE COURT:  Well, if, indeed, they're twenty years

23  old or older, then they would be covered by 803(16).  So as

24  long as you're agreeing to their authenticity --

25       MR. BUTLER:  We are, Your Honor.  I'm only reporting

14

1    the agreement that we believe we had confirmed in writing with

2    counsel.  And we can produce the e-mails.  But, you know, I'm

3    not disputing the fact that some of these documents are more

4    than twenty years old.

5              THE COURT:  Okay.  All right.

6              MR. BUTLER:  Your Honor, with respect to Exhibit 79,

7    which has Bates numbers DSRA 164-168, that document is

8    incomplete.  And we objected to it because it was incomplete.

9    However, in reviewing the documents we determined that Exhibit

10   Number 71 at Bates number AR 121 through AR 126 represents a

11   complete version of this document.  So we're not going to

12   object to Exhibit 79 coming in so long as it's supplemented by

13   Exhibit 71, which is the complete document.

14             THE COURT:  Okay.

15             MR. BUTLER:  Your Honor, based on these agreements

16   that have been reached as to the exhibits I just discussed, I

17   would move their admission subject to the terms of the

18   agreements placed on the record.

19             THE COURT:  All right, they're admitted.

20   (Letter from Delphi Plan Administrator was hereby received as

21   Hearing Exhibit 66 for identification, as of this date.)

22   (Benefit Books and Plan Communications from GM Retirees were

23   hereby received as Hearing Exhibit 67-75 and 79-85 for

24   identification, as of this date.)

25             MR. BUTLER:  Your Honor, there are some contested

15

1    items that were not agreed to.  I should say there's one more

2    that  we just settled before the hearing.  We had objected to

3    Exhibits 76 through 78.  These were exhibits offered by the

4    association consisting of GAO reports and Congressional

5    testimony with regards to retiree health insurance availability

6    and health coverage tax credits.  We've agreed that they can

7    come in, be viewed by Your Honor as to whatever weight of the

8    evidence should be attached to them.  But they're not admitted

9    as to the truth of the matter asserted in those documents.

10   That's our agreement that's been reached.

11            THE COURT:  Okay.

12            MR. GLOSTER:  Good morning, Your Honor.  Dean

13   Gloster, Farella Braun & Martel on behalf of the Delphi

14   Salaried Retirees' Association.  Those are, essentially,

15   legislative materials and they would come in in exception of

16   the hearsay rule.

17            But as a practical matter, Your Honor, we're simply

18   offering them like one would offer any other legislative

19   materials.  We're not -- obviously, the man who testified in

20   front of Congress is not here for cross examination.  But we

21   think they help the Court in the understanding of what actually

22   happens upon benefit termination.  And, as well, they help the

23   Court understand the difficulty that's created because of the

24   failure to coordinate with the health coverage tax credit here.

25            THE COURT:  Okay.

1          MR. BUTLER:  Your Honor, I think the only debtor

2   objection that's not been resolved, is we objected to Exhibits

3   83 to 85 -- 83 and 85 on completeness grounds.  These were

4   offered by the Retirees' Association.  They're excerpts,

5   apparently, of General Motor's Corporation benefit booklets for

6   the years 1988 and 1995.  Exhibit 83 contains only three pages

7   of what we believe is a fifty-four page document.  And Exhibit

8   85 contains only two pages of what we believe was a 102 page

9   document.  We, therefore, object on the grounds of

10  completeness because the entire documents were not offered by

11  the objector.  And we, also, on that basis, because of there

12  only be excerpts, and photocopies of excerpted documents, we've

13  also objected based on Federal Rule of Evidence 901 as to

14  authentication.

15          THE COURT:  Okay.

16          MR. GLOSTER:  Your Honor, Dean Gloster.

17          With regard to authentication, I believe that those

18  documents are self-authenticating.  If you view them in

19  connection with the other materials sent by GM, they are in the

20  same format, they have the same sort of -- those documents are

21  self-authenticating.  With respect to completeness, Your Honor,

22  we are representing hundreds of retirees, who, on short notice,

23  have sent us faxes and e-mails and are difficult to reach over

24  a weekend, and difficult to reach to get their benefit books.

25  We are happy to supplement the record hereafter with complete

1  copies of those.  But as a practical matter, it is the debtor

2  who likely has complete copies of these records, and so we

3  would seek to supplement the record with complete copies of

4  these if it becomes important to the Court.

5          THE COURT:  Okay.  I will admit them subject to

6  supplementation.  And with a further proviso that the debtors

7  use good faith efforts to assist you in supplementing the

8  books, if they're available at the debtors.  If they're not,

9  then you don't have to go beyond that.

10          MR. BUTLER:  Your Honor, we've already done that.  We

11  tried to locate these versions.  These are old General Motors'

12  documents and not Delphi documents.

13          THE COURT:  Okay.

14          MR. BUTLER:  And we were not able to locate them.

15          THE COURT:  All right.  So I'll admit them but only

16  on the condition that the record be subsequently supplemented

17  with the full book.

18  (GAO Report, Congressional Testimony with Regard to Retiree

19  Health Insurance and Health Coverage Tax Credits were hereby

20  received as Exhibit 76-78 for identification, as of this date.)

21          MR. GLOSTER:  Thank you, Your Honor.

22          MR. BUTLER:  Your Honor, I think the only other

23  evidentiary matter is that the association has an objection to

24  paragraph 23 of Mr. Miller's declaration, which is Exhibit 1,

25  Hearing Exhibit 1.  And they have objections to paragraphs 8,

1    9, 21, and 23 of Mr. Gebbia's declaration, which is Exhibit 2.

2    If counsel wants to present those objections.

3            THE COURT:  I'm sorry, what paragraph of the

4    Miller --

5            MR. BUTLER:  Start with Mr. Miller's, Your Honor,

6    there was an objection -- an unresolved objection by the

7    Association as to paragraph 23 of Mr. Miller's declaration.

8    Exhibit 1 having to -- regarding his understanding of the

9    debtors' right to terminate the plan.

10           MR. GLOSTER:  Your Honor, Dean Gloster.

11           Our objection is that there's lack of foundation,

12   there's no basis for his understanding stated here.  In

13   addition to the extent that his understanding relies on other

14   people, it is hearsay to the extent that it relies on

15   documents.  It's the best evidence rule.  It is also a legal

16   conclusion and an attempt to introduce expert opinion through

17   lay testimony.

18           THE COURT:  The documents speak for themselves.  I

19   will admit this, though, for the limited basis that Mr.

20   Miller's a member of the board and a member of the bodies that

21   deliberated on this proposal.  And he reflects in his affidavit

22   or his declaration that those groups were informed by various

23   parties, including professionals, with regard to these issues,

24   and made their deliberations accordingly.  So I'll admit it for

25   that purpose.  But the agreements will speak for themselves.

1    And, obviously, as far as the statement is one being asserted

2    for the truth of the matter as opposed to what he understood, I

3    won't consider it.

4    (Mr. Miller's Declaration was hereby received as Hearing

5    Exhibit 1 for identification, as of this date.)

6         MR. BUTLER:  Your Honor, the next unresolved

7    objection, all four of these deal with Mr. Gebbia's declaration

8    at Exhibit 2, Trial Exhibit 2.  And that is the first objection

9    the Association had was with respect to paragraph 8 of the

10   declaration.

11        MR. GLOSTER:  Your Honor, we withdraw that objection.

12        THE COURT:  Okay.

13        MR. BUTLER:  The next objection that the Association

14   had unresolved, was the final two sentences of paragraph 9 of

15   Mr. Gebbia's declaration.

16        MR. GLOSTER:  Your Honor, this is a testimony as to a

17   legal conclusion by a lay individual.  It is also inconsistent

18   with his understanding of the benefits that he states

19   throughout here where he says that they are, in fact,

20   terminable and modifiable in the future.  And misstates the law

21   with respect to COBRA continuation coverage, because if the

22   debtor does not have any program for health benefits then COBRA

23   continuation coverage, which allows retirees to pay 104 percent

24   of the cost of the premiums to continue COBRA, simply doesn't

25   give them any right to continue coverage if there is no medical

20

1    plan at all.  So it misstates the law, it's an attempt to

2    testify about a legal conclusion, it is inaccurate, it does not

3    match the witness' own understanding of the benefit programs.

4         MR. BUTLER:  Your Honor, to the extent that counsel

5    would be correct, that somehow there's a difference of view in

6    Mr. Gebbia's own testimony, that objection really goes to the

7    weight of the evidence not the admissibility of the evidence.

8    And counsel is going to be free to cross Mr. Gebbia on this.

9         There's no applicable hearsay objection here.  This

10   is a Court statement.  I think this objection really does go to

11   the weight of the evidence and not admissibility.  And,

12   finally, there's no legal conclusions here.  This is Mr.

13   Gebbia's statement as one of the Delphi executives responsible

14   for the administration of his plans, about his understanding of

15   the rights and obligations of the plans.  And that is a fact

16   and not a legal conclusion.  And it's not testimony that would

17   require specialized or scientific knowledge.  And they'll be

18   free to cross examine him as to his understandings in a few

19   moments.

20        THE COURT:  Okay.  Well, I -- the second sentence is

21   just a reservation of rights, which is clearly something that

22   the debtors are doing -- are free to do.  The first sentence

23   that's objected to is a statement of Mr. Gebbia's belief and

24   representing the debtors' belief as to what will happen if the

25   eligible retirees or surviving spouses elect to continue

1   existing health coverage under salary at OPEB.  I believe that

2   should be in the record as a statement of the debtors' belief.

3   And it could be subject to, obviously, parties showing me it's

4   wrong either as a matter of fact or law.

5          MR. BUTLER:  Your Honor, the next objection of the

6   Association relates to paragraph 21 of Mr. Gebbia's

7   declaration, regarding the offering of early retirement and the

8   conditions associated with that?

9          THE COURT:  The whole paragraph?

10         MR. BUTLER:  I believe the objection was to the whole

11   paragraph.

12         MR. GLOSTER:  Your Honor, we have no objection so

13   long as it is limited simply to discussing these programs.

14         MR. BUTLER:  I'm not sure what that limitations mean.

15   The word -- the testimony is what it is.

16         MR. GLOSTER:  To the extent he's talking about just

17   these programs, then we don't have an objection.  To the extent

18   that he is attempting to reach a conclusion as to other

19   programs that are not these and says my understanding is that

20   the programs generally have been coordinated from Delta

21   headquarters.  To the extent he's attempting to testify about

22   other programs of which he has no personal knowledge, it is

23   hearsay and there is no foundation.

24         MR. BUTLER:  He's not.

25         THE COURT:  Okay.  I don't -- I think there's really

22

1    no basis for this objection given what I read in this

2    paragraph.  If you want to clarify that further you can ask him

3    about it.  But I don't see -- I think the meaning of this

4    paragraph is clear.

5            MR. BUTLER:  Your Honor, the final unresolved

6    objection that I'm aware of this morning, is the Association's

7    objection to the final two sentences of paragraph 23 of Mr.

8    Gebbia's declaration, regarding those -- the subject matter of

9    those two sentences.

10           MR. GLOSTER:  Your Honor, you've already ruled with

11   respect to paragraph 9, which disposes of this objection.  It's

12   the same issue about him stating what the consequences are.

13           THE COURT:  Okay.

14           MR. GLOSTER:  Your Honor's already ruled.

15           THE COURT:  That ruling will apply to this paragraph,

16   too.

17           MR. BUTLER:  You Honor, I think that deals with all

18   of the written evidence.  We'd now move to the cross

19   examination on the declarations.

20           MR. CORNELL:  Your Honor, may I be heard this

21   morning?

22           Your Honor, we had agreed that the evidence that

23   would be used would cross all of the various motions that have

24   been filed today.  But we are making an objection to the order

25   of this proceeding, in that the debtor is putting on its case

23

1    in it's motion to terminate the benefits prior to the two

2    motions for the formation of a Section 1114 committee.  Your

3    Honor, we would proffer that that is putting the cart before

4    the horse.  The issue is -- ultimately what the debtors are

5    trying to argue is that there is unilateral termination and

6    they're going to be putting on evidence of it.   What we are

7    arguing in our motion and the motion filed by the Spencer Fane

8    firm, is that there needs to be a retiree committee so the

9    retirees can defend themselves against that very same motion.

10   So we're objecting to the procedural order, Your Honor.

11           MR. BUTLER:  Your Honor, the order of the agenda --

12   and 1114 is certainly something that has been dealt with across

13   all the motions, including the objectors have asserted 1114 in

14   their responses to this motion, so it's at issue here.  They

15   are in agenda order, they did file their motions after we filed

16   our motion for termination.  And, again, I think the -- there

17   is -- I think the case law here is pretty clear, that if we

18   have the unilateral right to terminate there's no right for

19   1114 committee.  And we think that this evidentiary record,

20   which we've agreed with counsel, would apply to all motions,

21   all these motions, and needs to come in prior to the argument

22   on any of the motions.

23           THE COURT:  Okay.  I believe the debtors' motion

24   should be heard first.  One of the objections to that motion is

25   that it puts the cart before the horse, and that objection

24

1    certainly will be raised as part of this -- of my hearing their

2    motion.  But in my view, the same objection could be made by

3    the debtors if I heard the motion for a committee first.  And

4    I'm not inclined to prejudge those motions by appointing a

5    committee to defend against the debtors' motion, which would

6    be the only reason to hear the motion for a committee first.

7    So I'll hear the debtors' motion first.  And I'm fully aware of

8    the objection, though, which is that this is the type of action

9    that would require the appointment of a representative and a

10   committee in going through the steps required by Section 1114.

11   And that objection, obviously, is made to this motion and is

12   part of the process that I'll consider in ruling on the

13   debtors' motion.

14           MR. BUTLER:  Your Honor, I just also want for clarity

15   of the record.  We did, when we filed our response, file

16   objections to the motions in the omnibus reply.  And we agree

17   with counsel that the evidentiary record would apply to all the

18   motions so that the matters will be essentially before Your

19   Honor before we finish the record.

20           THE COURT:  Okay.

21           MR. BUTLER:  Your Honor, the first declaration that

22   we're presenting for cross examination is the declaration of

23   Mr. Miller, who has provided, but stated the concurrence by the

24   board of directors, and made the substantive determination on

25   behalf of the Delphi Strategy Board, the Delphi Strategy

25

1    Investment Group, the two bodies that made the determinations

2    and the business judgment that's in the motion before you.

3              THE COURT:  Okay.  Does anyone want to cross examine

4    Mr. Miller?

5              MR. VEIS:  Yes, Your Honor.

6              THE COURT:  Okay.  So you can come up to the stand,

7    please.

8         (Pause)

9              THE COURT:  Would you raise your right hand, please.

10        (Witness is sworn)

11   CROSS EXAMINATION

12   BY MR. VEIS:

13   Q.   Good morning, Mr. Miller.  My name is Bryan Veis.

14   A.   Good morning.

15   Q.   I'm with the law firm of McTigue & Porter in Washington

16   D.C.  I represent the group that's filed an objection, the lead

17   name on that objection is Mr. Nicholson.

18        I'd like to ask you a few questions about your

19   declaration, if I may get to it here.  First, I'd like you to

20   take a look -- do you have your declaration in front of you?

21   A.   No, I do not.

22        (Pause)

23   A.   Thank you.

24   Q.   I'd like you to take a look, if you would, please, at

25   paragraph 9, which is on page 4.

26

1    A.   Yes, sir.

2    Q.   That paragraph relates to projected cash savings, and the

3    elimination of a liability from the debtors' balance sheet,

4    correct?

5    A.   Correct.

6    Q.   And those numbers are listed as a savings in excess of

7    seventy million dollars per year?

8    A.   Yes, sir.

9    Q.   And the --

10             THE COURT:  You said seventy?

11             MR. VEIS:  Sorry?

12             THE COURT:  Seventy?

13             THE WITNESS:  Yes.

14   Q.   Seventy million dollars per year.  And it also says cash

15   savings of approximately 200 million dollars in the aggregate

16   during the business plan period?

17   A.   Correct.

18   Q.   All right.  And it also represents that there is a

19   liability that will be eliminated of 1.1 million dollars,

20   correct?

21   A.   Correct.

22   Q.   Now, in your -- let me ask you this.  Did you perform the

23   calculations that underlay those numbers?

24   A.   No, I did not, personally.  Our staff did.

25   Q.   I'm sorry, you what?

1   A.   The Delphi financial staff prepared that analysis.

2   Q.   Did the financial -- in connection with your declaration

3   have you presented the underlying calculations for the Court to

4   review?

5   A.   No.

6   Q.   So the anticipated savings that you're testifying about

7   are savings that you have no personal knowledge of, correct?

8   A.   The reasonableness of the projections is based on the fact

9   that we have had this program in place for many years.  And we

10  have a run rate we can look at at the continuing health care

11  expense.  It is -- there's no particular assumption as to the

12  adjustment in those costs, other than a normal business

13  projection.  But it's based on the historical facts that had

14  been occurring for the duration of this program.

15  Q.   But you have no personal knowledge of that, do you, sir?

16  A.   No.

17  Q.   And you haven't provided the Court with any of the

18  analyses that underlie those projections, have you?

19  A.   I have not.

20  Q.   Now, let me invite your attention -- well, no.  First, in

21  your  declaration at paragraph 24, if you would take a look at

22  page 8.  You discuss the detailed presentation you received?

23  A.   Yes.

24  Q.   And you discuss the consideration of the impact of such

25  termination on retirees, correct?

28

1    A.    Correct.

2    Q.    And where is the impact on retirees reflected in the

3    materials attached to your declaration?

4    A.    There is a reference in the declaration acknowledging, we

5    understand, the hardship that this may entail for many of our

6    retirees.  The basis for the presentation was the harsh

7    economic reality facing this company as it seeks to

8    restructure.

9    Q.    Well, let me address your attention to a document that's

10   set forth at Tab 45, which is the 2009 recommended action

11   impacting U.S. seller and employees.

12            THE COURT:  Do you know what binder that's in?

13            MR. VEIS:  I'm not sure which binder

14            MR. BUTLER:  I have it at 3, Your Honor.

15            THE WITNESS:  Volume 3 it appears to be.

16   Q.    I'd like to ask you, sir, to look at the page that's been

17   marked DPHOTM 0001681.

18            MR. BUTLER:  I'm sorry, do you mean Exhibit 47 or 45?

19            MR. VEIS:  I'm sorry, did I get the wrong number.  I

20   have 45 in my list.  Is it --

21            MR. BUTLER:  It's 47.

22            MR. VEIS:  I apologize.  Apparently, it's Tab 47 in

23   the --

24   A.    The number ending in?

25   Q.    1681.

29

1    A.    I have it.

2    Q.    Now, you see the first bullet point, you see a line with

3    "discussions?"

4    A.    Yes.

5    Q.    And now do you see the second sentence and the third, the

6    one that starts "further, based on management?"

7    A.    Yes.

8    Q.    Could you read that aloud, please?

9    A.    "Further, based on management and advisor analysis OPEB

10   cessation, in particular, is necessary to address balance sheet

11   issues to enable a plan of reorganization.  Stakeholder input

12   provided to management and outside advisor, strongly reinforces

13   this conclusion."

14   Q.    Now, in your declaration you discussed stakeholders in

15   several places, don't you?

16   A.    Correct.

17   Q.    Now, for example, in paragraph 18, could you take a look

18   at that, please?  You see where it says "the debtors are

19   currently engaged in discussions," are you there, sir?

20   A.    Yes, sir.

21   Q.    Do you see where it says "the debtors are currently

22   engaged in discussions with their stakeholders who have a

23   continuing economic interest in the debtors' reorganization

24   cases to formulate further plan modifications," you see that

25   sentence?

30

1    A.    Yes, sir.

2    Q.    And in paragraph 8, you have another statement concerning

3    stakeholders, correct?  If you can take a look at the sentence

4    that begins in the seventh line.  Actually, the sentence starts

5    above that.

6    A.    Correct.

7    Q.    It says "Delphi has been working and continues to work

8    closely with its advisors and stakeholders," do you see that?

9    A.    Yes.

10   Q.    You haven't had any discussions with retirees, have you?

11   A.    No.

12   Q.    Does that indicate that you do not consider retirees to be

13   stakeholders of the debtors?

14   A.    I should amend my statement.  I do have some friends who

15   are retirees who have expressed their concerns to me.  I do

16   have from time to time written letters or e-mails that have

17   come to me from retirees, but I have not spoken to retirees as

18   an organized group.

19   Q.    Nor have you been working with any retirees to resolve

20   issues, have you?

21   A.    No, sir.

22   Q.    Now, does that indicate that you do not consider retirees

23   to be stakeholders, is that what you're telling me?

24   A.    I do consider retirees to be stakeholders.

25   Q.    Well, you recognize that retirees do have the continuing

31

1    economic interest in the debtors' reorganization?

2    A.    Yes.

3    Q.    Well, don't you think that being told that they're giving

4    up their OPEB coverage to generate hundreds of millions of

5    dollars in projected cost savings gives the salaried employees

6    a very significant economic interest?

7    A.    Yes, they have an economic interest in that.

8    Q.    Now, in paragraph 3 of your declaration, and this has been

9    discussed earlier in connection with the evidentiary

10    objections, you state that you understand that the terms of the

11    plans and programs that provide the OPEB reserve the right to

12    amend, modify, suspend or terminate the plans at any time,

13    correct?

14    A.    Correct.

15    Q.    Now, is that understanding based on Mr. Gebbia's

16    declaration?

17    A.    Well, it's based on the reviews that I had made in our

18    internal discussions looking at the documentation.

19    Particularly, all the plan documents which have consistently

20    reserved the right of the corporation to amend or terminate

21    OPEB.

22    Q.    If you would, please, turn to Exhibit 80.

23         (Pause)

24         THE COURT:    If you can, if you would let me know what

25    binder the exhibits are in?

32

1          MR. BUTLER:  Yes.  80 is in volume 5.

2          THE WITNESS:  5.

3   **A.    Yes, sir.**

4   **Q.    Number 80 is the General Motors 1980 summary plan**

5   **description, is it not?**

6   **A.    Correct.**

7   **Q.    Now, do you know if anyone working for Delphi looked at**

8   **the 1980 General Motors summary plan description prior to the**

9   **filing of the motion to terminate?**

10          MR. BUTLER:  Objection.  Your Honor, we have an

11  objection as to relevance as to lines of questioning dealing

12  with Exhibit 80.  This is a 1980 plan document.  It proceeds --

13  from General Motors Corporation.  It proceeds the decision made

14  in the Sprague case in the Sixth Circuit in 1988, where the

15  Sixth Circuit determined that all these GM plans had specific

16  reservation of rights.  And it was those plans, the plans that

17  were determined by Sprague, or the plans that Delphi took over

18  when Delphi was spun out.  There is no relevance to any

19  document from General Motors preceding the Sprague case in

20  connection with this hearing.

21          MR. VEIS:  Your Honor, if I may.  Mr. Doyle will be

22  presenting a more detailed analysis of the inapplicability of

23  the Sprague case in this matter.  But suffice it to say that

24  the law set out in Sprague is not the law in the Second

25  Circuit.  Mr. Doyle will be discussing that subsequently.  I'd

33

1   like to proceed at least to question Mr. Miller on this for a

2   couple of more questions, just to establish whether or not it

3   was looked at.

