Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 05-44481-rdd

4    - - - - - - - - - - - - - - - - - - - -x

5    In the Matter of:

6

7    DPH HOLDINGS CORP, et al.,

8

9              Debtors.

10

11   - - - - - - - - - - - - - - - - - - - -x

12

13                            United States Bankruptcy Court

14                            300 Quarropas Street

15                            White Plains, New York

16

17                            September 26, 2013

18                            10:17 AM

19

20   B E F O R E:

21   THE HONORABLE ROBERT D. DRAIN

22   U.S. BANKRUPTCY JUDGE

23

24

25   ECRO:  A. VARGAS

Page 2

1    HEARING re Motion for Order (I) Enforcing (A) Modified Plan and

2    Plan Modification Order Injunctions, (B) OPEB Orders, and (C)

3    Recoupment Order; (II) Enjoining James Sumpter's Second Lawsuit

4    Filed in the USDC for the Southern District of Indiana and

5    Requiring James Sumpter to Dismiss the Indiana Action with

6    Prejudice; and (III) Holding James Sumpter in Contempt and

7    Awarding Other Sanctions.

8

9    HEARING re Motion to Punish for Contempt Reorganized Debtors

10   Motion for Order (1) Enforcing (A) Modified Plan and Plan

11   Modification Order Injunctions, (B) OPEB Orders, and (C)

12   Recoupment Order; (II) Enjoining James Sumpter's Second Lawsuit

13   Filed in the USDC for the Southern District of Indiana and

14   Requiring James Sumpter to Dismiss the Indiana Action with

15   Prejudice; and (III) Holding James Sumpter in Contempt and

16   Awarding Other Sanctions.

17

18

19

20

21

22

23

24

25   Transcribed by:  Theresa Pullan

1    A P P E A R A N C E S :

2

3    BUTZEL LONG

4          Attorneys for Debtors

5          150 West Jefferson

6          Suite 100

7          Detroit, MI   48226

8

9    BY:   CYNTHIA HAFFEY, ESQ.

10         BRUCE L. SENDEK, ESQ.

11

12    JAMES SUMPTER, Pro Se

13

14

15

16

17

18

19

20

21

22

23

24

25

1                     P R O C E E D I N G S

2            THE COURT:  Good morning.  In re DPH Holdings.

3    Please be seated.

4            MS. HAFFEY:  Good morning, Your Honor.

5            THE COURT:  Good morning.

6            MS. HAFFEY:  Just brief, I'm going to give the Court

7    the agenda, and then turn it over to co-counsel.  Your Honor,

8    there is one --

9            THE CLERK:  I'm sorry, could you please state your

10   name for the record?

11           MS. HAFFEY:  I'm sorry, Cynthia Haffey, and I

12   represent the organized debtors.  There is one adjourned

13   matter, Your Honor, the motion to compel, motion for an order

14   to compel compliance with and to implement the modified plan,

15   plan modification order and related documents.  And my

16   recollection is that has now been adjourned until October 21st.

17           THE COURT:  This is the dispute with GM?

18           MS. HAFFEY:  That's correct, Your Honor.

19           THE COURT:  Okay.

20           MS. HAFFEY:  There are no uncontested matters.  There

21   is one contested matter, the Sumpter injunction motion and Mr.

22   Sumpter is in the Court today.  And then lastly, I'll just give

23   the Court a brief update on the adversary proceedings.  We have

24   resolved all of the adversary proceedings, some of them are

25   still in the final negotiation stage, but orders of dismissal

Page 5

1  will be entered in this Court no later than mid-December.

2          THE COURT:  Okay.  That's quite an accomplishment.

3          MS. HAFFEY:  Thank you.  It's been a long three

4  years.  And I'll now turn it over to Bruce Sendek.

5          THE COURT:  Okay.

6          MR. SENDEK:  Good morning, Your Honor, Bruce Sendek

7  for the reorganized debtors here on the motion requesting the

8  Court enjoin Mr. Sumpter from proceeding in the latest, which

9  is the second, Indiana action.

10          Preliminarily I'll tell the Court that the Indiana

11  court is aware of this proceeding today, and has copies of the

12  motion that we filed with this Court, and in fact a little bit

13  beyond that.  After we filed this motion with the Court, Mr.

14  Sumpter filed papers in the Indiana, Southern District of

15  Indiana seeking to enjoin this proceeding.  That court

16  responded with an order that essentially says it is appropriate

17  for this Court to consider the matter that we've now brought

18  before Your Honor.

19          THE COURT:  Right.  I read that order and that was

20  one of the reasons that I kept this matter on the calendar for

21  today.  I particularly wanted to, I was originally willing to

22  adjourn it for a month or so but it appeared that Mr. Sumpter's

23  health enabled him to participate today so it's on the

24  calendar.

25          MR. SENDEK:  So I just tell the Court that so there's

Page 6

1   no question of issues of comity or treading on the where the

2   Southern District of Indiana might otherwise go, and a small

3   other matter too.  After that case was filed in Indiana, we

4   filed what's called a notice of related case with the Judge

5   that was assigned to the newest case, Judge Lawrence, and the

6   court recently reassigned that case to the Judge who heard the

7   first Sumpter complaint, so that doesn't impact anything we're

8   doing today, I just tell the Court that by way of background.

9          In going to jurisdiction I don't know if the Court

10  has any questions about its jurisdiction to hear this matter,

11  but I think it's pretty clear that under Article 13P of the

12  modified plan, the Court did return, retain jurisdiction to

13  determine and consider any disputes involving the nature or

14  scope of the debtors' discharge including any dispute relating

15  to any liability arising out of the termination of a

16  retirement, of a retiree benefit program regardless of whether

17  such termination occurred prior to or after the effective date.

18         THE COURT:  Well I also have jurisdiction to

19  interpret and enforce my prior orders in addition to the

20  modification ordering the discharge [indiscernible] your

21  looking to enforce other prior orders.

22         MR. SENDEK:  Right.  And another reason I mention

23  that Article 13P is that it certainly contemplates that the

24  debtor was going to do other things with respect to the benefit

25  plans that were existing because it says whether such

Page 7

1   termination occurred prior to or after the effective date of

2   that October effective date.

3           So, now let's talk about Mr. Sumpter's new lawsuit in

4   Indiana.  It's a five count complaint.  It's premised on the

5   notion that the debtor has, the reorganized debtor has violated

6   the Court's OPEB order, and it's based on our view on a rather

7   tortured reading of that order.  So Mr. Sumpter says that we're

8   under that order obligated to continue to pay supplemental

9   extended disability benefits which is what's at issue here.

10          THE COURT:  I have sort of a basic initial question

11  here.  Does the debtor contend that under the OPEB termination

12  order from March 2009 I authorized the debtors to terminate

13  this particular plan pursuant to which they sent Mr. Sumpter

14  the termination letter of February 2012.

15          MR. SENDEK:  Yes, Your Honor.  The plan, the plan

16  that was before the Court in connection with the motion that

17  was filed that led up to that order was to get us to acquire

18  authority from the Court to terminate the life and disability

19  plan which these benefits are part of the life and disability

20  plan.  And what was before the Court was broadly defined, and

21  I'm looking at the motion right now, and here is the

22  definition.  By their terms all the employee benefit plans and

23  programs that provide post-retirement, health and life

24  insurance benefits hereinafter salaried OPEB to the eligible

25  salaried retirees and their surviving spouses may be amended,

Page 8

1    modified, suspended, terminated by the debtors.  That's the

2    issue that was before the Court.

3            THE COURT:  So it's the DPH's view that the motion

4    and then the order itself from March 1, 2009 when it lists or

5    defines salaried OPEB and defines the order salaried OPEB means

6    the debtors' current and future costs associated with providing

7    post-retirement health and life insurance benefits to salaried

8    retirees that the reference to health includes disability?

9            MR. SENDEK:  Yes, Your Honor.

10           THE COURT:  Okay.

11           MR. SENDEK:  That was what was before the Court.

12           THE COURT:  And then it says which termination inter

13   alia consists of, and the list includes in item B ceasing to

14   make company contributions to provide post retirement

15   healthcare for current and future salaried retirees and

16   surviving spouses.  Then it says, also says cancelling all

17   retirees health reimbursement accounts for Medicare eligible

18   salaried retirees or surviving spouses and ceasing the one

19   percent employer contributions to salaried retirement savings

20   plan for those active salaried employees hired after January

21   [indiscernible].  So those plans include the plan that is the

22   provider of the disability benefit --

23           MR. SENDEK:  It is the life and disability plan, yes

24   Your Honor.  And the reference to inter alia, that would

25   include, you know, may not be specifically enumerated there,

Page 9

1   but it includes the disability benefit, the extended to

2   supplemental disability benefit that's at issue here.

3            THE COURT:  Well is it disability benefit for health?

4   Is it for health care or is it just a flat sum because you got

5   a disability?

6            MR. SENDEK:  It's, well I guess it's related, it's,

7   the disability arises out of that health condition.  I'm not

8   sure exactly how to answer that question.  But it's a benefit

9   that was at one time available to employees that were on

10  disability for whatever reason, whatever health issues that

11  they had encountered.

12           THE COURT:  Well, let me ask you this question a

13  little differently.  The basis for my conclusion that this

14  relief could be granted back in 2009 was two-fold.  First, I

15  concluded, and this also involved an evidentiary hearing after

16  I appointed the retiree committee, that no benefits had

17  specifically vested so you aren't going back on vested

18  benefits; b) that a typical provisions of the applicable

19  programs contained an absolute right to terminate.  And those,

20  that language is cited in footnote 3 of Delphi's motion for

21  authority to terminate and it refers to Article 1, section

22  1(b)(1) of Delphi salaried healthcare program and Article 3,

23  section 3.05(b)(1) of Delphi salaried life and disability

24  benefits program, as well as Article 3, section 2 of the

25  salaried retirement savings program.  So those were the three

1    programs that whose language I interpreted.

