**Hearing Date And Time:  October 21, 2013 at 10:00 a.m. (prevailing Eastern Time)**

TOGUT, SEGAL & SEGAL LLP
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Neil M. Berger
Steven S. Flores

*Counsel for DPH Holdings Corp., et al.,*
    *Reorganized Debtors*

DPH Holdings Corp. Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

DPH Holdings Corp. Legal Information Website:
http://www.dphholdingsdocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x
                                                                :
In re                                                           :          Chapter 11
                                                                :
DPH HOLDINGS CORP., et al.,                                     :          Case No. 05-44481 (RDD)
                                                                :
            Reorganized Debtors.                                :          (Jointly Administered)
                                                                :
-----------------------------------------------------------------x

### REORGANIZED DEBTORS' REPLY TO OBJECTION BY GENERAL MOTORS LLC TO REORGANIZED DEBTORS' MOTION FOR AN ORDER TO COMPEL COMPLIANCE WITH, AND TO IMPLEMENT, THE MODIFIED PLAN, PLAN MODIFICATION ORDER AND RELATED DOCUMENTS

**Table of Contents**

PRELIMINARY STATEMENT .............................................................................................. 1

SUPPLEMENTAL BACKGROUND ...................................................................................... 4

    A.   Many Of The Issues Raised In New GM's Objection Have Been Resolved ..... 4

    B.   DPH Has Provided Sufficient Information To New GM .................................. 6

    C.   New GM's Objection Ignores The Purpose
        And Import Of Its Funding Commitment ............................................................ 7

REPLY ...................................................................................................................................... 9

    A.   Without A Prompt Ruling From This Court,
        Case Closing And The Wind Up Will Be Jeopardized ....................................... 9

    B.   New GM's Effort To Invent Ambiguities In The
        Funding Agreement Underscores The Agreement's Clarity .......................... 10

          (1)   The "Form" Budget Annexed to the Funding Agreement
               Does Not Purport to List All "Costs and Expenses" ..................... 10

          (2)   "Costs and Expenses" Versus "Liabilities" ..................................... 12

          (3)   DPH Is Not Paying Its "Future" DPH Costs Through
               the Formation of a Trust:  It Is Simply Settling Claims ................ 16

          (4)   There Has Been No Undue Delay with Settlement ........................ 17

    C.   DPH's Settlement Of, Or Posting Security For,
        Litigation Claims Are "Costs And Expenses" Of The Wind Up .................... 18

    D.   New GM's Request For More Information ....................................................... 20

# Table of Authorities

**Cases**

*Babbitt v. United Farm Workers Nat'l Union,*
  442 U.S. 289 (1979) ............................................................................................. 9

*Barclays Capital Inc. v. Giddens (In re Lehman Bros. Inc.),*
  No. 11 Civ. 6053, 2012 WL 1995089 (S.D.N.Y. June 5, 2012) ........................... 15

*GPIF-I Equity Co., Ltd. v. HDG Mansur Inv. Servs., Inc.,*
  No. 13 Civ. 547, 2013 WL 3989041 (S.D.N.Y. Aug. 1, 2013) ............................. 15

*In re Dow Corning Corp.,*
  211 B.R. 545 (Bankr. E.D. Mich. 1997) .............................................................. 19

*In re Roman Catholic Archbishop of Portland in Oregon,*
  339 B.R. 215 (Bankr. D. Or. 2006) ...................................................................... 19

*McCord v. Agard (In re Bean),*
  252 F.3d 113 (2d Cir. 2001) ................................................................................. 9

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n,*
  461 U.S. 190 (1983) ............................................................................................. 10

**Statutes**

8 Del. C. § 280(c)(1) ................................................................................................ 19

8 Del. C. § 280(d) .................................................................................................... 20

11 U.S.C. § 101 ........................................................................................................ 14

28 U.S.C. § 157(b)(5) ............................................................................................... 20

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

The Reorganized Debtors[1] hereby submit this reply (this "Reply") to New GM's objection (the "Objection") [Docket No. 22088] to the Reorganized Debtors' Motion in accordance with the Adjournment Orders (as defined below) and by agreement between the parties.  In further support of the Motion, and in response to the Objection as it pertains to the Motion, the Reorganized Debtors respectfully represent:

## PRELIMINARY STATEMENT

On August 6, 2013, this Court approved the blueprint for closing these Chapter 11 cases and concluding the Wind Up of the Reorganized Debtors [Docket No. 22121].  After four years of hard work since the effective date of the Modified Plan, an end is finally within reach.  Not only have the Reorganized Debtors sold nearly all of their assets, resolved all of their preference claims and positioned themselves to settle or otherwise resolve all of the outstanding Remaining Claims, but they have also reached an agreement in principle with the United States of America ("USAO") on behalf of the Environmental Protection Agency, the Michigan Department of Environmental Quality (the "MDEQ") and the Ohio Environmental Protection Agency (the "Ohio EPA," and together with the USAO and the MDEQ, the "Environmental Agencies") as to the total amount of the Environmental Claims.  Now, the only meaningful obstacle that stands between the Reorganized Debtors and their ability to consummate the Modified Plan, complete the Wind Up, and close these cases is New GM, which continues to improperly withhold critical funding that it is obligated to advance on account of the Claims Settlements (defined below).

