# Exhibit "1"



**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------- x
                                      :
    In re                           :    Chapter 11
                                      :
DELPHI CORPORATION, et al.,           :    Case No. 05-44481 (RDD)
                                      :
                                      :    (Jointly Administered)
    Debtors.                        :
------------------------------------- x

# SUPPLEMENT TO FIRST AMENDED DISCLOSURE STATEMENT WITH RESPECT TO FIRST AMENDED JOINT PLAN OF REORGANIZATION OF DELPHI CORPORATION AND CERTAIN AFFILIATES, DEBTORS AND DEBTORS-IN-POSSESSION (AS MODIFIED)

SKADDEN, ARPS, SLATE, MEAGHER
   && FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(800) 718-5305
(248) 813-2698 (International)
John Wm. Butler, Jr.
Ron E. Meisler
Nathan L. Stuart
Allison K. Verderber Herriott

                                        Of Counsel
SKADDEN, ARPS, SLATE, MEAGHER           DELPHI CORPORATION
   && FLOM LLP                                           5725 Delphi Drive
Four Times Square                                    Troy, Michigan 48098
New York, New York 10036                       David M. Sherbin
Kayalyn A. Marafioti                                    Sean P. Corcoran
Thomas J. Matz                                            Karen J. Craft

Attorneys for Debtors and Debtors-in-Possession

Dated:   New York, New York
               June 16, 2009

---

**DISCLAIMER**

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF ANY MODIFICATIONS TO THE PLAN CONFIRMED BY THE BANKRUPTCY COURT ON JANUARY 25, 2008. THE BANKRUPTCY COURT WILL DETERMINE UNDER 11 U.S.C § 1127 WHETHER ACCEPTANCES OR REJECTIONS OF THE MODIFICATIONS WILL BE SOLICITED, AND ANY ACCEPTANCES OR REJECTIONS OF THE MODIFICATIONS MAY NOT BE SOLICITED UNTIL THE BANKRUPTCY COURT HAS APPROVED THIS SUPPLEMENT TO THE DISCLOSURE STATEMENT. THIS SUPPLEMENT TO THE DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE COURT.**

---



**THE INFORMATION CONTAINED IN THIS SUPPLEMENT TO THE DISCLOSURE STATEMENT (HEREAFTER, THE "SUPPLEMENT") IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE FIRST AMENDED JOINT PLAN OF REORGANIZATION OF DELPHI CORPORATION AND CERTAIN AFFILIATES, DEBTORS AND DEBTORS-IN-POSSESSION (AS MODIFIED) (THE "MODIFIED PLAN"), AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE MODIFIED PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS SUPPLEMENT, REGARDING THE MODIFICATIONS TO THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE MODIFIED PLAN.**

**ALL CLAIM AND INTEREST HOLDERS ARE ADVISED AND ENCOURAGED TO READ THIS SUPPLEMENT AND THE MODIFIED PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE MODIFIED PLAN. SUMMARIES AND STATEMENTS REGARDING THE MODIFIED PLAN MADE IN THIS SUPPLEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE MODIFIED PLAN AND THE EXHIBITS ANNEXED TO THE MODIFIED PLAN AND THIS SUPPLEMENT. THE STATEMENTS CONTAINED IN THIS SUPPLEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF. IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTION SET FORTH IN THIS SUPPLEMENT AND THE TERMS OF THE MODIFIED PLAN, THE TERMS OF THE MODIFIED PLAN SHALL GOVERN.**

**THIS SUPPLEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1127 OF THE UNITED STATES BANKRUPTCY CODE, AS IT INCORPORATES SECTION 1125 AND OTHER PROVISIONS OF THE BANKRUPTCY CODE, AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW. THIS SUPPLEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION ("SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING SECURITIES OR CLAIMS OF DELPHI CORPORATION OR ANY OF ITS SUBSIDIARIES AND AFFILIATES SHOULD EVALUATE THIS SUPPLEMENT AND THE MODIFIED PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.**

**AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS SUPPLEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS SUPPLEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE MODIFIED PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, DELPHI CORPORATION OR ANY OF ITS SUBSIDIARIES AND AFFILIATES, DEBTORS AND DEBTORS-IN- POSSESSION IN THESE CASES.**

