# Exhibit "9"

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
                                          :
**In re**                                 :   **Chapter 11 Case No.**
                                          :
**MOTORS LIQUIDATION COMPANY,** *et al.*, :   **09-50026 (REG)**
   **f/k/a General Motors Corp.,** *et al.* :
                                          :
          **Debtors.** :   **(Jointly Administered)**
                                          :
---------------------------------------------------------------x


# DISCLOSURE STATEMENT FOR
# DEBTORS' AMENDED JOINT CHAPTER 11 PLAN


                WEIL, GOTSHAL & MANGES LLP
                767 Fifth Avenue
                New York, New York 10153
                (212) 310-8000

                Attorneys for the Debtors and Debtors in Possession

Dated: New York, New York
       December 8, 2010

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THE DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT TO DATE.**

# TABLE OF CONTENTS

Page

I. INTRODUCTION ..................................................................................................... 1
    A. Definitions and Exhibits ................................................................................. 1
        1. Definitions.......................................................................................... 1
        2. Exhibits ............................................................................................. 1
    B. Notice to Creditors .......................................................................................... 1
        1. Scope of Plan ..................................................................................... 1
        2. Purpose of Disclosure Statement ....................................................... 2
    C. Disclosure Statement Enclosures .................................................................... 3
        1. Disclosure Statement Approval Order .............................................. 3
        2. Notice of Confirmation Hearing ....................................................... 3
        3. Ballots ............................................................................................... 3
    D. Inquiries .......................................................................................................... 3
    E. Summary Table of Classification and Treatment of Claims and Equity Interests Under the Plan .................................................................... 4

II. OVERVIEW OF DEBTORS' OPERATIONS AND CHAPTER 11 CASES ............................................................................................................................ 8
    A. Debtors' Prepetition Business Operations ...................................................... 8
    B. Significant Events Leading to Commencement of Chapter 11 Cases ............................................................................................................ 10
    C. Restructuring of GM ..................................................................................... 16
    D. Debtors' Prepetition Capital Structure .......................................................... 20
    E. REALM/ENCORE Debtors .......................................................................... 25
    F. Chapter 11 Cases ........................................................................................... 26
        1. Commencement of Chapter 11 Cases .............................................. 26
        2. Appointment of Creditors' Committee ............................................ 26
        3. Appointment of Asbestos Claimants' Committee and Future Claimants' Representative ................................................... 27
        4. DIP Financing .................................................................................. 27
        5. 363 Transaction ................................................................................ 28
        6. Term Loan Avoidance Action ......................................................... 31

# TABLE OF CONTENTS
## (continued)

Page

|  |  | 7. | Wind-Down Process | 33 |
|  |  | 8. | Executory Contracts and Unexpired Leases/Dealerships | 33 |
|  |  | 9. | Claims Process | 34 |
|  |  | 10. | Reclamation Claims and 503(b)(9) Claims | 36 |
|  |  | 11. | Nova Scotia Objection | 37 |
|  |  | 12. | Automatic Stay Issues | 43 |
|  |  | 13. | Assessment of Environmental Liabilities | 43 |
|  |  | 14. | Asbestos Liability | 47 |
|  |  | 15. | De Minimis Asset Sales | 49 |
|  |  | 16. | Non-De Minimis Asset Sales | 50 |
|  |  | 17. | Settlement with Remy International, Inc. | 50 |
|  |  | 18. | Appointment of Fee Examiner | 52 |
|  |  | 19. | New GM Initial Public Offering and Valuation of New GM | 52 |
| III. | OVERVIEW OF THE PLAN | | | 52 |
|  | A. | General | | 52 |
|  | B. | Assets for Distribution Under the Plan | | 53 |
|  | C. | Description and Summary Table of Classification and Treatment of Claims and Equity Interests Under the Plan | | 56 |
|  | D. | Reservation of "Cram Down" Rights | | 67 |
|  | E. | Administrative Expenses for the Debtors | | 68 |
|  | F. | Provisions Governing Distributions Under the Plan | | 68 |
|  |  | 1. | Distribution Record Date | 68 |
|  |  | 2. | Payments and Transfers on Effective Date | 69 |
|  |  | 3. | Repayment of Excess Cash to DIP Lenders | 69 |
|  |  | 4. | Payment of Cash or Certain Assets to Charitable Organizations | 70 |
|  |  | 5. | Distributions of Cash | 70 |
|  |  | 6. | Sale of New GM Warrants About to Expire | 70 |
|  |  | 7. | Delivery of Distributions and Undeliverable Distributions | 71 |
|  |  | 8. | Withholding and Reporting Requirements | 72 |

