Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 05-44481-rdd

4    - - - - - - - - - - - - - - - - - - - -x

5    In the Matter of:

6

7    DPH HOLDINGS CORP, et al.,

8

9            Debtors.

10

11   - - - - - - - - - - - - - - - - - - - -x

12

13                          United States Bankruptcy Court

14                          300 Quarropas Street

15                          White Plains, New York

16

17                          October 21, 2013

18                          10:07 AM

19

20   B E F O R E:

21   THE HONORABLE ROBERT D. DRAIN

22   U.S. BANKRUPTCY JUDGE

23

24

25   ECRO:  A. VARGAS

Page 2

1    HEARING re 22189:  GM Cross Motion to Adjourn

2

3    HEARING re 22075: Reorganized Debtors' Motion for an Order to

4    Compel Compliance with, and to Implement, the Modified Plan,

5    Plan Modification Order and Related Documents

6

7    HEARING re Motion to Disallow Claims Reorganized Debtors Motion

8    for Order (1) Enforcing Modification Procedures Order, Modified

9    Plan and Plan Modification Order Injunction Against Curtis J.

10   Duxbury and Carol Duxbury, as Plaintiffs, in New York State

11   Court Personal Injury Action; and (II) Directing Curtis Duxbury

12   and Carol Duxbury to Dismiss Action to Recover Upon Discharged

13   and Expunged Claim ("Duxbury Injunction Motion")

14

15   HEARING re Motion for Order (I) Enforcing (A) Modified Plan and

16   Plan Modification Order Injunctions, (B) OPEB Orders, and (C)

17   Recoupment Order; (II) Enjoining James Sumpter's Second Lawsuit

18   Filed in the USDC for the Southern District of Indiana and

19   Requiring James Sumpter to Dismiss the Indiana Action with

20   Prejudice; and (III) Holding James Sumpter in Contempt and

21   Awarding Other Sanctions.

22

23

24

25   Transcribed by:  Theresa Pullan

Page 3

1   A P P E A R A N C E S :

2

3   TOGUT, SEGAL & SEGAL

4         Attorneys for DPH and Reorganized Debtors

5         One Penn Plaza

6         New York, NY  10119

7   BY:   NEIL BERGER, ESQ.

8         STEVEN S. FLORES, ESQ.

9

10   KING & SPALDING, LLP

11         Attorneys for General Motors LLC

12         1185 Avenue of the Americas

13         New York, NY  10036-4003

14   BY:   ARTHUR J. STEINBERG, ESQ.

15

16   BUTZEL LONG

17         Attorneys for Debtors

18         150 West Jefferson

19         Suite 100

20         Detroit, MI  48226

21   BY:   CYNTHIA HAFFEY, ESQ.

22         BRUCE L. SENDEK, ESQ.

23

24

25

1    JAMES B. SUMPTER

2         PRO SE

3         21169 Westbay Circle

4         Noblesville, IN  46062

5

6    VIA TELEPHONE:  DUANE D. SCHOONMAKER, ESQ.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              THE COURT:  Please be seated.  Good morning.  In re

3    DPH Holdings.

4              MR. BERGER:  Good morning, Judge, Neil Berger of

5    Togut, Segal & Segal, and joined today by my colleague, Steve

6    Flores.  My client, John Brooks, who is the president of DPH is

7    here with us today.

8              There are a number of matters on the calendar, Your

9    Honor.  Four -- three of them are resolved.  And if I can, Your

10   Honor, I think it would make sense to take numbers 1, 2 and 4.

11   Number 1 is the new GM motion, cross motion for an adjournment.

12   Number 2 is my client's, the reorganized debtor's motion to

13   compel.  And number 4 --

14             THE COURT:  Which is related to the GM.

15             MR. BERGER:  Yes, Judge,

16             THE COURT:  Right.

17             MR. BERGER:  And number 4 is the papers for what we

18   call the Duxbury injunction motion.  You'll hear in a moment

19   that that's been resolved, and we've consulted with our friends

20   at King & Spalding who are here today, Arthur Steinberg and

21   Scott Davidson concerning that settlement.  And in a moment

22   I'll talk to you about how the exhibit to our proposed

23   settlement agreement has been revised to account for that

24   settlement.

25             THE COURT:  That's not the Duxbury one, that's the GM

Page 6

1    one.

2            MR. BERGER:  Duxbury is resolved as well.

3            THE COURT:  Okay.  All right.

4            MR. SCHOONMAKER:  Your Honor, this is Wayne

5    Schoonmaker.  I'm appearing on behalf of the Duxbury --

6            THE COURT:  All right.  But you said King & Spalding,

7    but that's the GM.

8            MR. BERGER:  King & Spalding representing new GM.

9            THE COURT:  Yeah, but I, I thought you were referring

10   to them in connection with the Duxbury one.  That's a different

11   counsel.

12           MR. BERGER:  No, no, I did refer to them in

13   connection with  Duxbury because as Your Honor may recall --

14           THE COURT:  Well there's a tie-in to GM in the

15   Duxbury one.

16           MR. BERGER:  Yes.

17           THE COURT:  Right, okay.

18           MR. BERGER:  Yes, so we consulted with them over the

19   weekend.

20           THE COURT:  All right.  Okay.

21           MR. BERGER:  Your Honor, first on the calendar is

22   the, is the GM cross motion to adjourn found at document

23   number, docket number 22189.  That's resolved as part of the

24   larger settlement that we have on the debtors' motion to compel

25   found at docket number 22075.

Page 7

```
1              THE COURT:  Okay.
2              MR. BERGER:  Your Honor, we've been negotiating with
3      GM, and I'll refer to GM as new GM, over the last four months
4      concerning the debtors' motion to compel.  On Friday we
5      contacted chambers to advise that the parties have reached a
6      partial resolution concerning the funding request.  Your Honor
7      may recall that the funding agreement that's part of the master
8      disposition agreement is at the heart of that dispute.  We've
9      entered into a stipulation that reflects the parties'
10     resolution.  We sent to chambers an unredacted and a redacted
11     version of that stipulation.  It recites the parties'
12     agreements, at least as many of the issues that we were able to
13     resolve so far.  And it also constitutes the parties' joint
14     request that portions of the settlement agreement be redacted.
15             Your Honor, I know that this is a consensual
16     resolution that we presented to you, but if I may, I have a
17     very short proffer for Mr. Brooks who is in the courtroom
18     today.
19             THE COURT:  Okay.
20             MR. BERGER:  Thank you, Judge.
21             If called to testify, John Brooks would testify that
22     he has served as president of DPH Holdings Corp. on behalf of
23     itself and each of its subsidiaries in their capacities of
24     reorganized debtors since October 6th, 2009.
25             He would testify that he is familiar with the
```

1    reorganized debtors' motion to compel, and the responses that

2    have been filed by new GM and the reorganized debtors in

3    connection with that motion.

4         Mr. Brooks would also testify that he's familiar with

5    the funding agreement that is at the center of the parties'

6    disputes and that he's participated in the negotiations between

7    the reorganized debtors and new GM since that motion to compel

8    was filed on July 3rd, 2013.

9         Mr. Brooks would testify that the partial settlement

10   that's set forth in the proposed stipulation and order

11   represents the culmination of extensive negotiations between

12   the parties that occurred since the motion was filed.

13        He would also testify without waiving any rights,

14   claims or defenses in favor of the reorganized debtors that

15   litigation of the rights and assertions that are resolved by

16   the proposed stipulation would have been costly, could have

17   caused delay in the reorganized debtors' efforts to close these

18   cases, and that there was at least some risk concerning the

19   outcome of that litigation.  Consequently, the proposed

20   settlement represents the compromise of contested claims and

21   assertions.

22        He would testify that the stipulation represents a

23   significant achievement in the reorganized debtors' steps to

24   close these cases.

25        He would further testify that the reorganized

Page 9

1   debtors' agreement in the stipulation represent an exercise of

2   his considered business judgment taking into consideration the

3   parties' litigation positions and other circumstances.

4          Finally, Mr. Brooks would testify that certain

5   portions of the proposed stipulation contain confidential

6   commercial information, the disclosure of which would cause the

7   reorganized debtors and new GM commercial injury by adversely

8   impacting the reorganized debtors' ability to finalize

9   negotiations of outstanding claims.  Accordingly, he requests

10  on behalf of the reorganized debtors that as part of the

11  approval of the stipulation, the Court authorize and order the

12  redaction of the confidential information that is contained in

13  the stipulation and which was redacted in the proposed

14  stipulation and order that we provided to chambers.

15         That, Your Honor, is the sum of Mr. Brooks's proffer.

16  If I ask, if I may ask, Your Honor, Mr. Brooks to stand and

17  confirm to Your Honor his identity and confirm that that in

18  fact would have been his testimony.

19         THE COURT:  Okay.

20         MR. BROOKS:  It would be.

21         THE COURT:  Okay.  Does anyone want to cross-examine

22  Mr. Brooks on his proffer?  All right.  I don't have any

23  questions of him either.

24         MR. BERGER:  Thank you, Your Honor.

25         THE COURT:  So I'll accept that proffer.

1          MR. BERGER:  That is the end of his proffer.  And

2     with that, I think that Mr. Steinberg may have a short

3     statement for the Court.

4          THE COURT:  Okay.

5          MR. STEINBERG:  Good morning, Your Honor.

6          THE COURT:  Good morning.

7          MR. STEINBERG:  I think you can see that the

8     stipulation reflects that the parties put down in writing what

9     they could agree to at this point in time, and essentially

10    kicked the can down the road to the next omnibus day for those

11    issues that have not, capable of full resolution at this point

12    in time.  I think the good news is that if there's a

13    contemplated settlement of the environmental claims, the

14    funding that new GM has agreed to will be able to deal with

15    that contemplated settlement, and that is by far the largest

16    amount that was underlying the funding dispute.

17         Everything else that is left is relatively small

18    compared to it.  And although the stipulation has a number of

19    settlements that have been agreed to and discussed what the

20    funding was, there are a couple of settlements, there are a

21    handful that have not been resolved yet.  The benefit of

22    kicking the can down the road with the finality of the December

23    31 funding date, there is pressure on both the plaintiff and

24    defendants in those litigations to come to resolution.  And as

25    we go from the projection to the reality in all likelihood

1   there will not be disputes related to that either.  But because

2   we're not there yet --

3            THE COURT:  So in other words, the parties, GM and

4   the debtor, particularly GM, are closely monitoring the

5   remaining status of the claim litigation.

6            MR. STEINBERG:  Closely monitoring the remaining.

7   And when we say the claim litigations, these are litigations

8   where people have actually not filed a claim in the case, but

9   they, the litigations that were commenced after the case went

10  effective.

11           THE COURT:  Right.

12           MR. STEINBERG:  And we are, we are familiar enough to

13  understand what we think the ranges are, we've listened to what

14  the debtor has said about what the range of resolutions are.

15  And what we're more closely monitoring is the process upon

16  which they will come to a conclusion because that's the thing

17  that we're most emphasizing which is to conclude this matter

18  before the end of the year.  So I think, Your Honor, the

19  stipulation is a good result for now, we'll see where we are no

20  November 14th.  I'm fairly confident that we will be able to do

21  something further on November 14th on a consensual basis, but

22  the proof will be in the pudding as we get closer to that date.

23           THE COURT:  Okay.  Very well.

24           MR. BERGER:  Judge, just to confirm and to respond to

25  Your Honor's inquiry, we do speak frequently about those state

1    court claims.

2           Your Honor, that is our presentation concerning the

3    proposed stipulation.  One change was made over the weekend.

4    The Duxbury matter was resolved, new GM agreed to cover the

5    funding for that settlement.  The sole change that was made to

6    the stipulation was adding a dollar figure for the Duxbury

7    matter and having it redacted in the redacted version.  So that

8    is our presentation concerning matter 2, the motion to compel.

9    That also resolves obviously number 1 which is the GM motion,

10   cross motion for adjournment.  Before we close on this

11   stipulation, I think it would be helpful for my co-counsel to

12   speak about the Duxbury matter.

