Timothy T. Brock, Esq.
Aaron M. Zeisler, Esq.
SATTERLEE STEPHENS BURKE & BURKE LLP
230 Park Avenue
New York, New York 10169
Tel: (212) 818-9200

*Counsel for the DIP Agent*
*JPMorgan Chase Bank, N.A.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| DPH HOLDINGS CORP., *et al.*, | Case No. 05-44481 (RDD) |
| Reorganized Debtors. | Jointly Administered |

**LIMITED OBJECTION OF JPMORGAN CHASE BANK, N.A., TO THE REORGANIZED DEBTORS' MOTION FOR FINAL DECREE AND ORDER AND TO THE REORGANIZED DEBTORS' CASE CLOSING STATUS REPORT**

JPMorgan Chase Bank, N.A., ("JPMC"), by its attorneys, Satterlee Stephens Burke & Burke LLP, hereby submits this Limited Objection (the "Objection"), to the Reorganized Debtors' *Motion for a Final Decree and Order Pursuant to 11 U.S.C. §§ 105, 350(a), and 1142, Fed. R. Bankr. P. 3022, and Local Bankr. R. 3022-1 Closing the Bankruptcy Cases and Providing Related Relief* (the "Motion"), which is currently set for a continued hearing on December 18, 2013 (the "Hearing"), and to the *Reorganized Debtors' Case Closing Status Report* (the "Final Report") filed on December 13, 2013.

In short, JPMC, in its role as DIP Agent, faces significant ongoing fees and expenses in connection with a June 2013 IRS Summons (involving review of over 50,000 documents, potentially additional electronic discovery, analysis and potential witness testimony) for which the Reorganized Debtors are currently obligated to

1

1828514_6

indemnity JPMC pursuant to Section 10.05(b) of the Reorganized Debtors' Credit Facility (as described below), Paragraph 13(d) of the DIP Facility Order (as described below), and Paragraph 16 of the Court's July 30, 2009 order of modification (the "Confirmation Order") through which the Reorganized Debtors and "New Delphi" emerged from bankruptcy. Indeed, JPMC's indemnification claims are superpriorty and "continue in full force and effect until the DIP Obligations are indefeasibly paid in full." DIP Facility Order, ¶¶ 5 & 13(d). Therefore, these claims must be paid in full before any other remaining claim is satisfied from the Reorganized Debtors' available resources.

Yet, despite previously acknowledging their indemnification obligations and paying recent invoices, the Reorganized Debtors in their December 13, 2013 Final Report now wish to avoid their indemnification obligations in violation of the Credit Facility and above-referenced orders by recasting their current obligations as "unknown, contingent indemnification obligations" that supposedly should be handled in a Delaware Wind-Down Proceeding in which all proceeds have already been assigned to GM. (Final Report at 7 n.5 & ¶ 19). Thus, absent the establishment of a funded trust (or some other alternative funding arrangement) sufficient to cover the Reorganized Debtors' indemnity obligations to JPMC, these obligations effectively will be subordinated and unsatisfied, and JPMC will be irreparably harmed.

In support of the Objection, JPMC respectfully represents as follows:

**BACKGROUND**

1. On October 8 and 14, 2005 (the "Petition Date"), Delphi Corporation and its affiliates (collectively, "Debtors") filed voluntary petitions for relief (the "Chapter 11 Cases") under Chapter 11, Title 11 of the United States Code, 11 U.S.C. § 1101 et seq., as amended (the "Bankruptcy Code").

2

2.      On January 25, 2008, the Court issued an order confirming Debtors' first amended joint plan of reorganization (as modified). On October 3, 2008, Debtors filed a motion under 11 U.S.C. § 1127 for an order, *inter alia*, approving certain modifications to the confirmed plan. On June 1, 2009, Debtors filed a supplement to their previous motion for approval of certain modifications to the confirmed plan (the "Modified Plan"). On July 30, 2009, the Court entered an order approving the Modified Plan (the "Confirmation Order"), which Debtors substantially consummated on October 6, 2009 (the "Effective Date").

