# UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: <br><br> DPH HOLDINGS CORP., <u>et al.</u>, <br><br> Reorganized Debtors. <br><br>――――――――――――――――――――― <br><br> SOLUS ALTERNATIVE ASSET MANAGEMENT LP and ANGELO GORDON & CO, L.P., <br><br> Plaintiffs, <br><br> vs. <br><br> DELPHI AUTOMOTIVE PLC and DELPHI AUTOMOTIVE LLP, <br><br> Defendants. | Chapter 11 <br><br> Case No. 05-44481 (RDD) <br> (Jointly Administered) <br><br> **COMPLAINT FOR DECLARATORY RELIEF AND ANTICIPATORY BREACH OF CONTRACT** <br><br><br><br><br><br> Adversary No. _____ |

Plaintiffs, Solus Alternative Asset Management LP ("<u>Solus</u>") and Angelo, Gordon & Co., L.P. ("<u>Angelo Gordon</u>"), on behalf of certain funds they manage or control (collectively, "<u>Plaintiffs</u>"), in their capacities as holders of general unsecured claims against former Delphi Corporation and certain of its subsidiaries (the "<u>Debtors</u>" or "<u>Old Delphi</u>"), file this Complaint against defendants Delphi Automotive PLC and Delphi Automotive LLP (collectively, "<u>Defendants</u>" or the "<u>Company</u>") pursuant to 11 U.S.C. §§ 105(a), 1141(a), and 1142, 28 U.S.C. § 2201 and Rules 7001(1) and 7001(9) of the Federal Rules of Bankruptcy Procedure. In support of their Complaint, Plaintiffs allege as follows:

## I.    NATURE OF THIS ACTION

1.    This is an action to compel the Company to comply with its obligations to Old Delphi's unsecured creditors under the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors-In-Possession (As Modified) (the "Modified Plan").[1]  Although billions of dollars have been distributed to Old Delphi's creditors (who became owners of the Company) since the Modified Plan was confirmed in 2009, Plaintiffs have not received anything.  The Modified Plan provided that Old Delphi's general unsecured creditors will receive a recovery as soon as $7.2 billion is distributed to the Company's members.  As of November 26, 2014 approximately $6.754 billion in distributions have been made and, based on the Company's authorized share repurchase program and current rate of dividend payment, the $7.2 billion threshold will be exceeded in the first half of 2015.

2.    An unrelated lawsuit was brought in this Court by other unsecured creditors in December 2011.  The crux of that claim was whether the member's receipt of equity in Delphi Automotive PLC in exchange for equity of Delphi Automotive LLP through an initial public offering of the Company's stock should count toward the $7.2 billion threshold.  In that lawsuit, in addition to the equity exchange in the IPO, the Company took the position that $4.4 billion paid to redeem equity in the Company owned by General Motors Company ("GM") and the Pension Benefit Guaranty Corporation ("PBGC") do not count towards the distribution threshold under the Modified Plan.  The Court dismissed that action in March 2012.  The Court did not resolve the issue raised by this Complaint and stated that "I'm not dismissing the complaint as a

---

[1] Capitalized terms not otherwise defined herein have the meanings ascribed to such terms in the Modified Plan, which is attached hereto as Exhibit A.

2

whole with prejudice, but only in respect to that component of it that deals with the IPO."[2] In addition the Court noted that if the Company "make[s] distributions out of their assets to the owners which, when coupled with the payments that have already been made to GM and PBGC come close to or go over the 7.2 billion-dollar-threshold," unsecured creditors could come back and seek declaratory relief.[3] Plaintiffs accordingly bring this action.

3. As of November 26, 2014, the Company has distributed approximately $6.754 billion to its members, including GM and PBGC, through redemptions, repurchases, and dividends. The $7.2 billion threshold will be exceeded as soon as the next $446 million in distributions is made, whether through the Company's payment of dividends and/or additional share repurchases under the Company's authorized program or other distributions.

4. Old Delphi filed for bankruptcy in October 2005. Unsecured creditors have yet to receive their share of recoveries. The Company's position is that they are not entitled to share because the payments to GM and PBGC do not count as "Distributions" as technically defined in the Company's operating agreement [4] The Modified Plan did not specify any particular definition of "distributions" and the order confirming the Modified Plan (the "Confirmation Order") specifically prohibited such shenanigans.[5] Defendants should be compelled to comply with their obligations and provide unsecured creditors with their long-awaited distributions.

