# Exhibit B

Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 05-44481(RDD)

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

5   In the Matter of:

6   DPH HOLDINGS CORP, et al.

7            Debtors.

8   - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

9   Adversary No. 09-01510 (RDD)

10  In the Matter of:

11  ACE AMERICAN INSURANCE COMPANY, et al.,

12  V.

13  DELPHI CORPORATION, et al.,

14  - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

15  Adversary No.  11-02934(RDD)

16  In the Matter of:

17  CAI DISTRESSED DEBT OPPORTUNITY MASTER FUND LTD.,

18  V.

19  DELPHI AUTOMOTIVE PLC, et al.,

20  - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

21                  United States Bankruptcy Court

22                  One Bowling Green

23                  New York, New York

24                  March 22, 2012

25                  10:19 a.m.

Page 2

1 | B E F O R E:

2 | HON ROBERT D. DRAIN

3 | U.S. BANKRUPTCY JUDGE

4 | ECR OPERATOR:   ELVIRA AGUIRRE-MORENO

5 |

6 |

7 |

8 |

9 |

10 |

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

Page 3

1   Notice of Agenda Proposed Seventy-Fifth Omnibus Hearing

2   Agenda:

3   (1) Motion by Reorganized Debtors to Enforce Plan Injunction

4   Against Oldco Trustee;

5   (2) Motion by James Grai to Lift Stay;

6   (3) Letter Filed by Patricia Meyer;

7   (4) Motion by Michigan Defendants Regarding Lift Stay Order

8   (Ad #09-0150);

9   (5) Complaint by CAI Plaintiffs for Declaratory Relief (Ad

10  #11-2934)

11

12  Notice of Agenda Proposed Fifty-Third Claims Hearing Agenda

13

14  Adversary Proceeding: 09-01510-rdd ACE American Insurance

15  Company et al v. Delphi Corporation, et al.  Motion by

16  Michigan Regarding Lift Stay motion

17

18  Adversary Proceeding: 11-02934-rdd CAI Distressed Debt

19  Opportunity Master Fund Ltd. v Delphi Automotive PLC et al

20  Pretrial Conference

21

22

23

24

25  Transcribed by:  Sherri L. Breach, CERT*D-397

Page 4

1   A P P E A R A N C E S:

2   SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

3        Attorneys for Debtors

4        155 North Wacker Drive

5        Chicago, Illinois 60606-1720

6

7   BY:  NICK D. CAMPANARIO, ESQ.

8        AL HOGAN, ESQ.

9        LOUIS S. CHIAPPETTA, ESQ.

10

11  DEWEY & LEBOEUF, LLP

12       Attorneys for CAI plaintiffs

13       333 South Grand Avenue

14       Suite 3600

15       Los Angeles, California 90071-1530

16

17  BY:  JAMES O. JOHNSTON, ESQ.

18

19  DAVIS, POLK & WARDWELL

20       Attorneys for Delphi Automotive, PLC

21       450 Lexington Avenue

22       New York, New York 10017

23

24  BY:  BENJAMIN S. KAMINETZSKY, ESQ.

25

Page 5

```
 1   A P P E A R A N C E S (C O N T.):

 2   DUANE MORRIS, LLP

 3        Attorneys for ACE Companies & Pacific Life

 4        1540 Broadway

 5        New York, New York 1003-4086

 6

 7   BY:  WILLIAM C. HEUER, ESQ.

 8

 9   DUANE MORRIS, LLP

10        Attorneys for ACE Companies

11        30 South 17th Street

12        Philadelphia, Pennsylvania 19103-4196

13

14   BY:  LEWIS R. OLSHIN, ESQ.

15        MARGERY N. REED, ESQ.

16

17   ALSTON & BIRD, LLP

18        Attorneys for ACE Companies

19        90 Park Avenue

20        New York, New York 10016

21

22   BY:  MARTIN G. BUNIN, ESQ.

23

24

25
```

Page 6

1   A P P E A R A N C E S (C O N T.):

2   STATE OF MICHIGAN

3   BILL SCHUETTE, ATTORNEY GENERAL

4        Attorneys for Joint Michigan Defendants

5        Labor Division

6        5th Floor G. Mennen Williams Building

7        525 West Ottawa Street

8        P.O. Box 30736

9        Lansing, Michigan 48909

10

11  BY:  SUSAN PRZEKOP-SHAW, ESQ.

12       DENNIS J. RATERINK, ESQ.

13

14  ALSO APPEARING:

15  PATRICIA MEYER

16

17  APPEARED TELEPHONICALLY:

18  FRANK LAROSA

19  ROBERT G. KAMENEC

20  SHAUN WONG

21  GEORGE BRICKFIELD

22

23

24

25

 1                    P R O C E E D I N G S

 2            THE CLERK:  All rise.

 3            THE COURT:  Please be seated.

 4            Okay.  Good morning.  In re: DPH Holdings.

 5            MR. CAMPANARIO:  Good morning, Your Honor.  Nick

 6    Campanario of Skadden on behalf of the reorganized debtors

 7    and we're here this morning for a claims hearing and an

 8    omnibus hearing.

 9            THE COURT:  Right.

10            MR. CAMPANARIO:  On the claims side, there's

11    nothing at all on the agenda and so there's nothing to be --

12    nothing to be done with regard to claims.

13            On the omnibus side there are five items on the

14    agenda and we're prepared to proceed through those now, Your

15    Honor.

16            THE COURT:  Okay.  That's fine.

17            MR. CAMPANARIO:  The first item is the motion by

18    reorganized debtors to enforce plan injunction against Oldco

19    Trustee.  That motion has been resolved and the reorganized

20    debtors have filed a withdrawal of the motion.  That's at

21    Docket Number 21839.  That's all I have unless Your Honor

22    has questions about that.

23            THE COURT:  No.  That's fine.

24            MR. CAMPANARIO:  Okay.

25            The second item is the motion by James Grai to

Page 8

1    lift stay.  As the Court is aware the parties are working

2    toward a stipulation that would resolve this motion.

3          At this point DPH and ACE have completed and

4    they've exchanged their analyses of the claimants that were

5    covered by the motion.  There were some discrepancies

6    between the two analyses and we're working on reconciling

7    those at this point.

8          In connection with that we had some questions for

9    Michael Dowd who is the counsel for the claimants covered by

10   the motion.  We reached out to him with those questions and

11   we're awaiting response on those.

12          THE COURT:  Okay.

13          MR. CAMPANARIO:  That's where we are on that.

14          THE COURT:  Do the parties prefer doing this all -

15   - all at once as opposed to just going ahead with the ones

16   you agree with now and -- and saving the other ones for

17   later --

18          MR. CAMPANARIO:  Umm --

19          THE COURT:  -- or is it -- do you think there will

20   be a solution to this imminently?

21          MR. CAMPANARIO:  I don't know if I would say

22   imminently.  I think we would prefer to wrap it all up in

23   one stipulation.  If -- if we complete the reconciliation

24   process and for some reason it looks like it's going to take

25   a long time to resolve some portion of them, it may make

Page 9

```
 1   sense at that point to --

 2             THE COURT:  Yeah.  No.  I --

 3             MR. CAMPANARIO:  -- consider --

 4             THE COURT:  -- I think you should do that.

 5             MR. CAMPANARIO:  -- splitting them off.

 6             THE COURT:  I mean, there -- there are -- I mean,

 7   they're real -- there are people waiting on -- on this

 8   money.  It's important to them.  So I think if the

 9   reconciliation issues are limited to a -- you know, a

10   minority of the -- of the group and it looks like it's going

11   to take, you know, a couple of more months to resolve those,

12   then I think you should move ahead with the stipulation on

13   the ones that everyone agrees on.

14             MR. CAMPANARIO:  Understood, Your Honor.

15             THE COURT:  Okay.

16             MR. CAMPANARIO:  The third item is a letter and

17   other materials filed by Patricia Meyer on a pro se basis.

18   And I believe that Ms. Meyer may be in the courtroom today.

19   I'm not a hundred percent sure.

20             THE COURT:  Okay.  All right.  I -- I scheduled

21   this matter.  I don't know if -- is Ms. Meyer here or anyone

22   on her behalf?

23             MS. MEYER:  Yes, sir.

24             THE COURT:  All right.  You should -- you should

25   come up, ma'am.
```

Page 10

1

2            THE COURT:  I got a letter from you in January of

3    this year --

4            MS. MEYER:  Yes, Your Honor.

5            THE COURT:  I don't think it was served on anyone

6    in this case, but it was -- I had it filed on the docket.

7    And it appeared to assert claims either on your behalf or on

8    behalf of other parties.  It wasn't clear to me whether

9    those claims were against Delphi or against GM.  But it

10   asked for me to take action and I can't take action on an ex

11   parte basis.  So I -- I -- I directed my chambers to contact

12   you and ask if you wanted me to issue some sort of ruling or

13   --

14           MS. MEYER:  Yes, Your Honor.

15           THE COURT:  -- consider some sort of relief, to

16   get a hearing scheduled, which I gather you did for today.

17           MS. MEYER:  I did, Your Honor.

18           THE COURT:  What is the relief you are seeking?

19           MS. MEYER:  The relief would be for the entire

20   Delphi workers who -- or claim to be Delphi workers who

21   never worked for them.  Our agency has laws.  They were

22   advocate workers solutions.

23           THE COURT:  I'm sorry.  I can't -- I couldn't

24   hear.

25           MS. MEYER:  I'm sorry.  Our agency has laws.  It's

Page 11

1    called Labor Advocate Workers Solutions.  One of our members

2    of our board was retired from General Motors American Axle,

3    and in the past five years and up and before that time when

4    she received her pension from the PBGC, our agency started

5    working with the United States Government and the Federal

6    Bureau of Investigation.

7         So the relief would be the proof of what we know

8    about rulings in this situation with a worker who never

9    worked for Delphi and who is now in the PBGC.  We've worked

10   with agencies for five consecutive years:  the Federal

11   Bureau of Investigation, the Labor Department, the head of

12   the Internal Revenue.  And the assumption was that we had

13   gone to another law firm to ask for their advice and in

14   asking that advice they said there was a ruling that they

15   thought the Court should be aware of in this case.  It's

16   Rule 2008-45.

17        So if you ask what the compensation should be, it

18   should be that -- that the -- there was fraud perpetrated in

19   the case in this situation; that it was taken to all

20   agencies, federal agencies and we were advised to come to

21   give the information to you --

22        THE COURT:  All right.

23        MS. MEYER:  -- and I've done that today.

24        THE COURT:  Okay.  But -- well, all right.

25        MS. MEYER:  Okay.

1           THE COURT:  Other than pointing out to me your

2    belief that there was a fraud perpetrated with the GM/Delphi

3    spin-off -- that's the fraud you're referring to, right?

4           MS. MEYER:  We're referring to that and the

5    pensions of the Delphi workers.  You have two classes of

6    Delphi workers.  You have ones who were Delphi employees and

7    you have those who are not.  And what happened in this case

8    was it was brought to our attention and those workers

9    actually went to the various law agencies and, at the advice

10   of attorneys in the Grand Rapids, Michigan area, they

11   suggested that we were able to prove that this was fraud and

12   to bring it to your attention --

13          THE COURT:  But the --

14          MS. MEYER:  -- for compensation.

15          THE COURT:  The "this" you're referring to is the

16   spin-off and the assumption by Delphi of pension obligations

17   that you say were really obligations of GM?

18          MS. MEYER:  Yes.  That is correct, Your Honor.

19          THE COURT:  Okay.  I -- I don't see how that --

20   those would constitute claims against Delphi as opposed to

21   against GM.

22          MS. MEYER:  If Delphi is in the PBGC, the

23   employees --

24          THE COURT:  If Delphi is what?

25          MS. MEYER:  If Delphi has to their pensioners

Page 13

1    (sic) put them in the public PBGC and these people were not

2    part of that, that frauds the PBGC and payment for people

3    who were never there.  Delphi delegated it and if General

4    Motors was responsible, that's acceptable.  But it still

5    lies in the hands of you, the judge, I would think owing

6    that you have been in the Delphi bankruptcy.

7            THE COURT:  Well --

8            MS. MEYER:  Yes or no, Your Honor?

9            THE COURT:  -- the termination by Delphi of its

10   pension plans --

11           MS. MEYER:  Yes, Your Honor.

12           THE COURT:  -- the assumption of liability by the

13   PBGC was a -- was a matter that was noticed before this

14   Court on notice to the appropriate parties and was approved

15   by the Court, and that order is a final order.  It's res

16   judicata and it's binding, and I don't believe there's any

17   basis to overturn that order.

18           MS. MEYER:  If the -- if you live in the United

19   States and I came to you today honest on a claim that we

20   could prove that the PBGC has cases.  We've dealt with them.

21   We've dealt with the Federal Bureau of Investigation.  We've

22   dealt with several agencies and they explained to me that

23   they thought a letter should be sent to you about this.

24           THE COURT:  Well, I -- I have -- I've received the

25   letter and I don't believe that there is a --

1            MS. MEYER:  Did you read the docketing of the --

2            THE COURT:  Yes.  Yes, ma'am.

3            MS. MEYER:  Okay.

4            THE COURT:  I did.

5            MS. MEYER:  Okay.

6            THE COURT:  And I note that the letter notes that

7    you and your group were aware of potential claims arising

8    from the GM/Delphi spin-off at least with the publishing in

9    1998 of the Delphi prospectus.

10            MS. MEYER:  Yes, Your Honor.

11            THE COURT:  And, (a) I don't believe that you're

12   asserting claims against Delphi as opposed to claims against

13   GM, which I think, at least based upon one of the pleadings

14   attached to your letter or subsequently filed, has been the

15   subject of litigation in the Delphi -- in the GM case,

16   right?  You filed a claim in the GM case and it was objected

17   to?

18            MS. MEYER:  It was objected to because it was

19   Delphi.

20            THE COURT:  Right.  Well -- anyway, that's been

21   dealt with in the GM case.  I don't believe you filed a

22   claim in Delphi's case, right?

23            MS. MEYER:  I just sent you the letter and the

24   information --

25            THE COURT:  All right.

Page 15

1          MS. MEYER:  -- docketing what we had.

2          THE COURT:  Delphi established a bar date in its

3     case, early on in the case, on appropriate notice to those

4     that it knew were creditors and publication notice to those

5     that didn't know were creditors.  In addition to that, under

6     the confirmation order, which was entered more than three

7     years ago, Delphi got a discharge.  And I -- I believe that

8     any claims against Delphi at this point are -- are barred by

9     the bar date order and the discharge.

10          MS. MEYER:  Then, Your Honor --

11          THE COURT:  And I don't -- I actually don't really

12     see that there is a claim against Delphi, in any event,

13     given that the spin-off was a spin-off by GM. To the extent

14     that there was any claim that Delphi might have against GM

15     in respect to that spin-off, that was dealt with under the

16     plan.  GM got releases under the plan, on wide notice.  The

17     plan was confirmed.  And, as I said before, the order

18     approving the termination of the pension plan as well as the

19     retiree benefits, that order is a final order now.  It's --

20     it's not subject to appeal.  And --

21          MS. MEYER:  Okay, Your Honor.  Then maybe you

22     could advise me, because we've worked with the federal

23     agencies and et cetera, and they suggested that I write the

24     letter.  Then are you saying that if -- if we find -- who do

25     we go to?  You have a final order, but --

1               THE COURT:  I -- I don't --

2               MS. MEYER:  -- if the PBGC --

3               THE COURT:  I don't know.

4               MS. MEYER:  -- doesn't take it --

5               THE COURT:  I don't -- I don't know.

6               MS. MEYER:  You don't know?

7               THE COURT:  I don't know who you go to.  I could

8    tell you that having come to me on this point, I conclude

9    that there's no viable remaining claim at this point given

10   all of the orders that have been issued in this case.

11              MS. MEYER:  All right.

12              THE COURT:  -- on notice to parties.

13              MS. MEYER:  Thank you very much, Your Honor.

14              THE COURT:  Okay.

15              MS. MEYER:  But you do not know where I go, then,

16   right, with this?

17              THE COURT:  I don't.

18              MS. MEYER:  Okay.  Thank you very much.

19              THE COURT:  Okay.

20              I think Counsel for DPH should prepare an order

21   consistent with that ruling.

22              MR. CAMPANARIO:  Yes, Your Honor.

23              THE COURT:  Okay.  And -- and submit it to

24   chambers.

25              All right.

Page 17

```
 1              MR. CAMPANARIO:  May I address the Court from

 2    counsel table, Your Honor?

 3              THE COURT:  Wherever you're comfortable.

 4              MR. CAMPANARIO:  The fourth item is the motion by

 5    the Michigan defendants with respect to this Court's stay

 6    order, and Michigan defendants' counsel is present in the

 7    courtroom.

 8              THE COURT:  Okay.

 9              MR. RATERINK:  Good morning, Your Honor.

10              THE COURT:  Good morning.

11              MR. RATERINK:  Dennis Raterink appearing on behalf

12    of the Michigan Funds Administration.  I'm here, as usual,

13    with my colleague, Susan Przekop-Shaw --

14              THE COURT:  Good morning.

15              MR. RATERINK:  -- representing the Michigan

16    Workers' Compensation Agency.  As always we are referring to

17    our two clients as the joint Michigan defendants, as we

18    share similar positions in regards to this matter.

19              THE COURT:  Okay.

20              MR. RATERINK:  Your Honor, we are here today in

21    regards -- well, I -- I think I want to lay out at the

22    beginning what we are here for and then what we're not here

23    for in terms of our position.

24              We are here for discussion regarding our motion

25    that we have filed with the Court to partially lift the stay
```

1    order that this Court had entered pending the appeal of the

2    Court's order which had denied Michigan's motion to dismiss

3    the adversary proceeding.

4           Those decisions have been appealed to, first, the

5    U.S. District Court and to the Second Circuit Court of

6    Appeal.  On November 29th, 2011 the Second Circuit did issue

7    a decision which affirmed Your Honor's overall decision, but

8    made several pointed comments regarding a portion of this

9    case, specifically the Form 400 liability issue that has

10   been discussed throughout the litigation of this case.  We

11   would like to discuss the implications of those comments as

12   it pertains to the stay order going forward.

13          What we're not here for today specifically, we're

14   not here to rehash old events.  One of the parties had

15   indicated that - correctly, that the parties had expended

16   considerable time and resources coming here before you

17   originally to argue those issues and we don't intend to go

18   back and rehash those issues.

19          What we do want to do is -- is have the

20   opportunity to discuss the new developments that have arisen

21   in regards to the Second Circuit's order.

22          THE COURT:  Well, I don't view them as new.  The

23   first hour that I spent on this case in oral argument was to

24   ask you and your colleague whether there could be a suitable

25   agreement that the so-called Form 400 issue, divorced from

1   any issue with respect to the insurance policies, could be

2   reached, because I would issue an order or "so order" such

3   an agreement that that issue could go forward without any

4   violation of the plan injunction.

5             MR. RATERINK:  Correct.

6             THE COURT:  And it's reported to me, and I think

7   without dispute, that DPH and the insurer plaintiffs were

8   prepared to reach such an agreement, but Michigan wasn't.

9   And it seemed to me, at least from the oral argument on this

10  point, that that was a fair representation.

11            I mean, if you're prepared to enter into that

12  agreement at this point so that it's crystal clear to the

13  Michigan court or the Michigan administrative body what --

14  what is before it and nothing else, this is a non-issue.  It

15  always has been.

16            MR. RATERINK:  With due respect, Your Honor, I

17  think you're -- you're correct that there was extensive

18  discussion on the record back and forth regarding the

19  potential to stipulate and try to settle that issue to see -

20  -

21            THE COURT:  Right.

22            MR. RATERINK: -- if we could agree to send it back

23  to Michigan.  And there were limitations that -- that we had

24  in representing our state client in terms of how far we

25  could stipulate, what we were allowed to stipulate for,

1    whether we could stipulate as to issues of law, those kind

2    of things as you will recall.

3            And the bigger issue that we have at this point

4    now, after discussing with the appellate counsel that we've

5    added to our team and talking with the solicitor general for

6    the State of Michigan is, you know, one of the primary

7    issues that's been litigated in this going forward is

8    whether the Court's extension of its jurisdiction over these

9    matters impinges on Michigan's sovereign immunity.  And at

10   this point to go forward with the stipulation pertaining to

11   the Form 400 issue in limiting the, Michigan's abilities in

12   any ways regarding going back would be an admission that

13   this Court has jurisdiction over that issue to begin with.

14           THE COURT:  Well, then, we should go through the

15   appeal.  I mean, it's --

16           MR. RATERINK:  And --

17           THE COURT:  -- one or the other.

18           MR. RATERINK:  -- and we are.

19           THE COURT:  All right.  Then the stay should stay

20   in place.

21           MR. RATERINK:  And we -- we have been.  And -- and

22   I'll explain why I think the opportunity has presented

23   itself to come back to you at this point.

24           THE COURT:  Okay.

25           MR. RATERINK:  You know, out of respect to Your

1    Honor to some degree because we think that there has been a

2    change of circumstances.  If you disagree, then -- then I'm

3    sure the order you'll issue will reflect that.

