# Exhibit C

EXECUTION VERSION

Confidential Treatment Requested by General Motors Company Pursuant to the Freedom of Information Act

AMENDED AND RESTATED OPERATING AGREEMENT

OF

DIP HOLDCO 3, LLC[1]

---

Dated as of [_____], 2009

---

THE MEMBERSHIP INTERESTS REPRESENTED BY THIS AMENDED AND RESTATED OPERATING AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS. SUCH INTERESTS MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR EXEMPTION THEREFROM AND COMPLIANCE WITH THE OTHER SUBSTANTIAL RESTRICTIONS ON TRANSFERABILITY SET FORTH HEREIN.

THE MEMBERSHIP INTERESTS REPRESENTED BY THIS AMENDED AND RESTATED OPERATING AGREEMENT ARE ALSO SUBJECT TO ADDITIONAL RESTRICTIONS ON TRANSFER SET FORTH IN THIS AMENDED AND RESTATED OPERATING AGREEMENT.

---

[1] Agreement to be amended to include PBGC participation in distribution waterfall.

## TABLE OF CONTENTS

                                                                                    **Page**

ARTICLE I          DEFINITIONS; INTERPRETATIVE MATTERS ..........................................2
          Section 1.1    Definitions.............................................................................. 2
          Section 1.2    Cross-References ................................................................... 12
          Section 1.3    Interpretative Matters........................................................... 13

ARTICLE II         ORGANIZATIONAL MATTERS; GENERAL PROVISIONS....................14
          Section 2.1    Formation.............................................................................. 14
          Section 2.2    Name; Office; Registered Agent.............................................. 14
          Section 2.3    Purposes; Powers .................................................................. 15
          Section 2.4    Duration ............................................................................... 15
          Section 2.5    No State Law Partnership ...................................................... 16
          Section 2.6    Filings; Qualification in Other Jurisdictions............................. 16
          Section 2.7    Income Tax Classification ...................................................... 16

ARTICLE III        CAPITALIZATION; MEMBERSHIP INTERESTS ...............................16
          Section 3.1    Membership Interests; Initial Capitalization; Initial Capital Accounts
                         ............................................................................................ 16
          Section 3.2    Authorization and Issuance of Additional Membership Interests....... 17
          Section 3.3    Application of Article 8 of the Uniform Commercial Code .............. 17
          Section 3.4    Certification of Membership Interests ..................................... 18
          Section 3.5    Capital Accounts.................................................................... 18
          Section 3.6    No Right of Partition.............................................................. 19
          Section 3.7    Additional Capital Contributions and Financing ...................... 19

ARTICLE IV         SCHEDULE OF MEMBERS; BOOKS AND RECORDS ...........................20
          Section 4.1    Schedule of Members ............................................................ 20
          Section 4.2    Books and Records; Other Documents..................................... 20
          Section 4.3    Certain Tax Matters .............................................................. 22
          Section 4.4    Independent Auditor ............................................................. 23
          Section 4.5    Company Policies .................................................................. 24

ARTICLE V          DISTRIBUTIONS ................................................................................24
          Section 5.1    Distributions of Available Cash.............................................. 24
          Section 5.2    Successors ............................................................................ 25
          Section 5.3    Distributions of Assets other than Cash.................................. 25
          Section 5.4    Limitation on Distributions.................................................... 25
          Section 5.5    Tax Distributions................................................................... 25
          Section 5.6    Payments Pursuant to the Master Disposition Agreement................. 26
          Section 5.7    Certain Offsets ..................................................................... 26

ARTICLE VI         ALLOCATIONS....................................................................................26

i

# TABLE OF CONTENTS
## (continued)

Page

| | | |
|---|---|---|
| Section 6.1 | Allocations of Tax Book Profits and Tax Book Losses | 26 |
| Section 6.2 | Allocations for Tax Purposes | 27 |
| Section 6.3 | Certain Accounting Matters | 27 |
| Section 6.4 | Section 704(c) Allocations | 27 |
| Section 6.5 | Qualified Income Offset | 27 |
| Section 6.6 | Gross Income Allocation | 28 |
| Section 6.7 | Company Minimum Gain Chargeback | 28 |
| Section 6.8 | Member Nonrecourse Debt Minimum Gain Chargeback | 28 |
| Section 6.9 | Limitations on Tax Book Loss Allocations | 28 |
| Section 6.10 | Member Nonrecourse Deductions | 28 |
| Section 6.11 | Nonrecourse Deductions | 28 |
| Section 6.12 | Excess Nonrecourse Liabilities | 29 |
| Section 6.13 | Ordering Rules | 29 |
| Section 6.14 | Curative Allocations | 29 |
| ARTICLE VII | RIGHTS AND DUTIES OF MEMBERS | 29 |
| Section 7.1 | Members | 29 |
| Section 7.2 | No Management or Dissent Rights | 29 |
| Section 7.3 | No Member Fiduciary Duties | 30 |
| Section 7.4 | Meetings of Members | 31 |
| Section 7.5 | Notice of Meetings | 31 |
| Section 7.6 | Quorum | 31 |
| Section 7.7 | Voting | 32 |
| Section 7.8 | Action Without a Meeting; Telephonic Meetings | 33 |
| Section 7.9 | Record Date | 33 |
| Section 7.10 | Removal or Resignation of Members | 34 |
| Section 7.11 | Liability of Members | 34 |
| Section 7.12 | Investment Representations of Members | 34 |
| ARTICLE VIII | BOARD OF MANAGERS; OFFICERS | 35 |
| Section 8.1 | Establishment of Board of Managers | 35 |
| Section 8.2 | General Powers of the Board of Managers | 35 |
| Section 8.3 | Election of Managers | 35 |
| Section 8.4 | Meetings | 37 |
| Section 8.5 | Notice of Meetings | 38 |
| Section 8.6 | Quorum | 38 |
| Section 8.7 | Voting | 38 |
| Section 8.8 | Action Without a Meeting; Telephonic Meetings | 39 |
| Section 8.9 | Compensation of Managers; Expense Reimbursement | 39 |
| Section 8.10 | Committees of the Board of Managers | 40 |
| Section 8.11 | Delegation of Authority | 40 |
| Section 8.12 | Officers | 41 |

ii

## TABLE OF CONTENTS
### (continued)

Page

Section 8.13     Standard of Care; Fiduciary Duties; Liability of Managers and Officers .................................................................................................................. 42

ARTICLE IX     TRANSFER OF MEMBERSHIP INTERESTS; SUBSTITUTED MEMBERS ...............................................................................................44

Section 9.1     Limitations on Transfer of Membership Interests ................................ 44
Section 9.2     Void Transfers .................................................................................... 44
Section 9.3     Substituted Member ............................................................................ 44
Section 9.4     Effect of Transfer ............................................................................... 44
Section 9.5     Additional Transfer Restrictions ......................................................... 45
Section 9.6     Transfer Fees and Expenses ................................................................ 45
Section 9.7     Effective Date ..................................................................................... 45
Section 9.8     Acceptance of Prior Acts ................................................................... 45

ARTICLE X     DISSO ...................................................................................                                 LU

Section 10.1     In General ......................................................................................... 46
Section 10.2     Liquidation and Termination ............................................................. 46
Section 10.3     Complete Distribution ....................................................................... 46
Section 10.4     Filing of Certificate of Cancellation .................................................. 46
Section 10.5     Reasonable Time for Winding Up ...................................................... 47
Section 10.6     Return of Capital ............................................................................... 47
Section 10.7     Antitrust Laws ................................................................................... 47
Section 10.8     Other Remedies ................................................................................. 47

ARTICLE XI     INDEMNIFICATION ...........................................................................47

Section 11.1     General Indemnity ............................................................................. 47
Section 11.2     Fiduciary Insurance ........................................................................... 48
Section 11.3     Rights Non-Exclusive ........................................................................ 48
Section 11.4     Merger or Consolidation; Other Entities ............................................ 48
Section 11.5     No Member Recourse ........................................................................ 49

ARTICLE XII     OTHER AGREEMENTS .......................................................................49

Section 12.1     Matters Requiring Additional Consent ............................................... 49
Section 12.2     Further Matters Requiring Additional Consent ................................... 50
Section 12.3     Appointment of Chief Executive Officer ............................................ 51
Section 12.4     Preemptive Rights .............................................................................. 51

ARTICLE XIII     CONFIDENTIALITY ...........................................................................53

Section 13.1     Non-Disclosure .................................................................................. 53
Section 13.2     Exceptions ......................................................................................... 53

ARTICLE XIV     MISCELLANEOUS PROVISIONS ........................................................54

Section 14.1     Amendments ...................................................................................... 54

iii

### TABLE OF CONTENTS
### (continued)

|  |  | Page |
|---|---|---|
| Section 14.2 | Remedies | 54 |
| Section 14.3 | Notice Addresses and Notices | 54 |
| Section 14.4 | Counterparts | 55 |
| Section 14.5 | Assignment | 55 |
| Section 14.6 | Entire Agreement; Waiver | 55 |
| Section 14.7 | Severability | 55 |
| Section 14.8 | Governing Law | 55 |
| Section 14.9 | Independent Contractors; Expenses | 56 |
| Section 14.10 | Press Release | 56 |
| Section 14.11 | Survival | 56 |
| Section 14.12 | Creditors | 56 |
| Section 14.13 | Further Action; Initial Public Offering | 56 |
| Section 14.14 | Delivery by Facsimile or Email | 57 |
| Section 14.15 | Strict Construction | 57 |
| Section 14.16 | Consent to Jurisdiction | 57 |
| Section 14.17 | Waiver of Jury Trial | 58 |
| Section 14.18 | Specific Performance | 58 |

## SCHEDULES AND EXHIBITS[2]

Schedule of Members
Exhibit A —   Class A and Class B Subscribers
Exhibit B   —  Transaction Documents
Exhibit C   —  Company Policies
Exhibit D  —  Environmental Guidelines
Exhibit E  —  General Motors Consolidation Requirements
Exhibit F       Form of Transfer Instrument

---

[2] The parties will agree to the form of Exhibit F prior to closing.

15189195.21.BUSINESS

# AMENDED AND RESTATED OPERATING AGREEMENT
## OF
## DIP HOLDCO 3, LLC

This AMENDED AND RESTATED OPERATING AGREEMENT of DIP Holdco 3, LLC, a Delaware limited liability company (the "Company"), is made and entered into as of [_____], 2009 (the "Effective Date") by and among the Class B Holders who are Members on the date hereof and General Motors Company, a Delaware corporation ("General Motors"), as Members, and each other Person who at any time becomes a Member in accordance with the terms of this Agreement and the Act.

## RECITALS:

A.    The Company was formed as a limited liability company pursuant to the Delaware Limited Liability Company Act, 6 *Del. C.* § 18-101 et seq. (the "Act") by causing the filing of a Certificate of Formation of the Company (the "Certificate of Formation") with the office of the Secretary of State of the State of Delaware on July 13, 2009 and entering into the Limited Liability Company Agreement of the Company, dated as of July 25, 2009 (the "Original Agreement").

B.    [Delphi Corporation, a Delaware corporation ("Old Delphi"), on July [__], 2009 adopted a Plan of Reorganization (the "Reorganization Plan") in its proceedings under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (Case No. 05-44481 (RDD))].

C.    Old Delphi, the Company and certain other parties entered into a Master Disposition Agreement (the "MDA") on July 26, 2009 pursuant to which, among other things, Old Delphi proposed to sell to the Company certain assets of Old Delphi and certain subsidiaries of Old Delphi, on the terms and subject to the conditions set forth in the MDA (the "Asset Purchase").

D.    Concurrently therewith, the Company, General Motors, Elliott Associates, L.P. ("Elliott"), Silver Point Capital Fund, L.P. and Silver Point Capital Offshore Fund, Ltd. (collectively, "Silver Point") entered into an Investment Commitment Agreement (the "Investment Commitment Agreement"), pursuant to which, among other things, General Motors subscribed for Class A Membership Interests in the Company and Elliott and Silver Point subscribed for Class B Membership Interests in the Company subject to the terms and conditions set forth in such agreement.

E.    Pursuant to the Investment Commitment Agreement, Elliott and Silver Point assigned subscription rights to acquire Class B membership interests in the Company to the other Class B Holders (the "Other Class B Holders") listed on Exhibit A, subject to the terms and conditions set forth in such agreement.

F.    In connection with the consummation concurrently herewith of the Asset Purchase and the transactions contemplated by the Investment Commitment Agreement, the parties hereto desire to amend and restate the Original Agreement to (i) to admit General Motors and the Other Class B Holders as Members, (ii) to set forth the terms for the issuance of the

Membership Interests, and (iii) to set forth, *inter alia,* their understandings and agreements regarding the governance and certain operations of the Company.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants, conditions and agreements herein contained, the parties hereto, each intending to be legally bound, agree that the Original Agreement is hereby amended and restated in its entirety, and hereby further agree as follows:

## ARTICLE I
## DEFINITIONS; INTERPRETATIVE MATTERS

**Section 1.1**      **Definitions**.  The following terms, as used herein, shall have the following meanings:

"Adjusted Capital Account Balance" means, with respect to any Member, the balance in such Member's Capital Account after giving effect to the following adjustments:

(i)   debits to such Capital Account of the items described in Section 1.704-1(b)(2)(ii)(d)(4) through (6) of the Treasury Regulations; and

(ii)   credits to such Capital Account of such Member's share of Company Minimum Gain or Member Nonrecourse Debt Minimum Gain or any amount which such Member would be required to restore under this Agreement or otherwise.

The foregoing definition of Adjusted Capital Account Balance is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations.

"Additional Member" means any Person that has been admitted to the Company as a Member after the Effective Date pursuant to Section 3.2(b) and Article IX hereof by virtue of having received its Membership Interest from the Company and not from any other Member.

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly, whether through one or more intermediaries, Controls, is Controlled by or is under common Control with such Person, excluding any employee benefit plan or related trust.

"Agreement" means this Amended and Restated Operating Agreement and those Exhibits and Schedules attached hereto, as it may be amended or restated from time to time.

"Antitrust Law" means any Law relating to the preservation of or restraint against competition in commercial activities, including the United States Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"Available Cash" means (i) all cash and cash equivalents on hand of the Company from any source, less (ii) cash and cash equivalents reasonably reserved by the Company or reasonably anticipated by the Board of Managers to be required to fund the Company's operations and other needs.

"Business Day" means any day other than a Saturday, a Sunday or any other day on which commercial banks in Detroit, Michigan or New York, New York are authorized or required to close.

"Capital Contributions" means any cash or cash equivalents or the Fair Market Value of other property that a Member contributes to the Company with respect to any Membership Interests or other Equity Securities issued pursuant to Article III (net of any liabilities assumed by the Company or to which such property is subject).

"Class A Holders" means Members which hold Class A Membership Interests.

"Class A Membership Interest" means a Membership Interest having the rights and obligations specified with respect to Class A Membership Interests in this Agreement.

"Class B Holders" means Members which hold Class B Membership Interests.

"Class B Membership Interest" means a Membership Interest having the rights and obligations specified with respect to Class B Membership Interests in this Agreement.

"Code" means the United States Internal Revenue Code of 1986, as amended, and, to the extent applicable, any Treasury Regulations promulgated thereunder.

"Company Class A Interest" means, with respect to a particular Class A Holder at any time, the quotient expressed as a percentage obtained by dividing (i) the number of Class A Membership Interests held by such Class A Holder at such time, by (ii) the number of Class A Membership Interests held by all Class A Holders at such time, as adjusted from time to time pursuant to Article III and Article IX.

"Company Class B Interest" means, with respect to a particular Class B Holder at any time, the quotient expressed as a percentage obtained by dividing (i) the number of Class B Membership Interests held by such Class B Holder at such time, by (ii) the number of Class B Membership Interests held by all Class B Holders at such time, as adjusted from time to time pursuant to Article III and Article IX.

"Company Minimum Gain" shall have the meaning set forth in Section 1.704-2(b)(2) of the Treasury Regulations for "partnership minimum gain" and, as provided therein, shall generally be determined by computing, for each Nonrecourse Debt of the Company, any Tax Book Profit that the Company would realize if it disposed of the property subject to that liability for no consideration other than full satisfaction of the liability and then aggregating the separate amounts of Tax Book Profit so computed.

"Confidential Information" means, collectively, all documents and information that, in each case, is non-public, confidential or proprietary in nature concerning the Company (including commercial information and information with respect to customers, suppliers, vendors and proprietary technologies or processes), the Members or their Affiliates that was or may in the future be furnished to the Company, any Member or any of their respective Affiliates in connection with (i) the transactions leading up to and contemplated by this Agreement and the other Transaction Documents, including the terms hereof and thereof, or (ii) the operation and

activities of the Company; provided that any such information will not be Confidential Information if it is (A) otherwise available to the public through no action by such Member or Affiliate in violation of this Agreement or (B) otherwise in the rightful possession of such Member or Affiliate from any third Person having, to the knowledge of such Member or Affiliate after reasonable inquiry, no obligation of confidentiality with respect to such information to the other Members or the Company or any of its Subsidiaries, as applicable.

"Control," "Controlled" or "Controlling" means, with respect to any Person, any circumstance in which such Person is directly or indirectly controlled by another Person by virtue of the latter Person having the power to (i) elect, or cause the election of (whether by way of voting capital stock, by contract, trust or otherwise), the majority of the members of the Board of Managers or a similar governing body of the first Person, or (ii) direct (whether by way of voting capital stock, by contract, trust or otherwise) the affairs and policies of such Person.

"Depreciation" means, for each Fiscal Year, an amount equal to the depreciation, amortization or other cost recovery deduction as reported for federal income tax purposes with respect to an asset for such year or other period, except that if the Tax Book Value of an asset differs from its adjusted basis for federal income tax purposes, Depreciation shall be an amount which bears the same ratio to such beginning Tax Book Value as the federal income tax depreciation, amortization or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero, Depreciation shall be determined with reference to such beginning Tax Book Value using any reasonable method selected by the Board of Managers.

"DIP Lenders" has the meaning set forth in the MDA.

"Distribution" means each distribution after the Effective Date made by the Company to a Member, whether in cash, property or securities of the Company, pursuant to, or in respect of, Article V or Article X.

"Entity" means any general partnership, limited partnership, corporation, association, cooperative, joint stock company, trust, limited liability company, business or statutory trust, joint venture, unincorporated organization or Governmental Entity.

"Equity Securities" means, as applicable, (i) any capital stock, membership or limited liability company interests or other share capital or equity interests, (ii) any securities directly or indirectly convertible into or exchangeable for any capital stock, membership or limited liability company interests or other share capital or equity interests or containing any profit participation features, (iii) any rights or options directly or indirectly to subscribe for or to purchase any capital stock, membership or limited liability company interests, other share capital or equity interests or securities containing any profit participation features or to subscribe for or to purchase any securities directly or indirectly convertible into or exchangeable for any capital stock, membership or limited liability company interests, other share capital or equity interests or securities containing any profit participation features, (iv) any share appreciation rights, phantom share rights or other similar rights, or (v) any Equity Securities issued or issuable with respect to

the securities referred to in clauses (i) through (iv) above in connection with a combination of shares, recapitalization, merger, consolidation, conversion or other reorganization.

"Excess Nonrecourse Liability" means an "excess nonrecourse liability" within the meaning of Section 1.752-3(a)(3) of the Treasury Regulations.

"Exchange Act" means the United States Securities Exchange Act of 1934, as amended.

"Exempt Transfer" means, with respect to the Initial Class A Holders, the Transfer by such Holders of any Class A Membership Interest (or portion thereof), in accordance with Article IX, (i) to any Affiliate of such Holder, (ii) to any Person with the prior written consent of the Majority Class B Holders (which may be given or withheld in their discretion) and (iii) in the case of General Motors, to any Person in connection with the direct or indirect transfer, sale, merger, consolidation or similar reorganization of a substantial portion of General Motors' business.

"Fair Market Value" means (i) in reference to the Company or Membership Interests, the fair market value for the Company or such Membership Interests as between a willing buyer and a willing seller in an arm's length transaction occurring on the date of valuation, taking into account all relevant factors determinative of value, as reasonably determined by the Independent Managers of the Board of Managers, (ii) in reference to property or assets owned by the Company, the fair market value of such property or assets as reasonably determined by the Independent Managers of the Board of Managers, and (iii) in reference to property or assets other than the Company, Membership Interests or properties or assets owned by the Company (including any property or assets contributed to the Company after the Effective Date), the fair market value of such property or assets as reasonably determined by the Independent Managers of the Board of Managers.

"Fiscal Quarter" means each fiscal quarter of the Company and its Subsidiaries, ending on the last day of each of March, June, September and December of any Fiscal Year unless otherwise required by the Code or as otherwise determined by the Board of Managers.