4           MR. BUTLER:  The Sprague case was out in 1998, no

5   '88.  It is what Delphi took  -- the plans that are before this

6   Court are the plans that Delphi has expressly reserved rights

7   for and that General Motors reserves rights for.  And that

8   Sprague determined in 1998 when these were General Motors'

9   plans that there were absolute reservation of rights to

10  terminate.  And so we have taken these plans subject to the

11  Sprague decision.  Trying to go back in history beyond the 1998

12  decision to point to anything which the Sprague Court

13  conclusively resolved, as to the plans that Delphi took,

14  because that was the controlling authority as to what Delphi

15  took in 1999 is irrelevant to these proceedings.

16          THE COURT:  Okay.  I'll let you ask the question.

17          MR. VEIS:  Thank you, Your Honor.

18          THE COURT:  Which was, did you consider this 1980

19  plan?

20          THE WITNESS:  I don't recall specifically looking at

21  this 1980 plan.  I was generally aware of the Sprague case and

22  generally aware of the consistent documentation provided in

23  plan documents and made available to all of our salaried

24  employees from the inception of Delphi Corporation.

25  **Q.   But this predates the inception of Delphi Corporation,**

1    correct?

2    A.   I understand.

3    Q.   And I believe Mr. Gebbia's declaration discusses the

4    transition from General Motors to Delphi, but I'd like to talk

5    to you now about the 1980 summary plan description.  You don't

6    know whether the 1980 summary plan description contains a

7    reservation of rights, do you?

8            THE COURT:  He just said he didn't consider it.

9            MR. VEIS:  I'm sorry, Your Honor?

10           THE COURT:  He just said he didn't consider it.

11           MR. VEIS:  Thank you, Your Honor.

12   Q.   Now, the proposed termination of salaried retiree OPEB

13   benefits eliminates all benefits, isn't that correct?

14   A.   Well, all OPEB benefits, yes.

15   Q.   The documents that the debtors have submitted to the Court

16   contain no sensitivity analyses that would tell us whether

17   there were intermediate steps that could be taken to reduce

18   expenses without complete termination, do they?

19   A.   No.

20   Q.   And the documents don't mention, for example, modifying

21   the benefits to, say, half the current level, do they?

22           MR. BUTLER:  Objection, asked and answered?

23           THE COURT:  Sustained.

24           MR. VEIS:  I have no further questions, Your Honor.

25           MR. GLOSTER:  Your Honor, I have one brief question.

35

1          THE COURT:  Okay.  You can stay there if you want.

2     CROSS EXAMINATION

3     BY MR. GLOSTER:

4     Q.   Mr. Miller, the analysis performed of the cost savings,

5     what assumption was made about what percentage of the retirees

6     would elect COBRA continuation coverage?

7     A.   I'm not aware that we came to any conclusion as to how

8     many would elect the coverage.

9     Q.   Was there any discussion of the likely outcome of what

10    percentage of the retirees would elect COBRA continuation

11    coverage?

12    A.   I would only say that we were very aware that this would

13    be a significant hardship imposed on all of our retirees.  We

14    were very concerned about it, we discussed it at length, but we

15    came to the conclusion that we had no reasonable basis for a

16    business judgment to continue the program beyond the end of

17    March.  We are aware that there may be some who would elect to

18    forego continuing the coverage that is available because of

19    economic hardship that this may impose upon some families.  But

20    we did not make any kind of estimate as to how many -- any

21    estimate that I was aware of as to how many would choose to

22    continue coverage, and how many would forego coverage.

23    Q.   Was there any discussion of terminating the benefits

24    before GM purchased plants specifically to cut off any

25    potential COBRA continuation coverage responsibility of GM?

36

1   A.   We are in discussions with General Motors about the

2   possibility of their taking possession of the plants.  But

3   that -- those discussions are far from complete and far from

4   any certainty that that will occur.  In the meantime, the

5   debtor is under severe liquidity challenges.  Every week, every

6   month is a challenge.  We have to go back to renew our --

7   Q.   Mr. Miller, I understand that the debtor is under

8   substantial financial stress, but I'm asking a yes or no

9   question.  Was there a discussion of terminating these benefits

10  prior to any transaction with GM for the purpose of avoiding

11  any COBRA continuation coverage responsibility of GM?

12  A.   I do not recall that being part of the discussion.

13  Q.   Thank you, sir.

14          MR. GLOSTER:  No further questions.

15          MR. CORNELL:  If I may, briefly, Your Honor?

16          THE COURT:  Sure.

17  CROSS EXAMINATION

18  BY MR. CORNELL:

19  Q.   Mr. Miller, Trent Cornell on behalf of certain salaried

20  retirees.  Mr. Miller, you testified that it's your business

21  judgment that Delphi needs to eliminate this liability in order

22  to save 1.1 billion dollars, correct?

23  A.   Yes.

24  Q.   Are you aware that counsel for the debtors filed a

25  response to the various objections and motions that have been

37

1    brought with respect to Section 1114?

2    A.    Yes.

3    Q.    Are you aware that in that response brief, the debtors set

4    up that "if the Court were to find Section 1114 applicable,

5    therefore, the correct action would be to deny the debtors'

6    motion.  The debtors would then have to reevaluate whether and

7    when to proceed with the motion under Section 1114," is that

8    correct?

9    A.    Well, yes.

10   Q.    So are you saying then that if an 1114 committee is

11   appointed it would no longer be your business judgment to

12   eliminate this liability?

13   A.    No, sir.

14            MR. CORNELL:  Thank you.

15            THE COURT:  Okay.  Any other cross?  Any redirect?

16            MR. BUTLER:  No, Your Honor.

17            THE COURT:  Mr. Miller, let me ask you just in terms

18   of this question -- are you the right person to ask you or is

19   Mr. Gebbia?

20            The motion contemplates terminating these benefits as

21   of April 1.  Is that -- was that date picked just for

22   administrative convenience or is there a large payment coming

23   due at that time, or is this sort of a steady state of

24   payments?  And, again, if you're not the right person and Mr.

25   Gebbia is, I can save that question for him.

38

1          THE WITNESS:  No.  The -- I mean, I believe I'm

2     somewhat capable of answering this question.  This is a --

3     typically, a very steady stream of payments.  And -- however,

4     even as of the cutoff date there would continue to be bills

5     that would come in related to certain provider arrangements

6     that had occurred prior to that -- prior to that cutoff date.

7     So there will be a little bit of an expense tail even beyond

8     the end of March.  But there is no particular bulge that -- you

9     know, we're not aware of any -- you know, outbreak of a disease

10    or something that would cause there to be a big expense in

11    April that we're trying to forego.  It's simply whatever date

12    we pick there will be a tail, but it should be relatively flat

13    up to then except for, in my experience in one other situation

14    I was involved in with a termination of retiree health care

15    there tends to be a upward spike in utilization between the

16    time of notice and the time of the actual cutoff date.  And

17    that's the only caveat I would say.  But that would occur not

18    matter what cutoff date we have picked.

19          THE COURT:  Okay.  So there's no quarterly payment

20    coming due or anything like that?

21          THE WITNESS:  No.  No.

22          THE COURT:  Okay.  All right.  You can step down

23    then, sir.

24          THE WITNESS:  Thank you.

25          MR. BUTLER:  Your Honor, we now would provide

39

1    Mr. Steven Gebbia for cross examination in connection with his

2    declaration, which has been admitted as Hearing Exhibit number

3    2.

4              THE COURT:  Okay.  And I heard someone wanted to

5    cross examine Mr. Gebbia.

6              MR. VEIS:  Yes, Your Honor, I do.

7              THE COURT:  Okay.  So why don't you take the seat up

8    here, sir.

9         (Witness is sworn)

10             THE COURT:  And, for the record, could you spell your

11   name?

12             THE WITNESS:  Steven Gebbia.

13   S-T-E-V-E-N  G-E-B-B-I-A.

14             THE COURT:  Okay.  You can go ahead.

15             MR. VEIS:  Thank you, Your Honor.

16   CROSS EXAMINATION

17   BY MR. VEIS:

18   Q.   Good morning, Mr. Gebbia.

19   A.   Good morning.

20   Q.   How are you today?

21   A.   I'm well, thank you.

22   Q.   You heard me introduce myself to Mr. Miller, I think, so I

23   won't go through that.  Now, in your declaration you discuss

24   the 1998 General Motors plan and the 1999 Delphi plan, correct?

25   A.   Correct.

40

1    Q.    And you state that they contained language that reserved

2    the debtors' right to unilaterally modify or terminate the

3    salaried to OPEB.    Do you recall that?

4    A.    Yes.

5    Q.    Now, you didn't mention any earlier similar document of

6    plan descriptions, did you?

7    A.    I did not.

8    Q.    Did you ever look at the General Motors 1980 summary plan

9    description?

10   A.    I don't recall.

11   Q.    Did you ever look at any summary plan descriptions prior

12   to the 1999 Delphi plan?

13   A.    Yes, I did.    I was an employee for General Motors for

14   twenty-eight years, so as an employee I'm sure that I've looked

15   at those documents from time to time from the eyes of an

16   employee.

17   Q.    But you didn't look at them with respect to whether there

18   was a reservation of rights provision in those earlier

19   documents, did you?

20   A.    I don't recall specifically looking for them with that

21   frame of mind.    I don't recall specifically looking for them

22   with that frame of mind.

23          MR. VEIS:    No further questions, Your Honor.

24          THE COURT:    Okay.

25   CROSS EXAMINATION

41

1    BY MR. GLOSTER:

2    Q.   Good morning, Mr. Gebbia.  Dean Gloster, Farella Braun &

3    Martel.

4    A.   Good morning.

5    Q.   You mentioned that you had been an employee of GM for

6    twenty-eight years before joining Delphi.

7    A.   Correct.

8    Q.   There are many other employees of Delphi who spent decades

9    at General Motors.  Is that correct?

10   A.   Yes.

11   Q.   And some of them are now retired.  Is that correct?

12   A.   Yes.

13   Q.   And did some of those people retire not on an early

14   retirement program like you mention in paragraph 21 of your

15   declaration but rather simply upon reaching eligible retirement

16   age?

17   A.   Yes.

18   Q.   And those people would not have signed the specific

19   waivers that you reference in paragraph 21 of your declaration

20   accepting an early retirement program, correct?

21   A.   That is correct.

22   Q.   Thank you.  With regard to another group, which is people

23   who left the company under a determination that they were

24   disabled, would those people have signed the early retirement

25   package waivers in those four early retirement programs?

42

1    A.   No.

2    Q.   Are you aware of what the benefit commitments is to people

3    who retire on permanent disability?

4    A.   I understand their eligibility for benefits that are

5    driven by the type of retirement.  Yes.

6    Q.   And what is the nature of the disclosure made to those

7    disabled individuals?

8    A.   In the summary plan description there is a section that

9    would go to medical or life insurance coverages for employees

10   who retire, for example, under a total and permanent disability

11   retirement.

12   Q.   Thank you.  And did the debtor during this bankruptcy

13   case, previously, in 2007 or earlier, terminate life insurance

14   programs for salaried retirees?

15   A.   Not to my knowledge.  No.

16   Q.   Terminate any policies with respect to --

17   A.   We made a change with respect to health care in

18   retirement.  We eliminated company contributions toward retiree

19   health care for the salaried health care plan upon the

20   participant reaching Medicare eligibility, age sixty-five, but

21   we made no change to life insurance that I recall at that time.

22   Q.   Okay.  So my next question was to talk about what you just

23   covered, which is the change in benefits where you changed the

24   payments made for people over sixty-five who were Medicare

25   eligible.  Did the debtor seek Court authorization for that

43

1   change or the appointment of an 1114 committee?

2   A.   Not to my knowledge.

3       MR. GLOSTER:   Thank you.   No further questions.

4   CROSS EXAMINATION

5   BY MR. CORNELL:

6   Q.   Mr. Gebbia, good morning.

7   A.   Good morning.

8   Q.   My name is Trent Cornell on behalf of certain of the

9   retirees.   With respect to paragraph 21 of your declaration,

10  Mr. Gebbia, have you ever heard, or are you aware, of any

11  retirees being told that if they did not sign this document or

12  these types of documents that they would lose their pensions?

13  A.   No.

14  Q.   Never heard that?

15  A.   No.

16  Q.   You started at GM in 1971.   Is that correct?

17  A.   It is.

18  Q.   Do you remember getting documents like this mailed to you

19  by GM?

20  A.   Yes.

21  Q.   Let's see.   If you could look to Exhibit 68, please.

22      MR. BUTLER:   This is Binder 5, Your Honor.

23  Q.   Mr. Gebbia, I do recall from when you got these documents

24  originally they're large, so we've tendered them into an

25  original size.

44

1          MR. CORNELL:  If it would be easier we've tendered

2     that copy to the Court, to the debtors.  Your Honor, if you'd

3     like, I have the originals.  I could tender a copy to the

4     witness as well.

5          THE COURT:  Okay.

6     Q.   **Now, you got these personal statements when you were a GM**

7     **employee.  Is that correct?**

8     A.   **I did.**

9          MR. BUTLER:  Objection, Your Honor.  This is a 1975

10    statement.  Same statement, the same issue.

11         THE COURT:  I'll let you ask a few questions on this,

12    but I may cut you off depending on where you're going.

13         MR. CORNELL:  I'm not going to go cumulative on it,

14    Your Honor --

15         THE COURT:  Okay.

16         MR. CORNELL: -- but I do want to ask --

17         THE COURT:  That's fine.

18    Q.   **Mr. Gebbia, is there reservation of rights language in**

19    **this document?**

20    A.   **I don't know.  I'm not that familiar with this specific**

21    **document.  It -- going back this far.**

22    Q.   **Well, you're being proffered here for your experience in**

23    **employee benefits, and you're testifying that Delphi had**

24    **reservation of rights language in its documents.  Isn't that**

25    **correct?**

45

1    A.    Yes.

2    Q.    Do you see such language in this document?

3              THE COURT:  Well, rather than have him read this you

4    can point out to me whether there is or isn't --

5              MR. CORNELL:  Okay.

6              THE COURT: -- and Mr. Butler can point out to me

7    whether there is or isn't.

8              MR. CORNELL:  Okay.  Your Honor, I'd proffer that

9    it's not, but we can go ahead and do that in argument if that's

10   the way you'd prefer.

11             THE COURT:  That's fine.

12             MR. CORNELL:  Okay.  Thank you.

13             THE COURT:  Any other cross?  Okay.  Any redirect?

14             MR. BUTLER:  No, Your Honor.  We have none.

15             THE COURT:  Okay.

16             MR. BUTLER:  Your Honor, that completes the debtors'

17   evidentiary case with respect to this motion.  The objectors

18   have offered two declarations that they're going to want to

19   present, and we have very brief questions on those.

20             THE COURT:  Okay.

21             MR. VEIS:  Your Honor, I'd first like to present the

22   declaration of Mark E. Thornburg.

23             THE COURT:  What's that?  3?

24             MR. VEIS:  Yes.  That would be Exhibit 3.  And

25   subsequent to --

46

1          THE COURT:  I'm sorry.

2          MR. VEIS:  Subsequent to the cross examination of

3     Mr. Thornburg --

4          THE COURT:  Is it in the confidential volume?

5          MR. VEIS:  No, Your Honor.

6          THE COURT:  Oh, I see it.

7          MR. BUTLER:  It's way in the back, Your Honor.  These

8     declarations will be 3 and 4, which are the far back of Volume

9     1.

10          THE COURT:  I see.  I was looking at an exhibit to

11     another exhibit.  I have it.

12          MR. VEIS:  Sorry.  And subsequent to Mr. Thornburg's

13     examination we would proffer the declaration of Mr. McGrath,

14     which is in number 4.

15          THE COURT:  Okay.  And Mr. Thornburg is here?

16          MR. VEIS:  Yes, he is.

17          THE COURT:  Okay.  And do the debtors want to cross

18     examine him?

19          MR. BUTLER:  Briefly, Your Honor.

20          THE COURT:  Okay.  Could you take the stand, sir?

21        (Witness is sworn)

22          THE COURT:  And, just for the record, could you spell

23     your name?

24          THE WITNESS:  Mark, M-A-R-K, Thornburg,

25     T-H-O-R-N-B-U-R-G.

47

1   CROSS EXAMINATION

2   BY MR. BUTLER:

3   Q.   Mr. Thornburg, my name is Jack Butler.  I am counsel to

4   Delphi Corporation in connection with this motion.  Good

5   morning.

6   A.   Good morning.

7        MR. BUTLER:  Your Honor, I just remembered.

8   Q.   I just have a couple of questions about your declaration.

9   Do you have it in front of you?

10  A.   I do not.

11       MR. BUTLER:  Could we get it for him, please?

12  A.   Okay.

13  Q.   I'd like you to look at paragraph 4 of your declaration,

14  and in paragraph 4 you say, among other things, that you have

15  routinely and consistently received written communications from

16  Delphi that you would enjoy benefits offered for the employment

17  for the rest of your life.  Do you see that?

18  A.   Yes.

19  Q.   You don't attach any written communications from Delphi

20  that says that to your declaration, do you, sir?

21  A.   No.

22  Q.   Can I ask you where are the written communications from

23  Delphi that you routinely and consistently received that said

24  you'd enjoy benefits for employment for the rest of your life?

25  A.   The communications from Delphi didn't provide that.

48

1    They're available on the Fidelity website.

2    Q.    But you make a statement here you received written

3    communications from Delphi that routinely and consistently said

4    that you would get these benefits for the employment for the

5    rest of your life.  Correct?

6    A.    Yes.

7    Q.    That would mean to you that there'd be no reservation of

8    rights in any of those written communications.  Would that be

9    right?

10   A.    I'm not a lawyer.  I just read it from what it said, like,

11   you get, like, health care benefits for the rest of your life.

12   Q.    All right.  And if that document also said that Delphi

13   could terminate those benefits at any time would you have read

14   that section too or would you probably not have read that?

15   A.    I read -- what I read was is that they could be modified.

16   You want to know my interpretation of that or --

17   Q.    I just want to understand.  You made a statement here that

18   Delphi gave you written communications routinely and

19   consistently that said that you'd have these benefits for the

20   rest of your life.  I'm just trying to find out where those

21   written communications are and what they said.

22   A.    Okay.  I didn't present them, but what they said was that

23   I would have health care and life insurance for me and my

24   survivor for the rest of my life.

25   Q.    And did those written communications have reservation of

49

1    rights provisions in them that they could modify or terminate

2    it at Delphi's discretion?

3    A.   They had some wiggle words in them, that this -- what I

4    had viewed that to be was they could make corrections to the

5    document that maybe were put in there by mistake or they could,

6    like they did in 1993, quit offering that benefit.

7    Q.   Now, you're aware, Mr. Thornburg, in 2005 that Delphi

8    modified these plans to, as Mr. Gebbia had testified, eliminate

9    Delphi contributions for coverage beyond the age of sixty-five.

10   Correct?

11   A.   I couldn't tell you the exact date, but, yes, I'm aware of

12   that.

13   Q.   So in 2005 Delphi stopped providing benefits, at Delphi's

14   cost, for the rest of your life, didn't they?

15   A.   At -- when I was eligible for Medicare they quit providing

16   health care insurance.  They continued to provide life

17   insurance.

18   Q.   So, in fact, you'd agree with me that Delphi modified

19   these programs, acting on its discretion to do so, back in

20   2005, so that you wouldn't have those benefits from Delphi for

21   the rest of your life.  Would you agree with that --

22   A.   I agree with that.

23         MR. VEIS:  Objection, Your Honor.  That's compound,

24   because he's built in multiple clauses including assuming that

25   Mr. Thornburg agrees with Delphi's discretion, and I think

50

1    there's a legal matter, we believe, that the 1980 summary plan

2    document

3            THE COURT:  I'll overrule that objection.  I think

4    Mr. Thornburg understood the question.  I don't think it was a

5    trick question.

6    Q.   Mr. Thornburg, I also want to ask, in terms of General

7    Motors written communications, you attached a 1980 document to

8    your declaration, correct?

9    A.   Yes.

10   Q.   Did you receive any other documents after 1980 from

11   General Motors that would have had those wiggly words in them,

12   as you call them, those reservation of rights?

13   A.   The -- I received one of those compensation statements

14   annually, and the -- through 19 -- I can't remember.  I believe

15   it was 1987.  They didn't, they were completely without the

16   whatever we call those words.

17   Q.   But at some point did General Motors send you documents

18   that you recall that had those words in them?

19   A.   They -- they -- I believe they did, but I don't recall

20   which one first -- where they first appeared.

21   Q.   But you do recall receiving those communications from

22   General Motors.  Correct?

23   A.   Yes.

24           MR. BUTLER:  I have no further questions, Your Honor.

25           THE COURT:  Okay.  Any redirect?

51

1           MR. VEIS:  No, Your Honor.

2           THE COURT:  Okay.  You can step down, sir.  Okay.

3   And then there's the declaration of Mr. McGrath, and he's here

4   in the courtroom?

5           MR. VEIS:  Yes, Your Honor.  Mr. McGrath is here.

6           THE COURT:  Okay.  And do the debtors wish to cross

7   examine him?

8           MR. BUTLER:  Briefly, Your Honor.

9           THE COURT:  Okay.  If you could come up then,

10  Mr. McGrath.

11      (Witness is sworn)

12          THE COURT:  And, for the record, could you spell your

13  name?

14          THE WITNESS:  John McGrath.  J-O-H-N

15  Capital M-C-G-R-A-T-H.

16          THE COURT:  Okay.

17  CROSS EXAMINATION

18  BY MR. BUTLER:

19  Q.   Mr. McGrath, my name is Jack Butler.  I represent Delphi

20  Corporation.  Good morning.  Okay.  Do you have your

21  declaration in front of you, Mr. McGrath?

22  A.   No.  This is it?  Oh, yes, I have this one.  Yeah.

23  Q.   Great.

24  A.   Not the original.

25  Q.   No.  Just the copy of it.  Can you turn to paragraph 6?

52

1    In paragraph 6 you say that you always understood that in order

2    for Delphi or GM to modify your benefits you'd have to consent

3    to the modification.  Correct?

4    A.   Correct.

5    Q.   Mr. McGrath, you didn't consent to the 2005 modification

6    where Delphi changed the program to eliminate benefits for the

7    rest of your life that they were paying for but, instead,

8    stopping them at age sixty-five.

9    A.   I --

10   Q.   You never consented to that?

11   A.   No, I never did.

12           MR. BUTLER:  I have no further questions, Your Honor.

13           THE COURT:  Any redirect?

14           MR. VEIS:  No, Your Honor.

15           THE COURT:  Okay.  You can sit down, sir.

16           MR. BUTLER:  Your Honor, unless the objectors have

17   anything else I think that completes the evidentiary record.