2            MR. SENDEK:  Yes, Your Honor.

3            THE COURT:  And it's DPH's contention that the

4    particular plan under which Mr. Sumpter was given disability

5    and that was, he was notified in February of 2012 that it would

6    be terminated.  That's covered by one of these three programs

7    that I just cited to?

8            MR. SENDEK:  It is.  That is in the life and

9    disability plan.  So the same language, well that's the

10   language that the Court interpreted so --

11           THE COURT:  But is that -- the reason I'm getting to

12   this is I'm trying to figure out whether you're arguing res

13   judicata under the in violation of the, whether you're arguing

14   res judicata based on the March 2009 order or whether you're

15   arguing collateral estoppel.  And the difference would be

16   obviously if the plan itself was the subject of the motion

17   which I granted, then that would be res judicata.

18           MR. SENDEK:  Yes sir.

19           THE COURT:  If it wasn't, and instead you're relying

20   therefore on collateral estoppel, I would have to know whether

21   in fact the language upon which I base this relief was in, was

22   in some other pleading, some other plan or was within these

23   specific plans that I interpreted.

24           MR. SENDEK:  Yes, I understand what you're asking

25   Your Honor.  And first I will say, I will say it is really both

1    a collateral estoppels and res judicata, and I'll explain.  But

2    not collateral estoppel because it's in some other plan and has

3    the same type of vesting language.  It is, it is the vesting

4    language, the non vesting language, right, the ability to

5    modify, amend, discontinue the plan that the Court, you know,

6    focused on is in the life and disability plan which is, which

7    gives rise to the benefit that Mr. Sumpter claims in Indiana

8    was wrongfully cut off.  So, in that sense, it is res judicata

9    because that is the same order and the Court has, the Court has

10   already opined that under that plan that we had a right to do

11   so.  There may be some collateral estoppel effects because he –

12            THE COURT:  Of other relief he's seeking.

13            MR. SENDEK:  Of other relief and against other

14   parties.

15            THE COURT:  I don't want to get to that for a second.

16   I just want to focus on this.  So the life and disability plan,

17   is that, I think I read it in preparing for this but I'm not

18   sure where it appears in the binders you gave me, is it, can

19   you tell me what tab it appears in?

20            MS. HAFFEY:  The plan itself, Your Honor?

21            THE COURT:  Yeah.  Oh, I just found it.

22            MR. SENDEK:  Thank you.

23            THE COURT:  It's tab 3 in binder 1, I think, Delphi

24   Life and Disability Benefits program for salaried employees

25   effective January 1, 2004.  Okay.

1        MS. HAFFEY:  That's correct, Your Honor.  And we've

2   just provided you with the relevant section.

3        THE COURT:  Okay.  And so Mr. Sumpter would be

4   covered by this as -- when did you cease employment, Mr.

5   Sumpter, 2000?

6        MR. SUMPTER:  December 8, 2000.

7        THE COURT:  2000.  And when did you start?

8        MR. SUMPTER:  February 4th, 1991 I think was the

9   date.

10       THE COURT:  Okay.  Okay.  So I don't know if you

11   have, I think it's exhibit TT in the third binder, that's the

12   motion, the OPEB motion.

13       MR. SUMPTER:  Okay.

14       THE COURT:  And at page 22 there is a chart of the

15   benefits that Delphi was proposing to affect, affect with an a,

16   and I don't know if you have that in front of you but -- okay.

17       MR. SENDEK:  We're getting it out.  I think I know

18   the chart.

19       THE COURT:  I think it's page 22.

20       MS. HAFFEY:  Right.

21       THE COURT:  So I guess given the date of, dates of

22   Mr. Sumpter's employment, I guess he'd fit into the first box

23   there, active salaried employees hired by GM prior to 1993.

24   Oh, I'm sorry, he'd be in the bottom one.  He'd be retired

25   salaried employees who were hired by GM prior to 1993.

Page 13

1          MS. HAFFEY:  Mr. Sumpter, you were hired prior to '93

2    from GM?

3          THE COURT:  '91, right?

4          MR. SUMPTER:  '91.

5          THE COURT:  Okay.  So it's the bottom box then,

6    retired salaried employees who were hired by GM prior to 1993.

7    And the benefits being referred to there are, the first one is

8    Delphi subsidizes medical benefits until Medicare eligible,

9    i.e., 65, and insurance benefits for life.  Then it says may

10   purchase medical benefits in retirement.  That's the proposed

11   treatment.  And some other ones too including some

12   cancellations.  But which one of these, I guess I'm still

13   trying to figure out to make sure I understand the basis for

14   DPH's argument that this motion did contemplate the termination

15   of these, of Mr. Sumpter's benefits under Delphi Life and

16   Disability Benefits Program for Salaried Employees.

17         MR. SENDEK:  Yes, because what DPH wanted to do was

18   to terminate the plan, which was a life and disability plan,

19   and, you know, excuse me, get the Court's authorization to do

20   so, which it did based on the non-vesting language.

21         THE COURT:  The motion itself, neither the motion

22   itself nor the order specifically refers to any individual

23   plan.  It doesn't list, I don't think, unless you can point it

24   out to me, I read it, but maybe, you know, if there's something

25   in there I missed, you should show me.  But I don't think it

1    lists a specific, any specific plans, and there was more than

2    one.  This isn't the only one.

3            MR. SENDEK:  That's right, I think there were three,

4    Your Honor, that were before the Court, and I think the issue

5    is that you know the --

6            THE COURT:  Well how were they before the Court?

7    That's really what I'm getting at.

8            MR. SENDEK:  Through the motion itself, through the

9    filing of the motion to terminate.

10           THE COURT:  Well, the motion doesn't list these

11   plans.

12           MR. SENDEK:  It does identify the life and disability

13   plan.

14           THE COURT:  Where?  That's what I want to see.  Maybe

15   I missed this, but I --

16           MR. SENDEK:  I think it's on the first, I think it's

17   on the first page, it's on the footnote, right?  Here we are.

18           MS. HAFFEY:  Yeah, it lists them all on here.  If I

19   can interject for one moment, I think there may be confusions

20   from the use of the word plan versus a benefit.

21           THE COURT:  As long as benefit is the one we're

22   talking about here.  That's all I'm looking for.

23           MS. HAFFEY:  Yeah, because the --

24           THE COURT:  Because Mr. Sumpter's main point, and he

25   makes this very clear in his response is that he says my

Page 15

```
 1    disability benefits weren't covered by this order or this

 2    motion, that Delphi sought to terminate other stuff, but not

 3    this.  So that's what I'm trying to find out.

 4              MA. HAFFEY:  Right.  And as Mr. Sendek pointed out

 5    earlier on page 3 of the motion, the termination motion, the

 6    definition of salaried OPEB refers to all of the employee

 7    benefit plans and programs.

 8              THE COURT:  That provided post-retirement health and

 9    life insurance benefits.

10              MS. HAFFEY:  Correct.  But not saying only those,

11    they were looking to terminate those plans and the plans are

12    identified below then in footnote 3 which is the footnote is

13    at, you know, at the end of that sentence.  And then footnote 3

14    goes and identifies the three plans, the Delphi salaried health

15    care.

16              THE COURT:  So let me read that carefully then.  Oh,

17    yes, I looked right over it.  You're absolutely right, section

18    3.  It refers to section 3.05(b)(1) of Delphi salary life and

19    disability benefits program.  All right.

20              MS. HAFFEY:  Right, and it goes on and mentions the

21    two others in that same paragraph.

22              THE COURT:  Right.  But this is the one that --

23              MS. HAFFEY:  That's correct.  And admittedly, Your

24    Honor, the discussion of disability benefits --

25              THE COURT:  And you attach that language in exhibit
```

Page 16

1   3, section 3.05(b)(1) which is clear.  So, all right, I'm clear

2   now on this.  All right.  So the order really did deal with

3   this specific plan and gave the debtor the authority to

4   terminate.

5           MR. SENDEK:  Yes.  And that's why we get to res

6   judicata on some of the direct claims that Mr. Sumpter brings

7   on that.

8           THE COURT:  All right.  Okay.  You can respond to

9   this later, I just, I'm just trying to get out the debtors'

10  argument in full.

11          MR. SENDEK:  Okay.  And there is, and there's no way

12  that the Court could look at the order that was entered and say

13  that there is some affirmative duty to continue to pay extended

14  disability benefits, which is the crux of his claim to do so,

15  to do so for I guess until 65.  I mean it just runs afoul of

16  everything that the reorganized debtor was doing, you know, or

17  the debtor was doing, which was try to come up with a cessation

18  date, an end date for case closing.

19          THE COURT:  Now the debtor chose, I guess, however,

20  to continue disability benefits under this plan or program

21  until February 2012 even though I had authority to terminate

22  back in March.

23          MR. SENDEK:  That's right, and I think that's exactly

24  how it was set up, that you know if and when we make these

25  cutoffs or, there's not a question of if, it was going to

Page 17

1    happen because obviously there's going to be case closing, DPH

2    was winding down the affairs, it wasn't going to continue to

3    exist and pay benefits until, you know, employees were 65 or

4    older.  So obviously it was contemplated, and at such time as

5    they pulled the trigger on discontinuing the particular

6    benefit, they would pay it, and they did until March of 2012.

7    And that's of course what triggered a number of things, so Mr.

8    Sumpter objected to.

9              THE COURT:  And what Mr. Sumpter is looking to

10   collect at this point is from April going forward, April 2012

11   going forward.  So he's not looking to collect amounts that

12   Delphi owed before the termination.

13             MR. SENDEK:  In some of his counts.  He has, he has

14   one count I think he's looking for some additional money before

15   that date.  I think that's based on his notion of unjust

16   enrichment which is one of the counts in the Indiana court.  I

17   can go into that if you want, but --

18             THE COURT:  But that's a different issue, that's the,

19   that's based on the --

20             MR. SENDEK:  The PBGC ceding the pension to BPGC.  So

21   it's a little different flavor, but yes, the Court is right,

22   it's looking, it's looking for a payment, he's looking for

23   payment after that date, which is, and I think $4 million just

24   because in connection with claims of RICO civil conspiracy

25   extortion, that sort of things that are leveled against not

 1   only DPH but its attorneys, Mr. John Brooks and others.  So

 2   yes, that's part of it as well.