---

[1]    Capitalized terms used but not otherwise defined herein shall be ascribed the meanings given to them in the *Reorganized Debtors' Motion for an Order to Compel Compliance With, and to Implement, the Modified Plan, Plan Modification Order and Related Documents*, dated July 3, 2013 [Docket No. 22075] (the "Motion") and the Motion to Close Bankruptcy Cases (as defined below), as applicable.

Since this Court's entry of the Plan Modification Order and the inception of the Funding Agreement, New GM has advanced to DPH approximately ███████, without incident, to cover expected funding shortfalls with respect to the Reorganized Debtors' Wind Up.  Consistent with its contractual obligation to do so, DPH has repaid every dollar of New GM's Advances because proceeds of the Wind Up -- generated from asset sales and settlements -- covered the Reorganized Debtors' Wind Up costs and expenses to date.

As the Wind Up is drawing to a close, however, DPH cannot self-fund the Wind Up any longer.  And it should not have to.  New GM's obligation to fund the Wind Up, including settlement of the Environmental Claims and certain personal injury and product liability actions (collectively, the "Claims Settlements"), has always been a part of the consideration that New GM agreed to pay pursuant to the Modified Plan and the MDA as part of its purchase of valuable Delphi assets.  *See* Goldman Decl., Ex., 1 (MDA § 3.1.1.E.)[2]

New GM's funding obligation was not only part of the purchase price for critical Debtor assets, but it was also the lynchpin of this Court's finding that the Modified Plan was feasible.  Without New GM's commitment to provide "Emergence Capital," the form budget attached to the Funding Agreement would have reflected a ███████ shortfall -- making a finding of "feasibility" for confirmation of the Modified Plan impossible.

---

[2]    The "Goldman Decl." refers to the *Declaration of Richard M. Goldman in Support of Reorganized Debtors' Motion for an Order to Compel Compliance With, and to Implement, the Modified Plan, Plan Modification Order and Related Documents*, filed on July 3, 2013 [Docket No. 22076-1].

Based on its most recent monthly forecast (the "October 2013 Wind Up Budget"),

DPH will need approximately ███████ from New GM to complete the Wind Up.[3]

Contrary to New GM's assertion in its Objection, this is not a ███████████

███████ (Obj. ¶ 12.)  It is simply the most current "true up" of New GM's obligation to

fund the Reorganized Debtors' Wind Up.  New GM has known from the beginning of

its funding arrangement that DPH would be unable to fully fund its Wind Up and the

"Emergence Capital" (described below) that New GM committed to provide would

eventually be needed.  *See* Goldman Decl., Ex. 3 (Funding Agreement, Attach. A.)

Putting aside the ███████ anticipated need reflected on the form budget, the

Supplemental Disclosure Statement specifically addressed that DPH would likely

require tens of millions of dollars to satisfy the Environmental Claims.  *See Supplemental*

*Declaration of Richard M. Goldman in Support of the Motion*, dated October 16, 2013 (the

"Supp. Goldman Decl.), Ex. 1 (Supplemental Disclosure Statement, Art. III.D.6(b) at S-

37–S-38.)  Moreover, the approximately ███████ requested by DPH now (which is

the lowest amount that DPH has ever requested to satisfy the Claims Settlements) is

███████ *less* than DPH's originally estimated need from New GM, and which New

GM agreed to pay, when the parties entered into the MDA and proposed the Modified

Plan.  *See* Goldman Decl., Ex. 3 (Funding Agreement, Attach. A.)

New GM cannot dispute that until now, it has paid all Advances under the

Master Disposition Documents for years without incident.  Moreover, New GM cannot

dispute that it has provided ███████ of Advances while DPH has made

payments on account of, or otherwise resolved, hundreds of claims and causes of action

---

[3]    This updated request revised the Advance Request that the Reorganized Debtors provided to New
GM on September 26, 2013 in accordance with the terms of the Funding Agreement.  The October
2013 Wind Up Budget is attached as Exhibit ("Ex.") A to the *Declaration of John Brooks*, dated October
16, 2013 (the "Brooks Decl.").

in connection with the Wind Up.  The reason New GM is attempting to rewrite the Funding Agreement during the final months of its funding commitment is clear: because DPH has few assets left to fund the Wind Up, New GM anticipates that some or all of the Advances made now are unlikely to be returned.  Under these circumstances, New GM has little to lose by aggressively seeking to delay the resolution of this dispute for as long as it possibly can, and its scattershot Objection is designed to do just that.