5.  *Claims Reconciliation Progress*

The Debtors have sought to resolve their claims pool on an expedited basis. With $34 billion in liquidated amounts plus certain unliquidated amounts asserted against the Debtors as of May 26, 2009 in approximately 16,850 proofs of claim, and certain scheduled liabilities for which no proof of claim was filed, the Debtors faced a challenging task. Between September 19, 2006 and May 26, 2009, the Debtors filed 33 Omnibus Claims Objections (as defined below). As of May 26, 2009, the Debtors had objected to approximately 13,400 proofs of claim which asserted approximately $10.1 billion in aggregate liquidated amounts plus additional unliquidated amounts. The Court has entered orders disallowing and/or claimants have withdrawn approximately 9,950 of those proofs of claim, which reduced the amount of asserted claims by approximately $9.8 billion in aggregate liquidated amounts plus additional unliquidated amounts. In addition, the Court has entered orders modifying approximately 3,998 claims, reducing the aggregate amounts asserted on those claims by $350 million, which amounts are subject to further objection by the Debtors at a later date on any basis.

The Debtors and their advisors devoted a significant amount of time to the claims resolution process. For example, the Debtors gained court approval of certain claims objection procedures, which are discussed in more detail below, applicable to claims that become contested when claimants respond to an omnibus objection. Pursuant to these procedures, the Debtors scheduled multiple claims for adjudication in a hearing before the Bankruptcy Court, held multiple "meet-and-confer" discussions and mediations, and ultimately resolved several contested claims during the period from October 2006 through May 26, 2009 before they were scheduled for hearing.

As of May 26, 2009 there are approximately 40 proofs of claim of the approximately 16,850 proofs of claim which still require further reconciliation by the Debtors. The Debtors anticipate that some of these remaining proofs of claim will be withdrawn as they are reconciled and the Debtors intend to place all remaining proofs of claim that are not withdrawn on future omnibus claims objections

6.  *Key Classes Of Claims*

(a)  GM Claims

(i)  GM's Proof Of Claim

On July 31, 2006, GM filed an unliquidated amended proof of claim. The claims asserted by GM included warranty/recall claims, overpricing and overpayment claims, short shipments claims, damaged goods claims, missed price reduction claims, lease and service contract claims, flowback employee post employment benefits and relocation cost claims, claims arising under the special attrition programs, UAW benefit guarantee claims, personal injury indemnification claims, environmental claims, federal, state, and other tax claims, and intellectual property claims. For certain portions of its claim, GM provided documentation aggregating approximately $6 billion. Under the Amended GSA, GM received a $2.5 billion allowed general unsecured claim. In addition, certain of GM's warranty claims were settled by agreement of the parties as set forth more fully below. Further, GM received an administrative expense claim in

an amount up to $2.055 billion arising from the IRC Section 414(l) Transfer and an administrative claim for obligations under the GM Arrangement. As part of GM's consideration provided under the Master Disposition Agreement, at closing GM's administrative expense claim under Section 4.04(a)(i) of the Amended GSA, its administrative expense claim under the GM Arrangement, and its prepetition claim will be waived or deemed satisfied.

(ii)    Settlement Of GM Warranty Claims

GM asserted that it incurred costs and suffered damages arising from certain customer warranty claims and/or recall campaigns related to allegedly non-conforming parts and systems supplied by Delphi to GM. These claims were not subject to the general settlement with GM as documented in the Original GSA and Original MRA. During separate negotiations to resolve the warranty claims, GM advised Delphi that the amount of certain warranty claims had substantially increased from those asserted in GM's proof of claim.