# TABLE OF CONTENTS
### (continued)

Page

9. Time Bar to Cash Payments ........................................................... 72
10. Minimum Distributions and Fractional Shares ........................... 72
11. Setoffs ............................................................................................ 73
12. Transactions on Business Days ..................................................... 73
13. Allocation of Plan Distributions Between Principal and Interest ........................................................................................... 73
14. Surrender of Existing Publicly-Traded Securities ....................... 73
15. Class Proofs of Claim .................................................................... 74
16. Continued Evaluation of Distribution Mechanics ........................ 74

G. Means for Implementation and Execution of the Plan ............................. 74
   1. Substantive Consolidation .............................................................. 74
   2. The GUC Trust ................................................................................ 75
      a. Execution of GUC Trust Agreement ............................... 75
      b. Purpose of GUC Trust ...................................................... 76
      c. GUC Trust Assets ............................................................. 76
      d. Governance of GUC Trust ............................................... 76
      e. GUC Trust Administrator and GUC Trust Monitor ........ 76
      f. Role of GUC Trust Administrator .................................. 76
      g. Role of GUC Trust Monitor ............................................. 77
      h. Transferability of GUC Trust Interests ........................... 77
      i. Cash .................................................................................... 77
      j. Costs and Expenses of GUC Trust Administrator ........... 77
      k. Compensation of GUC Trust Administrator ................... 78
      l. Distribution of GUC Trust Assets ................................... 78
      m. Retention of Professionals by GUC Trust Administrator and GUC Trust Monitor .......................... 78
      n. U.S. Federal Income Tax Treatment of GUC Trust ........ 78
      o. Dissolution ......................................................................... 79
      p. Indemnification of GUC Trust Administrator and GUC Trust Monitor ........................................................... 79

# TABLE OF CONTENTS
## (continued)

Page

|   |   |   | |
|---|---|---|---|
| | q. | Closing of Chapter 11 Cases | 79 |
| 3. | The Asbestos Trust | | 80 |
| | a. | Execution of Asbestos Trust Agreement | 80 |
| | b. | Purpose of Asbestos Trust | 80 |
| | c. | Assumption of Certain Liabilities by Asbestos Trust | 80 |
| | d. | Asbestos Trust Assets | 80 |
| | e. | Governance of Asbestos Trust | 81 |
| | f. | The Asbestos Trust Administrator(s) | 81 |
| | g. | Role of Asbestos Trust Administrator(s) | 81 |
| | h. | Nontransferability of Asbestos Trust Interests | 81 |
| | i. | Cash | 81 |
| | j. | Costs and Expenses of Asbestos Trust Administrator(s) | 81 |
| | k. | Allowance of Asbestos Personal Injury Claims | 81 |
| | l. | Distribution of Asbestos Trust Assets | 81 |
| | m. | Retention of Professionals by Asbestos Trust Administrator(s) | 82 |
| | n. | U.S. Federal Income Tax Treatment of Asbestos Trust | 82 |
| | o. | Dissolution | 82 |
| | p. | Indemnification of Asbestos Trust Administrator(s) | 82 |
| 4. | The Environmental Response Trust | | 83 |
| | a. | Environmental Response Trust Agreement and Environmental Response Trust Consent Decree and Settlement Agreement | 83 |
| | b. | Purpose of Environmental Response Trust | 83 |
| | c. | Environmental Response Trust Assets | 84 |
| | d. | Governance of Environmental Response Trust | 84 |
| | e. | Role of Environmental Response Trust Administrative Trustee | 84 |