13           THE COURT:  Okay.

14           MS. HAFFEY:  Good morning, Your Honor.

15           THE COURT:  Good morning.

16           MS. HAFFEY:  This is Cynthia Haffey representing the

17   reorganized debtors.  And the Duxbury matter has been resolved

18   in principal.  We are adjourning the matter until the next

19   omnibus hearing with every expectation that we'll be

20   withdrawing the motion before that hearing, but the actual

21   settlement hasn't been papered yet.

22           THE COURT:  Okay.  All right.

23           MS. HAFFEY:  I think --

24           THE COURT:  Well I will -- I'm sorry to interrupt

25   you.

1           MS. HAFFEY:  I was just going to say counsel for the

2      Duxburys is on the line and probably would like to speak at

3      this time.

4           THE COURT:  Okay.

5           MR. SCHOONMAKER:  Yes, Your Honor, this is Wayne

6      Schoonmaker, I'm the attorney for Duxbury.  And yes it's my

7      understanding, I had numerous conversations on Friday with Mr.

8      Radom and we have an agreement in principal to settle the

9      matter.  It was my understanding that we would adjourn it until

10     the next hearing date assuming that we can work out whatever

11     logistics need to be worked out.

12          THE COURT:  Okay.  And I'm assuming the same, the

13     same intention with keeping things on hold in the state court

14     too.

15          MR. SCHOONMAKER:  Yes, yes, we're not going -- other

16     than perhaps proceeding because there are two other parties,

17     two other defendants in the Duxbury case.  We may proceed

18     against them, but we intend to take no action at this point

19     with respect to the reorganized debtor.

20          THE COURT:  Okay.

21          MR. BERGER:  If I may, just one clarifying point.

22     Counsel for new GM is correct.  My words were imprecise, they

23     haven't agreed to fund Duxbury, the agreement is that the

24     Duxbury settlement is included in the wind up budget.  There is

25     a function of how that funding agreement operates.

1          THE COURT:  Okay.  All right.  I will approve the

2    reorganized debtors' entry in to the settlement agreement which

3    is a partial settlement with new GM, and as a subset of that, I

4    approve the request to redact on the public record portions of

5    that settlement agreement which is consistent with the prior

6    orders I've entered in this case going back to 2009.  And I

7    agree with Mr. Brooks's proffer that it's a proper exercise of

8    the debtors' business judgment and reasonable.  So I guess you

9    need to email chambers of the final version of that.

10         MR. BERGER:  I have them on disk.

11         THE COURT:  Okay.  You can hand those over to Ms.

12   DiSalvo.

13         MR. BERGER:  Thank you.

14         THE COURT:  Is there a separate order on the 107(b)

15   relief?

16         MR. BERGER:  No, it's built into the stipulation

17   [indiscernible].

18         THE COURT:  Okay.  That's fine.

19         MR. BERGER:  And I have, Your Honor -- sorry, it's

20   Neil Berger speaking, I have a redacted form on diskette and a

21   separate diskette unredacted so Your Honor can see the changes.

22         THE COURT:  Right.  Okay.

23         MR. BERGER:  Your Honor, that takes care of items

24   number 1, 2 and 4.  And I'll cede the podium to my co counsel.

25         THE COURT:  All right.  Well, for the people who are

1    here either in person or on the phone on those items who don't

2    want to stay, you're certainly free to go.

3              MR. SCHOONMAKER:  Thank you very much, Your Honor.

4              THE COURT:  Okay.

5              MS. HAFFEY:  I'll wait until the Court is ready.

6              THE COURT:  That's okay, go ahead, it's fine.

7              MS. HAFFEY:  Good morning, Your Honor, this is

8    Cynthia Haffey, and if I may, I would like to address the Court

9    from counsel table rather than the podium because I have

10   certain documents spread out here.

11             THE COURT:  Sure.

12             MS. HAFFEY:  Your Honor, this is the continuation of

13   the reorganized debtors' motion to enjoin Mr. Sumpter's latest

14   Indiana action.  We were before this Court approximately a

15   month ago and the Court asked the parties to do a couple of

16   things, and that was to provide it with additional references

17   or evidence that disability benefits were before the Court and

18   understood by the parties to be part of the salaried OPEB

19   termination motion, as well as address the legal question of

20   collateral estoppel and this Court's jurisdiction.

21             So in our supplemental memorandum we did that, Your

22   Honor, and I'm going to address the first question and that is

23   in regards to additional references, citations, evidence that

24   disability benefits were before this Court.  And I think, Your

25   Honor, it starts with an understanding that what was before the

1    Court at the time was whether benefits were vested in the

2    Delphi plan.  So what the argument before the Court dealt with

3    was the reservation of rights provision in the three different

4    benefit plans.  Disability benefits was just one of those

5    benefits within those plans.

6           So the parties looked at the question as to whether

7    that reservation of rights provision was a provision that

8    allowed DPH, the reorganized debtors, and prior to, Delphi, to

9    be able to alter or modify or terminate those plans.  And this

10   Court did find that those, that language did permit the

11   reorganized debtors to do that, that it was an at-will

12   reservation provision.  And to show that the parties on both

13   sides understood that that was the focus, we have cited in our

14   memorandum several excerpts from the transcript.  In the

15   February 24th transcript, Mr. Gloster, who was at that time an

16   attorney for some of the objectors and then later an attorney

17   for the 1114 committee, argued to the Court that he felt the

18   reorganized debtors had a burden of presenting evidence of more

19   than just, he said, four benefits but all of the benefits.

20           THE COURT:  This was at the February hearing.

21           MS. HAFFEY:  This is at the February hearing.

22   Correct.  And specifically identified retirees with disability

23   benefits as a category that should warrant additional

24   attention.  And the attention at that time was to the benefits

25   that had the greatest costs to the reorganized debtors.  When

Page 17

1    this Court asked Mr. Gloster, well do you have any facts to

2    support that people who retired on full disability had a

3    separate promise, some other benefit plan or some other

4    promise, Mr. Gloster had to concede that there was not.  And

5    that was in February.

6            THE COURT:  Although that, I think to be fair, one of

7    the reasons that I appointed the committee and gave him the

8    charge of looking at this issue was to explore that very issue.

9            MS. HAFFEY:  And I do not disagree with that, Your

10   Honor.  And you will find later on in what we presented to the

11   Court that there wasn't any evidence presented through the 1114

12   committee at the March 11th hearing either that demonstrated

13   that.  During that same hearing, Mr. Butler also clarified that

14   it was the debtors' benefit plans that contained the

15   reservation of rights provision.  And during this colloquy that

16   he had with the Court, individuals receiving disability

17   benefits was again used as an example.

18           During the testimony of Mr. Gebbia (phonetic) who at

19   that time was employed with new Delphi and had been Delphi's

20   executive director of benefits and policy, he described the

21   benefit coverage under the plans, and again used disability

22   benefits as an example.  So the 1114 committee, we believe,

23   Your Honor, understood that their charge included disability

24   benefits, specifically because this Court stated at the

25   February 24th hearing that the purpose of the committee was to

Page 18

1   determinate "whether any group such as for example those

2   retired on disability would have vested rights."  And that's at

3   page 123, lines 8 through 17 of the February 24th transcript.

4          So, following the formation of the committee, this

5   Court then held a second hearing on March 11th.  The committee

6   did file a report and attached to it several exhibits.  When

7   providing an overview of the committee's report, Mr. Butler

8   again talked about the fact that these were the benefit plans

9   in which the benefits were contained, that there weren't 17

10  different plans to have 17 different benefits.  But there were

11  just these benefit plans that they were talking about and they

12  were the three benefit plans that were laid out in footnote 1

13  of the termination motion.

14         At the end of that hearing, this Court made several

15  rulings that found that the, all of Delphi's benefit plans

16  contained a clear and unambiguous reservation of rights to

17  terminate.

18         THE COURT:  Just to be clear, it's footnote 3 of the

19  motion.

20         MS. HAFFEY:  Is it?  Thank you.

21         THE COURT:  I'm sorry, go ahead.

22         MS. HAFFEY:  This Court stated that all of Delphi's

23  benefit plans contained a clear and unambiguous reservation of

24  the right to terminate, and that the debtors had met their

25  burden.  And again notably this Court went on to state that in

Page 19

1    light of the debtors having met their burden and in the absence

2    of any other evidence and other particular group -- and again

3    this Court uses an example, people on disability -- that there

4    hadn't be any evidence that anybody should be excluded from

5    your order.

6            The 1114 committee's report that was presented to the

7    Court before the March 11th hearing I think is notable.  On

8    page 23 and page 26, they expressly call out certain provisions

9    to  try to show that certain benefits were vested.  And on page

10   23, they call out monthly total and permanent disability

11   benefit payments.  And on page 26, again, they call out

12   disability income and payments under the disability benefits.

13           And lastly, they attach exhibits A, B and  C to their

14   motion.  So we believe, Your Honor, that when looking at the

15   hearing transcripts in total when looking at the motion and

16   looking at the briefs that were presented to this Court, that

17   it was clear that all the parties understood at that time that

18   disability benefits were contemplated and were part of the

19   termination motion.

20           I do want to, next, Your Honor, turn to Mr. Sumpter's

21   complaint in this action because it deals with the final OPEB

22   order.  And Mr. Sumpter in his complaint in Indiana states and

23   his causes of action either expressly say or derive expressly

24   from that order, and he says that paragraph 4 of your final

25   OPEB order, orders that, or holds that disability benefits are

Page 20

1    vested benefits, that this is what that, that is what this

2    Court found, and that the reorganized debtors are required

3    under the order to continue to provide him benefits until the

4    age of 65.  There is no reading of paragraph 4 that one can

5    find an interpretation.  But rather than my just reading it and

6    telling the Court that, we looked at the hearing transcripts to

7    see is there any reference in the transcript of paragraph 4 to

8    support that.  And of course there is, Your Honor.

9              And I'm going to start with the March transcript

10   first.  And on page, and I apologize, this isn't cited in my

11   brief, Your Honor, it's on page 100 and 101 of, excuse me, I

12   take that back, it's on page 52 of the March 11th order where

13   Mr. Butler says to the Court, the other provision that's not in

14   here, which Your Honor we propose to add, is a new paragraph 4.

15   And he goes on and tells the Court that the issue had come up

16   in the prior hearing with Mr. Rosenberg, and he said "and I

17   spoke about before the Court with the Court and at the last

18   hearing with Mr. Rosenberg and it dawned on me late last night

19   that we hadn't actually got anything in writing about this yet,

20   so we proposed to put in paragraph 4."  And then he cites

21   paragraph 4.  And he says "so that's what that says, and

22   therefore people don't have to go through the claims process."

23             Admittedly I wasn't entirely certain as to what Mr.

24   Butler was talking about here so I turned to the February 24th

25   hearing for clarification.  And on page 100, Mr. Rosenberg is

Page 21

1    addressing the Court, and he says that, on page 100, that he is

2    concerned that if this order is entered by the Court and the

3    benefits are terminated, and at that time there was a

4    contemplation that benefits would be terminated in April, that

5    individuals that had medical expenses and would fall through

6    this, you know, period in time between the time that they had a

7    medical expense, they went to the doctor and have a bill to

8    submit, and the order is entered and they haven't yet submitted

9    the bill to get, provided under their benefits that somehow

10   they would fall through the crack and that bill wouldn't get

11   paid.  And he wanted to make certain that those individuals

12   could submit those bills and that they wouldn't have to go

13   through the claims procedure.  And the reorganized debtors

14   ultimately agreed to that and that's what paragraph 4 is about.

15            So Mr. Sumpter in his complaint again states

16   expressly in several of the causes of action that we, that the

17   reorganized debtors are required under paragraph 4 to continue

18   to pay him benefits and that disability benefits were vested.

19   And as the transcript makes clear, that is not at all what

20   paragraph 4 entails.

21            Lastly, Your Honor, and I can see the Court is

22   looking for something, so if you'd like me to wait I will.

23            THE COURT:  No, go ahead that's fine.

24            MS. HAFFEY:  Lastly, Your Honor, we did provide the

25   Court with some case law which we think is real illustrative as

Page 22

1    to whether this Court can either on the basis of res judicata

2    or on collateral estoppel find that Mr. Sumpter's Indiana

3    motion is enjoined.