3.      The final determination of the assets of the Debtors (the "Delphi Emergence Transaction") was set forth in the "Master Disposition Agreement" (the "MDA") dated July 26, 2009 between, *inter alia*, debtor Delphi Corporation and General Motors Company ("GM"), the terms of which were incorporated by the Modified Plan and Confirmation Order.

4.      The Reorganized Debtors' Debtor-in-Possession financing was initially authorized by the Court in its January 5, 2007 order (the "DIP Facility Order"). The Reorganized Debtors were thereafter sustained by further Debtor-in-Possession financing authorized by three successive extension orders to the DIP Facility Order entered over the course of the subsequent year and a half, the final version of which (the "Third DIP Extension Order"), entered on May 30, 2008, authorized the (Second) *Amended and Restated Revolving Credit, Term Loan and Guaranty Agreement* dated May 9, 2008 (the "Credit Facility").

5.      The latter Credit Facility enabled the Reorganized Debtors to ultimately emerge, along with the successor entity that would become Delphi Automotive LLP ("New Delphi"), through the July 2009 Delphi Emergence Transaction.

3

6. The DIP Facility Order recites JPMC as the relevant Administrative Agent for the participating lenders ("DIP Lenders"). (See DIP Facility Order, Preamble.)

7. The DIP Facility Order states that all "DIP Obligations" are to have superpriority status under the Bankruptcy Code, even ahead of all administrative expenses. (DIP Facility Order at ¶ 5.) Moreover, Paragraph 13(d) provides, in relevant part, that:

> the Superpriority Claims and all other rights and remedies of the Agent and the DIP Lenders granted by the provisions of this Order and the DIP Documents shall survive, and *shall not be modified, impaired or discharged* by (i) the entry of an order converting any of the Cases to a case under chapter 7, dismissing any of the Cases, terminating the joint administration of these Cases or *by any other act or omission* … [and] the DIP Documents shall continue in full force and effect until the DIP Obligations are indefeasibly paid in full.

Id. ¶ 13(d) (emphasis added).

8. Paragraph 5 of the Third DIP Extension Order states that the DIP Facility Order, along with the two intervening extension orders, are supplemented, but otherwise "continue in full force and effect" and, in particular, that "nothing herein shall adversely affect any of the rights and remedies granted to the Agent and the DIP Lenders or any other secured creditor under the DIP Order, which rights and remedies shall continue in full force and effect and shall be deemed applicable to the Second Amended and Restated DIP Credit Facility to the same extent applicable to the DIP Facility."

9. Similarly, paragraph 5 of the Third DIP Extension Order also reaffirms all of the "DIP Obligations" set forth in the DIP Facility Order and the two intervening extension orders (the "definition of 'DIP Obligations' contained in the DIP Order shall be deemed to include all obligations and indebtedness arising under, in

4

respect of, or in connection with the Second Amended and Restated DIP Credit Facility (including, without limitation, all "Obligations" as defined in the First Amended and Restated DIP Credit Agreement, as amended and restated by the Second Amended and Restated DIP Credit Agreement)").

10. JPMC was the Administrative Agent for the Credit Facility and, as such, thereby retained all of its rights and remedies as Agent from the original DIP Facility Order, including superpriority under the Bankruptcy Code for any and all DIP Obligations (including the Indemnity, as defined below) accruing to its benefit. See Credit Facility at 28 ("'Obligations' shall mean . . . (b) the due and punctual payment of the Fees and all other present and future, fixed or contingent, monetary obligations of the Borrower and the Guarantors to the Lenders and the Administrative Agent under the Loan Documents.").

11. Section 10.05(b) of the Credit Facility contains an indemnification clause (the "Indemnity") by which the "Borrower", debtor Delphi Corporation, guaranteed by its affiliated debtors as "Guarantors", indemnified JPMC as Administrative Agent as follows:

> (b) The Borrower shall indemnify the Agents, the Arrangers/Bookrunners, the Issuing Lenders and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including the reasonable fees, charges and disbursements of any counsel for any Indemnitee (it being understood that claims for expense reimbursement hereunder shall be accompanied by back-up documentation supporting such request), incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (iii) the execution or delivery of this Agreement or any agreement or instrument contemplated hereby, the performance by the parties hereto of their respective obligations hereunder or the consummation of the Transactions or any other transactions contemplated hereby, (iv) any Loan or Letter of Credit or the use of the proceeds therefrom (including any refusal by the Issuing Lender to honor a demand for payment under a Letter of Credit if the documents

5

presented in connection with such demand do not strictly comply with the terms of such Letter of Credit), (v) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by the Borrower or any of its Subsidiaries, or any Environmental Liability related in any way to the Borrower or any of its Subsidiaries, or (vi) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; provided, that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the bad faith, gross negligence or willful misconduct of such Indemnitee (or such Indemnitee's officers, directors, employees or affiliates).