---

[2] See Transcript of Hearing on March 22, 2012, at 141:18-24, attached hereto as Exhibit B

[3] See Id. at 140:8-13.

[4] A copy of the form operating agreement of DAL (f/k/a DIP Holdco 3, LLC) relied upon by the Defendants is attached hereto as Exhibit C.

[5] A copy of the Confirmation Order, dated July 30, 2009, is annexed hereto as Exhibit D.

3

## II.    THE PARTIES

*The Plaintiffs*

5. Plaintiff Solus is a limited partnership organized under the laws of the State of Delaware, with its principal place of business in New York. Solus manages accounts that either directly or beneficially hold general unsecured claims against the Debtors.

6. Plaintiff Angelo, Gordon & Co., L.P. is a limited partnership organized under the laws of the State of Delaware, with its principal place of business in New York. Angelo Gordon manages accounts that either directly or beneficially hold general unsecured claims against the Debtors.

*The Defendants*

7. Defendant Delphi Automotive LLP ("DAL") is a limited liability partnership incorporated on August 19, 2009 under the laws of England and Wales with its principal place of business in Troy, Michigan. DAL was formerly known as DIP Holdco 3, LLC, which acquired certain assets and subsidiaries of Old Delphi.

8. Defendant Delphi Automotive PLC ("DAP") is a public limited company formed under the laws of Jersey, Channel Islands, on May 19, 2011. DAP was formed as a shell holding company and acquired the membership interests in DAL in connection with the initial public offering of DAP common stock on November 22, 2011.

## III.    JURISDICTION AND VENUE

9. This action arises in and from the chapter 11 cases filed with this Court commencing in October 2005 by the Debtors (the "Bankruptcy Cases").

10. On December 18, 2013, the Court entered the Final Decree And Order Pursuant To 11 U.S.C. § 350(a) And Fed. R. Bankr. P. 3022 And Local R. Bankr. P. 3022-1 Closing Chapter 11 Cases Of DPH Holdings Corp., Delphi Medical Systems Colorado Corporation,

4

Delphi Medical Systems Texas Corporation, Delphi Mechatronic Systems, Inc., And Delphi Automotive Systems LLC (Docket No. 22254 in Chapter 11 Case No. 05-44481 (RDD) Bankr. S.D.N.Y.) (the "Final Decree").

11. The Final Decree expressly provided that "[n]one of the entry of this final decree and order, the dissolution of DPH Holdings or any of the other relief contemplated by this final decree and order, the dissolution of DIPH Holdings or any of the other relief contemplated by this final decree and order or the Case Closing Order shall prejudice or otherwise limit the rights of holders of General Unsecured Claims to receive payment of the General Unsecured MDA Distribution (as such terms are defined in the Modified Plan) in accordance with the terms of the Modified Plan." (Id. ¶ 3).

12. Concurrently with the filing of this Complaint, Plaintiffs have filed a motion, pursuant to sections 105(a) and 350(b) of the Bankruptcy Code, to re-open the Bankruptcy Cases for the limited purpose of prosecuting this adversary proceeding.

13. This Court has jurisdiction pursuant to 28 U.S.C. §§ 157(b) and 1334(b), Article XIII(c) of the Modified Plan, and the Confirmation Order. This is an action to enforce, and for damages in breach of obligations under, the Modified Plan, specifically the provisions of the Modified Plan governing "General Unsecured MDA Distributions." Article XIII(c) of the Modified Plan provides that this Court shall have exclusive jurisdiction over all matters related to the Modified Plan, specifically including "any and all disputes arising from or relating to the distribution or retention of the General Unsecured MDA Distributions, or other consideration under this Plan." The Confirmation Order provides for the same broad retention of jurisdiction. See Confirmation Order at 78 (¶ 56) ("Retention Of Jurisdiction. Pursuant to sections 105(a) and 1142 … and notwithstanding the entry of this order or the occurrence of the effective date, but

5

subject to the jurisdiction provisions of the MDA Documents, the Court shall retain exclusive jurisdiction as provided in the Modified Plan over all matters arising out of, and related to, the Chapter 11 Cases and the Modified Plan to the fullest extent permitted by law, including, among other items and matters, jurisdiction over those items and matters set forth in Article XIII of the Modified Plan.").