4              THE COURT:  All right.

5              MR. RATERINK:  But we wanted to come back and talk

6    to you and have a discussion about these issues and the

7    implications of what the court specifically said.

8              It's important, we think, that the Second Circuit

9    has set some boundaries about what this case -- what is

10   properly before that Court and, by implication, this Court

11   and what is not before that -- that Court and -- and, again,

12   by implication this Court.

13             Before we get to the exact -- what -- exactly the

14   court said I think it's important to give just a small

15   amount of context because a lot of what happened occurred

16   after you were -- we were before you, Your Honor.

17             THE COURT:  Can I -- can I just interrupt you?

18             MR. RATERINK:  Certainly.

19             THE COURT:  I -- I've read the Second Circuit's

20   summary ruling carefully, as well as re-read my ruling and

21   Judge Marrero's ruling, and it appears to me that it's --

22   it's crystal clear that the Second Circuit has made it clear

23   that all issues pertaining to the insurance policies and

24   their effect are issues pursuant to which the bankruptcy

25   court has jurisdiction and pursuant to which Michigan has

1    waived sovereign immunity.  It's addressed very clearly.

2            Because Michigan is not prepared to limit the 401

3    issue or the 4 -- I'm sorry -- the Form 400 issue to an

4    issue that does not involve the policy, I think that the

5    issue that you're raising here, including in the context of

6    the Second Circuit's summary ruling is a red herring.  If it

7    were solely limited to that issue, then from the start of

8    this case it's been clear that that issue, the 400 issue,

9    could be decided.  But it's not, and you've just told me it

10   wouldn't be because you don't want to waive sovereign

11   immunity on -- on the related issue.

12           And, accordingly, I need to decide the issue of

13   the policy.  And I believe that if Michigan were to go

14   forward and determine what it has termed to be the 400

15   issue, I believe what it -- as it construes that issue, that

16   includes issues with respect to the policies and, therefore,

17   it would be violating the plan injunction.

18           So not being prepared to limit the issue to simply

19   the real Form 400 issue, which is separate and apart from

20   the policy, it appears to me that I need to decide, first,

21   the policy issue.  Once the policy issue is decided, you can

22   go and decide the Form 400 issue.  The Form 400 issue, as

23   the Second Circuit said and as the complaint makes clear, is

24   not in front of me, the pure Form 400 issue.  It's not part

25   of the adversary proceeding.  It's just the policy.

```
 1              So once I decide that, there will be a pure Form

 2     400 issue and you can decide that separately.  I don't think

 3     that there would be res judicata or collateral estoppel

 4     because it wouldn't cover that issue, except to the extent

 5     that it is determined that there is a defense to the Form

 6     400 theory which is that it pertains to -- it must be

 7     limited to whether there is a policy or not.  That would be

 8     collateral estoppel and res judicata because I would have

 9     decided that.

10              MR. RATERINK:  Understood.  I think the main

11     distinction we would take with Your Honor -- Your Honor's

12     analysis is that the -- the implication of the Court's

13     ruling.  You -- you've used the term --

14              THE COURT:  The Second Circuit's ruling.

15              MR. RATERINK:  Yes.  The Second Circuit's ruling.

16              THE COURT:  Okay.

17              MR. RATERINK:  I'm sorry.

18              THE COURT:  All right.

19              MR. RATERINK:  You've used the terms a couple of

20     times, the "pure" 400 issue, and I understand what you mean

21     by that.  But the -- that's not a term that the Second

22     Circuit used.  The Second Circuit spoke in terms of the Form

23     400 issue.  I mean, there can be no doubt, and we can -- we

24     can document the record, the pleadings and -- and Your

25     Honor's previous orders make it clear that -- that Your
```

Page 24

```
 1    Honor felt that you had jurisdiction over the Form 400 issue

 2    for the reasons that have been stated previously.

 3              THE COURT:  I'm not -- no.  It -- to the contrary.

 4    I didn't -- no.  Only to the extent that it implicates the

 5    policies.

 6              MR. RATERINK:  That -- that's what I mean.  You

 7    had indicated --

 8              THE COURT:  Right.

 9              MR. RATERINK: -- that you thought it was

10    intertwined and couldn't be separated.

11              THE COURT:  Right.

12              MR. RATERINK:  So to that extent you thought that

13    you had jurisdiction over those issues.

14              THE COURT:  Not -- not over -- again, only to the

15    extent that the policy is implicated; otherwise I don't, and

16    I -- I -- that's why I said you all should -- if you really

17    believe it's a separate issue, I'll "so order" a stipulation

18    and it will be clear to the Michigan Court.  It will be

19    clear to the parties and we'll -- you know, you can go

20    forward on that basis.

21              MR. RATERINK:  And -- and we talked about the

22    stipulation and those --

23              THE COURT:  Right.

24              MR. RATERINK: -- same difficulties that we had

25    previously still remain here.
```

1           THE COURT:  All right.  Well --

2           MR. RATERINK:  We can't stipulate for parties that

3    are not before the Court.

4           THE COURT:  Okay.

5           MR. RATERINK:  We can't control other people and

6    other individuals.

7           THE COURT:  Well, let me -- let me interrupt.

8    Maybe --

9           MR. RATERINK:  Sure.

10          THE COURT:  Maybe -- maybe this is an issue that -

11   where there have been discussions between the parties and

12   I'm just -- I'm not aware of those or I'm missing something.

13          Separate and apart -- this is really a question

14   for ACE.  Separate and apart from whether there is a policy

15   that covers these claims and/or whether it should be

16   reformed, is ACE asking me to decide just on a pure

17   regulatory basis that the filing or non-filing of a Form 400

18   doesn't create liability?

19          MR. OLSHIN:  Your Honor, Lou Olshin.  We've not

20   asked you to look at the question that you attempted for

21   eighteen months to separate out from the case.

22          THE COURT:  Okay.

23          MR. OLSHIN:  And there's been, at least by my

24   count, six opportunities through the various appeals and

25   proceedings and today for Michigan to say, yes, we consent

Page 26

1    to the entry of ACE's motion for summary judgment which

2    finds that there's no liability under the policies.  They've

3    refused to do that and I think we've spent numerous hours

4    and a lot of the Court's time trying to unravel, and now it

5    sounds like we have an appeal that -- or a cert petition to

6    the United States Supreme Court.  Obviously, our concern is

7    that it's clear from the prior records before Your Honor,

8    the District Court and the Second Circuit --

9            THE COURT:  Well, I -- I'm sorry.  I didn't -- I'm

10   going to interrupt you.  I was just really trying to --

11           MR. OLSHIN:  Okay.

12           THE COURT:  -- focus on this one question.

13           So -- so, for example, except for the ruling

14   you're seeking from me that there is no ACE policy that

15   covers these claims --

16           MR. OLSHIN:  Right.

17           THE COURT:  -- or that if -- that there's -- there

18   should be a reformation of the policy --

19           MR. OLSHIN:  To conform to the parties' intent.

20           THE COURT:  -- to conform to the parties' intent,

21   you are not seeking a ruling interpreting Form 400.

22           MR. OLSHIN:  Correct.

23           THE COURT:  Okay.  So --

24           MR. OLSHIN:  But --

25           THE COURT:  -- it's not even in front of me,

Page 27

1    consistent with what the Second Circuit said, and, I think,

2    consistent with what Judge Marrero said and what I said.

3           MR. OLSHIN:  But the issues on the merits before

4    this case became intertwined because Michigan refused to

5    stipulate --

6           THE COURT:  Right.  No --

7           MR. OLSHIN: -- to that concept.

8           THE COURT:  -- I -- yeah.

9           MR. OLSHIN:  And I think we spent a lot of time on

10   the record running through that --

11          THE COURT:  Okay.

12          MR. OLSHIN: -- issue as DPH Holdings pointed out

13   in their papers.

14          THE COURT:  Now one other thing you said, and I --

15   I should have asked you -- I should have asked counsel for

16   Michigan this question.  Has -- has a petition for cert

17   already been filed?

18          MR. RATERINK:  It has not been yet.

19          THE COURT:  It has not, okay, because it's not

20   until April --

21          MR. RATERINK:  8th or --

22          THE COURT:  -- 10th or 11th or something --

23          MR. RATERINK:  Correct.

24          THE COURT:  -- that's your deadline.  Okay.

25          MR. RATERINK:  Correct.

1             THE COURT:  Well, I mean, if -- if I'm not -- if

2    I'm not going to be asked to decide the Form 400 point

3    separate and apart from whether there's a policy in place, I

4    think the issue of whether there's jurisdiction or sovereign

5    immunity is moot and that's -- that's why the Second Circuit

6    didn't deal with it, I didn't deal with it and Judge Marrero

7    didn't deal with it.

8             MR. RATERINK:  Well, I -- I think that there's a -

9    - a distinction, Your Honor -- a difference of opinion here

10   because you read the second report -- the Second Circuit's

11   opinion to say the Court is saying that the issue of the

12   Form 400 is not before it, the pure 400 issue.  But, again,

13   I would reiterate the court never says anything to that

14   extent.  It doesn't even say --

15            THE COURT:  But it --

16            MR. RATERINK:  -- that the issue regarding the

17   interrelation -- it just says the Form 400 --

18            THE COURT:  All right.

19            MR. RATERINK: -- issue is not before it.

20            THE COURT:  But -- but it -- but it very clearly

21   says that all issues pertaining to the existence or

22   interpretation of the insurance policies are front and

23   center and, you know, that's what its opinion says in -- in,

24   you know, a pretty thorough way for a summary opinion.

25   There's -- there's core jurisdiction with a waiver of

Page 29

```
 1    sovereign immunity.

 2              So to the extent that Michigan is saying that the

 3    Form 400 issue includes issues with respect to whether and -

 4    - and where there is a policy that covers these claims and

 5    what that policy says is part of the Form 400 issue, then it

 6    -- I -- it's pretty clear to me from the Second Circuit's

 7    opinion that that's something I have jurisdiction over; and

 8    that's what the complaint is seeking.

 9              What they say is the complaint isn't seeking

10    relief on -- on the 400 issue, and since I -- it's pretty

11    clear what the complaint is seeking relief on, I have to

12    assume it isn't the so-called -- what I'm calling the pure

13    Form 400 issue because it's seeking a -- the complaint is

14    seeking relief on a declaration as to the policy.  And --

15    and they've clearly ruled on that.

16              MR. RATERINK:  Well -- and --

17              THE COURT:  And so I think there's only one in --

18    one possible interpretation of what -- what they're saying.

19              MR. RATERINK:  And you're -- and you're referring

20    to the pure 400 issue?

21              THE COURT:  Right.

22              MR. RATERINK:  And, again -- and for the record we

23    -- we would argue that the Court's opinion can be

24    interpreted differently and --

25              THE COURT:  Okay.
```

 1               MR. RATERINK: -- can be interpreted to say that --

 2      that there can be no question of the fact that the Michigan

 3      defendants from the get-go have argued that this Court

 4      doesn't have jurisdiction over the litigation of the Form

 5      400 issues in any manner, even with the interplay issue, and

 6      have continued to advance that argument at every stage of

 7      the process.

 8               So, then, for the Second Circuit to come back in

 9      its opinion and indicate that there is no 400 base claim in

10      the complaint, that was absolutely correct.  The complaint

11      was not sounded in -- in terms of the Form 400.  But Your

12      Honor himself indicated on Page 6 of his -- of your order

13      denying the motion to dismiss that the insurers were seeking

14      the declaration that the insurers are not liable under

15      either theory espoused by the agency.

16               So, clearly, the issue was before --

17               THE COURT:  But you --

18               MR. RATERINK: -- the Second Circuit.

19               THE COURT:  But I -- then I -- then I spent like a

20      whole page explaining why the State of Michigan, frankly,

21      was talking through its hat, as I spent two hours, and the

22      parties spent probably countless hours, nailing down.  I

23      mean, it's just not -- it's not credible.  I'm sorry.  I

24      spent too much time on this.  It is -- and it's -- it's --

25      it's clear to me.  And we've spent, you know, fifty minutes

Page 31

1    on it today.  The State is still not prepared to limit the

2    issue to simply the issue of, is the insurers' liability

3    driven by the form, and it's because they want to say that -

4    - or they're worried about the insurers' defense that --

5    that that incorporates the policy, and if there's no policy,

6    the form doesn't apply.

7              So I don't know how, you know, I could -- any --

8    any of the three courts could be any clearer on this issue.

9    And I'm not just not prepared to lift the stay, particularly

10   knowing, and I appreciate the candor, that -- that Michigan

11   would, in essence, argue the policy issue in front of the

12   Michigan court.

13             MR. RATERINK:  Well, and just to make clear on

14   that, Your Honor, there -- there were discussions regarding

15   that interplay about if a contract was raised on -- as a

16   defense --

17             THE COURT:  Right.

18             MR. RATERINK: -- to the Form 400 issue.  I think

19   we've made statements in the pleadings that -- that are

20   accurate.  We don't think the Form 400 really is base -- is

21   reliant on the contracts.  We are --

22             THE COURT:  Well, I mean --

23             MR. RATERINK:  -- regarding that.

24             THE COURT:  -- you could stipulate to that and

25   I'll -- I'll lift the stay, as I was prepared to lift it

Page 32

1    eighteen months ago and the people of -- you know, the

2    claimants can maybe get some money on that basis, you know,

3    if the Michigan State Court agrees with that.  But I don't

4    think that's going to happen.  I mean, I don't think that's

5    how -- if I just simply lift the stay, it won't -- that

6    won't happen, that -- that narrow determination won't

7    happen.  So it needs to be in writing, signed by Michigan,

8    and I -- and Michigan is not willing to do it.  And I -- I

9    appreciate why it's not willing to do it.  It doesn't want

10   to waive this contract issue.

11           MR. RATERINK:  Well, Your Honor had also evidenced

12   some concerns at the original hearing that even if Michigan

13   was able to stipulate to the extent to say that the

14   insurance contracts were not germane to the issue of the

15   Form 400, that the magistrates themselves, the other parties

16   who are not here today, the plaintiffs and any potential co-

17   defendants, would not be bound by that stipulation.

18           THE COURT:  But they would be -- they would be

19   bound by the stay.  I would basically say the stay is -- is

20   lifted for this issue.

21           MR. RATERINK:  You would -- you would say the stay

22   would be lifted -- partially lifted to allow the pure 400 --

23           THE COURT:  Right.

24           MR. RATERINK: -- issue to go forward.

25           THE COURT:  Similarly to the plan injunction would

1    have been lifted.  You know, that was the whole premise of

2    the --

3              MR. RATERINK:  Right.

4              THE COURT:  -- and -- and you can certainly say in

5    a stipulation that, to the extent that -- that no one is --

6    is entitled to argue that to the extent this might

7    constitute a waiver of sovereign immunity that it applies to

8    any other issue in the case or any other issue ever raised

9    by Michigan as far as sovereign immunity is concerned.

10             MR. RATERINK:  Understood.  And we may be able to

11   engage in further discussions along those lines, not

12   detracting from the fact that we do think the Second Circuit

13   has provided clear guidance in -- in a different manner that

14   the --

15             THE COURT:  Okay.

16             MR. RATERINK:  -- judge interprets what they have

17   said in this case.

18             They had every -- they had every ability to come

19   back and say we think to the extent that the Form 400s

20   implicates these insurance contracts, that this Court does

21   have jurisdiction and sovereign immunity is not implicated.

22   They didn't say that.

23             THE COURT:  It --

24             MR. RATERINK:  They just said the Form 400 --

25             THE COURT:  It wasn't in front of them.

Page 34

1              MR. RATERINK: -- issue was not before it.

2              THE COURT:  -- the complaint doesn't --

3              MR. RATERINK:  Right.

4              THE COURT:  -- it's -- they -- they shouldn't --

5     there's no reason why they would rule on something where the

6     complaint's -- doesn't cover that issue.

7              MR. RATERINK:  But the complaint wasn't the only

8     issue.  As your Court -- as Your Honor recognized, the issue

9     in the -- in the ongoing litigation of the case, the Form

10    400 issue was not raised until the defendants came to the

11    State of Michigan.  The Michigan defendants came in and

12    said, wait, Your Honor, there's a further jurisdictional

13    issue here.  So as -- as things got litigated further on

14    down the line, then the plaintiffs -- ACE in this case --

15    said, well, yeah, we want a ruling as to both, both on the

16    contracts and the Form 400.  That's the both theories of

17    liability that's --

18              THE COURT:  But their --

19              MR. RATERINK: -- stated in your contract.

20              THE COURT:  -- their counsel has just stated --

21    stated to the contrary.

22              MR. RATERINK:  I'm sorry.

23              THE COURT:  They want a ruling only as far as

24    their defense about there being a policy.  They're not --

25    they're not -- they are not seeking a ruling from me that,

 1    on its own, their form, if they -- if they don't have a

 2    policy that covers this, would or would not make them

 3    liable.  They're not seeking that ruling in front of me.

 4           So, therefore, my -- my ruling either way on -- on

 5    the complaint wouldn't be res judicata or collateral

 6    estoppel on that narrow issue.  It would be as far as, you

 7    know, if the parties then try to incorporate the policy

 8    terms into the form in some way, then it would be res

 9    judicata, but -- or collateral estoppel.  But, again, that

10    separates out the two issues.

11           MR. RATERINK:  Understood.

12           THE COURT:  So I -- I mean, I -- I just -- I --

13    I'm going to deny this motion, then.

14           MR. RATERINK:  Can I --

15           MS. PRZEKOP-SHAW:  Your --

16           MR. RATERINK:  -- take a moment to confer --

17           THE COURT:  Sure.

18           MR. RATERINK:  Thank you.

19       (Pause)

20           MS. PRZEKOP-SHAW:  Your Honor, Susan Przekop-Shaw

21    on behalf of the Michigan Workers' Compensation Agency.  How

22    are you?  Good.

23           What I wanted to cover before -- I know I heard

24    you just say that you deny it, but I would like to have the

25    opportunity on the agency's behalf to place some information

Page 36

1   on the record.

2           THE COURT:   Okay.   That's fine.   I thought you --

3   your co-counsel was speaking for both of you, but that's

4   fine.   You can go ahead.

5           MS. PRZEKOP-SHAW:   Thank you very much.

6           The Court just said that -- that ACE wanted to

7   find out whether they are liable under the insurance

8   contracts or policies for purposes of workers' compensation

9   benefits.   I think the question is whether -- whether ACE,

10  under those contracts -- let me switch it.   The question --

11  if the question is further narrowed in this manner whether

12  Delphi has any obligations to pay workers' compensation

13  benefits under the policies, that's distinctively different

14  than saying ACE has no liability under the insurance

15  policies because the issue before Michigan is not

16  contractual in nature, as the court acknowledged in the

17  Second Circuit.   It's a situation of ACE's liability apart

18  from the contractual theory.

19          So if the Court would consider drafting it so that

20  it's a stipulation that under these policies Delphi has no

21  obligation to pay for any workers' compensation benefits in

22  Michigan under the policies, that's more accurate.

23          And in regards to that, and similarly, the problem

24  that we're running into here is ACE continues to call them

25  the self-insured workers' compensation obligations.   That's

Page 37

1    not what it is.  It's not self-insured workers' compensation

2    benefits that are pending in Michigan right now.  It's

3    workers' compensation obligations, period.  Delphi is -- was

4    responsible for the self-insured workers' compensation

5    benefits that they -- because they were self-insured status

6    in Michigan were required to pay.  And in that case Delphi

7    was paying each one of the benefits.

8             Once this plan was entered and the injunction was

9    entered, Delphi -- the self-insured workers' compensation

10   benefits in the sense solely towards this contract no longer

11   existed.  There may be some post-petition claims and other

12   claims that are pending that are within the -- Delphi's

13   responsibility.  But in regards to this issue on the

14   contract policy, if you flip it and reflect -- and that's

15   what's the Court's job.  It's not what ACE's liability is.

16   It's what DPH Holding is obligated to pay.

17            And if -- if the Court considers that type of

18   interpretation, that that's where this is going, I think

19   that would be more attuned to what we're saying here because

20   in Michigan there -- we -- we do maintain that the Form 400

21   base claim is not based on any contract because that self-

22   insured contract -- insurance policy no longer exists.  It's

23   -- it's not -- it's not available for the Michigan employees

24   who have claims -- excuse me -- the Delphi employees who

25   have claims before the administrative law judge.