"Fiscal Year" means the fiscal year of the Company and shall be the same as its taxable year, which shall be the year ending December 31 unless otherwise required by the Code or as otherwise determined by the Board of Managers. Each Fiscal Year shall commence on the day immediately following the last day of the immediately preceding Fiscal Year.

"GAAP" means accounting principles generally accepted in the United States of America as in effect from time to time, consistently applied and maintained throughout the applicable periods both as to classification or items and amounts.

"Governmental Entity" means the United States of America or any other nation, any state, province or other political subdivision, any international or *supra* national entity, or any entity exercising executive, legislative, judicial, regulatory or administrative functions of government, including any court, in each case having jurisdiction over the Company or any of its Subsidiaries or any of the property or other assets of the Company or any of its Subsidiaries.

"Holders" means the Class A Holders, the Class B Holders and the holders of any other Membership Interests hereinafter created by the Board of Managers in accordance with the terms of this Agreement.

"Incremental Cost" means the incremental cost to the Company of delivering the items and complying with the terms and conditions set forth on Exhibit E or Section 4.2(h), as reasonably agreed by General Motors and the Company; provided, that if General Motors and the Company are unable to reach agreement, they shall promptly thereafter cause an independent accounting firm to review the disputed items and the decision of such mutually agreed upon accounting firm shall be final and binding upon General Motors and the Company.

"Independent" means with respect to any individual, any individual other than (i) an individual who is, or at anytime during the three years prior to the determination of whether such individual is Independent, was, a director, officer or employee of, or a consultant or advisor to (a) the Company or any of its Subsidiaries or (b) any direct or indirect equityholder of the Company or any of their respective Affiliates; (ii) an individual who has, or at anytime during three years prior to the determination of whether such individual is Independent, had, any direct or indirect interest of any kind in, or the right to participate in the profits of the Company or any direct or indirect equityholder of the Company or any of their respective Affiliates; and (iii) an individual who is, or at anytime during the three years prior to the determination of whether such individual is Independent, was involved in any business arrangement or other relationship (whether written or oral) (including acting as a lender to or borrower) with (a) the Company or any of its Subsidiaries or (b) any direct or indirect equityholder of the Company or any of their respective Affiliates; provided, however, that passive ownership of (x) less than 5.0% of the outstanding capital stock of any publicly traded company and (y) less than 1.0% of the outstanding capital stock or other equity or economic interest of any other entity (other than an Affiliate of the Company) shall not be considered for purposes of determining whether an individual is "Independent."

In addition to the above objective criteria, no individual shall be considered "Independent" if, in the reasonable opinion of each of the disinterested Managers (i.e., Class A Independent Managers (or, if no such Independent Managers have been appointed, the Class A Designee Managers), in the case of a Class B Independent Manager nominee, and the Class B Independent Managers (or, if no such Independent Managers have been appointed, the Class B Designee Managers), in the case of a Class A Independent Manager), the individual has a relationship which would interfere with the individual's exercise of independent judgment in carrying out the responsibilities of a Manager.

Notwithstanding the foregoing, if the Class A Designee Managers and the Class B Designee Managers agree in writing that an individual is Independent then such individual shall be deemed Independent for all purposes hereof.

"Independent Manager" means a Manager who is Independent.

"Initial Class A Holders" means General Motors or any Person holding Class A Membership Interests originally acquired by General Motors on the Effective Date that were

Transferred to such Person in one or more Transfers occurring after the Effective Date, all of which Transfers constituted Exempt Transfers.

"Initial Class B Holders" means Elliott, Silver Point and those Class B Holders listed on Exhibit A or any Person holding Class B Membership Interests originally acquired by such Class B Holders on the Effective Date that were Transferred to such Person in one or more Transfers occurring after the Effective Date in accordance with the terms of this Agreement.

"Initial Public Offering" means a firm commitment underwritten public offering pursuant to an effective registration statement filed under the Securities Act covering the offer and sale of common equity securities for the account of the Issuer in which the aggregate public offering price (before deduction of underwriters' discounts and commissions) equals or exceeds $200 million.

"Law" means any applicable law, statute, ordinance, rule, regulation, code, order, judgment, tax ruling, injunction or decree of any Governmental Entity, including any Law relating to the protection of the environment.

"Lien" means any mortgage, pledge, security interest, encumbrance, lien or charge of any kind (including any conditional sale or other title retention agreement or lease in the nature thereof), any sale of receivables with recourse against the Company or any of its Subsidiaries, any filing or agreement to file a financing statement as a debtor under the Uniform Commercial Code or any similar statute of any jurisdiction other than to reflect ownership by a third Person of property leased to the Company or any of its Subsidiaries under a lease that is not in the nature of a conditional sale or title retention agreement.

"Loan Agreements" means, collectively, the "Senior Loan Agreement" and the "Subordinated Loan Agreement".

"Majority Class A Holders" means, at any time, the Class A Holders which hold a majority of the then-outstanding Class A Membership Interests.

"Majority Class B Holders" means, at any time, the Class B Holders which hold a majority of the then-outstanding Class B Membership Interests.

"Majority Initial Class A Holders" means, at any time, the Initial Class A Holders which hold a majority of the then-outstanding Class A Membership Interests held by all of the Initial Class A Holders.

"Member" means General Motors, a Class B Holder and each other Person who is hereafter admitted as a Member of the Company in accordance with the terms of this Agreement and the Act. The Members shall constitute the "members" (as such term is defined in the Act) of the Company.

"Membership Interest" means, with respect to each Member, the class or classes of limited liability company interests of such Member, as set forth opposite such Member's name on the Schedule of Members hereto from time to time, including such Member's share of the Tax Book Profits and Tax Book Losses of the Company, and also the right of such Member to any

and all of the benefits to which such Member may be entitled as provided in this Agreement and in the Act, together with the obligations of such Member to comply with all the provisions of this Agreement and of the Act. The Company may issue whole or fractional Membership Interests pursuant to the terms of this Agreement.

"Member Nonrecourse Debt" means any Company liability to the extent such liability is nonrecourse for purposes of Section 1.1001-2 of the Treasury Regulations, and a Member (or related Person within the meaning of Section 1.752-4(b) of the Treasury Regulations) bears the economic risk of loss with respect to such liability under Section 1.752-2 of the Treasury Regulations.

"Member Nonrecourse Debt Minimum Gain" shall have the meaning set forth in Section 1.704-2(i)(3) of the Treasury Regulations for "partner nonrecourse debt minimum gain."

"Minimum Class A Condition" means the requirement that the Initial Class A Holders collectively hold at least fifty percent of the Class A Membership Interests acquired by General Motors on the Effective Date (determined after adjustment for any Pro Rata Adjustment Events after the date hereof).

"New Securities" means any Membership Interests or other Equity Securities issued by the Company, whether now authorized or not, and any rights, options or warrants to purchase Membership Interests or other Equity Securities and any indebtedness or class of Equity Securities of the Company which is convertible into Membership Interests (or which is convertible into a security which is, in turn, convertible into Membership Interests); provided, however, that the term "New Securities" does not mean (i) indebtedness of the Company which is not by its terms convertible into Membership Interests or other Equity Securities; (ii) Equity Securities issued as a distribution to all Members in accordance with the distribution provisions of this Agreement; (iii) Equity Securities granted or issued to employees, officers or directors of the Company or any of its Subsidiaries pursuant to incentive agreements, equity purchase or equity option plans, equity bonuses or awards, warrants, contracts or other arrangements that are approved by the Board of Managers; (iv) Equity Securities issued as consideration pursuant to an acquisition by or merger with the Company; (v) the issuance of any Equity Securities upon the exercise or conversion of any rights, options or warrants to purchase Membership Interests; and (vi) Membership Interests issued pursuant to the terms of the Investment Commitment Agreement.

"Nonrecourse Debt" means any Company liability to the extent that no Member or related Person bears the economic risk of loss for such liability under Section 1.752-2 of the Treasury Regulations.

"Nonrecourse Deductions" shall have the meaning set forth in Treasury Regulations Sections 1.704-2(b)(l) and 1.704-2(c)(1).

"Ordinary Course of Business" means the ordinary course of the business of the Company and its Subsidiaries, and including the ordinary course of the business of Old Delphi and its Subsidiaries acquired pursuant to the Reorganization Plan, as conducted prior to the date hereof.

"Person" means any individual or Entity.

"Preemptive Share" means, for the Class A Holders in the aggregate and the Class B Holders in the aggregate, the distribution percentage set forth in Section 5.1 in effect as of such calculation date (i.e. using the distribution percentages that would be in effect if a Distribution were to made under Section 5.1) for the Class A Holders (the "Class A New Securities Percentage") and the Class B Holders (the "Class B New Securities Percentage"); and (i) for each Class A Holder, the percentage that results from multiplying the Class A New Securities Percentage by a fraction, the numerator of which is the number of Class A Membership Interests held by such Class A Holder and the denominator is the number of Class A Membership Interests held by all Class A Holders and (ii) for each Class B Holder, the percentage that results from multiplying the Class B New Securities Percentage by a fraction, the numerator of which is the number of Class B Membership Interests held by such Class B Holder and the denominator is the number of Class B Membership Interests held by all Class B Holders. The Independent Managers of the Board of Managers shall make such equitable adjustment to this definition as necessary to reflect any additional class of Members.

"Pro Rata Adjustment Event" shall mean, with respect to any class of Membership Interests, any split, reverse split or combination or similar pro rata recapitalization event affecting Membership Interests of such class.

"Qualified Sale" shall mean any sale of all or substantially all of the assets or ownership interests in the Company (by merger or otherwise) to Persons unaffiliated with the Company in exchange for (i) cash and/or (ii) freely tradeable securities which are listed on a national or international exchange (subject only to customary lock-ups that expire no later than three (3) months after closing of the Qualified Sale), that results in net proceeds to the Company or the Members of not less than $3,641,757,563, less any Distributions made in accordance with this Agreement; provided, however, that such securities received by the Members shall not exceed 40% of the outstanding publicly traded securities of the purchaser of the Company (excluding shares owned by Affiliates of the purchaser) after taking into account the shares issued in such Qualified Sale.

"Release Conditions" means each of the following conditions: (i) (x) the Company shall have repaid in full the entire unpaid principal amount of each loan made by General Motors under the Senior Loan Agreement (including interest and fees and costs payable thereunder to General Motors as lender) and (y) the aggregate Unreturned Original Cost of the outstanding Class A Membership Interests issued to General Motors on the Effective Date shall equal zero, (ii) General Motors commitment to loan the Company funds pursuant to the Senior Loan Agreement shall have terminated or be equal to $0, (iii) the revenue to the Company and its Subsidiaries from General Motors shall be less than 15% of the Company's consolidated revenue for the twelve month period immediately preceding the date of determination and (iv) the earlier of the following shall have occurred (A) the third (3rd) anniversary of the Effective Date or (B) the Initial Class A Holders shall have sold 75% of the Class A Membership Interests originally acquired by General Motors on the Effective Date to one or more third parties (determined after adjustment for any Pro Rata Adjustment Events after the date hereof).

"Securities Act" means the United States Securities Act of 1933, as amended.

"Senior Loan Agreement" means that certain Senior Credit Facility among the Company, the other lenders party thereto and [_____] as administrative agent, as in effect on the date hereof, as amended in accordance with its terms.

"SOX" means the Sarbanes-Oxley Act of 2002, as amended.

"Subordinated Loan Agreement" means that certain Subordinated Credit Facility among the Company, the other lenders party thereto and [_____] as administrative agent, as in effect on the date hereof, as amended in accordance with its terms.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association, bank, savings bank, or other organization or business entity, whether incorporated or unincorporated, which is consolidated with such Person for financial reporting purposes under GAAP.  For purposes hereof, references to a "Subsidiary" of any Person shall be given effect only at such times that such Person has one or more Subsidiaries and, unless otherwise indicated, the term "Subsidiary" refers to a Subsidiary of the Company. Notwithstanding the foregoing, in no event shall the Company be considered a "Subsidiary" of General Motors or any Class B Holder for purposes of this Agreement.

"Substituted Member" means any Person that has been admitted to the Company as a Member pursuant to Section 9.3 by virtue of such Person receiving all or a portion of a Membership Interest from a Member and not from the Company.

"Tax Book Profit" and "Tax Book Loss" means, for each Fiscal Year, or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Section 703(a) of the Code; provided that for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss, with the following adjustments:

 (i) any income of the Company that is exempt from federal income tax and not otherwise taken in account in computing Tax Book Profit or Tax Book Loss pursuant to this provision shall be added to such taxable income or loss;

 (ii) any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as Code Section 705(a)(2)(B) expenditures pursuant to Section 1.704-1(b)(2)(iv)(i) of the Treasury Regulations, and not otherwise taken into account in computing Tax Book Profit or Tax Book Loss pursuant to this provision, shall be subtracted from such taxable income or loss;

 (iii) gain or loss resulting from any disposition of any asset of the Company with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Tax Book Value of the asset disposed of as determined under Treasury Regulations Section 1.704-1(b)(2)(iv), notwithstanding that the adjusted tax basis of such asset may differ from such Tax Book Value;

(iv)   in lieu of depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken in account Depreciation for such Fiscal Year, computed as provided in this Agreement, and

(v)   in the event the Tax Book Value of any Company asset is adjusted to reflect the Fair Market Value of such asset in accordance with the last sentence of the definition of "Tax Book Value," the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Tax Book Profit or Tax Book Loss.

If the Company's taxable income or loss for such Fiscal Year, as adjusted in the manner provided above, is a positive amount, such amount shall be Company's Tax Book Profit for such Fiscal Year, and, if a negative amount, such amount shall be the Company's Tax Book Loss for such Fiscal Year.

"Tax Book Value" of an asset means, as of any particular date, the value at which the asset is properly reflected on the books and records of the Company as of such date in accordance with Section 1.704-l(b)(2)(iv) of the Treasury Regulations as follows:

(i)   The initial Tax Book Value of each asset shall be its cost, unless such asset was contributed to the Company by a Member, in which case the initial Tax Book Value shall be the Fair Market Value for such asset determined by the Board of Managers, and, in each case, such Tax Book Value shall thereafter be adjusted for Depreciation with respect to such asset rather than for the cost recovery deductions to which Company is entitled for federal income tax purposes with-respect thereto.

(ii)   At the discretion of the Board of Managers, the Tax Book Values of all Company assets shall be adjusted to equal their respective Fair Market Values, as reasonably determined by the Board of Managers, as of the following times:

(A)   the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a *de minimis* additional Capital Contribution;

(B)   the Distribution by the Company to a Member of more than a *de minimis* amount of the Company assets, including money, if, as a result of such Distribution, such Member's interest in the Company is reduced;

(C)   the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-l(b)(2)(ii)(g); and

(D)   at any other time, as permitted by the Treasury Regulations.

"Transaction Documents" means the agreements and other documents set forth on Exhibit B.

"Transfer" means any sale, transfer, assignment, pledge, encumbrance, exchange, or other disposition of an interest (whether with or without consideration, whether voluntarily or involuntarily or by operation of Law).  The terms "Transferee," "Transferor," "Transferred," and other forms of the word "Transfer" shall have the correlative meanings.

"Treasury Regulations" means the regulations, including temporary regulations, promulgated by the United States Treasury Department under the Code.

"Unreturned Original Cost" means, with respect to the Class A Membership Interests, the amount (which shall be not less than zero) equal to (i) $1.75 billion, minus (ii) the aggregate Fair Market Value of the Distributions and any other cash or non-cash payments made to the holder of such Class A Membership Interests (including such holder's predecessors in interest) in respect of such Class A Membership Interests.

"1940 Act" means the United States Investment Company Act of 1940.

**Section 1.2     Cross-References.**  In addition to the terms set forth in Section 1.1, the following terms are defined in the text of this Agreement in the locations specified below:

| Term | Cross-Reference |
| --- | --- |
| Act | Recitals |
| Additional Purchase Right | Section 12.4(b) |
| Agents | Section 13.1 |
| Asset Purchase | Recitals |
| Assumed Tax Rate | Section 5.5 |
| Board of Managers | Section 8.1 |
| Capital Account | Section 3.5 |
| Certificate of Formation | Recitals |
| Chairman | Section 8.3(c) |
| Chief Executive Officer | Section 8.12(c)(i) |
| Chief Financial Officer | Section 8.12(c)(iii) |
| Class A Designee Managers | Section 8.3(a)(i) |
| Class A Independent Managers | Section 8.3(a)(ii) |
| Class A Manager | Section 8.3(a)(ii) |
| Class B Designee Managers | Section 8.3(a)(iii) |
| Class B Independent Managers | Section 8.3(a)(iv) |
| Class B Manager | Section 8.3(a)(iv) |
| Company | Preamble |
| Competitive Information | Section 8.7(b) |
| Direct Conflict | Section 8.7(a) |
| Effective Date | Preamble |
| Electing Member | Section 12.4(b) |

| Term | Cross-Reference |
|------|-----------------|
| Elliott | Recitals |
| Fifth Independent Manager | Section 8.3(a)(v) |
| General Motors | Preamble |
| Indemnified Persons | Section 11.1(a) |
| Independent Auditor | Section 4.4 |
| Indirect Conflict | Section 8.7(a) |
| Investment Commitment Agreement | Recitals |
| Issuance Notice | Section 12.4(a) |
| Managers | Section 8.1 |
| MDA | Recitals |
| Non-Exercising Members | Section 12.4(b) |
| Officers | Section 8.12(a) |
| Old Delphi | Recitals |
| Original Agreement | Recitals |
| Other Class B Holders | Recitals |
| President | Section 8.12(c)(ii) |
| Proceeding | Section 11.1(a) |
| Purchasing Member | Section 12.4(d) |
| Regulatory Allocations | Section 6.14 |
| Reorganization Plan | Recitals |
| Secretary | Section 8.12(c)(iv) |
| Silver Point | Recitals |
| Tax Distribution | Section 5.5 |
| Tax Matters Member | Section 4.3(a) |
| Voting Power | Section 7.7(a) |

**Section 1.3     Interpretative Matters**.  In this Agreement, unless otherwise specified or where the context otherwise requires:

(a)     the headings of particular provisions of this Agreement are inserted for convenience only and will not be construed as a part of this Agreement or serve as a limitation or expansion on the scope of any term or provision of this Agreement;

(b)     words importing any gender shall include other genders;

(c)     words importing the singular only shall include the plural and vice versa;

(d)     the words "include," "includes" or "including" shall be deemed to be followed by the words "without limitation";

(e)     the words "hereof," "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement;

(f)     references to "Articles," "Exhibits," "Sections" or "Schedules" shall be to Articles, Exhibits, Sections or Schedules of or to this Agreement;

(g)     references to any Person include the heirs, executors, administrators, legal representatives, successors and permitted assigns of such Person where the context so permits;

(h)     the use of the words "or," "either" and "any" shall not be exclusive;

(i)     wherever a conflict exists between this Agreement and any other agreement, this Agreement shall control but solely to the extent of such conflict;

(j)     references to "$" mean the lawful currency of the United States of America;

(k)     references to any agreement, contract, guideline, exhibit or schedule, unless otherwise stated, are to such agreement, contract, guideline, exhibit or schedule as amended, amended and restated, replaced, substituted, modified or supplemented from time to time in accordance with the terms hereof and thereof; and

(l)     references to any Law or a particular provision of any Law, unless otherwise stated, are to such Law and any successor Law or to such provision of Law and the corresponding provision in any successor Law, as applicable.

## ARTICLE II
## ORGANIZATIONAL MATTERS; GENERAL PROVISIONS

### Section 2.1     Formation.

(a)     The Company was formed under the Act by the filing of the Certificate of Formation with the Secretary of State of the State of Delaware on July 13, 2009. The Members agree to continue the Company as a limited liability company under the Act, upon the terms and subject to the conditions set forth in this Agreement.

(b)     The rights, duties and liabilities of the Members shall be as provided in the Act, except as otherwise provided herein. To the extent that the rights, powers, duties, obligations and liabilities of any Members are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

### Section 2.2     Name; Office; Registered Agent.

(a)     The name of the Company is DIP Holdco 3, LLC. The Board of Managers may change the name of the Company at any time and from time to time. Prompt notification of any such change shall be given to all Members.

(b)     The Company's principal office shall be located at [_____], or such other location in the United States of America as the Board of Managers shall designate from time to time in the manner provided by Law, which need not be in the State of Delaware,

and the Company shall maintain records at such place. The Company may maintain offices at such other place or places as the Board of Managers deems advisable. Prompt notice of any change in the principal office shall be given to all Members. The Company's initial registered agent in the State of Delaware for the service of process is as identified in the Certificate of Formation filed with the Secretary of State of the State of Delaware. The Board of Managers may from time to time change the registered agent, and any such change shall be reflected in appropriate filings with the Secretary of State of the State of Delaware.