18           MR. VEIS:  Nothing further, Your Honor.

19           THE COURT:  Okay.

20           MR. BUTLER:  Now, in terms of argument, Your Honor,

21   we have submitted fairly exhaustive papers on this subject.  I

22   think, if it's acceptable to the Court, in terms of making an

23   extended oral argument I'd rather respond to objectors than

24   repeat what I said in the papers, if that's okay?

25           THE COURT:  Okay.  I've reviewed the papers, so

1    that's fine.

2        MR. DOYLE:  Good morning, Your Honor.  Dan Doyle, Spencer

3    Fane Britt & Browne, St. Louis, for the Nicholson objectors.

4    Your Honor, I don't think there can be a more empathetic group

5    in any bankruptcy then the retirees of the debtor.  These are

6    the folks who've already provided the consideration for their

7    retiree benefits, who no longer can go on strike, stop work,

8    generally are on fixed incomes, may have health issues, and, in

9    most bankruptcy cases, would be totally unrepresented in terms

10   of formulating or negotiating in a plan of reorganization

11   absent Section 1114.  I'll submit to you that I think, in terms

12   of the legally and functionally, this is a case that Congress

13   envisioned when it passed 1114 and then later amended it in

14   2005 under BAPCPA.  We've got 15,000 retirees.  We've got

15   potential savings of a billion dollars.  We have competing

16   interests in this case, Tranche A, B and C bondholders.  We

17   have joint discussions over plans of reorganizations and how

18   it's going to be financed.  We've got financial projections.

19   We've got reorganization values.  But we don't have any

20   retirees in that mix to help decide whether or not the proposed

21   cuts to their benefits are fair and equitable and whether

22   they're actually necessary to permit reorganization.  As the

23   debtors' own witnesses concede, retiree benefit calculations

24   were more or less an afterthought.  They went with the run

25   rate.  They figured out what they could save.  And then they

1   all collectively decided that's what we're going to do.  We're

2   going to eliminate all benefits.  There's no halfway here.

3   There was no analysis in terms of what if they decide to reduce

4   the amount of the Part B subsidy that they currently offer.

5   What would happen if they capped the life insurance at 5,000

6   dollars apiece so at least their spouses can have a burial

7   policy?  What is the effect if GM does come to the rescue in

8   the case or the federal government?  Because once these

9   benefits are eliminated, which the debtor seeks to do today,

10   there is no snapback provision, unlike in 1114.  Under 1114, of

11   course, a retirees' committee can come back and say the

12   economics has changed, we need to restore some of the retiree

13   benefits.  The debtor here hangs his hat --

14           THE COURT:  But let me take that through.  There was

15   a lengthy period in this case where the debtors, supported by

16   the creditors' committee and the other lenders, determined to

17   keep welfare benefits in place.  They did that in the exercise

18   of their business judgment thinking that the elimination of

19   such benefits would hurt them more than it would help them.

20   And what is to prevent, for example, them from reinstating

21   health benefits if, for example, Congress does say, as Congress

22   is certainly within its power to say, as part of an automotive

23   bailout, we want to specifically protect retirees?  That money

24   is not going to go anywhere else.  We think it's a good thing

25   to help out retirees.  Why wouldn't the debtor then, in the

55

1    exercise of its judgment, take that money?

2          MR. DOYLE:  Your Honor, because it's not in the plan.

3    And it's not in the plan because there are no retiree

4    representatives.  There is --

5          THE COURT:  As far as I can tell there is no Chapter

6    11 plan, at this point, that's before the Court.  I'm talking

7    more about the scenario you just spun out, which is that

8    there's a return to viability of the debtors or a, not

9    viability, a return to more of the conditions that they

10   experienced before the bottom fell out of the automotive market

11   or, specifically, congressional action that would earmark money

12   for retirees.

13         MR. DOYLE:  Well, Your Honor, as you and I both know,

14   and everybody in this room, the debtor is not its own man in

15   this case.  I mean, there are pressures from other

16   constituencies to pull value out of the estate and into their

17   constituent's pockets.

18         THE COURT:  Well, I understand that.  But for --

19         MR. DOYLE:  The --

20         THE COURT:  But for two and a half more years those

21   people did not pressure the debtor into terminating these

22   benefits.

23         MR. DOYLE:  No, Your Honor, they do not.  And I think

24   that speaks to how these are.  I know the debtor would like to

25   say these are generous benefits, but I don't believe they are.

56

1    And obviously people came into this case with rosier

2    expectations than proved to be true.  The key difference is

3    with a retirees' committee and a compliance with 1114 if the

4    economics change the retirees would have a way to get in front

5    of this Court to seek a restoration of benefits rather than to

6    be left up to the goodness or the kind intentions of the

7    debtor, assuming that its other competing constituencies permit

8    it.

9            THE COURT:  Okay.  I understand that.  But that

10   presumes the main point that the debtors disagree with, which

11   is that the 1114 regime does, in fact, apply here to these

12   benefits.

13           MR. DOYLE:  That's right, Your Honor.

14           THE COURT:  I mean, I think the debtors concede that

15   if, in fact, 1114 did apply to these benefits then you'd

16   definitely have a committee.

17           MR. DOYLE:  That's right.  And you have moved right

18   on to my next point, which is that 1114 does apply, and let me

19   be clear.  I think Skadden, Arps is a great law firm.  I'm from

20   the Midwest, and we look out here to get our cues on what to

21   argue --

22           THE COURT:  I think there are many people from the

23   Midwest at Skadden, Arps, so --

24           MR. DOYLE:  But Mr. Butler said that the law is clear

25   on this.  And I think it should be especially clear to Skadden,

1    Arps, because they represented the appellant in Ames Department

2    Store in which Judge Lifland ruled that 1114 applied despite

3    the reservation of rights.

4              THE COURT:  No, it was Judge Conrad.

5              MR. DOYLE:  I'm sorry.

6              THE COURT:  And that's important, given his later

7    ruling in Drexel.

8              MR. DOYLE:  Which then went up to Judge Duffy who

9    decided that the bankruptcy court was right.  The case that the

10   debtor relies most on is Doskocil, which is out of Kansas City,

11   Kansas, which two years later, ten miles away, in Kansas City,

12   Missouri, Judge Venters ruled the other way.  So plain language

13   is plain language.  You read the statute, as we all must do, to

14   start, and it says that the debtor shall timely pay and shall

15   not modify retiree benefits.  It doesn't say they shall timely

16   pay but can modify unvested retiree benefits, which is exactly

17   what the debtor is arguing here.

18             Judge Flannagan, in the Doskocil decision, basically

19   held that Congress did not express a clear enough intent, for

20   his purposes, that the rights are modified under 1114,

21   notwithstanding what I think is plain language.  And

22   Judge Venters found the other way a couple of years later.

23   Under BAPCPA, I think, an argument that makes this even more

24   interesting is Congress went back and added Subsection L which

25   allows the Court under particular circumstances to go back 180

58

1    days and restore benefits that had been unilaterally modified,

2    probably under a reservation of rights pre-petition.  It's

3    counterintuitive to think that Congress would not offer even

4    more protection post-petition than pre-petition.

5            One thing that I don't think anybody in the courtroom

6    would disagree with is the heart of bankruptcy is modification

7    and alteration of contract rights.  Here Congress has clearly

8    expressed an intent that those debtors that had reserved rights

9    under their benefit plans for retirees cannot exercise those

10   rights absent going through the 1114 process, so as to make the

11   retirees stakeholders, real stakeholders with real voices, in

12   any Chapter 11 reorganization.  In other words, what Congress

13   intended is full disclosure under 1114 so that the retiree sees

14   everybody's cards, that it's not a black box process with the

15   constituencies in closed session all deciding well, let's

16   eliminate retiree rights in their totality.

17           In other words, if the numbers, once a retirees'

18   committee looks at it, justifies some elimination of retiree

19   benefits that can be crafted so as to provide the least amount

20   of impact on those retirees who are most at risk, such as

21   potentially providing bridge coverage for those who are not yet

22   Medicare eligible who may be uninsurable such as, you know,

23   lowering the coverage limits on life insurance.

24           But the debtor has done exactly what Congress

25   anticipated debtors do in this case.  Well, you know, we're

59

1    running out of cash.  Let's cut all retiree benefits.  And,

2    Your Honor, 1114 doesn't make it that simple, because in that

3    case every debtor in every case can plead poverty and say I'm

4    justifying exercising my reservation of rights.  Let's just

5    throw the retirees under the -- well, I won't say bus, but

6    they'll throw them under the locomotive and use that to provide

7    additional benefits to the other stakeholders.

8            And, Your Honor, in our papers we also attach an

9    order from Judge Beatty in Solutia which found that the debtor

10   in that case could not exercise its reservation of rights

11   against those Solutia retirees.

12           And, Your Honor, with regard to the Sprague case, I

13   believe there's --

14           THE COURT:  Before you go on there, let me ask you

15   about 1114(l).

16           MR. DOYLE:  Yes, Your Honor.

17           THE COURT:  If you're just counting cases, the

18   majority of the cases goes in favor of the debtors' position

19   with regard to unvested benefits and rights to terminate.  And

20   I'm leaving aside the issue of whether these are, in fact,

21   unvested benefits and the debtors do have the right to

22   terminate.  I understand you all have made a different point on

23   that issue.  But given that you had that, and including the

24   view in Collier's, if Congress really wanted to make it clear

25   in BAPCPA that it was actually prohibiting a debtor from

1    exercising its pre-bankruptcy right once it went into

2    bankruptcy, why wouldn't it have done that as opposed to have

3    enacted 1114(l)?

4              MR. DOYLE:  Because, Your Honor, I think Congress

5    thought that it had already said it plainly when it said thou

6    shalt timely pay and thou shalt not modify retiree benefits.

7    How much plainer can it be?  Vested, unvested, contingent,

8    uncontingent --

9              THE COURT:  Well, you know, some good judges,

10   including judges from this district and elsewhere, have thought

11   it wasn't that clear.  So there's the issue.  I'm just trying

12   to figure out how much to take away from 1114(l) and BAPCPA.

13             MR. DOYLE:  Well, Your Honor, this is what I'd take

14   away from it, which is --

15             THE COURT:  I mean, certainly Congress didn't

16   hesitate after the LTV ruling to act.

17             MR. DOYLE:  Yes, Your Honor, which is the Retiree

18   Benefit Protection Act.

19             THE COURT:  Right.

20             MR. DOYLE:  Rather than the Vested Retiree Protection

21   Act.

22             THE COURT:  Right.

23             MR. DOYLE:  But, Your Honor, yes, with LTV that, of

24   course, involved the expiration of a collective bargaining

25   agreement that provided retiree benefits.  With regard to

61

1    1114(l) --

2            THE COURT:  No, I'm talking about -- I'm sorry.  I'm

3    talking about the original LTV where Congress reacted --

4            MR. DOYLE:  Right.

5            THE COURT: -- to specific cases that --

6            MR. DOYLE:  That's right.  Well, and --

7            THE COURT: -- took positions against retirees that

8    raised the congressional hackles.

9            MR. DOYLE:  That's right.

10           THE COURT:  The Doskocil line of cases, perhaps,

11   didn't receive the notoriety that the original LTV case did

12   have, but it's hard to imagine Congress wasn't aware of that

13   line of cases starting in 1993 and going forward to 2005 when

14   it enacted BAPCPA.  And since they did focus on 1114 why

15   shouldn't I infer that they knew what they were doing when they

16   didn't overrule those cases?

17           MR. DOYLE:  Your Honor, well, LTV, of course, had to

18   do with the rejection of a collective bargaining agreement to

19   end retiree benefits there under 365.  Of course, back then

20   there was no 1114.  The stopgap legislation was the Retiree

21   Benefits Protection Act.  During the LTV case the CBO expired.

22   A careful reading, and even Doskocil acknowledges this, the LTV

23   really didn't fit its analysis because LTV has to do with

24   expiration of a collective bargaining agreement that contained

25   retiree benefits.  And that was also reflected in the Federated

62

1    Department Stores case out of the Southern District of Ohio

2    when the LTV cases involved the restoration, so to speak, of

3    retiree benefits under that collective bargaining agreement

4    that had expired.  And I think that if you look at, and this is

5    not in our brief because I didn't think we'd get into this kind

6    of detail, but if you look at the LTV decision by the Second

7    Circuit 945 F.2d 1205, 1211 you'll see that it really has to do

8    with whether or not a bankruptcy court can revive an expired

9    contract, which, I think, we all know it cannot do, so as to

10   create retiree benefits.  Here we don't have a retired benefits

11   contract.  Here we have benefits that were in place pre-

12   petition and continue to be in place until the debtor can get

13   authority through the 1114 process to modify those benefits.

14   And I think particularly telling is the dissent by

15   Judge Restani who said that the District Court effectively had

16   decided that the salaried employees' benefits terminable at

17   will were protected by the Retiree Benefits Protection Act.

18   And that's, you know, in a decision that's had the CBO, and

19   those benefits can't be restored because that contract has

20   expired.

21            THE COURT:  But isn't that decision, isn't the

22   Chateaugay decision one that really goes on what the parties

23   intended to contract to?  There is no intimation that the

24   parties intended LTV's obligation to continue beyond the life

25   of the wage agreement.  The Court's looking at what the parties

63

1    intended in their contract to be bound by.

2         MR. DOYLE:  That's right, Your Honor.  In other

3    words, when the contract expired there was nothing to keep it

4    alive.  There was no renewal option and there was no reopener.

5         THE COURT:  Right.

6         MR. DOYLE:  You know, Your Honor, it reminds me of

7    the cases you read about bankruptcy court jurisdiction back in

8    the seventies.

9         THE COURT:  Well, I mean, before we get to that.

10        MR. DOYLE:  All right.

11        THE COURT:  I mean, they continue to say that the

12   plan, the benefit plan, does not require LTV to pay for

13   benefits after the 1984 wage agreement expired.  LTV Steel and

14   the mining companies therefore are not obligated by the wage

15   agreement or by statute to continue to pay for retiree

16   benefits.  So I understand they were focusing on the wage

17   agreement.  But if they really read the language, which was the

18   '88 language, to override any termination of benefits, then

19   wouldn't that be a statute that would override that?  I mean,

20   they seem to be looking at --

21        MR. DOYLE:  Well, Your Honor --

22        THE COURT:  -- the pre-petition relationship between

23   the parties.

24        MR. DOYLE:  Your Honor, the subsequent cases that

25   have looked at LTV have decided that 1114 says that the debtor

64

1   shall not, shall timely pay and shall not modify retiree

2   benefits.  How they distinguish LTV was if the underlying

3   agreement expires on its own terms the debtor has done nothing

4   to modify benefits.  So it was not a modification that fell

5   under the statute.  And here, obviously, that's not the case.

6          And so, Your Honor, I've enjoyed our discussion, and

7   I believe that, as I opened with, this is a case --

8          THE COURT:  Let me ask you one other --

9          MR. DOYLE:  All right.

10         THE COURT: -- other statutory interpretation

11   question.  The same judge who issued the Ames decision in the

12   bankruptcy court, Judge Conrad, in the Drexel case cited

13   Doskocil and Chateaugay favorably in confirming a plan that

14   provided that under the plan, this is under the plan now and

15   dealing with 1129(a)(13) the retiree payments may be terminated

16   at will, and, therefore, that was sufficient protection of the

17   retirees to get the plan confirmed.

18         MR. DOYLE:  Your Honor, obviously Drexel carried

19   through the benefits, carried the plan past the confirmation to

20   the effective date, or intended to, and so there was no

21   modification of retiree benefits during the case.  And I think

22   the cases are very clear that 1114 only applies during the

23   pendency of the bankruptcy case, and part of the reason why

24   1114 is there is to allow retirees, through an authorized

25   representative, to bargain for and negotiate treatment under

1    the plan.  And that is certainly, you know, the issue in Drexel

2    is one that I think you see in Doskocil too, which, I think, is

3    a misinterpretation of the statute, which is 1129(a)(13), is

4    that if the plan comes through the bankruptcy process

5    unmodified, and it's adopted wholesale under the plan, then

6    magically it becomes vested.  And that is certainly not the

7    case.  And that is the narrow issue that I think Drexel

8    addressed.

9        THE COURT:  I'm sorry.  Let me make sure I understand

10    this.

11        MR. DOYLE:  Right.

12        THE COURT:  That 1114 creates a federal override of

13    modification of vested benefits only during the Chapter 11 pre-

14    plan period.

15        MR. DOYLE:  No, Your Honor.  It's through the

16    effective date.  I think there's the Ormed (ph.) case out

17    there.

18        THE COURT:  All right.  Until the plan goes

19    effective?

20        MR. DOYLE:  Yes, Your Honor.  It's to allow the

21    retirees to have a voice in what the plan ultimately is going

22    to look like.

23        THE COURT:  But if the plan -- if it snaps back to a

24    right to terminate at will, what good is giving them that

25    voice?

1          MR. DOYLE:  I --

2          THE COURT:  What is there to negoti -- why would

3    anyone, other than for business reasons, say I will waive that

4    right?

5          MR. DOYLE:  Your Honor, are you talking about pre-

6    effective date snap back or post --

7          THE COURT:  What is there to negotiate -- yes.

8          MR. DOYLE:  Because obviously --

9          THE COURT:  I mean, you prefaced all this by saying

10   everyone has leverage to negotiate a plan --

11         MR. DOYLE:  That's right, Your Honor --

12         THE COURT:  -- except for the retirees.  And that's

13   why Congress wanted to protect them.  But if, in fact,

14   1129(a)(13) kicks one back to a OPEB plan that is terminable or

15   modifiable at will, what is there to negotiate over?

16         MR. DOYLE:  Well, Your Honor, first of all, there's

17   the benefits during the case.

18         THE COURT:  Well, no, I understand that.

19         MR. DOYLE:  Secondly, assuming that everybody has

20   done their job in the bankruptcy case, the other constituencies

21   will have agreed to treatment of their claim in a payout over

22   time or, you know, additional collateral.  And, if the

23   reorganization actually works, at least in theory, the debtor

24   should be in the position where Delphi was at the beginning of

25   the case, in other words, finding that the cost benefit favors

67

1     keeping the retirees happy rather than cutting them off at the

2     knees.

3              THE COURT:  But, I guess Delphi is saying to me, and

4     I know you --

5              MR. DOYLE:  Let me --

6              THE COURT:  -- so one of you may dispute this, or

7     more of you may dispute this.  They're saying to me, to get to

8     a plan here, they need to show their funding source that they

9     won't have a 1.1 billion dollar liability on their balance

10    sheet for OPEB.

11             MR. DOYLE:  That's right, Your Honor.  That's what

12    they're --

13             THE COURT:  And --

14             MR. DOYLE:  -- that is what they're saying.  But 1114

15    gives the retirees the right to cut the deck and make sure

16    they're holding the high hand.

17             THE COURT:  But in connection with plan negotiations?

18             MR. DOYLE:  Yes, Your Honor.  Because 1114 requires

19    financial disclosures far beyond what's been disclosed here.

20    We don't have a financial advisor.  We --

21             THE COURT:  But where does --

22             MR. DOYLE:  -- don't have an actuary to double-check

23    their math.

24             THE COURT:  -- but if 1129(a)(13) gives the debtor

25    the right to spring back to the plan as not interrupted, if you

68

1    will, by 1114, then where is that right?

2          MR. DOYLE:  Your Honor, 1129(a)(13) simply says that

3    whatever the deal is that's cut with the committee of the

4    retirees under 1114 has to be integrated into a plan.  Now --

5          THE COURT:  It doesn't say that.  It says that the

6    plan must provide for the continuation after the effective date

7    of payment of all the retiree benefits, as that term is

8    defined, for the duration of the period the debtor has

9    obligated itself to provide such benefits.

10         MR. DOYLE:  That's right, Your Honor.  And so if the

11   retirees' committee has negotiated a certain amount of time in

12   which those benefits will continue post-effective date, the

13   plan has to reflect that.  If the --

14         THE COURT:  But the debtor doesn't have to negotiate

15   that, right?  The debtor doesn't have to -- if the debtor was

16   willing, under your interpretation of 1114, not to modify the

17   plan during the course of the case, pre-effective date, then

18   once the Chapter 11 plan is confirmed, it can do whatever it

19   wants, right?

20         MR. DOYLE:  That is what the case law appears to say,

21   Your Honor.

22         THE COURT:  Okay.

23         MR. DOYLE:  And that's assuming they have a

24   reservation of rights and they haven't contracted that away

25   during the -- modified that during the --

69

1          THE COURT:  Right.

2          MR. DOYLE:  -- bankruptcy process.

3          THE COURT:  Right.

4          MR. DOYLE:  And the reason why that is, is because

5    everybody expects a successful reorganization, including

6    continuation of retiree benefits.  In other words, the debtor

7    would continue to be economically able to provide those

8    benefits post-effective date.  The real issue comes in a case

9    like this, when the debtor believes that it cannot economically

10   maintain those benefits.  Then the issue becomes what level of

11   benefits should there be with regard to a modification through

12   the 1114 process and how is that going to be reflected in the

13   plan under 1129(a)(13).

14          And that can run, as I've already described, that can

15   run the gamut in terms of lowered benefits to meet the

16   financial model that the debtor might need to formulate in

17   order to be effective.  I mean, the whole thrust of 1114 is

18   that the retirees need a voice, and this Court, absent

19   agreement with the debtor and the committee, needs to find that

20   it's fair and equitable to the parties and that it's necessary

21   to permit a reorganization.  And obviously, those are being

22   lost over here today.

23          THE COURT:  Okay.

24          MR. DOYLE:  So, Your Honor, as I said, I enjoyed the

25   discussion and I would ask that the Court deny the motion and

1    order that 1114 apply.

2         THE COURT:  Okay.  You were going to talk about the

3    Sixth Circuit case, but maybe one of your colleagues is going

4    to cover that subject, so.

5         MR. DOYLE:  I'll clear the podium.

6         THE COURT:  Okay.

7         MR. GLOSTER:  Your Honor, I'd like to cover three

8    things briefly.  First, I'd like to respond to Your Honor's

9    questions about how the statute works, because we've done this

10   in other cases.  1114 simply protects amendable benefits for

11   the duration of the bankruptcy case until confirmation.  Then

12   1129(a)(13) says the debtor is not obligated to provide

13   amendable benefits going forward, unless the debtor has made a

14   commitment during the case to say I'll maintain these things

15   for a period of time.

16        What that means is, the debtor absolutely has a

17   choice.  They can say we don't want to modify retiree benefits

18   during the bankruptcy case, we'll simply terminate the

19   amendable benefits going forward upon confirmation.  Or they

20   can say we would like to negotiate with an 1114 committee

21   because we want to reduce our cash flow expenses today.  We're

22   not sure if we're going to be lingering in bankruptcy for

23   another two years.  We would like to save 70 million dollars a

24   year or some sizeable fraction of that, but we want to do it in

25   a way that's fair to retirees.  So we'd like to sit down and

71

1    negotiate with you over changes.

2          And in other cases, like this one, what we typically

3    find is, there is actually a mixture of amendable benefits and

4    benefits which, in fact, are vested.  And so those typically

5    get treated different, and there's a compromise by a committee,

6    and there's clarity for the debtor about what actually exists,

7    and it works all around.