 3           THE COURT:  Okay.

 4           MR. SENDEK:  So, again back to the res judicata, yes,

 5   I think it is clearly res judicata by virtue of this Court's

 6   prior order, and also by virtue of the Court's order approving

 7   the modification of the plan and the plan itself.  I mean that

 8   fits in well because there's language in --

 9           THE COURT:  Well to the extent there's a claim

10   asserted for this breach, I could see it being res judicata,

11   yes.

12           MR. SENDEK:  Right.  Right.  So the plan, the plan

13   covers it, there's a very broad discharge provision in section

14   11.2 of the plan that contemplates any and all claims and

15   including those that arose before the effective date which such

16   claims relate to a termination of a retiree benefit program

17   regardless of whether such termination occurred prior to or

18   after the effective date.  So the, the OPEB proceeding predated

19   that and I suppose if Mr. Sumpter had some additional challenge

20   to make regarding his benefit, his benefit plans or his

21   benefits, period, he could have filed objections to the plan

22   itself, and presumably attacked it at that time.  He didn't.

23   The plan was consummated and the order was entered.  So I think

24   at that point it has res judicata affects as well as, you know,

25   it exculpates the defendants who are also unfortunately part of

Page 19

1    the Indiana lawsuit he filed.

2           THE COURT:  The individual defendants, the lawyers

3    and the other parties.

4           MR. SENDEK:  Individual defendant, one entity which

5    is my law firm, Butzel Long, was also named as a party as well,

6    through the notions that there was a conspiracy to deprive him

7    of this benefit and other allegations of similar ilk, rather

8    scurrilous because we really didn't extort the man, but that's

9    the claim that was made.

10          THE COURT:  Well, again to me and Mr. Sumpter, you're

11   going to have to respond to this particular point.  It all

12   flows from whether I had previously given authority to the

13   debtor to terminate this plan.  If I gave authority to the

14   debtor to terminate this plan, which it appears to me I did,

15   then debtor and its agents was acting or were acting within

16   that authority and clearly doing nothing wrong, and moreover,

17   that's the basis for the exculpation and the injunction is to

18   ensure that post-reorganization the debtor and its agents would

19   not be sued for doing things that they had already been

20   authorized to do by a final order.  And if there are any claims

21   against the debtor that arose from the action that I authorized

22   which all come, all flow out of the termination of the benefit

23   plans, those claims were channeled through the plan, like

24   anyone else's claims, and paid as provided for under the plan.

25   So to me this all flows from and I think your response hits on

Page 20

1   this, Mr. Sumpter, it all flows from whether in fact the March

2   2009 OPEB order authorized the debtors to do this.  If it did,

3   then they weren't doing anything wrong.

4          MR. SENDEK:  I might suggest even beyond that if we

5   could imagine it didn't deal with that at all that the, that

6   the plan and the modification order would itself have res

7   judicata affects having that plan entered in place.  Again,

8   imagine it never happened, I think they would still have some

9   res judicata affects and preclude the claims, and also

10  exculpate the related parties.

11         THE COURT:  Well I guess they would preclude the

12  claims against the agents.  I understand that.  It would only

13  be against the debtor, and then they would be covered by the

14  plan provisions in the discharge.

15         MR. SENDEK:  Yes, Your Honor.  So I can talk more

16  specifically about the claims in Indiana if the Court wants to

17  go through them.

18         THE COURT:  Well I think, I mean I think we've spent

19  95 percent of the time so far focusing on the claim for

20  disability benefit and related claims, related to the

21  termination.  But as I read the complaint although it's hard

22  for me to -- I'm having a hard time understanding the bases for

23  it, I think there's, and you alluded to this also, there's a

24  claim for unjust enrichment and this deals with I think a

25  different issue, although maybe I'm wrong about that.  Maybe it

Page 21

1   is just the disability benefit, but because it refers the third

2   cause of action.

3          MR. SENDEK:  Right.

4          THE COURT:  It says plaintiff seeks to recover

5   pension benefit offsets that DPH has taken or will take from

6   the plaintiff's [indiscernible] but how does this, what pension

7   offsets are we talking about?

8          MR. SENDEK:  Yes, Your Honor, I'll give you my

9   interpretation of the claim and also a reason why I think the

10  Court can quickly dispatch it as well.  It is, it is I think

11  what Mr. Sumpter is saying is that DPH in his words in the

12  complaint ceded the pension plan to the PBGC.

13         THE COURT:  So, let me just stop you there.  We're

14  talking about a different plan than what we had been talking

15  about so far which is the --

16         MR. SENDEK: Disability.

17         THE COURT:  Disability and --

18         MR. SENDEK:  The disability benefits under the plan.

19  It's still, the disability benefits under the life and

20  disability plan still come into play, but he brings in the

21  concept of another plan which is the pension plan.  I think

22  what he is saying is in, is that, look, you debtor ceded your

23  obligations under the pension plan to the government, PBGC.

24  Okay.

25         THE COURT:  As part of the pension plan termination.

1           MR. SENDEK:  Right.  Which brings in another order

2     which was allowed by this Court and permitted.  And he says

3     that's wrongful, he says he breached, I mean this is actually

4     in the allegation of his complaint, they breached the

5     disability program when it ceded the pension program to the

6     PBGC.  So then the --

7           THE COURT:  But --

8           MR. SENDEK:  I'm going to get to the concept.  I

9     think the concept is that at that point, you know, while you

10    have rights to offset disability benefits against pension

11    benefits so that you know a recipient doesn't get overpaid, you

12    know, there is an offset that takes place to recognize that

13    there is a person getting a pension and disability, you don't

14    want them to profit from it, so there's an offset.  And the

15    claim is, again as I interpret it is that well once you didn't

16    have the obligation to pay the pension and went to the

17    government, you had no right to offset you were unjustly

18    enriched.

19          THE COURT:  But there's no offset anyway because

20    you're terminated.

21          MR. SENDEK:  Terminated, exactly.  Exactly.  And also

22    he talks about it occurred when they ceded it in July 2009,

23    which is, which is before the effective date of the plan, of

24    the modified plan.  So there is a reason there why it ought to

25    be --

1          THE COURT:  Well I guess the first issue I have

2     really isn't my issue.  I have jurisdiction only to enforce my

3     orders.  The point I was making I guess is really if I decided

4     that this claim didn't violate one of my prior orders then it

5     would be up to the Indiana court to decide whether there's any

6     claim here because the debtors aren't seeking to offset

7     anything.  But, so you're saying then that leaving aside

8     whether there be a claim or not, the claim is premised upon the

9     alleged improper termination of the pension plan.  Right?  And

10    then you're saying but it wasn't improper because the Court

11    authorized the termination.

12          MR. SENDEK:  He says that and also --

13          THE COURT:  No, you're saying that that it's not an

14    improper termination --

15          MR. SENDEK:  It's not improper.  The Court --

16          THE COURT:  -- because there was a court order that

17    permitted that the pension plan be terminated.

18          MR. SENDEK:  The Court ordered it, and also this

19    Court, you know, the Court entered the modified plan and the

20    order confirming the modified plan.  That creates res judicata.

21    If that claim hadn't been asserted by that date or the date

22    provided under the plan, then it's lost.  And there's one other

23    order that it implicates too.  This is, this is very close to

24    what Mr. Sumpter previously claimed in a motion called the

25    recoupment motion, and that was the same concept that he's now

Page 24

1   bringing here saying that --

2           THE COURT:  The unjust enrichment point.

3           MR. SENDEK:  I'm sorry.

4           THE COURT:  The unjust enrichment point.

5           MR. SENDEK:  Yes, and that was, that was denied.

6           THE COURT:  Although he didn't, he didn't really

7   argue unjust enrichment as --

8           MR. SENDEK:  Recoupment is what he said.  But

9   basically he's talking about offset, that's where collateral

10  estoppel comes in because he's claiming that there should not

11  have been offsets to his disability payments because of

12  whatever it was back then, Social Security, some other offsets,

13  and now he's added to the list pension, and it is just, it is

14  just another --

15          THE COURT:  But there aren't any offsets.

16          MR. SENDEK:  There are not any offsets.

17          THE COURT:  In the first place.  Well, I mean is it

18  contended that the debtors offset pension versus disability?

19  Is that a contention that the debtors have offset pension

20  versus disability after termination of the pension plan?

21          MR. SUMPTER:  The debtor reduced the disability

22  payments by the amount that was paid for part A and part B

23  pensions.  So those were offset, they reduced the disability

24  payment by part A and part B pension plans.

25          THE COURT:  After the termination of the pension

Page 25

1   plan?

2          MR. SUMPTER:  Yes.

3          THE COURT:  Is that what the complaint -- I'm just

4   trying to figure out -- I don't understand how that, how can

5   you reduce --

6          MR. SUMPTER:  I think I can explain it for you.

7          THE COURT:  Okay.  I'll let you -- we'll just

8   remember that and I'll let the debtor [indiscernible].

9          MR. SENDEK:  Well I'm looking at the complaint right

10  now and paragraph 27 he says however, Delphi breached the

11  program contract when it ceded the pension benefit program

12  underfunded by $7 billion to the Pension Benefit Guaranty

13  Corporation in July 2009.  Now if that's when it was breached

14  in July of 2009 the modified plan would extinguish that claim.

15  It's premised on a breach that occurred in July of 2009.

16         THE COURT:  Okay.  So you're saying whether or not

17  there is any sort of valid claim arising from this it's a

18  preconfirmation claim recovered by the administrative claim's

19  bar date and by the [indiscernible] discharge injunction.

20         MR. SENDEK:  Yes, based on --

21         THE COURT:  Because that's all post that date.

22         MR. SENDEK:  Yes, and that's right from the face of

23  his complaint so the Court can enforce that order it has and

24  the injunctive relief that we've asked for would apply equally

25  here.