New GM committed to fund the Wind Up four years ago.  It should stand by that commitment now.  DPH has nowhere else to turn for this funding.  A prompt ruling from this Court on the Motion is critical:  it will allow the Reorganized Debtors to complete their Wind Up and to fund the few remaining tasks necessary to finally close these Chapter 11 cases.

## SUPPLEMENTAL BACKGROUND

**A.    Many Of The Issues Raised In
       New GM's Objection Have Been Resolved**

1.    On July 3, 2013, the Reorganized Debtors filed the Motion [Docket No. 22075] and the *Reorganized Debtors' Motion for Final Decree and Order Pursuant to 11 U.S.C. §§ 105, 350(a), and 1142, Fed. R. Bankr. P. 3022, and Local Bankr. R. 3022-1 Closing the Bankruptcy Cases and Providing Related Relief* (the "Motion to Close Bankruptcy Cases") [Docket No. 22073].  New GM filed its consolidated Objection to the Motion and the Motion to Close Bankruptcy Cases on July 18, 2013 [Docket No. 22088].

2.    On July 25, 2013, counsel for the Reorganized Debtors and New GM appeared before the Court (the "Hearing to Adjourn") and represented that the parties had reached an interim agreement pertaining to the adjournment of the hearing to consider the Motion, and read the terms of that agreement into the record.

3.      On July 29, 2013, the Court entered the *Joint Stipulation and Order Between the Reorganized Debtors and General Motors LLC Regarding Adjournment of the Hearing to Consider the Motion to Compel* (the "First Adjournment Order") [Docket No. 22110], which, among other things, confirmed that this Court has, and will continue to have, jurisdiction over all matters related to the Motion until the issues raised therein have been resolved.  *See* Supp. Goldman Decl., Ex. 3 (First Adjournment Order ¶¶ 2–3.)

4.      On July 30, 2013, the Reorganized Debtors and New GM appeared before this Court in connection with those portions of the Objection that concerned the relief sought in the Motion to Close Bankruptcy Cases.  At that time, this Court overruled nearly all of New GM's objections and, by Order dated August 6, 2013 (the "Case Closing Order") [Docket No. 22121], the Court authorized the Reorganized Debtors to, among other things:  (i) form a trust for the purpose of resolving claims;  (ii) dissolve under Delaware law;  and (iii) provide releases to the Plan Implementation Parties upon the entry of the final decree.  (Case Closing Order ¶¶ 5–7.)

5.      Since that time, the parties entered into two additional stipulations to adjourn the hearing to consider the Motion.  On August 14, 2013, the Court entered the *Joint Stipulation and Order Between the Reorganized Debtors and General Motors LLC to Further Adjourn Hearing to Consider Motion to Compel* (the "Second Adjournment Order") [Docket No. 22124], which, in addition to reaffirming the terms of the First Adjournment Order, provided that New GM would not assert, and waived, any arguments that the relief sought in the Motion requires the commencement of an adversary proceeding or that the Motion should be dismissed as being procedurally improper.  *See* Supp. Goldman Decl., Ex. 4 (Second Adjournment Order ¶¶ 2, 4.)

6.      On September 19, 2013, this Court entered the *Second Joint Stipulation and Order Between the Reorganized Debtors and General Motors LLC to Further Adjourn Hearing*

*to Consider Motion to Compel* (the "Third Adjournment Order," and collectively with the First Adjournment Order and the Second Adjournment Order, the "Adjournment Orders") [Docket No. 22156].  The Third Adjournment Order, among other things, set the Motion for hearing on October 21, 2013.  *See* Supp. Goldman Decl., Ex. 5 (Third Adjournment Order ¶ 3.)

7.      On or about October 11, 2013, the Reorganized Debtors reached an agreement in principle with the Environmental Agencies concerning the total amount of the Environmental Claims.  That agreement is subject only to final documentation, applicable notice and approval by this Court.