On September 27, 2007, the Bankruptcy Court granted Delphi's motion to enter into and perform under a settlement agreement resolving the warranty claims (the "Warranty Settlement Agreement") with GM for a total estimated amount of approximately $200 million. With certain limited exceptions, the agreement (i) settles all outstanding warranty claims and issues related to a component or assembly supplied by Delphi to GM that are (a) known by GM as of August 10, 2007, (b) determined by GM to be Delphi's responsibility in whole or in part, and (c) managed in GM's investigation process, and (ii) limits the liability related to certain other warranty claims that have become known by GM on or after June 5, 2007. Under the Warranty Settlement Agreement, GM is foreclosed from bringing any type of claim set forth on the exhibits attached thereto, if it is shown that on or before August 10, 2007 (i) GM knew about the claim, (ii) the amount of the claim exceeded $1 million as of the date of the Warranty Settlement Agreement or GM believed the claim would exceed $1 million, (iii) the claim, as of the date of the Warranty Settlement Agreement, was in GM's investigation process or GM determined that it should have been in GM's investigation process but excluded it from that process for the purpose of pursuing a claim against Delphi, and (iv) GM believed as of the date of the Warranty Settlement Agreement, or reasonably should have believed at that time, that Delphi had some responsibility for the claim.

Delphi elected to defer amounts due under the Warranty Settlement Agreement until it expected to receive payments from GM, on or about the time of its emergence from chapter 11. Because Delphi elected to defer these payments, GM was to receive interest at the rate of 6% per annum on the payment from November 1, 2007, until the amounts were paid by Delphi or set off against amounts payable by GM. In conjunction with overall negotiations regarding potential amendments to the Confirmed Plan, GM agreed, on July 31, 2008, to forgive certain of the cash amounts due under the Warranty Settlement Agreement, including any applicable interest, which favorably impacted Delphi's operating income in July 2008 by $112 million.

(b)    Environmental And Other Regulatory Claims And Investigations

Delphi is subject to the requirements of U.S. federal, state, local, and non-U.S. environmental and occupational safety and health laws and regulations. These include laws regulating water discharge, waste management, and cleanup of contaminated sites. Delphi has

an environmental management structure designed to facilitate and support its compliance with these requirements. Historically, Delphi has tried to comply with all such requirements and regulations, although the Debtors cannot provide assurance that they are at all times in compliance. The Debtors have made and will continue to make expenditures to comply with environmental requirements. Environmental requirements are complex, change frequently, and have tended to become more stringent over time. Accordingly, the Debtors cannot assure that environmental requirements will not change or become more stringent over time or that the Debtors' or the Reorganized Debtors (to the extent certain liabilities are not discharged) eventual environmental cleanup costs and liabilities will not be material.

Delphi is also subject to complex laws governing the protection of the environment and requiring investigation and cleanup of environmental contamination. Delphi is in various stages of investigation and cleanup at its manufacturing sites where contamination has been discovered. Additionally, Delphi has received notices that it is a potentially responsible party ("PRP") in proceedings at various sites, including the Tremont Barrel Fill Site located in Tremont City, Ohio. In September 2002, Delphi and other PRPs entered into a Consent Order with the Environmental Protection Agency ("EPA") to perform a Remedial Investigation and Feasibility Study concerning a portion of the site. The Remedial Investigation and Alternatives Array Document were finalized in 2007. A Feasibility Study and Record of Decision are expected to be completed in late 2008 or 2009. Although Delphi believes that capping and future monitoring is a reasonably possible outcome, a different cleanup approach ultimately may be required for the site. Because the manner of remediation is yet to be determined, it is possible that the resolution of this matter may require Delphi to make material future expenditures, possibly as much as $11-15 million in excess of existing reserves. Delphi believes, however, that this liability, among others, will be discharged pursuant to the Modified Plan. Delphi will continue to reassess any potential costs and, as appropriate, its environmental reserve as the investigation proceeds.

When it has been possible to provide reasonable estimates of Delphi's liability with respect to environmental sites, provisions have been made in accordance with U.S. GAAP. As of March 31, 2009, Delphi's reserve for such environmental investigation and cleanup was approximately $103 million. The majority of that liability will be discharged. Also as of March 31, 2009, Delphi believes that Reorganized DPH Holdings Co. will incur approximately $32 million in clean up costs at certain domestic sites. These liabilities may not be subject to discharge and even if subject to discharge, Reorganized DPH Holdings Co. might be subject to the same liability to the extent it is the owner or operator of such sites. Nevertheless, Delphi cannot ensure that U.S. environmental requirements will not change or become more stringent over time or that Reorganized DPH Holdings Co.'s eventual environmental cleanup costs and liabilities in the U.S. will not exceed the foregoing amount. Moreover, facility sales and/or closures relating to the restructuring process could trigger additional and perhaps material environmental remediation costs, as previously unknown conditions may be identified.