# TABLE OF CONTENTS
## (continued)

Page

|   |   |   |   |
|---|---|---|---|
|   | f. | Nontransferability of Environmental Response Trust Interests | 85 |
|   | g. | Cash | 85 |
|   | h. | Indemnification of Environmental Response Trust Administrative Trustee | 85 |
|   | i. | U.S. Federal Income Tax Treatment of Environmental Response Trust | 85 |
| 5. | | The Avoidance Action Trust | 86 |
|   | a. | Execution of Avoidance Action Trust Agreement | 86 |
|   | b. | Purpose of Avoidance Action Trust | 86 |
|   | c. | Avoidance Action Trust Assets | 86 |
|   | d. | Governance of Avoidance Action Trust | 87 |
|   | e. | Avoidance Action Trust Administrator and Avoidance Action Trust Monitor | 87 |
|   | f. | Role of Avoidance Action Trust Administrator | 87 |
|   | g. | Role of Avoidance Action Trust Monitor | 87 |
|   | h. | Nontransferability of Avoidance Action Trust Interests | 88 |
|   | i. | Cash | 88 |
|   | j. | Distribution of Avoidance Action Trust Assets | 88 |
|   | k. | Costs and Expenses of Avoidance Action Trust | 88 |
|   | l. | Compensation of Avoidance Action Trust Administrator | 89 |
|   | m. | Retention of Professionals by Avoidance Action Trust Administrator and Avoidance Action Trust Monitor | 89 |
|   | n. | U.S. Federal Income Tax Treatment of Avoidance Action Trust | 89 |
|   | o. | Dissolution | 92 |
|   | p. | Indemnification of Avoidance Action Trust Administrator and Avoidance Action Trust Monitor | 92 |
| 6. | | Securities Law Matters | 93 |

# TABLE OF CONTENTS
## (continued)

Page

|     |                                                                                              |     |
| --- | -------------------------------------------------------------------------------------------- | --- |
|     | 7. Cancellation of Existing Securities and Agreements | 94 |
|     | 8. Equity Interests in MLC Subsidiaries Held by the Debtors | 95 |
|     | 9. Administration of Taxes | 95 |
|     | 10. Dissolution of the Debtors | 95 |
|     | 11. Determination of Tax Filings and Taxes | 96 |
|     | 12. Books and Records | 97 |
|     | 13. Corporate Action | 98 |
|     | 14. Effectuating Documents and Further Transactions | 98 |
|     | 15. Continued Applicability of Final Order Approving Dip Credit Agreement | 99 |
| H.  | Procedures for Resolving and Treating Disputed Claims | 99 |
|     | 1. Objections to Claims and Resolution of Disputed Claims | 99 |
|     | 2. No Distribution Pending Allowance | 100 |
|     | 3. Estimation | 101 |
|     | 4. Allowance of Disputed Claims | 101 |
|     | 5. Dividends | 101 |
| I.  | Treatment of Executory Contracts and Unexpired Leases | 101 |
|     | 1. Executory Contracts and Unexpired Leases | 101 |
|     | 2. Approval of Rejection of Executory Contracts and Unexpired Leases | 101 |
|     | 3. Claims Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan | 102 |
| J.  | Releases Granted Pursuant to the Plan | 102 |
|     | 1. Limited Releases | 102 |
|     | 2. Exculpation | 103 |
| K.  | Conditions Precedent to Effectiveness of Plan | 104 |
|     | 1. Condition Precedent to Confirmation of Plan | 104 |
|     | 2. Conditions Precedent to Effective Date | 104 |
|     | 3. Satisfaction and Waiver of Conditions | 104 |
|     | 4. Effect of Nonoccurrence of Conditions to Consummation | 105 |