4           The Texaco case I think, Your Honor, is right on

5    point.  And it is this Court's decision that was then affirmed

6    by the District Court and the court of, the Second Circuit

7    where there was an issue as to whether contamination to

8    property was a post-confirmation issue or a pre-confirmation

9    issue on whether the Court had jurisdiction.  And the Court

10   found that the contamination to the property actually happened

11   pre-confirmation and that therefore the Court had jurisdiction.

12   The situation is the same here, Your Honor.  We have a benefit

13   plan in which this Court found the reservation of rights

14   provision was a provision that has allowed the reorganized

15   debtors to alter, modify at will the benefits under it.

16   Therefore, they weren't vested benefits.  That, those benefit

17   plans, that provision didn't change pre-confirmation or post-

18   confirmation.

19          The action to actually then terminate happened post-

20   confirmation, but the benefit plan provision and the benefit

21   plans themselves didn't change.  They were the same benefits

22   pre- and post-confirmation.  So I think Texaco, Your Honor, is

23   real illustrative, and that the Court then when it entered its

24   modified plan and the injunction order and provisions in that

25   plan then provides this Court with a basis for res judicata.

Page 23

1                    Lastly, we provide the --

2               THE COURT:  And that's basically paragraph 13 or

3      section 13 of the plan, which says the Court retains exclusive

4      jurisdiction of all matters arising out of and related to the

5      chapter 11 cases in this plan including, skipping some text,

6      among other things, any dispute relating to any liability

7      arising out of the termination of any employee or retiree

8      benefit program regardless of whether such termination occurred

9      prior to or after the effective date.

10              MS. HAFFEY:  That's exactly right, Your Honor.

11              THE COURT:  And then there's an injunction to support

12     the actions taken.

13              MS. HAFFEY:  That's correct.

14              THE COURT:  What specific injunction covers this

15     besides protecting the employees and officers in acting in

16     accordance with the Court's order?  What specific injunction

17     language pertains to Mr. Sumpter's Indiana action?

18              MS. HAFFEY:  The fact that this is, Mr. Sumpter's

19     Indiana action directly relates expressly in his complaint to

20     this Court's final OPEB order.

21              THE COURT:  Okay.

22              MS. HAFFEY:  And the termination of the benefit plan.

23              THE COURT:  Okay.  Because you assert that order

24     authorized the debtors to terminate the plans.

25              MS. HAFFEY:  Yes.  We assert that Mr. Sumpter --

1          THE COURT:  I know, I understand.  But that would be

2     res judicata.

3          MS. HAFFEY:  That's correct.

4          THE COURT:  Because that would be on the theory that

5     the OPEB order directly authorized the plan to be terminated

6     with respect to these benefits.  If it's just collateral

7     estoppel, i.e., the issue is decided, but the order didn't

8     actually, the issue is decided being subsumed within the relief

9     that was sought or there was, of necessity a ruling on this

10    issue to get to the OPEB order, but that the OPEB order didn't

11    specifically grant the debtors the authority to terminate this

12    aspect of the plan, where would the injunction be?

13          MS. HAFFEY:  Where would the injunction be?  The

14    injunction --

15          THE COURT:  Maybe I'm not being clear.  And this goes

16    to the distinction between collateral estoppel and res

17    judicata.  Assume for the moment, I'm not asking you to agree

18    with this, but assume for the moment that the final OPEB order

19    from March 11th, 2009 authorized the debtors to terminate only

20    specific portions of the life insurance and disability plan

21    that do not include the disability portion, just assume that

22    for the moment.

23          MS. HAFFEY:  Okay.

24          THE COURT:  Assume also for the moment that to get to

25    that point, the Court ruled that there really was no exception

Page 25

1   in the plan to the right to terminate including for any other

2   disability payment.  To me there's a distinction there.  Res

3   judicata would apply to the specific order which authorized

4   termination of -- again, I'm not asking you to accept this, but

5   just hypothetically -- termination of specific aspects of the

6   life and disability plan.  But collateral estoppel would apply

7   because I in essence found that there's no exception for

8   disability at all.  So now turn to the plan modification order

9   and the plan.  There's an injunction in the plan modification

10  order that enforces the injunction in the plan, and this is

11  different than the jurisdiction point which we've already

12  talked about, section 13.  What aspect of the injunction would

13  apply to Mr. Sumpter's Indiana action if the Indiana action is

14  barred only because of collateral estoppel as opposed to a

15  previous order that I entered?

16          MS. HAFFEY:  I want to make sure I'm understanding

17  the Court. You're asking what section of the plan modification

18  order or what --

19          THE COURT:  Yeah, the injunction, the injunction

20  provision.

21          MS. HAFFEY:  Other than the injunction provision,

22  you're asking.

23          THE COURT:  No, what part of the injunction, I really

24  want to turn to the injunction provision, why don't we do it

25  that way?

1          MS. HAFFEY:  Okay.

2          THE COURT:  And I'm looking in the exhibit book for

3    it, for the plan modification order.  But if you can point it

4    to me faster, that would be great.  I thought I had it here,

5    but I'm not sure I do.

6          MS. HAFFEY:  Well of course, there's the section

7    11.11, the exculpation and limitation of liability provision,

8    Your Honor.

9          THE COURT:  Okay.  Let me just -- are you reading

10   from your exhibit book?  I'm just looking, I'm just trying --

11         MS. HAFFEY:  Are you looking for the modified plan,

12   Your Honor?

13         THE COURT:  I'm looking for the plan modification

14   order.

15         MS. HAFFEY:  The order.

16         THE COURT:  Yes.

17         MS. HAFFEY:  It is, the modification procedures order

18   is JJ, volume III.

19         THE COURT:  I got it.

20         UNIDENTIFIED:  Is it the procedures order or the plan

21   modification order?

22         MS. HAFFEY:  I'm sorry.  I think I pointed you in the

23   wrong direction, Your Honor.

24         THE COURT:  Well, it's not JJ?  It's not.

25         MS. HAFFEY:  Let's see where it's cited in the

Page 27

1    motion.

2        [attorneys speaking off record]

3            MS. HAFFEY:  Your Honor, I have the plan modification

4    order but not in the binder.  I would be happy to provide it to

5    the Court.

6            THE COURT:  Okay.  I'd appreciate that.  Thank you.

7            MS. HAFFEY:  Looks like it's my only copy.

8            THE COURT:  Let me take a quick look at it.  And this

9    is the July 30, 2009 order that is effectively the confirmation

10   order, including the modified plan.  We had another binder that

11   was still on my desk.  So --

12           MS. HAFFEY:  So on paragraph 22, of course, Your

13   Honor, the plan modification order is the provision enjoining,

14   precluding and permanently enjoining on the effective date any

15   claim or continuum of any manner, action or proceeding.  It's a

16   very broad provision.

17           THE COURT:  This is effectively, this is effectively,

18   well this is the only real injunction in the plan; but -- I'm

19   sorry, in the plan modification order.  But the plan itself is

20   approved in the modification order.  In the plan in section 11,

21   11.2 deals with the termination of benefits.  And 11.11

22   exculpates the employees in respect of that.

23           MS. HAFFEY:  Right.

24           THE COURT:  And now I'm going to beg your indulgence

25   and ask if you can --

Page 28

1          MS. HAFFEY:  In paragraph 20 the plan modification

2     order incorporates those sections of the plan.

3          THE COURT:  Right.  Right.  So then, I'm looking for

4     the plan itself, the exhibits.  Rosemary, do you have the plan?

5     Do you have the plan?  The plan, the modified plan?  Do you

6     have a copy of paragraph 11, or section 11 of the plan?

7          MS. HAFFEY:  I can give you my copy.

8          THE COURT:  Okay.  Okay, so 11.2 provides if the

9     debtors are discharged of all claims among other things that

10    arise from a termination of employment, a termination of any

11    employee or retiree benefit program regardless of whether such

12    termination occurred prior to or after the effective date.  So,

13    and then paragraph 11.11 exculpates and limits the liability

14    of, among others, the debtors, the reorganized debtors and

15    their members, officers, directors, employees, advisors,

16    attorneys, etc., arising out of any employee benefit plan, and

17    effectively enjoins claims brought against them for among other

18    things related to any employee benefit plan.

19          So then going back to my question, I guess, if the

20    express authority was not granted in the final OPEB order but

21    as a matter of law, the final OPEB order would be collateral

22    estoppel as to any remaining termination of a welfare plan.

23    Your assertion is that the plan and the modified, the plan

24    modification order, in addition to preserving the Court's

25    jurisdiction to decide these issues also discharges any claims,

Page 29

1  even if the actual termination occurred later.

2          MS. HAFFEY:  That's correct, Your Honor.

3          THE COURT:  Based on collateral estoppel.

4          MS. HAFFEY:  That's correct, Your Honor.  And those

5  provisions and what was just discussed, what the Court just

6  pointed out is in our original motion before this Court.

7          THE COURT:  Right.  And the Monarch case from the

8  First Circuit relies on collateral estoppel as opposed to res

9  judicata in saying this was really, this issue was already

10 decided by the Bankruptcy Court.

11         MS. HAFFEY:  That's correct.  And said that the plan

12 modification, or the order and the injunction provisions

13 discharged.

14         THE COURT:  Even though it wasn't the specific relief

15 granted, it was necessarily litigated and decided.

16         MS. HAFFEY:  That's correct.

17         THE COURT:  And why is it, why was it necessarily,

18 why was it actually litigated and necessarily decided?  You're

19 saying it's because there were no exceptions at all to the

20 benefits.

21         MS. HAFFEY:  That's right.

22         THE COURT:  And the termination, the terminability of

23 welfare benefits including any retiree benefits, because

24 there's no specific exception.

25         MS. HAFFEY:  That's right.

```
 1            THE COURT:  Okay.

 2            MS. HAFFEY:  Thank you, Your Honor.

 3            THE COURT:  All right.  I know you listed potential

 4    witnesses you wanted to call, but are you just reserving those

 5    for rebuttal?

 6            MS. HAFFEY:  I'm going to let Mr. Sendek --

 7            MR. SENDEK:  Your Honor, the answer is possibly.  We

 8    have two people that are --

 9            THE CLERK:  I'm sorry [indiscernible]

10            MR. SENDEK:  I know, that's the instructions, I

11    apologize.  Bruce Sendek, for the reorganized debtors.  We have

12    two people present, one by telephone, that's Mr. Hogan and John

13    Brooks is here in person.  With respect to Mr. Brooks, we

14    learned last week, maybe mid-week that Mr. Sumpter was trying

15    to subpoena him.  He didn't ask us to accept the subpoena, he

16    just said he was going to try to subpoena him.  We also knew

17    that Mr. Brooks was out of the country, so, I mean out of

18    state.  His office is in Michigan, so that was unlikely.  But

19    nonetheless, Mr. Brooks is here, not as our witness.  We may

20    have questions for him depending on what Mr. Sumpter --

21            THE COURT:  But he's made himself available if Mr.

22    Sumpter wants to examine him.

23            MR. SENDEK:  Exactly.  And just by way of explanation

24    why we wouldn't call him in chief is his duties as president of

25    DPH began in October 2009, that's of course after the OPEB
```

1    motion was filed, after the, after the orders were entered.

2    And Mr. Brooks has no personal knowledge of those proceedings.

3    So that's --

4              THE COURT:  Okay.

5              MR. SENDEK:  That said, Mr. Hogan has also received a

6    copy of what purported to be a subpoena.  There is issues with

7    that, but nonetheless I believe the Court is familiar with what

8    transpired there, and Mr. Hogan is available to testify today

9    and answer Mr. Sumpter's questions.  And given that he is, I

10   would proffer a brief direct of what Mr. Hogan would testify if

11   he were here, and we were to ask him questions.

12             THE COURT:  As your witness.

13             MR. SENDEK:  As our witness.

14             THE COURT:  Okay.

15             MR. SENDEK:  And I'll be very brief with it, Your

16   Honor.

17             THE COURT:  All right.

18             MR. SENDEK:  Mr. Hogan would testify that he is a

19   partner with Skadden Arps located in their Chicago office.

20             THE COURT:  Could you just state his full name so we

21   have that for the record?

22             MR. SENDEK:  Al Hogan, I believe it's Albert.  Yes,

23   Albert Hogan, III.

24             THE COURT:  Okay.

25             MR. SENDEK:  Mr. Hogan has been closely involved in

1    the Delphi bankruptcy case as counsel for the debtors since

2    near the time of its inception.  Mr. Hogan was part of the

3    Skadden team that filed the OPEB termination motion on behalf

4    of the debtors.  Mr. Hogan was present in Court for the

5    hearings on the termination motion in both February and March

6    of 2009.