12. Under the Modified Plan, the Credit Facility was incorporated by reference as the "DIP Credit Agreement" (Modified Plan at § 165) for which JPMC was designated as the "DIP Agent" (Id. at § 163).

13. Section 7.8 of the Modified Plan, in relevant part, restates the Borrower's and Guarantors' (post-Effective Date, as the "Reorganized Debtors") obligation under the DIP Credit Agreement's / Credit Facility's Indemnity to JPMC as DIP Agent, stating that the Reorganized Debtors shall remain obligated "(i) in respect of the indemnity to the DIP Agent to the extent contemplated under the DIP Credit Agreement and section 13(d) of the DIP Facility Order and (ii) for post Effective Date reasonable fees of the DIP Agent and out-of-pocket expenses related to the DIP Documents."

14. Section 16 of the Confirmation Order, in relevant part, likewise restates the Reorganized Debtors' obligation under the Indemnity to JPMC as DIP Agent.

15. Under the relevant terms of the MDA, GM has provided the Reorganized Debtors with up to $50 Million in "Emergence Capital" (Modified Plan at § 185) which is referred to in the Motion as the "GM Wind Down Facility". (Mot. at § 4).

6

16. The terms of the GM Wind Down Facility run until December 31, 2013. (Id.)

17. The Reorganized Debtors, using available cash and the available Emergence Capital in the GM Wind Down Facility, had been intending on funding a trust to settle certain Environmental Claims. (Mot. at § 21).

18. The Reorganized Debtors note that "Additional reserve or security accounts will be established to fund other necessary wind down expenses, including taxes, professional fees, security required by applicable law for the dissolution of DPH Holdings, and other administrative costs. Such accounts will be funded by the Reorganized Debtors' unrestricted cash and proceeds from the GM Wind Down Facility." (Id.)

19. The Reorganized Debtors, through their form of order entered by the Court on August 6, 2013, have reiterated their intent to address any Remaining Claims through, where necessary, the establishment of funded trusts in order to close these Chapter 11 Cases: "The distributions described in the Motion, including the funding of trusts and reserve accounts for payments associated with the Remaining Claims and any other obligations of the Reorganized Debtors, to be determined, in the Reorganized Debtors' sole discretion, by this Court and/or through the dissolution of DPH Holdings under applicable law, satisfy the requirements of the Modified Plan, the Modification Approval Order, and the MDA." (8-6-13 Ord. at § F).

20. By that token, the failure by the Reorganized Debtors to address any of their valid obligations through the establishment of a funded trust where necessary would appear to constitute a failure to satisfy the requirements of the Modified Plan,

1828514_6

Confirmation Order and the MDA, thereby impeding the full administration of the Reorganized Debtors' estates and the closure of these Chapter 11 Cases.

21.     The Reorganized Debtors have stated that, should the Motion be granted, they intend to dissolve DPH Holdings and the Trust and any residual assets will ultimately re-vest in "New Delphi".  (Mot. at §§ 23-27).

## JPMC'S LIMITED OBJECTION

22.     On June 11, 2013, JPMC, in its role as DIP Agent, was served with an IRS Summons (the "IRS Subpoena") seeking extensive documentation from JPMC concerning the Delphi Emergence Transaction.[1]

23.     In an SEC Form 10-Q for Delphi Automotive PLC, the company disclosed that the IRS is conducting an investigation.  See SEC Form 10-Q for Delphi Automotive PLC filed 11-5-13 at 19 ("The Company believes the [IRS] may assert that Delphi Automotive LLP [New Delphi], and as a result Delphi Automotive PLC, should be treated as a domestic corporation for U.S. federal income tax purposes, retroactive to the Acquisition Date. . . . The IRS is currently reviewing whether Section 7874 applies to Delphi Automotive LLP's acquisition of the automotive supply and other businesses of the Predecessor.").