14. Venue in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

15. This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (L), and (O).

### IV. FACTUAL BACKGROUND

**A. From The Debtors' Bankruptcy Filing To The Modified Plan**

16. Commencing on October 8, 2005, Old Delphi filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code with this Court.

17. In 2007, the Debtors filed their proposed "First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates" (the "Original Plan"), which provided for holders of general unsecured claims – estimated to total more than $3.2 billion – to be paid in full with accrued interest.

18. On January 25, 2008, the Court entered an order confirming the Original Plan. The Debtors, however, were unable to consummate the exit financing needed to finance distributions, and the Original Plan never became effective.

19. On June 1, 2009, the Debtors proposed modifications to the Original Plan providing, among other things, that distributions to general unsecured creditors would be drastically reduced. Specifically, the proposed modifications entitled unsecured creditors to receive just 3% of distributions made by the acquiror of the Debtors' assets to its members in excess of $7.2 billion, up to an aggregate maximum distribution to unsecured creditors of just

6

$180 million – an amount significantly less than the payment in full proposed in the Original Plan.

20. The Creditors Committee and unsecured creditors objected to the Debtors' proposed modifications, and the class of unsecured creditors rejected the proposed amended plan. Ultimately, a compromise was reached on the eve of the confirmation hearing, and the Debtors further amended the plan, agreeing to increase the maximum potential distributions to unsecured creditors from $180 million to $300 million (still less than 10 cents on the dollar of the estimated unsecured claims pool). The compromise was embodied in the Modified Plan.

21. In particular, section 5.3 of the Modified Plan provided for holders of general unsecured claims against the Debtors – including Plaintiffs – to receive their "Pro Rata share of the proceeds of the General Unsecured MDA Distribution." Modified Plan § 5.3. The General Unsecured MDA Distribution was defined as follows:

> **1.102 "General Unsecured MDA Distribution"** means, if and to the extent Company Buyer makes distributions to its members in accordance with the Company Buyer Operating Agreement, as described in section 3.2.3 of Master Disposition Agreement, in excess of $7.2 billion, an amount equal to $32.50 for every $67.50 so distributed in excess of $7.2 billion; provided, however, that in no event shall the General Unsecured MDA Distribution exceed $300,000,000 in the aggregate.

Ex. A (Modified Plan) § 1.102.

22. The Confirmation Order contemplated that certain agreements needed to be finalized, but the Court carefully protected the interests of general unsecured creditors who were not privy to such negotiations: "After the Effective Date, the MDA Documents may be modified, amended, or supplemented by the parties thereto in accordance with the terms thereof without further order of the Court; provided, however, that neither prior to or after the Effective Date shall any provision in the Master Disposition Agreement or Company Buyer Operating

7

Agreement regarding distributions to holders of general unsecured claims of the Debtors be amended, modified, or waived to reduce, eliminate, or otherwise affect such distributions." Ex. E (Confirmation Order) ¶ 64(g), at 87.

**B.    Obligations Under the Modified Plan To Make Distributions For The Benefit Of General Unsecured Creditors**

23.    For all purposes relevant to this Complaint, DAL is the "Company Buyer" for purposes of the Modified Plan, and DAP assumed DAL's obligations to make distributions for the benefit of general unsecured creditors under the Modified Plan.

24.    The Modified Plan referenced the Master Disposition Agreement dated as of July 26, 2009 (as subsequently amended and executed on August 5, 2009, as of July 30, 2009, the "MDA"), a copy of which is attached hereto as Exhibit E. The parties to the MDA included Old Delphi, DAL (f/k/a DIP Holdco 3, LLC), and GM. The MDA provided for Old Delphi to transfer substantially all of its businesses and assets to DAL. Section 3.2.3 of the MDA expressly obligates the Company to make any payments required for the benefit of general unsecured creditors under the Modified Plan.

25.    The Modified Plan also referenced the form of DAL's Operating Agreement, which was to set forth the governance and operating procedures of DAL. The Operating Agreement provided:

> In accordance with Section 3.2.3 of the MDA, if the Asset Purchase Agreement is consummated pursuant to the Plan of Reorganization, once an aggregate of $7,200,000,000 has been paid as Distributions to the Holders pursuant to this Agreement, the Company shall pay an amount equal to $32.5 to a disbursement agent on behalf of the unsecured creditors of Old Delphi for every $67.5 in excess of such $7,200,000,000 that is distributed to the Holders pursuant to Section 5.1(a)(iv), up to a maximum amount of $300,000,000.