Page 38

```
 1            THE COURT:  But why does it no longer exist?

 2            MS. PRZEKOP-SHAW:  Because the plan objection --

 3    the plan injunction, you released Delphi from paying any

 4    more self-insured obligations.  And if the plan, as they

 5    maintain, is based upon self-insurance --

 6            THE COURT:  But -- but --

 7            MS. PRZEKOP-SHAW: -- there's no issue.

 8            THE COURT: -- but let me -- but, again, this is --

 9    this goes back to the stipulation we -- we started the whole

10    case with.  And the Second Circuit was very clear on this.

11    They cited the same cases I cited, including PSI Net.  If,

12    in fact, the insurers' liability under Form 400 depends upon

13    whether or not there is a policy, they will have a claim

14    depending on one outcome or they will not have a claim

15    depending on the other outcome of that issue in this

16    bankruptcy case.

17            And so, therefore, it's front and center for me.

18            On the other hand, if the issue is clearly

19    delineated for the Michigan Court that the existence of a

20    policy is completely out of the picture as far as the Form

21    400 liability, then I -- I agree with you.  But that's not -

22    - I don't think that's the case, because the parties haven't

23    been able to limit it in that way.

24            So I -- it comes right back to the analysis that

25    appears at -- at Page 6 of the -- of the Second Circuit's
```

 1    opinion, and in both Judge Marrero's and in my opinion.

 2            MS. PRZEKOP-SHAW:  But in -- when you take it into

 3    that position then you are infringing or -- or basically by

 4    taking the position that you said instead of what I was

 5    initially proposing, then what's happening is that you are

 6    imparting the bankruptcy court's authority over what can and

 7    can't be said in that --

 8            THE COURT:  Well --

 9            MS. PRZEKOP-SHAW: -- in --

10            THE COURT:  -- I -- you know, I think at this

11    point that's an argument you need to be making to the

12    Supreme Court.

13            MS. PRZEKOP-SHAW:  Okay.  Fair enough.

14            One other point I wanted to say, and I would

15    really like this corrected.  The Michigan defendants are the

16    funds administration and the workers' compensation agency.

17    We don't speak on behalf of the State of Michigan.  And one

18    of the points that kept --

19            THE COURT:  I'm just using --

20            MS. PRZEKOP-SHAW: -- that kept coming --

21            THE COURT:  I'm just using shorthand when I say

22    Michigan.

23            MS. PRZEKOP-SHAW: Okay, because I -- there is a

24    major distinction because you even used the term state.

25    But, remember, it's the agency and the funds administration.

Page 40

1                    THE COURT:  Right.

2                    MS. PRZEKOP-SHAW:  We're not here speaking on

3         behalf of Mr. Dowd and on behalf of the plaintiffs that are

4         there.

5                    THE COURT:  No.  I understand,.

6                    MS. PRZEKOP-SHAW: If this Court ended up making

7         its decision, separating out the two entities, making its

8         decision I would anticipate it would be earlier than later.

9         But if this Court made its decision as to the insurance

10        policy and -- and permitted it to be going back, you know,

11        that -- that's a situation where -- and something happens,

12        we've maintained that the agency and the funds

13        administration continue to state that contracts are not part

14        of this Form 400 matter.

15                   And in regards to that -- in that -- in that

16        indication, others like Mr. Dowd or other entities may start

17        turning to the insurance policies again.  We can't control

18        that necessarily.  We can't control that.  That's part of

19        it.  And -- and the Court saying that it needs to control

20        that, it needs to control that because of the policy is

21        where we feel that the sovereign immunity arises.   And --

22        and, obviously, that's an issue that we can take to the --

23        to the Court --

24                   THE COURT:  Okay.

25                   MS. PRZEKOP-SHAW: -- to proceed on with it.

1          Anything else?

2          MR. RATERINK:  No.

3          MS. PRZEKOP-SHAW:  Thank you for your time.

4          THE COURT:  All right.  Thank you.

5          MS. PRZEKOP-SHAW:  I guess you're going to make a

6     ruling right now, right?

7          THE COURT:  Well, unless I -- unless the other

8     parties have something to say?

9          MR. OLSHIN:  I think we've covered it, Your Honor.

10          THE COURT:  Okay.  All right.

11          I have a motion before me by the State of Michigan

12     Workers' Compensation Insurance Agency and the State of

13     Michigan Funds Administration, two of the three defendants

14     in this declaratory judgment action brought by ACE American

15     Insurance Company and Pacific Employers Insurance Company.

16     I'll refer to them as the Michigan agencies, although one of

17     them is an administration instead of an agency, for ease of

18     reference.

19          The Michigan agencies seek a modification of an

20     order entered by this Court in late January, January 28th,

21     2010 granting a stay in this adversary proceeding pending

22     the Michigan agencies' interlocutory appeal of my order from

23     earlier that month denying the Michigan agencies' motion to

24     dismiss or abstain in the adversary proceeding.

25          The stay pending appeal was, obviously, for the

1    benefit of the Michigan agencies so that the proceeding

2    wouldn't go forward in accordance with my ruling pending the

3    appeal.  But to protect the plaintiffs, as well as the co-

4    defendant, DPH Holdings, I imposed conditions on the stay

5    which did not include a bond, but did condition the stay on

6    the agencies continuing their standing down on their

7    proceeding with actions in Michigan pertaining to the issues

8    that were on appeal.  They are specifically set forth in

9    subparagraphs (a) through (c) in the January 28 order.

10           The motion is premised upon language in the Second

11   Circuit's summary order affirming the District Court, Judge

12   Marrero, which in turn affirmed my ruling from January 2010,

13   in which, generally speaking, the Second Circuit stated that

14   this Court does, in fact, have core subject matter

15   jurisdiction over this adversary proceeding and that the

16   Michigan agencies are deemed to have waived sovereign

17   immunity under the U.S. Constitution Article I, Section 8,

18   Clause 2 as interpreted by, among other authorities, Central

19   Virginia Community College v. Katz, 546 U.S. 356-77 (2006).

20           The basis for the present motion is language that

21   appears in two places in the Second Circuit's summary

22   ruling.  First, the Second Circuit said:

23           "The Michigan defendants argue that the adversary

24   proceeding is only nominally about the insurance contracts

25   and is actually about whether the insurers are liable under

Page 43

1    Michigan law for filing Form 400 notices of coverage.  We

2    disagree.

3              "As the District Court and the bankruptcy court

4    concluded, the disputed issue in the adversary proceeding is

5    one sounding in contract.  The adversary complaint makes

6    clear that the proceeding is focused on the parties'

7    responsibilities under the contract.  There is no Form 400

8    base claim in the insurers' adversary complaint.

9              "Although the Michigan defendants may ultimately

10   prevail on the merits on their Form 400 theory, that

11   argument ultimately bears on the merits of whether the

12   insurers are liable apart from their contractual

13   obligations, which is not the question before us on

14   collateral review of the district court's denial of the

15   motion to dismiss the adversary complaint."

16             And then in paragraph -- I'm sorry -- in Footnote

17   2 to the ruling the Court states:

18             "This decision is limited to the matters before

19   us.  We express no view and render no decision as to whether

20   the bankruptcy court has jurisdiction over any claim or

21   challenge to the liability of the insurers for filing the

22   Form 400 notices.  Likewise, we express no view and render

23   no decision as to whether resolution of any claim brought in

24   federal court against the Michigan defendants would invade

25   their sovereign immunity."

Page 44

1           This issue is not a new issue in this matter.  In

2    fact, as noted during oral argument, it was the first issue

3    raised by the Court at oral argument on the Michigan

4    agencies' motion to dismiss.  The Court noted -- that is,

5    this Court noted, that if one could divorce the so-called

6    Form 400 theory from issues pertaining to whether there is

7    an applicable insurance policy and, therefore, whether the

8    debtor, having assumed all the policies, would be liable to

9    the insurers under such a policy, then this Court, the

10   District Court, and, I believe, the Second Circuit have made

11   it clear that that -- that dispute, the so-called, what I

12   call "pure" Form 400 theory dispute could proceed separate

13   and apart from, ultimately, the plan injunction issue

14   pursuant to the confirmation order in this case.

15          However, as addressed first by me at Pages 20

16   through 21 of my bench ruling on the motion to dismiss, as

17   well as by Judge Marrero, the parties and, in particular,

18   the Michigan agencies, have not been able to separate those

19   issues or divorce them, either as a matter of law or as a

20   matter of stipulation through -- that would be "so ordered"

21   by the Court.

22          Consequently, it was clear to me in January of

23   2010 and I believe is still clear to me today, based on the

24   very candid remarks of Mr. Raterink, that if I were to

25   modify the stay pending appeal to permit what Michigan

Page 45

1    contends is the Form 400 theory to proceed, it would subsume

2    the issues that are raised in this adversary proceeding,

3    issues that the Second Circuit has been crystal clear on are

4    ones that this Court has jurisdiction over because those

5    issues, as the Second Circuit stated, pertain inexorably to

6    whether there is going to be a viable claim or not against

7    the debtor's estate as well as to whether the debtor has an

8    insurance policy, or not, with the plaintiff insurers.

9            The Michigan agencies contend that I should review

10   or consider their motion under Bankruptcy Rule 7062 and,

11   more specifically, Bankruptcy Rule -- I'm sorry --

12   Bankruptcy Rule 7062 -- I'm sorry -- or more specifically

13   Federal Rule of Civil Procedure 62, which is incorporated by

14   Bankruptcy Rule 7062 and more specifically Federal Rule of

15   Civil Procedure 62(c), which deals with injunctions pending

16   an appeal of an interlocutory order.

17           However, I think that the proper way to look at

18   this is under Bankruptcy Rule 8005, which deals with stays

19   pending appeal and was the rule under which I entered the

20   January 28, 2010 order, which states, in pertinent part:

21           "Notwithstanding Rule 7062, the bankruptcy judge

22   may suspend or order the continuation of other proceedings

23   in the case under the Code or make any other appropriate

24   order during the pendency of an appeal on such terms as will

25   protect the rights of all parties in interest."

1            So, even to the extent that there's changed

2      circumstances that would justify modifying the order, I

3      believe in light of the very strong risk -- in fact, I

4      believe certainty -- that the contract and claim issues that

5      are front and center in this adversary proceeding are --

6      and, in fact, are the only issues in this adversary

7      proceeding, would be raised if I modified the January 28,

8      2010 order to permit the litigation based on the Michigan

9      agencies' definition of the so-called Form 400 issue; that

10     it simply would not be fair and protective of the parties to

11     modify the stay.

12            If the Michigan agencies want to preserve their

13     full panoply of arguments under their Form 400 issue,

14     including their arguments with respect to the insurers'

15     policy defense, then they need to wait upon a ruling on

16     their petition for cert, or, if they decide not to seek

17     certiorari of the Second Circuit's ruling, then we can

18     proceed on the merits of what is clearly before the Court in

19     the adversary proceeding which, again, as correctly stated

20     by the Second Circuit does not include this pure Form 400

21     issue, but only whether there's a policy in place, or

22     reformation.

23            So I will deny the motion and I'll ask counsel for

24     the insurers to submit an order consistent with this ruling.

25     The order does not need to be settled formally on the

1    Michigan agencies, but you should cc their counsel or at

2    least run it by them before you send it by email to chambers

3    so they can --

4              MR. OLSHIN:  Yes, Your Honor.

5              THE COURT:  -- make sure it's consistent with my

6    ruling.

7              Okay.  I would appreciate, I guess, the following:

8              If -- if -- well, I would like to know either way

9    whether either or both of the Michigan defendants do file a

10   petition for cert.  If they don't, someone should schedule a

11   pretrial conference so I could focus on what -- what is the

12   next step in this litigation.  If they do, then I'll at

13   least know sort of what the timing is.

14             MR. OLSHIN:  Yes, Your Honor.  We'll make

15   arrangements to make those notifications.

16             THE COURT:  Okay.  Thank you.

17             MR. RATERINK:  Thank you, Your Honor.

18             THE COURT:  Thanks.

19             MS. PRZEKOP-SHAW: Thank you.

20             THE COURT:  Thanks.

21             And, again, I -- I -- it's beating a dead horse.

22   I -- I still am amenable to so ordering a stip along the

23   lines that, you know, we've been talking about.

24             MR. CAMPANARIO:  Your Honor, the last item on the

25   agenda is a motion to dismiss by the defendants in an

Page 48

1    adversary proceeding that was brought by CAI Distressed Debt

2    Opportunity Master Fund Ltd and others.  Davis Polk

3    represents the defendants in that adversary proceeding --

4              THE COURT:  Okay.

5              MR. CAMPANARIO:  -- so I'll turn it over to them.

6              THE COURT:  That's fine.

7              MR. KAMINETZSKY:  Good morning, Your Honor.

8    Benjamin Kaminetzsky of Davis, Polk and Wardwell for the

9    defendants.

10             As the Court is aware we are here today on the

11   defendants' motion to dismiss with prejudice plaintiffs'

12   adversary proceeding, which basically asks this Court to

13   revisit and completely rewrite the distribution scheme for

14   general unsecured creditors that is set forth in the

15   confirmation order, the plan of reorganization, the master

16   distribution agreement and the operating agreement, a

17   distribution scheme that, by plaintiffs' own admission in

18   their complaint, was heavily negotiated and approved by the

19   Court.

20             Now plaintiffs ask Your Honor to rewrite these

21   documents in the context of one of the most brutal and hotly

22   contested bankruptcy cases in recent history because, quite

23   frankly, the plain language of these documents will not

24   provide them with the recovery that they seek.

25             If I could -- it might just be easier and quicker

Page 49

1    if I could just hand up to Your Honor -- I made a little

2    booklet with just excerpts of the relevant documents.

3    There's nothing more than that, just so Your Honor doesn't

4    have to flip through multiple hundred-page documents.  It

5    can just follow along.  Would that be okay?

6              THE COURT:  Well, if you've -- you know, have you

7    given a copy to the other side?

8              MR. KAMINETZSKY:  Yeah.  Here you go.  And, again,

9    it's just --

10             THE COURT:  All right.

11             MR. KAMINETZSKY:  -- the relevant pages that I'm

12   talking about.

13             THE COURT:  All right.

14             MR. KAMINETZSKY:  At bottom, Your Honor, this is a

15   case -- simple case summarized clearly and succinctly in

16   plaintiffs' complaint at paragraph 54, and this is what the

17   -- I mean, I couldn't have said it better myself -- this is

18   what the complaint says: "The distribution of DAP stock to

19   DAL members in exchange for those members' DAL interests

20   constitutes a distribution within the meaning of the

21   Modified Plan, the MDA and the Operating Agreement."

22             So, if under the terms of the documents plaintiffs

23   cite -- the modified plan, the MDA and the operating

24   agreement -- these exchanges involved "qualifying

25   distributions," we may be on the hook and this lawsuit can

Page 50

1    continue.  If --

2              THE COURT:  Well, where -- where does the phrase

3    "qualifying distributions" come from?  That's not anywhere

4    in the documents, right?

5              MR. KAMINETZSKY:  No.  Distributions.  You're

6    right.

7              THE COURT:  Okay.

8              MR. KAMINETZSKY:  I'm just saying because

9    "distributions" is -- is a term that we have to talk about

10   what it means.

11             THE COURT:  Okay.

12             MR. KAMINETZSKY:  But you're right.  If it's

13   "distributions," then we're on the hook.  If they're not,

14   then the complaint must be dismissed.

15             The only dispute here is whether the exchange

16   transaction constitutes a "distribution."  For the purposes

17   of this motion, there's no facts in dispute.  So what was

18   the transaction at issue?  Very briefly, as plaintiffs'

19   complaint explains, the DIP lenders set up an entity called

20   DIP Holdco III, LLC, for the purpose of acquiring Old

21   Delphi's assets.  In the modified plan, the term "Company

22   Buyer" is defined as DIP Holdco III.  That's important.

23             DIP Holdco III, LLC later became DIP Holdco, LLP

24   and then changed its name to Delphi Automotive, LLP,

25   referred to in the complaint and in the briefing as DAL.  As

Page 51

1    the name suggests, the L part, this was an LLP, a

2    partnership, and the partners held membership interests in

3    DAL.

4            Now, the entity, DAL, wanted to conduct an IPO,

5    but this raised a problem.  Generally, partnerships don't go

6    public, corporations do.  And as every corporate lawyer

7    knows, the simple way to go public is to establish a shell

8    corporation that will exchange its shares for the partners'

9    membership units, and that's what happened here.  DAL set up

10   a shell corp company called Delphi Automotive, PLC, referred

11   in the complaint as DAP, and DAP exchanged its shares for

12   the partners' membership units of DAL.

13           As a result, the partners who used to own

14   membership units in DAL now owned shares of DAP, a company

15   who, in turn, owned the membership units.  DAP was then able

16   to go public and the old partners of DAL, now shareholders

17   of DAP, could sell their shares in an IPO.

18           I hope that's clear.  I could --

19           THE COURT:  What happened to the interests in the

20   -- in DAL?

21           MR. KAMINETZSKY:  They just -- they're held by

22   DAP.  It's pretty -- it's --

23           THE COURT:  So it's an exchange, right?

24           MR. KAMINETZSKY:  It -- perfectly -- exchanged.

25   Suppose Davis Polk wanted to go public --

```
 1              THE COURT:  So -- so the interest holders in DAL

 2     got shares of DAP --

 3              MR. KAMINETZSKY:  That's it.

 4              THE COURT:  -- in place of the shares that they

 5     had in DAL?

 6              MR. KAMINETZSKY:  Right.  It was basically --

 7              THE COURT:  So -- so isn't the -- I mean, so when

 8     you cut through it, the issue is whether that constitutes a

 9     "distribution," right?

10              MR. KAMINETZSKY:  Well, there's three -- yeah.  I

11     mean, we're cutting through -- exactly.  I mean, that's one

12     of the three ways that they lose is that simply it wasn't a

13     distribution.  A distribution, Your Honor, we all know -- we

14     were -- you, me, Mr. Johnston, we're all partners in a law

15     firm.  So it's the same thing.  A distribution occurs when

16     Davis Polk, Paul Weiss, whomever, has a million dollars and

17     they decide, okay, let's distribute it to the partners.

18              THE COURT:  Well, the plan doesn't say cash.

19              MR. KAMINETZSKY:  What?  No.  Let's say Davis Polk

20     wanted to distribute, I don't know, eraser boards.

21              THE COURT:  Right.

22              MR. KAMINETZSKY:  They would -- they would then

23     give -- take that and give it to the partners.  How do you

24     know that happened, because the day before the distribution

25     there was a million dollars on their balance sheet.  The day
```

Page 53

1    after the distribution there's no longer a million dollars

2    of cash, securities, whatever on their balance sheet because

3    it's now in the partners' pockets.

4              What happened here not a dime, a dime of DAL or a

5    penny went to the partners.  Nothing was distributed.  What

6    happened was, as Your Honor said, was there was just an

7    exchange of shares.  The balance sheet of DAL didn't change

8    at all.  Not one penny went from DAL to the partners'

9    pockets, nothing.  To the extent that anyone did anything,

10   there was a DAL -- simply the membership -- the partners in

11   DAL simply exchanged one equity interest -- what we'll call

12   their membership interest in a partnership -- and got back

13   the amount of equity, stock in DAP.  That's it.  That's what

14   happens.  It was an exchange.

15             And how do you know a distribution didn't occur,

16   just cutting right through it as Your Honor said?  Because

17   if you look at the balance sheet the day before and the day

18   after, nothing changed.  Why did nothing change? Because DAL

19   didn't give anybody anything.

20             So I guess if -- I -- what I want to do, Your

21   Honor, if you could bear -- you know, kind of give me two

22   minutes, I could walk you through the various documents.

23   It's very quickly and just to show you what exactly was the

24   distribution scheme in the plan and what wasn't the

25   distribution scheme in the plan, and show you that under the

1    distribution scheme there had to be three -- there have to

2    be three criteria met in order for it to count to the 7.2

3    billion-dollar-threshold for the unsecureds.

4         So if you will indulge -- indulge me, let's start

5    with the terms of the modified plan.  And the modified plan

6    says very simply -- and, again, we have, if you want to just

7    take a look, if you want to follow along in the excerpt book

8    -- it says on Page 33, Section 5.3:  "On the effective date,

9    the disbursing agents shall establish a distribution account

10   to hold the proceeds, if any, of the general unsecured MDA

11   distribution."  That's Section 5.3.

12        Now the general unsecured MDA distribution is a

13   defined term and is defined on -- in Section 1.102 of the

14   modified plan on Pages 14 and 50.  And what does the word

15   say:

16        "'General unsecured MDA distribution' means if and

17   to the extent Company Buyer makes distributions to its

18   members in accordance with the buy -- the Company Buyer

19   Operating Agreement as described in Section 3.2.3 of the

20   Master Disposition Agreement in excess of $7.2 billion, in

21   an amount equal to," and then it sets forth a certain

22   formula, up to $300 million.

23        Now there are two documents listed in this plan

24   definition in black and white, but before we look at those

25   two documents, which is the operating agreement and the MDA,

1    let me quickly note something that Your Honor's already

2    picked up on.  We already know -- just by reading the

3    definition we already know two things:

4             One, for plaintiffs to be entitled to relief the

5    distribution must have been made by the "company buyer"

6    which is a defined term; and two, to count to the threshold

7    -- the 7.2 billion-dollar-threshold, a distribution must be

8    made.

9             If either or if certainly both of these criteria

10   were not met, if the alleged distributions were not made by

11   the company buyer or if there was no distribution at all,

12   plaintiffs lose.  Please hold this thought because we're

13   just getting started.

14            Now let's look at the two agreements referenced in

15   the modified plan's definition of "general unsecured MDA

16   distribution."