### Section 2.3    Purposes; Powers.

(a)    The nature of the business or purposes to be conducted or promoted by the Company is to (x) operate and maximize the value of the business of the Company acquired pursuant to the MDA as a vibrant, independent enterprise positioned for long term success and (y) engage in any lawful act or activity for which limited liability companies may be organized under the Act. The Company may engage in any and all activities necessary, desirable or incidental to the accomplishment of the foregoing. Notwithstanding anything herein to the contrary, nothing set forth herein shall be construed as authorizing the Company to possess any purpose or power, or to do any act or thing, forbidden by Law to a limited liability company organized under the Laws of the State of Delaware.

(b)    Subject to the provisions of this Agreement and except as prohibited by Law, (i) the Company may, with the approval of the Board of Managers, enter into, deliver and perform any and all agreements, consents, deeds, contracts, proxies, covenants, bonds, checks, drafts, bills of exchange, notes, acceptances and endorsements, and all evidences of indebtedness and other documents, instruments or writings of any nature whatsoever, all without any further act, vote or approval of any Member, and (ii) the Board of Managers may, pursuant to Section 8.11, authorize (including by general delegated authority) any Person (including any Member, Manager or Officer) to enter into, deliver and perform on behalf of the Company any and all agreements, consents, deeds, contracts, proxies, covenants, bonds, checks, drafts, bills of exchange, notes, acceptances and endorsements, and all evidences of indebtedness and other documents, instruments or writings of any nature whatsoever.

(c)    Subject to the other provisions of this Agreement, the Company shall do all things necessary to maintain its existence separate and apart from each Member and any Affiliate of any Member, including holding regular meetings of the Board of Managers and maintaining its books and records on a current basis separate from that of any Affiliate of the Company or any other Person.

(d)    Notwithstanding anything to the contrary contained herein, the Company shall take any and all actions, including by omission to act, necessary to prevent the Company or any of its Members from having, or being deemed to have, any income effectively connected with the conduct of a trade or business within the United States (including through the holding of any investment in U.S. real property interests, within the meaning of Section 897 of the Code).

### Section 2.4    Duration. The period of the Company's duration commenced on the filing of the Certificate of Formation with the office of the Secretary of State of the State of Delaware on July 13, 2009 and shall continue in full force and effect in perpetuity; provided

that Company may be dissolved and wound up in accordance with the provisions of this Agreement and the Act.

**Section 2.5**       **No State Law Partnership**.  The Members intend that the Company shall not be a partnership (including a limited partnership) or joint venture, and that no Member, Manager or Officer shall be a partner or joint venturer of any other Member, Manager or Officer by virtue of this Agreement, for any purposes other than as is set forth in Section 2.7, and this Agreement shall not be construed to the contrary.

**Section 2.6**       **Filings; Qualification in Other Jurisdictions**.  The Company shall prepare, following the execution and delivery of this Agreement, any documents required to be filed or, in the Board of Managers' view, appropriate for filing under the Act, and the Company shall cause each such document to be filed in accordance with the Act, and, to the extent required by Law, to be filed and recorded, and/or notice thereof to be published, in the appropriate place in each jurisdiction in which the Company may have established, or after the Effective Date may establish, a place of business.  The Board of Managers may cause the Company to be qualified, formed or registered under assumed or fictitious name statutes or similar Laws in any jurisdiction in which the Company transacts business where the Company is not currently so qualified, formed or registered.  Any Manager or Officer, acting individually as an authorized person within the meaning of the Act, shall execute, deliver and file any such documents (and any amendments and/or restatements thereof) necessary for the Company to accomplish the foregoing.  The Board of Managers may appoint any other authorized persons to execute, deliver and file any such documents.

**Section 2.7**       **Income Tax Classification**.  The Members intend that the Company be classified as a partnership for United States federal, state and local income tax purposes and the Members shall not elect pursuant to Treasury Regulation § 301.7701-3 to treat the Company otherwise.  Each Member and the Company shall file all tax returns in a manner consistent with such classification and shall take no tax reporting position inconsistent with that classification.

## ARTICLE III
## CAPITALIZATION; MEMBERSHIP INTERESTS

**Section 3.1**       **Membership Interests; Initial Capitalization; Initial Capital Accounts.**

(a)      The Company shall initially have two authorized classes of Membership Interests, consisting of 1,750,000 Class A Membership Interests and 354,500 Class B Membership Interests.  A Membership Interest shall for all purposes be personal property.  For purposes of this Agreement, Membership Interests held by the Company or any of its Subsidiaries shall be deemed not to be outstanding.  The Company may issue fractional Membership Interests pursuant to the terms of this Agreement, and all Membership Interests shall be rounded to the fourth decimal place.

(b)      Upon the execution and delivery of this Agreement, each of the Persons named as a Member on the Schedule of Members shall be admitted as a Member of the

Company with the type and number of Membership Interests set forth on the <u>Schedule of Members</u>, with effect as of the Effective Date. The Company shall update the <u>Schedule of Members</u> to reflect any changes in the Members and the Membership Interests of the Members in accordance with the terms of this Agreement. The initial Capital Account balance of each Member shall be deemed to be the amount set forth opposite its name on the <u>Schedule of Members</u>.

**Section 3.2**      <u>**Authorization and Issuance of Additional Membership Interests.**</u>

(a)      The Board of Managers shall have the right to cause the Company to issue and/or create and issue at any time after the Effective Date, and for such amount and form of consideration as the Board of Managers may reasonably determine, subject to the provisions of <u>Article XII</u>, additional Membership Interests (of existing classes or new classes) or other Equity Securities of the Company (including creating additional classes or series thereof having such powers, designations, preferences and rights as may be determined by the Board of Managers). In connection with the foregoing, subject to the provisions of <u>Sections 12.1</u>, <u>12.2</u> and <u>14.1</u>, as applicable, the Board of Managers shall have the power to make such amendments to this Agreement in order to provide for such additional Membership Interests, and such powers, designations and preferences and rights as the Board of Managers in its discretion deems necessary or appropriate to give effect to such additional authorization or issuance.

(b)      Subject to the provisions of <u>Article XII</u>, the Board of Managers shall have the right to admit Additional Members. A Person may be admitted to the Company as an Additional Member upon furnishing to the Board of Managers (i) a joinder agreement pursuant to which such Person agrees to be bound by all of the terms and conditions of this Agreement, and (ii) such other documents or instruments as the Board of Managers may reasonably determine be necessary or appropriate to effect such Person's admission as a Member (including entering into an investor representation agreement or such other similar documents as the Board of Managers may reasonably deem appropriate), which joinder agreement, documents and instruments shall be in form and substance reasonably satisfactory to the Board of Managers. Such admission shall become effective on the date on which the Board of Managers determines that the foregoing conditions and the conditions set forth in Article IX have been satisfied and when any such admission is shown on the books and records of the Company. Upon the admission of an Additional Member, the <u>Schedule of Members</u> shall be amended to reflect the name, notice address, Membership Interests and other interests in the Company, Capital Contributions and initial Capital Account balance of such Additional Member.

**Section 3.3**      <u>**Application of Article 8 of the Uniform Commercial Code**</u>. Each Membership Interest shall constitute a "security" within the meaning of and shall be governed by (a) Article 8 of the Uniform Commercial Code (including Section 8-102(a)(15) thereof) as in effect from time to time in the State of Delaware, and (b) the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995.

**Section 3.4**      **Certification of Membership Interests**. Membership Interests shall be issued in non-certificated form; provided that the Board of Managers may cause the Company to issue certificates to a Member representing the Membership Interests held by such Member. If any Membership Interest certificate is issued, then such certificate shall bear a legend substantially in the following form:

> This certificate evidences a [Class ___ Membership Interest] representing an interest in DIP Holdco 3, LLC and shall constitute a "security" within the meaning of and shall be governed by (i) Article 8 of the Uniform Commercial Code (including Section 8-102(a)(15) thereof) as in effect from time to time in the State of Delaware, and (ii) the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995.

> The Membership Interest in DIP Holdco 3, LLC represented by this certificate is subject to restrictions on transfer set forth in that certain Amended and Restated Operating Agreement of DIP Holdco 3, LLC, dated as of [_____], 2009, by and among the members from time to time party thereto, as the same may be amended from time to time.

> The Membership Interest in DIP Holdco 3, LLC represented by this certificate has not been registered under the United States Securities Act of 1933, as amended, or under any other applicable securities laws. Such Membership Interest may not be sold, assigned, pledged or otherwise disposed of at any time without effective registration under such Act and laws or, in each case, exemption therefrom.

**Section 3.5**      **Capital Accounts**. The Company shall maintain a separate capital account (a "Capital Account") for each Member in accordance with Section 1.704-1(b)(2)(iv) of the Treasury Regulations. Subject to the foregoing:

    (a)      each Member's Capital Account shall be increased by the amount of cash and the Fair Market Value of the property actually contributed to the Company, such Member's allocable share, if any, of any Tax Book Profits of the Company, and the amount of any Company liabilities assumed by such Member or which are secured by any property distributed to such Member,

    (b)      each Member's Capital Account shall be decreased by the amount of cash and the Fair Market Value of any Company property distributed to the Member pursuant to any provision of this Agreement, such Member's allocable share, if any, of any Tax Book Losses of

the Company, and the amount of any liabilities of such Member assumed by the Company or which are secured by any property contributed by such Member to the Company;

(c)     the provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Section 1.704-1(b)(2)(iv) of the Treasury Regulations, and shall be interpreted and applied in a manner consistent with such Treasury Regulations;

(d)     no interest shall be paid by the Company on Capital Contributions or on balances in Capital Accounts;

(e)     a Member shall not be entitled to withdraw any part of its Capital Account or to receive any Distributions from the Company, except as expressly provided herein;

(f)     no loan made to the Company by any Member shall constitute a Capital Contribution to the Company for any purpose. The amount of any loan shall be a debt of the Company to such Member and shall be payable or collectible in accordance with the terms and conditions upon which such loan is made; and except as required by the Act, no Member shall have any liability for the return of the Capital Contributions of any other Member.

Section 3.6      **No Right of Partition**. All property of the Company, whether tangible or intangible, shall be deemed to be owned by the Company as an entity. No Member shall have any interest in specific Company property solely by reason of being a Member. Except as specifically contemplated by this Agreement, any other Transaction Document or any other written agreement between the Company and any Member, no Member shall (a) have the right to seek or obtain partition by court decree or operation of Law of any property of the Company or any of its Subsidiaries, (b) have the right to own or use particular or individual assets of the Company or any of its Subsidiaries, or (c) be entitled to distributions of specific assets of the Company or any of its Subsidiaries.

Section 3.7      **Additional Capital Contributions and Financing**. No Member shall be required to make any additional Capital Contribution to the Company in respect of the Membership Interests then held by such Member (in its capacity as such) or to provide any additional financing to the Company; provided that a Member may make additional Capital Contributions or provide additional financing to the Company if approved by the Board of Managers and otherwise made in accordance with the applicable provisions of this Agreement. The provisions of this Section 3.7 are intended solely for the benefit of the Members in their capacity as Members, and, to the fullest extent permitted by Law, shall not be construed as conferring any benefit upon any creditor (including a Member in its capacity as a creditor) of the Company (and no such creditor shall be a third party beneficiary of this Agreement), and no Member shall have any duty or obligation to any creditor of the Company to make any additional Capital Contributions or to provide any additional financing or to cause the Board of Managers or any other Member to consent to the making of additional Capital Contributions or to the provision of additional financing.

## ARTICLE IV
## SCHEDULE OF MEMBERS; BOOKS AND RECORDS

**Section 4.1**    **Schedule of Members**.  The Company shall maintain and keep at its principal office the Schedule of Members on which it shall set forth the name and notice address of each Member, the aggregate number of Membership Interests of each class and the aggregate amount of cash Capital Contributions that have been made by such Member at any time, and the Fair Market Value of any property other than cash contributed by such Member with respect to the Membership Interests (including, if applicable, a description and the amount of any liability assumed by the Company or to which contributed property is subject).

**Section 4.2**    **Books and Records; Other Documents**.

(a)    The Company shall keep, or cause to be kept, (i) complete and accurate books and records of account of the Company, (ii) minutes of the proceedings of meetings of any class of Members, the Board of Managers and any committee of the Board of Managers, and (iii) a current list of the Managers and Officers and their notice addresses.  Any of the foregoing books, minutes or records may be in written form or in any other form capable of being accurately and completely converted into written form within a reasonable time.  The books of the Company (other than books required to maintain Capital Accounts) shall be kept on the accrual basis of accounting, and otherwise in accordance with GAAP, and shall at all times be maintained or made available at the principal office of the Company.  The Company shall, and shall cause its Subsidiaries to, (A) make and keep financial records in reasonable detail that accurately and fairly reflect all financial transactions and dispositions of the assets of the Company and its Subsidiaries and (B) maintain a system of internal accounting controls sufficient to provide reasonable assurances that (1) transactions are executed in accordance with authorization by the Person in charge and are recorded so as to provide proper financial statements and maintain accountability for assets and (2) safeguards are established to prevent unauthorized persons from having access to the assets, including the performance of periodic physical inventories.

(b)    At all times the Company shall maintain at its principal office a current list of the name and notice address of each Member, a copy of the Certificate of Formation, including any amendments thereto, copies of this Agreement and all amendments hereto, and all other records required to be maintained pursuant to the Act.

(c)    The Company also shall maintain at all times, at its principal office, copies of the Company's federal, state, local and foreign income tax returns and reports, if any, and all financial statements of the Company for all years ending after the Effective Date; provided, however, that the Company shall not be required to maintain copies of income tax returns and reports, if any, and any financial statements of the Company for any year which each Member has notified Company in writing that such Member's tax year has been closed.

(d)    The parties shall work in good faith to prevent the Company from becoming a consolidated subsidiary of General Motors in accordance with GAAP; provided, however, if General Motors shall conclude, in its sole discretion, that it is required to consolidate the Company in accordance with GAAP, the Company shall use all commercially reasonable

efforts to deliver the items and comply with the terms and conditions set forth on Exhibit E; provided, however, that General Motors shall reimburse the Company for any Incremental Cost to the Company of delivering the items and complying with the terms and conditions set forth on Exhibit E (it being understood and agreed that the Company shall notify General Motors in advance of incurring any such Incremental Cost and no such Incremental Cost shall be incurred without General Motors' consent).

 (e) The Company shall prepare and deliver to each Class A Holder that owns at least one percent (1.0%) of the then outstanding Class A Membership Interests and to each Class B Holder that owns at least one percent (1.0%) of the then outstanding Class B Membership Interests:

 (i) Within (x) 180 days after the end of the Fiscal Year ended December 31, 2009 and (y) 120 days after the end of each Fiscal Year thereafter, financial information regarding the Company and its Subsidiaries consisting of consolidated balance sheets of the Company and its Subsidiaries as of the end of such Fiscal Year and related statements of income and cash flows of the Company and its Subsidiaries for such Fiscal Year (or in the case of the Fiscal Year ending December 31, 2009, that portion of such Fiscal Year from the date hereof through the end of such Fiscal Year), all prepared in conformity with GAAP and accompanied by the opinion of independent public accountants of recognized national standing selected by the Company; and

 (ii) Within 60 days after the end of each of the first three Fiscal Quarters of each Fiscal Year (or, in the case of quarterly reports delivered from the date hereof through December 31, 2009, 105 days), financial information regarding the Company and its Subsidiaries consisting of consolidated unaudited balance sheets as of the close of such quarter and the related statements of income and cash flow for such quarter and that portion of the Fiscal Year ending as of the close of such quarter, setting forth in comparative form the figures for the corresponding period in the prior year (provided that such comparison to the corresponding period in the prior year shall not be required until the first quarterly report delivered after the first anniversary of the date hereof if the Company determines in its good faith discretion that it is impracticable to prepare such comparison prior to such date).

 (f) The Company shall provide (i) each Holder of 5% or more of the Class B Membership Interests, (ii) any representative who represents Persons who in the aggregate hold 5% or more of the Class B Membership Interests, and (iii) each Holder of 5% or more of the Class A Membership Interests, and their representatives or designees, (x) reasonable access, upon reasonable notice and during normal business hours, to all of the facilities, properties, books and records of the Company, (y) make the officers, employees and representatives of the Company, and the Company's independent public accountants, available to such Holders and their representatives, upon reasonable notice and during normal business hours, and (z) furnish such Holders and their representatives with any and all information concerning the Company that is reasonably available to the Company, or that the Company can produce using reasonable efforts but without incurring any material additional expense; provided, however, that all such Holders as a group shall have the right to access the Company's facilities, properties, books and records, personnel and representatives no more than one time during any fiscal quarter; provided

further, however, that to the extent that any such Holder referred to in (i), (ii) or (iii) above is a competitor of the Company, the Company shall be permitted to withhold competitively sensitive information.   In order to facilitate such quarterly limitation, the Company shall promptly distribute to all Holders entitled to access hereunder notice of any request of access by any such Holder and such Holders shall have five (5) Business Days to respond to the Company that such Holder desires to receive the requested information or participate in any meeting so requested.

(g)     The Company shall hold quarterly earnings conference calls for the Members, with each such conference call to be held within one week following the release of the Company's quarterly or annual financial reports.

(h)     Notwithstanding anything set forth in this Section 4.2 to the contrary, if General Motors shall conclude, in its reasonable discretion, that it is required to account for the Company in General Motors' financial statements pursuant to the equity method of accounting in accordance with GAAP, then the Company hereby agrees to use all commercially reasonable efforts to deliver such information to General Motors in order for General Motors to account for the Company using the equity method in a timely manner under all reporting requirements applicable to General Motors; provided that General Motors shall be responsible for any Incremental Cost associated with such reporting.

### Section 4.3     Certain Tax Matters.

(a)     Pursuant to Section 6231(a) of the Code, or any subsequent similar provision, the Class B Designee Managers and the Majority Class A Holders shall appoint on an annual basis by a resolution executed by such parties, the Company's "tax matters partner" within the meaning of Section 6231(a)(7) of the Code (the "Tax Matters Member"). The Tax Matters Member shall initially be General Motors and shall have the following rights and responsibilities:

(i)     The Tax Matters Member shall take such action as may be necessary to cause each of the other Members to become a "notice partner" within the meaning of Section 6231(a)(8) of the Code.

(ii)     The Tax Matters Member is authorized to represent the Company before the IRS and any other taxing authority with jurisdiction, and to sign such consents and to enter into settlements and other agreements with such agencies as the Board of Managers deems necessary or advisable.

(iii)     The Tax Matters Member shall promptly inform the Majority Class B Holders and the Majority Class A Holders of all significant matters that may come to its attention in its capacity as the Tax Matters Member and shall forward to the Majority Class B Holders and the Majority Class A Holders copies of all significant written communications it may receive or submit in such capacity, including any written adjustment by any taxing authority which would affect such Members' liability for taxes. The Tax Matters Member agrees to consult with the Majority Class B Holders and the Majority Class A Holders in good faith with respect to any written notice of any inquiries, claims, assessments, audits, controversies or similar events received from any

taxing authority, and the Tax Matters Member will not settle or otherwise compromise any material tax issue with respect to the Company without the prior written consent of the Majority Class B Holders and, for so long as the Minimum Class A Condition is satisfied, the Majority Class A Holders, which consent shall not be unreasonably withheld or delayed.

(b)     Promptly following the written request of the Tax Matters Member, the Company shall, to the fullest extent permitted by Law, reimburse and indemnify the Tax Matters Member for all reasonable expenses, including reasonable legal and accounting fees, incurred in connection with any administrative or judicial proceeding with respect to the tax liability of (i) the Company and/or (ii) the Members in connection with the operations of the Company.

(c)     The Company shall prepare or cause to be prepared the United States federal, state, local, foreign and any other required tax returns of the Company and shall file or cause to be filed such returns on a timely basis, which returns may have been reviewed by the Independent Auditor.

(d)     The Company shall transmit copies of the United States federal tax returns referenced in Section 4.3(c) to the Majority Class B Holders and the Majority Class A Holders on or before forty-five (45) calendar days before the due date of each such return, including any valid extensions thereto.  The Company shall not cause any such tax return to be filed unless each of (i) a majority of the Class B Managers (the "Majority Class B Managers") and (ii) for so long as any of the Release Conditions have not been satisfied, the Majority Class A Holders, have consented to its filing (with a failure to respond within thirty calendar days after receipt being deemed consent); provided, however, that, if the Majority Class B Managers and, for so long as any of the Release Conditions have not been satisfied, the Majority Class A Holders, do not consent to the filing of any tax return at least fifteen calendar days before the due date, then the Company (A) shall promptly notify the Majority Class B Managers and, for so long as any of the Release Conditions have not been satisfied, the Majority Class A Holders, of the disputed issues; and (B) may file such return after making a good faith effort to incorporate in such return any comments previously received from the Majority Class B Managers and, for so long as any of the Release Conditions have not been satisfied, the Majority Class A Holders.