8          There's a critical reason for doing it in this case,

9    Your Honor.  The debtor, in its Exhibit 49, that's the GM

10   restructuring plan, on page 33 it discusses Delphi.  And it

11   says that Delphi is "unlikely" to be able to make the payments

12   in the future for its pension plan for the salaried retirees

13   who are sitting in this room and protected by 1114.  So what

14   happens is, if that pension is turned over to the PBGC, under

15   Section 35 of the Internal Revenue Code, they have the right to

16   a health coverage tax credit where the federal government will

17   pay sixty-five percent of their health premiums for qualified

18   coverage.  Qualified coverage includes, at that point, COBRA

19   continuation coverage and it also includes, according to the

20   IRS, a follow-on plan negotiated by an 1114 committee, which is

21   more affordable than COBRA continuation coverage.

22         But you have to go out and get a private letter

23   ruling from the IRS.  You have to come up with a health plan

24   for the retirees that 's going to be cheaper than what the

25   debtor is providing today.  And you have to coordinate it so

1    that that is in place at the time that the pensions are

2    terminated.  And then the federal government pays sixty-five

3    percent of the health care costs for retirees who are fifty-

4    five to sixty-five.  And those are the expensive people that

5    we're talking about.

6         So there's a reason for it.  And Congress provided

7    very simple protection.  1114(a) says, "A plan, fund, or

8    program."  Your Honor asked, well, you know, couldn't Congress,

9    as part of this bail-out say you have to protect retirees?

10   Congress already did.  It said, during the bankruptcy case, you

11   cannot modify these benefits without going through the 1114

12   process.  To the extent that there was questions, and as you

13   look at each of these cases, Drexel's an 1129(a)(13) case.  It

14   simply says look at that statute.  The way the statutory

15   framework works is if the debtor doesn't want to agree to

16   extend coverage beyond a certain period of time, if those

17   benefits are truly amendable, they can just not do it.

18        THE COURT:  Of course, he cited to 1114 cases, not

19   1129 cases.

20        MR. GLOSTER:  Well, Your Honor, Your Honor is a

21   bankruptcy judge.  Bankruptcy judges are practical.  If this

22   case was converted to liquidation a week from Monday and Your

23   Honor knew it, there'd be no point in appointing an 1114

24   committee.  If the only basis for benefits had expired prior to

25   bankruptcy under a collective bargaining agreement, and there

73

1    wasn't a benefit that existed at the time of the bankruptcy

2    filing, there's no point, if you've already got a union there

3    protecting the workers, to go have an 1114 committee.

4            THE COURT:  But in Chateaugay, the benefit did exist

5    at the time of the filing.

6            MR. GLOSTER:  And then Congress passed 1114(l).  And

7    a couple of clarifications about that, Your Honor.

8            THE COURT:  Okay.

9            MR. GLOSTER:  First, at the time of 2005, Colliers

10   was not so radical in its interpretation of 1114 in favor of

11   the employers.  I know this because it was rewritten while we

12   were representing the 1114 committee in the Delta bankruptcy

13   and while our opposing counsel was a contributing editor to

14   Colliers.  That in fact, at the time Congress passed the 2005

15   amendments, the statute was clear, the cases were scattered,

16   and only a fraction of bankruptcy court cases end up being

17   reported.  And then as to the point of well, why didn't

18   Congress clear this up, Congress --

19           THE COURT:  But this issue --

20           MR. GLOSTER:  -- absolutely did.

21           THE COURT:  -- this issue had been highlighted since

22   1993.

23           MR. GLOSTER:  And Congress solved the problem,

24   because the question is, does 1114 apply to benefits that the

25   debtor can amend?  Answer:  Section 1114(l) says, unmistakably,

1    with no question, it absolutely applies to benefits the debtor

2    did amend in the 180 days before bankruptcy.  Therefore, it

3    must apply to benefits that the debtor can amend.  There is

4    just no factual circumstance under which the debtor -- if the

5    debtor said well, I've just violated ERISA and changed vested

6    benefits, there's a remedy under ERISA.  That is not the kind

7    of thing that Skadden Arps will recommend to their clients.

8    Generally, do not violate ERISA in clear fashion.

9           So 1114(l) says, for 180 days before bankruptcy, if

10   you modified these retiree benefits as defined by the statute,

11   then if the debtor was insolvent at the time, the 1114 process

12   applies.

13          THE COURT:  Well, no, it doesn't.  It's a different

14   standard.  It doesn't apply.  It's whatever's fair and

15   equitable.

16          MR. GLOSTER:  Well --

17          THE COURT:  And one could argue that if you agreed in

18   your contract to let it be modifiable, that's fair and

19   equitable.

20          MR. GLOSTER:  Well, but, Your Honor, if you look at

21   the case law under fair and equitable, under both 1113 and

22   1114, about clearly favored by a balance of the equities, you

23   look at whether one group is suffering disproportionate harm to

24   another group, and that's the In re Delta Airlines case

25   involving the Comair benefits for flight attendants.  It's a

75

1    fair and equitable analysis.  You ask who's being asked to --

2         THE COURT:  Well, actually this is just a balance of

3    the equities analysis.

4         MR. GLOSTER:  Well, it's a balance of the equities

5    analysis in the 1114 statute.  Congress says we're protecting

6    benefits which are retiree benefits, which are defined as a

7    plan, fund or program which provides these benefits.  1114(a)

8    is clear.  To the extent that there is case law that departs

9    from the reality, most of those cases are distinguishable on

10   their facts, and frankly, Your Honor, as between the statute

11   and the clear legislative history and the statutory framework

12   where 1114(a) gives very limited protection to retirees.

13        And let's put a human face on it.  When GM says that

14   they are facing hardship -- Delphi says that we're all facing a

15   harsh economic reality, Your Honor.  But harsh economic reality

16   for a retiree means, when you terminate paying for those

17   benefits, I have to choose between paying my rent or getting my

18   medication.  And when --

19        THE COURT:  And you pointed out, for many people

20   there's a gap, if they're not eligible for Medicaid yet.

21        MR. GLOSTER:  Right.  And those are the most

22   expensive benefits, Your Honor.  We -- people who are getting

23   up there in years and hurting ourselves are more expensive to

24   insure than twenty-eight year-olds.  And then when Mr. Miller

25   talked about a "upward spike in utilization", let's sort of

1    talk about what that means.  That means trying to schedule your

2    cancer surgery before your benefits expire and while you still

3    have life insurance.  That's what it means.  And that's why

4    1114 protects benefits only for the case.

5           It says look, get a retiree committee in there.

6    There will be a committee that represents people that can

7    actually sort out, and not in twenty days, not over a weekend,

8    not while you're trying to reach retirees in all different

9    parts of the country and people are sending faxes of two pages

10   of their benefit summary from GM.  You can actually find out

11   what was amendable and what was a commitment that the debtor

12   made.  And then you can negotiate something fair.  And we are

13   not under an illusion that Delphi just has stacks of money we

14   haven't found yet.

15          The retirees are going to have to take sacrifices

16   along with everybody else.  But 1114 says you can't force them

17   to make those sacrifices during the case without going through

18   that 1114 process.  And the debtor has a lot of leverage.

19   Because 1114 is only going to protect through the confirmation

20   of a bankruptcy plan.  But let's also be practical, Your Honor.

21   That might not be for a while, given the duration of this case

22   and what's happening in the automotive industry.  And in the

23   meantime, people are going to need to see their doctors, and

24   they're going to need to pay for their medications.  And the

25   consequences for them are life-threatening.

1           Let's talk about the factual issue, Your Honor.

2     Because the Sprague case, in fact, doesn't apply here.  The

3     Sprague case was a Sixth Circuit decision.  And when you look

4     at the dissent of the Sprague case, the dissent of the Sprague

5     case is essentially the rule that is applied in the Second

6     Circuit.  The Devlin case, which is 274 F.3d. 76, and the

7     Feifer case, which is 306 F.3d. 1202, have a different analysis

8     in the Second Circuit of how you resolve conflicts between

9     earlier plans that said that you get lifetime benefits, and

10    subsequent plan documents that say the employer's reserving the

11    right to change those benefits.

12          What the Second Circuit law is, is once the employer

13    makes those commitments that says you get lifetime health

14    benefits, and you worked for that employer for a period of

15    time, you obtain a contractual benefit.  And the mere fact that

16    later plan documents say that the employee -- that the benefits

17    are now subject to modification, amendment and termination,

18    does not change the underlying vested right.

19          So these employees, who were there since the 1970s,

20    who had that language, when they came over to Delphi and Delphi

21    said you get the rights you did under the GM plan last year,

22    last year those people had vested rights.  Now, some of them

23    may have given those up when they signed agreements and took

24    early retirement programs.  There are some pretty clear waivers

25    in some of those programs and they may have waived.  But a lot

1    of the retirees who retired because they reached the applicable

2    age, didn't do that.

3            In addition, it's the debtor who bears the burden of

4    proof to establish that all of these benefits are amendable,

5    and they simply come here and say, Your Honor, we have this

6    language about retaining the right to modify change, we're not

7    going to cover every early retirement program, we're simply

8    going to put in evidence about four of them.  We're not going

9    to talk about what commitments are made to people who retire

10   under an early disability, and we're not going to address the

11   fact that these people who retired, who were thirty-year

12   employees of GM came over to Delphi for two years and then

13   retired, how we're going to deal with that.  So they have the

14   burden of proof.

15           THE COURT:  Well, but the Second Circuit law -- I'm

16   reading the Bouboulis case, now -- seems to differ only

17   slightly from Sprague, given the emphasis on the need for an

18   actual promise.  I mean, the language in Bouboulis was pretty,

19   to my unlettered eye, "promissory," and yet the Second Circuit

20   didn't really see it that way.  So I guess I have to say, I

21   still haven't really seen -- and I appreciate that this is on

22   twenty-days' notice.  But for a group of people who basically

23   got this out of the blue twenty days notice is short.  But I

24   still haven't really seen language that would satisfy, I think,

25   the Second Circuit standard as set out in Bouboulis.

79

1          MR. GLOSTER:  Well, Your Honor, a couple of things.

2     First, I think when you look at the earlier cases, Devlin and

3     Feifer, they say that the employees ought to be given the

4     benefit of the doubt as to whether there's a genuine disputed

5     issue of fact given sort of contradictory language.  So

6     actually, the Second Circuit cases, which are all subsequent to

7     Sprague, specifically say look, you know, if you introduced a

8     promise, you ought to be able to do this.

9          And then second, Your Honor, my client's organization

10     was formed after this motion was filed.  We were contacted as

11     their counsel shortly before the opposition was due.  We

12     happened to be able to do that because we had represented,

13     successfully, the Delta retirees on the same legal issue of

14     amendable benefits and understood the Health Care Tax Credit,

15     how it would apply here.  But the reality is, Your Honor, one

16     of the reasons you don't see language that's clear about this

17     is that Delphi is doing this on twenty-days' notice.

18          And frankly, the retirees, who are about to lose

19     lifetime benefits -- and to me, Your Honor, GM said you will

20     get lifetime medical benefits unless you retire early.  They

21     said that.  That was the disclosure.  It said, you will get

22     lifetime medical benefits.  And it strikes me that the

23     recipient of that disclosure would have concluded I will get

24     lifetime medical benefits unless I take early retirement.

25          So I think, Your Honor, there actually was clear

80

1    statements that prior to 1980 GM committed, you're going to get

2    lifetime benefits.  And under the Second Circuit analysis that

3    that ought to answer the question.  Your Honor --

4              THE COURT:  Spend a moment with me on the people who

5    retired on full disability.  What is the factual point there as

6    far as their either having some separate promise or promissory

7    estoppel or if you want --

8              MR. GLOSTER:  Yes.  If you say to those people we're

9    going to provide you with life insurance until you turn

10   seventy-five, you in fact are going to be provided with life

11   insurance until you turn seventy-five.  And the issue is --

12             THE COURT:  I'm sorry.  And that's in the record?

13             MR. GLOSTER:  Your Honor, I think that the question

14   is, sort of, what is the disclosure made to a specific retiree

15   going out on early retirement.

16             THE COURT:  Right.  Is there anything in the record

17   to suggest that the debtor varied the SPD and --

18             MR. GLOSTER:  No, Your Honor.  But there's nothing in

19   the record regarding what other early retirement programs there

20   are and what specific disclosures were made to retirees.  You

21   know, the difficulty that we have is, we get contacted by the

22   retirees who say gee, you know, I've got to go track down my

23   booklets, but I know that back three years ago, I was told I

24   would get this for life, and I'm not about to, on three-days'

25   notice, present that statement to this Court and put on

81

1    evidence.  But if there is an 1114 committee here, then we can

2    absolutely sort that out.  And, Your Honor --

3           THE COURT:  But doesn't the 11 -- I think when you

4    use the phrase 1114 committee, you are thinking of a committee

5    that immediately gets into the process of the 1114 give and

6    take on modifying benefits.

7           MR. GLOSTER:  If the debtor wishes.  Look --

8           THE COURT:  No, but --

9           MR. GLOSTER:  -- Your Honor, I --

10          THE COURT:  -- that would, in essence -- and leaving

11   aside the statutory issue, you and your co-counsel there

12   discussed that issue, I think, as well as it could be

13   discussed.  Just on the factual issue, doesn't appointing a

14   full-fledged 1114 committee prejudge that issue, the factual

15   issue?

16          MR. GLOSTER:  Well, Your Honor, first, I would

17   argue --

18          THE COURT:  I'm not being clear.  Assume for the

19   moment that the debtors are right and that Doskocil is right,

20   and I know you're not -- just assume for the moment that's the

21   case.  And so that the only time the 1114 bargaining regime for

22   the pre-Chapter 11 plan period is in effect is where there's a

23   vested right.  Doesn't appointing a committee that gets into

24   that bargaining regime before the Court's satisfied that

25   there's a vested right prejudge that issue?

82

1          MR. GLOSTER:  Your Honor, I have to say, if you're

2     prepared to rule that 1114 doesn't apply to benefits that the

3     debtor has reserved the right to amend, respectfully, I think

4     that that would be an incorrect legal determination --

5          THE COURT:  No, I understand --

6          MR. GLOSTER:  -- and I think the statute's clear.

7          THE COURT:  -- you all have been very cogent on that

8     point.

9          MR. GLOSTER:  But to be clear, the debtor does have

10    language in their summary of plan documents today that says

11    benefits are amendable.  Their employees continue to work for

12    them today, who are future retirees.  And the people who went

13    out under four specific early retirement programs did, in fact,

14    sign fairly extensive waivers giving up their rights to vested

15    benefits, contractually under ERISA.  So that I would guess

16    that the universe of people who actually have a very strong

17    claim that they have vested benefits is relatively small.

18    And --

19          THE COURT:  But how -- what evidence do I have that

20    anyone has a very strong claim?  I think if you were able to

21    give me evidence that someone had a very strong claim, then --

22          MR. GLOSTER:  Well, there's the --

23          THE COURT:  -- we wouldn't be spending our time on

24    this.

25          MR. GLOSTER:  -- there's the evidence in the record

83

1   of the 1980 benefits book from GM, which says you have a right

2   for lifetime healthcare benefits.  There's the disclosures made

3   from --

4           THE COURT:  Could you show me that specific

5   paragraph?  I just want to make sure it says -- it has that

6   promissory language in it as opposed to "you have these

7   benefits."

8           MR. GLOSTER:  So that would be Exhibit 80, the

9   1980 --

10          THE COURT:  And that's volume 5 again?

11          MR. GLOSTER:  On page 20, Your Honor, I'm told.

12          THE COURT:  In which volume are we here?

13          MR. GLOSTER:  It's page 20 of Exhibit 80, Your Honor.

14          UNIDENTIFIED ATTORNEY:  Page 20 under Healthcare

15   Coverages.

16          THE COURT:  Okay.  Okay, "You may continue your basic

17   healthcare coverage for your lifetime provided you pay the full

18   monthly cost."  Is that the --

19          MR. GLOSTER:  That's the applicable language, Your

20   Honor.  And there's no language here that says we reserve the

21   right to modify, amend, and my understanding, and frankly, Your

22   Honor, if you look at the dissent in the Sprague case, it

23   actually goes through and talks about what disclosures were

24   made to GM retirees in earlier plans.  So what really happened

25   was that GM early on said we will give you lifetime healthcare

84

1    benefits at our expense unless you retire early.

2         And then later on, they provided disclosure documents

3    to the employees that, well, actually we reserve the right to

4    modify.  And under the Sixth Circuit standard well, the Sprague

5    Court said gee, I think you don't have a vested right.  Under

6    the Second Circuit standard, they do have a vested right, and

7    the debtor here has chosen not to file its bankruptcy case in

8    the Sixth Circuit.  They chose to file in the Second Circuit

9    for their reasons.  But one of the things they're stuck with is

10   Second Circuit law on these issues.

11        THE COURT:  And why is that?

12        MR. GLOSTER:  That is because, Your Honor, Second

13   Circuit law applies, and because --

14        THE COURT:  Why?  To construing a pre-petition --

15   again, I'm not --

16        MR. GLOSTER:  Well, to construing --

17        THE COURT:  -- don't assume I'm ruling against you on

18   the first point, but I'm assuming now that we're covering the

19   point where the debtor's right and 1114 doesn't abrogate or

20   amend pre-petition agreements.  So I'm looking at rights under

21   pre-petition agreements.  Why --

22        MR. GLOSTER:  Sure.

23        THE COURT:  -- doesn't Sixth Circuit law apply to

24   that, since Delphi is headquartered in the Sixth Circuit?

25        MR. GLOSTER:  Well, because, Your Honor, that the

85

```
 1    retirees are everywhere, and the determination is what are the

 2    retirees' vested benefits for purposes in your analysis,

 3    assuming we lose on the amendable benefits issue under 1114 and

 4    bankruptcy law.

 5              THE COURT:  Well, no.  But I'm looking at -- but that

 6    would be a Butner analysis.  I'm looking at pre-petition

 7    rights.  I mean, I'm assuming the Sixth Circuit applied Sixth

 8    Circuit law, because --

 9              MR. GLOSTER:  Well --

10              THE COURT:  -- they had the same employees for GM

11    were all over the --

12              MR. GLOSTER:  -- although, Your Honor, that's a

13    collateral estoppel issue.  Delphi is not General Motors.  And

14    the Delphi employees are not --

15              THE COURT:  No, no, I understand that.

16              MR. GLOSTER:  -- General Motors employees who are

17    litigating that.

18              THE COURT:  But just in terms of the choice of law

19    analysis, I'm not sure that Second Circuit law would apply.

20              MR. GLOSTER:  Well, I would encourage you to apply

21    it, Your Honor.  All right?

22              THE COURT:  Okay.  All right.

23              MR. GLOSTER:  So, Your Honor, just in closing.  These

24    benefits are critically important.  And, Your Honor, nothing

25    bad happens if you rule our way, if you say that the debtor is
```

1    free to leave these benefits in place or if the debtor wants to

2    cut those benefits on April 1 or May 1 or June 1.  And the

3    testimony from Mr. Miller is, there's no urgency about that

4    other than it would be good to start saving money two months

5    earlier rather than later.

6            Then the debtor can appoint an 1114 committee.  And

7    frankly, Your Honor can put them and the U.S. Trustee can put

8    them on a tight rein.  They ought not to be spending a whole

9    lot of money.  It's a discrete issue.  It's a quick

10   negotiation.  This is not raise the union flag from the halyard

11   of salaried employees.  This is simply protect the critical

12   benefits for people for some number of months and be practical

13   about it.

14           And if the debtor, frankly, is going to quickly

15   confirm a revised plan of reorganization, and I wish them the

16   best, and in fact, they think that they can be out of this

17   process in a few months, then they'll say, we'll let the

18   retirees keep their health benefits for a few months, and then

19   if they truly are amendable, we will terminate them post-

20   bankruptcy.

21           And the short answer, Your Honor, to your question

22   about well, couldn't the retirees ever get their benefits back.

23   That will never happen until the sun is gone and is a cinder.

24   Because the way it works is, the revested and reorganized

25   debtor will have a fiduciary duty to its shareholders, and it

1    will no more say that someone who worked here a decade ago

2    ought to be given some of my shareholders' money even though

3    I'm not obligated to pay them, any more than it would say, what

4    I'd really like to do is give money to the shareholders of the

5    pre-petition debtor, who lost all of their investment before we

6    went into bankruptcy.  It's simply not going to happen.  Once

7    these retirees lose their benefits, they lose them forever.

8           THE COURT:  Well, I think I agree with you with one

9    exception, which was actually, to my mind, a legitimate

10   exception, though.  Which is, that if -- and this was actually

11   raised by one of the objectors, who is a congressman -- that if

12   Congress actually earmarks funds for this, then I don't see why

13   any company wouldn't take the earmark.

14          MR. GLOSTER:  They did, Your Honor.  It's called the

15   Health Care Tax Credit.

16          THE COURT:  Okay.

17          MR. GLOSTER:  And I'm just fighting so that these

18   folks can get some of that money.

19          THE COURT:  No, I understand that point.

20          MR. GLOSTER:  And then --

21          THE COURT:  By the way, the debtors are -- well, I'll

22   ask Mr. Butler about that.  It's the analysis of what would be

23   necessary to preserve that tax credit and the cost of it.

24   Because, after all, what the debtors are seeking here is

25   authority to do this.  And I want to see how much they've

88

1   explored something like that, not you, but that you've outlined

2   on that point.

3              MR. GLOSTER:  Your Honor, my understanding is, very

4   little.  This is sort of news to them, and it's news typically

5   to counsel for debtors in these big cases, because it's arcane.

6   And the issue really is, if you elect COBRA continuation

7   coverage that's qualified coverage under the Health Coverage

8   Tax Credit, but very, very few retirees do.  It's expensive.

9   If we came up with a cheaper benefit and had the retirees pay

10  for it, then there would be enough of them who had elected

11  that, that there would be some of them who were actually

12  getting this, and then not all states have qualifying coverage.

13             So some are just going to be ineligible.  And of the

14  states that do have qualified coverage, that's typically the

15  kind of thing where it's very minimal coverage with a high

16  deductible, and so Uncle Sam is going to be paying sixty-five

17  cents for a benefit that's not worth very much.  So for all of

18  those reasons, Your Honor, I would encourage you to deny the

19  debtors' motion.  Thank you.

20             THE COURT:  Okay.  Thanks.

21             MR. CORNELL:  Your Honor, again, my name is Trent

22  Cornell.  And I'll do my best not to go over ground that's

23  already been covered.

24             THE COURT:  Okay.

25             MR. CORNELL:  Your Honor, there is an objection early

89

1   as to the proceeding.  The reason for that was a threshold

2   issue, and what is the threshold that is required for the

3   formation of an 1114 committee.  As we've gone further into

4   this hearing, it's become more of an issue of what do you have;

5   what have you found; what have you located; rather than is

6   there an obligation to create a committee in the first instance

7   to come up with answers like those questions.