1             THE COURT:  Okay.

2             MR. SENDEK:  And I also note just, you know, as I

3    observe this third count in paragraph 27, Mr. Sumpter refers to

4    the Delphi Life and Disability Program.  So I mean he

5    understands that the disability benefits come under that

6    particular plan or program which was before the Court in

7    connection with the OPEB order.

8             THE COURT:  All right.

9             MR. SENDEK:  Okay.  Well I'll turn it over to Mr.

10   Sumpter.

11            THE COURT:  Okay.  Now Mr. Sumpter I understand

12   you're not in the best of health.  Are you able to stand up or

13   is it okay to --

14            MR. SUMPTER:  I can stand, in fact standing is --

15            THE COURT:  Is better?

16            MR. SUMPTER:  A little of both is okay.

17            THE COURT:  Okay.

18            MR. SUMPTER:  Shall I stand here or there or does it

19   matter?

20            THE COURT:  Wherever you're comfortable.

21            MR. SUMPTER:  Well, let me say first that if I am

22   incorrect about the OPEB order in relation to the disability

23   benefits then my entire complaint in Indiana evaporates.  Okay.

24   it's all foundation on that.

25            THE COURT:  Okay.

Page 27

1            MR. SUMPTER:  But I mean I'm convinced, I mean I'm

2    reading that plain language of that order and also I was on the

3    1114 committee for a time up until the time of the negotiated

4    settlement.  And I am confident that disability benefits were

5    not a part of that termination order.  That order specifically

6    articulated each benefit that it was terminating, and it did

7    not articulate disability.  It specified life, it specified

8    healthcare, it specified the Social Security supplement, I

9    don't know maybe there's a health savings account, any one of

10   those things.  And they were all enumerated, and disability was

11   not enumerated.  And I contend the reason it wasn't enumerated

12   is because disability benefits were vested.  But --

13           THE COURT:  Well why, I mean the language is the

14   same, the language that led me to conclude that they were not,

15   that benefits were not vested, the so called salaried OPEB

16   benefits were not vested is the very language that's in this

17   claim in section 3.05(b)(1) which says the corporation reserves

18   the right to amend, modify, suspend or terminate the program in

19   whole or in part at any time by action of the board of

20   directors, the directors or the committee.  So it is the same

21   language.

22           MR. SUMPTER:  Well, I have to look to my notes to

23   refresh my memory on all those points.  But one of the points

24   is benefits vest at the time performance is due.  So I was

25   disabled and receiving disability benefits.  So my benefits

1    would have been vested already.  It would be as if a person was

2    sick and they terminated and was receiving treatment and they

3    terminated health care benefits, they would be obligated to

4    continue paying for that treatment.

5         THE COURT:  Well but I already ruled on that.

6         MR. SUMPTER:  I'm just using that as an example.

7         THE COURT:  Yes, they owed everything up to the point

8    of termination.  But since they had the right to terminate they

9    weren't vested, that was my ruling.

10        MR. SUMPTER:  Yes, I'm not disputing your ruling.

11   I'm saying but they didn't include disability benefits,

12   otherwise I think your ruling would have been different.  I

13   think that's why you had us go look for vested benefits, but we

14   didn't look for vested disability benefits because they weren't

15   included in the list.

16        THE COURT:  Well --

17        MR. SUMPTER:  I mean otherwise they would have, it

18   seems to me they would have said we are terminating the

19   healthcare benefit program and its number 006, we terminated

20   life and disability program, whatever else, whatever else

21   program, but they didn't do that, they articulated specifically

22   which benefits that they were terminating.

23        THE COURT:  Well they didn't articulate any program,

24   they spoke generically.

25        MR. SUMPTER:  That's right.  That's right.

1          THE COURT:  But let me get back to this point though,

2    if someone has a right to healthcare because they have, you

3    know, a preexisting condition, let's say they have diabetes,

4    okay, and so that's covered by the healthcare plan that that

5    condition exists before termination of the plan, I concluded

6    that they would have to pay up to the time they terminated

7    because that's what they chose to [indiscernible] but after

8    termination they don't have to provide it.  That's how I

9    interpreted vested.  Why wouldn't that apply equally to

10   disability?

11         MR. SUMPTER:  Because I think the sort of difference

12   there is claim.  A person who has say diabetes and doesn't have

13   an active claim --

14         THE COURT:  Well no, they do, they have that.

15   They're getting treatment for diabetes before the debtor

16   terminates the program.

17         MR. SUMPTER:  They get treatment on a discrete basis.

18   Like if I can choose a different analogy or whatever.  A person

19   is in the hospital for surgery, and he's in the hospital for

20   five days, and they terminate the healthcare plan on day 3, but

21   the claim would cover his full hospital stay, they would pay

22   that full claim.

23         THE COURT:  Why is that?

24         MR. SUMPTER:  Because the claim existed before the

25   termination, and there's case law, I mean I can go dig that up

1    when I did my search on vesting, performance was due at the

2    time that they went in the hospital.  Now once that discrete

3    event is over, you know, if he went out three days later and

4    stubbed his toe, that wouldn't have been covered because that's

5    a new claim.

6              THE COURT:  Well tell me again your reason for

7    thinking that rights under this plan were not covered by the

8    OPEB motion.

9              MR. SUMPTER:  Because the specific language didn't

10   include it.

11             THE COURT:  Well, I thought you were going to go into

12   more detail than that.  Remember back to the spring of 2009 I

13   had a preliminary ruling on this.

14             MR. SUMPTER:  Yes.

15             THE COURT:  But I appointed a retirement committee,

16   and their first responsibility was to look into whether

17   anything vested.  And then they made that report, I gave them a

18   budget to look at, they made that report and then I had an

19   evidentiary hearing.

20             MR. SUMPTER:  Yes.

21             THE COURT:  So why did you believe this wasn't,

22   disability wasn't the subject of this?  I mean I, for example,

23   I understood that you basically you got off the committee

24   because you thought they were going to settle with AVIVA

25   instead of doing COBRA and I guess none of that would be

Page 31

1    relevant if the disability wasn't covered in the first place.

2              MR. SUMPTER:  No, it has nothing to do with that

3    disability.

4              THE COURT:  No?

5              MR. SUMPTER:  Strictly, COBRA is strictly healthcare,

6    and AVIVA is strictly healthcare.

7              THE COURT:  Okay.

8              MR. SUMPTER:  So they are unrelated.

9              THE COURT:  Okay.  So are you representing to me that

10   there were discussions on the committee and even with the

11   debtors as to, you know, what types of plans would be covered

12   in its assignment as to look at what vested and what didn't

13   vest?

14             MR. SUMPTER:  No.  No.  I believe that if you go back

15   and look at the transcript, you're the first person to bring up

16   the word disability, and you asked the question would any of

17   these OPEB benefits, I'm paraphrasing now, sorry, would any of

18   these OPEB benefits be vest with somebody who had retired on

19   disability.  I can --

20             THE COURT:  Can you show me where that is?

21             MR. SUMPTER:  Let's see if I can find it.

22             THE COURT:  I know that in my ruling --

23             MR. SUMPTER:  I think, look at about page 80 of the

24   transcript and I'll see if I can narrow it down.

25             THE COURT:  Because in my ruling I say that the

Page 32

1   debtors take the position that notwithstanding 1114 they have

2   the right to terminate benefits even if, for medical surgical

3   hospital care and benefits or benefits in the event of

4   sickness, accident, disability, death.  So I know I raised it

5   there at the beginning of my ruling, but you say it's around

6   page 80?

7           MR. SUMPTER:  Page 80, and it's on line 4.

8           THE COURT:  Okay.

9           MS. HAFFEY:  What exhibit is that, Mr. Sumpter?

10          MR. SUMPTER:  That's the transcript.

11          THE COURT:  It's exhibit 2.

12          MS. HAFFEY:  Thank you.

13          THE COURT:  All right.  Okay.  So Mr. Glosser

14  (phonetic) didn't seem to, he doesn't like react to that by

15  saying well this doesn't even cover disability.  He doesn't

16  seem to be phased by that question.

17          MR. SUMPTER:  That's right, because I think he

18  doesn't believe that disability is affected, but he talks --

19          THE COURT:  No, I, to me I think it's just the

20  opposite.  If I say spend a moment with me on the people who

21  retired on full disability, what is the factual point there as

22  far as there either having some separate promise or promissory

23  estoppel.  I guess I would think if he believes that, lawyer

24  for the committee, the retiree committee, if he thought that

25  this motion didn't even cover disability, he would have said

Page 33

1    well wait a minute Judge, you know, you're going down the wrong

2    road here by mentioning disability, they're not looking to

3    terminate on disability.

4            MR. SUMPTER:  Well, I guess I see it differently.  I

5    think he understood that the motion wasn't terminating

6    disability.  But what he was addressing was what I believe he

7    understood to be the OPEB benefits and he uses an example.

8            THE COURT:  Life insurance.

9            MR. SUMPTER:  Life Insurance.  Which is one of the

10   OPEB benefits that are articulated in that list.  And so that's

11   what he was talking about and those are the things that we

12   looked for because there was no understanding that the

13   disability benefits were being terminated.  I mean it's just

14   not articulated there.  I don't understand how we could say we

15   articulated all the benefits but one.  And now we rely on the

16   fact that we're saying we're terminating these programs.  But

17   this one we choose not to specify.  I can tell you being on

18   disability if that had been specified my whole reaction would

19   have been, would have to have been more aggressive or whatever

20   just because that's affected me so severely as it has that that

21   would have been my top campaign.  In fact right now, you know,

22   the I mean the DSRA, that retirees' group has never concerned

23   itself about any disability issue because it was never, you

24   know, never comprehended that that benefit was terminated.

25           THE COURT:  How do I, I mean other than your

1    representation, is there anything else, would you be able to

2    offer evidence of that?