8.      As a result of the Case Closing Order and Adjournment Orders, New GM's arguments regarding:  (i) this Court's continuing jurisdiction to decide the issues raised in the Motion (Obj. ¶¶ 3–4);  (ii) the Reorganized Debtors' ability to form a trust for the purpose of resolving claims (*id*. ¶¶ 7–10);  (iii) the Reorganized Debtors' ability to dissolve under Delaware law (*id*. ¶¶ 49–50);  (iv) the releases (*id*. ¶ 46);  and (v) whether an adversary proceeding is required to adjudicate this dispute (*id*. ¶¶ 24–26, 55–56), have been fully resolved.  Consequently, they are not addressed in this Reply.

**B.      DPH Has Provided Sufficient Information To New GM**

9.      Since the Hearing to Adjourn, the Reorganized Debtors have continued to collect, review and produce documents and information to New GM concerning the Claims Settlements.  (Brooks Decl. ¶ 13.)  As of the date of this Reply, the Reorganized Debtors have produced to New GM several thousand additional pages of documents relating to the Environmental Claims or other litigation-related disputes -- a fact that New GM cannot dispute.  (*See id*.)

10.      Importantly, the information exchanges have not been limited to documents.  DPH has also held numerous telephone conferences and two lengthy in-

person meetings with New GM representatives -- one in Cleveland, OH and one in
New York, NY -- that included New GM's in-house and outside counsel, several New
GM business personnel and DPH's environmental expert.  (*See id.*)

11.     Consequently, the Reorganized Debtors have more than satisfied their
obligations under the Funding Agreement to respond to New GM's ███████
████████████ (Goldman Decl., Ex. 3 (Funding Agreement, ¶ 5)), and New
GM's assertion -- made approximately three months ago -- that it has not been supplied
with "reasonable information" (Obj. at 4 § (d), ¶ 11) should now be rejected as moot.

**C.     New GM's Objection Ignores The Purpose
         And Import Of Its Funding Commitment**

12.     New GM's funding commitment was a key component to the Court's
finding that the Modified Plan was feasible.  At the hearing to confirm the Modified
Plan and approve the Plan Modification Order, the Court accepted testimony from
multiple witnesses, including John D. Sheehan (Vice President and Chief Financial
Officer of Delphi) and Keith D. Stipp (Executive Director of Delphi).  Those witnesses
made clear that the "Emergence Capital"[4] needed to satisfy obligations under the
Modified Plan was critical to making the Modified Plan feasible, and New GM was to
provide part of that "Emergence Capital".  By way of example, the witnesses testified:

- ██████ Supp. Goldman Decl., Ex. 6 (*Declaration of John D. Sheehan in Support of Modifications to Debtors' First Amended Joint Plan of Reorganization in Respect of MDA, Modified Plan, and Pure Credit Bid*, dated July 19, 2009 at ¶ 37);

- ████████████████████████████████████
  ████████████████████████████
  ████████ *Id.* ¶ 127 (emphasis added);

---

[4]     The Modified Plan defines "Emergence Capital" to include that amount to be provided by New GM
to the Reorganized Debtors pursuant to Section 3.1.1 of the MDA "related to the post-Effective Date
operations of Reorganized DPH Holdings and the Reorganized Debtors" (*i.e.*, New GM's ████
funding obligation).  *See* Supp. Goldman Decl., Ex. 2 (Modified Plan, Art. I, Section B.1.85.)

- █████████████████████████████████████████████████

  *See* Supp. Goldman Decl., Ex. 7 (*Declaration of Keith D. Stipp in Support of Modifications to Debtors' First Amended Joint Plan of Reorganization*, dated July 18, 2009 at ¶ 33 (emphasis added);  and

- █████████████████████████████████████████████████ *Id.* ¶ 35(a) (emphasis added).[5]

13.    Without New GM's funding commitment, the form budget attached to the Funding Agreement would have reflected a ██████████ **shortfall**.  *See* Goldman Decl., Ex. 3 (Funding Agreement, Attach. A.)  Thus, what was true then remains true today.  If New GM is allowed to ignore its funding obligations now, the years of hard work from countless teams of professionals and this Court will fall short of bringing these Chapter 11 cases to an end, and New GM will receive an entirely unjustified ██████████ post-closing windfall on the critical Debtor assets that it purchased four years ago.

14.    New GM is required to advance its portion of the Emergence Capital to DPH so that DPH can conclude its Wind Up and fully consummate the Modified Plan. New GM has already funded some of the Wind Up obligations, and has been repaid every dollar of those Advances.  New GM should not be permitted to withhold necessary Advances of Emergence Capital under the guise of its unsupported argument that it can pick and choose which Wind Up obligations to pay -- effectively leaving the Reorganized Debtors just short of fully consummating the Modified Plan that this Court approved based on the simple understanding that the Emergence Capital would be available to the Reorganized Debtors when needed.  It is needed now.