Environmental Obligations will either be treated in accordance with the Master Disposition Agreement, retained by Reorganized DPH Holdings Co., or discharged under the Modified Plan.

(c) <u>Workers' Compensation Claims</u>

In many states where the Debtors conduct business, the Debtors self-insure their workers' compensation programs and, as required by state law, have obtained letters of credit for the benefit of the states in the event that the Debtors default on their obligations to pay workers compensation claims. Certain states in which the Debtors are self-insured have filed contingent claims for repayment in the event that the Debtors do not satisfy prepetition workers' compensation liabilities. If the Debtors default on such obligations, such states may allege that their claims for recovery of payments made to workers should be entitled to priority treatment by characterizing such claims as "excise taxes" under section 507(a)(8) of the Bankruptcy Code. In addition, certain employees who filed contingent claims on account of workers' compensation payments they are receiving may, upon a default by the Debtors, assert that they are entitled to priority under section 507(a)(3) or (4).

The Debtors estimate that allowed claims asserted by states, if any, on account of contingent workers' compensation claims would be in amounts less than $10 million. First, only a few states filed such claims on or prior to the Bar Date and the Debtors believe that, in the event they are determined to be excise taxes, such priority treatment would be limited to payments for injuries that occurred within three years of the commencement of the Chapter 11 Cases. Second, priority treatment for timely claims asserted by individuals, in the event they are determined to be employee wage or benefit claims under 507(a)(3) or (4) are capped at $10,000 per individual, and the Debtors have made payments to employees, including without limitation, workers' compensation payments to employees throughout the duration of the Chapter 11 Cases, in amounts that the Debtors believe likely exhausts the cap. To the extent asserted workers' compensation claims are administrative expense claims related to their respective acquired assets, such claims will be assumed by one of the Buyers pursuant to the Master Disposition Agreement with remaining administrative claims to be retained and paid by DPH Holdings Co. Any prepetition claims not barred by the Bar Date will be satisfied through the application of existing letters of credit, pursuant to the treatment set forth for either of the priority classes, or as set forth in Article 5.3 for allowed prepetition general unsecured claims, and will be discharged pursuant to the Modified Plan. To the extent no timely claim has been filed, such liabilities are barred by the Bar Date Order and will be discharged pursuant to the Modified Plan.

### 7. *Reclamation Claims Program*

On November 4, 2005, the Bankruptcy Court approved global procedures for receiving, reviewing, responding to, and resolving reclamation demands. The Debtors received thousands of reclamation demands, including duplicate demands. Due to the high volume of reclamation demands received by the Debtors, the Bankruptcy Court granted the Debtors a 45-day extension of the deadline to reconcile all reclamation claims. After reviewing these demands, the Debtors identified 855 non-duplicate reclamation demands with a total face amount of approximately $282.7 million.

To facilitate the review process of these 855 reclamation demands and the requirement to respond to all reclamation demands within 135 days, the Debtors developed a comprehensive process for responding to all such reclamation demands, evaluating any disagreements, and reaching agreed reclamation claim amounts subject to certain reserved defenses. Reclamation

Dated: Troy, Michigan
      June 16, 2009

                         DELPHI CORPORATION AND THE
                         AFFILIATE DEBTORS

                By: /s/ John D. Sheehan
                    John D. Sheehan
                    Vice President, Chief Financial Officer


SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(800) 718-5305
(248) 813-2698 (International)
John Wm. Butler, Jr.
Ron E. Meisler
Nathan L. Stuart
Allison K. Verderber Herriott

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti
Thomas J. Matz

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Of Counsel
DELPHI CORPORATION
5725 Delphi Drive
Troy, Michigan 48098
David M. Sherbin
Sean P. Corcoran
Karen J. Craft