# TABLE OF CONTENTS
### (continued)

Page

  L. Effects of Confirmation of Plan ................................................................ 105
    1. Vesting of Assets ........................................................................ 105
    2. Release of Assets from Bankruptcy Court Jurisdiction ............. 106
    3. Binding Effect ............................................................................ 106
    4. Term of Injunction or Stays ....................................................... 106
    5. Term Loan Avoidance Action; Offsets ...................................... 106
    6. Injunction .................................................................................... 106
    7. Injunction Against Interference with Plan ................................ 106
    8. Special Provisions for Governmental Units .............................. 107
  M. Retention of Jurisdiction by Bankruptcy Court ..................................... 107
  N. Dissolution of Committees ..................................................................... 109
  O. Exemption from Transfer Taxes ............................................................. 110
IV. ALTERNATIVES TO THE PLAN ..................................................................... 110
  A. Liquidation Under Chapter 7 of the Bankruptcy Code .......................... 111
  B. Alternative Chapter 11 Plan .................................................................... 111
  C. Certain Risk Factors ................................................................................ 111
V. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ................................................................................................................... 111
  A. Consequences to the Debtors .................................................................. 113
    1. Treatment of Asbestos Trust ...................................................... 114
    2. Treatment of GUC Trust ............................................................ 115
    3. Treatment of Avoidance Action Trust ...................................... 115
    4. Treatment of Environmental Response Trust ........................... 116
  B. Consequences to Holders of General Unsecured Claims ...................... 117
    1. Reorganization Treatment .......................................................... 118
    2. Fully Taxable Exchange ............................................................ 119
    3. Character of Gain or Loss .......................................................... 120
    4. Distribution with Respect to Accrued but Unpaid Interest ........ 121
    5. Ownership and Disposition of New GM Stock ........................ 122
      a. Dividends ................................................................. 122

# TABLE OF CONTENTS
## (continued)

Page

|   |   |   |   |   |
|---|---|---|---|---|
|   |   | b. | Sale, Redemption, or Repurpose ................................... | 123 |
|   | 6. |   | Ownership, Disposition, and Exercise of New GM Warrants ................................................................................ | 123 |
|   | 7. |   | Tax Treatment of Avoidance Action Trust and Beneficiaries of Avoidance Action Trust ................................ | 123 |
|   |   | a. | Classification of Avoidance Action Trust ...................... | 123 |
|   |   | b. | General Tax Reporting by Avoidance Action Trust and Beneficiaries of Avoidance Action Trust ................ | 124 |
|   |   | c. | Tax Reporting for Avoidance Action Trust Assets Allocable to Disputed Claims ...................................... | 126 |
| C. | Consequences to Holders of Asbestos Personal Injury Claims ............. | | | 127 |
| D. | Information Reporting and Withholding ............................................. | | | 128 |
| E. | Consequences to Non-U.S. Holders of Notes ....................................... | | | 128 |
|   | 1. | Distributions Under the Plan ..................................................... | | 129 |
|   |   | a. | Accrued Interest ............................................................ | 130 |
|   |   | b. | Treaty Benefits .............................................................. | 130 |
|   |   | c. | Foreign Government Exemption ................................... | 130 |
|   | 2. | Ownership and Disposition of New GM Securities ................... | | 131 |
|   |   | a. | Dividends ....................................................................... | 131 |
|   |   | b. | Sale, Redemption, or Repurchase ................................. | 131 |
|   |   | c. | Information Reporting and Backup Withholding .......... | 132 |
| VI. | VOTING PROCEDURES AND REQUIREMENTS ..................................... | | | 133 |
| A. | Ballots and Voting Deadline ................................................................ | | | 133 |
| B. | Holders of Claims Entitled to Vote ...................................................... | | | 134 |
| C. | Votes Required for Acceptance by a Class .......................................... | | | 134 |
| D. | Voting Procedures ................................................................................ | | | 135 |
|   | 1. | Holders of Claims in Classes 3 and 5 ....................................... | | 135 |
|   | 2. | Withdrawal of Ballot or Master Ballot ..................................... | | 135 |
| VII. | CONFIRMATION OF THE PLAN ............................................................... | | | 135 |
| A. | Acceptance of the Plan ......................................................................... | | | 135 |