7            Mr. Hogan would further testify that the Delphi Life

8    and Disability Benefit Programs for salaried employees was one

9    of three plans the debtor sought authority to terminate.  And

10   in fact the debtors were seeking authority to terminate all

11   welfare benefits and all groups of benefits that were housed

12   under those plans.

13           That concludes the proffer, Your Honor.  And I would

14   ask Mr. Hogan who is on the line, who is on the telephone that

15   --

16           THE COURT:  Right.  And I gave him specific

17   permission to appear, to be examined by phone --

18           MR. SENDEK:  Yes, Your Honor.

19           THE COURT:  -- given his location and also given his

20   status as a lawyer and officer of the Court.  Credibility

21   issues are less significant there.

22           MR. SENDEK:  That was appreciated, Your Honor, thank

23   you.  And I would just ask Mr. Hogan if he would agree with the

24   summary that I provided of his testimony were he to testify on

25   direct.

1          MR. HOGAN:  Judge, this is Al Hogan.  First, I echo

2     the appreciation for allowing the testimony to be taken

3     telephonically.  Yes, I agree with the proffer as Mr. Sendek

4     recited it.

5          THE COURT:  Okay.

6          MR. SENDEK:  Thanks.

7          THE COURT:  Okay.  Mr. Sumpter?

8          MR. SUMPTER:  It's a lot for me to retain what's

9     going on this morning.

10         THE COURT:  Sure.

11         MR. SUMPTER:  I think first I'd like to say there's

12    been a continual mischaracterization of my complaint, of my

13    OPEB objection in that I don't assert that the Court found that

14    disability benefits were vested during the hearing in February

15    of 2009.  And in my OPEB objection, I referred to the welfare

16    benefits of health care, life insurance, etc. being protected

17    because I was on disability.  I didn't say that disability was

18    vested.  And I made those points clear in my supplementary

19    response.  Because it's just a mischaracterization in terms of

20    what I alleged was a vested and not vested and who vested it.

21    But my personal argument on vesting is, as we discussed at the

22    last hearing, and I tried to go over it again in my

23    supplemental response, was that disability benefits were under

24    claimed, and [indiscernible] payment, and you know we cited

25    certain examples about that.  And I assert that's why they were

1    vested.  But also I assert that disability benefits were not

2    terminated by the OPEB order, and that the motion to terminate

3    the OPEB benefits did not include disability benefits.

4              Secondly, Ms. Haffey made a reference to I think she

5    said was paragraph 4, but I didn't try to find it, but in the

6    OPEB order, which I know I've referenced a section of that

7    numerous times.

8              THE COURT:  Right.  It is paragraph 4.

9              MR. SUMPTER:  Okay.  That says that the debtor shall

10   pay benefits on the claim without having to submit a new proof

11   of claim, that kind of thing.

12             THE COURT:  Right.

13             MR. SUMPTER:  And that, and she stated that that came

14   out of a discussion with Mr. Rosenberg or something like that.

15   But in fact, that came out of discussion with Mr. Dole

16   (phonetic), you can find that on page 67 of the transcript and

17   --

18             THE COURT:  Which one?  The March one or the February

19   one?

20             MR. SUMPTER:  I'm sorry, the February transcript.

21             THE COURT:  I'm sorry, 60 what?

22             MR. SUMPTER:  7.  And if you look at the bottom of

23   page 67, this is where it references 1129(a)(13), and you and

24   Mr. Dole actually had a discussion about the wording of that

25   because Mr. Dole kind of misstated it at first.  But ultimately

1    11 U.S.C., 1129(a)(13) I think is the foundation and genesis of

2    that paragraph of your order in what was described as paragraph

3    4.

4            THE COURT:  How so?  How do you contend it is?  As I

5    read it, he's basically saying that the plans might continue

6    even if you determine not to terminate them.

7            MR. SUMPTER:  No.  He's saying, let me just read it

8    here, then 1129(a)(13) says, the debtor is not obligated to

9    provide -- let me see, well maybe I misread, got the wrong one.

10   Let me flip to the next, and find the page.  I'm lost without

11   my computer.

12           THE COURT:  Okay.

13           MR. SUMPTER:  But I'll just have to try to summarize

14   because I can't, I'm just not able to find it.

15           THE COURT:  That's fine.

16           MR. SUMPTER:  Mr. Dole tried to quote 11 U.S.C. 1129

17   and you corrected him.  But at the end, he was saying after you

18   got agreement on what that meant, that for benefits that

19   weren't terminated, that 11 U.S.C. 1129(a)(13) states that the

20   debtor should pay them, and it went on somewhere on there it

21   even says and the reason for that is because the debtor is

22   supposedly well acknowledged, debts have been cured and so he

23   has the money to pay it, and there's no -- and I'm paraphrasing

24   -- but that was essentially the essence of it.  And if I was I

25   guess under a little less pressure I could find that.  Oh, it

Page 36

1   says, on 69, at least that part about the reason why is because

2   everyone expects a successor reorganization including

3   continuation of retiree benefits.  In other words, if the

4   debtor would contend to be economically able to provide those

5   benefits post-effective date.  So I guess if we go back on the

6   page before that.

7            THE COURT:  But I can tell you that I don't think

8   that's right.

9            MR. SUMPTER:  Okay.

10            THE COURT:  He was trying to argue that there was

11   really no authority to terminate these benefits under the

12   Bankruptcy Code except under 1114, and that I should really

13   look at this in the context of the eventual confirmation of a

14   plan, which is where 1129(a)(13) comes into play.

15            MR. SUMPTER:  Right.

16            THE COURT:  And says basically unless you know it's

17   been rejected under 1114 then you have to keep them in place.

18   But I disagreed with that.  And the final OPEB order reflects

19   that disagreement.  I concluded that the plan is as you take

20   it, and if it's terminable by its own terms, then you don't

21   need to go through the 1114 process and 1129(a)(13) isn't

22   implicated.  That's clearly how I ruled.  And that's a final

23   order.  The Third Circuit overruled the lower courts that

24   agreed with me in the Third Circuit, so there's a dispute among

25   the courts as to, you know, those provisions.  But I knew what

1   I was doing, I found that those provisions didn't apply here

2   except obviously they applied to a plan.  But if the plan

3   itself, that is the welfare plan, was terminable by its own

4   terms then there was really, you know, that Congress didn't

5   create any additional right beyond the plan itself.  So I don't

6   think that's the origin of that provision, the paragraph 4 in

7   the final OPEB order because the whole point of the final OPEB

8   order was to let them be terminated.

9           MR. SUMPTER:  Well if I can, if I can find my

10  reference point later, I'll seek an opportunity to make it, if

11  you'll allow it.

12          THE COURT:  Okay.

13          MR. SUMPTER:  But the other part of it is, as

14  indicated earlier, we were supposed to go out and see if we

15  could find additional evidence that supported --

16          THE COURT:  Either side's position.

17          MR. SUMPTER:  Exactly.

18          THE COURT:  Right.

19          MR. SUMPTER:  So in order to do that I issued, I

20  attempted to issue three subpoenas actually.  One was to Mr.

21  Gloster, another was to Mr. Brooks, and another to Mr. Hogan.

22          THE COURT:  Right.

23          MR. SUMPTER:  And just for point of clarification

24  because it seems to me that a couple of people interpreted that

25  way including Mr. Gloster, as I understood the rules, I have to

1    send a notice of subpoena prior to actually trying to serve the

2    subpoena.  So, for example, when I FedEx that document to Mr.

3    Gloster, it said, and if you look at the document he forwarded

4    to you, it said notice of subpoena.  I had a server actually

5    trying to serve Mr. Gloster, and the feedback I -- I'm sorry,

6    not Mr. Gloster, but Mr. Hogan -- and the feedback I got was

7    that he sent a person down to meet the server and refused to

8    come down and take it.

9             THE COURT:  Well he's going to testify to that, so

10   you don't have to worry about that.

11            MR. SUMPTER:  I understand.  Okay.  I just wanted to

12   say, I mean I actually, except for one error that Ms. Haffey

13   pointed out that I didn't give her a copy of the subpoenas for

14   the document request until she requested them, I mean I

15   originally tried to follow the instructions on issuing a

16   subpoena which meant I have to send a notice before I send the

17   subpoena.

18            THE COURT:  Okay.

19            MR. SUMPTER:  That's kind of, I know it's a side

20   issue, but what I wanted to do first was to go to this

21   declaration by Steven Gebbia (phonetic).  I'll summarize what I

22   believe is in there.  Mr. Gebbia stated that I think it was a

23   strategy board for the time when Delphi asked him to put

24   together an assessment regarding these benefit terminations --

25            THE COURT:  This is the declaration filed in

Page 39

1    connection with the OPEB motion?

2           MR. SUMPTER:  Yes.

3           THE COURT:  Right.  Okay.

4           MR. SUMPTER:  And so he provides a table and in the

5    declaration that's on page 6, and that table calls out all the

6    benefits that were terminated, but it does not call out

7    disability benefits.  And I've got to unfortunately, like I

8    said I'm lost without my computer and I tried to set it up here

9    in here and I will find it here in a second, and I'll ask to

10   give me time, I stated here that Mr. Gebbia had listed all of

11   the benefits that were being terminated, and he has a sentence

12   in here that says, that's the extent of the OPEB benefits that

13   they were attempting to terminate.  And so if you --

14          THE COURT:  Well I have his declaration, so that's

15   okay.

16          MR. SUMPTER:  Okay.  So what I'm saying is that

17   declaration listed the same benefits that were listed in the

18   OPEB motion.  But in that declaration, Mr. Gebbia states that

19   those were, the OPEB definition included those items

20   exclusively.  I'm paraphrasing now, but that's what that

21   declaration said.  So I think that that's a significant

22   indication that, that the debtor was not attempting to

23   terminate disability benefits.

24          Additionally, Ms. Haffey has referred to I think the

25   March 11 hearing where the attorneys for the 1114 committee

Page 40

1    said that, and they were definitely arguing about the language

2    of termination, that kind of thing, but they were arguing that

3    benefits such as health care, life, etc., were not terminable

4    because for disability recipients.  They were not arguing that,

5    I think they probably argued that disability benefits were

6    vested, but they weren't answering that in the context that

7    they thought that disability benefits were being terminated.

8    They were saying that the health and life insurance benefits --

9           THE COURT:  As they applied to retirees who were

10   disabled.

11          MR. SUMPTER:  Yes.

12          THE COURT:  I understand that point you're making,

13   and I think there's, that's a plausible interpretation of

14   what's going on here.  I guess my issue is I'm not sure whether

15   legally the distinction matters if in fact I concluded that

16   those people who are disabled weren't entitled to those

17   benefits even though they were disabled and that would trigger

18   their, the right to the benefit.  Why wouldn't that ruling also

19   extend to the other disability benefits?

20          MR. SUMPTER:  Well those other benefits, such as

21   health care, life insurance, those are benefits which I'll call

22   future benefits, they were on the claim.  That would be so that

23   you know if I had an accident in 2014, if the health care

24   benefits weren't terminated, then they would have covered the

25   accident.

Page 41

1           THE COURT:  But the trigger for those benefits for

2    someone who is on disability is the disability.

3           MR. SUMPTER:  I'm sorry, say that once again?

4           THE COURT:  If you're on disability, you know, before

5    your, before you retire, the reason for your right to benefits

6    generally under the plan, the life and disability plan, is the

7    disability; that's what gets you your entitlement to X, Y and Z

8    under the plan.

9           MR. SUMPTER:  Exactly.  But that's not a health care

10   claim.

11          THE COURT:  Well the, but health care and life were

12   clearly covered by this.  So I guess I don't see why there

13   would be a distinction as a legal matter for other disability

14   payments since it's the disability that triggers the right to

15   health care and life in the future, just like it's the

16   disability that triggers the right to disability payments in

17   the future.

18          MR. SUMPTER:  Well I think that's what, I think

19   that's what, I think it was Mr. Cornell was trying to argue.