24.     JPMC is taking the brunt of the U.S. government's current discovery efforts to scrutinize the Delphi Emergence Transaction that gave birth to New Delphi and allowed the Reorganized Debtors to emerge from bankruptcy.

25.     JPMC has already incurred some $125,000 in counsel fees in complying with the terms of the IRS Subpoena, of which approximately $95,000 has

---

[1] JPMC will make a copy of the IRS Subpoena available to the Court upon request with provision for appropriate confidentiality.

been paid by the Reorganized Debtors, and these fees are continuing (the "<u>Subpoena Fees</u>").

26. JPMC's Subpoena Fees comprise certain "liabilities and related expenses, including the reasonable fees, charges and disbursements of any counsel for any Indemnitee" incurred by an "investigation" that Reorganized Debtors have explicitly provided their Indemnity to JPMC under section 10.05(b) of the Credit Facility.

27. JPMC's obligations under the IRS Subpoena are ongoing and will continue both after the terms of the GM Wind Down Facility are set to expire on December 31, 2013, and after these Chapter 11 Cases are slated to be closed through the Court's granting of the Reorganized Debtors' present Motion. JPMC will have to expend significant resources to analyze information, review and respond to electronic discovery, prepare for witness depositions and continue to respond to IRS requests – all of which JPMC would not have incurred but for its role as DIP Agent.

28. As noted above, the Reorganized Debtors' obligation to provide JPMC with this Indemnity is an ongoing obligation that cannot be extinguished. Indeed, the language of the DIP Facility Order makes clear that reimbursement for JPMC's Subpoena Fees, along with all other rights and remedies of JPMC, "shall survive, and shall not be modified, impaired or discharged." <u>See</u> DIP Facility Order, ¶ 13(d).

29. Moreover, Paragraph 13(a) of the DIP Facility Order protects the superpriority status of JPMC's Indemnity by providing that no claim can receive a higher priority than that of the Indemnity claim and be allowed for payment while the Indemnity obligation remains outstanding. <u>Id.</u> ¶ 13(a). Here, however, the relief the Reorganized Debtors seek would allow – and make provision for payment of – the claims enumerated

9

in the Final Report, thereby effectively granting those claims a priority superior to the Indemnity Claim.  Clearly, this would violate paragraph 13(a) of the DIP Facility Order.

30. Accordingly, the Reorganized Debtor's recently-filed Final Report is objectionable because, despite the Reorganized Debtors' awareness of the IRS Subpoena, JPMC's Subpoena Fees, their payment of such Subpoena Fees and ongoing negotiations with JPMC over the Indemnity and the Subpoena Fees, the Final Report takes the position that such fees are "unknown, contingent indemnification obligations" that will be handled in a Delaware Wind-Down Proceeding in which all proceeds have already been assigned to GM.  (Final Report at 7, n.5).

31. Indeed, purporting to administer JPMC's fees and expenses in the Delaware Wind-Down Proceeding is akin to saying that JPMC's claims are disallowed and will not be paid.  For instance, Reorganized Debtors state in the Final Report that "*because it is unlikely that any assets will be available for distribution in the Delaware Proceeding*, the Reorganized Debtors attempted to reach settlements in pending litigations; litigation that could not be settled prior to dissolution will be resolved in the Delaware Proceeding."  Id. ¶ 17 (emphasis added).  Moreover, the Final Report states that "[t]he proceeds from assets being administered in the Delaware Proceeding have been assigned to GM pursuant to the GM Settlement in repayment of amounts funded by GM under the GM Wind Down Facility."  Id. ¶ 19.

32. Worse, despite their awareness of their obligations under the Indemnity, the Reorganized Debtors have simply refused to make provision to pay

10

JPMC's mounting Subpoena Fees and expenses arising from the IRS Subpoena, averring poverty,[2] while making provisions for the payment of claims of lesser priority.