Ex. D (Operating Agreement) § 5.6, at 26.

8

26. Following entry of the Confirmation Order on July 30, 2009, the Modified Plan became effective and was substantially consummated on or about October 6, 2009.

**C.     DAL and DAP Distributions To Members**

27. As part of DAL's acquisition of Old Delphi, DAL issued membership interests to its owners. Those membership interests were exchanged for common stock of DAP in November 2011.

28. Since March 2011, the Company has made distributions from the Company's property to its members in the form of share redemptions, repurchases, and dividends. As of November 26, 2014, distributions to members totaled approximately $6.754 billion. The Company is in the process of repurchasing shares under an authorized program pursuant to which it has repurchased approximately $531 million of shares as of October 23, 2014, with $469 million in shares remaining to be purchased under the program. The Company also continues to make quarterly dividends, currently at the rate of $0.25 per share. The $7.2 billion threshold will be exceeded as soon as the next $446 million in distributions is made, whether through the payment of dividends and/or the remaining share repurchases under the authorized program, or through other distributions.

29. On or about March 31, 2011, DAL made a distribution of approximately $4.4 billion to GM and PBGC on account of their membership interests. Specifically, DAL redeemed all of the 1,750,000 Class A membership interests owned by GM and all of the 100,000 Class C membership interests owned by the PBGC for $3.8 billion and $594 million, respectively. This distribution was funded by DAL's existing cash and from the proceeds of a credit facility secured by DAL's assets.

9

30. In October 2011, DAL repurchased 10,005 Class B membership interest units at a cumulative cost of approximately $179 million. DAL also made a distribution of approximately $95 million on December 5, 2011 to its members.

31. On information and belief, the foregoing payments were all made in accordance with the Operating Agreement.

32. The foregoing payments were made from the Company's property and constitute "distribution[s] to its members" under the Modified Plan.

33. The 2011 distributions described above totaled $4.668 billion, leaving a shortfall of $2.532 billion to meet the threshold for the General Unsecured MDA Distribution.

34. DAP has made a number of share repurchases since 2012: (i) a $300 million authorized program in January 2012 that was completed in September 2012, (ii) a $750 million authorized program in September 2012 that was completed in April 2014, and (iii) a $1.0 billion authorized program in January 2014 of which approximately $531 million of shares had been repurchased as of October 23, 2014, with $469 million remaining. See DAP, Form 10-Q, filed October 24, 2014, at 21.

35. DAP also introduced an initial dividend at $0.17 per quarter in the first quarter of 2013 and subsequently raised the dividend to $0.25 per quarter in the first quarter of 2014; the dividend has been paid quarterly since 2013. See id. ("In January 2014, the Board of Directors increased the annual dividend rate from $0.68 to $1.00 per ordinary share.").

36. On information and belief, the foregoing dividends were made in accordance with the Company's governing documents.

37. As a result of the foregoing, distributions made to members from the Company's property total approximately $6.754 billion as of November 26, 2014. Attached as Exhibit F hereto is a list of the Company's distributions as of November 26, 2014.

38. DAP has stated that the current quarterly dividend will grow in line with earnings growth and has never indicated it will stop paying quarterly dividends. Additionally, DAP has stated that share repurchases will accelerate from second quarter 2014 levels to the extent it is not active in the M&A market. Thus, with the quarterly dividends that DAP will pay of $0.25 per quarter in each of the quarters subsequent to June 30, 2014, and the $469 million in remaining share repurchases as of October 23, 2014, the Company likely will exceed the $7.2 billion threshold in early 2015.

39. Despite that the $7.2 billion threshold will be exceeded soon, the Company continually takes the position in its public SEC filings that it does not believe it is likely that it will ever exceed the $7.2 billion threshold and has therefore made no reserves for the payment of the General Unsecured MDA Distribution. See DAP, Form 10-Q, filed October 24, 2014, at 21 ("Under the terms of the Acquisition and the Fourth LLP Agreement, if cumulative distributions to the members of Delphi Automotive LLP under certain provisions of the Fourth LLP Agreement exceed $7.2 billion, Delphi, as disbursing agent on behalf of DPHH, is required to pay to the holders of allowed general unsecured claims against DPHH $32.50 for every $67.50 in excess of $7.2 billion distributed to the members, up to a maximum amount of $300 million. This contingency is not considered probable of occurring as of September 30, 2014 and accordingly, no reserve has been recorded."); Reorganized Debtors' Case Closing Status Report, at ¶ 11, filed Dec. 13, 2013 (Docket No. 22245 in Chapter 11 Case No. 05-44481 (RDD) Bankr.