17            So, the relevant portion of Section 3.2.3 of the

18   MDA is on Page 40 and states, if you go to the tab that

19   says, MDA, it's right there and I'm going to read it slowly:

20            "To the extent payable following the closing, the

21   Company Buyer" -- again, defined term -- shall pay to the

22   disbursement agent amounts payable to the unsecured

23   creditors of Delphi pursuant to the plan of organization and

24   the Company Buyer Operator agreement for distribution to

25   such unsecured creditors subject to the terms, conditions

1      and limits set forth in the plan of reorganization and the

2      operating agreement."

3                  Again, "subject to the terms, conditions and

4      limits set forth in the plan of reorganization and such

5      operating agreement."

6                  Please note that the -- that the words are very

7      clear and precise.  The company buyer, which both parties

8      agree refers to DAL, the partnership, has to pay the general

9      unsecured creditors only if the distributions were made

10     pursuant to both the modified plan and the operating

11     agreement.  And just in case that language wasn't clear

12     enough, the end -- the MDA -- the same paragraph emphasizes

13     that any obligation to the unsecureds is subject to the

14     terms, conditions and limits set forth in the plan of

15     reorganization and such operating agreement.

16                 Now let's look finally at the operating agreement,

17     which both the modified plan and the MDA specifically

18     reference.  We'll look at Section 5.6 entitled, payments

19     pursuant to master distribution agreement.  It states:

20                 "In accordance with Section" -- and, again, if you

21     want to just follow along in the -- in the booklet it's

22     under operating agreement.

23                 "In accordance with Section 3.23 of the MDA" --

24     that's the section we just looked at, Your Honor -- "if the

25     asset purchase is consummated pursuant to the plan of

1    reorganization once an aggregate of 7.2 billion has been

2    paid as capital d "Distributions" to the holders pursuant to

3    this agreement, the company shall pay an amount," and then

4    it's based on the formula up to $300 million.

5            And Section 1.1 on Page 4 contains the definition

6    of capital d "Distributions."  And here we go.

7    "Distributions" means:

8            "Each distribution, after the effective date, made

9    by the company to a member, whether in cash, property, or

10   securities of the company, pursuant to or in respect of

11   Article 5 or Article 10."

12           So, by simply reading the words of these three

13   documents, in order to be a qualifying "distribution" that

14   would count to the 7.2 billion threshold, the transaction

15   must be three things:

16           One, a distribution of cash or property;

17           Two, made by the Company Buyer, C.B -- that's DAL

18   to its members; and

19           Three, made pursuant to Article 5 or Article 10 of

20   the operating agreement.

21           You need to satisfy all three criteria to be a

22   qualifying distribution or to be a distribution.  And as

23   detailed in your -- in our papers, Your Honor, the exchanges

24   at issue were, on its face, the Holy Roman Empire of

25   distributions.  They were not distributions.  They were not

Page 58

1    made by DAL, and they were not made pursuant to Article 5 or

2    Article 10 of the operating agreement.  Plaintiffs are

3    literally zero for three.

4             So let's -- we've already touched on this, but

5    let's go -- talk about distributions.

6             Company buyer is a partnership, okay, and as we

7    talked about a -- we know how partners distribute cash or

8    other property.  Is that what happened here?  How much cash

9    or property was distributed?  The answer is nothing.  On the

10   day of the transaction the partners simply exchanged their

11   membership units in DAL for equity in DAP.  Not a single

12   cent of DAL cash, property was distributed to the partners.

13            So returning to what we talked about, the balance

14   sheet was completely unchanged.  Now to a corporate lawyer

15   and under the law, the difference between a distribution of

16   assets and an exchange of shares is both clear and vast.

17   And if you take a look at the example of the I -- the

18   Internal Revenue Code set forth on Page 4 or 5 -- 4 and 5 of

19   our reply brief it explains this in a very understandable

20   way.

21            Under the tax code a distribution by a partnership

22   is taxable -- is a taxable event, unfortunately for me,

23   while the exchange of equity in a partnership for shares in

24   a corporation is not taxable.  Why? The case law says

25   because it was a change in form, "not in substance."   And

1    in an economic sense, there was a mere change in the form of

2    ownership.  A change in form is exactly what we're talking

3    about now.  It's as if Davis Polk, LLP set up a company

4    called Davis Polk, Inc. and the partners exchanged shares

5    for Davis Polk, LLP for Davis Polk, Inc.

6           So what do plaintiffs say?  How can they say a

7    distribution occurred when not a single penny was

8    distributed?  They say, yes, the modified plan, the MDA and

9    the operating agreement used the term "distribution," but

10   what those documents really, really mean -- or in

11   plaintiffs' words on Page 12 of their brief "The obvious

12   concern and purpose was to ensure that if those assets

13   ultimately proved to be worth more than $7.2 billion

14   unsecured creditors would be entitled to payment."  That's

15   what they say.  I didn't make that up.  They suggest that

16   they are entitled to distributions based on the enterprise

17   value of DAL.

18          Now, Your Honor, we both have seen plans that are

19   -- when recover -- based on recoveries -- where recoveries

20   are based on enterprise value or in plaintiffs' parlance on

21   what the assets are worth.  The problem for plaintiffs is,

22   as we just saw from the documents, this is not such a plan.

23   And as detailed in Page 10 to 12 of our reply brief, if for

24   no -- some unknown reason the words of the modified plan

25   itself is not strong enough evidence that the distribution -

1    - the recoveries were based on distributions and not what

2    enter -- what the value of the assets were, the ultimate

3    nail in plaintiffs' enterprise theory is the fact that in

4    previous unconsummated plans in this case unsecured recovery

5    was based on enterprise value.

6           And it gets even better, because the unsecured

7    creditors committee, the UCC, of course understood the

8    difference between the unconsummated plan which was based on

9    enterprise value, and the later plans that were based on

10   distributions.  And, you know what, they objected

11   vociferously.  If you could just take a look on Pages 11 and

12   12 of our reply, this is from the unsecured creditors'

13   objection.  I'm quoting.  Recoveries would "not be based on

14   debtors' total enterprise value."  That's from the UCC's

15   objection, Paragraph 33.

16          Another one, "The value of the assets would be

17   completely irrelevant to whether the general unsecured

18   creditors receive any distribution."  That was Paragraph 9.

19          The reorganized debtors "actually have to generate

20   and distribute substantially more than 7.2 billion in actual

21   cash returns to its equity before the unsecured creditors

22   receive a penny, even a penny."

23          And my favorite quote, "Even if the value of

24   reorganized debtors' membership interests were worth tens of

25   billions of dollars in the future, general unsecured

1    creditors would not receive a penny unless reorganized

2    debtors, among other things, distributed 7.2 billion of its

3    members."

4              So to the -- to suggest that the modified plan

5    intends to implement a distribution scheme similar to that

6    of the unconsummated plan is completely contrary to the

7    words, but also contrary to what everyone knew at the time.

8    It is simply pure fantasy.

9              So if the Court finds that there was no

10   distribution -- and there wasn't -- game over.  The motion

11   to dismiss must be granted.

12             Then we get to -- so that's -- they failed prong

13   one, and if you fail any of the prongs you're out.  So there

14   was no distribution.

15             THE COURT:  Well, there was no distribution by

16   DAL.

17             MR. KAMINETZSKY:  There was no distribution by

18   DAL.  Query, whether there was a distribution by anyone, but

19   here we're getting to now the DAL point.  So the question is

20   -- okay.  So now let's assume what Your Honor is saying.

21   Remember, the definition of --

22             THE COURT:  Well, you're -- you're saying there

23   was no distribution by anyone because the IPO just

24   established the value of the interests that -- that the

25   former partners and now shareholders have.  It wasn't -- it

 1    wasn't a payment to them.

 2            MR. KAMINETZSKY:  Right.  Well --

 3            THE COURT:  it just made their interest more

 4    easily tradable.

 5            MR. KAMINETZSKY:  Exactly, but it's -- but it --

 6            THE COURT:  And established a market price for it.

 7            MR. KAMINETZSKY:  Yeah.  But it's even more than

 8    that, Your Honor, because, again, if you recall the

 9    definitions that we saw in the -- in the documents was that

10    it has to be a distribution by the Company Buyer.

11            THE COURT:  Well, no.  That's the second point.

12            MR. KAMINETZSKY:  Right.

13            THE COURT:  I mean, I --

14            MR. KAMINETZSKY:  I understand what you're --

15            THE COURT:  You said it's not a distribution --

16    you spent most of the last ten minutes telling me why it

17    wasn't a distribution -- why it wasn't by the company buyer,

18    but the earlier point was that it's not a distribution,

19    either because --

20            MR. KAMINETZSKY:  It's just an exchange.

21            THE COURT:  -- it just fixes the value of the

22    interest.  It doesn't -- it doesn't result in anyone

23    receiving something in respect of that interest.  It just

24    makes that interest publicly tradable and --

25            MR. KAMINETZSKY:  Right.  And -- and one of the

Page 63

1    requirements, as maybe we'll talk about a little later is

2    that the exchange had to be exactly pro rata.  In other

3    words, no one was supposed to get more or less of the stuff,

4    of the partnership.  It was -- you know, it's literally what

5    you said.  It used to be called a membership unit in an LLP

6    and now I'm getting the concomitant amount of equity in this

7    shell company that -- whose only asset is the membership

8    units.

9            So I guess it's hard to keep the three things

10   separate, but now like segueing into the Company Buyer

11   point, right.  We already talked about how DAL didn't

12   distribute anything to its members.  Okay.  But they say --

13   so to the extent anyone gave anything to anybody, it was

14   DAP, not the Company Buyer, but DAP, the PLC, the company

15   that did the exchange.

16           So what do plaintiffs say about that?  In other

17   words, the -- not in other words, the words of the plan say

18   company buy -- the only thing that qualifies are

19   distributions by Company Buyer.  Not a dime left the Company

20   Buyer.  To the extent anyone gave anything to anybody it was

21   the DAP giving these shares in a corporation whose only

22   asset was what you already had anyway.

23           So what do they say about that?  They say, well,

24   the fact that it says Company Buyer doesn't really mean it

25   has to be just Company Buyer.  And they say the fact that it

Page 64

1    was DAP and not DAL should be ignored because DAL and DAP

2    are affiliates.  And then they throw in like the alter ego

3    and say that they should all be considered and collapsed

4    into one.  And then they throw in some what-ifs and a parade

5    of horribles to suggest that the Company Buyer should be --

6    requirement should be ignored because theoretically DAL

7    could funnel distributions through an affiliate and,

8    therefore, avoid their obligations under the modified plan,

9    something that never happened.

10           I could say a lot about this, but let me limit

11   myself to two points because I think Your Honor has it.

12           First, the exchange at issue was not some sort of

13   clever policy -- plot cooked up to re-route distributions to

14   a dummy affiliate.  These precise transactions, these pre-

15   IPO transactions, including the creation of DAP, was

16   explicitly and specifically laid out and contemplated in the

17   controlling documents.

18           If you look, Your Honor, at Section 14.13 of the

19   operating agreement it's entitled, Further Action, Initial

20   Public Offering, and talks about setting up an entity

21   called, Issuer, and describes how DAL members will

22   contribute their "respective membership interest to a newly

23   formed corporation, i.e. the Issuer, in exchange for equity

24   in the Issuer."  This is exactly the transaction that

25   happened, that was alleged in the complaint.

1          And just to state the obvious, just the modified

2     plan could have been based on enterprise value, the

3     definition of "distribution" could have included

4     distributions by the Issuer, but it doesn't.

5          And to -- for the plaintiffs to suggest that the

6     Court should rewrite the controlling documents because

7     Delphi did something that was always contemplated and set

8     forth in black and white in Section 14.13 of the operating

9     agreement just so it could get paid is unsupportable.

10          THE COURT:  Well, it does -- it does say here that

11     this -- well, the -- unless I'm misreading this, that the

12     "common equity securities of the Issuer shall reflect the

13     residual interests of the members pursuant to Section

14     5.1(a)(iv)."

15          MR. KAMINETZSKY:  Right.  That --

16          THE COURT:  So there --

17          MR. KAMINETZSKY:  -- proves the point we were just

18     talking about.  That means that -- what that means, what

19     that's saying is exactly what we -- the dialogue we just had

20     two seconds ago is that that means that there -- no one

21     should be gaining or losing, getting more or less than what

22     they -- what they had before.  In other words --

23          THE COURT:  Well, but -- but I think what you're

24     suggesting, though, is that this is a separate argument from

25     the argument that you were making, which is that, in

Page 66

1    essence, it's the same thing and there's not been a

2    distribution, because here I think what you're saying is

3    that by going through the Issuer the right to a distribution

4    is cut off for all time.

5              So that, for example, if the -- if the Issuer sold

6    its assets or, you know, and there was, under your

7    definition, a distribution as opposed to just a -- you know,

8    turning the interest into stock, the rights under the plan

9    wouldn't -- would have been cut off.

10             MR. KAMINETZSKY:  Yeah.  You know, interesting

11   question.  It's just not -- it's interesting.  What you're

12   saying is that, so let's say the DAL does what -- a real

13   distribution, but it has to get --

14             THE COURT:  No.  DAP does.

15             MR. KAMINETZSKY:  Yeah.  Well, DAP -- the only

16   thing that it has to distribute -- it doesn't have anything

17   other than holding the membership units of DAL.  It's a

18   shell that the only asset is just I'm -- the membership

19   units.  It's really just a shell corporation on top that's

20   between the partners --

21             THE COURT:  Well, if someone buys DAP's stock --

22             MR. KAMINETZSKY:  Right.  Yeah.  I -- I don't -- I

23   mean, again, it's not presented in these facts so I'm not

24   sure we have to decide this, but it's not -- I mean, again,

25   the words "Company Buyer" are pretty clear.

1           And, Your Honor, the point here is -- the only

2      point I'm trying to make here --

3           THE COURT:  But what I'm saying is I think that --

4      that if the Company Buyer changes its stripes and becomes,

5      you know, super Company Buyer --

6           MR. KAMINETZSKY:  Company Buyer, Inc.

7           THE COURT:  Yeah, or company -- yeah.  Company

8      Buyer, Inc, or -- or, you know, Company Buyer LLP II and

9      gets distributed all of the assets of -- of the original

10     Company Buyer, it would seem to me that that would either be

11     an amendment to this operating agreement that would be

12     precluded from -- by the confirmation order from cutting off

13     the right to up to 300 million, or it would have to be done

14     as explicitly recognized by this Section 14.3 where it would

15     reflect the residual interests which I think would -- are

16     impressed with this right to up to 300 million.

17          MR. KAMINETZSKY:  Right.  So that -- that's what

18     happened here.  I mean, it's what -- the reason why we're

19     not confronted with your scenario, Your Honor, is because

20     what they're suing us for is precisely what we did pursuant

21     to 14.13 of the operating agreement.  We did -- you know,

22     look what it's written.  It's called Further Action: IPO.

23     We wanted to do the IPO that we always wanted to do and we

24     did it precisely according to 14.13.

25          And it could have been the company -- in other

Page 68

1    words, the plan of reorganization could have said if you do

2    distributions or if you do an IPO they get paid.  It didn't

3    say that.

4              THE COURT:  Well, in other words you're -- you're

5    saying that the two or three horrible hypotheticals that are

6    raised in the objection to the motion to dismiss really --

7    that -- that your arguments wouldn't apply to those

8    hypotheticals because it's a -- those are situations that

9    weren't contemplated by the -- by the parties.

10             MR. KAMINETZSKY:  I -- I don't -- I'm not able to

11   speak to that.  What I'm saying is that I -- I -- again,

12   it's not enough to defeat the plain words of a court order

13   and documents by saying possibly someone could do something

14   untoward.  They're saying that what happened here is a

15   distribution and clearly it wasn't.  If -- if --

16             THE COURT:  Okay.  All right.

17             MR. KAMINETZSKY:  -- in some future -- in some

18   future time --

19             THE COURT:  That's fine.

20             MR. KAMINETZSKY:  -- we do something that we

21   haven't done and they want to sue us again for that, I guess

22   that will be for another day.  But, again, you know, they're

23   not saying we did any of that.  They're saying we did the

24   IPO and that IPO, that exchange transaction, is a

25   "distribution" by the Company Buyer; and the answer is, it's

Page 69

1    not, and the answer is, it was fully contemplated, and the

2    plan could have said, if you do an IPO -- which we've seen

3    in other plans -- and the value of the asset is worth X, we

4    get paid.

5                THE COURT:  Okay.

6                MR. KAMINETZSKY:  It -- it just didn't.

7                THE COURT:  All right.

8                MR. KAMINETZSKY:  Okay.

9                If we could just -- if we could just now go on to

10   the final point, and this, I think, is just the -- quite

11   frankly, the -- just to review.  So we have -- we don't have

12   a distribution and we don't have it by the Company Buyer.

13               THE COURT:  When you say we don't have a

14   distribution, at this -- at this level you're saying we

15   don't even have a lower case distribution.

16               MR. KAMINETZSKY:  Yeah.  We don't have a lower

17   case distribution, capital distribution, subscript of D --

18               THE COURT:  Well, no.  Let's just leave it at

19   lower case --

20               MR. KAMINETZSKY:  Right.

21               THE COURT:  -- because now you're going to make

22   the capital D distribution argument, right?

23               MR. KAMINETZSKY:  Yeah.  I think they're going to

24   make it.  But, basically, what they're saying is that the

25   third prong -- so we needed Company Buyer.  We needed

Page 70

1    distribution.  No.  No.  And now it had to be pursuant to

2    Article 5 and 10 of the operating agreement.

3              Now plaintiffs also lose for the third time

4    because what happened here wasn't pursuant to Article 5 and

5    Article 10 of the distribution agreement.  So there's no

6    dispute that Article 10 -- sorry -- of the operating

7    agreement.  So there's no dispute that Article 10 doesn't

8    apply.  That leaves Article 5 and as -- as I just explained,

9    though, Section 14.13, that's Article 14 of the operating

10   agreement contemplates the very type of exchanges DAP

11   carried out with DAL members.  So Article 5 doesn't apply.

12             So what do plaintiffs say in response to the clear

13   requirements in the operating agreement that only

14   distributions under Article 5 or 10 count?  Well, after

15   spending a page telling the Court how various online

16   dictionaries define the word distribution, and perhaps my

17   favorite sentence in plaintiffs' brief, they say on Page 12,

18   and I'm quoting:

19             "To be sure, both the modified plan and the MDA do

20   make reference to the operating agreement.  That reference,

21   however, does not magically incorporate into the modified

22   plan the terms of the operating agreement."

23             Let me say that again:

24             "To be sure, both the modified plan and the MDA do

25   make reference to the operating agreement.  That reference,

Page 71

1    however, does not magically incorporate into the modified

2    plan the terms of the operating agreement."

3            Yes, it does.  When a document says in "accordance

4    with, pursuant to, and subject to the terms, conditions and

5    limits as set forth in," abracadabra aside, magically

6    incorporate is precisely what the words do.  What else do

7    they do?

8            Now plaintiffs also suggest that because a pre-IPO

9    transaction under Article 14 had to be done on the same pro-

10   rata basis as Article 5 distribution, the words in the

11   operating agreement that read, "pursuant to Article 5 or

12   Article 10" should nevertheless be read pursuant to Article

13   5, Article 10 or Article 14.  Again, the prospect of an IPO

14   was detailed in the documents and the definition of

15   qualifying distribution could have included an IPO, but it

16   doesn't.

17           So with nowhere else to go what do plaintiffs do?

18   They implore the Court to simply ignore the operating

19   agreement, pretend it doesn't exist, throw it away.  Well,

20   why?  They have two suggestions:

21           First, they suggest that the terms of the modified

22   plan and the operating agreement conflict.  No, they don't.

23   They can be -- they are and can be perfectly harmonized.

24   Happy to go through it again, but at this point Your Honor

25   is probably sick of looking at this language.  Where is the

1    conflict?  The case law is clear that even when you're

2    dealing with private contracts, not court-approved orders,

3    you don't look for conflicts.  You try to harmonize.

4              THE COURT:  But can I -- can I cut through this a

5    little bit?

6              MR. KAMINETZSKY:  Yeah.

7              THE COURT:  It seems to me that -- well, you

8    haven't addressed the payments to GM and the PBGC.  You've

9    so far just been focusing on -- on the IPO.

10             MR. KAMINETZSKY:  Yeah, because they don't -- I'm

11   sorry.

12             THE COURT:  But -- but as far as that is

13   concerned, I think that this capital D argument really is

14   just a restatement of the argument that the IPO wasn't a

15   distribution, lowercase d.

16             MR. KAMINETZSKY:  Yeah.  Again, there's --

17             THE COURT:  But it --

18             MR. KAMINETZSKY:  -- two things to say --

19             THE COURT:  But it --

20             MR. KAMINETZSKY:  -- one is that, yeah.  A

21   distribution is a word that has meaning and it's not a

22   distribution no matter -- again, look at their definitions

23   of distribution from the Webster dictionary and from Flags.