(e)     To the extent appropriate, the Majority Class B Managers and the Majority Class A Holders shall be consulted in connection with the preparation and filing of tax returns contemplated by this Section 4.3.

**Section 4.4     Independent Auditor**.  The Company and its Subsidiaries at all times shall engage a Person to audit its financial statements (the "Independent Auditor") that (a) is an independent public accounting firm within the meaning of the American Institute of Certified Public Accountants' Code of Professional Conduct (American Institute of Certified Public Accountants, Professional Standards, vol. 2, *et sec.* 101), (b) is a registered public accounting firm (as defused in Section 2(a)(12) of SOX, and (c) if the Company were an "issuer" (as defined in SOX), would not be in violation of the auditor independence requirements of SOX by reason of its acting as the auditor of the Company and its Subsidiaries.  The Independent Auditor shall be appointed by the Board of Managers and shall be a nationally recognized certified public accounting firm.  The Company shall engage the Independent Auditor from time

to time to conduct such review and testing as from time to time may be necessary or reasonably required under SOX and to issue to the Company its written opinions and recommendations with respect thereto.

**Section 4.5     Company Policies**.    At the first meeting of the Board of Managers after the Effective Date, the Members shall cause the Board of Managers (a) to reconfirm the policies, standards and procedures relating to the Company and its Subsidiaries set forth on Exhibit C and (b) to adopt or reconfirm, as applicable, the environmental guidelines set forth on Exhibit D.  It is the intent of the parties hereto that the Company and its Subsidiaries operate in compliance with all Laws.

## ARTICLE V
## DISTRIBUTIONS

**Section 5.1     Distributions of Available Cash.**

(a)    Subject to the Act, and except as set forth in this Article V, all Available Cash (and, in the case of the winding up of the Company, subject to Section 10.2) available for distribution to the Members may be distributed to the extent approved by the Board of Managers, in accordance with the applicable provisions of this Article V, in the following amounts and order of priority (and, for the avoidance of doubt, the parties hereto intend that for purposes of applying the following priorities, all Distributions shall be given cumulative effect):

(i)    first, simultaneously, (A) 61.40 percent to the Class A Holders and (B) 38.60 percent to the Class B Holders until the aggregate amount distributed to the Holders pursuant to clauses (A) and (B) of this subparagraph (i) equals $1,000,000,000;

(ii)    second, simultaneously, (A) 72.22 percent to the Class A Holders and (B) 27.78 percent to the Class B Holders, until the aggregate amount distributed to the Holders pursuant to clauses (A) and (B) of this subparagraph (ii) equals $ 1,641,757,563;

(iii)    third, simultaneously, (A) 26.25 percent to the Class A Holders and (B) 73.75 percent to the Class B Holders, until the aggregate amount distributed to the Holders pursuant to clauses (A) and (B) of this subparagraph (iii) equals $1,000,000,000; and

(iv)    thereafter, simultaneously, (A) 35.00 percent to the Class A Holders and (B) 65.00 percent to the Class B Holders.

(b)    Each Distribution to the Class A Holders under this Agreement shall be made ratably among the Class A Holders determined as of, and based on the Company Class A Interest of such Class A Holders as of, either (A) immediately prior to such Distribution or, if applicable, (B) on the record date set by the Board of Managers pursuant to Section 7.9 with respect to such Distribution.

(c)    Each Distribution to the Class B Holders under this Agreement shall be made ratably among the Class B Holders determined as of, and based on the Company Class B Interest of such Class B Holders as of, either (A) immediately prior to such Distribution or, if

applicable, (B) on the record date set by the Board of Managers pursuant to <u>Section 7.9</u> with respect to such Distribution.

Section 5.2  **Successors**.  For purposes of determining the amount of Distributions, each Member shall be treated as having made the Capital Contributions and as having received the Distributions made to or received by its predecessors in respect of any of such Member's Membership Interests.

Section 5.3  **Distributions of Assets other than Cash**.  With the consent of (a) in the case of Distributions to the Class A Holders, the Majority Class A Holders and (b) in the case of Distributions to the Class B Holders, the Majority Class B Holders, in each case subject to the Act, the Company shall be permitted to distribute property consisting of assets other than cash to the Members in accordance with <u>Section 5.1</u> and the other provisions of this Agreement; <u>provided</u> that no such consent shall be required in connection with any distribution in-kind pursuant to <u>Section 10.2</u>.  Any property distributed pursuant to <u>Section 5.3</u> shall be valued at Fair Market Value.

Section 5.4  **Limitation on Distributions**.

(a)  Notwithstanding anything to the contrary herein except as set forth in <u>Section 5.5</u> below, without the prior approval of the Majority Initial Class A Holders and the Majority Class B Holders, no Distributions shall be made pursuant to <u>Section 5.1</u> so long as the aggregate Unreturned Original Cost of the outstanding Class A Membership Interests issued to General Motors on the Effective Date exceeds zero, unless each of the following conditions is satisfied:

(i)  there are no principal amounts outstanding under the Senior Loan Agreement;

(ii)  the distribution occurs later than 18 months following the Effective Date;

(iii)  after giving effect to such Distribution, the Company and its Subsidiaries shall have at least $800,000,000 of cash and cash equivalents on hand; and

(iv)  the Company's cash flow from operating activities during the six months immediately prior to the distribution date was positive and the Company reasonably expects that its cash flow from operating activities will continue to be positive for six months following the distribution date; <u>provided</u>, <u>however</u>, if the proposed Distribution would cause the aggregate Unreturned Original Cost of the outstanding Class A Membership Interests issued to General Motors on the Effective Date to equal zero, then the conditions set forth in this clause (iv) shall be deemed satisfied.

Section 5.5  **Tax Distributions**.  Notwithstanding <u>Section 5.4</u> and <u>Section 5.7</u>, if there is Available Cash, such Available Cash shall be distributed (a "<u>Tax Distribution</u>") in an amount sufficient to enable the Holders to pay projected tax liabilities attributable to allocations of Tax Book Profits and Tax Book Losses by the Company using an assumed tax rate equal to the highest effective marginal combined U.S. federal, state and local income tax rate prescribed for a corporation resident in New York, New York (the "<u>Assumed Tax Rate</u>"),

assuming that taxable income or loss is equivalent to Tax Book Profits or Tax Book Losses, and assuming that such Holder does not have any items of income, gain, loss, deductions or credits other than those attributable to its Membership Interests. Tax Distributions shall be made to each Holder within 10 days prior to April 15, June 15, September 15 and December 15 of each year based upon the determination by the Board of Managers of the excess of (x) the product of (i) the amount of Tax Book Profits, if any, allocated to such Holder for the period beginning on January 1 of such year and ending on March 31, May 31, August 31 and November 30 as if each such period were a taxable year and (ii) the Assumed Tax Rate over (y) Tax Distributions previously made to such Holder with respect to any prior period within the same taxable year. Any Tax Distribution shall be treated as an advance of amounts otherwise distributable to such Holder pursuant to Section 5.1(a) such that, in determining a Holder's right to distributions pursuant to Section 5.1(a), distributions received by such Holder pursuant to this Section 5.5 shall be taken into account as if received pursuant to Section 5.1(a).

**Section 5.6      Payments Pursuant to the Master Disposition Agreement**. In accordance with Section 3.2.3 of the MDA, if the Asset Purchase is consummated pursuant to the Plan of Reorganization, once an aggregate of $7,200,000,000 has been paid as Distributions to the Holders pursuant to this Agreement, the Company shall pay an amount equal to $32.5 to a disbursement agent on behalf of the unsecured creditors of Old Delphi for every $67.5 in excess of such $7,200,000,000 that is distributed to the Holders pursuant to Section 5.1(a)(iv), up to a maximum amount of $300,000,000.

**Section 5.7      Certain Offsets.**   Each Class B Holder acknowledges and agrees that to the extent that the Company makes any payment or incurs liabilities and expenses pursuant to Section 4(f)(i) of the Investment Commitment Agreement, such amounts shall be withheld from Distributions otherwise payable to the Class B Holders under Section 5.1 and available to the Company for general corporate purposes.   Any amounts withheld shall be deemed distributed to the Class B Holders for the purposes of Section 5.1.

# ARTICLE VI
# ALLOCATIONS

**Section 6.1      Allocations of Tax Book Profits and Tax Book Losses**. Except as otherwise provided by this Article VI, the Tax Book Profit and Tax Book Loss of the Company for each Fiscal Year (or portion thereof) shall be determined as of the end of each such Fiscal Year (or portion thereof).   For each Fiscal Year of the Company, after adjusting each Member's Capital Account for all Capital Contributions and distributions during such Fiscal Year and all special allocations pursuant to this Article VI with respect to such Fiscal Year, all Tax Book Profits and Tax Book Losses (other than Tax Book Profits and Tax Book Losses specially allocated pursuant to Section 6.5 through Section 6.14) shall be allocated to the Holders' Capital Accounts in a manner such that, as of the end of such Fiscal Year, the Capital Account of each Holder (which have either a positive or negative balance) shall be equal to the amount which would be distributed to such Holder, determined as if the Company were to liquidate all of its assets for the Tax Book Value thereof and distribute the proceeds thereof pursuant to Section 10.2.

**Section 6.2**      **Allocations for Tax Purposes.**  Except as otherwise provided herein, any allocation to a Holder for a Fiscal Year or other period of a portion of the Tax Book Profit or Tax Book Loss, or of a specially allocated item, shall be determined to be an allocation to such Holder of the same proportionate part of each item of income, gain, loss, deduction or credit, as the case maybe, as is earned, realized or available by or to the Company for federal tax purposes.

**Section 6.3**      **Certain Accounting Matters.**  For purposes of determining Tax Book Profit, Tax Book Loss or any other items allocable to any period, such items shall be determined on a daily, monthly or other basis, as determined by the Board of Managers using any permissible method under Section 706 of the Code and the Treasury Regulations promulgated thereunder.

**Section 6.4**      **Section 704(c) Allocations.**

(a)      In accordance with Section 704(c) of the Code and the Treasury Regulations promulgated thereunder, income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall, solely for income tax purposes, be allocated among the Holders so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its Fair Market Value at the time of contribution.

(b)      In the event that the Tax Book Value of any Company asset is subsequently adjusted in accordance with the last sentence of the definition of Tax Book Value, any allocation of income, gain, loss and deduction with respect to such asset shall thereafter take account of any variation between the adjusted tax basis of the asset to the Company and its Tax Book Value in the same manner as under Section 704(c) of the Code and any Treasury Regulations promulgated thereunder.  Any elections or other decisions relating to such allocations shall be made by the Board of Managers in a manner that reasonably reflects the purpose and intention of this Agreement.

(c)      Allocations pursuant to this Section 6.4 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Holder's Capital Account or share of Tax Book Profit, Tax Book Loss or Distributions pursuant to any provision of this Agreement.

**Section 6.5**      **Qualified Income Offset.**  If any Member receives an unexpected adjustment, allocation or Distribution described in Section 1.704-l(b)(2)(ii)(d)(4) through (6) of the Treasury Regulations in any Fiscal Year or other period which would cause such Member to have a deficit Adjusted Capital Account Balance as of the end of such Fiscal Year or other period, items of Company taxable income and gain as adjusted pursuant to the definition of "Tax Book Profit" shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the deficit in such Member's Adjusted Capital Account Balance as quickly as possible.  This Section 6.5 is intended to comply with the qualified income offset provision in Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations and shall be interpreted consistently therewith.

**Section 6.6**    **Gross Income Allocation**.  If any Member would otherwise have a deficit Adjusted Capital Account Balance as of the last day of any Fiscal Year or other period, items of Company taxable income and gain as adjusted pursuant to the definition of "Tax Book Profit" shall be specially allocated to such Member so as to eliminate such deficit as quickly as possible.

**Section 6.7**    **Company Minimum Gain Chargeback**.  If there is a net decrease in Company Minimum Gain during a Fiscal Year or other period, each Member shall be allocated items of the Company taxable income and gain as adjusted pursuant to the definition of "Tax Book Profit" for such Fiscal Year or other period (and, if necessary, for subsequent Fiscal Years or periods) in proportion to, and to the extent of, such Member's share of such net decrease, except to the extent such allocation would not be required by Section 1.704-2(f) of the Treasury Regulations.  The amounts referred to in this Section 6.7, and the items to be so allocated shall be determined in accordance with Section 1.704-2 of the Treasury Regulations. This Section 6.7 is intended to constitute a "minimum gain chargeback" provision as described in Section 1.704-2(f) or 1.704-2(j)(2) of the Treasury Regulations and shall be interpreted consistently therewith.

**Section 6.8**    **Member Nonrecourse Debt Minimum Gain Chargeback**.  If there is a net decrease in Member Nonrecourse Debt Minimum Gain during a Fiscal Year or other period, then each Member shall be allocated items of the Company income or gain equal to such Member's share of such net decrease, except to the extent such allocation would not be required under Section 1.704-2(i)(4) or 1.704-2(j)(2) of the Treasury Regulations.  The amounts referred to in this Section 6.8 and the items to be so allocated shall be determined in accordance with Section 1.704-2 of the Treasury Regulations.  This Section 6.8 is intended to comply with the minimum gain chargeback requirement contained in Section 1.704-2(i)(4) of the Treasury Regulations and shall be interpreted consistently therewith.

**Section 6.9**    **Limitations on Tax Book Loss Allocations**.  With respect to any Member, notwithstanding the provisions of Section 6.1, the amount of Tax Book Loss for any Fiscal Year or other period that would otherwise be allocated to a Member shall not cause or increase a deficit Adjusted Capital Account Balance.  Any Tax Book Loss in excess of the limitation set forth in this Section 6.9 shall be allocated among the remaining Members, *pro rata* based on their respective positive Capital Account balances, to the extent such allocations would not cause such remaining Members to have a deficit Adjusted Capital Account Balance.

**Section 6.10**    **Member Nonrecourse Deductions**.  Member Nonrecourse Deductions for any Fiscal Year or other period shall be specially allocated to the Members who bear the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Section 1.704-2(i)(l) of the Treasury Regulations.

**Section 6.11**    **Nonrecourse Deductions**.  Nonrecourse Deductions, other than Member Nonrecourse Deductions, for any Fiscal Year shall be allocated to the Members *pro rata* based on their respective positive Capital Account balances.

Section 6.12    **Excess Nonrecourse Liabilities**.  Nonrecourse Debts of the Company which constitute Excess Nonrecourse Liabilities shall be allocated among the Members *pro rata* based on their respective positive Capital Account balances.

Section 6.13    **Ordering Rules**.  Anything contained in this Agreement to the contrary notwithstanding, allocations for any Fiscal Year or other period of Nonrecourse Deductions or Member Nonrecourse Deductions, or of items required to be allocated pursuant to the minimum gain chargeback requirements contained in this Article VI, shall be made before any other allocations hereunder.

Section 6.14    **Curative Allocations**.  The allocations set forth in Section 6.5 through Section 6.12 inclusive (collectively, the "Regulatory Allocations") are intended to comply with certain requirements of Sections 1.704-1(b) and 1.704-2 of the Treasury Regulations.  The Regulatory Allocations may result in allocations which are not consistent with the manner in which the Members intend to allocate Tax Book Profit and Tax Book Loss or make Distributions.  Accordingly, notwithstanding the other provisions of this Agreement, Members shall reallocate items of income, gain, deduction and loss among the Members so as to eliminate the effect of the Regulatory Allocations and thereby cause the respective Capital Accounts of the Members to be in the amounts (or as close thereto as possible) they would have been if Tax Book Profit and Tax Book Loss (and such other items of income, gain, deduction and loss) had been allocated without reference to the Regulatory Allocations.  In general, the Members anticipate that this will be accomplished by specially allocating other Tax Book Profit and Tax Book Loss (and such other items of income, gain, deduction and loss) among the Members so that the net amount of the Regulatory Allocations and such special allocations to each such Member is zero.  In addition, if in any Fiscal Year or other period there is a decrease in Company Minimum Gain, or in Member Nonrecourse Debt Minimum Gain, and application of the minimum gain chargeback requirements set forth in this Section would cause a distortion in the economic arrangement among the Members, the Members may, if they do not expect that Company will have sufficient other income to correct such distortion, request the IRS to waive either or both of such minimum gain chargeback requirements.  If such request is granted, this Agreement shall be applied in such instance as if it did not contain such minimum gain chargeback requirements.

## ARTICLE VII
## RIGHTS AND DUTIES OF MEMBERS

Section 7.1    **Members**.  The Members of the Company, and their respective class and numbers of Membership Interests, are listed on the Schedule of Members.  No Person may be a Member without the ownership of a Membership Interest.  The Members shall have only such rights and powers as are granted to them pursuant to the express terms of this Agreement and the Act.  Except as otherwise expressly provided in this Agreement, no Member, in such capacity, shall have any authority to bind, to act for, to sign for or to assume any obligation or responsibility on behalf of, any other Member or the Company.

Section 7.2    **No Management or Dissent Rights**.  Except as set forth herein or otherwise required by Law, the Members shall not have any right to take part in the management or operation of the Company other than through the Managers appointed by the

Members to the Board of Managers. No Member shall, without the prior written approval of the Board of Managers, take any action on behalf of or in the name of the Company, or enter into any commitment or obligation binding upon the Company, except for actions expressly authorized by the terms of this Agreement. Except as required by Law, Members shall not be entitled to any rights to dissent or seek appraisal with respect to any transaction, including the merger or consolidation of the Company with any Person.

### Section 7.3    No Member Fiduciary Duties.

(a)    No Member shall, to the maximum extent permitted by the Act and other applicable Law, owe any duties (including fiduciary duties) as a Member to the other Members or the Company, notwithstanding anything to the contrary existing at law, in equity or otherwise; provided, however, that each Member shall have the duty to act in accordance with the implied contractual covenant of good faith and fair dealing.

(b)    Except as otherwise expressly provided in this Agreement or any other contractual arrangements between the Company and one or more Members, any Member may engage in or possess any interest in another business or venture of any nature and description, independently or with others, whether or not such business or venture is competitive with the Company or any of its Subsidiaries or any other Member, and neither the Company nor any other Member shall have any rights in or to any such independent business or venture or the income or profits derived therefrom, and the doctrine of corporate opportunity or any analogous doctrine shall not apply to the Members and the direct and indirect members, shareholders, partners and Affiliates thereof. The pursuit of any such business or venture shall not be deemed wrongful, improper or a breach of any duty hereunder, at law, in equity or otherwise. Any Member and the members, shareholders, partners and Affiliates thereof shall be able to transact business or enter into agreements with the Company to the fullest extent permissible under the Act, subject to the terms and conditions of this Agreement.

(c)    Except as otherwise expressly provided in this Agreement or any other contractual arrangements between the Company and one or more Members, if a Member acquires knowledge, independently from a source other than the Company or in its capacity as a customer, of a potential transaction or matter that may be a business opportunity for both such Member and the Company, such Member shall have no duty to communicate or offer such business opportunity to the Company or any other Member and shall not be liable to the Company or the other Members for breach of any duty (including fiduciary duties) as a Member by reason of the fact that such Member pursues or acquires such business opportunity for itself, directs such opportunity to another Person, or does not communicate information regarding such opportunity to the Company.

(d)    The provisions of this Agreement, to the extent that they restrict or eliminate the duties (including fiduciary duties) and liabilities of a Member otherwise existing at law or in equity, are agreed by the Members to replace such duties and liabilities of such Member in their entirety.

### Section 7.4    Meetings of Members.

(a)     An annual meeting of the Class A Holders and Class B Holders shall be held in Detroit, Michigan, New York, New York or at such other place, within or without the State of Delaware, as shall from time to time be determined by the Board of Managers.  Prior to each such annual meeting, the Secretary shall circulate an agenda for such meeting, which agenda shall include a discussion of the financial reports of the Company most recently delivered to a Member as may be reasonably requested, such other matters relating to the Company as any Holder of more than fifteen percent (15%) of the Voting Power of the Class A Membership Interests or the Class B Membership Interests shall request to be included in such agenda and such other matters relating to the Company as the representatives of the Class A Holders and Class B Holders attending such meeting shall elect to discuss.  The Managers or Officers of the Company shall participate in the annual meeting; provided that such participation does not unreasonably interfere with the normal performance of their duties.

(b)     A special meeting of the Holders of the Class A Membership Interests or the Class B Membership Interests for any purpose or purposes specified by the person calling the meeting may be called at any time by (i) the Board of Managers, (ii) the Chief Executive Officer, or (iii) any Holder of more than fifteen percent (15%) of the Voting Power of such class of Class A Membership Interests or Class B Membership Interests.  At any such special meeting, no business shall be transacted and no action shall be taken other than that stated in the notice for such meeting.  The Board of Managers may elect, in its sole discretion, that special meetings of the Holders of different classes of Membership Interests called for the same purpose or purposes may be held on the same date and/or at the same place (whether at the same time or otherwise).