8          If you look to -- the biggest case that is out there

9   on the line is obviously the Doskocil in favor of the debtors'

10   position.  But it's very interesting.  The Court in Doskocil

11   noted a couple things.  It noted that "The retirees concede the

12   matter before the Court is a question of law with no genuine

13   issue of material fact.  The objection identifies the

14   committee's membership by attaching an exhibit listing 181

15   members' names.  All are said to be salaried non-union

16   retirees, not covered by a collective bargaining agreement at

17   the time of their retirement.  No other exhibits or affidavits

18   are presented."  Doskocil has a group of retirees that

19   presented no evidence, and in fact, agreed that the company had

20   a right of unilateral termination.

21          So that case has gone on, and it's been cited for a

22   little bit more than that.  And the debtors now are trying to

23   use it for a little bit more than that.  What they're trying to

24   say is, well, take that in conjunction with other cases out

25   there to come up with the proposition that in order to first

1    form the committee, you have to prove, beyond a standard it

2    seems of a summary judgment standard in the Second Circuit,

3    that there's no right of unilateral termination or a right of

4    unilateral termination from the debtors' perspective.

5         What we've tried to do is respond to that.  We've

6    tried to reach out to retirees.  We've e-mailed -- probably

7    about 1,200 retirees have contacted us at this point.  We did

8    this in a period of only a couple of days.  And in that time

9    frame we filed an objection, we had a couple documents.  We

10   filed a motion to form an 1114 committee.  We had a few more

11   documents.  Today we appeared to argue, and we have as evidence

12   a few more documents.  Is that the universe?  Absolutely not.

13   There are few things I can guarantee to a judge, but I can

14   guarantee that if this hearing were to take place, as it

15   should, with a retiree committee having done some of the work

16   that we've just begun, it might be a far different result.

17        The Sprague case is something else that the debtors

18   would like to hang their hat on, for obvious reasons.  There

19   were certain plans that were looked at.  But if you look to the

20   dissent of Chief Judge Martin, he says something very

21   interesting.  And I'm sort of behind the eight-ball as are the

22   other attorneys, because we haven't seen any of these

23   documents.  He has.  What he noted was, "The factual recitation

24   will show that General Motors repeatedly promised retirees

25   lifetime healthcare in a variety of written materials and only

1  occasionally included a reservation of its right to change

2  retiree benefits."  That's someone who's actually looked at the

3  documents.  I haven't.  Also --

4          THE COURT:  But he --

5          MR. CORNELL:  -- it goes a little further.

6          THE COURT:  -- he was on the losing side, though.

7          MR. CORNELL:  Well, that all goes to the issue of the

8  choice of law.

9          THE COURT:  Right.

10          MR. CORNELL:  It also goes to an issue of different

11  people looking at different evidence.  We don't know what they

12  put in.  Clearly he's seen more than I have to this point.  And

13  it sounds like he's seen a lot more than the debtors have at

14  this point.

15          THE COURT:  But so did the judges en banc, who -- but

16  it was all in the record -- the ones who ruled in favor of GM

17  had also seen it.

18          MR. CORNELL:  And we don't --

19          THE COURT:  I have to assume.

20          MR. CORNELL:  -- I have to -- I can only assume,

21  because I don't have what they were looking at.  But what is

22  interesting, too, is --

23          THE COURT:  Well, I'm sure that the dissenter wasn't

24  looking at material that wasn't in the record.

25          MR. CORNELL:  Oh, no.  He clearly was.  It's just a

1   matter of how much was actually put into the record.  That I

2   don't know.

3          THE COURT:  Okay.

4          MR. CORNELL:  But I would note that the chief judge

5   goes on to state that, "It is true that from 1977 to 1985 "your

6   benefits and retirement" did include a reservation of right

7   clause.  It bears noting, though, that these clauses were the

8   rather tepid statements that benefits "have been changed from

9   time to time through the years and are subject to change in the

10  future"."  Taking that statement and applying it to the case

11  law of the Second Circuit of Devlin and Feifer, that doesn't

12  cut it.

13         THE COURT:  I disagree.  When you read Bouboulis, it

14  cuts it completely.  You're just out of luck.  If that's really

15  the case, if that's what you're relying on -- and I'm not

16  saying you are -- because I understand your point.  There may

17  be documents that will come to light.  But I just --

18         MR. GLOSTER:  Well the --

19         THE COURT:  -- I can't read -- even if Second Circuit

20  law were to apply, I can't read the cases as saying that that

21  type of statement wouldn't be sufficient.

22         MR. GLOSTER:  -- well, the language in Devlin

23  appeared to be fairly bold too, in some of the other courts.

24  And what Devlin and what Feifer did, is they allowed --

25         THE COURT:  Because there was other language --

93

1        MR. GLOSTER:  Right.

2        THE COURT:  -- that induced someone to take action.

3   And since then, including in Bouboulis and in -- there was one

4   from December of 2008, Warren Pearl Construction, Southern

5   District.  It has to be -- for the promissory estoppel to

6   apply, you have to have a lot.

7        MR. CORNELL:  And we don't --

8        THE COURT:  I mean, Devlin, they cite Devlin for that

9   proposition.  So, anyway, I don't want to argue with you,

10  because I think I understand your basic point, which is that

11  there may be more.

12       MR. CORNELL:  Well, what we have, what we've located

13  so far, are documents that, without reservation language, say

14  these benefits are lifetime.

15       THE COURT:  This is the 1980 and going back?

16       MR. CORNELL:  No, Your Honor.  What I'm looking at --

17  well, let me start there.

18       THE COURT:  Well, there was the one from '75.

19       MR. CORNELL:  If we go back to the 1980 plan

20  document, which is the only one that I personally have, but I

21  believe Your Honor may have looked to language that was not the

22  language that I would have cited to the judge.

23       THE COURT:  Okay.

24       MR. CORNELL:  If I heard you read this correctly,

25  Your Honor.

1          THE COURT:  Is this still on page 20, or --

2          MR. CORNELL:  It's still on page 20, but it is the

3    first sentence under "Healthcare Coverages".  "Your basic

4    healthcare coverages, except vision, prior to October 1, 1980,

5    will be provided at GM expense for your lifetime."  I think if

6    I heard Your Honor correctly, you read the second paragraph.

7    First, up front, more powerful, "for your lifetime."

8          THE COURT:  Okay.

9          MR. CORNELL:  Now, beyond that document, we have

10   tendered in -- and I showed this to Mr. Gebbia.  It was these

11   large foldout maps.

12         THE COURT:  That was the '75, I think.

13         MR. CORNELL:  They started -- they came yearly.  And

14   there's 1975, we've got, '76, '77, '78 -- excuse me -- '77,

15   '79, '80, '83, '84, '88.  They all have the same language in

16   them.  Under "Retirement Benefits", and this is any of the

17   exhibits, if you look at under the section "Retirement

18   Benefits", there's a bullet point:  "Your healthcare coverages

19   will be continued for your lifetime."

20         Now that's the type of evidence that, at least in the

21   Second Circuit, we'd be looking at against the plans or other

22   SPDs other documents out there.  If GM followed suit with other

23   companies, it's likely that that language of the termination

24   language which first was introduced, it seems, around 1988,

25   probably did start coming in in fits and starts from that

95

1    point.  And then it probably was universal at the time of

2    Delphi.

3         But the question is, what was there before, what was

4    there even at Delphi?  We still don't know.  And to get to the

5    end result before there was a chance to vet it out, it does,

6    Your Honor, respectfully, abrogate Section 1114.  Because there

7    has been no ability on any type of a cohesive basis to search

8    for these documents and search for anything else that would be

9    beneficial to this group.

10        Your Honor, this is the fourth time I've represented

11   retirees in an automotive supplier case.  Every single time the

12   debtors said that there was a right of unilateral termination.

13   And in every other one of the cases, we were able to find

14   documents that disputed or rebutted that.  It's --

15        THE COURT:  Well, in Dana, there was a mixed -- the

16   debtors acknowledged it was mixed.

17        MR. CORNELL:  Well, that comes up. And I think that

18   Mr. Gloster mentioned that.  They did say that there was a

19   right of unilateral termination as to certain documents --

20        THE COURT:  But not -- only as to certain people.

21        MR. CORNELL:  -- but that's only because -- they

22   initially said that there was a right of unilateral termination

23   across the board.  As the process went forward --

24        THE COURT:  Didn't Dana actually move for the

25   formation of a committee?

96

1        MR. CORNELL:  They did.  But they said that they had

2   a right of unilateral termination from day one.

3        THE COURT:  Well, they wouldn't have moved for the

4   committee -- I read the motion papers.  They say that some are

5   covered and some aren't.

6        MR. CORNELL:  And when that motion was filed, Your

7   Honor, about two months after the formation of the committee,

8   where we had gotten documentation that showed that there was

9   subsets of the main group that did have different rights.

10       THE COURT:  Then that was consistent with Dana's

11  motion?

12       MR. CORNELL:  It was consistent with the motion they

13  filed at that time.  What they filed originally in the motion

14  for form an 1114 committee, they said that there was a right of

15  unilateral termination across the board.  As the time went on,

16  it came more to there are certain groups.  And that's what came

17  out because of the process of finding documentation that we

18  were able to establish that there were more groups, that there

19  was not a right of unilateral termination over them.

20       THE COURT:  I guess I -- I didn't read --

21       MR. CORNELL:  That was the --

22       THE COURT:  -- their motion that way, but.

23       MR. CORNELL:  Well, Your Honor, you wouldn't, seeing

24  solely that motion -- the context was --

25       THE COURT:  I did.  That's what I read.

1          MR. CORNELL:  -- I know.  You wouldn't see it because

2     the first motion is what set out the right across all groups.

3     By the time that they filed that motion for unilateral

4     termination, there was certain groups that we had

5     established -- that the committee had established, had

6     different rights than others.  And I would suspect that's the

7     case in almost every one of these cases, at least the ones that

8     I've seen, that a large retiree group, certain benefits were

9     changed over time, certain promises were made.  So, I have yet

10    to see, with one exception, a group where there was a universal

11    language that was used at all times for all people within the

12    group.

13          Your Honor, at the end of the day, this is a court of

14    equity, of course.  And what I would point out to the Court is,

15    if a committee is formed, and if it turns out that Delphi is

16    correct in the position that they're asserting today, and that

17    in this type of a hearing, if it takes place in a month or two

18    months, that there is no more information that what we've

19    already found, then at worst, the debtors have paid some money

20    for a committee to do an investigation to protect these 15,000

21    people.

22          If the debtors are incorrect, then today, 15,000

23    people lose their -- forever, lose their retiree benefits, and

24    there would have been no chance for them to have a committee to

25    speak up for them.  And that's exactly what 1114 is for.  I

1    urge Your Honor not to look to the end issue at this point,

2    when the retirees haven't been able to defend themselves, but

3    first to look to the threshold issue of does there need to be a

4    committee?  Is there a basis for a committee to be formed?  And

5    if so, I suggest that 1114 demands that it be formed.  Thank

6    you, Your Honor.

7          MS. CECCOTTI:  Good afternoon, Your Honor.  Babette

8    Ceccotti, Cohen Weiss and Simon for the UAW.  The UAW filed a

9    relatively limited pleading in response to the debtors' motion,

10   in part to serve as a clarification, really, regarding the two

11   small salaried units that UAW has represented.  They were

12   mentioned briefly in the debtors' papers, and we felt that it

13   was important just to clarify the record.  I don't believe

14   there's any dispute with the debtor on this point that the

15   benefits that are the subject of today's hearing are not

16   collectively bargained with the UAW.  They are subject to the

17   policies and programs that the debtor has in place for

18   similarly situated salaried --

19          THE COURT:  Sort of ride-along.

20          MS. CECCOTTI:  -- yes.  However, we anticipated,

21   correctly so, that there would be objections filed and that the

22   1114 issue would be raised.  So we wanted to make sure that if

23   the Court decided that 1114 applied, that these salaried

24   retirees would be included in whatever process the Court ruled

25   would be appropriate.

1        Now, the UAW does affirmatively contend, and we did

2   so in our limited objection, that 1114 does apply.  And we have

3   based our contentions squarely on the Farmland case.  You have

4   already heard this morning from three sets of very able

5   objectors here, and I do not need to go over all of that.  So

6   we are content to rest on our papers.

7        The only contribution that I will make, really goes

8   back to your colloquy with Mr. Doyle on 1114(l), the recently

9   enacted provision.  And I would just observe that, I don't know

10  that there is a legal basis for drawing an inference about

11  Congress amending a portion of a statute while not touching

12  another portion.  I have heard judges do this from time to

13  time, and I think that there is really -- absent a very clear

14  statement in the legislative history, and I haven't looked at

15  it lately, so I don't know that there is one, one could find

16  almost any reason for having a particular provision change one

17  piece of a statute but not another.  And I'm simply not aware

18  of anything that legally would give rise to any sort of legally

19  permissible inference on that point.  So I would urge the Court

20  not to read too much into the enactment of -- at least as a

21  legal matter -- into the enactment of 1114(l), without

22  touching, for example, some other section of the statute.

23       THE COURT:  That's probably fair.  Having been

24  involved, in a prior life, in amending the Bankruptcy Code.

25       MS. CECCOTTI:  Other than that, Judge, again, I think

100

1    we are able to simply rest on the arguments in the papers.

2    Thank you.

3              THE COURT:  Okay.  Thank you.

4              MR. ROSENBERG:  Good morning, Your Honor.

5              THE COURT:  Good morning.

6              MR. ROSENBERG:  On behalf of the committee, I've been

7    advised that perhaps our pleading was less than crystal clear

8    as to what our position is, so let me try very briefly to set

9    it forth for you.  Your Honor, the committee understands the

10   human pain and suffering involved in this motion and yet really

11   feels we have no choice but to support the debtors' business

12   judgment that a termination of these plans is appropriate.

13             Having said that, number one, we will take no

14   position on whether or not the 1114 arguments are correct or

15   not.  But secondly, we do believe that these people should have

16   the right, hereafter, to file claims in this case pursuant to

17   some kind of a revised bar date, to make that possible.  Now,

18   the claims we have in mind are not inconsistent with a ruling

19   by this Court, for example, that there is a right of

20   termination, and therefore no executory contract type damages,

21   but rather we are concerned that there will be people, either

22   presently or between now and April 11th, who get medical

23   treatments that have not yet been compensated for and are left

24   out of pocket for treatments that they should have been covered

25   for, and they should have the right to file claims for that

1   sort of thing in an appropriate --

2           THE COURT:  But those would be administrative

3   expenses, wouldn't they?

4           MR. ROSENBERG:  They may well be, Your Honor.  We

5   won't take a position on that.  If that's Your Honor's ruling,

6   then --

7           THE COURT:  Well, I'm --

8           MR. ROSENBERG:  -- that may not be a bar date.

9           THE COURT:  -- I mean, it seemed to me -- I mean, if

10  that was the committee's concern, I understand it.  It seemed

11  to me that if the committee really believed that people might

12  have claims based upon the termination of these benefits, then

13  we should be doing 1114.  But if the point is that you're

14  worried about people, notwithstanding what Mr. Miller said,

15  about there will be bills submitted after April 1st that will

16  cover the prior period and those bills aren't paid, I think

17  1114 would be pretty clear that those would have to be paid.

18          MR. ROSENBERG:  That, Your Honor, is the committee's

19  concern.

20          THE COURT:  Okay.

21          MR. ROSENBERG:  If -- thank you, sir.

22          THE COURT:  All right.

23          MR. BUTLER:  Your Honor, let me start with

24  Mr. Rosenberg's statement and then work backwards, because

25  having heard the clarification on the record, and I do

1      appreciate it, Mr. Rosenberg, I don't know that there's an

2      issue between the company and the committee as to claims.

3      Because the company would expect that it would have an

4      obligation to continue to pay the claims prior to termination,

5      even if those claims are submitted subsequent to the

6      termination date.  And certainly, if we didn't do that --

7               THE COURT:  Yes, it's (e)(2) -- 1114(e)(2).

8               MR. BUTLER:  -- right.  Without admitting as to

9      whether those are -- what type of priority those claims have,

10     we would nonetheless expect that people ought to be able to

11     come to court if we don't do that.

12              THE COURT:  Okay.

13              MR. BUTLER:  And our only point is, with respect to

14     anything post-termination, if the debtors' position is

15     sustained by the Court, we think, under the Ionosphere Clubs

16     case, among others, we don't believe that the cancellation of a

17     benefit at an on-will basis gives rise to a claim as defined in

18     Section 1015 of the Bankruptcy Code.

19              So we would oppose a claims process for any post-

20     termination claims for several reasons.  The main reason,

21     frankly, from my perspective, is I don't think that anyone

22     ought to be giving expectations to retirees that if they go

23     through the painful process of submitting claims, that they're

24     going to actually, then, have to go through a claims objection

25     process and we would argue at that point in time that the

1    claims, as other courts in this district have done, would find

2    that those claims should be denied.

3         And I see no reason to go through the pain and the

4    expense of the process.  It's a waste of, I think, judicial

5    resources and estate resources, and frankly an inappropriate

6    burden on retirees, just to make claims that have no

7    opportunity to have a chance of being allowed.  Because if our

8    position is correct that these are at-will benefits, I think

9    the authority in this district alone would indicate that

10   there's no claim.  So that was the purpose of our response to

11   the committee's statements.

12        THE COURT:  Okay, but --

13        MR. BUTLER:  But as to the gap period up to

14   termination, understand that.

15        THE COURT:  Okay.

16        MR. BUTLER:  And I think Ms. Ceccotti also said it

17   correctly, I don't think there's a basic difference of view

18   between the UAW and the company with respect to, I think it's

19   four people or whatever number of people there are who is

20   distinct bargaining units.  It is a me-too arrangement and they

21   will be dealt with.  And I think Ms. Ceccotti was concerned

22   that they be dealt with in the same way that everybody else is

23   dealt with, and they will be dealt with in that way.  So I

24   don't think there's a basic disagreement between Ms. Ceccotti

25   and the company in terms of that particular issue.

104

1          Let me just try to address and then answer any

2    questions the Court may have.  But let me just try and address

3    a couple of points that have been made in the oral argument.

4    The first, I think, is dealing with -- let me deal with 1114

5    first.  If you assume for a moment that these are at-will

6    benefits, and I will argue that in a few moments, then we think

7    the controlling authority -- the majority authority, not

8    controlling -- the majority authority supports the debtors'

9    position that an 1114 committee is not required or compelled by

10   the statute.

11          And Your Honor pointed out in oral argument that in

12   fact since, at least I think '93, maybe even earlier, Congress

13   has been aware of the issues associated with the split of

14   authority on this subject.  And I point out that Colliers

15   actually commented on this in Colliers recently in which

16   Colliers says, quote, "Congress is presumed to note prevailing

17   judicial interpretation.  It did not change operative parts of

18   1114 in BAPCPA."

19          And while I think I'd also agree with Ms. Ceccotti

20   that I don't think that there should be huge inferences drawn

21   either way on the subject because I think it's more complicated

22   than that, Congress certainly knows how to overrule,

23   particularly in this area -- knows how to overrule judicial

24   interpretations if it chooses to do so.  It did not do so.  And

25   even the major commentators have recognized that fact that it

1    did not do so when 1114(l) was enacted.

2           It seems to us, as we've thought about this process,

3    that to appoint an 1114 committee when the debtors' issue here

4    is, as we have described it in the exercise of the company's

5    business judgment, that we believe that the liability that's in

6    excess of a billion dollars in the reorganized balance sheet

7    has to go away in order to be able to obtain the financial

8    support from our stakeholders with a continuing economic

9    interest -- and I want to talk about that phrase in a minute --

10   but that those stakeholders with that interest would continue

11   to support the company.  That's really where the company is at

12   right now.  And that's why after having provided some forty-two

13   months of welfare coverage here on an at-will basis the company

14   has concluded that this motion is necessary.

15          Now, the reference, however inarticulate it may be in

16   hindsight, of stakeholders with an economic interest, what that

17   reference is meant by the company to mean is we're really

18   talking about people who, given the declining valuation of the

19   business enterprise values in the automotive sector and the

20   lack of capital available in the capital markets to companies

21   seeking to reorganize, as one looks to try and put together

22   plan modifications that are in fact confirmable and feasible,

23   the company has been spending a great deal of time in

24   discussions with the parties that have the most direct economic

25   interest here.  That starts with the DIP lenders and the DIP

1    steering committee that's been formed.

2         And those lenders have made it very clear to the

3    company that they will not support -- and there's evidence in

4    the record, including something called a half-time report --

5    that's one of the exhibits in the record.  They made it very

6    clear -- in their view, actually, they think the company has a

7    fiduciary duty to terminate these at-will benefits.  We have

8    pushed back on their interpretation, but nonetheless it is

9    clear to the company, as Mr. Miller testified to in his

10   declaration, that the stakeholders with the economic interest

11   at the top of the absolute priority waterfall that have to be

12   dealt with in this case, in the circumstances we find ourselves

13   in, simply will not support and will not countenance having

14   discretionary liabilities of this magnitude on the reorganized

15   balance sheet of the company -- reorganized company's balance

16   sheet.

17         THE COURT:  But again, that's -- let me parse through

18   that.

19         MR. BUTLER:  Yes.

20         THE COURT:  That's a plan point, right, when you're

21   talking about the reorganized balance sheet?

22         MR. BUTLER:  Yes.  Your Honor, the billion-one --

23         THE COURT:  I don't know if all of the objectors

24   concede this point, but I think it's pretty clear that

25   1129(a)(13) lets you deal with that issue in a plan.  Even if I

1    were to accept the argument that 1114 overrides a right in a

2    pre-petition contract to terminate, I think it only would do so

3    for the pre-plan period.  So for that period you're talking

4    about the cash flow that would go to pay these benefits after

5    April 1st.

6              MR. BUTLER:  Right.  And that's the second point,

7    Your Honor, which is as the testimony, which hasn't been

8    controverted in any way, I think, is compelling is that Mr.

9    Miller has testified and our papers indicate the company is

10   liquidity constrained.  And we are working very diligently

11   every day with our administrative creditors, including our

12   suppliers and customers, among others, to continue to provide

13   them with a sufficiently transparent liquidity runway that they

14   will continue to support the company.

15             That's coming largely, at the moment, at the expense

16   of exposure to administrative creditors.  That is to say,

17   General Motors is being asked to continue to increase its

18   support of the company financially, which it does and can only

19   do on a discretionary and consensual basis.  And there's an

20   amendment before the Court later today on that issue, on the

21   liquidity support agreement.  And the DIP lenders are being

22   asked to make material modifications to the accommodation

23   agreements, which they have agreed to do, that provides

24   additional liquidity to the company.

25             THE COURT:  Do either of those two agreements contain

1   any conditions or requirements that these benefits be

2   terminated as of April 1st?

3           MR. BUTLER:  No, they do not.  And although both of

4   those parties understood, at the time we negotiated these

5   amendments, what the debtors were doing with respect to this

6   issue.

7           THE COURT:  That you'd be seeking this relief?

8           MR. BUTLER:  Absolutely.  And I think, frankly, the

9   half-time report that's in one of the exhibits, which comes

10  directly from one of the tranches of lenders in the

11  confidential documents, indicates what their positions are on

12  these issues including this one.