3              MR. SUMPTER:  Of what the committee --

4              THE COURT:  That other people viewed this order as

5    not applying to disability.

6              MR. SUMPTER:  I'll can only tell you on the committee

7    it was never discussed.  Outside of that, I know maybe three or

8    four disabled people who were distressed by it.  I don't think

9    they were informed enough, even I for example --

10             THE COURT:  I guess the main thing I'm focusing on is

11   the committee.

12             MR. SUMPTER:  Right.  In the committee, it was never

13   discussed.  It was all the, what we understood, the issues we

14   understood to be OPEB and when we solicited --

15             THE COURT:  Well generically OPEB could include

16   disability, it's all the benefit obligations and disability is

17   a benefit.

18             MR. SUMPTER:  Right.  I believe that that would be

19   the case except for they defined it, the way they defined it.

20   I mean I suppose OPEB could include accidental life insurance

21   benefits if they chose to find it that way because that was

22   something that retirees could continue on and pay or whatever.

23   But I mean they defined the benefit.  And it seems to me if it

24   has to be interpreted, they are disadvantaged if nothing else

25   because they're the one that wrote the definition, and it did

Page 35

1   not include that one benefit, and it articulated each of the

2   other ones.  And those are benefits, many of those benefits are

3   associated with disability.  For example, when you're disabled

4   you receive Medicare and so, you know, if you're approved for

5   Social Security, preference it first for that, but then you're

6   entitled to the supplement.

7           THE COURT:  Well they did seek to cancel Medicare

8   special benefits.

9           MR. SUMPTER:  Right.

10          THE COURT:  They did seek to cancel those

11  specifically.

12          MR. SUMPTER:  Exactly.  And that's my point.  They

13  specified that benefit because the retirees, nondisabled

14  retirees when they get to 65 can also receive that benefit.

15  Okay.

16          THE COURT:  And they cancelled those too.

17          MR. SUMPTER:  Right.  But they specified they

18  cancelled those too.  I mean if they were just cancelling the

19  disability program, they wouldn't have had to specify any of

20  those things.

21          THE COURT:  Well they also say that they're

22  cancelling insurance benefits.

23          MR. SUMPTER:  Life insurance, right?

24          THE COURT:  Well it just says insurance in the chart.

25  Subsidies for medical and insurance benefits terminated.  Is

Page 36

1    this -- well obviously a question for the debtors as well as

2    you.

3              MR. SUMPTER:  Well if you look at --

4              THE COURT:  Is it fair to look at disability as an

5    insurance, an insurance benefit?

6              MR. SUMPTER:  It would be fair to look at I think

7    supplemental extended disability benefits that way because I

8    have to pay a premium for that.  For the extended disability

9    benefits, that was just a part of the benefit package when

10   you're hired on just like you got two times your salary in life

11   insurance, you didn't have to pay anything for that.  But if

12   you were employed for less than ten years, you had to, if you

13   wanted that supplemental extended disability benefit you had to

14   pay for it which I did do.  So I actually paid a premium for

15   that.

16             THE COURT:  Well I mean the program itself says

17   benefits under the program will be provided at the discretion

18   of the corporation through a self-insured arrangement or under

19   a group insurance policy or policies issued by a carrier set

20   forth [indiscernible] so I mean it is, I mean I think it is

21   insurance, and it's coming through --

22             MR. SUMPTER:  I don't disagree with that.  I mean I

23   paid a premium for it.

24             THE COURT:  Right.

25             MR. SUMPTER:  But I don't know that I would say in

Page 37

1    that sentence though, I mean you'd have to, it just seems to me

2    that what was being discussed was medical benefits and not --

3            THE COURT:  The order says that salaried OPEB means

4    the debtors current and future costs associated with providing

5    post-retirement health and life insurance benefits.  So --

6            MR. SUMPTER:  Health and life insurance.

7            THE COURT:  Right.  And you're saying disability is

8    not health.

9            MR. SUMPTER:  That's right.

10           THE COURT:  It doesn't depend on your health, you

11   have the disability, you're qualified for it and then you get

12   the payment.

13           MR. SUMPTER:  That's right.  And of course it

14   doesn't, if I'm dead, they're not paying benefits either, I

15   mean so it's not life insurance either.

16           THE COURT:  Right.  Okay.  But a portion of your

17   claim is for the things that were terminated on this.  Right?

18           MR. SUMPTER:  Well, the only part that, I don't think

19   so.  My part, the unjust enrichment has to do with the fact

20   that they do an offset --

21           THE COURT:  I'll go into that in a second.

22           MR. SUMPTER:  Okay.

23           THE COURT:  But I'm just focusing now on the

24   termination of February 2012.

25           MR. SUMPTER:  Right.  I don't claim anything that I

Page 38

1    believe that OPEB defines, because the only thing I talk about

2    is disability.

3            THE COURT:  So the Medicaid supplement, you're not

4    asking of that.

5            MR. SUMPTER:  I'm not asking, no, that's included.

6            THE COURT:  Just the basic disability.

7            MR. SUMPTER:  That's correct.

8            THE COURT:  Okay.  So let's turn then to the other,

9    the unjust enrichment claim.  I don't, I still don't really

10   follow that one.

11           MR. SUMPTER:  Okay.  When you receive disability

12   benefits the plan allows for certain offsets.

13           THE COURT:  Right.

14           MR. SUMPTER:  One is if you're receiving Social

15   Security disability, Social Security payments, they reduce your

16   disability payment by the amount of Social Security, and they

17   justify that by saying they pay the Social Security tax.  Okay.

18   Another offset is the part A and part B pension.  I don't know

19   why they're describing them as part A and part B, but they do.

20   Except for part B actually has another part and that's the part

21   that the beneficiary contributes to, so you might argue that's

22   a part C.  But anyway, they, and so they say okay you're

23   receiving $100 of disability, but of your pension part A of

24   that pension which is $10 say, and part B of that pension which

25   is $5, since you're receiving pension, we're going to reduce

Page 39

1   your disability payment by that much, by $15, so it brings it

2   down to 85.

3          THE COURT:  Okay.

4          MR. SUMPTER:  And I'm saying that if they had

5   maintained their responsibility for paying for the pension

6   which is, you know, the full, I don't know the right term right

7   now, but the full value of the funding.

8          THE COURT:  Not having terminated the pension plan

9   and turned it over to PBGC.

10          MR. SUMPTER:  Right.  If they had fully funded it, if

11   it was fully funded and turned over, I would think they would

12   have met their obligation, but because they didn't fully fund

13   it, now they're getting a benefit that they didn't actually pay

14   for.  They're getting money back from me, they're being

15   enriched because they're doing offsets on me, but they didn't

16   fully pay for their pension obligation.

17          THE COURT:  I guess I, I don't understand that

18   because even on the offset what they've paid and since they're

19   not paying, are you saying that they're offsetting anyway?

20          MR. SUMPTER:  That's right.  Even though they were

21   underfunded by $7 billion they still offset my pension payment

22   by the part A and part B, my disability payment by the part --

23          THE COURT:  Because it's still going on because the

24   pension, it wasn't, the PBGC has taken over the pension.

25          MR. SUMPTER:  Right.

1          THE COURT:  Okay.  But they, first, they were

2     authorized to do that --

3          MR. SUMPTER:  All right.

4          THE COURT:  -- by a Court order.  And secondly that

5     happened back before the plan actually went into effect, it

6     would be covered by the plan, so, you know, there needed to

7     have been a claim for that.  I'm not saying the claim would

8     have been allowed even if it had been asserted, but it can't

9     really be asserted now because that was part of the, that all

10    happened, that termination happened.  I mean I guess --

11         MR. SUMPTER:  Well, I was not --

12         THE COURT:  I think what you're, there are still

13    pension benefits being paid, right?

14         MR. SUMPTER:  Yes, by the PBGC.

15         THE COURT:  So, and you're not asserting that there's

16    -- there is a right to offset, right, because the pensions are

17    still getting paid.  You're just saying that the debtor is

18    unjustly enriched by the fact that it's not paying you, but

19    PBGC?  Are you saying there -- you're not saying there's no

20    right to offset?

21         MR. SUMPTER:  No, I'm saying under normal operation

22    of the plan, there is a right to offset.

23         THE COURT:  Okay.

24         MR. SUMPTER:  I'm saying because they didn't meet all

25    of their obligations in that contract of the plan, I'm

Page 41

1    considering the plan to be a contract, because they didn't meet

2    all the obligations.

3            THE COURT:  But the contract, you say the breach of

4    the contract was the termination of the pension plan.

5            MR. SUMPTER:  The pension plan is not terminated.

6            THE COURT:  Well I mean the --

7            MR. SUMPTER:  The breach of the contract they didn't

8    fully take --

9            THE COURT:  The pension plan, the breach was turning

10   over all the control of the pension plans to PBGC --

11           MR. SUMPTER:  No, I believe --

12           THE COURT:  -- with the reduced benefit.

13           MR. SUMPTER:  I believe the breach was that it was

14   underfunded.  I think had they turned it over and it was fully

15   funded --

16           THE COURT:  Okay.

17           MR. SUMPTER:  -- there wouldn't have been a breach.

18           THE COURT:  But that breach occurred no later than

19   July of 2009.

20           MR. SUMPTER:  Okay, I understand.

21           THE COURT:  And in fact it was underfunded well

22   before that.

23           MR. SUMPTER:  Right, I understand that.

24           THE COURT:  So to me that's a bankruptcy breach where

25   the claim needed to have been filed in the bankruptcy court and

1   it's the plan that governs how that claim gets paid, not, this

2   is like the, in that sense it's like the other the recoupment

3   plan you raised earlier in your earlier litigation where those

4   rights are dealt with in the bankruptcy case not afterwards,

5   you know a one hundred cent dollar against somebody post

6   bankruptcy.