---

[5]    The Court specifically relied on this testimony when confirming the Modified Plan.  *See* Supp. Goldman Decl., Ex. 2 (Plan Modification Approval Order, Docket No. 18707, ¶ V.)

## REPLY

15.    New GM asserts three main arguments in its Objection that have not already been foreclosed by the Case Closing Order or Adjournment Orders: (i) this Court should not hear this dispute now (Obj. ¶¶ 2–6); (ii) the Funding Agreement does not contemplate funding of the Claims Settlements (*id*. ¶¶ 15–16, 41–54); and (iii) DPH has not provided "reasonable information" to New GM (*id*. at § 4; *see also* ¶¶ 11, 17, 19).

**A.    Without A Prompt Ruling From This Court,
Case Closing And The Wind Up Will Be Jeopardized**

16.    The parties have now negotiated this dispute for approximately four months since the filing of the Motion. The core facts of this dispute make clear that a ruling is necessary now: (i) DPH has requested payments to satisfy the Claims Settlements in accordance with its obligations under the Funding Agreement,[6] including to reflect the Reorganized Debtors' recent and hard-fought agreement in principle with the Environmental Agencies concerning the total amount of the Environmental Claims, and (ii) New GM refuses to fund the Claims Settlements. (*See, e.g.*, Obj. ¶ 41.)[7] New GM's refusal to fund the requested Advances is the only meaningful impediment to the Reorganized Debtors' ability to fully and finally consummate the Modified Plan, and to complete the Wind Up and close these cases.

---

[6]    The Reorganized Debtors' Advance Request obligations under the Funding Agreement are limited to:

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

*See* Goldman Decl., Ex. 3 (Funding Agreement, ¶¶ 3, 5.) The Reorganized Debtors have complied with all of these obligations. (*See* Brooks Decl. ¶¶ 5–7.)

[7]    "The ripeness doctrine requires that there be a 'real, substantial controversy between parties' involving a 'dispute definite and concrete[,]'" which is precisely the case here in light of, among other things, DPH's funding request and New GM's refusal. *McCord v. Agard (In re Bean)*, 252 F.3d 113, 117 (2d Cir. 2001) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).

17.     While the Advance Request related to the settlement of the Environmental

Claims may not yet be technically overdue, New GM has repeatedly asserted that it will

not fund the Claims Settlements.  Moreover, the law is clear:  "One does not have to

await the consummation of threatened injury to obtain preventive relief.  If the injury is

certainly impending, that is enough."  *Pac. Gas & Elec. Co. v. State Energy Res.*

*Conservation & Dev. Comm'n*, 461 U.S. 190, 201 (1983) (citations and internal quotation

marks omitted).  And to state the obvious:  without a prompt commitment regarding

available funding, efforts to fully resolve outstanding claims will be significantly

hampered (if not made entirely impossible).[8]

**B.      New GM's Effort To Invent Ambiguities
In The Funding Agreement Underscores The Agreement's Clarity**

> *(1)     The "Form" Budget Annexed to the Funding
> Agreement Does Not Purport to List All "Costs and Expenses"*

18.     New GM asserts that the form budget attached to the Funding Agreement

lists all of the costs and expenses agreed upon by the parties, and that it is not obligated



(*See* Obj. ¶ 15.)  This claim is entirely inconsistent with the Funding Agreement

and form budget itself.

19.     <u>First</u>, the Funding Agreement only states that

Goldman Decl.,

Ex. 3 (Funding Agreement ¶ 1, "Wind Up Budget".)

Indeed, if every single cost and expense

---

[8]     *See generally Pac. Gas & Elec. Co.*, 461 U.S. at 201–02 (holding that a challenge was ripe for adjudication
because litigant would be forced to expend resources while awaiting a determination on the matter).

had to be enumerated with an individual line item, the form budget would have been

hundreds of pages in length.

20.    <u>Second</u>, the form budget itself states that ███████████████████

(*see* Goldman Decl., Ex. 3 (Funding Agreement, Attach. A (allowing DPH to ████████

████████████, and New GM cannot dispute that, over the last several years, the

form of Wind Up Budget has been modified on numerous occasions at New GM's

insistence.  In fact, █████████████████████████████████████████████

████████████████████████████████ *Compare* Goldman Decl.,

Ex. 3 (Funding Agreement, Attach. A, Facility Wind Down Costs, line 1) to Brooks Decl.,

Ex. A (October 2013 Wind Up Budget.) ███████████████████████

███████████████████████

21.    <u>Third</u>, even assuming that the form budget dictated the costs at issue, the

form budget does ███████████████████████ Goldman Decl., Ex. 3

(Funding Agreement, Attach. A, Facility Wind Down Costs, line 1). ███████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████ (Motion to Close

Bankruptcy Cases ¶¶ 8(iii), 13(v).)