## TABLE OF CONTENTS
### (continued)

Page

|  | B. | Confirmation of the Plan If a Class Does Not Accept the Plan/No Unfair Discrimination/Fair and Equitable Test ..................................... 136 |
|  | C. | Best Interests Test ............................................................................... 137 |
|  | D. | Feasibility ............................................................................................ 138 |
|  | E. | Classification of Claims and Equity Interests Under the Plan ............... 139 |
|  | F. | Confirmation Hearing ......................................................................... 139 |
| VIII. | CONCLUSION .............................................................................................. 141 |

Scotia Trustee and certain holders of the Nova Scotia Notes, the Nova Scotia Objection fails because, inter alia, (i) the Creditors' Committee is not entitled to relief under Fed. R. Civ. P. 60(b), (ii) the Creditors' Committee's allegations of fraudulent transfer are unsupportable for a number of reasons, including, without limitation, because (a) there was no transfer of estate property, (b) the Creditors' Committee is barred from raising such claims on numerous grounds, and (c) no actual or constructive fraudulent transfer occurred as MLC received reasonably equivalent value and there was no actual intent to hinder, delay, or defraud creditors, (iii) the Nova Scotia Wind-Up Claim and the Nova Scotia Guarantee Claims are not duplicative, (iv) the Creditors' Committee has not alleged (nor do facts exist that would support) a finding of equitable subordination, and (v) the Lock Up Agreement was not a postpetition transfer.

Despite their obligations under the Lock Up Agreement, the Debtors have remained silent regarding the Nova Scotia Objection. If the Nova Scotia Guarantee Claims and the Nova Scotia Wind-Up Claim are Allowed, each Claim will be classified as a General Unsecured Claim in Class 3 and receive distributions under the Plan *pari passu* with other General Unsecured Claims in Class 3.

12.    Automatic Stay Issues. On November 24, 2009, Deutsche Bank AG ("**DB**") filed a motion with the Bankruptcy Court (the "**DB Setoff Motion**") (ECF No. 4529) for relief from the automatic stay, asserting a right to set off $24,040,404 (the "**Swap Debt**") that DB owes in respect of interest rate swap debt against DB's Claim for $24,073,200 (the "**DB Bond Claim**") relating to the face value of the Debtors' bonds DB held as of the Commencement Date, as fully described in the DB Setoff Motion. DB filed a proof of claim in respect of the DB Bond Claim as a secured creditor. In the event the Bankruptcy Court finds that DB's asserted right of setoff is valid, the DB Bond Claim will constitute a Secured Claim, rather than an Unsecured Claim. In addition, pursuant to a stipulation approved by the Bankruptcy Court on September 24, 2010 (ECF No. 7112), the Debtors and New GM have agreed that upon completion of litigation with DB with respect to the setoff, to the extent that any proceeds of the Swap Debt become available to either the Debtors or New GM, (i) the Debtors shall receive the first $9 million of such proceeds and (ii) the balance of the recovery shall be split evenly between the Debtors and New GM. To the extent DB's right of setoff is validated, the Debtors and New GM also agreed that the Swap Debt may be used to effectuate the setoff against the DB Bond Claim.