20   But I agree the Court ruled against that.  I believe the Court

21   said that health care benefits or life benefits were, could be

22   terminated.  I mean I agree that that's what, but I don't think

23   there was any discussion about whether disability benefits

24   themselves, you know, the plans are separate except for the

25   disability plan says that a disability recipient also gets life

1    insurance and also gets a Medicare supplement, and also gets

2    health care.  But those are I'll call them additional

3    provisions of the disability plan.  The primary disability is

4    essentially wage replacement because I can't work.

5              THE COURT:  But the same termination language applies

6    for the whole plan.

7              MR. SUMPTER:  Well that's the part that I don't agree

8    with either.  I know they reference that.  The plan, they say

9    they were going to modify the life and disability plan.  And I

10   submit they did in fact modify it when they terminated life

11   insurance.  They didn't terminate the entire plan, they

12   modified it because they terminated life insurance, but they

13   didn't terminate disability insurance.

14             THE COURT:  Okay.

15             MR. SUMPTER:  And so Mr. Hogan is on the phone, I

16   don't know what the procedure is, Your Honor.

17             THE COURT:  Well, you can -- I'll put him under oath

18   and you can cross-examine him if you want to do that at this

19   point.

20             MR. SUMPTER:  Okay.  All right.

21             THE COURT:  Okay.  Mr. Hogan, can you hear Mr.

22   Sumpter?

23             MR. HOGAN:  I can, Judge.

24             THE COURT:  All right.  So, let me put you under

25   oath.

```
 1                    MR. ALBERT HOGAN, SWORN

 2            THE COURT:  So you can go ahead Mr. Sumpter.

 3    CROSS EXAMINATION

 4    BY MR. SUMPTER:

 5    Q.   Mr. Hogan, I have one of the documents that you supplied

 6    in response to my subpoena.  And I don't know if this will be

 7    useful to you or not, but it has a Bates number 0052 at the

 8    bottom of the page.  Is that something you have access to?

 9    A.   If you give me one second, I believe I can get that.

10            THE COURT:  Can you read off the title of it?

11            MR. SUMPTER:  It's really, it's an email.

12            THE COURT:  Okay.  Just give me the, just say the

13    date of it.

14            MR. SUMPTER:  The date is March 15th, 2009. It's an

15    email from Mr. Gloster to Mr. Hogan.

16            THE COURT:  Okay.  Okay, so do you have a question on

17    that one for Mr. Hogan?

18            THE WITNESS:  Just one moment, I'm attempting to get

19    that.

20            THE COURT:  We didn't catch that.

21            MR. SUMPTER:  I think that was just motion noise.

22            THE COURT:  Okay.  So this was provided to you in

23    connection with the subpoena, documents provided.

24            MR. SUMPTER:  Yes.

25            THE WITNESS:  Okay, I have, I believe I have the
```

1    email that you're referencing, Mr. Sumpter.

2            THE COURT:   Okay.

3    BY MR. SUMPTER:

4    Q.   Okay, I'm not going to read the whole thing, but I want to

5    get you to the point that I'm interested in.  It says "Al,

6    following up on our discussion," and then there's, below that

7    paragraph there's a web link, and then below that is this

8    sentence: "As we discussed please let me know what disability

9    benefits if any the debtors are proposing to terminate or

10   modify.  My understanding is that the PBGC and applicable law

11   provide that certain disability benefits are vested."

12   A.   I see that.

13   Q.   So, does that, do you have a recollection of receiving

14   that email and a discussion that followed that between you and

15   Mr. Gloster?

16   A.   I don't.  I don't recall specifically receiving this

17   email.  What I do recall discussing with Mr. Gloster with

18   respect to disability benefits, and it's a vague recollection,

19   but there were two points of discussion.  One is Mr. Gloster at

20   various points was asserting that under applicable ERISA law,

21   certain aspects of the benefits may be vested.  And I believe

22   we maintained and I think concluded that that was not the case.

23   The second aspect about disability benefits, which may not be

24   responsive to this email, that I recall ultimately settling the

25   retiree committee's appeal of the termination order, Delphi

Page 45

1   paid certain amounts into a VEBA including a hardship fund and

2   that hardship fund as I recall was to be administered by a

3   retiree committee of some sort.  Mr. Gloster explained to me

4   that among other matters that the committee would consider

5   participants with disabilities in determining how to dole out,

6   if you will, that hardship fund. And those are vague

7   recollections, but those were the two items I remembered

8   discussing about disability benefits with Mr. Gloster.

9           MR. SUMPTER:  Your Honor, and Mr. Hogan, I have a, as

10  a part of the effort to find additional information, because

11  one of the questions what was the committee thinking, so I

12  have, because it's been emphasized to me that this was a

13  client, attorney-client privileged documents between the

14  committee, or among the committee and the attorneys, so I

15  redacted the portions that weren't relevant here, but and I

16  have to read this to you, into the Court and Mr. Hogan because

17  you know not having copies to make available to him.  But these

18  are from the minutes.  Dean spoke with Al Hogan by --

19          THE COURT:  I'm sorry, can you just give the date?

20          MR. SUMPTER:  I'm sorry, March 17.  So this is just a

21  couple of days after that other email that Mr. Gloster sent Mr.

22  Hogan, and that was 2009, by the way.  "Dean spoke with Al

23  Hogan and was told that his intentions are as follows.  A

24  second deadline would be given to retirees of April 15th.  The

25  health care savings accounts were not funded and not an avenue

1    to draw from, that all accounts were at zero as of April 1."

2    That was one bullet.  The next bullet:  "disability supplements

3    will not terminate unless it is a health care related payment."

4    BY MR. SUMPTER:

5    Q.   Do you recall telling Mr. Gloster that, Mr. Hogan?

6    A.   No, I don't, and as I hear it, I don't really even know

7    what it means.

8    Q.   So would you believe, you suggest it is not a factual

9    representation that was given the committee about a

10   conversation?

11   A.   I can't speak to that document, Mr. Sumpter, I'm just

12   saying I don't remember having that discussion with Mr.

13   Gloster.

14          MR. SUMPTER:  Well that's the extent of my questions

15   for Mr. Hogan.

16          THE COURT:  For Mr. Hogan?

17          MR. SUMPTER:  Yes.

18          THE COURT:  Okay, do you have any redirect?

19          MR. SENDEK:  Just one, Mr. Hogan.  This is Bruce

20   Sendek speaking.

21                    REDIRECT EXAMINATION

22   BY MR. SENDEK:

23   Q.   The communications that Mr. Sumpter referenced were post

24   entry of the order.  Correct?

25   A.   I think that is correct.  I'm looking at the email that he

Page 47

1   directed me to, that was March 15th, so yes, that was I believe

2   after, certainly after the second hearing where Judge Drain

3   made his ruling.  Correct.

4   Q.   And I know you don't, you don't recall or perhaps never

5   saw the communication Mr. Sumpter just read, but it sounds as

6   though there were communications that you may have had that

7   were in connection with settlement discussions of an appeal.

8   Is that correct?

9   A.   That is correct.

10  Q.   And is that what your communications with Mr. Gloster

11  would have been about, post-entry of the OPEB order?

12  A.   Without remembering, it's hard for me to answer, but that

13  makes sense to me.  I know that I did have any number of

14  discussions with Mr. Gloster.  Again, my recollection there is

15  that we transition into discussing how to set up a VEBA, and

16  how to do so to preserve a health care tax credit for the

17  benefit of the retirees.  I worked with Mr. Gloster to achieve

18  that goal, and I had any number of discussions as to what

19  Delphi would pay to fund a VEBA in settlement of the issue and

20  in resolution of the appeal.

21            MR. SENDEK:  Nothing more from me.  Thank you.

22            THE COURT:  Okay.

23            MR. SUMPTER:  Can I have a follow-up question?

24            THE COURT:  Sure, go ahead.

25                      RECROSS EXAMINATION

1    BY MR. SUMPTER:

2    Q.    The discussions on a VEBA, did they come about before or

3    after there was a general agreement or a close agreement on how

4    much money would be paid to the retirees not to pursue the

5    appeal?

6    A.    My recollection is that Mr. Gloster raised the idea of a

7    VEBA and the health care tax credit very early in the

8    proceedings, even before the order, maybe in connection with

9    the first hearing.  So I remember frankly Mr. Gloster raising

10   that issue and helping us all understand the benefits of using

11   a VEBA to fund certain health care expenses in connection with

12   this health care tax credit.  My recollection is the amounts

13   that Delphi ultimately agreed to fund into a VEBA, I'm pretty

14   sure those discussions all took place after the entry of the

15   termination order.  You know, there may have been some

16   discussion about numbers before, but the real deal was cut

17   after the termination order was entered and the appeal was

18   being pursued, I believe.

19              MR. SUMPTER:  That's all I have.

20              THE COURT:  Okay.  Mr. Hogan, I have a question for

21   you.  I just want to ask you whether in connection with

22   negotiating the settlement of the appeal, there was any

23   commitment by Delphi not to terminate any specific welfare

24   benefits, including any disability benefits.

25              THE WITNESS:  Judge, I don't remember.  Frankly, I

1    don't remember much about the discussion, I certainly don't

2    remember making any commitment along those lines.  And I guess

3    I would say that if such a commitment were made, I would

4    certainly expect to see that in writing in some document.

5              THE COURT:  I think I know the answer to this one,

6    but do you recall any requests by the 1114 committee that

7    Delphi carve out from its right to terminate benefits any

8    particular benefit?

9              THE WITNESS:  I don't.  I don't recall them making

10   that request, Judge.  It's possible that they did, but that I

11   just do not recall.

12             THE COURT:  Okay.  Any questions on that exchange?

13             MR. SUMPTER:  No, I have no questions.

14             THE COURT:  Okay.  All right.  So unless you, unless

15   someone wants to reserve Mr. Hogan for any sort of rebuttal, I

16   think he can sign off if he wants to.

17             MR. SENDEK:  Nothing here, Your Honor.

18             THE COURT:  Okay.

19             MR. SUMPTER:  Nothing.

20             THE COURT:  Okay.  Thank you.

21             THE WITNESS:  Thank you, Judge.

22             MR. SUMPTER:  So, my, when I went through and found

23   these, the point is when I went back and looked through the

24   minutes, the genesis of the discussion on disability as you

25   might imagine came from me in the 1114 committee, I was the

Page 50

1    only disabled member.

2           THE COURT:  Can I interrupt you just for a second?

3           MR. SUMPTER:  Okay.

4           THE COURT:  Do you have any other testimony you want

5    to bring out, from Mr. Brooks, for example?

6           MR. SUMPTER:  Well I can do --

7           THE COURT:  You could point to other things in the

8    record; I just, I had a sense that you were going more towards

9    argument as opposed to evidence.  So if you want to have him

10   testify.

11          MR. SUMPTER:  No, I think I still, at least what I

12   think of is evidence, you might be able to correct me on that,

13   but what I was going to try to do is talk about some of the

14   other minutes and the communication.

15          THE COURT:  Okay.  Normally, although he is a

16   representative of the company, so I guess he can listen to

17   this, but generally I don't have the witnesses present when

18   you're talking about the evidence.

19          MR. SUMPTER:  Okay.

20          THE COURT:  Because it might affect their testimony.

21   But I don't know if you want to have Mr. Brooks testify after

22   all.  I don't know.

23          MR. SUMPTER:  I do.

24          THE COURT:  Okay.

25          MR. SUMPTER:  I don't think that the questions I'm

Page 51

1   going to ask Mr. Brooks --

2           THE COURT:  Go to this.

3           MR. SUMPTER:  Yes.

4           THE COURT:  All right.  Fine.  Okay.

5           MR. SUMPTER:  There was no discussion about

6   disability until I wrote an email to the committee and

7   specifically asked Mr. Gloster to research an issue.  And the

8   issue arose when we started talking about the potential that

9   the pension would be terminated.  And so I have another email,

10  this was sent to the committee from Mr. Gloster, and again, I

11  can delete everything that wasn't relevant.  And this was on --

12          MR. SENDEK:  Your Honor, before we continue, I really

13  do need to make an objection as to -- excuse me, Your Honor, I

14  really do need to make an objection as to hearsay.  I mean Mr.

15  Gloster is not here.

16          THE COURT:  This is, there was no objection when you

17  talked about the emails with Mr. Hogan because you were just

18  offering it to refresh his recollection, you weren't

19  introducing it into evidence.