33. Should these Chapter 11 Cases be closed without first establishing a trust sufficient to cover the Reorganized Debtors' Indemnity obligations to JPMC, the Indemnity set forth in the Credit Facility will be breached and the Reorganized Debtors will, *inter alia*, be in violation of Section 13 of the DIP Facility Order and Section 16 of the Confirmation Order.

34. Moreover, allowing a major chapter 11 debtor to simply renege on its agreement to pay valid administrative expenses (which were rightly granted superpriority under Section 364 of the Bankruptcy Code) incurred by its DIP Agent on its behalf would not only be manifestly unfair—the IRS Subpoena was issued because of the Delphi Emergence Transaction, after all—but could erode the confidence of lenders in providing Debtor-in-Possession financing.

35. A trust is therefore necessary, and these Chapter 11 Cases should remain open until a trust is created and adequately funded because the Reorganized Debtors have failed to properly account for their obligation to provide an Indemnity for JPMC, not least for JPMC's continuing fees and expenses in complying with the IRS Subpoena.

36. Such a trust, and the funding thereof, need not be open-ended: JPMC has proposed, in discussions with the Reorganized Debtors, a (capped) budget, and would return any excess payments made over that budget.

---

[2] Presumably, such resistance on the part of the Reorganized Debtors has arisen due to GM's likely resistance at making such payments. With the closure of the Chapter 11 Cases, any obligation on the part of GM to continue to provide Emergence Capital through the GM Wind Down Facility will also end, thereby terminating what apparently has been one of the main sources of funding for reimbursing JPMC for its previously-incurred Subpoena Fees.

11

37.     However, absent a trust or similar payment guaranty, JPMC, the DIP Agent, will be damaged if the Reorganized Debtors are able to close these Chapter 11 Cases without making any provision for the payment of JPMC's current and future superpriority administrative expenses arising under the Indemnity, most notably from the Subpoena Fees incurred by JPMC's ongoing compliance with the IRS Subpoena.

## CONCLUSION

38.     Until this dispute is resolved, these Chapter 11 Cases cannot be characterized as "fully administered" and are not susceptible to closure. JPMC therefore respectfully requests that the Court refuse to issue a Final Decree closing these Chapter 11 Cases unless the Reorganized Debtors establish a specific trust, as generally contemplated by them in their Motion (Mot. at § 21), for the post-closing funding of the Indemnity for JPMC, not least for the Subpoena Fees, in an amount no less than $585,000,[3] with provision to protect the Reorganized Debtors such that any unspent funds remaining after the final conclusion of the IRS Subpoena would be returned to the estate's designee.

**WHEREFORE**, JPMC respectfully requests that this Court (a) sustain the present Limited Objection and decline to: (i) authorize the payment of claims of lesser priority than the superpriority Indemnity claim of JPMC, or (ii) issue a Final Decree

---

[3] JPMC has based its $585,000 estimate on the following considerations: first, negotiated search terms resulted in a universe of approximately 170,000 documents to review, of which JPMC is undertaking to review 55,000 as an initial step; second, in light of the IRS reserving its rights to request that JPMC run additional search terms and to review the results, it seems probable that additional electronic discovery will need to be reviewed and provided; third, it is possible that JPMC will have to offer deposition testimony; and, fourth, if this litigation were to proceed to trial, it is possible that JPMC will have to offer trial testimony.

JPMC reserves the right to increase this demand to include the fees and costs of this Limited Objection and related activities.

closing these Chapter 11 Cases unless a trust is established by the Reorganized Debtors to fund their obligation to provide an Indemnity to JPMC, as set forth above; and (b) grant such other or additional relief as the Court deems just.

Dated: New York, New York
December 16, 2013

SATTERLEE STEPHENS BURKE & BURKE LLP

By:  /s/ Timothy T. Brock
    Timothy T. Brock, Esq.
    Aaron M. Zeisler, Esq.
230 Park Avenue, 11th Floor
New York, New York 10169
Tel: (212) 818-9200
Fax: (212) 818-9606
tbrock@ssbb.com
azeisler@ssbb.com

*Counsel for the DIP Agent*
*JPMorgan Chase Bank, N.A.*