11

S.D.N.Y.) ("As of the date hereof [12/13/13], New Delphi has not made *any* distributions pursuant to section 3.2.3 of the MDA.") (emphasis added).

40. In a letter dated December 4, 2014 (attached hereto as <u>Exhibit G</u>), Plaintiffs asked the Company to confirm that the General Unsecured MDA Distribution will begin to be paid after an additional $446 million is distributed to members (at which point the threshold would be met). The Company ignored the letter and has not provided any response. This lawsuit followed.

**COUNT ONE – DECLARATORY JUDGMENT**

**(Against all Defendants Pursuant to 28 U.S.C. 2201
and Fed. R. Bankr. P. 7001(9) and 7001(1))**

41. Plaintiffs incorporate by reference all of the foregoing paragraphs, as though fully alleged herein.

42. Pursuant to 28 U.S.C. § 2201, an actual, justiciable controversy exists with respect to Defendants' obligations to make the General Unsecured MDA Distribution. Based on distributions the Company has made and distributions it has committed to make, the threshold will be exceeded imminently. The Modified Plan and the Confirmation Order require payment of the General Unsecured MDA Distribution at that time. Defendants disagree that some or all of the distributions that have been made to members count towards the threshold and have stated they do not intend to make the General Unsecured MDA Distribution.

43. Pursuant to section 1141(a) of the Bankruptcy Code, "the provisions of a confirmed plan bind the debtor … and any creditor … whether or not such creditor … has accepted the plan." 11 U.S.C. § 1141(a).

44. Pursuant to section 1142(a) of the Bankruptcy Code, "[n]otwithstanding any otherwise applicable non-bankruptcy law … the debtor or any entity organized or to be

12

organized for the purpose of carrying out the plan shall carry out the plan and shall comply with any orders of the court."

45. Pursuant to section 1142(b) of the Bankruptcy Code, "[t]he Court may direct the debtor and any other necessary party to … perform any other act … that is necessary for the consummation of the plan."

46. Section 14.1 of the Modified Plan provides that it will be binding upon all parties, including, "the Debtors, the Reorganized Debtors, all current and former holders of Claims, all current and former holders of Interests, and all other parties-in-interest and their respective heirs, successors, and assigns." Ex. A (Modified Plan) § 14.1.

47. Plaintiffs and Defendants are parties to and/or bound by the Modified Plan as well as the Confirmation Order.

48. Nothing in the Operating Agreement or MDA modifies the rights of general unsecured creditors to receive their share of the General Unsecured MDA Distribution. To the extent such agreements have been amended or modified to permit distributions to be made to members in a way that reduces, eliminates, or otherwise affects general unsecured creditors' rights, such amendments or modifications are ineffective against Plaintiffs and other general unsecured creditors.

49. Defendants' position in respect of the General Unsecured MDA Distribution violates the Modified Plan, the Confirmation Order, and sections 1141(a) and 1142(a) of the Bankruptcy Code.

50. As a result of the foregoing, Plaintiffs seek a declaratory judgment pursuant to 28 U.S.C. § 2201 that:

    (a)    DAL's redemption of all of the 1,750,000 Class A membership interests owned by GM and all of the 100,000

13

    Class C membership interests owned by the PBGC for $3.8 billion and $594 million, respectively, DAL's repurchase of 10,005 Class B membership interest units at a cumulative cost of approximately $179 million and DAL's distribution of approximately $95 million on December 5, 2011 to its members constitute "distribution[s] to its members" of at least $4.668 billion under the Modified Plan;

(b) DAP's share repurchases since 2012, specifically (i) a $300 million authorized program in January 2012 that was completed in September 2012, (ii) a $750 million authorized program in September 2012 that was completed in April 2014, and (iii) a $1.0 billion authorized program in January 2014 of which approximately $531 million of shares had been repurchased as of October 23, 2014 (with $469 million remaining) constitute "distribution[s] to its members" of $1.581 billion under the Modified Plan;

(c) the payment by DAP of an initial dividend at $0.17 per quarter in the first quarter of 2013 and the subsequent payment of a dividend at $0.25 per quarter commencing in the first quarter of 2014 and continuing each quarter thereafter constitute "distribution[s] to its members" under the Modified Plan;

(d) failing to treat the transfers described herein as a distribution to the members of DAL under the Modified Plan, and failing to make any associated General Unsecured MDA Distribution, would be a breach of the Modified Plan and a violation of the Confirmation Order; and

(e) Plaintiffs are entitled to recover their attorney fees, costs, and expenses, as well as such other and further relief as the Court may deem just and proper.