24   It means --

25             THE COURT:  Right.

```
 1              MR. KAMINETZKY:  -- somebody gives stuff to

 2     someone else.

 3              THE COURT:  But on the -- on the other hand I --

 4     it seems to me that there's only one way that there are

 5     actual distributions made under this operating agreement and

 6     that is either through Article 5 or Article 10 --

 7              MR. KAMINETZKY:  Right.

 8              THE COURT:  -- on dissolution, or if you amend the

 9     agreement.  You get the consent of the parties to amend the

10     agreement.

11              MR. KAMINETZKY:  Right.

12              THE COURT:  So it seems to me given that the order

13     says you're not allowed to amend the agreement to get around

14     the deal, the -- all the real distributions here are under

15     Article 5, right?

16              MR. KAMINETZKY:  Well, no.  They --

17              THE COURT:  Even -- even the GM and PBGC

18     distributions are -- are under Article 5 because they're

19     either under Article 5 or there's been an amendment to the

20     agreement.

21              MR. KAMINETZKY:  No, because, Your Honor, let me

22     say two things.  The first thing is that the GM and PBGC

23     distributions don't matter because even they admit it

24     doesn't get them to the 7.2 --

25              THE COURT:  No.  I -- I understand that.
```

1           MR. KAMINETZSKY:  But, no.  See, that would be

2     fine, but they -- if there wasn't Article 12 and Article 12

3     of the operating agreement -- see, what Article 5 talks

4     about these pro rata distributions -- and we could talk

5     about it.  I just don't know if Your Honor wants to spend a

6     lot of time on it because it doesn't matter because they

7     admit that the only -- that they only win or they only

8     survive if the exchange offer --

9           THE COURT:  Well, Article 12 requires additional

10    consent, though, right?  So you're, in essence, amending the

11    agreement.

12          MR. KAMINETZSKY:  Let me -- let me take a look at

13    it.

14          THE COURT:  And you're saying that the

15    distribution went to GM and PBGC under Article 12, but that

16    required an amendment.  So then you run afoul of the order.

17          MR. KAMINETZSKY:  No.  No.  No.  I'm sorry.  12.2.

18          THE COURT:  Right.  Okay.  Okay.  Right.

19          MR. KAMINETZSKY:  Okay.  So it says:

20          "In addition to the approval of the board of

21    managers, the company shall take -- shall not take directly

22    or indirectly any of the action listed below nor permit any

23    of the subsidiaries to do so directly or indirectly without

24    consent of the majority initial class A holders."

25          So that -- that -- my understanding if that's who

Page 75

```
 1   we got -- we got consent.  I mean, that's not the

 2   unsecureds.  That's -- and then, B, if you look -- just flip

 3   the page, for so as long as the initial Class A holders own

 4   at least ten percent -- which we did -- of the Class A

 5   membership interest, then we could take out GM and the PBGC.

 6            So these -- these -- these distributions, the ones

 7   that, you know, they're saying were Article 5 distributions

 8   were specifically not Article 5 distributions.  They weren't

 9   pro rata distributions.  They were distributions pursuant to

10   Article 12, which is not 5 and not 10, but is something

11   else.

12            THE COURT:  But this provision isn't -- isn't one

13   that provides for a distribution.  It just -- it provides

14   for a --

15            MR. KAMINETZSKY:  Redeem, purchase or otherwise

16   acquire for value any membership interests, redeems them.

17            THE COURT:  But you -- you have to get the consent

18   to do that.

19            MR. KAMINETZSKY:  We -- the consent of whom, Your

20   Honor?  Look -- let's flip back.

21            THE COURT:  The other members.

22            MR. KAMINETZSKY:  No.

23            THE COURT:  The holders, the Class A holders.

24            MR. KAMINETZSKY:  The majority of initial Class A

25   holders.
```

1             THE COURT:  Right.  I know.  The committee didn't

2       bargain for their consent right here.

3             MR. KAMINETZSKY:  Right.

4             THE COURT:  But --

5             MR. KAMINETZSKY:  In other words, this document

6       authorizes to do exactly what we did under not Article 5,

7       not Article 10, but Article 12.  So that's -- that just

8       doesn't count because we saw the operating to be a

9       distribution.  It has to be pursuant to Article 5 or Article

10      10.

11            (Pause)

12            THE COURT:  Well, I guess the question I have

13      there is -- so you're saying that the available cash

14      available for distribution to the members under Section

15      5.1(a) now doesn't include -- now has this tax on it, in

16      essence, under 12.2(a)?

17            MR. KAMINETZSKY:  Yes, or -- or said another way,

18      that what we have to -- what counts towards the 7.2 billion-

19      dollar-threshold are distributions as defined here and

20      distributions as defined here are only distributions under

21      Article 5 and Article 10 --

22            THE COURT:  Well, all right.  But 5.1 says all

23      available cash available for distribution to the members may

24      be distributed to the extent approved by the board of

25      managers in accordance --

```
 1                  MR. KAMINETZSKY:  May be distributed.

 2                  THE COURT:  -- with the applicable provisions of

 3       this Article 5.

 4                  MR. KAMINETZSKY:  Yeah.  May be distributed under

 5       --

 6                  THE COURT:  Right.

 7                  MR. KAMINETZSKY:  -- Article 5 --

 8                  THE COURT:  Right.

 9                  MR. KAMINETZSKY:  -- but it may be distributed as

10       specifically contemplated in Article 12.2, and the

11       difference is Article 5 distributions count and Article 12

12       distributions do not count.

13                  THE COURT:  But why doesn't Article 12 just --

14       just modify the priorities here and these are available --

15       this is -- this is available cash, but you've modified the

16       waterfall in 5.1(a) through the consent to the redemption in

17       12.2?

18                  MR. KAMINETZSKY:  Because that's what -- that's

19       what -- yes.  That's what the document does.  I suppose that

20       is because it was always contemplated that we would want a -

21       - I'm making this up.  I wasn't part of the -- but that we

22       wanted to take GM and the PBGC out, so there was a specific

23       provision addressed to that.  And that was bargained for.  I

24       mean, these are documents that were court-ordered.

25                  THE COURT:  No.  I understand.  I'm just not --
```

1    I'm just telling you I -- I don't necessarily read there

2    being more than two distributions sections in this

3    agreement.  The redemption section can easily be read as

4    just simply modifying the order of priority that you make

5    distributions.

6             MR. KAMINETZSKY:  But it talks about -- it talks

7    about redeem, purchase or otherwise acquire.  It talks about

8    taking them out.

9             THE COURT:  Right.

10            MR. KAMINETZSKY:  And that's what we did with --

11            THE COURT:  Right.

12            MR. KAMINETZSKY:  -- as we were authorized --

13            THE COURT:  With cash, available cash.

14            MR. KAMINETZSKY:  Right, which we were authorized

15   to do.

16            THE COURT:  Right.

17            MR. KAMINETZSKY:  But --

18            THE COURT:  Why is that inconsistent with 5.1(a)?

19            MR. KAMINETZSKY:  Because it didn't have -- again,

20   pursuant to Article 5 is -- Article 5 requires you when you

21   do these distributions to do it according to the waterfall

22   that Your Honor just talked about.

23            THE COURT:  Except as modified by -- by the

24   agreement.

25            MR. KAMINETZSKY:  Right.  So we --

1          THE COURT:  By 12 -- by 12.2.

2          MR. KAMINETZSKY:  Right.  Exactly.  So we didn't

3     do it through Article 5.  We did it through Article 12.

4          THE COURT:  No.  That -- that just sounds too cute

5     to me.  I mean, you could -- you could easily then say that

6     -- I mean --

7          MR. KAMINETZSKY:  You know, Your Honor, I

8     disagree, but the good news is that's probably -- that -- if

9     we win on the exchange offer --

10         THE COURT:  Right.

11         MR. KAMINETZSKY:  -- this case is over.

12         THE COURT:  Okay.

13         MR. KAMINETZSKY:  And then it's just -- you know,

14    we could fight about the $2 billion, does it count or not

15    count --

16         THE COURT:  Right.

17         MR. KAMINETZSKY:  -- if and when there's a further

18    distribution.

19         THE COURT:  Right.  Okay.

20         MR. KAMINETZSKY:  Let me just conclude and then --

21    because I think -- if Your Honor has got it --

22         THE COURT:  All right.

23         MR. KAMINETZSKY:  And, again, the last five

24    minutes was not on the exchange offer.  It was just on the 2

25    billion issue --

Page 80

```
 1                THE COURT:  Right.

 2                MR. KAMINETZSKY:  -- not on the --

 3                THE COURT:  Right.

 4                MR. KAMINETZSKY:  -- not on the IPO.

 5                THE COURT:  Right.

 6                MR. KAMINETZSKY:  So what do they do about, again,

 7      the Article 5 and Article 10 problem, requirement with

 8      respect to the exchange offer.

 9                THE COURT:  Right.

10                MR. KAMINETZSKY:  And they basically then are left

11      to say that the Court should just basically throw out the

12      operating agreement.  They should ignore it and, why,

13      because it was allegedly withheld from the public.

14                Once again, there's a lot to say, but the

15      confirmation order approved the operating agreement and

16      ordered it "binding in all respects upon all creditors and

17      any holder of interest, whether known or unknown," and of

18      course Your Honor had a copy of the agreement.  So to

19      suggest that the operating agreement is not binding is a

20      direct impermissible collateral attack on the confirmation

21      order.

22                And, of course, the sealing order makes clear that

23      the unsecured creditors' committee had a copy of the

24      operating agreement and the PBGC was on the creditors'

25      committee and most of the plaintiffs are suing on behalf of
```

1    themselves and the PBGC -- I mean, to say that it was a

2    secret document. . . .

3              But more than that, and here's really the kicker,

4    there's no allegation in the complaint that they didn't have

5    access to the terms of the operating agreement.  In fact,

6    the allegations are precisely the opposite.  Paragraph 32 of

7    the complaint says:

8              "The provisions of the agreements relevant --

9    agreement relevant to this lawsuit" -- referring to the

10   operating agreement -- "are readily apparent through a

11   review of related documents."

12             And Paragraph 35 says:

13             "On information and belief, all provisions of the

14   operating agreement related to or affecting distributions to

15   holders of general unsecured claims of the debtors were

16   replicated faithfully in the LLP agreement in accordance

17   with the requirements of the confirmation order."

18             And it was.  And for good measure they attach a

19   copy -- two copies of the LLP agreement to their complaint.

20             So for them to suggest -- they basically tried to

21   do an amendment without looking.  In the complaint they said

22   they had the operating agreement or the relevant provisions,

23   and in their brief they say it was secret and withheld and

24   it shouldn't matter and -- and ignore it.

25             I guess I could go on, but I see you've had it

Page 82

1    with me.  So in the words of Winston Churchill, I'm just

2    making the rubble bounce.

3            Just -- the fully contemplated exchange

4    transaction in exchange for the fully contemplated IPO, and

5    we saw it laid out in Section 14.13, were not distributions

6    of assets.  They were exchanges of equity.  They were not

7    made by the company -- company buyer, DAL.  They were made

8    by the issuer, DAP, and they were not made pursuant to

9    Article 5 of the -- or 10 of the operating agreement.  They

10   were made pursuant to Article 14.  Plaintiffs are zero for

11   three and this isn't baseball.  One strike is enough for

12   their complaint to be dismissed.

13           Unless you have questions I'll sit down now and

14   let Mr. Johnston --

15           THE COURT:  Okay.

16           MR. KAMINETZSKY:  -- comment.

17           THE COURT:  Okay.

18           MR. JOHNSTON:  Good morning, Your Honor.  Jim

19   Johnston of Dewey and LeBoeuf on behalf of the plaintiffs.

20   This is my first time appearing before you.

21           THE COURT:  Good morning.

22           MR. JOHNSTON:  It's a pleasure to be here.

23           Your Honor, this is a case about entitlement to

24   distributions under the plan of reorganization, the one that

25   you confirmed two-and-a-half, almost three years ago.  I

Page 83

1    noted from the agenda that this is the seventy-fifth omnibus

2    hearing and while that's impressive, I'm sure you had hoped

3    to be rid of the matter by now.

4            I can tell you that my clients, all of whom are

5    general unsecured creditors certainly hoped to have received

6    what was promised to them under the plan, the relatively

7    modest amount of $300 million, by now.  Unfortunately, they

8    haven't received a dime, or to use Mr. Kaminetzsky's phrase,

9    a penny.  The defendants have made it clear, in fact, that

10   they do not intend to pay the 300 million now due under the

11   plan.  And so here we are.  This is a case to compel

12   performance of the plan, to compel performance and payment

13   of that $300 million.

14           And it is a case that, first and foremost, hinges

15   on the plain language and meaning of the plan.  I'll agree

16   with Mr. Kaminetzsky about that.  As I'll explain, the plan,

17   in no uncertain terms, provides that unsecured creditors are

18   due payment when the "Company Buyer makes distributions to

19   its members in excess of $7.2 billion."  I'll explain why

20   that's happened.

21           In an effort to dismiss this case now, you've

22   heard the defendants say that the plan doesn't really mean

23   what it says.  When you -- when the plan uses the term,

24   "distributions," it doesn't really mean all distributions,

25   just those that fit within a narrower term, "Distributions,"

Page 84

1    from an agreement that wasn't disclosed, that was secret,

2    that was never on the public docket at the time of

3    confirmation.

4              THE COURT:  Well, can I interrupt you?

5              MR. JOHNSTON:  Yes.

6              THE COURT:  I can -- I can sort of see your

7    argument on the redemptions to the PBGC and GM.  I'm having

8    a very hard time seeing your argument with regard to the

9    IPO.  The L -- the limited partnership interests in DAL, and

10   I know there was a predecessor, but we're just referring to

11   the DAL --

12             MR. JOHNSTON:  Yes.

13             THE COURT:  -- the limited partnership interests

14   were not public, but they were transferable.  You know,

15   hedge fund Y could have bought some of those interests or

16   all of them from the holders of those interests.  That

17   wouldn't be a distribution, would it?  That wasn't -- that's

18   not covered by this.  That's a -- the assets of DAL are

19   still there, right?

20             MR. JOHNSTON:  Agreed.  A transfer of the limited

21   partnership interests --

22             THE COURT:  Okay.

23             MR. JOHNSTON:  -- while technically permitted

24   under very limited circumstances as a practical matter

25   didn't happen.

1           THE COURT:  All right.  So -- so instead of that,

2    what happens is DAL, through the share transaction with DAP,

3    goes public.  So now the ownership interests are -- and I

4    for the moment I'm accepting that you might be able to treat

5    DAP and DAL as the same -- so the ownership interests are

6    now public and there's a price put on them, right?  That's

7    the only difference, is that there's a market price put on

8    them.  There -- how is that a distribution?

9           MR. JOHNSTON:  In a couple of ways, Your Honor.

10          We allege, and as you indicated you said that you

11   would accept the allegation that for present purposes --

12          THE COURT:  Well, just for the purpose of this

13   hypothetical.

14          MR. JOHNSTON:  Yes.  For -- for present purposes -

15   -

16          THE COURT:  Right.

17          MR. JOHNSTON:  -- DAP is the same as DAL.

18          THE COURT:  Right.

19          MR. JOHNSTON:  DAP was owned and controlled by

20   DAL.  DAP's only directors were DAL's CEO and --

21          THE COURT:  No.  Just --

22          MR. JOHNSTON:  -- general counsel.

23          THE COURT:  -- for the purpose of this

24   hypothetical --

25          MR. JOHNSTON:  Uh-huh.

1          THE COURT:  -- I'm accepting that.  So -- but,

2     again, how is -- how is -- the -- increasing the ability to

3     monetize the ownership interests a distribution?

4          MR. JOHNSTON:  The -- because there was a

5     distribution of that DAP shares to DAL's members, a

6     technical distribution.  There was a transfer of that

7     property and -- and that transfer of property actually was

8     the essence of the transaction because it enabled the

9     members of DAL to monetize their illiquid assets and to turn

10    those illiquid assets into cash.

11         THE COURT:  But so what?  It doesn't have any --

12    it -- it's -- it's --

13         MR. JOHNSTON:  Well --

14         THE COURT:  The assets are still there.

15         MR. JOHNSTON:  They're not there, though.  I mean,

16    keep in mind, Your Honor, that this was no ordinary IPO in

17    which an Issuer raises capital for future operations and the

18    like.  The Issuer here didn't receive a dollar of proceeds.

19    All of the IPO proceeds went directly to the company buyer's

20    members.  And what have they been doing since the IPO?  All

21    of the former member -- or yeah -- the former members of

22    DAL, now the shareholders of DAP, they've been liquidating

23    their investments.

24         To give you one example, Paulson and Company sold

25    20 million shares into the IPO.  They made $453 million in

1    the IPO.  Since then they've sold another four-and-a-half-

2    million-dollars, making another -- or four-and-a-half-

3    million shares making another 140 million.  That's $700

4    million to one member of Company Buyer.

5              THE COURT:  But the agreement did not provide that

6    either -- that -- that this right, this contingent right to

7    get up to $300 million, that it was triggered either by a --

8    you know, a public valuation of DAL or the monetization of

9    DAL's members interests.

10             MR. JOHNSTON:  No.  The agreement provided for

11   when the members of DAL took out of the company, received in

12   respect of their ownership interests $7.2 million, then

13   unsecured creditors were entitled to be paid.

14             THE COURT:  Well --

15             MR. JOHNSTON:  And what our --

16             THE COURT:  -- it -- it doesn't say that.  I mean,

17   you could provide that.  You could -- you could easily have

18   said in the agreement -- not you because you didn't draft

19   it.

20             MR. JOHNSTON:  Correct.

21             THE COURT:  But the creditors' committee could

22   have -- could have provided that, you know, we get -- I

23   haven't done the math -- like forty-five percent of every

24   distribution -- not every distribution, every proceed of

25   your membership interest in DAL, or any successor over and

Page 88

1    above your pro rata share of $7.2 billion.  It doesn't say

2    that.

3            MR. JOHNSTON:  No.  But the plan provided that

4    when the partners, the limited partners of this partnership,

5    the Company Buyer, received distributions --

6            THE COURT:  Right.

7            MR. JOHNSTON:  -- which as a practical matter was

8    the only way that they could get a return on their

9    investment above a certain amount, then unsecured creditors

10   got paid.  What the transactions here have done have

11   completely eliminated the -- that happening in the future.

12           And -- and I was going to end with this, but I

13   think it's appropriate to turn to it.  We have alleged, and

14   I think it's appropriate, what this transaction has done has

15   basically frustrated the purpose of the plan.

16           Even if these transactions somehow didn't qualify

17   as a distribution within the meaning of the plan, under the

18   allegations of the complaint the defendants have still

19   breached the plan because the new structure put into place

20   means that the 7.2 billion-dollar-threshold will be

21   certainly much harder to satisfy and probably will never be

22   satisfied, frustrating the purpose of the plan itself and

23   the deal that was implemented in the plan.

24           THE COURT:  Well --

25           MR. JOHNSTON:  Under --

Page 89

1            THE COURT:  Can I interrupt you there?

2            MR. JOHNSTON:  Uh-huh.

3            THE COURT:  I mean, it -- certainly, the

4     possibility of an IPO must have been in the minds of the

5     people that prepared this.  In fact, in -- and I -- it's

6     expressly contemplated in Section 14 -- I'm sorry -- 4.13.

7            MR. KAMINETZSKY:  14.

8            THE COURT:  I'm sorry.  14.13.  So I -- and I --

9     you know, I went back and looked at the supplemental

10    disclosure statement for the modified plan and it really

11    just refers to the -- I think, unless you can point me to

12    other language -- it really just refers back to this

13    operating agreement.  It doesn't say, for example, if you

14    get money in any way, shape or form on account of your

15    ownership interest above your pro rata share of 7.2 billion

16    you're going to pay the rest on this sharing formula.  It

17    doesn't say that.  I mean, I --

18            MR. JOHNSTON:  I think --

19            THE COURT:  -- I think if -- if people had relied

20    on that, I would be much more inclined to deny this motion.

21    But it just goes back to the operating agreement again.

22            MR. JOHNSTON:  Well, two points on that.

23            One, the operating agreement absolutely did

24    contemplate exactly what happened here.  The insertion of

25    this shell company between the partnership and the members

```
 1    and then an IPO.  And --

 2              THE COURT:  Right.

 3              MR. JOHNSTON: -- as you observed earlier Section

 4    14.13(b) provides for a distribution of the shares in

 5    exactly as was set forth in Article 5 of the operating

 6    agreement.

 7              THE COURT:  Right.

 8              MR. JOHNSTON:  That tells me that what happened

 9    here was a distribution and it was a distribution --

10              THE COURT:  Well, can I ask you --

11              MR. JOHNSTON: -- under Article 5.

12              THE COURT:  -- on that score -- and that's the

13    only way I can conceivably, I think, accept your argument.

14    The shares as distributed by DAP, I guess you could argue,

15    were impressed with this right, right, the right to get up

16    to $300 million?  I guess that's the -- I mean, to me that's

17    the only argument you could make here.  And that -- so that,

18    therefore, when you sell the shares in the future, you know,

19    if your pro -- if your pro rata share of that adds up to

20    more than $7.2 billion along with all the other

21    distributions that are made not through share sales,

22    arguably there is -- you know, there's a -- there's an

23    obligation to pay that over.  Although I don't know how you

24    -- how you would possibly monitor that.

25              MR. JOHNSTON:  It's not a matter of selling shares
```

1    in the future.  It's -- they -- they got cash equivalent by

2    virtue of these NYSE traded shares that the operating

3    agreement itself says has to go out through the Article 5

4    waterfall.