(c)     Each Holder of Class A Membership Interests or Class B Membership Interests shall have the right to attend any meeting of such class of Membership Interests.  Any Holder who is not a natural person shall designate one individual to act as such Holder's legal representative for purposes of voting at any such meeting.

**Section 7.5     Notice of Meetings**.  Written notice stating the place, day and time of every meeting of the Holders of any class of Membership Interests and, in case of a special meeting of the Holders of any class of Membership Interests, the purpose or purposes for which the meeting is called, shall be mailed (a) with respect to any annual meeting, not less than ten nor more than sixty calendar days before the date of the meeting (or if sent by facsimile, not less than five Business Days before the date of the meeting) or (b) with respect to any special meeting, not less than five nor more than thirty calendar days before the date of the meeting (or if sent by facsimile, not less than three Business Days before the date of the meeting), in either case to each Holder of such class of Membership Interests entitled to vote at such meeting, at its notice address maintained in the records of the Company by the Secretary.  Such further notice shall be given as may be required by Law, but a meeting may be held without notice if all the Holders of the class of the Membership Interests in respect of which the meeting is called entitled to vote at the meeting are present in person or by telephone or represented by proxy or if notice is waived in writing by those not present, either before or after the meeting.

**Section 7.6     Quorum**.  Any number of Holders of at least a majority of the Membership Interests of the class of Membership Interests entitled to vote with respect to the business to be transacted at a meeting of such class of Membership Interests and who shall be present in person or by telephone or represented by proxy at the meeting duly called shall

31

constitute a quorum for the transaction of business. If such quorum is not present within sixty minutes after the time appointed for such meeting, such meeting shall be adjourned and the Board of Managers shall reschedule the meeting no fewer than three nor more than ten Business Days thereafter. If such meeting is rescheduled two consecutive times, then those Holders of class of Membership Interests who are present or represented by proxy at the second such rescheduled meeting shall constitute a valid quorum for all purposes hereunder; provided that written notice of any rescheduled meetings shall have been delivered to all Holders of such class of Membership Interests at least three Business Day prior to the date of each rescheduled meeting.

**Section 7.7**      **Voting**.

(a)      Except as otherwise required by Law, Class B Holders holding Class B Membership Interests shall vote together, in their capacity as such Holders, as a separate class of Membership Interests, and Class A Holders holding Class A Membership Interests shall vote together, in their capacity as such Holders, as a separate class of Membership Interests. Each Class B Holder shall be entitled to one vote for each Class B Membership Interest held by such Class B Holder, in each case, in connection with the election of Class B Managers and on all matters to be voted upon by the Members or the Class B Holders (in each case without prejudice to any consent rights that the holders of any class or portion of any particular class of Membership Interests have expressly been granted under this Agreement). Each Class A Holder shall be entitled to one vote for each Class A Membership Interest held by such Class A Holder in each case, in connection with the election of Class A Managers and on all matters to be voted upon by the Members or the Class A Holder (in each case without prejudice to any consent rights that the holders of any class or portion of any particular class of Membership Interests have expressly been granted under this Agreement). The percentage of the total votes entitled to be cast by any Holder with respect to such Holder's class of Membership Interests, calculated pursuant to this Section 7.7, is herein referred to as the "Voting Power" of such Holder with respect to such class of Membership Interests.

(b)      At any meeting of the Holders of each class of Membership Interests, each Holder of such class of Membership Interests entitled to vote on any matter coming before the meeting shall, as to such matter, have a vote, in person, by telephone or by proxy, equal to the Voting Power of the number of Membership Interests of such class of Membership Interests held in its name on the relevant record date established pursuant to Section 7.9 (or the date of the meeting if no record date has been set).

(c)      Except as otherwise specified herein, when a quorum is present with respect to the Holders of any class of Membership Interests, the affirmative vote of the holders of a majority of the Voting Power of such class of Membership Interests present in person or represented by proxy at a duly called meeting and entitled to vote on the subject matter shall be the act of the Holders of such class of Membership Interests, unless the question is one upon which by express provisions of Law or of this Agreement a different vote is required, in which case such express provision shall govern and control the decision of such question. Where a separate vote by any class of Membership Interests is required, the affirmative vote of the Holders of at least a majority of the Voting Power of the Membership Interests of such class present in person or represented by proxy at the meeting of such class shall be the act of such

class, unless the question is one upon which by express provisions of Law or of this Agreement a different vote is required, in which case such express provision shall govern and control the decision of such question.

(d)     Each Member entitled to vote at a meeting of the Holders of any class of Membership Interests or to express consent or dissent to any action in writing without a meeting may authorize another person or persons to act for him or her by proxy, but no such proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period.  At each meeting of the Holders of any class of Membership Interests, and before any voting commences, all proxies filed at or before the meeting shall be submitted to and examined by the Secretary or a person designated by the Secretary, and no Membership Interests may be represented or voted under a proxy that have been found to be invalid or irregular.

## Section 7.8     Action Without a Meeting; Telephonic Meetings.

(a)     Any action required to be taken at any annual or special meeting of the Holders of any class of Membership Interests, or any action that may be taken at any annual or special meeting of the Holders of any class of Membership Interests, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken and bearing the dates of signature of the Holders who signed the consent or consents, shall be signed by the Holders holding not less than a majority of the Membership Interests of such class of Membership Interests.  Any such consent or consents shall be delivered to the Company by delivery to the Company's principal place of business, or an Officer or agent of the Company having custody of the book or books in which proceedings of meetings of the Holders are recorded.  If action is so taken without a meeting by less than unanimous written consent of the Holders of the applicable class of Membership Interests, a copy of such written consent shall be delivered promptly to all Holders of such class of Membership Interests who have not consented in writing. Any action taken pursuant to such written consent or consents of the Holders of any class of Membership Interests shall have the same force and effect as if taken by the Holders of such class of Membership Interests at a meeting of the Holders of such class of Membership Interests.

(b)     The Holders of each class of Membership Interests may participate in meetings of the Holders of such class of Membership Interests by means of conference telephone or similar communications equipment by means of which all Persons participating in the meeting can hear each other.  Participation in a telephonic meeting pursuant to this Section 7.8(b) shall constitute presence at such meeting and shall constitute a waiver of any deficiency of notice.

## Section 7.9     Record Date.  For the purpose of determining the Members entitled to notice of or to vote at any meeting of the Holders of any class of Membership Interests or any adjournment thereof, or entitled to receive a Distribution or a payment of any kind, or in order to make a determination of the Holders of any class of Membership Interests for any other proper purpose, the Board of Managers may fix in advance a date as the record date for any such determination of Members, such date in any case to be not more than seventy calendar days prior to the date on which the particular meeting or action requiring such determination of the Holders of such class of Membership Interests is to be held or taken.  If no record date is fixed by the Board of Managers, the date on which notices of the meetings are mailed or the date on which

the resolution of the Board of Managers declaring such Distribution is adopted, as the case may be, shall be the record date. When a determination of the Holders of a class of Membership Interests has been made as provided in this Section 7.9, such determination shall apply to any adjournment thereof unless the Board of Managers fixes a new record date, which it shall do if the meeting is adjourned to a date more than one hundred twenty calendar days after the date originally fixed.

**Section 7.10    Removal or Resignation of Members**.  A Member may not (a) be removed as a Member of the Company without such Member's prior written consent or (b) resign from the Company without the written consent of the Board of Managers, unless otherwise provided in this Agreement.

**Section 7.11    Liability of Members**.

(a)    Except as otherwise required by Law or as expressly set forth in this Agreement, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member or Manager shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member or Manager, whether to the Company, to any of the other Members, to the creditors of the Company or to any other third Person. Except as required by the Act, each Member (in its capacity as such) shall be liable only to make such Member's Capital Contribution to the Company, if applicable, and the other payments provided for expressly herein.

(b)    Under the Act, a member of a limited liability company may, under certain circumstances, be required to return amounts previously distributed to such member. It is the intent of the Members that no Distribution to any Member pursuant to Article V or Article X shall be deemed to constitute money or other property paid or distributed in violation of the Act, and the Members agree that each such Distribution shall constitute a compromise of the Members within the meaning of Section 18-502(b) of the Act, and, to the fullest extent permitted by Law, the Member receiving such Distribution shall not be required to return to any Person any such money or property, except as otherwise expressly set forth herein. If, however, any court of competent jurisdiction holds that, notwithstanding the provisions of this Agreement, any Member is obligated to make any such payment, such obligation shall be the obligation of such Member and not of the other Members, and, when funded, shall constitute a Capital Contribution by such Member.

**Section 7.12    Investment Representations of Members**.  Each Member hereby represents, warrants and acknowledges to the Company that: (a) such Member has such knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of an investment in the Company and is making an informed investment decision with respect thereto; (b) such Member is acquiring interests in the Company for strategic business or investment purposes only and not with a view to, or for resale in connection with, any distribution to the public or public offering thereof; (c) such Member has read, is familiar with, and understands Rule 501 of Regulation D under the Securities Act and represents that such Member is an "accredited investor" (as defined in Rule 501(a) of Regulation D

promulgated under the Securities Act) and (d) the execution, delivery and performance of this Agreement have been duly authorized by such Member.

## ARTICLE VIII
## BOARD OF MANAGERS; OFFICERS

**Section 8.1**    **Establishment of Board of Managers**.    There is hereby established a committee of Member representatives (the "Board of Managers") comprised of natural Persons (the "Managers") having the authority and duties set forth in this Agreement. The size of the Board of Managers shall initially be nine, and may from time to time be increased or decreased by the Board of Managers, but subject to the receipt of the prior written consent required by Section 12.1. Subject to Section 8.3, (i) the Class B Managers shall be elected at the annual meeting of the Class B Holders or a special meeting of the Class B Holders called for such purpose, and (ii) the Class A Managers shall be elected at the annual meeting of the Class A Holders or a special meeting of the Class A Holders called for such purpose. Each Manager elected shall hold office until a successor is duly elected and qualified or until his or her earlier death, resignation or removal as provided in this Article VIII. Notwithstanding the foregoing, the term of the Managers serving on the Effective Date shall be three years (it being understood and agreed that any such initial Manager may be re-elected at subsequent meetings).

**Section 8.2**    **General Powers of the Board of Managers**.    The property, affairs and business of the Company shall be managed exclusively by or with the direction of the Board of Managers, except as otherwise expressly provided in this Agreement. In addition to the powers and authority expressly conferred on it by this Agreement, subject to the consent requirement of Section 12.1, the Board of Managers may exercise all such powers of the Company and do all such lawful acts and things as are permitted by the Act and the Certificate of Formation. Each Manager shall be a "manager" (as such term is defined in the Act) of the Company but, notwithstanding the foregoing, no Manager shall have any rights or powers beyond the rights and powers granted to such Manager in this Agreement. Except as such power is delegated pursuant to Section 8.11, no Manager acting alone, or with any other Managers, shall have the power to act for or on behalf of, or to bind the Company.

**Section 8.3**    **Election of Managers**.

(a)    For so long as any of the Release Conditions have not been satisfied, the Board of Managers shall be comprised of the following Managers:

(i)    Two representatives elected by the Majority Class A Holders to serve as Managers (the "Class A Designee Managers");

(ii)    Two representatives elected by the Majority Class A Holders to serve as Independent Managers (the "Class A Independent Managers" and together with the Class A Designee Managers, the "Class A Managers");

(iii)    Two representatives (A) commencing on the Effective Date and until the third (3rd) anniversary of the Effective Date, one (1) of whom shall be elected by Silver Point and one (1) of whom shall be elected by Elliott, and (B) following the third (3rd) anniversary of the Effective Date, elected by the Majority Class B Holders, to serve as

Managers (the "Class B Designee Managers"); provided, however, that at any time either Silver Point or Elliott may elect to have their respective representative elected by the Majority Class B Holders; provided further, however that during such three (3) year period no former Class B Designee Manager may be elected as a Class B Independent Manager;

(iv)    Two representatives (A) commencing on the Effective Date and until the third (3rd) anniversary of the Effective Date, one (1) of whom shall be elected by Silver Point and one (1) of whom shall be elected by Elliott, and (B) following the third (3rd) anniversary of the Effective Date, elected by the Majority Class B Holders, to serve as Independent Managers (the "Class B Independent Managers" and together with the Class B Designee Managers, the "Class B Managers"); and

(v)    One Independent Manager (the "Fifth Independent Manager") elected by the majority vote of the Class A Independent Managers and the Class B Independent Managers (or, if there are no Class A Independent Managers or Class B Independent Managers at such time, the majority vote of the Class A Designee Managers and the Class B Designee Managers).

(b)    From and after such time as all of the Release Conditions have been satisfied, the Board of Managers shall be comprised of (i) for so long as the Initial Class A Holders own at least ten percent (10%) of the Class A Membership Interests originally acquired by General Motors on the Effective Date, one representative elected by the Majority Class A Holders to serve as a Manager and (ii) the remaining Managers shall be elected by the Majority Class B Holders.

(c)    A majority of the members of the Board of Managers shall elect the Chairman of the Board of Managers (who shall be an Independent Manager) (the "Chairman").

(d)    Any Manager shall be removed from the Board of Managers or any committee of the Board of Managers with or without cause at the written request of the Holders that have the right to elect such Manager under this Section 8.3 (or, in the case of the Fifth Independent Manager, at the written request of a majority of the Class A Independent Managers and Class B Independent Managers), but only upon such written request and under no other circumstances; provided, however, that to the extent that the Class A Holders shall lose the right to elect one or more Class A Managers pursuant to this Section 8.3, such Class A Manager or Class A Managers shall be automatically removed from the Board of Managers following a delivery of a notice from any Class B Manager. A Manager shall be removed as Chairman with or without cause at the written request of the Holders that have the right to appoint such Manager to such position under this Section 8.3, but only upon such written request and under no other circumstances.   Should an Independent Manager cease to be Independent, the majority of Holders who did not have the right to elect such Manager pursuant to this Section 8.3, may remove such formerly Independent Manager, provided, however, that in the case where the Fifth Independent Manager ceases to be Independent, the majority of the then Independent Managers may remove such Fifth Independent Manager.

(e)   Any Manager may resign (and any Manager may resign as Chairman) at any time by giving written notice to the members of the Board of Managers and the Chief Executive Officer or the Secretary.  The resignation of any Manager (or of any Manager as Chairman) shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice, and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

(f)   If any Manager elected pursuant to <u>Section 8.3(a)</u> or <u>8.3(b)</u> for any reason ceases to serve as a member of the Board of Managers, the resulting vacancy on the Board of Managers shall be filled, subject to the conditions of this <u>Section 8.3</u>, by a Manager elected by the Holders who initially elected such Manager, unless <u>Section 8.3(a)</u> or <u>Section 8.3(b)</u>, as applicable, would provide for a different right of election at such time (provided that any vacancy with respect to the Fifth Independent Manager shall be filled by the majority vote of the Class A Independent Managers and Class B Independent Managers (or, if there are no Class A Independent Managers or Class B Independent Managers at such time, the majority vote of the Class A Designee Managers and the Class B Designee Managers)).  If any Manager appointed as Chairman pursuant to <u>Section 8.3(c)</u> for any reason ceases to serve as a member of the Board of Managers (or otherwise resigns as Chairman), the resulting vacancy as to the position of Chairman shall be filled, subject to the conditions of <u>Section 8.3(c)</u>.

(g)   The Holders entitled to elect a Manager pursuant to this <u>Section 8.3</u> shall use all commercially reasonable efforts to fill a vacancy of such representative, in the case of any vacancy as of the Effective Date, within thirty calendar days, and, thereafter, within ninety calendar days after such representative ceases to serve as a member of the Board of Managers or a committee of the Board of Managers.

**Section 8.4   <u>Meetings</u>.**

(a)   Regular meetings of the Board of Managers may be held in Detroit, Michigan, New York, New York or at such other place, within or without the State of Delaware, as shall from time to time be determined by the Board of Managers, but in no event less than (i) four times during any twelve-month period, and (ii) once during any three-month period.  Special meetings of the Board of Managers may be called by or at the request of the Chief Executive Officer, and in any event shall be called by the Chief Executive Officer upon the written request of any Manager.  Special meeting notices shall state the purposes of the proposed meeting.

(b)   Any Manager or any member of a committee of the Board of Managers who is present at a meeting shall be conclusively presumed to have waived notice of such meeting except when such Manager attends for the express purpose of objecting or abstaining at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened.  Such Manager shall be conclusively presumed to have assented to any action taken unless his or her dissent or abstention shall be entered in the minutes of the meeting or unless his or her written dissent or abstention to such action shall be filed with the person acting as the secretary of the meeting before the adjournment thereof or shall be forwarded by registered mail to the Secretary promptly after the adjournment of the meeting. Such right to dissent or abstain shall not apply to any Manager who voted in favor of such action.

**Section 8.5**    **Notice of Meetings**.  Written notice stating the place, day and time of every meeting of the Board of Managers and, in case of a special meeting, the purpose or purposes for which the meeting is called, shall be mailed not less than five nor more than thirty calendar days before the date of the meeting (or if sent by facsimile, email or telephonically, not less than 24 hours before the date of the meeting), in each case to each Manager at his or her notice address maintained in the records of the Company by the Secretary.  Such further notice shall be given as may be required by Law, but meetings may be held without notice if all the Managers entitled to vote at the meeting are present in person or by telephone or represented by proxy or if notice is waived in writing by those not present, either before or after the meeting.

**Section 8.6**    **Quorum**.  Unless otherwise provided by Law or this Agreement, the presence of Managers constituting a majority of the then incumbent Managers shall be necessary to constitute a quorum for the transaction of business.  If such quorum is not present within sixty minutes after the time appointed for such meeting, such meeting shall be adjourned and the President or acting Chairman shall reschedule the meeting to be held not fewer than two nor more than ten Business Days thereafter.  If such meeting is rescheduled two consecutive times, then those Managers constituting a majority of the then incumbent Managers who are present at the second such rescheduled meeting shall constitute a valid quorum for all purposes hereunder; provided that written notice of any rescheduled meeting shall have been delivered to all Managers at least two Business Days prior to the date of such rescheduled meeting.  Notwithstanding any provision to the contrary contained herein, interested Managers may be counted in determining the presence of a quorum at a meeting of the Board of Managers or of a committee that authorizes any interested party contract or transaction.

**Section 8.7**    **Voting**.

(a)    Each Manager shall be entitled to cast one vote with respect to each matter brought before the Board of Managers (or any committee of the Board of Managers of which such Manager is a member) for approval.  Except as otherwise provided by Section 8.7(b) below and the other provisions of this Agreement, the Act, other Law or the Certificate of Formation, all policies and other matters to be determined by the Managers shall be determined by a majority vote of the members of the Board of Managers entitled to vote thereon (provided, that if any meeting is rescheduled two consecutive times in accordance with Section 8.6 above, then, at the second such rescheduled meeting, all such policies and other matters shall be determined by a majority vote of the members of the Board of Managers present at such second rescheduled meeting).  No Manager shall be disqualified from voting on matters as to which such Manager or the Persons that elected such Manager may have a conflict of interest, whether such matter is a direct conflict of interest in connection with which the Person that elected such Manager or any affiliate of such Person will engage in a transaction with the Company or one or more of its Subsidiaries (a "Direct Conflict") or of another nature (an "Indirect Conflict"); provided that (1) prior to voting on any such matter, such Manager shall disclose the fact of any such conflict to the other Managers (other than conflicts arising from such Manager's relationship with the Persons who elected such Manager) and, if such conflict is a Direct Conflict, the material terms of such transaction and the material facts as to the relationship or interest of the Person that elected such Manager or such Person's Affiliate, (2) any Manager may determine to recuse himself or herself from voting on any matter as to which such Manager or the Person that elected such Manager may have a conflict of interest, and whether or not a Manager recuses himself or

herself, if such matter is an Indirect Conflict, the Manager shall have no obligation to disclose the nature or substance of the conflict or any information related thereto other than the fact that a conflict exists and (3) no Manager shall have any duty to disclose to the Company or the Board of Managers confidential information in such Manager's possession (which information the Manager has determined in good faith is competitively sensitive) even if it is material and relevant information to the Company and/or the Board of Managers and, in any such case, such Manager shall not be liable to the Company or the other Members for breach of any duty (including the duty of loyalty and any other fiduciary duties) as a Manager by reason of such lack of disclosure of such confidential information.