13          And so the company is liquidity constrained.  And the

14  important point here is that the company is trying to take

15  steps to make sure that it can, week by week, month by month,

16  provide sufficient information to those parties who are

17  providing continuing administrative support of the company.

18  That wouldn't just be the DIP lenders and General Motors, but

19  it's all of our suppliers, and it's other creditors who do

20  business with us who provide us continued credit.  But they are

21  comfortable, or at least willing to continue to do that as we

22  sort through these plan modifications.

23          And the problem that we have as a matter of business

24  judgment here is to be spending a million and a half dollars a

25  week on completely discretionary expenses, at least in the

1    company's view, that those creditors have told us they don't

2    believe are benefiting the continuing reorganization of the

3    company, and they oppose us doing, when we are essentially, at

4    this point in the case, using other people's money to fund the

5    case.  And they're providing it to us not in large lines that

6    sustain us for the next year or eighteen months, but, as Your

7    Honor has come to understand, measured in months and sometimes

8    even in weeks to make sure that we are moving in a consensual

9    direction.

10          It is, in the company's view, as the company weighs

11   all of the various issues here, and the company is extremely --

12   Mr. Miller testified to it -- extremely sensitive about all of

13   these issues and sensitive to them.  The fact of the matter is

14   the company thinks it would be irresponsible to not seek to

15   move to terminate these on April 1st.  And frankly, that

16   provided somewhat of a runway to provide additional financing.

17   Certainly some of our stakeholders believe we should have done

18   it even more abruptly than we did.

19          And there's certainly a threshold question here as to

20   whether or not we even need a court authority to do this

21   because it's an at-will right of ours to do this and not clear

22   that we need any authority from the Court to do it.  Your

23   Honor's gotten to know, I think, the management team and the

24   advisors in this case well enough during the life of this case

25   that we simply weren't going to do this without creating this

1    forum and opportunity for there to be a complete record here.

2          And I think, frankly, the fact that there were some

3    1,600 filings in connection with this, the fact that three very

4    capable counsel, who represent and have represented other large

5    retiree groups in other large cases, are here before Your

6    Honor, I think is evidence to the fact that there is a complete

7    record here for purposes of this motion.

8          THE COURT:  Well, on that score, let me just make

9    sure I understand, on the notice point.  Did all current

10   employees who are affected by this motion get a copy of the

11   motion?

12         MR. BUTLER:  Yes.

13         THE COURT:  And also all retirees?

14         MR. BUTLER:  Yes.  I think overnight courier,

15   actually.

16         THE COURT:  Okay.

17         MR. BUTLER:  So, Your Honor, in dealing with 1114, I

18   can simply -- you know, our papers lay out, both in our

19   original motion and in our response, the fact that we think the

20   Court ought to follow the majority rule here.  And we believe

21   it is appropriate.  And I would note, my understanding --

22         THE COURT:  Can you remind me, what did you say about

23   Judge Beatty's case?

24         MR. BUTLER:  Are you talking about Solutia?

25         THE COURT:  Yes.

1          MR. BUTLER:  Well, in the Solutia case, we went back

2     and actually looked at the transcript in that case to see it

3     because the order did provide for an 1114 committee, but when

4     you read the transcript for that case, Judge Beatty indicated

5     in her ruling that in her view the benefits there were subject

6     to some form of a settlement agreement.  And her concern was

7     that she was uncertain over the degree the settlement agreement

8     created an obligation with respect to those benefits.  So

9     certainly there was some issue there about whether or not there

10    had been a vesting through that settlement agreement, which is

11    not the circumstance here.

12          And I think it's also the case in Delta, where

13    counsel indicated he was representing the 1114 committee, that

14    there was no 1114 determination made when that committee was

15    formed.  That issue was reserved when the committee was formed

16    as to whether it was required.

17          THE COURT:  Well, that's their point, I think.  I

18    mean, that's the same case in Dana  --

19          MR. BUTLER:  Right.

20          THE COURT:  -- that issue was reserved.

21          MR. DOYLE:  Your Honor, if I just might comment?

22    This is Dan Doyle.  I represented the committee in Solutia.

23    And yes, that was a concern, but she did not limit the

24    committee to just dealing with those groups of retirees who

25    were subject to an earlier settlement.  It covered every

1    retiree.

2              THE COURT:  Okay.

3              MR. GLOSTER:  And Your Honor, with regard to Delta

4    Airlines, at the time the 1114 committee was appointed, the

5    debtor had indicated that they did not have a current intention

6    to modify vested benefits.  But the committee was then

7    appointed in any event and dealt with both vested and unvested

8    benefits which we preserved for a period of time after the

9    confirmation.

10             THE COURT:  But Delta sought that committee, right?

11             MR. GLOSTER:  Delta opposed --

12             THE COURT:  The appointment of the committee.

13             MR. GLOSTER:  -- the appointment of the 1114

14   committee.  It was appointed over the objection of Delta.

15             THE COURT:  Okay.

16             MR. BUTLER:  Your Honor, moving to what at least two

17   counsel have indicated in their arguments, is sort of the

18   argument that the company's got the cart before the horse

19   because in fact if these were vested benefits, there would be

20   an 1114 committee and there's an open question as to whether

21   these are vested benefits so you need an 1114 committee

22   appointed under any circumstance to find out whether they're

23   vested, even though if you follow the majority rule, you only

24   appoint an 1114 committee if there are vested benefits.  And

25   they say let us go out and find that and find out whether there

1   are vested benefits.  And there are at least two -- this is, I

2   think, something that is not complex but I think clear, there

3   are all of the statements that General Motors made or didn't

4   make over a period of decades.  And then there are the plans

5   that the company took from General Motors in 1989.

6        And the plans that Delphi took -- and there is, by

7   the way, no document that has been put in by the objectors and

8   nothing in the record to suggest that Delphi documents don't

9   clearly have this reservation of rights in them in all the

10  documents.  And there are no other plans we're seeking to

11  modify other than the plans that are before the Court.  When

12  you're talking about someone on disability, as Mr. Gebbia

13  testified, you know, if someone went on disability, that might

14  affect what their eligibility was to participate in these

15  plans, the plans before this Court that have these reservation

16  of rights in them.

17       There are not seventeen other plans that we haven't

18  put before the Court.  These are the plans.  These are the

19  plans that the groups participate in.  And since Delphi has had

20  them, these plans have consistently and routinely had these

21  reservation of rights in there.  And --

22       THE COURT:  But what about the testimony that around

23  the time of the spin-off that the employees were told that it

24  essentially would be a rollover from GM as far as your

25  benefits?

114

1          MR. BUTLER:  Well, I think in fact the documents

2     speak for themselves.  I'll give you the exhibit number in a

3     minute of the document that was provided in 1989 in connection

4     with the transfer -- Your Honor can read the document for

5     himself - that, too, includes the reservation of rights

6     language in it.  And my point in this is that those plans, when

7     they came over from General Motors, came over subject to

8     Sprague.  Meaning, I accept the fact that there was a contested

9     issue between this group of retirees and General Motors before

10    Delphi was spun off about what those plan rights were.  And

11    that was litigated and conclusively determined that all the

12    things that happened in the 1950s and '60s and '70s and '80s

13    and '90s leading up to the decision in 1998 -- those plans, the

14    plans that came here, are subject to these reservation of

15    rights.  And so going back, the reason I objected to the

16    relevance during the evidentiary record of what was said in

17    1975 or 1980 to me is completely irrelevant to this Court when

18    in fact there's a final judicial determination that bound the

19    people to this plan when it was at General Motors, that we then

20    took as it was spun out to us, as to what occurred during the

21    General Motors history.

22          I mean, Sprague is very clear.  When you read

23    Sprague -- Your Honor made the point in oral argument that the

24    judges had all of the facts.  You read Sprague.  Sprague talks

25    about the fact that General Motors didn't have that language in

1   the 1980 plan but it was in three other pre-dated plans and

2   they call them out, they give the years.  And the 1980 SPD was

3   really an outlier to many of the other statements that have

4   been made.  When you read it, they actually call them out

5   factually and have them talk about it.  And the court in the

6   Sixth Circuit quotes a reservation of rights in 1965, '68 and

7   '71.

8          So this issue that counsel urge you now to sort of

9   re-litigate is, in our view -- was when the plans were spun out

10  from General Motors to Delphi they were spun out essentially

11  subject to the Sixth Circuit order that had determined that

12  there was a reservation of rights.  And the reservation of

13  rights has been maintained ever since.  I find it a bit

14  incredible that people would say no, what we now need to do is

15  go back and develop essentially the same evidentiary record

16  dating back to the 1960s and now we'll apply some other law to

17  it because somehow that determination, which was the basis upon

18  which this plan was spun out to Delphi and the basis upon which

19  all the representations were made to these same retirees, was

20  made based on Sprague.  They can't write Sprague out of the

21  chain of events here.

22         So from our perspective, we believe that there has

23  been -- and I think the evidence here supports, without

24  contravention, that since Sprague the chain since Sprague of

25  these reservations of rights has been unbroken.  And even the

1    declarants in support of the objectors basically acknowledge

2    that the categorical statements that they made in their

3    declarations I think were probably, on reflection, not complete

4    because they acknowledged that in fact, as one of the

5    declarants did, the wiggle words weren't in some of the General

6    Motors documents and the wiggle words were in the Delphi

7    documents.  And the other who said no, we always needed our

8    consent, acknowledged that we made modifications over the last

9    decade that have been put in place without their consent.

10   And so I don't think the Court can attach any weight, frankly,

11   probative weight, to those declarations.

12          THE COURT:  Let me ask you, and I think this is

13   really a point.  The debtors' motion is under 363(b).  Given

14   the objections, which are based on 1114, I have to make some

15   analysis of whether these are retiree benefits, as defined in

16   1114, which has its own regime, or something else.  And the

17   debtors argue that it's something else and I should, in

18   reviewing their business judgment, conclude that that business

19   judgment is properly exercised and grant the relief.

20          It seems to me that if that's the premise I'm taking,

21   I can't, under Orion, definitively rule that there isn't some

22   retiree out there who doesn't have a vested right.  They're not

23   all before me.  There are facts that may come up at some point.

24          MR. BUTLER:  I'm sorry, Your Honor, I don't follow

25   that.  They are before you.

1        THE COURT:  Well --

2        MR. BUTLER:  Every retiree of this company is a party

3   to this motion.

4        THE COURT:  No, I understand that.  But so were the

5   parties to the executory contracts in Orion.  And under Orion,

6   if this is properly a 363(b) motion, I can, since it's a

7   summary proceeding, say that this makes sense, this is the

8   debtors' business judgment and permit the debtor to terminate

9   these plans.  It seems to me I can't adjudicate each individual

10  retiree's rights, right?  Or does the tie-in to 1114, the

11  either/or analysis, mean that I have to adjudicate each

12  employee's rights by saying that they don't have any vested

13  rights?

14        MR. BUTLER:  Your Honor, I think that from the

15  debtors' perspective we believe that there are no vested

16  rights, which gives us the right under 1114 and under the

17  Bankruptcy Code to exercise the business judgment we did under

18  363.

19        THE COURT:  Right.

20        MR. BUTLER:  We believe that to be the case.  The

21  evidentiary record before you, even with the 1,600 objections

22  and the information that was put in there, does not -- there's

23  no material dispute to that except for the pre-Sprague

24  evidence.  And there's been no evidence introduced into this

25  record other than pre-Sprague documents that suggests, you

1   know, that there has been any communication by Delphi that

2   would provide the right to suggest that these somehow become

3   vested.  And I do think it's important to understand under

4   ERISA that -- and I think the Court gets this -- that absent a

5   showing that's tantamount to fraud where the burden really on

6   that is on the objectors, not on the company.  It's not my job

7   to prove there wasn't a fraud.

8           THE COURT:  For the promissory estoppel?

9           MR. BUTLER:  Right.  It's not my job to prove there

10  wasn't a fraud.  It's their job to prove that there was.  An

11  ERISA plan is not subject to modification as a result of

12  informal communications.  Congress intended the plans of the

13  SPD documents to control.  And that's a Second Circuit case I

14  think the Court's familiar with, the Moore case.  And so the

15  point here is that in exercising the business judgment it is

16  one of the premises of the business judgment that the company

17  had, and we freely admit, is that we believe this to be an at-

18  will determination and discretionary liability.

19          And that is a fundamental part of our calculus that

20  these were not discretionary liabilities, if these were, in

21  fact, contractual liabilities.  They would have to be evaluated

22  differently, as you pointed out, by the committee, by us, by

23  other parties and other stakeholders.  In our view, these are

24  not, and we think we're correct and we think the record

25  supports this, there is nothing to suggest that these are not

1    discretionary liabilities.

2         And as such, one of our prongs of our business

3    judgment, and it seems to me that Your Honor, in exercising

4    your own review under Orion, you have to be satisfied that our

5    business judgment is correct.  And I think it is.  Look, there

6    is an economic reality to this case.  There is a legal reality

7    to this case.  And there is a human/emotional desire reality to

8    this case.  There's nobody in this room, frankly, I think, who

9    regrets more being here than I do with respect to this

10   particular motion.  But the fact of the matter is, and we

11   fought for forty-two months to keep these discretionary

12   benefits in place.

13        THE COURT:  What about the --

14        MR. BUTLER:  The reality is we simply cannot do that

15   any more in light of where we are and what we need to do in

16   order to be able to preserve this company, and in preserving

17   this company, preserve the continuity of supply in the global

18   automotive business.  If we don't do this right, there's going

19   to be a real problem.

20        THE COURT:  What about the federal tax credit point?

21        MR. BUTLER:  Well, I've heard the point.

22        THE COURT:  Do the debtors think there's a material

23   cost to that?

24        MR. BUTLER:  First of all, there is -- and I'm not a

25   tax attorney, I don't hold myself out as one in understanding

1   all of this.  And part of what was talked about here was we're

2   talking about whether or not these were COBRA events.  What

3   we're talking about in this motion is not a COBRA event.  This

4   isn't going to be a COBRA event.  We're not terminating -- just

5   to be clear, we used the word termination because we wanted to

6   make clear what the effect of this was doing.

7        But we're not terminating the plans here.  What we're

8   doing is modifying the plans here so that the cost has to be

9   borne by the retirees.  And as I understand COBRA, this is not

10  a COBRA event.  And, you know, we had a lot stuff tossed out

11  there about how this was COBRA, and you know, this is not a

12  COBRA event.  If Your Honor approves this thing, I don't think

13  anyone --

14       THE COURT:  But I think what the suggestion was --

15  maybe I'm wrong about this -- is that you could structure it in

16  a way to preserve the right to the tax credit.  Is that --

17       MR. GLOSTER:  Could I speak to that for thirty

18  seconds, Your Honor?

19       THE COURT:  Yes, very briefly.

20       MR. GLOSTER:  Two things, Your Honor.  One, there's a

21  statute that says if you modify benefits during a bankruptcy,

22  it is a COBRA event.  But there is a reasonable dispute over

23  whether simply terminating a plan not in part of the 1114

24  process does, so if opposing counsel says that the company's

25  position is that this is not a COBRA event, I would disagree

121

1   legally.  But if they're right, all of the folks that are the

2   retirees fifty-five to sixty-five would lose COBRA continuation

3   coverage as a qualified coverage under the health care tax

4   credit, and that would be a disaster.

5          And then second, the IRS has said that if an 1114

6   committee negotiates a follow-on plan in lieu of COBRA

7   continuation coverage as part of the 1114 process, that can be

8   qualified coverage for purposes of the health care tax credit.

9   And we have a timing issue here because the debtor has not yet

10   turned their plan over to the Pension Benefit Guaranty

11   Corporation.  Had they done that, frankly, Your Honor, last

12   month, I think that there would be more enthusiasm for trying

13   to preserve the health coverage tax credit for the retirees.

14          MR. BUTLER:  Your Honor, we are still -- on the

15   pension point, as we have made clear in our pleadings, we are

16   still searching for a solution --

17          THE COURT:  That's not a done deal.

18          MR. BUTLER:  No, we are still searching for a

19   solution pension.  And it's not a done deal.  And I can't make

20   any representation to the Court about what will happen

21   ultimately with the pension programs other than to suggest that

22   I believe that at the end of the day the federal government's

23   going to make that call because at the end of the day, the

24   federal government's going to have to make some determinations

25   about how it's going to support the automotive industry in

VERITEXT REPORTING COMPANY

122

1    whether it wants to see these pensions continue.

2          We certainly hope that we can find a solution that

3    involves the support of the government in continuing these

4    pensions.  But that really is for another day.  And that

5    doesn't change the problems I have now for this company in

6    trying to be able to address the issues that our current

7    liquidity constraints provide.  And this is not, you know, just

8    to say it, this is not -- the legal standards for us, this is

9    not a but-for test that we're dealing with.  This is a business

10   judgment test about whether, given the extremely important

11   objectives of preserving liquidity and providing liquidity

12   transparency to our administrative creditors as we are

13   essentially getting support from our DIP lenders and from

14   General Motors to do that, as I've said before, on a week by

15   week and month by month basis, can the company, in working with

16   those stakeholders, continue to spend a million and a half

17   dollars a week on discretionary at-will expenses?  And the

18   conclusion the company has had after consulting with the

19   stakeholders is no, we can't.

20         THE COURT:  Let me run an idea by you.  I tend to

21   agree with you that the record for today suggests to me pretty

22   clearly that not only do the plan documents provide this right

23   but that there's nothing, under either a Sixth Circuit or a

24   Second Circuit law, that would override that right that exists

25   in the plan documents.

123

1          On the other hand, the Code in 1114(d), in addition

2     to having a mandatory order of the appointment of a committee,

3     gives the Court discretion to appoint one if it's

4     "appropriate."  And the consequence of the Court being wrong on

5     the issue of whether anyone is vested or not, at least for that

6     person, is pretty serious because that person, if he or she is

7     vested, would have the rights specified in 1114.

8          And so given that this relief would not kick in until

9     April 1st, consider the possibility of an order today granting

10    the debtors' motion subject to the Court's review of the

11    results of a committee appointed for the sole purpose of

12    determining whether any group, such as, for example, those who

13    retired on disability, in a more thorough look at the documents

14    which would occur over the next two weeks, would have a vested

15    right.  I would probably set a budget for that committee.  It

16    would give the debtor someone to talk with and employees

17    someone to coordinate with.

18          MR. BUTLER:  But the only --

19          THE COURT:  And let me just say one other thing too.

20    And perhaps this is anathema to someone who I've just told may

21    well win his motion, these issues are all issues that --

22    particularly the statutory construction issues, are all issues

23    that are nicely subject to appellate rights.  So you would have

24    a committee to talk to about that sort of thing too.  And

25    perhaps also about the federal tax plan, which, frankly, I

1   think I'm as mystified about as you are.

2        MR. BUTLER:  Well, Your Honor, the one reservation

3   I'd have about that approach is that I can see that committee

4   coming in and then saying okay, all the legal standards are the

5   1114 standards here.  And so we need to -- I mean, as you know,

6   under 1114 there's a whole process.

7        THE COURT:  I know.  I think the language -- or "if

8   the court otherwise determines that it is appropriate," it

9   gives me the authority to circumscribe the duties of that

10  committee.

11       MR. BUTLER:  And the legal standards that would be

12  imposed on the company?

13       THE COURT:  Right.

14       MR. BUTLER:  That's a --

15       THE COURT:  It would clearly not be a committee

16  authorized -- and in fact, the flip side of that would be the

17  company required to bargain under 1114.  That's not what I have

18  in mind.  Because again, I think there's an issue of putting

19  the cart before the horse here.  And given this record, I think

20  that the debtor has sustained its burden to show that these are

21  terminable-at-will or modifiable-at-will rights.  It's not like

22  the situation where there's a mix, as far as I can see on this

23  record.

24       But again, I am clearly cognizant of the fact that

25  there are 15,000 individuals, some of whom have been able to

125

1   hire capable lawyers, but they've only been able to do that

2   very recently.  And again, I think the difference as far as how

3   one comes out on this issue is significant, although ultimately

4   I'm not sure how significant because again, if it's necessary

5   for a plan, it doesn't appear to me that 1114 even really kicks

6   in in that sense.

7           But as far as cash flow management is concerned, it

8   would seem to me that even there the debtor has its rights for

9   interim relief as well if that becomes an emergency.  But

10  leaving all that aside, I guess I'm really not at the point to

11  see that 1114 generally kicks in.  But it's all premised upon

12  the notion that there are no vested rights here.  And the

13  record on that is clear today, but it's a record that was built

14  up on very short notice from the objectors' side and I still

15  have some questions about how Orion fits into all of this as

16  far as it's being a summary proceeding.

17          So my inclination, I think, is to authorize the

18  appointment of a committee with the marching instructions

19  limited to doing investigation on the vesting for particular

20  groups.  And I suppose also negotiating with the debtor, if

21  either side thinks it's advisable, on a settlement of any of

22  these issues ultimately, and it would be the settlement, I

23  guess, on an appellate basis.

24          MR. BUTLER:  Your Honor, if that would be without

25  imposing the 1114 regime?

126

1          THE COURT:  Right.  Right.  Correct.

2          MR. BUTLER:  And I know Your Honor's got a very full

3    docket today --

4          THE COURT:  No, I --

5          MR. BUTLER:  -- can I literally have two minutes to

6    talk to the people --

7          THE COURT:  That's fine because I need to collect my

8    thoughts for a ruling anyway, so I'll give you all five

9    minutes.

10          MR. BUTLER:  Thank you, Your Honor.

11          THE COURT:  Oh, before you go, the U.S. Trustee is

12    here.  I have a question, which is does the U.S. Trustee -- let

13    me sit down -- does the U.S. Trustee believe that you have the

14    duty of appointing -- if I order the appointment of a

15    committee, is it you who appoints it or is it me?  And if it's

16    me, can I delegate it to you?

17          MS. ADAMS:  Your Honor, we asked ourselves these same

18    questions last evening.  Our very quick research indicates that

19    there are no temporal limits in 1114.  And if Your Honor

20    directs, we would appoint.

21          THE COURT:  All right.

22          MS. ADAMS:  My one request or inquiry would be, given

23    that there are 15,000, and obviously we want to do this very

24    rapidly, if we could limit in some manner the solicitation

25    process to those represented by people in the courtroom?

1          THE COURT:  My taste -- and frankly I think there are

2    more than 1,600 objections because some of them may not have

3    gotten docketed or it's late by a day or so -- is that this

4    group of lawyers here represents a pretty representative body

5    of retirees.  So I think you can limit it, yes.

6          MS. ADAMS:  Thank you, Your Honor.

7          MR. BUTLER:  And that was actually what I wanted to

8    talk to the trustee about before if that could be a part of the

9    order.

10          THE COURT:  I envision this as a quick process and I

11    think that it can be quick because a lot of the initial work in

12    forming a committee has sort of been done by the participants.

13          MS. ADAMS:  Thank you, Your Honor.

14          MR. BUTLER:  Thank you, Judge.

15      (Recess from 1:10 p.m. until 1:19 p.m.)