7            MR. SUMPTER:  Okay.  I understand what you're saying

8   and I wouldn't have an argument against that except for I'd

9   like for you to consider one part of the OPEB order and I'm

10  going to ask you to apply your wisdom to it if I can use that

11  term, if I go to the OPEB order --

12           THE COURT:  My kids may doubt it.

13           MR. SUMPTER:  Let me find OPEB order here and --

14           THE COURT:  It's tab one in the first --

15           MR. SUMPTER:  Yeah, I have the Sumpter binder here,

16  so.  But it is attached to one of my responses.

17           THE COURT:  I have it here.

18           MR. SUMPTER:  I mean I know where it is because it's

19  in bold so I'll -- I'm sorry, I'm going to have to, I know a

20  place where I can find it quicker.

21           THE COURT:  Okay.  If you remember what page the

22  language is on, I can just turn to it.

23           MR. SUMPTER:  Let me see here now.  Let me just take

24  a moment to find it.

25           THE COURT:  Okay.

1           MR. SUMPTER:  On page 3 of the OPEB order, paragraph

2     4.

3           THE COURT:  Right.

4           MR. SUMPTER:  The debtors shall continue to provide

5     beneficial claims incurred by each eligible person but

6     shouldn't have to file a proof of claim.

7           THE COURT:  Right.

8           MR. SUMPTER:  So I'm asking and I'll be honest, I

9     haven't had a chance to process this because this argument

10    about it being kind of pre-bankruptcy is a concept that I

11    hadn't processed.  But as far as what I have here about not

12    being required to file a proof of claims, so I'm asking your

13    wisdom, would that exempt me from that, those claim bar dates

14    as far as this particular unjust enrichment claim?

15          THE COURT:  I don't know.  But I do know one thing,

16    which is that you can't go and enforce it somewhere else.

17          MR. SUMPTER:  Okay.

18          THE COURT:  So it couldn't be enforced in Indiana.

19          MR. SUMPTER:  Oh, actually I made a mistake.  I

20    wanted to put that out in the beginning.  When I wrote my

21    response, I referenced that I said it was cause 2, I really

22    should have said it was cause 3, unjust enrichment cause.

23          THE COURT:  Right.

24          MR. SUMPTER:  It in fact was the one issue I thought

25    would affect, for example, the debtor estate, and so the Court

Page 44

1    would in fact will be able to hear that.  You know I said there

2    were some things I didn't think this Court had the

3    constitutional authority, but this one, I mean I screwed up

4    because I mislabeled it.  But I tried to say that this one was

5    in your jurisdictional control.

6            THE COURT:  But you're still, the problem is you're

7    still seeking to enforce this claim, a) in the Indiana court,

8    and b) against the reorganized debtor in full in one hundred

9    cent dollars, and really that violates the plan order and

10   discharge.  You need to enforce this claim to the extent you

11   have it through this Court through the claims process.  You're

12   enjoined from pursuing it in another court on a hundred cent

13   dollars has to be dealt with through the plan process as a

14   claim in the bankruptcy case.  And I don't know whether, I

15   can't tell you just off the top of my head whether it's too

16   late to do that because you should have asserted that claim

17   back in 2009.

18            MR. SUMPTER:  Well I --

19            THE COURT:  So I think that one is, I think the

20   debtors are entitled to an injunction to be pursing that claim

21   number 3 that's in your Indiana complaint.

22            MR. SUMPTER:  All right.  Well, that's not my biggest

23   issue.

24            THE COURT:  Your main thing is the other, the

25   disability payments.

Page 45

1          MR. SUMPTER:  Right.  But what I decided was when I

2    decided to put the energy into it that everything that was

3    applicable was worth pursuing so I made a determination, and I

4    mean I understand what you're saying and I can accept it, I

5    made an erroneous determination possibly for pursuing that.

6    But I pursued them all at the same, I wasn't going to do three

7    different suits or whatever.

8          THE COURT:  All right.  Okay.

9          MR. SUMPTER:  So, it's just like the ERISA thing, I

10   mean I just, I --

11         THE COURT:  I know, but this was after the ERISA

12   case.

13         MR. SUMPTER:  I mean what I'm saying is --

14         THE COURT:  I can understand why the debtors are --

15         MR. SUMPTER:  When I meant the ERISA in this, there's

16   an ERISA argument in this, in the current complaint too that

17   terminating these benefits is an ERISA violation because the

18   benefits were vested and also because of your order.  You know,

19   and I was saving vested because they were already in payment,

20   the claim was already, and you know I had cited that case law

21   before and I can find it again, but you know performance was

22   due so they vest at that time.

23         THE COURT:  Okay.

24         MR. SUMPTER:  I don't know what else I have to add

25   other than that, you know, I think other than my errors there

Page 46

1    that my response articulates what I believe is that the

2    disability benefits were not part of the OPEB order.

3            THE COURT:  Okay.

4            MR. SUMPTER:  And so they weren't authorized to

5    terminate it.

6            THE COURT:  Okay.

7            MR. SENDEK:  Brief reply, Your Honor.  I'll try not

8    to be repetitive.  Just a few points.  I guess some of the

9    arguments that I heard was, I'll start with this.  You know,

10   the motion sought to terminate, sought authority to terminate

11   the plans, and that plan included the one at issue.

12           THE COURT:  Well it says in the first paragraph

13   Delphi is seeking an order infirming the debtors' authorizing

14   or alternatively authorizing but not directing the debtors to

15   terminate their applicable employee benefit plan program as

16   soon as practical so as to: a) eliminate eligibility for

17   employer paid post-retirement healthcare benefits for all

18   current and future active salaried employees.  Now this doesn't

19   fall into that, right, because it's not really a healthcare

20   benefit?

21           MR. SENDEK:  It's the life and disability.

22           THE COURT:  So let me go to the next one: b) cease

23   making company contributions to provide post-retirement health

24   care for recurring future salaried retirees and their surviving

25   spouses; c) cancel all retiree health reimbursement accounts,

Page 47

1    RHRA, and Medicare eligible salaried retirees and surviving

2    spouses; d) terminate the Medicare part B special benefits for

3    any future salaried retirees and their surviving spouses; e)

4    cease providing the one percent employer contribution to the

5    salaried retirement savings program for those active salaried

6    retiree employees hired after January 1, 1993 and on or prior

7    to December 31, 2000; f) eliminate eligibility for employer

8    paid post-retirement basic life insurance benefits for all

9    current and future active salaried employees; and g) cease

10   making company contributions to provide post-retirement basic

11   life insurance benefits for current and future salaried

12   retirees.  Looking at A through G in that list, I'm not sure

13   that this disability benefit falls within A through G, unless

14   it can be characterized as a post-retirement health care.  Now

15   I appreciate that the order is a little different.  The order

16   obviously is the operative governing document, grants the

17   motion, and it says for an order confirming the debtors

18   authority or alternatively authorizing but not directing the

19   debtors to terminate as soon as practical after March 31, 2009

20   salaried OPEB, and it drops a footnote which says, salaried

21   OPEB means the debtors current and future costs associated with

22   providing post retirement health and life insurance benefits to

23   salaried retirees or surviving spouses which termination inter

24   alia consists of, and there's the same list of A though G.  And

25   then the order says the debtors are authorized but not directed

Page 48

1    to terminate salaried OPEB benefits as provided in the motion.

2    So again unless it's health, I'm not sure disability fits into

3    it.  I appreciate that footnote 3 quotes this language, so

4    maybe you have a, more than maybe, you may very well have a

5    collateral estoppel argument.  But I think that's probably an

6    argument that the district court should determine.  That's not

7    really enforcing my order.  But before we get to that point

8    because that's more of a question, I'm not sure, I think Mr.

9    Sumpter may be right on this point.  I don't think the order in

10   granting the motion and defining the term salaried OPEB really

11   covers disability.

12           MR. SENDEK:  We can agree it could be better defined,

13   but I think what is clear is that the term, what was before the

14   Court was whether or not these plans were vested or could be

15   terminated by the debtor.  And the Court in its bench ruling,

16   Your Honor, in its bench ruling on March 10th, 2009, it's right

17   up front, it's right in the first --

18           THE COURT:  No I say its vested.  I'm sorry, it's not

19   vested and I had the trial on that.  I understand that.

20           MR. SENDEK:  And the Court also mentions disability

21   as being one of the issues --

22           THE COURT:  In the bench ruling.

23           MR. SENDEK:  Yes, in one of the issues in front of

24   the Court.  It says, if I can read quickly, the debtors take

25   the position that notwithstanding that the subject matter of

1   these plans that includes life and disability, involves

2   reimbursing or providing for the reimbursement of "payments for

3   retired employees and their spouses and dependents for medical,

4   surgical or hospital care benefits or benefits in the event of

5   sickness, accident, disability or death."  That their request

6   need not and in fact should not be governed by section 1104.

7         THE COURT:  Now that to me that sounds like I was

8   quoting some pleading that you all submitted or that Skadden

9   submitted.  And I did in the language Mr. Sumpter exchanged

10  with the retiree committee counsel at page 80 Mr. Sumpter

11  pointed out talked about disability also.  There are three

12  large binders that I did pretty much go through but I can't say

13  that I have complete understanding of whether disability

14  benefits were discussed during this hearing or in the briefing

15  leading up to it.  But unless it was I'm not sure that this

16  order itself specifically covers it.  I do make an

17  interpretation of the provision of this agreement.  On the

18  other hand, I'm not sure the issue as to disability was

19  actually litigated.

20        MR. SENDEK:  In going back to what some --

21        THE COURT:  Because you know there may be a legal

22  difference as Mr. Sumpter is arguing although he hasn't cited

23  any cases for this, between vesting of disability rights and

24  vesting of other benefits.

25        MR. SENDEK:  First --

1    THE COURT:  Let me just, I'm sorry to interrupt you,

2  but I took vesting here ultimately I concluded vesting was you

3  vest in the plan, and if debtor has the ability to terminate

4  the plan then you're not vested.  That makes sense to me.  It

5  certainly made sense in the context of everything that's listed

6  here.  I did raise the issue on disability which Mr. Gloster

7  kind of sidestepped, he didn't address it directly, he talked

8  about life insurance instead of disability.  But it may well be

9  two different things, there's my order and then there's the

10  collateral estoppel affect of my order, and those are, I think

11  they're two different things.