22.    <u>Fourth</u>, paragraph 6 of the Funding Agreement evidences DPH's and New

GM's express understanding that DPH may ████████████████████████

██████████████████████████████████████████

██████████████████████████████████████

███████████████ Goldman Decl., Ex. 3 (Funding Agreement ¶ 6 (emphasis added).)

██████████████████████████████████████████████

11

██████████████████████████████████████████████████████████

████████████████████████████████████████    (*See id.*)

23.    <u>Fifth</u>, New GM's argument about the form budget does not withstand even the slightest scrutiny.  By way of example only, the form budget ██████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████    Goldman Decl., Ex. 3

(Funding Agreement, Attach. A.)  Similarly, the form budget does not include ██████

██████████████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████

(2)    <u>*"Costs and Expenses" Versus "Liabilities"*</u>

24.    New GM also argues that it only agreed to fund certain costs and expenses of the Wind Up, and ██████████████████████████████████

████████████████████████████    (Obj. ¶ 15.)  In New GM's lexicon, liabilities are a ████████████████████████████    (*Id.*)  To buttress this self-serving interpretation, New GM states that, ████████████████████████████

██████████████████████████████████████████████████████████

(*Id.*)  Yet, New GM concedes, as it must, that it has agreed to fund certain "liabilities" (*id.*), but conveniently refers to the eventual settlement of Environmental Claims as "costs and expenses" (*id.* ¶ 22 ██████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████    (*Id.* ¶ 6.)

25.    <u>First</u>, the terms of the Funding Agreement make clear that New GM's payment obligation is extremely broad. ████████████████████████ ██████████████████████████████████████████████████ ████████████████████████ Goldman Decl., Ex. 3 (Funding Agreement ¶ 6.) ████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████

26.    <u>Second</u>, New GM's position is internally inconsistent, belied by the broad terms of the Funding Agreement and contradictory to the clear terms of Section 2.3.2 of the MDA, which provides that ████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████████████████████[9]

(Goldman Decl., Ex. 1 § 2.3.2.)  Section 1.1 of the MDA defines "Liabilities" as:

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████

(*Id*. at 16–17 (emphases added).)  Section 1.1 of the MDA defines "Claims" as:

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████

(*Id*. at 6 (emphases added).)

27.    There can be no legitimate dispute that under these agreed-upon broad definitions, the Environmental Claims are ████████████████████████ ████████████████████████████████████████████████

---

[9] ████████████████████████████████████████████████ ██████████████████████



28. Simply put, ██████████████████████████████████████

████████████████ (*see* Goldman Decl., Ex. 3 (Funding Agreement, Preamble)) and

(i) Article 9.6(a) of the Modified Plan makes the Reorganized Debtors responsible for,

among other things, resolving claims against, and demands for performance by, the

Debtors (*see* Supp. Goldman Decl., Ex. 2, Art. 9.6(a)), and (ii) ████████████████

████████████████ (*see* Goldman Decl., Ex. 1 § 2.3), settlement of the Environmental

Claims are part of the Reorganized Debtors' Wind-Up that New GM must fund.[10]

29. <u>Third</u>, this common sense reading is also consistent with other provisions

of the MDA.  By way of example, Section 2.1.4.W of the MDA provides that ████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████ (*Id.*, Ex. 1 § 2.1.4.W (first

emphasis added).) ██████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████ *See GPIF-I Equity Co., Ltd. v. HDG Mansur Inv. Servs., Inc.,*

No. 13 Civ. 547, 2013 WL 3989041, at *5 (S.D.N.Y. Aug. 1, 2013) ("[A] court must

consider the language of the terms of the contract when the contract is 'read as a whole'

and 'avoid interpretations that render contract provisions meaningless or superfluous.'"

(quoting *Barclays Capital Inc. v. Giddens (In re Lehman Bros. Inc.,* No. 11 Civ. 6053,

2012 WL 1995089, at *11 (S.D.N.Y. June 5, 2012))).[11]

30.    <u>Fourth</u>, although the applicable terms are clear, it is worth observing that

when resolving environmental claims in General Motors Corp.'s ("Old GM") own

Chapter 11 case, Old GM established a trust to "settle the Debtors' administrative

expense liability to the governments for cleanup of the Property . . . ."  (*See* Supp.