13.    Assessment of Environmental Liabilities. From the time leading up to the commencement of the Chapter 11 Cases, the Debtors engaged in an intense and involved process to assess the costs to remediate environmental contamination at the Property. This was done, in concert with federal and state governmental authorities, to ensure that the Debtors would have funds throughout the duration of the Chapter 11 Cases and after the Confirmation Date to conduct appropriate remediation at the Property. This process provided the body of knowledge for federal and state governmental authorities and the Debtors to reach agreement relating to the scope of the

43

Debtors' environmental remedial obligations with respect to the Property and settle the Debtors' administrative expense liability to the governments for cleanup of the Property in the Chapter 11 Cases, the single largest issue facing the Debtors' estates.

The assessment of the Debtors' remediation obligations and related costs at the Property occurred in three phases: (i) rapidly developing an initial approximation in order to budget adequate funds for the Wind-Down Facility, (ii) undertaking a thorough review, with guidance and agreement from federal and state governmental authorities, of the environmental conditions and regulatory obligations present at each of the Debtors' 136 owned Property sites; and (iii) hundreds of meetings, conference calls, and site visits with federal, state, and local governmental authorities to develop site specific plans and cost projections for addressing environmental contamination at each of the Properties. In order to undertake this process, the Debtors retained experienced environmental consultants to assess and manage the Debtors' environmental liabilities going forward. This approach was necessary because, immediately following the 363 Transaction, GM's entire environmental management department, made up of over 200 individuals, including lawyers, project managers, and support staff, resigned from GM to work for New GM. The consultants retained by the Debtors, and approved by the Bankruptcy Court, to assist with this process included ARCADIS U.S., Inc., a global environmental remediation engineering firm that had experience with many of the GM sites; Brownfield Partners, LLC and D McMurtry & Associates LLC, skilled in the redevelopment of industrial sites and environmental cost estimation; and The Claro Group, LLC, which has experience in economic modeling and assessing the adequacy of proposed environmental remedies to meet regulatory standards. The Debtors also hired previous independent project managers familiar with GM sites to expedite the analysis of the Debtors' environmental liabilities. With the assistance of these contractors, the Debtors were able to assess environmental conditions at the 136 sites and develop appropriate remediation plans in a relatively limited amount of time.

The first phase of the review focused on assessing available information to formulate an approximation of environmental obligations at the Property for purposes of ensuring that sufficient funds would remain with the Debtors after the 363 Transaction. As such, this first phase had to be completed prior to the Debtors' entering into the Wind-Down Facility on July 10, 2009, which would fund the Debtors' Administrative Expenses, including those related to environmental remediation at Property sites. To formulate the cost projections in less than twenty days, the Debtors' consultants conducted a review of thousands of documents, including regulatory orders, environmental data, and GM-prepared site summaries, relating to environmental conditions at a sampling of 29 Property sites that had the highest remediation costs accrued by GM or had the most potential for cost growth from prepetition estimates. The Debtors' environmental consultants then used this information to extrapolate estimates of environmental liabilities at 34 additional Property sites, where GM had identified remediation liabilities. Based on this first phase of the review, the Debtors projected it would cost $536 million, on a net present value basis, to remediate environmental contamination at the Property. This initial review also helped identify areas where further information would be needed to refine the cost projections.

44

Shortly after the 363 Transaction, the Debtors began the second phase of their environmental review that would cover each of the 90 industrial Property sites, which occupy over 7,000 acres and comprise over 48,000,000 square feet of property under roof.  The purpose of this second phase of the review was to develop site specific assessments of the cost to remediate and obtain regulatory closure of known or suspected environmental issues and to help state and federal environmental regulators better understand the Debtors' environmental remediation obligations and facilitate discussions regarding settlement of state and federal government claims.  The Debtors had to assess their sites in a manner not previously undertaken by GM, which, appropriately, limited its oversight and site assessment activities to environmental compliance typically required for operating facilities and responding to permit and enforcement requirements.  In other words, at no time in its history had GM conducted a review of each of its sites to determine what might be required to remediate existing environmental contamination; however, the Debtors and the federal and state governments needed to do exactly that to ensure that adequate funding was available to conduct any appropriate remediation.  During the fall of 2009, the Debtors and representatives of the U.S. Treasury and Justice Departments, as well as the United States Environmental Protection Agency, met to review the Debtors' plans and strategy for creating a body of information that would form the basis for a global settlement of administrative expense liability for the environmental claims of the governments relating to the Property, including their redevelopment to bring them back into productive use as soon as practicable.