20          MR. SUMPTER:  Okay.

21          THE COURT:  I don't know, you're now, this is your

22  testimony now?  I'm just trying to figure out --

23          MR. SUMPTER:  Yes, this is my testimony.

24          THE COURT:  Well --

25          MR. SUMPTER:  I also thought, well I would have, I

1    guess I have to apologize for not being really familiar with

2    the procedures in Court.

3              THE COURT:  That's fine, you're representing

4    yourself, and it's always awkward when the witness is

5    representing himself or herself.  The way I handle it generally

6    is I put that person under oath if it's now their testimony so

7    they know that it's subject to the penalty of perjury, but I

8    just let them talk as if it's a proffer.

9              MR. SUMPTER:  Okay.

10             THE COURT:  But when it comes to introducing other

11   evidence as part of that testimony, the basic evidentiary rules

12   apply.

13             MR. SUMPTER:  Okay.

14             THE COURT:  So that includes the rules that pertain

15   to introducing exhibits.  So before we get to the exhibit or

16   the proposed exhibit, let me put you under oath.

17             MR. SUMPTER:  Okay.

18             THE COURT:  Would you raise your right hand, please?

19                     MR. SUMPTER, SWORN

20             THE COURT:  I'm going to consider what you're telling

21   me your testimony.

22             MR. SUMPTER:  All right.

23             THE COURT:  The other side is entitled to object, you

24   know, saying this isn't really evidence, etc.  So now you want

25   to introduce this email or these minutes?

Page 53

1          MR. SUMPTER:  Yes.

2          THE COURT:  And can you identify them?

3          MR. SUMPTER:  This is minutes that were from March 4,

4    2009.

5          THE COURT:  Okay.

6          MR. SUMPTER:  And the subject was pension timing,

7    attorney-client privilege, attorney-work product, confidential,

8    do not forward.

9          THE COURT:  Okay.  And you should show a copy to the

10   other side, unless you have it already.

11         MR. SUMPTER:  That's my only copy, I was redacting

12   last night.

13         MS. HAFFEY:  We received documents from Mr. Gloster,

14   Your Honor, but not any of the privileged documents, so we've

15   not seen this document.

16         MR. SUMPTER:  But you wouldn't have received that

17   from --

18         MS. HAFFEY:  That's right.

19         MR. SUMPTER:  Oh, yeah, I don't think you received

20   that from Mr. Gloster.

21         MS. HAFFEY:  That's correct, I did not.

22         MR. SUMPTER:  Because really, that was, I think that

23   was attached to part of the minutes, so she wouldn't have

24   received that.

25         THE COURT:  So is there an objection to the admission

1   of this document?

2           MR. SENDEK:  Well, I believe so, Your Honor, it is

3   hearsay.  I mean it seems rather inconsequential, but on the

4   other hand, I don't want to open the door to introducing

5   communication after communication that actually purports to be

6   privileged in any event.  But still, it's hearsay.

7           THE COURT:  Can I take a look at it?

8           MR. SENDEK:  Yes.

9           THE COURT:  Okay, well it's a brief document.  I'll

10  not admit it -- hearsay means you're introducing something that

11  someone else said for the truth of what they said.

12          MR. SUMPTER:  Yes.

13          THE COURT:  I'll not admit it for that because it is

14  hearsay.

15          MR. SUMPTER:  All right.

16          THE COURT:  If you want to introduce it as for what

17  you thought he was saying, how it affected you --

18          MR. SUMPTER:  The point, the reason I wanted to

19  introduce it was to show what the committee was thinking

20  because that was what you had asked us about at the last

21  hearing.

22          THE COURT:  Okay.  Well why don't you go ahead and

23  I'll see if I'll admit it for any purpose.

24          MR. SUMPTER:  Okay.  So that was when the committee

25  learned that the, we thought that the, there had been some

Page 55

1    discussion that the termination of the pension was likely.

2    Then they started questions on at that point would disability

3    benefits be protected.

4              THE COURT:  Okay.  And so that email, I mean those

5    minutes basically you say reflect your and other committee

6    members' belief that the pension could well be terminated.

7              MR. SUMPTER:  Yes.

8              THE COURT:  All right.  I'll admit it for that

9    purpose.

10             MR. SUMPTER:  And so when we go back to those

11   documents that I, you know, I talked to Mr. Hogan about, one of

12   the reasons that Mr. Gloster wrote that email was because of

13   discussion in the committee about what was happening to

14   disability benefits.  And so, and then two days later after

15   that we had reported in the minutes from Mr. Gloster what I,

16   what I read was that Mr. Hogan said there was, they were only

17   interested in terminating health care and life benefits as far

18   as disability.

19             THE COURT:  Well were you on the committee at that

20   point?

21             MR. SUMPTER:  Yes I was.

22             THE COURT:  Okay.

23             MR. SUMPTER:  I was on the committee up until the

24   time that they I think it was probably around the 27th of March

25   when they went, they scheduled a meeting to go and negotiate

Page 56

1  their final payment terms, and I can, somewhere I have my --

2          THE COURT:  No, that's okay. that's okay.  I'm just

3  trying to --

4          MR. SUMPTER:  So the other part about this, you know,

5  I pawned a kidney so I could pay to have the attorneys come

6  here.  Mr. Gloster refused to, Mr. Gloster, I don't have a real

7  good relationship, but he refused to come.  And I think it's

8  outside the 100 mile --

9          THE COURT:  Radius.

10          MR. SUMPTER:  -- radius.  He had some other reasons,

11  like he thought I would subpoena --

12          THE COURT:  Well he doesn't, I mean that's all he

13  needs.

14          MR. SUMPTER:  Right.  I mean eventually I corrected

15  his other impressions, but I understood about the 100 mile

16  radius.  So I agreed that I would call the server off, the

17  server had been trying to serve him and he agreed to go ahead

18  and send me the documents.  And so, because I, you know, my

19  impression is that the Court places a little bit higher level

20  quality on the testimony from an officer from the Court than

21  might be a person about myself, so I thought --

22          THE COURT:  It all has to be true.

23          MR. SUMPTER:  Well I understand that, but just like

24  the reason you let Mr. Hogan testify via the telephone, I guess

25  because he's an officer of the Court and --

Page 57

1           THE COURT:  Right.

2           MR. SUMPTER:  -- there wasn't much issue about

3    credibility or whatever.  So I thought that having a different

4    voice than mine wouldn't hurt, but he had access to the same

5    minutes, except for he denies any memory or anything in our

6    conversation.  So, and I talked to Mr., I think his name is

7    Cohen (phonetic) who has been generally helpful.  He's the

8    other attorney that the retirees hired.  But he wasn't involved

9    in that aspect of, his responsibility was more collecting the

10   documents and searching them for that language and that kind of

11   thing.  He wasn't involved in the communication with Mr. Hogan

12   and that kind of thing.  And so he was willing to come, but he

13   felt like everything he had was hearsay, and it would be

14   objected to and so he didn't think it would serve me, it would

15   just waste my money.  He had been pretty helpful, I didn't

16   think he would mislead me, so I pulled back the subpoena for

17   him.  But that's, what I was trying to do was answer what was

18   the committee thinking --

19           THE COURT:  Right.

20           MR. SUMPTER:  -- as far as how we saw disability.

21   And that's the background I have.  We operated on that comment

22   that I read where Mr. Gloster said and Mr. Hogan said that they

23   weren't trying to terminate disability benefits, however, there

24   hadn't been a specific question about that, our questions had

25   centered on the pension, but that was something Mr. Gloster

Page 58

1    asked as a part of that process, but that's what he reported

2    back.  There had not been a question about that raised in the

3    committee, and I went through all the, I did all the searches,

4    you know, I did a bunch of cross-searches and there was no

5    other evidence of that.  So that's what I have to say about

6    what the committee thought and what it was working on.  And our

7    primary concern at that time was that Mr. Gloster communicated

8    with Mr. Hogan was what would happen when the pension was

9    terminated.

10            I have to make actually one accommodation if the

11   Court permits it, is one of the challenges I have with my

12   health is how it affects me and my ability to concentrate and

13   remember.  But, so I would ask you to I guess pay attention to

14   my supplemental response because that's where I'm able to

15   organize and keep things under control, where I might not be

16   able to do it here.

17            THE COURT:  Okay, I've certainly read that.

18            MR. SUMPTER:  Okay.  So the thing I'd like to do now

19   is I guess go to Mr. Brooks.

20            THE COURT:  Okay.  Wait, let's have him sit up here.

21   If you could just sit over here in the witness chair please.

22   You can sit down.  Would you raise your right hand please?

23                  MR. JOHN BROOKS, SWORN

24            THE COURT:  Could you spell your name for the record?

25            THE WITNESS: John Brooks.

1           THE COURT:  B-R-O-O-K-S?

2           THE WITNESS:  That's correct.

3           THE COURT:  Okay, thanks.

4           MR. SUMPTER:  Last May I was actually in the hospital

5    and I had my right knee replaced.  I'm going, I've got to give

6    you a little background if that's okay, Your Honor.  I got a

7    call from David Miller, and this paper, I mean, in itself is

8    not material other than it's a voicemail that my answering

9    machine converts it into a text, and this is just an email from

10   David Miller, a person who I didn't know, but he had been

11   following the case on the docket.

12          MR. SENDEK:  Can we see it, please?

13          MR. SUMPTER:  I'm sorry.

14          MR. SENDEK:  Thank you, Mr. Sumpter.

15          THE WITNESS:  May I retrieve my glasses?

16          THE COURT:  Yes.

17          MR. SENDEK:  Your Honor, it purports to be a May 19,

18   2012 communication.  I'm not entirely sure who it's from.  It's

19   rather garbled, but I do, I object to the --

20          THE COURT:  Well, I don't think he actually

21   introduced this.  This is just context for your question?

22          MR. SUMPTER:  Yes.

23          THE COURT:  Okay.

24          MR. SENDEK:  Well, I was going to object to him

25   cross-examining the witness on something that apparently --

1        THE COURT:  Right.  Well we'll see where it goes.

2        MR. SUMPTER:  I was just trying to establish why,

3   I'll still let him see it, Mr. Brooks see it.  But anyway, so I

4   communicated with Mr. Miller on the telephone and he told me he

5   was receiving supplemental extended disability benefits also.

6   And I understand that he signed --

7        MR. SENDEK:  Objection, Your Honor.  I mean we're

8   going too far now.

9        THE COURT:  Well, you should ask -- this is

10  examination of Mr. Brooks.

11       MR. SUMPTER:  Okay.

12       THE COURT:  You need to ask him a question, and this

13  is really not your testimony.

14       MR. SUMPTER:  I'm sorry.  All right.

15  BY MR. SUMPTER:

16  Q.   Mr. Brooks, I tried to serve you a subpoena for documents

17  concerning David Miller.  And the best information I had was

18  his last known address is what I put on the subpoena.  And one

19  of the things I asked for was his pay records.  And I didn't

20  receive any such document, I got this document from Ms. Haffey.

21  Do you not have pay records for Mr. Miller?

22  A.   Mr. Miller is not a DPH employee, so I have no records for

23  Mr. Miller.  He never was a DPH employee.  He was terminated

24  at, from DPH October 6th, 2009.

25  Q.   He was terminated from DPH or Delphi?

1   A.   He was terminated from DPH, he became a new Delphi

2   employee October 6th, 2009.

3   Q.   So was he working on October 6th, 2009?

4   A.   I believe he was on short-term disability, and as such

5   transferred to the new Delphi organization.

6   Q.   He transferred, he requested a transfer?

7   A.   No, he was terminated, and rehired by new Delphi.

8   Q.   While on disability?

9   A.   Short term.

10   Q.   That seems to be an unusual thing that you would hire

11   someone who is disabled.

12   A.   I can explain to you how it was explained to me, but this

13   is hearsay.

14          THE COURT:  If no one objects, you can say it.

15          THE WITNESS:  As it was explained to me, the

16   individuals that were on short term disability as of emergence

17   were assumed into the new Delphi organization to protect them

18   from a job standpoint.  If they were on pregnancy leave, which

19   is the majority of the short term disability, they would then

20   when they returned from their short term disability, they would

21   then have a job for them in the new Delphi organization.