### COUNT TWO – ANTICIPATORY BREACH OF CONTRACT

**(Against all Defendants For Breach of the Modified Plan)**

51. Plaintiffs incorporate by reference all of the foregoing paragraphs, as though fully alleged herein.

14

52. The Modified Plan, as confirmed by the Confirmation Order, constitutes a contract among the Debtors, their creditors and other parties in interest, including the Defendants and Plaintiffs, as holders of general unsecured claims.

53. Defendants' transfers described herein constitute distributions to members of DAL under the Modified Plan, in accordance with the Operating Agreement, as described in the MDA, and thus the amount of such transfers are required to be applied towards the $7.2 billion threshold to trigger a General Unsecured MDA Distribution.

54. The aggregate amount of distributions to the members of the Company was not less than $6.754 billion as of November 26, 2014 and will exceed $7.2 billion as soon as the next $446 million in distributions is made. Based on the Company's current rate of dividend payments and share repurchases under its authorized share repurchase program, the threshold will likely be met in early 2015.

55. In anticipatory breach of the Modified Plan, Defendants have stated they will not make any General Unsecured MDA Distribution in the foreseeable future or make any reserve therefore for the benefit of the holders of general unsecured claims of Old Delphi.

56. Plaintiffs have performed any obligations that they were required to perform under the Modified Plan.

57. As a direct and proximate result of Defendants' anticipatory breach of the Modified Plan, Plaintiffs will have sustained damages in an amount to be proven at trial, and are further entitled to recover interest on their damages at the maximum allowable rate, as well as their attorney fees, costs, and expenses incurred in this action.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1. As to the First Count, for a declaratory judgment as follows:

15

    (a)    (i) DAL's redemption of all of the 1,750,000 Class A membership interests owned by GM and all of the 100,000 Class C membership interests owned by the PBGC for $3.8 billion and $594 million, respectively, (ii) DAL's repurchase of 10,005 Class B membership interest units at a cumulative cost of approximately $179 million, and (iii) DAL's distribution of approximately $95 million on December 5, 2011 to its members constitute "distribution[s] to its members" of at least $4.668 billion under the Modified Plan;

    (b)    DAP's share repurchases since 2012, specifically: (i) a $300 million authorized program in January 2012 that was completed in September 2012, (ii) a $750 million authorized program in September 2012 that was completed in April 2014, and (iii) a $1.0 billion authorized program in January 2014 of which $531 million of shares had been repurchased as of October 23, 2014 (with $469 million remaining) constitute "distribution[s] to its members" under the Modified Plan;

    (c)    the payment by DAL and/or its successor DAP of an initial dividend at $0.17 per quarter in the first quarter of 2013 and the subsequent payment of a dividend at $0.25 per quarter commencing in the first quarter of 2014 and continuing each quarter thereafter constitute "distribution[s] to its members" under the Modified Plan;

    (d)    Failing to treat the transactions described herein as a distribution to the members of the Company under the Modified Plan, and failing to make any associated General Unsecured MDA Distribution, would be a breach of the Modified Plan and a violation of the Confirmation Order; and

    (e)    Plaintiffs are entitled to recover their attorney fees, costs and expenses, as well as such other and further relief as the Court may deem just and proper.

2.    As to the Second Count, for damages in an amount to be proven at trial, as well as interest on such damages at the maximum allowable rate, and recovery of Plaintiffs' attorney fees, costs, and expenses incurred in this action.

3.    For such other and further relief as the Court may deem just and proper.

DATED: New York, New York
December 29, 2014

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By: */s/ Susheel Kirpalani*
Susheel Kirpalani
James C. Tecce
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Fax: (212) 849-7100
susheelkirpalani@quinnemanuel.com
jamestecce@quinnemanuel.com

*Attorneys for Plaintiffs Solus Alternative Asset Management LP and Angelo, Gordon & Co., L.P.*