5              But I --

6              THE COURT:  So you're saying --

7              MR. JOHNSTON:  -- I did want to refer --

8              THE COURT:  -- the shares themselves have to go

9    out that way?

10             MR. JOHNSTON:  No.  The shares -- the shares

11   reflect the Article 5 distributions and -- and they say the

12   -- at first you have to give preferred securities with

13   preferences reflecting the amount of the distributions set

14   forth in Sections 5.1(a)(1) through --

15             THE COURT:  But how do you -- how do you -- maybe

16   I -- as a practical matter how do you calculate that?  Are

17   you -- I mean, it would seem to me that --

18             MR. JOHNSTON:  You --

19             THE COURT:  -- if the new shares are issued

20   they're issued pursuant to Section -- let's just say they're

21   stamped with 5.1(a)(iv), okay.  They're stamped with that --

22   that burden on them, okay.  So then what?  How does -- how

23   do you get to your 300 million at that point?

24             MR. JOHNSTON:  It -- it -- the 300 million is

25   satisfied because --

1            THE COURT:  No, but who -- who pays it?  How does

2    it get paid?

3            MR. JOHNSTON:  DAL or DAP, but --

4            THE COURT:  Out of its capital?

5            MR. JOHNSTON:  Out of -- out of -- yes, because

6    what DAL has done is it's distributed property with a market

7    value of $22 a share aggregate $7.2 billion value that the

8    market put on it to its members who can then go do what they

9    wish with it.  So it's not a question of going out and

10   tracking down individual members who say, gee, did you sell

11   on X and Y date, give us, you know, your share of the

12   obligation to pay the $300 million.

13           I -- I did want to return, Your Honor to --

14           THE COURT:  Well, but I guess the --

15           MR. JOHNSTON:  The distribution happened --

16           THE COURT:  Okay.

17           MR. JOHNSTON:  -- upon the --

18           THE COURT:  All right.

19           MR. JOHNSTON: -- transaction.  All of this was

20   simultaneous.  Exchange, IPO, members got publicly traded

21   market valued shares.

22           I did want to go back to the idea that -- that

23   somehow the operating agreement itself is the be all end all

24   of the question here as opposed to the plan.  I want to say,

25   you know, first, it's an odd contention given what happened

Page 93

1    in the case.

2            What we've heard is that a fundamental limitation

3    on the unsecured creditors only right to payment under the

4    plan isn't contained in the plan.  It's not contained in the

5    confirmation order.  It's not contained in the master

6    distribution agreement that was actually filed with the

7    plan, but it's in this operating agreement that was only

8    filed under seal, can't be found anywhere in the public

9    record or the bankruptcy cases.

10           I think, Your Honor, coming into this as someone

11   who wasn't there at the time that that can't be.  This was

12   the one provision of the plan that unsecured creditors cared

13   about.  It was so important that Your Honor specifically

14   ordered in Paragraph 64(g) of the confirmation order that

15   the rights to the MDA distribution couldn't be amended,

16   modified or waived to reduce, eliminate or otherwise affect

17   the distributions to unsecured creditors.

18           But we're supposed to believe that this allegedly

19   critical limitation was buried in a non-public document that

20   unsecured creditors never saw.

21           THE COURT:  But it's -- it's -- it's in every

22   provision.  It's in every public provision.

23           MR. JOHNSTON:  Well, not to the extent that Mr.

24   Kaminetzsky says.  It simply says "in accordance with the

25   Operating Agreement."  And what happened here?  These --

1                THE COURT:  Well, it says --

2                MR. JOHNSTON:  -- exchange transactions --

3                THE COURT:  -- subject to the terms and conditions

4     --

5                MR. JOHNSTON: -- were in accordance --

6                THE COURT:  It says "subject to the terms,

7     conditions and limits --

8                MR. JOHNSTON:  Yes.

9                THE COURT:  -- set forth in the POR and the

10    Company Operating Agreement."

11               MR. JOHNSTON:  Yes.  And -- and --

12               THE COURT:  And there's no dispute that the people

13    that negotiated this deal had access to the operating

14    agreement, right?

15               MR. JOHNSTON:  I -- I assume that that's the case.

16    I assume that that's the case, but it never found its way --

17               THE COURT:  And no one raised -- no one objected

18    to confirmation or to the supplemental disclosure statement

19    and said, "wait a minute, this is -- I want to see it.  I'm

20    not going to rely just on the committee.  I want to see it

21    myself and know what's happening."

22               MR. JOHNSTON:  On -- on what grounds would they

23    have had reasons to do so?  The plan --

24               THE COURT:  Because they want to see the -- they

25    want to see the agreement.

1          MR. JOHNSTON:  But the plan on its face is crystal

2     clear.  It just says distributions to members in amounts

3     above $7.2 billion.   There -- there was no disclosure that

4     the operating agreement limited creditor rights.  Creditors

5     had absolutely no reason to seek it out.

6          THE COURT:  Well, actually, I mean, the

7     supplemental disclosure actually says to unsecured

8     creditors: "pro rata share of deferred consideration under

9     the master disposition agreement."

10          MR. JOHNSTON:  Well the master disposition

11     agreement was disclosed.

12          THE COURT:  And it refers to the -- it refers to

13     this agreement, the operating agreement.  So --

14          MR. JOHNSTON:  Yes, but there's --

15          THE COURT:  -- I mean, honestly --

16          MR. JOHNSTON:  -- there's no --

17          THE COURT:  -- if you're -- if you're doing your

18     due diligence on this, you either -- you either trust in the

19     committee's judgment or you say "I want to see it," and I

20     probably would have let them see it.  At least they could

21     have signed a confidentiality agreement and seen it, but no

22     one wanted to see it.

23          MR. JOHNSTON:  We -- we don't know if anybody

24     wanted to see it or not.

25          THE COURT:  Well, I know because no one asked for

Page 96

```
1    it.

2              MR. JOHNSTON:  No.  But once there's a sealing

3    order in place in a bankruptcy court it's -- I'm -- you have

4    far more experience than I do.

5              THE COURT:  The sealing order contemplates the

6    ability to sign a confidentiality agreement, even -- even if

7    you -- even if you believe that the sealing order can't be -

8    - can't be --

9              MR. JOHNSTON:  I don't believe that's the case,

10   Your Honor.

11             THE COURT:  But that's -- but that -- look, I --

12             MR. JOHNSTON:  I mean, there --

13             THE COURT:  You're -- I -- you're not going to win

14   on this argument.  I'm sorry.  It's not going to work.

15             MR. JOHNSTON:  Okay.  The -- again, if there was a

16   general description that was misleading, this argument would

17   work because then you would have conflicting documents, but

18   you're led right back to the operating agreement.

19             Now you -- you make the argument that the

20   operating agreement in two or three ways isn't as rigid as

21   Mr. Kaminetzsky is saying and I -- I understand that in

22   part.  But if you don't have the operating agreement what do

23   you -- what do you have?  I mean, it's --

24             MR. JOHNSTON:  You have the very --

25             THE COURT:  I mean, you could basically say that -
```

1    - that it could be an enterprise value.  It could be

2    anything.

3            MR. JOHNSTON:  Well, no.  You have the plain

4    common sense meaning of the plan, which is what creditors

5    did --

6            THE COURT:  All right.

7            MR. JOHNSTON: -- have access to.

8            THE COURT:  Then if there is $7.2 billion of what?

9            MR. JOHNSTON: Are distributed to the members of

10   DAL, then unsecured creditors become entitled to the sharing

11   formula set forth --

12           THE COURT:  Okay.

13           MR. JOHNSTON: -- in the --

14           THE COURT:  And, again --

15           MR. JOHNSTON: -- definition of the plan --

16           THE COURT:  -- distributed -- distributed --

17   distributed by whom, by DAL or by the public buying the

18   shares that these people have in DAL?  I think that's --

19   that's your real hurdle here.

20           MR. JOHNSTON:  Well, and --

21           THE COURT:  And that's a -- that's a very

22   significant distinction.

23           MR. JOHNSTON:  And --

24           THE COURT:  And it's a -- it's such an obvious

25   distinction I would have to assume the parties were aware of

Page 98

1    it when they were negotiating this.  It's one thing to say

2    that we get this right, which you would normally get through

3    a warrant or, you know, through some form of equity whenever

4    the value -- you know, that we could monetize just like

5    they're monetizing it, just like the owners are monetizing

6    it, you know, a contingent value right or a warrant, if

7    it's, you know, turned into -- into publicly tradable

8    shares.

9            But to say a "distribution" is really a different

10   -- I mean, who is making the distribution here?  The only

11   way, again, I -- I can see this argument, and I want to hear

12   Mr. Kaminetzsky's response to it, is that "distribution" not

13   only means that the entity in which your -- in which the

14   investors owned an interest in pays them something, which is

15   I think the normal definition of a distribution, which is --

16   you know, you get something from your limited partnership,

17   in this case or your corporation.  You get a dividend.  You

18   get a redemption.  You get something directly from it.

19           But I think your argument is saying, well, that's

20   -- you know, it's more than that.  It's if they could ever

21   monetize it in any way, including getting a greater fool to

22   buy their interest in it, then you get a share of that.  And

23   there's so many ways to actually add that in, none of which

24   were done here.

25           MR. JOHNSTON:  And that --

 1              THE COURT:  You know, you get a right of first

 2       refusal.  You get a warrant.  You get an option.  I mean,

 3       it's -- those are all things that -- that cover that second

 4       alternative as opposed to just a payment, a distribution by

 5       the -- you know, by the limited partnership.

 6              MR. JOHNSTON:  And -- and the second alternative

 7       is not our argument.  The --

 8              THE COURT:  Well --

 9              MR. JOHNSTON: -- argument here is that the

10       distribution of --

11              THE COURT:  Was getting the common shares.

12              MR. JOHNSTON: -- of the common shares --

13              THE COURT:  All right.

14              MR. JOHNSTON:  -- is a qualifying distribution

15       under -- it -- it is a distribution that counts toward the

16       $7.2 billion and --

17              THE COURT:  And -- and why is that --

18              MR. JOHNSTON:  -- it counts --

19              THE COURT:  -- why is that a distribution?

20              MR. JOHNSTON: Because what the defendants here did

21       was take the limited partnership interests, convert them

22       into something that's essentially equivalent to cash, and

23       distributed it to members who can then do what they wish

24       with it.

25              THE COURT:  Okay.

Page 100

1          MR. JOHNSTON:  That --

2          THE COURT:  But why is that a distribution?

3          MR. JOHNSTON: Because it then enabled the members

4   to realize the values of their interests --

5          THE COURT:  But that's --

6          MR. JOHNSTON:  -- which is the same as a --

7          THE COURT:  But that's not a distribution in my

8   mind.  That's -- that's, again, selling your interest as

9   opposed to getting something from -- I mean, DAL is still

10  worth what it's worth, right?   It's still --

11         MR. JOHNSTON:  Yes.

12         THE COURT:  It's still impressed with this -- this

13  three -- up to three-hundred-million-dollar tax or interest

14  that --

15         MR. JOHNSTON:  Well, let me --

16         THE COURT:  -- that your clients have along with

17  all the other unsecured creditors.  So if someone ever wants

18  to sell DAL, then they'll get their money.

19         MR. JOHNSTON:  But who is going to sell DAL?

20         THE COURT:  Well, I don't know.

21         MR. JOHNSTON:  Do --

22         THE COURT:  I mean, but it would seem to me that

23  that's the question that the people should have been asking

24  when they negotiated the deal.

25         MR. JOHNSTON:  Let me -- let me drill down on

Page 101

1    this.  Under the pre-IPO structure, the individual members

2    of DAL controlled DAL and they had the economic interest in

3    receiving a return on their investment, right?  Over time it

4    stood to reason that those members would actually direct DAL

5    to make distributions at appropriate times.  That way they

6    would recoup their investment.  You saw that happen --

7              THE COURT:  Right.

8              MR. JOHNSTON: -- with the distributions to GM and

9    PBGC, some --

10             THE COURT:  Right.  I understand that.

11             MR. JOHNSTON:  -- four-million-dollars went out

12   the door.

13             THE COURT:  Right.  And I'm much more sympathetic

14   to your arguments there than I am on this other point.

15             MR. JOHNSTON:  And -- and that was the status when

16   the plan was struck, the plan deal was struck.

17             Now what do we have?  We have DAL controlled by a

18   publicly owned holding company, DAP, from which there's no

19   need for DAL to get distributions.  DAP wholly owns DAL.

20   All of DAL's financial results and balance sheets are rolled

21   up into DAP for accounting and reporting purposes --

22             THE COURT:  But why can't we --

23             MR. JOHNSTON:  -- as -- as a --

24             THE COURT:  Let me interrupt you.  Why can't --

25   why can't this very easily be interpreted, and appropriately

Page 102

1    interpreted, to say that the ownership interests in DAP are

2    impressed with this up to three-hundred-million-dollar

3    right, and whenever DAP makes a dividend or redemption or

4    sells its assets or sells DAL's assets, then, you know, you

5    keep totting those up and when they add up to 7.2 billion,

6    along with any distributions that occurred before the IPO,

7    then the 300 million kicks in?

8                  MR. JOHNSTON:  But -- but the point is -- is that

9    how is DA -- how and why would DAP make a dividend?

10                 THE COURT:  Well, but -- but wait.  You're --

11   you're -- I mean, you're buying the stock because you think

12   it's worth something, right?  At some point it's not just a

13   shell game.  You actually have to look at the value of the

14   company.

15                 MR. JOHNSTON:  Which -- which is -- which is the

16   point.  The value of the company is all rolled up into this

17   -- into DAL.

18                 THE COURT:  Well, I am assuming that the price

19   that they paid for the stock included the calculation that

20   this 300 million would have to get paid some day.  I mean,

21   that --

22                 MR. JOHNSTON:  Well --

23                 THE COURT:  -- that affects the price --

24                 MR. JOHNSTON:  That -- that raises an --

25                 THE COURT:  -- right?

1           MR. JOHNSTON:  -- interesting point.  What did the

2   company say about the 300 million when they issued the

3   shares?  And this is in our complaint.  When you look at the

4   S1 that -- that accompanied the IPO, what do they say?  They

5   say that the "contingency of member distributions exceeding

6   $7.2 billion is not considered probable of occurring."  They

7   said it's not going to happen.

8           THE COURT:  Well, when?  At what point --

9           MR. JOHNSTON:  Ever --

10           THE COURT:  -- in the future --

11           MR. JOHNSTON: Ever.

12           THE COURT:  -- or -- or as part of this

13   transaction?

14           MR. JOHNSTON:  No.  No.  Ever.

15           THE COURT:  Well --

16           MR. JOHNSTON:  Their disclosure is that -- their

17   disclosure is that it will never happen.

18           THE COURT:  Well, but that doesn't --

19           MR. JOHNSTON:  And --

20           THE COURT:  I mean, the people who bought the

21   stock may have a cause of action over that, but -- but you

22   guys don't, do you?

23           MR. JOHNSTON:  That -- we have a cause of action

24   because what they've done is frustrate the fundamental

25   purpose of --

Page 104

```
1              THE COURT:  Well --

2              MR. JOHNSTON:  -- this plan provision.

3              THE COURT:  All right.

4              MR. JOHNSTON:  They -- they've done this

5    transaction.  At the same time they tell the market this

6    contingency of future member distributions isn't going to

7    happen.  It's not going to happen and why is it not going to

8    happen, because the new structure they've put in, for all

9    intents and purposes, means that there will never be those

10   distributions.

11             THE COURT:  Well, but was there anything that --

12   that -- in the documents that precluded them from doing this

13   structure?  I mean, they -- in fact, it's specifically

14   contemplated in 14.13.

15             MR. JOHNSTON:  It's specifically contemplated in

16   14.13 and -- and as we argued, we believe that 14.13 then

17   incorporates the distribution provisions and reaffirms our

18   argument that what this was really was a distribution and it

19   really was a distribution of material assets worth -- worth

20   billions of dollars.

21             THE COURT:  All right.  Well, I guess that's -- to

22   me that's the only issue.  Is -- is whether that was -- that

23   stock that the limited partners received was a distribution

24   or simply a -- a non-material transformation of their

25   ownership interests.  And -- well, I guess I can see that
```

Page 105

1    the stock itself might be impressed with this right of the

2    unsecureds.  It's hard for me to see how it's a distribution

3    or that DAP -- I -- better yet, DAP is impressed with this

4    right.  It's hard for me to see how it's a distribution.

5           It -- it says that there's -- that you're supposed

6    to get -- ignoring the preferred securities -- common equity

7    securities of the issuer reflecting the residual interests

8    of the members pursuant to Section 5.1(a)(4).

9           MR. JOHNSTON:  And -- and before that preferred

10   equity securities.

11          THE COURT:  Right.

12          MR. JOHNSTON:  Right.

13          THE COURT:  Okay.  So -- was it just common or was

14   it preferred issued as part of the IPO?  I thought it was

15   just common.

16          MR. JOHNSTON:  I will find that out.

17          THE COURT:  But -- all right.  Anyway, it's --

18          MR. JOHNSTON:  I think it was just common.

19          THE COURT:  I mean, it -- it does -- the other one

20   -- okay.  So -- so how -- how does that language make it a -

21   - make the receipt of the shares an Article 5 distribution?

22   Even though it does refer to Article 5, how does it make it

23   a distribution as opposed to just saying you're getting --

24   you're getting your stock pursuant to the interest that's

25   laid out in (a)(iv)?

Page 106

1          MR. JOHNSTON:  Well, the distribution is by virtue

2    of the fact that this was DAL property, the shares of DAP.

3    That's -- that's the allegation in the complaint.  And --

4          THE COURT:  But how --

5          MR. JOHNSTON:  And then -- and then to defeat the

6    technical argument that somehow it doesn't really count as a

7    distribution unless it's a "Distribution" and then it has to

8    be a "Distribution" only if it occurs under Article 5 or

9    Article 10, what we read 14.13(b) as doing is saying that

10   that distribution of property, which is contemplated under

11   the operating agreement, has to adhere to Article 5.  That's

12   -- that's what this says.

13          I mean, Article 5 --

14          THE COURT:  Well, it says they get --

15          MR. JOHNSTON:  -- sets forth --

16          THE COURT:  Well, actually, what it really says is

17   they get -- they get the -- it gets distributed to them in

18   the percentages in 5.1(a)(iv).

19          MR. JOHNSTON:  Right, which -- which is exactly

20   how distributions of property are made.

21          THE COURT:  But 5.1(a) talks about distributions

22   of available cash.  5.3 talks about distributions of assets

23   other than cash.  But how is -- how is this -- how is the

24   issuance of the stock in return for the ownership interest

25   distribution of property of -- of -- of DAL?  It's not.

Page 107

1    It's a substitution of the interests in DAL for another

2    interest.  It's not a distribution of DAL's property.

3              MR. JOHNSTON:  When -- when you combine it with

4    the instantaneous issuance of the public and sale of the

5    public shares by the members, what it did was distributed

6    DAL's property.

7              THE COURT:  It didn't distribute DAL's property.

8    It distributed the ownership interests.  It just made it

9    more -- it made it more -- it made it market -- it made it

10   more marketable, but --

11             MR. JOHNSTON:  Right.

12             THE COURT:  I guess that's my problem with this.

13   I mean, I -- it goes back to my original question.  I don't

14   see a conceptual or, you know, logical difference between

15   selling an LLP interest and selling a stock interest.  I do

16   see that this language in the documents limits the

17   unsecureds' ability to monetize the -- their contingent

18   interests.  But I think that's what it does --

19             MR. JOHNSTON:  Well, and --

20             THE COURT:  -- particularly when there are all

21   these other ways that you can take care of that problem that

22   aren't dealt with here.

23             MR. JOHNSTON:  That --

24             THE COURT:  And believe me, you know, I -- I would

25   be flabbergasted if the issue of warrants or contingent

Page 108

1    value rights or some appraisal mechanism wasn't raised.  I

2    mean, it's -- those are all extremely well known ways to

3    deal with this type of problem.

4              MR. JOHNSTON:  Well, Your Honor, that's one of the

5    things that discovery in this case will show.

6              THE COURT:  But --

7              MR. JOHNSTON:  And -- and we have --

8              THE COURT:  But why do I have to have discovery on

9    it when the documents don't deal with this --

10             MR. JOHNSTON:  We --

11             THE COURT:  -- scenario?  They don't -- they don't

12   cover the ability to tag along with the equity.  They only

13   deal with the ability to get paid out of the LLP --

14             MR. JOHNSTON:  Your Honor --

15             THE COURT:  -- and, arguably, any successor.

16             MR. JOHNSTON:  -- one -- one of the causes of

17   action in our complaint is -- gets to precisely that subject

18   and -- and that is that by virtue of this transaction the

19   defendants have frustrated the purpose of the plan.