(b)     If a majority of the Independent Managers determine in good faith that (i) any matter to be discussed at any meeting of the Board of Managers or any committee thereof involves (A) competitively sensitive information regarding any competitor of General Motors or any Class A Holder and/or their respective Affiliates or any Class B Holder and its Affiliates who has or is entitled by itself, to appoint the Class B Manager Designees (the "Designating Members") or (B) agreements or arrangements between the Designating Members and/or their Affiliates, on the one hand, and the Company and/or its Affiliates, on the other hand, and (ii) as a result of the foregoing, it is appropriate that the Class A Designee Managers or any of the Class B Designee Managers, as applicable, be recused from discussion of such matters and not be provided information related thereto (the "Competitive Information"), then the Class A Designee Managers or the Class B Designee Managers, as applicable, shall be recused from discussions and shall not have access to such Competitive Information.  In the event that the Class A Designee Managers or the Class B Designee Managers are so recused pursuant to this Section 8.7(b) and the matter subject to such recusal is to be acted upon by the Board of Managers, approval of such matter by the Board of Managers shall require the approval of a majority of the Managers (and not including, for the avoidance of doubt, the Class A Designee Managers or the Class B Designee Managers so recused) present and entitled to vote thereon.

### Section 8.8     Action Without a Meeting; Telephonic Meetings.

(a)     On any matter requiring an approval or consent of Managers under this Agreement or the Act, the Managers may take such action without a meeting, without prior notice, and without a vote if a consent or consents in writing, setting forth the action so taken, shall be signed by all of the Managers.

(b)     Managers may participate in meetings of the Board of Managers by means of conference telephone or similar communications equipment by means of which all Persons participating in the meeting can hear each other.  Participation in a telephonic meeting pursuant to this Section 8.8(b) shall constitute presence at such meeting and shall constitute a waiver of any deficiency of notice.

### Section 8.9     Compensation of Managers; Expense Reimbursement.
Managers that are also Officers of the Company or employees of any of the Members or their Affiliates shall not receive any stated fee for services in their capacity as Managers; provided, however, that nothing herein contained shall be construed to preclude any Manager from serving the Company or any Subsidiary in any other capacity and receiving compensation therefor. Independent Managers may receive a stated salary for their services as Managers, in each case as

determined from time to time by the Board of Managers. Managers shall be reimbursed by the Company for any reasonable out-of-pocket expenses related to attendance at each regular or special meeting of the Board of Managers subject to the Company's requirements with respect to reporting and documentation of such expenses.

### Section 8.10    Committees of the Board of Managers.

(a)    The Board of Managers shall have an Audit Committee (which, for so long as the Class A Holders shall have the right to elect a Class A Designee Manager pursuant to Section 8.3), shall be comprised of (i) one Class A Independent Manager, (ii) one Class B Independent Manager and (iii) the Fifth Independent Manager, one of whom shall be an "audit committee financial expert" as such term is defined under the Exchange Act and (b) a Compensation Committee (which, for so long as the Class A Holders shall have the right to elect a Class A Designee Manager pursuant to Section 8.3), shall be comprised of (i) one Class A Independent Manager, (ii) one Class B Designee Manager and (iii) the Fifth Independent Manager. Additionally, the Board of Managers, with the affirmative vote of at least one Class A Designee Manager (for so long as the Class A Holders shall have the right to elect a Class A Designee Manager pursuant to Section 8.3) and one Class B Designee Manager, may by resolution designate one or more additional committees, each of which shall be comprised of one or more Managers. The Board of Managers may designate one or more of the Managers as alternate members of any committee, who may, subject to any limitations imposed by the Board of Managers (with the affirmative vote of at least one Class A Designee Manager (for so long as the Class A Holders shall have the right to elect a Class A Designee Manager pursuant to Section 8.3) and one Class B Designee Manager), replace absent or disqualified Managers at any meeting of any committee. To the extent not prohibited by Law, any Manager may attend the meetings of any committee of the Board of Managers on which he or she does not serve, as a non-voting observer.

(b)    Any committee of the Board of Managers, to the extent provided in any resolution of the Board of Managers, shall have and may exercise all of the authority of the Board of Managers, subject to the limitations set forth in Article XII and Section 14.1 or in the one or more resolutions of the Board of Managers establishing such committee. Any committee members may be removed, or any authority granted thereto may be revoked, at any time for any reason by a majority of the Board of Managers. Each committee of the Board of Managers may fix its own rules of procedure and shall hold its meetings as provided by such rules, except as may otherwise be provided in this Agreement or by a resolution of the Board of Managers establishing such committee.

### Section 8.11    Delegation of Authority. The Board of Managers may, from time to time (acting in any applicable case with any required consent under this Agreement, including, without limitation, Section 12.1), delegate to any Person (including any Member, Officer or Manager) such authority and powers to act on behalf of the Company as it shall deem advisable in its discretion, subject to the approval rights of the Majority Class B Holders or the Majority Class A Holders, as applicable, specified in this Agreement. Any delegation pursuant to this Section 8.11 may be revoked at any time and for any reason or no reason by the Board of Managers.

### Section 8.12    Officers.

(a)    The officers of the Company (the "Officers") shall consist of a Chief Executive Officer, a Chief Financial Officer, a President, a Secretary and such other Officers as may be appointed in accordance with the terms of this Agreement.  One Person may hold, and perform the duties of, any two or more of such offices.

(b)    Subject to Section 12.3, all of the Officers shall be appointed by the Board of Managers.  Subject to Section 12.3, any Officer may be removed, with or without cause, at any time by the Board of Managers.

(c)    No Officer shall have any rights or powers beyond the rights and powers granted to such Officers in this Agreement or by action of the Board of Managers.  The Chief Executive Officer, President, Chief Financial Officer and Secretary shall have the following duties and responsibilities:

(i)    Chief Executive Officer.  The Chief Executive Officer of the Company (the "Chief Executive Officer") shall perform such duties as may be assigned to him or her from time to time by the Board of Managers.  Subject to the direction of the Board of Managers, he or she shall have, and exercise, direct charge of, and general supervision over, the business and affairs of the Company.  He or she shall from time to time report to the Board of Managers all matters within his or her knowledge that the interest of the Company may require to be brought to its notice, and shall also have such other powers and perform such other duties as may be specifically assigned to him or her from time to time by the Board of Managers.  The Chief Executive Officer shall see that all resolutions and orders of the Board of Managers are carried into effect, and in connection with the foregoing, shall be authorized to delegate to the President and the other Officers such of his or her powers and such of his or her duties as the Board of Managers may deem to be advisable.

(ii)    President.  The President of the Company (the "President") shall perform such duties as may be assigned to him or her from time to time by the Board of Managers or as may be designated by the Chief Executive Officer.

(iii)    Chief Financial Officer.  The Chief Financial Officer of the Company (the "Chief Financial Officer") shall have the custody of the Company's funds and securities and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Company and shall deposit all monies and other valuable effects in the name and to the credit of the Company, in such depositories as may be designated by the Board of Managers or by any Officer authorized by the Board of Managers to make such designation.  The Chief Financial Officer shall exercise such powers and perform such duties as generally pertain or are necessarily incident to his or her office and shall perform such other duties as may be specifically assigned to him or her from time to time by the Board of Managers or the Chief Executive Officer.

(iv)    Secretary.  The Secretary of the Company (the "Secretary") shall attend all meetings of the Members of each class of Membership Interests and record all votes and

the minutes of all proceedings in a book to be kept for that purpose and shall perform like duties for any committee when required. He or she shall give, or cause to be given, notice of all meetings of the Members of each class of Membership Interests and, when necessary, of the Board of Managers. The Secretary shall exercise such powers and perform such duties as generally pertain or are necessarily incident to his or her office, and he or she shall perform such other duties as may be assigned to him or her from time to time by the Board of Managers or the Chief Executive Officer. To the greatest extent possible, the Secretary shall vote, or cause to be voted, all of the Equity Securities of any Subsidiary of the Company as directed by the Board of Managers.

For the avoidance of doubt, nothing contained herein shall confer on any Officer the authority to take any action which requires the consent of the Majority Initial Class A Holders or the Class B Manager Designees pursuant to <u>Section 12.1</u> without the prior written consent of those Persons required under <u>Section 12.1</u>.

### Section 8.13    <u>Standard of Care; Fiduciary Duties; Liability of Managers and Officers.</u>

(a)    Any Member, Manager or Officer, in the performance of such Member's, Manager's or Officer's duties, shall be entitled to rely in good faith on the provisions of this Agreement and on opinions, reports or statements (including financial statements, books of account any other financial information, opinions, reports or statements as to the value or amount of the assets, liabilities, profits or losses of the Company and its Subsidiaries) of the following other Persons or groups: (i) one or more Officers or employees of such Member or the Company or any of its Subsidiaries, (ii) any legal counsel, certified public accountants or other Person employed or engaged by such Member, the Board of Managers or the Company or any of its Subsidiaries, or (iii) any other Person who has been selected with reasonable care by or on behalf of such Member, Manager, Officer or the Company or any of its Subsidiaries, in each case as to matters which such relying Person reasonably believes to be within such other Person's professional or expert competence. The preceding sentence shall in no way limit any Person's right to rely on information to the extent provided in Section 18-406 of the Act.

(b)    On any matter involving a conflict of interest not provided for in this Agreement, each Manager and Officer shall be guided by its reasonable judgment as to the best interests of the Company and its Subsidiaries and shall take such actions as are determined by such Person to be necessary or appropriate to ameliorate such conflict of interest.

(c)    Subject to, and as limited by the provisions of this Agreement (including <u>Section 8.7</u>), the Managers and the Officers, in the performance of their duties as such, shall owe to the Company and its Members duties of loyalty and due care of the type owed under Law by directors and officers of a business corporation incorporated under the Delaware General Corporation Law of the State of Delaware; <u>provided</u> that, except as expressly set forth in this Agreement, the doctrine of corporate opportunity or any analogous doctrine shall not apply to the Managers; and <u>provided</u>, <u>further</u>, that, other than in connection with a Direct Conflict, no Manager and no Holder that elected such Manager shall have any duty to disclose to the Company or the Board of Managers confidential information in such Manager's or Holder's possession (which information the Manager has determined in good faith is competitively

sensitive) even if it is material and relevant information to the Company and/or the Board of Managers and neither such Manager nor such Holder shall be liable to the Company or the other Members for breach of any duty (including the duty of loyalty and any other fiduciary duties) as a Manager or Member by reason of such lack of disclosure of such confidential information. The provisions of this Agreement, to the extent that they restrict or eliminate the duties (including the duty of loyalty and other fiduciary duties) and liabilities of a Manager or Officer otherwise existing at Law or in equity or by operation of the preceding sentence, are agreed by the Members to replace such duties and liabilities of such Manager or Officer. Notwithstanding the foregoing provisions and Section 8.13(f), except as otherwise expressly provided in this Agreement or any other written agreement entered into by the Company or any of its Subsidiaries and any Manager, if a Manager acquires knowledge of a potential transaction or matter that may be a business opportunity for both the Holder that has the right to designate such Manager hereunder and the Company or another Member, such Manager shall have no duty to communicate or offer such business opportunity to the Company or any other Member and shall not be liable to the Company or the other Members for breach of any duty (including the duty of loyalty and any other fiduciary duties) as a Manager by reason of the fact that such Manager directs such opportunity to the Holder that has the right to designate such Manager or any other Person, or does not communicate information regarding such opportunity to the Company, and any such direction of an opportunity by such Manager, and any action with respect to such an opportunity by such Holder, shall not be wrongful or improper or constitute a breach of any duty hereunder, at law, in equity or otherwise; provided, however, that to the extent the Manager acquires knowledge in his role as a Manager of a potential transaction or other matter that could reasonably be a business opportunity for both the Holder that has the right to designate such Manager hereunder and the Company, such Manager shall have an affirmative duty not to communicate or offer such business opportunity to the Holder that designated such Manager or such Holder's Affiliates and the failure to comply with the foregoing shall constitute a breach of such Manager's fiduciary duties to the Company.

(d)    Except as required by the Act or otherwise provided in this Agreement, no individual who is a Manager or an Officer, or any combination of the foregoing, shall be personally liable under any judgment of a court, or in any other manner, for any debt, obligation or liability of the Company, whether that liability or obligation arises in contract, tort or otherwise solely by reason of being a Manager or an Officer or any combination of the foregoing.

(e)    No Manager or Officer shall be liable to the Company or any Member for any act or omission (including any breach of duty (fiduciary or otherwise)), including any mistake of fact or error in judgment taken, suffered or made by such Person if such Person acted in good faith and in a manner such Person reasonably believed to be in or not opposed to the best interests of the Company and which act or omission was within the scope of authority granted to such Person; provided that (x) such act or omission did not constitute fraud, willful misconduct, bad faith or gross negligence in the conduct of such Person's office and (y) nothing contained in this Section 8.13(e) shall relieve any Manager of its obligations under Section 8.13(c) (including, without limitation, the last proviso thereto) other than the duty of care referred to therein.

(f)    No Manager shall be liable to the Company or any Member for monetary damages for breach of fiduciary duty as a Manager provided that the foregoing shall not

eliminate or limit the liability of a Manager: (i) for any breach of such Manager's duty of loyalty (including, without limitation, the duty provided in the last proviso of <u>Section 8.13(c)</u> hereof) to the Company or its Members (but only to the extent such duty is modified pursuant to the terms of this Agreement); (ii) for acts or omissions of fraud or that are in bad faith or which involve willful misconduct or a knowing violation of Law; or (iii) for any transaction from which such Manager derived an improper personal benefit.

**ARTICLE IX**
**TRANSFER OF MEMBERSHIP INTERESTS; SUBSTITUTED MEMBERS**

**Section 9.1      <u>Limitations on Transfer of Membership Interests</u>.** From and after the Effective Date, no Holder may Transfer any Membership Interests (or any portion thereof), unless the Person to whom such Membership Interests are Transferred, executes, simultaneously with such Transfer, an addendum to this Agreement in substantially the form attached hereto as <u>Exhibit F</u>, setting forth such Person's agreement to be bound by the terms and conditions of this Agreement, and assuming all obligations of the assignor with respect to the acquired Membership Interest, on terms reasonably satisfactory to the Company (acting through its Board of Managers).

**Section 9.2      <u>Void Transfers</u>.** To the greatest extent permitted by the Act and other Law, any Transfer by any Member of any Membership Interests or other interest in the Company in contravention of this Agreement shall be void and ineffective and shall not bind or be recognized by the Company or any other Person. In the event of any Transfer in contravention of this Agreement, to the greatest extent permitted by the Act and other Law, the purported Transferee shall have no right to any profits, losses or Distributions of the Company or any other rights of a Member.

**Section 9.3      <u>Substituted Member</u>.** Each Person to whom any Membership Interest is Transferred in accordance with the provisions of this <u>Article IX</u> shall agree in writing to be bound by the provisions of this Agreement as a holder of such Membership Interests. Upon such agreement, such Person shall become a Substituted Member entitled to all the rights of a Member with respect to such Membership Interest, and the <u>Schedule of Members</u> shall be amended to reflect the name, notice address, Membership Interests and other interests in the Company of such Substituted Member and to eliminate the name and notice address of and other information relating to the Transferor with regard to the Transferred Membership Interests.

**Section 9.4      <u>Effect of Transfer</u>.**

(a)      Following a Transfer of any Membership Interests that is permitted under this <u>Article IX</u>, the Transferee of such Membership Interests shall be treated as having made all of the Capital Contributions in respect of, and received all of the Distributions made in respect of, such Membership Interests, and shall receive allocations and Distributions under <u>Article V</u>, <u>Article VI</u> and <u>Article X</u> in respect of such Membership Interests as if such Transferee were a Member.

(b)     The rights set forth in this Agreement are assignable or transferable by a Class B Holder to any Person in connection with the transfer of Class B Membership Interests to such Person pursuant to the terms of this Agreement.

### Section 9.5     Additional Transfer Restrictions.

(a)     Any Member proposing to make a Transfer of its Membership Interest pursuant to this Article IX and the proposed Transferee shall obtain (at its sole cost and expense, but with all reasonable cooperation from the Company) any waivers, consents or approvals from any third Person (including any Governmental Entity) that may be necessary in connection with the proposed Transfer and the admission of the proposed Transferee as a Substitute Member, if applicable.

(b)     Notwithstanding any other provisions of this Article IX, no Transfer of Membership Interests subject to this Article IX may be made unless in the opinion of counsel (who may be counsel for the Company), reasonably satisfactory in form and substance to the Board of Managers and counsel for the Company which opinion requirement may be waived, in whole or in part, at the discretion of the Board of Managers), such Transfer would not (i) violate any federal securities Laws or any state securities or "blue sky" Laws (including any investor suitability standards) applicable to the Company or the Membership Interests to be Transferred, (ii) cause the Company to be required to register as an "investment company" under the 1940 Act, (iii) subject the Company to the reporting requirements of the Securities Exchange Act of 1934, as amended or (iv) have a material and adverse effect on the Company as a result of any requirement of Law that becomes or that may become applicable in connection with or as a result of such Transfer.

(c)     Notwithstanding any other provisions of this Article IX, unless otherwise approved by the Board of Managers, no Transfer of Membership Interests subject to this Article IX may be made to a Person which is a competitor of the Company (as reasonably determined by the Independent Directors).

### Section 9.6     Transfer Fees and Expenses.   The Transferor and Transferee of any Membership Interests shall be jointly and severally obligated to reimburse the Company for all reasonable expenses (including attorneys' fees and expenses) incurred on behalf of the Company in connection with any Transfer or proposed Transfer, whether or not consummated.

### Section 9.7     Effective Date.   Any Transfer and any related admission of a Person as a Member in compliance with this Article IX shall be deemed effective on such date that the Transferee complies with the requirements of this Agreement.

### Section 9.8     Acceptance of Prior Acts.   A Transferee of the Membership Interest of a Member who is admitted to the Company in place and stead of a Member accepts, ratifies and agrees to be bound by all actions duly taken pursuant to the terms and provisions of this Agreement by the Company prior to the date it was admitted to the Company and, without limiting, the generality of the foregoing, specifically ratifies and approves all agreements and other instruments as may have been executed and delivered on behalf of the Company prior to such date and which are in force and effect on such date.

## ARTICLE X
## DISSOLUTION

**Section 10.1    In General**.  The Company shall dissolve and its affairs shall be wound up upon the first to occur of the following:  (a) the written consent of both (i) the Majority Class B Holders and (ii) the Majority Class A Holders; (b) at such time as there are no Members of the Company unless the Company is continued in accordance with the Act; or (c) the entry of a decree of judicial dissolution under Section 18-802 of the Act.

**Section 10.2    Liquidation and Termination**.  On the dissolution of the Company, the Board of Managers shall act as liquidator or (in its sole discretion) may appoint one or more representatives, Members or other Persons as liquidator(s).  The liquidators shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the Act.  The costs of liquidation shall be borne as a Company expense.  Until final distribution, the liquidators shall continue to operate the Company with all of the power and authority of the Board of Managers.  The steps to be accomplished by the liquidators are as follows:

(a)    the liquidators shall pay, satisfy or discharge from the Company funds all of the debts, liabilities and obligations of the Company (including all expenses incurred in liquidation and all such debts, liabilities and obligations owed to any Member other than with respect to such Member's Membership Interests) or otherwise make adequate provision for payment and discharge thereof (including the establishment of a cash fund for contingent liabilities in such amount and for such term as the liquidators may reasonably determine); and

(b)    after payment or provision for payment of all of the Company's liabilities has been made in accordance with <u>Section 10.2(a)</u>, all remaining assets of the Company shall be distributed in accordance with <u>Section 5.1</u>.

**Section 10.3    Complete Distribution**.  The distribution to a Member in accordance with the provisions of <u>Section 10.2</u> constitutes a complete return to the Member of its Capital Contributions and a complete distribution to the Member of its interest in the Company and all the Company's property and constitutes a compromise to which all Members have consented within the meaning of the Act.  If a Member returns funds to the Company and such funds exceed such Member's *pro rata* share of all funds required to be returned to the Company, then such Member shall have a claim against the other Members for an amount equal to such excess.  Each other Member shall be liable for a *pro rata* portion of such excess equal to the amount such Member would have paid had the amount paid by the Member seeking recovery been recovered from all Members *pro rata* based on the relative amount of funds to be returned by each such Member.

**Section 10.4    Filing of Certificate of Cancellation**.  Immediately following the completion of the distribution of the Company's assets as provided in this Article X, the Board of Managers (or such other Person or Persons as the Act may require or permit) shall file a certificate of cancellation with the Secretary of State of the State of Delaware, cancel any other filings made pursuant to this Agreement that are required to be canceled and take such other actions as may be necessary to terminate the Company.  The Company shall be deemed to

continue in existence for all purposes of this Agreement until such actions are taken pursuant to this Section 10.4.

Section 10.5    **Reasonable Time for Winding Up**. A reasonable time shall be allowed for the orderly winding up of the business and affairs of the Company and the liquidation of its assets pursuant to Section 10.2 to minimize any losses otherwise attendant upon such winding up.

Section 10.6    **Return of Capital**. The liquidators shall not be personally liable for the return of Capital Contributions or any portion thereof to the Members (it being understood that any such return shall be made solely from Company assets).