16          THE COURT:  We're back on the record in Delphi.

17          MR. BUTLER:  Your Honor, thank you for that brief

18    recess.  Not that Your Honor is looking for Delphi's view

19    particularly on this, but we did use the recess to try to

20    review the suggestions made on the record.  I wanted to note,

21    Your Honor, that subject to a couple of items I want to put on

22    the record, the company would be affirmatively supportive of

23    the suggestion that the Court was considering because, just

24    like the Court, the company wants to make sure we've got it

25    right too.  We're fiduciaries and we want to make sure that

1    this is appropriate; we think that it is.

2         A couple of items.  In order for us to be able to

3    implement this on April 1st, we would need to have this

4    order -- if Your Honor determines that this is going to be

5    provisionally approved today, we would need to have the order

6    include a provision that would allow us to begin the

7    administrative processes which would include communicating with

8    retirees and giving them the election options and the paperwork

9    that they need because they need to consider, over a thirty day

10   period, what they might want to do.

11        And we ultimately, in the second week of March, are

12   going to have to make a definitive determination about whether

13   we push the switch for April 1st because it affects the checks

14   that go out to pensioners because there are deductions being

15   taken out right now which would have to change as well as

16   other -- the notices that we have to give to the health care

17   system.  So we would need to have the final hearing relatively

18   early in the week of March 9th.  That would give two weeks for

19   this committee to move forward.

20        And I would tell Your Honor, even before -- and we've

21   spoken with the U.S. Trustee to talk about how we might do

22   this, they are already speaking to counsel, and I would tell

23   Your Honor we will commit, as a company, to obviously work

24   with, as we have been, with the counsel that have appeared here

25   today, pending the formation of that committee by the U.S.

129

1    Trustee.

2         We would like, Your Honor, the order, if you're

3    inclined to enter it in that way, to have language that the

4    U.S. Trustee's office signs off on, about the implementation of

5    the appointment so that we're all comfortable about how the

6    language works for the appointment.

7         We also, Your Honor -- and I don't know whether Your

8    Honor's prepared to address this in the ruling today, but the

9    company would certainly urge that Your Honor address the

10   Sprague issue today because the question on vesting, it's a

11   whole different question, it seems to us, whether the focus is

12   post-1998 to today, the last ten years or eleven years, or

13   whether we're going back six decades, five decades.  And that

14   has to do with the issue that's before the Court involving

15   Sprague.

16        But I think that subject to those issues, Your Honor,

17   we would be very supportive of this and we would hope Your

18   Honor would set a budget for this committee, because we are

19   cash constrained.  But we would pledge, Your Honor, to work

20   with the committee on the limited appointment idea that Your

21   Honor has asked us to consider.

22        THE COURT:  Okay.  Any additional thoughts from the

23   U.S. Trustee?

24        MS. ADAMS:  Thank you, Your Honor.  We did speak

25   briefly during the recess.  We have asked those present to get

130

1    us information tomorrow by 5 o'clock, not just on those willing

2    to serve, but particular characteristics of their termination

3    and their other issues so that we can form, as quickly as

4    possible, a representative committee.  And I would ask, as Mr.

5    Butler did, that the order delineate that we would be permitted

6    to solicit those -- only those attorneys and I think there were

7    a few other representatives in the courtroom, to form this

8    committee.

9            THE COURT:  Okay.  I have before me a motion by the

10    debtors in this case for authority under Section 363(b) of the

11    Bankruptcy Code to modify, in various significant measure, what

12    they refer to as OPEB but what also can be described as welfare

13    plans, including health and insurance plans under ERISA.  The

14    debtors take the position that notwithstanding that the subject

15    matter of these plans involves reimbursing or providing for the

16    reimbursement of payments for retired employees and their

17    spouses and dependants for medical, surgical or hospital care

18    and benefits or benefits in the event of sickness, accident,

19    disability or death, that their request need not, and in fact

20    should not, be governed by Section 1114 of the Bankruptcy Code.

21    The language I was quoting appears in Section 1114(a) which

22    defines, for purposes of that section, the term retiree

23    benefits.

24            Section 1114(e) provides that the Court shall -- I'm

25    sorry, notwithstanding any other provision of this title, the

1    debtor-in-possession shall timely pay and shall not modify any

2    retiree benefits except as provided in 1114(e)(1)(a) under

3    Sections 1114(g) or (h) or alternatively if the debtor-in-

4    possession and the authorized representative of the recipients

5    of those benefits agree to the modification of such payments.

6         The debtor contends that that regime does not apply

7    to the present request because the various welfare plans are,

8    under the terms of the plan documents, modifiable at will.  The

9    debtor contends that under Section 1114(a), therefore, the

10   benefits accorded under those plans are not retiree benefits

11   because the plans themselves, as maintained by the debtor,

12   permit such action.

13        The debtor has approximately 15,000 present and

14   former employees who would be affected by this motion, many of

15   whom would clearly be affected in very dire ways.  The debtor

16   provided notice of the motion by actually sending a copy of the

17   motion to all of these individuals.  And under the Court's case

18   management order, that notice was sufficient, although it fell

19   within the bear minimum of the twenty days set forth therein in

20   the bankruptcy rule.

21        The motion was objected to by approximately 1,600

22   individuals.  There have been, in addition, many slightly

23   untimely objections.  Most of those objections were by

24   unrepresented individuals.  However, individuals or groups of

25   individuals have retained quite able counsel to represent them,

1  and I have considered their objections at length, both as

2  submitted in writing and made orally at this hearing.

3          The objectors essentially make two objections.

4  First, they contend that under the plan language of Section

5  1114, as well as principles of statutory construction, the

6  debtors' interpretation of what constitutes a retiree benefit

7  that is required to be dealt with under 1114 is wrong and that

8  instead Congress, in Section 1114(a) and (e) overrode the pre-

9  petition contracts between companies such as Delphi and the

10  beneficiaries of health and welfare plans and required that

11  before those contracts could be modified, and notwithstanding

12  the language in those contracts permitting modification, during

13  the course of a Chapter 11 case at least prior to the effective

14  date of a Chapter 11 plan, the debtor must go through the

15  process set forth in 1114 and meet the requirements of either

16  1114(g) for interim relief or 1114(h).

17          They also contend, as a factual matter, that the

18  debtors' assertion that the OPEB benefits are modifiable at

19  will is incorrect.  Therefore, they contend that even if the

20  debtor is right in its interpretation of Section 1114, the

21  debtors' motion should be denied because in fact it does not

22  have the right to modify these benefits unilaterally under the

23  applicable non-bankruptcy law.  Perhaps a little more

24  specifically stated, the objectors contend that there may well

25  be retirees who have benefits that are not modifiable at will

1    and are instead vested.

2          As I think I noted, at least it was implicit during

3    oral argument, the first issue is an issue that has long been

4    identified by courts and commentators and it is one, as the

5    parties have pointed out, where there is conflicting authority.

6    The leading commentator on bankruptcy law, Collier on

7    Bankruptcy, analyzes this issue at some length in Collier on

8    Bankruptcy, paragraph 1114.03[1] and [2], and I believe cites

9    the applicable case law, and to the extent there is meaningful

10   commentary, most of the commentary as well, and concludes that

11   the majority of the courts addressing the issue have found that

12   a debtor-in-possession need not comply with the procedures and

13   requirements of Section 1114 if it has a right to unilaterally

14   terminate retiree benefits under the retirement plan in

15   question and applicable non-bankruptcy law.  It notes, however,

16   that there is conflicting authority and potentially conflicting

17   arguments.

18          The starting point for my analysis must be the plain

19   language of the statute.  But I conclude, particularly in light

20   of the two fundamental principals underlying all of the

21   Bankruptcy Code, as well as my review of the statute, that the

22   plain language does not compel the interpretation given by the

23   objectors.

24          And again, that interpretation is that Section 1114,

25   in essence, creates a federal law overriding pre-petition

1    contractual rights of the debtor when it comes to modifying

2    health and welfare benefits during the course of a Chapter 11

3    case.  Frankly, I cannot think of a substantive provision of

4    the Bankruptcy Code that would create such a federal right

5    other than limitations type of provisions like Section 546 that

6    permits one to perfect an interest post-bankruptcy.  And even

7    that type of limitation includes an appreciation of the

8    interruption of normal conduct by the bankruptcy.  Congress

9    arguably entered such a provision when it amended another

10   section of 546, 546(c) under the 2005 amendments, BAPCPA.

11   However, that provision, which referred to a forty-five day

12   right has been interpreted, I think, correctly and, again, by

13   the majority of courts as not creating, generally, a federal

14   right particularly given, as Judge Lifland stated in the Dana

15   case that such a right would be contrary to the purpose of the

16   Bankruptcy Code in enhancing the rights of one set of creditors

17   at the expense of other creditors simply because a bankruptcy

18   petition has been filed, citing, among other cases, Butner v.

19   United States, 440 U.S. 48 (1979) which states that property

20   interests are defined by state law unless some federal interest

21   requires a different result.  There is no reason why such

22   interests should be analyzed differently simply because an

23   interested party is involved in a bankruptcy proceeding.  See

24   also In re Pittsburgh Canfield Corporation, 309 B.R. 277, 287,

25   388 (6th Cir. B.A.P. 2004) in which the Court said permitting a

135

1    creditor whose claim outside of bankruptcy is nothing more than

2    a general unsecured claim to elevate its claim to

3    administrative or secured status in bankruptcy would give it a

4    windfall.

5         That's, again, especially the case, as we've been

6    reminded recently by the Supreme Court in the Second Circuit

7    where parties in interest are claiming rights to priority

8    treatment since ultimately bankruptcy is a zero sum game and

9    whatever's taken out of one constituent's pocket to go into

10   another constituent's pocket is hurting someone.

11        As the Second Circuit said in In re Bethlehem Steel

12   Corp, 479 F.3d 167, 172 (2nd Cir. 2007), because the

13   presumption in bankruptcy cases is that the debtors' limited

14   resources will be equally distributed among its creditors.

15   Statutory priorities are narrowly construed.  See also Howard

16   Delivery Service, Inc. v. Zurich American Insurance Company,

17   547 U.S. 651 (2006).

18        I believe that when amending the Bankruptcy Code

19   Congress is fully aware of these fundamental principles and

20   that as Dewsnup case state, when it amends the bankruptcy laws

21   it does not write on a clean slate.  The Supreme Court has,

22   therefore, been reluctant to accept arguments that would

23   interpret the code to affect a major change in pre-code

24   practice.  It is not the subject of at least some discussion in

25   the legislative history.  Dewsnup v. Timm, 502 U.S. 410, 419

1    (1992).

2         Everyone understands the origin of Section 1114.  It

3    grew out of the termination of health and welfare benefits by

4    LTV Corporation after it filed its bankruptcy case.  And the

5    belief -- in the belief of LTV that it had the right to do so

6    because 1113 of the Bankruptcy Code didn't apply and therefore

7    it could breach its agreements, fundamentally bankruptcy is all

8    about breaching agreements and generally speaking the means to

9    do so are very easy and fall within the debtors' business

10   judgment.

11        Congress reacted to that by drafting what eventually

12   became 1114.  But as was made clear over sixteen years ago the

13   issue of whether the amendment went beyond permitting a debtor

14   to breach its agreements and actually precluded a debtor from

15   exercising rights it had under those agreements was an open

16   issue under the statute.

17        The case that took this issue on directly was in re

18   Doskocil Companies, Inc., 130 B.R. 870 (Bankr. D. Kan 1991).

19   It relied, however, significantly although not entirely, about

20   In re Chateaugay Corporation, 945 F.2d 1205 (2nd Cir. 1991)

21   cert denied 502 U.S. 1093 (1992).  Chateaugay involves, as the

22   objectors point out, not a modifiable agreement but an

23   agreement that post bankruptcy terminated by its terms.

24        However, its analysis focuses on, consistent with

25   Butner, the pre-petition non-bankruptcy law rights of the

1   parties and did not envision, except in the decent, that

2   Congress created a new federal right under the predecessor of

3   Section 1114 which, for all intents and purposes, I view as

4   equivalent to 1114 on this issue.

5        Doskocil has been cited favorably by a number of

6   cases, perhaps most on point being the District Court of New

7   Jersey in In re New Valley Corporation 1993 U.S. Dist. LEXIS

8   21420 (D.N.J. Jan. 28, 1993) as well as In re CF&I Fabricators

9   of Utah, Inc., 163 B.R. 858 (Bankr. D. Utah 1994) and In re

10  North American Royalties, Inc., 276 B.R. 860 (Bankr. E.D. Tenn.

11  2002).  It was, however, rejected by the analysis of the

12  Bankruptcy Court for the Western District of Missouri in In re

13  Farmland Industries 294 B.R. 903 (2003).

14       It was also rejected in an unpublished opinion in the

15  Ames Corporation Department Stores case by Bankruptcy Judge

16  Conrad as well as by the District Court in that case.  However,

17  in the context of a ruling on a fee application related to that

18  dispute in the Ames case the Second Circuit pointed out that

19  both of those decisions were made without any reference to any

20  of the case law or analysis that I've just gone through.  And

21  that while the Second Circuit did not rule, since this was a

22  fee dispute, as to how it would come out on the interpretation

23  of 1114 to unvested rights, it noted the numerous authorities

24  supporting the debtors' position.  In addition, Bankruptcy

25  Judge Conrad in In re Drexel Burnham Inc., 138 B.R. 723 (Bankr.

138

1   S.D.N.Y. 1992) favorably cited both Doskocil and Chateauguay in

2   approving confirmation of Drexel's plan that permitted the

3   modification of plan -- of welfare plan benefits consistent

4   with the pre-petition plan documents.

5          The objectors have pointed out that Judge Conrad's

6   ruling was properly viewed as one under Section 1129(a)(13)

7   which arguably, and I think this is how it has been

8   consistently interpreted, notes or can be read to say that no

9   matter how 1114 applies to OPEB benefits arising before the

10  effective date of a plan.  A plan itself need only preserve the

11  benefits as they exist in that welfare plan that is a Chapter

12  11 plan itself and they preserve those benefits only as they

13  exist in the OPEB plan and go no further.  That is a legitimate

14  and I think correct interpretation.

15         How it relates to the proper interpretation of

16  Section 1114, I think, is another matter.  It strikes me as odd

17  that 1114 would give broader rights to the beneficiaries of

18  welfare plans for the limited pre-confirmation period and I

19  would rather harmonize the two provisions, that is 1129(a)(13)

20  and 1114, and take the view that they both recognize that plans

21  that are modifiable at will are not overridden by any provision

22  of the Bankruptcy Code that would restrict debtors' right to

23  seek approval under 363(b) or in the ordinary course if the

24  change was in the ordinary course to modify the plan pursuant

25  to its terms.

1           The objectors also point to another provision of the

2    Bankruptcy Code, Section 1114(l) which was enacted, again,

3    pursuant to the BAPCIPA amendments in 2005 which permits a

4    Court on the motion of a party in interest and after notice and

5    hearing to reinstate benefits that were modified during the 180

6    day period preceding the filing of the bankruptcy petition.

7    Based on the balance of the equities clearly favoring -- I'm

8    sorry -- unless the Court finds that the balance of the

9    equities clearly favor such modification.

10          The objectors rightly argue that this provision can

11   be viewed as an intrusion by congress and contrary to the

12   principle laid out in Butner into pre-petition contractual

13   relations.  And not like such intrusions under 547 and 544 and

14   548 of the Code for the benefit of the debtors' estate

15   generally but rather, potentially, for the benefit of a

16   discrete group that is retirees and those who are governed

17   by -- who have rights under benefit plans.

18          The provision, again however, does not specifically

19   deal with the issue of modifiable plans as of right and even if

20   one can read, and I cede much merit in the argument that

21   generally speaking a debtor would not breach and ERISA governed

22   contract and therefore is likely only to modify such a contract

23   as opposed to breach it.  But even if one were to read the

24   provision as covering otherwise contractually permissible

25   modifications, I do not view that provision as overruling

1    Doskocil and the line of cases that take its position nor does

2    there appear to me to be any legislative history or other

3    policy accompanying the 2005 amendments that would clearly set

4    forth Congress' intention generally in 1114 to override the

5    fundamental principle that bankruptcy does not create new

6    rights in individual parties in interest and thus cut back on

7    the basic tenets set forth in the Butner case.

8           For those reasons I believe that the debtors'

9    interpretation, which is the majority view, is the correct one.

10   And that if in fact the debtor has the unilateral right to

11   modify a collective bargaining agreement that is -- I'm

12   sorry -- modify a health plan or a welfare plan, that is the

13   plan that's maintained and the right is not abrogated by the

14   requirements of Section 1114.

15          The second issue is an interesting issue to put in

16   context, given the Second Circuit's guidance with regard to

17   summary of proceedings in In re Orion Pictures Corporation 4 F.

18   3d 1095.  I believe, given the interplay with Section 1114 that

19   before a Court is to permit a debtor to modify a health or

20   welfare plan under Section 363(b), on the theory that it has

21   the right to do so under the plan documents, the debtor must

22   make a significant showing that it in fact has that right.

23          That is what the debtor has done here.  Given the

24   plan, the summary -- the plans -- excuse me, the plan documents

25   including the summary of the plan documents and the absence of

1    any evidence on this record that would indicate that the

2    debtors otherwise promised or the debtors' predecessors

3    otherwise promised to the beneficiaries of those plans who are

4    affected by this motion, that notwithstanding the language in

5    the Delphi plans' documents those plans are not modifiable at

6    will.

7            The only evidence that has been submitted to counter

8    the language in the Delphi plan documents has pertained to plan

9    documents of GM Corporation, the debtors' predecessor.

10   Moreover, those documents all, it appears to me, predate the

11   decision of the Sixth Circuit in Sprague v. General Motors

12   Corporation, 133 F.3d, 388 (6th Cir. 1993).  Given that record,

13   it appears to me that the debtor has very clearly made the

14   showing that it has the right to modify the plan documents at

15   will.

16           The objectors have contended that since this Court

17   sits in the second circuit it should be bound by second circuit

18   law on this issue.  And that second circuit law, at least in

19   some respects, particularly pertaining to equitable estoppel,

20   promises by a predecessor corporation such as GM differs from

21   the holding of the Court of Appeals in the Sprague case of the

22   sixth circuit.  No one has briefed for me the choice of law

23   issue and I've not considered it at length.  But it appears to

24   me that given Delphi's headquarters in sixth circuit it's not

25   clear to me that I would be governed by second circuit law

142

1    here.

2         More importantly, I have two observations.  The first

3    is that after the issuance of the Sprague on bank opinion in

4    January of 1998, it would seem to me that any subsequent

5    employee of Delphi who had been covered by a GM plan would

6    clearly be on notice as to the Sprague decision and how to

7    interpret the language that existed in the GM plans prior to

8    his or her transfer to Delphi.  And that that notice would be,

9    I believe, clear that they types of language that have been so

10   far submitted to me, for example in Exhibit 80, would not

11   suffice to create a vested benefit right.

12        Secondly, as set forth, I believe most recently by

13   the second circuit in Bouboulis v. Transport Workers Union of

14   America, 442 F.3d 55 (2nd Cir. 2006) but also in a number of

15   District Court decisions that have come down since then,

16   including Warren Pearl Construction Corp. v. Guardian Life

17   Insurance Company of America, 2008 U.S. District LEXIS 101780

18   (S.D.N.Y. Dec. 9, 2008) and Eagan v. Marsh & McLennan

19   Companies, Inc. (2008) U.S.D. 6647 (S.D.N.Y. Jan. 29, 2008).

20        The law in the Second Circuit, although it may differ

21   somewhat from the Sixth Circuit, is still very restrictive in

22   giving beneficiaries of welfare plans rights that are not set

23   forth in a clear, affirmative promise in the plan documents

24   through, for example, a theory of promissory estoppel.

25        So again, on this record, it appears to me clear that

1   the debtors have met their factual burden, which I view as a

2   serious one, to take this motion outside of the ambit of

3   Section 1114.  I view the burden to be so serious and also

4   recognize that the notice here, while sufficient as a legal

5   matter, was sufficient only to permit fairly recent involvement

6   by counsel in an area that is fairly abstruse to pursue the

7   actual record that I believe I should exercise my authority

8   under 1114(d) to appoint a committee of retirees to act as a

9   representative.  Notwithstanding my belief that the debtor, on

10  the basis of this record, is not bound by the 1114 regime

11  generally.  I believe that it would be appropriate, given the

12  importance of the factual issues and the timing of this motion,

13  to give that committee a specific charge which is to review the

14  factual record to determine whether, under the logic that I've

15  just set forth with regard to vesting under ERISA, and

16  notwithstanding the language in the plan documents there is any

17  group of beneficiaries of these plans, any retirees who would

18  have vested rights, notwithstanding the language of the plan

19  documents and notwithstanding the Court's conclusion that

20  following Sprague they were on notice as to the inefficacy of

21  the argument that the documents addressed in Sprague overrode

22  the ability of GM to terminate the benefits at will or to

23  modify them at will.

24          I believe, given the very clear expertise and active,

25  although recent, involvement of the three counsel for objector

144

1    groups and the intense number or the great number of objectors

2    that the trustee can -- the U.S. trustee can form such a

3    committee out of the people who are participating in the

4    courtroom today and that that committee can move promptly to

5    conduct its analysis and meet and confer with the debtor on

6    whether in fact there would be, under my logic, a retiree or

7    retirees who would be covered by 1114.

8         I should make it clear that service as a

9    representative on this committee would not preclude any

10   individual party's right to appeal my ruling.  So that although

11   they would be fulfilling this task, they would not be deemed to

12   have agreed with the first part of my ruling which is that 1114

13   doesn't apply to this motion unless there is a vested benefit.

14        The work of that committee on this point should be

15   done so that any argument that would be made to modify my

16   provisional ruling would be heard on Wednesday, March 11th at

17   10 o'clock.  And I'm assuming that would mean that some formal

18   pleading would be filed in the preceding week and that there

19   would be a dialogue with the debtors.  I take the debtors at

20   their word that if in fact retirees are identified who do have

21   vested benefits, that they would go through an 1114 process

22   with them.  And so I think there should be an ongoing dialogue

23   with the debtors on that point.

24        I also believe that this committee should be

25   authorized to at least explore with the debtors the cost and

145

1    ability to utilize the federal tax credit identified by one of

2    the objectors.

3            I have debated whether setting a finite budget for

4    the committee's action in this regard or merely a budget that I

5    believe would be sufficient in giving them the ability to

6    convince me of their -- of the merits of exceeding that budget

7    in a subsequent fee application.  I've decided to do the later

8    and that the budget which I don't view as a license to spend

9    but merely as what I believe would be sufficient for this task

10   would be 200,000 dollars.

11           As far as the preliminary grant of the motion, having

12   dealt with what I believe are the two mail legal issues, let me

13   ultimately deal with the standard that I believe falls from

14   that analysis, which is whether the debtor has satisfied good

15   business judgment in modifying the OPEB programs as set forth

16   in its motion.

17           It is crystal clear to me, on this record and my

18   understanding of the case, that at this time and for the

19   foreseeable future the debtor will not -- the debtors' well

20   within his business judgment in assuming that it will need to

21   eliminate the accumulated OPEB projected liability, which is

22   projected in excess of 1.1 billion dollars from its balance

23   sheet, in order to reorganize.  So clearly that's within its

24   business judgment.