12    MR. SENDEK:  Your Honor, if I may.  At one level the

13  Court is being, and really what was at issue is -- may the

14  debtor terminate this plan, this plan, one of three, but

15  including the plan at issue, right, the life and disability

16  plan, may it do so?   And that was the key issue and --

17    THE COURT:  Well no one, it wasn't phrased that way.

18  It wasn't phrased that way, and I can certainly see someone in

19  Mr. Sumpter's position saying well wait a minute, nothing here

20  says disability and I rely on my disability and if I knew they

21  were terminating disability, I would have stood up and fought

22  it harder.

23    MR. SENDEK:  What I was getting to, Your Honor, is

24  that the question was whether the language that's in the plan,

25  which is the same language, whether or not that language gave

Page 51

1    the debtor the right to terminate.

2              THE COURT:  That's the collateral estoppel issue.  I

3    understand that.

4              MR. SENDEK:  Right.

5              THE COURT:  I understand that.

6              MR. SENDEK:  And --

7              THE COURT:  My order makes its finding premised upon

8    this language.

9              MR. SENDEK:  But I think by necessary implication,

10   the benefits that fall underneath that plan through res

11   judicata would equally be terminable at will by the debtor

12   which is what we're talking about here.

13             THE COURT:  Well only if I authorized it though.

14             MR. SENDEK:  I don't think the Court --

15             THE COURT:  I think you could, let's put it

16   differently.  I suppose you could rely based on collateral

17   estoppel or even just precedent on my conclusion that this,

18   that everything under this plan is terminable at will and do

19   that post-bankruptcy.  And in fact according to the Third

20   Circuit, that's the only right you had, but of course my order

21   is the final order so you had a right to do it during the

22   bankruptcy too.  But that's different than saying I authorize

23   you to terminate these benefits, it's a different thing.  Now I

24   guess that does raise an interesting issue which is this policy

25   or this program may not be terminable in part and I assume that

1   you did terminate the insurance part of it.  Right?  So I don't

2   know if you terminated it in part or not terminated it.  Do you

3   see what I'm saying?  I clearly authorized you to terminate the

4   life insurance part of it, and I don't know whether that means

5   that, you know, you have to terminate the whole thing.

6           MR. SENDEK:  Again, it would be helpful --

7           THE COURT:   If that were the case then this order

8   would be binding.

9           MR. SENDEK:  It would be helpful if after the word

10  inter alia, agreed, that it said disability.  But inter alia I

11  think is descriptive.

12          THE COURT:  No, but the key here, look, again, if it

13  just said, if it said to terminate as soon as practical,

14  salaried OPEB, it didn't define salaried OPEB.  I think under

15  people's general definition of OPEB, it would include

16  disability, but it does define OPEB, it says health and life

17  insurance benefits.  That's the problem.  And that's consistent

18  with the motion which says applicable, applicable employee

19  benefit plans so as to colon, so I think the list refers, that

20  defines what is applicable, A through G defines what is

21  applicable as opposed to all employee benefit plans.

22          MR. SENDEK:  Well, but inter alia suggested --

23          THE COURT:  But that, the inter alia isn't in the

24  motion, the inter alia is in the order.

25          MR. SENDEK:  Yes.

1          THE COURT:  And it follows the definition of what

2     we're talking about which doesn't include this, so the inter

3     alia is referring to health insurance plans.  I just, look, I'm

4     not sure I can decide this today.  I think you, I can decide

5     one portion of this today.  I conclude that the third claim is

6     enjoined by the plan injunction under the July 30, 2009 order

7     approving modifications under the plan.  It's dealing with a

8     claim that arose out of either the underfunding of the pension

9     plan or the termination of the plan and its assumption by the

10    PBGC.  It's that shortfall that gives rise to Mr. Sumpter's

11    unjust enrichment plan.  All of that is rooted in the, not in

12    the ongoing present but in the July 2009 going backwards pass

13    which is covered by the modified plan in the sections you've

14    cited including article 11 and also the exculpation provisions

15    of the plan and the injunction supporting it.  So I don't have

16    a, I mean that's, to the extent there's a claim for that it has

17    to be dealt with in the bankruptcy case with the proper

18    assertion of the claim.  If it's allowed it would be paid under

19    the plan however the plan would pay that sort of claim as

20    opposed to in clearly one hundred cent dollars through

21    enforcement by order of the Indiana District Court.  So you

22    don't have to argue that one.  I understand that.

23          MR. SENDEK:  Okay.

24          THE COURT:  I also believe that the claims against

25    the agents of the debtor are enjoined, they're exculpated for

1   taking actions in accordance with the plan.  And it seems to me

2   that at a minimum the, it's certainly reasonable for them to

3   have taken the view that these benefits were terminable either

4   based on the order or more likely based on the order's finding

5   that under 3.05 in the case law that I had cited back then the

6   board can terminate.  I have uncertainty as to whether I can

7   say that the claims in the lawsuit, the remaining claims in the

8   lawsuit which are premised all upon the wrongful termination of

9   a plan are actually the subject, are actually barred by my

10  order as a matter of res judicata.  And there is a, I guess an

11  interesting jurisdictional issue.  I clearly have the ability

12  to enforce my orders.  The orders all say that the debtor has

13  the right to do this and it all flows from that, if in fact the

14  debtor does have the right to do it.  The debtors' actions

15  thereafter in 2012 if it was authorized to do that, the debtor

16  would be protected by the injunction provisions in the plan

17  modification order.  If on the other hand, the debtor is just

18  relying upon collateral estoppel, I'm not sure that shouldn't

19  be something that's up for the district court in Indiana to

20  decide, the collateral estoppel affect of my order.  No one has

21  really briefed that or considered that.

22          MR. SENDEK:  But I think the Court does have

23  authority to rule on issues of collateral, I think, isn't that

24  the Texaco case, Your Honor, which actually was a question of

25  claim preclusion involving collateral estoppel.

1    THE COURT:  Well, you know, the Texaco case was

2  enforcing the discharge.  I don't know.  I didn't really focus

3  on this.  I guess I'd like you to address that point.  It's a

4  jurisdictional issue as to which court at this point should be

5  deciding the collateral estoppel affect of my order.  The

6  enforcement of my order, I clearly have jurisdiction over it.

7  And maybe I have jurisdiction over enforcing the order to the

8  extent its collateral estoppel, but I'm just not sure of that.

9    MR. SENDEK:  We can and I do believe the Texaco case

10  dealt with that.  It was a claim --

11    THE COURT:  Maybe it did, I just don't remember it.

12    MR. SENDEK:  Okay.  And the other point, Your Honor,

13  is do you require additional briefing on the question of the

14  plan, the --

15    THE COURT:  What was before me?

16    MR. SENDEK:  No, no.

17    THE COURT:  You know, if you can point out, either of

18  you, anything in the record back in 2009 where the issue of

19  disability was discussed, I'd appreciate that.  It seems to me

20  given the language that begins my bench ruling, I think, to me,

21  that looks like I was quoting from something.  Maybe I wasn't,

22  but, you know, if it was out there and being dealt with by

23  people beyond page 80 and the first page of my bench ruling,

24  I'd like to know that, pleadings, etc.

25    MR. SUMPTER:  May I say something, Your Honor?

1           THE COURT:  Sure.

2           MR. SUMPTER:  You know with computers, I did a word

3    search on that transcript, so I found every occurrence of the

4    word disability.

5           THE COURT:  Okay.

6           MR. SUMPTER:  So, I'm telling you --

7           THE COURT:  It's just those two places?

8           MR. SUMPTER:  Yeah.  So --

9           THE COURT:  All right.  But that still leaves

10   pleadings, you know, I don't know if there were just, this is

11   not an evidentiary hearing.  To me, you know, Mr. Sumpter

12   suggested for example, I mean I gave the retiree committee

13   which he was a member for a while, the charge of arguing the

14   vesting point.  I'm assuming, maybe I'm wrong, that before they

15   actually came to Court on that, there were discussions between

16   them and Skadden about what this was all about, about vesting.

17   If there were discussions about disability then, you know, or

18   if the committee, you know, assumed, you know, somehow carved

19   vesting disability out their charge, that would be useful for

20   me to know too.  So if anyone wants to present evidence on that

21   maybe I should hear that.  This is a relatively small amount of

22   money but it's important obviously to Mr. Sumpter, and I would

23   like to get it right.  So I guess I'm giving people an

24   opportunity to submit evidence on that.

25           MR. SENDEK:  It's important to the reorganized

Page 57

1   debtors as well.

2            THE COURT:  Well I know that too, I appreciate that.

3            MR. SENDEK:  They want to close things up.

4            THE COURT:  So to me my, we should probably do this

5   all in one ruling, but you know we have another date in October

6   I think, right?

7            MS. HAFFEY:  The 21st.

8            THE COURT:  Yeah.  And I don't think anything is

9   going to happen in Indiana before then.

10           MS. HAFFEY:  I believe Mr. Sumpter --

11           MR. SUMPTER:  That's correct.  I'm due to respond to

12  a motion from the defendants on the 28th of October.

13           THE COURT:  October.  And when is the hearing we

14  have, the 21st?

15           MS. HAFFEY:  That's correct.

16           MR. SUMPTER:  Well here's my challenge so you know,

17  it's difficult for me to manage, I have to get some relief from

18  somebody to be able to answer like --

19           THE COURT:  Well I expect you'll probably get some

20  relief from the Indiana court, because reading that Judge's

21  order, I appreciate now a different Judge has it, but reading

22  that order it seemed like they wanted this to happen first, you

23  know, but I imagine the debtors will give you some more time to

24  reply if the Indiana court is okay with that.  But I, so, I'm

25  going to give you, I don't think I need to hear more on the

 1    first two issues I ruled on which is that tab number 3 really

 2    is enjoined basically for the same, based on the same logic of

 3    my ruling on the recoupment motion and Judge Inglemyer's

 4    (phonetic) logic on the recoupment motion.  I believe that the

 5    exculpation and injunction provisions of the plan modification

 6    order protect the agents, the debtors' agents.  I say that

 7    because given what we were talking about, they're clearly

 8    acting in good faith, I don't think they're acting in bad faith

 9    by taking the position that they, that the debtor has the right

10    to terminate.