Goldman Decl., Ex. 9 (selected pages of Disclosure Statement for Debtors' Amended

Joint Chapter 11 Plan at 43–44, *In re Motors Liquidation Co.,* Case No. 09-50026 (REG)

(Bankr. S.D.N.Y. Dec. 8, 2010) [Docket No. 8023] (emphasis added)));  *see also id*. at 45

(describing the settlement as "a global settlement of administrative expense liability for

the environmental claims of the governments relating to the Property").  Furthermore,

Old GM referred to its environmental liability as the "cost" to remediate the properties:

- Stating in reference to the "Assessment of Environmental ***Liabilities***" that "the Debtors engaged in an . . . involved process to assess ***the costs*** to remediate environmental contamination at the Property." *Id*. at 43 (emphases added).
- "[T]he Debtors developed costs models . . . to project future environmental liabilities . . . ." *Id*. at 45.
- "The cost modeling allowed the Debtors . . . to determine a reasonable range of costs."  General Motors Corp. then "assess[ed] the likely upper bound of total potential environmental remediation costs." *Id*.

31.    New GM cannot run from these characterizations or "cherry-pick" the

Wind Up obligations it must fund now.  If New GM wanted to retain the ability to

select which Wind Up obligations it wanted to pay, it could have included that right in

---

[11]    New GM's position also contradicts the clear purpose of Section 2.1.4.W of the MDA, which provides, in part, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

the Funding Agreement.  However, the heavily-negotiated Funding Agreement does

not contain such a right;  and for good reason:  to have done so would have cast doubt

on the feasibility of the Modified Plan.[12]

  (3) *DPH Is Not Paying Its "Future" DPH Costs Through
    <u>the Formation of a Trust:  It Is Simply Settling Claims</u>*

  32. In the Case Closing Order, this Court unambiguously authorized DPH to

establish trusts to satisfy the Environmental Claims and attendant remediation costs.

(Case Closing Order, ¶ 9.)  New GM contends that DPH's request to fund a remediation

trust as part of its hard-fought settlement of the Environmental Claims is a request for

New GM (i) to fund "***future*** costs and expenses" (Obj. ¶ 22 (emphasis in original)) or

(ii) to "make provisions for ***future*** claims" or "potential ***future*** liabilities" (*id.* ¶¶ 51–52

(emphases in original)).  New GM is wrong.

  33. New GM's argument that a remediation trust may take years to clean up

the remaining properties is a red herring.  When the trust spends its money is

irrelevant.  What is relevant is this:  by reaching settlement now, DPH has resolved the

Environmental Claims.  (Motion to Close Bankruptcy Cases ¶ 8(iii).)[13] ████████████

████████████████████████████████████████

  34. Contrary to New GM's assertion (Obj. ¶¶ 22, 53), ████████████████

██████████████████████████████████████████████████████████ As

explained above, ████████████████████████████████████████

---

[12] Notably, the Modified Plan makes clear that it is "the product of extensive discussions and
negotiations between and among the Debtors, GM, GMCo., the DIP Agent, the DIP Lenders, the
Creditors' Committee, and certain other creditors and constituencies . . . . Accordingly, the general
rule of contract construction known as '*contra preferentem*' shall not apply to the construction or
interpretation of any provision of [the Master Disposition Documents]."  Supp. Goldman Decl., Ex. 2
(Modified Plan, Art. I.C., "Rules of Interpretation," pp. 28–29.)

[13] *See also Statement of the United States of America in Support of the Reorganized Debtors' Motion for an Order
to Compel Compliance With, and to Implement, the Modified Plan, Plan Modification Order and Related
Documents*, filed on July 24, 2013 ¶ 17 [Docket No. 22100].

███████████████████████████████████████████ New GM's rights vis-à-vis DPH

will not change as a result of this claim-settlement process.  Moreover, it is worth noting

that New GM ████████████████████████████████████████

(*Id*. ¶ 22.)  As noted in the Motion, the Funding Agreement ████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

*See* Goldman Decl., Ex. 3 (Funding Agreement, Attach. A.) ██████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████ (*id.*).

37.    New GM did not obtain the right to "micromanage," "second guess" or

"veto" DPH's chosen course of action.  ████████████████████████████████████

████████████████████████████████████████████████

(4)    *There Has Been No Undue Delay with Settlement*

36.    New GM suggests that DPH has squandered its time for settling the

Environmental Claims.  (Obj. ¶ 13 ("It is hard to understand why DPH is in the position

that it claims to be in, four years after the Effective Date of the Modified Plan.").)  To be

sure, these claims could have been settled long ago if DPH were willing to write a

"blank check" utilizing every dollar available under the Funding Agreement, to the detriment of New GM. DPH has not done that.