The Debtors' environmental consultants spent more than 20,000 hours evaluating site conditions and applicable regulatory requirements at each of the Debtors' 136 Property sites.  The Debtors' consultants conducted site visits, reviewed information contained in the files of GM and the state and federal environmental regulators, and interviewed GM project managers and government regulators to develop a comprehensive understanding of the actual and potential environmental issues present at each Property site.  After gathering and reviewing all available information on environmental conditions at the Property, the Debtors' environmental consultants developed remediation plans to investigate and remediate known and potential contamination with a goal of obtaining regulatory closure of known or suspected environmental issues, which was the focus of the federal and state governmental entities.  The Debtors' environmental consultants prepared, in a matter of months, remedial investigation and remediation plans for 60 sites that in some cases included long-term stewardship of up to one hundred years.

Working off the proposed investigation and remediation plans, the Debtors developed cost models, including decision tree analyses consistent with ASTM Standard E2137-06 (Standard Guide for Estimating Monetary Costs and Liabilities for Environmental Matters) for the largest sites, to project future environmental liabilities at each of the Property sites with known or likely environmental impacts.  The cost modeling allowed the Debtors to assess a variety of potential scenarios to determine a reasonable range of costs.  The Debtors then conducted a statistical analysis of the entire portfolio of properties to assess the likely upper bound of total potential environmental remediation costs.

45

Recognizing that the ultimate beneficiaries of this information were the federal and state governments, which needed to make decisions regarding the scope of remediation on a state-by-state and property-by-property basis, the Debtors created an active website known as IDEA to facilitate an open information exchange between the Debtors and state and federal governmental authorities. The Debtors uploaded more than 1,800 documents, including 491 site assessments and investigation reports and 436 corrective action and remediation reports, along with site maps, key legal documents, correspondence, and other relevant information for each of the Properties. The Debtors also shared with the governmental authorities the cost projections and investigation and remediation plans that the Debtors' consultants were developing so as to eliminate any information imbalance, maintain good relations, and advance the settlement negotiations. In all, information provided on the IDEA website was shared with more than 200 government personnel who collectively downloaded more than 5,800 documents from the site.

The Debtors' act of assessing, generating, and sharing information regarding remediation liabilities at the Property was critical to facilitating the settlement discussions that began in July 2009 between the Debtors, the U.S. Treasury, the United States Department of Justice, the United States Environmental Protection Agency, the Presidential Task Force, and the relevant state governmental authorities. Had the Debtors not conducted such a detailed investigation of environmental conditions, the governmental authorities either would have had to conduct their own investigations and data analysis, which could have taken years to complete, or negotiate a potential settlement without the benefit of detailed site-by-site information, a situation that would have delayed and undermined any settlement discussions. Instead, the governmental authorities were able to rely on the Debtors' assessments to reach their own conclusions regarding the magnitude of the Debtors' environmental liabilities and promptly commence settlement talks.

The third phase of the environmental cost projection process, which focused on advancing settlement discussions, began in November 2009 and continues to this day. During this phase, the Debtors and their environmental consultants met with state and federal regulators to explain, discuss, and refine the Debtors' environmental cost projections. This process included more than 75 in-person meetings and hundreds of conference calls with state and federal elected officials, legal representatives, and technical personnel, including the Brattle Group, an environmental consultancy firm hired by the United States Department of Justice to support the federal government in settlement negotiations. During this phase, the Debtors also undertook, at the urging of the state and federal governments, additional environmental investigations at sites where the potential for environmental liability was great, but where information regarding site conditions was scarce, including at sites in Willow Run and Saginaw, Michigan, and Massena, New York. Throughout this process, the Debtors have remained in constant contact with state and federal government officials to exchange information and respond to hundreds of technical and legal questions. These discussions allowed the Debtors and the Brattle Group to refine their cost projections such that, by April 2010, the Debtors' and the Brattle Group's respective projections of the Debtors' total remediation liabilities were materially aligned for the owned Property. Further discussions resulted in the