22   Individuals that were on long term disability as of October 6th

23   remained with the reorganized debtors.  Individuals on short

24   term disability were terminated from the reorganized debtors

25   and hired by new Delphi.  And that's the case with Mr. Miller.

Page 62

```
 1              MR. SUMPTER:  I don't have any other questions.

 2              THE COURT:  Okay.  Any cross?

 3              MR. SENDEK:  Nothing here, Your Honor.

 4              THE COURT:  Okay, you can step down sir.

 5              MR. SUMPTER:  The machinations I'll describe is what

 6   happens in bankruptcy is kind of interesting sometimes, but Mr.

 7   Miller received a termination letter, that's what he told me

 8   anyway.  This will be my testimony unless you object that --

 9              MR. SENDEK:  Mr. Sumpter, the Court -- I'm sorry,

10   Your Honor, I should address the Court.  I will object if he

11   goes beyond that.  I mean we've heard that he received a

12   termination, that's fine, but beyond that, I think it's all

13   hearsay what Mr. Miller might say or could say.

14              THE COURT:  Okay.  Well, I don't know what else

15   you're going to offer besides the fact that he was terminated.

16              MR. SUMPTER:  I'm sorry?

17              THE COURT:  I don't know what else you're going to

18   offer besides the fact that he was terminated.

19              MR. SUMPTER:  Well I had, the other things that he

20   told me, but --

21              THE COURT:  He's not here to testify and to be cross-

22   examined.

23              MR. SUMPTER:  In fact, I had trouble locating Mr.

24   Miller, I had trouble locating him, his phone number was --

25              THE COURT:  It doesn't matter, he's just not here to
```

Page 63

```
 1   testify.

 2           MR. SUMPTER:  I understand.

 3           THE COURT:  What he told you really --

 4           MR. SUMPTER:  I was just going to offer that I

 5   finally made contact with him this morning, that was all I was

 6   going to offer.

 7           THE COURT:  Okay.

 8           MR. SUMPTER:  So I don't have any more regarding him

 9   because I couldn't locate him until --

10           THE COURT:  Recently.

11           MR. SUMPTER:  Yeah.  So, well that's essentially, I

12   believe that I offered information on what the committee

13   thought, I believe that we go back and I'll find that specific

14   reference to Mr. Gebbias's declaration that was fairly explicit

15   about what OPEB benefits cover, and then we also talked about

16   what was stated in the OPEB motion.  And I made in my

17   supplemental response and I offered case law that I said

18   existed on the benefits on the claim were vested, and I

19   couldn't be retroactively terminated.  And so I think in

20   essence I believe the benefits were not terminated by your

21   order.  I also believe they were vested, and that they were

22   wrongly terminated, and that's the foundation of all my

23   complaints.  So that, if for example, the Court rules against

24   me, all my complaints evaporate.  I mean whether you go to the

25   collateral estoppel issue or not.
```

1            THE COURT:  Okay.

2            MR. SUMPTER:  As far as the collateral estoppel

3    issue, I think that the reference that Ms. Haffey or whoever

4    wrote that, raised, would only apply if disability, potentially

5    apply if disability benefits had been terminated in 2009, you

6    know, in your 2009 order.  Absent that, I don't see how it can

7    apply.

8            THE COURT:  Okay.  Okay.  Anything in rebuttal?

9            MR. SENDEK:  We won't have any cross, Your Honor.

10           THE COURT:  Okay.  Do you have any further oral

11   argument, or are you going to rest on the papers?

12           MR. SENDEK:  Other than just to state, Your Honor,

13   that, and I'll refer the Court back to the transcript cites

14   that I mentioned earlier in regards to paragraph 4, there

15   really can't be any question that the cites that I provided to

16   the Court are accurate, and Mr. Butler read into the record on

17   page 52, the exact wording of paragraph 4 and referred to as

18   conversation in the February 24th hearing with Mr. Rosenberg.

19   So, that's the only further response.

20           THE COURT:  Okay.  All right.  I have before me a

21   motion by DPH Holdings Corp. to enjoin Mr. Sumpter from

22   pursuing a lawsuit that's pending in the District Court,

23   Southern District of Indiana, that seeks to enforce claims

24   against DPH and certain of its officers and counsel under

25   various theories that all in essence go to Mr. Sumpter's

Page 65

1    contention that in March of 2012 DPH or the reorganized debtors

2    terminated his remaining benefits provided under the benefit

3    plans maintained by the reorganized debtors or DPH's

4    predecessor, Delphi Corporation.

5            More specifically, the complaint in the Indiana

6    action complains about the termination, or the wrongful

7    termination, of benefits under the Delphi Salaried Life and

8    Disability Benefits Program applicable to him.  The motion

9    contends that Mr. Sumpter is precluded by the confirmed plan in

10   this case and the plan modification order--the order that in

11   effect confirmed that plan, from July of 2009--as well as an

12   order issued by the Court on Mach 3rd, I'm sorry, March 11th,

13   2009 granting the debtors' motion for leave to terminate their

14   so-called OPEB or salaried OPEB obligations and plans for

15   eligible salaried retirees.

16           I held a hearing on this motion, which was a non-

17   evidentiary hearing, last month and concluded that I should

18   take evidence on what was intended to be covered by the

19   salaried OPEB motion in 2009, and, accordingly, the Court's

20   order on March 11th, 2009.  I've today held that hearing as

21   well as received and reviewed supplemental briefing by both DPH

22   and Mr. Sumpter.

23           I've concluded that I have jurisdiction over this

24   dispute notwithstanding that the motion was filed years after

25   confirmation of Delphi's chapter 11 plan.  That is because the

Page 66

1    plan and the order confirming the plan expressly provided that

2    the Court retained exclusive jurisdiction of all matters

3    arising out of and related to the chapter 11 cases and this

4    plan including any dispute relating to any liability arising

5    out of the termination of any employee or retiree benefit

6    program regardless of whether such termination occurred prior

7    to or after the effective date.  Modified Plan section 13(p).

8    In addition, this dispute implicates a core function under the

9    Bankruptcy Code, namely not only the Court's enforcement of the

10   confirmation order, but also the injunction issued by the Court

11   in furtherance of the plan injunction and exculpation

12   provisions found in sections 11.2 and 11.11 of the plan.

13   There's no more central feature to post-confirmation

14   jurisdiction than enforcing the confirmation order and, more

15   specifically, the plan's and the confirmation order's

16   provisions enjoining and channeling litigation from other

17   forums to the Bankruptcy Court forum.  See in re Texaco Inc.

18   505 Fed. Appx. 77 (2d Cir. 2012) at 78 - 79.

19            As narrowed at the September 20, 2013 hearing and

20   further as the subject of this hearing, the dispute here hinges

21   on whether the Court's prior orders, which I've referred to,

22   starting with the final OPEB order of March 11th, 2009 and then

23   going to the July 2009 plan modification or confirmation order,

24   in fact are binding on the parties with respect to the

25   termination in March 2012 of Mr. Sumpter's disability benefits.

Page 67

1    The motion granted by the final OPEB order sought an order

2    confirming the debtors' authority to terminate employer paid

3    post-retirement health care benefits and employer-paid post

4    retirement life insurance benefits for certain salaried

5    employees and retirees and their surviving spouses.  That so-

6    called salaried OPEB motion is obviously part of the record in

7    this case; it's dated February 4th, 2009.  On its face, and

8    more specifically in footnote 3 of that motion, the debtors

9    argued that the plan, the welfare plan under which Mr. Sumpter

10   until March of 2012 received disability benefits, as well as

11   other welfare plans maintained by Delphi, contained language

12   that specifically reserved to Delphi the right to amend,

13   modify, suspend or terminate the program in whole or in part at

14   any time by action of its board of directors or other

15   individual or committee expressly authorized by the board to

16   take such action.  Delphi contended in the salaried OPEB motion

17   that this language enabled it to terminate the plans described

18   in the motion notwithstanding sections 1114 and 1129(a)(13) of

19   the Bankruptcy Code.  I concluded after three days of hearings

20   that Delphi was correct. So there's no question that I

21   authorized Delphi in the order granting that motion to

22   terminate the benefit plans referred to in the motion insofar

23   as the motion sought such termination.

24         DPH has contended that it is the case that Delphi and

25   the other parties and the Court understood that included within

Page 68

1    the benefit programs or plans covered by the motion was Mr.

2    Sumpter's disability right or rights.  Mr. Sumpter contends, to

3    the contrary, that the final OPEB, I'm sorry, the salaried

4    employees' OPEB motion sought only the termination of a portion

5    of his rights under the Delphi Salaried Life and Disability

6    Benefits Program, i.e., his health benefits as a person covered

7    by that program in respect of his disability, and his life

8    insurance benefits, and potentially other benefits, but,

9    importantly, not the disability benefit payments on account of

10   his disability that were terminated in March of 2012.

11           The motion itself is not entirely clear on this

12   point, but I believe that a better reading of the motion is

13   that the motion did not seek authority to terminate the entire

14   Delphi Salaried Life and Disability Benefits Program insofar as

15   it applied to salaried retirees, but rather to the several

16   categories of salaried OPEB listed on page one of the motion,

17   i.e., eligibility for employer paid post-retirement health care

18   benefits for all current and active salaried employees, company

19   contributions to provide post-retirement health care for

20   current and future salaried retirees and their surviving

21   spouses, cancellation of all retiree health reimbursement

22   accounts, Medicare eligible salaried retirees and their

23   surviving spouses, termination of Medicare, Part B special

24   benefit for current and future salaried retirees and their

25   surviving spouses, the cessation of the one percent employer

Page 69

1    contribution to the salaried retirement savings program for

2    those active salaried employees hired on or after January 1,

3    1993 and on or prior to December 31, 2000, the elimination of

4    eligibility for employer paid post-retirement basic life

5    insurance benefits for all current and future active salaried

6    employees, and the cessation of making company contributions to

7    provide post-retirement basic life insurance benefits for

8    current and future salaried retirees, as again listed on page

9    two of the motion.   A similar list appears in the final OPEB

10   order.

11          I believe this is consistent also with the

12   termination letter that Delphi sent out on February 5th, 2009,

13   which appears as an exhibit to DPH's supplemental memorandum

14   submitted in connection with this motion, which notifies Delphi

15   Health and Life Program participants of Delphi's intention to

16   terminate certain benefits, which include health care coverages

17   and life insurance coverages, but does not reference all

18   disability benefits, including as is relevant here, disability

19   payments not for health coverage, but literally for any

20   disability under the disability and life insurance plan.

21          That, however, is not the end of the issue, because,

22   to reach that result, the Court and the parties considered

23   necessarily whether there was any vesting by any participant in

24   the Delphi Salaried Life and Disability Benefits Program that

25   would not be trumped by the reservation language that I

Page 70

1    previously quoted permitting the corporation to terminate in

2    whole or in part the policies.

3           Many retirees and those on disability as well as

4    active salaried employees objected to the salaried OPEB motion.

5    The Court held an initial hearing on the motion and those

6    objections on February 24, 2009.  There are numerous references

7    in that hearing transcript to issues as to whether,

8    notwithstanding the general reservation that I quoted, various

9    salaried employees, retirees or those on disability had in fact

10   vested rights in the plan which precluded the relief that

11   Delphi was seeking.  Concerned about those arguments, the Court

12   appointed, notwithstanding its preliminary view that Delphi

13   would prevail, an official committee of retirees under section

14   1114 of the Bankruptcy Code; and it charged that committee with

15   the task on behalf of all retirees, including those on

16   disability, of making the case as to whether any retirees--

17   including specifically, as based on the February 24th hearing

18   transcript, those on disability--had any vested rights that

19   would preclude the relief that Delphi was seeking or, more

20   broadly, create a vested right by those retirees.  The

21   references to that issue are set forth, and are accurately set

22   forth, I believe, in DPH's supplemental memorandum.

23          The committee did its analysis and presented it to

24   the Court on March 10th and March 11th, 2013.  Again, the

25   subject of the rights of former employees who are on disability

Page 71

1   came up a number of times at that hearing, and those times are

2   accurately set forth, again, in Delphi's supplemental

3   memorandum.  No evidence was found by the Court to establish

4   any vesting rights unique to those on disability, as concluded

5   by the Court in its bench ruling and also as summarized by

6   Delphi's counsel at that hearing.  If there had been any unique

7   vesting right for any disabled party, including Mr. Sumpter,

8   the Court would not have granted the relief it did, which

9   included terminating medical and life insurance benefits that

10  had been triggered by disability of such people.