20             Now maybe discovery will show that everyone

21   contemplated this and that warrants were asked for and

22   rejected, that there was some other kind of instrument was

23   on the table and wasn't -- and wasn't ultimately adopted and

24   that everybody understood that if an IPO like this happened

25   there wouldn't be a distribution and unsecured creditors

1    wouldn't have any rights.

2            Certainly, the public documents don't show that.

3    Certainly, the record available to unsecured creditors at

4    the time the plan was confirmed don't show that.  Responding

5    to one of Mr. Kaminetzsky's assertions earlier that our

6    complaint says, well, yeah, everybody knew because the LLP

7    agreement had similar provisions.  The LLP agreement didn't

8    come on the scene until after confirmation.  It was --

9            THE COURT:  Well, I think --

10           MR. JOHNSTON:  -- the agreement that replaced the

11   --

12           THE COURT:  -- I mean --

13           MR. JOHNSTON:  -- operating agreement.

14           THE COURT:  I think the complaint really says that

15   you have the documents now as opposed to then.

16           MR. JOHNSTON:  Right.

17           THE COURT:  So I -- I don't think it's an

18   admission that you had the documents then rather than

19   they're -- they're available now.

20           MR. JOHNSTON:  And -- and if you look at Count III

21   it alleges that:

22           "Defendants frustrated the rights of holders of

23   general unsecured creditors of the debtors in violation of

24   an implied covenant of good faith and fair dealing in the" -

25   -

Page 110

```
 1              THE COURT:  But why is the --

 2              MR. JOHNSTON:  -- "modified plan."

 3              THE COURT:  But -- well, but I -- I don't -- I

 4    mean, if the language of the contract is clear, why is there

 5    any sort of implied covenant of good faith?  The contract

 6    speaks for itself.  You don't get to that.

 7              MR. JOHNSTON:  Well, which --

 8              THE COURT:  The --

 9              MR. JOHNSTON:  -- contract are we talking about?

10    If we're talking about the plan --

11              THE COURT:  You're talking about the --

12              MR. JOHNSTON:  -- then the --

13              THE COURT:  Oh, well, I -- okay.  That's the

14    argument -- that the issue I -- I told you you were going to

15    lose on for sure --

16              MR. JOHNSTON:  All right.

17              THE COURT:  -- which is that something other than

18    the operating agreement is going to govern here.  I -- I

19    just -- it's --

20              MR. JOHNSTON:  All right.  Well --

21              THE COURT:  It's just not -- I mean, the very

22    provision that deals with this -- let me just turn to it is

23    1.102 that says, you know, "in accordance with the Company

24    Buyer Operating Agreement."  I mean, everyone knew there was

25    a document there.  And 3.2.3 of the MDA refers to the
```

1    "Company Operating Agreement."

2            So, you know, it -- that's -- that's where you

3    look.  That's the first place you go to.

4            MR. JOHNSTON:  If you could see it.

5            THE COURT:  Well, you could have -- no one asked

6    to see it, and, you know, that's their problem, I guess.

7            MR. JOHNSTON:  Let me turn briefly to the

8    distributions to General Motors and PBGC and I --

9            THE COURT:  Okay.

10           MR. JOHNSTON:   -- I understand what Your Honor

11   said earlier and, obviously, we agree.  But I think that the

12   fact of -- that the defendants are making the argument that

13   four-and-a-half-billion-dollars distributed directly in cash

14   by DAL to members doesn't count as a distribution to meet

15   the plan threshold, I think, bears a fair amount on their

16   arguments with respect to the other question because they --

17   they're trying to treat this as a game of --

18           THE COURT:  Well --

19           MR. JOHNSTON: -- gotcha.

20           THE COURT:  -- but let -- but let's assume I -- I

21   think that at a minimum the agreement is ambiguous on this

22   point, and maybe even go so far as to think that that's got

23   to be a distribution.  You're not close yet, right?  There's

24   -- there's a few billion dollars to go.

25           MR. JOHNSTON:  There is a few billion dollars to

1    go.

2              THE COURT:  Right.

3              MR. JOHNSTON:  That's right.  And -- and if Your

4    Honor does not give us leave to amend to address any

5    concerns you have in the complaint, if you say come back

6    when there's another two, two-and-a-half-billion-dollars of

7    distributions made, the problem we're going to be faced with

8    is the practical realities -- and this goes to the breach of

9    the covenant of good faith -- that the structure the

10   defendants have put in place makes it highly unlikely that

11   there will be future distributions and --

12             THE COURT:  They're never going to make a

13   dividend?

14             MR. JOHNSTON:  They -- they have no reason to make

15   a dividend.  That's the point that I was making earlier.

16             DAP can store all the excess cash.  It can make

17   purchases directly.  It can do deals.  It can direct buyer

18   to pay a -- a third party directly.  There's -- and

19   shareholders get the benefit of the enterprise value.

20   They're getting the benefit of the flow to the stock.  They

21   -- it's -- the people who bought this stock are buying the

22   enterprise value.  They're not buying it for dividends.

23   There's not going to be a dividend.  There's -- there's no

24   reason that any dividend would -- would be made in the

25   future.  And that goes to --

Page 113

1          THE COURT:  How do I know that?   I mean, I -- I

2    am assuming -- I mean, among other things, that's why this

3    provision was in here, is that if there are distributions,

4    redemption of stock, dividends.  I mean, they -- they sell

5    it, they sell the assets, they're just going to plow it back

6    into the company as opposed to -- to giving some of that

7    back to the shareholders?

8          MR. JOHNSTON:  The shareholders who hold NYSE

9    traded shares and are able to then realize the value, the

10   appreciated value that way.

11         THE COURT:  Well, okay.

12         MR. JOHNSTON:  I think that's all I have, Your

13   Honor.

14         THE COURT:  Okay.

15         MR. JOHNSTON:  Okay.  Thank you.

16         THE COURT:  Thanks.

17         MR. KAMINETZSKY:  Can I speak very brief or --

18         THE COURT:  Yeah.  I mean, the issue I wanted you

19   to address, although you can talk about other stuff, too, if

20   you want, is what is your response to the argument that when

21   the limited partners in DAL got their -- got the stock in

22   DAP they got a -- that -- that stock was impressed with the

23   requirement that once they receive value in excess of 7.2

24   billion that 300 million has to come out.  So, in essence,

25   the right was triggered at that point.

Page 114

1           MR. KAMINETZSKY:  A couple of things, Your Honor.

2    One is it just -- I mean, you could say a cat is a dog and

3    you can say a dog is a cat, but if you read -- forget the

4    operating agreement, just read 1.102.  It says "General

5    Unsecured MDA Distribution means if and to the extent

6    Company Buyer makes distributions to its member in

7    accordance with the company" --

8           THE COURT:  Right.

9           MR. KAMINETZSKY:  -- the MDA and the buyer in

10   excess of 7.2, the Company" -- and we've talked about this -

11   - and I think the best way to think about this is there's a

12   lot of case law on this.  The Internal Revenue Code says

13   there's two different things and they're treated very

14   differently and everyone knows the difference if you're a

15   corporate lawyer -- is that there's a distribution of assets

16   and the way you know if the distribution occurred of assets

17   of a partnership is you look at the balance sheet the day

18   before and the day after.  If it's changed, there must have

19   been a distribution.  If there's a negative it must have

20   been a distribution.

21          Here, as Your Honor has said, nothing left DAL and

22   what the -- what the IRS has found and there's lots of case

23   law on this and it's cited in our brief, that all that an

24   exchange is, it's just that.  You had a membership unit and

25   now you have a -- a stock.  They didn't get a -- who --

Page 115

1   there was a distribution by whoever bought their stock, by

2   the underwriter or by the public shareholder.

3           Again, DAL didn't cash out or -- or do anything.

4   That's -- I mean, that's the -- that's the answer is that

5   you can twist and -- I mean, somehow plaintiffs are

6   approaching this case like they have a constitutional right

7   -- hedge funds have a constitutional right to a distribution

8   and any document that says that they don't has to be

9   rewritten.

10          And, Your Honor, this would maybe be a little bit

11  interesting if -- two things, one is if there wasn't Section

12  14.13 that contemplated this very transaction, the pre-IPO

13  exchange and the IPO.  That would maybe be interesting.

14  Hey, nobody thought of this.  This was a surprise.  But

15  everyone thought of it.  It wasn't a surprise and, as you

16  said, the creditors committee didn't negotiate for -- for

17  it.

18          Your Honor, I've been involved and Your Honor has

19  been involved in plans that were based on enterprise value.

20  Everyone knows how to draft such a plan.  Dewey Ballantine

21  does, Skadden does.  I mean, you had really sophisticated

22  lawyers.  This would also be a little bit more interesting

23  if there wasn't a previous plan in this case that was based

24  on enterprise value, and when this plan came out the UCC

25  went crazy.  I read to you the quote saying, wait a second.

Page 116

1    This is nuts.  There could be tens of billions of dollars of

2    enterprise value and we won't get a penny.  Surprise.  Guess

3    what?  There could be an IPO.  There could be tens of

4    billions of enter -- tens of billions of enterprise value

5    and they don't get a penny because that's what the words

6    say.  I mean, it's -- it's hard -- it's -- you could turn

7    this into an enterprise value plan, but I humbly suggest

8    three years later is not the time to revisit very clear

9    words in the plan.

10          The -- and just a couple of -- a couple of points.

11   We're playing along with this idea and we put a footnote in

12   our brief that this is like a contract dispute and, you

13   know, we could pretend it's a contract dispute.  But it --

14   you know, Your Honor, it's not a contract dispute, these

15   were not private contracts and now we're coming to a court

16   as a third party and saying what do these things -- help us,

17   what does this mean.  These are all documents approved

18   pursuant to the Court order after a confirmation process, et

19   cetera.

20          They -- and -- and the -- which goes to the point

21   is, you know, they talk about Mr. Johnston said, you know,

22   he wants discovery.  I'm not sure whose discovery he's

23   talking about.  Your Honor approved these documents.

24   They're "so ordered" by the Court.  The plan specifically

25   says the plan -- sorry.  The confirmation order specifically

1    says that the operating agreement, the plan --

2             THE COURT:  Well, if -- if -- if the -- if the

3    documents were ambiguous then they would be entitled to

4    discovery.

5             MR. KAMINETZSKY:  Of who, of what Your Honor

6    thought when --

7             THE COURT:  No.  The --

8             MR. KAMINETZSKY:  -- you read the --

9             THE COURT:  -- the parties who negotiated on them,

10   what they were -- what they said and so forth.

11            MR. KAMINETZSKY:  I'm not sure -- but -- okay.

12   But there --

13            THE COURT:  I mean, otherwise, how do I know what

14   they mean?

15            MR. KAMINETZSKY:  Well, because -- I mean, I guess

16   --

17            THE COURT:  I mean, it's not --

18            MR. KAMINETZSKY:  Okay.

19            THE COURT:  -- it's not enough just to say that

20   they're there, because that doesn't -- that doesn't really

21   answer the question.  But I think I know what they mean, so

22   --

23            MR. KAMINETZSKY:  Okay.

24            THE COURT:  -- it doesn't matter.

25            MR. KAMINETZSKY:  But I'm not sure -- if -- it's -

1   - so the question would be what does "in accordance with"

2   mean, what does "pursuant to" mean, and what does "subject

3   to the terms and limitations" mean.  I mean, that's the kind

4   of discovery that they want to take.  It doesn't -- it

5   doesn't make any sense.  The MDA says you get distributions

6   if -- pursuant to, subject to and -- and subject to the

7   terms and conditions and limits.

8          The other thing that I found surprising is that,

9   you know, this idea that the operating agreement was secret

10  or anything else.  They bought into this deal and they've

11  already admitted that for litigation purposes they were able

12  to quickly figure out the terms of the operating agreement.

13         THE COURT:  Well, these -- these particular

14  plaintiffs, you're saying.

15         MR. KAMINETZSKY:  Right.

16         THE COURT:  Yeah.

17         MR. KAMINETZSKY:  So, I mean, like in other words

18  --

19         THE COURT:  That's fair.  I mean --

20         MR. KAMINETZSKY:  I can't be their insurer -- if

21  you have a document that -- if you have an instrument that

22  says you're distribution is contingent on -- contingent on

23  the terms of an operating agreement, you could either get

24  the operating agreement or not.  If you decide to buy it

25  anyway without getting the operating agreement, that's --

Page 119

1    I'm sorry, but that's your problem.

2              THE COURT:  Right.  That's all right.  I mean, I

3    was -- I was discussing the issue of those who were owners

4    of unsecured claims before the modified plan was confirmed.

5    I think it's a very different set of equities --

6              MR. KAMINETZSKY:  Right.

7              THE COURT:  -- afterwards.

8              MR. KAMINETZSKY:  But the --

9              THE COURT:  Although I'm not sympathetic to either

10   group --

11             MR. KAMINETZSKY:  Okay.

12             THE COURT:  -- on this point, so.

13             MR. KAMINETZSKY:  Well, our plaintiffs are --

14   actually like bought -- bought into this.

15             I just wanted to say one -- I think you -- Your

16   Honor, you got it.  I mean, the only way they get what they

17   want is if you turn this into something that it wasn't, but

18   -- and something that it was clearly and specifically and

19   deliberately not because we had an enterprise plan and it

20   was unconsummated, an enterprise value plan and then we had

21   this.

22             The other thing I wanted to say and I think it's

23   an important point is I -- I don't want to -- the PBGC and

24   the GM issue, I just -- I want to clarify something.

25   Available -- there's no obligation to use available cash to

Page 120

1    -- pursuant to Article 5 and give it out.  The board could

2    do whatever it wants with available cash.  It could use it

3    to buy another company.  It could use it for whatever.  Here

4    it shows to do the Article 12 redemption of the PBGC and --

5            THE COURT:  I understand that, but --

6            MR. KAMINETZSKY:  -- the GM.

7            THE COURT:  -- on the other hand, it's not like

8    they're -- I mean, they're -- they're doing it to make the

9    payment to the investors, I mean, to the -- to the holders

10   of interests in this entity.  It's not like they're doing it

11   to -- to buy a new plant.  So it -- it just -- it -- this

12   argument seems a little -- a little too cute to me.

13           MR. KAMINETZSKY:  Okay.

14           THE COURT:  I mean, you could -- you could-- I

15   mean, you could say that, you know, if you get -- if you get

16   the consent you could make a distribution that's not pro

17   rata, but would be off like, you know, $100 and then it

18   wouldn't be covered.  I -- I just --

19           MR. KAMINETZSKY:  Okay.

20           THE COURT:  -- you know, it's --

21           MR. KAMINETZSKY:  The good news is that's for

22   another day as plaintiff has -- have indicated.

23           THE COURT:  Right.

24           MR. KAMINETZSKY:  The other thing that I just

25   wanted to -- the part that I think just drives home the

Page 121

1    point, the partnership, it just -- it's factually

2    inaccurate.  The partnership interest, the membership units,

3    were traded as Your Honor said.  They were traded

4    frequently.

5              THE COURT:  Right.

6              MR. KAMINETZKY:  Yes.  The -- pursuant to the

7    exchange offer they became shares in a corporation rather

8    than -- but they were -- it just -- it --

9              THE COURT:  Well, the only distinction is counsel

10   is saying that rather than selling what they already had,

11   i.e. limited partnership interests, what happens here is

12   they got something new.  But it seems to me that the

13   something that they got that was new was simply a -- a

14   reformulation of their interest as --

15             MR. KAMINETZKY:  Right.

16             THE COURT:  -- opposed to a --

17             MR. KAMINETZKY:  And that's precisely what the

18   IRS says; that all it is, it's an exchange.  It's in form

19   and not -- read the cases.  As opposed to a distribution

20   where you get something and you're taxed --

21             THE COURT:  Right.

22             MR. KAMINETZKY:  -- this is just a swap of one --

23   and, Your Honor --

24             THE COURT:  I mean, I -- and to be honest with you

25   that's -- that's why I disagree with one of the prongs of

1    your argument, which is that now that it's DAP as opposed to

2    DAL, you know, DAP can --

3              MR. KAMINETZSKY:  Do whatever it wants.

4              THE COURT:  -- do whatever it wants --

5              MR. KAMINETZSKY:  Okay.

6              THE COURT:  -- because I -- I think --

7              MR. KAMINETZSKY:  I hear Your Honor loud and clear

8    and so does the company.

9              The other point I wanted to make, if -- if they're

10   right, then just think about it.  So it's not the money that

11   -- it just doesn't -- what we would have to do then, the

12   exercise to get to the 7.2 wouldn't be how much third

13   parties paid for the stocks.  It would be the difference

14   between what we could have sold the membership units for for

15   what it's now worth because it's no longer membership units,

16   but it's stock in a company.  We would have some -- to go

17   through some value -- because they're admitting that if it

18   was just member -- I mean, that just -- it's insane, quite

19   frankly.  It doesn't --

20             THE COURT:  I mean, that -- that seems right to

21   me.  I mean, what --

22             MR. KAMINETZSKY:  Because --

23             THE COURT:  -- what -- what's happened here is

24   that the ownership interest has become more valuable than it

25   was, but it was value -- it was worth something before then.

Page 123

1    So it -- I don't see how you can actually put a value -- you

2    know, it seems like a very weird process.

3             MR. KAMINETZSKY:  And -- and, Your Honor, just --

4             MR. JOHNSTON:  It enabled the members to cash out.

5             THE COURT:  Well --

6             MR. JOHNSTON:  -- which they couldn't cash --

7             THE COURT:  -- but they could have cashed out --

8             MR. JOHNSTON:  -- out before.

9             THE COURT:  -- before for less.  They could have

10   cashed out -- I mean, I'm sure there was -- there were

11   people there --

12            MR. JOHNSTON:  There --

13            THE COURT:  -- at the time who were willing to buy

14   it for, I don't know, you know, $4 billion --

15            MR. JOHNSTON:  There -- there's no --

16            THE COURT:  -- because --

17            MR. JOHNSTON:  -- evidence of that.

18            THE COURT:  But --

19            MR. JOHNSTON:  And we're on the --

20            THE COURT:  -- I mean, come on.

21            MR. JOHNSTON:  -- complaint --

22            THE COURT:  The partnership interests were worth

23   nothing and the -- and the stocks were worth everything?  It

24   just doesn't -- it's not common sense.  I mean, and I think

25   that really fails -- that just doesn't make sense, if that's

Page 124

1    --

2            MR. KAMINETZSKY:  And it's --

3            THE COURT:  -- what you're saying.

4            MR. KAMINETZSKY:  -- also factually inaccurate.

5    In fact, they were traded and then it's this hypothetical

6    exercise, and -- and that's just proof of what the IRS says

7    and what the case law says is true.  One -- there's a --

8    distributions are distributions and exchanges are exchanges.

9    One's for real and taxable because you're getting stuff and

10   one is an exchange of equity interests and it's not taxable

11   and -- because you're not getting stuff.

12           And the proof in the pudding is how I started is

13   that on day one DAL had $100.  On day five DAL still had

14   $100.  Not a penny of that went -- was -- I say went -- was

15   distributed to any of the members as required under the

16   terms of the plan to qualify for the 7.2.

17           And that's all I have, Your Honor, unless there's

18   anything else.

19           THE COURT:  Okay.  Okay.  Just briefly.

20           MR. JOHNSTON:  For the record, Your Honor, there's

21   -- there's nothing in the record and Mr. Kaminetzsky doesn't

22   know and I don't know when my clients acquired their claims.

23   So --

24           THE COURT:  All right.  That's --

25           MR. JOHNSTON:  So --

Page 125

1          THE COURT:  -- fair.

2          MR. JOHNSTON:  So to -- to say that they bought

3     into this risk and --

4          THE COURT:  Right.

5          MR. JOHNSTON:  -- and they bought into --

6          THE COURT:  Well, certainly, anyone who did buy

7     after confirmation, I suppose, or at least after the IPO

8     would know about the issue.  But as I said I don't -- I

9     don't think for purposes of my analysis there's really a

10    meaningful distinction.

11         MR. JOHNSTON:  Understood.  I --

12         THE COURT:  It's obviously worse.

13         MR. JOHNSTON:  -- I wanted to make that clear.

14         THE COURT:  Right.  No.  That's fine.

15         MR. JOHNSTON:  And -- and --

16         THE COURT:  That's fine.  And that's not -- that's

17    obviously not a fact that's in the complaint.  You don't

18    state when -- your clients don't state when they bought it -

19    -

20         MR. JOHNSTON:  Right.

21         THE COURT:  -- so it's not -- it's not relevant to

22    my analysis.