Section 10.7    **Antitrust Laws**. Notwithstanding any other provision in this Agreement, in the event that any Antitrust Law is applicable to any Member by reason of the fact that any assets of the Company shall be distributed to such Member in connection with the winding up of the Company, such Distribution shall not be consummated until such time as the applicable waiting periods (and extensions thereof) under such Antitrust Law have expired or otherwise been terminated with respect to each such Member.

Section 10.8    **Other Remedies**. Nothing in this Article X shall limit any Member's right to enforce any provision of this Agreement by an action at Law or equity, nor shall an election to dissolve the Company pursuant to this Article X relieve any Member of any liability for any prior or subsequent breach of this Agreement or another document referred to herein.

## ARTICLE XI
## INDEMNIFICATION

Section 11.1    **General Indemnity**.

(a)    To the fullest extent permitted by the Act, except as otherwise contemplated in Article VIII hereof, the Company, to the extent of its assets legally available for that purpose, shall indemnify and hold harmless each Person who was or is made a party or is threatened to be made a party to or is involved in or participates as a witness with respect to any action, suit or proceeding, whether civil, criminal, administrative or investigative (each a "Proceeding"), by reason of the fact that he or she, or a Person of whom he or she is the legal representative, is or was a Manager, Tax Matters Member or an Officer, or is or was serving at the request of the Company as a manager, director, officer, employee, fiduciary or agent of another Entity (collectively, the "Indemnified Persons") from and against any and all loss, cost, damage, fine, expense (including reasonable fees and expenses of attorneys and other advisors and any court costs incurred by any Indemnified Person) or liability actually and reasonably incurred by such Indemnified Person in connection with such Proceeding if such Indemnified Person acted in good faith and in a manner such Indemnified Person reasonably believed to be in or not opposed to the best interests of the Company and except that no indemnification shall be made in respect of any claim, issue or matter as to which such Indemnified Person shall have been adjudged to be liable to the Company unless and only to the extent that the Court of Chancery of the State of Delaware or the court in which such action or suit was brought shall

determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such Indemnified Person is fairly and reasonably entitled to indemnity for such expenses which the Court of Chancery or such other court shall deem proper. The termination of any Proceeding by judgment, order, settlement, conviction, or upon a plea of *nolo contendere* or its equivalent, shall not, of itself, create a presumption that the Indemnified Person did not act in good faith or in a manner such Indemnified Person reasonably believed to be in or not opposed to the best interests of the Company.

(b)     Except as otherwise contemplated in Article VIII hereof, the Company may pay in advance or reimburse reasonable expenses (including advancing reasonable costs of defense) incurred by an Indemnified Person who is or is threatened to be named or made a defendant or a respondent in a Proceeding; provided, however, that as a condition to any such advance or reimbursement, such Indemnified Person shall agree that it shall repay the same to the Company if such Indemnified Person is finally judicially determined by a court of competent jurisdiction not to be entitled to indemnification under this Article XI.

(c)     The Company shall not be required to indemnify a Person in connection with a Proceeding initiated by such Person against the Company or any of its Subsidiaries if the Proceeding was not authorized by the Board of Managers. The ultimate determination of entitlement to indemnification of any Indemnified Person shall be made by the Board of Managers.

(d)     Any and all indemnity obligations of the Company with respect to any Indemnified Person shall survive any termination of this Agreement. The indemnification and other rights provided for in this Article XI shall inure to the benefit of the heirs, executors and administrators of any Person entitled to such indemnification.

**Section 11.2    Fiduciary Insurance**. Unless otherwise agreed by the Board of Managers, the Company shall maintain, at its expense, insurance (a) to indemnify Company for any obligations which it incurs as a result of the indemnification of Indemnified Persons under the provisions of this Article XI, and (ii) to indemnify Indemnified Persons in instances in which they may not otherwise be indemnified by the Company under the provisions of this Article XI.

**Section 11.3    Rights Non-Exclusive**. The rights to indemnification and the payment of expenses incurred in defending any Proceeding in advance of its final disposition conferred in this Article XI shall not be exclusive of any other right which any Person may have or hereafter acquire under any Law, provision of this Agreement, any other agreement, any vote of Members or disinterested Managers or otherwise.

**Section 11.4    Merger or Consolidation; Other Entities**. For purposes of this Article XI, references to "the Company" shall include, in addition to the resulting company, any constituent company (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its managers, directors, officers, employees or agents, so that any Person who is or was a manager, director, officer, employee or agent of such constituent company, or is or was serving at the request of such constituent company as a director, officer, employee or agent of another company, partnership, joint venture, trust or other enterprise, shall stand in the same

position under this Article XI with respect to the resulting or surviving company as he or she would have with respect to such constituent company if its separate existence had continued. For purposes of this Article XI, references to "another Entity" shall include employee benefit plans; references to "fines" shall include any excise taxes assessed on a Person with respect to any employee benefit plan; and references to "serving at the request of the Company" shall include any service as a manager, director, officer, employee or agent of the Company that imposes duties on, or involves services by, such manager, director, officer, employee or agent with respect to an employee benefit plan, its participants or beneficiaries; and a Person who acted in good faith and in a manner such Person reasonably believed to be in or not opposed to the best interests of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner "not opposed to the best interests of the Company" as referred to in this Article XI.

Section 11.5   **No Member Recourse**.   Anything herein to the contrary notwithstanding, any indemnity by the Company relating to the matters covered in this Article XI shall be provided out of and to the extent of Company assets only and no Member shall have personal liability on account thereof or shall be required to make additional Capital Contributions to help satisfy such indemnity of the Company.

## ARTICLE XII
## OTHER AGREEMENTS

Section 12.1   **Matters Requiring Additional Consent.**   For so long as any of the Release Conditions have not been satisfied (or, with respect to clauses (b), (c), and (h) below, until the earlier of (i) such time as the Release Conditions have been satisfied or (ii) such time as the Initial Class A Holders no longer hold any of the Class A Membership Interests originally acquired by General Motors on the Effective Date), in addition to the approval of the Board of Managers, the Company shall not take any of the actions listed below nor permit or cause any of its Subsidiaries to do so (directly or indirectly) without the prior written consent of the Majority Initial Class A Holders (or, with respect to clauses (c) and (e), the Majority Class A Holders if there are no Majority Initial Class A Holders) and the Class B Designee Managers:

(a)   increase or decrease the number of Managers constituting the Board of Managers;

(b)   amend or restate (including by recapitalization, merger or otherwise other than in connection with a Qualified Sale of the Company or Initial Public Offering in each case, to the extent not prohibited by Section 12.1(h) hereof), modify or waive any provision of this Agreement except as necessary to reflect additional equity issuances approved in accordance with clause (c) below;

(c)   create, issue or sell any additional Membership Interests or any New Securities of the Company (other than on the Effective Date to General Motors and the Class B Holders, and other than New Securities described in clause (iii) of such definition), except for Equity Securities that do not adversely affect the Class A Membership Interests or the Class B Membership Interests in any manner (including, without limitation with respect to Distributions to the holders of Class A Membership Interests and Class B Membership Interests);

(d)    authorize or consent to the filing of any bankruptcy petition or appointment of a receiver;

(e)    enter into any transaction outside of the ordinary course of business with any of the Class B Holders, Class A Holders or any of their Affiliates that is on terms which in the aggregate are materially less favorable to the Company than would be obtainable in a comparable arms-length transaction with a Person that is not a Member or an Affiliate of the Company except in instances where the Company first obtains a fairness opinion from an independent financial advisor;

(f)    effect any acquisition (including by means of purchase of equity interests, purchase of assets, merger or otherwise) or sale or other disposal (including by means of sale of equity interests, sale of assets, merger or otherwise) of any business or assets of any Person (other than in the ordinary course of business) that requires payments by or to the Company in excess of $200 million unless the Company obtains a fairness opinion from an independent financial advisor reasonably acceptable to General Motors and the Class B Designee Managers in respect of such proposed acquisition, sale or disposition. In addition, General Motors shall have the right to approve the buyer in connection with any sale or other disposal of any business as to which the revenues received by such business from General Motors represent more than 15% of such business' total revenue for the twelve month period immediately preceding such sale or disposal (provided, that General Motors' approval shall not be unreasonably withheld, such determination to be based upon General Motors' reasonable assessment of the potential buyer solely in General Motors' capacity as a customer of the Company (provided, further, that nothing herein and no consent by General Motors hereunder shall modify General Motors' rights under, or be deemed to constitute General Motors' consent to the assignment of, its purchase orders and commercial agreements));

(g)    fail to comply with the provisions set forth in Article VII of the Senior Loan Agreement as in effect on the Effective Date (whether or not such agreements remains in effect) (provided, however, that this Section 12.1(e) shall not prevent the Company from incurring or suffering to exist a working capital debt facility on market terms with an aggregate maximum principal amount of $1.0 billion or from creating or suffering to exist any liens or encumbrances securing such indebtedness); and

(h)    (i) effect a public offering of the equity securities of the Company or its successor, other than on or after the date that is eighteen (18) months after the Effective Date an Initial Public Offering approved by the Board of Managers and undertaken in accordance with Section 14.13(b) or (ii) effect a sale of all or substantially all of the assets or ownership interests in the Company (by merger or otherwise) other than a Qualified Sale effected on or after the second anniversary of the Effective Date. For the avoidance of doubt, the parties acknowledge a Qualified Sale shall be subject to the provisions of Section 12.1(f), if applicable.

Section 12.2    **Further Matters Requiring Additional Consent**. In addition to the approval of the Board of Managers, the Company shall not take (directly or indirectly) any of the actions listed below nor permit any of its Subsidiaries to do so (directly or indirectly) without the consent of the Majority Initial Class A Holders:

(a)     from and after such time as the Release Conditions have been satisfied and until such time as the Initial Class A Holders no longer hold any of the Class A Membership Interests originally acquired by General Motors on the Effective Date, amend or restate (including by recapitalization, merger or otherwise other than in connection with a Qualified Sale or other sale of the Company not otherwise prohibited under this Agreement), or modify or waive any provision of this Agreement if such amendment, restatement modification or waiver would adversely affect General Motors, in its capacity as a Member, disproportionately as compared to any other Members; or

(b)     for so long as the Initial Class A Holders own at least ten percent (10%) of the Class A Membership Interests originally acquired by General Motors on the Effective Date, redeem, purchase or otherwise acquire for value (or pay into or set aside for a sinking fund for such purpose), any Membership Interests other than on a proportionate basis (except to repurchase Membership Interests owned by former employees of the Company or any of its Subsidiaries) (for purposes hereof, "proportionate" shall mean the proceeds of such event are paid to Members in the same proportions as if such amounts were distributed in accordance with Section 5.1).

**Section 12.3     Appointment of Chief Executive Officer.**  For so long as any of the Release Conditions have not been satisfied, the Board of Managers shall appoint the Chief Executive Officer, subject to the prior approval of the Majority Initial Class A Holders and the Class B Designee Managers.

**Section 12.4     Preemptive Rights.**

(a)     The Company shall give each Member that is an "accredited investor" (as defined in Rule 501(a) of Regulation D promulgated under the Securities Act) written notice (an "Issuance Notice") of any proposed issuance by the Company of any New Securities at least five (5) Business Days prior to the proposed issuance date.  The Issuance Notice shall specify the number and class of such New Securities and the price at which such New Securities are to be issued and the other material terms and conditions of the issuance.  If any proposed purchaser will purchase any such New Securities, each Member shall be entitled to purchase up to its Preemptive Share of the New Securities proposed to be issued at the price and on the other terms and conditions specified in the Issuance Notice.

(b)     A Member may exercise its rights under this Section 12.4 by delivering notice of its election to purchase such New Securities to the Company within ten (10) Business Days of receipt of the Issuance Notice.  A delivery of such notice (which notice shall specify the number (or amount) of New Securities to be purchased by a Member) by a Member (an "Electing Member") shall constitute a binding agreement of such Member to purchase, at the price and on the terms and conditions specified in the Issuance Notice, the number of shares (or amount) of New Securities specified in such Member's notice.  If, at the termination of such ten (10) Business Day-period, a Member shall not have exercised its rights to purchase its Preemptive Share of such New Securities, the Member shall be deemed to have waived all of its rights under this Section 12.4 with respect to, and only with respect to, the purchase of such New Securities.  If less than 100% of the Members shall have exercised their rights to purchase their respective Preemptive Share of such New Securities (the "Non-Exercising Members") then the

Company shall give each Electing Member which shall have exercised its right to purchase 100% of such Electing Member's Preemptive Share of such New Securities, notice of the aggregate amount of New Securities not being purchased by the Non-Exercising Members. Each such Electing Member shall have the right to elect to purchase an amount of such New Securities equal to the percentage obtained by dividing (x) such Electing Member's Preemptive Share by (y) the sum of such Electing Member's Preemptive Share plus the Preemptive Shares of all such Electing Members (the "Additional Purchase Right"). A Member may exercise its Additional Purchase Rights under this Section 12.4 by delivering notice of its election to purchase such additional New Securities to the Company within five (5) Business Days of receipt of the Issuance Notice. A delivery of such notice (which notice shall specify the number (or amount) of such additional New Securities to be purchased by such Electing Member) by an Electing Member shall constitute a binding agreement of such Member to purchase, at the price and on the terms and conditions specified in the Issuance Notice, the number of shares (or amount) of additional New Securities specified in such Electing Member's notice. If, at the termination of such five (5) Business Day-period, a Member shall not have exercised its Additional Purchase Right, the Electing Member shall be deemed to have waived all of its rights under this Section 12.4 with respect to, and only with respect to, such Additional Purchase Right.

(c)     The Company shall have 100 days from the date of the Issuance Notice to consummate the proposed issuance of any or all of such New Securities that the Members have elected not to purchase at the price and upon terms and conditions that are not less favorable to the Company than those specified in the Issuance Notice, provided that, if such issuance is subject to regulatory approval, such 100-day period shall be extended until the expiration of five (5) Business Days after all such approvals have been received, but in no event later than 120 days from the date of the Issuance Notice. At the consummation of such issuance, the Company shall issue the New Securities to be purchased by the Members should they exercise their preemptive rights pursuant to this Section 12.4 (and to any third party) and register such New Securities in the name of such Member (and to any third party), against payment by such Member (and to any third party) of the purchase price for such New Securities. If the Company proposes to issue any class of New Securities after such 100-day period or on other terms less favorable to the issuer, it shall again comply with the procedures set forth in this Section 12.4.

(d)     The Members hereby acknowledge and agree that the Company, due to timing constraints, confidentiality considerations, or other reasons, may request that a Member (the "Purchasing Member") acquire New Securities in advance of complying with the requirements of this Section 12.4, and each Member consents to such issuance, provided that, as promptly as practicable thereafter, either (i) the Company complies with the requirements of this Section 12.4 with respect thereto or (ii) the Purchasing Member offers the other Members the right to acquire from the Purchasing Member that number of New Securities that such Member would have been offered by the Company under this Section 12.4.

(e)     The Company shall not be under any obligation to consummate any proposed issuance of New Securities, nor shall there be any liability on the part of the Company to the Members if the Company has not consummated any proposed issuance of New Securities pursuant to this Section 12.4 for whatever reason, regardless of whether it shall have delivered an Issuance Notice in respect of such proposed issuance.

(f)    Notwithstanding the foregoing, the provisions contained in this Section 12.4 shall not apply to any Initial Public Offering made pursuant to an effective registration statement filed under the Securities Act.

<h1 style="text-align:center">ARTICLE XIII<br>CONFIDENTIALITY</h1>

**Section 13.1    Non-Disclosure.** Each Member agrees that it will use, and will cause each of its Affiliates, and each of its and their respective partners, members, managers, shareholders, directors, officers, employees and agents (collectively, "Agents") to use, all commercially reasonable efforts to maintain the confidentiality of all Confidential Information disclosed to it by any other party or the definitive agreements contemplated herein or through its interest in the Company or the operation of its business or the use or ownership of its assets, by limiting internal disclosure of any such information to those Persons who have an actual need to know such information in connection with the business of the Company and will not, without the prior written consent of the disclosing party, use such Confidential Information other than in connection with the transactions contemplated herein.  Without limiting the generality of the foregoing, in no event shall any Member knowingly use any Confidential Information regarding the Company or its business acquired by such Member (directly or indirectly) in its capacity as a Member (including as a result of electing any Manager to the Board) in any manner adverse to the Company's business (including the Company's customers) or which would result in a competitive disadvantage to the Company.

**Section 13.2    Exceptions.** Notwithstanding Section 13.1, any Member may make disclosure of Confidential Information contemplated by clauses (a), (c) and (e) below and the Company may make the disclosure of Confidential Information contemplated by (a) through (e) below: (a) to any Governmental Entity in connection with applications for approval of the transactions contemplated hereby and the other Transaction Documents (or, in the case of any regulated-Affiliate of a Member, in connection with audits by the applicable Governmental Entities), (b) to financial institutions in connection with the financing transactions contemplated hereby, (c) in the case of any Member, (i) to a *bona fide* potential Transferee if such Member desires to undertake any Transfer of its Membership Interests permitted by this Agreement, and (ii) to its direct and indirect stockholders, limited partners, members or other equityholders, as the case may be, all materials made available to such Member pursuant to the terms of this Agreement, (d) to any rating or similar agency in connection with its analysis or review of the Company or any of its Subsidiaries and (e) to any other Person if such party becomes compelled by Law (including by deposition, interrogatory, request for documents, subpoena, civil investigative demand, mandatory provision of Law, regulation or stock exchange rule) to disclose any of the Confidential Information.  In addition, each Member may report to its stockholders, limited partners, members or other equityholders, as the case may be, the general status of such Member's investment in the Company (without disclosing specific Confidential Information).  A disclosing Member shall be responsible for a breach by any third Person to whom such disclosing Member discloses Confidential Information in accordance with the terms of Section 13.1 and subclause (c)(ii) of this Section 13.2.  In the case of clause (e) above, the disclosing party shall (i) provide the other parties hereto with prompt written notice of such requirement so that such non-disclosing parties may seek a protective order or other appropriate remedy or waive compliance with the terms of this Article XIII and (ii) take such reasonable

legally available steps as the non-disclosing parties may reasonably request to resist or narrow such requirement (at the expense of the non-disclosing parties). In the event that such protective order or remedy is not obtained, or that the non-disclosing parties waive compliance with the terms hereof, the disclosing party agrees to furnish only that portion of the Confidential Information that it is advised by counsel is required to be furnished, and to exercise all commercially reasonable efforts to obtain assurance that confidential treatment shall be accorded such Confidential Information. The obligations with respect to Confidential Information in this <u>Article XIII</u> shall terminate two (2) years after a Person ceases to be a Member; <u>provided, however,</u> that the obligation to maintain the confidentiality of "trade secrets" shall not terminate.

## ARTICLE XIV
## MISCELLANEOUS PROVISIONS

**Section 14.1    <u>Amendments</u>.** Except as otherwise expressly provided herein, this Agreement may only be amended, modified or waived by the Board of Managers with the (a) written consent of the (i) Majority Class A Holders and (ii) Majority Class B Holders and (b) the consents required under <u>Section 12.1</u> or <u>Section 12.2</u>; <u>provided</u> that if any such amendment, modification or waiver would adversely affect in any material respect any Member(s) who have comparable rights under this Agreement disproportionately to the other Members having such comparable rights, such amendment, modification, or waiver shall also require the written consent of a majority in interest of the Member(s) so disproportionately adversely affected. Notwithstanding the foregoing, (i) any amendment that would require any Member to contribute or loan additional funds to the Company or impose personal liability upon any Member shall not be effective against such Member without its written consent and (ii) no consent of any Member shall be required for any amendment, modification or waiver of this Agreement to effectuate the creation or issuance of Membership Interests made in compliance with <u>Section 12.1</u>, <u>Section 12.2</u> and <u>Section 12.4</u>.

**Section 14.2    <u>Remedies</u>.** Each Member shall have all rights and remedies set forth in this Agreement and all rights and remedies that such Person has been granted at any time under any other agreement or contract and all of the rights that such Person has under any Law. Any Person having any rights under any provision of this Agreement or any other agreements contemplated hereby shall be entitled to enforce such rights specifically (without posting a bond or other security) to recover damages by reason of any breach of any provision of this Agreement and to exercise all other rights granted by Law.

**Section 14.3    <u>Notice Addresses and Notices</u>.** All notices, demands, financial reports, other reports and other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given or made when (a) delivered personally to the recipient, (b) sent by facsimile to the recipient (with hard copy sent to the recipient by reputable overnight courier service (charges prepaid) that same day) if sent by facsimile before 5:00 p.m. New York time on a Business Day, and otherwise on the next Business Day, or (c) one Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid). Such notices, demands and other communications shall be sent to the notice address for such recipient set forth on the <u>Schedule of Members</u>, or in the Company's books and records, or to such other notice address or to the attention of such other person as the recipient party has specified by prior written notice to the sending party. Any

notice to the Board of Managers or the Company shall be deemed given if received by the Board of Managers at the principal office of the Company designated pursuant to Section 2.2(b).