25           I also believe, on this record, that given the

1    debtors' serious need to conserve cash and all of the other

2    steps that it has taken to do so, as detailed primarily in

3    Mr. Miller's declaration as well as my knowledge of the current

4    funding of the debtors, that every dollar counts for these

5    debtors and therefore that the savings of 1.5 million a week

6    and projected cash savings of seventy million a year for the

7    pre-bankruptcy -- I'm sorry -- preplanned period, the period

8    prior to the effective date of reorganization plan, is also of

9    extreme importance to the debtor.  And that actions taken by

10    the debtor to save such money, including by modifying these

11    benefits, is supported by good business judgment in light of

12    the rights, as I see them, of the retirees.

13          The debtors, I believe properly, did not take the

14    step for almost three years in light of their assessment of the

15    business realities of their business and the inducement to

16    employees of having such benefits plans in place and their

17    relations with their retirees.  But over the last two or three

18    months their business, as the auto business generally has gone

19    through such enormous adverse changes that I recognize the

20    changed circumstances as a business matter, lead them to make

21    this decision now.

22          So I will enter an order granting the motion,

23    including permitting the debtors to take the initial steps to

24    implement it.  Those initial steps, as far as they consist of

25    giving notice to employees, should also note that there is this

1    procedure in place to determine if anyone is, in fact, vested.

2    And also the order will provide for an opportunity for a

3    hearing on March 11th to convince me, consistent with the

4    parameters that I've outlined in this ruling, that there are

5    individuals or groups of individuals who in fact are properly

6    vested and therefore would be covered by Section 1114.

7              Given the time constraints here, I'm not going to

8    require the debtors to settle that order but I think you should

9    work it out first with the U.S. Trustee and then promptly

10   circulate it to the counsel who've been active in this hearing

11   and then submitted to court.  Okay.  Thank you.

12             MR. BUTLER:  Yes, Your Honor.  We will.

13             THE COURT:  Okay.  Thank you.

14             MR. BUTLER:  Your Honor, mindful of the Court's

15   docket this afternoon, could we take about a five minute recess

16   so we can change out the folks here and get ready for the

17   balance of the hearing?

18             THE COURT:  Yes.

19             MR. BUTLER:  Thank you very much.

20             THE COURT:  And I'm probably saying the obvious but

21   if counsel or observers do not want to stay for the rest of the

22   Delphi hearing on the uncontested matters, they're certainly

23   free to leave.

24             MR. BUTLER:  Thanks, Judge.

25        (Recess from 2:13 p.m. until 2:22 p.m.)

148

1          THE COURT:  Please be seated.  Okay.  We're back on

2     the record in Delphi.

3          MR. BUTLER:  Yes, Your Honor.  Moving now to the

4     remainder of the docket, matter number six is the Anaheim sale

5     motion filed at Docket No. 14701.  There are exhibits we

6     provided the Court five of them including the declaration of

7     Keith Stipp in support of this and the proposed purchase and

8     sale agreement.  I'd move admission of Exhibits 1

9     through 5.

10         THE COURT:  Okay.  They're admitted.

11    (Hearing Exhibits 1-5 were hereby received, as of this date.)

12         MR. BUTLER:  Your Honor, all we're asking for today

13    is the approval of the first step of a two-step sale process.

14    We'll come back at the March 24th hearing to actually get the

15    sale approved to the Bercher (ph.) Anaheim Magnolia Avenue LLC,

16    the proposed purchaser, for twenty million dollars as proposed

17    or the successful bidder, as may be the case, if an auction

18    becomes necessary based on getting another qualified bid.

19         We're proposing a March 9, 2009 bid deadline.  An

20    auction on March 13, 2009 and a sale hearing on March 24, 2009.

21    This does involve 21.6 acres of now vacant land in Anaheim,

22    California for a purchase price of twenty million from the

23    seller being the debtor, Delphi Automotive Systems, LLC.  The

24    bid protection is capped at 450,000 dollars, subject to the

25    terms and conditions of the proposed asset purchase agreement.

1    There are no objections that have been filed to the motion.

2         THE COURT:  Okay.  As far as the interim relief is

3    concerned, it's appropriate.  The expense reimbursement is well

4    within what I and other judges have approved in the past.  So

5    I'll grant the interim relief that the debtors are seeking.

6         MR. BUTLER:  Thank you, Your Honor.  Your Honor, the

7    next matter on the agenda, matter 7, is the Lautzenhiser

8    Technologies LLC stay modification motion, filed at Docket No.

9    14702.  This involves some patent litigation that has been

10   filed against Delphi Medical in an action that's currently

11   pending in the United States District Court for the Southern

12   District of Indiana.  And this arises out of a lawsuit that

13   began back in 2007 against Sunrise Medical, one of Delphi's

14   medical customers, alleging infringement of various patents

15   relating to wheelchair technologies.

16        On April 24th of last year the plaintiffs filed a

17   motion for leave to amend a second amended complaint adding

18   Delphi Medical as a defendant.  That was approved by the State

19   Court and the summons and second amended complaint were served

20   on Delphi on July 28, 2008.  That's an important date for

21   purposes of the settlement we're asking you to approve today.

22        We're proposing to have the automatic stay, with

23   respect to this matter, lifted, or modified I should say, for

24   the sole limited purpose of allowing the plaintiffs to advance

25   their alleged patent infringement claims by seeking a

1  determination on the alleged liability and quantification of

2  damages including the potential for enhanced damages as a

3  result of willful infringement if at all and a finding as to

4  the appropriateness of injunctive relief in the State Court

5  patent infringement litigation.

6          Except for that, however, the automatic stay would

7  remain in full force and effect.  So in the event that the

8  Indiana District Court found in favor of the plaintiffs and

9  against Delphi Medical, they would be required to return to

10  this Court for any further relief from the automatic stay,

11  including any effort to enforce any judgment in the patent

12  litigation against any of the debtors including Delphi Medical.

13  Or to seek an even enforcement of any injunction that was

14  entered against Delphi Medical or any of the debtors.

15          Important as part of this modification arrangement,

16  the plaintiffs have agreed to waive their ability to seek any

17  damages with respect to claims in that litigation that might

18  have arisen from or accrued as a result of any actions of

19  Delphi Medical, the debtors or any of the affiliates of the

20  debtors that occurred on or before July 28, 2008.  That is the

21  date that we received the actual second amended complaint

22  served on us.

23          And there is various other relief with respect to the

24  terms of the agreement which are set forth in the order.  But I

25  think those are the material terms I wanted to bring to Your

1    Honor's attention.  Your Honor, given the nature of this

2    particular litigation the various factors, the Sonnax factors

3    that we all look at, the debtors believe that this was an

4    appropriate settlement of the effort on behalf of the

5    plaintiffs here, to seek a stay modification.  We'd ask that

6    Your Honor approve it.

7         THE COURT:  I think under Sonnax this is appropriate.

8    So I'll sign the stipulation and order.

9         MR. BUTLER:  Thank you, Your Honor.  Your Honor,

10    matter number 8 on the agenda is the accommodation amendment

11    motion at Docket No. 14703.  And matter 9 on the agenda is the

12    GM arrangement third amendment approval motion at Docket No.

13    14704.  We have an evidentiary record that applies to both of

14    these motions that have been submitted to Your Honor.  There

15    are twenty-three items in the Exhibits.  Exhibits 1-26, except

16    for Exhibits 20, 21 and 22 which we'll withdraw and so there

17    are twenty-three exhibits that deal -- outline the evidentiary

18    record in support of these motions, including the declarations

19    of John Sheehan as Exhibit 1 and the declaration of Keith Stipp

20    at Exhibit 2.  I'd ask Your Honor to move admission of this

21    record as to both motions but I'll deal with them separately.

22         THE COURT:  Okay.  Any objection?  All right.

23    They're admitted.

24    (Hearing Exhibits 1-26 were hereby received, as of this date.)

25         MR. BUTLER:  Your Honor, with respect to the

1    accommodation motion, I'd like to present Mr. Sheehan with

2    respect to his declaration for cross examination by any party.

3            THE COURT:  Does anyone want to cross examine

4    Mr. Sheehan on his affidavit?  And Mr. Sheehan, that affidavit

5    still would be your testimony?

6            MR. SHEEHAN:  Yes, sir.  I signed it last night.

7            THE COURT:  Okay.

8            MR. BUTLER:  So, Your Honor, in dealing then with the

9    -- let me just address, then, a few items with respect to the

10   amendments to the accommodation agreement.

11           THE COURT:  There's a supplement to this too.

12           MR. BUTLER:  There is.

13           THE COURT:  Right.  Okay.

14           MR. BUTLER:  I want to address that and the

15   supplement.

16           THE COURT:  Okay.

17           MR. BUTLER:  And explain to Your Honor where we are.

18   Your Honor, the accommodation amendment itself was entered on

19   January 30th, 2009.  It received ninety-seven percent of the

20   support of the participating lenders and became effective on

21   that date subject to the subsequent approval of this Court at

22   this hearing.

23           Importantly, in connection with the accommodation

24   amendment, that amendment addressed our liquidity runway which,

25   when we had gotten the accommodation agreement approved back on

1    December 1st, we thought we had worked out through the first

2    half of this year only to have the automotive industry and the

3    production by customers decline precipitously in December and

4    January.  And the estimates for production for the balance of

5    2009 declined precipitously from what had been the case.  And

6    we came to court back on December 1st, which has an implication

7    for liquidity throughout the automotive industry and including

8    at Delphi.  And therefore we have sought additional support

9    from General Motors and we sought additional concessions from

10   our DIP lenders in terms of whether we were required to make

11   certain pay downs on the DIP loan agreement.

12          And effectively what's happened here, one of the

13   major affects of this amendment, is that the DIP lenders that

14   amounts that would otherwise have been paid down for a period

15   of time have been put into a cash collateral account.  And

16   under the terms and conditions of the amendment, if the debtors

17   are able to meet various milestones and do certain things, that

18   liquidity, if the borrowing base continues and when the

19   borrowing base continues to improve, we essentially can get

20   that money back out of the cash collateral account.

21          We couldn't pay it down and re-borrow because there's

22   no longer borrowings permitted under the revolver.  So what the

23   participating lender said was, you put the cash into a cash

24   account and depending on what occurs in these cases over the

25   next several months, you either are going to be able to take

1    the money back and use it or we're going to require it be paid

2    down against the DIP loans.  And what the amendment does is

3    address the circumstances associated with that 117 million

4    dollars worth of cash collateral as well as, frankly, taking on

5    and resetting the global EBITDAR covenants consistent with

6    revised projections and addressing how the minimum liquidity

7    availability requirements of the accommodation agreement ought

8    to be modified in connection with the timetable for seeking a

9    consensual resolution of these cases with the DIP lenders and

10   our other stakeholders.

11            That amendment also required that we deliver some

12   reports to the DIP steering committee and the DIP lenders on

13   February 17th and 20th of this year.  Those reports, in fact,

14   were delivered.

15            And we have been performing under this amendment

16   since January 30th, subject to Your Honor's approval of that

17   And one of the elements, obviously, here we're seeking is,

18   under 363, is the approval of our agreement to pay some fees,

19   under those as outlined in the motion, to our lenders which

20   we've not paid pending Your Honor's approval.

21            During the course of the last three weeks we have

22   also been negotiating with General Motors and our DIP lenders

23   on potential modifications to our business plan and to various

24   transactions that would be included in a modified plan of

25   reorganization.  And as I think we advised Your Honor at the

1    last time we were here in January, we had been negotiating with

2    them about how that timetable would work and seeking their

3    report for modifying milestones where appropriate.

4         I should point out that I think that the DIP lenders

5    here and the DIP steering committee that's been formed that

6    we've been meeting with every week have been seeking to provide

7    the company with a sufficient runway to provide confidence to

8    other administrative creditors to continue to support the

9    company but also trying to keep the company on a fairly focused

10   path to reaching a consensual settlement that the DIP lenders

11   at the end of the day can support.

12        That led to the negotiation of the supplement -- the

13   supplemental amendment or the supplement to the amendment.

14   It's technically a supplemental amendment because it does amend

15   the accommodation agreement.  But it was intended to, among

16   other things, move the February 27th milestone date, this

17   Friday, having to do with filing a modified plan to April 2nd.

18   That's, in part, to address issues that I think even this Court

19   has recognized which indicates that at least presently, under

20   the TARP arrangements with General Motors, there is a very

21   important milestone with General Motors on March 31st that

22   General Motors and its stakeholders, including Delphi, are

23   moving towards.  And that I think there is an agreement among

24   the parties here that it would be difficult to get the kind of

25   clarity we need to make those plan modifications being filed

1    publicly until we understand how that's going to play out, if

2    you would.

3              THE COURT:  Right.

4              MR. BUTLER:  And so consequently we have reached an

5    agreement with them to change that date to April 2nd.  There's

6    also a series of agreements here to basically set additional

7    milestones and reporting requirements, much of which are

8    centered around whether the cash collateral account is able to

9    be used by Delphi or paid down by the lenders.  A series, if

10   you might think of them Your Honor, as a series of incentives

11   and disincentives on how we might conduct ourselves as we

12   continue to negotiate matters with them.  And the accommodation

13   supplement contains other terms and conditions into it.  I am

14   pleased to report that earlier today we received sufficient

15   affirmative votes from the participating lenders to make that

16   supplement effective.

17             And we believe, Your Honor, the reason we filed it

18   last night and because of the nature of the supplement, that we

19   wanted to ask Your Honor to approve both the amendment and the

20   supplement today.  We think, actually I would point out that

21   the supplement does have a failsafe in it that could allow the

22   supplement to be re-noticed out separately and heard in March.

23             THE COURT:  But it seems to me it is an improvement

24   for the estate so there's no reason to do that.

25             MR. BUTLER:  Well thank you, Your Honor.  We think

157

1    it's important -- we're filing our 10-K within the next week or

2    so we believe.  We're obligated to file it to the end of March

3    but we're probably going to file a 10-K in the next week or so.

4    And we'd like to be able to have the clarity of all of these

5    matters if we can.

6            THE COURT:  Okay.

7            MR. BUTLER:  So that's the -- and there are fees,

8    obviously, paid under the supplement too, which are outlined in

9    the affidavit and in the separate letters we provided the Court

10   in the confidential exhibit books.

11           With that in mind, Your Honor, that represents the

12   accommodation agreement.  There is no opposition to it of which

13   I'm aware.

14           MR. RIELA:  Your Honor, Michael Riela from the firm

15   of Latham & Watkins for the committee.  We certainly have

16   reviewed the accommodation agreement, the original amendment.

17   The advisors looked at the supplement agreement as well, had no

18   issues with it.  I just saw it for the first time a few minutes

19   ago with respect to one of the fees that is described in the

20   Sheehan affidavit, not something that was broached with the

21   committee but I think given the nature of the fees and the

22   amount, the committee would be supportive I would assume.  I

23   don't have authority from the committee to see -

24           THE COURT:  That was the ten basis points fee?

25           MR. RIELA:  No, the one on paragraph 24 --

158

1          THE COURT:  Okay.

2          MR. RIELA:  -- of the affidavit, I'm being vague.

3    But I don't have direct authority to say that we consent to

4    that but I have no basis at this point, in my own mind, to

5    object.

6          THE COURT:  All right.  I'll approve the amendment as

7    well as the supplement.  I believe that the fees are

8    reasonable.

9          MR. BUTLER:  Thank you, Your Honor.  Your Honor, then

10   turning to the GM arrangement third amendment approval motion.

11   With respect to the GM arrangement third amendment approval

12   motion, it's the same evidentiary record except I would present

13   Mr. Stipp who's here to testify with respect to his declaration

14   which is Exhibit 2, if anyone wants to cross examine him or if

15   the Court has any questions.

16         THE COURT:  Does anyone want to cross examine Mr.

17   Stipp?  I don't have any questions.  And I guess I have the

18   same question, other than that which is this declaration still

19   good as of today?

20         MR. STIPP:  Yes, Your Honor.

21         THE COURT:  Okay.  Thanks.

22         MR. BUTLER:  Your Honor, with respect to this motion,

23   we're asking -- again, these are amendments that became

24   effective, I believe, back also on January 30th when they were

25   entered into with GM at the same time we received the effective

1   accommodation agreement amendment.  They amend -- there's a

2   third amendment to the GM arrangement and there is -- which

3   changes certain definitions and provides certain additional

4   increased liquidity to the company.  And there is a pull

5   forward amendment that also enhanced the debtor's liquidity by

6   accelerating up to a hundred million dollars of the 300 million

7   of trade payments under that agreement from May 2009 to the

8   current quarter.

9           That agreement continues to be operative.  There is a

10  milestone or a decision point in that agreement where by the

11  end of this week GM needs to make an election in terms of

12  additional liquidity support for the company.  We're

13  negotiating with them about that and we'd expect that they'll

14  make that election on Friday as scheduled under the amendment.

15  And we are moving forward, Your Honor, in our negotiations with

16  them over the broader potential transactions that we'd work out

17  with them and with our DIP lenders that would be embodied in

18  proposed modifications to the plan.

19          THE COURT:  Okay.  Are there any other conditions to

20  the effectiveness of this?

21          MR. BUTLER:  No.  I'm not aware of any other

22  conditions to effectiveness.  It just looks to this Court's

23  approval at this point in time.

24          THE COURT:  Okay.

25          MR. BUTLER:  We're otherwise operating under it.

160

1        THE COURT:  All right.  Does anyone have anything to

2   say on this motion?  All right.  In light of that, as well as

3   my review of the motion, I'll approve it.

4        MR. BUTLER:  Thank you, Your Honor.  Your Honor, the

5   very last matter we have on the uncontested docket is the

6   special counsel retention confirmation motion that was filed at

7   Docket No. 14706.  The creditors' committee filed a statement

8   at Docket No. 14883 simply indicating they wanted the

9   opportunity to review and if necessary to object to the

10  expenditure of counsel fees in the debtors' business judgment

11  in doing so under those.  I'm pleased to report to Your Honor

12  that we've worked out an agreement between the committee and

13  the company and special counsel that would provide a mechanism

14  that would provide for a review process so the committee can

15  review those and if they have issues can object.

16        THE COURT:  Okay.

17        MR. BUTLER:  And there's a letter agreement that's

18  been signed between the company and the committee and approved

19  by both special counsel dealing with this.

20        As Your Honor recalls, we believe we have the

21  authority and in fact have been operating in the ordinary

22  course with respect to these retention matters since January

23  25th of last year, there was a desire to get something before

24  the Court, as I've advised the Court on earlier occasions,

25  about Freidman Kaplan and the Zussman firms with respect to

1    their retention by the debtors which occurred last year.  And

2    we simply are asking, in this motion, for confirmation of the

3    exercise of our business judgment in doing so and the use of

4    estate property subject to the terms and conditions of the

5    motion and proposed order.

6           THE COURT:  Is the agreement with the committee going

7    to be referenced in the order?

8           MR. BUTLER:  No, it's a side letter, Your Honor.

9           THE COURT:  But it's understood that that's part of

10   it?

11          MR. BUTLER:  Absolutely.  There's a side letter

12   agreement that's binding -- that binds the special counsel.

13          MR. RIELA:  The committee hasn't signed on to the

14   debtors' argument about do you need a confirmation order --

15          THE COURT:  But it's preserved its rights to raise --

16          MR. RIELA:  It's reserved its rights and basically --

17          THE COURT:  -- issues with the Court.

18          THE COURT:  -- what the side letter would do would

19   provide for our ability to review monthly statements, the

20   statements that are provided to the committee would allow us

21   until the effective date of a plan of reorganization to submit

22   an objection to the debtors.  We'd try to work it out and then

23   to the extent that we can't work it out, either special counsel

24   or the committee could bring the dispute to this Court for

25   final resolution.

162

1            THE COURT:  Okay.  All right.  I will approve that

2    arrangement and enter the order approving the retention of the

3    two firms.

4            MR. BUTLER:  Thank you, Your Honor.  That's all we

5    had on the docket.

6            THE COURT:  Okay.  Thank you.

7        (Proceedings concluded at 2:43 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

163

I N D E X

T E S T I M O N Y

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| Mr. Miller | Mr. Veis | 25 |
| Mr. Miller | Mr. Gloster | 34 |
| Mr. Miller | Mr. Cornell | 36 |
| Mr. Gebbia | Mr. Veis | 39 |
| Mr. Gebbia | Mr. Gloster | 41 |
| Mr. Gebbia | Mr. Cornell | 43 |
| Mr. Thornburg | Mr. Butler | 47 |
| Mr. McGrath | Mr. Butler | 51 |

E X H I B I T S

| HEARING | DESCRIPTION | PAGE |
|---|---|---|
| 6-13 | Salaried OPEB Plan Documents | 11 |
| 14-39 | Salaried OPEB Summary Plan Description and Employee Communications | 11 |
| 40-48 | Board Materials | 11 |
| 52-64 | Court Documents | 11 |
| 65, 86, 87, 88, 90 | Documents by Objectors | 11 |
| 66 | Letter from Delphi Plan Administrator | 14 |

164

1

2                          I N D E X

3                         (continued)

4

5                       E X H I B I T S

6      HEARING              DESCRIPTION                PAGE

7      67-75 and 79-85      Benefit Books and Plan     14

8                           Communications

9                           from GM Retirees

10     2                    Mr. Gebbia's Declaration   19

11     76-78                GAO Report, Congressional  17

12                          Testimony with Regard to

13                          Retiree Health Insurance

14                          and Health Coverage Tax

15                          Credits

16     1                    Mr. Miller's Declaration   19

17     1-5                                             148

18     1-26                                            151

19

20                       R U L I N G S

21                                              PAGE LINE

22     Motion for Order Under 11 U.S.C. Sections 105,   146  22

23     363(b)(1) and 1108, Approved

24     Motion to Approve Bidding Procedures,            149  5

25     etc., Approved

165

1

2                                    I N D E X

3                                  (continued)

4

5                                R U L I N G S

6                                                    PAGE  LINE

7    Motion to Approve Agreement to Modify          151   8

8    Automatic Stay, Approved

9    Motion to Approve Authorizing Debtors to       158   6

10   Enter into Amendment to Accommodation

11   Agreement, Approved

12   Motion Authorizing Debtors to Enter into       160   3

13   Third Amendment to Arrangement with GM,

14   Approved

15   Motion to Confirm Engagement and Retention     162   1

16   Of Special Counsel, Approved

17

18

19

20

21

22

23

24

25

166

1

2                          C E R T I F I C A T I O N

3

4       I, Esther Accardi, certify that the foregoing transcript is a

5       true and accurate record of the proceedings.

6       **Esther**          Digitally signed by Esther Accardi
                            DN: cn=Esther Accardi, c=US
                            Reason: I am the author of this
        **Accardi**        document
7       _____ Date: 2009.03.12 11:38:46 -04'00'

8       ESTHER ACCARDI

9

10      Veritext LLC

11      200 Old Country Road

12      Suite 580

13      Mineola, New York 11501

14

15      Date: February 26, 2009

16

17

18

19

20

21

22

23

24

25