11              So I think the focus should be on the debtor and

12    whether in fact it has the right to terminate and that falls

13    into two categories.  The first one is people could give me any

14    additional evidence they want on whether this order covered

15    disability.  Second, I'd like to have, it doesn't have to be

16    prolonged, or long, additional briefing on the following issue

17    assuming that the order is not res judicata, but the debtors

18    are instead relying upon collateral estoppel based on the same

19    language and the same right to terminate applying to the

20    disability.  Is that something that this Court has jurisdiction

21    to determine or is that something the Indiana court should

22    determine, i.e., collateral estoppel affect of the order.

23              MR. SENDEK:  I have an additional question, if I may

24    Your Honor.  And it hasn't had much discussion today, but we

25    also have the broad discharge provision of the plan, 11.2,

1    which would excuse the debtor --

2          THE COURT:  See, I guess that's, I don't see that

3    being operable unless, I mean this happened in February of

4    2012.

5          MR. SENDEK:  Right.

6          THE COURT:  So it's not, I don't think that would

7    apply.

8          MR. SENDEK:  But it contemplates by express language

9    the termination in the future of benefit plans, and the

10   language is, includes claims that arose on or before effective

11   date where such claims relate to termination of retiree benefit

12   program regardless of whether such termination occurred prior

13   to or after the effective date.

14         THE COURT:  Well, I understand, but I can tell you, I

15   view that language as covering something I specifically

16   authorized, i.e., if I didn't authorize the debtors to

17   terminate, the order, the OPEB order doesn't say you shall

18   terminate, give the debtors discretion.  But they got the

19   authority during the bankruptcy case.  To me, you know, maybe

20   you would have done better asking the Indiana judge about this,

21   but to me I couldn't authorize.  If you didn't have authority,

22   if there were some, if this were some retiree plans that you

23   didn't have authority to terminate, I can't imagine how I would

24   have the ability to enter that order, and I wouldn't have.

25   That's not what I had in mind in other words.  Now, it may fit

Page 60

```
 1    into your collateral estoppel argument because you may say, you

 2    know with regard to these plans I really did decide it, whether

 3    you asked for it then or not, because it's collateral estoppel.

 4    So that, I'm not throwing cold water on that idea, but I don't

 5    think you can just rely on that.  I mean for example, if there

 6    were some other benefit plan that didn't have the terminable at

 7    will language, but actually had people being vested in the plan

 8    because you can't terminate it, then this wouldn't have worked,

 9    I wouldn't have authorized it, you would have had to dealt with

10    it some other way.

11             MS. HAFFEY:  Can I make two points, Your Honor?  This

12    is Cynthia Haffey again.

13             THE COURT:  Because it, I'm sorry, because it was a

14    plan so it would have to be dealt with under 1114.  I'm sorry,

15    because I could anticipate the argument, but we're a debtor

16    that's going out of business, we have to go out of business,

17    you can't leave us without a remedy that clearly had to give a

18    remedy but that's not right because 1114 is a remedy.

19             MS. HAFFEY:  And perhaps the Court wants to wait to

20    hear this when we reconvene, but I did want to point out to the

21    Court the question about whether disability was before the

22    Court during the termination motion.

23             THE COURT:  Yes.

24             MS. HAFFEY:  I'm looking at Mr. Sumpter's actual

25    objection to that motion, and in the motion he himself brings
```

Page 61

1    up his disability benefits.

2            THE COURT:  All right.  That's fine.  I mean I

3    welcome anything like that.  And I just think, you know, on

4    today's record I'm a little uncomfortable reaching a conclusion

5    because I think there may be more out there on this from both

6    sides.

7            MS. HAFFEY:  Can I submit an order as to what the

8    Court has already stated today in regards to --

9            THE COURT:  I'd rather do it all at once, and I think

10   you probably would too so you're not dealing with two appeals

11   or three appeals.

12           MS. HAFFEY:  Okay.

13           THE COURT:  But the record is clear, I don't, the

14   only reason and it's just to have good housekeeping on this.

15   And if there is some attempt to speed up what's happening in

16   Indiana I mean I'm happy to issue an injunction, a TRO at least

17   to stop that, pending resolution of this hearing.

18           MS. HAFFEY:  We have a motion for personal

19   jurisdiction, a motion to dismiss based on lack of personal

20   jurisdiction.

21           THE COURT:  Yeah, but that's for the 28th.

22           MS. HAFFEY:  I'm sorry?

23           THE COURT:  That's October 28th.

24           MS. HAFFEY:  That's when Mr. Sumpter's response to

25   that motion is due.

Page 62

1          THE COURT:  All I'm saying is if, for example, Mr.

2     Sumpter said I need to get in front of you right away Judge in

3     Indiana by next week, you could come back to me for a TRO at

4     that point, because this hearing is still ongoing as far as

5     other issues.  I've already issued one injunction orally which

6     is on count 3.  I'd just rather make it a permanent injunction

7     as opposed to having several orders which multiplies

8     proceedings.

9          MS. HAFFEY:  Yeah, that's not a concern as much as

10    the case closing motion.

11         THE COURT:  When is that on for?

12         MR. SENDEK:  You mean the GM matter?

13         MS. HAFFEY:  Well the GM matter is on the 21st of

14    October, but of course we're trying to get everything wrapped

15    up to have the case close in December.

16         THE COURT:  I anticipate ruling finally on the 21st.

17         MS. HAFFEY:  Okay, very good.  Thank you, Your Honor.

18         THE COURT:  Thank you.

19         MR. SUMPTER:  Could I ask one question.  Ms. Haffey,

20    I wonder what motion she was referring to that she said I

21    referred to disability.

22         THE COURT:  I don't know.

23         MS. HAFFEY:  I'll show it to you, Mr. Sumpter, when

24    we're off the record.

25         MR. SUMPTER:  Okay.

Page 63

1          MR. SENDEK:  Thank you, Your Honor.

2          MR. SUMPTER:  I doubt if I'll make another trip, but

3     --

4          THE COURT:  Well --

5          MR. SUMPTER:  -- I thought I should --

6          THE COURT:  Let me just say, I'm sorry, you probably

7     already signed off.

8          THE CLERK:  No.

9          THE COURT:  Okay.  I'm giving the parties leave to

10    submit evidence for the October 21 hearing.  I usually don't

11    take testimony by phone.  So if --

12         MR. SUMPTER:  Well I mean if that's the only way,

13    I'll do it.

14         THE COURT:  Well I don't know whether you're going to

15    testify, I mean given your representations I could probably put

16    you [indiscernible] do you have someone else in mind, they

17    should be here and you should be here to cross-examine.  I'm

18    not telling you you have to do that, but similarly if you all

19    want to submit evidence, it's not just something I can take

20    judicial notice on [indiscernible].

21         MR. SENDEK:  I take it from the Court's comment that

22    an affidavit would not be satisfactory.

23         THE COURT:  Well an affidavit is satisfactory on

24    direct, but if Mr. Sumpter wants to cross-examine that person

25    or you want to cross-examine [indiscernible] that person needs

Page 64

1    to be here for cross-examination in person.

2            MR. SUMPTER:  Can I ask another question about that?

3    Because for example, let's assume for a second that I ask one

4    of the attorneys who were --

5            THE COURT:  Right.

6            MR. SUMPTER:  -- you know, with the retiree committee

7    to be here, I can't afford to pay him to get here.

8            THE COURT:  I understand.  I guess you could subpoena

9    him.  But they have the right to cross-examine.

10           MR. SUMPTER:  Right.  I'm just concerned how to

11   finance it, to get handled, that's all.

12           MR. SENDEK:  So I take it that then, that it would

13   not be acceptable to submit an affidavit if the other side

14   wants to cross-examine that person.

15           THE COURT: I wouldn't accept the affidavit.

16           MR. SENDEK:  You wouldn't accept it.  Okay.

17           THE COURT:  [indiscernible]

18           MR. SENDEK:  Okay, I understand.

19           THE COURT:  Unless it's an admission somehow.

20           MR. SENDEK:  Right, I understand.

21           MS. HAFFEY:  Mr. Sumpter, it was the objection that

22   you filed to the salaried OPB termination motion, you filed it

23   on February 6th.

24       (Hearing Adjourned 12:02 PM)

25

Page 65

1                          I N D E X

2

3                           RULINGS

4    DESCRIPTION                                        PAGE

5    HEARING re Motion for Order (I) Enforcing

6    (A) Modified Plan and Plan Modification

7    Order Injunctions, (B) OPEB Orders, and

8    (C) Recoupment Order; (II) Enjoining James

9    Sumpter's Second Lawsuit Filed in the USDC

10   for the Southern District of Indiana and

11   Requiring James Sumpter to Dismiss the

12   Indiana Action with Prejudice; and (III)

13   Holding James Sumpter in Contempt and

14   Awarding Other Sanctions.  (continued)

15

16   HEARING re Motion to Punish for Contempt

17   Reorganized Debtors Motion (continued)

18

19

20

21

22

23

24

25

Page 66

1                           CERTIFICATION

2            I, Theresa Pullan, certify that the foregoing is a

3    correct transcript from the official electronic sound recording

4    of the proceedings in the above-entitled matter.

5    Theresa Pullan    *Digitally signed by Theresa Pullan*
     *DN: cn=Theresa Pullan, o, ou,*
     *email=digital1@veritext.com, c=US*
     *Date: 2013.10.01 12:10:17 -04'00'*

6    AAERT Certified Electronic Transcriber CET**00650

7    Theresa Pullan

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22    Veritext

23    200 Old Country Road

24    Suite 580

25    Mineola, NY  11501