37.      Instead, DPH has sold nearly all properties that it had (and the environmental liabilities associated with those properties were transferred in connection with those sales). Negotiating with New GM over environmental liabilities concerning properties that could be (and were) sold would have clearly been a waste of resources.

38.      There can be no legitimate dispute that DPH negotiated in good faith over the last year to reduce the total amount of the Environmental Claims, the settlement of which will ultimately redound to the benefit of New GM in numerous ways. To the extent there has been any delay whatsoever, it has already substantially benefitted New GM because it has reduced the amount of environmental costs to be funded and postponed the need for New GM's funding.

**C.      DPH's Settlement Of, Or Posting Security For,
        Litigation Claims Are "Costs And Expenses" Of The Wind Up**[14]

39.      Since filing the Motion, the Reorganized Debtors have reached settlements in principle regarding three (3) of their thirteen (13) litigation matters.[15] The litigation matters are identified on the chart annexed as "Exhibit B" to the Brooks Declaration.

40.      The Reorganized Debtors continue to work toward settling or otherwise resolving these litigation matters. In the event that such resolution cannot be reached, the Reorganized Debtors may fund a security to the extent they determine such is required under Delaware dissolution law. Thus, the issue before the Court is narrow:

---

[14]    In the Motion, DPH inadvertently labeled its product liability litigations as patent litigations. None of these actions relate to patent litigations.

[15]    The Motion listed ten litigation matters. Two additional litigations were initiated against DPH after the filing of the Motion and a third has been discussed between the Reorganized Debtors and New GM in connection with information exchanges.

the Reorganized Debtors seek a ruling that funding settlements or posting of security

on account of the litigations is within New GM's obligations under the Funding

Agreement.

41. 

Because New GM cannot seriously dispute this, New GM seeks to attack the merits of

certain actions by asserting that the underlying claims are barred or otherwise

discharged.  (Obj. ¶ 18.)  The merits are irrelevant now because, among other reasons:

(i) DPH does not concede liability in any of the litigations;  (ii) dissolution does not

revive a barred claim, constitute an acknowledgement of liability or operate as a waiver

of any defense (*see* 8 Del. C. § 280(d);  and (iii) DPH will take into account all applicable

defenses when actually funding any security.  Resolution of this simple funding issue

does not require a mini-trial now.[16]  Moreover, the Funding Agreement provides that, ▮

*See* Goldman Decl., Ex. 3 (Funding

Agreement, ¶ 7(b).)

---

[16]    Indeed, a mini-trial would likely be impossible given none of the claimants consented to bankruptcy court jurisdiction by filing claims with this Court (except for two claimants, whose claims have been expunged).  Moreover, nearly all of these cases are personal injury tort actions that this Court cannot liquidate or estimate.  *See* 28 U.S.C. § 157(b)(5);  *see also In re Roman Catholic Archbishop of Portland in Oregon*, 339 B.R. 215, 220–21, 224 (Bankr. D. Or. 2006) (estimation by a bankruptcy court improper where debtor proposed to use the claim estimation process to create a fund for payment of personal injury tort claims);  *In re Dow Corning Corp.*, 211 B.R. 545, 566–70, 573–74 (Bankr. E.D. Mich. 1997).

**D.    New GM's Request For More Information**

42.    Three months ago, New GM claimed that it had not received "reasonable
information" concerning the Claims Settlements.  (*See* Obj. at 4 § d;  *see also* ¶¶ 11–14.)
This issue is now moot as New GM cannot dispute that, since filing the Motion, DPH
has:  (i) provided thousands of pages of documents to New GM;  (ii) given New GM
access to a "data room" that contains several thousand additional pages of documents;
(iii) conducted two in-person meetings to inform New GM about the environmental
and litigation issues (*see supra* ¶¶ 9–10);  and (iv) engaged in numerous phone calls with
New GM over the issues raised in the Motion.  (*See* Brooks Decl., ¶ 13 (describing
information exchange.)

43.    This information exchange far exceeds DPH's obligation to provide New
GM with reasonable information.  *See* Goldman Decl., Ex. 3 (Funding Agreement, ¶ 5.)

**WHEREFORE**, for the reasons set forth above, the Reorganized Debtors
respectfully request that this Court overrule the Objection, enter the revised proposed
order substantially in the form attached as "Exhibit A" hereto (a blackline against the
Proposed Order attached as "Exhibit A" to the Motion is attached as "Exhibit B"
hereto), and grant such other and further relief as this Court deems just and proper.

Dated:  New York, New York
          October 16, 2013

DPH Holdings Corp., *et al.*,
By Their Attorneys
TOGUT, SEGAL & SEGAL LLP
By:

/s/ Neil M. Berger
NEIL M. BERGER
STEVEN S. FLORES
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000