46

announcement, made by the President of the United States just one month later, that a "landmark agreement" had been reached, subject to the drafting of a definitive settlement agreement and approval by those with authority, to establish a trust fund to pay for the cleanup of 90 of the Environmental Response Trust Property sites located in 14 states. Since that time, the Debtors have been working with the governments to structure the trust and allocate funds to clean up the Environmental Response Trust Property. See Section III.G.4 below for an explanation of the Environmental Response Trust.

The Debtors and their environmental consultants were able to achieve consensus among various governmental parties regarding the cost to remediate the Environmental Response Trust Properties in an unprecedented time span. Similar negotiations in other bankruptcies have taken much longer. The swift resolution of the environmental cost projection efforts in these Chapter 11 Cases saved the Debtors' estates millions of dollars by avoiding costly litigation and estimation hearings. In addition, reaching amicable agreement among the governmental authorities regarding the Debtors' remediation obligations maintains positive regulatory relationships that will benefit the Debtors and the Environmental Response Trust as the remediation work moves forward. The Environmental Response Trust will be positioned to undertake the environmental remediation of the Environmental Response Trust Properties with the cooperation of the federal and state governments and with a better understanding of the work required to achieve regulatory closure. This benefits not only the Debtors' estates, which can fully resolve their obligations in this regard, but also the federal and state governments, which have certainty regarding future remediation activities and a willing and cooperative partner going forward, and also the municipalities and neighborhoods where the Environmental Response Trust Properties will be cleaned up and put back into productive use.

On October 20, 2010, the United States lodged the Environmental Response Trust Consent Decree and Settlement Agreement (ECF No. 7452) (a copy of which is annexed to the Plan as Exhibit "C"), which dictates that MLC fund the Environmental Response Trust with approximately $511 million in payments to cover remedial costs and Governmental Authority oversight costs for the Environmental Response Trust Properties (subject to certain adjustments to reflect payments made prior to the Effective Date) and $262 million in Cash and other assets that will be used to cover various administrative activities of the Environmental Response Trust. The United States Department of Justice will, and one or more of the States that are a party thereto may, accept public comments on the Environmental Response Trust Consent Decree and Settlement Agreement. After the conclusion of the public comment period, the United States and the States will file with the Bankruptcy Court any comments received and any responses thereto and, at that time, will request that the Bankruptcy Court approve the Environmental Response Trust Consent Decree and Settlement Agreement.

14.    <u>Asbestos Liability</u>.  Like other automobile manufacturers, the Debtors are subject to various Asbestos Claims arising from GM's use of various products containing asbestos over a number of years. Based on disclosures made in financial statements GM issued before the Commencement Date, including GM's 2008 Form 10-K, the products giving rise to the Asbestos Claims may be described generally

47

      Cadwalader, Wickersham & Taft LLP  
      700 Sixth St. NW  
      Washington, DC 20001  
      Attn:  Douglas S. Mintz, Esq.  
      Telephone:  (202) 862-2200  
      Telecopier:  (212) 504-6666  
      E-mail:  douglas.mintz@cwt.com

      If to the GUC Trust Administrator,  
      the Asbestos Trust Administrator(s),  
      the Environmental Response Trust Administrative Trustee, or  
      the Avoidance Action Trust Administrator,  
      to the address(es)  
      designated in the Confirmation Order

Dated:    New York, New York  
            December 7, 2010

                      Respectfully submitted,

                      MOTORS LIQUIDATION COMPANY

                      By:    /s/ Ted Stenger  
                              Name:  Ted Stenger  
                              Title:  Executive Vice President