11          Clearly the issue of vesting was actually litigated

12  as set forth in the transcript of the March 10th and 11th

13  hearing and as contemplated by the Court when it gave only a

14  preliminary ruling on February 24th, 2009, and when it

15  appointed the retiree committee to represent all the retirees

16  in respect of the vesting issue.  I believe that was clear also

17  to the retiree committee, which, as I believe I can conclude

18  from Mr. Hogan's testimony today, was concerned after the

19  issuance of the final OPEB order, on March 11th, 2009, that,

20  given the Court's ruling, Delphi was free to terminate all

21  retiree benefits, not just medical and life insurance.  This is

22  a, was a, perfectly logical reading by the committee given,

23  again, the nature of the analysis set out in the March hearing.

24          Ultimately, those issues I believe were in fact

25  settled by the settlement between Delphi and the retiree

1    committee which I previously approved by final order.  That

2    settlement set up a hardship fund as well as a VEBA to provide

3    material consideration to retirees, including those on

4    disability.  I do not believe that Delphi ever committed not to

5    terminate disability benefits in any respect.  Such a

6    commitment would require Court approval, and it's obviously

7    clearly inconsistent with the settlement that I've just

8    discussed, which says nothing about any such commitment, as

9    well as the Court's ruling on the salaried OPEB motion.

10           I conclude, therefore, that while the final OPEB

11   order is not res judicata for reasons that I've already stated

12   as well as my belief in reviewing Mr. Sumpter's objection to

13   the OPEB motion that Mr. Sumpter was objecting to the

14   termination of his retiree, I mean his disability, health and

15   life insurance benefits, that, again, while res judicata does

16   not apply here, collateral estoppel does.  New York preclusion

17   law applies here, and under that law, re-litigation of an

18   issue, or collateral estoppel, is precluded when two conditions

19   are met: the identical issue necessarily was decided in the

20   prior action and is decisive in the present action, and the

21   party to be precluded from litigating the issue had a full and

22   fair opportunity to litigate the issue in the prior action.

23   See Kaufman v. Eli Lilly & Co. 4 A2d 63, 67 (NY Court of

24   Appeals 1985).  See also Khandahr, K-H-A-N-D-A-H-R, v.

25   Elfenbein, 943 F.2d 244, 247 (2d Cir. 1991).

1          Here, obviously, Mr. Sumpter was a party to the OPEB

2    motion and had a full and fair opportunity to litigate the

3    issue.  Not only was he a party, he was also a member, until

4    well after the issuance of the final OPEB order as well as

5    before the March 10th and 11th hearing, of the retiree

6    committee which obviously was charged with taking the laboring

7    oar on behalf of the objectants after it was appointed.

8          I believe that the issue of termination rights for

9    those on disability was directly before the Court and actually

10   decided in order to decide the OPEB motion and that, therefore,

11   it is binding--that decision is now binding on Mr. Sumpter when

12   he is quite candidly again alleging that it was the wrongful

13   termination of his disability benefits that gives rise to his

14   claims, in the Indiana District Court action and does include

15   all his claims, whether they be a breach of fiduciary duty,

16   breach of contract or other violations of ERISA.  They all flow

17   from whether in fact the reorganized debtors had, or DPH had

18   the authority in March of 2012 to terminate his retiree

19   benefits.  The same authority that applied to the final OPEB

20   motion necessarily applies to that termination in March of

21   2012.

22          The right to disability health care and disability

23   life based on the triggering event of one's disability is no

24   different than the right to disability payments triggered by

25   one's disability.  In respect of the former issue, the retiree

Page 74

1    committee argued to the contrary before me on March 10th and

2    11th, 2009.  I disagreed with them, relying primarily on the

3    Sixth Circuit's Sprague (phonetic) decision, which I cited.

4    Mr. Sumpter in his supplemental memorandum as well, as I'm sure

5    he would similarly argue in the Indiana District Court, makes

6    the same argument that the retiree committee made, which is

7    that vesting for disability is somehow different than vesting

8    under a welfare plan for other rights.  In his case, he's

9    arguing for disability payments; they were arguing for

10   disability medical insurance and life insurance.  In each case,

11   though, the same principle applies, which is that where there

12   is explicit language to the contrary, and here that is the

13   unfettered right to terminate disability benefits, a benefit

14   may in fact be terminated even for those who are already

15   disabled.

16          This principle was recently confirmed in the Sixth

17   circuit in Price v. Board of Trustees of the Indiana Labor

18   Pension Fund, 707 F.3d, 647, 651 (6th Cir. 2013), reh'g denied,

19   2013 U.S. LEXIS 8400 (6th Cir. 2013), in which the Sixth

20   Circuit said that a welfare benefit plan may be terminated at

21   any time so long as the termination is consistent with the

22   terms of the plan, including in respect of disability payments

23   for beneficiaries of the plan who are already disabled and

24   receiving such payments.  See also Robinson v. Sheet Metal

25   Workers National Pension Fund, 515 F.3d 93, 98-99 (2nd Cir.

Page 75

1    2008), cert. denied 2008 U.S. LEXIS 5643 (October 6th, 2008).

2    Accordingly, Mr. Sumpter is collaterally estopped from

3    proceeding with his claims based upon the alleged improper

4    termination of his retiree benefits.

5            I had also asked the parties to brief whether that

6    collateral estoppel was sufficient for the Court to enforce the

7    injunction under the plan, which is a slightly different issue

8    than whether the Court has jurisdiction, which I've already

9    concluded I have.

10           I conclude, given the plan language that I previously

11   quoted from section 13(p) of the plan as well as the plan

12   modification order injunction and the injunction in the plan at

13   11.2 and 11.11 of the plan, that I in fact should enjoin Mr.

14   Sumpter's pursuit in contravention of those provisions, of the

15   Indiana District Court action based upon collateral estoppel.

16   In that sense, this case is closely analogous to Monarch Life

17   Insurance Company v. Ropes & Gray, 65 F.3d 973, (1st Cir.

18   1995).  The Court clearly had determined in March of 2009 that

19   the debtors had the right under the applicable welfare plan

20   document to terminate any of the retiree benefits.  That issue

21   had been actually litigated, the retiree committee having been

22   created and empowered to do so.  The chapter 11 plan set up DPH

23   with the clear understanding that it would have a finite life

24   to administer that plan and eventually go out of existence when

25   the case is closed.  It apparently delayed termination of all

Page 76

1    retiree benefits for three years after the Court's 2009 ruling,

2    and I believe that it is terminating those benefits or did

3    terminate them in 2012 with the eye to actually wrapping up the

4    estate rather than continuing to administer the plan when it

5    was not required to do so thereafter.  The bankruptcy plan and

6    confirmation order contemplated that type of determination when

7    it referred to not interfering by asserting a claim against DPH

8    and its agents in respect to the benefit plans "whether

9    terminated now or in the future."  And it is clear that that

10   was because of the limited life of the DPH entity and the fact

11   that the Court had already determined this issue.

12         Consequently, I believe that it is proper for me to

13   grant the motion in furtherance of the injunctions provided for

14   in the plan and the order confirming the plan.  I also find and

15   conclude that in addition to there being no evidence showing

16   that Delphi ever agreed not to terminate any benefits covered

17   by this plan, including disability benefits, it specifically

18   did not do so in paragraph 4 of the final OPEB order.  I

19   believe that order is in fact clear that until termination

20   Delphi will continue to honor the benefit plans, including the

21   disability plan, and that no claim need be filed for amounts

22   owing thereunder.  But the key caveat is "until termination."

23   This is made clear by the transcript references in the February

24   24th, 2009 and March 11th, 2009 hearings where, at page 100 of

25   the February 24th hearing transcript and page 52 of the March

1    11th transcript, the counsel for the official unsecured

2    creditors committee first proposed that while the benefits were

3    still in effect, i.e., while they had not yet been terminated,

4    beneficiaries would not have to file a claim for them to the

5    extent that they had already been earned, for example by visits

6    to the doctor, and the statement at page 52 of the March 11th

7    transcript by the debtors' counsel, Mr. Butler, confirming that

8    paragraph 4 was being added to the proposed OPEB order in

9    response to that point made by Mr. Rosenberg on behalf of the

10   official unsecured committee.  It's certainly consistent with

11   the Court's ruling, which is that the reservation language in

12   the applicable plans, including the plan that Mr. Sumpter is

13   suing under now, permitted termination and that there was no

14   separate vesting language as had existed for example in the

15   cases that he has cited, including Pfeifer v. Prudential

16   Insurance Company of America, 306 F.3d 1202, 1212 (2nd Cir.

17   2002) and as was referenced in, as a possibility, in Childs v.

18   Ceridian Corp. 95 F.3d 1505 (10th Cir. 1996).  I would not have

19   taken away in paragraph 4 of the final OPEB order the relief

20   that I had already found Delphi had a right to under that

21   reservation language.

22          So I will grant the motion by DPH and enjoin Mr.

23   Sumpter from pursuing the Indiana action against DPH or any of

24   its officers and agents, including its counsel, who are also

25   named defendants.  I had previously ruled in September that the

Page 78

1    other claim in that action, which was based on a different

2    theory premised upon a pre-confirmation and in fact arguably

3    prepetition, claim was separately barred by the plan

4    modification order and the discharge injunction.

5            One last point.  It is clear that Mr. Sumpter has

6    been paid all of the accrued disability up to the date of the

7    termination in March of 2012.  He seeks only forward-going

8    disability payments.  Given my ruling in 2009, which I've

9    reconfirmed just now, Delphi had an absolute right to terminate

10   those benefits and therefore there would be no claim for them,

11   even a claim under paragraph 4 of the final OPEB order.  So,

12   Ms. Haffey, you can email chambers that order.

13           MS. HAFFEY:  I will.  Thank you, Your Honor.

14           THE COURT:  All right.  Thank you.

15       (Hearing Adjourned 12:41 PM)

16

17

18

19

20

21

22

23

24

25

```
 1                          I N D E X

 2

 3                          RULINGS

 4     DESCRIPTION                                        PAGE

 5     HEARING re 22189:  GM Cross Motion to Adjourn        15

 6

 7     HEARING re 22075: Reorganized Debtors'

 8     Motion for an Order to Compel Compliance

 9     with, and to Implement, the Modified Plan,

10     Plan Modification Order and Related Documents        15

11

12     HEARING re Motion to Disallow Claims

13     Reorganized Debtors Motion for Order (1)

14     Enforcing Modification Procedures Order,

15     Modified Plan and Plan Modification Order

16     Injunction Against Curtis J. Duxbury and Carol

17     Duxbury, as Plaintiffs, in New York State

18     Court Personal Injury Action; and (II) Directing

19     Curtis Duxbury and Carol Duxbury to Dismiss

20     Action to Recover Upon Discharged and Expunged

21     Claim ("Duxbury Injunction Motion")                 15

22

23     HEARING re Motion for Order (I) Enforcing

24     (A) Modified Plan and Plan Modification

25     Order Injunctions, (B) OPEB Orders, and
```

Page 80

1    (C) Recoupment Order; (II) Enjoining James

2    Sumpter's Second Lawsuit Filed in the USDC

3    for the Southern District of Indiana and

4    Requiring James Sumpter to Dismiss the

5    Indiana Action with Prejudice; and (III)

6    Holding James Sumpter in Contempt and

7    Awarding Other Sanctions.                            77

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 81

1                          CERTIFICATION

2              I, Theresa Pullan, certify that the foregoing is a

3     correct transcript from the official electronic sound recording

4     of the proceedings in the above-entitled matter.

    Theresa     Digitally signed by Theresa Pullan

5     Pullan

                DN: cn=Theresa Pullan, o, ou,
email=digital1@veritext.com,
c=US
Date: 2013.10.28 12:42:29 -04'00'

6     AAERT Certified Electronic Transcriber CET**00650

7     Theresa Pullan

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22     Veritext

23     200 Old Country Road

24     Suite 580

25     Mineola, NY  11501