23         MR. JOHNSTON:  And I -- I understand it's not a

24    meaningful distinction in your mind as to --

25         THE COURT:  Right.

Page 126

1          MR. JOHNSTON:  -- what was and was not disclosed

2     at the time of confirmation with respect to the operating

3     agreement.  Our position is, in fact, it's -- it's pretty

4     darn important and it wasn't out there --

5          THE COURT:  Okay.

6          MR. JOHNSTON:  -- in an unsealed way.

7          THE COURT:  But, I guess, if that's the case I

8     would have expected someone -- if it was that -- if it was

9     that important to have -- to have objected and said, this

10    isn't an adequate disclosure.

11         MR. JOHNSTON:  It -- it's hard to get into the

12    mind of -- of parties in interest back then.  I mean,

13    certainly --

14         THE COURT:  Well, but, I mean, I --

15         MR. JOHNSTON:  -- this happened very rapidly --

16         THE COURT:  They certainly got --

17         MR. JOHNSTON:  -- as I understand it.

18         THE COURT:  -- disclosure of the public documents

19    which refer to the operating agreement.

20         MR. JOHNSTON:  Yes.  They -- they got disclosure

21    of the plan, the disclosure statement which repeats what's

22    in the plan.

23         THE COURT:  Right.

24         MR. JOHNSTON:  And the MDA which repeats what's in

25    the plan.

1           THE COURT:  But, I guess, I mean, in some sense it

2    seems to me to be kind of a red herring also, because the

3    operative word is "distribution" and if you -- if you leave

4    aside, as largely I have done, the argument that you have to

5    fit into Article 5 --

6           MR. JOHNSTON:  Right.

7           THE COURT:  -- and that, you know, there could be

8    certain types of distributions, but they're not Article 5

9    distributions so, therefore, you're not covered.  If you

10   leave that -- if you leave that out, I -- I just can't see

11   that this -- the issuance of the stock is a distribution.  I

12   just don't -- I mean, I don't --

13          MR. JOHNSTON:  Well, at the end of the day --

14          THE COURT:  I don't -- I don't see how it could be

15   a distribution.

16          MR. JOHNSTON:  At the end of the day it enabled

17   the members of DAL to, when you combine it with PBGC and GM,

18   to put in ten plus billion dollars into their pocket.  I

19   think if -- if you rolled back in time to when this

20   provision was being drafted, was being added to the plan and

21   you asked the unsecured creditors' committee if the members

22   of the company buyer were going to put $10 billion into

23   their pocket would unsecured creditors be entitled to their

24   three-hundred-million-dollar distribution the answer would

25   have been yes.  And I think --

Page 128

```
 1              THE COURT:  Yes.

 2              MR. JOHNSTON:  -- discovery will show that.

 3              THE COURT:  I mean, you weren't there and I was,

 4     but I'm not -- I'm trying to keep that out of my mind.

 5              MR. JOHNSTON:  Uh-huh.

 6              THE COURT:  But that wasn't the deal.

 7              MR. JOHNSTON:  Okay.  Thank you.

 8              THE COURT:  If it was they would have gotten

 9     warrants or CVRs.  But I'm leaving that out of my mind.

10              All right.  I have before me in this adversary

11     proceeding a motion by the defendants, Delphi Automotive

12     PLC, DIP Holdco III, LLC and DIP Holdco, LLP, d/b/a Delphi

13     Automotive, LLP to dismiss the adversary proceeding under

14     Bankruptcy Rule 7012.  That Rule incorporates Federal Rule

15     of Civil Procedure 12(b)(6), which is the Rule that the

16     movants here are relying upon.

17              Under that Rule the Court, in considering whether

18     the complaint sets forth a claim, may consider facts stated

19     on the face of the complaint and the documents appended to

20     the complaint or incorporated in the complaint by reference

21     as well as matters of which judicial notice may be taken and

22     documents that are not specifically incorporated by

23     reference but upon which the complaint heavily relies.  See,

24     e.g., DiFalco v. MSNBC Cable, LLC, 622 F.3d. 104-11 (2d Cir.

25     2011).
```

Page 129

1          The Court must accept the complaint's factual

2    allegations as true and draw reasonable inferences in the

3    plaintiffs' favor.  But the Court is not bound to accept as

4    true legal conclusions couched as factual allegations or

5    allegations that are clearly contradicted by documents

6    incorporated into the pleadings by reference or upon which

7    the complaint relies. In addition, where such issues are

8    relevant, i.e. where the Court is not relying upon the plain

9    meaning of documents, for example, or obviously, clear

10   issues of law, the complaint must also state a claim for

11   relief that's plausible on its face -- which does not

12   establish a probability requirement, but, rather, in the

13   light of the Court's experience and common sense would show,

14   in the particular context, the plaintiff has not asserted a

15   claim that is even plausible.  See, generally, Bell Atlantic

16   Corp. v. Twombley, 550 U.S. 544-555 (2007) and Ashcroft v

17   Iqbal, 129 S.Ct. 1937-49 (2009).

18          Here, the complaint, in essence, although it also

19   asserts breach of contract claims and related claims, seeks

20   to enforce under 11 U.S.C. Section 1142 the modified chapter

21   11 Plan in this chapter 11 case and, more specifically,

22   provisions of that plan that provide a contingent right of

23   the unsecured creditor class, or the general unsecured

24   creditor class, to what is referred to as the "General

25   Unsecured MDA Distribution."

1              The plan sets forth a mechanism pursuant to which

2     unsecured creditors would receive their pro rata share of

3     the General MDA Distribution and defines that term; that is,

4     General Unsecured MDA Distribution, in -- in Paragraph

5     1.102.  The term means:

6              "If and to the extent Company Buyer makes

7     distributions to its members in accordance with the Company

8     Buyer Operating Agreement, as described in Section 3.23 of

9     the Master Disposition Agreement, in excess of $7.2 billion,

10     an amount equal to $32.50 for every $67.50 so distributed in

11     excess of 7.2 billion; provided, however, that in no event

12     shall the General Unsecured MDA Distribution exceed $300

13     million in the aggregate."

14              The Company Buyer is defined in Paragraph 1.36 of

15     the modified plan as "DIP Holdco, III, LLC on behalf of

16     itself and other buyers as set forth in the Master

17     Disposition Agreement, as assignees of the rights of the DIP

18     agent to the Company Acquired Assets in connection with the

19     Credit Bid."

20              It's acknowledged that DIP Holdco, III, LLC, which

21     is one of the defendants here, was succeeded by Delphi

22     Automotive -- I'm sorry -- well, DIP Holdco, LLP d/b/a

23     Delphi Automotive, LLP, or DAL.

24              Section 3.2.3 of the Master Disposition Agreement

25     states:

Page 131

1            "To the extent payable following the closing, the

2      Company Buyer shall pay to a disbursement agent such amounts

3      payable to the unsecured creditors of Delphi and the filing

4      affiliates pursuant to the plan of reorganization as filed

5      on the date of execution of this agreement without

6      modification as to the consideration to be paid under this

7      Section 3.2.3 unless consented to by Company Buyer in the

8      form of Company Buyer Operating Agreement included as an

9      exhibit to the Securities' Purchase Agreement as in effect

10     as of the date hereof, regardless of whether such agreement

11     is subsequently amended for distribution to such unsecured

12     creditors of Delphi and their filing affiliates subject to

13     the terms, conditions and limits as set forth in the plan of

14     reorganization and such Operating Agreement, which payment

15     to such disbursement agent shall be made only if the

16     transactions contemplated hereby are consummated pursuant to

17     a plan of reorganization and which payment shall not exceed

18     $300 million in the aggregate."

19            The Company Operating Agreement, as referred to in

20     Section 3.2.3 of the MDA and, therefore, as referred to in

21     Paragraph 1.102 of the modified plan, it is agreed, was, in

22     fact, executed and is attached as an exhibit to the

23     Kaminetzsky declaration submitted in support of the present

24     motion.

25            The complaint contends that, in essence, the 7.2

1    billion-dollar threshold for the commencement of -- or the

2    fixing of the general unsecureds' rights under the plan to

3    their distribution has occurred.  The complaint contends

4    that it occurred based upon two transactions in the

5    aggregate (although there's another ninety-five-million-

6    dollar tax distribution that is also included in the

7    complaint, but standing on its own would obviously not

8    trigger the 7.2 billion-dollar-threshold).

9            The complaint asserts that under the Operating

10   Agreement the DAL limited partnership redeemed approximately

11   $4.7 billion from holders of interests in DAL, namely GM and

12   the PBGC.  In addition, the complaint asserts that pursuant

13   to an integrated IPO transaction the ownership interests in

14   DAL were exchanged for stock in the third defendant in this

15   adversary proceeding, which is Delphi Automotive, PLC, or

16   DAP, that stock was issued to the public or -- DAP's stock -

17   - other stock -- was issued to the public, which created a,

18   or established a market value for such stock of in excess of

19   $7.2 billion, in fact, over $10 billion.

20           The complaint alleges that those two sets of

21   transactions, the redemptions with respect to GM and PBGC

22   and the going-public transaction, including the exchange of

23   partnership interests for stock, were "distributions" that

24   would fall within the definition of paragraph 1.102 of the

25   plan by the Company buyer, DAL, to its members in accordance

Page 133

1    with the Operating Agreement, and that, therefore, as of

2    today it is clear that $300 million should be set aside by

3    either DAL or DAP for distribution to the unsecured

4    creditors under the plan.

5            The defendants contend as the basis for their

6    motion to dismiss a number of things.  I conclude that the

7    most important thing that they contend, and the dispositive

8    thing that they contend, requires the grant of their motion.

9            They assert that the exchange of limited

10   partnership interests in DAL for public stock in DAP is not

11   a distribution under the Operating Agreement or as a matter

12   of law.  They contend in this respect, among other things,

13   that distributions under the Operating Agreement for

14   purposes of the 7.2 billion-dollar-threshold and the right

15   of unsecured creditors to recover under the plan are

16   governed by Paragraph 5.6 of the Operating Agreement, which

17   states that:

18            "In accordance with Section 3.2.3 of the MDA if

19   the asset purchase is consummated pursuant to the plan of

20   reorganization, once an aggregate of $7.2 billion has been

21   paid as Distributions to the holders pursuant to this

22   agreement, the Company shall pay an amount equal to $32.50

23   to a disbursement agent on behalf of the unsecured creditors

24   of Old Delphi for every $67.50 in excess of such $7.2

25   billion that is distributed to the holders pursuant to

Page 134

1    Section 5.1(a)(iv) up to a maximum amount of $300 million."

2              They point out that the word "Distributions,"

3    which is used in that section, is defined on Page 4 of the

4    Operating Agreement as:

5              "Each distribution after the effective date made

6    by the Company to a member whether in cash, property or

7    securities of the Company pursuant to or in respect of

8    Article 5 or Article 10."

9              They contend that the exchange of partnership

10   interests in DAL for stock in DAP [see paragraphs 14, 47,

11   53, and 54 of the Complaint] does not fall within this

12   distribution definition, or use of the term "distribution"

13   in Section 5.6 of the Operating Agreement, but, rather, was

14   specifically contemplated in a different section of the

15   operating agreement, Section 14.13(b), which does, in fact,

16   provide for the conversion of DAL into a corporation and the

17   contribution of the respective membership interests to that

18   corporation in return for the stock of that corporation,

19   again, all for the purpose of implementing an initial public

20   offering.

21             The provision that I'm referring to, Section 14.13

22   states that the common equity securities of the issuer, i.e.

23   DAP, would be provided in exchange to the members reflecting

24   the residual interests of the members pursuant to Section

25   5.1(a)(iv) of the Operating Agreement, as shall be diluted

Page 135

1    in ways that are irrelevant to the present dispute.

2              The movants contend, therefore, that such an

3    exchange as specifically contemplated under Section 14.13

4    does not fall within Article 5 of the Operating Agreement or

5    more specifically, Section 5.6, in that it is not a

6    distribution of the assets of DAL, but rather an exchange of

7    the ownership interests in DAL [for ownership interest in

8    DAP by the limited partners of DAL].

9              While it is clear from the operative documents

10   that the term "distributions" can include assets other than

11   cash, I believe it's plain from the terms of the agreement

12   that those assets need to be assets of DAL rather than

13   interests in DAL.  It appears clear to me, therefore, that

14   based on the plain language of the Operating Agreement,

15   which does, I believe, clearly govern the general unsecured

16   creditors' right to their contingent distribution, the

17   exchange of limited partnership ownership interests in DAL

18   for stock in DAP merely changes the ownership interests that

19   the holders had, as opposed to resulting in a distribution

20   to them for purposes of the plan.

21             It is certainly true that the exchange and related

22   IPO enabled the owners of DAL to more successfully and

23   efficiently monetize their interests.  Their receipt of the

24   DAP stock was a step in the going-public transaction, and

25   that transaction created a more efficient and widespread

Page 136

1    market for those interests. But, ultimately, it was the same

2    enterprise that they owned.  It is clear to me from reading

3    the relevant provision of the plan as well as the Operating

4    Agreement that what the plan contemplated was a distribution

5    not in respect of the ownership of those who had shares or

6    limited partnership interests in the Company Buyer, but of

7    the Company Buyer's assets itself.

8           It is clear to me that if, in fact, the plan

9    contemplated the former, i.e. the right to up to 300 million

10   being triggered by the value of the owners of the Company

11   Buyer's interests exceeding $7.2 billion, it would not have

12   been drafted in the way it has been drafted, but what --

13   rather it would have been tied to the value of the

14   interests, either directly through a valuation mechanism or,

15   more likely, through the distribution of rights that would

16   ride along with or could be monetized at the same time that

17   the owners monetized their interests, i.e. either in the

18   form of warrants or contingent value rights or the like.

19          I do not believe, therefore, that the issuance of

20   DAP stock and the exchange of that stock for the ownership

21   interests [of the limited partners] in DAL constitutes a

22   "distribution" under the plain language of Paragraph 1.102

23   of the modified plan.  This is really separate and apart

24   from whether "distributions" under that paragraph should be

25   read as "Distributions" under the Operating Agreement, or

1    not, but simply in terms of the operative language as a

2    description of a distribution by the Company Buyer.

3            Let me be clear on this point.  I do not believe

4    that the Company Buyer made a distribution by simply

5    facilitating the exchange of ownership interests between DAP

6    and the limited partners.  So I am not relying on the fact

7    that what the limited partners received came not from DAL,

8    but rather from DAP.

9            It's conceivable to me, for example, that if DAL

10   transferred material assets to another entity and then that

11   entity transferred those assets to the holders of limited

12   partnership interests, such a distribution, even though it

13   might not be a "Distribution," would probably violate and/or

14   trigger, if it exceeded the 7.2 billion-dollar-threshold,

15   Paragraph 1.102 of the modified plan.  But that's not what

16   happened here.  The owners of DAL did not receive DAL's

17   assets.

18           This may seem and probably does seem to the

19   general unsecured creditors to be unfair.  However, it was

20   the bargain that was struck by the terms of the plain

21   language of the plan.  And I cannot undo the plan.  I can

22   only enforce it under Section 1142 of the Bankruptcy Code.

23           There's no allegation here of any fraud in

24   connection with the obtaining of confirmation of the plan,

25   the plan has been fully consummated and the statutory period

Page 138

1    has long expired to challenge it and undo it.

2            In that regard, whether the Operating Agreement

3    was "a secret agreement" or not, I believe, is irrelevant

4    since there's no allegation of any fraud in connection with

5    this transaction being put before this Court, in connection

6    with confirmation of the modified plan.

7            Moreover, the supplemental disclosure made by the

8    debtors in connection with the plan modification motion and

9    the terms of the modified plan itself lead one quickly and

10   inescapably to the Company Operating Agreement.  I can take

11   judicial notice of the fact that there was -- there was no

12   motion made by any party who was not entitled to see the

13   Company Operating Agreement to obtain permission to see such

14   agreement.

15           I believe it's a matter of common sense that the

16   fiduciaries representing the unsecured creditors, most

17   importantly the unsecured creditors' committee did, in fact,

18   see the agreement and knew what it said.  But even if they

19   didn't, they had the right to.  And everyone in the case had

20   the right to ask to see it.

21           So there's, I believe, no basis for contending

22   that it should not inform the Court's interpretation of the

23   right accorded to the general unsecured creditors under the

24   plan to this contingent distribution.

25           Given that it is necessary from the face of the

1    complaint to treat the IPO stock issuance [and exchange] as

2    a "distribution" for purposes of the plan before the 7.2

3    billion-dollar-threshold is met, I believe that it would be

4    improper to consider whether the other transactions

5    described in the complaint, namely the GM and PBGC

6    transactions, would contribute to reaching the 7.2 billion-

7    dollar-threshold.

8           The parties have made their arguments both ways on

9    that point, but I believe both of them acknowledge that

10   given the shortfall of approximately $2.4 billion, it would

11   be improper to consider that issue in a vacuum, i.e. whether

12   Section 5.6 of the Operating Agreement as well as Section

13   12.2 preclude treating the very significant payments made by

14   DAL to GM and PBGC as distributions for purposes of Section

15   1.102 of the plan.

16          So I will not go further on that point, but I do

17   not believe that, at this point, even if I ruled in favor of

18   the plaintiffs on this argument, the matter would be ripe

19   for any of the relief requested in the complaint, including

20   the request for declaratory judgment, since (a) there would

21   not be a breach yet because the 7.2 billion-dollar threshold

22   had not been reached, and (b) the gap before the 7.2

23   billion-dollar threshold would be reached is so significant

24   that it would not be proper to grant declarative relief and

25   subject the parties to the costs of litigation and appeals

Page 140

1   when it's far from clear to me that there's any imminence of

2   the 7.2 billion-dollar threshold being met.  See Olin Corp

3   v. Consolidated Aluminum Corp, 5 F.3d. 10, 17, (2d Cir.

4   1993).

5           On the other hand, as I think I've made clear

6   during oral argument, if, in fact, either DAL or DAP make a

7   -- make distributions out of their assets to the owners

8   which, when coupled with the payments that have already been

9   made to GM and PBGC come close to or go over the 7.2

10  billion-dollar threshold, I believe that there would, in

11  fact, be a basis for seeking declaratory relief, although

12  I'm not going to rule today how I would determine such a

13  request.

14          So for those reasons I'll -- I'll grant the motion

15  to dismiss.  The request was made to dismiss with prejudice.

16  I will dismiss with prejudice as to the IPO transaction, but

17  not as to the other claims, since, as I've said, I'm -- I'm

18  really not ruling on the other claim distributions.  And

19  that goes for all of the counts in the complaint.

20          And as I stated before, my ruling with respect to

21  this matter is based upon the plain language of the plan,

22  first and foremost, as well as the Operating Agreement and,

23  accordingly, my belief that there's no breach and to the

24  extent it exists, and it's questionable given 1142 of the

25  Bankruptcy Code, any duty of good faith and fair dealing,

Page 141

1    since that good faith and fair dealing duty is overridden

2    here by the clear language of the agreement which was set

3    forth in the plan.

4            So the defendants can submit that order.  You

5    don't need to settle it on Dewey LeBoeuf, but you should run

6    it by counsel beforehand just so that he's comfortable it's

7    consistent with my ruling and then you can email it to

8    chambers.

9            MR. KAMINETZSKY:  Thank you.

10           THE COURT:  I -- there was a request for leave to

11   modify or sort of a request in the opposition to the motion.

12   My -- my practice generally is unless I believe there's --

13   there's no basis to -- to improve on a cause of action --

14   and here I've -- I've said that with respect to the IPO

15   cause of action, to deal with those issues only if there

16   actually is a motion filed.  So I'm -- I'm not really

17   dealing with that issue at this point.

18           And, again, as I think I made clear, if actual

19   distributions by DAL or DAP get up towards the $7.2 billion

20   when you factor in the GM and PBGC distributions, I can

21   certainly conceive of a situation where a new complaint

22   could be filed, which is why I'm not dismissing the

23   complaint as a whole with prejudice, but only in respect to

24   that component of it that deals with the IPO.

25           Okay.  Thank you.

Page 142

1          MR. CAMPANARIO:  Thank you, Your Honor.

2          THE COURT:  All right.

3      (Whereupon these proceedings were concluded at 1:41

4   p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 143

```
1                        I N D E X

2

3                          RULINGS

4    DESCRIPTION                          PAGE       LINE

5

6    Letter Filed by Patricia Meyer        16          7

7

8    Adversary Proceedings 09-01510-rdd

9    ACE American Insurance Company et al

10   V Delphi Corporation et al.  Motion by

11   Michigan regarding Lift Stay Motion    46         22

12

13   Adversary Proceeding  11-0934-rdd

14   CAI Distressed Debt Opportunity Master Fund

15   Ltd v Delphi Automotive PLC, et al.  Motion

16   to Dismiss                            140          9

17

18

19

20

21

22

23

24

25
```

Page 144

1            C E R T I F I C A T I O N

2

3    I, Sherri L. Breach, CERT*D-397, certified that the

4    foregoing transcript is a true and accurate record of the

5    proceedings.

6

7

8

     SHERRI L. BREACH

9

     AAERT Certified Electronic Reporter & Transcriber

10

     CERT*D -397

11

12

13

     Veritext

14

     200 Old Country Road

15

     Suite 580

16

     Mineola, NY  11501

17

18

     Date:  March 25, 2012

19

20

21

22

23

24

25