Section 14.4    **Counterparts.**  This Agreement may be executed in several counterparts, each of which will be deemed an original but all of which will constitute one and the same instrument.

Section 14.5    **Assignment.**  Subject to the provisions of this Agreement relating to transferability, this Agreement shall be binding upon and inure to the benefit of the Members and their respective permitted assigns, but no rights, interests, or obligations of any Member herein may be assigned except Transfers of Membership Interests in compliance with the terms of Article IX; provided, however, that no assignment of this Agreement or any rights hereunder shall be made without the assignee, as a condition of such assignment, assuming in writing its assignor's obligations under this Agreement, to the extent applicable to such assignment. Notwithstanding the foregoing, General Motors may assign this Agreement and any or all rights or obligations hereunder (i) to any of its Affiliates and (ii) to any Person in connection with the direct or indirect transfer, sale, merger, consolidation or similar reorganization of a substantial portion of General Motors, business; provided that each such assignee agrees in writing to be bound by all of the terms, conditions and provisions contained herein.

Section 14.6    **Entire Agreement; Waiver.**  Subject to Section 14.7, this Agreement and the other documents referred to herein, constitute the entire agreement among the parties and contain all of the agreements among the parties with respect to the subject matter hereof and supersede alt prior agreements and negotiations between the parties concerning the subject matter herein, including the Original Agreement. Failure by any party hereto to enforce any covenant, duty, agreement, term or condition of this Agreement, or to exercise any right hereunder, shall not be construed as thereafter waiving such covenant, duty, term, condition or right; and in no event shall any course of dealing, custom or usage of trade modify, alter or supplement any term of this Agreement.

Section 14.7    **Severability.**  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under Law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any Law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or any other jurisdiction, but this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

Section 14.8    **Governing Law.**  This Agreement shall be governed by, and construed and enforced in accordance with, the Laws of the State of Delaware, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware.

Section 14.9    **Independent Contractors; Expenses.**  This Agreement does not constitute any party hereto the partner, agent or legal representative of any other party hereto,

except to the extent that Company is classified as a partnership for United States federal income tax purposes and the Members are treated as "partners" for such tax purposes. Each party hereto is independent and responsible for its own expenses (except as otherwise agreed pursuant to Article XI), including attorneys' and other professional fees incurred in connection with the transactions contemplated by this Agreement.

**Section 14.10    Press Release**. Each of the Members shall consult with the Majority Class B Holders before issuing any press releases or otherwise making any public statements with respect to this Agreement or the transactions contemplated hereby, and no Member shall issue any press release or make any public statement without the prior written consent of the Majority Class B Holders, except as may be required by Law and then only with such prior consultation with the Majority Class B Holders to the extent practicable.

**Section 14.11    Survival**. The provisions of Article X, Article XI, Article XIII, Section 14.7, Section 14.8, Section 14.11, Section 14.14, Section 14.16 and Section 14.17 shall survive and continue in full force in accordance with its terms, notwithstanding any termination of this Agreement or the dissolution of the Company.

**Section 14.12    Creditors**. None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Members, the Company or any of its Affiliates (other than Indemnified Persons), and no creditor who makes a loan to any Member, the Company or any of its Affiliates may have or acquire (except pursuant to the terms of a separate agreement executed by the Company in favor of such creditor) at any time as a result of making the loan any direct or indirect interest in Company profits, losses, Distributions, capital or property other than as a secured creditor.

**Section 14.13    Further Action; Initial Public Offering**.

(a)    The parties hereto agree to execute and deliver all documents, provide all information and take or refrain from taking such actions as may be necessary or appropriate to achieve the purposes of this Agreement. Additionally, the parties hereto will work in good faith to ensure that the governance structure and other arrangements do not impair the Company's commercial prospects.

(b)    Notwithstanding anything contained in this Agreement to the contrary but subject to Section 12.1(h) hereof, the Board of Managers may determine at any time that the Company should engage in an Initial Public Offering of the Issuer's (as defined below) common equity securities. In connection with any such Initial Public Offering, and upon the request of the Board of Managers, each of the Members hereby agrees that it will take such action and execute such documents as may reasonably be necessary to effect such Initial Public Offering, at the Company's expense, including, without limitation, taking such actions and executing such documents as may reasonably be necessary to convert the Company into a corporation, to contribute its respective Membership Interests to a newly formed corporation or in connection with such other structure approved by the Board of Managers (such entity, in any such case, the "Issuer"), in each case substantially concurrently with the closing of the Initial Public Offering. In connection with any such conversion, contribution or other structure approved by the Board of Managers, unless otherwise agreed by the Majority Class A Members and the Majority Class B

Members, the Members shall be entitled to receive, (1) one or more series of participating preferred equity securities of the Issuer with preferences reflecting the amount of distributions set forth in Sections 5.1(a)(i)-(iii) to the extent distributions were not previously made under such Sections (the "Preferred Securities") and (2) common equity securities of the Issuer reflecting the residual interests of the Members pursuant to Section 5.1(a)(iv), as shall be diluted by such additional common equity securities being sold in connection with such Initial Public Offering.  In the event that the Board of Managers authorizes the Company to consummate such an Initial Public Offering, (1) the Company and the Members shall enter into a customary registration rights agreement providing that stockholders of the Issuer holding in excess of 10% of the Issuer's registrable common securities shall be entitled to an aggregate of four demand registrations (one of which shall be allocated to General Motors if it holds in excess of 10% of the Issuer's registrable common securities), and customary piggyback and S-3 registration rights, (2) the terms of the Preferred Securities shall grant the Holders thereof (i) customary class voting rights regarding modification to such Preferred Securities and (ii) the right to designate members of the Issuer's board of directors in the same number as nearly as practicable as such Holder was entitled to designate pursuant to Section 8.3(a)(i) hereof and Section 8.3(a)(iii) hereof as applicable, and Section 8.3(b) hereof, prior to the Initial Public Offering, subject to any applicable listing standards, and (3) the rights contained in Article XII hereof, shall terminate upon the consummation of such Initial Public Offering; provided, however, that if such Initial Public Offering occurs prior to twenty four (24) months after the date hereof, the rights provided pursuant to the second sentence of Section 12.1(f) hereof shall survive until the expiration of such twenty four (24) month period.

Section 14.14   **Delivery by Facsimile or Email**.   This Agreement, the agreements referred to herein, and each other agreement or instrument entered into in connection herewith or therewith or contemplated hereby or thereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine or email with scan or facsimile attachment, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of any party hereto or to any such agreement or instrument, each other party hereto or thereto shall re-execute original forms thereof and deliver them to all other parties.  No party hereto or to any such agreement or instrument shall raise the use of a facsimile machine or email to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or email as a defense to the formation or enforceability of a contract, and each such party forever waives any such defense.

Section 14.15   **Strict Construction**.   The parties hereto have participated collectively in the negotiation and drafting of this Agreement, accordingly, if any ambiguity or question of intent or interpretation arises, then it is the intent of the parties hereto that this Agreement shall be construed as if drafted collectively by the parties hereto, and it is the intent of the parties hereto that no presumption or burden of proof shall arise favoring or disfavoring any party hereto by virtue of the authorship of any provisions of this Agreement.

Section 14.16   **Consent to Jurisdiction**.   Each Member hereby irrevocably and unconditionally (a) agrees that any suit, action or proceeding, at law or equity, arising out of or relating to this Agreement shall only be brought in the Court of Chancery of the State of

Delaware (or, if the Court of Chancery of the State of Delaware lacks jurisdiction, then in the applicable Delaware state court), or if under applicable Law exclusive jurisdiction of such suit, action or proceeding is vested in the federal courts, then the United States District Court for the District of Delaware, (b) expressly submits to the personal jurisdiction and venue of such courts for the purposes thereof and (c) waives and agrees not to raise (by way of motion, as a defense or otherwise) any and all jurisdictional, venue and convenience objections or defenses that such party may have in such suit, action or proceeding.  Each party hereto hereby irrevocably and unconditionally consents to the service of process of any of the aforementioned courts.  Nothing herein contained shall be deemed to affect the right of any party hereto to serve process in any manner permitted by Law or commence legal proceedings or otherwise proceed against any other party hereto in any other jurisdiction to enforce judgments obtained in any suit, action or proceeding brought pursuant to this <u>Section 14.16</u>.

**Section 14.17    Waiver of Jury Trial.    EACH MEMBER HEREBY IRREVOCABLY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY SUIT, ACTION OR PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUR OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THE ACTIONS OF ANY PARTY IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE AND ENFORCEMENT OF THIS AGREEMENT.**

**Section 14.18    Specific Performance.**    Each of the parties hereto acknowledges and agrees that the other parties hereto would be damaged irreparably in the event that any of the provisions of this Agreement are not performed in accordance with their specific terms or otherwise are breached.  Accordingly, each of the parties hereto agrees that the other parties hereto shall be entitled to seek an injunction or injunctions to prevent breaches of the provisions hereof in any action instituted in any court of the United States or any state thereof having jurisdiction over the parties hereto and the matter (subject to the provisions set forth in <u>Section 14.16</u> above), in addition to any other remedy to which they may be entitled, at law or in equity.

**[END OF PAGE]**

**[SIGNATURE PAGES FOLLOW]**

## SIGNATURE PAGES TO AMENDED AND RESTATED OPERATING AGREEMENT

IN WITNESS WHEREOF, the undersigned have executed or caused to be executed on their behalf this Agreement as of the date first written above.

### [CLASS B HOLDERS]

By: _____

      Name:

      Title:

**SIGNATURE PAGES TO AMENDED AND RESTATED OPERATING AGREEMENT**

      IN WITNESS WHEREOF, the undersigned have executed or caused to be executed on their behalf this Agreement as of the date first written above.

**GENERAL MOTORS COMPANY**

By: _____
      Name:
      Title:

# SCHEDULE OF MEMBERS
## (As of [_____], 2009)

| Name and Notice Address of Member | Initial Capital Account Balance | Number of Class B Membership Interests | Number of Class A Membership Interests | Capital Contributions |
|---|---|---|---|---|
| [Class B Holders] | $ | 354,500 Class B | | |
| General Motors Company<br>300 Renaissance Center<br>Detroit, Michigan 48265-3000<br>Facsimile: (313) 665-4978<br>Attention: Director of Business Development<br><br>with copies (which shall not constitute notice to General Motors) to:<br><br>General Motors Company<br>300 GM Renaissance Center<br>Detroit, MI 48265<br>Facsimile: (313) 665-4960<br>Attn: General Counsel | | | 1,750,000 Class A | |

# EXHIBIT A
## CLASS A and CLASS B SUBSCRIBERS

**EXHIBIT B**
**TRANSACTION DOCUMENTS**

1.    Master Disposition Agreement

2.    Investment Commitment Agreement

3.    Loan Agreements

# EXHIBIT C
# COMPANY POLICIES

1. The Company shall, and shall cause each of its Subsidiaries and require each of its Officers, employees and other agents to at all times conduct its business in accordance with the U.S. Foreign Corrupt Practices Act and applicable anti-bribery laws in other jurisdictions.

2. Unless otherwise determined by the Board of Managers, the Company shall, and shall cause each of its Subsidiaries to, obtain, maintain and preserve and take all necessary action to timely renew all permits, licenses, authorizations, approvals, entitlements and accreditations which are necessary in the proper conduct of its business.

3. Unless otherwise determined by the Board of Managers, the Company shall, and shall cause each of its Subsidiaries to, (a) maintain and preserve its existence, rights and privileges, and become or remain duly qualified and in good standing in each jurisdiction in which the character of the properties owned or leased by it or in which the transaction of its business makes such qualification necessary, (b) maintain insurance with financially sound, responsible and reputable insurance companies or associations (including comprehensive general liability, hazard, rent and business interruption insurance) with respect to its properties (including all real properties leased or owned by it) and business, in such amounts and covering such risks as is carried by any Governmental Entity having jurisdiction with respect thereto and as is carried generally in accordance with sound business practice by companies in similar businesses similarly situated, and (c) maintain and preserve all its intellectual property which is necessary in the proper conduct of its business.

4. The Company shall, and shall cause each of its Subsidiaries to, pay, before the same shall become delinquent, all taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or upon any of its properties, except to the extent contested in good faith by proper proceedings which stay the enforcement of any Lien resulting from the non-payment thereof and with respect to which adequate reserves have previously been set aside for the payment thereof in accordance with GAAP.

5. The Company shall notify each Manager promptly (and in any event within five Business Days) after (a) discovery by the Company or any of its Subsidiaries of the occurrence of (i) any material default under any material agreement to which the Company or such Subsidiary is a party, (ii) any condition or event that could reasonably be expected to result in any material liability to the Company or such Subsidiary under any Law relating to public health and safety, worker health and safety or pollution or protection of the environment, or (iii) any other material adverse change, event or circumstance affecting the Company or such Subsidiary (including the filing of any material litigation against the Company or such Subsidiary or the existence of any dispute with any Person that involves any likelihood of such litigation being commenced), or (b) receipt by the Company or any of its Subsidiaries of any report, management letter or other detailed information concerning material aspects of the Company's or such Subsidiary's operations or financial affairs given to the Company or such Subsidiary by the Independent Auditor. Any such event or information shall be discussed at the next scheduled regular or special, as applicable, meeting of the Board of Managers.

**EXHIBIT D**
**ENVIRONMENTAL GUIDELINES**

1.    Written environmental management guidelines for the Company and its Subsidiaries establishing the overall environmental practices and policies of the Company and its Subsidiaries, including an environmental policy statement, which shall be signed by the Chief Executive Officer, to ensure that the Company and its Subsidiaries, and their respective directors, officers and employees at all times act so as to comply with all Laws relating to the environment.

2.    Environmental performance standards that are consistent with General Motors' Environmental Performance Criteria (as in effect on the date of the first meeting of the Board        of        Managers        after        the        Effective        Date).

**EXHIBIT E**
**GENERAL MOTORS CONSOLIDATION REQUIREMENTS**

Section 1.1    Financial Information and Related Matters.

(a)    Books and Records.  The Company shall keep at its principal place of business books and records consistent with the Company's prior practice, to permit the preparation of financial statements as may be required by applicable law and in accordance with GAAP.

(b)    Financial Information.  The Company shall:

(i)    deliver to General Motors as soon as practicable, but in any event within forty (40) days after the close of each Fiscal Year of the Company, financial statements, including (1) a balance sheet as of the end of such year, and (2) statements of income, changes in members' or stockholders' equity and cash flows for such year, and (3) notes to such financial statements, all such financial statements prepared in accordance with GAAP and audited and certified by an internationally recognized accounting firm that is registered with the Public Company Accounting Oversight Board (PCAOB);

(ii)    deliver to General Motors as soon as practicable, but in any event within fifteen (15) days after the close of each fiscal month and quarter of the Company (including without limitation any such end that is also a calendar quarter end or Fiscal Year end), an internally prepared balance sheet, income statement, statement of changes in members' or stockholders' equity and statement of cash flows, prepared in accordance with GAAP (except for notes to the financial statements) as of the end of and for such month or quarter, together with comparable year-to-date amounts by the above-mentioned fifteen (15) day due date.  For each calendar quarter end, within twenty five (25) days after the close of each quarter of the Company, the financial statements provided should (1) include notes to such financial statements as required by Article 10 of Regulation S-X and (2) contain a review report provided by an internationally recognized accounting firm that is registered with the PCAOB.  In addition, with the balance sheet and income statement for the months of November, February, May, and August, the Company will also provide an accompanying forecasted balance sheet and income statement as of the end of and for the quarterly period ending December 31, March 31, June 30 and September 30, respectively, by the above-mentioned fifteen (15) day due date.  For example, the financial statements delivered as of the end of and for the month of November will also include a forecasted balance sheet and income statement as of the end of the quarter ending December;

(iii)    deliver to General Motors prior to the end of each Fiscal Year, a annual business plan for the next fiscal year, which shall be broken out by month and include balance sheets, income statements, statements of changes in members or stockholders equity and statements of cash flows, and deliver to General Motors as soon as practicable any other revised budgets prepared by the Company; and

(iv)    cooperate with General Motors with respect to, and provide General Motors with, such additional information as General Motors shall reasonably request, such as footnote information, in connection with the preparation of (1) the consolidated financial statements of General Motors (2) the Annual Report on Form 10-K of General Motors and (3) the Quarterly Reports on Form 10-Q of General Motors.  Such information may include the components of financial statement balances, financial policies and procedures, information pertaining to off-balance sheet obligations and contingent obligations, information relating to actual and projected research and development expenditures, as well as other information necessary for General Motors' consolidated financial reporting purposes, including any SEC periodic reporting requirements.  Such information shall be provided within reasonable timeframes to permit the meeting of General Motors reporting deadlines. (v)    deliver, if required, to General Motors any audited annual and unaudited interim financial statements of the Company required by Rule 3-05 of Regulation S-X within sixty (60) days of the Closing Date.

(c)    Internal Controls.  The Company shall establish and maintain internal controls over its financial reporting that provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external reporting purposes in accordance with GAAP.  As required, to permit General Motors to comply with the requirements of Section 404 of SOX, the Company will complete a management assessment of its internal control over financial reporting consistent with the SEC's rules and staff guidance implementing Section 404 of the Act and the Company's internal control over financial reporting shall be audited and certified by an internationally recognized accounting firm.

The Company shall use all commercially reasonable efforts to assure that the financial information delivered pursuant to clause (b)(i), b(ii), b(iii), or b(iv) above shall be in accordance with the books and records of the Company, have been prepared in accordance with GAAP consistently applied throughout the periods covered thereby, except for absence of footnote disclosure for any monthly statements, and fairly and accurately present the consolidated assets and liabilities (including all reserves) of the Company, as of their respective dates, and the consolidated revenues, expenses, results of operations and cash flows for the periods covered thereby and consolidated changes in financial position of the Company as of their respective dates and for the periods covered thereby.  For the avoidance of doubt, if, for any period, the Company has any subsidiary whose accounts are consolidated with those of the Company, then in respect of such period the financial statements delivered pursuant to the foregoing sections shall be the consolidated and consolidating financial statements of the Company and all such consolidated subsidiaries.

Section 1.2    SEC Reporting.  The Company shall use all commercially reasonable efforts provide all information needed for General Motors to comply with its SEC reporting requirements, including the filing of periodic reports in accordance with the SEC's rules and regulations.

Section 1.3    <u>Inspection and Audit Rights</u>.

(a)    The Company shall (i) provide General Motors and its representatives reasonable access, upon reasonable notice and during normal business hours, to all of the facilities, properties, books, and records (including, but not limited to, access to the Company's transaction detail, contracts, and other information that supports the Company's financial statements), (ii) make the officers, employees and representatives of the Company, and the Company's independent public accountants, available to General Motors and its representatives, upon reasonable notice and during normal business hours, and (c) furnish General Motors and its representatives with any and all information concerning the Company that is reasonably available to the Company, or that the Company can produce using reasonable efforts but without incurring any material additional expense; <u>provided</u> that the Company may limit access to any information that the Company determines in its reasonable judgment is of a commercially sensitive nature (other than the information provided to General Motors pursuant to <u>Section 1.1</u> of this <u>Exhibit E</u>). The Company and General Motors will negotiate in good faith to determine a method to provide such information to General Motors in a manner that protects the confidentiality and commercial sensitivity of the Company's information so that the same cannot be used to the Company's detriment and provides access to such information to satisfy a bona fide financial reporting need of General Motors. Any employee of General Motors who is provided access to such information shall execute a customary confidentiality agreement to maintain the confidentiality of the information and to specify the restrictions on the use of the information.

(b)    If it deems it to be necessary, General Motors may engage another accounting firm of international standing to audit the financial accounting or internal control over financial reporting of the Company, at General Motors' expense. General Motors shall ensure that such other auditor shall keep confidential all information audited by him. The Company shall permit such other auditor to have reasonable access to the books and records of the Company, will provide the necessary office space and facilities to enable such examination to be carried out effectively and will otherwise provide any cooperation reasonably requested in connection therewith. In addition, General Motors may (at its own expense) send its internal auditors to the Company to audit the Company's financial accounting or controls over financial reporting, and the Company shall provide any cooperation reasonably requested in connection therewith.

Section 1.4    <u>Termination</u>. The requirements set forth in this <u>Exhibit E</u> shall terminate and be of no further force or effect on a prospective basis at such time as General Motors concluding that it is no longer required to consolidate the Company in accordance with GAAP such that the information, and reasonable access thereto, is no longer required by General Motors to prepare its consolidated financial statement in accordance with GAAP.